UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 11380 WGY

| | |
|---|---|
| KERI EVANS, on behalf of herself and a class of all others similarly situated, | ) ) ) ) Civil Action No. |
| Plaintiff, | ) ) |
| v. | ) CLASS ACTION COMPLAINT ) FOR VIOLATIONS OF THE ) EMPLOYEE RETIREMENT |
| JOHN F. AKERS, RONALD C. CAMBRE, MARYE ANNE FOX, JOHN J. MURPHY, PAUL J. NORRIS, THOMAS A. VANDERSLICE, H. FURLONG BALDWIN, INVESTMENTS AND BENEFITS COMMITTEE, ADMINISTRATIVE COMMITTEE, BRENDA GOTTLIEB, W. BRIAN McGOWAN, MICHAEL PIERGROSSI, FIDELITY MANAGEMENT TRUST COMPANY, STATE STREET BANK & TRUST COMPANY, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | ) INCOME SECURITY ACT ) ) MAGISTRATE JUDGE ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

MAGISTRATE JUDGE

RECEIPT #_____
AMOUNT $ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1____
WAIVER FORM____
MCF ISSUED____
BY DPTY. CLK. TOM
DATE 6/17/04

**PREFATORY NOTES**

- On April 2, 2001, W. R. Grace & Co. ("Grace"or the "Company") and 61 of its U.S. subsidiaries filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. References herein to "Grace" include W. R. Grace & Co. and its subsidiaries. The bankruptcy case is ongoing. As such, this action is stayed as to Grace unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs are not prosecuting this action against Grace.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Grace, Plaintiffs will notify the Court and will proceed against Grace.

- To the extent that proceeding against "committees" of Grace, as enumerated herein, will be deemed violative of the bankruptcy proceeding, Plaintiffs will only

00002748.WPD ; 1

proceed against the committees' members as set forth herein.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiff, which are partially based on personal knowledge. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiff will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

Plaintiff Keri Evans ("Evans"), a participant in the W. R. Grace & Co. Savings and Investment Plan (the "Plan"),[1] on behalf of herself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.  This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including the Defendants, on behalf of all persons who were participants in, or beneficiaries of, the Plan at any time between July 1, 1999 and February 27, 2004 (the "Class Period").

2.  During the Class Period, Defendants caused ongoing Plan investments to be made in certain Plan funds consisting, at least in part, of Grace common stock after the investments became imprudent as a result of the Company's setbacks in asbestos litigation, the rising number of asbestos-related suits, and the Company's under-funding of its asbestos litigation reserves/funds. Consequently, Grace common stock became an imprudent investment and the Plan's purpose of saving for retirement and accumulating capital was compromised. Grace filed

---

[1] As more fully explained below, on December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and Investment Plan was merged with the W. R. Grace & Co. Salaried Employees Savings and Investment Plan, forming the current Plan, the W. R. Grace & Co. Savings and Investment Plan. To the extent applicable, this action is brought on behalf of the predecessor plans.

for bankruptcy on April 2, 2001.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio. Grace common stock was one of the investment alternatives in the Plan during the Class Period. Additionally, as more fully explained below, Grace has matched a portion of the employee's contribution by purchasing Company stock on the employee's behalf.

4.      Defendants were fiduciaries of the Plan, and responsible for investing Company matching contributions, selecting and monitoring investment options offered for participant contributions, and informing participants of the risks involved in each investment option provided under the Plan. As such, Defendants were obligated to comply with ERISA's fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries, including Class members (as defined herein).

5.      Plaintiff was an employee of Grace and was a participant in the Plan during the Class Period. Plaintiff's retirement investment portfolio included Grace common stock.

6.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Grace stock.

7.      During the Class Period, Defendants knew or should have known that Grace stock was an imprudent investment alternative for the Plan, whether for individual or Company matching contributions. Defendants had intimate knowledge of the perilous condition of the

Company due, in part, to setbacks in asbestos litigation, the rising number of asbestos-related suits and the Company's under-funding of its asbestos litigation reserves/funds.

8.  Despite Grace's troubled financial situation, Defendants caused the Plan to continue to invest in Grace stock until well after Grace filed its bankruptcy petition and the shares had lost almost all of their value.

