reaction to this news, Grace's stock dropped from $4.56 on October 5, 2000 to $3.81 on October 6, 2000. In this one day drop, the Company's stock lost approximately 16.45% of its value.

72.     Also citing the growing number of asbestos-related claims, still another asbestos company, Armstrong World Industries ("Armstrong") filed for Chapter 11 bankruptcy protection on December 6, 2000.[10] In reaction to this news, Grace's stock dropped from $1.75 on December 6, 2000 to $1.31 on December 7, 2000. In this one day drop, the Company's stock lost a further 25.14% of its value.

73.     Consequently, by early 2001, Grace and its affiliates were among the few "deep pocket" defendants left who were potentially subject to joint and several liability. Thus, the number of asbestos claims against them increased dramatically. Despite continued efforts to forge a legislative solution (prior efforts in 1981, 1982, 1984, and 1991 had all failed), bankruptcy relief remained the most viable means for defendants such as Grace to resolve their liability. As one CEO later told Fortune magazine, "We should've filed for bankruptcy on the day after the Georgine settlement was overturned by the Supreme Court. Every asbestos defendant should've done the same thing." The *Ortiz* decision finished what the *Georgine* decision began, sealing the fate of global settlements and, ultimately, asbestos defendants.

**Grace's Improper Accounting of Asbestos-Related Claims**

74.     In 1996, Grace began accruing funds for all then-current asbestos-related bodily injury claims and those that were expected to be asserted over the following five-year period.

75.     In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-

---

[10] At the time of its bankruptcy filing, Armstrong faced more than 170,000 asbestos-injury lawsuits resulting from its past sales and installation of asbestos insulation.

related bodily injury claims. Grace explained the reasons behind this change in its 1999 10-K filed with the SEC on March 28, 2000. Specifically, the Company stated:

> *Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims* expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury cases and claims then pending . . . as well as all bodily injury claims expected to be filed in the future. (emphasis added).

76. In Grace's 2000 10-K filed with the SEC on April 16, 2001, the Company stated, in relevant part:

> Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). *In most of these lawsuits, Grace is one of many defendants.*
>
> * * *
>
> Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to *reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted*, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending, . . . as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.) (emphasis added)

77.     Contrary to what was reported in the Company's 10-K, and as the Company later admitted, Grace failed to properly account for the increasing number of Chapter 11 filings by its asbestos-related litigation "co-defendants" and its effect on Grace as being one of the few remaining "deep pockets" not under bankruptcy protection. The growing number of plaintiffs turning to Grace for joint and several liability led directly to the Company's filing for Chapter 11 bankruptcy protection and the significant devaluation one of the Plan's primary assets, principally Grace common stock.

78.     As the Company noted in its Form 10-K annual report, filed with the SEC on March 28, 2002:

> [C]osts to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. *In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks.* These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001. (emphasis added).

**Asbestos Claims Threaten Grace's Financial Health**

79.     As the asbestos claims filed against Grace multiplied exponentially, Grace's management realized that its asbestos reserves were grossly inadequate.

80.     Grace received a total of 26,941 asbestos-related bodily injury claims in 1999. In 2000, the number climbed to 48,786. For the first quarter of 2001 alone, Grace received 16,411

bodily injury claims. By the time Grace filed for bankruptcy, on April 2, 2001, it was a defendant in *65,656* asbestos-related lawsuits.

81. However, ***despite the Company's bankruptcy filing***, the Defendants took no steps to protect the Plan from continued losses stemming from the Plan's heavy investment in Company stock until it was much too late. Indeed, it was not until April 16, 2003, *more than two years after Grace filed bankruptcy*, that the Defendants first took the most minimum of actions to protect the Plan.[11]

82. Given that the Company had already filed for bankruptcy, these belated, minimal, actions, taken by Defendants, did not go nearly far enough to protect the Plan. In fact, it was not until February 27, 2004 that State Street Bank & Trust Company, which currently, upon information and belief, acts as the investment manager and independent fiduciary of the 401(k) Plan, determined that it would be prudent to begin complete divestment of the Plan's holdings of Grace common stock.

83. Simply put, Defendants' actions were too little too late in terms of protecting the Plan from the massive losses it suffered as a result of its imprudent investment in Grace stock.

**B.  Defendants Knew or Should have Known that the Grace Funds and/or Grace stock was not a Prudent Plan Investment**

84. At all relevant times, Defendants knew or should have known that Grace's accounting for asbestos-related litigation was materially skewed by its failure to account for the growing number of bankruptcy filings by its co-defendants. The effect of this failure, in addition

---

[11] Specifically, commencing on April 16, 2003, Grace prohibited participants from directing further contributions towards Grace stock. Also, effective April 21, 2003, participants were prohibited from making transfers from other investment options into Grace stock.

to the direct effect these bankruptcy filings had on Grace stock, made Grace stock an indisputably imprudent Plan investment. It is inconceivable that the high ranking Defendants named in this complaint did not have personal knowledge of, if not a direct role in, the Company's accounting of asbestos-related litigation and the true financial health of the Company throughout the Class Period.

