# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**04 11380 WGY**

MAGISTRATE JUDGE

| | | |
|---|---|---|
| KERI EVANS, on behalf of herself and a class of all others similarly situated, | ) ) ) ) | Civil Action No. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| JOHN F. AKERS, RONALD C. CAMBRE, MARYE ANNE FOX, JOHN J. MURPHY, PAUL J. NORRIS, THOMAS A. VANDERSLICE, H. FURLONG BALDWIN, INVESTMENTS AND BENEFITS COMMITTEE, ADMINISTRATIVE COMMITTEE, BRENDA GOTTLIEB, W. BRIAN McGOWAN, MICHAEL PIERGROSSI, FIDELITY MANAGEMENT TRUST COMPANY, STATE STREET BANK & TRUST COMPANY, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 6/11/04

## PREFATORY NOTES

- On April 2, 2001, W. R. Grace & Co. ("Grace" or the "Company") and 61 of its U.S. subsidiaries filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. References herein to "Grace" include W. R. Grace & Co. and its subsidiaries. The bankruptcy case is ongoing. As such, this action is stayed as to Grace unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs are not prosecuting this action against Grace.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Grace, Plaintiffs will notify the Court and will proceed against Grace.

- To the extent that proceeding against "committees" of Grace, as enumerated herein, will be deemed violative of the bankruptcy proceeding, Plaintiffs will only

00002748.WPD ; 1

proceed against the committees' members as set forth herein.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiff, which are partially based on personal knowledge. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiff will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

Plaintiff Keri Evans ("Evans"), a participant in the W. R. Grace & Co. Savings and Investment Plan (the "Plan"),[1] on behalf of herself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including the Defendants, on behalf of all persons who were participants in, or beneficiaries of, the Plan at any time between July 1, 1999 and February 27, 2004 (the "Class Period").

2.    During the Class Period, Defendants caused ongoing Plan investments to be made in certain Plan funds consisting, at least in part, of Grace common stock after the investments became imprudent as a result of the Company's setbacks in asbestos litigation, the rising number of asbestos-related suits, and the Company's under-funding of its asbestos litigation reserves/funds. Consequently, Grace common stock became an imprudent investment and the Plan's purpose of saving for retirement and accumulating capital was compromised. Grace filed

---

[1] As more fully explained below, on December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and Investment Plan was merged with the W. R. Grace & Co. Salaried Employees Savings and Investment Plan, forming the current Plan, the W. R. Grace & Co. Savings and Investment Plan. To the extent applicable, this action is brought on behalf of the predecessor plans.

for bankruptcy on April 2, 2001.

3.    401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio. Grace common stock was one of the investment alternatives in the Plan during the Class Period. Additionally, as more fully explained below, Grace has matched a portion of the employee's contribution by purchasing Company stock on the employee's behalf.

4.    Defendants were fiduciaries of the Plan, and responsible for investing Company matching contributions, selecting and monitoring investment options offered for participant contributions, and informing participants of the risks involved in each investment option provided under the Plan. As such, Defendants were obligated to comply with ERISA's fiduciary duties to act prudently and in the sole interest of the Plan and its participants and beneficiaries, including Class members (as defined herein).

5.    Plaintiff was an employee of Grace and was a participant in the Plan during the Class Period. Plaintiff's retirement investment portfolio included Grace common stock.

6.    Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Grace stock.

7.    During the Class Period, Defendants knew or should have known that Grace stock was an imprudent investment alternative for the Plan, whether for individual or Company matching contributions. Defendants had intimate knowledge of the perilous condition of the

Company due, in part, to setbacks in asbestos litigation, the rising number of asbestos-related suits and the Company's under-funding of its asbestos litigation reserves/funds.

8.     Despite Grace's troubled financial situation, Defendants caused the Plan to continue to invest in Grace stock until well after Grace filed its bankruptcy petition and the shares had lost almost all of their value.

9.     Defendants are liable under ERISA to restore losses sustained by the Plan participants as a result of their breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and some Defendants reside and/or transact business in this district.

12.     Notably, Grace Performance Chemicals, a primary business unit of Grace, is headquartered at 62 Whittemore Avenue, Cambridge, MA, 02140, where it maintains twenty-one manufacturing sites, and approximately 3,300 employees.

## PARTIES

### Plaintiff

13.     Plaintiff is an employee at Grace and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7).  Consequently, Plaintiff held Grace stock in her retirement investment portfolio.

