**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KERI EVANS and TIMOTHY WHIPPS, on behalf of themselves and a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN F. AKERS, RONALD C. CAMBRE, MARYE ANNE FOX, JOHN J. MURPHY, PAUL J. NORRIS, THOMAS A. VANDERSLICE, H. FURLONG BALDWIN, INVESTMENTS AND BENEFITS COMMITTEE, ADMINISTRATIVE COMMITTEE, BRENDA GOTTLIEB, W. BRIAN McGOWAN, MICHAEL PIERGROSSI, ROBERT M. TAROLA, EILEEN WALSH, DAVID NAKASHIGE, ELYSE NAPOLI, MARTIN HUNTER, REN LAPADARIO, STATE STREET BANK & TRUST COMPANY,   STATE STREET GLOBAL ADVISORS, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, <br><br> Defendants. | Civil Action No.  04-11380 (WGY) <br><br> FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 <br><br> CLASS ACTION COMPLAINT <br><br> **JURY TRIAL DEMANDED** |

Consolidated With:

BUNCH et al.,

Plaintiffs,

v.

W.R. GRACE & CO., et al.,

Defendants.

THIS DOCUMENT RELATES TO:

The Evans Action

## PREFATORY NOTES

- On April 2, 2001, W. R. Grace & Co. ("Grace" or the "Company") and 61 of its U.S. subsidiaries filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. References herein to "Grace" include W. R. Grace & Co. and its subsidiaries. The bankruptcy case is ongoing. As such, this action is stayed as to Grace unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs are not prosecuting this action vis-a-vis Grace.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Grace,[1] Plaintiffs will notify the Court and will proceed against Grace.

- To the extent that proceeding against "committees" of Grace, as enumerated herein, will be deemed violative of the bankruptcy proceeding, Plaintiffs will only proceed against the committees' members as set forth herein.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiffs, which are partially based on personal knowledge. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiffs will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

Plaintiffs Keri Evans ("Evans") and Timothy Whipps ("Whipps") (together, the "Plaintiffs"), on behalf of the W.R. Grace & Co. Savings and Investment Plan (the "Plan"), themselves and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Defendants, fiduciaries of the Plan.

2.    401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may

---

[1] Plaintiffs, if permitted to bring an action against Grace, would allege that Grace, a fiduciary to the Plan, breached its fiduciary duties to the Plan and its participants under ERISA by its own actions regarding the Plan's administration and management of its assets. Grace is also responsible for the actions of its employees and agents through the doctrine of *respondeat superior* and/or ERISA Section 405.

have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio.  Common stock of W.R. Grace & Co. ("Grace" or the "Company"), the Plan's sponsor, was one of the Plan's investments/investment alternative during the Class Period (as defined below).

3.      Plaintiffs were employed with Grace and participants in the Plan during the Class Period.  Plaintiffs' retirement investment portfolio in the Plan during the Class Period included Grace stock.

4.      Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to the Plan, themselves, and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's various and heavy holdings of Grace stock.

5.      Specifically, Plaintiffs allege in Count I that the Defendants, each having certain responsibilities regarding and/or authority over the management of the investment of Plan assets, breached their fiduciary duties to them, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Grace securities by (1) continuing to offer Grace common stock as a Plan investment option for participant contributions, (2) utilizing Grace securities for employer contributions to the Plan, and (3) maintaining the Plan's pre-existing heavy investment in Grace securities when the stock was no longer a prudent investment for the Plan, running directly counter to the express primary purpose of the Plan which was to help provide funds for participants' retirement.

6.      Plaintiffs' Count II alleges that certain Defendants charged with the selection and monitoring of other Plan fiduciaries failed to (1) provide the "monitored" fiduciaries with material information regarding the imprudence of investing Plan assets in Grace securities and (2) remove certain such fiduciaries whose performance was deficient and caused damage to the

Plan and its participants.

7.    Plaintiffs' Count III alleges that certain Defendants failed to communicate to the Plan participants complete and accurate information regarding the Plan's investment in Grace securities sufficient enough to advise participants of the true risks of investing their retirement savings in Grace stock.

8.    Plaintiffs' Count IV describes how the Defendant-fiduciaries breached their duty of loyalty to the Plan and its participants by failing to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single"-minded fiduciaries with only the Plan's and its participants' best interests in mind.  Each count also alleges that, even if certain fiduciaries were not involved in the breach of fiduciary duty set forth in that particular count, they knew of and did nothing to stop, or indeed abetted, the particular breach and therefore were liable for breach of their co-fiduciary duties under ERISA § 405, 29 U.S.C. § 1105.

9.    Plaintiffs allege that Defendants allowed the heavy imprudent investment of Plan assets in Grace securities throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained below in detail, the perilous condition of the Company.  Factors contributing to the Company's condition were, in part, (1) setbacks in earlier asbestos liability litigation, (2) the rising number of newly-filed asbestos-related suits during the Class Period and (3) the Company's under-funding of its asbestos litigation reserves/funds.

10.    This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132.  Because Plaintiffs' claims apply to the Plan as a whole, and because ERISA specifically authorizes

participants such as the Plaintiffs to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan, and all affected participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.[2]

## PARTIES

**Plaintiffs**

13.    Plaintiff Evans worked for Grace, was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Grace shares in her retirement investment portfolio during the Class Period.

14.    Plaintiff Whipps worked for Grace, was a participant in the Grace Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Grace shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Board of Directors / "Director Defendants"**

15.    Defendant John F. Akers ("Akers") served on Grace's Board of Directors during

---

[2] Notably, Grace Performance Chemicals, a primary business unit of Grace, is headquartered at 62 Whittemore Avenue, Cambridge, MA, 02140, where it maintains twenty-one manufacturing sites, and approximately 3,300 employees.

the Class Period.  As director, Akers participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Akers was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

16.     Defendant Ronald C. Cambre ("Cambre") served on Grace's Board of Directors during the Class Period.  As a director, Cambre participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Cambre was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17.     Defendant Marye Anne Fox ("Fox") served on Grace's Board of Directors during the Class Period.  As a director, Fox participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Fox was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18.     Defendant John J. Murphy ("Murphy") served on Grace's Board of Directors during the Class Period.  As a director, Murphy participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the

ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Murphy was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19.    Defendant Paul J. Norris ("Norris") served on Grace's Board of Directors during the Class Period.   In addition, for at least a portion of the Class Period, Norris also served as the Company's President and Chief Executive Officer ("CEO").  As a director (indeed, as Chairman of the Board) Norris participated in the appointment of members of the Committee, and was responsible for, among other Plan-related duties described herein, the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Norris was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.    Defendant Thomas A. Vanderslice ("Vanderslice") served on Grace's Board of Directors during the Class Period.  As a director, Vanderslice participated in the appointment of members of the Committee, and was, among other Plan-related duties described herein, responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Vanderslice was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.    Defendant H. Furlong Baldwin ("Baldwin") served on Grace's Board of Directors during at least part of the Class Period.  As a director, Baldwin participated in the appointment of members of the Committee, and was responsible for, among other Plan-related duties described herein, the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Baldwin

was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Investment and Benefits Committee**

22.     Defendant Investment and Benefits Committee ("Committee") was the fiduciary responsible for selecting, maintaining, monitoring and evaluating the Plan's investments/investment vehicles during the Class Period. The Committee's duties and responsibilities are described in more detail herein and within Plan documents attached to this Complaint. The Committee, and each of its individual members, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Robert M. Tarola ("Tarola") served as Senior Vice President and Chief Financial Officer of Grace during the Class Period and was also a member of the Committee during the Class Period. Tarola was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     Eileen Walsh ("Walsh") served as a member of the Committee during the Class Period. Walsh was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Walsh also served as a member of the Administrative Committee during the Class Period (*see* below).

