**<u>Unpublished Authority Cited In Defendant State Street Bank And Trust Company's Motion To Dismiss The Amended Consolidated Complaints</u>**

LEXSEE 2005 U.S. DIST. LEXIS 24914

**VINCENT D. DIFELICE, on behalf of himself and all others similarly situated, Plaintiff, v. US AIRWAYS, INC., et al., Defendants.**

Case No. 1:04cv889

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

397 F. Supp. 2d 758; 2005 U.S. Dist. LEXIS 24914; 36 Employee Benefits Cas. (BNA) 1204

October 19, 2005, Decided

**SUBSEQUENT HISTORY:** Stay denied by, Motion denied by DiFelice v. U.S. Airways, Inc., 2005 U.S. Dist. LEXIS 35658 (E.D. Va., Dec. 12, 2005)

**PRIOR HISTORY:** Difelice v. US Airways, Inc., 397 F. Supp. 2d 735, 2005 U.S. Dist. LEXIS 22182 (E.D. Va., 2005)

**COUNSEL:** [**1] For Vincent D. Difelice, on behalf of himself and all others similarly situated, Plaintiff: Stephen Ray Pickard, Alexandria, VA.

For US Airways, Inc., Suggestion of Bankruptcy filed 10/4/04, Defendant: Christine Bannon Cox, Morgan Lewis & Bockius LLP, Washington, DC

For Fidelity Management Trust Company, Defendant: Craig Crandall Reilly, Richard McGettigan Reilly & West PC, Alexandria, VA.

**JUDGES:** T. S. Ellis, III, United States District Judge

**OPINIONBY:** T. S. Ellis, III

**OPINION:**

[*761] MEMORANDUM OPINION

This is a breach-of-fiduciary-duty class action brought by a participant in a company § 401(k) retirement plan against the plan fiduciaries for losses to the plan pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2). At issue on summary judgment is the extent of a named fiduciary's duties (i) to disclose information concerning plan investment options, and (ii) to select and manage prudently plan investment options.

[*762] I. n1

n1 The facts recited here are largely undisputed. Where disputes exist, they are noted and, if material, the facts are construed favorably to plaintiff, as required. See Matsushita Elec. Indus. Corp v. Zenith Radio Corp, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

[**2]

Defendant US Airways, Inc. ("US Airways") is a Delaware corporation and a major American passenger airline. In 1988, US Airways created the US Airways, Inc 401(k) Savings Plan ("the Plan"), an ERISA retirement plan, for the express purpose of providing retirement income for certain flight attendants and mechanics. The Plan divided decision-making authority among three principal actors: (i) US Airways, the Plan administrator and named fiduciary; (ii) Fidelity Management Trust Company ("Fidelity"), the directed trustee of the Plan; and (iii) the Plan participants, who were each responsible for making investment decisions for their individual accounts. Broadly viewed, this dispute concerns the allocation of responsibility among these actors for losses suffered by the Plan as a result of the financial decline and ultimate bankruptcy of US Airways and its parent company, US Airways Group, Inc ("US Air Group").

1. The Plan

US Airways established the Plan on September 1, 1988 as a qualified profit sharing plan in order to provide retirement income to certain employees on a tax deferred basis pursuant to § 401(k) of the Internal Revenue Code, [**3] 26 U.S.C. § 401(k). Plan § 1.1 The Plan was funded (i) from payroll contributions to individual re-

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 3 of 17

Page 2

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

tirement savings accounts made by participants, (ii) from US Airways' matching cash contributions to eligible participants' accounts, and (iii) from transfers and rollovers from certain prior retirement accounts. Plan §§ 4.1, 4.8, 5.1, 5.2. Under the terms of the Plan, US Airways was the Plan administrator and a named fiduciary of the Plan with responsibility for selecting and, if necessary, terminating the investment options available to Plan participants. Plan §§ 7.1, 7.2. The Plan also directed US Airways to enter into a trust agreement for the holding, management and administration of all Plan assets, and provided that the terms of the trust agreement are to be incorporated by reference into the Plan itself. Plan § 14.1.

Pursuant to this direction, US Airways entered into a trust agreement for the Plan ("Trust Agreement") with defendant Fidelity Management Trust Company ("Fidelity") in 1993. The Trust Agreement set forth the relative responsibilities of US Airways and Fidelity, and confirmed that US Airways alone was responsible for choosing the investment options for the Plan. Trust Agreement [**4] § 1.5(a). The various investment funds from which US Airways could choose were set forth in Schedule C of the Trust Agreement and included actively managed mutual funds, a fixed income fund, and the publicly traded shares of US Air Group. Trust Agreement § 1.5, Schedule C. Plan participants were not able to buy shares of US Air Group directly, but instead were able to purchase units of the US Air Group Common Stock Fund ("the Company Stock Fund") which consisted primarily of shares of US Air Group stock, including any paid dividends, plus an amount of cash sufficient only to satisfy the Fund's needs for transfers and payments. Trust Agreement § 8.1. The value of each unit was determined daily by dividing the net assets of the Company Stock Fund by the total number of units outstanding in the Company Stock Fund. Because US Airways had not paid any dividends since 1990, the value of each unit of the Company [*763] Stock Fund was primarily dependent upon the value of the underlying US Air Group stock. When a participant transferred assets out of the Company Stock Fund, the participant received the equivalent value of his units in cash, paid out of the Company Stock Fund's cash component. [**5] Conversely, when a participant directed assets into the Company Stock Fund, she received the number of units equivalent to the value of those assets at the time, and the assets were added to the Company Stock Fund's cash component. The Company Stock Fund was set up in this manner to enable participants to trade in and out of the Company Stock Fund on a daily basis, rather than having to wait for the three day settlement period normally required for purchases and sales of stock.

Article 8.1 of the Trust Agreement tasked Fidelity and US Airways jointly with determining the appropriate percentage of cash in the Company Stock Fund and tasked Fidelity with ensuring that the amount of cash in the Company Stock Fund did not stray more than 1% from this target. Fidelity and US Airways agreed that a cash target range of 10% of total assets would be sufficient for the cash component's limited purpose and Fidelity did not allow this percentage to fluctuate by more than a few percentage points throughout the class period. If, owing to participants' decisions to buy or sell units of the Company Stock Fund, the value of cash in the Company Stock Fund failed to fall within the predetermined range, [**6] Fidelity was directed to purchase or sell shares of US Air Group stock to return the cash to stock ratio to the appropriate range. In addition, as the value of US Air Group shares declined the percentage of cash in the Company Stock Fund would necessarily increase thereby obligating Fidelity to purchase shares of US Air Group to maintain the agreed-upon percentage of cash in the Company Stock Fund. Therefore, not all purchases of US Air Group stock for the Company Stock Fund were caused by participants' directions; some purchases of US Air Group stock for the Company Stock Fund by Fidelity occurred as a result of variations in the price of US Air Group stock.

