LEXSEE 2005 U.S. DIST. LEXIS 12624

JOHN D. BRUGOS, et al., Plaintiffs vs. GERRY NANNENGA, et al., Defendants

CAUSE NO. 2:03-CV-547 RM

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

2005 U.S. Dist. LEXIS 12624

June 24, 2005, Decided

**SUBSEQUENT HISTORY:** Motion denied by Brugos v Nannenga, 2005 U.S. Dist. LEXIS 18350 (N.D. Ind., Aug. 25, 2005)

**COUNSEL:** [*1] For John D Brugos, Douglas Robinson, solely in their capacities as fiduciaries and members of the Special Litigation Committee and Board of Trustees of the Indiana Regional Council of Carpenters Pension Trust Fund a/k/a Northwest Indiana Regional Council of Carpenters Pension Trust Fund, Builders and Carpenters LLC, Plaintiffs: Kevin B Duff, Marion B Adler, Rachlis Durham Duff & Adler, Chicago, IL.

For Indiana Regional Council of Carpenters Pension Trust Fund, also known as Northwest Indiana Regional Council of Carpenters Pension Trust Fund, Plaintiff: Drew G A Peel, Scott F Hessell, David E Suchar, Kirkland and Ellis -- Chi/IL, Chicago, IL.

For Gerry Nannenga, Defendant: David Cerven, David Kenneth Ranich, Joseph A Samreta, Burke Murphy Costanza and Cuppy LLP -- Mun/IN, Munster, IN; Natalie V Shrader, Burke Murphy Costanza and Cuppy, Munster, IN

For Debbie Nannenga, Defendant: David Kenneth Ranich, Burke Murphy Costanza and Cuppy LLP -- Mun/IN, Munster, IN; Natalie V Shrader, Burke Murphy Costanza and Cuppy, Munster, IN.

For Carl Paul Ihle Jr, Sand Creek Sales & Development Inc, doing business as IPO Real Estate LLC doing business as Coffee Creek Realty, Defendants: [*2] Alison L Benjamin, Nick J Thiros, Cohen & Thiros PC, Merrillville, IN.

For Peter Manous, Defendant: Mark L Rotert, Law Office of Mark L Rotert, Chicago, IL; Matthew J Gulde The Law Office of Mark L Rotert, Chicago, IL; Scott E Yahne, Efron Efron & Yahne PC, Hammond, IN.

For Lake Erie Land Co, Defendant: Ronald S Safer PHV, John C Martin PHV, Matthew D Lahey, Schiff Hardin LLP -- Chi/IL, Chicago, IL.

For Robert Novak, Defendant: Gregory J Sarkisian, Sarkisian and Fleming, Portage, IN; Albert J Lucas, Peter A Rosato, Calfee Halter & Griswold LLP -- Col/OH, Columbus, OH; John Patrick Reed, Abrahamson Reed & Bilse, Hammond, IN.

For James Bohlen, Defendant: Albert J Lucas, Peter A Rosato, Calfee Halter & Griswold LLP -- Col/OH, Columbus, OH; Harold Abrahamson, John Patrick Reed, Kenneth D Reed, Abrahamson Reed & Bilse, Hammond, IN.

For Robert Beiker, Terry Sherwood, ThirdParty Defendants: Steven J Roeder, The Hunt Law Group LLC, Chicago, IL.

For Mark Danielson, ThirdParty Defendant: Blake T Hannafan, Michael T Hannafan, Nicholas A Pavich, Michael T Hannafan & Associates Ltd, Chicago, IL.

For Carl Lakomek, ThirdParty Defendant: Kevin B Duff, Rachlis Durham [*3] Duff & Adler, Chicago, IL.

For David Tharp, ThirdParty Defendant: Kevin B Duff, Marion B Adler, Rachlis Durham Duff & Adler, Chicago, IL.

For Carl Paul Ihle Jr, Cross Defendant: Alison L Benjamin, Cohen & Thiros PC, Merrillville, IN.

For Peter Manous, Cross Defendant: Scott E Yahne, Efron Efron & Yahne PC, Hammond, IN

For Sand Creek Sales & Development Inc, Cross Defendant: Alison L Benjamin, Cohen & Thiros PC, Merrillville, IN.

For Gerry Nannenga, Cross Defendant: Joseph A Samreta, Natalie V Shrader, Burke Murphy Costanza and Cuppy, Munster, IN.

For John D Brugos, Douglas Robinson solely in their capacities as fiduciaries and members of the Special Litigation Committee and Board of Trustees of the Indiana Regional Council of Carpenters Pension Trust Fund a/k/a Northwest Indiana Regional Council of Carpenters Pension Trust Fund, Counter Defendants: Kevin B Duff, Rachlis Durham Duff & Adler, Chicago, IL.

For Mark Danielson, ThirdParty Defendant: Blake T Hannafan, Michael T Hannafan, Nicholas A Pavich, Michael T Hannafan & Associates Ltd, Chicago, IL.

For Carl Lakomek, ThirdParty Defendant: Marion B Adler, Rachlis Durham Duff & Adler, Chicago, [*4] IL.

For Gerry Nannenga, Cross Defendant: Joseph A Samreta, Burke Murphy Costanza and Cuppy, Munster, IN.

For Debbie Nannenga, Cross Defendant: Natalie V Shrader, Burke Murphy Costanza and Cuppy, Munster, IN.

JUDGES: Robert L. Miller, Jr., Chief Judge.

OPINIONBY: Robert L. Miller, Jr

OPINION:

OPINION AND ORDER

This matter comes before the court on five motions to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) by Terry Sherwood, Robert Beiker, David Tharp, John Brugos, Douglas Robinson, Carl Lakomek, and Mark Danielson. For the following reasons, the court denies the motions filed by Messrs. Sherwoood, Beiker, and Danielson, and denies in part and grants in part the motions filed by Messrs. Tharp, Brugos, Robinson, and Lakomek.

