Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 1 of 19

Page 10
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n23 Defendants characterize this statement as inactionable puffery. Although the statement that Cytyc could capture 100% of the market is corporate puffery, the statement that Cytyc had 57% of the market is not puffery. The statement quantifies market share and two analysts repeated the statement. (P 102); see In re Scientific Atlanta, 239 F.Supp.2d 1351, 1361 n. 6 (N.D.Ga. 2002). The 57% market share statement is nonetheless not actionable given the absence of a strong inference of scienter. See n. 65.

[*33]

(P 99, emphasis in complaint; Docket Entry # 32, Ex. I). Two market analysts repeated Sullivan's statement that the company's current market share was 57%. (P 102).

In February 2002, Cytyc announced a definitive merger agreement to acquire Digene Corporation ("Digene"), a publicly held manufacturer of a cervical cancer diagnostic screening system. Subject to regulatory approval and a tender of over 50% of Digene stock, the deal proposed Cytyc purchasing Digene "for $ 76.9 million in cash, plus 23 million shares of Cytyc common stock." n24 (P 103). Shortly after the announcement, Cytyc shares increased by $ 2.00. (P 104). Although Digene shareholders tendered more than 50% of outstanding Digene shares, the Federal Trade Commission ("FTC") eventually voted to block the acquisition on June 25, 2002.

n24 The 2001 Form 10-K released in March 2002 warns investors that, "Although [Cytyc] expects that its acquisition of Digene will close during the second quarter of 2002, [Cytyc] may not be able to complete the acquisition during the second quarter, or at all." (Docket Entry # 32, Ex. J).

[*34]

On March 1, 2002, Cytyc filed the company's 2001 Form 10-K with the SEC. The form repeats the statement in the 2000 Form 10-K that Cytyc has offered discounts in the past to stimulate demand "and *may elect* to do so in the future" and that such discounts "could *have* a material adverse effect on the Company's business, financial condition and results of operations." n25 (P 110, emphasis in complaint; Docket Entry # 32, Ex. J). The 2001 Form 10-K shows 2001 net sales of $ 220,993,000 or "an increase of 55.6%" over 2000 net sales of $ 142,065,000 (P 115; Docket Entry # 32, Ex. J, p. F-4)

n25 Plaintiffs contend that a reasonable inference from this statement is that Cytyc only offered a one time discount. They point to the April 24, 2002 conference call as supporting this inference. On its face, however, the statement refers to "discounts," not "a discount." Thus, the language of the statement, which refers to the plural "discounts" when describing the discounting in the past, coupled with the fact that the 2000 Form 10-K also notes that Cytyc has offered "discounts" in the past to stimulate demand makes the inference unreasonable.

[*35]

9. April 24, 2002 Conference Call

In an April 24, 2002 press release, Cytyc again announced "record" earnings for the first quarter of 2002. Cytyc reported net sales "of $ 68 million and net income of $ 17.6 million" or "increases of 43% and 58%, respectively, over the numbers for the first quarter 2001." (P 117; Docket Entry # 32, Ex. K). It also reported a market share of 64%. (P 117). The company scheduled a conference call after the close of trading.

The conference call began by cautioning listeners not to rely on forward looking statements. (Docket Entry # 32, Ex. L). During the conference call, Bowen noted that the company's current estimate for the year 2002 is "between $ 0.55 and $ 0.60 per share" (Docket Entry # 32, Ex. L, p. 11), a downward departure from the $ 0.64 to $ 0.66 estimate forecast by Sullivan during the January 24, 2002 Bloomberg News interview.

The complaint states that during the conference call, Cytyc explained that "its larger customers were tightening inventory'" n26 and "that the inventory problem had manifested itself only in the first quarter of 2002." (PP 124 & 125). The actual transcript reveals the following statements regarding inventory: [*36]

> Bowen: . . . Selected large lab ordering patterns shifted lower in the first quarter due to what we believe was an imbalance in physician demand versus existing lab inventory levels or a change in inventory management practice at the lab.
>
> Also during the quarter we implemented a promotional program directed at smaller labs, which was well received. Although we believe that underlying demand at large and small labs continues to increase,

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 2 of 19

Page 11

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

large labs, consolidation in the lab industry and the response to our first quarter and promotional program at smaller labs, we anticipate a decline in near term shipment levels.

> n26 See footnote 28.

(Docket Entry # 32, Ex. L, p. 10). n27

> n27 Plaintiffs do not expressly object to considering the transcript of the conference in defendants' appendix and referred to in the complaint. See Shaw v. Digital, 82 F.3d at 1220; Watterson v. Page, 987 F.2d at 3.

[*37]

Thus, with regard to the inventory problem manifesting "itself *only* in the first quarter of 2002" (P 125, emphasis supplied), the actual transcript shows that both Bowen and Sullivan noted a change or shift in ordering patterns in the first quarter. The complaint alleges that the statement was false or misleading because it fails to disclose the "systemic and continuous channel stuffing" as well as the shipment of unordered product and customer alienation. (P 126).

When asked to "flush out" this sales promotion, Sullivan explained that Cytyc introduced the sales promotion as a response to "a change in ordering pattern at selected larger labs. That change in ordering pattern we believe was either due to an imbalance at the lab in physician demand versus their existing inventory levels at that time or a change in the way in which they choose to manage their ThinPrep Pap Test inventory levels." (Docket Entry # 32, Ex. L, p. 13). In essence, both Bowen and Sullivan disclosed that selected larger laboratories had an inventory "imbalance" and "ordering patterns shifted lower in the first quarter." n28 (Docket Entry # 32, Ex. L, pp. 10 & 13) As a result, the company offered a promotional [*38] program to smaller laboratories during the first quarter.

> n28 The complaint describes the "tightening inventory" statement, which originates from a Bloomberg News report, as misleading because Cytyc omitted that the inventory tightening stemmed from the channel stuffing. (P 124; "Cytyc failed to state that its largest customers had been stuffed with so much extra inventory that there was no need for those customers to order any more product for a long time to come").

The Bloomberg News article, dated April 25, 2002, reads as follows:

> Big laboratories are tightening inventory, and Cytyc offered incentives to smaller labs, analysts said. "The big concern is there's an inventory pushback on the part of large labs," said Banc of America Securities analyst Kurt Kruger, who rates Cytyc buy.' "The company scrambled to provide some discounts to small labs to offset this."

(P 119, quotation marks taken from complaint). Defendants argue, inter alia, that the report fails the entanglement test

[*39]

During the conference call, Sullivan explicitly advised the audience that, "This is not the first time-the first quarter that we've ever had promotional type programs." (Docket Entry # 32, Ex. L, p. 16). Bowen gave a more positive description explaining that, "We don't expect to have promotional programs in the small labs going forward, and what we expect to do is have our pricing patterns return to what we would consider to be the norm." n29 (Docket Entry # 32, Ex. L, p. 16).

> n29 Sullivan's remark not only shows that Cytyc disclosed, again, the discounts, but also militates against a finding of scienter. Given Sullivan's description, Bowen's description shows at most negligence and the attempt to put a good face on the disclosure. The forward looking remark, which in any event is *not* particularized in the complaint, also falls under the safe harbor provision of the PSLRA. The market was not fooled inasmuch as Cytyc stock dropped precipitously the following day

After the conference call, a number of analysts [*40] made statements that plaintiffs seek to attribute to Cytyc. One such third party statement derives from a UBS Warburg report wherein the analyst states that Cytyc stated during the conference call that it had ' instituted a one-time promotion for the smaller labs to drive conversion

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 3 of 19

Page 12
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

the conference call, however, Sullivan explicitly disclaimed that the promotion was a one time offer. (Docket Entry # 32, Ex. L, p. 16).

  n30 Plaintiffs seek to hold Cytyc responsible for this third party statement of the promotion as a "one-time'" event. They submit the description is misleading inasmuch as Cytyc engaged in a continuous pattern of channel stuffing throughout the class period.

In addition to the Bloomberg News article and the UBS Warburg analyst's comments, an April 25, 2002 Pacific Growth Equities analyst report states that, "a change in the ordering and inventory practices of Cytyc's large lab customers necessitated a special promotion targeting smaller labs [*41] in order for Cytyc to meet Q1 expectations.'" n31 (P 120). As a result, the report explains, " Cytyc lowered forward guidance.'" n32 (P 120).

  n31 There is nothing false or misleading about the statement that Cytyc offered a "special promotion." Cytyc did offer a special promotion. There was no duty to also add, "as we've done a number of times in the past." As argued by defendants (Docket Entry # 31, pp. 22-25 & n. 14), the complaint fails to sufficiently pled why the statement was false or misleading. The third party statement attributing the statement to "Cytyc" also fails the entanglement test described infra.

  n32 In particular, the report states that, "Cytyc's recent experience with shifting laboratory inventory practices led to lowered guidance for Q2 and the remainder of 2002." (Docket Entry # 32, Ex. N).

