Unpublished Authority Cited in State Street Bank And Trust Company's Reply Memorandum In Support of Motion to Dismiss the Complaint in the *Bunch Action*

LEXSEE 2006 U.S. DIST. LEXIS 3276

CAROLYN PIMENTAL, f/k/a CAROLYN IGOE, Plaintiff, v. WACHOVIA MORTGAGE CORP., f/k/a FIRST UNION MORTGAGE CORP., Defendant.

CIVIL ACTION NO. 05-11097-WGY

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2006 U.S. Dist. LEXIS 3276

January 30, 2006, Decided

COUNSEL: [*1] For Wachovia Mortgage Corporation, Defendant: Donald E. Frechette Edwards & Angell, LLP, Boston, MA.

For Wachovia Mortgage Corporation, Defendant: Nicholas J. Rosenberg Edwards & Angell, LLP, Boston, MA.

For Carolyn Pimental, Plaintiff: John H. Molloy, Law Offices of John H. Molloy, Revere, MA.

JUDGES: WILLIAM G. YOUNG, DISTRICT JUDGE.

OPINIONBY: WILLIAM G. YOUNG

OPINION:

MEMORANDUM AND ORDER

January 30, 2006

YOUNG, D.J.

I. INTRODUCTION

Carolyn Pimental's n1 ("Pimental") Complaint [Doc. No. 2] charges that the defendant Wachovia Mortgage Corporation n2 ("Wachovia") breached its construction loan contract with her and was negligent in its disbursement of loan funds to her contractor. The complaint further alleges that Wachovia violated Massachusetts General Laws, Chapter 93A by disbursing her loan funds to her contractor without first ensuring that the contractor had satisfactorily completed the necessary work.

n1 Carolyn Pimental was formerly known as Carolyn Igoe.

n2 Wachovia Mortgage Corporation was formerly known as First Union Mortgage Corporation.

[*2]

Wachovia has moved to dismiss on grounds that it had no duty to assure that the contractor had completed the work to Pimental's satisfaction. Wachovia claims that, although the terms of the mortgage permit the mortgagee to withhold disbursements to the contractor if the bank finds the work to be inadequate, this provision of the contract is solely for the protection of Wachovia's own interests.

A. Procedural Posture

On May 19, 2005, Pimental filed an amended complaint [Doc. No. 2] against Wachovia in the Massachusetts Superior Court sitting in and for the County of Suffolk, alleging breach of contract, negligence, and violation of Massachusetts General Laws, Chapter 93A, Section 2(a). State Ct. Rec. [Doc. No. 2], Ex. 4 ("Amended Complaint") ("Compl."). n3 Pimental seeks an award of damages, "along with costs, interest and reasonable attorney's fees[,] and for such other and further relief as this Court deems just and proper." Compl. at 4. In connection with her Chapter 93A claim, Pimental seeks "double or treble the amount of actual damages due to defendant's bad faith and willful violation of [Chapter 93A]", in addition to actual damages, attorney's fees and costs [*3] Compl at 5. She also requests a jury trial. Compl. at 6

n3 Pimental originally filed a complaint in March of 2004 naming Raymond Peveri, the contractor, as the sole defendant Def.'s Mem in Supp. of Mot to Dismiss [Doc. No. 4] ("Def's Mem ") at 4 Peveri filed for bankruptcy in April

Case 1:04-cv-11380-WGY   Document 77-2   Filed 03/01/2006   Page 3 of 18

Page 2
2006 U.S. Dist. LEXIS 3276, *

of 2004. Def.'s Mem., Ex. C. In March of 2005, Pimental filed this action, dropping Peveri as a defendant and naming Wachovia as the sole defendant, but never served Wachovia with the original complaint. The amended complaint was filed and served upon Wachovia in May of 2005. Def.'s Mem. at 4.

Pimental's underlying grievance is that the contractor performed substandard and incomplete work on her property. Wachovia was not a party to the contract between Pimental and Champion Homes USA ("Champion") and, therefore, had no duties under that contract.

On May 25, 2005, Wachovia filed a Notice of Removal [Doc. No. 1] in the United States District Court for the District of Massachusetts. On June 7, 2005, Wachovia filed a Motion [*4] to Dismiss all three claims under Federal Rule of Civil Procedure 12(b)(6), accompanied by a Memorandum in support of the motion. Mot. to Dismiss [Doc. No. 3]; Def.'s Mem. This Court, on July 12, 2005, set the hearing on the motion for September 14, 2005. See Notice of Hearing (July 12, 2005).

Pimental requested an extension of time to file her response to Wachovia's motion, and was granted an extension until August 3, 2005. See Assented to Mot. [Doc. No. 5]; Order of July 22, 2005. On August 4, 2005, Pimental filed her Opposition to the Motion to Dismiss [Doc. No. 6], accompanied by a Memorandum in Support of the Opposition [Doc. No. 7]. Wachovia moved for leave to file a reply to Pimental's opposition, which was both granted and filed on August 11, 2005. See Mot. for Leave to File Reply [Doc. No. 8]; Order of Aug. 11, 2005. On August 12, 2005, Wachovia withdrew its request for oral argument on its motion to dismiss. See Letter from Nicholas J. Rosenberg (Aug. 12, 2005) [Doc. No. 10].

### B. Facts

For the purposes of this motion to dismiss, the facts gleaned from the complaint are taken as true. Pimental purchased [*5] property located at 88-90 Madison Avenue (also known as 84 Madison Avenue) in Everett, Massachusetts on August 16, 2001. Compl. PP 4-5 & Ex. 2. That same day, Pimental secured a mortgage in the amount of $ 260,100.00 against this property, with First Union Mortgage Corporation ("First Union") -- the predecessor corporation of Wachovia. Compl. P 6 & Ex. 3. A construction rider (the "Rider") accompanied the mortgage from Pimental to First Union. See Compl. P 7 & Ex. 4.

On May 23, 2001, Pimental entered into a contract with Raymond Peveri, d/b/a Champion Homes USA, whereby Champion agreed to construct a pre-fabricated home on Pimental's Madison Avenue property and to accept payments according to a specified time and work-completion schedule. Compl. P 8 & Ex. 1. Pimental planned to pay Champion partly with proceeds from the loan from First Union and partly with private funds. Compl. P 8.

Pimental and Wachovia entered into two modifications to the loan agreement, extending the date upon which Pimental's construction was to be completed from the original date of March 1, 2002, first to June 1, 2002, then to July 31, 2002. Compl. PP 9-10 & Exs. 5, 6.

The construction loan contained [*6] a provision granting the mortgagee the right to inspect the property to ensure that the construction had progressed satisfactorily before the bank was obligated to disburse payments to the contractor. Compl., Ex. 4, at P 2. On June 15, 2002, agents of Wachovia inspected the property pursuant to this clause. Compl. P 12. Following this inspection, Wachovia determined that the construction project was ninety percent complete and issued $ 105,819.00 to Champion. Compl. P 14. At the time of the inspection and disbursement of funds, however, only half of the modular home had even been delivered to the property site. Compl. PP 15-16. Furthermore, the work that had been completed was of substandard quality. Compl. P 11. On June 25, 2002, Champion ceased work at the site -- prior to completing the work for which Pimental had contracted and paid. Compl. P 13.

When Champion discontinued its work at Pimental's property, less than twenty-five percent of the work contracted for had been completed. n4 Compl. P 20. Pimental sought the services of another contractor to complete the construction and to correct the deficiencies in Champion's work at an additional cost of $ 130,000.00. Compl. P 22-23. Pimental [*7] claims an additional loss of $ 43,345.41 in unnecessary interest and extension fees incurred due to Wachovia's disbursement. Compl. P 24. In addition, Wachovia's disbursement of funds to Champion caused her financial difficulties that delayed the construction by a new contractor and led to the loss of a potential buyer who was unable to postpone purchase of Pimental's property until the new contractor completed the job. Compl. P 25.

---

n4 Although Wachovia concedes, for purposes of its motion to dismiss, that less than twenty-five percent of the work was complete when Champion ceased its work, Def.'s Mem. at 2 n.1, its inspectors determined that ninety percent of the work had been completed by June 15, 2002. Compl. P 14. Thus, the Court notes that the

actual extent of completeness of the project is unclear.

### C. Federal Jurisdiction

This Court has jurisdiction and venue over this matter pursuant to Title 28, Sections 1332 and 1391 of the U.S. Code, respectively. Diversity jurisdiction is proper, as Pimental [*8] is a domiciliary of Massachusetts and Wachovia is a foreign entity with its principle place of business in Florida. Pimental claims damages in excess of $ 75,000.00.

