Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 1 of 18

Page 11
2006 U.S. Dist. LEXIS 1948, *

proper "hard dollar" revenue sharing payments that were then reimbursed out of MFS Fund assets. See Compl. PP 46-51, 97-104, 106-07, 109-13, 161. There are also illustrating allegations regarding these types of arrangements with one particular broker-dealer, as well as allegations that a large number of other broker-dealers were similarly involved. See Compl. PP 40, 56-75, 82-83. The plaintiffs also give adequate notice of how these arrangements are alleged to have benefitted the defendants while at the same time harming the MFS Funds and their investors. See Compl. PP 3-4, 48, 52, 79, 84, 94, 102-03, 108, 163. The plaintiffs allege that as the MFS Funds grew the defendants failed to pass on economies of scale from that growth by failing to reduce fees accordingly. See Compl. PP 102-03. Finally, the plaintiffs allege that the advisory fees [*43] MFS Company received were wrongfully inflated by shifting to the MFS Funds and their investors costs that should rightfully have been borne by the MFS Company. See Compl. P 105.

The defendants also argue, relying on cases such as Migdal, 248 F.3d at 326-27 and Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 143-44 (3d Cir. 2002), that the § 36(b) claim should be dismissed because the plaintiffs have failed alleged sufficient facts that, if proven, would demonstrate that the services rendered by the defendants were disproportionate to the fees charged. This argument is unpersuasive. This is not a case like the cited cases where the plaintiffs only alleged the fees were high but made no allegations regarding services rendered and the relationship between the two. Here, although the plaintiffs do not make any allegations regarding the quality of services rendered, that factor may be irrelevant to their theory of excessiveness. The plaintiffs' contention is that the fees were excessive because they were unauthorized and taken from fund assets to the benefit of the defendants only, not the funds. The plaintiffs' theory is that fees that amount [*44] to "something for nothing" are inherently excessive. At least one court has concluded in a different § 36(b) context that the wrongful retention of monies by an investment adviser that were in essence "something for nothing" could represent a disproportional relationship between fees and services. See Jones v. Harris Assocs., L.P., 2005 U.S. Dist. LEXIS 39560, Civ. No. 04 C 8305, 2005 WL 831301, at *3 (N.D. Ill. Apr. 7, 2005). For present purposes, the plaintiffs' pleading of this claim is sufficient to survive a motion to dismiss.

B. Limits on the Surviving § 36(b) Cause of Action

The defendants assert that even if the complaint adequately states a claim under § 36(b), the claim as stated is overbroad in two respects: the complaint can be understood to claim damages for greater period than is allowed by the statute, and it appears to claim damages against the Trustee Defendants, who are not proper defendants under the statute. I agree, and the § 36(b) claim will be limited accordingly.

As to the damages period, the plaintiffs generally allege, for all the claims, a class period beginning March 14, 1999 and ending March 31, 2004. See Compl. P 128. The plaintiffs do not allege [*45] any separate damages period applicable to their § 36(b) claim. The text of § 36(b) limits recovery to "actual damages" and further provides that "[no] award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3). Therefore, this lawsuit having been filed on March 25, 2004, the damages period applicable to the § 36(b) claim thus begins on March 25, 2003.

The defendants also argue that the Trustee Defendants are not proper defendants because they are not alleged to be "recipients" of the allegedly excessive fees or commissions. By its terms, an action under § 36(b) may only be brought against the "recipient of [the allegedly wrongful] compensation or payments." 15 U.S.C. § 80a-35(b)(3). The plaintiffs argue that any dismissal of the Trustee Defendants at this point is premature -- instead being a matter for summary judgment -- and that the Trustee Defendants could possibly be held liable as "indirect" recipients of the fees. The only allegations in the complaint that could be viewed as supporting such a theory of indirect receipt are the allegations recounting [*46] the Trustee Defendants' compensation and the allegations that, in general, they failed in their fiduciary duties. This is insufficient. I agree with the reasoning of the courts that have recently addressed this issue in the context of nearly identical sets of allegations against other mutual fund trustees that the trustees are not proper § 36(b) defendants where, as here, there are no allegations that the annual compensation received by the Trustee Defendants was in exchange for "advisory services" or in some way represented advisory fees that were to be paid to the MFS Company but instead were diverted to the Trustee Defendants. See In re Dreyfus Mut. Funds Fee Litig., Master File No. 04-0128, slip op. at 12-14 (W.D. Pa. Sept. 28, 2004); In re Eaton Vance Mut. Funds, 380 F. Supp.2d at 238; In re AllianceBernstein, 2005 WL 2677753, at *6-7; cf. Green v. Fund Asset Mgmt., L.P., 147 F. Supp.2d 318, 329-30 (D.N.J. 2001) (dismissing § 36(b) against officers of funds because the officers were not "recipients" of compensation alleged to be wrongful under the statute where plaintiffs' only allegation of receipt was regular salary paid [*47] to the directors).

Accordingly, the § 36(b) claim that survives as Count III is limited in terms of the damages that may be recovered as described above and is only properly asserted against MFS Company and MFS Distributors.

**VI. The plaintiffs have no standing to assert the surviving § 36(b) claim as to non-owned funds.**

The plaintiffs purport to assert their § 36(b) claims on behalf of a class consisting of shareholders of sixty-two funds within the MFS fund complex. However, only two of the four named plaintiffs -- Eric Forsythe and Richard Koslow -- owned shares in only two of the sixty-two MFS Funds -- Massachusetts Investors Trust and MFS Utilities Fund -- at the time this lawsuit was filed. See Compl. PP 20, 22. Thus, the defendants argue that the plaintiffs lack standing to assert any § 36(b) claim except on behalf of those two funds. I agree.

Under § 36(b), only the SEC and "security holders" in an investment company are entitled to bring a claim "on behalf of" the company. See 15 U.S.C. § 80a-35(b). "Security holders" means current security holders. Former security holders may not bring a claim on behalf of an investment [*48] company that they formerly held shares in, but no longer do. The only claims that are sufficient under § 36(b) are the claim by Eric Forsythe on behalf of the Massachusetts Investors Trust Fund and the claim by Richard Koslow on behalf of the MFS Utilities Fund. All other claims the complaint purports to state on behalf of the various MFS Funds, either never owned by any plaintiff or only formerly owned by a plaintiff, should be dismissed due to a lack of standing. n16

n16 Plaintiff City of Chicago Deferred Compensation Plan claims to have formerly held shares in (1) MFS High Income Fund, (2) MFS Growth Opportunity Fund, and (3) Massachusetts Investors Growth Stock Fund. Plaintiff Larry Eddings claims to have formerly held shares in (1) MFS Capital Opportunities Fund, (2) MFS Strategic Income Fund, (3) Massachusetts Investors Growth Stock Fund (the same as plaintiff City of Chicago), (4) Massachusetts Investors Trust (the same as plaintiff Eric Forsythe), (5) MFS Total Return Fund, (6) MFS High Income Fund, and (7) MFS Emerging Growth Fund.

[*49]

This conclusion follows not only from the plain statutory language, but also from the unique nature of the § 36(b) cause of action. As the Supreme Court explained in Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 535, 104 S. Ct. 831, 78 L. Ed. 2d 645 (1984), the § 36(b) cause of action is an "unusual cause of action." In the broadest sense, it is a "derivative" cause of action because it is brought "on behalf of" an investment company to vindicate the rights of the investment company and any recovery flows to the investment company, not the shareholder plaintiff. See id. at 535 n.11. Nevertheless § 36(b) is not like the traditional derivative cause of action because the fund itself does not have the power to bring an action under the statute. See id. at 535-42. Instead, Congress explicitly gave the right to enforce violations of the statute to shareholders and to the SEC but not to the investment company itself. See id. The Supreme Court made clear in Daily Income Fund that the shareholder suing under § 36(b) sues on behalf of a fund, though not in substitution for the fund. Any recovery belongs to the fund, not the shareholder. Consistent with the statutory [*50] language, a plaintiff must hold a present interest in each fund on behalf of which he purports to bring a § 36(b) claim.

