Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 1 of 15

Page 11

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

supplemental material pursuant to Federal Rule of Evidence 201(b) ("Rule of Evid. 201(b)").

n27 "You're out of order. You're out of order. The whole trial is out of order." And Justice For All (Columbia 1979).

A. Motion to Dismiss

In evaluating whether a complaint will withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must assume the truth n28 of a plaintiff's "well-pleaded allegations." Albright v. Oliver, 510 U.S. 266, 268, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994); LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991). The court also must read the complaint generously and draw reasonable inferences in favor of the pleader. See LaBounty, 933 F.2d at 123. A court's function is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980); [*41] accord Ricciuti v. New York City Transit Auth., 941 F.2d 119, 124 (2d Cir. 1991). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). Thus, a court will not dismiss a complaint unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to the relief requested. See Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991).

n28 "You can't handle the truth." A Few Good Men (Columbia 1992).

In the context of an antitrust complaint, the standard is even more rigorous. The Supreme Court has stated that "in antitrust cases, where 'the proof is [*42] largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hospital Bldg. Co. v. Trustees of the Rex Hosp., 425 U.S. 738, 746, 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1976)(quoting Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 7 L. Ed. 2d 458, 82 S. Ct. 486 (1962)). This Court, therefore, will not dismiss any of the antitrust charges in the amended complaint that include "a short plain statement of the claim," Rule 8(a)(2), that "adequately . . . define[s] the relevant product market, . . . allege[s] antitrust injury, [and] . . . allege[s] conduct in violation of the antitrust laws." Re-Alco Indus., Inc. v. National Center for Health Educ., Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993).

When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein. See Fed. R. Civ. P. 12(b)(6); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991); Kramer, 937 F.2d at 773. [*43] "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer, 937 F.2d at 773; accord Kopec v. Coughlin III, 922 F.2d 152, 155-56 (2d Cir. 1991); Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988). If a court wishes to consider material outside the pleadings, it must convert the motion to dismiss into one for summary judgment under Rule 56. See Kramer, 937 F.2d at 773; Kopec, 922 F.2d at 155-56; Fonte, 848 F.2d at 25.

B. Judicial Notice

Defendants petition this Court to look beyond the amended complaint to consider certain relevant facts that occurred after its filing. On April 16, 1998, the United States, the State of New York, and the State of Illinois filed a civil antitrust action in the United States District Court for the Southern District of New York against Loews, Cineplex, Sony Corporation America, and J.E. Seagram Corporation alleging that the merger, then pending, of Loews and Cineplex would violate § 7 of the [*44] Clayton Act. Defendants ask this Court n29 to take judicial notice that on that same date, April 16, 1998, the parties to that action entered into a settlement requiring Loews and Cineplex to divest themselves of a total of fourteen movie theatres in Manhattan--one Loews theatre and thirteen Cineplex theatres. See Memorandum in Supp. of Defs.' Request that the Court take Judicial Notice of Certain Adjudicative Facts ("Defendants' Judicial Notice Mem."); see also Proposed Final Judgment and Competitive Impact Statement ("Stipulation and Order"), 98-CIV-2716, 63 Fed. Reg. 25071, 25076 (May 6, 1998). In particular, Defendants want this Court to recognize that the Stipulation and Order explained that "the divested theatres constituted slightly more in box office revenue in Manhattan . . . than the [merged entity, LCE] . . . acquired in [the Manhattan] market and, as a result . . . reduced the [merged entity's] share back to (or actually slightly less than) pre-merger levels . . . ." Defendants' Judicial Notice Mem. at 2 (quoting Stipulation and Order at 25078) "Stated differently, as a result of the Stipulation and Order requiring Loews and Cineplex to divest [*45] a total of fourteen (14) first-run theatres in Manhattan, LCE operates the same

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 2 of 15

Page 12

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

number of theatres as Loews alone operated prior to the merger." Reply Br. in Supp. of Defs. Request that the Court Take Judicial Notice of Certain Adjudicative Facts at 2.

> n29 "There's only one question you should ask yourself: 'Do I feel lucky?' Well, do you, punk?" Dirty Harry (Warner Brothers 1971).

"A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)(citation and internal quotations omitted); see also Kramer, 937 F.2d at 774 (stating that documents filed with the SEC "are relevant not to prove the truth of their contents but only to determine what the documents stated"). Thus, this Court may recognize that the Government and the States [*46] of New York and Illinois did bring a civil antitrust suit against Defendant Loews with regard to its merger with Cineplex. This Court may also notice that the parties entered into a Stipulation and Order directing Loews and Cineplex to dispossess certain theatres. It would be improper, however, for this Court to accept as true any of the statements, allegations, or agreements contained in the Stipulation and Order that do not comply with the standard set forth in Rule of Evid. 201(b).

Rule of Evid. 201(b) permits a court to take judicial notice of facts "not subject to reasonable dispute." Fed. R. Evid. 201(b). Such facts must either be "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id. The Second Circuit stated that "facts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source." International Star Class, 146 F.3d at 70 (citation omitted). Here, Defendants effectively want this Court [*47] to acknowledge that as a result of compliance with the Stipulation and Order the size of Loews' share of the movie exhibition market in Manhattan remains unchanged since the merger. This Court may not glean this information from the Stipulation and Order because to do so would be to rely on facts decided in a prior case.

Nevertheless, in support of this request, Defendants submitted copies of the April 2, 1998 and April 3, 1998 New York Times advertisement for Loews Theatres showing that Loews operated ten theatres in Manhattan. See Affidavit of Ira S. Sacks in Supp. of Defs.' Request that the Court take Judicial Notice of Certain Adjudicative Facts at Exs. A, B. Defendants also offered an excerpt from the March 18, 1999 New York Times, confirming that the merged entity, LCE, managed the same number of theatres after the divestiture. See id. at Ex. C. By relying on the citations from the New York Times, "whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), this Court can accept that Loews, now known as LCE, operates the same number of theatres that it did prior to the merger. n30

> n30 Although Defendants failed to comply with this Court's Individual Rules requiring that they seek a pre-motion conference before submitting their motion or asking this Court for special permission to file such a motion, see Individual Rules of Judge David N. Edelstein 2.A., it would be remiss for this Court to reject the motion in view of the significance of the facts detailed therein. It would be futile and illogical for this Court to analyze the individual pre-merger market share of movie theatres that Loews possessed in Manhattan and speculate as to its potential market share if merged with Cineplex, disregarding that Loews and Cineplex have already actually merged into LCE.

[*48]

V. Federal Law Claims

Principles of supplemental jurisdiction allow this Court to analyze the sufficiency of both Plaintiff's federal and state claims. See 28 U.S.C. § 1367(a). This Court has original jurisdiction over Plaintiff's antitrust claims and may exercise jurisdiction over Plaintiff's state claims as they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Id. Because 28 U.S.C. § 1367 also directs that a court may decline to exercise jurisdiction over state law claims if the court has dismissed all federal claims, this Court will first examine the adequacy of Plaintiff's federal antitrust claims.

A. Sherman Act § 1 Claims: Agreements in Restraint of Trade

Plaintiff frames its § 1 claim as a block-booking claim against Defendants. After carefully reviewing and sorting through the amended complaint, this Court finds that Plaintiff's § 1 claim, though somewhat mixed up and imprecise, may stand either as a block-booking claim against Defendant Sony Pictures and the other Sony Corporate Entities or as an illegal relationship licensing

Page 13

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

claim [*49] against all of the Sony Defendants. Discovery, therefore, may proceed on both claims.

