Case 1:04-cv-11380-WGY   Document 77-5   Filed 03/01/2006   Page 1 of 12

Page 26
2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

tractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful." Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); see also PPX, 818 F.2d at 269 ("If defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct."); Imtrac Indus., Inc. v. Glassexport Co. Ltd., 1996 U.S. Dist. LEXIS 1022, *35-36, No. 90 Civ. 6058, 1996 WL 39294, at *11 (S.D.N.Y. Feb. 1, 1996)("In the context of tortious interference with prospective business relations, self-interest can operate to nullify the claim itself.").

Here, however, Defendants are not only Plaintiff's competitors in the movie exhibition business. More significantly, with regard to the prospective business relations at issue, Defendants were also [*107] Plaintiff's agent. Thus, Defendants owed Plaintiff a fiduciary duty and were, thereby, required to act in Plaintiff's best interests. It, therefore, would be a violation of fiduciary duty for Defendants to divert a lucrative business opportunity, such as the re-release of Belle, away from Plaintiff or to encourage a distributor not to continue the exhibition of its film at Plaintiff's theatre.

Additionally, Defendants' alleged competitor status would protect them only if "no unlawful restraint of trade [were] effected" by their conduct. Guard-Life, 50 N.Y.2d at 191; accord Martin Ice Cream, 554 F. Supp. at 946 (holding that actions that unreasonably restrain trade or attempts to monopolize trade "would constitute improper means"). Accordingly, "if [Plaintiff] is able to prove . . . antitrust violations . . . it will also be able to prove improper means." Martin Ice Cream, 554 F. Supp. at 946. In this case, Plaintiff has already offered a factual basis for antitrust claims against Defendants. This Court, therefore, finds that the facts adequately set forth allegations demonstrating that Defendants tortiously interfered with [*108] Plaintiff's pre-contractual relations while employing dishonest, unfair, and improper tactics. Plaintiff may use discovery to identify the specific relations at issue and gather further information to support its claim. n48

n48 This Court, however, cautions Plaintiff to be thorough in its research and to offer only specific contractual relations that realistically could be used to establish a claim for tortious interference. In its opposition memorandum to this Court, Plaintiff suggests that 'Defendants' failure to disclose to Plaintiff the availability of The Spitfire Grill, a Columbia film, for exhibition at the Paris could be a viable business relationship with which Defendants interfered. See Plaintiff's Mem. at 30 (citing Amended Compl. at P 62).

Arguing that this allegation supports a claim for tortious interference with a prospective economic advantage is extremely tenuous. If, as Plaintiff states, Defendants never informed Plaintiff of the opportunity to exhibit The Spitfire Grill, then Plaintiff is effectively asking this Court to find tortious interference with a future economic advantage of which Plaintiff was not even aware. See Minnesota Mining, 1997 WL 166497, at *7 (requiring a plaintiff to identify "some particular, existing business relationship") The law was not intended to protect a party from such a contorted interpretation of the tort.

[*109]

B Breach of Fiduciary Duty

Plaintiff asserts that Defendants breached their fiduciary duties as Plaintiff's agent with respect to the operation and management of Plaintiff's theatres. See Amended Compl. at PP 95-100. For these alleged breaches of fiduciary duty, Plaintiff seeks an unspecified amount of damages and punitive damages of at least $ 100 million. See id. at P 99. Defendants respond that an exculpatory clause in the Twin Agreement expressly states that Plaintiff is prevented from bringing an action for damages based on breaches of fiduciary duty. The Twin Agreement discusses Sony's fiduciary obligation to Plaintiff and provides that Plaintiff's "sole remedy for any violation of [Sony's] obligations under this Section shall be to terminate this Agreement and [Plaintiff] shall not assert any claim for damages for any such violation." Twin Agreement at § 5.09.

While courts generally recognize exculpatory clauses, Defendants blatantly disregard well-settled case law holding that contractual terms exempting a party from liability for harm caused intentionally or willfully is wholly unenforceable. The New York Court of Appeals stated:

> An exculpatory agreement, [*110] no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts. More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the mis-

Case 1:04-cv-11380-WGY   Document 77-5   Filed 03/01/2006   Page 2 of 12

Page 27

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

conduct for which it would grant immunity smacks of intentional wrongdoing.

Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384-85, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983)(citations omitted); see also McNally Wellman Co. v. New York State Elec. & Gas, 63 F.3d 1188, 1198 (2d Cir. 1995); Petrocelli Elec. Co., Inc. v. Crow Constr. Co., 1999 U.S. Dist. LEXIS 15547, No. 93 Civ. 8387, 1999 WL 791683, at *6 (S.D.N.Y. October 5, 1999); Federal Ins. Co. v. Honeywell, Inc., 641 F. Supp. 1560, 1562 (S.D.N.Y. 1986); Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 192 A.D.2d 83, 600 N.Y.S.2d 212, 215 (App. Div. 1st Dep't 1993); Great N. Assocs., Inc. v. Continental Casualty Co., 192 A.D.2d 976, 596 N.Y.S.2d 938, 940 (App. Div. 3d Dep't 1993). This public policy is so central [*111] to adjudicating contractual relationships that even if the parties to an exculpatory clause contemplated that the violating conduct would be incorporated within the purview of the exempting language, the clause would still be unenforceable. See Kalisch-Jarcho, 58 N.Y.2d at 385; Great N. Assocs., 596 N.Y.S.2d at 940. Here, Plaintiff argues that Defendants "intentionally, willfully, and maliciously" acted to destroy Plaintiff's ability to compete in the movie industry and maintains that it will be able to prove n49 such grossly negligent conduct through discovery. If Plaintiff can indeed support such claims, this Court will not permit Defendants to evade monetary liability for their purported breaches of fiduciary duty by relying on the unenforceable exculpatory clause contained in § 5.09 of the Twin Agreement.

