Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 1 of 16

Page 5
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Cytyc also shipped "significant" amounts of "additional product" above and beyond what customers ordered. (P 61). As noted above, Cytyc's senior representative describes shipments of unknown quantities of ThinPrep to unknown customers "from at least July 1999." (P 44). At Cytyc, shipping more product than ordered to increase sales occurred near the end of the financial reporting periods. (PP 5 & 7; see also P 49).

B. Specific Company Statements During Class Period

1. July 25, 2001 Press Release

At the outset of the class period on July 25, 2001, Cytyc's stock was trading for $ 24.79. (P 9). On that day, Cytyc issued a press release reporting "record" revenue and earnings for the second quarter of 2001. (Docket Entry # 32, Ex. A) The release accurately reported $ 52,997,000 of revenue for the quarter or net income of $ .13 per diluted share. n13 (P 67; Docket Entry # 32, Ex. D, p. 4; Docket Entry # 32, Ex. J, p F-22).

> n13 There is no indication that these numbers were subsequently restated. (Docket Entry # 32, Ex. J, p. F-22).

[*16]

Plaintiffs take issue with the following statements, the first historical and the others forward looking, made by Sullivan in the press release: n14

> "We are pleased to report record revenues and earnings," said Patrick Sullivan, Cytyc's president and chief executive officer. "In addition, we increased our U.S. market share by five percentage points for the second consecutive quarter. Our U.S. market share has grown substantially to approximately 46 percent at June 30 from 36 percent at the end of 2000, and we expect to exceed 50 percent domestic market conversion by year-end *This growth has been driven by the combination of our proven marketing strategy, best-in-class sales team, and superior technology.*"
>
> In conclusion, Mr. Sullivan stated, "As Cytyc continues to achieve record results in the marketplace, I am confident in our ability to *continue the momentum established in the first half of the year* We look forward to *continuing our consistent quarter to quarter growth* and *delivering a record financial performance* for 2001."

> n14 The press release was relatively short, consisting of two pages of text and two pages of a company balance sheet

[*17]

(PP 67 & 69-70; emphasis in complaint). Defendants purportedly knew that the stated reasons ("proven marketing strategy, best-in-class sales team, and superior technology") were not the real reasons for the historical growth. Instead, the real reasons were the channel stuffing of products at the end of every quarter and the shipments of unordered product. Cytyc then improperly recognized the revenue on these products at the expense of future sales and in contravention of the company's stated revenue recognition policy, GAAP and SEC rules. (P 68).

With respect to the forward looking statements, plaintiffs submit that defendants knew that the "momentum" and "consistent quarter to quarter growth" were the result of channel stuffing, including the steep, end-of-quarter discounts, and that the momentum could not continue without continuing the channel stuffing practices (PP 69-70). It is worth noting, however, that the relatively short press release contains the following cautionary language:

> Investors are cautioned that statements in this press release which are not strictly historical statements, including, without limitation, statements regarding management's expectations [*18] for future growth, profitability, and objectives for future management and operations, as well as statements regarding the management and operations . . . constitute forward-looking statements which involve risks and uncertainties which could cause actual results to differ, including, without limitation, risks associated with the Company's dependence on a single product, uncertainty of market acceptance and additional cost, dependence on proprietary technology, dependence on timely and adequate levels of third-party reimbursement, dependence on key personnel, management of growth, limited marketing, sales, and private equity investment experience, and limited number of customers and lengthy sales cycle . . . and other risks detailed in the Company's filings

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 2 of 16

Page 6
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

with the Securities and Exchange Commission, including under the heading "Certain Factors Which May Affect Future Results" in its 2000 Form 10-K filed with the Commission

(Docket Entry # 32, Ex. A). The language in the Form 10-K under the referenced caption provides added detail about the above risk factors. Regarding the "Limited Marketing and Sales Experience" factor, the Form 10-K warns that:

> No assurance can [*19] be given that the Company's direct sales force or strategic marketing relationships will succeed in promoting the ThinPrep System to healthcare providers, third-party payors or clinical laboratories, or that additional marketing and sales channels will be successfully established . . . Failure to successfully expand its marketing and sales capabilities in the United States . . . would have a material adverse effect on the Company's business, financial condition and results of operations.

(Docket Entry # 32, Ex. B). With respect to the "Limited Number of Customers and Lengthy Sales Process" factor, the Form 10-K explicitly states that, "Due in part to a recent trend toward consolidation of clinical laboratories, the Company expects that the number of potential domestic customers for its products will decrease." (Docket Entry # 32, Ex. B)

The press release notes that management would discuss the results and future expectations at a 5:00 p.m. conference call later that day. After the conference call, accessed by the public through the company's website, analysts projected the company's market share as soon reaching 50%. (P 72).

2. Bloomberg News Interview August 2, 2001 [*20]

On August 2, 2001, Bloomberg News interviewed Sullivan and published a transcript of the interview. Whereas on July 25, 2001, Sullivan attributed past growth as driven by the company's "proven market strategy" and "sales team," he forecasted that similar factors of the company's "unique sales and marketing strategy" would allow the company to increase its market share in the future. (P 73). Referring to the July 25, 2001 conference call, he projected annual revenues in 2001 as between $ 210,000,000 and $ 220,000,000 and between $ 275,000,000 and $ 300,000,000 for the following year

The text of the interview reads, in pertinent part, as follows: n15

> [Bloomberg News]: Mr. Sullivan, taking a look at your revenue numbers, this past quarter, they grew at 12% sequentially and they were up about 60% from a year ago. *Can you maintain that kind of growth in terms of revenue?*
>
> Sullivan: *We believe so.* If you look at the market opportunity. We believe we're getting started and hitting our stride. In the sweet spot of the curve. If you look at the 50 million Pap smears, it represents for us about a $ 500 million to $ 700 million market opportunity
>
> [Bloomberg News]: [*21] *Well, how will you increase, though market share and be aggressive in gaining market share [in] this?*
>
> Sullivan: *We have a unique sales and marketing strategy in that we have a direct sales force that calls on the OB/GYN's who perform the procedure in their office. In addition we have a sales force calling on the laboratory. It is creating the demand at the physician's office.* And we have also started some direct consumer advertising campaigns . . .
>
> [Bloomberg News]: Give *investors some sort of landmarks that they should sort of watch out for or milestones, if you will that they should watch for from your company over the next six to eight months to see that you're certainly on track in terms of exceeding or meeting your growth goals?*
>
> Sullivan: Well, *we've guided the street in our conference call* that we believe we're going to finish this year somewhere between $ 210 million and $ 220 million in top line revenue, [we] believe that we will be at the top end of that range. Next year we expect to be in the $ 275 million to $ 300 million range. In addition we have these additional products that we're currently working on that we expect to have completed [*22] by the end of this year. n16

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 3 of 16

Page 7
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

> n15 Punctuation is taken from the transcript.
>
> n16 Like the July 25, 2001 statements, defendants submit that the statements are corporate puffery and do not denote marketing strategy and the sales force as the only factors effecting growth. They also maintain that the projections, which reference the conference call, were not material inasmuch as they did not alter the total mix of information available to the investing public. Plaintiffs characterize Sullivan's stated reasons as false and materially misleading inasmuch as channel stuffing was and would continue to have an adverse impact on future sales.

(PP 73 & 75, emphasis in complaint; Docket Entry # 32, Ex. C).

