# EXHIBIT B

Westlaw.

Not Reported in F.Supp.                                                                                                Page 1
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

H

United States District Court, W.D. Missouri,
Western Division.
Lewis H. BIBEN, et al., Plaintiffs,
v
Harold E. CARD, et al., Defendants.
**No. 84-0844-CV-W-6.**

Jan. 6, 1986.

Jack Corinblit, Marc M. Seltzer, Corinblit & Seltzer, Los Angeles, Cal., Herbert E. Milstein, Lisa M. Mezzetti, Kohn, Milstein, Cohen & Hausfeld, Arthur M. Schwartzstein, Washington, D.C., Robert C. Gordon, Gordon & Whitaker, Kansas City, Mo., for plaintiffs; David H. Weinstein, Barbara A. Podell, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., of counsel.
John J. Kitchin, Louise L. Lucas, Swanson, Midgley, Gangware, Clarke & Kitchin, Kansas City, Mo., for Card.
C. Edward Simpson, Jones, Bell, Simpson & Abbott, Los Angeles, Cal., for Jallow.
Clark Waddoups, Rooker, Larson, Kimball & Park, Salt Lake City, Utah, for Redd.
Paul H. Niewald, Raymond L. Dahlberg, Niewald, Waldeck, Norris & Brown, Kansas City, Mo., for Tierney and Tierney & Ernst.
Reggie C. Griffin, John R. Bancroft, Larry W. Joye, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for Compton.
Colvin A. Peterson, Stephen W. Grow, Brian D. Williams, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Wright and Wright, Herfordt & Sanders.
Lawrence M. Berkowitz, George E. Feldmiller, Don M. Downing, Stinson, Mag & Fizzell, Kansas City, Mo., for Peat, Marwick, Mitchell & Company.
Thomas M. Bradshaw, Hoskins, King McGannon & Hahn, Kansas City, Mo., for Ira W. Palmer and William H. Palmer.
Sheldon G. Bardach, Los Angeles, Cal., and Frederick Beihl, Shook, Hardy & Bacon, Kansas City, Mo., for Keil and Financial Communications Group.
Ronald R. Walker, defendant pro se.
Van Oliver, Akin, Gump, Struss, Hauer & Feld, Dallas, Tex., for Process Management Company, Inc.

MEMORANDUM AND ORDER
SACHS, District Judge.
*1 Although counsel for the various parties in the above-captioned consolidated securities fraud action did informally discuss Rule 23, F.R.Civ.P., issues with the court at an October 19, 1985, conference, all sides have consented to determination of the pending motion for class certification without an evidentiary hearing. Voluminous filings have been received in opposition to this motion with all of the Rule 23 prerequisites being raised in the context of the eight proposed class representatives. The court has concluded, after studying the briefing and extracted deposition testimony cited to by the parties, that this case should proceed as a class action (with the named plaintiffs serving as class representatives), subject to reconsideration and possible decertification if merit discovery reveals that no significant portion of the class relied on the integrity of the market in purchasing Midwestern stock.[FN1] While the court recognizes its duty to subject any class certification motion to "rigorous analysis" so as to determine whether the Rule 23(a) prerequisites have been satisfied, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982), the following order will for the most part only outline the reasons I have concluded that class action treatment is appropriate here. Commencement of the next phase of discovery in this case should not be further delayed for a more exhaustive written evaluation of the evidence and arguments presented on both sides.[FN2] This litigation is well into its second year and a comparatively "prompt" ruling is needed to comply with Rule 23(c)(1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2

Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

BACKGROUND

The proposed class consists of:
[A]ll persons and entities who purchased the common stock of the Midwestern Companies, Inc. ("Midwestern") on the open market during the period from and including November 2, 1982, through and including March 23, 1984 ("the Class Period"), and were damaged thereby.

Excluded from the class are the Midwestern Companies and the defendants (and their family members)-individual officers and directors of Midwestern in addition to law, accounting, and public relations firms that allegedly participated in the fraudulent scheme to artificially inflate the price of Midwestern common stock. The essence of the consolidated class complaint is the allegation that the various defendants engaged in a plan or conspiracy to make Midwestern stock attractive to potential purchasers by issuing a series of materially false and misleading public reports or statements about the company. Artificial increases in Midwestern stock are claimed to be largely the result of "creative" accounting-specifically, reporting as current income and profits the "sales" of certain ethanol plants. Omissions of material facts throughout the class period are alleged relating to nondisclosure of the marginal nature of Midwestern's operations, especially in the ethanol production area. It is the consolidated complaint's position that trading in Midwestern common stock during the class period would have been relatively inactive in the absence of the public misrepresentations and omissions about the company's earnings and prospects for the future.[FN3]

