Not Reported in F.Supp.                                                                                                  Page 3
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

| Transaction Date | Shares | Per Share Cost | Total Price | Purchased From |
|---|---|---|---|---|
| 1. 11/19/81 | 13,566.00 | $12.90 | 175,000.00 | Unknown |
| 2. 03/19/82 | 301.00 | 8.75 | 2,633.75 | Clopier |
| 3. 11/15/82 | 2,425.00 | 14.86 | 36,026.69 | Citizens Bank |
| 4. 12/16/81 | 20,934.56 | 19.15 | 400,995.74 | Jensen, Hal |
| 5. 01/05/82 | 306.52 | 21.49 | 6,587.20 | Citizens Bank |
| 6. 12/20/82 | 5,036.00 | 13.90 | 70,000.00 | Citizens Bank-Shares, Inc. |
| 7. 06/06/83 | 4,000.00 | 17.50 | 70,000.00 | Harris, Gary |
| 8. 02/09/84 and 02/15/84 | 3,412.70 | 8.50 | 29,007.95 | Newey, Robert L. & Newey Kathleen G. |
| 9. 08/08/83 | 800.00 | 8.46 | 6,766.65 | EF Hutton |
| 10. 04/10/84 | 1,142.86 | 17.50 | 20,000.00 | Lamph, Max D. |
| 11. 05/04/84 | 120.75 | 8.50 | 1,026.38 | Bingham, Grant H. & LaDere |
| 12. 05/09/84 | 21.00 | 8.50 | 178.50 | Mullock, Wayne & Ila R. |
| 13. 10/24/84 | 24.15 | 8.50 | 205.28 | Bingham, Kurt C. |
| 14. 10/15/84 | 68.25 | 8.50 | 580.13 | Hirst, Steven T. |
| 15. 02/04/85 | 659.00 | 8.25 | 5,436.75 | First Equities Corp. |
| 16. 02/21/85 | 110.25 | 8.50 | 937.13 | Nuffer, Gary |
| | 35,564.40 | Total Purchases at 4/22/85 | | |

*3 17. Nuffer and Harris caused the Plan to acquire the shares listed in transactions 1 and 6 from CBI and the shares listed in transactions 3 and 5 from Citizens Bank.

18. Citizens Bank and CBI are parties in interest to the Plan and disqualified persons within the meaning of 26 U.S.C. (Internal Revenue Code) § 4975(e)(2).

19. Nuffer and Harris caused the Plan to acquire the shares listed in transactions 4 and 7 from Harris.

20. Harris is a disqualified person within the meaning of IRC § 4975(e)(2).

21. Nuffer and Harris caused the plan to acquire the shares listed in transaction 10 from director Lamph.

22. Lamph is a disqualified person with the meaning of IRC § 4975(e)(2).

23. Prior to causing the Plan to purchase the shares of CBI listed in transaction 3, 4, 5, 6, 7 and 10 from disqualified persons, Nuffer and Harris did not obtain valuations establishing the fair market value of such shares on the respective dates of the transactions.

24. The consideration paid for the shares of CBI acquired by the Plan in transactions 3, 4, 5, 6, 7 and 10 exceeded the fair market value of such shares on the respective dates of such transactions. The Secretary's expert witness on valuation, Professor O. Maurice Joy, testified that the fair market value of CBI common and preferred stock was as follows on the dates indicated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1992 WL 121511224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

|          | 1981   | 1982   | 1983   | 1984     | January, 1985    |
|----------|--------|--------|--------|----------|------------------|
| Common   | $8-$9  | $8-$9  | $7-$9  | $6-$8.50 | Maximum $8.50    |
| Preferred| $9-$11 | $9-$11 |        |          |                  |

In arriving at his determinations of the fair market value of common stock, Professor Joy used three valuation methods commonly used by experts in valuing stock: examining share prices from actual arm's length transactions; performing a comparative analysis using publicly-traded companies engaged in similar businesses; and performing a present-value analysis. In valuing the preferred stock, Professor Joy used the value of CBI common shares as a starting point and made adjustments for the value of the preferred stock's added features under a variety of scenarios.

C. *Assignment of the Jensen Agreement (Transaction 4)*

25. On December 16, 1981, Harris entered into an agreement with Hal R. Jensen, a director of CBI, to buy out the Jensen's interest in CBI by purchasing 24,628.56 shares of CBI stock owned by the Jensens (the "Jensen Agreement").

26. Harris agreed to pay $529,416.17 or $21.50 per share for Jensen's stock. Harris considered Jensen a dissident shareholder and sought to obtain Jensen's resignation from the Board of Directors in return for the buy-out.

27. Fifteen percent of the purchase price under the Jensen Agreement or $79,412.42 was paid by Harris to the Jensens as a down payment and the remaining principal balance of $450,003.74 was to be paid off over ten years with interest.

28. The purchase price of $21.50 was the result of negotiations between Harris and Jensen and was substantially higher than the fair market value price at which individual shares of CBI were then being purchased and sold by investors in CBI.

*4 29. Following the sale of his shares to Harris, Jensen resigned as a director of CBI on December 16, 1982.

30. The shares sold by Jensen to Harris were placed in escrow. An appropriate number of the shares were to be released each time an annual payment was made reducing the outstanding principal balance owed by Harris to Jensen under the Jensen Agreement.

31. On April 25, 1982, Harris assigned the Jensen Agreement to the Plan, including both his right to receive shares of CBI and his obligation to make the annual payments under the Jensen Agreement.

