## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KERI EVANS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **JOHN F. AKERS, et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

| | |
|---|---|
| | ) **Consolidated** |
| **LAWRENCE W. BUNCH, et al.** | ) **Case No. 04-11380-WGY** |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) |
| **W. R. GRACE & CO., et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### FIRST AMENDED CLASS ACTION COMPLAINT
### AND JURY DEMAND

### INTRODUCTION AND STATEMENT OF CASE

1.    On December 11, 2003 State Street's hand picked Independent Fiduciary Group recommended that the W.R. Grace & Co. Retirement Plan retain its 8 million shares of Grace common stock. The Independent Fiduciary Group recommended "State Street not override the Plan documentation." According to the Group, " … if this recommendation is approved, the Plan will continue to hold Grace stock."  Unfortunately, the Plan's ERISA fiduciaries ignored the

recommendation and instead, within a few weeks, began to sell almost 8 million shares of Grace. The fire sale cost Grace workers almost $50 million in retirement savings.

2.    This case is intended to recover for the Retirement Plan the loss. The beneficiaries of this effort are the approximate 3,500 present and former employees of W. R. Grace & Co. ("Grace" and/or "Company"), who participated in the W. R. Grace & Co. Employees Savings and Investment Plan (the "Plan"). Grace encouraged these workers to share in the Company's growth and success by using the Plan to invest their retirement savings in the common stock of Grace. Grace in fact designed, sponsored, and administered the Plan solely for the purpose of investing voluntary employee contributions in the common stock of Grace. Neither the Plan participants nor Grace intended the Plan to invest in any other financial vehicle.

3.    By 2003, Grace started to abandon its promises and the stated purpose of the Plan. Grace began to jointly participate in an unlawful scheme with its delegated investment advisor-- State Street Bank and Trust and related entities ("State Street")--that deprived the Plaintiff class of their investment in Grace common stock.

4.    Grace, its directors and its officers failed in their duty to monitor its delegated financial advisor and co-fiduciary State Street by:

> (a)    Permitting State Street to liquidate the Plan's holdings in Grace when it knew that the divestment of the stock was imprudent and when State Street's own advisors recommended against selling the stock;
>
> (b)    Permitting uncontrolled self-dealing by State Street when State Street purchased Grace common stock for its clients and affiliated funds while at the same time State Street was selling the entire Grace common stock position owned by the Plan; and,

(c)    Concealing and covering up State Street's unjustified conduct by suddenly abandoning its representations and promises and intentionally misrepresenting to Participants that the Plan's investment in Grace was imprudent.

5.    State Street knew when it told participants that an investment in its stock was imprudent that its statement was false. State Street understood from internal reports and from the recommendation of its Independent Fiduciary Group that Grace was an undervalued stock and was positioned to climb. State Street, as the Plan's investment manager, violated its fiduciary duty by:

(a)    Liquidating the Plan's portfolio in Grace despite knowing that the stock price was positioned to rapidly increase;

(b)    Ignoring the sound advice of its hand picked Independent Fiduciary Group; and,

(c)    Engaging in self-dealing and inuring unlawful benefits from the Plan by serving as both a purchaser and seller of Grace stock.

6.    By ignoring the Independent Fiduciary's advice and by selling the stock at an artificially deflated price, State Street violated the very role Grace hired it to perform. Within a few months of State Street dumping nearly 7 million shares in a block sale for $3.50, the value of the stock increased nearly 300%. The forced divestment of the Plan's holdings of Grace stock deprived the Plan and therefore the employees of a rightfully deserved profit.

7.    Plaintiffs are filing this Amended Class Action Complaint as directed by the Court during the December 20, 2006 hearing. According to the Court,

…[A]mendments are freely allowed, why don't I give them [Plaintiffs] 30 days to spiff up this complaint and he can put in the complaint…what he's just told me…It is so ordered. Thirty days to amend the complaint.[1]

---

[1] Transcript of December 20, 2006 hearing at p. 9, lines 17-20 and p. 11, lines 6-7.

8.      Plaintiffs, Lawrence W. Bunch, Jerry L. Howard, Sr., and David Mueller (collectively "Plaintiffs"), directly on behalf of themselves and other similarly situated shareholders of Grace, bring this action against Grace, Grace's Executive Officers and Board of Directors, the Investment and Benefits Committee, State Street, and State Street Global Advisors, and alleges as follows:

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(e)(1), which grants to United States District Courts jurisdiction over claims of this type.

10.     This Court has personal jurisdiction over Defendants because, as required by ERISA, 29 U.S.C. §1132(e)(2), one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company has offices in Cambridge, Massachusetts.   Defendants systematically and continuously do business in this state, and the case arises out of Defendants' acts within this state.

11.     Venue is proper pursuant to ERISA, 29 U.S.C. §1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and one or more of the Defendants may be found in this District.

