**Unpublished Authority Part 2 or 3**

LEXSEE 1998 U.S. DIST. LEXIS 18066


Cited
As of: Feb 02, 2007

BRENT BERTI, et al., PLAINTIFFS v. VideoLan TECHNOLOGIES, et al., DEFENDANTS

CIVIL ACTION NO. 3:97-CV-296-H

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION

*1998 U.S. Dist. LEXIS 18066*

**June 10, 1998, Decided**
**June 10, 1998, Entered**

**DISPOSITION:** [*1] Motions of John Haines, Peter Beck, Steven Rothenberg, Vernon Jackson, and Ted Ralston (the "Defendants") to dismiss the claims of Brent Berti and others similarly situated (the "Plaintiffs") DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, corporation and corporate officers (corporation), filed a motion pursuant to *Fed. R. Civ. P. 12(b)(6)*, to dismiss a class action filed in the United States District Court for the Western District of Kentucky, Louisville Division, by plaintiffs, purchasers, for a violation of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. §§ 78j(b)*, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 10b-5.

**OVERVIEW:** The corporation owned a patent for technology that was used to develop a stand alone desktop unit that permitted video-conferencing over conventional copper telephone lines. The corporation issued a press release stating that it had a distribution agreement for the product as part of an agreement with another company. Information regarding the distribution agreement was repeated in the financial press on several occasions, and the corporation was named as the best performing IPO of 1995. The corporation's annual report with the Securities Exchange Commission described the distribution as a prospective agreement. The other company subsequently terminated the distribution agreement and the corporation ceased operations. The purchasers filed an action under Rule 10b-5, which claimed that the corporation falsely represented the distribution agreement. The corporation filed a motion to dismiss the action under *Fed. R. Civ. P. 12(b)(6)*. The court found that the purchasers had sufficiently explained the nature of the alleged fraud and that it could not conclude that the press release was not false and misleading as a matter of law.

**OUTCOME:** The court denied the corporation's motion to dismiss the complaint for failure to state a cause of action.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN1] On a motion to dismiss for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court will accept as true all well-pled allegations and all reasonable inferences will be made in favor of the non-moving party. Dismissal of the complaint is proper only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Fraud on the Market*
[HN2] In order to state a valid legal claim for securities fraud under Rule 10b-5 of the Securities Exchange Act of 1934, *17 C.F.R. § 240.10b-5*, a plaintiff must allege (1) a misrepresentation or misleading omission, (2) materiality, (3) scienter, (4) reliance, and (5) proximate causation of injury. Reliance may be presumed when the plaintiff proceeds on a fraud on the market theory.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*
[HN3] The Private Securities Litigation Reform Act of 1995, *15 U.S.C.S. § 78u-4(b)(1)*, sets forth the specific pleading requirements for a Rule 10b-5 violation. Under the Act, the complaint shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. Additionally, with regard to the element of scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *15 U.S.C.S. § 78u-4(b)(2)*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN4] A statement of belief about future sales may be false or misleading if: (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN5] Forward-looking statements cannot be considered fraudulent merely because they ultimately prove false. A plaintiff must show that the statements were not made in good faith or lacked a reasonable basis.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*

[HN6] Under *15 U.S.C.S. § 78u-4(b)(2)*, a plaintiff must plead with particularity sufficient facts to create a strong inference of actual knowledge of reckless disregard.

*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
[HN7] The limitations period for Rule 10b-5 actions, *17 C.F.R. § 240.10b-5*, is measured from the time the plaintiff had access to facts that would have put a reasonable investor on notice of the possibility of fraud. Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice. At that point, the plaintiff must exercise reasonable diligence in attempting to uncover the fraud.

*Civil Procedure > Dismissals > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
[HN8] A "storm warning" is "any indication in the annual report or other subsequent communications that could reasonably be considered contrary to the rosy predictions that the plaintiffs claim were misrepresentations. The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Truth on the Market*
[HN9] In order to succeed on a "truth on the market" defense, the defendant must show that there was a corrective disclosure of sufficient force and effect to counter the false impression created by the prior misstatement.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Duty to Disclose*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Materiality > Statements of Opinion*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Insider Trading > Tippee Duties*

Case 1:04-cv-11380-WGY    Document 146-2    Filed 02/02/2007    Page 4 of 10

Page 3
1998 U.S. Dist. LEXIS 18066, *

[HN10] Even in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received only brief mention in a few poorly circulated or lightly regarded publications. The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. In order to avoid Rule 10b-5 liability, *17 C.F.R. § 240.10b-5*, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.

