The Committee shall maintain (i) a Company Stock Account and (ii) an Investment Account for each Participant. Each Participant's Company Stock Account shall consist solely of [*20] shares of Company Stock. Each Participant's Investment Account shall consist of the Participant's shares of Trust Assets other than Company Stock.

See Trial Exhibit 3, Bates stamped page AVDL 25450.

Further, Article VIII, § 8.2 provided:

> **Investment of Trust Fund.** The Trust Fund shall be invested primarily in Company Stock; provided that the Trustee may also invest the Trust Fund in cash, cash equivalents, certificates of deposit, money market funds, guaranteed investment contracts, short term securities, bonds, and other investments at the direction of, or in accordance with the investment policy established by, the Committee or an authorized Investment Manager.

See Trial Exhibit 3, Bates stamped page AVDL 25468.

Article IX, § 9.1 set forth the duties and responsibilities of the Board of Directors in connection with the administration of the Plan, and such duties and responsibilities included "making decisions with respect to amending or terminating the Plan." See Trial Exhibit 3, Bates stamped page AVDL 25471.

Under Article XI, § 11.1, "the Board of Directors reserved the right to amend the Plan or Trust ..., in whole or in part, [*21] at any time and for any reason without the consent of any Participating Employer, Participant or Beneficiary." See Trial Exhibit 3, Bates stamped page AVDL 25479. However, under § 11.3, no amendment could be made which would either:

> (i) deprive any Participant or Beneficiary of any part of his Accounts as constituted at the time of such amendment, or (ii) make it possible for any part of the Plan assets ... to be used for or diverted to any purposes other than for the exclusive benefit of Participants and Beneficiaries under the Plan prior to the satisfaction of all liabilities of the Plan.

*Id.*

### 2. Avondale's ESOP Plan (After Amendment Number Three)

Effective January 1, 1996, n6 the Avondale ESOP was amended by "Amendment Number Three", which divided the Plan into two portions: the employee stock ownership plan portion and the stock bonus plan portion. n7 The Preamble to the Plan was amended to read:

> The purpose of the Plan is to encourage employees to make and continue careers with Avondale Industries, Inc. and certain related employers by allowing employees to obtain beneficial interests in the common stock of Avondale Industries, Inc. [*22] , to provide an effective means for employees to accumulate funds for their own retirement, and to enable employees to share in the appreciation and depreciation of the common stock of Avondale Industries, Inc. **and other assets accumulated by the Plan. The Plan shall be divided into two portions, the employee stock ownership plan portion and the stock bonus plan portion.** The employee stock ownership plan portion of the Plan is designed to invest primarily in common stock of Avondale Industries, Inc. and **the stock bonus plan portion of the Plan is designed to invest in a diversified portfolio.**
>
> The Plan and its related Trust are intended to qualify as a stock bonus plan and as an employee stock ownership plan and trust under Sections 401(a), 501(a) and 4975(e)(7) of the Internal Revenue Code of 1986, as amended. **The stock bonus plan portion of the Plan will be separately accounted for and administered from the employee stock ownership plan portion of the Plan.**

See Trial Exhibit 4, Bates stamped pages AVDL 03772-03773 (emphasis added).

> n6 While Amendment Number 3 was effective as of January 1, 1996, it was actually not executed until February 5, 1996. The date of the

Case 1:04-cv-11380-WGY    Document 151-8    Filed 02/23/2007    Page 2 of 21

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

secondary offering was the next day on February 6, 1996.

[*23]

n7 [HN11] The act of amending a plan is a sponsor function that does not trigger ERISA's fiduciary provisions. *Lockheed Corp. v. Spink*, 517 U.S. 882, 891, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996); *Grindstaff v. Green*, 133 F.3d 416, 425 (6th Cir. 1998) (citations omitted).

Section 5.1 of Article V, Participant Accounts, was amended to read as follows:

The Committee shall maintain (i) a Company Stock Account and (ii) an Investment Account for each Participant. The Company Stock Account will constitute the employee stock ownership plan portion for the Plan. One subaccount of the Company Stock Account will consist solely of shares of Company Stock. Another subaccount of the Company Stock Account will consist of other investments held for liquidity and other administrative purposes. The Investment Account will constitute the stock bonus plan portion fo the Plan. Each Participant's Investment Account will consist of investments as determined by the Committee. The Committee may establish a subaccount under the Investment Account to hold Company Stock. The Committee [*24] may, in its discretion and from time to time, establish one or more investment funds for the non-Company Stock portion of any Account or invest such funds in a single commingled investment portfolio.

See Trial Exhibit 4, Bates stamped page AVDL 03773.

Section 8.2 of Article VIII was amended and re-stated to read:

8.2 **Investment of Trust Fund.** The Trust Fund shall be divided into an employee stock ownership plan portion and a stock bonus plan portion. **The Committee shall have discretion from time to time to determine which portion of the Trust Fund is allocated to the employee stock ownership plan and which portion of the Trust Fund is allocated to the stock bonus plan portion.** In addition, the Committee shall have discretion to instruct the Trustee to sell shares of Company Stock and, except to the extent the Committee determines to hold proceeds in the employee stock ownership plan portion for liquidity and other administrative purposes, **to direct that the proceeds of such sale be allocated to the stock bonus plan portion of the Plan.**

The **employee stock ownership portion** of the Trust Fund shall be invested primarily in Company [*25] Stock; provided that the Trustee may also invest the employee stock ownership plan portion of the Trust Fund in cash, cash equivalents, certificates of deposit, money market funds, guaranteed investment contracts, short term securities, bonds, stocks and other investments at the discretion of, or in accordance with the investment policy established by, the Committee or an authorized Investment Manager.

...

The **stock bonus plan portion** fo the Trust Fund shall be invested in a diversified portfolio consisting of cash, cash equivalents, certificates of deposit, money market funds, guarantee investment contracts, short-term securities, bonds, stocks and other investments at the discretion of, or in accordance with the investment policy established by, the Committee or an authorized Investment Manager.

...

For purposes of the Avondale Industries, Inc. Pension Plan, the Trust Fund shall be considered one account.

See Trial Exhibit 4, Bates stamped pages AVDL 03774-03775 (emphasis added).

The Committee's special counsel (Roger Siske), who supported the adoption of Amendment Three, testified that he gave the Committee the following advice regarding Amendment [*26] Three:

I advised the committee that before plan amendment 3, they could sell stock, that is company stock, and invest in virtually any other type of investment asset, because the trust had very broad investment discretion for them. I indicated to them that the only constraint on their ability to sell was the requirement that they remain, they keep the ESOP over time, on a time weighted average that's not entirely clear, primarily, that is, more than half, in Avondale stock.

I advised them that at any given time they could actually, on this time weighted basis, have less than half in company stock, but that the law was not entirely clear as to how the time weighted average was going. That there was a bright line that if they always stayed more than half, they were always primarily. And if they went under it, it was a question of how you did the arithmetic to figure how long you could be how far under. Given that the plan was, for a long time, almost 100 percent in company stock, and when you averaged that with period of time when they were under 50 percent, there were questions as to how you figured out that more than half arithmetic.

And so the advice I gave the committee [*27] was they could go that way, but it would be clearer and clearer if they didn't have to do this arithmetic to do the more than half measurement and that if this third amendment, an amendment like the third amendment were executed, that they would be relieved from this continuing arithmetic monitoring to make sure that they otherwise were monitoring the primarily requirement.

(TR. 1347-48 [Siske]). n8

n8 See also concurring testimony of the Committee's regular counsel, Rudolph Ramelli, TR. 776-77.

Before the amendment was effective, the Committee, in a letter dated December 21, 1995, apprised the ESOP participants that it was considering amending the Plan. That letter read:

Dear ESOP Participant:

The ESOP Administrative Committee ... and Avondale ... have been in discussions concerning the desirability of amending the ESOP trust documents to grant to the Committee greater flexibility in selling shares of Company common stock and diversifying the ESOP investment portfolio. The Committee [*28] is presently considering the sale pursuant to a public offering of between 3,000,000 and 3,450,000 shares of the Company's stock. At the request of the Committee, the Company has filed a registration statement with the Securities and Exchange Committee covering the proposed offering and sale of these shares. Any such sale would be subject to the effectiveness of the registration statement, the Company's adoption of a satisfactory amendment to the ESOP, and the Committee's determination to sell after considering market conditions, the price of Company stock and the advice of its independent financial and legal counsel. If this sale were to occur, the ESOP's current ownership of approximately 49% of Avondale's outstanding stock would be reduced to between 23% and 27%.

The Committee will keep you apprised of progress and its decisions in this matter.

(See Exhibit 49B).

Peter Hill, the only Plaintiff who testified at Trial, admitted receiving this letter close to the date on the letter (December 21, 1995), "drawing a connection between the divestiture of ESOP from Avondale stock and the movement of the union through the Avondale Shareholders Committee to try to effect certain [*29] changes to management." (TR. 873-74 [Hill]). At that point, he first believed there was a conflict of interest, he understood the concept of fiduciary duty, and specifically he understood the ESOP had a fiduciary responsibility to the plan participants. (Id. at 874).