9.  Defendants are liable under ERISA to restore losses sustained by the Plan participants as a result of their breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and some Defendants reside and/or transact business in this district.

12. Notably, Grace Performance Chemicals, a primary business unit of Grace, is headquartered at 62 Whittemore Avenue, Cambridge, MA, 02140, where it maintains twenty-one manufacturing sites, and approximately 3,300 employees.

## PARTIES

### Plaintiff

13. Plaintiff is an employee at Grace and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7). Consequently, Plaintiff held Grace stock in her retirement investment portfolio.

**Defendants**

14.     Defendant John F. Akers ("Akers") served on Grace's Board of Directors during the Class Period. As director, upon information and belief, Akers participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Akers, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15.     Defendant Ronald C. Cambre ("Cambre") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Cambre participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Cambre, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

16.     Defendant Marye Anne Fox ("Fox") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Fox participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Fox, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17. Defendant John J. Murphy ("Murphy") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Murphy participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Murphy, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18. Defendant Paul J. Norris ("Norris") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Norris participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. In addition, for at least a portion of the Class Period, Norris also served as the Company's President and Chief Executive Officer ("CEO"). Consequently, Norris, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19. Defendant Thomas A. Vanderslice ("Vanderslice") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Vanderslice participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Vanderslice, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant H. Furlong Baldwin ("Baldwin") served on Grace's Board of Directors during at least part of the Class Period. As a director, upon information and belief, Baldwin participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Baldwin, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Defendant Investment and Benefits Committee ("Committee") was the Plan's investment manager during the Class Period. Upon information and belief, the Committee was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Defendant Administrative Committee, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Brenda Gottlieb ("Gottlieb") served as the Chairman for the Administrative Committee during the Class Period and signed the Company's 11-K filings for 2000 and 2001 in that capacity. Upon information and belief, Gottlieb was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24. Defendant W. Brian McGowan ("McGowan") served on the Administrative Committee during the Class Period and signed the Company's 2002 11-K filing in that capacity. In addition, he also signed the Company's fiscal 2000 Forms 5500 submitted to the Internal Revenue Service ("IRS") and the Department of Labor ("DOL") for both the Hourly and Salary Plans, the "W. R. Grace & Co. Savings Plan Master Trust" Form 5500 for fiscal year 2001, the Hourly Plan's Form 5500 for fiscal year 2001 and the Salary Plan's for fiscal 2002. McGowan was also the Company's Senior Vice President of Corporate Administration for at least a portion of the Class Period. Upon information and belief, McGowan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25. Defendant Michael Piergrossi ("Piergrossi") signed, as Plan Administrator, the Company's Form 5500 annual reports for fiscal year 2000 for both the Hourly and Salary Plans, as well as the Hourly Plan's Form 5500 for fiscal year 2001 and Salary Plan's for fiscal 2002. Upon information and belief, Piergrossi was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26. Defendant Fidelity Management Trust Company ("Fidelity") is the Plan's Trustee. Upon information and belief, Fidelity was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27. Defendant State Street Bank & Trust Co. ("State Street"), a subsidiary of State Street Corporation, is the Plan's investment manager. Upon information and belief, State Street

was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period. These Defendants, whose identities are currently unknown to Plaintiff, may include additional Grace employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE PLAN

29.     The W. R. Grace & Co. Savings and Investment Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

30.     As noted above, on December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and Investment Plan ( the "Hourly Plan") was merged with the W. R. Grace & Co. Salaried Employees Savings and Investment Plan (the "Salaried Plan"), forming the current Plan. Effective on the date of the merger, $34,303,697 was transferred from the Hourly Plan into the Plan. On January 1, 2002, the newly augmented Plan was renamed the W. R. Grace & Co. Savings and Investment Plan.

31.     According to the Company's Form 11-K filed with the Securities and Exchange Commission ("SEC") on June 27, 2003 for Fiscal Year 2002 (the "2002 Form 11-K"), Grace is the Plan's Sponsor.

32.     A separate account is established for each Plan participant at the time of enrollment in the Plan. The participant's contribution is credited in accordance with the

directions given by the participant in one or more of a number of investment alternatives.