85. Defendants clearly failed to conduct an appropriate investigation into whether the Grace Funds and/or Grace stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding Grace's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding the Grace Funds and/or Grace stock in the Plan, and otherwise failed to protect the Plan and its participants against inevitable losses.

86. All Defendants were aware, or should have been aware, of the serious financial problems facing Grace because of its growing asbestos liability, especially in the wake of the *Ortiz* decision. By no later than July 1, 1999, Defendants knew that Grace's asbestos liability threatened Grace's future, and that investing in Grace stock was highly risky.

87. After *Ortiz*, Defendants knew that alternative settlement methods, including global settlement schemes, would likely prove ineffective in resolving their asbestos liability problems efficiently. As a result of the failure of global and other alternative settlements in resolving asbestos liability, and Congress's consistent rejection of legislative solutions, Defendants knew or should have known that Grace's most likely course to resolve its liability issues was to seek bankruptcy protection. Defendants further knew, or should have known, that if that course was taken, Grace shareholders, including the Plan participants, would lose the great

majority of their heavy investment in Grace stock.

88.   An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in the Grace Funds and/or Grace stock, under these circumstances, was imprudent. A reasonably and prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

89.   Because Defendants knew or should have known that the Grace Funds and/or Grace stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in the Grace Funds and/or Grace stock.

90.   Defendants had available to them several different options for satisfying this duty, including: divesting the Plan of Grace stock; discontinuing further Company-matching and participant-directed investment contributions in the Grace Funds and/or Grace stock much earlier than they actually did; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries to the extent that as a result of their employment by Grace they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Grace stock.

**C.   Defendants Regularly Communicated with Plan Participants Concerning Purchases of the Grace Funds and/or Grace Stock Yet Failed to Disclose the Imprudence of Investment in the Grace Funds and/or Grace Stock**

91.   Upon information and belief, Defendants regularly communicated with employees, including Plan participants, about Grace's performance, future financial and business

prospects, and the Grace Funds and/or Grace stock, upon information and belief, one of the largest single assets in the Plan. Upon information and belief, during the Class Period, the Defendants fostered a positive attitude toward the Grace Funds and/or Grace stock as a Plan investment, and/or allowed Plan participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in the Grace Funds and/or Grace stock. As such, Plan participants could not appreciate the true risks presented by investments in the Grace Funds and/or Grace stock and therefore could not make informed decisions regarding investments in the Plan.

**D.   Defendants Suffered From Conflicts of Interest**

92.   Grace's SEC filings, including annual reports on form 10-K, during the Class Period, make it clear that a number of the corporate Directors and Executive Officers compensation is in the form of stock grants or stock option grants.

93.   Because the compensation of at least some Defendants, and likely others, was significantly tied to the price of Grace stock, Defendants had incentive to keep the Plan's assets heavily invested in Grace stock on a regular, ongoing basis, at least prior to the Company's Chapter 11 filing. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Grace stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Grace stock, resulting in lower compensation for the Defendants.

94.   Some Defendants may have had no choice in tying their compensation to Grace stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a

large extent in Grace stock, or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

95. These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

## CLAIMS FOR RELIEF UNDER ERISA

96. At all relevant times, Defendants were, and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

97. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

98. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

99. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

100. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things:

   a. The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

   b. A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

   c. A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

101. ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act

or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

102. Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## CAUSATION

103. The Plan suffered many millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Grace Funds and/or Grace stock during the Class Period, in breach of Defendants' fiduciary duties. This loss was reflected in the diminished account balances of the Plan's participants.

104. Defendants are responsible for losses caused by participant direction of investment in the Grace Funds and/or Grace stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Grace Funds and/or Grace stock, and Defendants remain

liable under ERISA for losses caused by such investment.

105. Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in the Grace Funds and/or Grace stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

106. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in the Grace Funds and/or Grace stock, eliminating the Grace Funds and/or Grace stock as an investment alternative when it became imprudent, and divesting the Plan from the Grace Funds and/or Grace stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in the Grace Fund and/or Grace stock.

## COUNT I

### Failure to Disseminate Necessary Information

107. Plaintiff incorporates the allegations contained in the previous paragraphs of thus Complaint as if fully set forth herein.

108. ERISA fiduciaries have a duty to speak truthfully, to not mislead participants, and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan. In a plan with various funds available for investment, this duty to inform and disclose includes: (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from making material misrepresentations.

109. A fiduciary must not only disclose complete and correct material information, but must provide information (even where not requested) if failing to convey the information would be harmful to participants. In essence, a fiduciary must act to protect participants from losses when he knows or should know of facts that cast doubt on the soundness of certain plan investment alternatives.