**Defendants**

14.      Defendant John F. Akers ("Akers") served on Grace's Board of Directors during the Class Period.  As director, upon information and belief, Akers participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Akers, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15.      Defendant Ronald C. Cambre ("Cambre") served on Grace's Board of Directors during the Class Period.  As a director, upon information and belief, Cambre participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Cambre, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

16.      Defendant Marye Anne Fox ("Fox") served on Grace's Board of Directors during the Class Period.  As a director, upon information and belief, Fox participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Fox, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

00002748.WPD ; 1                              5

17.    Defendant John J. Murphy ("Murphy") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Murphy participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Murphy, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18.    Defendant Paul J. Norris ("Norris") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Norris participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. In addition, for at least a portion of the Class Period, Norris also served as the Company's President and Chief Executive Officer ("CEO"). Consequently, Norris, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19.    Defendant Thomas A. Vanderslice ("Vanderslice") served on Grace's Board of Directors during the Class Period. As a director, upon information and belief, Vanderslice participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Vanderslice, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.    Defendant H. Furlong Baldwin ("Baldwin") served on Grace's Board of Directors during at least part of the Class Period.  As a director, upon information and belief, Baldwin participated in the appointment of members of the Committee, and was responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Baldwin, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.    Defendant Investment and Benefits Committee ("Committee") was the Plan's investment manager during the Class Period.  Upon information and belief, the Committee was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.    Defendant Administrative Committee, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.    Defendant Brenda Gottlieb ("Gottlieb") served as the Chairman for the Administrative Committee during the Class Period and signed the Company's 11-K filings for 2000 and 2001 in that capacity.  Upon information and belief, Gottlieb was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

00002748.WPD ; 1                                7

24.    Defendant W. Brian McGowan ("McGowan") served on the Administrative Committee during the Class Period and signed the Company's 2002 11-K filing in that capacity. In addition, he also signed the Company's fiscal 2000 Forms 5500 submitted to the Internal Revenue Service ("IRS") and the Department of Labor ("DOL") for both the Hourly and Salary Plans, the "W. R. Grace & Co. Savings Plan Master Trust" Form 5500 for fiscal year 2001, the Hourly Plan's Form 5500 for fiscal year 2001 and the Salary Plan's for fiscal 2002. McGowan was also the Company's Senior Vice President of Corporate Administration for at least a portion of the Class Period. Upon information and belief, McGowan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25.    Defendant Michael Piergrossi ("Piergrossi") signed, as Plan Administrator, the Company's Form 5500 annual reports for fiscal year 2000 for both the Hourly and Salary Plans, as well as the Hourly Plan's Form 5500 for fiscal year 2001 and Salary Plan's for fiscal 2002. Upon information and belief, Piergrossi was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26.    Defendant Fidelity Management Trust Company ("Fidelity") is the Plan's Trustee. Upon information and belief, Fidelity was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27.    Defendant State Street Bank & Trust Co. ("State Street"), a subsidiary of State Street Corporation, is the Plan's investment manager. Upon information and belief, State Street

was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period. These Defendants, whose identities are currently unknown to Plaintiff, may include additional Grace employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE PLAN

29.     The W. R. Grace & Co. Savings and Investment Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

30.     As noted above, on December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and Investment Plan ( the "Hourly Plan") was merged with the W. R. Grace & Co. Salaried Employees Savings and Investment Plan (the "Salaried Plan"), forming the current Plan. Effective on the date of the merger, $34,303,697 was transferred from the Hourly Plan into the Plan. On January 1, 2002, the newly augmented Plan was renamed the W. R. Grace & Co. Savings and Investment Plan.

31.     According to the Company's Form 11-K filed with the Securities and Exchange Commission ("SEC") on June 27, 2003 for Fiscal Year 2002 (the "2002 Form 11-K"), Grace is the Plan's Sponsor.

32.     A separate account is established for each Plan participant at the time of enrollment in the Plan. The participant's contribution is credited in accordance with the

directions given by the participant in one or more of a number of investment alternatives.

33.    The 2002 Form 11-K states that participants may make elective pre-tax and/or after-tax contributions between 2% and 16% of their compensation to their retirement investment accounts.

34.    The 2002 Form 11-K further provides that the Company matched 100% of the first 6% of the base compensation that a Plan participant contributed to the Plan.[2]  Beginning on January 1, 2001, the Company's matching contribution was allocated to the investment options chosen by the Plan participant for their participant directed contribution investments.  Prior to January 1, 2001, the Company's matching contributions were invested in the New Grace Common Stock Fund,[3] which was purportedly an Employee Stock Ownership Plan ("ESOP"), according to the Company, within the meaning of the Internal Revenue Code of 1986 (the "Code").[4]

35.    As of December 31, 2002, the Plan offered 27 mutual funds, the Grace Common Stock Fund, and a Fixed Income Fund (comprised primarily of guaranteed investment contracts) as investment options for participant-directed contributions.

---

[2] Prior to this, as of the Salary Plan's change effectuated on October 1, 2000, the Company contributed 75% of the first 6% of the base compensation that a Plan participant contributed to the Plan. Prior to October 1, 2000, the Company matched only 50% of the first 6% of the Plan participant's contribution to the Plan.  Upon information and belief, the same held true for the Hourly Plan as well.