25.     David Nakashige ("Nakashige") served as a member of the Committee during the

Class Period.  Nakashige was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26.    Elyse Napoli ("Napoli") served as a member of the Committee during the Class Period.  Napoli was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27.    Martin Hunter ("Hunter") served as a member of the Investment and Benefits Committee during the Class Period.  Hunter also served as a member of the Administrative Committee during the Class Period, and as Vice President Finance-Treasury. Hunter was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.    Ren Lapidario ("Lapidario") served as a member of the Committee during the Class Period.  Lapidario was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Administrative Committee**

29.    Defendant Administrative Committee was tasked with the general administration and management of the Plan and, as indicated below, was the Plan's administrator as that term is defined in ERISA Section 3(16)(A).[3]  The Committee's duties and responsibilities are described

---

[3] As noted below, the Plan documentation currently available to Plaintiffs makes it unclear if the Administrative Committee existed throughout the Class Period or was, at some point, merged with/into the Committee.  Plaintiffs reserve their right to amend this Complaint to (1) make clear the overlap/existence of these and any other fiduciary committees and (2) to add additional individual members of these or any other fiduciary

in more detail herein and within Plan documents attached to this Complaint. The Committee, and each of its individual members, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

30.    Defendant Brenda Gottlieb ("Gottlieb") served as the Chairman for the Administrative Committee during the Class Period and signed the Company's 11-K Plan annual report filings for fiscal 2000 and 2001 in that capacity.  Gottlieb was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

31.    Defendant W. Brian McGowan ("McGowan") served on the Investment and Benefits Committee and the Administrative Committee during the Class Period.  McGowan was also the Company's Senior Vice President of Corporate Administration for at least a portion of the Class Period.  McGowan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

32.    Defendant Michael Piergrossi ("Piergrossi") signed, as Plan Administrator, the Company's Form 5500 annual reports for fiscal year 2000 for both the Hourly and Salary Plans, as well as the Hourly Plan's Form 5500 for fiscal year 2001 and Salary Plan's for fiscal 2002. Upon information and belief, Piergrossi was a member of the Administrative Committee and a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority

---

committees.  As this information is almost always solely in the hands of Defendant-fiduciaries, Plaintiffs will need to engage in significant discovery in order to properly evaluate the need for any such amendment(s).

with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Investment Manager**

33.    Defendant State Street Bank & Trust Company acted as an investment manager and was a fiduciary to the Plan during the Class Period. State Street Bank & Trust Company was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

34.    Defendant State Street Global Advisors acted as an investment manager and was a fiduciary to the Plan during the Class Period. State Street Global Advisors was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

35.    State Street Global Advisors is the fiduciary arm of State Street Bank and Trust Company.  Both entities are referred to in the Plan documents, seemingly interchangeably.  As such, State Street Bank and Trust Company and State Street Global Advisors are referred to, collectively, as "State Street."

## THE PLAN

**The Nature of the Plan**

36.    The W. R. Grace & Co. Savings and Investment Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

37.     On December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and Investment Plan (the "Hourly Plan") was merged with the W. R. Grace & Co. Salaried Employees Savings and Investment Plan (the "Salaried Plan"), forming the current Plan. Effective on the date of the merger, $34,303,697 was transferred from the Hourly Plan into the Plan.  On January 1, 2002, the newly augmented Plan was renamed the W. R. Grace & Co. Savings and Investment Plan, (i.e., the "Plan").[4]

38.     The Plan is offered to employees as "a convenient way to save regularly."  *See* 2004 Summary Plan Description ("2004 SPD"),[5]  GR000309 (attached hereto as Exhibit A).

39.     The Plan is sponsored by Grace.  *See* Form 11-K Plan annual report filed with the Securities and Exchange Commission ("SEC") on June 27, 2003 for Fiscal Year 2002 (the "2002 Form 11-K") (attached hereto as Exhibit B); 2004 SPD, GR000357.

**History of the Plan**

40.     The current Plan evolved over the years as a result of a number of corporate mergers and savings plan integrations.  According to the W.R. Grace & Co. Savings Plan, amended through July 1, 2004[6]:

> The W.R. Grace & Co. Salaried Employees and Investment Plan (the "Plan") was originally established by W.R. Grace & Co., a Connecticut Corporation ("Grace Connecticut"), as of September 1, 1976. . . .
>
> As a result of corporate reorganization whereby Grace Connecticut became a subsidiary of W.R. Grace & Co., a New York Corporation ("Grace New York") (and was renamed "W.R. Grace & Co. –Conn."), Grace Connecticut amended the Plan

---

[4] Because the Class Period begins prior to the merger, Plaintiffs bring these claims on behalf of the Plan's predecessors as well, including the Hourly and Salaried Plans.

[5] SPDs are referred to herein by their year.  All cited documents are attached hereto.

[6] Only the history of the Plan relevant to the context of Plaintiff's claims, primarily corporate history, is included here.  There is additional information in this description that Plaintiffs omit, including a number of past Plan amendments.

effective May 25, 1988 and Grace New York adopted the Plans, as amended, with respect to its eligible employees and assumed the sponsorship of the Plan on behalf of itself and its participating subsidiaries as of such date.

Grace New York thereafter amended the Plan effective January 1, 1989 and effective July 1, 1989, to, among other things, establish an employee stock ownership plan (within the meaning of section 4975(e)(7) of the Internal Revenue Code of 1986, as amended) which forms a portion of the Plan. . . .

**** 

Effective September 27, 1996, as a result of a transaction whereby National Medical Care, Inc. became a part of Fresenius Medical Care AG ("Fresenius"), Grace New York also became part of Fresenius, and the Plan became sponsored by a Delaware corporation, renamed W.R. Grace & Co. ("Grace I").

****

Effective March 31, 1998, as a result of a transaction whereby the Cryovac business of Grace-I became part of Sealed Air Corporation, Grace I also became part of Sealed Air Corporation and the Plan became sponsored by a Delaware corporation, renamed W.R. Grace & Co. ("Grace").

****

Effective at the beginning of the Plan Year commencing January 1, 2002, the W.R. Grace & Co. Savings and Investment Plan for Hourly Employees is being merged into the W.R. Grace & Co. Savings and Investment Plan for Salaried Employees, and the name of the Plan is changed [from] the W.R. Grace & Co. Savings and Investment Plan for Salaried Employees to the W.R. Grace & Co. Savings & Investment Plan, effective immediately after such merger.

W.R. Grace & Co. Savings and Investment Plan, as amended through July 1, 2004 ("2004 Plan")

(attached hereto as Exhibit C),[7] GR001655-57.

**The Structure of the Plan**

41.    Eligible employees may join the Plan on the first of any month on or after

completing three months of service with the Company during which they have at least 250 hours

of service.  2003 SPD (attached hereto as Exhibit D), GR000248. (Upon information and belief, these requirements were modified during the Class Period but these modifications are not pertinent to the instant pleading).

42.    As of July 1, 2004, participants were permitted to save between 2 to 25 percent of their pay in either before- or after-tax dollars or a combination of both, in steps of 1 percent. 2004 SPD, GR000311. (Plaintiffs note the percentage of compensation participants were allowed to contribute during the Class Period changed over time.  *E.g.*, the 2003 SPD stated that participants were allowed to contribute 2 to 16 percent of their eligible contribution to the Plan. *See* 2003 SPD, GR000249).

43.    The Plan's assets were held together in a single master trust, as described in the 2004 Plan, GR001787:

> A Trust Fund shall be established by a Trustee or Trustees appointed from time to time by the Board of Directors.  All assets of the Plan shall be deposited in the Trust Fund.  The corpus and income of the Trust Fund shall be used to provide benefits under the Plan and to defray the reasonable expenses of Plan administration and no part thereof shall be used for or diverted to purposes other than for the exclusive benefit of Participants. . . . Effective July 1, 1989, the Trustee of the Plan was appointed as the Trustee of the ESOP portion of the Trust Fund.

*See also* 2002 SPD (attached hereto as Exhibit E), GR000192 ("Your savings, company contributions, and related earnings are held in a trust fund that has been set up for the sole benefit of participants and their beneficiaries").

44.    The Plan's Trustee is Fidelity Management Trust Company ("Fidelity" or the "Trustee").[8]  *See* Master Trust Agreement Between W.R. Grace & Co. and Fidelity Management Trust Company, ("Trust Agreement") dated July 1, 1993 (including amendments) (attached

---

[7] Plan documents are referred to herein by reference to their year.

hereto as Exhibit F).