Decisions to retain the Company Stock Fund as a Plan investment option rested solely with US Airways. n2 The Trust Agreement expressly provided that US Airways "shall continually monitor the suitability under the fiduciary duty rules of Section 404(a)(1) of ERISA . . . of acquiring and holding Company Stock." n3 Trust Agreement § 8.3. Importantly, however, Plan participants were themselves solely responsible for choosing among the various investment options, including the Company Stock Fund, and for making the investment decisions [**7] for their own § 401(k) accounts. Significantly, the Trust Agreement provided that "neither the Trustee [Fidelity] nor the Company shall have any liability for any losses which may result from either the Participant's direction of any investment . . . or for any loss which may result by reason of failure of a Participant to make such direction." Trust [*764] Agreement § 8.3. And, in this respect, the Plan permitted participants to allocate their account assets into one or more of the available investment options, and to alter this allocation at any time. Plan §§ 6.1, 6.2.

  n2 For a discussion of the limited role of Fidelity as the directed trustee, see *Difelice v. US Airways, Inc.*, 397 F.Supp.2d 735, 2005 WL 2386227 (E.D.Va. 2005).

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 4 of 17

Page 3

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

n3 *See also*, Trust Agreement § 1.5 ("The Company shall direct the Trustee in writing to establish and invest the assets of the Trust in separate Investment Funds and to select the particular investment vehicle or vehicles for such Investment Funds. The Trustee shall have no responsibility for the determination of Investment Funds or the selection of investment vehicles for such Investment Funds and shall not render investment advice to any person in connection thereto.").

[**8]

During the relevant time period, the Plan allowed participants to choose from among 13 different investment options, including a money market fund, a fixed income fund, various mutual funds, several diversified portfolio funds, and the Company Stock Fund. n4 The Plan stated that giving participants control over their investment decisions was intended to trigger the operation of ERISA § 404(c), whereby participants become "solely responsible" for any losses resulting from the exercise of their control. Plan § 6.4

n4 Significantly, only employee contributions, as opposed to US Airways' matching contributions, could be invested in the Company Stock Fund. Investment Brochure, "Destination Retirement" ("Brochure") (Def. App. 237-45).

Pursuant to ERISA's disclosure requirements, US Airways provided participants with a Summary Plan Description ("SPD"), and investment brochures which described aspects of the Plan, including rules for investments in the Company Stock Fund. Participants were advised to diversify the [**9] assets in their accounts among investments with different risk/return characteristics, and characterized investments in the Company Stock Fund as "involving more risk" than investments in a diversified fund. Similarly, the SPD advised participants that an investment in the Company Stock Fund "involves all the risks of securities ownership." Significantly, the SPD illustrated the volatility of US Air Group shares by providing the annual rates of return for shares of US Air Group common stock for the prior seven years, which ranged from a gain of 212% to a loss of 67%. The SPD further stated that US Airways, US Air Group, and Fidelity could not "guarantee the performance of the Fund and have no obligation to compensate for any losses suffered by any participant should any such losses occur."

2. The Decline and Bankruptcy of US Airways

US Airways' serious financial problems had become publicly apparent at least by the year 2000 when US Airways and US Air Group began accumulating losses that would ultimately total annual pre-tax operating losses of $ 350 million and $ 270 million respectively. In May 2000, in an attempt to reverse the deterioration of US Airways' financial fortunes, [**10] US Air Group entered into a tentative merger agreement with UAL Corp. ("UAL"), the parent company of United Air Lines, Inc. ("United"), to merge the two airlines into a single entity. The market responded favorably to this merger announcement, and US Air Group's share price rose from $ 25.938 to $ 49.00. The merger was approved by US Air Group's shareholders on October 12, 2000.

Yet, shareholder approval alone would not be enough to ensure the success of the proposed merger. On February 7, 2001 the Chairman of US Airways, Stephen Wolf, appeared before the Senate Judiciary Committee and acknowledged the possibility that the merger might be prevented by operation of the federal antitrust laws. He warned that there were "real threats" to US Airways' long-term viability should the merger be blocked. Similarly, in a conference call announcing US Airways' financial results for the quarter ending March 31, 2001, Rakesh Gangwal, President and CEO of US Airways, informed investors that "there is no plan B" were regulators to block the proposed merger. [*765] Notwithstanding these dire predictions, investment analysts publicly expressed doubt that the proposed merger would be approved and hence continuing [**11] concern regarding US Airways future. Thus, on May 29, 2001, Moody's Investors Service lowered its rating on US Airways senior secured debt from Ba3 to B1, indicating that the debt was a speculative investment. The investing public expressed the same doubts and skepticism about US Airways' prospects, as by May 29, 2001, the price for shares in US Air Group had declined from the post-announcement high of $ 49.00 to $ 24.18. On July 27, 2001, doubts about the merger's prospects proved well-founded when the United States Department of Justice announced its intention to file suit to block the proposed merger under the federal antitrust laws. Shares of US Air Group responded by declining in price further and sharply to $ 17.26.

The terrorist attacks of September 11, 2001 made US Airways' already bleak financial situation particularly acute. Because of the importance of the East Coast in general, and Ronald Regan National Airport in particular, to US Airways' route system, the attacks upon the World Trade Center in New York City and the Pentagon in Northern Virginia had a disproportionately harmful impact on US Airways. In communications with US Airways employees immediately following the [**12] attacks, management conceded that the airline was in a

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 5 of 17

Page 4

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

"struggle for its very survival," and that it would be necessary to curtail its costs drastically to survive. Management openly admitted the possibility of a bankruptcy filing, stating that it may be "the only viable way to restructure." In October 2001, US Airways' management further informed its employees that it had "shifted its focus in the aftermath of September 11 from improving profitability to a much simpler and more immediate and near-term goal -- to be able to generate enough cash so that the Company may continue to operate." The impact of the September 11 terrorist attacks on US Air Group's financial future was reflected in the share price, which declined by nearly 65% from a September 10, 2001 price of $ 11.62 per share to a September 27, 2001 price of $ 4.10 per share. For the fiscal year ending December 31, 2001, US Air Group and US Airways reported net losses of $ 2.12 billion and $ 1.86 billion respectively.

US Airways' financial health continued to deteriorate in 2002. Management attempted to avoid bankruptcy by expanding its regional jet service, and by successfully negotiating an agreement with the pilots union [**13] to double the number of regional jets the company could operate. In the end, however, these efforts were not enough to stem the rising tide of red ink. In its annual report filing of March 28, 2002, US Air Group revealed its expectation to lose $ 3 million daily. In April, US Airways engaged counsel to render advice on restructuring, including a potential bankruptcy filing. On May 10, 2002 US Airways filed its Form 10Q and acknowledged that it was likely to seek bankruptcy protection in the event employee concessions and government loans were not obtained. In an attempt to avoid a bankruptcy filing, management urged employees to tell their Congressmen that "securing a $ 1 billion loan guarantee is critical to the survival of U.S. Airways." On June 24, 2002 US Airways announced that it would defer payment on selected debt obligations.

Three days later, on June 27, 2002, US Airways announced in a letter to Plan participants that it had appointed Aon Fiduciary Counselors, Inc. ("Aon") as an independent fiduciary to manage the US Air Group stock held in the company's defined contribution plans, including the [*766] 401(k) Plan. According to US Airways management, the "Company took this action [**14] to assure participants that the plan assets will continue to be managed in their best interests." The letter elaborated on the timing of Aon's appointment:

> President and CEO David Siegel has said on several occasions that we must restructure this Company either outside of a Chapter 11 reorganization or through a judicial restructuring. Our future, with all clearly have an impact upon the value of US Airways common stock. The appointment of an independent fiduciary ensures that decisions regarding the US Airways stock held by the retirement plans are made solely in the interests of plan participants and beneficiaries and avoids any real or perceived conflict of interest in connection with these decisions. We believe this is the most prudent course of action given our current challenges and the uncertainties facing us.