BACKGROUND

Familiarity with the basic facts is presumed, and the court recites only those facts needed to resolve today's motions. The plaintiffs have asserted one claim against James Bohlen and Robert Novak alleging breach of fiduciary duties in conjunction with the Pension Fund's investment in the Coffee Creek property and in violation of the Employee Retirement Income Security Act [*5] 29 U.S.C. § § 1104, 1105, and 1109. Mr. Bohlen and Mr. Novak filed their answers to this claim, denying liability and also asserting their own counterclaims, cross-claims, and third-party claims for contribution or indemnification against Terry Sherwood, Robert Beiker, Mark Danielson (trustees when the Pension Fund voted to purchase the Coffee Creek investment), and David Tharp, John Brugos, Douglas Robinson, Carl Lakomek (post-purchase trustees). n1 The counterclaim, cross-claim, and third-party defendants all seek dismissal of the claims against them because they are not ripe and there is no relief upon which can be granted on them.

> n1 After the motions to dismiss were filed against Mr. Bohlen's and Mr. Novak's claims, the plaintiffs filed a third amended complaint. Mr. Bohlen and Mr. Novak filed their answer to the third amended complaint containing identical claims against identical counterclaim, cross-claim, and third-party defendants. The court deems the motions to dismiss as operative against Mr. Bohlen's and Mr. Novak's claims contained in their answer to the third amended complaint

[*6]

STANDARDS OF REVIEW

The motions were filed under both FED. R. CIV. P. 12(b)(1) and FED. R. CIV. P. 12(b)(6).

Rule 12(b)(1) authorizes dismissal of complaints that bring no actionable claim within the federal courts' subject matter jurisdiction. Such a motion presents a threshold question of the court's power over a claim: the court must assure itself that it possesses jurisdiction over the subject matter of a case before it can proceed to take any action on the merits of the action. See Cook v. Winfrey, 141 F.3d 322, 325 (7th Cir. 1998). A court deciding a motion brought under Rule 12(b)(1) may (but need not) accept the truth of the allegations in the complaint, and may look beyond the complaint and the pleadings to evidence that calls the court's jurisdiction into doubt. See Bastien v. AT&T Wireless Servs., 205 F.3d 983, 990 (7th Cir. 2000); see also Long v. Shorebank Dev. Corp., 182 F.3d 548, 554 (7th Cir. 1999) ("The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence [*7] has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." (quotations and citations omitted))

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint, not its underlying merits, see Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990), and the court must accept all factual allega-

Case 1:04-cv-11380-WGY    Document 60-2    Filed 01/24/2006    Page 3 of 13

Page 3
2005 U.S. Dist. LEXIS 12624, *

tions in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiffs. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) Dismissal under Rule 12(b)(6) is proper only if it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief. *Szumny v. American Gen. Fin.*, 246 F.3d 1065, 1067 (7th Cir. 2001).

Under a Rule 12(b)(1) motion, the party asserting jurisdiction bears the burden of demonstrating subject matter jurisdiction by competent proof. *See Thomson v. Gaskill*, 315 U.S. 442, 446, 86 L. Ed. 951, 62 S. Ct. 673 (1942); *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). Under a Rule 12(b)(6) motion, the defendant bears the burden of showing the plaintiff has failed to allege [*8] a claim upon which relief can be granted. *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005).

ANALYSIS

RULE 12(B)(1) MOTION

The Post-Purchase Trustees question the ripeness of Mr. Bohlen's and Mr. Novak's claims, and Messrs. Danielson, Sherwood, and Beiker reference and incorporate the issue. There are "two factors that determine whether an issue is ripe for judicial consideration. First, the issue on which review is sought must be fit for judicial discretion. Second, the courts must take into account any hardship to the parties of withholding court consideration." *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (quotations and citations omitted). The ripeness doctrine "is grounded in both Article III and prudential concerns . . . cases are unripe when the parties point only to a hypothetical, speculative, or illusory dispute[] as opposed to actual, concrete conflicts." *Id.* (quotations and citations omitted).

The Post-Purchase Trustees say the claims for contribution or indemnification are not ripe because the breach of fiduciary duty claims against Mr. Bohlen and Mr. Novak still pend in the underlying litigation. The Post-Purchase Trustees [*9] essentially argue that if Mr. Bohlen and Mr. Novak are found liable for the underlying breach of fiduciary duty claim, only then should they file their (identical) claims against these defendants. Mr. Bohlen and Mr. Novak respond that previous courts have allowed for claims for contribution or indemnification to be filed at the outset of the litigation, and urge the court to do the same as it would better serve this litigation process.

Mr. Bohlen's and Mr. Novak's claims survive the two-factored test for ripeness. The Post-Purchase Trustees' arguments weigh the first factor towards dismissing the contribution and indemnification claims, but does not render the claims so "hypothetical, speculative, or illusory" as to require dismissal for lack of fitness for judicial discretion. Moreover, the second factor strongly counsels against dismissing these claims as unripe. The Pension Fund (the party of interest in the underlying litigation), Mr. Bohlen, and Mr. Novak would incur serious hardship without opportunity for a quick and final litigation and resolution of all the issues in this case. Mr. Bohlen's and Mr. Novak's counterclaims, cross-claims, and third-party claims are ripe for adjudication. [*10] n2

> n2 The court does not address the reference in the Post-Purchase Trustees' reply to Mr. Bohlen's and Mr. Novak's lack of standing to bring a claim of contribution or indemnification under ERISA. *See United States v. Feinberg*, 89 F.3d 333, 340-341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *see also United States v. Magana*, 118 F.3d 1173, 1198 n. 15 (7th Cir. 1997) ("it is improper to present new arguments in a reply brief").

RULE 12(B)(6) MOTIONS

The counterclaim, cross-claim, and third-party defendants all assert Mr. Bohlen and Mr. Novak fail to state a claim for contribution or indemnification upon which relief can be granted. While ERISA does not explicitly provide for a right to contribution or indemnification, the court of appeals has identified such rights in dicta contained in *Donovan v. Robbins*, 752 F.2d 1170, 1177-1178 (7th Cir. 1984), *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984), [*11] and *Alton Mem'l Hosp. v. Metro. Life Ins. Co.*, 656 F.2d 245, 250 (7th Cir. 1981). Such rights do not provide for unlimited relief -- there must be some basis for liability on the part of the supposed contributing or indemnifying party. *See Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 464 (7th Cir. 1991).