In response to the April 24, 2002 disclosure, Cytyc common stock fell from $ 24.80 per share on April 24 to $ 15.73 per share at the close of trading on April 25. (P 129). In May and June, members [*42] of Cytyc's sales force discussed whether the stock "would plummet further." (P 132).

During the April 24, 2002 conference call, Sullivan intimated that Cytyc was going to try to cue its business more closely to physician demand. According to Sullivan, Cytyc would try to have a leaner "supply chain" and a better understanding of inventory at the laboratories. (Docket Entry # 32, Ex. L, p. 24). In May and June 2002, Cytyc executives informed the salesforce "that they were changing the market strategy, to have more stable shipments so that we wouldn't be flooded at the end of the quarters,'" according to the former Cytyc manufacturing manager. (P 131; see also P 156). The company, however, continued to pressure the sales force to meet the quotas, according to the former Cytyc CA account executive. n33 (P 131).

  n33 The former Cytyc manufacturing manager related that in May and June 2002:

    I heard that the stock is probably going to take a downswing, because of the fact that the channels are flooded. I asked, well how did the channels get that flooded? That became the first time that someone in distribution explained to me that the sales people were under pressure to make deep discounts [in order to convince customers] to buy bigger quantity at the end of quarters in order to meet the goals to keep the revenues up so that the stock price could be maintained.

  (P 132).

[*43]
At least one market analyst viewed the Cytyc issue as short term. According to his or her June 21, 2002 report, " We believe that some of the short term issues, mainly inventory in the channels . . . will be resolved over the next six weeks.'" (P 134). On June 24, 2002, however, Cytyc issued a press release further lowering the company's expected revenues for 2002 to a " range of $ 230 million to $ 245 million, with pro forma earnings of $ 0.40 to $ 0.44 per share.'" (P 137).

During the conference call the following day, "Cytyc representatives explained that the downward revision was necessitated because of the method of gauging demand for ThinPrep that Cytyc had been using, which had been based on shipments to laboratories, overestimated end-user demand." (P 138). Cytyc also announced a change in revenue recognition "to a system that was more reflective of end-user demand." (P 138).

The market negatively reacted to the news and the price of Cytyc shares fell from $ 11.46 per share on June 24 to $ 6.88 per share at the close of trading on June 25, 2002. In contrast to the 64% market share Cytyc reported for the first quarter of 2002 in the April 24, 2002 press

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 4 of 19

Page 13

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

posited that, " we believe the ThinPrep Test had a 50.0% market share at the end of 1Q02.'" (PP 117 & 140). Another market analyst likewise depicted " an inventory overhang of $ 32-35 million that needs to work its way through the lab channel for Cytyc to put this issue behind it " (P 141)

As a further means to infer scienter, the complaint notes that Sullivan and Bowen controlled the content of Cytyc press releases and SEC filings and could therefore falsify information about Cytyc's performance and products. (P 147). Intimately involved in the company, both Sullivan and Bowen were kept informed "on an ongoing basis" about the company's problems. (PP 148-149). n34 Both Sullivan and Bowen, described as "very hands-on managers," attended sales meetings where Cytyc management stressed the importance of meeting sales expectations, according to the former Cytyc CA account executive and the unnamed human resources representative. (PP 153 & 154).

n34 The complaint does not attribute the statement to anyone or provide a time frame.

[*45]

Sullivan also purchased Cytyc stock during the class period. More specifically, on December 6, 2001, Sullivan sold 55,000 shares of Cytyc common stock at a price of $ 24.90 per share. He sold an additional 20,000 shares the following day, also for $ 24.90 per share. Gross proceeds totaled $ 1,867,500 or approximately four times Sullivan's annual salary.

The amount, however, represents approximately 10% of Sullivan's Cytyc holdings. The $ 24.90 share price was not the high during the class period, which briefly hovered around $ 30.00 per share in October 2001. (Docket Entry # 32, Ex. R). n35 Even more significant, Sullivan's sales during the class period are less than his sales both prior to and after the class period. For example, Sullivan sold 130,800 shares or approximately 15% of his holdings in April 2001 and 189,930 shares or approximately 22% of his holdings in December 2002. (Docket Entry # 32, Ex. Q) n36

n35 Although the data is attached to defendants' opposition, it is appropriate to take judicial notice of the sales price during the class period on a motion to dismiss. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3rd Cir. 2002) (affirming lower court's decision to take judicial notice of stock price data on motion to dismiss). Plaintiffs did not object to the submission. In any event, the complaint reflects a class period high of $ 27.59

(P 10), a price still in excess of the price Sullivan sold his shares.

[*46]

n36 Where, as here, plaintiffs raise an allegation of insider trading (see Docket Entry # 36, p. 43) and do not challenge the authenticity of the public documents, this court may consider the entirety of the Form 4 filings without converting the motion to dismiss into a motion for summary judgment. See In re Stone & Webster, 253 F.Supp.2d at 128 & n. 11 (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In re Millstone Scientific Securities Litigation, 103 F.Supp.2d at 450-451& n. 15 (considering numerous SEC public filing documents without converting motion to dismiss into motion for summary judgment and noting that court may consider "matters of public record" and "documents referred to in the complaint"); see also Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6), Fed. R. Civ. P.); Watterson v. Page, 987 F.2d at 3.

C. Cytyc's Revenue Recognition [*47] Policy

As a result of the end of quarter discounts, Cytyc pushed sales into earlier quarters than normally would have occurred. Customers also accumulated inventory in amounts that they did not immediately use. Improper recognition of revenue materially inflated the company's reported results making the financial statements misleading or false, according to the complaint.

Plaintiffs allege that the channel stuffing as well as the shipments of additional and unordered product violated the company's revenue recognition policy, GAAP and SEC regulations n37 thereby evidencing a strong inference of scienter. Plaintiffs maintain that Cytyc's channel stuffing violates certain provisions of the Financial Accounting Standards Board ("FASB"), SEC Staff Accounting Bulletin 101 ("SAB 101"), FASB Statement of Financial Accounting Standards ("SFAS") and an opinion of the Accounting Principles Board ("APB"). n38 The complaint alleges that during the class period, the financial statements of Cytyc violated the following principles of fair financial reporting:

(1) the principle that financial reporting should provide accurate, reliable and useful information concerning an entity's performance [*48] and that investors

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 5 of 19

Page 14
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

monly use the company's performance in the past as a reliable indicator of the company's performance in the future (PP 54 & 61, citing FASB Concepts Statement No. 1; PP 34, 42 & 58-59); n39

(2) the principle that revenues should not be recognized until "realized or realizable and earned" (P 56, citing FASB Concepts Statement No. 5, P 83; SAB 101; FASB Concepts Statement No 2; SFAS No. 48; n40 Accounting Research Board No. 43; APB opinion 10; PP 57, 59 & 80, all citing SAB 101); n41 and (3) the principle requiring companies to "describe known trends or uncertainties" that have a material effect on sales and revenues in all Form 10-K and 10-Q reports, particularly those events known to management that would cause reported financial information not to be reflective of future operating results (PP 63-66, citing 17 C.F.R. § 229.303). n42

n37 The complaint (P 55) correctly notes that under an SEC regulation, 17 C.F.R. § 210.4-01(a)(1), "filings that do not comply with GAAP " will be presumed to be misleading and inaccurate.'" In re Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002) (citing to 17 C.F.R. § 210.4-01(a)(1))

[*49]

n38 GAAP " are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB")'" In re Enron Corporation Securities, 235 F.Supp.2d 549, 572 n. 11 (S.D.Tx 2002). The complaint cites inter alia to FASB Concepts Statements 2, 5, 33, 34, 41, 42, 58, 59 and 83.

n39 In relation to this category, the complaint further notes that by pulling in revenues from future quarters into earlier quarters, defendants violated FASB Concepts Statement Number One because reported revenues in the earlier quarters were not reliable representations of revenues (P 62).

n40 SFAS 48 circumscribes declaring revenue when a right of return exists. See generally Aldridge v. A.T. Cross Corporation, 284 F.3d at 79. There are no particular allegations that Thin-Prep shipments were returned or that such ship-

ments amounted to contingent sales. Moreover, under SFAS 48 allowing a right of return in a particular transaction "does not per se mean that revenue cannot be recognized at the time of sale." In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d 134, 151 (D.Mass. 2001).