## II. DISCUSSION

### A. Standard of Review

When considering Wachovia's motion to dismiss, all factual allegations in Pimental's Complaint are assumed to be true and all inferences drawn in Pimental's favor. Coyne v. City of Somerville, 770 F. Supp 740, 743 (D. Mass. 1991) "Dismissal is warranted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" Id. at 743 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); Wellesley Hills Realty Trust v. Mobil Oil Corp., 747 F. Supp. 93, 95 (D. Mass. 1990) (Caffrey, S.J.) (same). Pimental must put forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st. Cir. 1988).

### B. Breach of Contract

Because there is no dispute between [*9] the parties as to the terms of the agreements or the parties' actions, Pimental's breach of contract claim can be decided as matter of law.

1. Express Terms of the Contract

The parties agree that Wachovia's inspection of the subject property is a condition precedent to its disbursement of funds. See Pl.'s Opp'n to Def.'s Mot. to Dismiss [Doc. No. 6] ("Pl.'s Mem.") at 2-3; Def.'s Mem. at 5-6. They disagree, however, in their particularized understandings of the condition. Pimental asserts that Wachovia's receipt of "supporting information or notice" that construction was completed satisfactorily was a necessary pre-condition for disbursement of funds. Pl.'s Mem at 5. Wachovia counters that the condition precedent granted Wachovia the discretion to exercise a power to inspect and withhold funds, but did not require it to do so. Def.'s Mem. at 7-8. Wachovia maintains that the inspection provision was solely for its own benefit and, as such, was freely waivable by Wachovia at any time. Id. at 7-8.

The contractual terms regarding disbursements specify that Wachovia's obligation to disburse funds is conditional upon Wachovia's satisfaction that the construction work completed [*10] has been adequate:

> Disbursements for the project are to be made at the discretion of the Lender, when construction of the improvements herein agreed to be constructed reach the stages of completion to be designated . . . [and] upon inspection in each instance by the Lender in accordance with the Construction Advance Schedule . . . .
>
> Disbursements can be withheld or refused by the Lender after inspection at any stage of construction, if the work required to be done has not been done to the satisfaction of the Lender. It is further agreed that the Lender may alter disbursements from the Schedule, at its discretion.
>
> Upon the making of each advance and as a condition to making the advance, Borrower will . . . deliver to Lender any written verified statements of Borrower and proofs of payment to contractor . . . as the Lender may demand.

Def.'s Mem., Ex. B, P 2. The mortgage agreement provides that

> advances will be made from time to time as construction progresses for work "in place only", as determined by [Wachovia] based upon inspection of the progress of the work. . . . Requests for disbursements must be accompanied by a statement by the Borrower that the Borrower [*11] believes the work in place has progressed to a point where disbursement as scheduled is proper . . . .

Def.'s Mem., Ex. A, P 17

Pimental asks this Court to read these provisions as placing an obligation upon Wachovia to seek certification from Pimental that work had been completed and paid for. See Pl.'s Mem. at 9-11. A more accurate reading, however, is that these provisions grant Wachovia the authority to withhold loan funds until it is satisfied that

Case 1:04-cv-11380-WGY    Document 77-2    Filed 03/01/2006    Page 5 of 18

Page 4
2006 U.S. Dist. LEXIS 3276, *

the work has been completed to an adequate extent under the terms of the construction contract, but they do not require Wachovia to do so before disbursement can be proper. Indeed, the contractual language is permissive, rather than requisite, n5 indicating that Wachovia may chose to forego some -- or all -- of these steps. Furthermore, the loan agreement clearly commits the decision to disburse funds to Wachovia alone: "Disbursements ... are to be made at the discretion of the Lender ..." Def.'s Mem., Ex. B, P 2.

> n5 E.g., Def.'s Mem., Ex. B, P 2 ("Disbursements can be withheld ... if the work required to be done has not been done to the satisfaction of the Lender. ... Borrower will ... deliver to Lender any written verified statements ... and proofs of payment to contractor ... as the Lender may demand." (emphasis added)).

[*12]

Nothing in the contract indicates that Wachovia's inspections were to account for Pimental's interests. On the contrary, the commitment letter expressly states that the right to inspect the property is for the sole benefit of Wachovia:

> Borrower expressly acknowledges that [Wachovia] will inspect but not approve the quality or completeness of the construction, and that [Wachovia] will complete its inspection solely for its own purposes and not for Borrower's benefit. Borrower agrees that Borrower will not hold [Wachovia] responsible for its judgement concerning the amount and value of the work that has been completed. Borrower agrees that Borrower will not hold [Wachovia] responsible concerning the quality or completeness of any construction.

Def.'s Mem., Ex. A, P 18. The Rider appended to Pimental's mortgage to Wachovia contains similar language. It reads in part:

> [Wachovia's] sole purpose in inspecting the work is to determine the approximate amount and value of the work which has been done. This is so that it can decide how much money to advance to me.

> I understand that [Wachovia] is doing its inspection solely for themselves and not for me. [*13] I agree that I will not hold them responsible for their judgment concerning the amount and value of the work that has been done. I also will not hold them responsible concerning the quality or completeness of any construction.

Compl., Ex. 4, at P 2.

The contractual language is unambiguous. In suggesting that these terms require Wachovia to conduct a thorough evaluation of the contractor's work prior to disbursing funds, see Pl.'s Mem. at 9-11, Pimental asks this Court to construe the contract in a manner that is unreasonable and counter to its plain meaning. The provisions in the commitment letter and Rider to which Pimental refers in support of her assertion that the contract required Pimental to demand money before Wachovia could disburse it, see id., and required her to provide Wachovia with evidence that construction had been completed satisfactorily before disbursement, id. at 5, can only be read to provide protections to Wachovia, which Wachovia was free to employ -- or not employ -- at its own discretion.

Pimental's breach of contract claim is without merit because the actions she alleges constitute a breach were, in fact, exactly in accordance with the [*14] terms of the contract. The contract states that Wachovia does not intend to "approve the quality or completeness of the construction" through the inspections. Def.'s Mem., Ex. A, P 18. Nor did Wachovia purport to make a precise evaluation of the value of work completed, as the inspections are "to determine the approximate amount and value of the work which has been done." Compl., Ex. 4, at P 2 (emphasis added). These documents further state that Pimental agreed that Wachovia's judgements as to the completeness of the contractor's work and appropriateness of disbursement would be committed to Wachovia's discretion. By signing these agreements, Pimental relieved Wachovia of any responsibility to her with regard to the inspections and disbursement decisions. See Compl., Ex. 4, at P 2.

The express terms of such a loan are enforceable under Massachusetts law. See Blais v. Warren Five Cents Sav. Bank, 1993 Mass. App. Div. 213 (1993). Where a loan contract imposes a condition precedent for the benefit of the lender alone, the lender is at liberty to waive the conditions. Clark v. Rowe, 428 Mass. 339, 346, 701 N.E.2d 624 (1998); Blais, 1993 Mass. App. Div. at 213; [*15] see also F.D.I.C. v. Smith, 848 F.Supp. 1053, 1058 n.9 (D. Mass. 1994) (Tauro, C.J.)

Case 1:04-cv-11380-WGY   Document 77-2   Filed 03/01/2006   Page 6 of 18

Page 5
2006 U.S. Dist. LEXIS 3276, *

(applying Massachusetts law); F.D.I.C. v. Fordhman (In re Fordham), 130 B.R. 632, 642 (Bankr. D. Mass. 1991) (Queenan, B.J.) (same). This is especially true where, as here, the loan contract specifically states that the condition is solely for the benefit of the lender and freely alterable by it. See Blais, 1993 Mass. App. Div. at 213; Fordham, 130 B.R. at 648. Even absent express contractual language granting the lender authority to waive its rights to impose conditions, a lender is presumed to have the authority to waive conditions that exist for its sole benefit. Fordham, 130 B.R. at 642.

There is one potential point of distinction between the facts of this case and those of Blais and Fordham. In Blais, the lender disbursed funds directly to the borrower, and in Fordham, the disbursement was at the specific request of the borrower. Blais, 1993 Mass. App. Div. at 213; Fordham, 130 B.R. at 640. Here, Pimental alleges that Wachovia advanced funds to her [*16] contractor, Champion, directly. Compl. P 14. Even if Wachovia disbursed the funds directly to Champion without Pimental's knowledge, this cannot form the basis of a breach of contract claim because the contract empowers Wachovia to make such disbursements. Furthermore, neither the Blais nor the Fordham decision indicates that these facts were crucial to the outcome of those cases. The Blais decision indicates that the explicit language of the loan agreement that allowed the lender to alter the disbursement schedule at will was as important, or more important, a factor supporting its decision. Blais, 1993 Mass. App. Div. at 213. Such language is also in the contract between Pimental and Wachovia.

Based on Pimental's allegations, there appears to be no legal basis to find that Wachovia breached any express terms of the construction loan contract between the parties.