The plaintiffs cite various cases which they assert demonstrate that they have standing to sue on behalf of MFS Funds they have no ownership interest in, alleging that the MFS Funds have engaged in a common course of wrongful conduct and thus, like the security holders, ERISA plan beneficiaries, and the like in those cases, they should be able to proceed with this case. See Pls.' Opp'n to Mot. to Dismiss at 23-26. Those cases are inapposite. For the most part they concern class certification issues, most of them dealing with injuries alleged to have occurred directly to groups of plaintiffs under other securities laws or under ERISA, not § 36(b). Furthermore, as this court and others have held in the mutual fund context, it is appropriate to treat each MFS Fund as a separate and distinct entity in the § 36(b) context and a plaintiff may not use the corporate structure of the broader investment company to confer standing. See Wicks, 2005 WL 705360, at * 3; see also Stegall, 394 F. Supp.2d at 362-63; In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 40-41 (D. Mass. 2003). [*51] n17

n17 Since each MFS Fund should be properly treated as a separate and distinct entity, the plaintiffs' alternative argument that they have standing by reason of an ongoing financial interest in all of the MFS Funds, including those they own no shares in, is precluded.

Standing is a threshold inquiry and is particularly important in securities litigation, where strict application of standing principles is needed to avoid vexatious litigation and abusive discovery. See Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1531 (D. Mass 1991). A plaintiff may not avoid the standing inquiry merely by styling his suit as a class action, see In re Bank of Boston, 762 F. Supp. at 1531, and courts have traditionally resolved questions of standing before reaching issues of class certification. See In re

AllianceBernstein, 2005 WL 2677753, at * 9; In re Eaton Vance Corp. Sec. Litig., 220 F.R.D. 162, 165-69 (D. Mass. 2004). [*52] n18 As the Supreme Court has instructed, the fact "that a suit maybe a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (citations and internal quotation marks omitted). Other judges in this district have relied on this same reasoning in holding that plaintiffs have no standing to sue on behalf of mutual funds they did not own despite the fact that they owned shares in other funds in the fund complex. See Stegall, 394 F. Supp.2d 361-63; In re Eaton Vance Corp., 219 F.R.D at 40-41; Nenni v. Dean Witter Reynolds, Inc., Civ. No. 98-12454-REK, 1999 U.S. Dist. LEXIS 23351, at * 5-6 (D. Mass. Sept. 29, 1999).

n18 I agree with the reasoning of the court in In re Eaton Vance Corp., 220 F.R.D. at 168-69 (addressing a similar issue of non-ownership of mutual funds upon whose behalf a plaintiff purported to sue) and the court in In re AllianceBernstein, 2005 WL 2677753, at * 9 (addressing a nearly identical issue to that faced here) that this is a straightforward securities case and this case does not present special concerns discussed in Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999) that led the Supreme Court to conclude that in rare exceptions the consideration of class certification should precede the standing inquiry.

[*53]

To sum up: the plaintiffs have no standing to sue under § 36(b) "on behalf of" other funds in the MFS fund complex simply because they style their case as a class action. The cause of action that remains open to them, based on § 36(b), limits eligible plaintiffs to those who hold shares in the funds on whose behalf they purport to make a claim. Here, only two named plaintiffs meet that requirement as to two named MFS Funds. The plaintiffs may not rely on the rules-based class action procedural device as a method to "bootstrap themselves into standing they lack" merely because in theory some member of the putative class, if it were to be certified, might have a claim because they owned shares in the other MFS Funds at the time the suit was brought. See In re Eaton Vance Corp., 220 F.R.D. at 169 n19.

n19 The plaintiffs also argue that under the so-called "juridical links" doctrine, they have standing to pursue claims on behalf of all other shareholders of MFS Funds in which they did not own shares because the collective prosecution of the action would be the most efficient means to resolve the dispute. However, this doctrine, developed in the context of class certification analysis under Fed. R. Civ. P. 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived. In the separate and distinct inquiry into a plaintiff's standing undertaken here, the juridical links doctrine is not relevant. See In re Eaton Vance Corp., 220 F.R.D. at 169-71; see also In re Franklin Mut., 388 F. Supp.2d at 462 n.7; cf. Raines v. Byrd, 521 U.S. 811, 820, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997) (courts must carefully inquire into whether standing exists and "put aside the natural urge to proceed to the merits of [an important dispute]" and "settle" it for the sake of convenience and efficiency).

[*54]

Therefore, the remaining § 36(b) claim is limited to the claims brought on behalf of the two MFS Funds in which plaintiffs Eric Forsythe and Richard Koslow have standing, Massachusetts Investors Trust and MFS Utilities Fund. To the extent Count III purports to state a claim "on behalf of" other MFS Funds under § 36(b), it is dismissed. Plaintiffs Larry R. Eddings and the City of Chicago Deferred Compensation Plan are also dismissed from the case because the complaint lacks any allegation that they had an ownership interest in any MFS Fund when the case was initiated.

VII. Conclusion

For the foregoing reasons, the defendants' motion to dismiss (Dk. # 73) is GRANTED in part and DENIED in part. All of plaintiffs' claims except Count III, brought under § 36(b) of the ICA, are dismissed for the reasons set forth above. Plaintiffs Eddings and the City of Chicago Deferred Compensation Plan are dismissed from the case. As to Count III, the plaintiffs are only permitted to assert a claim on behalf of the two MFS Funds in which they owned shares at the time of bringing this action, Massachusetts Investors Trust and MFS Utilities Fund. The damages period for the surviving claims [*55] is limited to the period beginning on March 25, 2003. The claims against the Trustee Defendants under § 36(b) are dismissed.

It is SO ORDERED.

January 19, 2006

DATE                                    George A. O'Toole, Jr.
                                        DISTRICT JUDGE

LEXSEE 2005 U.S. DIST. LEXIS 24583

JAMES A. TORCHIA, Plaintiff, vs. STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, Defendant.

CASE NO. 4:05-CV-110-SPM/AK

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION

2005 U.S. Dist. LEXIS 24583; 18 Fla. L. Weekly Fed. D 883

August 19, 2005, Decided
August 19, 2005, Filed

**COUNSEL:** [*1] For JAMES A TORCHIA, Plaintiff: BARRY STEVEN MITTELBERG, MITTELBERG & NICOSIA PA - FORT LAUDERDALE FL, FT LAUDERDALE, FL; MARC ANTONY CELELLO, MARC A CELELLO LC - ATLANTA, GA, ATLANTA, GA.

For STATE OF FLORIDA OFFICE OF FINANCIAL INSTITUTIONS AND SECURITIES REGULATION, Defendant: GREGG RILEY MORTON, OFFICE OF FINANCIAL REGULATION - TALLAHASSEE FL, TALLAHASSEE, FL; PETER GUNNAR FISHER, FINANCIAL REGULATIONS - TALLAHASSEE FL, TALLAHASSEE, FL.

**JUDGES:** Stephan P. Mickle, United States District Judge

**OPINIONBY:** Stephan P. Mickle

**OPINION:**

ORDER DISMISSING CASE

THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss (doc. 4) filed June 2, 2005 and Plaintiff's Response (doc. 6-1) filed June 20, 2004. The Defendant has set forth four arguments as to Count I and one argument as to Count II, each of which will each be addressed in turn. For the reasons stated below, the Court finds that the motion must be granted.

LEGAL STANDARD

The most-cited standard by which a court should judge a motion to dismiss was originally set forth in Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957):

[A] complaint should not be dismissed for failure to state a claim unless [*2] it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Id. at 45-46. The question is whether, "in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1990)(internal citations omitted). This standard is an "exceedingly low" one. United States v. Baxter Int'l, 345 F.3d 866 (11th Cir. 2003)(citing In re Southeast Banking Corp., 69 F.3d 1539 (11th Cir. 1995)). As a result, motions to dismiss are not only viewed with disfavor, but are rarely granted. Gasper v. Louisiana Stadium and Exposition Dist., 577 F.2d 897 (5th Cir. 1978) n1 (citing Madison v. Purdy, 410 F.2d 99 (5th Cir. 1969)).

---

n1 The Eleventh Circuit adopted all decisions by the Fifth Circuit rendered on or before September 30, 1981, pursuant to Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

---

[*3]
COUNT I

ROOKER-FELDMAN DOCTRINE

The Rooker-Feldman doctrine provides that federal courts do not have appellate jurisdiction over decisions rendered by state courts in civil proceedings. See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462,

Case 1:04-cv-11380-WGY    Document 77-3    Filed 03/01/2006    Page 6 of 18

Page 2
2005 U.S. Dist. LEXIS 24583, *; 18 Fla. L. Weekly Fed. D 883

75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413, 68 L. Ed. 362, 44 S. Ct. 149 (1923). There are three circumstances in which the Rooker-Feldman doctrine applies: 1) when seeking review of a state court decision; 2) when raising new claims that are "inextricably intertwined" with that previous state court decision; and 3) when challenging the constitutionality of a statute as applied. Each aspect of the doctrine is discussed *infra*.