1. Block-booking

In the landmark case United States v. Paramount Pictures, Inc., the Supreme Court defined block-booking as "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period." 334 U.S. at 156. As such, block-booking is a type of tying arrangement, see Fields Prods., Inc. v. United Artists Corp., 318 F. Supp. 87, 88 (S.D.N.Y. 1969); aff'd 432 F.2d 1010 (2d Cir. 1970), which is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958). Block-booking violates § 1 because distributors force theatres to accept films that they do not desire and, thereby, prevent other exhibitors from access to those movies, while at the same time depriving competing distributors of an opportunity to license their own [*50] movies to the coerced theatres. Fields, 318 F. Supp. at 88. The Supreme Court held that block-booking is inimical to the antitrust laws because it "prevents competitors from bidding for single features on their individual merits." Paramount, 334 U.S. at 156-57. As recently as 1989, the Second Circuit found that block-booking is one of the most common practices used within the film industry to frustrate competition. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 658 (2d Cir. 1989).

Because block-booking involves a distributor compelling a theatre to accept movies that it does not want, actual coercion "is an indispensable element" of a block-booking violation. Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir. 1982); accord American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131, 1137 (2d Cir. 1971). The Supreme Court stated that

> the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that [*51] the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984); accord United States v. Loew's Inc., 371 U.S. 38, 45, 9 L. Ed. 2d 11, 83 S. Ct. 97 (1962)(quoting Northern Pac., 356 U.S. at 6)("The standard of illegality is that the seller must have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . .'")

Defendants correctly emphasize that because coercion is a critical element of a tying claim, a defendant must have sufficient economic power in the market for a product to be able to coerce buyers into purchasing the product. See Defendants' Mem. at 13. Only a film distributor, who possesses the copyright to a movie, has the ability to coerce an exhibitor to accept an unwanted film along with a desired one and, thereby, satisfy the coercion element of a tying agreement. Block-booking, therefore, is a wrong that distributors perpetrate upon exhibitors. Thus, Plaintiff's block-booking claim cannot [*52] stand against any of the exhibitor Defendants, which are not copyright holders and do not possess the economic power over copyrighted motion pictures necessary to coerce a buyer to take undesired films. n31

> n31 The exhibitor Defendants include: Sony, Loews, TBA, Loews Fine Arts, James Loeks, Barrie Loeks, Travis Reid, Thomas Brueggemann, and Seymour H. Smith.

Still, although Plaintiff may not bring a block-booking claim against any of the exhibitor Defendants, Plaintiff has set forth sufficient allegations in the amended complaint alleging block-booking against Sony Pictures and the other Sony Corporate Entities to survive Defendants' Rule 12(b)(6) motion. Plaintiff specifically relies on letters it received from Defendant Reid, addressing Plaintiff's criticisms about Sony's booking practices at Plaintiff's theatres. See Amended Compl. at PP 79-80. Indeed, this Court finds that those letters present adequate facts indicating that the Sony Corporate Entities engaged in block-booking practices that adversely [*53] affected Plaintiff.

In a September 19, 1996 letter to Solow, Defendant Reid explained that distributors expect n32 to establish "long term relationships with . . . exhibitors who agree to participate in the liquidation of all their product, not just high profile films." Id. at P 81. Ostensibly, Reid's letter stated that if an exhibitor hopes to receive any suitable movies at all for a theatre, it is customary within the film industry for the exhibitor to agree to show all of a distributor's product, both the desired movies as well as the packaged ones. Defendant Reid's letter of January 16, 1996, responding to Solow's inquiry about possible exhibition of Sense and Sensibility at the Twin, confirmed that Sony Pictures adheres to the practice of expecting to

Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 4 of 15

Page 14

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

liquidate its entire product with one exhibitor. See id. at P 80. In that letter, Reid stated that a change in Sony's East Side booking methods to play Sense and Sensibility at the Twin would have "obligated [Sony] to play a full portion of the Sony Pictures release schedule." Id. at P 80. This statement suggests that short of agreeing to exhibit all of Sony Pictures' [*54] films, Solow, or Sony as Solow's agent, could have done nothing to convince Sony Pictures to award the rights to show Sense and Sensibility to the Twin.

n32

> James Bond: "Do you expect me to talk?"
> Goldfinger: "No Mr. Bond, I expect you to die."
> Goldfinger (GB United Artists 1961).

Distributors' expectations that an exhibitor will play a full schedule of their films and will comply with such a demand put a premium on the size of a theatre chain's circuit of theatres and eliminate the opportunity for a small, independent theatre owner, such as Plaintiff, to bid for films individually and obtain quality movies. See Paramount, 334 U.S. at 154. Plaintiff contends that, on the whole, it received only poorly performing movies and that it was unable to procure more desirable films because of the actions of Sony Pictures and the other Sony Corporate Entities.

Thus, this Court finds that the amended complaint includes adequate facts to support the allegation that the Sony Corporate [*55] Entities engaged in block-booking to the detriment of Plaintiff in violation of § 1. At this point in the litigation, the facts suggest that Plaintiff's difficulty in acquiring more profitable movies may be attributed to its unwillingness or its inability to accept all of Sony Pictures' films. Still, because block-booking is traditionally a claim that exhibitors bring against distributors, Plaintiff may assert such a claim only against the Sony Corporate Entities.

2. Illegal Relationship Licensing

While this Court finds that Plaintiff has included sufficient factual allegations in the amended complaint to support a block-booking claim against the Sony Corporate Entities, such a claim cannot stand against any of the exhibitor Defendants because Plaintiff properly may assert a block-booking claim only against a distributor Defendant Sony suggests that a block-booking claim likewise may not stand against them because "there is no claim that the [Sony] defendants were coerced into buying packages of films," and any relationships that they established with distributors were voluntary. In their submissions to this Court, Defendants confirmed that they "in fact desire the product that [*56] Plaintiff claims they are being forced to accept." Sacks Letter at 3; see also Defendants' Mem. at 15.

Indeed, some of Plaintiff's statements in the amended complaint identify Sony's booking arrangements as voluntary. According to the amended complaint:

> Sony has entered into agreements with certain motion picture distributors concerning the block-booking of motion pictures being distributed by those distributors.
>
> Pursuant to those block-booking arrangements, Sony agrees to "liquidate" or exhibit in its theatres all of the motion picture product of a distributor. In order to obtain high quality motion pictures, Sony agrees to also exhibit the lesser motion pictures.

Amended Compl. at PP 112-113 (emphasis added). These paragraphs do not assert that anyone coerced Defendant Sony to accept unwanted films, nor do they allege that Defendant Sony forced anyone to provide it with packages of films. Rather, these paragraphs indicate that Defendant Sony voluntarily engaged in relationships with distributors to exhibit all of a distributor's product and, thereby, guarantee a ready supply of films to play in their theatres.

These statements, therefore, are, surprisingly, [*57] somewhat contradictory to Plaintiff's block-booking claim. Nevertheless, ironically, despite the inconsistent allegations, Plaintiff unknowingly asserts an alternative theory of a § 1 violation against the exhibitor Defendants. Although Plaintiff's block-booking claim against the exhibitor Defendants must fail, Plaintiff has included sufficient facts in the amended complaint to sustain a § 1 illegal relationship licensing claim against all of the Sony Defendants. Thus, although Plaintiff has mislabeled its § 1 claim against Defendant Sony, this Court will analyze Plaintiff's allegations in light of the prevailing case law.