> n49 "I just wanna prove somethin'--I ain't no bum from the neighborhood. It don't matter if I lose . . . don't matter if he opens my head . . . . The only thing I wanna do is go the distance. That's all." Rocky (United Artists 1976).

[*112]

VII. Allegations against the Sony Corporate Entities and the Individual Defendants

In addition to alleging claims against Sony, Plaintiff brings its claims against the Sony Corporate Entities and the Individual Defendants. Defendants argue that Plaintiff has not identified sufficient allegations to sustain any of its claims against either the Sony Corporate Entities or the Individual Defendants. This Court, however, finds that Defendants' objections ultimately go to Plaintiff's future burden of proving its claims rather than to its present burden of pleading. Accordingly, this Court refuses to dismiss any of the claims against these defendants.

A. Sony Corporate Entities

Plaintiff alleges that the Sony Corporate Entities own, dominate, and control Sony and "condoned, and benefitted from the violations alleged [in the amended complaint]." Id. at P 21. With respect to the asserted violations, Plaintiff contends that "all of the defendant corporations effectively operated as a single . . . entity." Id. Specifically, Plaintiff states that at the opening of the Lincoln Square theatre, the President and CEO of Defendant Sony Electronics gave a speech in which he commended [*113] the former Chairman and CEO of Defendant Sony Pictures for having "the vision n50 to create the concept" for the Lincoln Square theatres. Id. Additionally, Plaintiff claims that it wrote to all of the Sony Defendants regarding their conduct toward Plaintiff's theatres and maintains that the Sony Defendants collectively refused to rectify the situation. See id. In that regard, Plaintiff asserts:

> Officers of Sony Theatres consulted with officers of Sony Pictures concerning defendants' conduct in relation to plaintiff, as reflected by the practice of Sony Theatres officers in providing officers of Sony Pictures with copies of correspondence addressing the matters alleged [in the amended complaint]. Officers of Sony [Electronics] and Sony Corporation received and responded to correspondence concerning these disputes, ratifying the violations by the other defendants. For example, after receiving a September 11, 1996 letter from Solow writing on behalf of plaintiff concerning the situation, Nobuyuki Idei, President of Sony Corporation, instructed Ted Kawai, Deputy President of Sony [Electronics], to investigate and respond to plaintiff's concerns. Officers of Sony [Electronics], [*114] Sony Pictures and Sony Theatres thereafter coordinated their responses . . . . At each stage of this process, Mr. Kawai of Sony [Electronics] reported to Mr. Idei of Sony Corporation and consulted closely with officers of Sony Pictures and Sony Theatres.

Id. at P 22.

> n50 "Don't you eyeball me boy! Use your peripheral vision." Officer and a Gentleman (Paramount 1982).

Case 1:04-cv-11380-WGY   Document 77-5   Filed 03/01/2006   Page 3 of 12

Page 28

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

Defendants would like this Court to find that the Sony Corporate Entities had no role in exhibiting movies at Plaintiff's theatres and, therefore, Plaintiff cannot support any of its claims against them. Defendants argue that the Sony Corporate Entities' contacts with Defendant Sony involved nothing more than general consultation between parent corporations and their subsidiary, acceptable conduct that does not implicate the antitrust laws. See Reisner v. General Motors Corp., 511 F. Supp. 1167, 1173 (S.D.N.Y. 1981)("A parent corporation and its subsidiary must be able to consult on some matters of company policy without [*115] violating the antitrust laws absent a demonstration of anticompetitive motivation.")(citation omitted), aff'd, 671 F.2d 91 (2d Cir. 1982). This Court, however, forcefully rejects Defendants' suggestion that the facts Plaintiff alleged against the Sony Corporate Entities demonstrate only nominal consultation.

The purported control that Plaintiff attributes to the Sony Corporate Entities helps validate Plaintiff's contention that the Sony Corporate Entities dominated and controlled Sony's actions with respect to Sony's operation of Plaintiff's theatres. From Plaintiff's allegations, it is reasonable for this Court to find that Sony's allegedly improper actions toward Plaintiff were taken pursuant to directions it received from its parent organizations, the Sony Corporate Entities. n51 First, Plaintiff asserts that the President of Sony Corporation, Sony's ultimate parent company, instructed the Deputy President of Sony Electronics, the immediate parent company of Sony Pictures, "to investigate and respond to plaintiff's concerns," and that the Deputy President of Sony Electronics, thereafter, "consulted closely with officers of Sony Pictures and Sony Theatres" and continuously [*116] reported back to the President of Sony Corporation. Amended Compl. at P 22. The allegations suggest a top-down coordinated effort on behalf on the entire Sony corporation against Plaintiff. Such an effort, if proven, would constitute extensive involvement, going beyond simple consultation and into the realm of "anti-competitive motivation." See Reisner, 511 F. Supp. at 1173; see also Baratta v. Kozlowski, 94 A.D.2d 454, 464 N.Y.S.2d 803, 805 (App. Div. 2d Dep't 1983)(dismissing claims against parent company because "complaint failed to allege that it exercised complete domination and control over the subsidiary"). Second, if the Sony Corporate Entities are truly as uninvolved with film exhibition as Defendants would want this Court to find, it is curious that at the opening of the Lincoln Square theatres, which presumably Defendant Sony operates as exhibitors, the President and CEO of Sony Electronics praised the former Chairman and CEO of Sony Pictures for his insight to develop the complex. See Amended Comp. at P 21. n52 Third, this Court has already noted that the Sony Corporate Entities are proper defendants with regard to Plaintiff's § 1 [*117] block-booking claim. See supra part V.A.1. Thus, this Court considers the factual allegations more than sufficient to allow Plaintiff to go forward with its claims against the Sony Corporate Entities.