3. August 8, 2001 Second Quarter Form 10-Q

On August 8, 2001, Cytyc issued the Form 10-Q for the quarter ending June 30, 2001. All defendants, including Bowen, signed the form. The form reflects the following method for recognizing revenue:

> The Company recognizes product revenue upon shipment, [*23] provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(PP 58 & 78; accord Docket Entry # 32, Ex. B & J, pp. F-7). Cytyc therefore recognized revenue upon shipment n17

> n17 As explained in greater length infra, plaintiffs allege that Cytyc departed from this stated policy by recognizing the revenue upon shipping the unordered product and by offering the deep discounts offered customers at the end of every quarter or otherwise engaging in channel stuffing. (P 79).

This second quarter Form 10-Q for 2001 portrays net sales of $ 100,464,000, an increase from the $ 62,303,000 reported during the corresponding period in 2000. The Form 10-Q advises that certain factors may affect future results, refers to additional factors disclosed in the Form 10-K for 2000 and [*24] cautions that, "past financial performance should not be considered an indication of future performance." (Docket Entry # 32, Ex. D, p. 13).

In describing the company's liquidity and capital resources, the form notes that, "Net inventories decreased approximately $ 1.3 million during the six months ended June 30, 2001 primarily due to improved inventory management and production control." (P 81; Docket Entry # 32, Ex. D, p. 11). The release of the August 8, 2001 Form 10-Q caused a one day increase in the price of Cytyc stock from $ 24.20 to $ 25.90.

4. October 19, 2001 Boston Herald Article

On October 18, 2001, Cytyc announced that it would acquire Pro-Duct Health, Inc. ("Pro-Duct"), a private company that makes a breast cancer screening device, for $ 38,000,000 in cash and 5,000,000 shares of Cytyc common stock. Sullivan described the acquisition as an "ideal fit" with "an annual potential U.S. market of $ 1.5 billion, growing to $ 4.0 billion." (P 84). The acquisition was scheduled to close and did close in the fourth quarter of 2001. Cytyc's stock increased from $ 25.79 on October 17 to $ 26.55 on October 18, 2001. (P 84; Docket Entry # 32, Ex. E).

On October 19, 2001, the [*25] Boston Herald ran an article quoting Sullivan as saying, "*We feel confident in our success based on our track record with the ThinPrep Pap Smear, which has made this acquisition possible.*" n18 (P 87, emphasis in complaint; Docket Entry # 32, Ex. E). Cytyc stock closed at $ 28.03 on October 19, 2001. (P 86).

> n18 Plaintiffs describe the statement as misleading because it omits the fact that Cytyc's "track record" is based upon undisclosed channel stuffing. Plaintiffs also point out that Cytyc's stock would have been worthless and the acquisition therefore costlier if the company had not artificially inflated the company's stock through channel stuffing. (Docket Entry # 36). Defendants, in turn, assert that the statement amounts to inactionable corporate puffery and there is no connection between the statement, i.e., the efficacy of ThinPrep, and the omitted information of channel stuffing.

5. October 24, 2001 Press Release

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 4 of 16

Page 8
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

On October 24, 2001, Cytyc issued a press release reporting record revenues for [*26] the third quarter of 2001. Third quarter revenue "was $ 57.2 million, . . . a 54 percent increase from the $ 37 million reported in the comparable quarter last year." n19 (P 89; Docket Entry # 32, Ex. F). Sullivan glowingly described the Pro-Duct acquisition as " providing an excellent opportunity for significant revenue and earnings growth.'" (P 89; Docket Entry # 32, Ex. F).

> n19 The Form 10-K for 2001, released in March 2002, reflects these same figures. (Docket Entry # 32, Ex. J, p. F-22).

Plaintiffs take issue with Sullivan's historical description of the company's consistent revenue growth as emanating from " *the effectiveness of [Cytyc's] sales and marketing strategy*.'" n20 (P 89, emphasis in complaint; Docket Entry # 32, Ex. F). According to the complaint, the statement is misleading because the reported growth arose from the "systemic and continuous channel stuffing" as well as shipping unordered products to customers, a practice that alienated such customers and caused them to cease doing business [*27] with Cytyc. (P 90) Further, Cytyc did not experience "consistent revenue and earnings growth" because the Cytyc sales and marketing strategy of channel stuffing pushed sales into earlier quarters at the expense of later periods. (P 91).

> n20 The complete statement in the press release is as follows:
>
> > "We believe the superior clinical performance of the ThinPrep Pap Test and the *effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance,*" said Patrick Sullivan, Cytyc's president and chief executive officer. "Last week we announced that Cytyc has entered into a definitive merger agreement to acquire Pro-Duct Health, Inc., an acquisition that we expect will expand our product line to include breast cancer and provide an excellent opportunity for significant revenue and earnings growth."
>
> (P 89, emphasis in complaint; Docket Entry # 32, Ex. F).

6. January 14, 2002 Press Release

On January 14, 2002, Cytyc issued [*28] a press release reiterating the company's comfort level with the estimate of "approximately $ 0.13 per diluted share" for the 2001 fourth quarter and "approximately $ 0.45 per diluted share" for the full year. (P 95; Docket Entry # 32, Ex. G). Cytyc also forecasted 2002 per share earnings as "approximately $ 0.64 to $ 0.66." (P 95; Docket Entry # 32, Ex. G). The latter forecast did not materialize.

Like the July 25, 2001 press release, the January 14, 2002 press release cautions investors not to rely on the forecasts and that current expectations "are subject to risks and uncertainties which could cause the outcomes to differ materially from [the forward-looking] statements." (Docket Entry # 32, Ex. G). The press release identifies various risk factors and refers investors to the company's SEC filings.

The complaint depicts the falsity of the statements insofar as the revenue numbers, inflated because of the company's channel stuffing practices, contravene the company's stated revenue recognition policy as well as GAAP and SEC rules. (P 100)

7. January 23, 2002 Press Release

On January 23, 2002, Cytyc announced "record" revenues for the 2001 fourth quarter and for the year. [*29] The press release shows revenues "of $ 63 million for the quarter" representing a "49% increase over the fourth quarter 2000 revenues, and" net income of $ 0.13 per share. (P 96). Revenues grew to $ 221 million for the year. (P 96) As set forth in the complaint, these earnings include ThinPrep sales resulting from the channel stuffing and shipments of unordered product thereby violating the company's stated revenue recognition policy, GAAP and SEC rules. (P 100).

The complaint highlights and complains about two statements, the first being historical and the second forward looking, that Sullivan made in the press release. The statements, italicized below, are as follows:

> "This was an outstanding year for Cytyc Corporation," said Patrick Sullivan, Cytyc's president and chief executive officer. "*We have now reported fifteen consecutive quarters of revenue growth.* In addition, we acquired Pro-Duct Health, expanding our product line to include breast cancer risk assessment." Mr. Sullivan continued, "We believe the success of

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 5 of 16

Page 9

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

the company was further demonstrated by Cytyc's recent addition to the S & P Midcap 400 Index and The Nasdaq-100 Index." Mr. Sullivan concluded, *"We [\*30] believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year* and the success of ThinPrep(R) System, to continue domestic and international market conversion to the ThinPrep(R) PapTest(TM), and to launch Cytyc's ductal lavage procedure for patients at high risk for breast cancer."

(P 96, emphasis in complaint).

As the complaint alleges, plaintiffs submit that the first statement is misleading and false because Cytyc achieved the historical growth by resort to undisclosed channel stuffing. n21 (P 100). Again, the reported growth improperly includes sales from the channel stuffing at the end of each quarter and the shipments of unordered products. (P 100). In light of this improper revenue recognition, the assertion that Cytyc was " in a solid position'" to build upon previous " momentum'" was false and misleading. (P 100). The press release contains cautionary statements similar to those in previous press releases.

   n21 Plaintiffs do not take issue with the veracity of the numbers as reflecting what Cytyc achieved. (Docket Entry # 36).