*2 The eight proposed class representatives all purchased Midwestern common stock during the class period, although in different parts of the country. James Clements, Raymond Fisher, Stanley Nugit and Ardell Weinstein are California residents; John Kapnistos made his purchases in the Kansas City, Missouri, area; the Bibens (Lewis, Beverly and Bradley) made their purchases on the East Coast, presumably in Washington, D.C.[FN4] They seek to represent a class of persons estimated to be perhaps 1,500 in number who relied to their detriment on the integrity of the market in purchasing Midwestern common stock during the class period. A Rule 23(b)(3) class action is sought to be maintained. In addition to the numerosity, typicality, commonality, and adequacy of representation prerequisites of Rule 23(a), plaintiffs must demonstrate to the court's satisfaction "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The court notes initially that class certification motions require a balancing of interests not easily quantified. On the one hand is the defendants' desire to avoid the *in terrorem* effect of litigation that proceeds as a class action. The potential value of a plaintiff's case (i.e., leverage vis-a-vis settlement) obviously increases upon certification. On the other hand, it must be recognized that, especially in the securities fraud area where a multitude of small investors may be involved, a class action may be the only practical mechanism by which the rights of those investors can be vindicated through the judicial system. Skilled representation is needed which ordinarily can be secured only by the prospect of large-scale recovery. It is often doubtful whether individuals with relatively small stakes in the affairs of a corporate entity would have the financial incentive or practical ability to bring their claims to court in a form other than a class action.[FN5]

While an examination of these adverse interests necessarily entails a look at the factual bases for plaintiffs' claims, the standard for class certification is not as rigorous as the standard for ultimate recovery on the various fraud claims.[FN6] As Judge Hunter has written,
In deciding whether to certify a class, the Court must not require plaintiffs to establish the merits of their substantive claims or a likelihood of prevailing on those claims.

*Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149, 157 (W.D.Mo.1977). *See also In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 139 (D.N.J.1984) (The affirmative defense of non-reliance "goes to the merits of the case and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3

Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

cannot be considered by the court on a certification motion."). With these general principles in mind, the court will now turn to separate consideration of the Rule 23 prerequisites.

### NUMEROSITY

*3 A proposed class in a Rule 23 action must be "so numerous that joinder of all members is impracticable." The named plaintiffs here have presented evidence that there were between 1,500 and 1,600 shareholders of Midwestern common stock both in April 1983 (during the class period) and in March 1984 (at the conclusion of the class period). Approximately two million shares of the stock were outstanding during the class period; trading in that stock exceeded 11 million shares during the same time frame. Defendants argue that despite these statistics no hard proof of the size of the class has been presented since it is possible that a relatively few large investors purchased most of the shares that changed hands during the class period. If that were the case, a large percentage of the 1,500 Midwestern shareholders might have purchased their shares prior to the commencement of the class period.

"[T]he prevailing view is that the plaintiff need not allege the exact number or identity of class members." 1 *Newberg on Class Actions*, ¶ 3.05 at 139 (Second Edition 1985). The court here concludes that the evidence of shares traded and approximate number of shareholders during the class period is sufficient proof that joinder of proposed class members would be impracticable.
The large number of Midwestern shares changing hands is consistent with the highly speculative nature of the stock during the class period. While it is clear that Midwestern stockholders do not constitute as large a group as shareholders in many other companies whose stock is sold in the open market, it is reasonable to assume that a considerable number of the 1,500 or so stock owners were active in buying and selling Midwestern shares during the seventeen month class period.[FN7] Moreover, even if the actual size of the proposed class is considerably less than 1,500, the geographic diversity of the purchasers of Midwestern stock points in favor of class certification. 1 *Newberg on Class Actions*, ¶ 3.06 at 144-45 ("[A] plaintiff or defendant with a small but geographically diverse class may meet the requirement of Rule 23(a)(1), whereas a centrally located class of similar size might not."). A nationwide class is contemplated here with Missouri as the forum state because of Midwestern's presence in and around Joplin. A class numbering at least in the hundreds spread throughout the United States would not be easily joined.[FN8] Accordingly, the numerosity requirement of Rule 23 has been satisfied.

### TYPICALITY

At least three related arguments made by defendants in their briefing address the Rule 23(a)(3) prerequisite that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Initially, it is asserted that the relative sophistication of a number of the named plaintiffs (in particular the California plaintiffs-Weinstein, Clements, Fisher and Nugit) renders them atypical of the ordinary purchaser of Midwestern stock. Specifically, unlike the neophyte in the stock market, sophisticated investors presumably should be charged with a higher degree of diligence in investigating public statements and press releases of the Midwestern companies. Defendants principally rely on *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir.1984), where the proposed class representative was a licensed securities broker, a bank vice-president, and "a sophisticated investor in the financial market who worked daily with yields and calculations of yields on investment securities."
On the other hand, in *Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 70 (S.D.Tex.1984), a class representative who had an economics degree and owned securities in a number of other companies was not considered "a sophisticated investor compared to other class members."

*4 That the named plaintiffs in the *Biben* consolidated complaint had some experience in buying and selling stock on behalf of themselves and their families does not render them unduly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?format=HTMLE&dataid=A00558000000357000052... 6/6/2006

Case 1:04-cv-11380-WGY   Document 104-3   Filed 06/09/2006   Page 5 of 14

Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
(Cite as: Not Reported in F.Supp.)

sophisticated investors.[FN9] There is also no indication in the present record that those persons whom the plaintiffs seek to represent were any less involved in securities transactions than Clements, Weinstein, et al. The court will not assume, as the defendants apparently would like me to do, that the typical Midwestern shareholder was a person unschooled in the investment field. The highly speculative nature of the stock at a time of purportedly tremendous company growth suggests otherwise-that most of the stock owners were not rank amateurs. The court does not find the amount of stock purchased by the named plaintiffs or these persons' prior involvement in the stock market particularly out of the ordinary so as to defeat the typicality of their claims of fraud.