32. On December 31, 1982, Harris and Nuffer caused the Plan, pursuant to the assignment, to pay to Jensen $82,821, for which 1,395 shares of CBI stock were released to the Plan by the escrow agent. The average cost to the Plan for each share received by the Plan was $59.40.

33. On January 9, 1984 Harris and Nuffer caused the Plan, pursuant to the assignment, to pay Jensen $68,021, for which 1,395 shares of CBI stock were released to the Plan by the escrow agent. The average cost to the Plan for each share received by the Plan was $49.48.

34. On January 31, 1985 Harris and Nuffer caused the Plan, pursuant to the assignment, to pay Jensen $66,294, for which 1,395 shares of CBI stock were released to the Plan by the escrow agent. The average cost to the Plan for each share received by the Plan was $47.52.

35. But for the assignment of the Jensen Agreement to the Plan, Harris would have been obligated under the Jensen Agreement to make the three installment payments of $82,821, $68,021 and $66,294.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

36. By causing the Plan to make the payments which were the obligation of Harris, Nuffer and Harris used the assets of the Plan for the benefit of Harris, a party in interest to the Plan.

37. By causing the Plan to accept the assignment of the Jensen Agreement from Harris, Nuffer and Harris caused the Plan to engage in an exchange of property between the Plan and Harris, a party in interest to the Plan.

38. Harris acted on behalf of both himself, as assignor, and the Plan, as assignee, when Harris caused the Plan to accept the assignment of the Jensen Agreement from Harris.

39. Nuffer and Harris caused the Plan to pay more than the fair market value for the shares of CBI the Plan received pursuant to the assignment to the Plan of the Jensen Agreement.

D. *Purchase of CBI Preferred Stock (Transaction 6)*

40. On August 7, 1981, the Board of Directors of Citizens Bank entered into a Memorandum of Understanding with the Federal Deposit Insurance Corporation ("FDIC") pursuant to which the Board of Directors agreed to
correct unsatisfactory conditions disclosed in the December 12, 1980 examination report prepared by examiners of the Federal Deposit Insurance Corporation and the State of Utah Department of Financial Institutions ...

by, among other things, increasing the bank's equity capital by not less than $600,000 within five months of the date of the agreement.

*5 41. In order to obtain capital funds for the infusion of the required equity capital into Citizens Bank, the articles of Incorporation of CBI were amended on November, 16, 1981, to authorize the issuance of $600,000 worth of Preferred Stock.

42. On November 17, 1981, one day after the Articles of Incorporation were amended authorizing the issuance of $600,000 in preferred stock, the Board of Directors of CBI converted the existing employee benefit plan from an insured annuity arrangement established to provide benefits to employees of CBI affiliates, to an employee stock ownership plan (the Plan or ESOP).

43. In a letter to Mr. Harry W. Green, Vice President of the Federal Reserve Bank of San Francisco dated August 16, 1983, Harris stated that the Plan "was formed for the specific purpose of providing a source of capital for both the Bank and Bankshares."

44. Reo B. Cutler of First Equities Corporation suggested to Harris in a letter dated October 12, 1981, that the valuation of the preferred shares CBI sold to the Plan be tied to the book value of CBI common stock to avoid any claims of dilution of equity. Cutler further stated in his letter:
If you sense anybody getting upset, offer them a chance to buy part of the issue. You won't have any takers.

45. On November 19, 1981, Nuffer and Harris caused the Plan to purchase 13,566 shares of CBI preferred stock at $12.90 per share.

46. No fair market valuation of the CBI preferred shares was obtained by the Plan prior to the November 19, 1981 purchase.

47. Common stock of CBI at the time of transaction 1 was trading at between $8.25 and $9.00 per share.

48. On December 20, 1982 Nuffer and Harris caused the Plan to acquire 5,036 additional shares of CBI preferred at $13.90 per share (Transaction 6).

49. No fair market valuation of CBI preferred shares was obtained by the Plan prior to the December 20, 1982 purchase.

50. The price per share paid by the Plan for CBI preferred stock in Transaction 6 was more than the fair market value of the shares.

51. Nuffer and Harris, while acting on behalf of the Plan in transaction 6, simultaneously acted on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

behalf of CBI the seller in their capacities as officers of CBI.

### E. *Purchases of CBI Stock from Citizens Bank (Transactions 3 and 5)*

52. On November 15, 1982 Harris and Nuffer caused the Plan to purchase 2,425 shares of CBI common stock from Citizens Bank, a party in interest to the Plan, at $14.86 per share (Transaction 3).

53. On January 5, 1982, Harris and Nuffer caused the Plan to purchase 306.52 shares of CBI common stock from Citizens Bank, a party in interest to the Plan, at $21.49 per share (Transaction 5).

54. No fair market valuation of the common shares of CBI was obtained by the Plan prior to acquiring shares of CBI stock in Transactions 3 and 5.

55. At or about the time of Transactions 3 and 5, common shares of CBI were being traded at between $8.25 to $9.00 a share.

56. The price per share paid by the Plan for CBI common stock in Transactions 3 and 5 was more than the fair market value of the shares.

### F. *Purchases of CBI Stock from Harris and Lamph (Transactions 7 and 10)*

*6 57. On June 6, 1983, Nuffer and Harris caused the Plan to purchase 4,000 shares of CBI stock from Harris at $17.50 a share (Transaction 7).

58. On April 10, 1984 Nuffer and Harris caused the Plan to purchase 1,142.86 shares of CBI stock from Lamph at 17.50 a share (Transaction 10).