## THE PARTIES

12.     Plaintiff Lawrence W. Bunch is a resident of the Commonwealth of Kentucky. Mr. Bunch is a current employee of Grace and is a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8).  Mr. Bunch suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

13.     Plaintiff Jerry L. Howard, Sr. is a resident of the Commonwealth of Kentucky. Mr. Howard is a former employee of Grace and is a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8).  Mr. Howard suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

14.     Plaintiff David Mueller is a resident of the State of Ohio.  Mr. Mueller is a current employee of Grace and is a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8).  Mr. Mueller suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

15.     Defendant Grace is a Connecticut corporation that has operations throughout the United States including at Whittemore Avenue in Cambridge, Massachusetts and at Wilder, Kentucky.  Grace describes itself as a leading global supplier of catalyst and silica products, specialty construction chemicals, building materials, sealants and coatings.  Grace's common stock is traded on the New York Stock Exchange under the symbol "GRA".  Until Grace abdicated this responsibility to State Street, Grace was the Plan's Sponsor and Administrator as defined by ERISA and has at all times acted in regard to the Plan in a fiduciary capacity in exercising authority or control respecting with management or disposition of the Plan assets, in accordance with ERISA, 29 U.S.C. §1002(21), in its own name and acting through the Company's Employees' Benefit Committee.  Grace is also a party in interest to the Plan within the meaning of ERISA, 29 U.S.C. §1002(14).

16.     Grace is the Plan's Sponsor and Administrator as defined by ERISA, and has at all times acted in regard to the Plan in a fiduciary capacity in exercising authority or control respecting the management or disposition of the Plan's assets in accordance with ERISA, 29

U.S.C. §1002(21), in its own name and acting through the Company's Employees' Benefit Committee. In particular but without limitation:

(a)    Grace at all times exercised discretion as to whether to make matching employer contributions into the Plan, as described below, in cash or in stock, and discretion as to whether to sell Grace common stock to the trustees for investment by the Plan;

(b)    Grace, as the Plan's Sponsor, established the only investment available to the Plan's participants;

(c)    Grace imposed restrictions on the Grace Stock Fund, depriving Plaintiffs and Class members of the opportunity to exercise control over their assets.

(d)    Grace deprived the Plan participants of their right and ability to exercise independent judgment as to the type of investment vehicle and amount of their contribution to the Grace Stock Fund by transferring all decisions to State Street.

17.    Grace was responsible for the appointment and ongoing monitoring and review of the performance of the trustee, Fidelity, and the Plan's fiduciaries, including State Street Bank and Trust Company and State Street Global Advisors.

18.    Defendant W. R. Grace Investment and Benefits Committee ("Benefits Committee") of Grace was the Plan Administrator and was a fiduciary with regard to the Plan. The Benefits Committee was responsible for the general administration and interpretation of the Plan and for carrying out the Plan's provisions including decisions as to the investment of Plan assets.

19.    Defendant Fred E. Festa served as President and Chief Operating Officer of the Company. On information and belief, in these capacities Festa has exercised discretionary

authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

20.     Defendant Paul J. Norris served as Chairman and Chief Executive Officer of the Company.  On information and belief, in these capacities Norris has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

21.     Defendant Robert M. Tarola served as Senior Vice President and Chief Financial Officer of the Company.  On information and belief, in these capacities Tarola has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

22.     Defendant John F. Akers served as a Director of the Company.  On information and belief, in this capacity Aker has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

23.     Defendant Henry Furlong Baldwin served as a Director of the Company. On information and belief, in this capacity Baldwin has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

24.     Defendant Ronald C. Cambre served as a Director of the Company.  On information and belief, in this capacity Cambre has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

25.     Defendant Marye Anne Fox served as a Director of the Company.    On information and belief, in this capacity Fox has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

26.     Defendant John J. Murphy served as a Director of the Company.  On information and belief, in this capacity Murphy has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

27.     Defendant Thomas A. Vanderslice served as a Director of the Company.   On information and belief, in this capacity Vanderslice has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

28.     Defendant State Street Bank and Trust Company ("State Street") is a Massachusetts corporation and the principal subsidiary of State Street Boston Corporation, operating its principal office at 225 Franklin Street, Boston, Massachusetts 02110.  State Street describes itself as a $32 billion diversified financial services holding company, and combines information technology with corporate banking, trust, investment management and securities processing capabilities in support of both institutional and corporate clients worldwide.

29.     Defendant State Street Global Advisors ("State Street" and "State Street Global Advisors" will be collectively referred to as "State Street") is the investment management arm of State Street Bank and Trust Company and, with more than $1.2 trillion in institutional assets under management, is the largest asset manager in the United States.

30.    Defendants Grace, the Benefits Committee, and the Individual Defendants exercised discretionary authority respecting the Plan's management and/or administration within the meaning of ERISA, 29 U.S.C. §1002(21)(A), particularly in light of the alleged status of the Plan under ERISA §404(c) and its regulations, and are or were during relevant times fiduciaries of the Plan based on actions alleged herein.  These actions included, but were not limited to, the issuance of communications directed to the Plan's participants concerning the revenue, earnings and financial condition of the Company that affected present or potential assets or investments of the Plan and decisions of the participants.

### NATURE OF ACTION AND BACKGROUND

**The Class is Pursuing Claims of Breach of Fiduciary Duty
and Promissory Estoppel Based on the Independent
and Joint Acts of Grace and State Street**

**W. R. Grace Savings and Investment Plan**

31.    The W. R. Grace Savings and Investment Plan ("Plan") is a savings plan covering employees of the Company and its subsidiaries.