**COUNSEL:** For BRENT BERTI, STEVEN SHAW, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, ROBERT BLACKWELL, plaintiffs: Ron R. Parry, Arnzen, Parry & Wentz, Covington, KY.

For BRENT BERTI, STEVEN SHAW, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, ROBERT BLACKWELL, plaintiffs: Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, Hartford, CN.

For BRENT BERTI, STEVEN SHAW, EDWARD R. TOZZI, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, ROBERT BLACKWELL, plaintiffs: Mark C. Gardy, Karin E. Fisch, Abbey, Gardy & Squitieri, New York, NY.

For BRENT BERTI, STEVEN SHAW, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, ROBERT BLACKWELL, plaintiffs: James V. Bashian, New York, NY.

For BRENT BERTI, STEVEN SHAW, EDWARD R. TOZZI, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, ROBERT BLACKWELL, plaintiffs: Joseph H. Weiss, Jack I. Zwick, Weiss & Yourman, New York, NY.

For BRENT BERTI, STEVEN SHAW, EDWARD R. TOZZI, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, plaintiffs: Jules Brody, Howard T. Longman, Aaron Brody, Stull, Stull & Brody, New York, NY.

For BRENT BERTI, STEVEN SHAW, EDWARD R. TOZZI, FRED ZAYAS, CAPITAL LENDING NETWORKS, INC., CHRISTOPHER COHRS, JOSEPH A. CUZMA, MALCOLM DOW, DAVID HERBST, DALE HINSON, ANTHONY MAYER, TRIBAL VENTURES INC, FREDERICK VOGEL, RICHARD YANUS, ROBERT YOUNG, DANA YOUNG, plaintiffs: Les L. Levy, Stephen D. Oestreich, Wolf & Popper, New York, NY.

For EDWARD R. TOZZI, plaintiff: Richard S. Wayne, William K. Flynn, Strauss & Troy, Cincinnati, OH.

For FRED ZAYAS, plaintiff: Norman Berman, Jeffrey C. Block, Berman, Devalerio & Pease, Boston, MA.

For ROBERT BLACKWELL, CHRISTOPHER COHRS, plaintiffs: Richard S. Wayne, Strauss & Troy, Cincinnati, OH.

For ROBERT BLACKWELL, plaintiff: Norman Berman, Berman, Devalerio & Pease, Boston, MA.

For ROBERT BLACKWELL, plaintiff: Jules Brody, Stull, Stull & Brody, New York, NY.

For ROBERT BLACKWELL, plaintiff: Les L. Levy, Wolf & Popper, New York, NY.

For ROBERT BLACKWELL, plaintiff: J. Daniel Hoffman, Sherman & Sandy, Waterville, ME.

For ROBERT BLACKWELL, plaintiff: Steven J. Toll, Andrew N. Friedman, Cohen, Milstein, Hausfeld & Toll, Seattle, WA.

For VIDEOLAN TECHNOLOGIES, INC., JOHN HAINES, PETER BECK, STEVEN ROTHENBERG,

VERNON JACKSON, TED RALSTON, defendants: Barry D. Hunter, Brown, Todd & Heyburn, Lexington, KY.

For JOHN HAINES, defendant: Walter Lapp Sales, Ogden, Newell & Welch, Louisville, KY.

For VERNON JACKSON, defendant: Michael A. Valenti, Zoppoth, Valenti & Hanley, Louisville, KY.

**JUDGES:** JOHN G. HEYBURN II, JUDGE, U.S. DISTRICT COURT.

**OPINION BY:** JOHN G. HEYBURN II

**OPINION:**

### MEMORANDUM OPINION

This matter is before the Court on the motion of John Haines, Peter Beck, Steven Rothenberg, Vernon Jackson, and Ted Ralston (the "Defendants") to dismiss the claims of Brent Berti and others similarly situated (the "Plaintiffs") pursuant to *F.R.C.P. 12(b)(6)* and *F.R.C.P. 9(b)*. Plaintiffs' class action complaint alleges that VideoLan Technologies, Inc. and the named officers and directors violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. n1 Their theory is that false statements and misleading omissions by the Defendants during the class period caused injury to Plaintiffs who purchased VideoLan stock at an artificially inflated price. For the reasons stated, the Court will deny the current motions.