When the court asked Plaintiff Hill why he did not voice his concerns to the Committee (back in December 1995), he unconvincingly replied "I felt like it would fall on deaf ears." (Id. at 878). n9

Case 1:04-cv-11380-WGY    Document 151-8    Filed 02/23/2007    Page 4 of 21

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

n9 [HN12] A claim for breach of fiduciary duty under ERISA begins to run six years after the breach or three years after the plaintiff had "actual knowledge" of the breach or violation. 29 U.S.C. § 1113. "Actual knowledge" is

> knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm.

*Maher v. Shipping Co., 68 F.3d 951, 954 (5th Cir. 1995), quoting Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3rd Cir. 1992).*

"Actual knowledge" requires a showing

> that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA.

*Maher, 68 F.3d at 954, quoting Int'l Union v. Murata Erie North America, 980 F.2d 889, 900 (3rd Cir. 1992).*

Defendants argue that both Plaintiff Hill's and Plaintiff Thompson's breach of fiduciary claims are time barred. (Defendants' Joint Brief at 35).

Based on Plaintiff Hill's Trial testimony, the court finds that Plaintiff Hill had actual knowledge of the facts forming the basis of his breach of fiduciary claim as to the 1996 sale no later than April 1996. Thus, since Plaintiffs filed this suit more than three years later (on November 11, 1999), Hill's 1996 claim (Count 2) is time-barred.

As to Plaintiff Harry Thompson, whether or not he had the requisite "actual knowledge" (re Count 2) is not as clear. Plaintiff Thompson was a member of the Avondale Shareholders Committee and he testified (in a deposition taken on April 20, 2001) that, in his opinion, the February 1996 sale was not in the workers' best interest. In ques-

tions aimed at the untimeliness issue, he was asked if he received (1) the ESOP Committee's December 1995 letter which outlined the 1996 sale (Ex. 49A), (2) his April 30, 1996 ESOP account statement which indicated the number of shares sold out of his ESOP account in February 1996 (Ex. 185), and (3) the January 1996 ESOP Alert in which the ASC posed several questions challenging the 1996 sale (Ex. 189). (Thompson Deposition, Doc. No. 217 at 66-81). However, Thompson's responses were equivocal. *(Id.).*

In any event, the court declines to rule as to whether or not Thompson's 1996 claim (Count 2) is time-barred, because both Plaintiff Hill's and Plaintiff Thompson's breach of fiduciary claims as to the 1998 claims (Count 3) are not time-barred, and Defendants make no argument that any of the claims Count 2 & 3) asserted by Plaintiff Raymond Young are time-barred.

[*30]

The court concludes, from both a legal and business prospective, that the Plan was properly divided into two components (an ESOP component and a stock bonus component) by Amendment Number Three. n10 Further, the ESOP Participants were duly put on notice that the amendment was being considered, and no objections were timely made. The effect of Amendment Three is discussed next.

> n10 Purely business decisions by an ERISA employer are not governed by § 1104's fiduciary standards. *Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995).*
>
> The court notes that Amendment Three, at least as far as the Internal Revenue Service was concerned, did not affect the continued qualified status of the Plan under the Internal Revenue Code. *See* Trial Exhibit 686. (To the extent that Plaintiffs object to this limited observation, their objection is overruled).

### 3. Pursuant to Amendment Number Three, Did the Plan Remain an ESOP, with ESOP Committee Having the Discretion to Allocate Existing Assets of [*31] the Plan Between the ESOP Component and the Stock Bonus Component?

The parties' fiduciary experts disagree on the answer to this question. Plaintiffs' expert, David Heald, n11 thought that the Plan (as amended by Amendment Num-

ber Three) remained an ESOP, but with an addition of a stock bonus plan portion. Thus, the traditional rules and considerations should apply to that ESOP, with the "continuing guidance that the ESOP is to be primarily invested in company stock." (TR. 831-33).

> n11 David Heald is a founding principal of Consulting Fiduciaries, Inc., which provides professional, independent fiduciary decision making, consultation and alternative dispute resolution services to ERISA plans, plan sponsors, trustees and investment advisers. He has been retained as an expert witness in several cases, but this is the first case that has gone to trial. (*See* resume attached to Heald's report, part of Doc. No. 230, & TR. 809-15 [Heald]).

However, Mr. Heald opined that while Amendment Number Three gave [*32] the Committee the discretion to what goes into the two different components (the ESOP component or "bucket" and the stock bonus component or "bucket") n12, the Committee did not have a mandate to sell ESOP shares because ESOPs are designed to hold company stock. Rather, "to the extent they want to fund the stock bonus portion, they can easily do that out of **continuing** contributions." (TR. 834, emphasis added).

> n12 At Trial, the two different components were often referred to as "buckets".

Further, Mr. Heald believed that while Amendment Number Three gave the ESOP fiduciaries a range of discretion, it did not allow them to engage in the February 1996 secondary offering absent a compelling circumstance such as impending bankruptcy. To do that the Plan should have been amended into a 401(K) or profit sharing plan so that it was no longer an ESOP. (TR. 818-19, 836).

On the other hand, Defendants' fiduciary expert, Kelly Driscoll, n13 opined that Amendment Number Three gave the ESOP fiduciaries "the authority [*33] to determine when they should sell stock in the ESOP and diversify it." (TR. 1002-03; *see also* TR. 1034-35). With regard to the February 6, 1996 sale, Ms. Driscoll testified that under Amendment Number Three, the ESOP Administrative Committee had the "discretion" to sell a portion of the ESOP shares and at the same time hold a portion of the ESOP shares. (TR. 1004, 1026).

> n13 Kelly Driscoll oversees the independent fiduciary transaction services at State Street Bank & Trust Company, which is a large financial institution in Boston that primarily services pension and ERISA funds and mutual fund custody. State Street is typically hired to serve as an independent fiduciary for ERISA plans, generally involving transactions where employer securities are either purchased or sold. This case is the first time she has been hired an expert witness. (TR. 994-95 [Driscoll]).

The court concludes (contrary to the speculative opinion of Plaintiff's fiduciary expert) that Amendment Three was not designed to accommodate [*34] *future* contributions of Avondale. Rather, under this amendment, the Committee had the discretion and responsibility to allocate *existing* Plan assets between the ESOP component and the Stock Bonus component. When the Committee sold Avondale stock out of the ESOP component, it still kept the ESOP component primarily invested in Avondale stock, and it used proceeds from the sale of the stock to maintain the Stock Bonus component in a diversified portfolio. Thus, the Committee complied with the Plan.

Further, contrary to Plaintiffs' assertions, neither ERISA nor the Plan required the Committee to have a "compelling reason" to sell the Avondale stock. [HN13] While ESOPs are exempted from ERISA's diversification requirement, ESOP fiduciaries are not required to have a compelling reason to diversify. n14 Rather, they are always required to act pursuant to their duties of loyalty and care in deciding whether or not to diversify (when the language of the Plan gives them the discretion to diversify). As Defendants' fiduciary expert, Kelly Driscoll, testified:

> THE COURT: Under these circumstances, in your opinion, was it a breach of fiduciary duty to sell the stock without having, without [*35] being compelled to?
>
> K. DRISCOLL: I think under these circumstances, what the fiduciary committee was compelled to do was make a decision. They had to decide ...
>
> So, you know, my point is that once the committee was given that authority and that discretion, then they were compelled to make a decision. They had to make a decision. They could have made a deci-

Case 1:04-cv-11380-WGY   Document 151-8   Filed 02/23/2007   Page 6 of 21

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

sion to keep it all in. They could have made a decision like they did to keep some of it in and sell some of it. They could have made the decision it was appropriate to sell, but they had to make a decision. They were compelled to make a decision.

THE COURT: Could they make a decision to sell without some compelling reason to sell?

K. DRISCOLL: Absolutely. I think absolutely they could have made a decision to sell because Amendment Three says that. They had the discretion when to sell and how much to sell in this structure. Absolutely.

(TR. 1044-45). n15

n14 [HN14] While an ESOP fiduciary is statutorily exempted from diversification, an ESOP fiduciary may nevertheless be sued for an imprudent decision *not* to diversify because an ESOP fiduciary is still required to prudently discharge his duties solely in the interests of the plan participants and beneficiaries. *Kuper v. Iovenko, 66 F.3d 1447, 1458(6th Cir. 1995); Moench v. Robertson, 62 F.3d 553, 571 (6th Cir. 1995)* (while an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA, that presumption may be overcome by showing that the fiduciary abused its discretion by investing in employer stock).

[*36]

n15 Even before Amendment Number Three, the Plan authorized the Committee to diversify as long as it maintained, over the life of the Plan, at least 51% of the assets in Avondale stock. (Siske Testimony, TR. 1347-48, *quoted* in text of this ruling, *supra* p. 20).

**B. A Prudent Person in Like Circumstances Would Determine that Diversification through the 1996 and 1998 Sales was Prudent and in the Best Interest of the Plan Participants and Beneficiaries.**

[HN15] The ESOP fiduciaries' main responsibility in making investments is to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *29 U.S.C. § 1104*(a)(1)(B).