33. The 2002 Form 11-K states that participants may make elective pre-tax and/or after-tax contributions between 2% and 16% of their compensation to their retirement investment accounts.

34. The 2002 Form 11-K further provides that the Company matched 100% of the first 6% of the base compensation that a Plan participant contributed to the Plan.[2] Beginning on January 1, 2001, the Company's matching contribution was allocated to the investment options chosen by the Plan participant for their participant directed contribution investments. Prior to January 1, 2001, the Company's matching contributions were invested in the New Grace Common Stock Fund,[3] which was purportedly an Employee Stock Ownership Plan ("ESOP"), according to the Company, within the meaning of the Internal Revenue Code of 1986 (the "Code").[4]

35. As of December 31, 2002, the Plan offered 27 mutual funds, the Grace Common Stock Fund, and a Fixed Income Fund (comprised primarily of guaranteed investment contracts) as investment options for participant-directed contributions.

---

[2] Prior to this, as of the Salary Plan's change effectuated on October 1, 2000, the Company contributed 75% of the first 6% of the base compensation that a Plan participant contributed to the Plan. Prior to October 1, 2000, the Company matched only 50% of the first 6% of the Plan participant's contribution to the Plan. Upon information and belief, the same held true for the Hourly Plan as well.

[3] On March 31, 1998, a predecessor of the Company ("Old Grace") completed a transaction in which its flexible packaging business ("Cryovac Business") was combined with Sealed Air Corporation ("Sealed Air"). As a result of the transaction, each shareholder of Old Grace common stock received 1 share of the "New W. R. Grace & Co." ("New Grace"), .536 shares of Sealed Air common stock, and .475 shares of Sealed Air convertible preferred stock. Consequently, Old Grace common stock was canceled and all balances in the Sealed Air Common Stock Fund and the Sealed Air Preferred Stock Fund were required under the Plan's direct to be transferred out of those funds by December 31, 2000.

[4] Further, effective October 1, 2000, participants were permitted to transfer all or a portion of the Company's contributions from the "ESOP" to any of the other funds.

36. Notably, the Plan's heavy investment in Grace stock during the Class Period resulted in devastating losses to participants' retirement accounts. For example for the year ended December 31, 1999, the Hourly Plan and the Salaried Plan, combined, held approximately 9,328,844 shares of Grace stock worth a then-current market value of approximately *$62,835,218*. However, by the year ended December 31, 2002, the Plan held 23,703,537 shares of Grace stock worth a then-current market value of merely *$24,101,477*, representing a *38%* decrease in value, *notwithstanding* a 40% *increase* in the number of shares held by the Plan.

37. According to the Company's 2002 Form 11-K, Fidelity Management Trust Company ("Fidelity" or "Trustee") was the Plan's trustee and was specifically tasked with managing "the Grace Common Stock Fund and the ["ESOP"]portion of the Plan. . ."

38. Also according to the Company's 2002 Form 11-K, investment management of the Fixed Income Fund and oversight of the Fidelity mutual funds offered under the Plan is the responsibility of the "Investment and Benefits Committee" appointed by the Company's Board of Directors.

39. Upon information and belief, the Investment and Benefits Committee also exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, including the Grace Common Stock Fund.

**The Plan's Blackout/Lock-Down Period**

40. On March 17, 2003 Grace notified Plan participants that, beginning on April 16, 2003, Grace would prohibit Plan participants from directing payroll contributions into the Grace Stock Fund. If a Plan participant failed to change their directives regarding the Grace Stock

Fund, the contributions would be automatically invested in the Fixed Income Fund.

41. Additionally, Plan participants were notified that, effective April 21, 2003, Plan participants would be prohibited from making transfers out of other investment options and into the Grace Stock Fund.

42. Due in part to these notifications and the subsequent selling of Grace stock, Fidelity, on March 26, 2003, temporarily suspended the ability of participants with investment balances in the Grace Common Stock Fund to redeem (i.e., sell or transfer) any interest in Grace Common Stock. This suspension or "black-out" period ended on April 14, 2003. During this time, Plan participants were forced to remain invested in Grace common stock, irrespective of their desires to divest their interest in Company stock.