110. The Defendants breached their fiduciary duties by failing to provide Plan participants and beneficiaries with complete and accurate information regarding investment in Grace stock, including, but not limited to Grace's under-funding of its asbestos-related litigation reserves and failing to account for its increasing liability in the wake of its co-defendants' bankruptcy filings. The Defendants failed to provide Plan participants and beneficiaries of the Plan information regarding the true risk of investment in the Grace Common Stock Fund and Grace stock given Defendants' knowledge of the mounting asbestos liability, probability of a future bankruptcy filing and the negative effects these factors would have on Grace stock ownership. The Defendants provided misleading, incomplete, and inaccurate information regarding the true financial state of Grace *vis-a-vis* its asbestos-related litigation expenses/liabilities through press releases, SEC filings, and elsewhere, characterized Grace as a healthy, growing business concern. The Defendants' failure to inform the public and Plan participants of the likelihood and immense size of potential asbestos litigation artificially inflated the value of Grace stock, and misled participants and beneficiaries regarding the soundness and prudence of investing their retirement benefits in Grace stock during the Class Period. This information was especially critical because investment in Grace stock was, by definition, an undiversified investment in a single company's common stock and, as such, carried with it an

31

inherently high degree of risk.

## COUNT II

### Breach of Duty to Prudently Manage and Invest Plan Assets

111. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112. A fiduciary's duties of loyalty and prudence also entail a duty to continually monitor and, if necessary and prudent, conduct independent investigations into the relative merits of all the Plan's investments and of the investment alternatives available in a plan, including employer securities, to ensure that each investment is suitable and prudent.

113. Defendants breached this duty with respect to the Company stock investment. By the beginning of the Class Period, if not before, Grace Funds and/or Grace stock were plainly unsuitable and imprudent investment options for the Plan and its participants and beneficiaries. By no later than the beginning of the Class Period, the Defendant-fiduciaries could and should have made a determination that the Grace Funds and/or Grace stock were not suitable and prudent investments for the Plan, either for a participant's discretionary account or for the Company's matching investments, and should have taken appropriate action as soon as the stock became imprudent, including adoption of a reasonable policy of divestment, elimination or restriction of further investment, corrective disclosure to Plan participants, and/or notification of the Secretary of Labor.

114. The Defendants further breached their fiduciary duties by not monitoring or putting in place procedures to monitor the actions of the Committee and/or any other employees designated by Grace to administer the Plan, and other Plan fiduciaries.

115. Under ERISA, fiduciaries are responsible for the prudence of plan investments and liable for losses resulting from breach of their duty of prudence. The defense to such liability provided for in ERISA § 404(c), 29 U.S.C. § 1104(c), is unavailable to Defendants here because the Plan and the Fiduciary Defendants' administration thereof did not satisfy the requirements of the statute or the regulations promulgated thereunder.

## COUNT III

### Claim for Relief for Co-Fiduciary Liability in Violation of ERISA § 405

116. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117. By virtue of the facts alleged herein, Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a)(1), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of these breaches, failed to make reasonable efforts to remedy these breaches. Accordingly, the Defendants, as fiduciaries of the Plan, are each liable for the others' violations pursuant to ERISA §§ 405(a)(2) and (3), 29 U.S.C. §§ 1105(a)(2) and (3).

118. ERISA imposes strict co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (a) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

    (b)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (c)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach

119.    Each of the Defendants (i) participated knowingly in or undertook to conceal an act or omission described in this Claim of another fiduciary, knowing such act or omission was a breach, or (ii) in failing to discharge his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim, or (iii) had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach, and, therefore, was also a co-fiduciary liable for the breaches committed by each other fiduciary under ERISA § 405, 29 U.S.C. § 1105. As discovery progresses in these cases, Plaintiffs will seek leave to amend this Complaint to identify those Defendants, in addition to the Defendants named in this Complaint, with co-fiduciary liability as described in this paragraph.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

120.    The Defendant fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Grace equity.

121.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

122.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

123.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

124.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs and interest on these amounts, as provided by law; and (e) such other legal or equitable relief as may be just and proper.

125.   Each Defendant is jointly liable as a co-fiduciary for the acts of the other Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A. A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B. A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. Imposition a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G. An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in the common stock of Grace maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Grace;

H. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.  An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: June 16, 2004

Respectfully submitted,

**GILMAN AND PASTOR, LLP**

By: _/s/ David Pastor_

David Pastor (BBO #391000)
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Gerald D. Wells, III
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**SLEVIN & HART, P.C**
Thomas J. Hart
1625 Massachusetts Avenue, N.W.
Suite 450
Washington, D.C. 20036
Telephone: (202) 797-8700

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) __Keri Evans v. John F. Akers, et al.__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   - [ ] I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.
   - [X] II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   *Also complete AO 120 or AO 121 for patent, trademark or copyright cases
   - [ ] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.
   - [ ] IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.
   - [ ] V.   150, 152, 153.

   04-11380 WGY

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES [ ]   NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES [ ]   NO [X]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES [ ]   NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES [ ]   NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES [X]   NO [ ]

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division [X]   Central Division [ ]   Western Division [ ]

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division [ ]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES [ ]   NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME __David Pastor__
ADDRESS __Gilman and Pastor, LLP, 999 Broadway, S. 500, Saugus, MA 01906__
TELEPHONE NO. __781-231-7850__

(Coversheetlocal.wpd - 10/17/02)