[3] On March 31, 1998, a predecessor of the Company ("Old Grace") completed a transaction in which its flexible packaging business ("Cryovac Business") was combined with Sealed Air Corporation ("Sealed Air").  As a result of the transaction, each shareholder of Old Grace common stock received 1 share of the "New W. R. Grace & Co." ("New Grace"), .536 shares of Sealed Air common stock, and .475 shares of Sealed Air convertible preferred stock.  Consequently, Old Grace common stock was canceled and all balances in the Sealed Air Common Stock Fund and the Sealed Air Preferred Stock Fund were required under the Plan's direct to be transferred out of those funds by December 31, 2000.

[4] Further, effective October 1, 2000, participants were permitted to transfer all or a portion of the Company's contributions from the "ESOP" to any of the other funds.

36.    Notably, the Plan's heavy investment in Grace stock during the Class Period resulted in devastating losses to participants' retirement accounts. For example for the year ended December 31, 1999, the Hourly Plan and the Salaried Plan, combined, held approximately 9,328,844 shares of Grace stock worth a then-current market value of approximately *$62,835,218*. However, by the year ended December 31, 2002, the Plan held 23,703,537 shares of Grace stock worth a then-current market value of merely *$24,101,477*, representing a *38%* decrease in value, *notwithstanding* a 40% *increase* in the number of shares held by the Plan.

37.    According to the Company's 2002 Form 11-K, Fidelity Management Trust Company ("Fidelity" or "Trustee") was the Plan's trustee and was specifically tasked with managing "the Grace Common Stock Fund and the ["ESOP"]portion of the Plan. . ."

38.    Also according to the Company's 2002 Form 11-K, investment management of the Fixed Income Fund and oversight of the Fidelity mutual funds offered under the Plan is the responsibility of the "Investment and Benefits Committee" appointed by the Company's Board of Directors.

39.    Upon information and belief, the Investment and Benefits Committee also exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, including the Grace Common Stock Fund.

**The Plan's Blackout/Lock-Down Period**

40.    On March 17, 2003 Grace notified Plan participants that, beginning on April 16, 2003, Grace would prohibit Plan participants from directing payroll contributions into the Grace Stock Fund. If a Plan participant failed to change their directives regarding the Grace Stock

Fund, the contributions would be automatically invested in the Fixed Income Fund.

41.    Additionally, Plan participants were notified that, effective April 21, 2003, Plan participants would be prohibited from making transfers out of other investment options and into the Grace Stock Fund.

42.    Due in part to these notifications and the subsequent selling of Grace stock, Fidelity, on March 26, 2003, temporarily suspended the ability of participants with investment balances in the Grace Common Stock Fund to redeem (i.e., sell or transfer) any interest in Grace Common Stock. This suspension or "black-out" period ended on April 14, 2003. During this time, Plan participants were forced to remain invested in Grace common stock, irrespective of their desires to divest their interest in Company stock.

## DEFENDANTS' FIDUCIARY STATUS

43.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

44.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

45.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Plan document describes Grace and/or the "Committee" and/or the Administrative Committee as a named fiduciary(ies).

46.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Grace chose to internalize at least some of these fiduciary

00002748.WPD ; 1                                    12

functions.

47.    Upon information and belief, the Plan and its assets are administered and managed by "Committees" selected and monitored by, upon information and belief, Grace's Board of Directors ("Board").

48.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

## CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between July 1, 1999 and February 27, 2004 (the "Class Period") and whose accounts included investments in Grace stock.

50.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

      (b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

      (c)     whether Defendants violated ERISA; and

      (d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages

52.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

55.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of

establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or

refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive, declaratory, or other equitable relief with respect to the Class as a whole; and (iii)

questions of law or fact common to members of the Class predominate over any questions

affecting only individual members and a class action is superior to the other available methods

for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

**A.    Grace Stock Was an Imprudent Investment for the Plan**

**Background**

56.    Grace is a global supplier of catalysts and silica products, specialty construction

chemicals and building materials, and container products.  It currently has annual sales of

approximately $2 billion, over 6,000 employees and worldwide operations in nearly 40 countries.

57.    In 1954, Grace entered the specialty chemicals industry when it acquired both the

Dewey and Almy Chemical Company and the Davison Chemical Company.

58.    From 1970 through 1989, Grace sold Monokote® 4 and Monokote® 5, which

were spray-applied fireproofing materials used to protect structural steel in a variety of

commercial/industrial construction.  As explained more fully below, these products contained

trace amounts of naturally occurring asbestos.  These products, in addition to other Grace

products containing asbestos sold during the 1960s, 1970s and 1980s, would expose Grace to a

raft of asbestos-related litigation from the 1980s through the present.

59.    In 1995, Grace began to divest its interest in many of its larger businesses, a

continuation of a series of corporate reorganizations that it began in the beginning of the decade.