45.     The Investment and Benefits Committee is responsible for directing Fidelity with regard to the investment of Plan assets.  *See* Trust Agreement, GR001191-92.

46.     The Plan is managed by the Company, the Board of Directors, the Investment and Benefits Committee and, for at least a portion of the Class Period, the Administrative Committee.

47.     The Administrative and Investment and Benefit Committees share responsibility for administration of the Plan. [9] *See, e.g.* 2004 SPD, GR000357 ("The plan administrator is the Administrative Committee of the W.R. Grace & Co. Benefit Plans. . . .  The Investment and Benefits Committee has the full, exclusive, and discretionary authority to interpret the terms of the plan, except to the extent that such authority has been delegated to the Administrative Committee."); 2001 Hourly SPD (attached hereto as Exhibit G), GR000110; *see also* 2001 Salaried SPD (attached hereto as Exhibit H), GR000175 (same) ("The plan administrator is the Investment and Benefits Committee of the W.R. Grace & Co. Hourly Employees Savings and Investment Plan . . . .  The Investment and Benefits Committee is responsible for the management and operation of the plan, and has the full, exclusive, and discretionary authority to determine eligibility for benefits and to interpret the terms of the plan.").

48.     The Plan provided for Participant contributions as well as Company contributions.

**Participant Contributions**

49.     "Each Participant shall elect to have the Company make Before Tax Contributions on his behalf in accordance with Section 3.02, or shall elect to make After Tax

---

[8] Fidelity, a party to Plaintiff's initial complaint, has been dismissed from this action without prejudice, upon agreement of the Plaintiffs and Fidelity.

Contributions as to the Plan in accordance with Section 3.03, or both."  2004 Plan, GR001690.

50.    The Plan offered participants a number of investment options, including the:

> Grace Common Stock Fund (fund Code: 93857).  This is a fund that pools your money with that of other employees to buy shares of stock of Grace or its affiliates and an amount of short-term investments designed to allow you to buy or sell without the usual trade settlement period for individual stock transactions.  Your ownership is measured in units of the fund instead of shares of stock. . . .

> This fund seeks to increase the value of your investments over the long term by investing in the common stock of your company.  Under normal circumstances, this fund primarily invests in Grace stock as well as in short-term investments.  The amount of short-term investments is based upon a target established by the Company, but the actual amount of short-term investments on any given business day will vary with the amount of cash awaiting investment and with participant activity in the fund (contributions, payments, investment transfers, withdrawals, etc.).  The value of your investment will vary depending on the performance of the Company, the overall market, and the performance and amount of short-term investments held by the fund, less any expenses accrued against the fund.  Investing in a non-diversified single stock fund involves more risk than investing in a diversified fund.

> The Investment and Benefits Committee (or its designee) manages the Grace Common Stock Fund by purchasing shares of Grace common stock and selling these shares to the extent necessary to obtain cash for payments and transfers from this fund."

2002 SPD, GR000196.  *See also* 1998 Salaried SPD (attached hereto as Exhibit I), GR000013;

2001 Hourly SPD, GR000066; 2004 Plan, GR001729.

**Company Contributions**

51.    The Company provided matching contributions to the Plan as a benefit for

participants.  *See generally* Section 4 of the 2004 Plan; 1997 Master Plan Document – Reflecting

2002 Merger of Plans  (attached hereto as Exhibit J), GR001548.

---

[9] It appears that at some point during the Class Period, the Investment and Benefits Committee assumed the duties of the Administrative Committee.  As noted above, Plaintiffs will seek to clarify this point once they have

52.     During at least part of the Class Period, the Company matched 100 percent of participants' savings, "up to the first 6 percent of pay you save."  *See e.g.*, 1998 Salaried SPD, GR000008.

53.     The Board of Directors, along with the Investment and Benefits Committee, was responsible for managing the Company match:

> Important!  The current dollar-for-dollar Company match, up to the first 6 percent of pay you save, has been authorized by Grace's Board of Directors for the two-year period from January 1, 2001 through December 31, 2002.  You'll be advised before the end of this two-year period whether or not any changes to the Company match will be made.

2001 Salaried SPD, GR000126.  *See also*, 2002 SPD, GR000191 (making same announcement for the period up through December 31, 2003).

54.     From the beginning of the Class Period to January 1, 2001, Company Matching Contributions were made to the portion of the Trust purporting to be an Employee Stock Ownership Plan ("ESOP").  As such, Company Matching Contributions were made in Grace stock or made with cash used to purchase Grace stock.  2004 Plan, GR001704.

55.     Nonetheless, the Plan also provided that "[t]he Trustee may also invest the assets of the ESOP portion of the Trust Fund in such other investments as the Investment and Benefits Committee deems appropriate or desirable or such assets may be held temporarily in cash."  2004 Plan, GR001732; *Cf.* 1998 Salaried SPD, GR00017.

56.     Company matching contributions were originally – during the period delineated above -- invested in Grace stock in the "Company Contribution Fund."  "The Company contributions credited to your account are deposited in the Company Contribution Fund, which invests primarily in Grace common stock.  Dividends earned in this fund may be reinvested in

---

conducted discovery.

Grace common stock or paid to participants as directed by the Board of Directors." 1998 Salaried SPD, GR000017.

57. Further, at the beginning of the Class Period, participants were not permitted to remove their Company contributions in Grace stock from the Company Contribution Fund. "If you're **age 50 or older**, *once each calendar year* you may elect to transfer all or part of the Company contributions and related earnings credited to your account in the Company Contribution Fund . . . . If you're under age 50, Company contributions and related earnings credited to your account may **not** be transferred out of the Company Contribution Fund or the Sealed Air Funds." (emphasis original). 1998 Salaried SPD, GR000018.

58. After January 1, 2001, however, Company Matching Contributions were made to the Savings Plan portion of the Trust, and were allocated to participants' investment funds in accordance with participants' investment elections. 2001 Salaried SPD, GR001703. "As of January 1, 2001, the Company contributions that are credited to your account are invested according to the investment elections you have made for your own savings. . . . Before January 1, 2001, the Company contributions that were credited to your account were deposited in the Company Contribution Fund, which primarily invested in Grace common stock or paid to participants as directed by the Board of Directors." 2001 Salaried SPD, GR000139. *See also* 2002 SPD, GR000206; 2004 SPD, GR000328.

**The Plan's Investment in Grace Securities**

59. The Plan offered participants the opportunity to invest in Grace common stock throughout almost all of the Class Period. After the Company stopped investing Company matching contributions in Grace stock, participants were still permitted (and encouraged) to invest in Grace via the Grace Common Stock Fund.

60.    According to the 1998 Salaried SPD (GR000013), the Grace Common Stock Fund "seeks long-term capital growth, current income, and growth of income by investing primarily in Grace common stock.  The fund invests a small portion of its assets in money-market instruments for liquidity purposes.  Dividends earned in this fund (if any) are automatically reinvested in Grace common stock."  1998 Salaried SPD, GR000013.  "The Investment and Benefits Committee (or its designee) manages the Grace Common Stock Fund…."  *Id.* at GR000014.

61.    Eventually, the Company permitted participants to divest their Company matching contributions out of Grace stock into other investments, if they so wished.  "We're pleased to announce that, as of January 1, 2000, you'll be able to choose the investment of matching company contributions the same way as you can your own savings.  That is, you'll be able to invest all or part of the matching contributions credited to your account in any available investment option, including the Company Contribution Fund.  You may not, however, invest matching company contributions in the Grace Stock Fund – this fund is only available for the investment of your own savings."  *See* January 2000 Grace Benefit News (attached hereto as Exhibit K), GR001820.

62.    "We also changed the requirement that the Company match be provided in the form of Grace stock.  In the future, you will be able to self direct the Grace matching contributions in the same manner as you direct your own savings.  These changes become effective on January 1, 2001, and the 100% match will last for two years.  These special enhancements come as a consequence of market uncertainty surrounding companies, like Grace, that have significant asbestos liabilities.  When our stock traded on market fundamentals, employees realized good growth in the Grace stock funds.  These enhancements are intended to

provide you with greater investment flexibility and, in some respect, to help restore the investment potential of the Plan." *See* December 15, 2000 letter to Plan participants from Defendant Norris (attached hereto as Exhibit L), GR001833.