Immediately after its appointment, Aon ceased further purchases of US Air Group stock for the Company Stock Fund, and began to liquidate the shares held by the Company Stock Fund as Aon put it "to the extent that sales could be made without adversely affecting the market and the value of the rest of the US Airways stock held by the Stock Fund."

US Air [**15] Group and its subsidiaries filed for bankruptcy protection on Sunday, August 11, 2002, and the New York Stock Exchange immediately halted trading in US Air Group shares. In a special bulletin of that day, US Airways acknowledged that "one of the elements of any plan of reorganization may be the cancellation of the Company's existing equity securities without the prospects of any distribution to existing shareholders." US Airways proceeded to advise that "appropriate caution be exercised with respect to existing and future investments in any of these securities as the value and prospects are highly speculative." The closing price of US Air Group shares on the previous Friday was $ 2.45 at which time the Company Stock Fund held 19.8 million shares, representing roughly 29% of all shares outstanding. Subsequent to the bankruptcy filing, Aon halted all trading activity in the Company Stock Fund and transferred the remaining $ 16.8 million in cash to a money market fund.

On August 3, 2001 the Company Stock Fund, which was an investment option for not only the Plan at issue in this case, but other US Airways pension plans as well, n5 held approximately 15.8% of the total shares outstanding, [**16] representing a total value of just over $ 188 million. By the time Aon was appointed as the independent fiduciary, the Company Stock Fund holdings as a percentage of total shares outstanding had more than doubled to 32.2%, but, due to the sharp decline in US Air Group's share price, the monetary value of the US Air Group shares held by the Company Stock Fund had dropped by over fifty percent, to just over $ 81 million. Because of market and legal constraints, Aon was able to

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 6 of 17

Page 5
397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

holdings before US Air Group and its subsidiaries filed for bankruptcy.

> n5 The US Airways Employee Savings Plan, the 401(k) Plan for Pilots, and the Piedmont Supplemental Plan also participated in the Company Stock Fund. Through the first seven months of 2002, the Plan at issue in this case held roughly 31% of the total value of the Company Stock Fund.

### 3. Procedural History

In July 2004, Plaintiff Vincent D. DiFelice, a US Airways employee and Plan participant, brought this [**17] class action lawsuit [*767] against US Airways and Fidelity Trust pursuant to ERISA § 502(a)(2) for losses suffered by the Plan due to its holdings of US Air Group stock between August 1, 2001, and August 11, 2002, the date of the bankruptcy filing. Plaintiff alleges that by August 1, 2001 -- shortly after the Department of Justice announced that it would file suit to block the US Airways-United merger -- US Airways and Fidelity knew or should have known that US Air Group stock was no longer a prudent investment, and thus breached their duties as Plan fiduciaries under ERISA § 404(a), by continuing to offer the Company Stock Fund as a Plan investment option. n6 Plaintiff asserts (i) one count of breach of fiduciary duty against US Airways; (ii) one count of breach of fiduciary duty against Fidelity; and (iii) one count of liability as a co-fiduciary pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a), against both defendants. Fidelity subsequently moved successfully to dismiss the claims against it pursuant to Rule 12(b)(6), Fed. R. Civ. P. See DiFelice v. U.S. Airways, Inc., et al., F.Supp.2d , 2005 U.S. Dist. LEXIS 22182, 2005 WL 2386227 (E.D. Va. 2005). [**18] US Airways has moved to dismiss or for summary judgment pursuant to Rule 56, Fed. R. Civ. P., contending that undisputed facts demonstrate that it met its fiduciary duties, or, in the alternative, that any losses suffered by the Plan were solely the result of participants' investment choices, and that US Airways is consequently shielded from liability pursuant to ERISA § 404(c). After the motion was fully briefed and argued, it was granted in part and denied in part by Order dated September 27, 2005. This memorandum sets forth the reasons for this ruling.

> n6 Accordingly, Plaintiff describes as the putative class of plaintiffs all Plan participants and beneficiaries thereof who held positions in the Company Stock Fund between August 1, 2001, and August 11, 2002.

### II.

Summary judgment is appropriate only when, viewing the evidence in a light most favorable to the non-moving party, there is no issue of material fact and the movant is entitled to judgment as a matter [**19] of law. Rule 56(c), Fed. R. Civ. P.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Importantly, it is also true that "the mere existence of some disputed facts does not require that a case go to trial," rather, "the disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). In this case, to the extent that the facts are known, they are largely undisputed. Thus, the issue to be resolved is whether, on the undisputed facts in the record, defendants are entitled to judgment as a matter of law.

### III.

Plaintiff alleges that US Airways breached its fiduciary duties as the Plan administrator and named fiduciary in several respects, and is therefore liable to 'make good to [the [**20] Plan] any losses to [the Plan] resulting from each such breach . . ." ERISA § 409(a), 29 U.S.C. § 1109(a). It is undisputed that US Airways was a fiduciary: It had the power to exercise "discretionary authority or discretionary control respecting management of [*768] [the Plan] . . .," ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and it was also a "named fiduciary" in the Plan documents. n7 As such, US Airways was bound to carry out its duties with the care, skill, prudence and diligence of a prudent man with respect to the exercise of any of its authority. ERISA § 404(a), 29 U.S.C. § 1104(a).

> n7 See Plan § 13.1 ("The Company and the Trustee shall be a "named fiduciary" as that term is defined in Section 402(a)(2) of the Act.") Although, Plan § 13.1 allowed US Airways to delegate its authority to the trustee or to some other person, there is no suggestion that it ever did so.

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 7 of 17

Page 6

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

Plaintiff's allegations of US Airways' breach of this duty [**21] fall into two general categories: (i) failure to provide adequate information to Plan participants, and (ii) failure to select and manage Plan investments prudently for the sole benefit of the Plan. Each claim is separately addressed to ascertain whether US Airways is entitled to judgment as a matter of law based on the existing factual record.

A

The starting point in the analysis of the first claim -- the failure to provide complete and accurate information to Plan participants -- is ERISA's "comprehensive set of reporting and disclosure requirements." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 131 L. Ed. 2d 94, 115 S. Ct. 1223 (1995). These reporting requirements, contained in Part I of ERISA, ERISA §§ 101-111, require a plan administrator: (i) to furnish to all plan participants a copy of the summary plan description; (ii) to make available for participant inspection the summary plan description, the latest annual report and any bargaining agreement, trust agreement, contract or other instrument under which the plan was established; (iii) to furnish an adequate summary of the latest annual report; and (iv) to furnish upon request of any plan participant the latest updated summary [**22] plan description, the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract or other instruments under which the plan is established or operated. ERISA § 104(b), 29 U.S.C. § 1024(b).

The summary plan description must be "written in a manner calculated to be understood by the average plan participant" and must contain information concerning the plan's governance "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." n8 ERISA § 102(a), 29 U.S.C. § 1022(a). [*769] *See also Varity Corp. v. Howe*, 516 U.S. 489, 531 n.10, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996). Likewise, ERISA § 103 sets forth the detailed financial information required to be disclosed in the annual report. *See* ERISA § 103(b), (c), 29 U.S.C. § 1023(b), (c).