The counterclaim, cross-claim, and third-party defendants all say Mr. Bohlen and Mr. Novak state no claim because they have not pleaded enough facts upon which relief could be granted. Plaintiffs need not, however, include all the facts or law showing they can prevail on their claim. FED. R. CIV. P. 8(a); *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). The claim of breach of fiduciary duty brought against Mr. Bohlen and Mr. Novak, contained in count V of the third amended complaint, provides the requisite facts and law to plead a claim under 29 U.S.C. §§ 1104, 1105, and 1109. Mr. Bohlen and Mr. Novak adequately reference count V in their claims for contribution or indemnification, and such reference provides the requisite foundation to put the

Case 1:04-cv-11380-WGY   Document 60-2   Filed 01/24/2006   Page 4 of 13

Page 4
2005 U.S. Dist. LEXIS 12624, *

court will not dismiss the claims for contribution or indemnification on this basis.

Messrs. Brugos, Robinson, Tharp and Lakomek (the "Post-Purchase Trustees") independently argue that no claim for contribution or indemnification can be brought against them because they were not trustees at the time of the underlying breach of fiduciary duty alleged in count V of the third amended complaint. Mr. Bohlen and Mr. Novak respond that the Post-Purchase Trustees could be liable for contribution or indemnification because they failed to divest the Coffee Creek property once they assumed the roles of fiduciaries of the Pension Fund.

For a fiduciary to seek contribution or indemnification against another fiduciary under ERISA, there must be some basis for liability for the underlying claim. *See* Factory Mut. Ins. Co v. Bobst Group USA, Inc., 392 F.3d 922, 924 (7th Cir. 2004); *see also* Daniels v. Bursey, 329 F. Supp. 2d 975, 981 (N.D. Ill. Aug. 5, 2004). Moreover, ERISA provides that "no fiduciary shall be liable with respect to a breach of fiduciary duty . . . if such breach was committed before he became a [*13] fiduciary or after he ceased to be a fiduciary." 29 U.S.C § 1109(b). The Post-Purchase trustees assert that the plain language of count V limits the time frame for the underlying claims against Mr. Bohlen and Mr. Novak so as to bring the Post-Purchase Trustees under the protection of 29 U.S.C. § 1109(b).

The Post-Purchase Trustees' arguments are convincing. Count V of the third amended complaint alleges that Mr. Bohlen and Mr. Novak breached their fiduciary duties during the initial stages of the Coffee Creek investment. According to the complaint, the initial stages took place in 1998 and 1999, when none of the Post-Purchase Trustees were fiduciaries to the Pension Fund. Mr. Bohlen and Mr. Novak only argue the Post-Purchase Trustees could be liable for the damages accrued by not divesting Coffee Creek property, but that conduct is irrelevant to liability for alleged breaches that occurred in 1998 and 1999. n3 Because 29 U.S.C. § 1109(b) expressly precludes any liability for breaches that occurred prior to a fiduciary's appointment, it is beyond doubt that Mr. Bohlen and Mr. Novak cannot prove a set of facts [*14] that would entitle them to relief on their claims against the Post-Purchase Trustees.

n3 Mr. Bohlen's and Mr. Novak's proposed amendments would not cure this deficiency, and so the court need not address their request to amend these claims.

CONCLUSION

For the reasons set forth above, Mr. Danielson's, Mr. Sherwood's, and Mr. Beiker's motions to dismiss are DENIED [Doc Nos. 105, 106, & 118], and the Post-Purchase Trustees' motions to dismiss Mr. Bohlen's and Mr. Novak's claims for contribution or indemnification are DENIED IN PART AND GRANTED IN PART [Doc. Nos. 108 & 109]. Mr. Bohlen's and Mr. Novak's counterclaims against Mr. Brugos and Mr. Robinson, as well as their third-party claims against Mr. Tharp and Mr. Lakomek are DISMISSED WITHOUT PREJUDICE.

SO ORDERED

ENTERED: June 24, 2005

Robert L. Miller, Jr

Chief Judge

United States District Court

LEXSEE 2005 U.S. DIST. LEXIS 6166

IN RE CYTYC CORP. SECURITIES LITIGATION

CIVIL ACTION NO. 02-12399-NMG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

2005 U.S. Dist. LEXIS 6166; Fed. Sec. L. Rep. (CCH) P93,225

March 1, 2005, Decided

**COUNSEL:** [*1] For Robert Haddon, Jacob Blaz, Plaintiffs: Daniel Altman, Rachel S. Fleishman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Nancy F. Gans, Moulton & Gans, PC, Boston, MA.

For Deka Investment Gmb, Plaintiff: Andrew L. Barroway, Darren Check, Stuart L. Berman, Schiffrin & Barroway, LLP, Radnor, PA; David Pastor, Gilman and Pastor, LLP, Saugus, MA; Nancy F. Gans, Moulton & Gans, PC, Boston, MA; Steven G. Schulman, U. Seth Ottensoser, Milberg Weiss Bershad & Schulman LLP, New York, NY.

For Plumbers and Pipefitters National Pension Fund, Plaintiff: Andrew L. Barroway, Darren Check, Stuart L. Berman, Schiffrin & Craig, Ltd, Bala Cynwyd, PA; David Pastor, Gilman and Pastor, LLP, Saugus, MA; Nancy F. Gans, Moulton & Gans, PC, Boston, MA; Steven G. Schulman, U. Seth Ottensoser, Milberg Weiss Bershad & Schulman LLP, New York, NY.

For Congregation Zichron Samuel Ohel Moshe, Stanley Sved, Michael Pickar, Terry Kay Reitz, Plaintiffs: Daniel Altman, Rachel S. Fleishman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Theodore M. Hess-Mahan, Shapiro Haber & Urmy LLP, Boston, MA

For Lead Plaintiffs, Plaintiff: Nancy F. Gans, Moulton & Gans, PC, Boston, MA.