Alternatively, the complaint's brief reference to the regulation, without more, is conclusory and lacks the necessary pleading detail required under the PSLRA. See Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d 12, 35 (D.Mass. 2000).

[*50]

n41 Although revenue does not have to be received before recognized, there should be "persuasive evidence of an arrangement." (P 56). In other words, there should be evidence of delivery and a fixed price such that "collectability of the sales price is reasonably assured." (P 56). There must be sufficient evidence of an arrangement. (P 80, quoting SAB 101).

n42 The pertinent SEC regulation imposes a duty on registrants to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The company's financial statements during the class period and the 2001 Form 10-K contain the company's stated policy [*51] for revenue recognition. The policy corresponds to SAB 101 and reads as follows:

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 6 of 19

Page 15

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

> The Company recognizes product revenue upon shipment, provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(PP 58 & 78; accord Docket Entry # 32, Ex. J, p. F-7). The 2001 Form 10-K elsewhere describes Cytyc's policy in a similar manner:

> The Company follows very specific and detailed guidelines in measuring revenue; *however, certain judgments affect the application of its revenue policy. For example, revenue is not recognized from sales transactions unless the collection of the resulting receivable is reasonably assured. The Company assess [sic] collection based on a number of factors, including past transaction history with the customer and the credit-worthiness of the customer.* If it is determined that the collection fee is not reasonably assured, the fee is deferred and revenue is recognized at the time collection becomes reasonably [*52] assured, which is generally upon receipt of cash.

(P 112, emphasis in complaint; Docket Entry # 32, Ex. J, p. 20).

Cytyc's channel stuffing purportedly improperly pulled revenue from future quarters into previous quarters. (P 62, citing FASB Concepts Statement No. 1; PP 33, 41 & 58-59). Because of Cytyc's practice of channel stuffing, the Forms 10-K and 10-Q covering the class period failed to disclose that current revenues were achieved at the expense of future revenues. (P 66). The forms thereby mischaracterized current financial growth and failed to disclose known trends in violation of 17 C.F.R. § 229.303, according to the complaint. (P 66).

DISCUSSION

A. Essential Elements of Securities Fraud Liability

Liability under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, requires the plaintiff to plead with particularity that, in connection with the sale or purchase of a security, the defendant (1) "made a false statement or omitted a material fact;" (2) "with the requisite scienter;" and that (3) the "plaintiff relied on the statement or omission;" (4) "with [*53] resultant injury." In re Boston Tech. Sec. Litig., 8 F. Supp. 2d 43, 52 (D. Mass. 1998); accord Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (the "plaintiff must plead, with sufficient particularity, that the defendant made *a* false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury"). The circumstances in the case at bar primarily concern the first and second elements.

Under the first element, the plaintiff must allege that a defendant either: " (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'" Baron v. Smith, 380 F.3d 49, 52 (1st Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)). The falsity or untruth of the various statements presents a relatively straight forward analysis. The misleading nature of the statements poses a more exacting inquiry.

In order to create liability for an omission, as opposed to [*54] an affirmatively stated falsehood, there must be a duty to disclose the omitted nonpublic information. Gross v. Summa Four, Inc., 93 F.3d at 992 ("corporation must first have a duty to disclose the nonpublic material information"); Shaw v. Digital Equipment Corporation, 82 F.3d at 1202 ("silence, absent a duty to disclose, cannot be actionably misleading") Simply reporting past historical earnings or successes does not give rise to a duty to report present circumstances which are less rosy. Suna v. Bailey Corporation, 107 F.3d 64, 68 (1st Cir. 1997). For example, if a corporation accurately reports that, " This is our eighth consecutive quarter in which our gross has increased,'" there is not duty to add, " We are concerned about the next one.'" Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 n.4 (1st Cir. 1994) (further noting the rule may be different if the defendant apprehends " a disaster'")

Where, however, "a corporation does make a disclosure -- whether it be voluntary or required -- there is a duty to make it complete and accurate." Gross v. Summa Four, Inc., 93 F.3d at 992; Backman v. Polaroid Corporation, 910 F.2d 10, 16 (1st Cir. 1990) [*55] ("voluntary disclosure that a reasonable investor would consider material must be complete and accurate"); In re Boston Tech. Sec. Litig., 8 F. Supp.2d at 54 ("when an issuer opts to make a statement, that statement must be complete and accurate'"); see also Lucia v. Prospect Street High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994) (recognizing that statement can be literally accurate but nonetheless misleading). A duty thus arises

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 7 of 19

Page 16

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." Gross v. Summa Four, Inc., 93 F.3d at 992; see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d 235, 242 (D.Mass. 2001) (" duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement'"); see also Shaw v. Digital Equipment Corporation, 82 F.3d at 1202-1203 ("task depends, in essence, on conceptions of materiality").

It is equally well settled [*56] that the false or omitted fact must be "material." An omitted or misrepresented fact is "considered material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.'" Gross v. Summa Four, Inc., 93 F.3d at 992; accord In re Cabletron, 311 F.3d at 33 ("fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available"). "Information which would have assumed actual significance in the deliberations of a reasonable shareholder is material." Baron v. Smith, 380 F.3d at 52. Issues of materiality are normally left for the "jury rather than resolved by the court on a motion to dismiss." In re Cabletron, 311 F.3d at 34.

In addition to a materially false statement or the omission of a material fact, the plaintiff must show that the defendant acted with scienter. Scienter is " a mental state embracing intent to deceive, manipulate, or defraud.'" Greebel v. FTP Software, 194 F.3d at 194 [*57] (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 47 L. Ed 2d 668, 96 S. Ct. 1375 (1976)). It can be proven with knowing or reckless conduct. Geffon v. Micrion Corporation, 249 F.3d 29, 35 (1st Cir. 2001). Under the former, the plaintiff must show that the defendant "knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors." Geffon v. Micrion Corporation, 249 F.3d at 35. Under the latter, there must be a showing of "more than mere negligence." Geffon v. Micrion Corporation, 249 F.3d at 35. Recklessness, which is more akin to a lesser form of intent than ordinary negligence, Greebel v. FTP Software, Inc., 194 F.3d at 199, consists of " a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" Geffon v. Micrion Corporation, 249 F.3d at 35; Orton v. Parametric

Technology Corporation, 344 F.Supp.2d 290, 299 (D.Mass. 2004) [*58] (same).

B. Pleading Requirements

Greebel is the seminal case in this circuit with respect to pleading a securities action under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the PSLRA. Greebel v. FTP Software, 194 F.3d at 193-194; In re Allaire Corporation Securities Litigation, 224 F.Supp.2d 319, 325 (D.Mass. 2002). As explained in Greebel, the pleading standards under the PSLRA are congruent to the First Circuit's strict and rigorous application of Rule 9(b) prior to the 1995 enactment of the PSLRA. Greebel v. FTP Software, 194 F.3d at 192.

The pleading requirements under the PSLRA, as well as First Circuit caselaw interpreting Rule 9(b), first require the plaintiff to specify in the complaint "each allegedly false or misleading statement including its time, place and content.'" In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324 (quoting Greebel v. FTP Software, 194 F.3d at 193-194). Second, the complaint must " specify the reason or reasons why the statement is misleading.'" Greebel v. FTP Software, 194 F.3d at 193 [*59] (quoting statute with internal brackets omitted). In other words, the complaint must explain and provide factual support as to "why the challenged statement or omission is misleading." Greebel v. FTP Software, 194 F.3d at 193; see In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324 ("every claim that a statement or omission was fraudulent must be supported by facts showing exactly why it was misleading"). Third, if a claim rests on information and belief, the plaintiff must " set forth the source of the information and the reasons for the belief." Greebel v. FTP Software, 194 F.3d at 194; In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324; see also In re Cabletron, 311 F.3d at 28 (discussing inconsistency in definitions of what constitutes a statement made upon "information and belief").