2. Implied Covenant of Good Faith

Under Massachusetts law, good faith is an implied term of all contracts. Kerrigan v. City of Boston, 361 Mass. 24, 33, 278 N.E.2d 387 (1972) (citing Clark v. State Street Trust Co., 270 Mass. 140, 152-53, 169 N.E. 897 (1930)); see also McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 301 (1st Cir. 2004) [*17] (applying Massachusetts law). Wachovia's failure to act in good faith, therefore, could form the basis of a breach of contract claim, even if Wachovia fulfilled all the express terms of the contract. In loan agreements, the duty of good faith "require[s] that a bank be honest in its dealings with a borrower and not purposefully injure a borrower's right to obtain the benefits of the contractual relationship . . . ." Adams Co-operative Bank v. Greenberg (In re Greenberg), 212 B.R. 422, 429 (Bankr. D. Mass. 1997) (Boroff, B.J.); see, e.g., EIU Group, Inc. v. CitiBank Del., Inc., No. 00-CV-12565-WGY (D. Mass. 2005), Jury Verdict (Dec. 6, 2005) [Doc. No. 177] (refusing to enforce a straightforward promissory note evidently because one of the plaintiff's officers violated a fiduciary duty to the defendant, thus destroying the ability to repay). A bank's failure affirmatively to disclose information to a borrower generally will not constitute a breach of the covenant of good faith. See Greenberg, 212 B.R. at 429.

Pimental does not claim that the contract was entered into through coercion, fraud, n6 or other unfair or deceptive means. [*18] She does, however, allege that "Wachovia acted in bad faith by wrongfully disbursing funds . . . ." Pl.'s Mem. at 5. Pimental charges that Wachovia did so to advance its "pecuniary interest in disbursing a substantial percent of the construction loan funds . . ." since Pimental was obligated to pay interest, expenses, and fees associated with all money disbursed. Id.

Pimental's allegation that Wachovia "reckless[ly]" disbursed funds, id., is speculative, and "[a] court need not accept unreasonable inferences based upon conjecture or speculation." Fordham, 130 B.R. at 644 (internal quotation marks omitted) (rejecting plaintiff-borrower's allegation that lender disbursed loan funds in bad faith where plaintiff failed to show motivation for doing so). The charge that Wachovia failed to perform in good faith is also dubious because it is unlikely that a secured creditor would disburse loan funds in a reckless manner. If Wachovia were knowingly to disburse funds in spite of its recognition that Champion's work was substandard and incomplete, it would counteract the very purpose of the Rider, which is to protect the bank's interest in not advancing funds in excess [*19] of the value of its collateral. Had Wachovia not made the Rider a term of the loan, it would have advanced the full amount of the construction loan to Pimental at the closing, which would put her in no different a position from that which she currently occupies. The fact that Wachovia appended the Rider to Pimental's mortgage indicates that Wachovia was protective of its own interest in disbursing funds to Pimental only in proportion to the value of the property.

---

n6 Because Pimental did not plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b), a fraud claim would be foreclosed to her at this point.

---

Furthermore, the "bad faith" behavior Pimental alleges was behavior that was in accordance with the express terms of the contract. The contract permits Wachovia to conduct inspections and withhold funds on the basis of such inspections, but does not require Wachovia to account for Pimental's interests in so doing. See

Compl., Ex. 4, at P 2. Pimental's [*20] bad faith charge goes to the terms of the negotiated contract, rather than to Wachovia's spirit of performance. This is essentially a complaint that, in retrospect, Pimental does not like certain terms of the contract to which she agreed. Since she freely contracted to these terms with Wachovia, there is no basis for her claim that Wachovia breached the implied covenant of good faith.

### B. Negligence

Pimental's negligence claim can stand only if the construction loan contract between the parties imposes duties upon Wachovia to protect the interests of Pimental in its disbursement of funds to her contractor. If the contract does impose such duties, there is the further question of whether Wachovia acted negligently in inspecting the property or disbursing the loan funds.

Lenders normally do not owe borrowers fiduciary duties. Greenberg, 212 B.R. at 428; Blais, 1993 Mass. App. Div. at 213; see also Clark, 428 Mass. at 346. A lender can, however, assume a duty of care to the borrower through contractual terms. Blais, 1993 Mass. App. Div. at 213. A fiduciary relationship also can arise if a lender both knows that [*21] a borrower is placing her trust in it and accepts that trust. See Blais, 1993 Mass. App. Div. at 213; Greenberg, 212 B.R. at 429. Pimental does not make any claim that such a special fiduciary relationship arose between the parties, either contractually or through an unusual relationship of trust between her as borrower and Wachovia as lender. Wachovia is not liable to Pimental for its inspection of her property and subsequent disbursement of loan funds because it owed her no duty of care. See Smith, 848 F. Supp. at 1058. Thus, there is no legal basis to Pimental's assertion that Wachovia should have protected her interests in its assessment of Champion's work at the site and subsequent payment of loan proceeds to Champion. Without such a duty, her negligence claim must fail.

### C. Massachusetts General Laws, Chapter 93A

Pimental's third claim is that Wachovia violated Massachusetts General Laws, Chapter 93A, Section 2(a) in its dealings with her. Compl. PP 32-37. Section 2(a) declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Mass. Gen. Laws ch. 93A, § 2(a) [*22]. The double or treble damages Pimental requests in her complaint, Compl. at 5, requires a further showing that "the use or employment of the . . . act or practice was a willful or knowing violation of said section two." Mass. Gen. Laws ch. 93A, § 11.

This Court is asked to address whether Wachovia's disbursement of loan funds rightfully could be characterized as an "unfair or deceptive" act. Pimental alleges that the specific acts that form the basis of her Chapter 93A claim were Wachovia's "premature and erroneous disbursal of construction loan funds . . . done willfully and knowingly[,] . . . constituting unfair, unlawful and deceptive practices . . .", Compl. P 33, and "fail[ure] to adequately inspect the Property . . .", Pl.'s Mem. at 10.

Pimental's Chapter 93A claim hinges upon her breach of contract and negligence claims; she alleges that Wachovia's "unfair or deceptive" practices were its "premature and erroneous disbursal of construction loan funds . . . " Compl. P 33. Wachovia's duties to Pimental are defined by the terms of the loan contract, which expressly commit the inspection of the property and the decision to disburse funds to the [*23] discretion of Wachovia without imposing a duty upon it to protect Pimental's interests. Since Pimental has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding Wachovia liable under Chapter 93A. See Egan v. Athol Mem. Hosp., 971 F. Supp. 37, 47 (D. Mass. 1997) (Gorton, J.) (holding that where there was no evidence of the claimed underlying violation, and where there were "no unique arguments related to [the] Chapter 93A claim", defendant was entitled to summary judgment on plaintiff's Chapter 93A claim).

A practice may be a violation of Massachusetts General Laws, Chapter 93A "if [an act or practice] may reasonably be found to have caused a person to act differently than she otherwise might have." Hogen v. Riemer, 35 Mass. App. Div. 360, 365 (1993). Thus, Pimental's Chapter 93A claim might be sustainable if Wachovia's actions in entering into the contract were found to be unfair or deceptive. Pimental does not make such an allegation in her complaint, however, nor is there any evidence in the record indicating that she would [*24] have such a claim.

### III. CONCLUSION

This Court dismisses all three counts against Wachovia. Pimental became fully responsible for the full loan amount of $ 260,100.00 when the parties closed the loan. The Rider served as a limitation upon Wachovia's obligations to disburse the full amount on the day of closing and was executed for the sole benefit of Wachovia. The Rider did not create rights in Pimental that would allow her to sustain her claims.

### A. Breach of Contract

The terms of the loan contract between the parties that permitted Wachovia to condition its disbursement of funds on the satisfactory results of the lender's inspection of the construction at the site were for the benefit of Wachovia alone. As such, Wachovia was free to waive the

condition and disburse the full loan amount without establishing any particular level of completeness of the construction. Because it was acting within its discretion, Wachovia did not breach its contract with Pimental when it disbursed her loan funds. Furthermore, Pimental does not allege any facts that would lead this Court to suspect that Wachovia performed its inspection of the property or disbursement of loan funds in [*25] bad faith.

### B. Negligence

Since lenders owe no fiduciary duties to borrowers (absent particular arrangements to the contrary), Wachovia was under no obligation to ensure that Pimental's interests were protected when it decided to disburse the funds to Champion. Wachovia owed no such duty to Pimental, and her negligence claim is without merit.

### C. Massachusetts General Laws, Chapter 93A

Pimental's Massachusetts General Laws, Chapter 93A, Section 2(a) claim must fail, because Pimental has alleged no facts indicating that Wachovia engaged in unfair or deceptive practices. Insofar as the Chapter 93A claim depends upon a breach of a contractual or common law duty to Pimental, of which there are none sufficiently alleged, it, too, is unsustainable.