### Review of State Court Decisions

Rooker-Feldman applies "to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp v. Saudi Basic Indus. Corp., --U.S.--, 161 L. Ed. 2d 454, 125 S. Ct. 1517, 1521-22 (2005). Although Plaintiff states that he is not looking for review and rejection, [*4] he is in actuality asking this Court to review the ruling handed down by the Fourth District Court of Appeal in 2004. That opinion affirmed Defendant's order adopting the administrative law judge's recommendation and imposing penalties upon Plaintiff for selling unregistered securities in violation of the Florida Securities and Investor Protection Act. Plaintiff petitioned the Florida Supreme Court for a writ of certiorari, which was subsequently denied.

Plaintiff now couches the same argument in different terms by arguing that 1) Defendant unconstitutionally applied the Act to Plaintiff; and 2) Florida courts "failed to employ traditional canons of statutory interpretation in reconciling conflicting statutes." This attempt to place the federal courts in a position of reviewing the Fourth District Court of Appeal's opinion is squarely barred by Rooker-Feldman, as noted by Narey v. Dean, 32 F.3d 1521, 1525 (11th Cir. 1994)(holding that "if the decision of a state agency has been upheld by a state court, then the Rooker-Feldman doctrine applies, because a challenge to the agency's decision necessarily involves a challenge to the judgment of the state court"). [*5]

### *"Inextricably Intertwined"/As-Applied Unconstitutionality*

Rooker-Feldman also applies to claims that were not raised in state court but which are "inextricably intertwined" with the state court judgment. Powell v. Powell, 80 F.3d 464, 466 (11th Cir. 1996) (citing Feldman, 460 U.S. at 482 n.16). Plaintiff states that his claim "that Chapter 517 as applied in light of Chapter 626 is unconstitutionally vague, in violation of the Fifth and Fourteenth Amendments[]" is an "independent claim not inextricably intertwined with issues adjudicated by the state court."

This argument is not well-taken. The Powell court noted that the issue of unconstitutional statutory application "clearly is a particularized challenge to the ... state trial court's judgment." Powell, 80 F.3d at 468 n.3. The Eleventh Circuit Court of Appeals has agreed: "In contrast to the facial constitutional challenge, [an] as-applied challenge is inextricably intertwined with the state court proceedings and is barred by the Rooker-Feldman doctrine." Greenberg v. Zingale, 138 Fed. Appx. 197, 2005 WL 1432471 at *3 (11th Cir. 2005).

If this [*6] Court were to find the challenged statute unconstitutional, it would effectively nullify the Fourth District's ruling adopting the OFR's finding that Plaintiff sold unregistered securities as an unregistered person in violation of the Florida Securities and Investor Protection Act. In order to protect the sovereignty of state court decisions, Rooker-Feldman precludes this Court from reviewing the issues raised by Plaintiff.

### ELEVENTH AMENDMENT

Simply put, the Eleventh Amendment prohibits suits against states and their agencies. See Alabama v. Pugh, 438 U.S. 781, 57 L. Ed. 2d 1114, 98 S. Ct. 3057 (1978). This jurisdictional bar applies "regardless of the nature of the relief sought," *i.e.*, regardless of whether the suit is in equity or at law. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-01, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984) (citing Missouri v. Fiske, 290 U.S. 18, 27, 78 L. Ed. 145, 54 S. Ct. 18 (1933)). Unless there has been a "legitimate abrogation of immunity by Congress", or a "waiver of immunity" by the state, the Eleventh Amendment is an absolute bar to suit. Gamble v. Florida Dep't of Health and Rehab. Servs., 779 F.2d 1509, 1511 (11th Cir. 1986) In his first complaint, [*7] Plaintiff has sued only the State of Florida's Office of Financial Regulation--a governmental entity clearly protected by the Eleventh Amendment.

Pursuant to Ex Parte Young, n2 the Eleventh Amendment does not bar suits seeking prospective relief against a state official. See Florida Ass'n of Rehabilitation Facilities, Inc. v. State of Fla. Dep't of Health and Rehabilitative Servs., 225 F.3d 1208 (11th Cir. 2000). Plaintiff has requested leave to amend the complaint to substitute Don Saxon in his capacity as the commissioner of Florida's Department of Financial Services (see doc 12). However, this addition would be futile, as the complaint is still subject to dismissal for the other reasons stated in this order.

---

n2 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908).

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 7 of 18

Page 3

2005 U.S. Dist. LEXIS 24583, *; 18 Fla. L. Weekly Fed. D 883

## FULL FAITH AND CREDIT ACT

The Full Faith and Credit Act, codified at 28 U.S.C. § 1738, provides that "judicial proceedings ... shall have the same full faith and credit in every court within the United States [*8] ... as they have by law or usage in the courts of such State ... from which they are taken." Because Plaintiff's claims would be unsuccessful under Florida law, they may not be raised in federal court.

In Florida, the doctrine of *res judicata* precludes claims that were raised in a previous court, as well as claims that could have been raised, from being relitigated. Fla. DOT v. Juliano, 801 So. 2d 101, 105 (Fla. 2001). Here, not only are the parties identical to Plaintiff's previous state case, but the underlying facts are the same. Under Florida law, Plaintiff's constitutional as-applied challenge to chapters 517 and/or 626 are properly raised in the state's district courts of appeal:

> Sitting in their review capacity, the district courts provide a proper forum to resolve this type of constitutional challenge because those courts have the power to declare the agency action improper and to require any modifications in the administrative decision-making process necessary to render the final agency order constitutional. A party may, however, seek circuit court relief for injuries arising from an agency decision which the party accepts [*9] as intrinsically correct, as illustrated in this case.

Key Haven Assoc. Enterp., v. Bd. of Trustees of the Internal Improvement Trust Fund, 427 So. 2d 153, 158 (Fla. 1982). Nowhere in the law is mention made of seeking relief in federal court. Because Plaintiff's constitutional challenge involves the same set of facts as in the state court suit, he should have raised the issue before the Fourth District Court of Appeal at the same time he appealed on other grounds.

Thus, having determined that Plaintiff's claim would be barred in Florida by the doctrine of *res judicata*, this Court gives full faith and credit to the final judgment rendered by the Fourth District in Plaintiff's state case and finds that the instant suit is barred.

## VOID FOR VAGUENESS

It is a fundamental tenet of due process that a statute cannot be overly vague. "A statute ... is void for vagueness when, because of its imprecision, it fails to give adequate notice of what conduct is prohibited." Sult v. State, 906 So. 2d 1013, 30 Fla. L. Weekly S470 (Fla. Jun. 23, 2005). In Count I of his complaint, Plaintiff asks the court to decide if the statutory scheme involving Chapters 517 and 626 of the [*10] Florida Statutes is void for vagueness, arguing that reasonable persons cannot determine from the language of the statutes whether viatical settlement purchase agreements are subject to regulation as securities under chapter 517 or whether chapter 626 exclusively covers those transactions.

On June 15, 2005, the Governor signed into law Committee Substitute for Senate Bill 2412, codified at Laws of Fla. ch. 237. n3 The bill amended chapter 517 to explicitly include "viatical settlement investments" in the definition of "securities". The amended statute goes on to define "viatical settlement investments", specifically exempts certain transfers or assignments, and clarifies that certain exemptions in a companion statute do not apply to viatical settlement investments.

> n3 To the extent that Plaintiff objects to Defendant's notice of supplemental authority (doc. 7), which advises that this law was passed after the motion to dismiss was filed, this Court is bound to judicially notice laws of any state: "'The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.'" Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991)(quoting Lamar v. Micou, 114 U.S. 218, 223, 29 L. Ed. 94, 5 S. Ct. 857 (1885)).

[*11]

This new law removes any doubt as to what constitutes illegal conduct under chapter 517 or chapter 626. These statutes (now, if not previously) give persons of common intelligence fair and unambiguous notice of what is prohibited under the law.