This Court recognizes the complexity of this issue and realizes that it must balance the interests of Defendants' autonomy in establishing their own booking relationships with the importance of having a fair and free economy and ensuring that those relationships do not violate the antitrust laws. To support their contention that

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 5 of 15

Page 15

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

distributors and exhibitors may have booking relationships with each other that do not violate the antitrust laws, Defendants cite the Supreme Court, which held that group-booking relationships that do not involve coercion can be legal. [*58] The Court stated:

> We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted.

Paramount, 334 U.S. at 159. Moreover, Defendants also attempt to rely on a 1988 Department of Justice report ("Report") that thoroughly analyzed the history of the Paramount case and discussed various film-booking arrangements. See Defendants' Mem. at 15 n.6; Fleishman Aff. at Ex. E. The Report identified relationship licensing as "a distributor's selection of a preferred exhibitor in whose theatre the distributor would like to play all or almost all of its pictures." Fleishman Aff. at Ex. E at 39. The Report went on to explain that

> the distributor makes an initial on-the-merits selection of the exhibitor's theatre to play its films, and thereafter for an indeterminate period the distributor offers its films to the exhibitor and the exhibitor plays them. . . . In the Antitrust Division's view, the theatre-by-theatre injunction [that the Paramount case [*59] established] does not prohibit this type of relationship licensing.

Id. at Ex. E at 40. Moreover "so long as a competing exhibitor [is] not foreclosed from having his theatre considered on its merits for the licensing of one or more pictures in that group," the Report found that relationship licensing does not violate the antitrust laws. Id. at Ex. E at 42. In fact, the Report suggested that "relationship licensing may assure a small operator a ready supply of pictures to play." Id. at Ex. E at 43. Thus, Defendants assert that because they voluntarily accepted any group-bookings that distributors offered to them, Plaintiff fails to include adequate allegations of the bedrock principle of a tying violation: coercion. See Defendants' Mem. at 15; Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Reply Mem.") at 2-3. Therefore, Defendants argue that this Court should dismiss Plaintiff's block-booking claim. See Defendants' Mem. at 15; Reply Mem. at 2-3.

Defendants' reliance on the Supreme Court decision and the Report, however, is misplaced and disingenuous because it ignores the underlying rationale driving the Supreme Court's decision in [*60] Paramount and its establishment of the theatre-by-theatre injunction. The Court's primary consideration in the Paramount case was to prevent the stifling of competition by ensuring that all exhibitors have fair access to motion pictures. When discussing certain kinds n33 of licensing relationships, the Court recognized that some licensing arrangements are unlawful restraints of trade because they

> eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit [of theatres]. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators.

Paramount, 334 U.S. at 154; see Loew's, 705 F. Supp. at 880 (citing this explanation as the crux of the rationale in Paramount).

> n33 "You see in this world there's two kinds of people my friend--those with loaded guns and those who dig. You dig!" The Good, the Bad, and the Ugly (United Artists 1966).

[*61]

Thus, if distributors and exhibitors engaged in relationship licensing in such a manner as to hinder other exhibitors' ability to acquire quality movies, then such relationship licensing would violate § 1. Moreover, the Report actually propounds such a position on relationship licensing. Defendants were selective in their citation of the Report. While the Report indicated that relationship licensing may be legal under the antitrust laws, it also stated:

> The foregoing discussion should not be read to suggest, however, that in all cases relationship licensing is lawful. Where, for example, such licensing involves circuit dealing, favoritism toward affiliates, preferential contract terms, or rejection out-of-hand of competing exhibitors' of-

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 6 of 15

Page 16

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

fers without any "on-the-merits" determination, the mere fact that relationship licensing is also involved will not immunize that conduct. Thus, we will review on its merits each complaint that the theatre-by-theatre injunction has been violated to determine whether in a relationship licensing situation any of the prohibited conduct discussed above is present.

Fleishman Aff. at Ex. E at 50-51. n34 Accordingly, in considering Plaintiff's [*62] allegations against Defendants, this Court must be mindful of the Supreme Court's concern that some booking relationships may have the effect of excluding exhibitors, especially small, independent exhibitors, from fair access to films.

> n34 Both the Supreme Court decision and the Report suggest that any illegality in relationship licenses would generally be caused by a distributor at the expense of exhibitors, particularly small, independent exhibitors. The Supreme Court, however, also noted that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." Paramount, 334 U.S. at 161. Thus, because relationship licensing is consensual between the participating distributors and exhibitors, it follows that a court may also hold exhibitors liable for any illegality.

Here, the amended complaint recites sufficient allegations suggesting that Defendants have engaged in illegal relationship licensing, "elevating [their] own interests over those [*63] of the plaintiff's theatres, in using plaintiff's theatres to curry favor with movie distributors purely for Sony's own advantage and to benefit Sony's own theatre operations." Amended Compl. at P 50. First, Defendant Sony effectively guaranteed distributors a venue for their films despite any declining box-office receipts, by either exhibiting movies at Plaintiff's theatres for extended runs, or moving films to Plaintiff's theatres from Sony's theatres once those movies became less profitable. See id. at PP 51, 58, 61-62, 65, 72. For instance, regardless of sharply decreasing profitability, in 1996, Sony showed Hamlet at the Paris for an allegedly unreasonably long run, and in 1997, Sony booked Face Off at the Twin for a three-month period. See id. at 65, 72.

Second, Defendant Sony arranged for the premieres of several films at the Paris, affording distributors the benefit of the Paris's special reputation as an elite premiere venue, but thereafter exhibited those films at its own theatres, where it received 100 percent of the profits. See id. at PP 51-53. For example, after helping Miramax plan the premiere of Emma at the Paris in April 1996, Sony transferred [*64] Emma to its Lincoln Square theatre and to a Cineplex theatre. See id. at P 52.

Third, purportedly in an effort to foster its own relationships with distributors by offering them more than one venue to exhibit their films, Sony executives allegedly attempted to harass Plaintiff into deviating from its long-time exclusive booking practice at the Paris. Plaintiff recounts that in June 1996, Defendant Brueggemann notified Solow that Sony was discussing with distributors the exhibition of films at the Paris on a non-exclusive basis. See id. at P 60. Plaintiff also cites an August 15, 1996 letter from Defendant Reid, warning that unless Plaintiff agreed to abandon its exclusive booking policy, Sony would refuse to book certain films at the Paris. See id. at P 66.

Fourth, Plaintiff includes allegations in the amended complaint that Sony elevated its own business interests over Plaintiff's. In 1995, Solow asked Defendant Brueggemann to inquire about the possibility of leasing and exhibiting Belle at the Paris. See id. at P 55. Plaintiff asserts that, with the intent of strengthening Sony's ties to Miramax, Brueggemann instead proposed the idea to Miramax, which thereafter [*65] bought and exhibited Belle at the Paris, thereby favoring Miramax and depriving Plaintiff of a lucrative business opportunity. See id. at P 57.

Fifth, the amended complaint demonstrates that Sony is in a propitious position to accept all of a distributor's product, because, as manager of Plaintiff's theatres, Sony is able to keep all the heralded films for its own theatres, where it receives all the profits, while "dumping the refuse of its . . . deals" in Plaintiff's theatres, id. at P 117, where it may keep only forty percent of net income after expenses. See id. at P 40. Plaintiff enumerates a long list of underperforming films that Sony booked at the Twin while Sony played more popular and productive pictures at its own theatres. See id. at PP 68-71; see also id. at PP 58, 77 (alleging that Sony "failed to book appropriate films at the Paris" and "used [the Festival] as a 'dumping ground'"). Plaintiff also points to a statement from Defendant Reid, acknowledging the acceptance of sub-standard pictures as a method of "forming relationships [with distributors] in order to be booked properly on a long term basis." Id at P 79.