> n51 Indeed, the Supreme Court has recognized the "unity of purpose or a common design" that exists between parents and subsidiaries of the same company, finding that parent and subsidiary companies are not legally capable of conspiring with one another under § 1. Copperweld Corp v. Independence Tube Corp., 467 U.S. 752, 753, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984). The Court stated:
>
>> The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise .... A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate objectives are guided or determined not by two separate corporate consciousnesses, but one With or without a formal "agreement," the subsidiary acts for the parent's benefit. If the parent and the subsidiary "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests ....
>
> Id. [*118]

> n52 It is also interesting that a senior officer of Sony Pictures provided the initial motivation behind the construction of the Lincoln Square complex. In the context of this case, such influence on behalf of Sony Pictures, a distributor, can be understood as a desire for Sony Pictures to have a large, ready outlet for its films.

B. Individual Defendants

Plaintiff asserts that the Individual Defendants have 'with malice toward plaintiff, personally engaged and

Case 1:04-cv-11380-WGY Document 77-5 Filed 03/01/2006 Page 4 of 12

Page 29

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

participated in the antitrust, contract, tort and fiduciary violations described [in the amended complaint] and have controlled, directed, authorized and ratified the violations committed by Sony." Amended Compl. at P 19. Pursuant to this alleged involvement, Plaintiff argues that this Court should hold the Individual Defendants personally liable for Plaintiff's injuries. See id. Defendants, however, maintain that the amended complaint fails to include adequate facts to sustain either the federal or state claims against them. See Defendants' Mem. at 28-30; Reply Mem. at 15-22.

This Court finds that Plaintiff has satisfactorily [*119] plead antitrust allegations against the Individual Defendants. A corporate officer or director can be held personally liable for damages arising from an antitrust violation where he or she participated in the unlawful acts, or where he or she acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws. Hoffman Motors Corp. v. Alfa Romeo, 244 F. Supp. 70, 82 (S.D.N.Y. 1965); Cott Beverage Corp. v. Canada Dry Ginger Ale, Inc., 146 F. Supp. 300, 301-02 (S.D.N.Y. 1956). Accordingly, the extent to which the Individual Defendants were involved with the alleged antitrust violations is an important fact for this Court to consider. See Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc., 994 F. Supp. 133, 142 (E.D.N.Y. 1998); New York v. Cedar Park Concrete Corp., 665 F. Supp. 238, 247 (S.D.N.Y. 1987). Here, Plaintiff argues that this Court should hold the Individual Defendants, all of whom are major employees, personally liable for the purported antitrust violations because of the influence they exerted in effectuating Sony's corporate policy. [*120] This Court finds that such an allegation meets the pleading requirement of Rule 8(a).

With regard to the state claims, this Court dismisses Plaintiff's contract claim against the Individual Defendants. Under New York law, "a corporate officer cannot be held liable for a corporation's breach of contract claims." Komatsu Invs., Ltd. v. Greater China Corp., 1997 U.S. Dist. LEXIS 310, No. 96 Civ. 3833, 1997 WL 16667, at *2 (S.D.N.Y. Jan. 17, 1997); accord Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc., 1999 U.S. Dist. LEXIS 1518, No. 98 Civ. 4132, 1999 WL 76803, at *6 (S.D.N.Y. Feb. 17, 1999); Cruz v. Nynex Info. Resources, 263 A.D.2d 285, 2000 N.Y. App. Div. LEXIS 1294, 2000 WL 150864, 703 N.Y.S.2d 103, at *6 (N.Y. App. Div. 1st Dep't 2000). Even if a corporate individual's actions caused a breach of a corporation's contractual obligations, such conduct does not render the individual personally liable. See Cruz, 2000 WL 150864 at *6.

Indeed, Plaintiff effectively concedes this point. In its opposition memorandum to this Court, Plaintiff attempts to clarify its position, explaining that it "seeks to hold the individual defendants liable in tort for their direct participation in the antitrust violations, the breach [*121] of fiduciary duties owed to Plaintiff, and the tortious interference with Plaintiff's business relationships . . . recognizing the distinction between officers' liability on their corporation's contracts, and their liability for their own torts, even those committed in the course of their employment." Plaintiff's Mem. at 37 (citing Komatsu, 1997 WL 16667, at *2).

Plaintiff, thereby, has indicated its intention to assert against the Individual Defendants only those state claims that lie in tort. Because a court may ordinarily hold an individual corporate officer personally liable for participation in the commission of a tort, even one arising out of his or her duties for the corporation, see Lopresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997); Komatsu, 1997 WL 16667, at *2; National Survival Game, Inc. v. Skirmish, U.S.A., Inc., 603 F. Supp. 339, 341 (S.D.N.Y. 1985); Key Bank of N.Y. v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403, 404 (App. Div. 3d Dep't 1996), this Court permits Plaintiff to go forward against the Individual Defendants with the claims for breach of fiduciary duty n53 and tortious [*122] interference with prospective business relations. Alleging that the Individual Defendants have personally participated in and exercised dominion and control over the tort and fiduciary violations described in the amended complaint is a short, plain statement of the claims that satisfies Rule 8(a).