[\*31]

8. Bloomberg News Interview January 24, 2002

The day after the January 23, 2002 press release, Bloomberg News interviewed Sullivan about the reported fourth quarter profits. Without referring to the January 23, 2002 press release or the cautionary statements therein, Sullivan forecasted revenues " in the $ 295 to $ 305 million range'" and an increase in earnings per share to " between 64 and 66 cents.'" n22 (P 99).

   n22 Defendants submit that the complaint fails to identify which remarks in the interview are false. To the contrary, however, paragraph 99 not only quotes the above forecast but also repeats the forecast by stating that, "Sullivan raised Cytyc's expected revenues for 2002 to between $ 295 million-$ 305 million, up from the $ 275 million-$ 300 million range originally given on August 2, 2001." (P 99). The next paragraph alleges that, "Defendants knew that the statements in paragraphs 95-97, 99, were false." (P 100). Defendants' additional challenge that the forecast is inactionable puffery (Docket Entry # 39, n. 3, referring to "the January 24, 2002 press release [sic]") is unavailing given the explicit nature of the forecast. The statement, to the extent based on a current projection, provides the revenue range and expected earnings per share for the time frame of one year.

   As explained infra with respect to the August 2, 2001 projection and argued in general by defendants in their memorandum (Docket Entry # 31, p. 39) and at the hearing, however, the complaint fails to show sufficient facts to support the information and belief that Sullivan knew the forecast was either false or materially misleading. Neither the opinion by the former human resources employee (P 154) nor his or her characterization of Sullivan and Bowen as " hands-on'" managers (P 40) is enough. As to materiality, disclosing the use of discounts as effecting the projection would not alter the total mix of information inasmuch as the SEC filings already disclosed such discounts. Alternatively, the projection fails to warrant liability given the absence of a strong inference of scienter.

[\*32]

Shortly after this forecast, the following exchange took place:

   [Bloomberg News]: *What keeps growth moving forward?*

   Sullivan: *Well, we're very focused on continued conversion of the ThinPrep Pap Test in the market, from 57 percent to-we believe we could capture-100 percent of the market.* n23 There's no reason for a physician to use a conventionally prepared Pap smear, when you have a much more effective test that's in the ThinPrep PapTest . . . In addition, we have acquired a company that puts us into breast cancer screening called Product Health [sic], that we have just launched with our sales force at the beginning of this year. And we expect somewhere between $ 9 and $ 15 million of revenue from that product, to kick in 2002.

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 6 of 16

Page 10
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n23 Defendants characterize this statement as inactionable puffery. Although the statement that Cytyc could capture 100% of the market is corporate puffery, the statement that Cytyc had 57% of the market is not puffery. The statement quantifies market share and two analysts repeated the statement. (P 102); see In re Scientific Atlanta, 239 F.Supp.2d 1351, 1361 n. 6 (N.D.Ga. 2002). The 57% market share statement is nonetheless not actionable given the absence of a strong inference of scienter. See n. 65

[*33]

(P 99, emphasis in complaint; Docket Entry # 32, Ex. I). Two market analysts repeated Sullivan's statement that the company's current market share was 57%. (P 102).

In February 2002, Cytyc announced a definitive merger agreement to acquire Digene Corporation ("Digene"), a publicly held manufacturer of a cervical cancer diagnostic screening system. Subject to regulatory approval and a tender of over 50% of Digene stock, the deal proposed Cytyc purchasing Digene "for $ 76.9 million in cash, plus 23 million shares of Cytyc common stock." n24 (P 103). Shortly after the announcement, Cytyc shares increased by $ 2.00. (P 104). Although Digene shareholders tendered more than 50% of outstanding Digene shares, the Federal Trade Commission ("FTC") eventually voted to block the acquisition on June 25, 2002.

n24 The 2001 Form 10-K released in March 2002 warns investors that, "Although [Cytyc] expects that its acquisition of Digene will close during the second quarter of 2002, [Cytyc] may not be able to complete the acquisition during the second quarter, or at all." (Docket Entry # 32, Ex. J).

[*34]

On March 1, 2002, Cytyc filed the company's 2001 Form 10-K with the SEC. The form repeats the statement in the 2000 Form 10-K that Cytyc has offered discounts in the past to stimulate demand "and *may elect* to do so in the future" and that such discounts "could *have* a material adverse effect on the Company's business, financial condition and results of operations." n25 (P 110, emphasis in complaint; Docket Entry # 32, Ex. J). The 2001 Form 10-K shows 2001 net sales of $ 220,993,000 or "an increase of 55.6%" over 2000 net sales of $ 142,065,000 (P 115; Docket Entry # 32, Ex. J, p. F-4)

n25 Plaintiffs contend that a reasonable inference from this statement is that Cytyc only offered a one time discount. They point to the April 24, 2002 conference call as supporting this inference. On its face, however, the statement refers to "discounts," not "a discount." Thus, the language of the statement, which refers to the plural "discounts" when describing the discounting in the past, coupled with the fact that the 2000 Form 10-K also notes that Cytyc has offered "discounts" in the past to stimulate demand makes the inference unreasonable.

[*35]

9. April 24, 2002 Conference Call

In an April 24, 2002 press release, Cytyc again announced "record" earnings for the first quarter of 2002. Cytyc reported net sales "of $ 68 million and net income of $ 17.6 million" or "increases of 43% and 58%, respectively, over the numbers for the first quarter 2001." (P 117; Docket Entry # 32, Ex. K) It also reported a market share of 64%. (P 117). The company scheduled a conference call after the close of trading.

The conference call began by cautioning listeners not to rely on forward looking statements. (Docket Entry # 32, Ex. L). During the conference call, Bowen noted that the company's current estimate for the year 2002 is "between $ 0.55 and $ 0.60 per share" (Docket Entry # 32, Ex. L, p. 11), a downward departure from the $ 0.64 to $ 0.66 estimate forecast by Sullivan during the January 24, 2002 Bloomberg News interview.

The complaint states that during the conference call, Cytyc explained that "its larger customers were tightening inventory" n26 and "that the inventory problem had manifested itself only in the first quarter of 2002." (PP 124 & 125). The actual transcript reveals the following statements regarding inventory: [*36]

> Bowen: . . . Selected large lab ordering patterns shifted lower in the first quarter due to what we believe was an imbalance in physician demand versus existing lab inventory levels or a change in inventory management practice at the lab.
>
> Also during the quarter we implemented a promotional program directed at smaller labs, which was well received. Although we believe that underlying demand at large and small labs continues to increase, in light of first quarter actions by selected

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 7 of 16

Page 11
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

large labs, consolidation in the lab industry and the response to our first quarter and promotional program at smaller labs, we anticipate a decline in near term shipment levels

n26 See footnote 28.

(Docket Entry # 32, Ex. L, p. 10). n27

n27 Plaintiffs do not expressly object to considering the transcript of the conference in defendants' appendix and referred to in the complaint. See Shaw v. Digital, 82 F.3d at 1220; Watterson v. Page, 987 F.2d at 3.

[*37]

Thus, with regard to the inventory problem manifesting "itself *only* in the first quarter of 2002" (P 125, emphasis supplied), the actual transcript shows that both Bowen and Sullivan noted a change or shift in ordering patterns in the first quarter. The complaint alleges that the statement was false or misleading because it fails to disclose the "systemic and continuous channel stuffing" as well as the shipment of unordered product and customer alienation. (P 126).