The most repeated and emphasized reason for opposing class certification in the present case relates to the assertion that the named plaintiffs purchased Midwestern stock not on the basis of the integrity of the market but rather in reliance on the recommendations of their brokers. Those brokers, it is argued, were either privy to inside information on the financial health and prospects of Midwestern or were themselves guilty of making oral misrepresentations to the named plaintiffs.
Defendants cite to a number of reported decisions for the proposition that fraud on the market securities fraud actions based on varying oral representations are not properly certified as class actions because nonreliance on the market constitutes a unique defense. *See, e.g., Seiler v. E.F. Hutton & Co., Inc.,* 102 F.R.D. 880, 888 (D.N.J.1984) ("It is the general rule that an action based substantially on oral rather than written communications is inappropriate for treatment as a class action); *Zandman v. Joseph,* 102 F.R.D. 924, 930-31 (N.D.Ind.1984); *Markewich v. Ersek,* 98 F.R.D. 9, 10-11 (S.D.N.Y.1982) (The proposed plaintiff's claims are atypical because he "may be uniquely subject to the claim that his decision was based upon the recommendation of his broker who was privy to inside information and the victim of misrepresentations other than those contained in the financials,"); *McNichols v. Loeb Rhoades & Co., Inc.,* 97 F.R.D. 331, 336-37 (N.D.Ill.1982); and *In re LTV Securities Litigation,* 88 F.R.D. 134 (N.D.Tex 1980).

The court does not believe that the above line of cases precludes class certification here although ultimately proof that no significant number of class members relied on the integrity of the market would doubtless require decertification. Initially, I note my agreement with Judge Brotman in *In re Data Access Systems,* 103 F.R.D. at 139, that the fact that investors buy a stock for a multitude of different reasons should not be enough to defeat class action treatment of securities fraud cases.

*5 There will always be some individuals who read the financial statements directly, others who read secondary analyses such as Moody's or Value Line, and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.

In the present case, moreover, there is no reason to believe that other class members (whom the named plaintiffs seek to represent) would not be subject to the same defense of reliance on factors other than market integrity. As defendants are quick to point out, the market for Midwestern stock was not as well-developed as the more common securities traded on the stock exchanges and, consequently, a large number of the stockholders in the proposed class may have relied heavily on the investment advice of brokers, investment counselors, etc. The conflicting accounts of the influences on and motivations of the named plaintiffs in purchasing Midwestern stock do not establish that these persons' claims are any less typical (in the context of the class period) than those of the class they desire to represent. It should be added that the typicality (as well as adequacy of representation) requirements should be considered in light of the fact that the named plaintiffs are the only ones who have yet stepped forward to represent the class. These plaintiffs and their attorneys have vigorously pursued this lawsuit to this point in the proceedings (a considerable task given the volume of opposition to class certification) and no more typical class representatives have appeared or been identified.

Despite defendants' assertions to the contrary, it is also likely that many of the brokers to whom the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

named plaintiffs looked for investment advice made statements that "merely reiterated, digested or reflected the misstated information that forms the basis of the securities fraud claims." *Zandman,* 102 F.R.D. at 931. Reliance on the advice of third parties who serve simply as conduits of the defendants' misrepresentations and omissions does not make class certification less appropriate. *Grossman,* 100 F.R.D. at 788-89 ("[I]t is likely that many investors rely upon information digested by others and not simply on 'the market' as such." *Steiner v. Equimark Corp.,* 96 F.R.D. 603, 609 n. 13 (W.D.Pa.1983). Assuming for present purposes the truth of plaintiffs' underlying allegation that defendants combined to provide inaccurate and false financial information about Midwestern, it is inherently unlikely that such misrepresentations supplied in writing and publicly distributed would not have had a substantial indirect effect, if not a direct effect, on the investment advice received by potential purchasers of Midwestern stock. This logical progression is at the heart of the fraud on the market theory of liability. *See Dekro v. Stern Brothers & Co.,* 540 F.Supp. 406, 416-17 (W.D.Mo.1982) (Stevens, J.), and *Stoller v. Baldwin-United Corporation,,* Fed.Sec.L.Rep. (CCH) ¶ 92,298, at 92,026 n. 8 (S.D.Ohio, June 4, 1985) ("The assumption that the market adequately reflects the information provided its participants is fundamental not only to market fraud cases in general ... but to securities regulation in general.").

If further discovery in this case reveals that the overwhelming number of class members did not rely, directly or indirectly, on the integrity of the market but rather on the independent misrepresentations of their brokers (i.e., that the alleged artificial inflation of Midwestern stock prices resulting from defendants' common course of conduct had no significant bearing on class investment decisions), then decertification or judgment on the merits for defendants would likely become necessary.

*6 Finally, the court finds persuasive the conclusion of Judge Hunter in *Hurwitz* that questions of individual reliance go to the merits of the securities fraud lawsuit and could be litigated separately after the common issues of law and fact are tried. 76 F.R.D. at 168-69 and n. 34. Any other result would have the practical effect of eliminating the class action device as a possible way of handling most complex securities fraud cases.