59. No fair market valuation of the shares acquired by the Plan in Transactions 7 and 10 was obtained by the Plan prior to the purchases.

60. The price per share paid by the Plan in Transactions 7 and 10 exceeded the fair market value of the shares.

### G. *The Harris Loan*

61. On February 21, 1985 Nuffer and Harris caused the Plan to loan Harris $40,000.

62. At the time the loan was made by the Plan, the Plan Document did not permit participant loans.

63. On or about March 1985, after the $40,000 loan was made to Harris, an amendment was made to the Plan authorizing participant loans provided that the following conditions, among others, were satisfied:
a. the loan was approved by the Retirement Committee of the Plan;
b. the loan is for an extraordinary or emergency expenditure and does not exceed the actual amount of such extraordinary or emergency needs; and
c. the loan is made against collateral, that collateral being the assignment of the borrower's entire interest in and to the Trust Fund, supported by the borrower's promissory note for the amount of the loan.

64. The Harris loan was not made in compliance with the terms and conditions of the Plan.

65. Participants in the Plan were never advised of the availability of participant loans and none were offered or made to any participant of the Plan other than Harris.

### H. *The Harris Withdrawal Of Contributions*

66. On February 14, 1985, Nuffer and Harris caused Harris to withdraw from the Plan all of Harris's contributions to the Plan, both voluntary and mandatory. The mandatory contributions totalled $18,729.15.

67. Pursuant to Article 3.2(b) of the Plan Document, Harris was only entitled to withdraw "the total of his voluntary contributions then credited to his Employee Contribution Account."

68. In a letter to Nuffer dated February 14, 1985, CBI counsel Paul J. Graf of the law firm of Snow, Christensen & Martineau advised Nuffer that Harris

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.            Page 7
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

had been informed by Graf that he (Harris) could not withdraw mandatory contributions.

I. *The Board Of Directors' Conduct*

69. On November 17, 1981, the CBI Board of Directors unanimously appointed Nuffer as Trustee of the Plan. Defendant Harline was present and voting.

70. Nuffer, a CBI vice-president, had no prior training or experience in managing an employee benefit plan or investing its assets. He was not present at the meeting.

71. The Board of Directors did not question Nuffer regarding his qualifications to serve as trustee and did not investigate to determine whether he was qualified by training or experience to serve as Trustee of the Plan.

72. After appointing Nuffer pursuant to the Plan Document, the Board of Directors did not review the performance of Plan investments made by Nuffer or otherwise monitor the performance of Nuffer as a Trustee.

*7 73. Board of Directors did not request any annual reports from the Retirement Committee with respect to the administration of the Plan. In fact, the parties stipulated that the Board of Directors never appointed a Retirement Committee.

74. The Board of Directors did not require that Nuffer evaluate the Trust Fund at fair market value on an annual basis as provided in Article 4.5 of the Plan Document. Nuffer made the annual evaluation using book value.

75. The Board of Directors did not require that Nuffer submit to them an annual certified evaluation of the Trust Fund together with a statement of net income or loss as provided under Article 4.5 of the Plan Document.

76. On February 18, 1983, internal auditor David A. Westover prepared for the members of the Board of Directors an audit review of the Plan for the period ending December 31, 1982.

77. The audit review disclosed transactions 1, 2, 3, 4, 5 and 6 as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State of Utah regarding the temporary order. Sutton stated in part as follows:
We consider allowing continuing contributions to the ESOP an unsafe and unsound practice for several reasons. First, at the present time, the stock of Citizens Bankshares is worth little or nothing, and was not worth much more than that when the December 31, 1982 statement was issued to the plan participants. I see no way of avoiding this conclusion because there is no public market for the stock which means the only way of valuing it is at its book value, and presently the holding company is technically insolvent.

I think a strong argument could be made by a beneficiary that the trustees have breached their fiduciary duties by continuing to invest salary deductions into assets which they know to be worthless. I think this particularly true when the contract obligation is possibly voidable, at least by the beneficiaries since it involves using employee pension funds to buy out a former stockholder and thereby consolidate power in the present stockholders.
The misrepresentations concerning the value of the fund are probably a separate breach of fiduciary duties.

83. Harline, as a Director of CBI, knew or reasonably should have known of the existence of the temporary order and the underlying factual basis for the order outlined in the December 5, 1983 letter from George Sutton.

84. Following the issuance of the temporary order, Harline continued to allow Nuffer and Harris to invest assets of the Plan in shares of CBI.

85. On November 23, 1984, R.E. Reid of the Federal Reserve Bank of San Francisco sent to the CBI Board of Directors a Report of Inspection of CBI as of June 30, 1984, prepared by the Federal Reserve. The Report of Inspection at page 1 of the Examiner's Comments states:
*Employee Stock Ownership Plan (ESOP)*
The administration of the company's ESOP did not appear to be in accordance with the governing instruments nor with the Employee Retirement Income Security Act of 1974 (ERISA). As a fiduciary under Section 3(21)(A) of ERISA, the company (i.e. the board of directors) should take action to have additional independent appraisals of company stock by a qualified outside appraiser. Adjustments should be made to the plan for any excessive price paid for company stock and for any loss of income. Management should require the trustees to keep accurate and detailed records of assets and transactions of the trust. In addition, procedures must be implemented to accurately reflect the shareholder's records for the company stock.
*9 Pursuant to law, the federal banking agencies have agreed to furnish the U.S. Department of Labor (DOL) with information noted during examinations regarding certain types of possible violations of ERISA. If any matters commented upon in this report of examination are referred to the DOL, Citizens Bankshares, Inc. will be notified by the Federal Reserve Bank.
It was recommended to management that the Plan be administered by an unaffiliated third party. Chairman Harris indicated that he would follow this suggestion and make necessary arrangements within 30 days.