32.    At all times relevant, the Plan was and continued to be a "defined contribution plan" within the meaning of ERISA, 29 U.S.C. §1002(34), and an "eligible individual account plan" within the meaning of ERISA, 29 U.S.C. §1107(d)(3).  Further, the Plan was and continued to be a qualified cash or deferred arrangement within the meaning of the Internal Revenue Code §401(k), 29 U.S.C. §401(k).

33.    At all relevant times, Grace was the Plan's sponsor.

34.    At all relevant times, Defendants acted as fiduciaries of the Plan pursuant to ERISA, 29 U.S.C. §1102(21)(A).  Defendants Grace, the Benefits Committee, and the Individual

Defendants exercised discretionary authority or control over the management or administration of the Plan or control in the management or disposition of the Plan's assets.

35.    The Benefit Committee administers the Plan.    The Committee has the responsibility for managing the Grace Stock Fund and for selecting the investment funds available for employee directed investments.    The directors, officers or employees of the Company or its subsidiaries also perform certain administrative and discretionary functions.

36.    Since September 1, 1976 employees were given the opportunity to participate in the Plan by electing to have their contributions invested in Grace Stock Fund, which consists of Grace common stock or a number of other mutual funds. Company matching contributions, however, were only invested in the Grace Stock Fund.

37.    The Plan enabled employees to save regularly for retirement by purchasing common stock of the Company and other investments.    Grace permitted participants to save from 2 to 16 percent of their pay through regular payroll deductions. Participants could choose to invest in Company stock through the Grace Stock Fund or they could invest in a variety of mutual funds and similar accounts.    As an additional incentive to choose to participate in the Grace Stock Fund, Grace matched the money allocated by employees into the Stock Fund.    The Company deposited its contributions in the employee stock plan and invested in Grace common stock.    The Company originally matched 50 percent -- and later 100 percent -- of the employees' savings, up to and including the first 6 percent of their pay saved, with the Company's matching contributions initially being used to buy only more Grace common stock and vesting immediately.

38.    Grace, the Benefits Committee, and the Individual Defendants conducted numerous Company meetings in which they encouraged participants to invest their monies in Grace common stock.

39.    The Plan prospectus states that:

> the purpose of the Plan is to encourage eligible employees to obtain additional financial security, to supplement retirement income through savings on a regular, long-term basis and _to share in the Company's performance through ownership of the Company's Common Stock . . ._ (Emphasis added)

40.    Grace structured the Plan to permit Plan participants to immediately transfer their investments from the Grace Stock Fund into other investment options. Employees who chose to maintain their retirement funds invested in the Grace Stock Fund are the people who constitute the members of the Class.

### Elimination of Rights and Drastic Changes to the Plan

41.    On March 17, 2003 the Company announced to all Plan participants that effective April 21, 2003 Grace would limit the ability of Plan participants to make future investments in Grace stock by preventing Plan participants from making additional savings deposits into the Grace Stock Fund. The participants lacked the ability to block this change and were informed by the Company that this change was necessary and would limit the participants' exposure due to the approaching March 31, 2003 deadline for filing of claims in the bankruptcy court in the Company's pending Chapter 11 reorganization.   When Grace made this announcement, it certainly understood that the market price for its stock failed to reflect the value of the stock. According to Grace, "…the price of Grace stock no longer reflects the Company's solid operating results."

42.    On April 2, 2003 the Company announced that effective April 14, 2003 it would convert to "Real-Time Trading" of Company stock within the Savings and Investment Plan, with

11

the cash reserves that existed in the Grace Stock Fund as of April 9, 2003 being credited to the fund's participants on a pro-rata basis into the Fixed Income Fund, one of the funds available in the Plan.

43.     On December 8, 2003 the Company announced that it had retained State Street as the new and exclusive investment manager for the Grace Stock Fund within the Plan, effective December 15, 2003. The documents between Grace and State Street provided that Grace would continue to possess responsibilities concerning the operation and management of the Plan. According to the November 24, 2003 letter of engagement, State Street only assumed responsibility for deciding whether to sell or hold the shares of Grace stock owned by the Plan. When it announced that it had retained State Street, the Company claimed that substantial conflicts had existed and continued to exist in the management of the Plan.   The Company also said the change was necessary to avoid additional conflicts that would arise as a result of the Chapter 11 bankruptcy.  The Company then delegated the duty to manage the Plan's assets to State Street, which both the Company and State Street claimed was an independent third party.

44.     On its face, the transfer, with the possible sale of the Plan's assets, was contrary to the clear language of the Plan and to the Company's previous representations to its employees. Indeed, the Company expressly induced class members to participate in the Plan by claiming that the Plan only would invest in Grace common stock. Yet, the Company allowed State Street to suspend the ability of class members to use their Plan participation as a means to trade in Company stock.

45.     On January 26, 2004, Grace told Plan participants that its promises concerning investment in Grace stock were irrelevant and that it had transferred to State Street total discretion to sell the Plan's holdings in Grace. "…State Street has the authority to determine at

any time that all or a portion of the shares of Grace held in the Grace Stock Fund should be sold…" On January 26, 2004 Grace sought to justify State Street's inevitable sale of the Plan's investment in Grace by claiming that the pending bankruptcy made ownership in Grace volatile and risky. When it made this statement, Grace reasonably could not have believed that the liquidation of the Plan's entire holdings in Grace was consistent with an investment advisor's fiduciary role:

> (a)    Throughout the bankruptcy proceedings, Grace continued to encourage its employees to participate in the Plan. If Grace had believed that bankruptcy made Grace stock a risky investment and that the investment advisor had the inherent right to change investment vehicles, why did Grace permit the Plan to continue to hold and to purchase Grace stock before and during the bankruptcy?