> n1 The claims against VideoLan Technologies, Inc. are now stayed due to its bankruptcy filing.

[*2]

### I. Facts

VideoLan owns a patent for technology making it possible to perform functions such as video-conferencing over conventional copper telephone lines. This is a promising technology since it creates the potential to avoid the large costs associated with constructing a separate fiber optic network to carry voice, data, and video transmissions. Since its inception, VideoLan's sole product has been the VL 2000, a stand-alone desktop unit based on its patent technology. In the summer of 1995, VideoLan went public as a development company and began to list its shares on the NASDAQ.

On November 7, 1995, VideoLan issued a press release announcing a distribution agreement giving Samsung Corporation exclusive rights for three years to sell, service, and distribute the VL 2000 in Korea. n2 The press release went on to state that "over the term of the agreement Samsung is to purchase fifty to seventy million dollars worth of VL 2000 Desk Top Multimedia Products and associated peripherals from VideoLan." It also stated that VideoLan planned to start shipping the VL 2000 in the first quarter of 1996 and would commence full-scale marketing of its products in the second quarter of that [*3] year.

> n2 The agreement indicates that it was entered into by the parties on August 26, 1995.

Through mid-November, this information was repeated in the financial press on several occasions. One story attributed the excellent performance of VideoLan's stock during an otherwise gloomy period for technology stocks to the Samsung deal. In late January, 1996, VideoLan was named the best performing IPO of 1995, ending the year trading at 1,411% of its offer price.

Throughout February, VideoLan experienced significant fluctuations in its stock price. In response to concerns about the volatility of its stock, CEO Steven Rothenberg issued a statement early in the month that the company was unaware of any "internal, operational, or financial reasons" for the volatility and assuring that "previously announced product introductions and commitments are on schedule, and the company is in sound financial condition." Chairman Ted Ralston subsequently reiterated the message that the company was "solid as ever."

On February [*4] 18, Rothenberg announced the signing of $10 million contract with a distributor and stated that "we're in production and expect to start shipping soon." In early March, VideoLan issued a press release stating that it would begin shipping the VL 2000 that month. However, no shipments were reported until summer.

On April 1, 1996, VideoLan filed its Form 10-KSB annual report for 1995 with the Securities and Exchange Commission. In the "Business Strategy" section of the annual report, VideoLan described the Samsung agreement. It also reported that the parties had signed an addendum to the agreement in October, whereby Samsung had "prospectively agreed" to purchase the VL 2000 and associated peripherals. The report went on to state in the next sentence that "there can be no assurances that Samsung will purchase significant quantities of the VideoLan System." The Samsung agreement was attached as an exhibit. n3

1998 U.S. Dist. LEXIS 18066, *

n3 The sales volumes specified in Addendum A (and in the original agreement) received confidential treatment and were filed separately with the SEC. According to Addendum A, "sales volumes have been agreed by both parties to be 2,400 units, 4,000 units, 6,000 units for the first, second, third calendar years of the contract, respectively."

[*5]

In a post-effective amendment to its Form SB-2 registration statement for three million shares of common stock, filed May 28, 1996, VideoLan made essentially the same disclosures. It also disclosed that it had engaged in "limited marketing" and was "beginning to implement its marketing strategy." VideoLan's Form 10-QSB quarterly report for the second quarter of 1996, filed in August, made no mention of the Samsung contract.

In late August, responding to further inquiries about the volatility of its stock, VideoLan issued a press release stating that it was unaware of any "operational, technological, or market reasons" for the price fluctuations. VideoLan also stated that current shipments of the VL 2000 and the completion of its first sales demonstrated that it was making the transition from a development-stage company to a revenue-generating company. The following month, VideoLan responded to an analyst's recommendation to sell its stock short by stating that it expected to reach its goal, announced at a June shareholder meeting, of posting meaningful revenue in the third and fourth quarters of 1996. In early October, VideoLan publicly announced third quarter sales of the VL 2000 [*6] in excess of $ 500,000 to various corporate and U.S. government customers. In its press release, it stated that rapid growth in sales was expected for the fourth quarter of 1996 and into 1997.