Under ERISA, "courts have focused the inquiry under the 'prudent man' rule on a review of the fiduciary's independent investigation of the merits of a particular investment, rather than on an evaluation of the merits alone. *Donovan, 716 F.2d at 1467.* [*37]

Quoting from a leading commentator, the Fifth Circuit states:

> the test of prudence-the Prudent Man Rule-is one of conduct, and not a test of the result of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.

*Id., quoting* 19B *Business Organizations, S. Young, Pension and Profit-Sharing Plans* § 17.02[3] at 17-29.

Further, "conducting an investigation that is structured to remove the taint associated with conflicting interests goes a long way toward satisfying the duty of loyalty." *Bussian, 223 F.3d at 299, n. 15.* And "the level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict." *Metzler, 112 F.3d at 213.*

Here, the court finds that the ESOP Defendants, at the time they engaged in the challenged sales, exercised independent judgment in evaluating whether to sell Avondale shares, and then employed the appropriate methods to thoroughly and impartially investigate and implement the sales. In so doing, [*38] the ESOP Defendants prudently decided to diversify through the 1996 and 1998 sales, and they took the necessary steps to alleviate any potential conflict with the Management Defendants, reasonably believing they were acting in the participants' best interests. There is simply insufficient evidence that in implementing the 1996 and 1998 sales, the ESOP Defendants ever placed Management's anti-Union sentiments over the Plan's interests or ever failed to keep "an eye single to the interests of the participants and beneficiaries." *Bussian, 223 F.3d at 298.*

*1. The Nuts and Bolts of the 1996 Secondary Offering*

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

In 1988, the initial public offering price of Avondale's stock was $ 15/share. (Joint Stipulations 56 & 57). By 1992, the stock had fallen to $ .875/share bid and $ 1.00/share ask. (Joint Stipulation 65). By 1994, the stock price had recovered somewhat, but the Committee considered diversifying the ESOP's holdings based on its strong belief that the participants' retirement funds would be safer in a diversified instrument rather than in a single volatile stock. n16 The Committee knew that Avondale's business was inherently risky since Avondale essentially relied [*39] on the Navy for the majority of its business, and even when Avondale successfully negotiated contracts with the Navy, such contracts were not always profitable. Further, the Committee was concerned that the increasing age of the Plan participants made them less able to absorb market crashes and still receive adequate retirement benefits.

n16 Indeed, the Committee's legal counsel explained:

one of the things the committee had always been concerned about was the fact that their concentration of investment in Avondale stock. This committee had seen the stock ... go way up, go down to 87 1/2 cents, and they were ... constantly ... kind of concerned about that.

I had advised the committee that under ERISA as an ESOP, that the ERISA had an exemption from the normal diversification requirement for ESOPs. I mean, ERISA has a specific requirement that plans have to diversify their portfolio. ERISA recognizes that there is ... kind of an almost special case for ESOPs and there is an exemption from the diversification.

Nevertheless, there had been some cases [and/ or] discussion in the ESOP or ERISA world that Administrative Committees could not blindly sit by and rely on that exemption. So I recommended to them, I guess it was some time in '94, that they engage Duff & Phelps, who had been ... kind of a financial advisor to the committee

over a number of years to basically ... look at the Avondale stock, look at their portfolio and to ... basically come up with a recommendation, not necessarily a recommendation, but to help the committee make the decision that relying on that exemption was prudent.

I felt that the committee could be faulted if they did not periodically review their holdings on Avondale stock.

(TR.754-55 [Ramelli]).

[*40]

In November 1995, the Committee retained Duff & Phelps Capital Markets Co. (Duff & Phelps) to provide expert financial advice regarding the valuation of Avondale stock and the merits of a secondary offering. The Committee also retained the law firm of Sonnenschein, Nath & Roth (SNR) to provide expert legal advice and it interviewed several potential underwriters regarding their possible participation in such a sale, ultimately selecting Salomon Brothers to act as lead underwriter for the potential sale. n17

n17 Neither the Duff & Phelps nor the SNR law firm were strangers to the ESOP Administrative Committee, as the Committee had retained them for financial and legal advice respectively in the past.

Further, the qualifications or credentials of the advisors from Duff & Phelps and counsel from SNR are indisputable. Greg Range, who supervised the Duff & Phelps' reports, is the managing partner of the Duff & Phelps Los Angeles office, serving in that capacity since 1990. From 1983 to 1990, he worked with the Houlihan Lokey firm (occasionally working with Plaintiffs' fiduciary expert, Richard Braun). (TR. 1081 [Range]). He obtained his undergraduate degree in economics from Stanford University in 1981, and he received an MBA with a concentration in finance from UCLA in 1983. He holds a designation from the American Society of Appraisers with a specialty in business valuation, a series 7 securities industry license, and a series 63 license which is granted by the National Association of Securities Dealers. He is a member of the Ameri-

can Society of Appraisers, the ESOP Association, and the National Center for Employee Ownership. He has also taught courses in the discipline of business valuation, and wrote or copyrighted articles on business valuation, poison pills and shareholder rights plans. For virtually his whole career, he has advised ESOP fiduciaries on fair market value issues concerning the sponsored stock held by ESOPs. His first engagement with the Avondale ESOP was in 1987, and his last was in 1999. (TR. 1175-79 [Range]).

The Committee's special legal counsel, Roger Siske, is a partner in the Chicago firm of SNR, and is the head of the firm's national employee benefits and executive compensation department. He obtained a B.S. in finance with honors from Ohio State University in 1996. He received his JD magna cum laude from the University of Michigan in 1969. He was also a member of the Order of the Coif, and an associate editor of the law review. In 1971, he was detailed to the Judge Advocates Court while serving in Viet Nam. He is a member of the Ohio bar, and has written numerous articles and publications on employee benefits law. He is founding charter fellow of the American College of Employee Benefits Law. (TR. 1342-44 [Siske]). Mr. Siske was the main legal advisor to the Committee in connection with the February 1996 secondary offering and the 1998 Dutch Auction. *Id.* at 1342.

The Committee's regular counsel, Rudolph Ramelli, graduated from Tulane Law School in 1977. He was a member of the law review and Order of the Coif, and he was awarded the Dean's medal and faculty medal for highest grades. He then received an LLM in taxation from New York University School of Law, where he also took courses on employee benefits law. Mr. Ramelli is also a CPA. He is a member of the Louisiana bar and is presently a partner in the Jones Walker law firm, heading its tax section. He began representing the Avondale ESOP Committee in 1987, but he withdrew from representing the Committee in connection with the February 1996 secondary offering to avoid a conflict of interest because he was also Avondale's general counsel. (TR. 745-49 [Ramelli]).

[*41]

As of December 31, 1995, the ESOP held $ 99 million (82.7%) of its $ 120 million in assets in Avondale common stock. (Joint Stipulation 243). In deciding whether to sell, the Committee reviewed draft and final reports from Duff & Phelps and met with Greg Range (who supervised preparation of the reports), to discuss the reports and ask for clarification when needed. The Committee also consulted with its legal counsel about the advisability of the sale. The Committee members considered the advice of these experts, together with their personal work experience at Avondale, and ultimately made the decision to sell the stock. After hearing the testimony of the witnesses and reviewing the documents introduced at Trial, the court is convinced that the decision to consider the sale and actually go forward with it came from the Committee members themselves, *not* their advisors or Avondale management.

On February 6, 1996, after negotiating with Salomon the best price it could obtain for the sale of over three million shares and considering the opinion of Greg Range of Duff & Phelps regarding the price at which to sell the ESOP-held Avondale stock to an underwriting syndicate, the Trustees [*42] of the ESOP sold 3,581,000 shares of Avondale common stock in a secondary offering for $ 15.75/share, resulting in a price of $ 14.84 net of the $ .91/share underwriting discount. (Joint Stipulation 250). The sale proceeds were invested in a diversified portfolio, with the remainder of the ESOP's Avondale common stock left in the ESOP component of the Plan. (Joint Stipulation 252). As a result of the sale, the ESOP stock ownership in Avondale Industries was reduced from approximately 47.2% to approximately 22.4% all shares issued and outstanding. n18

n18 *See* fn. 32, *infra.*

*2. The Nuts and Bolts of the 1998 Dutch Auction* n19

n19 A "Dutch Auction" in the context of a self-tender offer is described as follows:

Although tender offers are usually offers by third parties to purchase shares at a specified price, a corporation may make an offer to purchase a number of its own shares from the shareholders. Like the tender offer of a third party, the corporation may structure the offer to a specific number of shares at a set price and set conditions for the number of shares it will purchase at a specified price, which may be more or less than the market price. Self-tender offers

by their nature are not coercive and the shareholder can decide to hold her shares, make a tender in accordance with the terms of the tender offer or sell on the market.

One method utilized in a self-tender is the so-called Dutch Auction. The Dutch Auction permits the selling shareholder rather than the corporation to set the price to be paid for the shares. The corporation sets a price range within which individual shareholders may designate the price at which they are willing to sell. The corporation then determines the lowest price at which it can purchase the number of shares it needs and buys at that price all the shares tendered at or below that price, on a pro rata basis if necessary. Any shares above that price are excluded.