## DEFENDANTS' FIDUCIARY STATUS

43. During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

44. During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

45. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Plan document describes Grace and/or the "Committee" and/or the Administrative Committee as a named fiduciary(ies).

46. Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Grace chose to internalize at least some of these fiduciary

functions.

47. Upon information and belief, the Plan and its assets are administered and managed by "Committees" selected and monitored by, upon information and belief, Grace's Board of Directors ("Board").

48. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between July 1, 1999 and February 27, 2004 (the "Class Period") and whose accounts included investments in Grace stock.

50. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

    (b) whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

    (c) whether Defendants violated ERISA; and

    (d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages

52. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

53. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

55. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of

establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

### A. Grace Stock Was an Imprudent Investment for the Plan

**Background**

56.     Grace is a global supplier of catalysts and silica products, specialty construction chemicals and building materials, and container products. It currently has annual sales of approximately $2 billion, over 6,000 employees and worldwide operations in nearly 40 countries.

57.     In 1954, Grace entered the specialty chemicals industry when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company.

58.     From 1970 through 1989, Grace sold Monokote® 4 and Monokote® 5, which were spray-applied fireproofing materials used to protect structural steel in a variety of commercial/industrial construction. As explained more fully below, these products contained trace amounts of naturally occurring asbestos. These products, in addition to other Grace products containing asbestos sold during the 1960s, 1970s and 1980s, would expose Grace to a raft of asbestos-related litigation from the 1980s through the present.

59.     In 1995, Grace began to divest its interest in many of its larger businesses, a continuation of a series of corporate reorganizations that it began in the beginning of the decade.

According to an article appearing on *www.seattlepi.nwsource.com*, lawyers in the asbestos-related litigation against Grace claim that these corporate reorganizations were effectuated to conceal assets and cloud the corporate lines of responsibility. Although the Company has denied these accusations, the Environmental Protection Agency ("EPA") has begun working with forensic accountants in the Justice Department to determine whether or not the Company moved assets to its newly formed corporations.

**Asbestos-Related Litigation**

60.     Individuals with asbestos-related illnesses often take 20 years or more after exposure to exhibit symptoms. This is normally well after the individual is removed from whatever exposed himself/herself to asbestos in the first place.

61.     Typically in asbestos-related litigation, plaintiffs will file suit against multiple defendants. The litigation often lists 10 to 20 or more corporations that either produced asbestos or used it in products they manufactured. Consequently, affected corporations may face numerous suits, even if their culpability is, at least superficially, remote. The rising tide of asbestos-related personal injury suits, caused in part by the time delay for the illness to manifest itself, has caused 26 companies to file for Chapter 11 bankruptcy protection between 1982 and 2001.

62.     By November 1999, more than 250,000 individual asbestos related suits had been filed against Grace. In April 2001, the number of asbestos-related suits had risen to over 325,000 and had cost the Company nearly $2 billion.[5]

---

[5] It is estimated that, during the course of asbestos-related illness, it can cost a person between $300,000 to $500,000 for hospitalization, oxygen, medication and home care (notably these figures are 2001 estimates). Due to the high costs of health care for individuals with asbestos-related illness, financial claims against a company can

63.     Unlike many other asbestos suits where the manufacturer/distributor of the product that may have exposed an individual to asbestos is not clearly identifiable, Grace was the principal defendant in several asbestos-related suits where it was clearly the primary, if not only, defendant. For example, Grace was the primary supplier of asbestos-tainted vermiculite for "Zonolite" attic insulation, which was used in as many as 2 million homes around the United States. Hence, Grace is the principal defendant in suits brought by the homeowners who used Zonolite, as well as the employees who worked at vermiculite plants around the U.S.

64.     Additionally, Grace was the primary defendant in suits brought by miners and other employees of companies that processed vermiculite. A prime example of this is Grace's Libby, Montana vermiculite mines which it operated from 1963 to 1990. Health problems related to the Libby mine first began to surface in 1999. In 2001, the federal government conducted a health screening of the 6,114 people who live, or lived, in or near Libby during the Class Period. Analysis of the first 1,067 examinations showed that 30% of the people screened exhibited signs of asbestos-related disease.