According to an article appearing on *www.seattlepi.nwsource.com*, lawyers in the asbestos-related litigation against Grace claim that these corporate reorganizations were effectuated to conceal assets and cloud the corporate lines of responsibility. Although the Company has denied these accusations, the Environmental Protection Agency ("EPA") has begun working with forensic accountants in the Justice Department to determine whether or not the Company moved assets to its newly formed corporations.

**Asbestos-Related Litigation**

60.      Individuals with asbestos-related illnesses often take 20 years or more after exposure to exhibit symptoms. This is normally well after the individual is removed from whatever exposed himself/herself to asbestos in the first place.

61.      Typically in asbestos-related litigation, plaintiffs will file suit against multiple defendants. The litigation often lists 10 to 20 or more corporations that either produced asbestos or used it in products they manufactured. Consequently, affected corporations may face numerous suits, even if their culpability is, at least superficially, remote. The rising tide of asbestos-related personal injury suits, caused in part by the time delay for the illness to manifest itself, has caused 26 companies to file for Chapter 11 bankruptcy protection between 1982 and 2001.

62.      By November 1999, more than 250,000 individual asbestos related suits had been filed against Grace. In April 2001, the number of asbestos-related suits had risen to over 325,000 and had cost the Company nearly $2 billion.[5]

---

[5] It is estimated that, during the course of asbestos-related illness, it can cost a person between $300,000 to $500,000 for hospitalization, oxygen, medication and home care (notably these figures are 2001 estimates). Due to the high costs of health care for individuals with asbestos-related illness, financial claims against a company can

63.     Unlike many other asbestos suits where the manufacturer/distributor of the product that may have exposed an individual to asbestos is not clearly identifiable, Grace was the principal defendant in several asbestos-related suits where it was clearly the primary, if not only, defendant. For example, Grace was the primary supplier of asbestos-tainted vermiculite for "Zonolite" attic insulation, which was used in as many as 2 million homes around the United States. Hence, Grace is the principal defendant in suits brought by the homeowners who used Zonolite, as well as the employees who worked at vermiculite plants around the U.S.

64.     Additionally, Grace was the primary defendant in suits brought by miners and other employees of companies that processed vermiculite. A prime example of this is Grace's Libby, Montana vermiculite mines which it operated from 1963 to 1990. Health problems related to the Libby mine first began to surface in 1999. In 2001, the federal government conducted a health screening of the 6,114 people who live, or lived, in or near Libby during the Class Period. Analysis of the first 1,067 examinations showed that 30% of the people screened exhibited signs of asbestos-related disease.

65.     In 2003, a federal judge ordered Grace to repay the federal government the $54.5 million that the government spent investigating and cleaning up the asbestos-riddled town of Libby. Noting the magnitude of the payment, the Justice Department announced that it was the *largest post-trial judgment ordered in the history of the federal Superfund law.*[6] Grace also

---

quickly climb into the tens of millions of dollars even if only a relatively small number of people were exposed. Unfortunately for Grace, the number of people that it potentially exposed to its asbestos-tainted products number in the thousands.

[6] "Superfund" is the better-known name for the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) passed by Congress in 1980. Under this law, parties found responsible for polluting a site must clean up the contamination or reimburse the EPA for doing so. Liability is strict, retroactive, joint and several.

agreed to spend $2.75 million to create a fund to provide additional health care for Libby

residents with asbestos-related diseases. As of 2003, asbestos contamination had been blamed

for 200 deaths and the health problems of further hundreds of Libby area residents.

**Effects of the Asbestos-related Suits on the Asbestos Industry**

66.     On June 23, 1999, the United States Supreme Court issued its opinion in *Ortiz v.*

*Fibreboard Corp.*, 527 U.S. 815 (1999) ("*Ortiz*"), overturning a circuit court ruling that would

have enabled asbestos defendants to manage their liability exposure by settling claims on a global

scale. That decision followed by two years the Court's rejection of another, earlier global

settlement, *Amehem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ("*Georgine*"). These

Supreme Court decisions ended the ability of asbestos defendants, such as Grace, to limit their

asbestos-related liability exposure without filing for bankruptcy.[7]

67.     Given the avalanche of liability arising from individual asbestos suits that these

Supreme Court decisions unleashed upon the asbestos industry, since at least the beginning of the

Class Period, Grace and the Defendants knew or should have known that asbestos liability

threatened Grace's future, and that investing in Grace stock was, at best, highly risky and more

realistically an inherently losing proposition.[8]

68.     Indeed, in the months following the Supreme Court's *Ortiz* decision, many

---

[7] Section 524(g) of the Bankruptcy Code (the "Code") was specifically adopted by Congress in 1994 to help resolve current and future asbestos liabilities through Code provisions. Use of the provision, however, requires the debtor(s) to relinquish a majority of the company's equity value to a trust created to pay asbestos claims. This aspect of the Code essentially guarantees that shareholders at the time of Grace's bankruptcy filing, such as the Plan, would lose *virtually all* of the value of their equity investments.