63. Nonetheless and despite this lukewarm and completely insufficient fiduciary communication, participants were ***still*** permitted to invest in Grace stock. "Participants will, however, continue to be permitted to transfer money from the Company Contribution Fund to other available investment options, and will continue to have the ability to invest in Grace common stock as described above." *See* Summary Material Modification, effective January 1, 2001 (attached hereto as Exhibit M), GR001834.

64. Too late for the Plan, the fiduciaries finally began to admit the absolute imprudence of maintaining Plan investments in Company stock. "Effective as of the close of business April 9, 2003, the short term investments in the Grace Common Stock Fund and the ESOP shall be liquidated and the proceeds immediately transferred to the Fixed Income Fund, and credited to each Savings Plan Account, on a pro-rata basis, in accordance with the interest in those Funds, of each affected Participant, Inactive Participant or former Participant, as of that date. Effective April 10, 2003, all transactions involving the Grace Common Stock Fund and the ESOP shall be suspended. During such suspension, these two Funds shall be merged into one fund, called the "Grace Stock Fund." 2004 Plan, GR001741.

65. Notably, the Plan's heavy investment in Grace stock during the Class Period resulted in devastating losses to participants' retirement accounts. For example for the year ended December 31, 1999, the Hourly Plan and the Salaried Plan, combined, held approximately 9,328,844 shares of Grace stock worth a then-current market value of approximately $62,835,218. However, by the year ended December 31, 2002, the Plan held 23,703,537 shares

of Grace stock worth a then-current market value of merely $24,101,477, representing a 38%

decrease in *gross* value, notwithstanding a 40% increase in the ***gross number*** of shares held by

the Plan.

66.    In a March 17, 2003[10] memo to all participants in Plan (attached hereto as Exhibit

N), Defendant McGowan explained the belated decision to stop the Plan from investing in Grace

stock:

> Over the last few years, in a variety of forums, the point has been
> made that the price of Grace stock no longer reflects the
> Company's solid operating results. Instead, the market has been
> reacting to a number of different issues. Principal among them is,
> most likely, the speculation surrounding the value of Grace's
> asbestos liabilities and its effect on the value of shareholders'
> equity in any Chapter 11 plan of reorganization.
>
> ****
>
> We are now approaching a period when speculation regarding the
> value of Grace's asbestos liabilities (and other liabilities), and the
> possible provisions of a plan of reorganization (emergence), will
> likely increase. Such speculation is inevitable as we approach the
> March 31, 2003 bar date for filing all claims (except asbestos
> personal injury and Zonolite attic insulation claims). Also, court
> proceedings, discussions and other activities, which address the
> value of the liabilities and a plan of reorganization, are likely to
> become more intense and are likely to become more intense and
> consume more time of the Grace Board of Directors and
> Management.
>
> Following a thorough discussion on this matter with the Grace
> Board and outside advisors, the Company has determined that it is
> necessary to implement another change regarding Grace stock
> within the S&I Plan, which will further limit the participants'
> exposure to such speculation.
>
> Effective April 21, 2003, participants in the Plan will not be

---

[10] In addition, during this time period, the fiduciaries initiated a "blackout" period, lasting several weeks, when Plan participants were unable to divest their holdings of Grace stock, irrespective of their wishes to do so. *See* March 26, 2003 letter to Plan participants from Defendant McGowan (attached hereto as Exhibit O), GR001851. Plaintiffs reserve their right to amend this Complaint upon discovery targeted towards the decision-making behind and implementation of this "blackout" period.

allowed to make transfers of assets from other S&I Plan Funds into the Grace Stock Fund.

Also, payroll contributions to the S&I Plan, which are currently directed to the Grace Stock Fund, will be automatically redirected to the Fixed Income Fund, effective for all salaried and hourly payroll periods that begin on or after April 16, 2003. . . .

\*\*\*\*

We will continue to evaluate how best to manage the Grace Stock Fund and the Company Contribution Fund.  One approach being seriously considered is the appointment of an independent non-Grace entity (known as an independent fiduciary) to directly manage these two Funds.  Such an appointment would avoid any possible conflict of interest between Grace management's and the Grace Board's role in negotiating a plan of reorganization, and their role as fiduciaries of the Funds.

\*\*\*\*

Finally, as a general rule, if you have invested in the Grace Stock Fund or the Company Contribution Fund, you should evaluate the appropriateness of Grace stock in your investment portfolio, given market conditions, Grace's Chapter 11 status and your own personal risk tolerance.  In this regard, please refer to the 2002 Grace Annual Report on Form 10-K, which was filed with the SEC last week.  The 2002 Report is currently available through the Grace website (along with other investor information).  The Grace website is www.Grace.com.  To access the Reports, click on "Investor Information" as that website, then click on "SEC filings."  The 2002 Annual Report will be mailed in April to S&I Plan participants who hold Grace stock.

67.     "Effective April 17, 2003, the Grace Stock Fund shall cease to accept any contributions or allocations to that Fund, whether or not such contribution or allocation is directed by a Participant, Inactive Participant or former Participant, and whether or not such a contribution or allocation is directed to the ESOP Account within the Fund or the other portion of the Fund.  As of that date, all contributions designated for, or directed to, the Grace Stock Fund shall be redirected to the Fixed Income Fund."  GR001742

68.     Effective April 21, 2003 Grace retained Aon Fiduciary Counselors Inc. as the independent fiduciary for Grace stock in the Plan.  2004 Plan, GR001854.[11]

69.     Despite the recognition of the imprudence of Grace stock, the Defendants-fiduciaries continued to permit investment in it.  State Street sent a "Notice to Participants in Grace Stock Fund," dated January 26, 2004 (attached hereto as Exhibit P), which stated as follows:

> Finally, as a reminder, each participant should continue to consider carefully the advisability of his or her continued investment in the Grace Stock Fund, particularly given the high degree of risk and potential volatility of an investment in stock of a company that is in the middle of a bankruptcy reorganization proceeding.  Each participant should carefully evaluate whether the investment of his or her accounts in the Grace Stock Fund adequately reflects these risks and, in light of his or her particular situation, provides adequate diversification from an investment perspective.

GR001866.

70.     Not until February 27, 2004, did Plan fiduciaries inform participants that, as they knew during the Class period, investment in Grace stock was clearly imprudent, as described in a press release – "W.R. Grace & Co. . . . today announced that State Street Bank & Trust Company, which acts as investment manager and independent fiduciary for the Grace stock fund in Grace's Savings and Investment Plan . . ., has determined that it is no longer consistent with [ERISA] for the Plan to continue to hold all of the shares of Grace common stock currently in the stock fund.  State Street has advised the company that it is commencing a selling program of Grace shares in the fund, and has filed a Form 144 with the Securities and Exchange

---

[11] Plaintiffs have not named Aon Fiduciary Counselors, Inc. as a Defendant in this action at this time because it is not possible to tell, from available documentation, the exact breadth of their fiduciary responsibilities and duties during the Class Period.  Plaintiffs' will amend to add Aon if discovery dictates that they had discretion over the Plan investments in Grace stock and breached any duty to the Plan and its participants regarding such investment.

Commission."  *See* Exhibit Q attached hereto, GR001867.

71.    In a February 27, 2004 communication to the Plan's participants, State Street notified participants that, as investment manager for the Grace Stock Fund, it determined that "it is no longer consistent with ERISA for the Plan to continue to hold all of the shares of Grace stock currently in the Grace Stock Fund."  Thus, State Street commenced a program to sell Grace stock.  *See* Exhibit R attached hereto, GR001868.

72.    The February 27, 2004 communication included a "Questions and Answers" form that provided, in part, as follows:

> 6)    **The Plan document states that the Grace Stock Fund should be invested in Grace Stock, doesn't that prevent State Street from selling?**
>
> Under ERISA, a plan document is controlling only to the extent that the plan document is consistent with ERISA.  Thus, the plan document cannot override the ERISA fiduciary and investment requirements.  The United States Department of Labor has stated very clearly that a plan document may not be relied upon to avoid other ERISA requirements.
>
> 7)    **These are my shares, shouldn't I be able to decide what happens to them?**
> State Street has determined that it is not consistent with ERISA to continue to have the Grace Stock Fund invested in such a large block of Grace stock.  Therefore, it has decided to commence sales of Grace stock from the fund regardless of whether participants wish to remain invested in Grace stock.  Currently, you may at any time transfer all or part of your account balance in the Grace Stock Fund to other investment options available under the Plan. However as indicated in the enclosed notice to participants, State Street could determine that all participant transfers should be suspended in the best overall interests of the Plan and its participants.  You will be notified of any decision by State Street to suspend participant transfers, however, we may be unable to do so in advance of such restriction.