N8 The summary plan description must contain the following information:

> (i) The name any type of administration of the plan; (ii) in the case of a group health plan, . . . whether a health insurance issuer . . . is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; (iii) the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; (iv) the name and address of the administrator; (v) names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); (vi) a description of the relevant provisions of any applicable collective bargaining agreement; (vii) the plan's requirements respecting eligibility for participation and benefits; (viii) a description of the provisions providing for nonforfeitable pension benefits; (ix) circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; (x) the source of financing of the plan and the identity of any organization through which benefits are provided; (xi) the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; (xii) the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan . . . and the remedies available under the plan for the redress of claims which are denied in whole or in part . . . .

ERISA § 102(b), 29 U.S.C § 1022(b).

[**23]

Plaintiff does not contend that US Airways failed to comply with any of these ERISA reporting requirements. Indeed, the record confirms that US Airways complied with ERISA's reporting and disclosure requirements n9 Given this, the question then becomes whether in the

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 8 of 17

Page 7
397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

plication, any further disclosure requirements. Given the specificity of ERISA's reporting requirements in Part I of ERISA, courts generally have declined to read other ERISA provisions as creating obligations to provide further disclosure. As the Supreme Court has stated: "This may not be a foolproof informational scheme, although it is quite thorough. Either way, it is the scheme that Congress devised. And we do not think Congress intended it to be supplemented by a faraway provision in another part of the statute . . . ." *Schoonejongen*, 514 U.S at 84. n10 In general, therefore, a fiduciary fulfills its duty to disclose information if it complies with ERISA's disclosure requirements.

n9 Indeed, because US Airways intended the Plan to allow participants to exercise control pursuant to ERISA § 404(c)(1), US Airways provided considerable information beyond ERISA's basic requirements in order to satisfy the Department of Labor's exacting requirements for treatment under ERISA § 404(c). See 29 C.F.R. 2550.404c-1.

[**24]

n10 *See also Varity Corp. v. Howe*, 516 U.S. 489, 531-532, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) ("No provision of ERISA requires an employer to keep plan participants abreast of the plan sponsor's financial security."); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996) (rejecting "an attempt to use the general fiduciary duty standard of § 404(a)(1)(A) to expand the duties imposed under another ERISA section that specifically governed the situation at issue."); *Baker v. Kingsley*, 387 F.3d 649, 662 (7th Cir. 2004) (holding that there is no fiduciary duty to disclose the possibility of the termination of a plan); *Sprague v. General Motors Corp*, 133 F.3d 388, 406 (6th Cir. 1998) ("We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed.").

There are, however, limited circumstances judicially recognized as giving rise to a further duty to disclose. These circumstances may arise where a named fiduciary such as US Airways fails to meet its ERISA § 404(a) [**25] duty to avoid providing any materially false or misleading information to plan participants. Thus, the Supreme Court has recognized that a fiduciary has a duty under ERISA § 404(a) to avoid providing any misleading

*Howe*, 516 U.S. 489, 506, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996); *Faircloth v. Lundy Packing*, 91 F.3d 648, 656 (4th Cir. 1996). More specifically, the Fourth Circuit, in *Griggs v. E.I. DuPont De Nemours*, 237 F.3d 371, 381 (4th Cir. 2001), described the limited circumstances that would give rise to an affirmative duty pursuant to ERISA § 404(a) to provide information beyond that required by ERISA §§ 101-111. According to the Fourth Circuit, because a fiduciary has a responsibility to avoid providing misleading information to plan participants, it follows that the fiduciary has an affirmative [*770] duty to correct any material misunderstandings of participants that were fostered by information provided by the fiduciary. *Griggs*, 237 F.3d at 381. As the *Griggs* opinion puts it, "an ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan [**26] benefits that will inure to his detriment cannot remain silent -- especially when that misunderstanding was fostered by the fiduciary's own material misrepresentations or omissions." *Id.* at 381. In *Griggs*, the plaintiff took early retirement based on the mistaken belief that he could roll certain benefits, paid to encourage early retirement, into a tax deferred account. *Id.* at 375. This mistaken belief was based on assurances provided by the named fiduciary, DuPont, that "all or part of the lump sum can be rolled into the [tax-deferred account], or any qualified IRA, within 60 days." n11 *Id.* at 375. Importantly, before Griggs elected early retirement, DuPont determined through its own calculations that, in fact, he could not roll over all of his early retirement benefits into the tax-deferred account, and yet DuPont failed to inform Griggs of this fact until after he had retired. *Id.* at 375-76. On these facts, the Fourth Circuit held that DuPont had an affirmative duty to correct Griggs' mistaken belief, and that its failure to do so constituted a breach of its fiduciary duties under § 404(a). *Id.* at 383-84. [**27] Thus, *Griggs* makes clear that where a fiduciary is aware that the participant is laboring under a material misunderstanding n12 fostered by the fiduciary's own communications, it has a § 404(a) duty to provide disclosures beyond what §§ 101-111 require for the purpose of correcting the misinformation. Otherwise, however, an ERISA fiduciary has no affirmative duty to provide information that is neither required by Part I of ERISA, nor specifically requested by a plan participant.

n11 In discussing the limits of this affirmative duty, the Fourth Circuit emphasized that "it is critical that Griggs's misunderstanding was fostered by DuPon't TPS explanation." *Griggs*, 237 F.3d at 382.

n12 *See Griggs*, 237 F.3d at 380 ("Naturally,

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 9 of 17

Page 8

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

making material misrepresentations to the beneficiary."); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 439 (6th Cir. 2002) ("[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . benefits to which she may be entitled "); *In re Duke Energy ERISA Litig.*, 281 F.Supp. 2d 786, 791 (W.D.N.C. 2003) ("To state a claim for breach of fiduciary duty arising from a misrepresentation, the plaintiff must establish that the misrepresentation was material.").

[**28]

The undisputed summary judgment record provides no facts that bring this case within *Griggs* thereby triggering any affirmative duty to disclose corrective information. No evidence of any materially misleading statements made by US Airways in its role as Plan fiduciary is disclosed in the record. Nor can it be plausibly argued that the statement, contained in the introduction to the SPD, that "the investment funds are professionally managed" is materially misleading as to the mechanics of the Company Stock Fund. The same document contained an entire chapter on the nature of the Company Stock Fund and informed participants that "the Fund consists of shares of US Air Group Common Stock and short-term liquid investments necessary to satisfy the Fund's cash needs for transfers and payments." The SPD also addressed any potential misunderstandings concerning the extent of the cash component in the Company Stock Fund by accurately informing participants that "the short-term investments will be minimal in relation to the [*771] total value of the Fund." Similarly, descriptions of the Company Stock Fund in the Trust Agreement, n13 and the Plan investment brochures, n14 make clear that the Company [**29] Stock Fund was designed to allow participants to invest in US Air Group stock. Thus, in the face of the clear and accurate message to participants that the Company Stock Fund was a non-diversified investment designed to allow participants to invest in the shares of their employer, the statement that "the investment funds are professionally managed" cannot reasonably be viewed as referring to the Company Stock Fund or as misleading in any way. The statement that the funds are professionally managed is an obvious reference to the mutual fund options from which Plan participants could choose, which are described in the investment brochures, and which included the Fidelity Equity Income Fund, the Neuberger Berman Guardian Fund, the Spartan U.S Equity Index Fund, the Fidelity *Magellan* Fund, the T. Rowe Price Small Cap Fund, and the Putnam International Growth Fund. Thus, given the detailed description of the Company Stock Fund, US Airways had no further duty to disclose information relating to its operation.

n13 *See* Trust Agreement § 8.1 ("The Trustee is responsible for ensuring that the actual cash held in the Company Stock Fun falls within the agreed upon range over time.")