For Cytyc [*2] Corp., Patric J Sullivan, Robert B. Bowen, Defendants: Andrea J. Robinson, Christopher R Noyes, Jeffrey B. Rudman, Peter J. Kolovos, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA;

For Jean-Luc Centeleghe, Movant: Nancy F. Gans, Moulton & Gans, PC, Boston, MA

**JUDGES:** MARIANNE B. BOWLER, United States Magistrate Judge

**OPINIONBY:** MARIANNE B. BOWLER

**OPINION:**

REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION TO DISMISS THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (DOCKET ENTRY # 30)

BOWLER, U.S.M.J.

Pending before this court is a motion to dismiss (Docket Entry # 30) filed in this consolidated class action by defendants Cytyc Corporation ("Cytyc"), Patrick Sullivan ("Sullivan"), Cytyc's President and Chief Executive Officer throughout the class period, n1 and Robert Bowen ("Bowen"), Cytyc's Chief Financial Officer and Vice President throughout the class period. After conducting a hearing, this court took the motion (Docket Entry # 30) under advisement

---

n1 Sullivan also took on the role of Chairman of the Board of Directors on November 20, 2001, a role he maintained throughout the remainder of the class period.

---

[*3]

PROCEDURAL BACKGROUND

The gravamen of the corrected amended complaint (henceforth: "the complaint") (Docket Entry # 27) filed by lead plaintiffs Plumbers and Pipefitters National Pension Fund and Deka Investment GMBH ("plaintiffs") is that Sullivan and Bowen ("the individual defendants") and Cytyc, a company that produces and manufactures

Case 1:04-cv-11380-WGY    Document 60-2    Filed 01/24/2006    Page 6 of 13

Page 2
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

cers, engaged in channel stuffing throughout the class period (July 25, 2001 to June 25, 2002). Channel stuffing is the practice of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999) It has "the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." Greebel v. FTP Software, Inc., 194 F.3d at 202.

The channel stuffing, which purportedly occurred at the end of each quarter, concerned Cytyc's principal product, the ThinPrep system ("ThinPrep"). ThinPrep competes with the more traditional Pap smear test as a means of screening women for cervical [*4] cancer.

Plaintiffs submit that the individual defendants and Cytyc (collectively: "defendants") failed to disclose or only partially disclosed the channel stuffing during the class period. Statements made by Sullivan, various third parties or contained in the company's SEC filings were false or materially misleading regarding the deep discounts that Cytyc offered customers near the end of every quarter. As a result, reported revenues, earnings and market share were artificially inflated. Defendants thereby mislead investors about earnings and the reasons for the company's growth and increased sales. In addition, defendants violated the company's internal revenue recognition policy, SEC regulations and generally acceptable accounting principles ("GAAP") by shipping unordered product to customers and engaging in channel stuffing.

The two count, 62 page complaint, which includes 187 paragraphs, alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants move to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. [*5] ("Rule 12(b)(6)"), for failing to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Defendants additionally seek dismissal on the basis that the statements are inactionable corporate puffery, neither false or misleading, not material and lack the necessary strong inference of scienter. Defendants also rely on the safe harbor provision of the PSLRA pertaining to forward looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i); 17 C.F.R. § 240.3b-6

STANDARD OF REVIEW

In reviewing the motion to dismiss, this court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs. See Alternative Energy v. St. Paul Fire & Marine, 267 F.3d cepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs"). Without crediting unsubstantiated conclusions, Rodi v. Southern New England School of Law, 389 F.3d 5, 10 (1st Cir. 2004) [*6] (ignoring " bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [and] outright vituperation'"), dismissal is appropriate "only if it appears to a certainty that the plaintiff would be unable to recover under any set of facts.'" State Street Bank and Trust Company v. Denman Tire Corporation, 240 F.3d 83, 87 (1st Cir. 2001); accord Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001) (dismissal proper "only if, under the facts alleged," plaintiffs "cannot recover on any viable theory;" internal quotation marks omitted).

The pleading standards under the PSLRA do not alter this standard of review. Aldridge v. A.T. Cross Corporation, 284 F.3d 72, 78 (1st Cir. 2002). Facts, drawn primarily from the complaint as well as certain public and integral documents referred to in the complaint, n2 are as follows

> n2 In re Stone & Webster, 253 F.Supp.2d 102, 128 & n. 11 (D.Mass. 2003) (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In re Millstone Scientific Securities Litigation, 103 F.Supp.2d 425, 450-451 & n. 15 (D.N.J. 2000); see Alternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33-34 (1st Cir. 2001); Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6)); Shaw v. Digital Equipment Corporation, 82 F.3d 1194, 1206 n. 13 & 1220 (1st Cir. 1996) (inasmuch as complaint alleged nondisclosure in registration statement and prospectus, court may examine text of filings and any incorporated SEC filings); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d 206, 213 n. 7 (D.Mass. 2001) (considering "full text of the Form 10-Q," including "parts not relied on by the plaintiffs," on a motion to dismiss inasmuch as complaint refers to the document); see also Clorox Company Puerto Rico v. Proctor & Gamble, 228 F.3d 24, 32 (1st Cir. 2000) (" when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

[*7]

BACKGROUND

Case 1:04-cv-11380-WGY   Document 60-2   Filed 01/24/2006   Page 7 of 13

Page 3
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Cytyc develops, manufactures and markets the sample preparation system known as ThinPrep. ThinPrep is an automated system for preparing cervical cell specimens on microscope slides. In May 1996, Cytyc received premarket approval from the Food and Drug Administration ("FDA") to market ThinPrep as a screening system for cervical cancer. The product directly competes with the conventional Pap smear test. In November 1996, the FDA allowed Cytyc to label and market ThinPrep as "significantly more effective in detecting cervical cancer than the Pap smear." (P 34). n3

> n3 Unless otherwise noted, citations to paragraphs only refer to paragraphs in the complaint, Docket Entry Number 27.