Fourth, the complaint must state "with particularity facts that give rise to a strong inference' of scienter rather than merely a reasonable inference." In re Cabletron, 311 F.3d at 28 (quoting statute). Although pleading scienter may and often is established [*60] through inference, the inference must be strong. In re Cabletron, 311 F.3d at 28 (further explaining how this framework alters "the usual contours" of Rule 12(b)(6) analysis); Greebel v. FTP Software, 194 F.3d at 195 (same). n43

N43 As also explained in Greebel, the PSLRA does not alter the pre-existing substantive definition of scienter employed in the First Cir-

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 8 of 19

Page 17

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Before exploring the absence of a strong inference of scienter with respect to any remaining statements, this court examines and rejects the revenue recognition allegations and the misleading nature of the discounting statement set forth in the financial statements as well as the allegations based upon unordered or additional product. Proceeding along a statement by statement analysis, see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 243; In re Boston Technologies Securities Litigation, 8 F.Supp.2d at 55, [*61] this court then culls the actionable statements in the complaint as distinguished from the nonactionable statements of corporate puffery and those that fall within the safe harbor provision of the PSLRA for forward looking statements.

C. Revenue Recognition

In support of pleading a strong inference of scienter as well as setting forth this material element, plaintiffs point to defendants' purported violations of SEC rules, GAAP and Cytyc's own revenue recognition policy. n44 (Docket Entry # 36, pp. 37-40). Separate and apart from the fact of this case, plaintiffs' legal position is accurate. See Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 (paraphrasing Geffon v. Micrion Corporation, 249 F.3d at 35, that "accounting shenanigans' may be evidence of scienter"); In re Cabletron, 311 F.3d at 39 ("significant GAAP violations also could provide evidence of scienter'"); Greebel v. FTP Software, Inc., 194 F.3d at 203 ("violations of GAAP standards ... could provide evidence of scienter"); In re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d 251, 266 (D.Mass. 2001) (" a violation [*62] of a company's own policies supports an inference of scienter'")

> n44 Plaintiffs additionally contend that the violations of GAAP, SEC regulations and Cytyc's policy show the falsity or misleading nature of the statements made during the class period because revenue should not be recognized until realized or realizable. (See, e.g., PP 60-62).

Plaintiffs identify statements in the Forms 10-K regarding discounts as materially misleading (PP 110-111 & 116) as well as the company's stated policy of recognizing revenue as materially misleading because the company engaged in channel stuffing. (PP 112-114 & 116); see, e.g., In re Cabletron, 311 F.3d at 34 (noting the allegation of financial report filings as materially misleading). Plaintiffs further complain that the company's financial statements were materially false and misleading because they inflated or overstated revenues, accelerated revenues into earlier quarters and failed to disclose known trends such as channel stuffing. (See, e.g. [*63], n45 PP 52, 53, 56 & 66). Unfortunately for plaintiffs, none of these allegations survive defendants' motion.

> n45 To state the obvious, the cited list of paragraphs is not exhaustive.

Turning to the first two aforementioned global categories of revenue recognition violations, it is true that systemically recognizing revenues before earned and accounting for such premature revenues contravene GAAP principles set forth in FASB Concepts Statement Number One. See Sparling v. Daou (In re Daou Sys.), 397 F.3d 704, 2005 WL 237645 at *8 (9th Cir. 2005) ("premature recognition ... could violate other GAAP principles such as" FASB Concepts Statement No. 1); (PP 34 & 58-59; P 61, citing these principles). It is also true that the cited regulations in the second category generally require that a company not recognize revenue in financial statements until "realized or realizable and earned." n46 (P 56; see also PP 57 & 79-80). For example, SAB 101, repeatedly referenced in the complaint (PP [*64] 56, 57, 59 & 80), "requires that " revenue should not be recognized until it is realized or realizable and earned.'" In re BellSouth Sec. Litig., 355 F. Supp. 2d 1350, 2005 WL 327178 at *16 (N.D.Ga. 2005) (quoting SAB 101) Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 2005 WL 57928 at *3 (5th Cir. 2005) (further noting that SEC adopted SAB 101 "to guide companies in applying SEC Rules and GAAP to revenue recognition issues"). SEC regulations additionally state that filings that do not conform with GAAP are presumed to be misleading or inaccurate. (P 55); 17 C.F.R. § 210.4-01(a)(1); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 164 n. 4 (D.Mass. 2000).

> n46 Plaintiffs' citation to a litany of SEC regulations and accounting principles is conclusory and fails to explicitly tie the violation to a particular duty and accounting regulation.

The class period Forms 10-Q and 10-K, however, do not evidence improper revenue recognition [*65] under these regulations. The channel stuffing allegations (see, e.g., PP 68 (f)) are not within the reach of the aforementioned regulations inasmuch as there is no evidence that ThinPrep shipments were returned or that Cytyc engaged in contingent sales, a pattern of undisclosed price protection and take back guarantees or reported revenue from fictitious sales. Cf. Aldridge v. A.T. Cross Corporation, 284 F.3d at 79 (involving price protection policy and

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 9 of 19

Page 18
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

contingent sales as opposed to only channel stuffing). n47 As aptly explained by a court in this district:

> Pull-ins or deep discounts are not the nefariously manipulative scheme that plaintiffs make them out to be. Pull-ins do not result in the improper recognition of revenue under generally accepted accounting principles ("GAAP"). They are actual sales which are treated no differently than any other sale.

n47 The Aldridge case is distinguishable for the reasons set forth by defendants in their reply brief. (Docket Entry # 39, p. 16). Although defendants exaggerate the absence of specific statements, there remains the absence of contingent or fictitious sales, returned product or a pattern of price protection and take back guarantees in the case at bar. The facts fail to indicate that the discounts resulted in revenue not being realized, as reported. See Gross v. Summa Four, Inc., 93 F.3d at 994. Thus, there is an absence of factual support for the necessary element of falsity or material omissions with respect to the innocuous channel stuffing alleged in this action as applied to the alleged GAAP, SEC and company policy violations.

Thus, while the number of former unnamed employees is sufficient and they occupy positions that give them a strong basis for possessing the information about the company's channel stuffing, see In re Cabletron Systems, 311 F.3d at 30; Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 22, the stories themselves lack the necessary facts to support the allegation that Cytyc violated the aforementioned GAAP, SEC and its own revenue recognition rules.

[*66]

In re Peritus Software Services, Inc., 52 F.Supp.2d 211, 223 n. 3 (D.Mass. 1999) (internal quotation marks, brackets and citations omitted). The facts fail to indicate that the discounts resulted in revenue not being realized, as reported and in accordance with the Cytyc's stated accounting or revenue recognition policy. See Gross v. Summa Four, Inc., 93 F.3d at 994. Stated otherwise, the excessive discounting did not prevent transactions from being completed. The financial statements accurately reflect earnings made upon and after persuasive evidence of an arrangement.

In any event, contrary to plaintiffs' position, the discounting was adequately disclosed. The Forms 10-K and 10-Q recognize the use of discounts and that such discounts could have a material adverse effect on Cytyc's financial condition. (Docket Entry # 32, Ex. B & J, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations;" Docket Entry # 32, Ex. D, incorporating risks detailed [*67] in the 2000 Form 10-K and that such risks "may have a material adverse effect upon on the Company's business, financial condition and results of operations").

Accordingly, Cytyc's stated accounting or revenue recognition policy as well as the statement regarding discounts (PP 110-116) in the financial statements neither contravenes the aforementioned regulations in the first and second categories nor amounts to a false or misleading statement. n48 Also in this respect, there is no inference of scienter due to the absence of a violation of the foregoing GAAP and SEC provisions and Cytyc's revenue recognition policy or otherwise. n49

n48 Additional reasons explaining why the discount statement is not misleading or false are discussed infra.

n49 Even if such activity gave rise to a weak inference of scienter, without more, the complaint fails to pled the strong inference of scienter now required under the PSLRA.

The final category of allegedly improper revenue recognition which arises under Item 303 of [*68] 17 C.F.R. § 229.303 is likewise unavailing. n50 First, although the complaint expressly complains about the failure of the Forms 10-K and 10-Q to disclose the use of discounts as a known trend " that would cause reported financial information not to be necessarily indicative of future operating results'" (PP 64 & 66, quoting instructions to Item 303), the rule in "Item 303, 17 C.F.R. § 229.303(a)(3)(ii), . . . has to be read in light of the SEC's instruction to this paragraph which expressly states that forward-looking information need not be disclosed. 17 C.F.R. § 229.303(a), Instruction 7." Glassman v. Computervision Corporation, 90 F.3d 617, 631 (1st Cir. 1996); accord Romine v. Acxiom Corporation, 296 F.3d 701, 708 n. 3 (8th Cir. 2002) ("While § 229.303(a)(3)(ii) provides that 'known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed. 17 C.F.R. §

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 10 of 19

Page 19

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n50 The regulation, 17 C.F.R. § 229.303(a) and (b), commonly referred to as "Item 303," governs Form 10-K and 10-Q filings. Item 303 "requires corporate management to disclose, inter alia, any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. . . .'" Kafenbaum and Schulman v. GTECH Holdings Corporation, 217 F.Supp.2d 238, 249 (D.Mass. 2002).