Accordingly, Wachovia's Motion to Dismiss [Doc. No. 3] is ALLOWED, and judgement shall enter in its favor.

SO ORDERED.

WILLIAM G. YOUNG

DISTRICT JUDGE

LEXSEE 2006 U.S. DIST. LEXIS 1948

**ERIC FORSYTHE, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. SUN LIFE FINANCIAL, INC., et al., Defendants.**

CIVIL ACTION NO. 04-10584-GAO

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2006 U.S. Dist. LEXIS 1948

January 19, 2006, Decided

**PRIOR HISTORY:** Forsythe v. Sun Life Fin. Inc., 2005 U.S. Dist. LEXIS 517 (D. Mass., Jan. 13, 2005)

**COUNSEL:** [*1] For Eric Forsythe, Plaintiff: Richard A. Acocelli, Weiss & Yourman, New York, NY.

For Lead Plaintiffs, Plaintiff: Jerald Bien-Willner, Bernstein Litowitz, Berger & Grossman LLP, San Diego, CA.

For Evelyn Keller, Henry Berdat, Karen Peach, Kathleen Blair, Marcus Dumond, Margie Booth, Richard Keller, Rosemary Sturgess, Stuart V. Sturgess, William Booth, Movants: Michelle H. Blauner, Shapiro Haber & Urmy LLP, Boston, MA.

For John W. Ballen, Defendant: Alison V. Douglass, Goodwin Procter, Boston, MA.

For John W. Ballen, Defendant: John J. Falvey, Jr., Testa, Hurwitz & Thibeault, Boston, MA.

For Eric Forsythe, Larry R. Eddings, City of Chicago Deferred COmpensation Plan, Richard Koslow, Forsythe Plaintiffs, Lead Plaintiffs, Plaintiffs: Nancy F. Gans, Moulton & Gans, Boston, MA.

For Eric Forsythe, Plaintiff: Robert S. Gans, Bernstein Litowitz Berger & Grossman, San Diego, CA.

For Evelyn Keller, Henry Berdat, Karen Peach, Kathleen Blair, Marcus Dumond, Margie Booth, Richard Keller, Rosemary Sturgess, Stuart V. Sturgess, William Booth, Movants: Edward F. Haber, Shapiro Haber & Urmy LLP, Boston, MA.

For Jeffrey L. Shames, Defendant: Abigail K. Hemani, [*2] Goodwin Procter, Boston, MA.

For Eric Forsythe, Plaintiff: Kim E. Levy, Milberg, Weiss, Bershad & Schulman, New York, NY.

For Eric Forsythe, Plaintiff: Marshall N. Perkins, Law Offices of Charles J. Piven, P.A, Baltimore, MD.

For Larry R. Eddings, Eric Forsythe, Plaintiffs: Janine L. Pollack, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, NY.

For Eric Forsythe, Plaintiff: Michael Reese, Milberg, Weiss, Bershad & Schulman LLP, New York, NY.

For Jeffrey L. Shames, Defendant: James Rehnquist, Goodwin Procter, Boston, MA

For Eric Forsythe, Plaintiff: J. Erik Sandstedt, Bernstein Litowitz, Berger & Grossman LLP, New York, NY.

For Eric Forsythe, Plaintiff: Steven G. Schulman, Milberg Weiss, Bershad Hynes & Lerach LLP, New York, NY.

For Massachusetts Financial Services Company, Sun Life Financial Inc., MFS Fund Distributors, Inc., Defendants: Jonathan A. Shapiro, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA.

For Jeffrey L. Shames, Defendant: Allison H. Stiles, Goodwin Procter LLP, Boston, MA.

For Sun Life Financial Inc., Defendant: Matthew A. Stowe, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA.

For Eric Forsythe, [*3] Plaintiff: James E. Tullman, WEISS & YOURMAN, New York, NY.

**JUDGES:** George A. O'Toole, Jr., DISTRICT JUDGE.

**OPINIONBY:** George A. O'Toole, Jr.

**OPINION:**

MEMORANDUM AND ORDER

O'TOOLE, D.J.

## I. Background

This case is a putative class action brought by four named plaintiffs -- Eric Forsythe, the City of Chicago Deferred Compensation Plan, Larry R. Eddings, and Richard Koslow -- who either now own or have owned mutual funds within the Massachusetts Financial Services (MFS) fund complex. They purport to bring their claims as a class action (with the exception of Count V, styled as a derivative action) on behalf of a class defined as "all persons or entities who held shares, units, or like interests in any of the MFS Funds between March 24, 1999 and March 31, 2004 inclusive . . . and were damaged thereby [excepting the defendants and others closely related to the defendants]." The claims are stated directly on behalf of the class under the Investment Company Act (ICA) of 1940, 15 U.S.C. §§ 80a-1-80a-64, and the common law and derivatively under the Investment Advisers Act (IAA) of 1940, 15 U.S.C. §§ 80b-1-80b-21. The consolidated amended [*4] complaint n1 names the following persons or entities as defendants: (1) Massachusetts Financial Services Company (MFS Company), the investment adviser to the MFS Funds, (2) MFS Distributors, Inc. (MFS Distributors), MFS Company's wholly-owned registered broker-dealer, (3) Sun Life Financial, Inc., the ultimate parent company of MFS Company (Sun Life), and (4) twelve trustees of various MFS Funds (the Trustee Defendants). n2

> n1 For ease of reference, the consolidated amended complaint in this case will be referred to as simply "the complaint" and cited as "Compl."
>
> n2 The complaint also names the MFS Funds as nominal defendants and John Doe defendants 1-100, who are described as "Trustees and/or officers charged with overseeing the MFS Fund Complex during the class period, and any other wrongdoers later discovered."

In general terms, the complaint makes the following allegations: The defendants participated in a scheme during the class period whereby they made substantial payments to brokers in exchange for [*5] the brokers' steering unwitting clients to invest in the MFS Funds. The practices engaged in were sometimes referred to by the defendants as buying "shelf space" and satisfying "strategic alliances." The plaintiffs allege that such arrangements existed between the defendants and many brokerage houses. n3 The defendants are alleged to have compensated the brokers by means of a variety of methods including wrongful utilization of "directed brokerage," n4 payment of excessive commissions in the form of "soft dollars" beyond what was allowed by law, and payments of cash or "hard dollars" to brokers (sometimes referred to as "revenue sharing") that were allegedly reimbursed from fund assets. These schemes are alleged to have violated provisions of the Security and Exchange Commission's Rule 12b-1 on allowable marketing fees. See 17 C.F.R. § 270.12b-1. In March 2004 these "shelf space"/"strategic alliance" schemes were the subject of an SEC regulatory enforcement action against and settlement with MFS Company for failure adequately to disclose the arrangements to the MFS Boards and to MFS shareholders.

> n3 The plaintiffs name ten brokerages as alleged participants in this type of scheme but allege that the defendants had "shelf space" arrangements with more than 100 brokerages.

[*6]

> n4 "Directed brokerage" is alleged to involve steering the defendants' securities trading business on behalf of the funds under management (and thus commissions) to brokers who agreed to more aggressively push MFS Funds.

The plaintiffs further allege that the defendants used assets of the MFS Funds to engage in these schemes and charged excessive and improper fees, allegedly motivated by the prospect that if the schemes were successful, more investors would be steered into MFS Funds and thus the fees that the defendants would collect would increase as the amount of assets under management increased. The plaintiffs allege that as a result the defendants reaped substantial profits, while the MFS Funds and their shareholders received no benefit.

Additionally, the plaintiffs allege that these schemes created insurmountable conflicts of interest for MFS Company as investment adviser to the MFS Funds because it was not motivated to act in the best interests of fund investors but instead was concerned with increasing its own management fees. n5 Because these arrangements were not disclosed to investors, [*7] the plaintiffs assert that MFS Funds' prospectuses, annual statements, and similar public filings were materially false and misleading. Finally, the plaintiffs allege that the Trustee De-

fendants who oversaw the MFS Funds failed properly to supervise and monitor the investment adviser MFS Company because of their dependence on and control by the investment adviser.

> n5 The plaintiffs also claim that the defendants should be held liable for aiding and abetting a breach of fiduciary duty by brokers who sold MFS Funds, because the various schemes caused the brokers to violate their obligations to act in the best interests of their clients.

The defendants have moved to dismiss the entire complaint on various grounds. I conclude that the motion to dismiss ought to be granted in part and denied in part as set forth below.

## II. Counts I, II and IV are dismissed because there is no implied private right of action under ICA § 34(b), § 36(a) or § 48(a).