## COUNT II

Plaintiff alleges in his complaint that the Florida court "failed to employ traditional canons of statutory interpretation in reconciling conflicting statutes." This allegation states no recognized cause of action; it merely asks this Court to review and reweigh the decision made by the Fourth District Court of Appeal. As detailed *supra* this Court has no authority to undertake such an activity.

Accordingly, it is

ORDERED AND ADJUDGED as follows:

Case 1:04-cv-11380-WGY    Document 77-3    Filed 03/01/2006    Page 8 of 18

Page 4
2005 U.S. Dist. LEXIS 24583, *; 18 Fla. L. Weekly Fed. D 883

1. Defondant's motion to dismiss (doc. 4) is hereby *granted*

2. Plaintiff's motion to strike Defendant's supplemental brief (doc. 9) is hereby *denied*

3. Plaintiff's motion for leave to file an amended complaint (doc. 12) is hereby *denied*

4. This case is *dismissed.*

**DONE AND ORDERED** this nineteenth day of August, 2005.

s/ Stephan P. Mickle

Stephan P. Mickle

United States District Judge

LEXSEE 2000 U.S. DIST. LEXIS 2604

SIX WEST RETAIL ACQUISITION, INC., Plaintiff, -against- SONY THEATRE MANAGEMENT CORP.; LOEWS THEATRE MANAGEMENT CORP.; TALENT BOOKING AGENCY, INC.; LOEWS FINE ARTS CINEMAS, INC.; SONY PICTURES ENTERTAINMENT CORP.; SONY ELECTRONICS CORP.; SONY CORP.; JAMES LOEKS; BARRIE LAWSON LOEKS; TRAVIS REID; SEYMOUR H. SMITH; AND THOMAS BRUEGGEMANN, Defendants.

97 Civ. 5499 (DNE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 2604; 2000-1 Trade Cas. (CCH) P72,823

March 8, 2000, Decided
March 9, 2000, Filed

**DISPOSITION:** [*1] Defendants' Motion to Dismiss GRANTED with regard to Plaintiff's breach of contract claim against the Individual Defendants. Defendants' Motion to Dismiss DENIED in all other respects.

**COUNSEL:** For SIX WEST RETAIL ACQUISITION, INC., plaintiff: David Boies, Boies & Schiller LLP, Armonk, NY.

For SIX WEST RETAIL ACQUISITION, INC., plaintiff: David A. Barrett, Barrett Gravante Carpinello & Stern LLP, New York, NY.

For SONY THEATRE MANAGEMENT CORPORATION, LOEWS FINE ARTS CINEMAS, INC., SONY PICTURES ENTERTAINMENT CORPORATION, SONY ELECTRONICS CORPORATION, SONY CORPORATION, JAMES LOEKS, BARRIE LAWSON LOEKS, TRAVIS REID, THOMAS BRUEGGEMANN, TALENT BOOKING AGENCY, INC., defendants: Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, New York, NY.

For TALENT BOOKING AGENCY, INC., LOEWS FINE ARTS CINEMAS, INC., SEYMOUR H. SMITH, defendants: Ira S. Sacks, Fried, Frank, Harris, Shriver, New York, NY.

For TALENT BOOKING AGENCY, INC., counter-claimant: Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, Ira S. Sacks, Fried, Frank, Harris, Shriver, New York, NY.

For SIX WEST RETAIL ACQUISITION, INC., counter-defendant: David Boies, Boies & Schiller LLP, Armonk, NY.

For [*2] SIX WEST RETAIL ACQUISITION, INC., counter-defendant: David A. Barrett, Barrett Gravante Carpinello & Stern LLP, New York, NY.

**JUDGES:** David N. Edelstein, U.S.D.J.

**OPINIONBY:** David N. Edelstein

**OPINION:**

OPINION & ORDER

In this action, Plaintiff alleges that Defendants breached various written and oral contracts existing between the parties regarding Defendants' management of three movie theatres that Plaintiff owned, breached fiduciary duties arising therefrom, tortiously interfered with Plaintiff's prospective business relations, and violated antitrust laws through the operation of Plaintiff's theatres and Defendants' participation in the film industry. Presently before this Court is Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).

At the heart of Plaintiff's claims is its alleged inability to compete for more profitable films to exhibit at its theatres. In the spirit of such Hollywood epics as Gone With the Wind, Ben Hur, The Ten Commandments, and Braveheart, this Court sets forth the following detailed opinion after fully contemplating all the complex and

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 10 of 18

Page 2
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

significant principles of law that the amended complaint implicates. [*3] n1

> n1 "You're gonna need a bigger boat." Jaws (Universal 1975).

Background

This matter reaches this Court framed as a Rule 12(b)(6) motion. Accordingly, the facts recited herein are drawn predominantly from Plaintiff's amended complaint.

I. Parties

Plaintiff Six West Retail Acquisition, Inc. ("Six West" or "Plaintiff"), formerly Solow Theatre Corporation, is a New York corporation with its principal place of business in New York, New York. See Amended Compl. at PP 6, 34. Six West is the lessee and controller of: (1) the New York Twin (the "Twin"), a 1000-seat, two-screen movie theater located at 265 East 66th Street in New York City, (2) the Paris Theatre (the "Paris"), a 575-seat movie theatre located at 4 West 58th Street in New York City, and (3) the premises located at 6 West 57th Street in New York City, formerly the Festival Theatre (the "Festival"). See id. at PP 4, 6. Sheldon H. Solow ("Solow"), a New York City real estate developer, is the owner, the sole shareholder, and an officer [*4] of Plaintiff. See id. at PP 4, 6.

Defendant Loews Theatre Management Corporation ("Loews" or "Loews Theatres"), also known at various times as Sony Theatre Management Corporation ("Sony" or "Sony Theatres"), is a Delaware corporation with its principal place of business in New York, New York. Defendant Sony, also known at various times as Loews, is a Delaware corporation with its principal place of business in New York, New York. See id. at P 7. n2 Defendant Talent Booking Agency Inc. ("TBA") is a New York corporation with its principal place of business in New York, New York. See id. at P 9. TBA, originally a Loews Corporation subsidiary, is an affiliate of Sony Theatres and its predecessors-in-interest. See id. at PP 9, 34. Defendant Loews Fine Arts Cinemas, Inc. ("Loews Fine Arts") is a New York Corporation with its principal place of business in New York, New York. See id. at P 10. Loews Fine Arts is a subsidiary of Sony Theatres through which Sony Theatres conducted business with the Paris and the Festival. See id. As used herein, the term "Sony" includes Defendants Sony Theatres, Loews Theatres, TBA, and Loews Fine Arts, all of which are allegedly the [*5] same entity or closely affiliated entities.

> n2 In December 1986, through a series of stock purchases, Tri-Star Pictures, Inc. ("Tri-Star") acquired Loews Theatres. See Memorandum in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defendants' Mem.") at 7. In 1987, Tri-Star acquired Columbia Pictures Entertainment, Inc. and was renamed Columbia Pictures Entertainment, Inc. ("Columbia"). See id. Finally, in 1989, Columbia, through a series of transactions with Sony Corporation, became Sony Pictures Entertainment, Inc. See id. On July 29, 1994, Sony informed Six West that Loews had changed its name to Sony. See Amended Compl. at P 42.

Defendant Sony Pictures Entertainment Corporation ("Sony Pictures"), a Delaware corporation, is the parent n3 company of Sony Theatres. See id. at P 11. Sony Pictures engages in the production and distribution of motion pictures, as well as the exhibition of movies through, among other companies, its subsidiary Sony Theatres. See id. Defendant Sony Electronics [*6] Corporation ("Sony Electronics"), a New York corporation, is the parent company of Sony Pictures. See id. at P 12. Defendant Sony Corporation, a Japanese corporation, is the ultimate parent company of Sony Electronics and the other Sony Defendants. See id. at P 13. n4

> n3
>
> > "No, I am your father." The Empire Strikes Back (20th Century Fox 1980).
> > "Mother--what's the phrase? Isn't quite herself today." Psycho (Paramount 1960).
>
> n4 This Court will hereinafter refer to Sony Pictures, Sony Electronics, and Sony Corporation collectively as the "Sony Corporate Entities."