Finally, considering [*66] these allegations, this Court is concerned that Defendants will use the benefits of their merger, which brought together top distributors and exhibitors, see infra part V B, to secure a competitive dominance within the film industry, by favoring affiliates and freezing out small exhibitors from access to

Case 1:04-cv-11380-WGY  Document 77-4  Filed 03/01/2006  Page 7 of 15

Page 17

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

movies. This Court's wariness is heightened by such evidence as Defendant Reid's June 1996 threat that Defendants "would make every effort to influence distributors not to deliver quality films to plaintiff's theatres," if Plaintiff terminated Sony as manager of Plaintiff's theatres. Id. at P 84.

Plaintiff states that "as a result of the foregoing agreements in restraint of trade, plaintiff is damaged because its ability to compete as an independent theatre owner is effectively undermined." Id. at P 117. All of the actions that Plaintiff cites in support of its claim promote relations between Defendants and other distributors and help ensure that Defendants will have a supply of quality films from which to choose and a competitive advantage over other exhibitors. Plaintiff asserts that it "did not benefit from Defendants' anti-competitive arrangements and was repeatedly [*67] damaged by those arrangements." Id. Accordingly, Plaintiff sets forth enough facts to uphold a claim for illegal relationship licensing against Defendants.

At this stage, Plaintiff must now proceed in a more astute manner, delineating more cogently the exact nature of its § 1 claims against the proper Sony Defendants and their underlying bases. The lack of precision in Plaintiff's amended complaint was disconcerting to this Court. It was unclear whether Plaintiff's § 1 claim alleged block-booking, illegal relationship licensing, or both. See Rule 8(e)(2)("A party may set forth two or more statements of a claim ... alternately or hypothetically, either in one count ... or in separate counts .... A party may also state as many separate claims ... as the party has regardless of consistency ..."). Plaintiff conflates a block-booking claim against Defendants, which requires an element of coercion, with allegations that Sony agreed to engage in the block-booking relationships. Emphasizing that their booking relationships with distributors were voluntary, Defendants correctly point out that a block-booking claim against them cannot stand because Plaintiff fails to [*68] demonstrate coercion. Still, Defendants arguments do not exonerate them from any antitrust violations. Defendants cannot have it both ways because even voluntary relationships may violate § 1.

Defendants' motion to dismiss Plaintiff's § 1 claim is, therefore, denied. Defendants had the burden of demonstrating to this Court that Plaintiff's amended complaint presented no interpretation of facts that could support a § 1 claim. Defendants have failed to sustain their burden. Defendant Reid's January 16, 1996 letter suggests that Sony felt forced "to play a full portion of Sony Pictures release schedule." Amended Compl. at P 80. If, as this letter appears to indicate, Sony Pictures did employ coercion against Sony, Plaintiff's managing agent, then Plaintiff may proceed with a block-booking claim, a per se violation of § 1, solely against the Sony Corporate Entities. If, however, as Defendants argue, Reid's letter is merely an overstatement and Defendants' booking relationships are completely voluntary, then the block-booking claim must fail and there is no per se violation of § 1. Instead, Plaintiff should move forward on an illegal relationship licensing claim against Defendants [*69] At that point, this Court will be in a position to review the individual merits of this case to determine whether Plaintiff asserts a satisfactory illegal relationship licensing violation.

Either way, the amended complaint contains enough facts to support a § 1 claim against Defendants. Further discovery may enlighten both the parties and this Court as to which construction of a § 1 claim is more feasible. Accordingly, despite the imprecise and ambiguous nature of the amended complaint, Plaintiff presents an actionable § 1 claim either as a block-booking claim against the Sony Corporate Entities or as an illegal relationship licensing claim against all of the Sony Defendants.

B. Clayton Act § 7 Claims: Merger

Plaintiff claims that the merger that Defendants entered into with Cineplex to form LCE violates § 7. See Amended Compl. at PP 127-131. Plaintiff contends that it will be unable to compete as an independent theatre operator because "the merger will dramatically enhance Sony's market power in relevant markets." n35 Id. at P 129. Specifically, Plaintiff argues that the merger effectuates intimate affiliations between exhibitors, Sony and Cineplex, and distributors, [*70] Sony Pictures and Universal Pictures, which, in turn, "will impede plaintiff's ability to obtain quality motion pictures." Id. at P 130.

---

n35 Identifying the appropriate market--product and geographic--is a "necessary predicate" to an analysis of the probable effects that a merger will have on competition. Brown Shoe v. United States, 370 U.S. 294, 324, 335, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962). Here, this Court finds that the product market is the film exhibition market, and the relevant geographic market is Manhattan. See id. at 336 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."). In addition, it should be noted that the Upper East Side of Manhattan is "the most important market because of the concentration of nationally influential film critics and news media." Loew's, 705 F. Supp. at 887-88 (citation omitted).

Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 8 of 15

Page 18

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

Section 7 prohibits mergers whose effect "may be substantially [*71] to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The Supreme Court remarked that § 7 creates a "relatively expansive definition of antitrust liability." California v. American Stores Co., 495 U.S. 271, 284, 109 L. Ed. 2d 240, 110 S. Ct. 1853 (1990). Additionally, as § 7 aims to catch a threat to competition in its incipiency, the Supreme Court held that § 7 is concerned with probabilities, not certainties, and, therefore, "mergers with a probable anticompetitive effect [are] . . . proscribed by [§ 7]." Brown Shoe, 370 U.S. at 323 (emphasis added); accord Fruehauf Corp. v. Federal Trade Commission, 603 F.2d 345, 351 (2d Cir. 1979). Nevertheless, the Second Circuit emphasized that "'mere possibility' will not suffice," and, rather, a reasonable probability of substantial impairment of competition must exist. Fruehauf, 603 F.2d at 351.

Accordingly, to have standing, under § 7, to challenge the LCE merger, Plaintiff must offer a sufficient factual basis demonstrating that the merger threatens Plaintiff with probable antitrust injury. See American Stores, 495 U.S. at 281-82; [*72] Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 105, 122, 93 L. Ed. 2d 427, 107 S. Ct. 484; Consolidated Gold Fields PLC v. Minorco, S.A. 871 F.2d 252, 254 (2d Cir. 1989); R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102, 103 (2d Cir. 1989); see also Remington Prods., Inc. v. North Am. Philips, Corp., 755 F. Supp. 52, 55 (D. Conn. 1991)("One seeking equitable relief [to demonstrate a violation of § 7] need only show 'threatened' loss or damage.").

Moreover, the Supreme Court has held that a

> plaintiff[] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [a] defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)(quoting Zenith Radio Corp v. Hazeltine Research, 395 U.S. 100, 125, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969)) [*73] The Supreme Court explained that

> injury, although casually related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since '[it] is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition."

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990)(quoting Cargill, 479 U.S. at 109-10 (quoting Brunswick, 429 U.S. at 488))(alterations in original).

The issue before this Court, therefore, is whether the amended complaint has alleged adequate facts to show that the LCE merger threatens Plaintiff with the kind of injury Congress targeted in enacting the antitrust laws. This Court finds that the amended complaint has sustained this burden. Here, Plaintiff alleges that the merger causes antitrust injury by restraining Plaintiff's access to quality motion pictures and, effectively, depriving Plaintiff of its ability to compete for first-run films. n36 See Amended Compl. at P 130. The amended complaint presents facts [*74] demonstrating Defendants' anticompetitive actions designed to limit Plaintiff's ability to obtain select movies. See id. at PP 51-53, 58, 68-71, 77; see supra part V.A.2. Plaintiff maintains that the merger will enhance Defendants' ability to divert more profitable films away from Plaintiff's theatres See Amended Compl. at PP 129-30 The Second Circuit has found the claim that a merger prevents a plaintiff from competing in the relevant market sufficient under § 7 See Bigelow, 867 F.2d at 108, 111.