---

n53 Defendants argue that the amended complaint never identifies facts from which this Court can conclude that a fiduciary relationship had been established between Plaintiff and the Individual Defendants. See Defendants' Mem. at 29; Reply Mem. at 20. Such a contention is meritless. Besides § 5.09 of the Twin Agreement, which establishes, in writing, a fiduciary relationship between Sony's executives and Plaintiff, the Individual Defendants owed fiduciary duties to Plaintiff by the very fact that they served as Plaintiff's agents in the operation of its theatres.

---

Thus, Plaintiff's assertions against the Individual Defendants provide grounds for Plaintiff to proceed with discovery to identify particular instances [*123] where the Individual Defendants actively participated in the antitrust and tort violations. n54 Indeed, Plaintiff has already specified certain actions by the Individual Defendants that raise the specter of antitrust and tort violations against Plaintiff. See, e.g., Amended Compl. at PP 55-57, 59, 66, 79-81, 83-84.

Page 30

2000 U.S. Dist. LEXIS 2604, *; 2000-1 Trade Cas. (CCH) P72,823

n54 To bolster their contention that this Court should dismiss the antitrust claims against the Individual Defendants, Defendants cite Brown v. Donco Enters., Inc., 783 F.2d 644 (6th Cir. 1986), a Sixth Circuit case that states:

> Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions.

Id. at 646. First, the Sixth Circuit case is not binding here. See Newsweek, 663 F.2d at 1196. Second, even the Sixth Circuit acknowledged the paucity of support for the above proposition, stating "at the outset, the court recognizes that the conduct proscribed by the antitrust laws is often difficult to distinguish 'from the gray zone of socially acceptable and economically justifiable business conduct,'" and citing only "one court," from the Northern District of California, in a 1979 decision. Id. In addition to the lack of precedential value that the Sixth Circuit case has for this Court, this Court finds that, in any event, Plaintiff has complied with the Sixth Circuit standard for purposes of withstanding a motion to dismiss.

[*124]

Conclusion

Granting a motion to dismiss is a blunt weapon and a drastic remedy that a court should employ only after careful consideration of all the salient issues leads to the conclusion that no interpretation of facts could support a plaintiff's claims. Sustaining a motion to dismiss is particularly difficult for a defendant in a case involving antitrust claims, where a court's wariness of dismissal is heightened. This Court has pored over the allegations in the amended complaint and the parties' submissions in view of the relevant case law. This Court finds that Plaintiff has sufficiently alleged in its amended complaint its federal and state claims against all of the Defendants with the exception of Plaintiff's contract claim against the Individual Defendants. Therefore, this Court refuses to dismiss the amended complaint at this juncture in the litigation. The parties should proceed with discovery on the remaining issues. n55 Accordingly,

n55 "May the force be with you." Star Wars (20th Century Fox 1977).

[*125]

IT IS HEREBY ORDERED THAT Defendants' Motion to Dismiss is GRANTED with regard to Plaintiff's breach of contract claim against the Individual Defendants. n56

n56 In the amended complaint, Plaintiff alleges breaches of the Twin Agreement, the Paris Agreement, and the Festival Agreement. See Amended Compl. at PP 86-94. This Court directs Plaintiff in its future submissions related to its contract claims against Defendants to detail the arrangements governing the Paris and Festival contracts, as the amended complaint fails to delineate the specifics of either.

IT IS FURTHER ORDERED THAT Defendants' Motion to Dismiss is DENIED in all other respects.

The End.

MM

SO ORDERED.

Dated: March 8, 2000

New York, New York

David N. Edelstein

U.S.D.J.

LEXSEE 2004 U.S. DIST. LEXIS 28547

KATHLEEN GUERRA, Individually and on behalf of all others similarly situated, Plaintiffs, v. TERADYNE INC., et al., Defendants.

CIVIL ACTION NO. 01-11789-NG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2004 U.S. Dist. LEXIS 28547

January 16, 2004, Decided
January 16, 2004, Filed

**SUBSEQUENT HISTORY:** Magistrate's recommendation at Guerra v. Teradyne Inc., 2004 U.S. Dist. LEXIS 28548 (D. Mass., Jan. 16, 2004)

**COUNSEL:** [*1] For Daniel Kucero, individually and on behalf of all others similarly situated, Consolidated Plaintiff: Nancy F. Gans, Milberg Weiss Bershad & Schulman LLP, Boston, MA.

For Stanley J. Dabrowski, Consolidated Plaintiff: Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA.

For Kathleen Guerra, individually and on behalf of all others similarly situated, Plumbers and Pipefitters National Pension Fund Group, Plaintiffs: Nancy F. Gans, Milberg Weiss Bershad & Schulman LLP, Boston, MA

For Teradyne Inc., George Chamillard, Michael A. Bradley, Defendants: Jordan D. Hershman, Bingham McCutchen LLP, Boston, MA.

**JUDGES:** Judith Gail Dein, United States Magistrate Judge

**OPINIONBY:** Judith Gail Dein

**OPINION:**

MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS' MOTION TO STRIKE CERTAIN EXHIBITS INCLUDED IN DEFENDANTS' APPENDIX

DEIN, U.S.M.J.