When asked to "flush out" this sales promotion, Sullivan explained that Cytyc introduced the sales promotion as a response to "a change in ordering pattern at selected larger labs. That change in ordering pattern we believe was either due to an imbalance at the lab in physician demand versus their existing inventory levels at that time or a change in the way in which they choose to manage their ThinPrep Pap Test inventory levels." (Docket Entry # 32, Ex. L, p. 13). In essence, both Bowen and Sullivan disclosed that selected larger laboratories had an inventory "imbalance" and "ordering patterns shifted lower in the first quarter." n28 (Docket Entry # 32, Ex. L, pp. 10 & 13). As a result, the company offered a promotional [*38] program to smaller laboratories during the first quarter.

n28 The complaint describes the "tightening inventory" statement, which originates from a Bloomberg News report, as misleading because Cytyc omitted that the inventory tightening stemmed from the channel stuffing (P 124; "Cytyc failed to state that its largest customers had been stuffed with so much extra inventory that there was no need for those customers to order any more product for a long time to come").

The Bloomberg News article, dated April 25, 2002, reads as follows:

Big laboratories are tightening inventory, and Cytyc offered incentives to smaller labs, analysts said. "The big concern is there's an inventory pushback on the part of large labs," said Banc of America Securities analyst Kurt Kruger, who rates Cytyc buy.' "The company scrambled to provide some discounts to small labs to offset this."

(P 119, quotation marks taken from complaint). Defendants argue, inter alia, that the report fails the entanglement test.

[*39]

During the conference call, Sullivan explicitly advised the audience that, "This is not the first time-the first quarter that we've ever had promotional type programs." (Docket Entry # 32, Ex. L, p. 16). Bowen gave a more positive description explaining that, "We don't expect to have promotional programs in the small labs going forward, and what we expect to do is have our pricing patterns return to what we would consider to be the norm." n29 (Docket Entry # 32, Ex. L, p. 16).

n29 Sullivan's remark not only shows that Cytyc disclosed, again, the discounts, but also militates against a finding of scienter. Given Sullivan's description, Bowen's description shows at most negligence and the attempt to put a good face on the disclosure. The forward looking remark, which in any event is *not* particularized in the complaint, also falls under the safe harbor provision of the PSLRA. The market was not fooled inasmuch as Cytyc stock dropped precipitously the following day.

After the conference call, a number of analysts [*40] made statements that plaintiffs seek to attribute to Cytyc. One such third party statement derives from a UBS Warburg report wherein the analyst states that Cytyc stated during the conference call that it had 'instituted a one-time promotion for the smaller labs to drive conversion at these customers in the quarter.'" n30 (P 121). During

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 8 of 16

Page 12

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

the conference call, however, Sullivan explicitly disclaimed that the promotion was a one time offer. (Docket Entry # 32, Ex. L, p. 16).

> n30 Plaintiffs seek to hold Cytyc responsible for this third party statement of the promotion as a "one-time'" event. They submit the description is misleading inasmuch as Cytyc engaged in a continuous pattern of channel stuffing throughout the class period.

In addition to the Bloomberg News article and the UBS Warburg analyst's comments, an April 25, 2002 Pacific Growth Equities analyst report states that, "a change in the ordering and inventory practices of Cytyc's large lab customers necessitated a special promotion targeting smaller labs [*41] in order for Cytyc to meet Q1 expectations.'" n31 (P 120). As a result, the report explains, "Cytyc lowered forward guidance.'" n32 (P 120).

> n31 There is nothing false or misleading about the statement that Cytyc offered a "special promotion." Cytyc did offer a special promotion. There was no duty to also add, "as we've done a number of times in the past." As argued by defendants (Docket Entry # 31, pp. 22-25 & n. 14), the complaint fails to sufficiently pled why the statement was false or misleading. The third party statement attributing the statement to "Cytyc" also fails the entanglement test described infra.
>
> n32 In particular, the report states that, "Cytyc's recent experience with shifting laboratory inventory practices led to lowered guidance for Q2 and the remainder of 2002." (Docket Entry # 32, Ex. N).

In response to the April 24, 2002 disclosure, Cytyc common stock fell from $ 24.80 per share on April 24 to $ 15.73 per share at the close of trading on April 25. (P 129). In May and June, members [*42] of Cytyc's sales force discussed whether the stock "would plummet further." (P 132).

During the April 24, 2002 conference call, Sullivan intimated that Cytyc was going to try to cue its business more closely to physician demand. According to Sullivan, Cytyc would try to have a leaner "supply chain" and a better understanding of inventory at the laboratories. (Docket Entry # 32, Ex. L, p 24) In May and June 2002, Cytyc executives informed the salesforce "that they were changing the market strategy to have more stable shipments so that we wouldn't be flooded at the end of the quarters,'" according to the former Cytyc manufacturing manager. (P 131; see also P 156). The company, however, continued to pressure the sales force to meet the quotas, according to the former Cytyc CA account executive. n33 (P 131).

> n33 The former Cytyc manufacturing manager related that in May and June 2002:
>
>> I heard that the stock is probably going to take a downswing, because of the fact that the channels are flooded. I asked, well how did the channels get that flooded? That became the first time that someone in distribution explained to me that the sales people were under pressure to make deep discounts [in order to convince customers] to buy bigger quantity at the end of quarters in order to meet the goals to keep the revenues up so that the stock price could be maintained.
>
> (P 132).

[*43]

At least one market analyst viewed the Cytyc issue as short term. According to his or her June 21, 2002 report, "We believe that some of the short term issues, mainly inventory in the channels . . . will be resolved over the next six weeks.'" (P 134). On June 24, 2002, however, Cytyc issued a press release further lowering the company's expected revenues for 2002 to a "range of $ 230 million to $ 245 million, with pro forma earnings of $ 0.40 to $ 0.44 per share.'" (P 137).

During the conference call the following day, "Cytyc representatives explained that the downward revision was necessitated because of the method of gauging demand for ThinPrep that Cytyc had been using, which had been based on shipments to laboratories, overestimated end-user demand." (P 138). Cytyc also announced a change in revenue recognition "to a system that was more reflective of end-user demand." (P 138)

The market negatively reacted to the news and the price of Cytyc shares feel from $ 11.46 per share on June 24 to $ 6.88 per share at the close of trading on June 25, 2002. In contrast to the 64% market share Cytyc reported for the first quarter of 2002 in the April 24, 2002 press release, a Thomas [*44] Weisel Partners LLP analyst

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 9 of 16

Page 13
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

posited that, " we believe the ThinPrep Test had a 50.0% market share at the end of 1Q02.'" (PP 117 & 140). Another market analyst likewise depicted " an inventory overhang of $ 32-35 million that needs to work its way through the lab channel for Cytyc to put this issue behind it." (P 141).

As a further means to infer scienter, the complaint notes that Sullivan and Bowen controlled the content of Cytyc press releases and SEC filings and could therefore falsify information about Cytyc's performance and products. (P 147). Intimately involved in the company, both Sullivan and Bowen were kept informed "on an ongoing basis" about the company's problems. (PP 148-149). n34 Both Sullivan and Bowen, described as "very hands-on managers," attended sales meetings where Cytyc management stressed the importance of meeting sales expectations, according to the former Cytyc CA account executive and the unnamed human resources representative. (PP 153 & 154).

n34 The complaint does not attribute the statement to anyone or provide a time frame.

[*45]

Sullivan also purchased Cytyc stock during the class period. More specifically, on December 6, 2001, Sullivan sold 55,000 shares of Cytyc common stock at a price of $ 24.90 per share. He sold an additional 20,000 shares the following day, also for $ 24.90 per share. Gross proceeds totaled $ 1,867,500 or approximately four times Sullivan's annual salary.