For essentially the same reasons as discussed above, I also reject the argument that the named plaintiffs' contacts with the defendants-in particular, the officers and directors of the Midwestern companies-render these persons atypical of the class they seek to represent. It is not at all clear, despite defendants' protestations, that such conversations as occurred between the named plaintiffs and the Midwestern officials constituted the improper dissemination of insider information. Similar information and/or contacts may have been available to the general investing public. That these conversations were unusual in the context of the proposed class has so far been only the subject of speculation. It is always possible that a smoking gun piece of evidence (for example, that a named plaintiff was in possession of material inside information that was not obtainable elsewhere) will be uncovered subsequently so that removal of a named plaintiff as a class representative might become necessary. That class representative could by then, however, likely be replaced as more information is uncovered about the identities and locations of other class members. The court is simply not prepared at this time to conclude, from the record presented in regard to the pending certification motion, that any of the named plaintiffs are so tainted by the stain of insider information that they cannot continue as class representatives.

In sum, I find that the named plaintiffs are typical of the proposed class in that they were purchasers of Midwestern stock, and were likely not appreciably more sophisticated investors than the class members in general. In addition, the purported reliance on brokers' advice is characteristic of how most stockholders buy and sell securities and is not grounds alone for defeating class certification under a fraud on the market theory of liability.

ADEQUACY OF REPRESENTATION

The requirement of Rule 23(a)(4) that "the representative parties ... [must] fairly and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 6

Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

adequately protect the interests of the class" has generally been recognized as imposing two related standards: (1) an absence of conflicts of interest between the named plaintiffs and the rest of the class members, and (2) an assurance of vigorous prosecution of the lawsuit on behalf of the entire class. *See* 1 *Newberg on Class Actions,* § 3 .22 at 198. As for the latter test, courts will usually " focus on the competence and experience of class counsel." *Id.* at 203. The court has had occasion to review the qualifications of plaintiffs' team of attorneys and is well satisfied with the level of experience demonstrated in securities fraud actions of this sort. I have been impressed with the performance of these attorneys at the two conferences already held in this case as well as with their extensive written work submitted to me. The court has no doubts that plaintiffs' counsel has the skill, incentive, and determination to proceed with this complex litigation on a nationwide basis.

*7 Of course, class actions are not certified on the basis of plaintiffs' attorneys alone. The class representatives must not constitute mere figureheads-fictional entities that lawyers use to generate fees. In this regard, defendants here have challenged the named plaintiffs' proposed representative status because of their alleged ignorance of the nature and progress of the lawsuit *and* their alleged financial inability to pursue this litigation on behalf of the class. As for the former contention, defendants misconstrue the extent to which class representatives as laymen need to know of and follow their securities fraud action. "A complex securities action cannot be founded upon an investigation of a litigant." *Weinberger v. Jackson,* 102 F.R.D. 839, 845 (N.D.Cal.1984). *Accord, Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 366 (E.D.Pa.1980) ("To require a person unschooled in the realm of our complex and abstract securities laws to have first-hand knowledge of facts cloaked in an alleged conspiratorial silence and which present themselves as a wrong-doing that may be actionable would render the class action device an impotent tool.").
It is not only appropriate but usually necessary that plaintiffs' counsel, experienced in securities law, take the lead in pre-litigation investigation (to determine the identity of the wrongdoers) and in pre-trial discovery. Consequently, the ability of the representative's counsel is a more important factor in assessing the adequacy of representation than are the "[p]ersonal qualifications or motives of the proposed class representative." *Weinberger,* 102 F.R.D. at 845. In the present case, the named plaintiffs know at the very least that their Midwestern stock became practically worthless almost overnight. Absent some sudden change in economic prospects, a reasonable alternative supposition is that somehow the market value had become grossly over-inflated. With the assistance of counsel, plaintiffs have so far pursued "a resolution of the controversy with the requisite vigor and in the interest of the class." *Piel,* 86 F.R.D. at 366.

That the lion's share of the time spent pursuing class certification has been expended by plaintiffs' counsel is not a peculiar result; the named plaintiffs have their own careers which cannot be expected to come to a halt merely because they have filed this complex lawsuit. This court has no qualms about plaintiffs' counsel taking the lead in large part because of the prospect of substantial attorneys' fees. This financial motive should encourage vigorous prosecution of the lawsuit on behalf of the entire class-it will be in the attorneys' interest to identify all potential class members. Moreover, the court's control over the amount of attorneys' fees that may be awarded after settlement or success at trial will also indirectly assist the adequacy of class representation. Class counsel will be officers of the court as well as advocates. I am satisfied at this point that they will perform both functions diligently.

*8 The willingness of the proposed class representatives to finance this action has been challenged largely on the ground that the potential expense far outstrips the eight named plaintiffs' combined assets. This court has previously had the opportunity to discuss the financial component of the adequacy of representation requirement. In *Van-S-Aviation v. Piper Aircraft Corp.,* 101 F.R.D. 759 (W.D.Mo.1984), I agreed with a prior ruling of Judge Gorbey that the proposed class representative (a single corporate airplane dealer) had not demonstrated the ability and willingness "to finance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a nationwide class action of considerable complexity." I wrote that when a serious question about financial commitment is raised, a proposed class representative cannot "rest on unconvincing generalities and ambiguous remarks" but rather must give meaningful assurances "that adequate financing is available, either directly from the client or from a supporting group or (within ethical limits) from counsel." *Id.* at 762.