86. The Report of Inspection went on to cite a number of possible violations of ERISA in connection with the management and administration of the plan. Among other things, the report stated:
Since inception of the plan in November 1981, the trustee had been paying widely varying prices for company stock for the plan. The prices paid ranged from $8.50 to $21.50. JPS Financial Consultants placed a reasonable price of $20.00 per share on the stock in its letter of December 10, 1981. However, for the last two annual valuations of plan assets the trustee has used book value as the fair market value; $16.85 at year-end 1982, and $14.63 at 1983. Director shareholders have been consistently paid above these stated values, while other non-director shareholders have been consistently paid less. The justification for price(s) paid to shareholders to obtain stock for the plan is not documented. The higher price(s) paid may constitute a violation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                Page 10
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

Section 404(a)(1) of ERISA, which relates to operating a plan in the interest of the participants. Of further concern is that a higher than indicated fair market value has been paid to board members. The board is the body which was stated to have determined the price to be paid. Authorized and unissued shares of common stock have been purchased from the company which could have provided additional capital to the company, a stated purpose of the plan. Further, it appeared that shares from the unissued class could have been purchased at a more favorable price to the plan than those purchased from directors.

87. Following the receipt of the Report of Inspection, the Board of Directors did not select an unaffiliated third party to manage the plan as the Federal Reserve recommended. The Board permitted Nuffer and Harris to continue to manage the assets of the Plan.

88. The evidence shows that Harline was generally familiar with the value of common shares of CBI during the time he served on the Board of Directors. Harline made the following purchases of CBI shares for his own account:

| Date | Action | | | Price | Total |
|---|---|---|---|---|---|
| 1/29/82 | Buy 171 | Shares | x | $8.75 | $1496.25 |
| 11/26/82 | Buy 400 | Shares | x | $9.00 | 3600.00 |
| 12/29/82 | Buy 217 | Shares | x | $9.00 | 1953.00 |
| 1/26/83 | Buy 207 | Shares | x | $9.00 | 1863.00 |
| 3/05/85 | Buy 377 | Shares | x | $8.375 | 3157.38 |
| 3/12/85 | Buy 252 | Shares | x | $8.375 | 2110.50 |

89. At the January 26, 1982 meeting of the Board of Directors of CBI, which Harline attended, an Incentive Stock Option Plan was approved. Harline was appointed to the Plan Committee for the Stock Option Plan. The minutes of the meeting state:
*10 FURTHER RESOLVED, that it is the determination of the Committee that on the 26th day of January, 1982, the fair market value of Bankshares $2.00 par value common stock is $11.00 per share.

II. CONCLUSIONS OF LAW

A. *Background*

1. This Court has jurisdiction over this action pursuant to section 502(e)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(e)(1).

2. Venue is proper in the Northern Division of the District of Utah pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). The Secretary of Labor has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 11
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

authority to bring this action pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5).

3. Gary Nuffer, as trustee of the Plan, was a fiduciary to the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

4. By virtue of his direction and control of the actions of trustee Nuffer in the exercise of Nuffer's fiduciary responsibilities, Gary Harris also was a fiduciary to the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

5. Under the terms of the Plan and its governing instruments, CBI and its directors bore responsibility for the appointment of and removal of the Plan's trustee and the appointment of a successor. By virtue of this responsibility, and by virtue of his exercise of the appointment power, defendant Wesley Harline was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21). *See Eaves v. Penn,* 587 F.2d 453, 458 (10th Cir.1978); *Batchelor v. Oak Hill Medical Group,* 870 F.2d 1446 (9th Cir.1989) (Consortium of physicians operating medical clinics are liable for breach of fiduciary duty in selection of a third party as fund administrator); *Hickman v. Tosco,* 840 F.2d 564 (8th Cir.1988) (Company is a fiduciary within the meaning of ERISA because it appoints and removes the members of the administrative committee that administers the pension plan); *Leigh v. Engle,* 727 F.2d 113, 133 (7th Cir.1984) (Individual and corporation related to profit sharing plan of another corporation were plan fiduciaries to the extent that they were responsible for the selection and retention of plan administrators); *Mclaughlin v. Tomasso,* 682 F.Supp. 1287 (E.D.N.Y.1988) (Union which had authority to appoint and remove trustees had exercised discretionary control over the management of the welfare fund and was therefore a fiduciary to the fund); *McKinnon v. Cairns,* 698 F.Supp. 852, 860 (W.D.Okla.1988); *Moehle v. NL Industries, Inc.,* 646 F.Supp. 769, 775 (E.D.Mo.1986) (Employer which appointed and removed plan committee members was a fiduciary).

B. *The Board of Directors' Fiduciary Responsibilities*

6. As a fiduciary responsible for the appointment and removal of the Plan's trustee, defendant Harline had a duty under the prudence standard of ERISA § 404(a)(1)(B) to prudently appoint a trustee, and to review periodically and generally oversee Nuffer's performance of his responsibilities as trustee. Harline's failure to conduct any independent investigation into Nuffer's qualifications to serve as a fiduciary, and his failure to conduct such periodic reviews of Nuffer's performance after his appointment, constitute breaches of the duty of prudence. *See Eaves v. Penn,* 587 F.2d 453, 458 (10th Cir.1978); *Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984); *Whitfield v. Cohen,* 682 F.Supp. 188 (S.D.N.Y.1988).