> (b)    Grace, based on its earlier representations to Plan participants and in public disclosures, understood that the market was undervaluing its stock and that Grace was achieving solid operating results;

> (c)    By the time Grace engaged State Street, internal Grace reports and studies demonstrated that an investment in Grace stock was no longer speculative. Indeed, during the period that Grace was delegating responsibility to State Street, Grace in public filings represented that it had quantified and capped its potential outstanding asbestos liability.

### State Street Divests the Plan of its Grace Holdings and Refuses to Provide Important Information Concerning the Sale to Participants

46.    Despite its repeated <u>representations</u> and the <u>clear language</u> of the Plan, on April 12, 2004, the Company announced that State Street had concluded a selling program that resulted in the sale of the entire portfolio of Grace in the Grace Stock Fund. Of course, the announcement

that State Street sold approximately 8 million shares placed downward pressure on the price of the stock. Interestingly, as Grace announced the massive sell-off, Grace continued to tout its success and the value of its stock. In its public release, Grace proudly declared, "Grace is a leading global supplier of catalyst and silica products, specialty construction chemicals, building materials, and sealants and coatings. With annual sales of approximately $2 billion, Grace has over 6,000 employees and operations in nearly 40 countries."

47.     State Street always understood that it owed a duty to participants to communicate with them to explain events and other important matters. In a December 11, 2003 State Street memo regarding a Fiduciary Committee Meeting, State Street discussed its obligation to communicate. "S. Johnson raised the concern with respect to State Street's responsibility to communicate with plan participants. M. Ewing states that, as invest manager under the current Engagement Agreement, State Street has the obligation to communicate with participants."

48.     Despite committing itself to discuss important matters with participants, State Street, with Grace's concurrence, abandoned its responsibility.  Instead of making itself available to answer participant concerns, State Street, with the knowledge and consent of Grace, sought to insulate itself against a storm of anticipated negative reaction from Plan participants. In a February 27, 2004 notice to participants, State Street declared that it would refuse to answer questions and concerns. "As investment manager, State Street does not accept direct inquiries from participants nor can participants direct State Street…to stop selling Grace stock in the Grace Stock Fund."

49.     To the extent Plan participants had questions, State Street directed the participants to contact Grace but discouraged making the inquiry by asserting that the contact was nothing more than a waste of time. "You may contact Brian McGowen or John Forgach at W.R. Grace.

However, keep in mind, they will only have access to the same information that has already been provided to you."  Through their effort to stifle dissent and inquiry, Grace and State Street had made certain that the participants in the Plan remained powerless to understand the reasons for the sale, to understand their rights, and to block the effect of the transfer of management even though all of the money belonged to the participants.

50.    State Street compounded the lack of information by offering participants little more than perfunctory reasons for liquidating the Plan of its Grace stock. In its form answer as to whether it was prudent to sell Grace stock at a low price, State Street said the following: "While it is not appropriate to comment on State Street's strategy as investment manager, you should know that State Street is required to act as a prudent investor would act in such situations. Therefore, State Street feels that prudence requires it to commence the sale of Grace stock at this time."

### State Street Divested the Plan of Grace Stock at a Price Significantly Below the Stock's Value and Knowing that the Sale was Imprudent

#### The State Street Created Independent Fiduciary Group Recommends Against Liquidation

51.    Prior to telling participants that retention of Grace stock was imprudent, State Street knew to the contrary.  Before it became the Plan's investment manager, State Street formed an Independent Fiduciary Group to examine whether the Plan should follow the intentions of the Plan, the intentions of Grace, and, the intentions of the participants and continue to own Grace stock.

52.    The Independent Fiduciary Group worked with legal counsel, Goodwin, Procter and with the financial consulting firm of Duff & Phelps. The Independent Fiduciary Group "completed substantial due diligence with respect to Grace."

53.    After the Independent Fiduciary Group extensively reviewed the Grace situation, the Group recommended that the Plan continue to hold Grace. "…IFG [Independent Fiduciary Group] is recommending that State Street not override the Plan documentation. **Therefore, if this recommendation is approved, the Plan will continue to hold Grace stock.**" (Emphasis added.)

### State Street Knew that the Price of Grace Stock was Likely to Rapidly Increase and that a Sale of the Stock was Not Prudent

54.    If the recommendation of the Independent Fiduciary Group was insufficient to demonstrate to State Street that the sale of Grace stock was imprudent, State Street, similar to Grace, possessed information that demonstrated that State Street reasonably should have known that the price of Grace had reached the low point and was ready to rebound. Indeed, State Street had a January 29, 2004 financial and valuation report from Duff & Phelps.  In the report, Duff & Phelps concluded that each share of Grace had a value of $13.79. Of course, State Street never shared this information with Plan participants and ignored the report.

55.    Despite the Duff & Phelps report, the recommendation of the Independent Fiduciary Group and other materials, State Street sold the Plan's entire portfolio of Grace.  On April 12, 2004, the Company announced that State Street, during the four months that it served as the Plan's investment advisor, had sold more than 7.9 million shares of the Plan's Grace stock holdings.