On November 11, 1996, VideoLan filed its Form 10-QSB quarterly report for the third quarter of 1996. In the section marked "Revenues," VideoLan disclosed that Samsung had decided to terminate the distribution agreement and return all VL 2000 units. VideoLan also disclosed that it had only engaged in "limited marketing" of the VL 2000 system and was "currently beginning to implement its marketing strategy." It nonetheless predicted that "significant revenues are unlikely to be realized until the second quarter of 1997 at the earliest." Shortly thereafter, VideoLan publicly announced that the Samsung deal had fallen through. Things did not improve for VideoLan in the following year. By the end of 1997, VideoLan announced that it would cease operations.

[HN1] On a motion to dismiss for failure to state a claim pursuant to F.R.C.P. 12(b)(6), the Court will accept as true all well-pleaded allegations and all reasonable inferences will be made in favor of the non-moving party. See Picard Chemical Inc. [*7] Profit Sharing Plan v. Perrigo Company, 940 F. Supp. 1101, 1115 (W.D. Mich. 1996). Dismissal of the complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id.

II. Alleged Misrepresentations

[HN2] In order to state a valid legal claim for securities fraud under Rule 10b-5, a plaintiff must allege (1) a misrepresentation or misleading omission; (2) materiality; (3) scienter; (4) reliance; and (5) proximate causation of injury. See Stransky v. Cummins Engine Company, 51 F.3d 1329, 1331 (7th Cir. 1995); Picard Chemical Inc. Profit Sharing v. Perrigo Company, 940 F. Supp. 1101, 1121 (W.D. Mich. 1996). Reliance may be presumed when the plaintiff proceeds on a "fraud on the market theory." See Basic Incorporated v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 991-92, 99 L. Ed. 2d 194 (1988). n4 [HN3] The Private Securities Litigation Reform Act of 1995 sets forth the specific pleading requirements for a Rule 10b-5 violation. Under the Act, "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ." 15 USC [*8] § 78u-4(b)(1). Additionally, with regard to the element of scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 USC § 78u-4(b)(2).

n4 The Court takes judicial notice of the fact that the NASDAQ is an efficient stock market, permitting the assumption that all public information is reflected in the price of stocks traded on that exchange.

In the complaint, Plaintiffs allege that Defendants falsely represented to the public (1) that Samsung would buy $ 50-70 million worth of the VL 2000 under the distribution agreement; (2) that distribution of the VL 2000 would begin in the first quarter of 1996; (3) that full-scale marketing would commence in the second quarter; and (4) failed to timely inform the public that the Samsung deal had fallen through during the summer of 1996. Each of these will be treated in turn.

The central focus of the complaint seems to be Defendants' public statements about the Samsung contract. [*9] Plaintiffs say that Defendants told the public that Samsung would buy a significant quantity of its product when in fact Samsung had no obligation to buy any. From the face of the Exclusive Distribution Agreement,

it is evident that Samsung was not obligated to purchase any VL 2000 systems. The Agreement simply gave Samsung the exclusive right to sell this product in Korea. n5 Plaintiffs suggest that it was misleading to tell the public that this contract would generate millions of dollars in sales when Samsung was not legally obligated to purchase any VL 2000 units.

> n5 That the Agreement did not purport to obligate Samsung to buy any units is demonstrated by the plain language of Section 3.1 ("Offer and Acceptance"), which details the procedure for consummating each "proposed purchase and sale transaction." The Addendum to Section 3.4 ("Sales Volume") seems intended merely to provide sales estimates for the three year life of the contract.

Defendants counter that Plaintiffs have failed to explain how VideoLan's [*10] public statements were false or misleading. They argue that it was entirely true that VideoLan had signed a distribution agreement with Samsung and that the parties had agreed to sales volumes that would be expected generate millions of dollars of revenue. They contend that while the deal ultimately fell through, they had no duty under the securities laws to inform the public of every possible contingency -- such as a breach by the other party -- that might lead to the termination of the contract.