19 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 3:111.20 (Westlaw database updated Nov. 2002).

[*43]

After the 1996 Secondary Offering, the Committee remained convinced to further diversify if the price was right. In early 1997, the Committee considered selling the entirety of the ESOP's holdings of Avondale stock through another secondary offering. Thus, the Committee again engaged Duff & Phelps and SNR to respectively provide expert financial and legal advice, and it also interviewed an underwriter about a potential sale. Ultimately, however, the Committee did not go forward with the sale because in its opinion the price was too low at that time.

On May 5, 1998, the Avondale Board of Directors approved a Dutch Auction self-tender-offer to buy up to 1,250,000 shares of its common stock, at a range of $ 26.50 to $ 29 per share, representing a premium of up to 10.5% on the pre-announcement market price of $ 26.50 per share. (Joint Stipulation 295). The Committee thought this was a good opportunity to continue its diversification strategy, especially when the Dutch Auction was structured to preclude the possibility of the ESOP receiving less than the prevailing public market price for its shares. (Joint Stipulation 297). Further, Defendant Kitchen (Avondale's Corporate Vice President [*44] and Chief Financial Officer) explained that Avondale looked at the Dutch Auction as a way to enhance value for the entire Avondale shareholder base. n20 (TR. 585-86 [Kitchen]).

n20 In contrast, when another potential secondary offering had been discussed in 1997, the price of the stock started out at $ 23/share, but then it significantly dropped to $ 17/share, leaving the shareholder base unhappy. (TR. 585-86 [Kitchen]).

However, before participating in the Dutch Auction, the Committee once again meaningfully consulted with both its financial and legal advisors (respectively, Duff & Phelps and SNR). Ultimately, the Committee submitted a "laddered tender," which was designed to maximize both the price and volume of tendered shares. The clearing price of the Dutch Auction was $ 28.875/share, resulting in the Committee obtaining a 10% premium over the pre-announcement market price. (Joint Stipulation 304).

On June 3, 1998, the ESOP sold approximately 1,055,000 shares of Avondale common stock in the Dutch Auction [*45] tender at a price of $ 28.875. (Joint Stipulation 305). Immediately before the Dutch Auction, the ESOP held approximately 2,808,000 common shares, or 19.4% of the issued and outstanding Avondale common stock. As a result of the Dutch Auction, the ESOP's ownership of Avondale common stock decreased to approximately 1,753,000 common shares, or 13.4% of the issued and outstanding Avondale common stock. (Joint Stipulation 308).

### 3. The Committee's Use of Experts for Both the 1996 and 1998 Sales Was Appropriate.

[HN16] The reference in ERISA, § 1104(a)(1)(B) to a prudent man "familiar with such matters" does not create a "prudent expert" under ERISA, and prudent fiduciaries are entitled to rely on the advice they obtain from independent experts. *Donovan, 716 F.2d at 1467, n. 26, & 1474.* On the other hand, subjective good faith-- "a pure heart and an empty head"--is not enough. *Donovan, 716 F.2d at 1467.*

Rather, the prudent man rule is a flexible standard: "the adequacy of a fiduciary's investigation is to be evaluated in light of the 'character and aims' of the particular type of plan he serves." *Id.*

In order to rely on an expert's [*46] advice, a "fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on

Case 1:04-cv-11380-WGY    Document 151-8    Filed 02/23/2007    Page 10 of 21

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

the expert's advice is reasonably justified under the circumstances."

...

A determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand ... The goal is not to duplicate the expert's analysis, but to review that analysis to determine the extent to which any emerging recommendation can be relied upon.

_Bussian,_ 223 F.3d at 301.

Here, for both the 1996 Secondary Offering and the 1998 Dutch Auction, the Committee sought both financial and legal advice from professionals whose qualifications and credentials were not disputed. n21 However, the evidence also establishes that the Committee members did not blindly rely on these experts. Rather, each Committee member considered the [*47] various analyses and extensive reports of the experts, had various meetings with the experts, and then made up his or her own independent decision as to whether to sell, or not sell, the shares. n22

n21 _See_ fn. 17, _supra_ for experts' qualifications and credentials.

n22 _Contrast Chao v. Hall Holding Co., Inc.,_ 285 F.3d 415, 431-34 (6th Cir. 2001) (fiduciaries blindly relied on their valuation expert because fiduciaries had no input on the retention of its valuation advisor, advisor was not provided with complete and accurate information, fiduciaries were not consulted on major decisions, fiduciaries failed to consult legal advisors, and they had no input on the stock price paid by the ESOP).

While the Committee members were not required to duplicate their financial experts' valuations, they had to try to understand the valuation and question the experts' methods and assumptions if they did not make sense. And this they did, together with considering Avondale's

business prospects in [*48] light of their rather substantially collective work experience at Avondale. n23

n23 The Committee members were not "sophisticated investors". However, as a group, the Committee members had a broad range of experience within many divisions of Avondale, with each member having a minimum of 30 years service at Avondale. Mr. Church (the Chairman of the ESOP Committee) has a 33 year history of employment with Avondale. He joined Avondale in 1966, and worked his way up through the ranks to become Vice-President of Contracts, Credit and Insurance in 1981. In 1997, he was promoted to Vice-President and Chief Administrative Officer of Avondale. (_See_ Church Stipulations, Exhibit 891). He was appointed to the ESOP Administrative Committee by the Avondale Board of Directors in 1990, and was elected Chairman of the Committee in 1991. During his tenure on the Committee, the ESOP thrived, with assets increasing from just under $ 60 million to in excess of $ 219 million. (TR. 200-01 [Church]). Further, during this same time frame, the ESOP paid in excess of $ 64 million in benefits to retirees. _Id._

Mr. Duhon started at Avondale as a pipefitter helper and, during his 41 years at Avondale, he went to the position of leaderman, to foreman, to assistant superintendent, to superintendent, to manager, and ultimately to Vice-President of Outfitting managing over 700 employees. He had the ultimate responsibility for completing system installations (painting, pipe, electrical) on all vessels after they were launched and went to wet dock. (TR. 314-23 [Duhon]).

Through her some 41 years at Avondale, Ms. Barlotta also moved up the ranks from payroll clerk to Vice-President of Information Resources, providing computer services for the accounting department, keeping Avondale's hardware and software current, and educating information resources employees. (TR. 357-59 [Barlotta]).

Mr. Griffin began his 35 year career at Avondale in the Human Resources Department, working his way up to become the Director of Human resources. He also had prior investment experience from his approximately 15-year service on the Defined Benefit Plan Committee. (Griffin Dep. 8-13).

Mr. Blanchard started at Avondale as a sheet metal helper and retired 46 years later as Vice-

President of Production. His production department was responsible for translating bid estimates into line-item budgets and production schedules. (TR. 672-76 [Blanchard]).

[*49]

Further, regarding valuation, the Committee's understanding of every nuance of the professional valuation was not critical, because Avondale was publicly traded and the Committee members were aware of Avondale's stock price on nearly a daily basis. As Defendants' fiduciary expert testified, [HN17] "[a fiduciary need not be] any smarter than the marketplace [and need not] second guess what the marketplace is factoring into the company value." (TR. 1055 [Driscoll]).

With regard to the Committee's legal counsel, Plaintiffs maintain that "the ESOP Defendants relied on the advice of counsel who were conflicted due to their ties to management." (Plaintiffs' Post-Trial Brief at 22, n. 10). However, "nothing in ERISA explicitly requires that outside counsel invariably be consulted." *Bidwill v. National Football League,* 943 F.2d 498, 509 (4th Cir. 1991); *see also Ashenbaugh v. Crucible, Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1531-32 (3rd Cir. 1988). n24

n24 The *Ashenbaugh* court reasoned:

[ERISA] [HN18] 29 U.S.C. § 1108(c)(3) specifically allows officers and others connected with the employer to serve as plan fiduciaries; given that Congress clearly contemplated the administration of ERISA plans by employers, we think that if it had intended to impose a requirement that plan administrators consult outside counsel in the course of their administration, it would have made this intention clear in the statute.

*Ashenbaugh,* 854 F.2d at 1531.

In *Becher v. Long Island Lighting Co. (In re Long Island Lighting Co.),* 129 F.3d 268 (2nd Cir. 1997), the court pointed out that:

[HN19] by authorizing the employer to act as plan fiduciary in the first place, *see* ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), ERISA has surely absolved the employer of the lesser conflict of using a single lawyer (or its in-house counsel) to advise it in both capacities.

*Id.* at 272.

[*50]

The Committee's regular counsel, Rudolph Ramelli (of the Jones Walker firm), testified that any time he believed that any conflict between the Committee and Avondale could potentially arise, he withdrew from his representation of the Committee in favor of Roger Siske (of SNR), whose firm represented Avondale on tangential matters wholly unrelated to the Union dispute. (TR. 748-54 [Ramelli]; TR. 507-08 [Bossier]). For purposes of this litigation, Ramelli withdrew before the Committee's final consideration of the 1996 and 1998 sales, and he also withdrew during the Committee's consideration of the several shareholder proposals submitted for consideration by the Avondale Shareholder's Committee at the Avondale Shareholders' Meetings in 1994-98. (TR. 748-54 [Ramelli]).