65.     In 2003, a federal judge ordered Grace to repay the federal government the $54.5 million that the government spent investigating and cleaning up the asbestos-riddled town of Libby. Noting the magnitude of the payment, the Justice Department announced that it was the *largest post-trial judgment ordered in the history of the federal Superfund law.*[6] Grace also

---

quickly climb into the tens of millions of dollars even if only a relatively small number of people were exposed. Unfortunately for Grace, the number of people that it potentially exposed to its asbestos-tainted products number in the thousands.

[6] "Superfund" is the better-known name for the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) passed by Congress in 1980. Under this law, parties found responsible for polluting a site must clean up the contamination or reimburse the EPA for doing so. Liability is strict, retroactive, joint and several.

agreed to spend $2.75 million to create a fund to provide additional health care for Libby residents with asbestos-related diseases. As of 2003, asbestos contamination had been blamed for 200 deaths and the health problems of further hundreds of Libby area residents.

**Effects of the Asbestos-related Suits on the Asbestos Industry**

66.     On June 23, 1999, the United States Supreme Court issued its opinion in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ("*Ortiz*"), overturning a circuit court ruling that would have enabled asbestos defendants to manage their liability exposure by settling claims on a global scale. That decision followed by two years the Court's rejection of another, earlier global settlement, *Amehem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ("*Georgine*"). These Supreme Court decisions ended the ability of asbestos defendants, such as Grace, to limit their asbestos-related liability exposure without filing for bankruptcy.[7]

67.     Given the avalanche of liability arising from individual asbestos suits that these Supreme Court decisions unleashed upon the asbestos industry, since at least the beginning of the Class Period, Grace and the Defendants knew or should have known that asbestos liability threatened Grace's future, and that investing in Grace stock was, at best, highly risky and more realistically an inherently losing proposition.[8]

68.     Indeed, in the months following the Supreme Court's *Ortiz* decision, many

---

[7] Section 524(g) of the Bankruptcy Code (the "Code") was specifically adopted by Congress in 1994 to help resolve current and future asbestos liabilities through Code provisions. Use of the provision, however, requires the debtor(s) to relinquish a majority of the company's equity value to a trust created to pay asbestos claims. This aspect of the Code essentially guarantees that shareholders at the time of Grace's bankruptcy filing, such as the Plan, would lose *virtually all* of the value of their equity investments.

[8] On July 1, 1999, the beginning of the Class Period, Grace stock was trading at $19.19 per share. Unfortunately for the Plan participants, Grace's stock price would never rise above $19 per share after September 3, 1999 for the remainder of the Class Period and would instead spiral downward, losing more than 85% of its value.

corporate asbestos defendants abandoned settlement efforts, and instead chose to file for bankruptcy to avoid their massive liability. However, Defendants stood by idly and did nothing to protect Plan assets even as numerous companies involved in the manufacture and production of asbestos-related products toppled into bankruptcy under the staggering liability of individual-based asbestos suits.

69.    For example, on February 22, 2000, citing the mounting rise in asbestos-related suits against the company, Babcock & Wilcox ("B&W") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District of Louisiana in New Orleans. In reaction to this news, Grace's stock dropped from $11.62, on February 22, 2000, to $10.63 on February 24, 2000, the next day of trading. In this one day drop, the Company's stock lost approximately 8.52% of its value.

70.    The growing uncertainty surrounding the full effects of this tidal wave of asbestos litigation on affected companies drove the price for Grace stock down throughout the summer and fall of 2000.

71.    Furthering the uncertainty regarding Grace's economic future, on October 5, 2000, the world's largest manufacturer of fiberglass insulation, Owens Corning Corporation ("Owens Corning"), filed for Chapter 11 bankruptcy protection.[9] At the time of its bankruptcy filing, Owens Corning had revenues exceeding $5 billion per year, making it one of the wealthiest corporations to ever be afforded bankruptcy protection by U. S. courts. Indeed, Owens Corning's bankruptcy, to that date, was the largest filed in 2000 and the second largest filed since 1995. In

---

[9] According to news reports, at the time of its bankruptcy filing, Owens Corning had received over 460,000 asbestos-related personal injury claims and had paid or agreed to pay over $5 billion in asbestos-related awards and settlements, legal expenses and claims processing fees.