[8] On July 1, 1999, the beginning of the Class Period, Grace stock was trading at $19.19 per share. Unfortunately for the Plan participants, Grace's stock price would never rise above $19 per share after September 3, 1999 for the remainder of the Class Period and would instead spiral downward, losing more than 85% of its value.

corporate asbestos defendants abandoned settlement efforts, and instead chose to file for bankruptcy to avoid their massive liability. However, Defendants stood by idly and did nothing to protect Plan assets even as numerous companies involved in the manufacture and production of asbestos-related products toppled into bankruptcy under the staggering liability of individual-based asbestos suits.

69.    For example, on February 22, 2000, citing the mounting rise in asbestos-related suits against the company, Babcock & Wilcox ("B&W") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District of Louisiana in New Orleans. In reaction to this news, Grace's stock dropped from $11.62, on February 22, 2000, to $10.63 on February 24, 2000, the next day of trading. In this one day drop, the Company's stock lost approximately 8.52% of its value.

70.    The growing uncertainty surrounding the full effects of this tidal wave of asbestos litigation on affected companies drove the price for Grace stock down throughout the summer and fall of 2000.

71.    Furthering the uncertainty regarding Grace's economic future, on October 5, 2000, the world's largest manufacturer of fiberglass insulation, Owens Corning Corporation ("Owens Corning"), filed for Chapter 11 bankruptcy protection.[9] At the time of its bankruptcy filing, Owens Corning had revenues exceeding $5 billion per year, making it one of the wealthiest corporations to ever be afforded bankruptcy protection by U. S. courts. Indeed, Owens Corning's bankruptcy, to that date, was the largest filed in 2000 and the second largest filed since 1995. In

---

[9] According to news reports, at the time of its bankruptcy filing, Owens Corning had received over 460,000 asbestos-related personal injury claims and had paid or agreed to pay over $5 billion in asbestos-related awards and settlements, legal expenses and claims processing fees.

reaction to this news, Grace's stock dropped from $4.56 on October 5, 2000 to $3.81 on October 6, 2000. In this one day drop, the Company's stock lost approximately 16.45% of its value.

72.    Also citing the growing number of asbestos-related claims, still another asbestos company, Armstrong World Industries ("Armstrong") filed for Chapter 11 bankruptcy protection on December 6, 2000.[10] In reaction to this news, Grace's stock dropped from $1.75 on December 6, 2000 to $1.31 on December 7, 2000. In this one day drop, the Company's stock lost a further 25.14% of its value.

73.    Consequently, by early 2001, Grace and its affiliates were among the few "deep pocket" defendants left who were potentially subject to joint and several liability. Thus, the number of asbestos claims against them increased dramatically. Despite continued efforts to forge a legislative solution (prior efforts in 1981, 1982, 1984, and 1991 had all failed), bankruptcy relief remained the most viable means for defendants such as Grace to resolve their liability. As one CEO later told Fortune magazine, "We should've filed for bankruptcy on the day after the Georgine settlement was overturned by the Supreme Court. Every asbestos defendant should've done the same thing." The *Ortiz* decision finished what the *Georgine* decision began, sealing the fate of global settlements and, ultimately, asbestos defendants.

**Grace's Improper Accounting of Asbestos-Related Claims**

74.    In 1996, Grace began accruing funds for all then-current asbestos-related bodily injury claims and those that were expected to be asserted over the following five-year period.

75.    In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-

---

[10] At the time of its bankruptcy filing, Armstrong faced more than 170,000 asbestos-injury lawsuits resulting from its past sales and installation of asbestos insulation.

related bodily injury claims. Grace explained the reasons behind this change in its 1999 10-K

filed with the SEC on March 28, 2000. Specifically, the Company stated:

> *Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims* expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury cases and claims then pending . . . as well as all bodily injury claims expected to be filed in the future. (emphasis added).

76.    In Grace's 2000 10-K filed with the SEC on April 16, 2001, the Company stated,

in relevant part:

> Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). *In most of these lawsuits, Grace is one of many defendants.*
>
> * * *
>
> Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to *reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted,* based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending, . . . as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.) (emphasis added)

77.     Contrary to what was reported in the Company's 10-K, and as the Company later admitted, Grace failed to properly account for the increasing number of Chapter 11 filings by its asbestos-related litigation "co-defendants" and its effect on Grace as being one of the few remaining "deep pockets" not under bankruptcy protection.  The growing number of plaintiffs turning to Grace for joint and several liability led directly to the Company's filing for Chapter 11 bankruptcy protection and the significant devaluation one of the Plan's primary assets, principally Grace common stock.

78.     As the Company noted in its Form 10-K annual report, filed with the SEC on March 28, 2002:

> [C]osts to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. *In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks.*  These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system.  As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001. (emphasis added).