WRG001870.

73.    On April 12, 2004, Grace announced in a press release that State Street sold the

substantial remainder of all Grace shares to a single buyer at $3.50 per share.[12]  *See* Exhibit S,

GR001873.

74.    "As of April 21, 2003, no deposits into the Grace Stock Fund were permitted.  As

of April 15 and 16, 2004, all stock within this fund was sold at the direction of State Street Bank

& Trust Company, the fund's investment manager.  After the three-day settlement period related

to these sales, all proceeds from the sale of the stock were deposited into the plan's Fixed Income

Fund.  As of April 19, 2004, the Grace Stock Fund ceased to exist."  2004 SPD, GR000327.

## **DEFENDANTS' FIDUCIARY STATUS**

75.    During the Class Period Defendants had discretionary authority with respect to

the management of the Plan and/or the management or disposition of the Plan's assets.

76.    During the Class Period, all of the Defendants acted as "Named" or *de facto*

fiduciaries of the Plan pursuant to Section 3(21)(A) of ERISA, 29 U.S.C. Section  1002(21)(A),

and the law interpreting that section.

77.    ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan."  ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1).  The Plan's operative documents during the Class Period

describe the Investment and Benefits Committee and the Administrative Committee as named

fiduciaries of the Plan.

78.    Instead of delegating all fiduciary responsibility for the Plan to external service

providers, Grace chose to internalize at least some of these fiduciary functions.  Indeed, until

appointing State Street, the Grace Defendants maintained all fiduciary responsibility for the

---

[12] According to the complaint in the action consolidated with this action, *Bunch et al. v. W.R. Grace & Co. et al.* (the "*Bunch*" action), State Street in fact purchased the remaining shares itself and turned it over for a profit, further bringing into serious doubt State Street's compliance with its fiduciary duties.  *See e.g., Bunch* action complaint allegations, pp. 9-10.

Plan's investment in Grace stock.

**Director Defendants**

79.    The Director Defendants are given a number of fiduciary oversight responsibilities and duties regarding the Plan and its assets, as described in numerous sections herein, including discretion over Company matching contributions.

80.    In addition, the Director Defendants held the power to appoint/remove the members, and monitor the activities of, and the functions of the Investment and Benefits Committee, the Administrative Committee, and State Street.

81.    Director Defendants, including Defendant Norris as described above, communicated, on a Plan-wide basis, with participants regarding the prudence of investing in Grace stock.

**Investment and Benefits Committee**

82.    The Investment and Benefits Committee is a Named Fiduciary of the Plan as that term is understood pursuant to ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).  "The duties and responsibilities of the Committee include:  Developing, reviewing and revising Plan investment policies; Evaluating mutual fund or investment advisor performance, as appropriate; Selecting and eliminating mutual fund alternatives; Appointing/discharging investment managers and consultants; and Evaluating and recommending investment suggestions from investment advisors and others."  W.R. Grace & Co. Savings & Investment Plan Investment Policy Statement, Adopted March 1, 2004 (attached hereto as Exhibit T), GR001329.  These duties are described in more detail above.

83.    In addition, the Investment and Benefits Committee had the power to appoint investment monitors, and thus had the duty to monitor its appointees, including State Street.

**Administrative Committee**

84.    The Administrative Committee served as a fiduciary of the Plan for at least part of the Class Period.  "The general administration of the Plan and the responsibility for carrying out its provisions (excluding any decisions as to investment and reinvestment of the Trust Fund) shall be placed in an Administrative Committee (or any appropriate designee of that Committee) consisting of not less than three persons who shall be appointed from time to time by the Board of Directors of Grace (or its designee) to serve at its pleasure. . . .  Effective June 14, 1995, the Administrative Committee shall be the Investment and Benefits Committee as created by the Board of Directors as of that date."  2004 Plan, GR001791.

**State Street**

85.    State Street was also a named fiduciary of the Plan.  "State Street acknowledges that, in acting under this Agreement as an investment manager, it will be acting as a fiduciary within the meaning of Section 3(21)(A) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), with respect to the Account [of the Trust containing Company Stock].  In such capacity, State Street will exercise independent discretionary judgment in the performance of its obligations hereunder in accordance with the fiduciary requirements set forth in Part 4 of Subtitle B of Title I in ERISA."  [GR001299]]

86.    A December 8, 2003 letter to Plan participants from W. Brian McGowan, Senior Vice President, Administration (attached hereto as Exhibit U), informed participants that, "[b]eginning December 15, State Street [Bank & Trust Company], rather than Grace, will have the responsibility to determine whether the continued investment in Grace stock is consistent with the law governing retirement plans, [ERISA]."  GR001865.  However, even if Grace successfully delegated some of its fiduciary duties to State Street, the fiduciary entities at Grace

retained overarching fiduciary duties to the Plan, including the duties of prudence and monitoring.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

87.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions.  Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

88.    During the Class Period, Defendants' direct and indirect communications with the Plan's participants included statements about the Company and its securities which caused the Plan, Plaintiff and members of the Class to purchase, and to hold and maintain, investments in Grace securities, and to accept at face value investments in Grace's securities.   These communications included, but were not limited to, Company SEC filings, including, but not limited to, those incorporated through the Company's September 29, 2000 S-8 filing, annual and quarterly reports, press releases and other communications from the Defendants-fiduciaries to the Plan's participants.   Defendants provided this information to participants, encouraged participants to review the information in these communications when evaluating the merits of investment in Grace securities and also acted as fiduciaries to the extent of this activity.

## CLASS ACTION ALLEGATIONS

89.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following

class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at
> any time between July 1, 1999[13] and April 19, 2004 (the "Class
> Period") and whose accounts included investments in Grace stock.

90.    The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time,
and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a
minimum, thousands of members of the Class who participated in, or were beneficiaries of, the
Plan during the Class Period.

91.    Common questions of law and fact exist as to the Plan and all members of the
Class and predominate over any questions affecting solely individual members of the Class.
Among the questions of law and fact common to the Plan and Class are:

(a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs and
members of the Class;

(b)    whether Defendants breached their respective fiduciary duties to the Plan,
Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the
Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan and members of the Class have sustained damages and, if
so, what is the proper measure of damages.

92.    Plaintiffs' claims are typical of the claims of the members of the Class because
Plaintiffs and the other members of the Class each sustained damages arising out of the

---

[13] Plaintiffs note that discovery may very well reveal that the Plan's fiduciaries, including certain
Defendants, knew or should have known of the imprudence of investing Plan assets in Grace stock before July 1999.
Plaintiffs reserve the right to amend the class period, through amendment of this Complaint and/or a motion for class
certification, upon uncovering of this information in discovery.

Defendants' wrongful conduct in violation of federal law as complained of herein.

93.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

94.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests. Class action status is also warranted under the other subsections of  Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

### A.    Grace Stock Was an Imprudent Investment for the Plan Background

95.    Grace is a global supplier of catalysts and silica products, specialty construction chemicals and building materials, and container products.  It currently has annual sales of approximately $2 billion, over 6,000 employees and worldwide operations in nearly 40 countries.

96.     In 1954, Grace entered the specialty chemicals industry when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company.

97.     From 1970 through 1989, Grace sold Monokote® 4 and Monokote® 5, which were spray-applied fireproofing materials used to protect structural steel in a variety of commercial/industrial construction.  As explained more fully below, these products contained trace amounts of naturally occurring asbestos.  These products, in addition to other Grace products containing asbestos sold during the 1960s, 1970s and 1980s, would expose Grace to a raft of asbestos-related litigation from the 1980s through the present.