[**30]

n14 *See* Destination Retirement Brochure (Def App. 242) ("This is neither a mutual fund nor a managed investment option.").

Similarly unpersuasive is plaintiff's allegation that US Airways had a duty to disclose to Plan participants the extent of the concentration of US Airways shares in the Company Stock Fund. No provision of ERISA requires US Airways to disclose the percentage of US Air Group shares outstanding held by the Company Stock Fund, nor is there any evidence that US Airways ever misrepresented the extent of the Company Stock Fund's holdings in US Air Group's outstanding shares, or knew of any participant's mistaken belief concerning this. Indeed, the record discloses no specific requests by Plan participants for information concerning the concentration of US Air Group shares in the Company Stock Fund.

In sum, under the standard set forth in *Schoonejongen* and *Griggs*, plaintiff's claim that US Airways failed to comply with its fiduciary duty to disclose information must fail.

B.

The rest of plaintiff's allegations all, in one way or another, essentially charge US Airways [**31] with failing to satisfy its duty of prudence in the selection and management of the Company Stock Fund. More specifically, plaintiff contends that US Airways, as the named fiduciary, had a § 404(a) duty to close the Company Stock Fund on and after August 2001 and to cease to allow participants to buy units in the Company Stock Fund after that date in view of US Airways' dire financial prospects. For example, plaintiff alleges that the accumulation of an increasingly large percentage of the outstanding shares of US Air Group was a breach of US Airways' duty of prudence. Similarly, the allegation that US Airways failed "to adjust the mix of investment in the Company Stock Fund to hold less Group stock and more cash or liquid assets" is simply a restatement of plaintiff's primary allegation that retaining the Company Stock Fund as an investment option was imprudent. The Company Stock Fund was intended to consist primarily of US Air Group stock, and the complaint that US Airways should have allowed for a greater [*772] percentage of

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 10 of 17

Page 9
397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

the investment in US Air Group stock was less prudent than holding cash. Thus, plaintiff's claim is that [**32] US Airways acted imprudently by retaining the Company Stock Fund, as it was then structured, especially in light of the increasing concentration of US Air Group Shares in the Company Stock Fund.

Again, the starting point in the analysis of this claim, as with the first claim, must be the statute itself, which in § 404(a) sets forth the standard of care US Airways, as named fiduciary, owed the Plan participants. This provision states, in pertinent part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

ERISA § 404(a), 29 U.S.C. § 1104(a).

Courts construing this provision have sensibly concluded that the "prudent man" standard is an objective [**33] standard and when applied to investment decisions requires the fiduciary to: "(1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions." *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 564 (D. Md. 2003) (quoting *Reich v. King*, 861 F. Supp. 379, 384 (D. Md. 1994)). And, courts have also sensibly ruled that § 404(a)(1)(B)'s requirement that a fiduciary act with the 'care, skill, prudence and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" means, in this context, that a "fiduciary's behavior [is] measured against the standards in the investment industry." *Ulico Casualty*

340 (N.D.N.Y. 2004); *Lanka v. O'Higgins*, 810 F. Supp. 379, 387 (N.D.N.Y. 1992).

The Department of Labor ("DOL") has provided further guidance on the application of the § 404(a) prudent man [**34] standard to a fiduciary's investment decisions. According to the DOL, a fiduciary has satisfied "the prudent man" standard in relation to its investment duties if it:

> has given *appropriate consideration* to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in the that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and . . . has acted accordingly.

29 C.F.R. § 2550.404a-1 (emphasis added). n15 And according to the DOL, "appropriate [*773] consideration" includes a "determination by the fiduciary that the particular investment course of action is reasonably designed . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment . . . ." *Id.* Factors to consider in this determination include: "(i) the composition of the portfolio with regard to diversification; [**35] (ii) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (iii) the projected return of the portfolio relative to the funding objectives of the plan." Thus, although a named fiduciary is not required to ensure the performance of a given plan investment, a named fiduciary is required, at a minimum, to examine the characteristics of an investment, including its risk characteristics and its liquidity, to ensure that it is an appropriate plan investment, and that it is in the best interests of the plan participants.

> n15 The presumption of prudence that applies to the decision of an ESOP fiduciary to invest plan assets in company shares, which was first recognized in *Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995) ("An ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision.") does not extend to a fiduciary's decision to include

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 11 of 17

Page 10
397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

pany shares as an investment option in a 401(k) plan like the plan presently in issue here. *See In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231, 238 (3rd Cir. 2005).

[**36]

The task, then, is to apply these principles here to ascertain whether on the existing record construed favorably to plaintiff a reasonable fact-finder could conclude that US Airways failed to act prudently as the named fiduciary when on or after August 2001, it did not take steps to close the Company Stock Fund or to preclude the Company Stock Fund from acquiring any more US Air Group shares. This is no easy task, for significantly, this is not a case in which a plaintiff alleges fraud or concealment by a fiduciary or that the fiduciary possessed crucial information not publicly available. Cases involving such facts or allegations clearly present triable issues of fact. *See e.g., In re Syncor ERISA Litigation*, 351 F.Supp.2d 970, 981 (C.D.Cal. 2004) (involving allegations that company management engaged in a bribery scheme resulting in criminal charges which adversely affected the stock price); *In re Ikon Office Solutions, Inc. Securities Litig*, 86 F.Supp.2d 481, 483 (E.D.Pa 2000) (involving allegations that the company "systematically engaged in improper accounting, leasing, and billing procedures in order to inflate Ikon stock artificially"). [**37] By contrast, this is a case in which the plaintiff alleges that the publicly available information was more than sufficient to require a fiduciary to take prompt steps to close or restrict the Company Stock Fund and the failure to do so was imprudent under § 404(a). In these circumstances, a breach of fiduciary duty is not as easily discerned and more difficult to establish. This is so because ERISA fiduciaries with responsibility for selecting and terminating plan investment options for plan participants are required to exercise investment judgment in the context of constantly changing, complex financial markets. In doing so, these fiduciaries are entitled to substantial latitude and their judgments must not be assessed using 20/20 hindsight n16

> n16 *See Ulico*, 335 F. Supp. 2d at 340 ("The court must look to the time the fiduciary was making the decisions regarding the Funds, and not hindsight.")

Yet, in the end, it cannot be said that on this record, as a matter of law, US Airways fulfilled [**38] its fiduciary duty to act prudently in selecting and managing the Company Stock Fund as a plan investment. n17 [*774] The current record, construed in plaintiff's favor, reflects

ing US Airways were left unresolved when the merger with United was blocked by the Department of Justice; (ii) management warned of the possibility of a bankruptcy throughout the class period; (iii) analysts repeatedly downgraded US Air Group's debt rating; (iv) US Airways had well known cash flow problems; (v) the September 11, 2001 terrorist attacks had a particularly acute impact on US Airways' business; (vi) during the proposed class period the Company Stock Fund accumulated nearly a third of all US Air Group shares outstanding in the Company Stock Fund in a market with quickly diminishing demand for such shares; and (vii) the independent fiduciary, Aon, halted purchases of US Air Group stock immediately upon its appointment, raising the possible inference that US Airways was imprudent in not acting similarly earlier. All of these factors, taken together, are sufficient to allow a jury to question the prudence of the decision to continue to allow the Plan [**39] to invest in US Air Group stock.