The company, which has a plant in Boxborough, Massachusetts, began selling ThinPrep nationwide in 1997. It is the company's chief or principal product. In September 1997, the FDA gave Cytyc premarket approval to use specimen collected in ThinPrep solution to test for the presence of the human papillomavirus. The company [*8] markets ThinPrep to healthcare providers, insurance companies and clinical laboratories. In 1998, it began marketing ThinPrep selectively overseas in international markets.

Net sales for the year ending in December 2000 reached $ 142,337,000 before the start of the class period. Cytyc's reported share of the cervical testing market prior to the class period ranged from 50% to 60%.

A. Customer Complaints, Discounts and Unordered Products

According to an unnamed, former medical and sales representative ("Cytyc sales representative"), "Beginning in at least 1999, . . . Cytyc typically engaged in channel stuffing at the end of each quarter.'" (P 38). This sales representative dealt directly with physicians concerning ThinPrep and describes, in general terms, that "Cytyc overloaded laboratories with inventory" in order to drive up profitability and sales. (P 38). With slightly greater specificity, he or she identifies Onco, located in Gaithersburg, Maryland as "a frequent victim of Cytyc's channel stuffing." n4 (P 47). Also according to this sales representative, certain unidentified "Cytyc account executives" told him or her that "Cytyc occasionally sent merchandise to laboratories, [*9] despite requests from those customers to refrain from shipping any more product." (P 49)

> n4 The representative does not provide any additional detail such as the amount of product stuffed and the dates of the shipments.

An unnamed former managed care executive ("Cytyc managed care executive") who dealt directly with laboratories and physicians states that, Cytyc offered special discounts to customers "towards the end of each quarter." (P 50). He or she does not identify the customer, the amount of the discount or the relationship of the amount shipped to Cytyc's revenues. Instead, the managed care executive posits that if a customer, again unidentified, "needed only one thousand tests a month, the customer still knew that if it took three thousand tests in the last month of a quarter, Cytyc would offer a much bigger discount." (P 50).

Another unnamed, former regional sales manager who became a senior representative ("Cytyc senior representative") and dealt directly with customers in six western states describes [*10] that, "from at least July 1999, Cytyc shipped additional product to its customers, above what had been ordered" until the customer complained that it had too much inventory. n5 (P 44). Labcorp was one of the Cytyc customers that complained to the Cytyc senior representative about the company's sales practices. n6 (P 49).

> n5 The complaint does not identify when these shipments occurred, the amount and the amount's relation to Cytyc's overall business. There is no indication that the shipments were returned.
>
> n6 The complaint does not attribute this assertion to a particular individual. The source of the statement is thus unknown. There is also no indication when the complaint[s] occurred or the amount of the shipment[s] involved.

A former Cytyc account executive who covered the northwest region ("Cytyc NW account executive") and had direct customer contact relates that customers complained about storing the excess product on "pallets in their hallways." n7 (P 43). Likewise, an unnamed, former Cytyc electrotechnical [*11] technician ("Cytyc technician") relates, again at an undetermined time and in an undetermined amount, seeing "stockpiles of inventory lying unused" when he visited customers in the New England region to fix technical problems. (P 51).

Case 1:04-cv-11380-WGY    Document 60-2    Filed 01/24/2006    Page 8 of 13

Page 4
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n7 Again, no detail is provided regarding the identity of the customers and when and how much pallet storing occurred.

Another former, unnamed Cytyc account executive for California ("Cytyc CA account executive") notes that in December 2000, Cytyc shipped the Palo Alto Medical Foundation ("Palo Alto Medical") "a year's worth of product without having received an order to do so." n8 (P 45). There is no indication that Palo Alto returned the shipment. It was, however, given a 50% discount, which exceeded the typical 20% end of quarter discount. n9

n8 A "year's worth" of ThinPrep would, of course, extend into the class period which began in June 2001.

n9 The complaint fails to articulate the amount of the shipped product discounted and/or the relation to Cytyc's overall revenues.

[*12]

The Cytyc CA account executive also identifies Stockton Pathology, located in Stockton, California, as receiving "six months' worth of product," albeit at an unidentified time. Although not returned, n10 the excess product "lay unused, piled floor-to-ceiling in the customer's offices." (P 45) At an undetermined time, "Stanford University Hospital and Marin Pathology cancelled their agreements with Cytyc because they were fed up with being shipped unwanted merchandise," according to this executive. (P 157).

n10 Although not expressly stated in the complaint, this is the only reasonable inference inasmuch as the complaint depicts how the excess product lay unused at the customer's offices.

"Management" encouraged channel stuffing to meet unrealistic quarterly quotas, according to the Cytyc CA account executive. (PP 46 & 47). Channel stuffing occurred at the end of every quarter, according to both this executive and the Cytyc managed care executive (PP 111 & 123) and was well known in the company (P 150). During [*13] the last quarter of 2001, the company increased its channel stuffing practices by offering "extra incentives" to customers and created a "war room'" to field the daily telephone calls from sales representatives giving updates of sales figures, according to an unnamed human resources representative at Cytyc who describes Sullivan and Bowen as "very involved" in daily management. n11 (PP 40 & 101). As a result of the channel stuffing, the market share described to analysts by Sullivan and other management officials was allegedly overstated (P 47)

n11 The company was highly focused on meeting the sales quotas which were "set by Cytyc's management" (P 153) and, according to an unnamed manufacturing manager ("Cytyc manufacturing manager"), top executives met frequently with employees "to discuss sales strategies." (P 39). Cytyc senior management also closely managed the everyday business of Cytyc and attended meetings with the salesforce. (PP 41 & 150).

Cytyc disclosed the use of discounts in the December 2000 Form 10-K [*14] annual report, signed by Sullivan and Bowen, in the following terms:

The Company's success and growth will depend on market acceptance of the ThinPrep System among healthcare providers, third-party payors and clinical laboratories. The Company will continue to sell the ThinPrep Processor to customers and charge separately for related disposable reagent filters and supplies. *In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations.*

(Docket Entry # 32, Ex. B, p. 8; emphasis supplied). Cytyc repeated this disclosure in the company's 2001 Form 10-K annual report. n12 (Docket Entry # 32, Ex. J, pp. 8-9).

n12 Like the 2000 Form 10-K annual report, the 2001 Form 10-K annual report discloses that, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations." (Docket Entry # 32, Ex. J, pp. 8-9).