[*69]

Second, it is not objectively unreasonable to omit the fact that the discounts, or channel stuffing, "would" as opposed to "could" have a material adverse effect on the company's future earnings. See, e.g., Oxford Asset Management, Limited v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("failure to allege facts from which the objective unreasonableness of Kos management's decision not to include the prescription information . . . could be inferred forecloses reliance upon Item 303 as a source of a duty to disclose that information"), cert. denied, 540 U.S. 872, 157 L. Ed. 2d 132, 124 S. Ct. 205 (2003). In addition, the import of the language was obvious making the distinction between "could" and "would" immaterial. See Baron v. Smith, 285 F. Supp. 2d 96, 104 (D.Mass. 2003) ("where company disclosed that largest customer began 'trial' of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word 'trial'") (paraphrasing In re Boston Technologies Securities Litigation, 8 F.Supp 2d at 61), aff'd, 380 F.3d 49 (1st Cir. 2004). [*70] Finally, although the information regarding discounts appears in the Forms 10-K under "marketing and sales" as opposed to under "results of operations," the placement, without more, is not actionable. n51

n51 The Form 10-Q refers to the risk factors in the annual Form 10-K report without expressly listing the use of discounts.

Third, the Forms 10-K directly and the Form 10-Q by incorporation adequately disclosed the use of discounts. See, e.g., Shaw v. Digital Equipment Corporation, 82 F.3d at 1206 (disclosure of marketing strategy in reducing prices adequately disclosed in SEC filings thereby obviating alleged violation of 17 C.F.R. § 229.303); Baron v. Smith, 380 F.3d at 54-56.

D. Unordered and Additional Product

Recognizing as revenue unordered product or shipping additional product without an order, as distinguished from channel stuffing through the use of deep discounts, is more egregious and poses a more forceful argument that Cytyc [*71] engaged in conduct in violation of its own or SEC and GAAP revenue recognition requirements. With respect to unordered or additional product, however, the complaint falls well short of providing sufficient detail to satisfy Rule 9(b) and the PSLRA. See In re Galileo Corporation, 127 F.Supp.2d at 268 (generally alleging that revenues in second quarter were false and failing to provide details about amount of warranty reserve understatement made pleading deficient under Rule 9(b) and PSLRA); Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 35-36 (channel stuffing allegations deficient under Rule 9(b) and PSLRA); Lirette v. Shiva Corporation, 27 F. Supp. 2d 268, 278 (D.Mass. 1998).

In contrast to the repeated and numerous allegations of channel stuffing on the part of former Cytyc employees, n52 the complaint provides few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship between the amount of unordered product shipped and the company's total revenues. The two instances of shipment of additional product related by the former Cytyc senior representative (P 44) and the [*72] former Cytyc sales representative (P 38) are too general and lack repeated corroboration to satisfy PSLRA pleading. Cf. In re Cabletron, 311 F.3d at 30-31. Thus, the instances of unordered product or shipment of additional product above what had been ordered (see PP 5, 7, 44, 49, 61 & 82(c)), as distinguished from the deep discounting at the end of every quarter and/or "channel stuffing," lack detail and corroboration by other employees. Eschewing a categorical approach, see In re Cabletron, 311 F.3d at 32 (rejecting "categorical approach" and noting that " Congress was concerned with the quantum, not type, of proof"), the complaint lacks the "quantum" of proof and particularity to satisfy the PSLRA with respect to the shipments of unordered or additional product. Accordingly, such allegations cannot support a finding that Cytyc's stated revenue recognition policy or the use of discounts or other channel stuffing activity was false or misleading or that defendants acted with scienter.

n52 See footnote number 47, P 2.

[*73]

E. Specific Statements

Defendants attack a number of the statements in the

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 11 of 19

Page 20
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

within the PSLRA's safe harbor provision for forward looking statements.

As to the former, "Vague and loosely optimistic statements" are "nonactionable as a matter of law." Gross v. Summa Four, Inc., 93 F.3d at 987 (affirming dismissal of complaint). This rule applies to statements concerning both current affairs and future prospects. Orton v. Parametric Technology Corporation, 344 F. Supp. 2d at 300 ("corporate puffery rule covers loose optimism about both an issuer's current state of affairs and its future prospects'"); In re Boston Technology, Inc. Securities Litigation, 8 F. Supp. 2d at 54 (same). "Rosy affirmations commonly heard from corporate managers," such as we "expect another year of strong growth" or "the company is on target toward achieving the most profitable year in its history," are "numbingly familiar." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217-1218 (internal quotation marks and citations omitted). Consequently, "no reasonable investor could find" such [*74] "optimistic" or "vague" statements "important to the total mix of information." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217. In the parlance of common law fraud, such statements amount to "'puffing' or sales talk.'" Shaw v. Digital Equipment Corporation, 82 F.3d at 1217 n.32.

The more specific, definite or concrete the outward statement is, however, the greater the likelihood the statement is material and not mere puffery. See Gross v. Summa Four, Inc., 93 F.3d at 995 (distinguishing the actionable statements in Alfus v. Pyramid Technology Corporation, 764 F. Supp. 598 (N.D.Cal. 1991), from inactionable statements in that case because "statements in Alfus dealt with definite projections," such as a forecast of 40% revenue growth). For example, the inclusion of "a market share figure" might push a nonactionable statement beyond the realm of "mere optimistic corporate puffery." Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 26 (finding phrase "continued market demand'" vague and optimistic in part because phrase did not specify "market share figure"). Similarly, more cautious [*75] or subdued statements are less likely to be actionable than more strongly optimistic or concrete statements that contrast sharply with internal reality. See Glassman v. Computervision Corporation, 90 F.3d at 635-636 (duty to disclose problems with new product "may arise where a company makes strongly optimistic or concrete statements ... in stark contrast to its internal reports" as opposed to "subdued generally optimistic statements" that amount to "puffery," citing San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996)). "Mild statements of hope, couched in strongly cautionary language," are not materially misleading Glassman v. Computervision Corporation, 90 F.3d at 636.

Defendants also rely on the PSLRA's safe harbor provision with respect to a number of the forward looking statements in the complaint. Generally speaking, forecasts or other forward looking statements are not exempt from liability. Suna v. Bailey Corporation, 107 F.3d at 70. They are, however, only actionable "if the forecast might affect a reasonable investor in contemplating [*76] the value of a corporation's stock." Suna v. Bailey Corporation, 107 F.3d at 70 (internal quotations marks and citation omitted). In addition, there must be a showing that the forecast was false or misleading, in other words, that facts known by the forecaster at the time of the forecast (as distinguished from simply fraud by hindsight) made the anticipated forecast or success unlikely. See Suna v. Bailey Corporation, 107 F.3d at 70 (had the plaintiff "presented facts known by Bailey, and contemporaneous with the statements above, that would show that Bailey's anticipated success was unlikely, such facts would have adequately alleged a claim of securities fraud").

The PSLRA provides a safe harbor provision for forward looking statements that include cautionary warnings. Analogous to the "bespeaks caution" doctrine, see H.R. Conf. Rep. No. 104-369, *44 (1995) ("the Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created bespeaks caution' doctrine"), the relevant provision in 15 U.S.C. § 78u-5(c)(1)(A)(i) "shelters forward-looking statements that are accompanied [*77] by meaningful cautionary statements." Greebel v. FTP Software, Inc., 194 F.3d at 201; 15 U.S.C. § 78u-5(c)(1)(A)(i). The statutory language precludes liability for a forward looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or is "immaterial." n53 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii). The Conference Committee's discussion clarifies that "'important' factors means [that] the stated factors identified in the cautionary statement must be relevant to the projection." n54 H.R. Conf. Rep. No. 104-369, * (1995) (further noting that "boilerplate warnings will not suffice"). On the other hand, the cautionary statement does not necessarily have "to include the particular factor that ultimately causes the forward-looking statement not to come true." n55 H.R. Conf. Rep. No. 104-369, *44 (1995).

   n53 The inclusion of the latter language simply clarifies that, "Courts may continue to find a forward-looking statement immaterial and thus

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 12 of 19

Page 21
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

not actionable under the 1933 Act and the 1934 Act-on other grounds" irrespective of the statutory safe harbor provision." H.R. Conf. Rep. No. 104-369, *43 (1995).