In Count I, the plaintiffs purport to assert a claim on [*8] behalf of the class against MFS Company and the Trustee Defendants for alleged violations of § 34(b) of the ICA, 15 U.S.C. § 80a-33(b), n6 based upon materially false and misleading statements in annual reports, semi-annual reports, registration statements and other filings and public statements. In Count II, the plaintiffs assert claims, again on behalf of the class, against MFS Company, the Trustee Defendants, and MFS Distributors for alleged breaches of their fiduciary duties under § 36(a) of the ICA, 15 U.S.C. § 80a-35(a). n7 Count IV alleges violations of § 48(a) of the ICA, 15 U.S.C. § 80a-47(a), by Sun Life and MFS Company. n8 Count IV alleges that MFS Company acted as a "control person" of both the Trustee Defendants and MFS Distributors (the wholly-owned broker dealer of MFS Company) and thus is liable for having caused the violations of the ICA alleged in Counts I (§ 34(b), II (§ 36(a), and III (§ 36(b)). Similarly, the plaintiffs allege that as a parent of MFS Company, Sun Life is liable for MFS Company's breaches of those same provisions. The defendants argue that Counts I, II, and IV should [*9] be dismissed because the statutes at issue may not be enforced by a private right of action. n9 I agree.

> n6 ICA § 34(b) provides: "It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document." 15 U.S.C. § 80a-33(b)

> n7 ICA § 36(a) provides: "The [SEC] is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts --
>
> (1) as officer, director, member of any advisory board, investment adviser, or depositor; or
>
> (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.
>
> If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a-1(b) of this title." 15 U.S.C. § 80a-35(a).

[*10]

> n8 ICA § 48(a) provides: "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder." 15 U.S.C. 80a-47(a).

n9 Any liability arising under § 48(a) would necessarily, by the terms of the statute, be secondary and require proof of a primary violation of the ICA by another person. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp.2d 243, 264 (S.D.N.Y. 2003). In light of my ruling here as to the § 34(b) and § 36(a) claims and my dismissal, infra, of the § 36(b) claim against the Trustee Defendants, the only remaining potential claims under Count IV are that Sun Life has § 48(a) liability for causing a violation of § 36(b) by MFS Company and that MFS Company has § 48(a) liability for causing a violation of that same statutory section by MFS Distributors.

Neither § 34(b), § 36(a), nor § 48(a) expressly provides [*11] for enforcement by a private right of action. To bring these claims, the plaintiffs must show that there is an *implied* private right of action under each statute. For the following reasons, I conclude that there is no such implied private right of action and that Counts I, II, and IV should therefore be dismissed.

In Gonzaga Univ. v. Doe, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002) and Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001), the Supreme Court clarified the law regarding implied private rights of action. See Bonano v. East Caribbean Airline Corp., 365 F.3d 81, 84, 86 n.4 (1st Cir. 2004). A private right of action, like all substantive federal law, must be created by Congress. See Sandoval, 532 U.S. at 286; Bonano, 365 F.3d at 86. A statute may imply the existence of a private enforcement cause of action if it indicates Congress' intent to create both a private right and a private remedy under the statute. See Gonzaga Univ., 536 U.S. at 283-84, Sandoval, 532 U.S. at 286; Bonano, 365 F.3d at 84. Without a finding of a congressional intention to create a private remedy, [*12] however, courts may not infer one, regardless of how desirable that might be as a policy matter or how compatible it might be with the purpose or objective of the statute. Sandoval, 532 U.S. at 286-87.

Finding a congressional intention to imply a private right of action, like other tasks of statutory interpretation, depends in the first instance on the text and structure of the statute. See, Gonzaga Univ., 536 U.S. at 283-84, Sandoval, 532 U.S. at 288-89, Bonano, 365 F.3d at 84-85. Thus, a private right of action may be implied by statutory text that contains "rights-creating" language. Gonzaga Univ., 536 U.S. at 283-84; Sandoval, 532 U.S. at 288-89. Generally, however, statutes that focus on the persons or conduct to be regulated and not on the persons to be protected by the regulation create "no implication of an intent to confer rights on a particular class of persons." See Sandoval, 532 U.S. at 289. Moreover, when Congress has expressly provided a method of enforcing substantive rules, it may ordinarily be inferred that Congress correspondingly intended not to [*13] provide others. See Sandoval, 532 U.S. at 290, Bonano, 365 F.3d at 85; see also Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979) ("Obviously . . . when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."). In particular, courts should be cautious about finding an implied private right of action where Congress has provided within a statutory scheme a narrow ground for private enforcement but left the rest of the statute's provisions to agency enforcement. See Bonano, 365 F.3d at 85-86 (the existence of a narrow express private right of action in the Federal Aviation Act that exhibits an overall Congressional preference for public enforcement bolsters conclusion that implying a private right of action would be improper). n10

n10 The plaintiffs argue that the Supreme Court's recent decision in Jackson v. Birmingham Board of Educ., 544 U.S. 167, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005) has limited the holding in Sandoval. The plaintiffs misread Jackson; it does not narrow Sandoval in the manner they assert it does. The statute at issue in Jackson *does* include the important rights-creating language that was found lacking in the analysis in cases such as Sandoval and Bonano. See Jackson, 125 S. Ct. at 1503-04 (Title IX provides that "no person in the United States shall, on the basis of sex, be excluded . . ."). The Jackson court itself said, "In step with Sandoval, we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." See Jackson, 125 S. Ct. at 1507. The plaintiffs' argument that Jackson somehow nullifies the broad change that Sandoval wrought in the approach to finding implied private rights of action is wrong. See In re Mut. Funds Inv. Litig., 384 F. Supp.2d 845, 868 n.24 (D. Md. 2005) (rejecting a similar argument).

[*14]

Neither § 34(b), § 36(a), nor § 48(a) contains the "rights-creating language" necessary to find an implied private right of action. Those statutes simply describe prohibited conduct, focusing only on the persons regulated by the statute, rather than a class of persons benefitted by the regulation. Moreover, with the limited exception of the private cause of action expressly created by Congress under § 36(b), discussed below, the responsi-

Case 1:04-cv-11380-WGY    Document 77-2    Filed 03/01/2006    Page 13 of 18

Page 5
2006 U.S. Dist. LEXIS 1948, *

bility for the overall enforcement of the ICA statutory scheme is not given to private individuals but rather to the SEC. See 15 U.S.C. § 80a-41. Section 36(a) in particular not only lacks "rights-creating language" but also specifically authorizes only the SEC -- not private litigants -- to take enforcement action. Therefore I conclude, as many other courts have recently done in similar mutual fund cases, that § 34(b), § 36(a), and § 48(a) do not provide an implied private right of action for mutual fund shareholders. n11

n11 See In re Davis Selected Mut. Funds Litig., 2005 U.S. Dist. LEXIS 23203, Civ. No. 04-4186 (MGC), 2005 WL 2509732, at *2 (S.D.N.Y. Oct. 11, 2005); In re Dreyfus Mut.Funds Fee Litig., 2005 U.S. Dist. LEXIS 29152, Master File No. 04-0128, slip op., at 12-14 (W.D. Pa. Sept. 28, 2005); In re Franklin Mut. Funds Fee Litig., 388 F. Supp.2d 451, 464-68 (D.N.J. 2005); In re Lord Abbett Mut. Funds Fee Litig., 385 F. Supp.2d 471, 486-87 (D.N.J. 2005); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp.2d 222, 229-33 (S.D.N.Y. 2005); see also Stegall v. Ladner, 394 F. Supp.2d 358, 367-71 (D. Mass. 2005) (no implied private right of action under § 36(a)); In re Mut. Funds Inv. Litig., 384 F. Supp.2d 845, 868-70 (D. Md. 2005) (no implied private right of action under § 34(b) and § 36(a)); In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp.2d at 243, 259 (S.D.N.Y. 2003) (§ 34(b) does not provide an implied private right of action); White v. Heartland High-Yield Mun. Bond Fund, 237 F. Supp.2d 982, 986-88 (E.D. Wis. 2002) (§ 22 and § 34(b) do not provide an implied private right of action); Dorchester Investors v. Peak Int'l Ltd., 134 F. Supp.2d 569, 581 (S.D.N.Y. 2001) (§ 34(b) does not provide an implied private right of action)

[*15]