Defendants James Loeks and Barrie Lawson Loeks ("Barrie Loeks"), formerly co-Chairpersons of Sony Theatres, are residents of Rye, New York. See id. at PP 14-15. Defendant Travis Reid, a resident of Saddle River, New Jersey, is President of Sony Theatres and TBA. See id. at P 16. Defendant Thomas Brueggmann, a resident of New York, New York, is Vice President of Sony Theatres. See id. at P 17. Defendant Seymour H. Smith, [*7] a resident of New York State, is the Executive Vice President of Sony Theatres and TBA. See id. at P 18 n5

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 11 of 18

Page 3

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

n5 This Court will hereinafter refer to these corporate officers of Sony as the "Individual Defendants."

## II. Facts

In this case, Plaintiff asserts both federal antitrust law and state law claims. The events and claims underlying this lawsuit arise from Defendants' operation of the three motion picture theatres that Plaintiff controlled and Defendants' alleged violations of the agreements with Plaintiff to run those theatres. Plaintiff describes in the amended complaint the details of the relationship between Plaintiff and Defendants regarding the management of Plaintiff's theatres. Plaintiff also contends that

> in operating plaintiff's theatres, Sony began to elevate its own interests over those of the plaintiff's theatres, in using plaintiff's theatres to curry favor with movie distributors purely for Sony's own advantage and to benefit Sony's own theatre operations. Sony's conduct has [*8] blatantly violated its contractual and fiduciary obligations to plaintiff.

Id. at P 50.

Thus, it is important to examine the nature of the agreements between the parties and in what manner Plaintiff claims Defendants violated those understandings. Moreover, it is necessary to highlight Plaintiff's other allegations of Defendants' anti-competitive behavior.

### A. Events Concerning the New York Twin

During the 1970s, Solow, who built the Twin, developed a close personal relationship with Bernard Myerson ("Myerson"), a senior executive of Loews Theatres. n6 See id. at P 33. On December 13, 1978, Solow Theatre Corporation, Plaintiff's predecessor-in-interest, entered into an agreement with TBA regarding the management and operation of the Twin (the "Twin Agreement"). See id. at P 34. The Twin Agreement expired on December 31, 1993, see Twin Agreement at § 2.01, but on July 14, 1992, Sony exercised an option to extend the duration of the agreement from January 1, 1994 to December 31, 2003. See Amended Compl. at P 42.

n6 "I think this is the beginning of a beautiful friendship." Casablanca (Warner Brothers 1942).

[*9]

Under the provisions of the Twin Agreement, Plaintiff was to receive sixty percent (60%) and the operator of the Twin was to receive forty percent (40%) of net theatre income after the deduction of expenses. See Twin Agreement at § 4.02. The Twin Agreement also provided:

> [TBA] agrees to operate the [Twin] as [a] prestige theatre[] showing neighborhood first-run motion pictures, n7 if available consistent with sound business practice, and in no event dissimilar to other Loews Theatres in the greater New York Metropolitan area.

Twin Agreement at § 7.01. n8 Furthermore, under the terms of a Lease Agreement and a Four Party Agreement, TBA and Loews were committed to

> keep in the [Twin] and maintain in good condition and working order . . . all . . . projection equipment, sound equipment, ticket booth equipment, screens, drapery tracks, draperies, drapery motors, masking motors, carpeting, seats, aisle lights, lighting fixtures, concession equipment, lobby and lounge furniture and attraction signs and any other trade fixtures, equipment, decorations and furnishings, as shall be necessary or desirable for the efficient operation of the [Twin] as [*10] [a] first class motion picture theatre[].

Amended Compl. at P 41.

n7 When a film is released in a given locality it will have one or more "runs" at various movie theatres. "The critical run for a film is its first run. If a film's first run is not successful, it may have no . . . subsequent runs." Amended Compl. at P 30.

n8 Under the terms of a Lease Agreement and a Four Party Agreement that Solow, Solow Theatre Corporation, TBA, and Loews executed on December 13, 1978, contemporaneously with the Twin Agreement, TBA and Loews agreed to

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 12 of 18

Page 4
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

the same. See Amended Compl. at P 41; Affidavit of Rachel S. Fleishman ("Fleishman Aff.") at Ex. B.

Still, the Twin Agreement also acknowledged that TBA had the obligation and exclusive right to book movies for exhibition at the Twin. The Twin Agreement stated:

> [Six West] acknowledges that [TBA] has not made and does not make any representation or warranty to [Six West] as to the manner of booking pictures for the [Twin], the clearance of motion [*11] pictures to be exhibited at the [Twin], the prices to be paid or charged for admission thereto, or whether pictures of a particular producer or distributor will be exhibited at the [Twin], all of which is specifically reserved to the sole discretion of [TBA].

Twin Agreement at § 7.01. The Twin Agreement also expressly noted that Plaintiff was aware that TBA's corporate affiliates, including Loews Theatres, operated several other movie theatres in Manhattan and declared that nothing in the Twin Agreement

> shall be deemed to prohibit or in any way impair the right of Loews Corporation, Loew's Theatres, Inc. or any of their subsidiaries (a) to acquire other motion picture theatres which may be competitive with [the Twin]; or (b) to operate its existing motion picture theatres in any way which in its sole judgment it shall determine.

Id. at § 7.02.

Because the Twin Agreement also prohibited Loews from assigning its interest in the Twin Agreement to an entity unaffiliated with Loews absent Plaintiff's consent, on July 3, 1985, in contemplation of Sony's predecessor-in-interest's acquisition of Loews, Loews and Solow entered into an agreement providing [*12] for Plaintiff's consent in exchange for specific covenants ("Consent and Covenant"). See Amended Compl. at PP 36-37; see also Fleishman Aff. at Ex. B. The parties have referred to the Twin Agreement and the Consent and Covenant collectively as the "Amended Twin Agreement." See Amended Compl. at P 38; Fleishman Aff. at P 3.

The Consent and Covenant underscored the special relationship between Solow and Myerson, n9 expressly conditioning Plaintiff's consent on Myerson's position as the "Chief Executive Officer of [TBA] . . . in charge of programming motion pictures for and the operation of the . . . Twin," and affording Solow an opportunity to disapprove of any successor to Myerson. n10 Fleishman Aff. at Ex. B. Moreover, while the Consent and Covenant extended the rights of §§ 7.01 and 7.02 of the Twin Agreement to any successor to TBA by merger, the Consent and Covenant also stated that

> in the event a successor to Bernard Myerson is agreed upon, the Operator shall exhibit at the Loews New York Twin only first run motion pictures (or reissues distributed on a first run basis) of the type, quality and character equal to or better than motion pictures exhibited at [*13] the other theatres operated under the "Loews" name and situated on the east side of Manhattan . . . .

Fleishman Aff. at Ex. B. Plaintiff asserts that this promise was "the core consideration for Solow's consent to the transfer of Loews' management of the Twin" from Myerson. Amended Compl. at P 38.

---

n9 "You are my best friend. You're my only friend." The Frisco Kid (Warner Brothers 1979).

n10 "Strange, isn't it? Each man's life touches so many other lives--and when he isn't around he leaves an awful hole, doesn't he? . . . You see, George, you really had a wonderful life." It's a Wonderful Life (RKO 1946).

---

Plaintiff claims, however, that Defendants did not fulfill this obligation to play only first run films of equal or better quality than the movies n11 shown at Defendants' other East Side theatres. Additionally, Plaintiff contends that Defendants violated the Amended Twin Agreement by booking poorly performing movies at the Twin, exhibiting movies at the Twin for a protracted period, and failing [*14] to maintain the physical condition of the Twin. See id. at PP 68-74. The amended complaint alleges a litany of specific violations.

---

n11 "I don't go to the movies much--if you've seen one, you've seen them all." Singin' in the Rain (Metro-Goldwyn-Mayer 1951).