---

N36 "See you don't understand. I could have had class. I coulda been a contender." On the Waterfront (Columbia 1954).

---

This Court must, therefore, determine if the merger affords LCE the power to limit its competitors' ability to compete. When a court evaluates the effects of a merger, "the starting point is [the merged entity's] post-acquisition market share." Id. at 107 (citing Brown Shoe, 370 U.S. at 343). The Supreme Court stated that "market share [*75] . . . is one of the most important factors to be considered when determining the probable effects of the combination on . . . competition in the relevant market." Brown Shoe, 370 U.S. at 343

Thus, the size of the merged company in relation to the size of its competitors is a primary consideration See United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 363, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963)(noting that

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 9 of 15

Page 19

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

the size of a merger can make the merger "inherently suspect in light of Congress' design in § 7 to prevent undue concentration"); see also Brunswick, 429 U.S. at 487 ("If the acquisition here were unlawful, it is because they brought a 'deep pocket' parent into a market of 'pygmies.'") Indeed, the legislative history of the 1950 amendments to § 7 indicates that a merger may be perceived as substantially lessening competition or tending to create a monopoly if, inter alia, "the relative size of the acquiring corporation has increased to such a point that its advantage over competitors threaten[s] to be 'decisive'." H.R. Rep. No. 1191, 81st Cong., 1st Sess., ("H.R. 1191") at 8 (1949), quoted in Brown Shoe, 370 U.S. at 321 n.36; [*76] see Brown Shoe 370 U.S. at 315 ("The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy."). The Supreme Court understood this rationale for the amendments as an "intense congressional concern with [market] concentration [that in certain cases] warrants dispensing . . . with elaborate proof of market structure, market behavior, or probable anticompetitive effects." Philadelphia Nat'l Bank, 374 U.S. at 363.

Moreover, the Court emphatically agreed with Congress's concern, stating:

> We think that a merger that produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

Id. (citing United States v. Koppers Co., 202 F. Supp. 437 (W.D. Pa. 1962)) Here, this Court is presented with both a horizontal merger n37 [*77] and, more significantly, a vertical merger. n38 See H.R. 1191 at 11; Brown Shoe, 370 U.S. at 317 (noting that § 7 applies to both horizontal and vertical mergers)

> n37 "An economic arrangement between companies performing similar functions in the production or sale of comparable goods or services is characterized as 'horizontal.' Brown Shoe, 370 U.S at 334. The LCE merger horizontally consolidated the distributor Sony Pictures with the distributor Universal Pictures and the exhibitor Sony with the exhibitor Cineplex.

> N38 "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical'" Brown Shoe, 370 U.S. at 323 The LCE merger vertically consolidated the distributors Sony Pictures and Universal Pictures with the exhibitors Sony and Cineplex.

Defendants observe that this Court must consider the size of Defendants' post-merger market share when weighing the probable effects on competition. Therefore, [*78] in view of the Stipulation and Order that required Sony and Cineplex to divest themselves of a total of fourteen theatres before merging, Defendants urge this Court to dismiss Plaintiff's § 7 claim See Defendants' Judicial Notice Mem. at 1-2; see also Sacks Letter at 3 ("Plaintiff's merger claim is moot because DOJ has already cleared the merger between LTM Holdings, Inc. and Cineplex and in so doing, DOJ required them to divest certain theatre assets in both Manhattan and Chicago.") This Court recognizes that as a result of the divestiture, the merged entity LCE operates the same number of New York theatres that Sony managed prior to the merger See supra part IV. Nevertheless, this Court finds this fact alone insufficient to support the motion to dismiss.

First, n39 it must be noted that "the Department of Justice at times countenances a higher level of anticompetitive behavior than do the courts," and, therefore, it is the responsibility of this Court to undertake its own evaluation of the merger in light of the allegations in the amended complaint. Loew's, 705 F. Supp. at 891; see also id. at 879 ("The Attorney General's concessions [*79] to the court regarding what might be widespread anti-competitive behavior in this industry left open a number of crucial questions that the court felt needed to be answered . . . ."); John M. Garon, Media & Monopoly in the Information Age: Slowing the Convergence at the Marketplace of Ideas, 17 Cardozo Arts & Ent. L.J. 491, 621 n.563 (1999)("Despite regular review by the Department of Justice . . . illegal trade practice [within the film industry] continue[s] to occur.")" Second, the Stipulation and Order itself states:

> Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C 16(a), the proposed Final Judgment has no prima facie

Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 10 of 15

Page 20
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

effect in any subsequent private lawsuit that may be brought against defendants

Stipulation and Order at 20. Accordingly, the settlement that Sony, Cineplex, the Government, and the States of New York and Illinois entered to complete the merger does not govern Plaintiff's § 7 claim.

> n39 "Who's on first, What's on Second, I Don't Know is on third . . . ." The Naughty Nineties (Universal 1945).

[*80]

Additionally, at this point, the parties have not presented this Court an adequate factual foundation upon which to evaluate the actual effects of the horizontal merger. For example, while this Court notices that LCE possesses the same number of theatres in Manhattan that Sony ran prior to the merger, this fact does not necessarily diminish Defendants' market share in Manhattan. This Court has no information regarding the nature of the divested theatres, i.e., their age, their condition, or whether they are single or multi-screen theatres. Perhaps, while controlling the same number of theatres in Manhattan, LCE now has twice as many screens; perhaps the divestiture merely has delayed LCE's dominance over the competition. This Court is also interested in the effect the merger has had on exhibition prices. n40 Therefore, further discovery is necessary to address this Court's concerns.

> n40 This Court is wary that the merger may facilitate escalating and prohibitively expensive ticket-prices. On February 28, 1999, the New York Times reported the recent increase of LCE ticket prices to $ 9.50, the highest in the nation. See Robert D. McFadden, Appearing Finally in Theaters: The $ 9.50 Movie, N.Y. Times, February 28, 1999. Granted, the increase may have had no connection at all to the merger, as in recent years, increases in ticket prices have been a regular occurrence in Manhattan. A March 19, 1999 New York Times article reported that "in the last five years, movie ticket prices in the city have gone up by 27 percent, more than twice as fast as the cost of living." Clyde Haberman, Moviegoers Vs Theaters: Food Fight!, N.Y. Times, March 19, 1999, at B1.
>
> The present jump to $ 9.50, however, occurred despite assurances from a Cineplex executive, at the time of the merger, guaranteeing that the merger would not cause an increase in ticket prices. See id ("I can guarantee you that ticket prices will not increase as a result of this merger."). This Court also notes that Manhattan, in addition to having the dubious distinction of charging the most expensive movie-ticket prices, offers a paucity of matinee theatre prices at its movie theatres.

[*81]

More alarming to this Court, though, is the vertical unification that the LCE merger caused between powerful distributors and exhibitors. The Supreme Court warned that an important factor for a court to consider when assaying the legality of a merger is "the trend toward concentration in the industry." Brown Shoe, 370 U.S. at 332. Indeed, one court has noted that the film industry "is a concentrated industry in which there has been a recent trend toward vertical integration which appears significant." Loew's, 705 F. Supp. at 885.