This is a class action securities fraud suit. Plaintiffs are all purchasers of the common stock of Teradyne, Inc. ("Teradyne") between July 14, 2000 and October 17, 2000 (the "Class Period"). The defendants, Teradyne and two of its officers (collectively "Teradyne"), have moved to dismiss the Consolidated Amended Class Action Complaint (Docket [*2] # 28) ("Complaint"). The motion to dismiss (Docket # 32) is pending. In connection with the motion to dismiss, Teradyne has filed an Appendix (Docket # 34) and Supplemental Appendix (Docket # 52) containing written material which it contends is appropriately considered in connection with the motion to dismiss.

The plaintiffs have filed a Motion to Strike Certain Exhibits Included in Defendants' Appendix (Docket # 41). For the reasons detailed herein, the motion to strike is ALLOWED IN PART and DENIED IN PART.

**STANDARD OF REVIEW**

In considering a motion to dismiss, the court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 988 (1st Cir. 1992). Generally, in ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]" Fed. R. Civ. P. 12(b). There are, however, limited exceptions to this rule. Thus, in connection with a motion [*3] to dismiss, "the Court may consider documents pertinent to the action and/or referenced in the complaint." In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176, 182-83 (D. Mass. 2001), and cases cited. In addition, in accordance with Fed. R. Evid. 201(b)(2), a court may take judicial note of a fact "not subject to reasonable dispute" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Accord In re Stone & Webster, Inc., Sec. Litig., 253 F.

Case 1:04-cv-11380-WGY    Document 77-5    Filed 03/01/2006    Page 7 of 12

Page 2
2004 U.S. Dist. LEXIS 28547, *

Supp. 2d 102, 128 nn.10 & 11 (D. Mass. 2003) (in accordance with Fed. R. Evid. 201, court may consider not only documents referenced in the complaint, but also documents required to be filed, and actually filed, with the SEC), and cases cited. Applying these principles to the instant case compels the conclusion that the motion to strike be allowed in part and denied in part.

## SPECIFIC REQUESTS n1

n1 The requests will be addressed in the order presented by the plaintiffs.

[*4]

**Exhibits 12 and 13: Forms 4 and 5 Filed with the SEC** n2

n2 All references to Exhibits in this decision will be to the "Appendix" (Docket # 34) unless otherwise noted.

These documents were submitted by the defendants to show the individual defendants' holdings and transactions in Teradyne's stock during the Class Period. It is defendants' contention that the (undisputed) fact that the value of their stock holdings declined $ 30 million during the Class Period refutes any inference of scienter. Plaintiffs, on the other hand, argue that they do not rely on any trading on the part of the individual defendants to establish scienter, and that these documents are irrelevant.

It is clear that the court may take judicial notice of these SEC filings. See In re Stone & Webster, Inc., Sec. Litig., 253 F. Supp. 2d at 128 n.11. It is true, as plaintiffs argue, that improper trading is not controlling on the issue of scienter. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002). [*5] Nevertheless, substantial losses on the part of the individual defendants may be relevant to the issue, and may "undermine" any inference of scienter. Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998). Therefore, the motion to strike these SEC filings is denied.

**Exhibits 9 and 10: Form S-4 Filed with the SEC and Notice of Annual Shareholder Meeting**

Exhibit 9 is an Amended Form S-4 filed with the SEC on September 25, 2001. Defendants have submitted this form to identify the date on which Teradyne first announced the filing of the so-called "Herring case" referenced in the Complaint. See Mem of Law in Opp to Pls' Mot. to Strike (Docket # 50) (hereinafter "Opp.") at 9. Plaintiffs, on the other hand, argue that the document is neither referenced in the Complaint nor relevant. See Pls' Mem. of Law in Supp. of Mot. to Strike (Docket # 42) (hereinafter "Mem.") at 6. This is the type of document for which the court may appropriately take judicial notice, and, therefore, the motion to strike is denied. The significance, if any, of the fact established by Exhibit 9 will be addressed in the separately issued Report and Recommendation on Defendants' [*6] Motion to Dismiss.

As for Exhibit 10, the notice of shareholders meeting, it was submitted to show the individual defendants' stockholdings and that they had not sold any stock during the Class Period. Opp. at 6. For the reasons detailed above, the fact that the individual defendants suffered a loss during the Class Period, while not controlling, is a relevant fact in connection with the issue of scienter, and the motion to strike, therefore, is denied.

**Exhibit 20: Boston Globe Article**

The plaintiffs' have moved to strike Exhibit 20, a Boston Globe article dated May 22, 2001, which was submitted by the defendants solely as background material about the company. Opp. at 9-10. Since this document is neither "pertinent to the action and/or referenced in the complaint," In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d at 182, and does not have the indicia of reliability required by Fed. R. Evid. 201, the motion to strike is allowed.

**Exhibit 21: Summary of Cautionary Disclosures**

Exhibit 21 contains excerpts from annual and quarterly reports filed with the SEC. The complete reports have been included [*7] as Exhibits 4-6, to which plaintiffs have not raised any objection. Plaintiffs claim that they have been unable to test the validity and integrity of the quoted materials. Mem. at 7. However, the summary clearly identifies the report, and page, from which each quote is taken. Since the summary will aid the court in reviewing the unobjectionable filings with the SEC, the motion to strike is denied. Plaintiffs also challenge this Exhibit to the extent it encompasses information outside the Class Period. Id. at 7. The significance, if any, of the facts contained in the reports which are outside the Class Period will be determined in connection with the ruling on the Motion to Dismiss.