The amount, however, represents approximately 10% of Sullivan's Cytyc holdings. The $ 24.90 share price was not the high during the class period, which briefly hovered around $ 30.00 per share in October 2001. (Docket Entry # 32, Ex. R). n35 Even more significant, Sullivan's sales during the class period are less than his sales both prior to and after the class period. For example, Sullivan sold 130,800 shares or approximately 15% of his holdings in April 2001 and 189,930 shares or approximately 22% of his holdings in December 2002. (Docket Entry # 32, Ex. Q). n36

n35 Although the data is attached to defendants' opposition, it is appropriate to take judicial notice of the sales price during the class period on a motion to dismiss. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3rd Cir. 2002) (affirming lower court's decision to take judicial notice of stock price data on motion to dismiss). Plaintiffs did not object to the submission. In any event, the complaint reflects a class period high of $ 27.52

(P 10), a price still in excess of the price Sullivan sold his shares.

[*46]

n36 Where, as here, plaintiffs raise an allegation of insider trading (see Docket Entry # 36, p. 43) and do not challenge the authenticity of the public documents, this court may consider the entirety of the Form 4 filings without converting the motion to dismiss into a motion for summary judgment. See In re Stone & Webster, 253 F.Supp.2d at 128 & n. 11 (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In re Millstone Scientific Securities Litigation, 103 F.Supp.2d at 450-451 & n. 15 (considering numerous SEC public filing documents without converting motion to dismiss into motion for summary judgment and noting that court may consider "matters of public record" and "documents referred to in the complaint"); see also Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6), Fed. R. Civ. P.); Watterson v. Page, 987 F.2d at 3.

C. Cytyc's Revenue Recognition [*47] Policy

As a result of the end of quarter discounts, Cytyc pushed sales into earlier quarters than normally would have occurred. Customers also accumulated inventory in amounts that they did not immediately use. Improper recognition of revenue materially inflated the company's reported results making the financial statements misleading or false, according to the complaint.

Plaintiffs allege that the channel stuffing as well as the shipments of additional and unordered product violated the company's revenue recognition policy, GAAP and SEC regulations n37 thereby evidencing a strong inference of scienter. Plaintiffs maintain that Cytyc's channel stuffing violates certain provisions of the Financial Accounting Standards Board ("FASB"), SEC Staff Accounting Bulletin 101 ("SAB 101"), FASB Statement of Financial Accounting Standards ("SFAS") and an opinion of the Accounting Principles Board ("APB"). n38 The complaint alleges that during the class period, the financial statements of Cytyc violated the following principles of fair financial reporting:

(1) the principle that financial reporting should provide accurate, reliable and useful information concerning an entity's performance [*48] and that investors com-

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 10 of 16

Page 14

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

monly use the company's performance in the past as a reliable indicator of the company's performance in the future (PP 54 & 61, citing FASB Concepts Statement No. 1; PP 34, 42 & 58-59); n39

(2) the principle that revenues should not be recognized until "realized or realizable and earned" (P 56, citing FASB Concepts Statement No. 5, P 83; SAB 101; FASB Concepts Statement No. 2; SFAS No. 48; n40 Accounting Research Board No. 43; APB opinion 10; PP 57, 59 & 80, all citing SAB 101); n41 and (3) the principle requiring companies to "describe known trends or uncertainties" that have a material effect on sales and revenues in all Form 10-K and 10-Q reports, particularly those events known to management that would cause reported financial information not to be reflective of future operating results (PP 63-66, citing 17 C.F.R. § 229.303) n42

n37 The complaint (P 55) correctly notes that under an SEC regulation, 17 C.F.R. § 210.4-01(a)(1), "filings that do not comply with GAAP " will be presumed to be misleading and inaccurate.'" In re Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002) (citing to 17 C.F.R. § 210.4-01(a)(1))

[*49]

n38 GAAP " are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").'" In re Enron Corporation Securities, 235 F.Supp.2d 549, 572 n. 11 (S.D.Tx. 2002). The complaint cites inter alia to FASB Concepts Statements 2, 5, 33, 34, 41, 42, 58, 59 and 83.

n39 In relation to this category, the complaint further notes that by pulling in revenues from future quarters into earlier quarters, defendants violated FASB Concepts Statement Number One because reported revenues in the earlier quarters were not reliable representations of revenues. (P 62)

n40 SFAS 48 circumscribes declaring revenue when a right of return exists. See generally Aldridge v. A.T. Cross Corporation, 284 F.3d at 79. There are no particular allegations that Thin-Prep shipments were returned or that such shipments amounted to contingent sales. Moreover, under SFAS 48 allowing a right of return in a particular transaction "does not per se mean that revenue cannot be recognized at the time of sale." In re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d 134, 151 (D.Mass. 2001).

Alternatively, the complaint's brief reference to the regulation, without more, is conclusory and lacks the necessary pleading detail required under the PSLRA. See Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d 12, 35 (D.Mass. 2000).

[*50]

n41 Although revenue does not have to be received before recognized, there should be "persuasive evidence of an arrangement." (P 56). In other words, there should be evidence of delivery and a fixed price such that "collectability of the sales price is reasonably assured." (P 56). There must be sufficient evidence of an arrangement. (P 80, quoting SAB 101).

n42 The pertinent SEC regulation imposes a duty on registrants to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The company's financial statements during the class period and the 2001 Form 10-K contain the company's stated policy [*51] for revenue recognition. The policy corresponds to SAB 101 and reads as follows:

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 11 of 16

Page 15
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

> The Company recognizes product revenue upon shipment, provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(PP 58 & 78; accord Docket Entry # 32, Ex. J, p. F-7) The 2001 Form 10-K elsewhere describes Cytyc's policy in a similar manner:

> The Company follows very specific and detailed guidelines in measuring revenue; *however, certain judgments affect the application of its revenue policy. For example, revenue is not recognized from sales transactions unless the collection of the resulting receivable is reasonably assured. The Company assess [sic] collection based on a number of factors, including past transaction history with the customer and the credit-worthiness of the customer.* If it is determined that the collection fee is not reasonably assured, the fee is deferred and revenue is recognized at the time collection becomes reasonably [*52] assured, which is generally upon receipt of cash.

(P 112, emphasis in complaint; Docket Entry # 32, Ex. J, p. 20).

Cytyc's channel stuffing purportedly improperly pulled revenue from future quarters into previous quarters. (P 62, citing FASB Concepts Statement No. 1; PP 33, 41 & 58-59). Because of Cytyc's practice of channel stuffing, the Forms 10-K and 10-Q covering the class period failed to disclose that current revenues were achieved at the expense of future revenues. (P 66) The forms thereby mischaracterized current financial growth and failed to disclose known trends in violation of 17 C.F.R. § 229.303, according to the complaint. (P 66).

DISCUSSION

A. Essential Elements of Securities Fraud Liability

Liability under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, requires the plaintiff to plead with particularity that, in connection with the sale or purchase of a security, the defendant: (1) "made a false statement or omitted a material fact;" (2) "with the requisite scienter;" and that (3) the "plaintiff relied on the statement or omission;" (4) "with [*53] resultant injury." In re Boston Tech. Sec. Litig., 8 F. Supp. 2d 43, 52 (D.Mass. 1998); accord Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (the "plaintiff must plead, with sufficient particularity, that the defendant made *a* false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury"). The circumstances in the case at bar primarily concern the first and second elements.