The present case differs greatly from the situation described in *Van-S-Aviation.* For one thing, plaintiffs' counsel here have indicated their willingness to advance a great deal of the money needed for pre-trial procedures.[FN10] *See, In re McDonnell Douglas Corp. Securities Litigation,* 92 F.R.D. 761 (E.D.Mo.1981), a case I distinguished in the *Van-S* ruling. 101 F.R.D. at 762. In this case I am prepared to follow Judge Hungate's lead. Moreover, the named plaintiffs have provided the court with at least some documentation of their financial condition. Clearly, these persons, as a group, have substantial resources to expend on this litigation. In sum, the court is satisfied with the named plaintiffs' representations about the financial aspects of pursuing the case.[FN11]

Defendants also label the named plaintiffs as inadequate class representatives because of alleged credibility problems. Specifically, defendants point to inconsistencies in the deposition testimonies of the proposed class representatives and their brokers. Citations to the brokers' depositions are made to counter the assertions of the named plaintiffs that they did not know that Midwestern stock was a highly speculative investment but that they did rely on Midwestern financial statements (or the market reaction thereto). Unlike the Second Circuit in *Kline v. Wolf,* 702 F.2d 400, 402-403 (1983), I am not prepared to make even a preliminary finding on the credibility issues raised here. Even the *Kline* opinion recognized that "a court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be to eliminate any class representation." *Id.* at 402. Defendants' search for perfect class representatives is doomed to failure-which of course is the desired result. Defendants simply have not convinced me that the named plaintiffs are likely guilty of any dishonesty that would seriously taint their proposed representative status. Even if they did know of some of the risks involved in Midwestern stock, this knowledge may well have been possessed by the class members generally. Certainly, that the class representatives and their brokers do not recall some of the events surrounding the trading in Midwestern stock similarly is to a certain degree to be expected and does not establish the existence of deliberate falsehoods. Most importantly, such variances in memory do not support a conclusion that the named plaintiffs would sacrifice the interests of the class-in other words, that a conflict of interests exists.

**\*9** As indicated at the October 19, 1985, conference, however, the court is more concerned about whether the decision to drop E.F. Hutton (and E.F. Hutton brokers) as defendants in the consolidated *Biben* complaint may indicate a conflict of interests between the proposed class representatives and the class at large. Hutton and the Hutton broker Jack Timmer were named defendants in one of the cases originally transferred to the Western District of Missouri, the *Leff* complaint. This court did grant plaintiffs leave to file their consolidated class complaint on November 6, 1984, but this cannot be construed in any manner as a calculated approval of deleting the Hutton defendants. Neither I nor apparently the defendants recognized the significance of the change of parties at the time the November 6, 1984, order was entered.

Defendants point out possible motives for the dropping of the Hutton parties that would indicate a clear conflict of interest. Many of the named plaintiffs (apparently seven out of eight) had dealings with Hutton brokers and several of them were in some way related to such brokers.[FN12] In addition, two of the attorneys for the proposed plaintiff class (Herbert Milstein and Arthur Schwartzstein) apparently represented Hutton broker Scherer in matters relating to the collapse of the Midwestern companies. The implication that defendants seek to draw is that for reasons of friendship, kinship or attorney-client relationships, the named plaintiffs have chosen [FN13] not to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11380-WGY    Document 104-3    Filed 06/09/2006    Page 9 of 14

Not Reported in F.Supp.                                                                          Page 8
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
(Cite as: Not Reported in F.Supp.)

pursue possible claims against important wrongdoers-Hutton and its brokers. It is asserted that Hutton's promotional activities on behalf of Midwestern were so substantial that the brokerage house became a market maker of Midwestern stock. If that were the case, defendants reason, a substantial number of the class members may have been harmed by Hutton misrepresentations and the class deserves representatives willing to pursue *all* potential claims, including those against brokers.

In candor, the questions surrounding the deletion of Hutton strike me as the most serious obstacle to class certification, in particular because no adequate explanation for that decision has been presented.
In the absence of any development of documentation of nationwide fault by Hutton, however, it would seem that the possible omitted claims would be individualized ones against particular Hutton brokers. As opposed to the presently named defendants whose alleged misconduct in disseminating written misrepresentations would have affected the entire class (by undermining the integrity of the market and artificially inflating the price of Midwestern stock), the Hutton brokers would not likely have had such classwide impact. The class members would necessarily have dealt with different brokers, many of whom were unaffiliated with Hutton.[FN14] The joinder of Hutton and/or its brokers, consequently, would cause undue and unnecessary complications in the litigation.[FN15] Moreover, the interests of class members vis-a-vis Hutton (or non-Hutton brokers for that matter) can be safeguarded by the use of a class notice that clearly indicates that claims against brokers that have been asserted by some Midwestern shareholders are not involved in this litigation and that any such claims must be pursued outside the context of the present case. With a degree less certainty than in my other rulings, therefore, I conclude that the Hutton problem does not render the named plaintiffs inadequate representatives of the proposed class.
The capabilities of counsel, the vigorous prosecution of this case to the present date, and the essential compatibility of interests between class representatives and class members all point in favor of class certification here. It would probably weaken rather than strengthen the prosecution of the case to take the *Leff* plaintiffs and their counsel out of this litigation, although their conduct in silently abandoning a claim that may be colorable gives me some concern.