*11 7. The CBI Board of Directors, and the directors individually, imprudently neglected to monitor the administration and investment of Plan assets by Nuffer and Harris; imprudently permitted Nuffer and Harris to continue to purchase shares of CBI with Plan assets when they knew or through the exercise of reasonable diligence should have known that the prices paid for the shares acquired were not determined by a qualified contemporaneous valuation and were in excess of the fair market value of such shares; and imprudently failed to remove Nuffer or take the appropriate steps to prevent Nuffer from continuing to violate ERISA in connection with the management of the Plan. *See Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984; *Sandoval v. Simmons,* 622 F.Supp. 1174, 1215 (C.D.Ill.1986). *See also* 29 CFR § 2509.75-8, Questions and Answers D-4 and FR-17 (Department of Labor specifically states that appointing fiduciaries have a duty to ensure that the performance of appointed trustees has been in compliance with the terms of the plan and ERISA).

8. Although the appointing director's duty of oversight is independent of any requirement of the documents governing the Plan, those documents also imposed a duty of oversight on the directors, and defendant Harline's failure to observe the requirements of the Plan document specifically relating to the board of directors' oversight responsibilities constitutes a violation of ERISA §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 12
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). In particular, the Board's failure to appoint a Retirement Committee to assist the trustee and report to the Board, as required by the Plan Document, rendered the Board responsible to perform the functions which otherwise would have been delegated to the Committee.

9. Under ERISA and the common law, a fiduciary has the fundamental duty to follow the trust document and is liable for losses incurred if he does not do so. *Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1241-1242 (2d Cir.1989) ("A fiduciary's failure to meet these specific requirements [of 29 U.S.C. § 1104(a)(1)(D) ] is not merely evidence of imprudent action but may, in itself, be a basis for liability under section 1109."); Bogert, Trusts & Trustees, § 680 at 97 (2d Ed.1982), and § 541 at 154-55 (2d Ed.1978); *See In re Goebel's Estate,* 177 Misc. 553, 31 N.Y.S.2d 7, 9 (1941) (In making investments of trust funds, the trustee is under a duty to conform to the terms of the trust and can be surcharged for any losses resulting from the making of unauthorized investments). Moreover, if a trust document has stipulated the manner in which a power is to be exercised, the fiduciary must strictly adhere to those terms. Bogert, § 551 at 7 (2d Ed.1980). Neither good faith nor reliance on advice of counsel is a defense to a breach of a trustee's duty of compliance. Restatement (Second) of Trusts § 201 comment b (1959).

10. Corporate directors who appoint fiduciaries who are untutored and inexperienced in the operations of an employee benefit plan and the investment of its assets owe a special duty to the Plan to ensure that the appointed fiduciary clearly understands his obligations, that he has at his disposal the appropriate tools to perform his duties with integrity and competence, and that he is appropriately using those tools. *Cf.* Bogert, Trusts and Trustees, § 557 at 155 (2d Ed.1980) (Analogous duty of a trustee to use reasonable care in selecting and instructing a qualified person to whom to delegate power). The Secretary's expert, Jeffrey N. Clayton, testified that in situations where the appointed fiduciary does not have the requisite experience or training, the board of directors should provide the fiduciary with knowledgeable advisors, establish guidelines for conduct, and create a reporting and supervision system to facilitate monitoring by the board of directors. The Court agrees that, in circumstances where, as here, the appointed fiduciary is given considerable discretion and is unsophisticated in employee benefit matters, especially careful monitoring by the appointing fiduciary of the appointed fiduciary's performance, and of his compliance with ERISA and plan documents, is required under ERISA § 404(a)(1)(B).

*12 11. The directors' apparent acquiescence in Harris's direction of Nuffer in Plan matters did not constitute a prudent monitoring system under the circumstances. The directors knew, or should have known, that state and federal banking regulators were highly critical of Harris's leadership, the financial condition of the Bank, and the management of the Plan. They knew, or should have known, that Harris was directing Nuffer in connection with transactions between Harris and the Plan. Permitting Harris to supervise Nuffer in the exercise of his fiduciary duties was imprudent under ERISA § 404(a)(1)(B), given the deteriorating condition of the company and the participation by Harris in insider transactions involving the Plan.

12. Sections 405(a)(2) and (3) of ERISA, 29 U.S.C. §§ 1105(a)(2) and (3), provide that a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility by another fiduciary if, among other circumstances, he has enabled such other fiduciary to commit a breach by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, or if he has knowledge of a breach by such other fiduciary, and fails to make reasonable efforts under the circumstances to remedy the breach. *See Free v. Briody,* 732 F.2d 1331 (7th Cir.1984); *Whitfield v. Cohen,* 682 F.Supp. 188 (S.D.N.Y.1988); *Sandoval v. Simmons,* 622 F.Supp. 1174, 1215 (C.D.Ill.1986).