56.    A significant portion of the sale occurred when State Street made a block sale of 7.2 million shares for $3.50. When it made the sale, State Street and Grace certainly knew that $3.50 a share was grossly below the value of the stock.  Prior to the block sale, in March of 2004 Grace, in a Form 10-K SEC filing, disclosed that it had a reasonable basis for believing that it

could cap its asbestos liability exposure at $1 billion. Based on this calculation, both Grace and State Street reasonably should have believed that the risk Grace stock previously experienced had ended and that a significantly higher price reflected the reasonable value of the stock. Yet, State Street, with the approval of Grace, violated the express purpose of the Plan and sold the Plan's remaining holdings in Grace at a grossly discounted price when compared to the intrinsic value of the stock.

57.    The actual trading experience of Grace stock, after State Street sold the Plan's holdings, demonstrates that Grace and State Street failed to exercise their fiduciary duties to protect members of the class. Immediately after the liquidation, the value of the Grace stock increased nearly 300% in less than 120 days. By the end of 2004, the stock closed at $13.61.

### State Street Engaged in Self-Dealing When it Divested the Plan of its Grace Holdings and Transferred the Holdings to Affiliated Entities

58.    The sudden increase in the publicly traded price of Grace stock certainly did not surprise State Street. State Street, in fact, benefited, at least indirectly, from the increased value of the stock. State Street, in violation of its fiduciary duties and responsibilities, began to acquire shares of Grace.

59.    At approximately the same time as it was selling Grace stock, State Street began to acquire a significant position in Grace stock. According to an initial Form 13F filed by State Street for period ending June 30, 2004, State Street increased its ownership in Grace by approximately 8 million shares. A year and a half later in October of 2005 after the filing of this action, State Street amended its Form 13F filing and reduced its holdings in Grace too approximately 2 million shares. Nonetheless, aside from the suspicious amendment, State Street still had increased its holdings by almost 1 million shares.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### ERISA Overview and Breach of Fiduciary Duty By
### Liquidating the Plan of its Grace Holdings

60.    Plaintiffs incorporate by reference each allegation in this First Amended

Complaint as if fully rewritten.

61.    ERISA is a comprehensive statute covering virtually all aspects of employee

benefit plans, including retirement savings plans such as the Plan and its predecessor plans:

> *It is hereby declared to be the policy of this Act to protect interstate commerce and the interest of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.*

ERISA §2(b), 29 U.S.C. §1001(b).

62.    Under ERISA, those responsible for plan management and oversight stand in a

fiduciary relationship with respect to plan participants.  Pursuant to ERISA, a "fiduciary" is

defined broadly to include all persons or entities that are able to exercise discretionary authority

or control over the management of a plan or its assets.

63.    ERISA requires strict fidelity and loyalty in the execution of a plan's management

pursuant to 29 U.S.C. §1102(21).  In addition, ERISA imposes on plan management a fiduciary

duty of prudence, requiring those responsible for plan management to:

> *discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.*

29 U.S.C. §1104(a)(1). ERISA also imposes on those responsible for plan management a duty of loyalty, requiring the fiduciary to:

> *discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries.* Id.

64. Defendants' fiduciary duties of loyalty, due care and prudence include a duty to disclose and inform participants of any material adverse information about the Company. When a plan is composed of various investment funds, such as the Grace Plan, this duty to inform and disclose also includes: (a) the duty to impart to the plan's participants material information which the fiduciary knows or should know is sufficient to apprise the average plan participant of the risks associated with investing in any particular investment; and (b) a duty to convey complete and accurate information material to the circumstances of the plan participants and their beneficiaries. The disclosure duties and fiduciary duties imposed on plan management by ERISA were designed to reduce the disparity in access to company information that exists between the fiduciaries and the participants and their beneficiaries.

65. ERISA imposes on plan fiduciaries the duty, *inter alia*, to adhere to the terms of the plan, including those purposes established in the plan document as, in this instance:

> *to encourage eligible employees to obtain additional financial security, to supplement retirement income through savings on a regular long-term basis and to share in the company's performance through ownership of the company's common stock.*

66. Other duties imposed upon those who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management or disposition of plan assets include, but are not limited to:

(a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of plan assets;

(b)    The duty to evaluate all investment decisions with "an eye single" to the interests of plan participants and beneficiaries;

(c)    The duty to avoid placing themselves in a position where their acts as officers, directors or employees of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advance;

(d)    To the extent that a party is responsible for appointing and removing named fiduciaries, the duty to monitor those persons who have been named; and,

(e)    The duty, if a directed trustee, to act only upon those directions that are consistent with the terms of the plan and with ERISA.

67.    Defendants breached their fiduciary duties of loyalty, due care, and prudence with respect to the Plan's use of Company stock as a plan investment because, among other reasons, the Plan's investment in Grace was a primary investment vehicle for the participants and represented the participants' own monies derived from their employment with the Company. Defendants knew that participants were aware that Grace was in bankruptcy proceedings but nonetheless desired to maintain their investment in Grace stock. Indeed, in an internal December 11, 2003 Memorandum, State Street wrote that each participant had the "ongoing right to shift all or any portion of his holding out of the fund at any time."