However, Defendants appear to concede that Samsung was within its rights when it terminated the Agreement. Plaintiffs emphasize this point. In their view, when Defendants announced the contract with Samsung, and placed a dollar value on it, they had a duty to inform the public that Samsung actually had no obligation to purchase anything. To omit to provide this essential detail, they argue, was to mislead the public into believing that Samsung was in fact contractually obligated to buy the VL 2000.

In analyzing this issue, the Court would place less emphasis on the issue of whether Samsung was legally obligated to make purchases under the contract. Clearly, they were not. However, legal [*11] obligations and true intentions or understandings may differ. At this point, the failure to explicitly disclose the lack of such a binding obligation probably would not require the conclusion that the Defendants misled the public. It is quite plausible that the typical investor was fully aware that the Samsung deal was not a purchase agreement. In the Court's view, it is more accurate to treat the November 7 press release, not as a statement of historical fact about Samsung's contractual obligations, but rather as a prediction of future sales that might or might not have required more explanation or cautionary warnings in order not to be misleadingly optimistic. *See In re Apple Computer Securities Litigation, 886 F.2d 1109, 1113-14 (9th Cir. 1989).*

VideoLan told the public that Samsung "is to purchase" $ 50-70 million worth of the VL 2000. The statement seems somewhere between the affirmation that "Samsung will purchase" and the belief or prediction that "we expect Samsung to purchase." [HN4] A statement of belief about future sales may be false or misleading if (1) the statement is not actually believed; (2) there is no reasonable basis for the belief; or (3) the speaker is aware of [*12] undisclosed facts tending seriously to undermine the statement's accuracy. *See Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996).* Only questions which are yet unanswered will determine whether Videolan's statement is actionable under one or more of these possibilities. Perhaps its unadorned assertion was overly exuberant in light of the actual understanding between VideoLan and Samsung or the condition of VideoLan's operations at the time. Perhaps this statement would have suggested to a reasonable investor that the chances of VideoLan's actually realizing these sales were far greater than they actually were in light of the undisclosed risks. Further discovery will no doubt shed light on these possibilities. At this point in the proceedings, the Court is unable to conclude as a matter of law that the November 7 press release was not misleading. n6

> n6 Defendants argue that Plaintiffs have failed to meet the strict requirements for pleading fraud. However, Plaintiffs did give a reason for their allegations in the complaint, namely, that the November 7 press release failed to disclose the lack of a firm commitment to purchase the requisite quantities of the VL 2000. Additional facts necessary to flesh out this theory are likely to be in the possession of the Defendants. At this time, Plaintiffs have sufficiently explained the nature of the alleged fraud to satisfy their burden at the pleading stage.

[*13]

The complaint also alleges (1) that it was a material misrepresentation for the Defendants to tell the public that they would begin shipping the VL 2000 in the first quarter of 1996 (by March at the latest), when in fact the first shipments were delayed until summer and (2) that the Defendants misled the public by announcing that full-scale marketing would commence in the second quarter of 1996, when in fact VideoLan had engaged in only limited marketing by the fourth quarter and still had not attained this objective before ceasing operations

completely in 1997. Defendants argue that these allegations of fraud are deficient.

Defendants correctly point out that [HN5] forward-looking statements of this sort cannot be considered fraudulent merely because they ultimately prove false. Plaintiffs must show that they were not made in good faith or lacked a reasonable basis. *See Stransky v. Cummins Engine Company, 51 F.3d 1329, 1331 (7th Cir. 1995).* However, Plaintiffs have alleged more than simply that Defendants predictions did not pan out. The complaint suggests that, at the time the statements were made, VideoLan insiders knew that the company was not in a position to meet these goals. [*14] In support of this conclusion, they point to (1) evidence of significant management and organizational changes in early 1996 and (2) a statement from VideoLan CEO Jack Shirman in late 1996 that the company still had "no product and no organization" and was "still in the diaper stage." Thus, Plaintiffs have sufficiently explained this allegation of fraud at the pleading stage.