### 4. In Both 1996 and 1998, the Committee Prudently Sold the Avondale Stock at Fair Market Value.

#### (a) Application of the Efficient Market Theory

Greg Range, who again supervised the Duff & Phelps reports on the 1996 Sale and 1998 Sale, testified that "the starting point for fair market value is the publicly traded market price." (TR. 1100 [Range]). n25 Defendants' business valuation expert, Richard [*51] C. May, likewise testified that the publicly traded market price of a stock that trades in an efficient market is presumptively its fair market value, and he found that the market for Avondale stock was efficient at the time of both sales. (TR. 1214-15 [May]). n26

n25 In connection with a November 1990 report prepared by Duff & Phelps, Range testified that the Avondale stock was trading in the marketplace at $ 3.75/share, but that its "fundamental value range" was $ 6-8/share. At this time, Avondale was a relatively new public company, with low trading volume, and the ESOP ultimately purchased shares in the marketplace. (TR. 1099-1100 [Range]).

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

Range explained the difference between "fundamental value" and "fair market value" as follows:

> Fundamental value for a public company would be where, you know, we--this is our view of our analysis of what we think the inherent fundamental value is.
>
> Fair market value in most cases for a public company is the traded price. That's the willing buyer/willing seller definition.
>
> Now ... we might see something that would suggest that in the long run it might move to a different range. That's our view of the fundamental value.
>
> But ... the starting point for fair market value is the publicly traded price.

(TR. 1100 [Range]).

[*52]

n26 May testified in part:

> Q. What is the percentage of your engagements that have involved valuation of the stock of publicly held companies that trade on a recognized market?
>
> A. The percentage ... would be low. I would estimate probably less than five percent of the engagements I have been involved in.
>
> Q. And can you tell us why so few of your engagements called for you to value the stock of publicly traded companies?
>
> A. Well, the presumption of needing an evaluation for fair market value purposes is that generally you look to ... a recognized market, an efficient market, the trading prices of the publicly traded stocks.
>
> If you already have a stock in public marketplace, the presumption is that that's a fair market value. To engage us to value such a company is expensive. It's an expensive proposition. It has to be special circumstances.
>
> Q. So if I am interested in the value of the XYZ public company, why would I hire you, given that?
>
> A. You would only hire us if there was some question of the efficiency of the trading of that stock in the marketplace.
>
> Q. Did you check the efficiency of the market for Avondale stock in the period leading up to the 1996 secondary public offering?
>
> A. Yes, we did.
>
> Q. What were your conclusions?
>
> A. Our conclusions were that the stock was efficiently traded. You could rely upon the public market prices as fair market value.
>
> Q. And did you check the efficiency of the market for Avondale stock in the period of time leading up to the June 1998 Dutch Auction?
>
> A. Yes, we did.
>
> Q. And what were your conclusions there?
>
> A. The same. We did a similar qualitative and statistical analysis and determined that the stock was being efficiently traded and, therefore, you could rely upon the public price as its fair market value.

(TR. 1214-15 [May]).

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

[*53]

While the application of efficient market theory is rebuttable, n27 Plaintiffs offered no evidence of market inefficiency and no evidence that the market undervalued Avondale stock at the time of the 1996 and 1998 sales. Contrary to Plaintiffs' assertions, the Duff & Phelps reports for the 1996 and 1998 sales (Exhibits 52 & 91) are not evidence that the value of the Avondale stock exceeded its market price. While these reports contain scenarios that give indications in excess of market price, such scenarios must be offset by other scenarios in the reports that value the Avondale stock below then market prices. (Exhibit 52 at DP 10466 & Exhibit 91 at AVDL 10591, 10593). n28

n27 [HN20] "Although there is generally a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market, the presumption is rebuttable ...." *Nathenson v. Zonagen Inc., 267 F.3d 400, 415 (5th Cir. 2001).*

n28 Moreover, the optimistic scenario in the 1996 report assumed that Avondale completed the Maritrans commercial contract (for the construction of six double-hulled 42,000 DWT Product Carriers for Maritrans Ocean Transport Inc.) and was awarded the Navy's contract for construction of the LPD-17 (which at the time was a new class of amphibious transport dock vessel). (Exhibit 52 at 10461). However, the Maritrans contract was cancelled, and the LPD-17 contract was then less than a 50/50 probability. (TR. 478: 8-15; 487-88 [Bossier]).

The optimistic scenario in the 1998 report rested on the express assumption that the Navy would exercise all outstanding options for additional vessels (including the Strategic Sealifts and LPD-17's), and the implicit assumption that Avondale would perform its contracts without loss. (Exhibit 91 at AVDL 10586; TR. 477-78 [Bossier]). However, Avondale lost money on two of its major contracts in place as of the 1998 report and its financial condition suffered as a result. (TR. 478-80 [Bossier]; TR. 645:3-22, 646-47; 656-58 [Kitchen]).

[*54]

Further, the Salomon Brothers' June 28, 1996 report (Exhibit 243), rendered six months after the 1996 sale, and its October 13, 1997 report (Exhibit 246), rendered

twenty months after the 1996 sale and eight months before the 1998 sale, provide no evidence to rebut application of the efficient market theory. n29 Angela Timm, who helped prepare these reports, explained that they showed the stock's "potential value" which was a range of value based on company projections. She declined to characterize such value as "actual value," because "the stock price would be the actual value of a company at the time." (*See* Doc. No. 220, Timm Dep. at 196-97).

n29 The Salomon opinions of value ranged from a low of $ 13.02 to a high of $ 38.67/share (June 28, 1996 report, Exhibit 243 at S 3374), and from $ 24.24 to $ 43.02/share (October 13, 1997 report, Exhibit 246 at S 0427). While the Salomon opinions used many of the same uncertain projections used in the Duff & Phelps reports, they also used internal management projections unavailable to Duff & Phelps.

While Plaintiffs argue that Avondale's business plans and projections should have been provided to Duff & Phelps, such corporate information was confidential, non-public information that Avondale did not distribute to its shareholders. Rather, Avondale properly treated the ESOP as a third party shareholder, because disclosure of inside information may have precluded the Committee from taking action in the marketplace. (TR. 1053-54 [Driscoll]).

Further, even considering the use of internal projections, Avondale management thought the Salomon reports were speculative, and the valuation ranges so broad as to be unreliable to make decisions. (TR. 460:8-21 [Bossier]; TR. 641-43 [Kitchen]).

[*55]

Mark Renton, who supervised Salomon's engagement with Avondale, also explained that Salomon prepared valuation summaries indicative of the value of the company as a whole, and potentially that value would include any premium associated with selling control of the company. (*See* Doc. No. 221, Renton Dep. at 44-45). While such a value would be higher than the marketable minority interest value, neither the 1996 nor 1998 sales involved selling control. n30 (*See* this opinion, *infra* pp. 46-48, 49-50).

n30 Renton defined "marketable minority interest" as "the value represented by the multiplication of the number of shares held by the then prevailing market price of the security." (Renton

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

Dep. at 44). He further defined "control value" as "a value ascribed for the sale of a ... controlling position in a publicly-traded company." *(Id.)*

Plaintiffs also contend that:

> the ESOP Defendants had a significant advantage over other market participants in that they were closely allied with Avondale and [*56] familiar with the Company's operations. As such, they were surely aware that: (1) Avondale's financial success was likely to continue; (2) the award of several large contracts which would positively affect the value of the Avondale stock was likely; and (3) the Company's true value exceeded the prices reflected in the market.

(Plaintiffs' Memo. at 31).

However, while the ESOP Defendants were unquestionably familiar with the Company's operations, their collective testimony at Trial supports just the opposite of Plaintiffs' arguments. Given their long and varied experience with the Company, the ESOP Defendants were actually skeptical that both Avondale's financial success would continue and the award of several large contracts would favorably impact the value of Avondale stock. Further, the ESOP Defendants had serious concerns about the history of the stock's high volatility, and to conclude that, at the time of the subject transactions, they were "surely aware ... the Company's true value exceeded the prices reflected in the market" would be an unwarranted stretch of the facts.

### (b) The 1996 Secondary Offering Was at Fair Market Value.

Because the 1996 secondary [*57] offering did not involve a party in interest (in contrast to the 1998 Dutch Auction which involved Avondale), that section of ERISA requiring "adequate consideration" to exempt a transaction from otherwise being prohibited, was not triggered by the 1996 transaction. Thus, for purposes of the 1996 transaction, there is no need to parse the ERISA meaning of "adequate consideration". n31 Nevertheless, the court must determine whether ESOP Committee sold the stock in 1996 at a prudent and reasonable price as mandated by the Committee's fiduciary duty.

n31 *But see* discussion of "adequate consideration" in connection with the 1998 Dutch Auction, pp. 48-49 *infra*, this opinion.