**Asbestos Claims Threaten Grace's Financial Health**

79.     As the asbestos claims filed against Grace multiplied exponentially, Grace's management realized that its asbestos reserves were grossly inadequate.

80.     Grace received a total of 26,941 asbestos-related bodily injury claims in 1999.  In 2000, the number climbed to 48,786.  For the first quarter of 2001 alone, Grace received 16,411

bodily injury claims. By the time Grace filed for bankruptcy, on April 2, 2001, it was a defendant in *65,656* asbestos-related lawsuits.

81.    However, ***despite the Company's bankruptcy filing***, the Defendants took no steps to protect the Plan from continued losses stemming from the Plan's heavy investment in Company stock until it was much too late. Indeed, it was not until April 16, 2003, *more than two years after Grace filed bankruptcy*, that the Defendants first took the most minimum of actions to protect the Plan.[11]

82.    Given that the Company had already filed for bankruptcy, these belated, minimal, actions, taken by Defendants, did not go nearly far enough to protect the Plan. In fact, it was not until February 27, 2004 that State Street Bank & Trust Company, which currently, upon information and belief, acts as the investment manager and independent fiduciary of the 401(k) Plan, determined that it would be prudent to begin complete divestment of the Plan's holdings of Grace common stock.

83.    Simply put, Defendants' actions were too little too late in terms of protecting the Plan from the massive losses it suffered as a result of its imprudent investment in Grace stock.

**B.    Defendants Knew or Should have Known that the Grace Funds and/or Grace stock was not a Prudent Plan Investment**

84.    At all relevant times, Defendants knew or should have known that Grace's accounting for asbestos-related litigation was materially skewed by its failure to account for the growing number of bankruptcy filings by its co-defendants. The effect of this failure, in addition

---

[11] Specifically, commencing on April 16, 2003, Grace prohibited participants from directing further contributions towards Grace stock. Also, effective April 21, 2003, participants were prohibited from making transfers from other investment options into Grace stock.

00002748.WPD ; 1

23

to the direct effect these bankruptcy filings had on Grace stock, made Grace stock an indisputably imprudent Plan investment. It is inconceivable that the high ranking Defendants named in this complaint did not have personal knowledge of, if not a direct role in, the Company's accounting of asbestos-related litigation and the true financial health of the Company throughout the Class Period.

85.    Defendants clearly failed to conduct an appropriate investigation into whether the Grace Funds and/or Grace stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding Grace's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding the Grace Funds and/or Grace stock in the Plan, and otherwise failed to protect the Plan and its participants against inevitable losses.

86.    All Defendants were aware, or should have been aware, of the serious financial problems facing Grace because of its growing asbestos liability, especially in the wake of the *Ortiz* decision. By no later than July 1, 1999, Defendants knew that Grace's asbestos liability threatened Grace's future, and that investing in Grace stock was highly risky.

87.    After *Ortiz*, Defendants knew that alternative settlement methods, including global settlement schemes, would likely prove ineffective in resolving their asbestos liability problems efficiently. As a result of the failure of global and other alternative settlements in resolving asbestos liability, and Congress's consistent rejection of legislative solutions, Defendants knew or should have known that Grace's most likely course to resolve its liability issues was to seek bankruptcy protection. Defendants further knew, or should have known, that if that course was taken, Grace shareholders, including the Plan participants, would lose the great

majority of their heavy investment in Grace stock.

88.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in the Grace Funds and/or Grace stock, under these circumstances, was imprudent.  A reasonably and prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

89.     Because Defendants knew or should have known that the Grace Funds and/or Grace stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in the Grace Funds and/or Grace stock.

90.     Defendants had available to them several different options for satisfying this duty, including: divesting the Plan of Grace stock; discontinuing further Company-matching and participant-directed investment contributions in the Grace Funds and/or Grace stock much earlier than they actually did; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries to the extent that as a result of their employment by Grace they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Grace stock.

**C.      Defendants Regularly Communicated with Plan Participants Concerning Purchases of the Grace Funds and/or Grace Stock Yet Failed to Disclose the Imprudence of Investment in the Grace Funds and/or Grace Stock**

91.     Upon information and belief, Defendants regularly communicated with employees, including Plan participants, about Grace's performance, future financial and business

prospects, and the Grace Funds and/or Grace stock, upon information and belief, one of the largest single assets in the Plan. Upon information and belief, during the Class Period, the Defendants fostered a positive attitude toward the Grace Funds and/or Grace stock as a Plan investment, and/or allowed Plan participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in the Grace Funds and/or Grace stock. As such, Plan participants could not appreciate the true risks presented by investments in the Grace Funds and/or Grace stock and therefore could not make informed decisions regarding investments in the Plan.