98.     In 1995, Grace began to divest its interest in many of its larger business lines, a continuation of a series of corporate reorganizations that it began at the beginning of the decade. According to an article appearing on www.seattlepi.nwsource.com, lawyers in the asbestos-related litigation against Grace claim that these corporate reorganizations were effectuated to conceal assets and cloud the corporate lines of responsibility.  Although the Company has denied these accusations, the Environmental Protection Agency ("EPA") has worked with forensic accountants at the Justice Department to determine whether or not the Company moved assets to its newly formed corporations.

**Asbestos-Related Litigation**

99.     Individuals with asbestos-related illnesses often take 20 years or more after exposure to exhibit symptoms.  This is normally well after the individual is removed from whatever exposed himself/herself to asbestos in the first place.

100.     Typically in asbestos-related litigation, plaintiffs will file suit against multiple defendants.  The litigation often lists 10 to 20 or more corporations that either produced asbestos or used it in products they manufactured.  The rising tide of asbestos-related personal injury

suits, caused in part by the time delay for the illness to manifest itself, caused 26 companies to file for Chapter 11 bankruptcy protection between 1982 and 2001.

101.    By November 1999, more than 250,000 individual asbestos-related suits had been filed against Grace.  In April 2001, the number of asbestos-related suits had risen to over 325,000 and had cost the Company nearly $2 billion.[14]

102.    Unlike many other asbestos suits where the manufacturer/distributor of the product that may have exposed an individual to asbestos is not clearly identifiable, Grace was the principle defendant in numerous asbestos-related suits where it was clearly the primary, if not only, defendant.  For example, Grace was the primary supplier of asbestos-tainted vermiculite for "Zonolite" attic insulation, which was used in as many as 2 million homes around the United States.  Hence, Grace is the principle defendant in suits brought by the homeowners who used Zonolite, as well as the employees who worked at vermiculite plants around the U.S.

103.    Additionally, Grace was the primary defendant in suits brought by miners and other employees of companies that processed vermiculite.  A prime example of this is Grace's Libby, Montana vermiculite mines which it operated from 1963 to 1990.  Health problems related to the Libby mine first began to surface in 1999.  In 2001, the federal government conducted a health screening of the 6,114 people who live, or lived, in or near Libby during the Class Period.  Analysis of the first 1,067 examinations showed that 30% of the people screened exhibited signs of asbestos-related disease.

104.    In 2003, a federal judge ordered Grace to repay the federal government the $54.5

---

[14] It is estimated that, during the course of asbestos-related illness, it can cost a person between $300,000 to $500,000 for hospitalization, oxygen, medication and home care (notably these figures are 2001 estimates).  Due to the high costs of health care for individuals with asbestos-related illness, financial claims against a company can quickly climb into the tens of millions of dollars even if only a relatively small number of people were exposed.  Unfortunately for Grace, the number of people that it potentially exposed to its asbestos-tainted products number in the thousands.

million that the government spent investigating and cleaning up the asbestos-riddled town of Libby.  Noting the magnitude of the payment, the Justice Department announced that it was the largest post-trial judgment ordered in the history of the federal Superfund law.[15]  Grace also agreed to spend $2.75 million to create a fund to provide additional health care for Libby residents with asbestos-related diseases.  As of 2003, asbestos contamination had been blamed for 200 deaths and the health problems of further hundreds of Libby area residents.

**Effects of the Asbestos-related Suits on the Asbestos Industry**

105.    On June 23, 1999, the United States Supreme Court issued its opinion in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), overturning a circuit court ruling that would have enabled asbestos defendants to manage their liability exposure by settling claims on a global scale.  That decision followed by two years the Court's rejection of another, earlier global settlement, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  These Supreme Court decisions ended the ability of asbestos defendants, such as Grace, to limit their asbestos-related liability exposure without filing for bankruptcy.[16]

106.    Given the avalanche of liability arising from individual asbestos suits that these Supreme Court decisions unleashed upon the asbestos industry, since at least the beginning of the Class Period, Grace and the other Defendants knew or should have known that asbestos liability threatened Grace's future, and that investing in Grace stock was an inherently losing

---

[15] "Superfund" is the better-known name for the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) passed by Congress in 1980.  Under this law, parties found responsible for polluting a site must clean up the contamination or reimburse the EPA for doing so. Liability is strict, retroactive, joint and several.

[16] Section 524(g) of the Bankruptcy Code (the "Code") was specifically adopted by Congress in 1994 to help resolve current and future asbestos liabilities through Code provisions.  Use of the provision, however, requires the debtor(s) to relinquish a majority of the company's equity value to a trust created to pay asbestos claims.  This aspect of the Code essentially guarantees that shareholders at the time of Grace's bankruptcy filing, such as the Plan, would lose virtually all of the value of their equity investments.

proposition.[17]

107.    Indeed, in the months following the Supreme Court's *Ortiz* decision, many corporate asbestos defendants abandoned settlement efforts, and instead chose to file for bankruptcy to avoid their massive liability.  However, Defendants stood by idly and did nothing to protect Plan assets even as numerous companies involved in the manufacture and production of asbestos-related products toppled into bankruptcy under the staggering liability of individual-based asbestos suits.

108.    For example, on February 22, 2000, citing the mounting rise in asbestos-related suits against the company, Babcock & Wilcox ("B&W") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District of Louisiana in New Orleans.  In reaction to this news, Grace's stock dropped from $11.62, on February 22, 2000, to $10.63 on February 24, 2000, the next day of trading.  In this one day drop, the Company's stock lost approximately 8.52% of its value.

109.    The growing uncertainty surrounding the full effects of this tidal wave of asbestos litigation on affected companies drove the price for Grace stock down throughout the summer and fall of 2000.

110.    Furthering the uncertainty regarding Grace's economic future, on October 5, 2000, the world's largest manufacturer of fiberglass insulation, Owens Corning Corporation ("Owens Corning"), filed for Chapter 11 bankruptcy protection.[18]  At the time of its bankruptcy

---

[17] On July 1, 1999, the beginning of the Class Period, Grace stock was trading at $19.19 per share. Unfortunately for the Plan participants, Grace's stock price would never rise above $19 per share after September 3, 1999 for the remainder of the Class Period and would instead spiral downward, losing more than 85% of its value before even starting to recover.

[18] According to news reports, at the time of its bankruptcy filing, Owens Corning had received over 460,000 asbestos-related personal injury claims and had paid or agreed to pay over $5 billion in asbestos-related awards and settlements, legal expenses and claims processing fees.

filing, Owens Corning had revenues exceeding $5 billion per year, making it one of the wealthiest corporations to ever be afforded bankruptcy protection by U.S. courts. Indeed, Owens Corning's bankruptcy, to that date, was the largest filed in 2000 and the second largest filed since 1995. In reaction to this news, Grace's stock dropped from $4.56 on October 5, 2000 to $3.81 on October 6, 2000. In this one day drop, the Company's stock lost approximately 16.45% of its value.

111.    Also citing the growing number of asbestos-related claims, still another asbestos company, Armstrong World Industries ("Armstrong") filed for Chapter 11 bankruptcy protection on December 6, 2000.[19]   In reaction to this news, Grace's stock dropped from $1.75 on December 6, 2000 to $1.31 on December 7, 2000. In this one day drop, the Company's stock lost a further 25.14% of its value.

112.    Consequently, by early 2001, Grace and its affiliates were among the few "deep pocket" defendants left who were potentially subject to joint and several liability. Thus, the number of asbestos claims against them increased dramatically. Despite continued efforts to forge a legislative solution (prior efforts in 1981, 1982, 1984, and 1991 had all failed), bankruptcy relief remained the most viable means for defendants such as Grace to resolve their liability. As one CEO later told Fortune magazine, "We should've filed for bankruptcy on the day after the Georgine settlement was overturned by the Supreme Court. Every asbestos defendant should've done the same thing." The *Ortiz* decision finished what the *Georgine* decision began, sealing the fate of global settlements and, ultimately, asbestos defendants.

**Grace's Improper Accounting of Asbestos-Related Claims**

113.    In 1996, Grace began accruing funds for all then-current asbestos-related bodily

---

[19]    At the time of its bankruptcy filing, Armstrong faced more than 170,000 asbestos-injury lawsuits resulting its past sales and installation of asbestos insulation.

injury claims and those that were expected to be asserted over the following five-year period.