> n17 While the parties have cited no case with facts essentially similar to those presented here, other decisions support the denial of summary judgment on the current record. *See In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 475 (S.D.N.Y. 2005) (holding that a plaintiffs stated a claim for breach when defendants maintained an investment in company stock despite a steep drop in stock price); *In re Uniphase Corp. Erisa Litig*, 2005 U.S. Dist. LEXIS 17503, No. C 03-04743, 2005 WL 1662131, at *8 (N.D.Cal. July 14, 2005) (denying a motion to dismiss in part on continued investments in company stock despite declining business); *In re Sprint Corp ERISA Litig*, 388 F. Supp. 2d 1207, 2004 U.S. Dist. LEXIS 9622, 2004 WL 1179371, at *8 (D.Kan. 2004) ("Plaintiffs' complaint, however, states a claim that defendants were acting in their fiduciary capacities by allowing the Company Stock Fund to invest so heavily in Sprint stock"); *Meyer v. Berkshire Life Ins Co.* 250 F. Supp. 2d 544, 566 (D.Md. 2003) (finding a breach of the prudent man standard because of a lack of appropriate consideration of the investment's opportunity for gain versus its risk of loss). Indeed, the Third Circuit has found a continuing investment in company stock despite declining fortunes sufficient to overcome the presumption of prudence that applies to ESOPs, but does not apply to the US Airways Plan. *Moench v Robertson*, 62 F.3d 553, 572 (3rd Cir. 1995), *see supra* note 15.

[**40]

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 12 of 17

Page 11

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

Of course, there are also facts and circumstances militating against a finding that US Airways breached its fiduciary duty. Thus, US Airways may demonstrate to a jury that it gave appropriate consideration to its decision to maintain the Company Stock Fund as a Plan investment option. The misfortunes of US Airways were well known to investors, and therefore, reflected in the US Air Group share price. Through the spring of 2002, US Airways management continued to pursue strategies to improve US Airways financial prospects and avoid bankruptcy, including: (i) negotiating loans with the federal government; (ii) negotiating concessions with its employees in order to reduce costs; and (iii) expanding its regional jet service in an attempt to improve profitability. These significant efforts were pregnant with promise; had any proved successful, investments in US Airways shares may well have proved quite lucrative. Therefore, US Airways may persuade a jury that it prudently considered the potential upside in US Air Group stock as outweighing the risks of bankruptcy. For summary judgment purposes, however, it is enough that plaintiffs have demonstrated facts sufficient to allow a jury to [**41] find that US Airways did not appropriately consider the continued retention of the Company Stock Fund.

Yet, this does not end the summary judgment analysis, for US Airways argues that ERISA § 404(c)(1) shields it as a matter of law from liability for its alleged breach of fiduciary duty. Specifically, US Airways argues that § 404(c) shields it [*775] from liability because Plan participants made their own investment choices and were in sole control of whether they directed assets to the Company Stock Fund or any of the other Plan investment options.

ERISA § 404(c)(1) provides that:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)--
>
> (A) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and
>
> (B) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

ERISA [**42] § 404(c)(1), 29 U.S.C. § 1104(c)(1). By its terms, therefore, § 404(c) makes clear that in appropriate instances, a fiduciary is shielded from liability, even when the fiduciary arguably may have breached its duties. Yet importantly, this protection from liability is available only if three conditions are met.

The first condition--that the plan at issue be "a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account"--is not disputed. *Id.* The term "individual account plan" is defined in ERISA § 3(34), 29 U.S.C. § 1002(34), as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account . . . ." ERISA § 3(34), 29 U.S.C. § 1002(34). The US Airways Plan squarely fits this definition; it provides for individual accounts and permits a participant to exercise control over the assets in his account by allowing the participant to move assets into and out of the various investment options available under the Plan. The first [**43] of § 404(c)'s conditions is therefore met.

The second condition for the application of § 404(c)(1)'s shield to fiduciary liability requires the participant to have *actually* exercised the control permitted by the Plan. This inquiry must be guided by the DOL regulations promulgated pursuant to § 404(c). *See* 29 C.F.R. § 2550.404c-1. Generally speaking, these regulations provide that a participant or beneficiary will be deemed to be exercising control over the assets in his account if the plan allows the participant to:

> (1) choose from a broad range of investment alternatives . . . each of which has materially different risk and return characteristics;
> (2) give investment instructions with a frequency appropriate in light of the volatility of the investment alternatives . . .;
> (3) diversify investments within the investment alternatives; and
> (4) obtain sufficient information to make informed investment decisions with respect to investment alternatives available under the plan

*See* Final Regulation Regarding Participant Directed Individual Account Plans, 57 Fed. Reg. 46906, 46906 (October 13, 1992) (codified [**44] at 29 C.F.R. § 2550.404c-1). The question whether the Plan satisfies these detailed requirements is not without some com-

Case 1:04-cv-11380-WGY  Document 60  Filed 01/24/2006  Page 13 of 17

Page 12

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

addressed, because US Airways cannot meet the third condition.

The third condition is essentially a causation requirement that limits fiduciary liability only if the "loss" or the [*776] "breach" is the result of a participant's exercise of control. ERISA § 404(c)(1)(B). US Airways' decision to retain the Company Stock Fund as an investment option, and the consequent loss to the Plan, cannot plausibly be viewed as "resulting from [any] participant's or beneficiary's exercise of control." Id. As the DOL has consistently noted, "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an § 404(c) plan is a fiduciary function which . . . is not a direct or necessary result of any participant direction of such plan." n18 Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 Fed. Reg. 46906, 46924 n. 27 (October 13, 1992). Put differently, the alleged [**45] breach in this instance is not the type envisioned by Congress when it drafted § 404(c)'s exemption from liability for breach, as US Airways clearly had sole and plenary authority under the Plan to select and retain the various Plan investment options that was in no way contingent on Plan participants' acts. n19 Plan § 7.1. This conclusion is supported by the absurdity of the alternative. If a participant's direction to invest a portion of his account in a given investment shielded the named fiduciary from liability for its imprudent selection and retention of that investment in the plan, then by logical extension, a fiduciary who offered only imprudent plan investment options likewise would be shielded from liability by the mere fact that a plan participant decided to participate in the plan at all. The claim that Congress intended such a broad exception to the otherwise demanding standard of fiduciary conduct required by ERISA strains credulity. See In re Electronic Data Systems Corp., 224 F.R.D. at 625. (citing Varity Corp. v. Howe, 516 U.S. 489, 513, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996)).

n18 See also, Final Regulation Regarding Participant Directed Individual Account Plans, 57 Fed. Reg. 46906, 46922 (October 13, 1992); DOL ERISA Opinion Letter No. 98-04(A), 1998 WL 326300, *2 n.1 (May 28, 1998); Letter from Pension and Welfare Benefits Administration, U.S. DOL to Douglas O. Kant, 1997 WL 1824017, *2 (Nov. 26, 1997); Brief for United States Department of Labor as Amicus Curiae Opposing Motions to Dismiss, In re Enron Corp Securities, Derivative & ERISA Lithog., 284 F. Supp. 2d 511(S.D.Tex. 2002) 2002 WL 32157092 at *37 and n.9. Though the DOL's position is not part of the regulations and therefore does not have the force of law, it is entitled to deference because of its "power to persuade." See Skidmore v Swift & Co., 323 U.S. 134, 140, 89 L. Ed. 124, 65 S. Ct 161 (1944) ("The weight of [agency guidance] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

[**46]

n19 See In re Elec. Data Sys. Corp. "ERISA" Litig., 224 F.R.D. 613, 625 (E.D.Tex 2004) ("Thus, the 404(c) is inapplicable to shield plan fiduciaries from liability for imprudently selecting the plan's investment options and overseeing their performance."); Schied v Dynegy, Inc (In re Dynegy, Inc. ERISA Litig.), 309 F. Supp. 2d 861, 893-94 (S.D.Tex. 2004) (holding that 404(c) is not applicable to claims of breach for failure to prudently manage investments); In re Enron Corp. Securities, Derivative & ERISA Lithog., 284 F. Supp. 2d 511, 578 (S.D.Tex. 2003) (same).