[*15]

Case 1:04-cv-11380-WGY   Document 60-2   Filed 01/24/2006   Page 9 of 13

Page 5

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Cytyc also shipped "significant" amounts of "additional product" above and beyond what customers ordered. (P 61). As noted above, Cytyc's senior representative describes shipments of unknown quantities of ThinPrep to unknown customers "from at least July 1999." (P 44). At Cytyc, shipping more product than ordered to increase sales occurred near the end of the financial reporting periods. (PP 5 & 7; see also P 49)

B. Specific Company Statements During Class Period

1. July 25, 2001 Press Release

At the outset of the class period on July 25, 2001, Cytyc's stock was trading for $ 24.79. (P 9). On that day, Cytyc issued a press release reporting "record" revenue and earnings for the second quarter of 2001. (Docket Entry # 32, Ex. A). The release accurately reported $ 52,997,000 of revenue for the quarter or net income of $ .13 per diluted share. n13 (P 67; Docket Entry # 32, Ex. D, p. 4; Docket Entry # 32, Ex. J, p. F-22).

n13 There is no indication that these numbers were subsequently restated. (Docket Entry # 32, Ex. J, p F-22).

[*16]

Plaintiffs take issue with the following statements, the first historical and the others forward looking, made by Sullivan in the press release: n14

> "We are pleased to report record revenues and earnings," said Patrick Sullivan, Cytyc's president and chief executive officer. "In addition, we increased our U.S. market share by five percentage points for the second consecutive quarter. Our U.S. market share has grown substantially to approximately 46 percent at June 30 from 36 percent at the end of 2000, and we expect to exceed 50 percent domestic market conversion by year-end. *This growth has been driven by the combination of our proven marketing strategy, best-in-class sales team and superior technology.*"
>
> In conclusion, Mr. Sullivan stated, "As Cytyc continues to achieve record results in the marketplace, I am confident in our ability to *continue the momentum established in the first half of the year.* We look forward to *continuing our consistent quarter to quarter growth* and *delivering*

n14 The press release was relatively short, consisting of two pages of text and two pages of a company balance sheet.

[*17]

(PP 67 & 69-70; emphasis in complaint). Defendants purportedly knew that the stated reasons ("proven marketing strategy, best-in-class sales team, and superior technology") were not the real reasons for the historical growth. Instead, the real reasons were the channel stuffing of products at the end of every quarter and the shipments of unordered product. Cytyc then improperly recognized the revenue on these products at the expense of future sales and in contravention of the company's stated revenue recognition policy, GAAP and SEC rules. (P 68).

With respect to the forward looking statements, plaintiffs submit that defendants knew that the "momentum" and "consistent quarter to quarter growth" were the result of channel stuffing, including the steep, end-of-quarter discounts, and that the momentum could not continue without continuing the channel stuffing practices. (PP 69-70). It is worth noting, however, that the relatively short press release contains the following cautionary language:

> Investors are cautioned that statements in this press release which are not strictly historical statements, including, without limitation, statements regarding management's expectations [*18] for future growth, profitability, and objectives for future management and operations, as well as statements regarding the management and operations . . . constitute forward-looking statements which involve risks and uncertainties which could cause actual results to differ, including, without limitation, risks associated with the Company's dependence on a single product, uncertainty of market acceptance and additional cost, dependence on proprietary technology, dependence on timely and adequate levels of third-party reimbursement, dependence on key personnel, management of growth, limited marketing, sales, and private equity investment experience, and limited number of customers and lengthy sales cycle . . . and other

Case 1:04-cv-11380-WGY   Document 60-2   Filed 01/24/2006   Page 10 of 13

Page 6
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

with the Securities and Exchange Commission, including under the heading "Certain Factors Which May Affect Future Results" in its 2000 Form 10-K filed with the Commission

(Docket Entry # 32, Ex. A). The language in the Form 10-K under the referenced caption provides added detail about the above risk factors. Regarding the "Limited Marketing and Sales Experience" factor, the Form 10-K warns that:

> No assurance can [*19] be given that the Company's direct sales force or strategic marketing relationships will succeed in promoting the ThinPrep System to healthcare providers, third-party payors or clinical laboratories, or that additional marketing and sales channels will be successfully established . . . Failure to successfully expand its marketing and sales capabilities in the United States . . . would have a material adverse effect on the Company's business, financial condition and results of operations

(Docket Entry # 32, Ex. B). With respect to the "Limited Number of Customers and Lengthy Sales Process" factor, the Form 10-K explicitly states that, "Due in part to a recent trend toward consolidation of clinical laboratories, the Company expects that the number of potential domestic customers for its products will decrease." (Docket Entry # 32, Ex. B).

The press release notes that management would discuss the results and future expectations at a 5:00 p.m. conference call later that day. After the conference call, accessed by the public through the company's website, analysts projected the company's market share as soon reaching 50%. (P 72).

2. Bloomberg News Interview August 2, 2001 [*20]

On August 2, 2001, Bloomberg News interviewed Sullivan and published a transcript of the interview. Whereas on July 25, 2001, Sullivan attributed past growth as driven by the company's "proven market strategy" and "sales team," he forecasted that similar factors of the company's "unique sales and marketing strategy" would allow the company to increase its market share in the future. (P 73). Referring to the July 25, 2001 conference call, he projected annual revenues in 2001 as between $ 210,000,000 and $ 220,000,000 and between $ 275,000,000 and $ 300,000,000 for the following year.