[*78]

n54 The following parts of the committee's discussion are illuminating:

> The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business. As part of the analysis of what constitutes a meaningful cautionary statement, courts should consider the factors identified in the statements. "Important" factors means the stated factors identified in the cautionary statement must be relevant to the projection and must be of a nature that the factor or factors could actually affect whether the forward-looking statement is realized
>
> The Conference Committee expects that the cautionary statements identify important factors that could cause results to differ materially-but not all factors. Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor. The Conference Committee specifies that the cautionary statements identify "important" factors to provide guidance to issuers and not to provide an opportunity for plaintiff counsel to conduct discovery on what factors were known to the issuer at the time the forward-looking statement was made.
>
> The use of the words "meaningful" and "important factors" are in-
tended to provide a standard for
>
> the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant. The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.

H.R. Conf. Rep. No. 104-369, *44 (1995)

[*79]

n55 The April 24, 2002 conference call fits comfortably within this framework. Although plaintiffs complain that the warnings in the conference call were simply boilerplate, the warnings were specific, detailed and relevant to the projection. Contrary to plaintiffs' position, the omission of the discounts and inventory does not dispel the specificity of the warning and prevent it from being sufficient under the PSLRA. This is particularly true where, as here, the warning refers the investor to the company's SEC filings and the 2001 Form 10-K expressly advised the investor about the company's use of discounts. The forward looking statements in the conference call therefore lie within the safe harbor.

Furthermore, although not argued or addressed by the parties, the conference call was an oral warning at the time it was given even though it is now reduced to a transcript. As explained in the next paragraph, such oral statements do not require the level of specificity required for written statements. In any event, the warning is sufficient for either a written or oral forward looking statement.

[*80]

The safe harbor provision also extends to oral statements in a less exacting manner. It allows a company to rely on this safe harbor when making an oral statement by simply referring to the written document containing the cautionary language. 15 U.S.C. § 78u-5(c)(2); see H.R. Conf. Rep. No. 104-369, *45 (1995).

The analogous "bespeaks caution" doctrine precludes liability for forecasts and projections where the context of the forecast bespeaks caution. Shaw v. Digital

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 13 of 19

Page 22
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Equipment Corporation, 82 F.3d at 1213-1214. Under this doctrine, the forward looking statement is not materially misleading if "accompanied by adequate cautionary disclosures." In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162. Like the statutory safe harbor provision, the cautionary language under the bespeaks caution doctrine must be " sufficiently related in subject matter'" as opposed to "merely boilerplate." In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162. Summarily stated, the doctrine "embodies the principle that when statements of soft' information such as forecasts, estimates, [*81] opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the soft' statements may not be materially misleading under the securities laws." Shaw v. Digital Equipment Corporation, 82 F.3d at 1213.

With the foregoing principles in mind, including the adequacy of the pleading under Rule 9(b) and the PSLRA, this court turns to the statements in the complaint.

The July 25, 2001 statement that growth is "driven by our proven market strategy, best-in-class sales team, and superior technology" is not actionable due to the failure to articulate or establish a basis for the statement's false or misleading nature. See Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 (distinguishing the actionable fueling growth statement in In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 331-332). Plaintiffs fail to allege that the market strategy or the sales team or the superior technology is not "without any positive impact on [Cytyc's] performance." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 299 [*82] (statement that credited "company's separation of business units and focus on product sales for Parametric's financial performance" as opposed to undisclosed improper revenue recognition deemed inactionable because "purchasers . . have not alleged that Parametric's strategic business decisions were without any positive impact on their performance"). Nowhere does the complaint particularize with the requisite specificity that Cytyc's growth was not assisted by the company's market strategy, sales team and superior technology. See also Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 301-302 (statement that "we executed well this quarter" and "believe our strategic efforts in this past year in developing software solutions, expanding distribution and improving customer satisfaction are helping us to expand our leadership position as the product development company" lacked "requisite specificity" because "the plaintiffs have not alleged . . that Parametric had executed its software development. product distribution or customer service goals.")

Moreover, defendants correctly point out that the statement does not present an exhaustive list of all the [*83] reasons for the growth. See, e.g., In re Boston Technology, Inc. Securities Litigation, 8 F. Supp. 2d at 69 ("paragraph B is not reasonably construed to attribute the shortfall to an exclusive cause, and it was therefore immaterial to the investment decision"). As noted by the court in Polaroid, "Statements discussing how some market factors (like mergers among retail drug chains) are affecting business are not false or misleading simply because they do not implicate other negative market influences as well." In re Polaroid Corporation Securities Litigation, 134 F.Supp.2d 176, 185 (D.Mass. 2001). Thus, the omission of the extensive end of quarter discounting does not render the statement materially misleading. See Gross v. Summa Four, Inc., 93 F.3d at 992 (revealing one fact about a product does not require corporation to "reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead'")

The statement is also inactionable corporate puffery. See, e.g., Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 [*84] (classifying as puffery statement that "Our eleventh straight quarter of record revenues is the result of continued market demand for our enterprise network and data security solutions"). Indeed, it is strikingly similar to the following statement in Orton that the court considered puffery: "Although we are not immune to the weakening economy in the near-term, we feel confident that the combination of our motivated workforce, solid infrastructure and total commitment to product development which is intended to deliver a high return on investment for customers, positions us for long-term growth." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 (discounting statement as puffery and not "material to any reasonable analysis of the company's prospects"). The court in Orton rejected the foregoing statement as puffery against the contention that the statement failed to disclose that "long-term growth was unlikely because of Parametric's improper recognition of revenue in earlier periods." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300. The other portions of the statement pertaining to the continuation of "momentum" [*85] and the company's "consistent quarter to quarter growth" is likewise mere puffery and sales talk. See, e.g., In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well positioned for growth" and that it expects more revenue growth in opportunities in Asia in the coming years"). n56

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 14 of 19

Page 23
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

> n56 As explained infra with respect to these and other statements, the omission of the deep discounting at Cytyc falls significantly short of reckless when placed in context and the complaint as a whole fails to demonstrate a strong inference of scienter.

The same reasoning applies to the similar statements in the August 2, 2001 Bloomberg news article. When asked how Sullivan would increase or aggressively gain market share, Sullivan lists Cytyc's "unique sales and marketing strategy" as "creating the demand at the physician's office." (P 73). Although the complaint adequately pleads the time, place and content of the communication, [*86] the statement itself is not false or misleading. Like the July 25, 2001 statement, the list is not exhaustive or otherwise materially false or misleading. There is no indiction that the direct sales force was not creating, at least in part, the demand. In addition, the nondisclosure of the use of discounts did not significantly alter the total mix of information inasmuch as the 2000 Form 10-K filing discloses the use of such discounts. Alternatively, the self directed comment is puffery as is Sullivan's mildly optimistic prediction about the company's ability to maintain similar growth ("We believe so") (P 73). n57

> n57 Like the July 25, 2001 comments, this court's decision obviates the need to address the applicability of the PSLRA's safe harbor provision to these comments.

In the interview, however, Sullivan also quantifies revenue projections (P 75). The quantification provides sufficient specificity to avoid defendants' assertions of puffery. Sullivan's revenue projections in the interview, bereft of cautionary [*87] language or a reference to documents identified as containing cautionary statements, n58 do not fall within the reach of the safe harbor provision or the bespeaks caution doctrine. See 15 U.S.C. § 78u-5(c)(2); H.R. Conf. Rep. No. 104-369, *45 (1995) ("Companies who want to make a brief announcement of earnings or a new product would first have to identify the statement as forward-looking").

> N58 Instead, during the televised exchange Sullivan simply refers to a conference call.

Contrary to defendants' position that the information does not alter the total mix of information, the forecast gives a specific range for 2002 revenues. Cf. Suna v. Bailey Corporation, 107 F.3d at 70 (discounting projections as not actionable in part because they do not project specific numbers that the company will certainly attain"). Projections and the company's ability to meet financial targets are "certainly material to any sensible evaluation of [a] company's performance." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302. [*88] Theoretically, the projection was materially misleading when made because the preexisting and continuous deep discounting and over-stuffing of customers would prevent Cytyc from meeting the forecast. Existing revenue growth was achieved at the expense of future sales. (P 82).

The issue therefore devolves into whether Sullivan had information known to him at the time that would show that the anticipated or projected earnings for 2001 n59 and/or 2002 were unlikely. See generally Suna v. Bailey Corporation, 107 F.3d at 70. This is where the complaint falters. First, the complaint fails to plead sufficient facts to support the information and belief that Sullivan knew that the projection was false when made. See 15 U.S.C. § 78u-4(b)(1). The facts alleged fail to adequately show that Sullivan had knowledge of specific facts regarding the channel stuffing and the magnitude or extent of the end of quarter discounting in August 2001 that would make Sullivan's projection unreasonable. See In re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d at 54 ("Absent bad faith, a defendant must have had -- at the time the statement [*89] was made -- knowledge of specific facts making the statement unreasonable"); see also Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361. Furthermore, under the facts alleged there is absolutely no bad faith or intentional deception reasonably inferred.