It is true that prior to Sandoval, various courts, including the First Circuit, had held that there were implied private rights of action under various provisions of the ICA. See Lessler v. Little, 857 F.2d 866, 871 (1st Cir. 1988) (finding implied private right of action under ICA § 17(a)(2)); see also Olmsted v. Pruco Life Ins. Co., 283 F.3d 429, 434 n.4 (2d Cir. 2002) (citing cases that had previously recognized implied private rights of action under the ICA). However, as the Olmsted court explained, the courts deciding those prior cases acted in accordance with then-existing principles governing the discernment of a private right of action. 283 F.3d at 433-34. n12 Sandoval represented a break with those prior lines of decision and instructed that courts should no longer infer a private right of action simply to "make effective [a statute's] purpose." 532 U.S. at 287; see also Olmsted, 283 F.3d at 434. Other courts addressing the same argument in cases very similar to this case have discounted pre-Sandoval precedent in concluding there is no implied private right of action under § 34(b), [*16] § 36(a) and § 48(a). See In re Lord Abbett, 385 F. Supp.2d 471, 486 (D.N.J. 2005); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp.2d 222, 233 (S.D.N.Y. 2005); cf. In re Franklin Mut. Funds Fee Litig., 388 F. Supp.2d 451, 467 (D.N.J. 2005). The First Circuit has also recognized, albeit in the context of another statute, that Sandoval "changed the legal landscape" and thus cast doubt on the validity of at least some of the prior precedents finding implied private rights of action. See Bonano, 365 F.3d at 86 n.4. In this case, as well, the plaintiffs' reliance on outdated precedent should be rejected in light of more recent guidance.

n12 Some of the cases were decided prior to 1975, when courts merely needed to find that a federal statute was "enacted for the benefit of a special class" to find an implied private right of action, while others were decided under the regime of Cort v. Ash, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975), in which "legislative intent" was only one factor in the implied private right of action analysis. See Olmsted, 283 F.3d at 434.

[*17]

The plaintiffs argue that even under the Sandoval method of analysis their claims should be upheld because the general statutory intent and structure of the ICA shows it was enacted for the global purpose of "protection of investors," despite the fact that the statutes do not contain any rights-creating language indicating an intent to create a private right of action. Such an argument is out of step with Sandoval, Bonano and the many cases decided post-Sandoval refusing to imply private rights of action under the ICA. Looking at the text and structure of § 34(b), § 36(a), and § 48(a), it is clear that there is no implication of a private right of action.

**III. Count V (Derivative Claim under the IAA) is dismissed for failure to comply with Fed. R. Civ. P. 23.1.**

In Count V, the plaintiffs purport to state a claim under § 215 of the IAA, 15 U.S.C. § 80b-15, derivatively on behalf of all the named MFS Funds against MFS Company in its role as investment adviser to the MFS Funds. The allegations are that MFS Company vio-

Case 1:04-cv-11380-WGY    Document 77-2    Filed 03/01/2006    Page 14 of 18

Page 6
2006 U.S. Dist. LEXIS 1948, *

lated its fiduciary duty to the MFS Funds, imposed by § 206 of the IAA, [*18] 15 U.S.C. § 80b-6, by (1) charging improper Rule 12b-1 marketing fees, (2) making improper undisclosed payments of "soft dollars," (3) making unauthorized use of "directed brokerage" to satisfy *quid pro quo* "shelf space" arrangements, and (4) charging excessive and improper commission payments to brokers. The plaintiffs claim that as a result of these breaches of duty, the MFS Funds are entitled to rescind their investment advisory contracts with the MFS Company and recover all fees paid in connection with such agreements.

That this claim is derivative in nature is conceded by the plaintiffs. The defendants argue that because the plaintiffs have failed to comply adequately with Fed. R. Civ. P. 23.1, Count V should be dismissed. The plaintiffs respond that any demand that the trustees who oversee the MFS Funds bring the claims would be futile and demand should thus be excused. For the reasons set forth below, I conclude that the plaintiffs have failed adequately to plead that demand would be futile, and this count should therefore be dismissed.

Shareholder derivative actions in federal court are governed by Fed. R. Civ. P. 23.1 [*19]  See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991); Gonzalez Turul v. Rogatol Distribs., Inc., 951 F.2d 1, 2 (1st Cir. 1991). Under this rule, the shareholder must plead with particularity that either demand was made or that demand would have been futile. Gonzalez Turul, 951 F.2d at 2; see also Fed. R. Civ. P. 23.1. In this Circuit, the requirements of Rule 23.1 are "vigorously enforced" and a court should dismiss derivative actions when plaintiffs do not comply. Gonzalez Turul, 951 F.2d at 2; see Grossman v. Johnson, 674 F.2d 115, 125 (1st Cir. 1982); Heit v. Baird, 567 F.2d 1157, 1160 (1st Cir. 1977); see also Landy v. D'Alessandro, 316 F. Supp.2d 49, 59-60 (D. Mass. 2004). Allegations necessary for a finding of demand futility must be particularly set forth in the complaint. A shareholder may not plead in general terms hoping that, by discovery or otherwise, he can later establish a case for demand futility. See Gonzalez Turul, 951 F.2d at 3; see also Grossman, 674 F.2d at 123, 125. [*20] Although the general standards applicable to motions to dismiss still apply to the extent that the court must take as true all well-pleaded allegations and make all reasonable inferences in favor of the plaintiff, the court must not accept mere conclusions or generalized allegations of control, acquiescence, wrongful participation, or the like. Instead, the plaintiff must allege with particularity facts that would support such a conclusion. See Gonzalez Turul, 951 F.2d at 3; Landy, 316 F. Supp.2d at 60-75; see also Grossman, 674 F.2d at 124; Heit, 567 F.2d at 1161.

In considering whether demand should be excused because it would be futile, a federal court must look to the law of the state of incorporation of the entity on whose behalf the plaintiff purports to sue. See Kamen, 500 U.S. at 97-108; Gonzalez Turul, 951 F.2d at 2. Here, the plaintiffs assert derivative claims on behalf of the MFS Funds, which are all organized as Massachusetts business trusts. See Compl. P 42. Therefore, Massachusetts law regarding demand and demand futility will govern the analysis of the plaintiffs' [*21] allegations.

Massachusetts takes a narrow view of demand futility; demand is excused only when there is a particularized showing that "a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested." Harhen v. Brown, 431 Mass. 838, 730 N.E.2d 859, 865 (Mass. 2000); see also In re Mut. Funds Inv. Litig., 384 F. Supp.2d 845, 877 (D. Md. 2005); In re Eaton Vance Mut. Funds, 380 F. Supp 2d at 239. n13 With respect to a Massachusetts business trust that is an investment company registered under the ICA, a trustee is presumptively "deemed to be independent and disinterested when making any determination or taking any action as trustee" if the trustee is not an "interested person" as that term is defined in the ICA. See Mass. Gen. Laws ch. 182, § 2B. Thus, in order to show that demand would have been futile, the plaintiffs must allege with particularity that a majority of the trustees were "interested" within the ICA definition. See In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 239; ING Principal Protection Funds Derivative Litig., 369 F. Supp.2d 163, 171-72 (D. Mass. 2005). [*22]

n13 The new Massachusetts Business Corporation Act, which became effective in July 2004, includes a "universal demand" requirement which applies in *all derivative cases*, meaning there is no longer a futility exception to the requirement, even if the directors are deemed to be "interested" with respect to the subject matter of the demand. See Mass. Gen. Laws ch. 156D, § 7.42 ("No shareholder may commence a derivative proceeding" until written demand is made and certain time periods have elapsed); see ING Principal Protection Funds Derivative Litig., 369 F. Supp.2d 163, 170 (D. Mass. 2005); Demoulas v. Demoulas Super Markets, Inc., 2004 Mass. Super. LEXIS 286, Civ No. 033741 BLS, 2004 WL 1895052, at * 1 (Mass. Super. Ct. Aug. 2, 2004) The defendants do not argue that this statute applies; the initial complaint was filed prior to the enactment of that statute and the statute is not retroactive.

Case 1:04-cv-11380-WGY   Document 77-2   Filed 03/01/2006   Page 15 of 18

Page 7
2006 U.S. Dist. LEXIS 1948, *

According to the complaint, there are twelve trustees on the relevant boards of trustees [*23] that oversee the MFS Funds. See Compl. P 25-37. All trustees are named as Trustee Defendants. The plaintiffs allege that three trustees, who served on all the boards, were officers of MFS Company. See Compl. PP 25-27. Trustees who are officers of the adviser would be considered "interested" under the ICA. See 15 U.S.C. § 80a-2(a)(3)(D), (19). However, in order to find a majority of the board "interested" under the ICA, it would be necessary for the plaintiffs to allege with particularity that at least four more trustees sitting on each board at the time the complaint was filed were "interested." The plaintiffs' only argument on this score is that the remaining nine Trustee Defendants on each board should all be viewed as "interested" because they were "controlled" by the investment adviser MFS Company and thus within the ICA's definition. See 15 U.S.C. § 80a-2(a)(3)(C) ("affiliated person" includes "any person directly or indirectly controlling, controlled by, or under common control, with such other person"); 15 U.S.C. § 80a-2(a)(19) ("interested person" of another person/entity includes any [*24] "affiliated person"); see also In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 239 (a trustee is an interested person if he is "controlled by" the Investment Adviser as defined in the ICA). However, under the ICA there is a statutory presumption that a natural person is not a "controlled person," subject to specific rebuttal. See 15 U.S.C. § 80a-2(a)(9); see Krantz v. Fidelity Mgmt & Research Co., 98 F. Supp 2d 150, 154-55 (D. Mass 2000).