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 13 of 18

Page 5

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

First, Sony allegedly showed quality first run movies at its own East Side theatres, see id. at P 68, while "saddling [the Twin] with . . . a long list of undesirable n12 movies." Id. at P 71. According to Plaintiff, throughout 1995, Sony booked several allegedly unprofitable and sub-standard movies at the Twin, including Disclosure and I.Q. in late January and early February 1995; Tommy Boy in April 1995; My Family and Panther in May 1995; Free Willy 2 in July 1995; and Copycat and It Takes Two in December 1995. See id. at PP 68, 71. Between August and November 1996, a similar pattern occurred when Sony exhibited the popular films A Time to Kill and The First Wives Club at the Sony Tower East theatre, [*15] while it booked a string of less profitable movies at the Twin, including Eraser, Harriet the Spy, and Joe's Apartment in August 1996; Grace of My Heart, She's the One, Infinity, and Giant in September and October 1996; and Dear God in November 1996. See id. at PP 70-71. In May and June 1997, Sony booked Night Falls on Manhattan at the Sony Tower East theatre, while showing the sub-par movies Father's Day and Brassed Off at the Twin. See id. at P 70. Furthermore, while Sony showed Emma at the Sony Lincoln Square theatre and the Cineplex Odeon ("Cineplex") Beekman theatre n13 for a ten-week run, it booked in the Twin "a series of utter failures . . . all of which failed to earn any profit whatever for the New York Twin," including Harriet the Spy; Joe's Apartment; Eraser; Cold Comfort Farm, a second-run film; A Very Brady Sequel; Grace of My Heart; and Infinity. Id. at P 69.

n12

Mrs. Robinson: "Do you find me undesirable?"
Ben Braddock: "Oh, no. I think you're the most attractive of my parents' friends." The Graduate (United Artists 1967).

[*16]

n13 Showing Emma, an allegedly popular film, at Cineplex's Beekman theatre benefitted Cineplex, Sony's future merger partner. Pursuant to the merger settlement permitting consummation of the merger, see infra part IV., Cineplex divested itself of the Beekman.

Second, Plaintiff asserts that Sony exhibited films at the Twin for an extended period of time, causing box office receipts to decline. See id. at P 72. For example, Sony booked the initially profitable Face Off at the Twin for twelve weeks in 1997, including a six week stint at both Twin theatres, despite sharply declining gross receipts. See id. Moreover, during the last three weeks of its Twin run, Sony did not show Face Off at any of its own theatres. See id.

Third, Plaintiff contends that Sony habitually "'cherry-picked' hit movies by opening them at theatres where it receives 100 percent of the profits and then, after several weeks, moving them to the Twin (where Sony gets only 40 percent of the profits) when their revenue-generating potential has declined." Id.

Fourth, Sony allegedly has not operated [*17] the Twin theatres "as prestige theatres," as required under the Amended Twin Agreement Twin Agreement at § 7.01. In particular, Plaintiff argues that "Sony has failed to provide the Twin with modern equipment such as digital sound capacity and allowed the physical condition of the Twin to deteriorate markedly." Id. at P 73. Plaintiff also claims that Sony has obstructed Plaintiff's efforts "to undertake basic and necessary repairs and refurbishment of the New York Twin." Id.

B. Events Concerning the Paris Theatre n14

n14 "We'll always have Paris." Casablanca (Warner Brothers 1942).

In 1990, Solow, on behalf of Six West, began to operate the Paris Theatre, allegedly one of the country's most prestigious theatres and one recognized as a top premiere venue. See id. at PP 43, 51. Shortly thereafter, Sony commenced management of the Paris for Plaintiff pursuant to a financial arrangement similar to that for the Twin. See id. at P 43. After the payment of all operating expenses, Plaintiff received [*18] the first $ 200,000 of net income each year and the parties divided the remainder, sixty percent (60%) for Plaintiff and forty percent (40%) for Sony. See id.

The amended complaint does not define the responsibilities of the parties or the parameters of the working relationship between them regarding the Paris. While the parties did exchange drafts of written management agreements over the course of several years, none were ever signed. Still, Plaintiff contends that the parties effectively acted pursuant to two letter agreements--an October 1, 1993 proposal n15 that Solow presented and a May 18, 1994 proposal that Loews Fine Arts offered. See id. at P 44.

Case 1:04-cv-11380-WGY    Document 77-3    Filed 03/01/2006    Page 14 of 18

Page 6
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

> n15 "I'll make him an offer he can't refuse."
> The Godfather (Paramount 1972).

Plaintiff asserts that these two proposals "contain provisions that are largely compatible," id., and refers to them as the "Paris Agreement." Id. at P 45. Plaintiff also maintains that "before the breaches by Sony, the parties conducted themselves in accordance with [*19] those mutual understandings." Id. at P 44. This Court, however, recognizes certain key differences between the two proposals. n16

> n16 In considering a motion to dismiss, a court may look at documents incorporated in the complaint by reference. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

While Solow's letter states, "Operator shall manage and operate the Theatre in accordance with the same standards as it manages and operates other Loews Theatres in the City of New York," Fleishman Aff. at Ex. C, the Loews Fine Arts letter reads, "Operator shall manage and operate the Theatre *substantially* in accordance with the same standards that it manages and operates other Loews Theatres in the Borough of Manhattan." Id. at Ex. D (emphasis added). Furthermore, while both proposals agree that "Operator shall be deemed to be acting in a fiduciary capacity for the benefit of Owner," id. at Exs. C, D, the Loews Fine Arts letter qualifies that acknowledgment by adding the [*20] words "subject to the provisions of Paragraph 7 hereof." Id. at Ex. D. Paragraph 7 of the Loews Fine Arts letter provides:

> Owner has been advised and acknowledges that Operator and its affiliates are involved in, and may increase involvement in, numerous aspects of the motion picture industry, including the production and distribution of motion picture films for exhibition in motion picture theatres and the ownership, operation or management of other motion picture theatres. Owner has been advised that Columbia Pictures, Tri-Star Pictures, Sony Picture Classics and Triumph Releasing Corporation are affiliates of Operator. Owner has been further advised that Operator now operates [other theatres], and that affiliates of Operator contemplate the opening of a 12-auditoria theatre plus an IMAX Theatre at Lincoln Square at 67th Street and Broadway in Manhattan in November 1994. Owner recognizes that these operations may result in actual or potential conflicts of interest, and conflicts of interest shall not in and of itself [sic] constitute a basis for any claim by Owner against Operator or any of its affiliates.

Id.

Thus, even considering the two letter agreements, [*21] the details of the arrangement between Plaintiff and Sony regarding the Paris are still unknown. Nevertheless, despite discrepancies between the two letters and the amended complaint's lack of detail regarding the terms under which Sony managed the Paris, Sony unquestionably did indeed operate the Paris beginning in 1990, acting as Plaintiff's agent and, thereby, Plaintiff's fiduciary in some capacity. In fact, "upon its takeover of the Paris in 1990, and before the letter agreements were drafted, Loews Theatres publicly announced its agreement to operate the Paris and professed its commitment[] to maintaining the 'upscale nature' and traditional policies of the Paris," which included a longstanding policy of exclusive bookings. Amended Compl. at PP 44, 66. Moreover, in April 1996, in a discussion with Plaintiff, Defendant Barrie Loeks emphasized the importance of sustaining the prestige of the Paris and of exclusive bookings to preserve the theatre's stature, assuring Plaintiff that "before a film [would be] booked for the [Paris] Theatre, [Sony would] have a written agreement with the distributor that the film [would] run exclusively at the Paris." Id. at P 59.

Plaintiff [*22] asserts that Defendants violated the arrangement regarding the Paris Theatre and the aforementioned guarantees that Defendants made to Plaintiff by premiering movies at the Paris, affording the benefit of the Paris's prestige to those movies and their distributors, and then refusing to continue to show those films at the Paris or Plaintiff's other theatres; exhibiting movies at the Paris for a protracted period; and ignoring prior guarantees to continue the Paris's history of exclusive bookings while diverting successful films to its Lincoln Square theatre for exclusive and non-exclusive runs. See id. at PP 51-67. Plaintiff specifically alleges a long list of violations.

First, Plaintiff maintains that "Sony abused the special reputation and quality of the Paris Theatre, premiering top quality films there for minimal fees and then failing to exhibit those films at any of plaintiff's theatres, currying favor with certain distributors, with no benefit to plaintiff." Id. at P 51. Plaintiff insists, however, that Sony did show those films at its own theatres. For example, Sony arranged for the premiere of Emma, produced by the distributor Miramax, at the Paris in April [*23]

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 15 of 18

Page 7

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

1996, benefitting Miramax and strengthening Sony's relationship with Miramax. See id. at P 52. Thereafter, Emma did not play at any of Plaintiff's theatres but rather at the Sony Lincoln Square theatre and the theatre formerly known as the Cineplex Beekman. See id. Sony also helped plan the premiere of The First Wives Club, a popular and successful Paramount production, at the Paris in September 1996, enhancing Sony's relationship with Paramount while conferring no benefit onto Plaintiff. See id. at P 53. The First Wives Club then played at, among other theatres, the Sony Tower East, but not at the Paris. See id. Further, Sony arranged these premieres without Plaintiff's consent, allegedly in violation of the Paris Agreement, which required Plaintiff's consent for such showings. See id. at P 54. n17

n17 The two letter agreements of October 1, 1993 and May 18, 1994 both contain the provision: "Operator shall not enter into any so-called '4-wall deals' without the prior approval of Owner." See Fleishman Aff. at Exs. C, D. A movie premiere is "a form of 'four wall deal' in which the theatre is rented out at a set price for a set period of time." See Amended Compl. at P 54.