Accordingly, this Court must be vigilant in assessing the effects of the prominent vertical integration in this case, as Defendants are both exhibitors and distributors and the merger places them within the same company. Defendants represent a unique entity. To understand the precise structure of this entity, this Court must consider Defendants in their entirety. To do otherwise would be shortsighted. Defendants are indeed the sum of all their parts, and they cannot evade scrutiny by partitioning themselves. Pieces of a puzzle viewed separately form unintelligible, irregular shapes, but considered together reveal a discernible [*82] image. n41 Thus, to allow fragmentation to provide an escape from responsibility would be to deal in illusion. This Court sees right through the cellophane fence that Defendants attempt to hide behind.

> n41 "I guess Rosebud is just a piece in a jigsaw puzzle." Citizen Kane (RKO 1941).

In this case, the LCE merger vertically integrated elite exhibitors and distributors, concentrating those entities together to create a film industry powerhouse. n42 Prior to the merger between Sony and Cineplex, Sony was the largest motion picture exhibitor in Manhattan and one of the largest in the United States; Sony Pictures was the largest film distributor in the world and was also closely affiliated with Columbia Pictures; Cineplex was the second largest movie exhibitor in Manhattan and the fourth largest exhibitor in the United States; and Universal Studios, the distributor with a controlling interest in Cineplex, was also one of the six largest national film distributors. See Amended Compl. at PP 1, 3; Plaintiff's Mem [*83] in Opp'n to Defs.' Mot. to Dismiss ("Plain-

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 11 of 15

Page 21

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

tiff's Mem.") at 1-2. Thus, regardless of the divestiture of theatres resulting in LCE's possession of the same total number of theatres within Manhattan that Sony had before consummating the merger, the merger still combined two dominant Manhattan movie exhibitors with extensive connections to powerful film distributors. See H.R. 1191 at 8 (suggesting that § 7 can be violated if "buyers and sellers in the relevant market had established relationships depriving their rivals of a fair opportunity to compete"), quoted in Brown Shoe, 370 U.S. at 321 n.36.

> n42 "Ladies and gentlemen, look at Kong, the eighth wonder of the world." King Kong (RKO 1933).

A vertical merger, however, does not automatically have an anti-competitive effect. See Fruehauf, 603 F.2d at 351.

> As the Supreme Court recognized in Brown Shoe . . . the fountainhead of § 7 analysis of vertical mergers, the competitive significance of a vertical merger results [*84] primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) by foreclosing competitors of the selling firm . . . from access to the market or a substantial portion of it, or (3) by forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration. . . . The ultimate objective, however, is to determine whether and how the particular merger in issue may lessen competition, i.e., what its anticompetitive effect on the market, if any, is likely to be.

Id. at 352 (citing Brown Shoe, 370 U.S at 328). Thus, in assessing the competitive results of the vertical merger that exists in this case, this Court must primarily concern itself with the possibility of market foreclosure, the exact antitrust injury that Plaintiff alleges.

In view of this high standard, this Court is amazed at Defendants' flat and unsupported denial [*85] of Plaintiff's allegation that the merger will permit LCE to obtain more quality films than Sony and Cineplex were able to acquire separately. See Defendants' Mem. at 20-21. Defendants adamantly assert that "the notion is illogical," insisting that distributors, who have the market power to offer films, decide where to place their films and what exhibitor bids to accept. Id. In so claiming, Defendants seek to circumvent the instruction of the district court in Paramount that "defendants must be viewed collectively rather than independently as to the power which they exercise[] over the market by their theatre holdings." United States v. Paramount Pictures, Inc., 85 F. Supp. 881, 894 (1949) (citing American Tobacco Co v. United States, 328 U.S. 781, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946))

Analyzing the vertical merger, particularly in the context of the motion picture industry, see Brown Shoe, 370 U.S. at 321-22, this Court notes that in Loew's, where a producer/distributor requested that the court consider modifying the antitrust consent judgment, the court warned of the danger that when distributors and exhibitors merge, the merged entities may predominantly [*86] or exclusively deal only with one another. 705 F. Supp. at 886. The Court in Loew's recognized the real potential for foreclosure of access to theatre space for competing distributors and of access to film product for competing exhibitors that may result if the vertically integrated company attempts to keep everything "in house." n43 See id. at 887, 888.

> n43 "There's no place like home!" The Wizard of Oz (Metro-Goldwyn-Mayer 1939). "E.T. phone home." E.T. the Extra-Terrestrial (Universal 1982).

Here, Plaintiff alleges that LCE will exploit its new commanding position in the film industry and the relevant market to acquire advantageous booking relationships that will stifle competition from independent exhibitors such as Plaintiff. This Court looks askance at the booking relationships that the merger facilitates because of "the likelihood that foreclosure of access to film product or exhibition space might be caused by the . . . acquisition." Loew's, 705 F. Supp. at 885. [*87] Plaintiff alleges that prior to the merger, Defendants already engaged in activity that frustrated Plaintiff's ability to obtain films for exhibition. See Amended Compl. at PP 51-53, 58, 68-71, 77; see supra part V.A.2 The merger presents Defendants with an opportunity and an avenue through which they can further thwart Plaintiff's and other exhibitors' access to movies. A decision by LCE's distributors and exhibitors to restrict availability to their films and to their theatre space could potentially harm

Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 12 of 15

Page 22
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

competition. This Court is, therefore, worried that "the market presence of the new vertically integrated company [may be] great enough that the potential anti-competitive effects become a significant concern." Loew's, 705 F. Supp. at 886 (citing Brown Shoe, 370 U.S. at 328-29)

Thus, both parties now have the opportunity to present further facts supporting their positions, thereby enabling this Court to make a determination about the effects of the LCE merger on competition on a more fully developed record. First, this Court is aware that "while market share data alone does not create an irrebutable presumption of illegality, such a [*88] presumption can be overcome only by evidence that the market share data gives an 'inaccurate account of the acquisition's probable effects on competition.'" Bigelow, 867 F.2d at 108 (quoting United States v. Citizens & Southern Nat'l Bank, 422 U.S. 86, 120, 45 L. Ed. 2d 41, 95 S. Ct. 2099 (1975)(internal citations omitted). Discovery will offer Defendants a chance to present evidence to this Court refuting this presumption.

Second, a more detailed record is indispensable to a court assessing the legality of a merger. In Brown Shoe, the Supreme Court stated that examining "the very nature and purpose of a [merger]" is an extremely important factor in assessing its legality. Brown Shoe, 370 U.S. at 329. Discovery on the § 7 claim will afford Defendants an opportunity to present evidence that the merger was motivated by a legitimate business purpose. See, e.g., Loew's, 705 F. Supp. at 884-85 (discussing several legitimate business purposes that motivated a producer/distributor to acquire a movie exhibition company). Additionally, in Cargill, the Supreme Court referred to evidence that the plaintiff presented [*89] at trial to help define the threatened loss, 479 U.S. at 114, and in Bigelow the Second Circuit suggested that a full trial on the merits may be necessary to appropriately assess market share data, market foreclosure, and the decrease of competition. 867 F.2d at 111. This Court, likewise, awaits more detailed submissions from both parties before making determinations about potential foreclosure.

Based on the alleged facts available to this Court at this time, however, there is certainly an adequate basis to recognize a reasonable probability that the LCE merger will lessen competition. Plaintiff "is entitled to the benefit of all reasonable inferences that follow from the alleged deliberate acquisition by merger of substantial monopoly power in the [Manhattan movie market] and to a presumption that . . . [LCE will] be likely to eliminate competition in that market by, inter alia, reducing [Plaintiff's] access to [quality films]," a sufficient antitrust injury. Bigelow, 867 F.2d at 111.