**Exhibit 23: Philly Semiconductor Index**

Exhibit 23, which is unlabelled, is apparently the Philly Semiconductor Index. Defendants have submitted the index to show the general state of the semiconductor industry at the relevant times. See Opp. at 11-12. This court recognizes that in certain circumstances it may be appropriate for a court to take judicial notice of a stock index. Nevertheless, in the instant case, the state of the industry in general is not relevant to whether the Com-

Case 1:04-cv-11380-WGY    Document 77-5    Filed 03/01/2006    Page 8 of 12

Page 3
2004 U.S. Dist. LEXIS 28547, *

plaint [*8] states a cause of action. Thus, if the Complaint states a claim of fraud, Teradyne might seek to defend itself by arguing that its stock decline was consistent with the industry, making the stock index relevant. At the present stage of this case, however, such a fact-based defense is not relevant. The stock index relates to information beyond the Complaint and is not referenced in the Complaint. The motion to strike, therefore, is allowed.

### Exhibits 39-48: Documents Relating to the Herring Litigation

Exhibits 39-48 are described as documents "relevant to the Herring litigation," which litigation is referenced in the Complaint. See Opp at 12. The actual complaints filed in the Herring litigation have been submitted as Exhibits 49 and 50, to which plaintiffs do not object. With the exception of Exhibits 45 and 46, which are the agreements by which Teradyne purchased the companies at issue, the motion to strike is allowed. The remaining documents have been submitted by the defendants to buttress their argument as to the true motivation of the Herring plaintiffs in bringing suit. That issue exceeds the appropriate scope of inquiry at the motion to dismiss stage. The acquisition [*9] of the companies by Teradyne, and the terms of those acquisitions, on the other hand, are repeatedly referenced in the Complaint. Therefore, the motion to strike will be denied as to Exhibits 45 and 46, and allowed as to Exhibits 39-44 and 47-48.

### CONCLUSION

In sum, plaintiffs' Motion to Strike is ALLOWED as to Exhibits 20, 23, 39-44 and 47-48. It is DENIED as to Exhibits 9-10, 12-13, 21 and 45-46. n3

> n3 Although the plaintiffs challenge the authenticity of the documents at issue in the present motion, this contention fails because the plaintiffs have failed to explain why these documents are any less authentic than the other Exhibits to which they raise no objection. See Mem. at 9-10

Judith Gail Dein

United States Magistrate Judge

LEXSEE 2005 U.S. DIST. LEXIS 6166

IN RE CYTYC CORP. SECURITIES LITIGATION

CIVIL ACTION NO. 02-12399-NMG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2005 U.S. Dist. LEXIS 6166; Fed. Sec. L. Rep. (CCH) P93,225

March 1, 2005, Decided

**COUNSEL:** [*1] For Robert Haddon, Jacob Blaz, Plaintiffs: Daniel Altman, Rachel S. Fleishman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Nancy F. Gans, Moulton & Gans, PC, Boston, MA.

For Deka Investment Gmb, Plaintiff: Andrew L. Barroway, Darren Check, Stuart L. Berman, Schiffrin & Barroway, LLP, Radnor, PA; David Pastor, Gilman and Pastor, LLP, Saugus, MA; Nancy F. Gans, Moulton & Gans, PC, Boston, MA; Steven G. Schulman, U. Seth Ottensoser, Milberg Weiss Bershad & Schulman LLP, New York, NY.

For Plumbers and Pipefitters National Pension Fund, Plaintiff: Andrew L. Barroway, Darren Check, Stuart L. Berman, Schiffrin & Craig, Ltd, Bala Cynwyd, PA; David Pastor, Gilman and Pastor, LLP, Saugus, MA; Nancy F. Gans, Moulton & Gans, PC, Boston, MA; Steven G. Schulman, U. Seth Ottensoser, Milberg Weiss Bershad & Schulman LLP, New York, NY.

For Congregation Zichron Samuel Ohel Moshe, Stanley Sved, Michael Pickar, Terry Kay Reitz, Plaintiffs: Daniel Altman, Rachel S. Fleishman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Theodore M. Hess-Mahan, Shapiro Haber & Urmy LLP, Boston, MA.

For Lead Plaintiffs, Plaintiff: Nancy F. Gans, Moulton & Gans, PC, Boston, MA.

For Cytyc [*2] Corp., Patric J. Sullivan, Robert B. Bowen, Defendants: Andrea J. Robinson, Christopher R. Noyes, Jeffrey B. Rudman, Peter J. Kolovos, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA;

For Jean-Luc Centeleghe, Movant: Nancy F. Gans, Moulton & Gans, PC, Boston, MA

**JUDGES:** MARIANNE B. BOWLER, United States Magistrate Judge

**OPINIONBY:** MARIANNE B. BOWLER

**OPINION:**

**REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION TO DISMISS THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (DOCKET ENTRY # 30)**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss (Docket Entry # 30) filed in this consolidated class action by defendants Cytyc Corporation ("Cytyc"), Patrick Sullivan ("Sullivan"), Cytyc's President and Chief Executive Officer throughout the class period, n1 and Robert Bowen ("Bowen"), Cytyc's Chief Financial Officer and Vice President throughout the class period. After conducting a hearing, this court took the motion (Docket Entry # 30) under advisement.

---

n1 Sullivan also took on the role of Chairman of the Board of Directors on November 20, 2001, a role he maintained throughout the remainder of the class period.