Under the first element, the plaintiff must allege that a defendant either: " (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'" Baron v. Smith, 380 F.3d 49, 52 (1st Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)) The falsity or untruth of the various statements presents a relatively straight forward analysis. The misleading nature of the statements poses a more exacting inquiry.

In order to create liability for an omission, as opposed to [*54] an affirmatively stated falsehood, there must be a duty to disclose the omitted nonpublic information. Gross v. Summa Four, Inc., 93 F.3d at 992 ("corporation must first have a duty to disclose the nonpublic material information"); Shaw v. Digital Equipment Corporation, 82 F.3d at 1202 ("silence, absent a duty to disclose, cannot be actionably misleading"). Simply reporting past historical earnings or successes does not give rise to a duty to report present circumstances which are less rosy. Suna v. Bailey Corporation, 107 F.3d 64, 68 (1st Cir. 1997). For example, if a corporation accurately reports that, " This is our eighth consecutive quarter in which our gross has increased,'" there is not duty to add, " We are concerned about the next one.'" Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 n. 4 (1st Cir. 1994) (further noting the rule may be different if the defendant apprehends " a disaster'").

Where, however, "a corporation does make a disclosure -- whether it be voluntary or required -- there is a duty to make it complete and accurate." Gross v. Summa Four, Inc., 93 F.3d at 992; Backman v. Polaroid Corporation, 910 F.2d 10, 16 (1st Cir. 1990) [*55] ("voluntary disclosure that a reasonable investor would consider material must be complete and accurate"); In re Boston Tech. Sec. Litig., 8 F.Supp.2d at 54 ("when an issuer opts to make a statement, that statement must be complete and accurate'"); see also Lucia v. Prospect Street High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir 1994) (recognizing that statement can be literally accurate but nonetheless misleading). A duty thus arises where, for instance, 'a corporation has previously made a

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 12 of 16

Page 16
2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." Gross v. Summa Four, Inc., 93 F.3d at 992; see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d 235, 242 (D.Mass. 2001) (" duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement'"); see also Shaw v. Digital Equipment Corporation, 82 F.3d at 1202-1203 ("task depends, in essence, on conceptions of materiality").

It is equally well settled [*56] that the false or omitted fact must be "material." An omitted or misrepresented fact is "considered material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.'" Gross v. Summa Four, Inc., 93 F.3d at 992; accord In re Cabletron, 311 F.3d at 33 ("fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available"). "Information which would have assumed actual significance in the deliberations of a reasonable shareholder is material." Baron v. Smith, 380 F.3d at 52. Issues of materiality are normally left for the "jury rather than resolved by the court on a motion to dismiss." In re Cabletron, 311 F.3d at 34.

In addition to a materially false statement or the omission of a material fact, the plaintiff must show that the defendant acted with scienter. Scienter is " a mental state embracing intent to deceive, manipulate, or defraud.'" Greebel v. FTP Software, 194 F.3d at 194 [*57] (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)). It can be proven with knowing or reckless conduct. Geffon v. Micrion Corporation, 249 F.3d 29, 35 (1st Cir. 2001). Under the former, the plaintiff must show that the defendant "knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors." Geffon v. Micrion Corporation, 249 F.3d at 35. Under the latter, there must be a showing of "more than mere negligence." Geffon v. Micrion Corporation, 249 F.3d at 35. Recklessness, which is more akin to a lesser form of intent than ordinary negligence, Greebel v. FTP Software, Inc., 194 F.3d at 199, consists of " a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" Geffon v. Micrion Corporation, 249 F.3d at 35; Orton v. Parametric Technology Corporation, 344 F.Supp.2d 290, 299 (D.Mass. 2004) [*58] (same).

B. Pleading Requirements

Greebel is the seminal case in this circuit with respect to pleading a securities action under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the PSLRA. Greebel v. FTP Software, 194 F.3d at 193-194; In re Allaire Corporation Securities Litigation, 224 F.Supp.2d 319, 325 (D.Mass. 2002). As explained in Greebel, the pleading standards under the PSLRA are congruent to the First Circuit's strict and rigorous application of Rule 9(b) prior to the 1995 enactment of the PSLRA. Greebel v. FTP Software, 194 F.3d at 192.

The pleading requirements under the PSLRA, as well as First Circuit caselaw interpreting Rule 9(b), first require the plaintiff to specify in the complaint "each allegedly false or misleading statement including its time, place and content.'" In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324 (quoting Greebel v. FTP Software, 194 F.3d at 193-194). Second, the complaint must " specify the reason or reasons why the statement is misleading.'" Greebel v. FTP Software, 194 F.3d at 193 [*59] (quoting statute with internal brackets omitted). In other words, the complaint must explain and provide factual support as to "why the challenged statement or omission is misleading." Greebel v. FTP Software, 194 F.3d at 193; see In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324 ("every claim that a statement or omission was fraudulent must be supported by facts showing exactly why it was misleading"). Third, if a claim rests on information and belief, the plaintiff must " set forth the source of the information and the reasons for the belief.'" Greebel v. FTP Software, 194 F.3d at 194; In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324; see also In re Cabletron, 311 F.3d at 28 (discussing inconsistency in definitions of what constitutes a statement made upon "information and belief").

Fourth, the complaint must state "with particularity facts that give rise to a strong inference' of scienter rather than merely a reasonable inference." In re Cabletron, 311 F.3d at 28 (quoting statute). Although pleading scienter may and often is established [*60] through inference, the inference must be strong. In re Cabletron, 311 F.3d at 28 (further explaining how this framework alters "the usual contours" of Rule 12(b)(6) analysis); Greebel v. FTP Software, 194 F.3d at 195 (same). n43

N43 As also explained in Greebel, the PSLRA does not alter the pre-existing substantive definition of scienter employed in the First Circuit. Greebel v. FTP Software, 194 F.3d at 200.

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 13 of 16

Page 17

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

Before exploring the absence of a strong inference of scienter with respect to any remaining statements, this court examines and rejects the revenue recognition allegations and the misleading nature of the discounting statement set forth in the financial statements as well as the allegations based upon unordered or additional product. Proceeding along a statement by statement analysis, see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 243; In re Boston Technologies Securities Litigation, 8 F.Supp.2d at 55, [*61] this court then culls the actionable statements in the complaint as distinguished from the nonactionable statements of corporate puffery and those that fall within the safe harbor provision of the PSLRA for forward looking statements.

C. Revenue Recognition

In support of pleading a strong inference of scienter as well as setting forth this material element, plaintiffs point to defendants' purported violations of SEC rules, GAAP and Cytyc's own revenue recognition policy. n44 (Docket Entry # 36, pp. 37-40). Separate and apart from the fact of this case, plaintiff's legal position is accurate. See Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 (paraphrasing Geffon v. Micrion Corporation, 249 F.3d at 35, that "'accounting shenanigans' may be evidence of scienter"); In re Cabletron, 311 F.3d at 39 ("significant GAAP violations also could provide evidence of scienter'"); Greebel v. FTP Software, Inc., 194 F.3d at 203 ("violations of GAAP standards . . . could provide evidence of scienter"); In re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d 251, 266 (D.Mass. 2001) ("a violation [*62] of a company's own policies supports an inference of scienter'").

n44 Plaintiffs additionally contend that the violations of GAAP, SEC regulations and Cytyc's policy show the falsity or misleading nature of the statements made during the class period because revenue should not be recognized until realized or realizable. (See, e.g., PP 60-62).