### COMMONALITY

*10 Not only must plaintiffs establish the existence of questions of law or fact common to the class ( Rule 23(a)(2)), but the court must also find, in a Rule 23(b)(3) class action, that those common questions "predominate over any questions affecting only individual members." Plaintiffs identify the common issues here as including whether a fraudulent scheme to misrepresent the true financial condition of Midwestern was undertaken by the defendants during the class period and whether this scheme had a causal connection to the inflation of the price of Midwestern common stock. The "alleged existence of a conspiracy to inflate artificially the price of securities or to maintain an inflated value of the securities ... has been found sufficient to satisfy the commonality requirement" of Rule 23(a)(2). *Steiner,* 96 F.R.D. at 608.

Defendants contend, nonetheless, that various individual issues predominate over the common course of conduct allegation of plaintiffs' complaint. Primarily, defendants point to the interrelated concepts of reliance and causation. Since plaintiffs received varying information about the Midwestern companies from numerous sources, it is argued that "the presumption of reliance" described in *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976), has been sufficiently rebutted to defeat class certification. As this court noted in its rulings on motions to dismiss (April 10, 1985):
Under *Blackie,* defendants may destroy the presumption [of reliance on the integrity of the market] by showing that the alleged misrepresentations were not material, or that plaintiffs would have purchased the securities even had they known of the alleged misrepresentations.

Fed.Sec.L.Rep. (CCH) ¶ 92,010, at 91,001. *See also, Kline v. Wolf,* 88 F.R.D. 696, 700

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?format=HTMLE&dataid=A00558000000357000052...    6/6/2006

Not Reported in F.Supp.                                                                      Page 9

Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

(S.D.N.Y.1981) ("It is recognized that reliance is presumed once the materiality of an omission is established or the material misrepresentation affected the price of the stock traded in the market-but the presumption is rebuttable."). The defendants here, like the defendants in *Stoller,* have demonstrated in their briefs that the federal courts have taken different approaches in deciding what evidence rebuts the presumption of reliance in a fraud on the market case. Fed.Sec.L.Rep. (CCH) ¶ 92,298, at 92,025. Yet, I agree with Senior Judge Porter that the mere possibility that defendants will offer proof of nonreliance at trial as to class representatives is not alone enough to defeat the commonality/predominance prerequisite of Rule 23. "To hold otherwise would be to defeat the principles behind the market fraud cases, and would subject plaintiffs to denial of class certification based solely upon the defendants' predictions of difficulties they may face in opposing plaintiffs' claims." *Id.* at 92,026. *Accord In re LTV Securities Litigation,* 88 F.R.D. 134, 143 n. 4 (N.D.Tex.1980).

If after merit discovery defendants can demonstrate either that the proposed class as a group did not directly or indirectly rely on market integrity in purchasing Midwestern common stock or that the class representatives' reasons for purchasing the stock were fundamentally different than those of the class, then decertification or a change in representatives might be appropriate under the typicality, adequacy of representation *or* commonality requirements. FN16 At the present time, however, defendants' attempt to rebut the presumption of reliance is premature (*Dekro v. Stern Brothers,* 540 F.Supp. at 417), goes to the merits of the case (*In re Data Access Systems Securities Litigation,* 103 F.R.D. at 139), and does not overcome the predominant common issues-whether a common scheme to artificially inflate the price of Midwestern stock existed during the class period and whether that scheme was successful in that it induced the class to purchase in reliance, directly or indirectly, on the integrity of the market.FN17

*11 A related predominance argument raised by defendants here is that the length of the proposed class period and the great number of public reports issued about the Midwestern companies during that period raise individual questions of materiality, diligence, reliance, scienter and damages. The absence of standardized representations during the class period would mean that those class members purchasing early in the class period would have an entirely different set of considerations and justifications than later purchasers. In upholding a district court's decision not to certify a shareholders' derivative suit as a class action, the Eighth Circuit in *Polin v. Conductron Corp.,* 552 F.2d 797, 802, *cert. denied,* 434 U.S. 857 (1977), agreed that "the purchase dates of the various buyers would be of importance in determining the rights of each purchaser," and that the diversity of factual issues involved in the four year class period made certification inappropriate.

The court does not find *Polin* to be dispositive here for a number of reasons. First of all, the Eighth Circuit there was applying an abuse of discretion standard of review to a lower court's certification ruling. "It is well settled that the trial court has broad discretion in determining whether a class action may be maintained and its determination should be given great weight by a reviewing court." 552 F.2d at 802. Moreover, at the heart of plaintiffs' complaint in the *Biben* action is the allegation of a pervasive, common course of conduct to falsely portray by a particular methodology the present status and future condition of Midwestern so as to induce substantial investment in the company. This scheme's effects have been narrowed by plaintiffs to a seventeen month period in 1982-84 (rather than the 4-year proposed class period in *Polin* ). That the common plan extended over a period of months or years and was executed by the release of different documents at different times does not make class action treatment improper. *See, e.g., Steiner,* 96 F.R.D. at 608 ("[F]luctuations in the underlying facts over the class period" does not defeat class certification); *Stoller,* Fed.Sec.L.Rep. (CCH) ¶ 92,298, at 92,023-024; *Blackie,* 524 F.2d at 902 ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions ..."). Finally, it is fairly well-established that named plaintiffs in a securities fraud action may represent a class consisting of those who purchased at an earlier or later time during the period when defendants' conduct had its intended impact on the market. *Dura-Bilt Corporation v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981); *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 61-62 (S.D.N.Y.1980); *Stoller,* Fed.Sec.L.Rep. (CCH) ¶ 92,298, at 92,023. The fraud on the market theory directs attention not to the specific effect of each public statement but rather on the cumulative effect of all of the documents and representations on the investing public's decision to purchase a particular security.