13. Harline's failure to properly exercise his duties under ERISA § 404(a)(1)(B) of review and oversight over trustee Nuffer enabled Harris and Nuffer to commit the breaches of fiduciary duty set forth below. Moreover, defendant Harline had actual or constructive knowledge of the facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 13

Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

constituting breaches of fiduciary duty on the part of Harris and Nuffer, and failed to take reasonable efforts to remedy such breaches. Such reasonable steps would include, at a minimum, the replacement of Nuffer as trustee with a qualified person or corporation independent of Harris's influence, and the commissioning of qualified independent appraisals of value for CBI common and preferred stock. Defendant Harline therefore is liable under ERISA §§ 405(a)(2) and (3) for the breaches of fiduciary responsibility by Harris and Nuffer.[FN1]

> FN1. Defendant Harline argues that he was only one of several directors and could not have prevented or remedied the breaches of Harris and Nuffer through his own efforts. The presence of other fiduciaries in the central events of this case does not in any manner absolve Harline for liability for his failure to act when his responsibilities required him to act. The liability of breaching fiduciaries is joint and several; there is no safety in numbers. ERISA §§ 405(a) and 409(a), 29 U.S.C. §§ 1105(a) and 1109(a); *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1221 (2d Cir.1987).

### C. *The Transactions*

14. Although Gary Harris and Gary Nuffer both have settled, a central issue in this case is whether they committed breaches of fiduciary duty and engaged in prohibited transactions for which the remaining defendant, Wesley Harline, is liable. The Court finds that Harris and Nuffer violated ERISA, as set forth in conclusions of law 15 through 22 below. Harline is liable for such violations under ERISA §§ 404(a)(1)(B) and (D), and 405(a)(2) and (3), for the reasons identified in conclusions of law 1 through 13 above, and 21 and 22 below.

15. The central duty of fiduciary loyalty, codified in ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires the fiduciary to discharge his plan duties " solely in the interest of participants and beneficiaries " and for the "exclusive purpose" of providing plan benefits and defraying reasonable expenses of plan administration. This rule against divided loyalties is designed "[t]o deter the trustee from all temptation and to prevent any possible injury to the beneficiary " and "must be enforced with 'uncompromising rigidity." ' *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329-330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672, 680 (1981), quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (Cardozo, C.J.).

*13 16. In addition to the general duty of loyalty, ERISA § 406(b) prohibits self-dealing by plan fiduciaries. Section 406(b)(1), 29 U.S.C. § 1106(b)(1), explicitly prohibits fiduciaries from dealing with the assets of a plan in their own interest or for their own account. ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), also prohibits fiduciaries from acting on behalf of other parties whose interests are adverse to the interests of the plan in any transaction involving the plan.

17. ERISA also codifies trust law's prudent man rule in ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), which requires that a fiduciary discharge his duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." The test of prudence under ERISA is one of conduct, and not a test of the subjective good faith of fiduciary. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Courts reviewing investments by plan fiduciaries have focused on whether the fiduciary conducted an independent investigation of the merits of the investment. *Id.* The prudence analysis centers on "whether the [fiduciaries], at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola,* 716 F.2d 1226, 1232, (9th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

18. In addition to imposing general duties on plan fiduciaries in ERISA § 404, and proscribing self-dealing in § 406(b), Congress also prohibited certain types of transactions in § 406(a),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 14
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

transactions "that experience had shown to entail a high potential for abuse." *Cunningham,* 716 F.2d at 1464-1465. Among other things, ERISA § 406(a)(1) prohibits any direct or indirect sale of property or loan of money between a plan and a party in interest, and prohibits any transfer of plan assets to a party in interest. 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D). An employer of any employees covered by a plan is a party in interest with respect to that plan. ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C).

19. A statutory exemption to the prohibited transaction rules, however, ERISA § 408(e), 29 U.S.C. § 1108(e), permits an "eligible individual account plan," under specified conditions, to buy or sell securities issued by the employer sponsoring the plan. In order for acquisition or sales to qualify for the exemption, the documents governing the plan must specifically provide for acquisition and holding of "qualifying employer securities," there must be no commission charged to the plan on such transactions, and the acquisitions or sales must be for "adequate consideration." 29 U.S.C. §§ 1107(d)(3) and (5), and 1108(e).

*14 20. "Adequate consideration," in the case of securities not having a generally recognized market, is defined in ERISA as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." ERISA § 3(18), 29 U.S.C. § 1002(18). The leading case applying the adequate consideration test in the context of a purchase of employer securities by an employee benefit plan is *Donovan v. Cunningham.* 716 F.2d 1455. The Fifth Circuit characterized the test of good faith as an objective standard based upon the conduct of the fiduciaries, rather than on their state of mind. *Cunningham,* 716 F.2d at 1467-1468. Fiduciaries who purchase employer securities using plan assets bear the burden of proving that adequate consideration was paid, and they can meet that burden only "by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Id.*

21. The Secretary established by undisputed evidence that fiduciaries Gary Nuffer and Gary Harris engaged in transactions (transactions 3, 4, 5, 6, 7, and 10) which would be prohibited, imprudent, and self-dealing, unless it could be shown that the Plan paid no more than adequate consideration for CBI stock purchased from parties in interest. 29 U.S.C. §§ 1104(a)(1)(A) and (B), 1106(a)(1)(A), (B) and (D), 1106(b)(1) and (2), and 1108(e).[FN2] Defendant Harline failed to meet his burden to prove that the determination of prices for CBI stock was the result of a reasoned, contemporaneous, and independent appraisal of CBI stock based on all relevant factors.[FN3] The transactions challenged by the Secretary therefore were not for adequate consideration and constituted violations of ERISA by Nuffer and Harris, for which Harline is liable pursuant to ERISA §§ 404(a)(1) and 405(a).