68.    Despite knowing that each Plan participant had made the decision to invest in Grace stock, Defendants, in violation of the terms of the Plan and in violation of the wishes of

Plan participants, and in violation of the recommendation of the Independent Fiduciary Group, discontinued the right of participants to use the retirement plan to invest in Grace stock. Additionally, Defendants drastically and inalterably changed the Plan by liquidating the Plan's holdings in Grace stock.

69.    By eliminating the purpose of the Plan and by liquidating the Plan's holdings in Grace, Defendants breached their ERISA fiduciary duties. The breached duties include but are not limited to: the fiduciary duties of loyalty, due care and prudence.

70.    As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

71.    Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

72.    Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty Through Mismanagement of Plan Assets by Selling the Plan's Holdings of Grace at an Unreasonably Low Price

73.    Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

74.    Pursuant to ERISA Section 404(a), 29 U.S.C. §1104(a), Defendants had a duty to discharge their Plan obligations with the care, skill, prudence and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use.

75.    Defendants' failure to fulfill their fiduciary obligations to the Plan resulted, among other things, in the inappropriate liquidation of the Plan's portfolio of Grace common stock.

76.    Defendants, when they announced that State Street intended to sell the Plan's holdings of Grace, reasonably knew that the existing market price of the stock failed to reflect the reasonable value of the stock. Grace, for example, understood that it had a sound basis for knowing the extent of its potential asbestos liability. Similarly, State Street knew through its internal analysis that a reasonable price for Grace stock far exceeded the existing price.

77.    Despite knowledge that the risk that the market had calculated into the price of Grace stock was decreasing and was becoming less important and despite internal Grace and State Street assessments that the market was pricing Grace too low, and despite the recommendation of the Independent Fiduciary Group, State Street, with the knowledge and approval of Grace, sold the Plan's entire holdings of Grace.

78.    Defendants, by selling the Plan's entire holdings of Grace at a price that failed to reflect the value of the reasonable value of the stock, acted imprudently and violated their fiduciary duty.

79.    Defendants further violated their fiduciary duty of diligence and prudence by selling the Plan's entire stake in Grace. Assuming that Defendants had a reasonable belief that a reasonable investor would sell a portion of the Plan's Grace portfolio, Defendants failed to exercise prudence when it sold the entire Grace portfolio and failed to allow the Plan to retain any portion of the Plan's stake in Grace. Defendants knew that the risk associated with Grace was abating, the company was achieving sound earnings, and that internal analysis reflected that the market was undervaluing the stock.

80.     As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

81.     Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

82.     Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty by State Street for Self-Dealing and Having Divided Loyalty by Selling the Plan's Holdings to Related Entities and by Breaching ERISA's Anti-Inurement Provisions

83.     Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

84.     ERISA requires Plan fiduciaries to manage the Plan for the exclusive purpose of ". . . providing benefits to the participants and their beneficiaries." ERISA, 29 U.S.C. §§ 1103 (c) and 1104 (a) (1) (A), also forbids Plan fiduciaries from inuring benefits from the use of the Plan's assets.

85.     After State Street assumed investment management responsibilities it created an inherent conflict of interest by acting as both a purchaser and a seller of Grace stock. In a series of transactions, State Street dramatically changed the amount of Grace stock that it held in its accounts. Prior to 2004, State Street apparently held approximately 1 million shares of Grace Stock.

86.     After assuming authority on December 15, 2003 State Street liquidated on April 19, 2004, the Plan's ownership in 8 million shares of Grace.

87.    At the same time as it was selling Grace stock, State Street and/or companies and entities affiliated with State Street began to acquire a significant position in Grace stock.

88.    According to an initial Form 13F filed by State Street for period ending June 30, 2004 State Street increased its ownership in Grace by approximately 8 million shares.

89.    A year and a half later, in October of 2005, after the filing of this action, State Street amended its Form 13F filing. The amended 13F appears to reflect a reduction in State Street's holdings in Grace to approximately 2 million shares. Nonetheless, aside from the suspicious amendment, State Street still had increased its holdings by almost 1 million shares.

90.    The simultaneous sale and purchase of Grace stock by State Street violates State Street's ERISA's fiduciary duty by placing the interests of itself and its affiliates over the interest of Plan participants and by inuring an unlawful benefit from the sale of the Plan's portfolio of Grace stock.

91.    As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

92.    Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

93.    Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty by Grace for Failing to Monitor State Street

94.    Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

95.    ERISA requires a Plan fiduciary who seeks to delegate a fiduciary duty to another person or entity to monitor the person or entity responsible for carrying out the fiduciary duty. According to ERISA, 29 U.S.C. § 1105(a)(3) and 29 U.S.C. §1105(c)(2)(B), fiduciaries are liable for the breaches of fiduciary duty by entities and persons to whom they delegate responsibility. Under ERISA, a proper delegation of fiduciary duties causes the delegating fiduciary to retain an obligation to oversee and monitor the activities of his delegate. Indeed, a fiduciary can be held liable for the acts or omissions of his delegate, if *inter alia*, he has knowledge of a breach by the fiduciary.

96.    By January of 2004, Grace sought to delegate responsibility for management of the Plan's assets to State Street. Although Grace claims to have delegated responsibilities to State Street, Grace continued to owe a fiduciary duty to Plan participants and continued to exercise control over certain aspects of the Plan.