Finally, the complaint alleges that it was a misleading omission for Defendants to fail to disclose in a timely manner that Samsung had terminated the distribution agreement. *Cf. In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1245 (3rd Cir. 1989)* ("There can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."). The facts show that VideoLan announced the termination of the deal in November. The complaint states that the agreement fell through several months earlier and supports this allegation with alleged statements by Steven Rothenberg in a May 26, 1997 newspaper article. These facts are sufficient to justify Plaintiffs' allegations of a misleading omission about the termination date of the contract. [*15]

III. Scienter

A final issue relating to the allegations in the complaint is whether the Plaintiffs have sufficiently pled scienter in the complaint. [HN6] Under § 78u-4(b)(2), a plaintiff must plead "with particularity" sufficient facts to create a "strong inference" of actual knowledge of reckless disregard. *See Epstein v. Itron, Inc., 993 F. Supp. 1314, 1319-20 (E.D. Wash. 1998).* The federal courts are still in the process of fleshing out the precise contours of this new pleading standard. Some courts have followed the Second Circuit approach that a strong inference of scienter arises from (1) facts showing that defendants had both motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior. *Id. at 1324.* Others have held that evidence of motive and opportunity will not alone suffice, though it may be considered in conjunction with other proof. *See Glenayre Technologies, Inc. Securities Litigation, 982 F. Supp. 294, 298 (S.D.N.Y. 1997).*

The Court need not resolve this issue, because Plaintiffs have pled the requisite state of mind with both types of evidence. First, Plaintiffs have pled circumstantial evidence. They have alleged [*16] that Defendants announced that the Samsung deal would generate $ 50-70 million in sales when the agreement did not actually guarantee any sales. They have also alleged that Defendants stated specific dates for the commencement of shipping and marketing the VL 2000 when in fact the company lacked the capacity to meet those deadlines. Finally, Plaintiffs have alleged that Defendants did not announce the termination of the Samsung deal until several months after it had fallen through.

Second, plaintiffs have supplemented these factual allegations with additional evidence of motive and opportunity. During the relevant time periods, VideoLan was a development-stage company with one product and one potentially lucrative distribution agreement. During this critical time in the growth of the company, Defendants would obviously have had a motive to overstate the strength of this single agreement and to conceal its demise. While Defendants are correct that any publicly-traded company would have similar incentives to boost the value of its stock through fraudulent means, the incentives here were potentially much greater. Viewed together, Plaintiffs' factual allegations are sufficient to create [*17] a strong inference of scienter.

IV. Statute of Limitations

Defendants have pled the one-year statute of limitations for 10b-5 actions as an affirmative defense. *See Tregenza v. Great American Communications Company, 12 F.3d 717, 718 (7th Cir. 1993).* [HN7] The limitations period is measured from the time the plaintiff had access to facts that would have put a reasonable investor on notice of the possibility of fraud. "Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Securities Inc., 785 F. Supp. 626, 634 (E.D. Mich. 1992).* At that point, the plaintiff must exercise reasonable diligence in attempting to uncover the fraud. *See id.*

Defendants contend that VideoLan's 1995 annual report to the SEC, filed April 1, 1996, would have put a reasonable investor on notice as to the possibility of fraud. This report contained a statement that VideoLan could not guarantee that Samsung would purchase "significant quantities" of the VL 2000. Plaintiffs did not react to this statement with an investigation and did not file suit until May 9, 1997, more than a year after [*18] it was made. Defendants therefore claim that the limitations period has passed and Plaintiffs' claim is time-

Case 1:04-cv-11380-WGY   Document 146-2   Filed 02/02/2007   Page 9 of 10

Page 8
1998 U.S. Dist. LEXIS 18066, *

barred. Plaintiffs respond that the limitations period was not triggered until November 11, 1996, the day Video-Lan filed its quarterly report with the SEC disclosing the termination of the Samsung deal.

Simply put, the issue is whether the "storm warnings" in this case were sufficient to alert a reasonable investor as to the possibility of fraud. *See Harner, 785 F. Supp. at 634.* [HN8] A "storm warning" is "any indication [in the annual report] or other subsequent communications that could reasonably be considered contrary to the rosy predictions that the Plaintiffs claim were misrepresentations." *Id.* It has been noted that "the question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss." *Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).* This appears to be one of those cases. The statements made by VideoLan in its SEC filings are somewhat cryptic and might or might not be perceived by a reasonable investor as contradicting the previous statements about [*19] the Samsung contract. n7 Whether these statements should have made a reasonable investor suspicious may be a question of meaning and nuance appropriate for determination by a jury. At this point in the proceedings, the Court is unable to conclude as a matter of law that the April SEC filing placed the Plaintiffs on inquiry notice, thus triggering the statute of limitations.