Over the thirty days before the 1996 sale, the trading history of Avondale stock showed that the stock averaged in the high $ 15's, averaging $ 15.57/share high bid. n32 On February 5, 1996, the high bid for Avondale stock was $ 15.75/share; on February 6, 1996, the high bid was $ 16.25/share. n33

n32 *See* Parties' First Joint Stipulation No. 3, filed on November 8, 2001, Doc. No. 138, & attached Exhibit 3, daily bidding prices of Avondale Industries, Inc. common stock publicly traded on the NASDAQ NMS as reported to and by the Bloomberg Professional Service for the period March 30, 1988 through July 30, 1999. [*58]

n33 *Id.*

The **$ 15.75/share** high bid on February 5, 1996 (the day preceding the February sale) was the fair market value of Avondale stock for the 1996 sale. n34 (TR. 1216:12-16, [May]) n35. And on February 6th, the 1996 sale took place at $ 15.75/share, which included a [cents] 91 share underwriting discount, for a $ 14.84/share net proceeds to the ESOP.

n34 In the public marketplace, the **"bid price"** is the price that the seller would expect to receive for its stock in "over the counter market". (TR. 1216:23-1217:5, May). In contrast, the **"ask price"** is the price that the buyer would expect to pay for that security. (*Id.* at 1217:6-8). On February 5, 1996, the "asking price" was $ 16.125, and on February 6, 1996, the "asking price" was $ 16.625. (*See* Parties' First Joint Stipulation No. 2, filed on November 8, 2001, Doc. No. 138, & Asking Prices at attached Exhibit 2).

The **"spread"** in between the "bid" and the "ask" goes to the market makers. (TR. 1217:9-11, May).

Finally, the **"close"** is the last ask of the day. (TR. 1217:12-16, May). On February 5, 1996, the "closing price" was $ 16.00, and on February 6, 1996, the "closing price" was $ 16.625. (*See* Parties' First Joint Stipulation No. 1, filed on No-

Case 1:04-cv-11380-WGY    Document 151-8    Filed 02/23/2007    Page 15 of 21

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

vember 8, 2001, Doc. No. 138, & Closing Prices at attached Exhibit 1).

[*59]

n35 Richard May was Defendants' valuation expert. He is the president of Valuemetrics, Inc. which is in the business of providing financial advisory services to companies, their boards and shareholders. (*See Curriculum Vitae* attached to May's 1996 report, contained in Doc. No. 230 & TR. 1212-14 [May]).

The sale price of $ 15.75/share resulted after negotiations of the underwriters (Salomon and Johnson Rice) with potential buyers, coupled with the ESOP's negotiations with the underwriters and a review of Duff & Phelps' own syndicate (underwriting) desk. Consistent with the 1996 Duff & Phelps Report, Greg Range testified at Trial that the $ 15.75/share (or $ 14.84/share net) received by the ESOP was fair and reasonable n36 and the ESOP's counsel agreed. (Trial Exhibit 52, 1996 Duff & Phelps Report at DP 10430; TR. 1114-18 [Range]; TR. 1356-59 [Siske]).

n36 Greg Range of Duff & Phelps testified that for purposes of the 1996 Duff & Phelps report, he was not asked to render a "fair market value opinion," but he did a "fair market value analysis" or "fairness opinion." (TR. 1116 [Range]). When asked by the court the difference between "fairness" and a "fair market value", Range explained:

RANGE: Fairness embodies the specific transaction and it includes the concept that how did you get to that transaction. So, for instance, in this case, this was the result of an arm's length negotiated ... underwriting between Salomon, Smith, Barney and the investors they came up with and the ESOP ... That's how the process .. was arrived at.

We can then independently go and do our fair market value analysis. **We couldn't render a fairness opinion unless the fair market value test was passed.**

So ... **we not only came to the conclusion that fair market value test was passed,** but also that ... there was nothing untoward in the negotiations with Salomon that we were aware of. And it all seemed like it was a fair process that got them there. **So it's a higher standard, fairness is.**

But then we weren't asked to separately render the opinion that's common when we don't do a fairness opinion, which is that we don't think that the ESOP ... sold at too low a price.

THE COURT: Why would you render an opinion as to the fairness as a positive, if the net receipt was going to be less than the traded price?

RANGE: Because that was ... the best available price for the shares. That was within our view of the fair market value for that block of stock.

When you ... get into the why, you have ... a situation where you have to (A) pay a commission to Salomon, Smith, Barney. This is a reasonable commission.

And (B) ... they have attempted to drum up an interest for the stock. This is the price they came up with.

(C), this is a block of stock that's been advertised for sale. Not only did they publish an underwriting document saying ... this is publicly available information. Here it is for sale and here's all the information, and then went around trying to drum up interest from buyers to solicit buyers. And here's the price that they were able to come up with.

(TR. 1117-18 [Range]) (emphasis added).

Richard May (of Valuemetrics) agreed that, in his experience, "a fairness opinion would always encompass a fair market value assessment." (TR. 1217 [May]).

[*60]

Plaintiffs argue that Defendants fail "to recognize that the price which securities trade in the market reflects only the stock's marketable minority interest" and for the 1996 sale, a control premium should have been added to the sales price. However, at Trial, the evidence was at best too speculative to show that the ESOP could sell effective control of Avondale in 1996, and thus realize a control premium.

Indeed, several factors limited the ESOP's control. First, the ESOP held 47.2% of total shares outstanding, which is below the common 50% benchmark for determining whether control exists. n37 (1996 D&P Report, Exhibit 52 at DP 10488). Second, Avondale's Charter and By-laws (Exhibits 113-14) provided for a classified board of directors, limiting turnover to 1/3 of the directors at each annual meeting and requiring supermajority votes of 80% of all issued and outstanding shares to take most major corporate actions (such as mergers, replacing directors, calling a special shareholders' meeting and amendment of the Charter of By-laws).

n37 The 1995 Annual Meeting of Avondale Shareholders took place on April 28, 1995. As of the March 21, 1995, record date for the annual meeting of Avondale shareholders, Avondale had outstanding 14,464,175 shares of common stock, of which the ESOP owned 7,079,666 shares of Avondale common stock or 48.8% of all shares issued and outstanding. (Joint Stipulations 209-10).

At the time of the February 1996 sale, the ESOP held 47.2% of total shares outstanding. (Exhibit 52 at DP 10488). The number of shares sold in the 1996 sale was 3,581,000, which was approximately 25% of the total issued and outstanding Avondale stock. Thus, the size of such a bloc of stock may not have commanded a **premium** because it represented less than numerical control. Further, the ESOP's stock was also unregistered stock not readily marketable except through the public offering underwriting process, a factor that could instead warrant a **discount** from the public market price.

After the February 1996 sale, the ESOP owned 3,372,349 shares of Avondale common

stock or approximately 22.4% of all shares issued and outstanding. (Joint Stipulation 251).

[*61]

Third, there was no actual single buyer for the ESOP's block of stock. Fourth, the Stockholder Protection Rights Agreement, n38 a form of "poison pill" designed to discourage hostile corporate takeovers at a less than fair price, provided for the dilution by up to 50% the stock of anyone who owned more than 15% of Avondale's issued and outstanding stock. n39 Fifth, the ESOP Trust required the Trustees to pass through or vote according to the directions given by each participant with respect to the shares in the participant's ESOP account on matters put to a vote of Avondale's shareholders, including issues which went to control. n40

n38 See Trial Exhibit 32, the Stockholder Protection Rights Agreement.

n39 The Stockholder Protection Rights Agreement grandfathered the ESOP's ownership up to the 49.7% held as of the record date of the Agreement. (Joint Stipulations 152-53). However, even assuming a hypothetical buyer of just the ESOP's 47.2% bloc of Avondale stock as of the 1996 sale (as opposed to a buyer fro all of the stock) for a premium over the market price, the poison pill furnished so substantial a disincentive to purchase that no one would buy, absent repeal or cancellation of the pill. (TR. 1220 [May] and 1394-95 [Siske]). Avondale's Board of Directors would not have agreed to repeal the poison pill for a sale of only the ESOP's 47.2% bloc of shares, because it would have been unfair to the other shareholders. (TR. 523-25 [Bossier]).

[*62]

n40 See also the 1994 and 1996 Duff & Phelps reports (Exhibits 29 at L 51 & 52 at DP 10488) that discuss "control" (and lack thereof), and Siske's testimony that the Committee considered obtaining a control premium and his explanation why the Committee could not obtain a control or block premium. (TR. 1354-55 [Siske]).

Considering all of the factors relevant to the 1996 sale, the court concludes that the 1996 sale (at $ 15.75 /share) took place at a reasonable and prudent price and at the fair market value for the stock. n41 Finally, the court finds that the [cents] 91 discount was reasonable

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

and that under almost any scenario, the ESOP would incur a transaction cost.

> n41 The court also rejects the opinion of Plaintiffs' valuation expert, Richard Braun (of Willamette Management Associates), who relied on the cash-free valuation approach, because he failed to properly use the public market price of Avondale stock, he impermissibly included a control premium, and he failed to adjust for the company's working capital deficit.