**D.    Defendants Suffered From Conflicts of Interest**

92.    Grace's SEC filings, including annual reports on form 10-K, during the Class Period, make it clear that a number of the corporate Directors and Executive Officers compensation is in the form of stock grants or stock option grants.

93.    Because the compensation of at least some Defendants, and likely others, was significantly tied to the price of Grace stock, Defendants had incentive to keep the Plan's assets heavily invested in Grace stock on a regular, ongoing basis, at least prior to the Company's Chapter 11 filing. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Grace stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Grace stock, resulting in lower compensation for the Defendants.

94.    Some Defendants may have had no choice in tying their compensation to Grace stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a

26

large extent in Grace stock, or whether to properly inform participants of material negative

information concerning the above-outlined Company problems.

95.    These conflicts of interest put the Defendants in the position of having to choose

between their own interests as executives and stockholders, and the interests of the Plan

participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve

with an "eye single."

## CLAIMS FOR RELIEF UNDER ERISA

96.    At all relevant times, Defendants were, and acted as fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

97.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

98.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches

any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such

breach, and to restore to such plan any profits of such fiduciary which have been made through

use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial

relief as the court may deem appropriate, including removal of such fiduciary.

99.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the*

*interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to*

*participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

     100.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

*duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They

entail, among other things:

        a.     The duty to conduct an independent and thorough investigation into, and

              continually to monitor, the merits of all the investment alternatives of a

              plan;

        b.     A duty to avoid conflicts of interest and to resolve them promptly

              when they occur.  A fiduciary must always administer a plan with an "eye

              single" to the interests of the participants and beneficiaries, regardless of

              the interests of the fiduciaries themselves or the plan sponsor;

        c.     A duty to disclose and inform, which encompasses: (1) a negative

              duty not to misinform; (2) an affirmative duty to inform when the fiduciary

              knows or should know that silence might be harmful; and (3) a duty to

              convey complete and accurate information material to the circumstances of

              participants and beneficiaries.

     101.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

          "...in addition to any liability which he may have under any other
          provision of this part, a fiduciary with respect to a plan shall be liable
          for a breach of fiduciary responsibility of another fiduciary with
          respect to the same plan in the following circumstances: (A) if he
          participates knowingly in, or knowingly undertakes to conceal, an act

or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

102.    Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## CAUSATION

103.    The Plan suffered many millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Grace Funds and/or Grace stock during the Class Period, in breach of Defendants' fiduciary duties. This loss was reflected in the diminished account balances of the Plan's participants.

104.    Defendants are responsible for losses caused by participant direction of investment in the Grace Funds and/or Grace stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Grace Funds and/or Grace stock, and Defendants remain

00002748.WPD ; 1                                29

liable under ERISA for losses caused by such investment.

105.    Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in the Grace Funds and/or Grace stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

106.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in the Grace Funds and/or Grace stock, eliminating the Grace Funds and/or Grace stock as an investment alternative when it became imprudent, and divesting the Plan from the Grace Funds and/or Grace stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in the Grace Fund and/or Grace stock.

## COUNT I

### Failure to Disseminate Necessary Information

107.    Plaintiff incorporates the allegations contained in the previous paragraphs of thus Complaint as if fully set forth herein.

108.    ERISA fiduciaries have a duty to speak truthfully, to not mislead participants, and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan.  In a plan with various funds available for investment, this duty to inform and disclose includes: (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from making material misrepresentations.

00002748.WPD ; 1                              30

109.    A fiduciary must not only disclose complete and correct material information, but must provide information (even where not requested) if failing to convey the information would be harmful to participants. In essence, a fiduciary must act to protect participants from losses when he knows or should know of facts that cast doubt on the soundness of certain plan investment alternatives.

110.    The Defendants breached their fiduciary duties by failing to provide Plan participants and beneficiaries with complete and accurate information regarding investment in Grace stock, including, but not limited to Grace's under-funding of its asbestos-related litigation reserves and failing to account for its increasing liability in the wake of its co-defendants' bankruptcy filings. The Defendants failed to provide Plan participants and beneficiaries of the Plan information regarding the true risk of investment in the Grace Common Stock Fund and Grace stock given Defendants' knowledge of the mounting asbestos liability, probability of a future bankruptcy filing and the negative effects these factors would have on Grace stock ownership. The Defendants provided misleading, incomplete, and inaccurate information regarding the true financial state of Grace *vis-a-vis* its asbestos-related litigation expenses/liabilities through press releases, SEC filings, and elsewhere, characterized Grace as a healthy, growing business concern. The Defendants' failure to inform the public and Plan participants of the likelihood and immense size of potential asbestos litigation artificially inflated the value of Grace stock, and misled participants and beneficiaries regarding the soundness and prudence of investing their retirement benefits in Grace stock during the Class Period. This information was especially critical because investment in Grace stock was, by definition, an undiversified investment in a single company's common stock and, as such, carried with it an

31

inherently high degree of risk.