114.   In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related bodily injury claims.  Grace explained the reasons behind this change in its 1999 10-K filed with the SEC on March 28, 2000.  Specifically, the Company stated:

> Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury cases and claims then pending (except for the Lindholm case referenced above with respect to Grace's attic fill insulation, which was not filed until February 2000 and for which insufficient information exists to estimate any potential liability), as well as all bodily injury claims expected to be filed in the future.

115.   In Grace's 2000 10-K filed with the SEC on April 16, 2001, the Company stated, in relevant part:

> Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.
>
> * * *
>
> Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31,

2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending (except for the cases and claims related to Grace's attic fill litigation as described above), as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.)

116.    Contrary to what was reported in the Company's 10-K, and as the Company later admitted, Grace failed to properly account for the increasing number of Chapter 11 filings by its asbestos-related litigation "co-defendants" and its effect on Grace as being one of the few remaining "deep pockets" not under bankruptcy protection.  The growing number of plaintiffs turning to Grace for joint and several liability led directly to the Company's filing for Chapter 11 bankruptcy protection and the significant devaluation one of the Plan's primary assets, principally Grace common stock.

117.    As the Company noted in its Form 10-K annual report, filed with the SEC on March 28, 2002:

> [C]osts to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11.  These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks.  These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system.  As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

**Asbestos Claims Threaten Grace's Financial Health**

118.    As the asbestos claims filed against Grace multiplied exponentially, Grace's

management realized that its asbestos reserves were grossly inadequate.

119.    Grace received a total of 26,941 asbestos-related bodily injury claims in 1999.  In 2000, the number climbed to 48,786.  For the first quarter of 2001 alone, Grace received 16,411 bodily injury claims.  By the time Grace filed for bankruptcy, on April 2, 2001, it was a defendant in 65,656 asbestos-related lawsuits.

120.    Despite the Company's bankruptcy filing, the Defendants took no steps to protect the Plan from continued losses stemming from the Plan's heavy investment in Company stock until it was much too late.  Indeed, it was not until April 16, 2003, more than two years after Grace filed bankruptcy, that the Defendants first took the most minimal of actions to protect the Plan.[20]

121.    Given that the Company had already filed for bankruptcy, these belated, minimal, actions, taken by Defendants, did not go nearly far enough to protect the Plan.  In fact, it was not until February 27, 2004 that State Street Bank & Trust Company, which currently, upon information and belief, acted as the investment manager and independent fiduciary of the 401(k) Plan, determined that it would be prudent to begin complete divestment of the Plan's holdings of Grace common stock.

122.    Simply put, Defendants' actions were too little too late in terms of protecting the Plan from the massive losses it suffered as a result of its imprudent investment in Grace stock.

**B.    Defendants Knew or Should have Known that the Grace Funds and/or Grace stock were not Prudent Plan Investments**

123.    At all relevant times, Defendants knew or should have known that Grace's accounting for asbestos-related litigation was materially skewed by its failure to account for the

---

[20]    Specifically, commencing on April 16, 2003, Grace prohibited participants from directing further contributions towards Grace stock.  Also, effective April 21, 2003, participants were prohibited from making transfers from other investment options into Grace stock.

growing number of bankruptcy filings by its co-defendants. The effect of this failure, on top of the industry-crushing weight of asbestos litigation which caused widespread bankruptcy filings and increasing pressure on Grace, was to make Grace stock an indisputably imprudent Plan investment. It is inconceivable that the high ranking director and officer Defendants named in this Complaint did not have personal knowledge of, if not a direct role in, the Company's accounting of asbestos-related litigation and portrayal/obfuscation of the true financial health of the Company throughout the Class Period.

124.    Defendants clearly failed to conduct an appropriate investigation (or ignored the results of any such investigation) into whether Grace stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with complete and material information regarding Grace's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding the Grace stock held by the Plan, and otherwise failed to protect the Plan and its participants against inevitable and significant losses arising from such investment.

125.    All Defendants were aware, or should have been aware, of the serious financial problems facing Grace because of its growing asbestos liability, especially in the wake of the *Ortiz* decision. By no later than July 1, 1999 (and likely well before), Defendants knew that Grace's asbestos liability threatened Grace's future, and that investing in Grace stock was highly risky.

126.    After *Ortiz* (and likely before), Defendants knew that alternative settlement methods, including global settlement schemes, would likely prove ineffective in resolving their asbestos liability problems efficiently. As a result of the failure of global and other alternative settlements in resolving asbestos liability, and Congress's consistent rejection of legislative

solutions, Defendants knew or should have known that Grace's most likely course to resolve its liability issues was to seek bankruptcy protection. Defendants further knew, or should have known, that if that course was taken, Grace shareholders, including the Plan and its participants, would lose the great majority of their heavy investment in Grace stock.

127.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Grace equities, under these circumstances, was unarguably dangerous and imprudent. A reasonably and prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made vastly different investment decisions.

128.    Because Defendants knew or should have known that Grace stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Grace stock.

129.    Defendants had available to them several different options for satisfying this duty, including: divesting the Plan of Grace stock at an appropriate time; discontinuing further Company-matching and participant-directed investment contributions in the Grace Funds and/or Grace stock much earlier than they actually did; or resigning as Plan fiduciaries as soon as they became conflicted to the extent that as a result of their employment by Grace they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Grace stock.

**C.    Defendants Regularly Communicated with Plan Participants Concerning Grace Stock Yet Failed to Disclose the Imprudence of Investment of Plan assets in Grace Stock**

130.    Defendants regularly communicated with employees, including Plan participants,

about Grace's performance, future financial and business prospects. Grace stock, for much of the relevant period, was one of the largest single assets in the Plan. Upon information and belief, during the Class Period, the Defendants fostered a materially inaccurate, misleading and incomplete picture of Grace, and therefore its stock as a Plan investment, and/or allowed Plan participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in the Grace stock. As such, Plan participants could not appreciate the true risks presented by investments in Grace stock and therefore could not make informed decisions regarding investments in the Plan.

131.    SEC filings, Company statements and other releases and communications issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plan and its participants to purchase, and to hold and maintain, Plan investments in Grace stock.

**D.    Defendants Suffered From Conflicts of Interest**

132.    Grace's SEC filings, including 10-K annual reports, during the Class Period make it clear that a number of the corporate Directors and Executive Officers compensation is in the form of stock grants or stock option grants.

133.    Because the compensation of at least some Defendants, and likely others, was significantly tied to the price of Grace stock, Defendants had incentive to keep the Plan's assets heavily invested in Grace stock on a regular, ongoing basis, at least prior to the Company's Chapter 11 filing. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Grace stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Grace stock, resulting in lower compensation for the Defendants.

134.    Some Defendants may have had no choice in tying their compensation to Grace

stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Grace stock, or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

135.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

## CLAIMS FOR RELIEF UNDER ERISA

136.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

137.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

138.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

139.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan ***solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to***

*participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

140.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

*duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They

entail, among other things,

> a.    The duty to conduct an independent and thorough investigation
> into, and continually to monitor, the merits of all the investment
> alternatives of a plan;

> b.    A duty to avoid conflicts of interest and to resolve them promptly
> when they occur.  A fiduciary must always administer a plan with
> an "eye single" to the interests of the participants and beneficiaries,
> regardless of the interests of the fiduciaries themselves or the plan
> sponsor;

> c.    A duty to disclose and inform, which encompasses: (1) a negative
> duty not to misinform; (2) an affirmative duty to inform when the
> fiduciary knows or should know that silence might be harmful; and
> (3) a duty to convey complete and accurate information material to
> the circumstances of participants and beneficiaries.

141.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co fiduciary,"

provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable for a
> breach of fiduciary responsibility of another fiduciary with respect to the
> same plan in the following circumstances: (A) if he participates knowingly
> in, or knowingly undertakes to conceal, an act or omission of such other
> fiduciary, knowing such act or omission is a breach; (B) if, by his failure
> to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the
> administration of his specific responsibilities which give rise to his status
> as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (C) if he has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the breach."

Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

142.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

143.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

144.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investments, including those involving Grace securities and equity.

145.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants or utilized by employers under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in Grace securities in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

146.    In addition, Defendants failed to conduct an appropriate investigation of the merits of continued investment in Grace securities even in the face of obvious red flags that, at a

minimum, raised questions regarding the risks of continued investment in Grace securities, including, among other information, reports of Grace's disappointing financial performance, loss in competitive advantage and concerns about its ability to survive as a going concern. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to investment in Grace securities.

147.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries. *Herman v. NationsBank Trust Co. (Georgia),* 126 F.3d 1354, 1369 (11th Cir. 1997). Also, a fiduciary cannot allow others, including those whom they direct or who are directed by the plan, including plan trustees, to follow plan documents if to do so would also harm plan participants.

148.    The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that Grace securities were not suitable and appropriate investments for the Plan as described herein. Investment in Grace securities during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to such future "savings." Despite all of this, these fiduciaries continued to offer the Grace securities as a very significant investment vehicle for the Plan and to direct and approve the investment in Grace securities, instead of cash or other prudent investments.

149.    Similarly, at times during the Class Period, these fiduciaries permitted Company matching/employer contributions to be made in Grace securities, including Grace preferred and

common stock in the Grace ESOP Stock Fund. In so doing, Defendants further breached their fiduciary duties. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take ***any meaningful*** steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in the Grace securities, including through the Company's matching/employer contributions in Grace securities. Further, given that such a high concentration of the assets of the Plan were invested in the securities of a single company – Grace -- Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

150. Moreover, the fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

151. The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal the failure to prudently and loyally manage the Plan's assets with respect to offering Company stock as an investment option in the Plan; providing and maintaining Company matching/employer contributions in Grace securities, including Grace preferred and common stock, despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage Plan assets with respect to the Plan's investments, including the match as a result of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

152. Specifically, at least some of the Defendants had actual knowledge of the

Company's precarious financial position and/or constructive knowledge of this condition due to their high-ranking positions at the Company. Despite this knowledge, they participated in each others' failure to prudently manage the Plan's assets and knowingly concealed such failures by not informing participants that the Plan's vast holdings of Grace securities were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Grace securities, despite inarguably having knowledge of such breaches.

153.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Grace securities, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Grace securities.

154.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

155.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor the Investment and Benefits Committee Defendants and State Street
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Director Defendants[21])**

156.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

158.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.

159.    The duty to monitor entails both giving information to and reviewing the actions of the "monitored fiduciaries" (the Committee Defendants and State Street).  In this case, that means that the monitoring fiduciaries, the Director Defendants had the duty to:

(1)    Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)    Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

---

[21]    As to monitoring/informing State Street, this claim also lies against the Investment and Benefits Committee, which is considered a "monitoring fiduciary" for this count.  Upon information and belief, the Investment and Benefits Committee had at least some power to appoint investment managers during the relevant period.

(3)    Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company.  The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

160.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

161.    The monitoring fiduciaries breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company securities and equity an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in undiversified investment funds which was made up primarily of Company securities, an

investment that was imprudent and subject non-market risks peculiar to its own precarious corporate situation. The monitoring fiduciaries knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the Grace Common Stock Fund as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Grace Common Stock and ESOP Fund in Grace securities when it no longer was prudent to do so. Despite this knowledge, they failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

162.    In addition, the monitoring fiduciaries, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Grace that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

163.    The monitoring fiduciaries are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the Individual Defendants, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

164.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other

participants and beneficiaries, lost a significant portion of their retirement investments.

165.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA by the
Investment and Benefits Committee, Administrative Committee
and the Director Defendants)**

166.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

167.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

168.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

169.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding Plan investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all Plan investment options, including investment in Grace

stock (and, derivatively, Grace preferred stock intrinsically tied to the value of Grace common stock).

170.    Because investment in the Plan was not diversified (i.e. the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in Grace securities), such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Grace securities, including within the Grace Common Stock Fund.

171.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Grace stock, the Company's precarious financial condition, public misrepresentations and inflated forecasts regarding the likelihood of the Company's recovery, and the consequent artificial inflation of the value of Grace stock and, generally, by conveying inaccurate information regarding the soundness of Grace stock and the prudence of investing retirement contributions in Grace equity. These failures were particularly devastating to the Plan and the participants; a heavy percentage of the Plan's assets were invested in Grace securities, including common stock, during the Class Period and, thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

172.    These actions and failures to act were uniform and caused the participants and beneficiaries of the Plan to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the participants and beneficiaries did not have complete and accurate information concerning their investments.  Plaintiffs and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding Grace stock.

173.    Defendants in this Count are also liable as co-fiduciaries because (1) they

knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Grace stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

174.    Specifically, Defendants named in this count knew or should have known that incomplete information had been provided by one another and the Plan's other fiduciaries, yet failed to undertake any action to remedy this breach.  In addition, the appointing fiduciaries named in this count, through their own failure to prudently monitor their appointees, enabled their co-fiduciaries named in this count to fail to provide complete and accurate information regarding Grace stock and the true risks that it presented as an investment for Plan participants' retirement investments.

175.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Grace Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Grace stock during the Class Period.  Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

176.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

177.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA by All Defendants)

178.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

179.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

180.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

181.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make

independent judgments concerning the Plan's investment in the Grace securities; failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made Grace securities an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plan's investment in Company securities.

182.    According to Plaintiff Bunch's allegations as described above, State Street also was in a position of conflict with the interests of the Plan and its participants.

183.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's otherwise participants and beneficiaries, lost a significant portion of their retirement investment.

184.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

185.    The Plan suffered a loss, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in Grace securities during the Class Period in violation of the Defendants' fiduciary duties.

186.    As to contributions invested in the Grace Common Stock Fund, Defendants were

responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

187.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.    In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.    In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary."    29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

188.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding investment of their contributions in Grace stock under the Plan. Accordingly, participants failed to exercise the requisite independent control over their investment in Grace stock in the Plan.

189.    In addition, § 404(c) does not apply to any portion of the Plan deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not.    *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).    Nor can § 404(c) apply to any losses that result from the Company's matching/employer contributions in the Grace ESOP Stock Fund, as participants did not exercise any control over these investments.

190.    The Defendants' liability to Plaintiff for relief stemming from the Plan's

imprudent investments in Grace stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## CAUSATION

191.    The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Grace securities during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in diminished Plan trust master account balances as well as the account balances of the Plan's participants.

192.    Defendants are responsible for losses caused by participant direction of investment in the Grace Common Stock Fund and/or Grace securities because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants failed to apprise Plaintiff of the growing precarious financial state of the Company regarding the true health and ongoing viability of the Company, thereby misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Grace Common Stock Fund and/or Grace securities, and Defendants remain liable under ERISA for losses caused by such investment.

193.    Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in the Grace ESOP Stock Fund and/or Grace stock during the Class Period, as Defendants controlled the investment, and the investment was

imprudent.

194.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning the financial viability of the Company and the corresponding prudence of investment in the Grace Common Stock Fund and/or Grace securities, the elimination of the Grace Common Stock Fund and/or Grace securities as investment alternatives when they became imprudent, and the divesture of the Plan from the Grace Common Stock Fund and/or Grace securities (including investments in the Grace ESOP Fund) when maintaining such investments became imprudent, the Plan would have avoided a substantial portion of the losses that they suffered through their continued investment in the Grace securities.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

195.    The Defendant-fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Grace equity.

196.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

197.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

198.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and

beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

199.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

200.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Grace securities maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Grace stock and other Grace securities held by the Plan during the Class Period;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable monetary relief against the defendants.

Respectfully submitted this 19th day of December, 2005.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

GILMAN AND PASTOR, LLP


By: /s/ David Pastor
David Pastor (BBO #391000)
**GILMAN AND PASTOR, LLP**
60 State Street, 37th Floor
Boston, MA 02109
Telephone: 617-742-9700
Facsimile: 617-742-9701


**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Katherine B. Bornstein
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

**SLEVIN & HART, P.C.**
Thomas J. Hart
1625 Massachusetts Avenue, N.W.
Suite 450
Washington, D.C. 20036
Telephone: (202) 797-8700