The examples used to illustrate the DOL's regulations implementing § 404(c)(1) support this interpretation. n20 [*777] See 29 C.F.R. 2550.404c-1(f). To demonstrate the typical situation in which § 404(c)(1)'s shield would operate, the regulations hypothesize a situation where a participant, exercising control permitted by the plan, directed the fiduciary to engage in a transaction with a party in interest. In this situation, the fiduciary would not be liable under ERISA § 406 [**47] as it normally would because the fiduciary's breach in this instance was the result of a participant's exercise of control. See 29 C.F.R. 2550.404c-1(f)(6). The regulations then proceed to provide examples of the operation of § 404(c)(1) in the context of investment decisions. See 29 C.F.R. § 2550.404c-1(f)(10), (11). These examples assumes that a participant directs a plan fiduciary to invest all of the assets in his individual account in a collective trust managed by the fiduciary. In the example in subsection (f)(10), the value of the common stocks in the collective trust are then assumed to decline due to economic factors. In this situation, the fiduciary is not liable because the losses are the result of the participant's exercise of control, and there is no alleged breach by the fiduciary. On the other hand, as subsection (f)(11) makes clear, where the fiduciary,

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 14 of 17

Page 13

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

in managing the collective trust fund, invests the assets of the fund solely in a few highly speculative stocks[,] . . . [The fiduciary] is liable for losses resulting from its imprudent investment in the speculative stocks and for [**48] its failure to diversify the assets of the account. *This conduct involves a separate breach of [the fiduciary's] duty that is not a direct or necessary result of [the participant's] exercise of control.*"

29 C.F.R. § 2550.404c-1(f)(11) (emphasis added). As the regulations clearly envision, a breach of a fiduciary's duty to exercise prudence in selecting Plan investment options is not the type of breach for which § 404(c)(1) provides a defense.

> n20 Because the statute clearly confers authority on the DOL to promulgate the regulations, and because the regulations, unlike the text of the preamble, did undergo notice and comment rulemaking, they are entitled to *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001); *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-45, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984).

In opposition to this conclusion, US Airways relies chiefly on the Third Circuit's decision in *Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)* 74 F.3d 420, 445-46 (3rd Cir. 1996) [**49] n21 Closely read, this opinion is neither apposite nor persuasive here. To begin with, because the DOL's regulations were not in effect when the transactions at issue in *In re Unisys* occurred, the Third Circuit did not consider them in its analysis. *See In re Unisys*, 74 F.3d at 444 n.21 Moreover, the decision fails to draw the important distinction between losses caused by a participant's exercises of control and losses attributable to a fiduciary's acts or failures to act. Thus, in the Third Circuit's view, § 404(c)(1) would shield a fiduciary from liability for its imprudent investment decisions if "a causal nexus between a participant's or a beneficiary's exercise of control and the claimed loss is demonstrated." *Id.* at 445. Accordingly, if a defendant fiduciary could demonstrate that "a beneficiary's control was a cause-in-fact, as well as a substantial contributing factor in bringing about the loss incurred," the defendant fiduciary would be entitled to the § 404(c) shield from liability. *Id.* Yet this is dictum, for ultimately, the Third Circuit declined to apply the § 404(c) defense because it found that the participants did not exercise [**50] actual control. *Id.* at 447. n22 Thus this dicta concerning [*778] the causation language of § 404(c)(1)(B) understandably did not fully develop the scope of § 404(c)'s protections for the breach of the fiduciary

> N21 Plaintiff also relies on the district court opinion in *Schwartz v. Gordon*, No.80 Civ. 5036, 1983 U.S. Dist. LEXIS 20130 (S.D.N.Y. 1983). The case is distinguishable on its facts, because the plaintiff and not the defendant bank selected the imprudent investments at issue, and thus there was no question that the loss was attributable to plaintiff's exercise of control.

> n22 Because the Third Circuit decided that the available facts at issue did not prove that the participants in fact exercised control, they did not consider the difficulty that would arise if a court were forced to make independent causation inquiries about every participant in the plan at the summary judgment stage. *See In re Unisys*, 74 F.3d at 447 But see *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 487-88 (W.D.N.C. 2003) (denying a motion for class certification because consideration of whether a participant exercised control would require independent determination).

[**51]

Under ERISA § 409(a) a fiduciary is liable only for a loss which "results from" its breach. n23 If a given loss to a plan "results from" a participant's exercise of control, then that loss necessarily did not "result from" the fiduciary's breach and therefore, the fiduciary would not be liable under § 409(a) for that loss. Conversely, and in exactly the same way, if a given loss "results from" the breach of the fiduciary's duty, it necessarily cannot "result[] from . . . [a] participant's or beneficiary's exercises of control," and therefore § 404(c)(1)'s protection from liability does not apply *except* in the unusual situation (described in § 404(c)(1)) where the fiduciary's breach is itself caused by a participant's exercise of control. The *In re Unisys* dicta assumes that any given loss to an ERISA plan could "result from" both a participant's exercise of control and a fiduciary's *independent* imprudent selection of investment options, and that if a participant's exercise of control is merely a 'substantial contributing factor" the fiduciary will be relieved of liability for its independent breach. Thus, under the *In re Unisys* dicta, § 404(c)(1)'s protections [**52] would apply to situations where a fiduciary's breach and a participant's exercise of control are independent causes to the overall loss to a plan. This is inconsistent with the scope of § 404(c)(1)

Case 1:04-cv-11380-WGY    Document 60    Filed 01/24/2006    Page 15 of 17

Page 14
397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

as elucidated by the DOL, namely that the protection of § 404(c)(1) applies only where the fiduciary's breach and the consequent loss to the plan is a direct result of the participant's exercise of control. And, as noted above, the *In re Unisys* dicta arguably leads to absurd results in light of ERISA's well-recognized emphasis on the protection of employee's assets invested in the plan. *See Varity Corp v. Howe*, 516 U.S. 489, 513, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) (considering ERISA's purpose of protecting the financial interests of participants, "it is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy."). Because US Airways' alleged breach of its fiduciary duty was not caused by participant's exercise of control, US Airways is not entitled to the protections from liability afforded by § 404(c).

n23 Section 409 provides that a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be liable to make good to such plan *any losses to the plan resulting from each such breach* . . . ." ERISA § 409(a), 29 U.S.C. § 1109(a) (emphasis added).