The text of the interview reads, in pertinent part, as follows: n15

> [Bloomberg News]: Mr. Sullivan, taking a look at your revenue numbers, this past quarter, they grew at 12% sequentially and they were up about 60% from a year ago. *Can you maintain that kind of growth in terms of revenue?*
>
> Sullivan: *We believe so.* If you look at the market opportunity. We believe we're getting started and hitting our stride. In the sweet spot of the curve. If you look at the 50 million Pap smears, it represents for us about a $ 500 million to $ 700 million market opportunity.
>
> [Bloomberg News]: [*21] *Well, how will you increase, though market share and be aggressive in gaining market share [in] this?*
>
> Sullivan: *We have a unique sales and marketing strategy in that we have a direct sales force that calls on the OB/GYN's who perform the procedure in their office. In addition we have a sales force calling on the laboratory. It is creating the demand at the physician's office.* And we have also started some direct consumer advertising campaigns . . .
>
> [Bloomberg News]: Give *investors some sort of landmarks that they should sort of watch out for or milestones, if you will that they should watch for from your company over the next six to eight months to see that you're certainly on track in terms of exceeding or meeting your growth goals?*
>
> Sullivan: Well, *we've guided the street in our conference call* that we believe we're going to finish this year somewhere between $ 210 million and $ 220 million in top line revenue, [we] believe that we will be at the top end of that range. Next year we expect to be in the $ 275 million to $ 300 million range. In addition we have these additional products that we're currently working on that we expect to have completed [*22] by the end of this year n16

Case 1:04-cv-11380-WGY   Document 60-2   Filed 01/24/2006   Page 11 of 13

Page 7

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n15 Punctuation is taken from the transcript.

n16 Like the July 25, 2001 statements, defendants submit that the statements are corporate puffery and do not denote marketing strategy and the sales force as the only factors effecting growth. They also maintain that the projections, which reference the conference call, were not material inasmuch as they did not alter the total mix of information available to the investing public. Plaintiffs characterize Sullivan's stated reasons as false and materially misleading inasmuch as channel stuffing was and would continue to have an adverse impact on future sales.

(PP 73 & 75, emphasis in complaint; Docket Entry # 32, Ex. C).

### 3. August 8, 2001 Second Quarter Form 10-Q

On August 8, 2001, Cytyc issued the Form 10-Q for the quarter ending June 30, 2001. All defendants, including Bowen, signed the form. The form reflects the following method for recognizing revenue:

> The Company recognizes product revenue upon shipment, [*23] provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(PP 58 & 78; accord Docket Entry # 32, Ex. B & J, pp. F-7) Cytyc therefore recognized revenue upon shipment. n17

n17 As explained in greater length infra, plaintiffs allege that Cytyc departed from this stated policy by recognizing the revenue upon shipping the unordered product and by offering the deep discounts offered customers at the end of every quarter or otherwise engaging in channel stuffing. (P 79)

This second quarter Form 10-Q for 2001 portrays net sales of $ 100,464,000, an increase from the $ 62,303,000 reported during the corresponding period in 2000. The Form 10-Q advises that certain factors may affect future results, refers to additional factors disclosed in the Form 10-K for 2000 and [*24] cautions that, "past financial performance should not be considered an indication of future performance." (Docket Entry # 32, Ex. D, p. 13).

In describing the company's liquidity and capital resources, the form notes that, "Net inventories decreased approximately $ 1.3 million during the six months ended June 30, 2001 primarily due to improved inventory management and production control." (P 81; Docket Entry # 32, Ex. D, p. 11). The release of the August 8, 2001 Form 10-Q caused a one day increase in the price of Cytyc stock from $ 24.20 to $ 25.90.

### 4. October 19, 2001 Boston Herald Article

On October 18, 2001, Cytyc announced that it would acquire Pro-Duct Health, Inc. ("Pro-Duct"), a private company that makes a breast cancer screening device, for $ 38,000,000 in cash and 5,000,000 shares of Cytyc common stock. Sullivan described the acquisition as an "ideal fit" with "an annual potential U.S. market of $ 1.5 billion, growing to $ 4.0 billion." (P 84). The acquisition was scheduled to close and did close in the fourth quarter of 2001. Cytyc's stock increased from $ 25.79 on October 17 to $ 26.55 on October 18, 2001. (P 84; Docket Entry # 32, Ex. E).

On October 19, 2001, the [*25] Boston Herald ran an article quoting Sullivan as saying, '*We feel confident in our success based on our track record with the ThinPrep Pap Smear, which has made this acquisition possible.*'" n18 (P 87, emphasis in complaint; Docket Entry # 32, Ex. E) Cytyc stock closed at $ 28.03 on October 19, 2001 (P 86)

n18 Plaintiffs describe the statement as misleading because it omits the fact that Cytyc's "track record" is based upon undisclosed channel stuffing. Plaintiffs also point out that Cytyc's stock would have been worthless and the acquisition therefore costlier if the company had not artificially inflated the company's stock through channel stuffing. (Docket Entry # 36). Defendants, in turn, assert that the statement amounts to inactionable corporate puffery and there is no connection between the statement, i.e., the efficacy of ThinPrep, and the omitted information of channel stuffing

### 5. October 24, 2001 Press Release

Case 1:04-cv-11380-WGY  Document 60-2  Filed 01/24/2006  Page 12 of 13

Page 8
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

On October 24, 2001, Cytyc issued a press release reporting record revenues for [*26] the third quarter of 2001. Third quarter revenue "was $ 57.2 million, . . . a 54 percent increase from the $ 37 million reported in the comparable quarter last year." n19 (P 89; Docket Entry # 32, Ex. F). Sullivan glowingly described the Pro-Duct acquisition as " providing an excellent opportunity for significant revenue and earnings growth.'" (P 89; Docket Entry # 32, Ex. F)

n19 The Form 10-K for 2001, released in March 2002, reflects these same figures. (Docket Entry # 32, Ex. J, p. F-22).

Plaintiffs take issue with Sullivan's historical description of the company's consistent revenue growth as emanating from " *the effectiveness of [Cytyc's] sales and marketing strategy*.'" n20 (P 89, emphasis in complaint; Docket Entry # 32, Ex. F). According to the complaint, the statement is misleading because the reported growth arose from the "systemic and continuous channel stuffing" as well as shipping unordered products to customers, a practice that alienated such customers and caused them to cease doing business [*27] with Cytyc. (P 90) Further, Cytyc did not experience "consistent revenue and earnings growth" because the Cytyc sales and marketing strategy of channel stuffing pushed sales into earlier quarters at the expense of later periods. (P 91).

n20 The complete statement in the press release is as follows:

"We believe the superior clinical performance of the ThinPrep Pap Test and the *effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance*," said Patrick Sullivan, Cytyc's president and chief executive officer. "Last week we announced that Cytyc has entered into a definitive merger agreement to acquire Pro-Duct Health, Inc., an acquisition that we expect will expand our product line to include breast cancer and provide an excellent opportunity for significant revenue and earnings growth."