> n59 Cytyc met the 2001 projection. (PP 96 & 115). This is true with respect to both the earnings projection on August 2, 2001 and on January 14, 2002.

Sullivan also had no knowledge that the projection was materially misleading. See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 (under Rule 9(b), "complaint must set forth specific facts that make it reasonable to believe that defendants knew that a statement was materially false or misleading"). To the contrary, there was little reason to believe that the failure to disclose the discounting was materially misleading and would alter the total mix of information inasmuch as the 2000 Form 10-K already disclosed the use of discounts. Similarly, there was no duty to disclose [*90] the discounting under the circumstances. The projection is therefore not actionable under the facts alleged. n60

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 15 of 19

Page 24
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n60 Alternatively, as discussed infra, there is an absence of a strong inference of scienter.

Sullivan's equally glowing repetition of 2002 projected earnings on January 14, 2002, as "approximately $ 0.64 to $ 0.66" (P 95) is not puffery but nonetheless fails for identical reasons. It is true that the complaint notes that the continuous channel stuffing was and would continue to have an adverse impact on future sales and/or the market share was overstated because of the channel stuffing, not to mention that customers were ceasing to do business with Cytyc because of such practices. (P 100). The complaint fails, however, to provide facts to support the information and belief regarding Sullivan's knowledge that the projection was false or misleading when made. In any event, the strong inference of scienter is notably absent. n61

n61 The January 14, 2002 press release contains an adequate cautionary proviso that the projections are forward looking statements and sufficiently warns investors of the risks, including those identified in the 2000 Form 10-K filing. Consequently, although defendants neglect to expressly rely on the safe harbor provision or the bespeaks caution doctrine as applied to this statement, it is highly likely that the statement is not actionable. Given the absence of an explicit argument to this effect, however, this court rests its decision with respect to this statement on the conclusion that plaintiffs fail to plead a strong inference of scienter. Defendants present the scienter argument (as well as the corporate puffery, materiality and Rule 9(b)/PSLRA pleading shortcomings) universally as applied to all the allegations in the complaint. (Docket Entry # 31, § Introduction & § I(C)(2))

[*91]

The October 19, 2001 comment by Sullivan that the company feels "confident in our success based on our track record" with ThinPrep is sales talk. See, e.g., In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 217 (statement that "we continue to have confidence in the fundamental strength of our business and in our strong competitive position" considered puffery); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that, 'There are very few companies that are positioned as well as us and have the track record, the experience and the management"). Unaccompanied by any specifics regarding the company's "track record," see Fitzer v. Security Dynamics Technologies, Inc., 119

F.Supp.2d at 24 (finding phrase "continued market demand" vague inasmuch as it failed to "specify a particular market demand [or] a market share figure"), no reasonable investor would consider the statement material to an investing decision.

For the same reasons that apply to the July 25, 2001 statement, the strikingly similar statement in the October 24, 2001 press release ("We believe [*92] the superior clinical performance of the ThinPrep Pap Test and the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance") is not actionable. The statement does not purport to identify all of the factors effecting growth and performance. Alternatively, for reasons expressed with respect to the July 24, 2001 statement, the statement amounts to puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect").

Plaintiffs next challenge in a January 23, 2002 press release that Cytyc had "now reported fifteen consecutive quarters of revenue growth." (P 96). Although plaintiffs contend and plead that the statement is false because of the failure to disclose the channel stuffing which numerous former employees articulate, the statement was an accurate portrayal of past and present earnings. It was not false. Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 & n. 4 ("defendants may not be held liable under the securities [*93] laws for accurate reports of past successes, even if present circumstances are less rosy"). As to the misleading nature of the statement, defendants had no duty to disclose the channel stuffing with respect to this statement. The omitted disclosure of channel stuffing did not cause what Sullivan did say, to wit, 15 past quarters of growth, to be misleading. See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse"). In contrast to a similar statement deemed actionable in Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 ("we met the third quarter targets we set in April"), n62 plaintiffs cannot, as explained supra, empirically show that Cytyc did not meet the earnings for the quarters in violation of the cited regulatory provisions and the company's revenue recognition policy. Cf. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 (above statement actionable because, in theory, "the Purchasers could empirically disprove Harrison's [*94] statement by demonstrating that Parametric did not actually meet the financial targets set in April under GAAP and under the company's own accounting policies").

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 16 of 19

Page 25
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n62 Like the entire objectionable portions of the January 23, 2002 statement, the statement in Orton reads in full as follows: "We met the third quarter targets we set in April . . . . Solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302.

The remaining objectionable portion of the statement ("We believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year") is puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect"); Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 [*95] (after stating that company met the target for the April quarter, the further statement that "solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves" was puffery); In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years"). Such general optimism regarding the elusive concept of "momentum" building for an indeterminable amount of time into the future is not actionable.

As already explained, n63 the forecast in the January 24, 2002 Bloomberg news interview (" $ 295 to $ 305 million" and earnings per share "of between 64 and 66 cents" for upcoming year) is not puffery but nonetheless fails to constitute an actionable statement.

n63 See footnote number 22

Sullivan's additional statement that [*96] "we believe" that Cytyc could capture "100 percent of the market" is, to a large degree, so unrealistic that no reasonable investor would give it credence. Put another way, a reasonable investor would not consider such a prophesy material to an investing decision. It also amounts to inactionable corporate puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70; Orton v Parametric Technology Corporation, 344 F.Supp.2d at 302; In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221. Alternatively, as explained in connection elsewhere, the statement is not actionable because of the absence of a strong inference of scienter

Plaintiffs next identify various statements in the April 24, 2002 press release and conference call as actionable. The forward looking statements (see, e.g., P 118; P 119, 2002 revenues) fall easily within the parameters of the PSLRA's safe harbor. n64

n64 See footnote 55.

The historical recitation [*97] of earnings in the April 24, 2002 press release (P 117), without more, was not false. n65 The statement also did not give rise to a duty to disclose the deep discounts or channel stuffing and was therefore not misleading. The press release did not present the statement of past earnings as a basis to forecast future growth but, instead, advised that Cytyc management would discuss future expectations at the conference call See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse").

n65 To the extent the market share (PP 47, 68, 82, 90, 100, 102, 109 & 117) or conversion rate stated at various times in the complaint was not accurate (see, e.g., P 127), there is an absence of a strong inference of scienter.

The tightening inventory statement is not actionable for a number of reasons. First, the statement (PP 119 & 124) [*98] fails the so-called "entanglement test." Under this test, recently adopted by the First Circuit, "liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree." In re Cabletron, 311 F.3d at 37-38; accord Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 (same). n66 Second, the conclusory assertions that defendants intended analysts to rely upon and repeat various statements (P 76), that the company provided guidance to analysts and that the company used analysts as a conduit to provide false and misleading information (PP 167-172) do not satisfy Rule 9(b). See Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 ("Suna also rejects the notion that general statements regarding a company's 'practice' of communicating regularly with securities analysts . . . and [of] providing detailed "guidance" to these analysts' are sufficiently particularized to give rise a notion to dismiss

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 17 of 19

Page 26
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

under Rule 9(b)). The article itself does not [*99] quote a company source or imply that Cytyc adopted the statements therein. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 74 (rejecting under 9(b) allegation attributing statements to company inasmuch as "reports do not appear to quote any Bailey officer or employee, nor do they imply that the forecasts were supplied or confirmed by any Bailey officer or employee").

n66 Plaintiffs' reliance on Stone & Webster (Docket Entry # 36, p. 30) is misplaced for reasons set forth in defendants' reply (Docket Entry # 39, pp. 13-14).

The assertion that Cytyc falsely represented in the conference call that the inventory problem manifested itself "only in the first quarter of 2002" (P 125) or that, as reflected in a UBS Warburg report, the company "instituted a one-time promotion'" (PP 121 & 122) is belied by the transcript. See In re Computervision Corporation Securities Litigation, 914 F.Supp. 717, 719 (D.Mass. 1996) (noting "fundamental and fatal defect[]" in securities fraud [*100] action that, with respect to the allegedly actionable statements, "the Company simply did not say what the plaintiffs say it said"). Sullivan explicitly stated that this was not the first time for company promotions. The 2000 and 2001 Forms 10-K also both note the use of "discounts" (plural) "in the past." (Docket Entry # 32, Ex. B & J).