The plaintiffs contend that the allegations in the complaint, taken as true, support an inference that, because of the "close-knit" structure of the MFS organization, even the supposedly independent Trustee Defendants felt their duty of loyalty was to MFS Company, not the funds and their investors. See Compl. PP 44, 45, 91, 135. The First Circuit has held that in making an allegation of control of a fund's Board of Trustees by an investment adviser, a plaintiff must make "particularized allegations and [present] specific facts." See Grossman, 674 F.2d at 124. Here, the allegations by the plaintiffs are not particularized. The allegations in P 44 and P 135 are little [*25] more than conclusions that (1) the MFS Funds all function as part of one unitary organization and thus have no independent will apart from MFS Company and (2) although the trustees may be voted out by shareholders, the trustees know that event is extremely unlikely so long as MFS Company supports the trustees. The allegation in P 45 may be sufficient to demonstrate that MFS Company, MFS Distributors, and the MFS Funds all have a cooperative relationship, but it does not demonstrate anything more about how the Trustee Defendants themselves were interested. Finally, as to P 91, the presence of MFS officers as trustees on the board is not enough, without any additional facts regarding board operations, to allege with particularity that each of the non-affiliated Trustee Defendants was controlled by MFS Company. The plaintiffs' conclusory assertion that these officers were put in place to "ensure that the Trustees toed the line" will not suffice.

The plaintiffs also argue that they have alleged that each Trustee Defendant personally benefitted from the wrongdoing alleged in the complaint. They rely on allegations that the Trustee Defendants served for indefinite terms at the pleasure [*26] of the investment adviser defendant, see Compl. P 91, received substantial compensation (ranging from $ 100,000-200,000 annually) for their duties overseeing the one-hundred twelve funds in the MFS fund complex, see Compl. P 140, and were self-interested in alleged improper kickbacks paid to brokers to steer clients into the MFS Funds because they would lose their positions if the funds did not grow. See Compl. P 139. These allegations are insufficient to excuse demand. First, the factual allegation that the Trustee Defendants serve indefinite terms does not, without more, warrant the conclusion that they serve "at the pleasure" of MFS Company, particularly in light of the acknowledged fact that the shareholders retain the right to vote out a trustee. The complaint's allegation that these Trustee Defendants are intimidated into doing the bidding of MFS Company is a conclusion without articulated factual support. See Compl. P 135. In addition, board membership by itself does not warrant a conclusion that the trustee is "interested," even though the trustee is well compensated and was appointed by the defendant. See Demoulas v. Demoulas Super Markets, Inc., Civ. No. 033741BLS, 2004 WL 1895052, at * 15 (Mass. Super. Ct. Aug. 2, 2004); [*27] see also In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 240; In re AllianceBernstein Mut. Fund Excessive Fee Litig., 2005 U.S. Dist. LEXIS 24263, Civ. No. 4885(SWK), 2005 WL 2677753, at * 8 (S.D.N.Y. Oct. 19, 2005). In the mutual fund context, other courts have similarly concluded that the fact that trustees receive substantial compensation for their service on multiple boards within a fund complex is not in itself sufficient to establish that they were under the "control" of the adviser. See Krantz, 98 F. Supp 2d at 155, 157; see also In re Mut. Funds Inv. Litig., 384 F Supp.2d 873, 878-89. Likewise, the Massachusetts courts have held that the receipt of "usual and customary director's fees and benefits" does not render a director interested. See Harhen, 730 N.E.2d at 864 n.5. Finally, the plaintiffs' allegation that the Trustee Defendants were "interested" because the wrongful scheme alleged would lead to fund growth, thus permitting them to maintain their positions and salaries, depends on a series of general inferential conclusions -- that the alleged wrongful "kickback" arrangements [*28] were necessary to maintain fund growth, that if growth stagnated the MFS Funds would be disbanded or merged, and if this oc-

curred as to one of the many MFS Funds the Trustee Defendants oversaw they would lose their positions -- that are nowhere supported by particularized factual allegations.

It is not enough to allege simply that the Trustee Defendants approved the advisory fees and other distributions that are alleged to have been wrongful. See Compl. PP 89-95, 136, 137, 138. Allegations that do not go beyond asserting that the trustees had approved transactions that are alleged to have been wrongful are insufficient to excuse demand without further evidence of bias or self interest on the part of the trustees. See Grossman, 674 F.2d at 124-25; ING Principal Protection, 369 F. Supp.2d at 172. Here there are no particular allegations that any of the non-officer Trustee Defendants acted out of bias or self-interest in approving the challenged transactions. Similarly, there are also no particularized allegations, beyond the mere fact of approval, that the Trustee Defendants were actively involved in the wrongfulness of any actions.

For the foregoing [*29] reasons, I conclude that the plaintiffs have failed to adequately allege that the majority of the board of trustees was "interested" so that demand would be excused under Massachusetts law. Therefore, since it is undeniable that the plaintiffs have not made demand on the boards of trustees, their failure to allege with particularity that demand would be futile requires that their derivative claim under the IAA set forth in Count V should be dismissed. See Fed. R. Civ. P. 23.1.

### IV. Counts VI-IX (state law claims) are dismissed.

In Counts VI, VII, VIII, and IX, the plaintiffs purport to state on behalf of all class members four separate claims under state law for alleged breaches of fiduciary duty or unjust enrichment. Despite the plaintiffs' characterization of these claims as "direct" claims, they are properly regarded as derivative.

Under Massachusetts law, n14 if the wrong underlying claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause [*30] of action is derivative. See Bessette v. Bessette, 385 Mass. 806, 434 N.E.2d 206, 208 (Mass. 1982); Jackson v. Stuhlfire, 28 Mass. App. Ct. 924, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990); see also Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir. 2000) (applying Massachusetts law); Stegall v. Ladner, 394 F. Supp.2d 358, 364 (D. Mass. 2005) (SAME); In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 233-34; (SAME); In re Franklin Mut., 388 F. Supp.2d at 462 (under Mass. law, the issue turns on whether the shareholders suffered an injury distinct from the injury suffered by the corporation).

n14 The parties do not address which state's law should apply to this issue. However, their arguments, premised on Massachusetts law, implicitly recognize the fact that I must look to the law to the Funds' state of organization, Massachusetts, for resolution of this issue of "shareholder standing." See Stegall, 2005 WL 2709127, at * 4; In re AllianceBernstein, 2005 WL 2677753, at * 3; see also Compl. P 42 (MFS Funds are all organized under Massachusetts law).

[*31]

Here, any injury caused by the alleged state law wrongs committed by the defendants would occur primarily and directly to the MFS Funds and only indirectly to the plaintiffs by virtue of their status as investors. These claims should have been brought as derivative claims, with appropriate compliance with Rule 23.1.

The plaintiffs' argument that this result is somehow altered by the "unique nature" of mutual funds, relying on Strigliabotti v. Franklin Resources, Inc., 2005 U.S. Dist. LEXIS 9625, Civ. No. C 04-00883 SI, 2005 WL 645529, at * 7-8 (N.D. Cal. Mar. 7, 2005), is unavailing. In Strigliabotti, the court decided that the injuries the plaintiffs allegedly suffered from excessive payment of 12b-1 distributions and advisory fees by the funds at issue were direct injuries under California law. However, that authority is not controlling, and I find its reasoning unpersuasive. The approach taken in that case ignores the fact that the injuries claimed by the plaintiffs here would be suffered only by reason of a precedent wrong to the MFS Funds.

The plaintiffs' remaining arguments on this score are similarly unpersuasive and do not merit extended discussion. n15 Therefore, I conclude that all of the [*32] state law claims are properly viewed as derivative claims.

n15 The plaintiffs argue that the class members have sustained separate and distinct injury because the rates paid by classes are different and, therefore, the shareholders falling within each class are directly impacted by the payments. This is a *non sequitur*. If the facts are as alleged, it simply means that the shareholders of different classes may suffer their indirect injuries to a differing extent. Besides, this argument is also inconsistent with the claims stated in the complaint that make no effort to distinguish between the classes of shareholders but rather allege that all

investors were similarly injured. See In re Eaton Vance, 380 F. Supp. 2d at 235-36. The plaintiffs also argue that a direct action is necessary to vindicate the rights of class members no longer holding their shares. This argument is unavailing because such a result occurs in all derivative actions, where it is the fund that benefits directly from any remedy (because it was the fund that was injured directly), not the individual shareholders. See Ross v. Bernhard, 396 U.S. 531, 538-39, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970) ("The proceeds of the [derivative] action belong to the corporation," not to the former shareholders.). Present shareholders find the value of their shares proportionately increased by a damage recovery by the fund; past shareholders, who have become present non-shareholders, do not

[*33]

Counts VI through IX were improperly brought as direct claims when they are in fact derivative claims, and they must be dismissed. Even if the claims were to be viewed as derivative claims, they would all be subject to the demand requirement of Fed. R. Civ. P. 23.1. For the reasons discussed above in relation to the IAA claim under Count V, the plaintiffs have failed to comply with Rule 23.1 because they failed either to make the demand required by that rule or to allege adequately the futility of such demand. All four of these counts must be dismissed.