[*24]

Second, Plaintiff alleges that "Sony . . . failed to book appropriate films for the Paris, in violation of its contractual and fiduciary obligations, and often extended for an unreasonable duration the exhibition of underperforming motion pictures." Id. at P 58. Furthermore, Plaintiff agrees that while "Sony[] refused to exhibit suitable, high quality motion pictures at the Paris for an extended period," id. at P 51, "Sony exhibited a number of motion pictures on an exclusive basis at its own Lincoln Square facility." Id. at P 58. For instance, in July 1996, when Sony informed Plaintiff that it would be unable to exhibit The Garden of the Finzi-Continis at the Paris until 1997 "because of difficulty in getting the materials from Italy," id. at P 61, Sony continued to show Purple Noon, "an underperformer," for a prolonged run at the Paris. Id. at P 62. Sony claimed that it would be unable to obtain an alternative to book at the Paris until Surviving Picasso would open in late September 1996. See id. Plaintiff later learned that during the extended run of Purple Noon, Sony could have booked The Spitfire Grill exclusively at the Paris. [*25] See id. n18 Also in 1996, after reneging on its representation to Plaintiff to exhibit The English Patient for an exclusive run at the Paris, Sony continued to show the four hour long Hamlet at the Paris "for an inordinately long run." Id. at P 65.

n18 Columbia, a close affiliate of Sony, distributed The Spitfire Grill. See id.

Third, despite guarantees from Defendant Barrie Loeks to continue the tradition of exclusive bookings at the Paris, Sony, allegedly in an effort to promote its own relations with distributors, "attempted to bully plaintiff into departing from the Paris Theatre's traditional exclusive booking policy." Id. at PP 60, 66. In June 1996, Defendant Thomas Brueggmann informed Solow that Sony was negotiating to exhibit several movies at the Paris on a non-exclusive basis. See id. at P 60. Additionally, in a letter dated August 15, 1996, Defendant Travis Reid "expressly threatened that Sony would book the movies Hamlet, Surviving Picasso and The English Patient [*26] at the Sony Lincoln Square theatre instead of the Paris Theatre unless plaintiff accepted downtown showings of those movies in a departure from the Paris Theatre's longstanding exclusivity policy." Id. at P 66.

Fourth, Plaintiff alleges that while claiming an inability to locate films for exclusive showings at the Paris, Sony repeatedly diverted the exhibition of quality films from the Paris to its own theatres, including the Sony Lincoln Square theatre. Plaintiff speculates that "because Sony made such an extraordinarily large investment in the Sony Lincoln Square theatre complex, it was willing to breach its obligations to plaintiff in order to advance Lincoln Square's competitive position." Id. at P 64. For example, in 1996, when Sony did not fulfill its commitment to book The English Patient exclusively at the Paris, it instead played The English Patient at the Sony Lincoln Square complex. See id. at P 65. Moreover, when Sony failed to inform Plaintiff of the availability of The Spitfire Grill to replace Purple Moon at the Paris, Sony opened The Spitfire Grill for an exclusive run at the Sony Lincoln Square theatre. See id. at P 62.

Finally, [*27] before Sony unilaterally terminated its operation of the Paris in 1997, Plaintiff requested that Sony continue to manage the Paris for another month and to continue to show Anna Karenina ("Anna") at the Paris. See id. at P 67. Plaintiff asserts that "Sony refused to do so unless plaintiff agreed to release Sony from all potential claims arising from its management of the Paris." Id. Plaintiff claims that when it rebuffed Sony's condition, "Sony intentionally induced the distributor Warner Brothers . . . to decide not to continue to exhibit Anna at the Paris Theatre, as previously arranged, and instead to move it to the Sony Tower East theatre in February 1997." Id. Ultimately, Sony's alleged attempts to decrease or even eliminate competition for its theatres, especially the Sony Lincoln Square complex, were successful when Plaintiff's failure to obtain quality films to book at the Paris purportedly forced Plaintiff to close the Paris for a lengthy period. See id. at P 64. n19

Case 1:04-cv-11380-WGY    Document 77-3    Filed 03/01/2006    Page 16 of 18

Page 8
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

n19 The amended complaint does not state when or for how long Plaintiff closed the Paris.

[*28]

C. Events Concerning the Festival Theatre

At the time Sony assumed operation of the Paris, it also publicly announced its management of the Festival. See id. at P 47. Plaintiff and Sony acted "on the same terms that governed the Paris, except that Plaintiff received no priority payment of net income (the 'Festival Agreement')." See id.

The amended complaint is devoid of specific details governing the Festival Agreement. According to Plaintiff, however, it was the understanding of the parties that Sony was Plaintiff's agent and undertook fiduciary obligations pursuant to that relationship. See id. Additionally, the amended complaint states that "in negotiating to manage the Festival Theatre, Sony represented that it could make more money than the previous operator of the theatre and that it would improve the physical condition and quality of films shown at the Festival." Id. at P 48. n20 Plaintiff argues that notwithstanding these assurances, "Sony grossly mismanaged the Festival Theatre and allowed its profitability and physical appearance to deteriorate dramatically." Id. at P 75.

n20 The amended complaint does not, however, mention the profitability of or describe the appearance of the Festival prior to Sony's assumption of management.

[*29]

First, Plaintiff alleges that "the Festival was being used as a 'dumping ground' for inferior film product," causing the theatre's reputation to deteriorate. Id. at P 77. Thus, while the Festival was profitable during the last six months of 1990, the initial period of Sony's management, the Festival lost money from 1991 until 1994, when it closed permanently. See id. at P 75. In fact, "the Festival's annual gross receipts from ticket sales under Sony's management were only about one-half or less than the amounts recorded in 1989, the last full year prior to Sony's takeover." Id

Second, Plaintiff claims "Sony incurred unnecessary expenses in operating the Festival," by overstaffing the Festival after attendance decreased, without justification for the increase in personnel. Id at P 76. "Indeed, in 1992 and 1993, employee salaries and benefits alone substantially exceeded gross box office revenues." Id.

Third, Plaintiff states that Sony permitted the physical condition of the theatre to fall into utter disrepair. See id. at PP 76-77. The Festival became so unsuitable and squalid that on December 26, 1993, the New York Times quoted a movie industry executive [*30] who said the following about the Festival: "It's a pig sty. Every other seat is broken. It smells like rat poison. It looks like Dresden." Id. at P 77. Ultimately, in 1994, Plaintiff closed the Festival, citing Sony's inept management, Sony's estimates of the expenditures necessary to refurbish and upgrade the Festival--of which Plaintiff was responsible for sixty percent pursuant to the Festival Agreement--and the Festival's declining reputation. See id at PP 75, 77.

In sum, Plaintiff maintains that

> Sony's actions in showing second-run movies, poorly performing movies and insisting on overlong runs, combined with Sony's intentional neglect of the theatres' equipment and physical condition, have seriously impaired the image of [Plaintiff's three theatres]. Sony's improper film choices and failure to maintain [Plaintiffs' theatres] violate the [agreements between Plaintiff and Sony], Sony's implied duty of good faith and fair dealing and Sony's fiduciary duties. Sony intended these violations to advance its own business interests and monopolistic and anti-competitive objectives, all to the detriment of plaintiff

Id. at P 74.