One court in this Circuit has stated that the film industry "has shown a proclivity for anti-competitive behavior when given the opportunity" [*90] and noted "evidence of a climate of non-compliance with this court's consent judgments." Loew's, 705 F. Supp. at 885. Considering Plaintiff's allegations, which this court must accept as true, that Defendants have attempted to achieve a competitive advantage over Plaintiff and other exhibitors and that Defendants have already successfully effected the closure of the Festival permanently and the Paris temporarily, see Amended Compl. at P 121, this Court cannot, at this time, assume that Defendants, in their new position as part of LCE, will be on their best behavior. Accordingly, this Court will not dismiss Plaintiff's § 7 claim.

C. Sherman Act § 2 Claims: Attempted Monopolization

Plaintiff asserts that Defendants' conduct constitutes an attempted monopolization in violation of § 2. See id. at PP 119-126. Plaintiff maintains that Defendants have manifested an intent to monopolize the motion picture exhibition market in Manhattan and have "engaged in predatory conduct, including threats of a concerted refusal to deal and actual diversion of motion picture product," all aimed at effectuating their plan to eliminate competition from other exhibitors such as [*91] Plaintiff. Id. at P 121. Allegedly, Defendants' actions have already been successful, "forcing the temporary closure of the Paris Theatre, dramatically damaging business at the New York Twin, and precipitating the economic decision to close the Festival Theatre." Id. In addition, Plaintiff claims that the merger creates too high of a concentration of exhibition theatres and corporate affiliations with distributors, affording Defendants "the power [to] effectively deprive independent theatre owners such as plaintiff of quality motion pictures, as well as to raise prices to consumers virtually at will." Id. at P 126.

Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. n44 To establish a claim for attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993). [*92] The amended complaint sets forth an adequate claim against Defendants for attempted monopolization.

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 13 of 15

Page 23
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

n44 "Greed, for the lack of a better word, is good. Greed is right. Greed works." Wall Street (20th Century Fox 1987).

Plaintiff has supplied this Court with ample allegations of Defendants' anti-competitive acts. See supra parts V.A., V.B. In view of the litany of alleged anti-competitive acts that Plaintiff included in the amended complaint, Defendants' argument that Plaintiff "has not alleged any predatory conduct by the defendants" confounds this Court. Defendants' Mem. at 21. The amended complaint contains an extensive depiction of actions through which Defendants purportedly attempted to divert profitable movies away from Plaintiff's theatres and to diminish competition. See Amended Compl. at PP 51-85. Plaintiff maintains that Defendants' conduct successfully prevents it from having access to quality films and from effectively competing within the Manhattan exhibition market.

This Court also finds [*93] ample evidence demonstrating Defendants' specific intent for attempted monopolization. First, the Second Circuit has held that a court may infer specific intent from a defendant's conduct. See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 101 (2d Cir. 1998)(citing Northeastern Tel. Co. v. American Tel. Co., 651 F.2d 76, 85 (2d Cir. 1981)); Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988). Considering the laundry list of anti-competitive acts that Plaintiff asserts in its amended complaint, this Court finds it more than likely that Defendants possessed specific intent to destroy competition. Second, the Second Circuit stated that defendants' intent "can be derived from their words." Tops Markets, 142 F.3d at 101. Here, Plaintiff alleges that Defendant Reid, a Sony official, "adopted a peremptory, adversarial and threatening tone in communicating with plaintiff." Amended Compl. at P 83. Specifically, Plaintiff complains that Defendant Reid "threatened that he and the other defendants would make every effort to influence distributors not to deliver quality films [*94] to plaintiff's theatres." Id. at P 84. This Court, therefore, accepts as sufficient Plaintiff's allegations that Defendants intended to monopolize the Manhattan market, as evidenced by the words of one of their own officials.

Defendants, however, argue that Defendant Reid's threat of encouraging diversion of product away from Plaintiff was in response to Plaintiff's intimation that it might terminate Sony as manager of Plaintiff's theatres, an act that never n45 occurred. See Defendants' Mem. at 22. Citing case law from the Eighth and Ninth Circuits, Defendants contend that "allegations . . . of conditional 'threats' (with an unfulfilled condition) fail to sufficiently allege that defendants engaged in predatory or anticompetitive conduct." Id. (citing Conoco Inc. v. Inman Oil Co., 774 F.2d 895, 905 (8th Cir. 1985); Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17, 19 (9th Cir. 1971)). Defendants' argument is both tenuous and erroneous.

n45 "Call your mother and tell her you will never be a lawyer." The Paper Chase (20th Century Fox 1973).

[*95]

First, based on the other allegations in the amended complaint, it appears to this Court that Defendants may have not only engaged in threats but actually followed through with the predatory actions of which Reid threatened. This Court also finds it just as reasonable to speculate that Defendant Reid's threat was motivated by Defendants' own realization that without Plaintiff's theatres, Defendants would be without an outlet to dump the substandard films that they received from distributors. Thus, a fair reading of Reid's threat can be understood to indicate that, regardless of whether Plaintiff ultimately fired Sony as manager of its theatres, Defendants were interested in reducing competition from Plaintiff.

Second, in support of their proposition that words are not enough to demonstrate specific intent, Defendants cite to other Circuits, ignoring the view of this Circuit in Tops Market. 142 F.3d at 101. Not only are the opinions of other Circuits not binding upon this Court, but they certainly must be rejected when the law of this Circuit expresses a contrary view. See Newsweek, Inc. v. United States Postal Serv., 663 F.2d 1186, 1196 (2d Cir. 1981) [*96] ("At the outset, it is well settled that the decisions of one Circuit Court of Appeals are not binding upon another Circuit."); Christ the King Regional High Sch. v. Culvert, 644 F. Supp. 1490, 1496 (S.D.N.Y. 1986), aff'd, 815 F.2d 219 (2d Cir. 1987)(emphasizing that contrary views or criticisms from other Circuits do not authorize a district court to reject the opinion of the Second Circuit). Defendants do not even attempt to distinguish the facts of our case from those in the Second Circuit's decision.

Third, even under the rationales of the Eighth and Ninth Circuits, Defendants' contention fails. Both the Eight and Ninth Circuit's opinions hold that a court must reject the implication of specific intent from statements only when corroborating evidence of anti-competitive conduct does not exist. See Conoco, 774 F.2d at 905 (stating that "isolated statements by a single . . . official . . . are insufficient to prove . . . intent to monopolize in the absence of corroborating conduct"); Dahl, 448 F.2d at 19 (finding that "a manifestation of intent . . . in the absence of evidence of unfair, anti-competitive or predatory [*97] conduct, is not enough to establish a violation

Case 1:04-cv-11380-WGY    Document 77-4    Filed 03/01/2006    Page 14 of 15

Page 24

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

of § 2"). In this case, this Court finds ample corroborating allegations to help substantiate Defendant Reid's threats.

Finally, Plaintiffs allege sufficient facts to establish the real probability that Defendants possess the requisite power to achieve monopolization. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." Spectrum Sports, 506 U.S. at 456; accord AD/SAT v. Associated Press, 181 F.3d 216, 1999 WL 415326, at *8 (2d Cir. 1999)(stating that for an attempted monopolization claim, defendant's market share is the principal sign of a dangerous probability of success); Tops Markets, 142 F.3d at 100 ("Critical to deciding the dangerous probability prong of plaintiff's attempted monopolization claim is defendant's economic power in the relevant market."). This Court has already examined, at length, Plaintiff's allegations regarding Defendants' market presence and has determined that there are enough facts [*98] upon which to posit that the LCE merger enables Defendants to destroy competition. See supra part V.B.