---

[*3]

PROCEDURAL BACKGROUND

The gravamen of the corrected amended complaint (henceforth: "the complaint") (Docket Entry # 27) filed by lead plaintiffs Plumbers and Pipefitters National Pension Fund and Deka Investment GMBH ("plaintiffs") is that Sullivan and Bowen ("the individual defendants") and Cytyc, a company that produces and manufactures medical devices that screen for cervical and breast can-

Case 1:04-cv-11380-WGY   Document 77-5   Filed 03/01/2006   Page 10 of 12

Page 2
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

cers, engaged in channel stuffing throughout the class period (July 25, 2001 to June 25, 2002). Channel stuffing is the practice of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999) It has "the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." Greebel v. FTP Software, Inc., 194 F.3d at 202.

The channel stuffing, which purportedly occurred at the end of each quarter, concerned Cytyc's principal product, the ThinPrep system ("ThinPrep"). ThinPrep competes with the more traditional Pap smear test as a means of screening women for cervical [*4] cancer.

Plaintiffs submit that the individual defendants and Cytyc (collectively: "defendants") failed to disclose or only partially disclosed the channel stuffing during the class period. Statements made by Sullivan, various third parties or contained in the company's SEC filings were false or materially misleading regarding the deep discounts that Cytyc offered customers near the end of every quarter. As a result, reported revenues, earnings and market share were artificially inflated. Defendants thereby mislead investors about earnings and the reasons for the company's growth and increased sales. In addition, defendants violated the company's internal revenue recognition policy, SEC regulations and generally acceptable accounting principles ("GAAP") by shipping unordered product to customers and engaging in channel stuffing.

The two count, 62 page complaint, which includes 187 paragraphs, alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants move to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. [*5] ("Rule 12(b)(6)"), for failing to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Defendants additionally seek dismissal on the basis that the statements are inactionable corporate puffery, neither false or misleading, not material and lack the necessary strong inference of scienter. Defendants also rely on the safe harbor provision of the PSLRA pertaining to forward looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i); 17 C.F.R § 240.3b-6

STANDARD OF REVIEW

In reviewing the motion to dismiss, this court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs See Alternative Energy v. St. Paul Fire & Marine, 267 F.3d 30, 33 (1st Cir. 2001) (on motion to dismiss, court accepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs"). Without crediting unsubstantiated conclusions, Rodi v. Southern New England School of Law, 389 F.3d 5, 10 (1st Cir. 2004) [*6] (ignoring " bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [and] outright vituperation'"), dismissal is appropriate "only if it appears to a certainty that the plaintiff would be unable to recover under any set of facts.'" State Street Bank and Trust Company v. Denman Tire Corporation, 240 F.3d 83, 87 (1st Cir. 2001); accord Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001) (dismissal proper "only if, under the facts alleged," plaintiffs "cannot recover on any viable theory;" internal quotation marks omitted).

The pleading standards under the PSLRA do not alter this standard of review. Aldridge v. A.T. Cross Corporation, 284 F.3d 72, 78 (1st Cir. 2002). Facts, drawn primarily from the complaint as well as certain public and integral documents referred to in the complaint, n2 are as follows.

> n2 In re Stone & Webster, 253 F.Supp.2d 102, 128 & n. 11 (D.Mass. 2003) (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In re Millstone Scientific Securities Litigation, 103 F.Supp.2d 425, 450-451 & n. 15 (D.N.J. 2000); see Alternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33-34 (1st Cir. 2001); Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6)); Shaw v Digital Equipment Corporation, 82 F.3d 1194, 1206 n. 13 & 1220 (1st Cir. 1996) (inasmuch as complaint alleged nondisclosure in registration statement and prospectus, court may examine text of filings and any incorporated SEC filings); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); In re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d 206, 213 n. 7 (D.Mass. 2001) (considering "full text of the Form 10-Q," including "parts not relied on by the plaintiffs," on a motion to dismiss inasmuch as complaint refers to the document); see also Clorox Company Puerto Rico v. Proctor & Gamble, 228 F.3d 24, 32 (1st Cir. 2000) (" when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations").

[*7]
BACKGROUND

Case 1:04-cv-11380-WGY   Document 77-5   Filed 03/01/2006   Page 11 of 12

Page 3
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Cytyc develops, manufactures and markets the sample preparation system known as ThinPrep. ThinPrep is an automated system for preparing cervical cell specimens on microscope slides. In May 1996, Cytyc received premarket approval from the Food and Drug Administration ("FDA") to market ThinPrep as a screening system for cervical cancer. The product directly competes with the conventional Pap smear test. In November 1996, the FDA allowed Cytyc to label and market ThinPrep as "significantly more effective in detecting cervical cancer than the Pap smear." (P 34). n3

> n3 Unless otherwise noted, citations to paragraphs only refer to paragraphs in the complaint, Docket Entry Number 27.

The company, which has a plant in Boxborough, Massachusetts, began selling ThinPrep nationwide in 1997. It is the company's chief or principal product. In September 1997, the FDA gave Cytyc premarket approval to use specimen collected in ThinPrep solution to test for the presence of the human papillomavirus. The company [*8] markets ThinPrep to healthcare providers, insurance companies and clinical laboratories. In 1998, it began marketing ThinPrep selectively overseas in international markets.

Net sales for the year ending in December 2000 reached $ 142,337,000 before the start of the class period. Cytyc's reported share of the cervical testing market prior to the class period ranged from 50% to 60%.