Plaintiffs identify statements in the Forms 10-K regarding discounts as materially misleading (PP 110-111 & 116) as well as the company's stated policy of recognizing revenue as materially misleading because the company engaged in channel stuffing (PP 112-114 & 116); see, e.g., In re Cabletron, 311 F.3d at 34 (noting the allegation of financial report filings as materially misleading). Plaintiffs further complain that the company's financial statements were materially false and misleading because they inflated or overstated revenues, accelerated revenues into earlier quarters and failed to disclose known trends such as channel stuffing. (See, e.g. [*63], n45 PP 52, 53, 56 & 66). Unfortunately for plaintiffs, none of these allegations survive defendants' motion.

n45 To state the obvious, the cited list of paragraphs is not exhaustive.

Turning to the first two aforementioned global categories of revenue recognition violations, it is true that systemically recognizing revenues before earned and accounting for such premature revenues contravene GAAP principles set forth in FASB Concepts Statement Number One. See Sparling v. Daou (In re Daou Sys.), 397 F.3d 704, 2005 WL 237645 at *8 (9th Cir. 2005) ("premature recognition . . . could violate other GAAP principles such as" FASB Concepts Statement No. 1); (PP 34 & 58-59; P 61, citing these principles) It is also true that the cited regulations in the second category generally require that a company not recognize revenue in financial statements until "realized or realizable and earned." n46 (P 56; see also PP 57 & 79-80). For example, SAB 101, repeatedly referenced in the complaint (PP [*64] 56, 57, 59 & 80), "requires that " revenue should not be recognized until it is realized or realizable and earned.'" In re BellSouth Sec. Litig., 355 F. Supp. 2d 1350, 2005 WL 327178 at *16 (N.D.Ga. 2005) (quoting SAB 101) Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 2005 WL 57928 at *3 (5th Cir. 2005) (further noting that SEC adopted SAB 101 "to guide companies in applying SEC Rules and GAAP to revenue recognition issues"). SEC regulations additionally state that filings that do not conform with GAAP are presumed to be misleading or inaccurate. (P 55); 17 C.F.R. § 210.4-01(a)(1); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 164 n. 4 (D.Mass. 2000)

n46 Plaintiffs' citation to a litany of SEC regulations and accounting principles is conclusory and fails to explicitly tie the violation to a particular duty and accounting regulation.

The class period Forms 10-Q and 10-K, however, do not evidence improper revenue recognition [*65] under these regulations. The channel stuffing allegations (see, e.g., PP 68 (f)) are not within the reach of the aforementioned regulations inasmuch as there is no evidence that ThinPrep shipments were returned or that Cytyc engaged in contingent sales, a pattern of undisclosed price protection and take back guarantees or reported revenue from fictitious sales. Cf. Aldridge v. A.T. Cross Corporation, 284 F.3d at 79 (involving price protection policy and

Case 1:04-cv-11380-WGY    Document 77-6    Filed 03/01/2006    Page 14 of 16

Page 18

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

contingent sales as opposed to only channel stuffing). n47 As aptly explained by a court in this district:

> Pull-ins or deep discounts are not the nefariously manipulative scheme that plaintiffs make them out to be. Pull-ins do not result in the improper recognition of revenue under generally accepted accounting principles ("GAAP") They are actual sales which are treated no differently than any other sale.

n47 The Aldridge case is distinguishable for the reasons set forth by defendants in their reply brief. (Docket Entry # 39, p 16) Although defendants exaggerate the absence of specific statements, there remains the absence of contingent or fictitious sales, returned product or a pattern of price protection and take back guarantees in the case at bar. The facts fail to indicate that the discounts resulted in revenue not being realized, as reported. See Gross v. Summa Four, Inc., 93 F.3d at 994. Thus, there is an absence of factual support for the necessary element of falsity or material omissions with respect to the innocuous channel stuffing alleged in this action as applied to the alleged GAAP, SEC and company policy violations.

Thus, while the number of former unnamed employees is sufficient and they occupy positions that give them a strong basis for possessing the information about the company's channel stuffing, see In re Cabletron Systems, 311 F.3d at 30; Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 22, the stories themselves lack the necessary facts to support the allegation that Cytyc violated the aforementioned GAAP, SEC and its own revenue recognition rules.

[*66]

In re Peritus Software Services, Inc., 52 F.Supp.2d 211, 223 n 3 (D.Mass. 1999) (internal quotation marks, brackets and citations omitted) The facts fail to indicate that the discounts resulted in revenue not being realized, as reported and in accordance with the Cytyc's stated accounting or revenue recognition policy. See Gross v Summa Four, Inc., 93 F.3d at 994 Stated otherwise, the excessive discounting did not prevent transactions from being completed. The financial statements accurately reflect earnings made upon and after persuasive evidence of an arrangement.

In any event, contrary to plaintiffs' position, the discounting was adequately disclosed. The Forms 10-K and 10-Q recognize the use of discounts and that such discounts could have a material adverse effect on Cytyc's financial condition. (Docket Entry # 32, Ex. B & J, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations;" Docket Entry # 32, Ex D, incorporating risks detailed [*67] in the 2000 Form 10-K and that such risks "may have a material adverse effect upon on the Company's business, financial condition and results of operations").

Accordingly, Cytyc's stated accounting or revenue recognition policy as well as the statement regarding discounts (PP 110-116) in the financial statements neither contravenes the aforementioned regulations in the first and second categories nor amounts to a false or misleading statement. n48 Also in this respect, there is no inference of scienter due to the absence of a violation of the foregoing GAAP and SEC provisions and Cytyc's revenue recognition policy or otherwise. n49

n48 Additional reasons explaining why the discount statement is not misleading or false are discussed infra.

n49 Even if such activity gave rise to a weak inference of scienter, without more, the complaint fails to pled the strong inference of scienter now required under the PSLRA.

The final category of allegedly improper revenue recognition which arises under Item 303 of [*68] 17 C.F.R. § 229.303 is likewise unavailing. n50 First, although the complaint expressly complains about the failure of the Forms 10-K and 10-Q to disclose the use of discounts as a known trend " that would cause reported financial information not to be necessarily indicative of future operating results'" (PP 64 & 66, quoting instructions to Item 303), the rule in "Item 303, 17 C.F.R. § 229.303(a)(3)(ii), . . . has to be read in light of the SEC's instruction to this paragraph which expressly states that forward-looking information need not be disclosed 17 C.F.R. § 229.303(a), Instruction 7." Glassman v. Computervision Corporation, 90 F.3d 617, 631 (1st Cir. 1996); accord Romine v. Acxiom Corporation, 296 F.3d 701, 708 n. 3 (8th Cir 2002) ("While § 229.303(a)(3)(ii) provides that known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed 17 C.F.R. § 229.303(a)").

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 15 of 16

Page 19

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

n50 The regulation, 17 C.F.R. § 229.303(a) and (b), commonly referred to as "Item 303," governs Form 10-K and 10-Q filings. Item 303 "requires corporate management to disclose, inter alia, any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. . . .'" Kafenbaum and Schulman v. GTECH Holdings Corporation, 217 F.Supp.2d 238, 249 (D.Mass. 2002).

[*69]

Second, it is not objectively unreasonable to omit the fact that the discounts, or channel stuffing, "would" as opposed to "could" have a material adverse effect on the company's future earnings. See, e.g., Oxford Asset Management, Limited v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("failure to allege facts from which the objective unreasonableness of Kos management's decision not to include the prescription information . . . could be inferred forecloses reliance upon Item 303 as a source of a duty to disclose that information"), cert. denied, 540 U.S. 872, 157 L. Ed. 2d 132, 124 S. Ct. 205 (2003). In addition, the import of the language was obvious making the distinction between "could" and "would" immaterial. See Baron v. Smith, 285 F. Supp. 2d 96, 104 (D.Mass. 2003) ("where company disclosed that largest customer began 'trial' of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word 'trial'") (paraphrasing In re Boston Technologies Securities Litigation, 8 F.Supp.2d at 61), aff'd, 380 F.3d 49 (1st Cir. 2004). [*70] Finally, although the information regarding discounts appears in the Forms 10-K under "marketing and sales" as opposed to under "results of operations," the placement, without more, is not actionable. n51

n51 The Form 10-Q refers to the risk factors in the annual Form 10-K report without expressly listing the use of discounts.