The class period here is limited enough to support the common plan allegations of the complaint without unduly raising individual fact issues. *Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 504 (S.D.N.Y.1984) (class certification where documents and press releases covered a period of slightly over two years). Apportionment of damages, of course, would occur only after the common issues of liability are resolved by the factfinder.

### SUPERIORITY OF THE CLASS ACTION DEVICE

**\*12** Class certification is an option available to parties to a lawsuit only where this procedure is found to be superior to other means of handling multiple claims or parties-such as joinder, intervention, consolidation, or test cases. Rule 23(b)(3), 1 *Newberg on Class Actions,* § 4.27 at 327. Underlying the entire discussion above is recognition of the fact that securities fraud cases are the classic Rule 23(b)(3) class actions. *See Ridings v. Canadian Imperial Bank,* 94 F.R.D. 147, 150 (N.D.Ill.1982) (Securities fraud cases are "uniquely suited to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing."

). A major advantage of the class action procedure that I identified in *Van-S-Aviation,* 101 F.R.D. at 762-"that it may enable litigation of multiple claims that cannot, with financial feasibility, be prosecuted for the benefit of one individual" applies with great force here. The thirty-four *Sullivan* plaintiffs represent only a small percentage of the proposed class and their decision to opt out of any class action should not be given undue significance. As a practical matter, the legitimate claims of a large number of Midwestern shareholders may never be vindicated without class certification. The court is satisfied that the Missouri forum, the named plaintiffs, and the experienced class counsel present here make the *Biben* consolidated cases the best action in which to certify a nationwide class, and thereby to litigate the nationwide consequences of the rise and fall of Midwestern and its alleged fraudulent causes. Class certification or not, the factual and legal issues raised in the *Biben* pleadings will not be easily resolved through trial or otherwise. Complications will surely arise, but the court believes that such problems are inherent in the case itself and will not be exacerbated by class certification. The nature of the wrongs alleged and the number and diversity of apparent victims all point in favor of a class action as the most appropriate management device here.

### CERTIFICATION OF PENDENT STATE LAW CLAIMS

Largely because Missouri appellate courts have not adopted the fraud on the market theory (and, therefore, the presumption of reliance), and because the geographical diversity of Midwestern shareholders may require the application of the laws of numerous states, defendants assert that the pendent state law claims should not be certified regardless of what the court decides as to the federal securities law claims. Plaintiffs counter that their common law fraud claims are predicated upon exactly the same conduct that is allegedly actionable under the federal securities law and that, consequently, considerations of judicial economy make certification of both federal and state claims appropriate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The remaining state law counts [FN18] (Counts VI and VII) assert common law actions under Missouri law-fraud and deceit, negligent misrepresentation. Missouri law is presumably applicable for the same reasons that venue is proper in the Western District of Missouri-the acts alleged occurred in that district including the preparation of the controverted financial statements, reports, and documents; the corporate headquarters, executive offices and corporate staff of Midwestern are located in this district; several individual defendants reside in this district. Consolidated class complaint, paragraph 3.

*13 To the extent that Missouri substantive law will govern these common law claims, the court believes that the certification order should encompass them. *See generally, Dekro,* 540 F.Supp. at 418. Judge Stevens there went further than I am now prepared to rule in concluding that "variations in the elements of fraud among the states need not defeat class certification." His reasoning, however, is instructive when he writes that "[i]t is conceivable that defendant's conduct should be evaluated under the law of that state with the most significant contacts to the underlying transaction." Clearly, plaintiffs' theory in the present case is that Missouri law should govern the pendent claims because the principal acts of alleged wrongdoing occurred in (or had their origin in) Missouri. For purposes of ruling the pending motion, the court will accept this choice of law analysis and will certify the Missouri common law claims. If it turns out that the laws of multiple states will necessarily be applied, reconsideration of this aspect of the certification order may be sought. That the proof of reliance may be different for the federal and state law counts does not destroy the commonality or typicality already demonstrated. *Dekro,* 540 F.Supp. at 418 ("[W]here reliance is genuinely disputed, the parties and the court should be able to fashion a workable arrangement for trying the issue without destroying the efficacy of class proceedings on other issues.").

## CONCLUSION

Certification of the remaining federal and state law counts as a class action is hereby GRANTED with the class period and class membership defined as proposed by the pending motion. Plaintiffs Kapnistos, Clements, Fisher, Weinstein, Nugit, Lewis Biben, Bradley Biben, and Beverly Biben are certified as class representatives. It is further

ORDERED that plaintiffs serve and file a proposed form of notice to the class, pursuant to Rule 23(c)(2), F.R.Civ.P., within forty-five (45) days from the date of this order. Defendants may file a response to plaintiffs' proposed form of notice within ten (10) days thereafter. The parties should consult among themselves in an effort to compose an agreed form of notice that incorporates the court's directions to inform class members that claims against brokers are not encompassed by this action.

FN1. The case has proceeded through the pleading and class action discovery phases on a fraud on the market theory approved by this court. *See Biben v. Card,* Fed.Sec.L.Rep. (CCH) ¶ 92,010, at 90,999-91,001 (W.D.Mo.1985).