> FN2. As officers of CBI, Nuffer and Harris had an interest in CBI and Citizens Bank that could affect the exercise of their best judgment as fiduciaries. In Transactions 3, 5, and 6, Nuffer and Harris violated ERISA §§ 406(b)(1) and (2) because, without the benefit of an exemption, they purchased stock from those organizations and acted on both sides of the transactions as buyer and seller. Harris also engaged in prohibited self-dealing, and was allowed to do so by Nuffer, when he caused the Plan to relieve him of his personal obligation to acquire CBI stock from Hal Jensen at a negotiated, above-market price, in violation of ERISA §§ 406(b)(1) and (2).

> FN3. Defendant Harline argues that the purchases challenged by the Secretary were for large blocks of stock and that therefore the prices paid were justified as reflecting a "control premium." This argument is unavailing. First, if a control premium were appropriate, the burden is on the party seeking the benefit of the exemption to show that price was determined as part of a careful, independent investigation. *See Cunningham,* 716 F.2d 1455. There is no evidence of such an investigation in this case. Second, there is no evidence that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.   Page 15
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

Plan in this case ever obtained control-in-fact over CBI as the result of its stock purchases.

22. The Secretary also established by undisputed evidence that Nuffer and Harris violated ERISA §§ 404(a)(1)(B) and (D), and 406(a)(1)(B) and (D), 29 U.S.C. §§ 1104(a)(1)(B) and (D), and 1106(a)(1)(B) and (D), by loaning Plan assets to Harris and making an unauthorized distribution of Plan assets to Harris. These transactions did not qualify for any exemption available under ERISA. *See* ERISA §§ 408(b)(1) and (9), 29 U.S.C. § 1108(b)(1) and (9). As with the prohibited stock transactions, defendant Harline's failure to use prudence in appointing a trustee, and his failure to monitor the trustee's performance of his duties, renders him liable for these breaches pursuant to ERISA §§ 404(a)(1) and 405(a).

### C. *Harline's Affirmative Defenses*

23. Harline asserts, without evidentiary support, that the ERISA three-year statute of limitations bars the Secretary from recovery in this case. Prior to its amendment in 1987, ERISA section 413(a), 29 U.S.C. § 1113(a), which is applicable in this case, provided that no action could be commenced with respect to any breach of duty after three years from the earliest date
*15 (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of the breach or violation was filed with the Secretary under this title.[FN4]

   FN4. Subsection "B" was repealed by the Omnibus Budget Reconciliation Act of 1987, P.L. 11-203, § 9342(b), effective December 17, 1987, with respect to reports required to be filed after December 31, 1987.

24. The term "reports" refers only to annual report forms 5500 filed with the Secretary of the Treasury and to nothing else. *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 956 (D.C.Cir.1985); *Whitfield v. Cohen,* 682 F.2d 188, 193 (S.D.N.Y.1988). Harline did not carry his burden to show that the Forms 5500 filed by the Plan contained information from which the Secretary could reasonably be expected to have obtained knowledge of any breach alleged by the Secretary. Whatever notice, if any, that there was to the Secretary was insufficient to trigger the running of the statute of limitations. With respect to actual knowledge, the testimony of Leonard L. Garofolo, Area Director for the Pension and Welfare Benefits Administration, U.S. Department of Labor, showed that the Department of Labor received actual notice of some of the facts underlying the violations no earlier than December 17, 1984, less than three years prior to the Secretary's institution of this lawsuit. The statue of limitations, therefore, is no bar to the Secretary's recovery.

25. Harline also argues that under Utah law, the Secretary should be held to have released Harline by allegedly failing to reserve her rights against Harline in settling with defendant CBI. This defense also is ineffective to bar recovery by the Secretary. To the extent it relates to restitution from fiduciaries to employee benefit plans, Utah Code Ann. § 15-4-5, relied upon by Harline, is pre-empted by ERISA § 514(a), 29 U.S.C. § 1144(a). Under ERISA § 409(a), 29 U.S.C. § 1109(a), each fiduciary causing a breach of duty is individually liable to make the injured plan whole. Settlement with one breaching fiduciary does not release other breaching fiduciaries from liability for their individual defalcations, so long as the plan is not made more than whole. Moreover, there is nothing in the record of this case to show that the Secretary has released any defendant, including CBI, without an express reservation of rights against the non-settling defendants.

### D. *Relief*

26. Fiduciaries who breach any of the duties imposed upon them by Title I of ERISA are personally liable to the injured plan for any losses resulting from each such breach. ERISA § 409(a), 29 U.S.C. § 1109(a). Co-fiduciaries who have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 16
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

knowledge of, knowingly participate in, or enable the commitment of a breach of duty by another fiduciary are jointly and severally liable with the breaching fiduciary. ERISA § 405(a), 29 U.S.C. § 1105(a); *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1221 (2d Cir.1987). In addition to financial liability, the full range of equitable remedies is available to the court to correct past abuses and to deter future misconduct. ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

*16 27. Defendant Harline is liable to make restitution to the Plan for all losses to the Plan resulting from the breaches of fiduciary duties set out above. At the very least, such losses include the difference between the price paid by the Plan for the shares purchased in transactions 3, 4, 5, 6, 7 and 10 and the fair market value of the shares, plus interest on the purchase price from the date of each transaction to the present. *See Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978). This Court finds that the values assigned to CBI shares by the Secretary's expert witness, O. Maurice Joy, represent the fair market value of such stock, and the Court adopts such values in calculating the loss to the Plan.

28. This Court has broad discretion in awarding whatever relief is necessary to make the Plan whole. Under the common law of trusts, pre-judgment interest was recoverable in cases of breach of fiduciary duty. *See e.g., Bartlett & Co. Grain v. Commodity Credit Corp.,* 307 F.2d 401, 409 (8th Cir.1962).