97.    In its publications and announcements, Grace admits that it anticipated that State Street would liquidate the Plan's holdings of Grace. Additionally, well before State Street's sale, Grace understood that the market price for Grace stock was below the fair value of the stock and that the stock likely would experience a significant increase in price as the market recognized the reduced risk.

98.    Despite having knowledge of the sale of Grace stock at an artificially depressed price, Grace failed to take any action to prevent State Street from making the sale. The failure of Grace to undertake reasonable efforts under the circumstances to remedy the breach constitutes a breach of its fiduciary duty to monitor State Street.

99.    As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

100.    Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

101.    Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## FIFTH CAUSE OF ACTION

### Breach of Co-Fiduciary Duty by Grace for State Street's Breach of Fiduciary Duty

102.    Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

103.    ERISA, 29 U.S.C. § 1105(a), renders a fiduciary liable for breaches committed by other fiduciaries in three situations:

(a)    If the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(b)    If, by his failure to comply with the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or,

(c)    If the fiduciary has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

104.    Grace is liable as a co-fiduciary for several reasons. The reasons include but are not limited to:

(a)    Grace discouraged Plan participants from making any inquiry of State Street concerning the sale of Grace stock, and thus, Grace participated in the concealment of the breach;

(b)    Grace possessed knowledge that State Street was engaging in unlawful behavior when State Street divested the Plan of all Grace stock; yet, it failed to make any reasonable effort to remedy the breach; and,

(c)    Grace, as a fiduciary, failed to provide relevant and material information that could impact State Street's decision-making process. State Street likewise failed to investigate Grace's true situation and Grace's calculations and plans with respect to its reorganization.

105.    As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

106.    Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

107.    Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## SIXTH CAUSE OF ACTION

### Promissory Estoppel Against Grace

108.    Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

109.    Grace encouraged its employees to participate in the Plan. According to Grace, the purpose of the Plan was to encourage eligible employees to obtain additional financial security, to supplement retirement income through savings on a regular, long-term basis and to

share in the Company's performance through ownership of the its common stock. Even when the stock precipitously dropped and Grace was in the midst of bankruptcy proceedings, Grace continued to represent and promise to Plan participants that participation in the stock plan was a good investment and an investment that would enable participants to share in Grace's performance. Grace also promised participants that the participants controlled how their money was invested. To this end, Grace structured the Plan in a manner that afforded each participant the right to shift all or any portion of his/her holdings out of the fund any time.

110.    Grace promised Plan participants that their investment in the Plan's stock fund would provide future financial security because the participant's investment would increase in value based on the success of Grace.

111.    When it made its promise regarding financial security based on it success, Grace reasonably anticipated that its promise to provide generous retirement benefits based on the success of Grace would induce Plan participants to select company stock as the investment vehicle of choice.

112.    Grace's promise of generous retirement benefits based on the company' success of Grace did induce Plan participants to select to participate in the Stock Fund.

113.    As a direct and proximate result of Grace's failure to honor its promise to allow Plan participants to benefit from the financial success of Grace, Plan participants have suffered injury. Grace, by authorizing State Street to sell the Plan's investment in Grace stock prevented participants from realizing the promised benefit of sharing in the Company's success. The loss is significant. Indeed, immediately after Grace announced State Street's sale of all of the Grace stock held by the Plan, the price of the stock climbed almost $6 a share. Based on the sale of 8 million shares, Plan participants collectively lost approximately $54 million.

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty Against Grace and State Street for Making Misrepresentations and Nondisclosures

114.    Plaintiffs incorporate by reference each allegation in this First Amended Complaint as if fully rewritten.

115.    Defendants failed to disclose important material information to Plan participants who comprise the Class.  Grace, for example, prior to transferring the investment management to State Street but during the period that it encouraged and allowed employees to participate in the Plan, failed to disclose that it would transfer the investment management to an entity that likely would divest the Plan of its holdings in Grace. Accordingly, Grace failed to disclose that the new investment advisor would prevent Plan participants from sharing in the growth and success of Grace.

116.    State Street, when it took control of the investment management of the Plan, failed to disclose that it intended to function simultaneously as a seller and investor.  State Street also misrepresented the ability of Grace to answer questions concerning the liquidation and failed to disclose the real reasons that it liquidated the Plan's entire holdings of Grace stock. Additionally, State Street and Grace, when they were telling Plan participants that an investment in Grace was imprudent, failed to disclose that the Independent Fiduciary Group recommended that the Plan continue to maintain its position in Grace.

117.    Pursuant to the fiduciary duties encompassed in ERISA Section 404(a), 29 U.S.C. §1104 (a)(1)(B), Defendants had the duty to convey accurate information concerning the Plan to the Plan's participants. The failure to communicate material information, even if inadvertent and unintentional, may render a Plan fiduciary liable to participants.

118.    Defendants breached their fiduciary duties by making material misrepresentations to Plan participants and by failing to disclose material information. Defendants' failure to fulfill their fiduciary obligations to Plan participants resulted in, among other things, the continued participation by members of the Class in the Plan, the sale of the Plan's holdings of Grace stock at an artificially low price, and the unjust enrichment of State Street and its affiliates.

119.    Plan participants relied upon and are presumed to have relied upon Defendants' misrepresentations and nondisclosures to their detriment both directly and because of the artificially depressed price of Grace stock when State Street liquidated the Plan of its holdings in Grace. As a consequence of these breaches, the Plan and its participants who comprise the Class suffered damages and losses.