---

n7 In this filing, VideoLan stated the following: "In August, 1995, the Company signed a three year distribution agreement with Samsung America, Inc. and Samsung Corporation of Korea. Under the terms of the agreement, Samsung will have a three year exclusive right to sell, service, and distribute the VideoLan System in Korea. In October, 1995, the Company and Samsung signed an addendum to the agreement whereby Samsung has prospectively agreed to purchase, the VideoLan System and associated peripherals from the Company. There can be no assurances that Samsung will purchase significant quantities of the VideoLan System."

---

V. Class Period

In [*20] the complaint, Plaintiffs argue that the class period should extend from November 7, 1995, the date of the initial press release about the Samsung contract, to November 11, 1996, the date the contract was terminated. Defendants contend that the class period should only extend from November 7, 1995 to April 1, 1996, the date VideoLan first made the disclaimer about the quantity of sales under the agreement. The argument is that, given the assumption of the "fraud on the market" theory that an efficient stock market incorporates all relevant information into stock prices, the price of VideoLan stock could not have been artificially inflated after the April SEC filing publicly disclosing the truth about the Samsung contract. *See Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1261-62 (4th Cir. 1993); In re ZZZZ Best Securities Litigation, 864 F. Supp. 960, 975 (C.D. Cal. 1994).* Accordingly, they contend that those putative class members whose claims are based on purchases on VideoLan stock after April 1, 1996 should be dismissed from the case.

[HN9] In order to succeed on this "truth on the market" defense, the Defendants must show that there was "a corrective disclosure of sufficient [*21] force and effect to counter the false impression created by the prior misstatement." *ZZZZ Best, 864 F. Supp. at 975.* As noted by the Ninth Circuit:

> [HN10]
> Even in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received only brief mention in a few poorly-circulated or lightly-regarded publications. The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. In order to avoid Rule 10b-5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.

*In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir. 1989).*

Whether the cautionary statement in the April SEC filing was sufficient to counter the alleged misrepresentation in the November press release cannot be resolved on this motion. One interpretation of the April disclosure is that it merely says the obvious -- that it ignores the November prediction and therefore [*22] does very little to deflate it. Other interpretations are also possible. In any case, whether the subsequent disclaimer was sufficient in force and effect to counter the initial optimistic prediction is an issue of fact not appropriate for resolution on this motion. *See Cooke, 998 F.2d at 1262-63.* The Court cannot conclude as a matter of law that the market was fully apprised of the nature of the Samsung agreement on April 1. Therefore, at this time, the Court finds it unnecessary to shorten the putative class period.

However, Plaintiff has identified other allegedly fraudulent statements in the November press release that VideoLan would begin shipping and commence the full-scale marketing of the VL 2000 by the first and second quarters of 1996. It appears undisputed that these predictions were contradicted by subsequent SEC filings and public announcements. n8 Without determining the precise dates when these facts credibly entered the marketplace, it appears that Defendants may have a strong argument that the class period with respect to these particular statements should close on the dates they were publicly falsified. The parties have not sufficiently argued the issue. At a [*23] later time the Court may consider the impact of these other statements on the class period.

n8 For example, VideoLan stated in a registration statement, filed on May 28, 1996, that it was just "beginning to implement its marketing strategy." This appears inconsistent with achieving "full-scale marketing" by the second quarter of 1996.

The Court will issue an order consistent with this memorandum opinion.

JOHN G. HEYBURN II

JUDGE, U.S. DISTRICT COURT

**ORDER**

This matter is before the Court on the motions of John Haines, Peter Beck, Steven Rothenberg, Vernon Jackson, and Ted Ralston (the "Defendants") to dismiss the claims of Brent Berti and others similarly situated (the "Plaintiffs") pursuant to *F.R.C.P. 12(b)(6)* and *F.R.C.P. 9(b)*. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motions are DENIED.

This 10th day of June, 1998.

JOHN G. HEYBURN II

JUDGE, U.S. DISTRICT COURT