[*63]

### (c) The 1998 Dutch Auction Was at Fair Market Value.

In the 1998 Dutch Auction, Avondale purchased stock from the ESOP. Therefore, Avondale [HN21] was a party-in-interest, and the ESOP had to receive "adequate consideration" or the 1998 sale would have been a prohibited transaction. See ERISA § 406 (a)(1)(A), 29 U.S.C. § 1106(a)(1)(A); and ERISA § 408(e), 29 U.S.C. § 1108(e).

ERISA § 3(A) defines "adequate consideration" ... "in the case of a security for which there is a generally recognized market" as either (i) the price of the security prevailing on a national securities exchange which is registered under section 78f of Title 15, or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest." 29 U.S.C. § 1002(18)(A).

In earlier motion practice, the court found that the ESOP received adequate consideration for the sale of its Avondale stock through the 1998 Dutch Auction because: [*64]

> In June 1998, Avondale stock traded on the National Association of Securities Dealers Automated Quotation/ National Market System (NASDAQ-NMS), a generally recognized market. However, at that time, NASDAQ-NMS was not registered under 15 U.S.C. § 78f. Thus, ERISA, 29 U.S.C. § 1002(18)(A)(ii) applies.
>
> On June 3, 1998, Avondale reached a high bid of $ 28.625 per share and closed with an ask price of $ 28.813 per share. (See Defendants' Exhibits 1 & 2, First Joint

> Stipulation of Parties and Excerpts of Bloomberg Professional Service Reports, respectively). At midnight on June 3, 1998, the ESOP received $ 28.875 per share for its tender to Avondale. Thus, the Dutch Auction at issue occurred at a price in excess of both the high bid and the closing ask prices of Avondale stock on June 3, 1998.

(See Minute Entry, entered February 19, 2002, Doc. No.; and Joint Stipulations 303 & 305).

In the Dutch Auction, the ESOP sold approximately 1,055,000 common shares of Avondale stock. (Joint Stip. 305). Immediately before the Dutch Auction, the ESOP held approximately 2,808,000 common shares, or 19.4% of the issued and outstanding [*65] stock. (Joint Stipulation 308). As a result of the Dutch Auction, the ESOP's ownership of Avondale common stock decreased to approximately 1,753,000 common shares, or 13.4% of the issued and outstanding Avondale common stock. Id. Thus, the 1998 Sale involved no question of control.

### 5. After the 1996 and 1998 Sales, the Value of the Plan Steadily Increased.

For the 38 months from April 30, 1996 to June 30, 1999, the Committee obtained a 66.5% return on its diversified investments, annualized to 18.2% per annum. (Joint Stipulation 351). While Avondale ultimately merged with Litton Industries in the summer of 1999 with Avondale shareholders receiving $ 39.50/share for their Avondale stock, the evidence in this case does not show that the Committee could have reasonably anticipated Litton's purchase before engaging in either the 1996 or 1998 sale.

### C. The Role of the Management Defendants

The crux of Plaintiffs' case is the existence of an impermissible conflict between Avondale Management and the ESOP Committee, arising from Management's opposition to the unionization of Avondale. However, as previously discussed, the court has concluded that the ESOP [*66] Committee members did not breach their fiduciary duties, and as discussed below, the court finds that neither did the Management Defendants (whether as named/ de jure fiduciaries under the Plan, § 9.1, or de facto fiduciaries).

### 1. No liability as de jure fiduciaries or cofiduciaries

Under § 9.1 of the Plan, the Board of Directors had the following duties and responsibilities in connection with the administration of the Plan:

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

(a) making decisions with respect to contributions to the Plan;

(b) making decisions with respect to amending or terminating the Plan;

(c) making decisions with respect to the selection, retention and removal of the Trustee and members of the Committee;

(d) periodically reviewing the performance of the Trustee and the members of the Committee; and

(e) performing such additional duties as are imposed by law.

(*See* Plan, Exhibit 3, § 9.1).

In support of their claim that the Management Defendants are liable as fiduciaries (or co-fiduciaries), Plaintiffs argue that in appointing members of the ESOP Administrative Committee, "the Management Defendants chose Committee members who, in the case of Church, [*67] was conflicted due to his own management position, and, in the case of Church and all other Committee members, were conflicted by virtue of their reliance on the Board of Directors, and Defendant Bossier in particular, for their livelihood and thus would be amenable to following management's directives." (Plaintiffs' Post-Trial Brief at 38). Further, Plaintiffs contend that the Management Defendants failed to select the best qualified persons to act for the Plan, failed to oversee those chosen, and failed to give the ESOP Defendants information which the Management Defendants knew or should have known was material to their investment decisions. (*Id.* at 39).

However, neither the record nor the law supports such arguments. As to ESOP Chairman Dean Church's position as Vice-President and Chief Administrative Officer of Avondale, Section 408(c)(3) of ERISA, [HN22] 29 U.S.C. § 1108(c)(3), specifically provides that: "nothing in section 1106 of this title shall be construed to prohibit any fiduciary from ... serving as a fiduciary in addition to being an officer, employee, agent or other representative of a party in interest." *See also Donovan v. Cunningham, 716 F.2d 1455, 1466 (5th Cir. 1983)* [*68] ("ERISA clearly provides that a fiduciary may be an officer or employee of the company whose securities he purchases on behalf of a plan").

Similarly, while the Committee members were mid-level managers who reported to senior management,

[HN23] ERISA recognizes and approves of corporate managers serving as ESOP fiduciaries, and this practice is quite prevalent. *Grindstaff v. Green, 133 F.3d 416, 421-22 (6th Cir. 1998).* Further, the members chosen to serve on the Committee were dedicated and long-term Avondale employees (each with 20-30 years experience); they represented a substantial cross-section of the employees' work force; and they were known as honest, competent, hard-working individuals who had demonstrated common sense decision-making in the discharge of their employment duties.

Finally, the Management Defendants knew that the Committee members could hire financial and legal experts for advice where they lacked experience or specialized knowledge. n42 Indeed, the prudent investigations undertaken by the Committee for both the 1996 and 1998 sales (as previously discussed) belie Plaintiffs arguments that the Committee members were neither qualified nor properly monitored. [*69] And to the extent that the Committee members had divided loyalties with potential for conflict of interest, the Committee members unquestionably sought independent advice regarding the sales.

n42 Both the Committee's financial advisor (Greg Range of Duff & Phelps) and general legal advisor (Rudolph Ramelli) were favorably impressed with the Committee's abilities and conduct. Greg Range testified:

From the time I started interacting with this committee, I was favorably impressed. I thought they exercised a lot of careful deliberation. They asked a lot of questions ... As I compare them to other administrative committees of employees, this was the single best committee that I dealt with ever, ..., in [] 19 years in this business ... This committee was the most careful, the most thorough, the most pro-active of any I ever dealt with. If I compared them to institutional trustees that do this for a living, I wouldn't put them as the best but I would put them in the top-- certainly the top half, probably the top third.

TR. 1185:9-25 [Range]).

2003 U.S. Dist. LEXIS 2318, *; 29 Employee Benefits Cas. (BNA) 2865

Similarly, Mr. Ramelli testified that the Committee was "diligent", "capable" and "did a great job." (TR. 756:9-15; 757:2-758:6 [Ramelli]).

[*70]

With regard to Plaintiffs' claim that the Management Defendants withheld material information thereby preventing the ESOP Defendants from making well-informed decisions as to the subject sales, Plaintiffs make three arguments:

(1) the Management Defendants had reviewed the Salomon Brothers reports and were aware that the actual value of the Avondale stock was significantly higher than the sale prices obtained by the Committee in 1996 and 1998;

(2) the Management Defendants knew that the Duff & Phelps reports did not include a discounted cash flow analysis based upon management projections; and

(3) with respect to the 1996 sale, the Duff & Phelps Report as of February 6, 1996 failed to establish a fair market value for the Avondale stock owned by the ESOP.

(Plaintiffs' Post-Trial Brief at 39-40).

However, none of these arguments have merit. As the court previously noted, n43 when Salomon prepared its reports, it used internal business plans and projections that constituted non-public information that Avondale did not, during the relevant time frame, distribute to its shareholders. (TR. 644:4-19 [Kitchen]). Rather, Avondale properly treated the ESOP as a [*71] third party shareholder or on an arm's length basis. (TR. 460:22-462:3, 509:17-510:19 [Bossier]; 634-35 [Kitchen]). And disclosure of inside information would have precluded the Committee from engaging in any sale of Avondale stock. (TR. 1053:18-1054:1 [Driscoll]).

n43 *See* fn. 29, *supra.*

Further, even considering the use of internal projections, Avondale Management found the Salomon reports speculative, and the valuation ranges so broad as to be unreliable to make decisions. (TR. 460:8-21 [Bossier]; TR. 641-43 [Kitchen]). Management also kept its own projections proprietary and confidential, because such

projections were just a "best guess" on Management's part and certainly not accurate enough for third-party reliance. (TR. 643-44 [Kitchen]). Even the author of the Salomon reports disclaimed their accuracy for "actual value" purposes. (*See* Doc. No. 220, Timm Dep. at 196-97).