## COUNT II

### Breach of Duty to Prudently Manage and Invest Plan Assets

111.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112.   A fiduciary's duties of loyalty and prudence also entail a duty to continually monitor and, if necessary and prudent, conduct independent investigations into the relative merits of all the Plan's investments and of the investment alternatives available in a plan, including employer securities, to ensure that each investment is suitable and prudent.

113.   Defendants breached this duty with respect to the Company stock investment.  By the beginning of the Class Period, if not before, Grace Funds and/or Grace stock were plainly unsuitable and imprudent investment options for the Plan and its participants and beneficiaries. By no later than the beginning of the Class Period, the Defendant-fiduciaries could and should have made a determination that the Grace Funds and/or Grace stock were not suitable and prudent investments for the Plan, either for a participant's discretionary account or for the Company's matching investments, and should have taken appropriate action  as soon as the stock became imprudent, including adoption of a reasonable policy of divestment, elimination or restriction of further investment, corrective disclosure to Plan participants, and/or notification of the Secretary of Labor.

114.   The Defendants further breached their fiduciary duties by not monitoring or putting in place procedures to monitor the actions of the Committee and/or any other employees designated by Grace to administer the Plan, and other Plan fiduciaries.

115.    Under ERISA, fiduciaries are responsible for the prudence of plan investments and liable for losses resulting from breach of their duty of prudence.  The defense to such liability provided for in ERISA § 404(c), 29 U.S.C. § 1104(c), is unavailable to Defendants here because the Plan and the Fiduciary Defendants' administration thereof did not satisfy the requirements of the statute or the regulations promulgated thereunder.

## COUNT III

## Claim for Relief for Co-Fiduciary Liability in Violation of ERISA § 405

116.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117.    By virtue of the facts alleged herein, Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a)(1), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of these breaches, failed to make reasonable efforts to remedy these breaches.  Accordingly, the Defendants, as fiduciaries of the Plan, are each liable for the others' violations pursuant to ERISA §§ 405(a)(2) and (3), 29 U.S.C. §§ 1105(a)(2) and (3).

118.    ERISA imposes strict co-fiduciary duties on plan fiduciaries.  ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (a)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(b)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(c)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach

119.    Each of the Defendants (i) participated knowingly in or undertook to conceal an act or omission described in this Claim of another fiduciary, knowing such act or omission was a breach, or (ii) in failing to discharge his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim, or (iii) had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach, and, therefore, was also a co-fiduciary liable for the breaches committed by each other fiduciary under ERISA § 405, 29 U.S.C. § 1105. As discovery progresses in these cases, Plaintiffs will seek leave to amend this Complaint to identify those Defendants, in addition to the Defendants named in this Complaint, with co-fiduciary liability as described in this paragraph.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

120.    The Defendant fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Grace equity.

121.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

122.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries .

. . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other

equitable or remedial relief as the court may deem appropriate . . . ."

     123.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result

in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in

the plan would not have made or maintained their investments in the challenged investment and,

where alternative investments were available, that the investments made or maintained in the

challenged investment would have instead been made in the most profitable alternative

investment available.  In this way, the remedy restores the values of the plan's assets to what they

would have been if the plan had been properly administered.

     124.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the

form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan

resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c)

reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the

common fund doctrine, and other applicable law; (d) taxable costs and interest on these amounts,

as provided by law; and (e) such other legal or equitable relief as may be just and proper.

     125.   Each Defendant is jointly liable  as a co-fiduciary for the acts of the other

Defendants.

00002748.WPD ; 1

35

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in the common stock of Grace maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Grace;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

00002748.WPD ; 1

36

I.    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable monetary relief

against the Defendants.

DATED: June 16, 2004

Respectfully submitted,

**GILMAN AND PASTOR, LLP**

By:  _David Pastor_

David Pastor (BBO #391000)
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Gerald D. Wells, III
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone:  (610) 667-7706
Facsimile:   (610) 667-7056

**SLEVIN & HART, P.C**
Thomas J. Hart
1625 Massachusetts Avenue, N.W.
Suite 450
Washington, D.C.  20036
Telephone:  (202) 797-8700

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)_____Keri Evans v. John F. Akers, et al.____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

    [ ] I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [X] II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        *Also complete AO 120 or AO 121
                                                                                    for patent, trademark or copyright cases

    [ ] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    [ ] IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    [ ] V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.       N/A

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                                        YES [ ]    NO [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
                                                                        YES [ ]    NO [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                                        YES [ ]    NO [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                                        YES [ ]    NO [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                                        YES [X]    NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?
        Eastern Division [X]    Central Division [ ]    Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
        Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                                        YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    David Pastor
ADDRESS    Gilman and Pastor, LLP, 999 Broadway, S. 500, Saugus, MA 01906
TELEPHONE NO.    781-231-7850

(Coversheetlocal.wpd - 10/17/02)