[**53]

The fact that § 404(c)(1)'s protections do not apply in these circumstances does not, however, prohibit US Airways from arguing that some portion of the decline in the assets of the Plan are due not to its alleged breach, but to other factors, whether participant exercises of control or general economic factors. As noted, under § 409(a) a fiduciary is liable only for losses that result from its breach, and therefore not for any losses that result from other factors. Plaintiffs retain their ultimate burden to prove that any losses suffered by the plan are the result of US Airways' alleged breach of its fiduciary duty. *See Electronic Data Systems*, 224 F.R.D. at 625 n.11 [*779] Although the Fourth Circuit has not had the opportunity to pass on the showing required to prove causation under § 409, US Airways has not demonstrated the absence of disputed facts concerning causation under the broad standards adopted by other circuits. *See Roth v. Sawyer-Cleator Lumber Co*, 61 F.3d 599, 604 (8th Cir. 1995) ("'losses to the plan' in § 1109 [should be construed] broadly in order to further the remedial purposes of ERISA.") (citations omitted); *Dardaganis v. Grace Capital Inc*, 889 F.2d 1237, 1243 (2d Cir. 1989) [**54] ("If, but for the breach, the Fund would have earned more than it actually earned there is a 'loss' for which the breaching fiduciary is liable."). Accordingly, US Airways is not entitled to summary judgment on causation grounds.

## IV.

Plaintiff also claims that US Airways is liable under ERISA § 405(a), 29 U.S.C. § 1105(a), n24 for the breaches of its co-fiduciaries, which allegedly include Fidelity, the Human Resources Committee and the Pension Investment Committee of US Airways, as well as the members of those committees. As an initial matter, US Airways can have no co-fiduciary liability for the acts or omissions of Fidelity. While Fidelity was a fiduciary, it was a directed trustee, and as such, it breached no duty to the Plan with respect to investment options generally and the Company Stock Fund in particular. *See DiFelice v. U.S. Airways, Inc, et al.*, F.Supp.2d , 2005 U.S. Dist. LEXIS 22182, 2005 WL 2386227 (E.D. Va. 2005). And because a co-fiduciary's breach is a prerequisite to any form of co-fiduciary liability it follows that US Airways can have no § 405(a) co-fiduciary liability stemming from any failure to act by Fidelity. This [**55] reasoning, of course, does not apply to plaintiff's allegations of co-fiduciary liability based on the acts or failures to act by other persons or committees alleged by plaintiff to be fiduciaries by virtue of delegated authority under the Plan.

n24 ERISA § 405(a), 29 U.S.C. § 1105(a), describes the circumstances which give rise to liability for the breach of a co-fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

under the circumstances to remedy the breach.

[**56]

ERISA defines a fiduciary as a person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets . . . [or] has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), (iii), 29 U.S.C. 1002(21)(A)(i), (iii). Significantly, § 3(21)(A) makes clear that the "term [fiduciary] includes any person designated under section 405(c)(1)(B) of this title." Section 405(c)(1) concerns the effects on the liability of a named fiduciary, such as US Airways, when it delegates its authority under the plan to employees, such as the Pension and Investment Committee, and makes clear that while a plan may allow a named fiduciary to delegate its [*780] responsibilities, it may not thereby shield itself from liability. n25

n25 ERISA § 405(c) provides, in part:

(c) Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities

(1) The instrument under which a plan is maintained may expressly provide for procedures . . . (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

(2) If a plan expressly provides for a procedure described in paragraph (1), and pursuant to such procedure any fiduciary responsibility of a named fiduciary is allocated to any person, or a person is designated to carry out any such responsibility, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that--

(A) the named fiduciary violated

section 404(a)(1) of this title--

(i) with respect to such allocation or designation,

(ii) with respect to the establishment or implementation of the procedure under paragraph (1), or

(iii) in continuing the allocation or designation; or

(B) the named fiduciary would be otherwise liable in accordance with [ERISA § 405(a)].

ERISA § 405(c), 29 U.S.C. § 405(c).

[**57]

Article 13 of the Plan allows the Board of Directors to delegate to employees any of the Company's authority under the Plan. Plaintiff's uncontested allegation is that the Board delegated to the Pension Investment Committee the fiduciary responsibility to manage Plan assets, including setting the Plan's investment policies. As such, this committee and its members clearly qualify as fiduciaries under ERISA § 3(21)(A) and therefore, by operation of § 405(c), US Airways would retain any liability under ERISA § 405(a) for any breaches committed by these committees or employees. Therefore, US Airways is not entitled to summary judgment for the alleged breaches of employees or committees to whom it has delegated authority.

Plaintiff contends that US Airways is also liable for the acts of its employees under common law agency principles. This allegation fails as a matter of law, for it is clear that the common law is, in this case, supplanted by ERISA. The Supreme Court has made clear that "in order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534, 123 L. Ed. 2d 245, 113 S. Ct. 1631 (1993) (citing [**58] *Mobil Oil Corp v. Higginbotham*, 436 U.S. 618, 625, 56 L. Ed. 2d 581, 98 S. Ct. 2010 (1978); *Milwaukee v. Illinois*, 451 U.S. 304, 315, 68 L. Ed. 2d 114, 101 S. Ct. 1784 (1981)). Because ERISA § 405(c) directly addresses the liability of a fiduciary for the breaches of its

Case 1:04-cv-11380-WGY   Document 60   Filed 01/24/2006   Page 17 of 17

Page 16

397 F. Supp. 2d 758, *; 2005 U.S. Dist. LEXIS 24914, **;
36 Employee Benefits Cas. (BNA) 1204

delegates, it has therefore supplanted traditional agency principles in this specific context. n26 Therefore, ERISA § 405(c) is the lone remedy available to plaintiffs for any alleged breach by US Airways' committees or employees.

n26 The district court in *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132 (D. Mass. 2004), allowed a claim based on agency principles because it could not "cite a single authority that evinces an intent within ERISA to eliminate the vicarious liability of a corporation for the acts of its employees or agents." *Kling*, 323 F. Supp. 2d at 146. The district court opinion in *Kling* did not consider ERISA § 405(c), which deals precisely with the issue of principal liability for delegated authority. *Id.* ("However, Defendants have failed to cite a single authority that evinces an intent within ERISA to eliminate the vicarious liability of a corporation for the acts of its employees or agents."). *See also, Stanton v. Shearson Lehman/American Exp., Inc* 631 F. Supp. 100, 104-05 (N.D. Ga. 1986) (applying respondeat superior liability to a brokerage firm for the acts of an individual broker without considering the effect of § 405(c)).

[**59]

[*781] V.

In summary, because plaintiff is unable to identify any failure of US Airways to disclose information required by the statute to be disclosed, and because there are no record facts indicating that US Airways misled participants in any material regard, or failed to correct any participant's misunderstanding of which it was aware, defendant's motion for summary judgment must be granted as to plaintiff's failure to disclose claims. Plaintiff's claims for the imprudent management of plan assets stand on a different footing. The facts are sufficient to raise a triable issue of fact as to US Airways' prudence in retaining the Company Stock Fund as a plan investment option on or after August 2001. And because US Airways' alleged breach is not the result of any participant's exercise of control over his or her account, US Airways cannot avail itself of the § 404(c) defense. Therefore, US Airways' motion for summary judgment must be denied with respect to plaintiff's claims for breach of its fiduciary to duty to exercise prudence in determining whether to close the Company Stock Fund or otherwise cease to offer units of the Company Stock Fund to Plan participants on or after August [**60] 2001 in view of US Airways failing financial prospects.

An appropriate Order has issued.

Alexandria, VA
October 19, 2005

T. S. Ellis, III

United States District Judge