(P 89, emphasis in complaint; Docket Entry # 32, Ex. F).

6. January 14, 2002 Press Release

On January 14, 2002, Cytyc issued [*28] a press release reiterating the company's comfort level with the estimate of "approximately $ 0.13 per diluted share" for the 2001 fourth quarter and "approximately $ 0.45 per diluted share" for the full year. (P 95; Docket Entry # 32, Ex. G). Cytyc also forecasted 2002 per share earnings as "approximately $ 0.64 to $ 0.66." (P 95; Docket Entry # 32, Ex. G). The latter forecast did not materialize.

Like the July 25, 2001 press release, the January 14, 2002 press release cautions investors not to rely on the forecasts and that current expectations "are subject to risks and uncertainties which could cause the outcomes to differ materially from [the forward-looking] statements." (Docket Entry # 32, Ex. G). The press release identifies various risk factors and refers investors to the company's SEC filings.

The complaint depicts the falsity of the statements insofar as the revenue numbers, inflated because of the company's channel stuffing practices, contravene the company's stated revenue recognition policy as well as GAAP and SEC rules. (P 100).

7. January 23, 2002 Press Release

On January 23, 2002, Cytyc announced "record" revenues for the 2001 fourth quarter and for the year. [*29] The press release shows revenues "of $ 63 million for the quarter" representing a "49% increase over the fourth quarter 2000 revenues, and" net income of $ 0.13 per share. (P 96). Revenues grew to $ 221 million for the year. (P 96). As set forth in the complaint, these earnings include ThinPrep sales resulting from the channel stuffing and shipments of unordered product thereby violating the company's stated revenue recognition policy, GAAP and SEC rules. (P 100).

The complaint highlights and complains about two statements, the first being historical and the second forward looking, that Sullivan made in the press release. The statements, italicized below, are as follows:

"This was an outstanding year for Cytyc Corporation," said Patrick Sullivan, Cytyc's president and chief executive officer. *"We have now reported fifteen consecutive quarters of revenue growth.* In addition, we acquired Pro-Duct Health, expanding our product line to include breast cancer risk assessment." Mr. Sulli-

Case 1:04-cv-11380-WGY    Document 60-2    Filed 01/24/2006    Page 13 of 13

Page 9
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

the company was further demonstrated by Cytyc's recent addition to the S & P Midcap 400 Index and The Nasdaq-100 Index." Mr. Sullivan concluded, *"We [*30] believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year* and the success of ThinPrep(R) System, to continue domestic and international market conversion to the ThinPrep(R) PapTest(TM), and to launch Cytyc's ductal lavage procedure for patients at high risk for breast cancer."

(P 96, emphasis in complaint).

As the complaint alleges, plaintiffs submit that the first statement is misleading and false because Cytyc achieved the historical growth by resort to undisclosed channel stuffing. n21 (P 100). Again, the reported growth improperly includes sales from the channel stuffing at the end of each quarter and the shipments of unordered products. (P 100). In light of this improper revenue recognition, the assertion that Cytyc was "in a solid position" to build upon previous "momentum" was false and misleading. (P 100). The press release contains cautionary statements similar to those in previous press releases

> n21 Plaintiffs do not take issue with the veracity of the numbers as reflecting what Cytyc achieved. (Docket Entry # 36).

[*31]

8. Bloomberg News Interview January 24, 2002

The day after the January 23, 2002 press release, Bloomberg News interviewed Sullivan about the reported fourth quarter profits. Without referring to the January 23, 2002 press release or the cautionary statements therein, Sullivan forecasted revenues "in the $ 295 to $ 305 million range" and an increase in earnings per share to "between 64 and 66 cents.'" n22 (P 99)

> n22 Defendants submit that the complaint fails to identify which remarks in the interview are false. To the contrary, however, paragraph 99 not only quotes the above forecast but also repeats the forecast by stating that, "Sullivan raised Cytyc's expected revenues for 2002 to between $ 295 million-$ 305 million, up from the $ 275 million-$ 300 million range originally given on August 2, 2001. (P 99). The next paragraph alleges

that, "Defendants knew that the statements in paragraphs 95-97, 99, were false." (P 100). Defendants' additional challenge that the forecast is inactionable puffery (Docket Entry # 39, n. 3, referring to "the January 24, 2002 press release [sic]") is unavailing given the explicit nature of the forecast. The statement, to the extent based on a current projection, provides the revenue range and expected earnings per share for the time frame of one year.

As explained infra with respect to the August 2, 2001 projection and argued in general by defendants in their memorandum (Docket Entry # 31, p. 39) and at the hearing, however, the complaint fails to show sufficient facts to support the information and belief that Sullivan knew the forecast was either false or materially misleading. Neither the opinion by the former human resources employee (P 154) nor his or her characterization of Sullivan and Bowen as "hands-on" managers (P 40) is enough. As to materiality, disclosing the use of discounts as effecting the projection would not alter the total mix of information inasmuch as the SEC filings already disclosed such discounts. Alternatively, the projection fails to warrant liability given the absence of a strong inference of scienter.

[*32]

Shortly after this forecast, the following exchange took place:

> [Bloomberg News]: *What keeps growth moving forward?*
>
> Sullivan: *Well, we're very focused on continued conversion of the ThinPrep Pap Test in the market, from 57 percent to-we believe we could capture-100 percent of the market* n23 There's no reason for a physician to use a conventionally prepared Pap smear, when you have a much more effective test that's in the ThinPrep PapTest . . . In addition, we have acquired a company that puts us into breast cancer screening called Product Health [sic], that we have just launched with our sales force at the beginning of this year. And we expect somewhere between $ 9 and $ 15 million of revenue from that product, to kick in 2002