Having addressed various statements, this court turns to the issue of scienter or, more accurately, the absence thereof.

E. Scienter

Having already defined the concept of scienter, this court simply notes that there is no one fact pattern that predominates the calculus. Instead, the fact pattern presented in each individual case is analyzed to determine if the allegations are sufficient to support a strong inference of scienter. Geffron v. Micrion Corporation, 249 F.3d at 36 ("this Court does not categorize patterns of facts as acceptable or unacceptable to prove scienter,' but instead analyzes the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter'"); Greebel v. FTP Software, 194 F.3d at 196.

What consistently strikes this court [*101] in reading and rereading the complaint and other relevant and properly considered documents is the absence of the strong inference of scienter now required under the PSLRA. First, there is nothing inherently wrong with discounts or pressing for sales to be made in earlier quarters or at the end of a quarter. Greebel v. FTP Software, 194 F.3d at 202 ("there is nothing inherently improper in pressing for sales to be made earlier than in the normal course"); n67 accord Johnson v. Tellabs, Inc., 262 F.Supp.2d 937, 950 (N.D.Ill. 2003) ("in the business world, there certainly is nothing inherently wrong with offering incentives to customers to purchase products"). Nor is there any additional suggestion of inventory parking, contingent sales or other improper activity. n68

n67 There is nevertheless a line between offering discounts or encouraging earlier than normal sales versus knowingly hiding low earnings in the earlier quarters by artificially inflating revenues through improper revenue recognition. See Greebel v. FTP Software, 194 F.3d at 202; accord In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 149. The latter provides a weak inference of scienter. Greebel v. FTP Software, 194 F.3d at 202-203; accord In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 149-150. Given the absence of improper revenue recognition, even this weak inference is missing.

[*102]

n68 The three cases outside this circuit prominently cited by plaintiffs (Docket Entry # 36, pp. 1-2) are distinguishable for reasons stated by defendants in their reply memorandum (Docket Entry # 39, pp. 3-4 & n. 2) and eloquently expressed at the hearing.

Second, throughout the class period, the company's SEC filings disclosed the use of discounts, albeit not to the degree plaintiffs insist was necessary. Given the fact that Cytyc's public documents disclosed the use of discounts, i.e., the company's "channel stuffing practices," see In re Segue Software, Inc. Securities Litigation, 106 F.Supp.2d at 168 (allegation of improperly booking contingent sale to boost revenue and not disclosing the right of return in the large and identified million dollar sale to named customer not fraudulent given the Form 10-K disclosure); n69 see also Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 35-36 (finding list prices in Form 10-K not fraudulent inasmuch as the disclosure was made that the prices were "subject to volume discounts and other licensing terms [*103] and conditions"), the record fails to reflect a strong inference that defendants knew that the statements were false or materially misleading by omitting the information regarding the extent of the discounting at Cytyc. See Gef-

Case 1:04-cv-11380-WGY    Document 60-3    Filed 01/24/2006    Page 18 of 19

Page 27
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

fon v. Micrion Corporation, 249 F.3d at 36 ("even if the statements at issue were material and false or misleading, the evidence does not support a finding that defendants knew the statements would materially mislead the investing public"). Indeed, during the April 24, 2002 conference call, Sullivan forthrightly sought to provide investors with the information that this was not the first time the company had used promotions. See Geffon v. Micrion Corporation, 249 F.3d at 37 (noting that "Micrion sought to provide investors with adequate warnings of the possibility that not all seventy-five units would be purchased")

Third, as already explained, the allegations of insider trading and revenue recognition or accounting violations lack merit. Although insider trading may provide evidence of scienter, see Greebel v. FTP Software, 194 F.3d at 196 (noting the "many different types of evidence as relevant to show scienter, [*104] " including insider trading), the inference is nonexistent in the case at bar. Bowen never traded during the class period. Sullivan's trading was less during the class period than prior to or after the class period. Likewise and also as previously explained, violations of GAAP, SEC or company policy may give rise to an inference of scienter, see Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 ("'accounting shenanigans' may be evidence of scienter"); In re Cabletron, 311 F.3d at 39 ("significant GAAP violations also could provide evidence of scienter'"); In re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 266 ("'a violation of a company's own policies supports an inference of scienter'"), but the record is devoid of any such violations.

---

n69 Indeed, the disclosure in the Form 10-K in Segue was even less forthcoming that the ones in the case at bar. In Segue, the Form 10-K affirmatively stated the contrary, to wit, that, "The Company typically does not grant to its customers a contractual right to return software products." In re Segue Software, Inc. Securities Litigation, 106 F. Supp. 2d at 168. The form then gave the impression that rights of return were the exception and not contained in typical, if any, contracts with customers. The relevant language was that, "When approved by management, however, the Company has accepted returns of certain software products and has provided an allowance for those specific products." In re Segue Software, Inc. Securities Litigation, 106 F. Supp. 2d at 168.

[*105]

Defendants' alleged motive to inflate the stock price and use the inflated price to purchase Pro-Duct and Digene at more attractive prices is unconvincing. See, e.g., In re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 270 ("the mere statement that an acquisition occurred after Galileo's stock prices increased is insufficient even to create an inference that the two events were necessarily related, not to mention insufficient to create a strong inference either of an intent to deceive or of recklessness"). Sullivan and Bowen's involvement in discussing sales strategies, knowledge of daily activities, positions in the company, setting and encouraging unrealistic sales quotas, general access to internal information and/or focus upon the company's stock price (PP 39-41, 46-47, 144, 147-151 & 153-154) are also equally unconvincing. See Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 254 (rejecting "knowledge derived by Sims and Toscanini from unspecified plans, budgets, forecasts, reports, conversations, connections, meetings and other' information to which these defendants had access because of their positions with CTP" [*106] as adequate to plead scienter); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 25 (declining to "speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them"); Lirette v. Shiva Corporation, 27 F.Supp.2d at 283 ("attempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss"); In re Viewlogic Sys. Sec. Litig., 1996 U.S. Dist. LEXIS 22371 at *37-39 (D.Mass. March 13, 1996); see also Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998).

In sum, there is a marked void of the necessary strong inference of scienter. Finally, lacking a predicate violation of section 10(b) of the Securities Exchange Act of 1934 or of Rule 10b-5, 17 C.F.R § 240.10b-5, the section 20(a) claim is also subject to dismissal. See Suna v. Bailey, 107 F.3d at 72; In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 224. [*107]

Defendants seek a dismissal with prejudice. In a footnote, however, plaintiffs summarily request leave to replead in the event this court 'determines that there are efficiencies in the Complaint as to any of the named defendants." (Docket Entry # 36, n. 26). This court assumes plaintiffs meant to use the word "deficiencies." As discussed, there are numerous deficiencies.

Although this case is rapidly approaching the three year mark, the PSLRA "stays all discovery, with certain narrow exceptions, during the pendency of any motion to dismiss." In re Cabletron, 311 F.3d at 33. In analogous

Case 1:04-cv-11380-WGY   Document 60-3   Filed 01/24/2006   Page 19 of 19

Page 28
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

2004 U.S. Dist. LEXIS 28548, 2004 WL 1467065 (D.Mass. Jan. 16, 2004), recommended a dismissal without prejudice given the plaintiffs' footnote request for leave to replead. Accordingly, the recommendation will be to dismiss without prejudice subject to allowing plaintiffs an opportunity to replead if there are grounds for such an amendment consistent with the rulings made in this opinion. n70 See, e.g., Guerra v. Teradyne, Inc., 2004 U.S. Dist. LEXIS 28548, 2004 WL 1467065 at *28 (D.Mass. Jan. 16, 2004) (refusing to dismiss case with prejudice inasmuch [*108] as the plaintiffs asked to be given leave to replead in a footnote if the court dismissed the complaint).

n70 It is, of course, entirely in the province of the district judge as to the amount of time he wishes to allow plaintiffs to submit a motion to amend together with an attached proposed consolidated second amended complaint. In the event plaintiffs chose to file a motion for leave to amend, this court suggests that the proposed consolidated second amended complaint should clearly identify the newly added language and any omitted language.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS** n71 that the motion to dismiss (Docket Entry # 30) be ALLOWED except to the extent that the dismissal be without prejudice subject to allowing plaintiffs an opportunity to replead consistent with the rulings made in this opinion.

n71 Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

[*109]

**MARIANNE B. BOWLER**

United States Magistrate Judge