### V. Count III states a claim under § 36(b) of the ICA.

#### A. Adequacy of the Complaint

In Count III, the plaintiffs assert claims against MFS Company (the investment adviser), MFS Distributors (the principal underwriter), and the Trustee Defendants for alleged breaches of fiduciary duty under § 36(b) of the ICA, 15 U.S.C. § 80a-35(b). The plaintiffs allege that the defendants violated § 36(b) by their improper collection of purported Rule 12b-1 marketing fees, their concomitant failure to reduce advisory fees proportionately to the benefit received [*34] by MFS Company from these payments, and their use of MFS Fund assets to make undisclosed payments of "soft dollars" and excessive commissions in violation of Rule 12b-1 in exchange for preferential marketing services, despite the fact that the payments at issue benefitted only the defendants and not the MFS Funds or their investors. Compl. P 160. The plaintiffs also contend that the defendants wrongfully inflated their advisory fees in an amount that would reimburse them for further revenue sharing payments ostensibly made out of the assets of MFS Company and MFS Distributors. Compl. P 160. All of this, the plaintiffs allege, demonstrates that the plaintiffs charged advisory fees so disproportionately large that they bore no reasonable relationship to the services rendered, could not have been the product of arm's length bargaining, and thus violated the fiduciary duty imposed by § 36(b). Compl. PP 160, 161. The defendants have moved to dismiss this claim on the grounds that it fails to state a claim upon which relief can be granted.

Under § 36(b), a security holder of a registered investment company (such as the MFS Funds here) may bring an action "on behalf of such company" against [*35] an investment adviser of that investment company or "any affiliated person of such investment adviser" for a breach of the statutorily created fiduciary duty "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof." 15 U.S.C. § 80a-35(b). In Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982), the Second Circuit set forth a standard that has since been widely cited by other courts in addressing claims under § 36(b). According to Gartenberg, an investment adviser or manager may be liable for a breach of its fiduciary duty under § 36(b) if it charged a fee "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Id. at 928. The Gartenberg court proposed six factors typically to be considered, including (1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; [*36] (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. See Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir. 1989) (citing Gartenberg, 694 F.2d at 929-30). The First Circuit has not expressly adopted the so-called Gartenberg factors nor has it established a specific pleading standard for § 36(b) claims. My judgment, previously stated elsewhere, is that Gartenberg (if it were to be followed in this Circuit) does not establish a heightened pleading standard for § 36(b) claims and the plaintiffs' failure to plead facts that specifically address the Gartenberg factors is not in itself a ground for dismissal. See Wicks v. Putnam Inv. Mgmt., LLC, 2005 U.S. Dist. LEXIS 4892, Civ. No. 04-10988, 2005 WL 705360, at * 4 (D. Mass. Mar. 28, 2005). This conclusion is consistent with recent instruction from the Supreme Court and the First Circuit that heightened pleading standards should not be applied unless such a heightened standard is mandated either by statute or rule of civil procedure. See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512-13, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 66 (1st Cir. 2004). [*37] Because there is no heightened pleading standard for claims under § 36(b), the plaintiffs here need only comply with the usual notice pleading requirements of Fed. R. Civ. P. 8.

Under Rule 8, a complaint is sufficient as long as it contains a "short and plain statement of the claim showing that the pleader is entitled to relief" that "gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." See Educadores, 367 F.3d at 66 (citing Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); see also Fed. R. Civ. P. 8(a). A court should dismiss a complaint on a Rule 12(b)(6) motion only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." See Educadores, 367 F.3d at 66 (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)). Of course, as the defendants correctly point out, the liberality of Rule 8 should not be read to mean that there are not some minimal standards that must be met. The complaint should at least set forth basic facts [*38] as to who did what to whom, when, where and -- if relevant to the case -- why. See Educadores, 367 F.3d at 68. Additionally, in evaluating a motion to dismiss for failure to state a claim a court must "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." See id., at 68. While a plaintiff need not plead facts in evidentiary detail, a complaint will be deemed insufficient if all it does is "parrot the language of a statutory cause of action, without providing some factual support." See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir. 2004).

In sum, the following principles apply: (1) a § 36(b) plaintiff need only set forth a "short and plain statement" that gives "fair notice" of the claim of breach of fiduciary duty with respect to the receipt of compensation or other material payments made by the fund or its shareholders; and (2) the plaintiff need not plead in a high degree of factual detail and failure to plead specifically any of the Gartenberg factors is not itself a ground for dismissal; but (3) a § 36(b) complaint is not sufficient if it rests [*39] solely on general and conclusory legal assertions that the fees charged were excessive.

The defendants contend that the complaint's § 36(b) claim should be dismissed because it does not allege conduct sufficient to sustain a claim under the statute. First, although the defendants describe the plaintiffs' claim as nothing more than one for non-disclosure of certain practices, the complaint can reasonably be read as alleging that the nondisclosed practices were themselves wrongful under § 36(b). The defendants are correct that § 36(b) is not a general vehicle for bringing claims for any and all purported breaches of fiduciary duty; claims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser or affiliated persons. See, e.g., Stegall, 394 F. Supp. 2d at 374-77 (describing how both the so-called "broad" and "narrow" view of § 36(b) liability both require that the breach of fiduciary duty was in some way tied to excessive compensation). Thus, to the extent that plaintiffs argue that the complaint, properly understood, is "not limited to excessive fees and charges, but also includes Defendants' breach [*40] of fiduciary duty [by failing to adequately inform investors about conflicts of interest involving compensation received by MFS Company] in connection with the fees they charged, which is an independent violation of § 36(b)," Pls.' Opp'n to Mot. to Dismiss at 36, they are incorrect. See Stegall, 394 F. Supp.2d at 376; see also Migdal v. Rowe Price-Fleming, Int'l, Inc., 248 F.3d 321, 328-29 (4th Cir. 2001).

On the other hand, I am unwilling to conclude at this stage of the case, based only on pleadings, that a claim under § 36(b) may not attack the lawfulness of the types of distributions that the plaintiffs allege were wrongful here -- excessive Rule 12b-1 fees, soft dollar payments, and excessive broker commissions -- despite the fact that such payments may not be "advisory fees" in the most literal sense. See Meyer v. Oppenheimer Mgmt. Corp., 764 F.2d 76, 82-83 (2d Cir. 1985) (expressly rejecting the proposition that § 36(b) "deals only with compensation for *advisory* services" to mutual funds, noting the broad scope of the language of § 36(b), which applies to payments made to any "affiliated person" of the investment [*41] adviser) (emphasis in original); Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 866 (2d Cir. 1990) (§ 36(b) applies to claims related to excessive payments other than purely advisory fees -- "the costs of 12b-1 plans . . . as well as advisory fees are subject to review under Section 36(b)"); In re AllianceBernstein, 2005 WL 2677753, at * 5; In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 236-37; ING Principal Protection, 369 F. Supp.2d at 167-69; Pfeiffer v. Bjurman, Barry & Assocs., 2004 U.S. Dist. LEXIS 16924, Civ. No. 03-9741 DLC, 2004 WL 1903075, at * 4 (S.D.N.Y. Aug. 26, 2004); cf. Krinsk, 875 F.2d at 412-13 (allegation of improper Rule 12b-1 fees could not be brought separately under Rule 12b-1 because it was part of cognizable § 36(b) excessive compensation claim); Pfeiffer v. Integrated Fund Servs., Inc., 371 F. Supp.2d 502, 508-09 (S.D.N.Y. 2005) (holding such claims are cognizable but dismissing claim because there were improper defendants named).

I conclude that Count III sufficiently comports with Rule 8's pleading standard. It alleges wrongful conduct specific to the defendants in some factual [*42] detail. In addition, it alleges that the defendants have caused the MFS Funds to pay improper "kickbacks" to brokers in exchange for steering clients into MFS Funds via "shelf space arrangements," to pay excessive commissions under the guise of "soft dollars," to engage in improper "directed brokerage" arrangements, and to make im-