D. Other Allegations [*31] Demonstrating Sony's Anti-competitive Behavior

To substantiate the claim that Sony advanced its own business interests over Plaintiff's, the amended complaint also describes several other actions that Defendants undertook In 1995, when Sony claimed to be having trouble booking an appropriate movie for exhibition at the Paris, Solow asked Defendant Brueggemann to research the possibility of leasing Belle de Jour, ("Belle"), a classic 1967 film. See id. at P 55. After making some inquiries, Defendant Brueggemann informed Solow that the owner of the rights to Belle would consider only selling the rights, not leasing See id. at P 56 Solow then directed Defendant Brueggemann to determine the cost of the rights to facilitate Plaintiff's purchase of the movie See id Plaintiff contends that "rather than pursuing Mr. Solow's request as agent for plaintiff, Mr Brueggemann suggested the concept to Miramax,

Case 1:04-cv-11380-WGY    Document 77-3    Filed 03/01/2006    Page 17 of 18

Page 9

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

which subsequently bought and re-released Belle de Jour [at the Paris] with great success." Id. at P 57. An advertisement in Variety stated that in its first week at the Paris, Belle grossed over $ 100,000, at that time, "history's highest grossing [*32] foreign language film on a single screen." Id. Plaintiff argues that Defendants Brueggemann and Sony thereby intended "to curry favor with Miramax [and] effectively deprive[] plaintiff of a substantial business opportunity." Id.

Additionally, Plaintiff alleges that Sony engaged in a series of block-booking agreements with distributors, limiting the availability of motion pictures to independent theatre owners and reducing competition. See id. at P 78. Block-booking, a per se violation of the antitrust laws, is an illegal practice n21 through which film distributors condition the license or sale of their movies on the acceptance of unwanted or inferior films. See United States v. Paramount Pictures, Inc., 334 U.S. 131, 156, 92 L. Ed. 1260, 68 S. Ct. 915 (1948). n22 Plaintiff claims that Sony's correspondence with Plaintiff, answering Plaintiff's dissatisfaction about the films Sony exhibited at Plaintiff's theatres, demonstrates Sony's "pattern of blatantly anticompetitive conduct." Amended Compl. at P 78.

> n21 "Damn it all, why is everything we're good at illegal?" Butch Cassidy and the Sundance Kid (20th Century Fox 1969).

[*33]

> n22 For a brief general history of the Paramount case see United States v. Loew's Inc., 705 F. Supp. 878, 880-81 (S.D.N.Y 1988). In particular, this Court notes that the Supreme Court found the Paramount defendants, eight studios that owned production, distribution, and exhibition facilities and dominated and controlled the movie industry, guilty of restraining and monopolizing the distribution and exhibition of films in violation of § § 1 and 2 of the Sherman Act. Id. at 880 (citations omitted). A series of consent judgments followed, prohibiting the Paramount defendants, most significantly:
>
> > From licensing any features for exhibition upon any run in any theatre in any other manner than that each license shall be offered and taken theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others
>
> Id. at 881 (citation omitted)(emphasis added).

In a January 16, 1996 letter to Solow explaining why Sony made no effort to obtain Sense and Sensibility, a [*34] Sony Pictures' release, to play at the Twin, Defendant Reid wrote,

> if we were to decide to attempt to change our relationships on the east side of New York this business does not work in such a way that we would only play Sense and Sensibility, but that we would become obligated to play a full portion of the Sony Pictures release schedule.

Id. at P 80. In an August 15, 1996 letter to Solow, Defendant

Reid stated that it is

> necessary to form relationships in order to be booked properly on a long term basis. Our relationships on the East side are with Paramount, Warner Brothers and Gramercy. Harriet the Spy (Paramount) was released by the same company that has this year given the Twin Mission Impossible and Primal Fear .... Similarly, Joe's Apartment (Warner Brothers) was released by the same company that gave us Heat and Eraser ....

Id. at P 79 (alterations in original). On September 19, 1996, Defendant Reid sent another letter to Solow that detailed the booking practices that at least some distributors desire to have with exhibitors, writing: "In order for distributors to be certain of proper placement in [*35] this zone [the East Side of Manhattan], they make long term relationships with one or two of these exhibitors who agree to participate in the liquidation of all their product, not just high profile films ...." Id. at P 81 Plaintiff asserts that these letters "constitute an admission of block-booking agreements between Sony and [various] distributors," id. at P 79, that "makes it unreasonably difficult for an independent theatre owner to compete for high quality motion pictures." Id. at P 81

Plaintiff further asserts that Sony resented Plaintiff's discontent with Sony's booking arrangements at Plain-

Case 1:04-cv-11380-WGY   Document 77-3   Filed 03/01/2006   Page 18 of 18

Page 10
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

tiff's theatres. Plaintiff alleges that Defendant Reid "adopted a peremptory, adversarial and threatening tone in communicating with plaintiff." Id. at P 83. For example, in an October 7, 1996 letter to Plaintiff, Defendant Reid wrote "The Management Agreement for the New York Twin does not require Sony Theatres to discuss individual bookings with you, and it is not my intention to do so." Id. n23 Furthermore, in late 1996, when Plaintiff indicated that it may terminate Sony as manager of Plaintiff's theatres, Defendant Reid "threatened that he and the other [*36] defendants would make every effort to influence distributors not to deliver quality films to plaintiff's theatres." Id. at P 84. Plaintiff asserts that Sony was motivated by the many millions of dollars that it expended to build the Lincoln Square complex, n24 maintaining that "eliminating competition by precipitating the demise" of Plaintiff's theatres was a "strong incentive to ensure Lincoln Square's success." Id. at P 85.

n23 "Frankly, my dear, I don't give a damn." Gone with the Wind (Selznick-Metro-Goldwyn-Mayer 1939).

n24 "If you build it, he will come." Field of Dreams (Universal 1989).

Finally, shortly before Plaintiff filed its amended complaint, Sony announced an intention "to merge its operations--which include the largest movie theatre chain in Manhattan--with the Cineplex Odeon chain--Manhattan's second largest theatre operator." Id. at P 3. On September 30, 1997, Loews and Cineplex entered into a merger agreement, making Cineplex a wholly owned subsidiary of Loews and creating [*37] the company Loews Cineplex Entertainment Corporation ("LCE"). See Proposed Final Judgment and Competitive Impact Statement, 98-CIV-2716, 63 Fed. Reg. 25071, 25076 (May 6, 1998). The parties finally consummated the merger pursuant to a settlement requiring the divestiture of various Loews and Cineplex movie theatres in Manhattan and Chicago. See id. Plaintiff alleges that the merger between Sony and Cineplex demonstrates Sony's monopolistic intent and violates the antitrust laws. See Amended Compl. at PP 3, 127-131.

III. Procedural History

On July 24, 1997, Plaintiff commenced the instant litigation by filing a complaint. Thereafter, on October 14, 1997, this Court held a pretrial conference n25 at which this Court granted Plaintiff permission to amend its complaint to add a Clayton Act § 7 claim. On December 4, 1997, Plaintiff filed an amended complaint asserting seven federal and state claims against Defendants: (1) breach of contract; (2) breach of fiduciary duty; (3) tortious interference with prospective business relations; (4) unjust enrichment; (5) block-booking agreements in restraint of trade in violation of § 1 of the Sherman Act ("§ 1"), [*38] 15 U.S.C. § 1; (6) attempted monopolization in violation of § 2 of the Sherman Act ("§ 2"), 15 U.S.C. § 2; and (7) merger violations of § 7 of the Clayton Act ("§ 7"), 15 U.S.C. § 18. See id. at PP 86-131.

n25 "Why don't you come up sometime, see me? Come up, I'll tell your fortune." She Done Him Wrong (Paramount 1933).

On January 8, 1998, Defendants filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6). Submissions from both parties followed. This Court agreed to table the motion to dismiss while the parties attempted to narrow the scope of the claims to be tried while simultaneously pursuing discovery. Based on correspondence from the parties in February 1999, however, this Court concluded that the parties were unable to consensually narrow the issues or to amicably complete discovery. See Letter from David Boies, attorney for Plaintiff, to Judge David N. Edelstein of 2/1/99; Letter from Ira S. Sacks, attorney for [*39] Defendants, to Judge David N. Edelstein of 2/8/99 ("Sacks Letter"). At that point, this Court determined that it was necessary to consider the motion to dismiss. Then, on March 8, 1999, Defendants brought a motion requesting that this Court take judicial notice of certain adjudicative facts that occurred after Defendants briefed the motion to dismiss. See infra part IV. Submissions from both parties followed.

Discussion

This Court now n26 turns to the claims Plaintiff raises in the amended complaint. Before resolving these issues, this Court will first set forth the legal standards that govern the instant Opinion and Order.

n26 "What we need right now is a stupid, futile gesture on someone's part." National Lampoon's Animal House (Universal 1978).

IV. Relevant Standards

The appropriate legal standards for purposes of this Opinion and Order n27 are those that control: (1) a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), and (2) a party's [*40] request that a court take judicial notice of