Sony Pictures, as a distributor, is now intimately connected with two major movie chains to license the rights of its films, while Sony, as exhibitors, has established concrete relationships with top film distributors from whom they can obtain a ready supply of movies to exhibit. The awesome vertical integration that the merger created affords Defendants extensive power within the film industry to gain a major competitive advantage over rival distributors and exhibitors. Such market power, coupled with Defendants' alleged exclusionary conduct and intent to control the market, leads this Court to the conclusion that a dangerous probability of achieving monopolization also exists. See Paramount, 334 U.S. at 174 (stating that "a vertically integrated enterprise . . . will constitute monopoly which, though unexercised, violates the Sherman Act provided a power to exclude competition is coupled with a purpose or intent to do so."); Volvo, 857 F.2d at 74 (holding that when a court is faced with "both exclusionary conduct and the existence of monopoly [*99] power . . . a dangerous probability of success, may be inferred."). Accordingly, this Court finds that the amended complaint satisfactorily alleges that, by their words and actions, Defendants have demonstrated a specific intent to create a monopoly with a dangerous probability of success.

VI. State Claims

Having found that Plaintiff has set forth sufficient factual allegations in the amended complaint to support its federal law claims against Defendants, for purposes of judicial economy, convenience, and fairness, this Court chooses to exercise supplemental jurisdiction over Plaintiff's state claims. See City of Chicago v. International College of Surgeons, 522 U.S. 156, 173, 139 L. Ed. 2d 525, 118 S. Ct. 523 (1997)(citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988)).

A. Tortious Interference with Prospective Business Relations n46

n46 This tort has also been referred to as interference with economic advantage, prospective advantage, business relations, or pre-contractual relations. See Martin Ice Cream, Co. v. Chipwich, Inc., 554 F. Supp. 933, 945 (S.D.N.Y. 1983).

[*100]

Plaintiff alleges that Defendant unlawfully interfered with Plaintiff's prospective contractual relationships. See Amended Compl. at PP 101-104. Specifically, Plaintiff argues that

> defendants' actions in inducing film distributors not to provide quality films to plaintiff and in preventing plaintiff from pursuing the substantial business opportunity associated with plaintiff's concept of acquiring the rights to and reissuing the film Belle de Jour . . . have interfered with and continue[] to interfere with plaintiff's prospective business relations in the field of motion picture exhibition.

Id. at PP 102-03. To sustain its claim for tortious interference with prospective economic advantage, Plaintiff must satisfy an extremely high pleading standard. Plaintiff's allegations must include elements "more demanding than those for interference with [the] performance of an existing contract." Fine v. Doernberg & Co., Inc., 203 A.D.2d 419, 610 N.Y.S.2d 566, 567 (App. Div. 2d Dep't 1994)(citation omitted)(alteration in original). Under New York law, to succeed on the claim, Plaintiff must show "(1) business relations with a third party; (2) [*101] defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)(citation omitted); accord PPX Enters. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir. 1987). This Court finds

Case 1:04-cv-11380-WGY   Document 77-4   Filed 03/01/2006   Page 15 of 15

Page 25

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

that Plaintiff has set forth a satisfactory claim to warrant further discovery on this issue.

To establish a successful claim, Plaintiff "'must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.'" Minnesota Mining and Mfg. Co. v. Graham-Field, Inc., 1997 U.S. Dist. LEXIS 4457, No. 96 Civ. 3839, 1997 WL 166497, at *7 (S.D.N.Y. April 9, 1997)(quoting Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258 (S.D.N.Y. 1995)); see also Envirosource, Inc. v. Horsehead Resource Dev. Co., 1996 U.S. Dist. LEXIS 9099, No. 95 Civ. 5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996)(quoting McGill v. Parker, 179 A.D.2d 98, 582 N.Y.S.2d 91, 95 (App. Div. 1st Dep't 1992))("A 'general [*102] allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship' will not withstand a motion to dismiss."). Because of the nature of this tort, it is axiomatic that the selected business relationships need not have amounted to an actual contract. See Volvo, 857 F.2d at 74.

Despite the high burden of proof that Plaintiff will ultimately need to satisfy for the claim, at this point in the action, Rule 8(a) requires only that Plaintiff allege "a short and concise statement, detailed only to the extent necessary to enable defendant[s] to respond." Geisler, 616 F.2d at 640 (citing Fed. R. Civ. P. 8). The amended complaint "complies with this standard because it identifies the prospective business relationships as being with [owners of movie rights and distributors of films], such that it does not appear 'beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" SLM, Inc. v. Shelbud Prods. Corp., 1993 U.S. Dist. LEXIS 5171, No. 92 Civ. 3073, 193 WL 127969, at *5 (S.D.N.Y. April 20, 1993)(quoting Conley, 355 U.S. at 45-46) [*103]

In any event, Plaintiff has already identified in the amended complaint certain pre-contractual relationships with which Defendants interfered. For example, at PP 55-57 of the amended complaint, Plaintiff recites the steps it took to attempt to re-release Belle. See Amended Compl. Specifically, Solow enlisted Defendant Brueggemann, its agent, to investigate the possibility of leasing the film. See id. at P 55. After some inquiries, Defendant Brueggemann informed Solow that the owners of the rights to Belle were interested only in selling. See id. at P 56. Solow then instructed Brueggemann to pursue purchasing the movie. See id. Plaintiff asserts that instead, Brueggemann presented the idea of buying Belle to Miramax, which, thereafter, purchased and re-released the picture with great success. See id. at P 57.

Based on these facts, it is at least arguable that Plaintiff had entered into negotiations with the owners of the rights to Belle. "Interference with a plaintiff's business relations with a third party can be found if the plaintiff had a 'reasonable expectancy of a contract' with the third party, which can [*104] result from 'mere negotiations.'" Strapex Corp. v. Metaverpa N.V., 607 F. Supp. 1047, 1050 (S.D.N.Y. 1985)(quoting Morse v. Swank, Inc., 459 F. Supp. 660, 667 (S.D.N.Y. 1978)). Here, the owners of Belle were certainly inclined to sell the rights to the film, as evidenced by their sale to Miramax. At this point, therefore, it is reasonable to infer that but for Defendant Brueggemann's interference, Plaintiff would have been able to acquire the rights to Belle and would have been able to acquire the rights to Belle and would have realized the substantial profits that Miramax enjoyed in its place.

Additionally, at P 67 of the amended complaint, Plaintiff states that "Sony intentionally induced the distributor Warner Pictures . . . to decide not to continue to exhibit Anna Karenina at the Paris Theatre, as previously arranged, and instead to move it to the Sony Tower East theatre." Amended Compl. Considering that Anna had already been playing at the Paris, any interruption with the exhibition of Anna that Defendants caused would be interference with an existing business relationship. At this juncture in the litigation, it is tenable [*105] that but for Defendants' interference Plaintiff could have negotiated to continue to show Anna at the Paris and realize greater profits. n47

> n47 It is also possible that Plaintiff once again has mislabeled its claim against Defendants. Plaintiff contends that Defendants interfered with the exhibition of Anna at the Paris "as previously arranged," suggesting there was already an agreement between Plaintiff and Warner for the showing of Anna. If so, Defendants' purported interference would be not with a prospective contractual relationship but, rather, with an established contractual relation, implicating an entirely different tort. See Martin Ice Cream, 554 F. Supp. at 945. This Court directs Plaintiff to be more precise with regard to this matter in its future submissions.

Furthermore, Plaintiff has sufficiently alleged the element of the tort requiring that Defendants "acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means." Purgess, 33 F.3d at 141 [*106] (emphasis added). It is well settled that a defendant's "status as a competitor . . . may excuse him from the consequences of interference with prospective con-