A. Customer Complaints, Discounts and Unordered Products

According to an unnamed, former medical and sales representative ("Cytyc sales representative"), "Beginning in at least 1999, . . . Cytyc typically engaged in channel stuffing at the end of each quarter.'" (P 38). This sales representative dealt directly with physicians concerning ThinPrep and describes, in general terms, that "Cytyc overloaded laboratories with inventory" in order to drive up profitability and sales. (P 38). With slightly greater specificity, he or she identifies Onco, located in Gaithersburg, Maryland as "a frequent victim of Cytyc's channel stuffing." n4 (P 47). Also according to this sales representative, certain unidentified "Cytyc account executives" told him or her that "Cytyc occasionally sent merchandise to laboratories, [*9] despite requests from those customers to refrain from shipping any more product." (P 49).

> n4 The representative does not provide any additional detail such as the amount of product stuffed and the dates of the shipments.

An unnamed former managed care executive ("Cytyc managed care executive") who dealt directly with laboratories and physicians states that, Cytyc offered special discounts to customers "towards the end of each quarter." (P 50). He or she does not identify the customer, the amount of the discount or the relationship of the amount shipped to Cytyc's revenues. Instead, the managed care executive posits that if a customer, again unidentified, "needed only one thousand tests a month, the customer still knew that if it took three thousand tests in the last month of a quarter, Cytyc would offer a much bigger discount." (P 50)

Another unnamed, former regional sales manager who became a senior representative ("Cytyc senior representative") and dealt directly with customers in six western states describes [*10] that, "from at least July 1999, Cytyc shipped additional product to its customers, above what had been ordered" until the customer complained that it had too much inventory. n5 (P 44). Labcorp was one of the Cytyc customers that complained to the Cytyc senior representative about the company's sales practices. n6 (P 49).

> n5 The complaint does not identify when these shipments occurred, the amount and the amount's relation to Cytyc's overall business. There is no indication that the shipments were returned.
>
> n6 The complaint does not attribute this assertion to a particular individual. The source of the statement is thus unknown. There is also no indication when the complaint[s] occurred or the amount of the shipment[s] involved.

A former Cytyc account executive who covered the northwest region ("Cytyc NW account executive") and had direct customer contact relates that customers complained about storing the excess product on "pallets in their hallways." n7 (P 43). Likewise, an unnamed, former Cytyc electrotechnical [*11] technician ("Cytyc technician") relates, again at an undetermined time and in an undetermined amount, seeing "stockpiles of inventory lying unused" when he visited customers in the New England region to fix technical problems. (P 51).

Case 1:04-cv-11380-WGY    Document 77-5    Filed 03/01/2006    Page 12 of 12

Page 4
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n7 Again, no detail is provided regarding the identity of the customers and when and how much pallet storing occurred

Another former, unnamed Cytyc account executive for California ("Cytyc CA account executive") notes that in December 2000, Cytyc shipped the Palo Alto Medical Foundation ("Palo Alto Medical") "a year's worth of product without having received an order to do so." n8 (P 45). There is no indication that Palo Alto returned the shipment. It was, however, given a 50% discount, which exceeded the typical 20% end of quarter discount n9

n8 A "year's worth" of ThinPrep would, of course, extend into the class period which began in June 2001.

n9 The complaint fails to articulate the amount of the shipped product discounted and/or the relation to Cytyc's overall revenues.

[*12]

The Cytyc CA account executive also identifies Stockton Pathology, located in Stockton, California, as receiving "six months' worth of product," albeit at an unidentified time. Although not returned, n10 the excess product "lay unused, piled floor-to-ceiling in the customer's offices." (P 45). At an undetermined time, "Stanford University Hospital and Marin Pathology cancelled their agreements with Cytyc because they were fed up with being shipped unwanted merchandise," according to this executive. (P 157)

n10 Although not expressly stated in the complaint, this is the only reasonable inference inasmuch as the complaint depicts how the excess product lay unused at the customer's offices

"Management" encouraged channel stuffing to meet unrealistic quarterly quotas, according to the Cytyc CA account executive (PP 46 & 47) Channel stuffing occurred at the end of every quarter, according to both this executive and the Cytyc managed care executive (PP 111 & 123) and was well known in the company (P 150). During [*13] the last quarter of 2001, the company increased its channel stuffing practices by offering "extra incentives" to customers and created a "war room" to field the daily telephone calls from sales representatives giving updates of sales figures, according to an unnamed human resources representative at Cytyc who describes Sullivan and Bowen as "very involved" in daily management. n11 (PP 40 & 101). As a result of the channel stuffing, the market share described to analysts by Sullivan and other management officials was allegedly overstated. (P 47).

n11 The company was highly focused on meeting the sales quotas which were "set by Cytyc's management" (P 153) and, according to an unnamed manufacturing manager ("Cytyc manufacturing manager"), top executives met frequently with employees "to discuss sales strategies." (P 39). Cytyc senior management also closely managed the everyday business of Cytyc and attended meetings with the salesforce. (PP 41 & 150).

Cytyc disclosed the use of discounts in the December 2000 Form 10-K [*14] annual report, signed by Sullivan and Bowen, in the following terms:

> The Company's success and growth will depend on market acceptance of the ThinPrep System among healthcare providers, third-party payors and clinical laboratories. The Company will continue to sell the ThinPrep Processor to customers and charge separately for related disposable reagent filters and supplies. *In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations.*

(Docket Entry # 32, Ex. B, p. 8; emphasis supplied). Cytyc repeated this disclosure in the company's 2001 Form 10-K annual report. n12 (Docket Entry # 32, Ex. J, pp 8-9).

n12 Like the 2000 Form 10-K annual report, the 2001 Form 10-K annual report discloses that, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations." (Docket Entry # 32, Ex. J, pp. 8-9).

[*15]