Third, the Forms 10-K directly and the Form 10-Q by incorporation adequately disclosed the use of discounts. See, e.g., Shaw v. Digital Equipment Corporation, 82 F.3d at 1206 (disclosure of marketing strategy in reducing prices adequately disclosed in SEC filings thereby obviating alleged violation of 17 C.F.R. § 229.303); Baron v. Smith, 380 F.3d at 54-56.

D. Unordered and Additional Product

Recognizing as revenue unordered product or shipping additional product without an order, as distinguished from channel stuffing through the use of deep discounts, is more egregious and poses a more forceful argument that Cytyc [*71] engaged in conduct in violation of its own or SEC and GAAP revenue recognition requirements. With respect to unordered or additional product, however, the complaint falls well short of providing sufficient detail to satisfy Rule 9(b) and the PSLRA. See In re Galileo Corporation, 127 F.Supp.2d at 268 (generally alleging that revenues in second quarter were false and failing to provide details about amount of warranty reserve understatement made pleading deficient under Rule 9(b) and PSLRA); Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 35-36 (channel stuffing allegations deficient under Rule 9(b) and PSLRA); Lirette v. Shiva Corporation, 27 F. Supp. 2d 268, 278 (D.Mass. 1998).

In contrast to the repeated and numerous allegations of channel stuffing on the part of former Cytyc employees, n52 the complaint provides few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship between the amount of unordered product shipped and the company's total revenues. The two instances of shipment of additional product related by the former Cytyc senior representative (P 44) and the [*72] former Cytyc sales representative (P 38) are too general and lack repeated corroboration to satisfy PSLRA pleading. Cf. In re Cabletron, 311 F.3d at 30-31. Thus, the instances of unordered product or shipment of additional product above what had been ordered (see PP 5, 7, 44, 49, 61 & 82(c)), as distinguished from the deep discounting at the end of every quarter and/or "channel stuffing," lack detail and corroboration by other employees. Eschewing a categorical approach, see In re Cabletron, 311 F.3d at 32 (rejecting "categorical approach" and noting that " Congress was concerned with the quantum, not type, of proof"), the complaint lacks the "quantum" of proof and particularity to satisfy the PSLRA with respect to the shipments of unordered or additional product. Accordingly, such allegations cannot support a finding that Cytyc's stated revenue recognition policy or the use of discounts or other channel stuffing activity was false or misleading or that defendants acted with scienter.

n52 See footnote number 47, P 2.

[*73]

E. Specific Statements

Defendants attack a number of the statements in the complaint as nonactionable corporate puffery or falling

Case 1:04-cv-11380-WGY   Document 77-6   Filed 03/01/2006   Page 16 of 16

Page 20

2005 U.S. Dist. LEXIS 6166, *; Fed. Sec. L. Rep. (CCH) P93,225

within the PSLRA's safe harbor provision for forward looking statements

As to the former, "Vague and loosely optimistic statements" are "nonactionable as a matter of law." Gross v. Summa Four, Inc., 93 F.3d at 987 (affirming dismissal of complaint). This rule applies to statements concerning both current affairs and future prospects. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 ("corporate puffery rule covers loose optimism about both an issuer's current state of affairs and its future prospects"); In re Boston Technology, Inc. Securities Litigation, 8 F. Supp. 2d at 54 (same). "Rosy affirmations commonly heard from corporate managers," such as we "expect another year of strong growth" or "the company is on target toward achieving the most profitable year in its history," are "numbingly familiar." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217-1218 (internal quotation marks and citations omitted). Consequently, "no reasonable investor could find" such [*74] "optimistic" or "vague" statements "important to the total mix of information." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217. In the parlance of common law fraud, such statements amount to " 'puffing' or sales talk.'" Shaw v. Digital Equipment Corporation, 82 F.3d at 1217 n. 32.

The more specific, definite or concrete the outward statement is, however, the greater the likelihood the statement is material and not mere puffery. See Gross v. Summa Four, Inc., 93 F.3d at 995 (distinguishing the actionable statements in Alfus v. Pyramid Technology Corporation, 764 F.Supp. 598 (N.D.Cal 1991), from inactionable statements in that case because "statements in Alfus dealt with definite projections," such as a forecast of 40% revenue growth). For example, the inclusion of "a market share figure" might push a nonactionable statement beyond the realm of "mere optimistic corporate puffery." Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 26 (finding phrase " continued market demand'" vague and optimistic in part because phrase did not specify "market share figure"). Similarly, more cautious [*75] or subdued statements are less likely to be actionable than more strongly optimistic or concrete statements that contrast sharply with internal reality. See Glassman v. Computervision Corporation, 90 F.3d at 635-636 (duty to disclose problems with new product "may arise where a company makes strongly optimistic or concrete statements . . . in stark contrast to its internal reports" as opposed to "subdued generally optimistic statements" that amount to "puffery," citing San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996)) "Mild statements of hope, couched in strongly cautionary language,' are not materially misleading. Glassman v. Computervision Corporation, 90 F.3d at 636.

Defendants also rely on the PSLRA's safe harbor provision with respect to a number of the forward looking statements in the complaint. Generally speaking, forecasts or other forward looking statements are not exempt from liability. Suna v. Bailey Corporation, 107 F.3d at 70. They are, however, only actionable "if the forecast might affect a reasonable investor in contemplating [*76] the value of a corporation's stock." Suna v. Bailey Corporation, 107 F.3d at 70 (internal quotations marks and citation omitted). In addition, there must be a showing that the forecast was false or misleading, in other words, that facts known by the forecaster at the time of the forecast (as distinguished from simply fraud by hindsight) made the anticipated forecast or success unlikely. See Suna v. Bailey Corporation, 107 F.3d at 70 (had the plaintiff "presented facts known by Bailey, and contemporaneous with the statements above, that would show that Bailey's anticipated success was unlikely, such facts would have adequately alleged a claim of securities fraud").

The PSLRA provides a safe harbor provision for forward looking statements that include cautionary warnings. Analogous to the "bespeaks caution" doctrine, see H.R. Conf. Rep. No. 104-369, *44 (1995) ("the Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created bespeaks caution' doctrine"), the relevant provision in 15 U.S.C. § 78u-5(c)(1)(A)(i) "shelters forward-looking statements that are accompanied [*77] by meaningful cautionary statements." Greebel v. FTP Software, Inc., 194 F.3d at 201; 15 U.S.C. § 78u-5(c)(1)(A)(i). The statutory language precludes liability for a forward looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or is "immaterial." n53 15 U.S.C. §  78u-5(c)(1)(A)(i) & (ii). The Conference Committee's discussion clarifies that " important' factors means [that] the stated factors identified in the cautionary statement must be relevant to the projection." n54 H.R. Conf. Rep. No. 104-369, * (1995) (further noting that "boilerplate warnings will not suffice"). On the other hand, the cautionary statement does not necessarily have "to include the particular factor that ultimately causes the forward-looking statement not to come true." n55 H.R. Conf. Rep. No. 104-369, *44 (1995).

n53 The inclusion of the latter language simply clarifies that 'Courts may continue to find a forward-looking statement immaterial-and thus