FN2. The court anticipates entering a scheduling order covering merit discovery shortly, hopefully within two weeks of the date of the present order.

FN3. The seventeen month class period apparently represents the time during which the falsity of the public documents and press releases was not known to the general investing public. A March 5, 1984, article in *Barron's* seriously questioned the financial viability of Midwestern and allegedly put potential investors on notice of the fraudulent scheme. The *Barron's* piece is described by plaintiffs as the catalyst for the financial markets and the investing public to reevaluate the integrity of the market for Midwestern stock. According to the complaint, the price of Midwestern common stock fell from a high of $24 1/2 to $1 7/8 as of April 30, 1984. The Midwestern companies (Midwestern and Titan Energy Engineering, Inc.) filed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11380-WGY    Document 104-3    Filed 06/09/2006    Page 13 of 14

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
(Cite as: Not Reported in F.Supp.)

bankruptcy petitions in May 1984.

FN4. Bradley Leff, originally a named plaintiff in the consolidated complaint, has been removed as a proposed class representative.

FN5. Consideration in the present case, however, must be given to the fact that the thirty-four *Sullivan* plaintiffs have chosen to seek their remedies outside the context of the proposed class action. The apparent need for such a substantial pooling of interests is consistent with the general analysis here presented.

FN6. Remaining federal claims include private causes of action under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and the RICO statute, 18 U.S.C. §§ 1962 and 1964. Claims for violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), were dismissed in the court's April 10, 1985, memorandum and order.

FN7. "Though we do not now have before us any information as to the number of persons who bought Waste Management stock during the class period, as opposed to the number of shares traded during that period, we are entitled to make 'common sense assumptions' in order to support a finding of numerosity." *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 785 (N.D.Ill.1984).

FN8. "Impracticable" as used in Rule 23(a)(1) should be defined as impractical, unwise or imprudent "rather than ' incapable of being performed' or ' infeasible.' " *Goldstein v. North Jersey Trust Co.*, 39 F.R.D. 363, 367 (S.D.N.Y.1966).

FN9. By contrast, the proposed class representative in *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994, 998 (7th Cir.1980), was an open-end diversified mutual fund "very familiar with financial statements," and, therefore, may not have been as justified "in relying on any material misrepresentations or omissions of material facts as other purchasers of American Appraisal stock."

FN10. In contrast, I found in *Van-S-Aviation* no demonstration of class counsel's commitment "to expend large cash sums."

FN11. It should also be noted that a number of courts have concluded that the proposed class representatives' personal finances are not relevant to the adequacy of representation question. *See* 1 *Newberg on Class Actions*, § 3.37 at 239-40 and n. 555.

FN12. Hutton employee Robert Scherer, for example, was a son-in-law of Lewis Biben.

FN13. This "choice" is described by the defendants as the decision of class counsel and not of their clients. The parties have contested in their briefing whether all of the named plaintiffs were even consulted on the decision to drop the Hutton defendants.

FN14. The *Sullivan* plaintiffs, for example, have sued their broker-First Affiliated Securities. The claims against First Affiliated would be specific to the thirty-four plaintiffs in the *Sullivan* cases just as the claims against Hutton would likely be specific to those class members who purchased Midwestern stock through Hutton brokers.

FN15. While plaintiffs' "right" to choose the parties against whom claims are asserted is necessarily circumscribed by their obligation to adequately represent the entire class, joinder of broker defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 13

Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462
**(Cite as: Not Reported in F.Supp.)**

might have the practical effect of destroying typicality and of making a class action unmanageable. Every class member's relationship with his own broker would immediately become an issue and, as a result, the fraud on the market theory of liability might become almost impossible to pursue. Although this is likely the result that defendants seek, the court cannot conclude that the fraud on the market principle was intended to be so easily defeated. Compliance with Rule 23(e) is more problematical. The requirements of court approval and notice to class members before a class action is dismissed or compromised apply "even for dismissal as to some of the defendants" and even prior to the court's initial determination of whether a class is to be certified. *See* 3B *Moore's Federal Practice,* ¶ 23.80[2.-1], at 23-507 to 23-509 (1985). Accordingly, a formal motion to delete Hutton and Timmer from the consolidated *Biben* complaint may be required as a part of or after notice of class certification is given to the entire class under Rule 23(c)(2).

FN16. The use of subclasses pursuant to Rule 23(c)(4)(B) might be an alternative approach if the proof develops in the latter fashion.

FN17. Judge Hunter certified a securities fraud class action in *Hurwitz* even though the issue of reliance lurked behind the plaintiffs' claims. "We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary." 76 F.R.D. at 169. It may be noted that the *Hurwitz* litigation was finally disposed of by agreement and without the predicted complications.

FN18. In the court's April 10, 1985, memorandum and order, Counts V (a negligence claim against Peat, Marwick, Mitchell & Co.) and VIII (private cause of action against all defendants under the Missouri Uniform Securities Act) were dismissed entirely, while Count VII (negligent misrepresentation under Missouri common law) was dismissed as to defendants Peat, Marwick, Mitchell & Co., Wright, Herfordt & Sanders, and Carl E. Wright.

D.C.Mo.W.D.,1986.
Biben v. Card
Not Reported in F.Supp., 1986 WL 1199 (W.D.Mo.), Fed. Sec. L. Rep. P 92,462

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.