29. Pre-judgment interest on the total losses incurred by the ESOP is appropriate in this case, because an award of solely the principal amounts of the losses, which were incurred many years ago, would not place the ESOP in the same position that it would occupy today if the losses had not occurred.

30. For purposes of determining the amount of such pre-judgment interest, this Court adopts both the interest rates and the compounding methods specified in 26 U.S.C. §§ 6621 and 6622 and the Treasury Regulations issued thereunder. In reaching this conclusion, this Court acknowledges the Congressional determination that the interest rates specified under 26 U.S.C. § 6621 represent "the most accurate measure of the true economic interest rate." [1982] U.S.Code Cong. & Admin. News 781, 1048. Thus, these rates cannot be characterized as punitive.

31. Identical or similar rates have been applied by other courts in similar situations and been found equitable. *E.g., Whitfield v. Tomasso,* 682 F.2d 1287, 1306 (E.D.N.Y.1988); *Whitfield v. Cohen,* 682 F.2d 188, 193 (S.D.N.Y.1988); *Brock v. Ardito,* 8 Empl. Ben. Cas. (BNA) 2303, 2309 (E.D.N.Y.1987); *Brock v. Gillikin,* 9 Empl. Ben. Cas. (BNA) 1803, 1808 (E.D.N.C.1988); *Marshall v. Snyder,* 1 Empl. Ben. Cas. (BNA) 1878 (E.D.N.Y.1979); *see Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984) (prime rate plus one percent).

32. Compound interest should be allowed against a breaching fiduciary where it is necessary to compensate the beneficiaries for losses caused by the breach, where money is unlawfully invested, or where the trustee has a duty to reinvest the interest accumulated by the trust. Bogert, § 863 at pp. 55-57; A.W. Scott, *Law of Trusts* § 207.2 (1967); Restatement (Second) of Trusts, Comments § 207. For periods before January of 1983, Section 6622 of the Internal Revenue Code specified that the I.R.S. adjusted prime interest rate not be compounded. 26 U.S.C. § 6622 (1982). For subsequent periods, however, the statute specifies daily compounding. Pub.L. 97-248, Title III, § 344(c), Sept. 3, 1982, 96 Stat. 635.

*17 33. Defendant Harline has not demonstrated that the interest rates and calculations adopted by the Court in this case are unreasonable. The Court finds that Harline is liable to restore to the ESOP the amount of $761,441. [FN5]

> FN5. The Secretary has stipulated that Harline shall receive credit for any amounts obtained by the Secretary from settling defendants in this case.

34. In addition to restitution, ERISA § 409, 29 U.S.C. § 1109, allows for further equitable or remedial relief, as appropriate. The court may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 17
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138
**(Cite as: Not Reported in F.Supp.)**

fashion remedies particular to the facts of the case to protect plan assets. *Mazzola,* 716 F.2d at 1253; *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. at 643. Serious misconduct that violates ERISA obligations is sufficient grounds for a permanent injunction without the need for showing a likelihood of future misconduct. *Beck v. Levering,* 14 Empl. Ben. Cas. (BNA) 1561 (2d Cir.1991).

35. The courts have a duty to fashion a remedy that will protect plan assets from dissipation through breaches of the fiduciary duty and responsibility imposed on trustees by ERISA. *Donovan v. Mazzola,* 716 F.2d at 1235; *Eaves v. Penn,* 587 F.2d at 462; *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. at 643. This includes the duty to remove trustees and/or to permanently enjoin them from assuming positions for which they have been shown to be unfit. Under the circumstances of this case, it is entirely appropriate to issue an injunction against Harline. Harline shall be permanently enjoined from acting as a fiduciary of, or providing any services to, any ERISA-covered employee benefit plan. Harline shall further be permanently enjoined from violating or inducing others to violate any of the provisions of Title I of ERISA.

An appropriate order shall issue.

JUDGMENT AND FINAL ORDER

On the basis of the Findings of Fact and Conclusions of Law entered in this case, it is hereby ORDERED, ADJUDGED, AND DECREED:

*18 1. Defendant Wesley G. Harline shall pay the sum of $761,441 to the Citizens Bankshares, Inc. Employee Stock Ownership Plan for pro-rata distribution to participants and beneficiaries. This amount shall be reduced by the principal amount of any monetary settlements obtained by the Secretary from other defendants in this action.

2. Defendant Wesley G. Harline is permanently enjoined, either individually or in participation with any person or entity, from serving-

(a) as a fiduciary, administrator, officer, trustee, custodian, counsel, agent, employee, or representative in any capacity of any employee benefit plan;

(b) as a consultant or adviser to any employee benefit plan or to any entity whose activities are in substantial part devoted to providing goods or services to any employee benefit plan; or

(c) in any capacity that involves decision-making authority with respect to, or custody or control of the assets or property of, any employee benefit plan.

3. Defendant Wesley G. Harline is permanently enjoined, either individually or in participation with any person or entity, from violating or inducing others to violate any of the provisions of Title I of ERISA.

4. Upon motion by the Secretary the Court will consider the Secretary's request for the appointment of a receiver to distribute the assets of the Plan, pending a showing by the Secretary that there are assets to distribute, and nomination by the Secretary of a suitable receiver.

D.Utah,1992.
Martin v. Harline
Not Reported in F.Supp., 1992 WL 12151224 (D.Utah), 15 Employee Benefits Cas. 1138

Briefs and Other Related Documents (Back to top)

• 1:87cv00115 (Docket) (Sep. 28, 1987)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.