120.    Defendants are personally liable to compensate the Plan and its participants who comprise the Class for any losses to the Plan resulting from the identified breaches.

121.    Pursuant to ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3), the Court also should award equitable relief in the form of restitution.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all Plan participants and entities who owned shares of Grace's publicly traded common stock through the Grace Stock Plan during the period from December 15, 2003 to April 30, 2004 ("Class Period").  Excluded from the Class are those individuals identified as Defendants and members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest during the Class Period.

123.    The Class consists of thousands of persons located throughout the United States. Class members are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The exact number and identity of Class members can be determined through discovery.  Based upon public information, there were approximately of 3,500 participants who owned Grace stock through the Stock Fund.

124.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to Class members which predominate over questions which may affect individual Class members include but are not limited to:

(a)    Whether ERISA applies to the claims at issue here;

(b)    Whether Defendants owe and owed fiduciary duties to Class members;

(c)    The nature of the fiduciary duties Defendants owe or owed to Class members;

(d)    Whether Defendants breached their fiduciary duties under ERISA; and

(e)    The extent of harm sustained by Class members and the appropriate measure of relief.

125.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and Class members suffered similar harm as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Class members may not receive restitution or other appropriate relief and will continue to suffer losses, and these violations of law will proceed without remedy.

126.    Plaintiffs are committed to pursuing this action and have retained counsel experienced in class action litigation of this nature.  Plaintiffs will fairly and adequately

represent the interests of the Class and Plaintiffs have no interests which conflict with those of the Class.

127.    The prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants.  Individual actions may, as a practical matter, be dispositive of the interests of the Class.

128.    A class action is the superior method for fair and efficient adjudication of this controversy.  The likelihood that individual Class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Plaintiffs' counsel, highly experienced in class actions, sees no difficulty in the management of this case as a class action.

129.    Plaintiffs will fairly and adequately protect and represent the interests of all Class members.  Plaintiffs have retained Stanley M. Chesley, Esq. and James R. Cummins, Esq., and the firm of Waite, Schneider, Bayless & Chesley Co., L.P.A., and Jeffrey C. Block, Esq. of Berman Devalerio Pease Tabacco Burt & Pucillo as legal counsel. Counsel for Plaintiffs are competent and experienced in class action litigation, complex business litigation, and securities litigation.  Counsel for Plaintiffs are likewise competent to seek to recover damages from Defendants as a result of Defendants' misconduct, including damages for breach of fiduciary duties, fraud, negligence, and punitive damages.

130.    A class pursuant to Rule 23(B)(1)(a) is appropriate because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.  Plaintiffs' claims involve similar issues of fact and law; the similar impact and effect of Defendants' actions, misstatements, misrepresentations, and omissions regarding

Grace's investments; the similar duties owed by Defendants to Plaintiffs and other Class members; and similar damages suffered by Plaintiffs and other Class members as a result of Defendants' actions and omissions.

131.    A class pursuant to Rule 23(B)(1)(b) is appropriate to avoid adjudications with respect to individual Class members which would, as a practical matter, substantially impair or impede the ability of other members not party to the individual adjudications to protect their interests.  Further, such a class is appropriate because the class members are so numerous and because the costs to litigate each claim individually would be so great that Class members would effectively be denied an opportunity to pursue their rights against Defendants.

132.    A class pursuant to Rule 23(B)(2) is appropriate because the Defendants have acted or failed and refused to act on grounds generally applicable to the entire class, thereby making appropriate the award of damages with respect to the class as a whole.  Defendants' actions, misstatements, misrepresentations, and omissions equally affected the individual members of the class, and apply to all members of the class.

133.    A class pursuant to Rule 23(B)(3) is appropriate because the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Defendants' actions, misstatements, misrepresentations, and omissions applied to and impacted equally the individual members of the class.  Further, Plaintiffs and other Class members were similarly damaged by the Defendants' actions, misstatements, misrepresentations, and omissions.

134.    As a result of Defendants' failure to disclose and inform, Plaintiffs and Class members suffered losses, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiffs and Class members for these losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A    Determining that this is a proper class action to be certified under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants have violated the duties, responsibilities and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure requirements as described above;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure;

D.    Awarding Plaintiffs, Class members and the Plan restitution and/or remedial relief;

E.    Awarding Plaintiffs, Class members and the Plan pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs; and,

F.    Awarding such other relief as this Court may deem just and proper.


## JURY DEMAND

With the filing of this Complaint, Plaintiffs demand a trial by jury.

Respectfully submitted,

BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO

*/s/ Jeffrey C. Block*
Jeffrey C. Block
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
Email:  jblock@bermanesq.com

and

WAITE, SCHNEIDER, BAYLESS
 & CHESLEY CO., L.P.A.

*/s/ James R. Cummins*
Stanley M. Chesley
James R. Cummins
Jane H. Walker
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 381-2375
E-mail  jcummins@wsbclaw.com
E-mail:  janehwalker@wsbclaw.com

*Counsel for Lawrence W. Bunch, Jerry L. Howard,*
*Sr. and David Mueller, Both Individually and*
*Behalf of All Others Similarly Situated*

Dated:  January 16, 2007