Regarding the Duff & Phelps' reports, the 1996 Duff & Phelps' Report contained no explicit finding of fair market [*72] value, but a fair market value analysis is implicit in and part of the fairness opinion. (TR. 1217:17-1218:1 [May]; TR. 1114:23-1115:15; 1116:8-1117:19 [Range]). n44 Further, while Plaintiffs complain that the Duff & Phelps reports failed to include a discounted cash flow analysis based upon management projections, Robert Gordon (a Bank of America employee who advised Avondale) testified the discounted cash flow methodology is "subjective" and he agreed that "due to the inherent uncertainty of projections, this method is often less reliable in determining the value of a company." (Gordon Dep., Doc. 218 at 110-11).

n44 *See* fn. 36, *supra.*

There was also no failure of Avondale Management to disclose (or Duff & Phelps to obtain) information on potential mergers. At Trial, there was no evidence introduced to show that, at the time of the subject 1996 and 1998 sales, Avondale was about to be bought at an above-market premium. Rather, Avondale intended to remain independent, and at one point even entertained [*73] acquiring Ingalls Shipyard. (TR. 614-15 [Kitchen]).

In fact, all of the management Defendants sold Avondale shares (or stock appreciation rights) shortly before the Dutch Auction. And in August 1998, shortly after the Dutch Auction, Bossier sold almost half of the Avondale shares he held outside the ESOP for approximately $ 760,000 less than he would have received had he waited until the Litton acquisition of Avondale. (TR. 532-33 [Bossier]). The court concludes that any potential merger discussions at the time of the 1996 and 1998 sales were without substance and thus immaterial, and the Management Defendants had no duty to disclose them.

Finally, the fact that Defendant Church (who was both Chairman of the Committee and Vice President and Chief Administrative officer of Avondale) had a Change of Control Agreement does not support Plaintiffs' contention that Avondale was "in play" at the time of the subject sales. Attorney Curtis Hearn, n45 the author of the Change of Control Agreement, explained that this agreement, which was consistent with industry practice,

was intended to protect Church (a key officer of Avondale) against the immediate takeover of the company. (TR. 793-94 [Hearn]). [*74] However, there is no evidence that a takeover was pending, or even contemplated, at the time it was issued. (See also TR. 794 [Hearn]). The court concludes that Avondale's issuance of the agreement was a non-fiduciary function in the ERISA context and supported by a rational business purpose.

> n45 Mr. Hearn is a partner in the Jones Walker law firm, practicing in the corporate and securities section. He is a 1976 honor graduate of the University of Delaware, and a 1979 honor graduate from George Washington Law School. (TR. 789 [Hearn]).

### 2. No liability as de-facto fiduciaries

Plaintiffs also contend that, based on circumstantial evidence presented at Trial, Avondale and the Management Defendants are liable as *de facto* fiduciaries because they directed the ESOP Committee, either directly or indirectly, to dispose of the ESOP's shares in 1996 and 1998. The court disagrees. While the Management Defendants readily admitted that Avondale management strongly opposed unionization of Avondale, [*75] such an admission of a Union dispute (without more) does not prove that Avondale Management directed or (conspired with) the Committee to decrease Union strength through sales of stock held by the ESOP.

At Trial, Avondale Management and each of the ESOP Committee members flatly denied that Avondale's anti-union management influenced the Committee members in their decisions pertaining to the ESOP, including their decisions related to the 1996 and 1998 stock sales. Only Plaintiff Peter Hill said otherwise, but he chose not to voice his concerns to the Committee. (TR. 877-78 [Hill]). n46 And while Plaintiff Thompson complained about both the 1996 and 1998 sales when he was deposed, n47 he too offered no persuasive evidence to buttress his complaints and opinions.

> n46 See fn. 9, *supra* and accompanying text.

> n47 At Trial, Plaintiff Thompson's deposition testimony was offered in lieu of his live testimony. See Thompson Deposition, Doc. No. 211.

Further, as reflected by the low percentages (averaging [*76] 8.25%) of ESOP-owned Avondale shares which were voted for the Union-sponsored shareholder

resolutions from 1995 through 1998, the vast majority of Avondale ESOP participants supported management over the Union. n48 Thus, the Committee's opposition to shareholder proposals tracked the desires of the ESOP participants and reflected what apparently they had determined to be in their best interest.

> n48 See Exhibit A, attached to Defendants' Joint Post-Trial Brief; Joint Stipulations 138-44, 212, 214-15, 261-63, 286-88, 324-26; & Exhibits 211-12, 350-51, 381, 386-87.

Avondale Management never believed there was any meaningful "Union strength" in the ESOP. (TR. 516:4-8[Bossier]). Even before the 1996 sale, Management knew that the ESOP's stock sales favored the Union because the purchasing institutions would likely support the shareholder resolutions. In a November 30, 1995, Memorandum to Kitchen (re: Institutional Ownership), Burton Rice of Corporate Communications, Inc. writes:

> as we discussed, one [*77] of the aspects of the ESOP's offering will be to shift about 25% of our shares into hands (likely?) less friendly. Issues such as confidential voting and recission of the poison pill will get some automatic support from many institutions.

See Exhibit 669, Memo to Kitchen dated November 30, 1995; TR. 652-53 [Kitchen]; and TR. 517-18 [Bossier]. And indeed, from 1994 through 1998, total shareholder support for the shareholder resolutions actually grew as the 1996 and 1998 sales put Avondale stock into the hands of institutional shareholders. n49

> n49 See Exhibit B, attached (as amended) to Defendants' Joint Post-Trial Brief; Joint Stipulations 144, 226, 267, 291 & 329; and Exhibit C, attached to Defendants' Joint Post-Trial Brief.

Avondale Management also knew that the Union did not need the ESOP to submit shareholder resolutions. (TR. 518:17-20 [Bossier]). Several ASC members or persons affiliated with the ASC were shareholders of record. At the time of the 1996 sale, the law required ownership [*78] of at least $ 1,000 in market value of securities to propose a shareholder resolution. 17 C.F.R. § 240.14a-8(a)(1)(1996). John Meese, president of the Union, was a member of the ASC and held 100 Avondale shares. By July 1995, when Avondale stock began

to close consistently above $ 10/share, Meese's holdings alone entitled him to submit a shareholder resolution. Further, by mid-December 1996, when Avondale stock began to close consistently above $ 20/share, the 50 shares owned by the United Brotherhood of Carpenters (another ASC member) entitled it to submit shareholder resolutions. (TR. 518-19[Bossier]).

### 3. The Committee voted on resolutions according to Participants' direction, not Management's directive.

Contrary to Plaintiffs' contention that the ESOP Defendants consistently voted against shareholder proposals because Management expected them to, the Committee (in each of the shareholders' meetings between 1994 and 1998) actually followed the direction of the participants as to how to vote the shares **allocated** to participant accounts. *See* Joint Stipulations 139-41, 212-15, 220-23, 262-65, 286-88, and 323-26; *see also* Minutes [*79] of Administrative Committee Meetings, Exhibit 80, pp. 135-39, 148-55, 241-49, 307-11, 355-62, 402-12, 414-23 (at shareholder meetings between 1994 and 1998, the Committee accepted the directions of the participants). As to a minimal number of **unallocated shares,** n50 the Committee did vote these against the resolutions, but only after determining that the resolutions were not in the best interest of Avondale. Exhibit 80, pp. 102-10, 241-49, 264-66, 307-11, 355-62, and 414-25.

n50 For each relevant year, the unallocated shares totaled as follows: 3,094 in 1994; 20,798 in 1995; 8308 in 1996; 5,406 in 1997 and 7,056 in 1998. *See* Exhibits 305, 306 & 649.

### III. CONCLUSION

For the reasons set forth above, the court concludes that Plaintiffs have failed to prove their claims against Defendants. Rather, the preponderance of evidence shows that none of the Defendants violated either their ERISA duty of care or their ERISA duty of loyalty by engaging in the 1996 and 1998 sales of Avondale stock owned [*80] by the ESOP. Accordingly, Judgment will be entered in favor of all Defendants, dismissing Plaintiffs' claims in Counts 2 and 3 of the Amended Complaint.

\*\*\*\*

A.J. McNAMARA

### JUDGMENT

For reasons set forth in this court's Minute Entry (Doc. No. 33 entered on February 19, 2002, and dismissing Count 1 of Plaintiffs' Amended Complaint against Avondale Industries, Inc.) and "Order and Reasons" (Doc. No. 245 entered on February 14, 2003, and dismissing Counts 2 and 3 of Plaintiffs' Amended Complaint against all Defendants),

**IT IS ORDERED, ADJUDGED AND DECREED** that Judgment be entered herein in favor of Defendants (Avondale Industries, Inc., Albert L. Bossier, Jr., Thomas M. Kitchen, Kenneth Dupont, Blanche S. Barlotta, R. Dean Church, Rodney J. Duhon, Jr., Ernest F. Griffin, Jr. and Eugene E. Blanchard, Jr.), and against Plaintiffs (Harry L. Thompson, Jr., Raymond Young, Sr. and Peter J. Hill), dismissing all of Plaintiffs' claims against Defendants with prejudice and at Plaintiffs' costs.

New Orleans, Louisiana, this 14 day of Feb., 2003.

A.J. McNAMARA

UNITED STATES DISTRICT JUDGE