# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KERI EVANS, TIMOTHY WHIPPS and MARK SIAMIS, on behalf of themselves and a class of all others similarly situated, ) ) ) | Civil Action No. 04-11380 (WGY) |
| Plaintiffs, ) ) ) | SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 |
| v. ) ) | |
| JOHN F. AKERS, RONALD C. CAMBRE, MARYE ANNE FOX, JOHN J. MURPHY, PAUL J. NORRIS, THOMAS A. VANDERSLICE, H. FURLONG BALDWIN, INVESTMENTS AND BENEFITS COMMITTEE, ADMINISTRATIVE COMMITTEE, BRENDA GOTTLIEB, W. BRIAN McGOWAN, MICHAEL PIERGROSSI, ROBERT M. TAROLA, EILEEN WALSH, DAVID NAKASHIGE, ELYSE NAPOLI, MARTIN HUNTER, REN LAPADARIO, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION COMPLAINT |
| Defendants. ) ) | |
| Consolidated With: ) ) | |
| BUNCH et al., ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| W.R. GRACE & CO., et al., ) ) | |
| Defendants. ) ) | |
| THIS DOCUMENT RELATES TO: ) ) | |
| The Evans Action ) | |

## PREFATORY NOTES

- On April 2, 2001, W. R. Grace & Co. ("Grace" or the "Company") and 61 of its U.S. subsidiaries filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. References herein to "Grace" include W. R. Grace & Co. and its subsidiaries. The bankruptcy case is ongoing. As such, this action is stayed as to Grace unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs are not prosecuting this action vis-a-vis Grace.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Grace,[1] Plaintiffs will notify the Court and will proceed against Grace.

- To the extent that proceeding against "committees" of Grace, as enumerated herein, will be deemed violative of the bankruptcy proceeding, Plaintiffs will only proceed against the committees' members as set forth herein.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiffs, which are partially based on personal knowledge. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiffs will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

Plaintiffs Keri Evans ("Evans"), Timothy Whipps ("Whipps") and Mark Siamis ("Siamis") (together, the "Plaintiffs"), on behalf of the W.R. Grace & Co. Savings and Investment Plan (the "Plan"), themselves and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.     This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Defendants, fiduciaries Plan.

---

[1] Plaintiffs, if permitted to bring an action against Grace, would allege that Grace, a fiduciary to the Plan, breached its fiduciary duties to the Plan and its participants under ERISA by its own actions regarding the Plan's administration and management of its assets. Grace is also responsible for the actions of its employees and agents through the doctrine of *respondeat superior* and/or ERISA Section 405.

2.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio.  Common stock of W.R. Grace & Co. ("Grace" or the "Company"), the Plan's sponsor, was one of the Plan's investments/investment alternative during the Class Period (as defined below).

3.      Plaintiffs were employed with Grace and participants in the Plan during the Class Period.  Plaintiffs' retirement investment portfolio in the Plan during the Class Period included Grace stock.

4.      Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to the Plan, themselves, and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's various and heavy holdings of Grace stock.

5.      Specifically, Plaintiffs allege in Count I that the Defendants, each having certain responsibilities regarding and/or authority over the management of the investment of Plan assets, breached their fiduciary duties to them, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Grace securities by (1) continuing to offer Grace common stock as a Plan investment option for participant contributions, (2) utilizing Grace securities for employer contributions to the Plan, and (3) maintaining the Plan's pre-existing heavy investment in Grace securities when the stock was no longer a prudent investment for the Plan, running directly counter to the express primary purpose of the Plan which was to help provide funds for participants' retirement.

6.      Plaintiffs' Count II alleges that certain Defendants charged with the selection and monitoring of other Plan fiduciaries failed to (1) provide the "monitored" fiduciaries with

3

material information regarding the imprudence of investing Plan assets in Grace securities and (2) remove certain such fiduciaries whose performance was deficient and caused damage to the Plan and its participants.

7.    Plaintiffs' Count III alleges that certain Defendants failed to communicate to the Plan participants complete and accurate information regarding the Plan's investment in Grace securities sufficient enough to advise participants of the true risks of investing their retirement savings in Grace stock.

8.    Plaintiffs' Count IV describes how the Defendant-fiduciaries breached their duty of loyalty to the Plan and its participants by failing to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single"-minded fiduciaries with only the Plan's and its participants' best interests in mind.  Each count also alleges that, even if certain fiduciaries were not involved in the breach of fiduciary duty set forth in that particular count, they knew of and did nothing to stop, or indeed abetted, the particular breach and therefore were liable for breach of their co-fiduciary duties under ERISA § 405, 29 U.S.C. § 1105.

9.    Plaintiffs allege that Defendants allowed the heavy imprudent investment of Plan assets in Grace securities throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained below in detail, the perilous condition of the Company.  Factors contributing to the Company's condition were, in part, (1) setbacks in earlier asbestos liability litigation, (2) the rising number of newly-filed asbestos-related suits during the Class Period and (3) the Company's under-funding of its asbestos litigation reserves/funds.

4

10.    This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. § 1109.  Because Plaintiffs' claims apply to the Plan as a whole, and because ERISA specifically authorizes participants such as the Plaintiffs to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiffs brings this as a class action on behalf of the Plan, and all affected participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.[2]

## PARTIES

### Plaintiffs

13.    Plaintiff Evans worked for Grace, was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Grace shares in her retirement investment portfolio during the Class Period.

14.    Plaintiff Whipps worked for Grace, was a participant in the Grace Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Grace shares in his retirement investment portfolio during the Class Period.

---

[2] Notably, Grace Performance Chemicals, a primary business unit of Grace, is headquartered at 62 Whittemore Avenue, Cambridge, MA, 02140, where it maintains twenty-one manufacturing sites, and approximately 3,300 employees.

15.    Plaintiff Siamis worked for Grace, is a current participant in the Grace Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Grace shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Board of Directors / "Director Defendants"**

16.    Defendant John F. Akers ("Akers") served on Grace's Board of Directors during the Class Period.  As director, Akers participated in the appointment of members of the Committee, and was responsible for, among other Plan-related duties described herein, the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Akers was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17.    Defendant Ronald C. Cambre ("Cambre") served on Grace's Board of Directors during the Class Period.  As a director, Cambre participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Cambre was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18.    Defendant Marye Anne Fox ("Fox") served on Grace's Board of Directors during the Class Period.  As a director, Fox participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Fox was a fiduciary

6

of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19.     Defendant John J. Murphy ("Murphy") served on Grace's Board of Directors during the Class Period.  As a director, Murphy participated in the appointment of members of the Committee, and was responsible, among other Plan-related duties described herein, for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Murphy was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant Paul J. Norris ("Norris") served on Grace's Board of Directors during the Class Period.   In addition, for at least a portion of the Class Period, Norris also served as the Company's President and Chief Executive Officer ("CEO").  As a director (indeed, as Chairman of the Board) Norris participated in the appointment of members of the Committee, and was responsible for, among other Plan-related duties described herein, the ongoing monitoring of the actions of the Plans' fiduciaries. Consequently, Norris was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Defendant Thomas A. Vanderslice ("Vanderslice") served on Grace's Board of Directors during the Class Period.  As a director, Vanderslice participated in the appointment of members of the Committee, and was, among other Plan-related duties described herein, responsible for the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Vanderslice, was a fiduciary of the Plan within the meaning of ERISA in that he exercised

discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.    Defendant H. Furlong Baldwin ("Baldwin") served on Grace's Board of Directors during at least part of the Class Period.  As a director, Baldwin participated in the appointment of members of the Committee, and was responsible for, among other Plan-related duties described herein, the ongoing monitoring of the actions of the Plans' fiduciaries.  Consequently, Baldwin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Investment and Benefits Committee**

23.    Defendant Investment and Benefits Committee ("Committee") was the fiduciary responsible for selecting, maintaining, monitoring and evaluating the Plan's investments/investment vehicles during the Class Period.  The Committee's duties and responsibilities are described in more detail herein and within Plan documents attached to this Complaint.  The Committee, and each of its individual members, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.    Defendant Robert M. Tarola ("Tarola") served as Senior Vice President and Chief Financial Officer of Grace during the Class Period and was also a member of the Committee during the Class Period.  Tarola was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

8

25.     Eileen Walsh ("Walsh") served as a member of the Committee during the Class Period. Walsh was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Walsh also served as a member of the Administrative Committee during the Class Period (*see* below).

26.     David Nakashige ("Nakashige") served as a member of the Committee during the Class Period. Nakashige was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27.     Elyse Napoli ("Napoli") served as a member of the Committee during the Class Period. Napoli was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Martin Hunter ("Hunter") served as a member of the Investment and Benefits Committee during the Class Period. Hunter also served as a member of the Administrative Committee during the Class Period, and as Vice President Finance-Treasury. Hunter was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

29.     Ren Lapidario ("Lapidario") served as a member of the Committee during the Class Period. Lapidario was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**Administrative Committee**

30.     Defendant Administrative Committee was the tasked with the general administration and management of the Plan and, as indicated below, was the Plan's administrator as that term is defined in ERISA Section 3(16)(A).[3] The Committee's duties and responsibilities are described in more detail herein and within Plan documents attached to this Complaint. The Committee, and each of its individual members, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

31.     Defendant Brenda Gottlieb ("Gottlieb") served as the Chairman for the Administrative Committee during the Class Period and signed the Company's 11-K Plan annual report filings for fiscal 2000 and 2001 in that capacity.  Gottlieb was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

32.     Defendant W. Brian McGowan ("McGowan") served on the Investment and Benefits Committee and the Administrative Committee during the Class Period.  McGowan was also the Company's Senior Vice President of Corporate Administration for at least a portion of the Class Period.  McGowan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

---

[3] As noted below, the Plan documentation currently available to Plaintiffs makes it unclear if the Administrative Committee existed throughout the Class Period or was, at some point, merged with/into the Committee.  Plaintiffs reserve their right to amend this Complaint to (1) make clear the overlap/existence of these and any other fiduciary committees and (2) to add additional individual members of these or any other fiduciary committees.  As this information is almost always solely in the hands of Defendant-fiduciaries, Plaintiffs will need to engage in significant discovery in order to properly evaluate the need for any such amendment(s).

33.     Defendant Michael Piergrossi ("Piergrossi") signed, as Plan Administrator, the
Company's Form 5500 annual reports for fiscal year 2000 for both the Hourly and Salary Plans,
as well as the Hourly Plan's Form 5500 for fiscal year 2001 and Salary Plan's for fiscal 2002.
Upon information and belief, Piergrossi was a member of the Administrative Committee and a
fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority
with respect to management and administration of the Plan and/or management and disposition
of the Plan's assets.

34.     State Street Bank & Trust Company acted as an investment manager to the Plan
during the Class Period.

35.     State Street Global Advisors acted as an investment manager during the Class
Period.  Street Global Advisors is the fiduciary arm of State Street Bank and Trust Company.
Both entities are referred to in the Plan documents, seemingly interchangeably.  As such, State
Street Bank and Trust Company and State Street Global Advisors are referred to, collectively, as
"State Street."

## THE PLAN

**The Nature of the Plan**

36.     The W. R. Grace & Co. Savings and Investment Plan is an "employee pension
benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The relief requested
in this action is for the benefit of the Plan and its participants/beneficiaries.

37.     On December 31, 2001 the W. R. Grace & Co. Hourly Employees Savings and
Investment Plan (the "Hourly Plan") was merged with the W. R. Grace & Co. Salaried
Employees Savings and Investment Plan (the "Salaried Plan"), forming the current Plan.
Effective on the date of the merger, $34,303,697 was transferred from the Hourly Plan into the

Plan. On January 1, 2002, the newly augmented Plan was renamed the W. R. Grace & Co. Savings and Investment Plan, (i.e., the "Plan").[4]

38.    The Plan is offered to employees as "a convenient way to save regularly." *See* 2004 Summary Plan Description ("2004 SPD"),[5] GR000309 (attached hereto as Exhibit A).

39.    The Plan is sponsored by Grace. *See* Form 11-K Plan annual report filed with the Securities and Exchange Commission ("SEC") on June 27, 2003 for Fiscal Year 2002 (the "2002 Form 11-K") (attached hereto as Exhibit B); 2004 SPD, GR000357.

**History of the Plan**

40.    The current Plan evolved over the years as a result of a number of corporate mergers and savings plan integrations. According to the W.R. Grace & Co. Savings Plan, amended through July 1, 2004[6]:

> The W.R. Grace & Co. Salaried Employees and Investment Plan (the "Plan") was originally established by W.R. Grace & Co., a Connecticut Corporation ("Grace Connecticut"), as of September 1, 1976. . . .
>
> As a result of corporate reorganization whereby Grace Connecticut became a subsidiary of W.R. Grace & Co., a New York Corporation ("Grace New York") (and was renamed "W.R. Grace & Co. –Conn."), Grace Connecticut amended the Plan effective May 25, 1988 and Grace New York adopted the Plans, as amended, with respect to its eligible employees and assumed the sponsorship of the Plan on behalf of itself and its participating subsidiaries as of such date.
>
> Grace New York thereafter amended the Plan effective January 1, 1989 and effective July 1, 1989, to, among other things, establish an employee stock ownership plan (within the meaning of

---

[4] Because the Class Period begins prior to the merger, Plaintiffs bring these claims on behalf of the Plan's predecessors as well, including the Hourly and Salaried Plans.

[5] SPDs are referred to herein by their year. All cited documents are attached hereto.

[6] Only the history of the Plan relevant to the context of Plaintiffs' claims, primarily corporate history, is included here. There is additional information in this description that Plaintiffs omit, including a number of past Plan amendments.

section 4975(e)(7) of the Internal Revenue Code of 1986, as amended) which forms a portion of the Plan. . . .

**\*\*\*\***

Effective September 27, 1996, as a result of a transaction whereby National Medical Care, Inc. became a part of Fresenius Medical Care AG ("Fresenius"), Grace New York also became part of Fresenius, and the Plan became sponsored by a Delaware corporation, renamed W.R. Grace & Co. ("Grace I").

**\*\*\*\***

Effective March 31, 1998, as a result of a transaction whereby the Cryovac business of Grace-I became part of Sealed Air Corporation, Grace I also became part of Sealed Air Corporation and the Plan became sponsored by a Delaware corporation, renamed W.R. Grace & Co. ("Grace").

**\*\*\*\***

Effective at the beginning of the Plan Year commencing January 1, 2002, the W.R. Grace & Co. Savings and Investment Plan for Hourly Employees is being merged into the W.R. Grace & Co. Savings and Investment Plan for Salaried Employees, and the name of the Plan is changed [from] the W.R. Grace & Co. Savings and Investment Plan for Salaried Employees to the W.R. Grace & Co. Savings & Investment Plan, effective immediately after such merger.

W.R. Grace & Co. Savings and Investment Plan, as amended through July 1, 2004 ("2004 Plan") (attached hereto as Exhibit C),[7] GR001655-57.

**The Structure of the Plan**

41.    Eligible employees may join the Plan on the first of any month on or after completing three months of service with the Company during which they have at least 250 hours of service. 2003 SPD (attached hereto as Exhibit D), GR000248. (Upon information and belief, these requirements were modified during the Class Period but these modifications are not pertinent to the instant pleading).

---

[7] Plan documents are referred to herein by reference to their year.

13

42.    As of July 1, 2004, participants were permitted to save between 2 to 25 percent of their pay in either before- or after-tax dollars or a combination of both, in steps of 1 percent. 2004 SPD, GR000311. (Plaintiffs note the percentage of compensation participants were allowed to contribute during the Class Period changed over time.  *E.g.*, the 2003 SPD stated that participants were allowed to contribute 2 to 16 percent of their eligible contribution to the Plan. *See* 2003 SPD, GR000249).

43.    The Plan's assets were held together in a single master trust, as described in the 2004 Plan, GR001787:

> A Trust Fund shall be established by a Trustee or Trustees appointed from time to time by the Board of Directors. All assets of the Plan shall be deposited in the Trust Fund. The corpus and income of the Trust Fund shall be used to provide benefits under the Plan and to defray the reasonable expenses of Plan administration and no part thereof shall be used for or diverted to purposes other than for the exclusive benefit of Participants. . . . Effective July 1, 1989, the Trustee of the Plan was appointed as the Trustee of the ESOP portion of the Trust Fund.

*See also* 2002 SPD (attached hereto as Exhibit E), GR000192 ("Your savings, company contributions, and related earnings are held in a trust fund that has been set up for the sole benefit of participants and their beneficiaries").

44.    The Plan's Trustee is Fidelity Management Trust Company ("Fidelity" or the "Trustee").[8] *See* Master Trust Agreement Between W.R. Grace & Co. and Fidelity Management Trust Company, ("Trust Agreement") dated July 1, 1993 (including amendments) (attached hereto as Exhibit F).

45.    The Investment and Benefits Committee is responsible for directing Fidelity with regard to the investment of Plan assets. *See* Trust Agreement, GR001191-92.

---

[8] Fidelity, a party to Plaintiff's initial complaint, has been dismissed from this action without prejudice, upon agreement of the Plaintiffs and Fidelity.

14

46.    The Plan is managed by the Company, the Board of Directors, the Investment and Benefits Committee and, for at least a portion of the Class Period, the Administrative Committee.

47.    The Administrative and Investment and Benefit Committees share responsibility for administration of the Plan. [9] *See, e.g.* 2004 SPD, GR000357 ("The plan administrator is the Administrative Committee of the W.R. Grace & Co. Benefit Plans. . . .  The Investment and Benefits Committee has the full, exclusive, and discretionary authority to interpret the terms of the plan, except to the extent that such authority has been delegated to the Administrative Committee."); 2001 Hourly SPD (attached hereto as Exhibit G), GR000110; *see also* 2001 Salaried SPD (attached hereto as Exhibit H), GR000175 (same) ("The plan administrator is the Investment and Benefits Committee of the W.R. Grace & Co. Hourly Employees Savings and Investment Plan . . . .  The Investment and Benefits Committee is responsible for the management and operation of the plan, and has the full, exclusive, and discretionary authority to determine eligibility for benefits and to interpret the terms of the plan.").

48.    The Plan provided for Participant contributions as well as Company contributions.

**Participant Contributions**

49.    "Each Participant shall elect to have the Company make Before Tax Contributions on his behalf in accordance with Section 3.02, or shall elect to make After Tax Contributions as to the Plan in accordance with Section 3.03, or both." 2004 Plan, GR001690.

50.    The Plan offered participants a number of investment options, including the:

> Grace Common Stock Fund (fund Code: 93857).  This is a fund that pools your money with that of other employees to buy shares of stock of Grace or its affiliates and an amount of short-term

---

[9] It appears that at some point during the Class Period, the Investment and Benefits Committee assumed the duties of the Administrative Committee.  As noted above, Plaintiffs will seek to clarify this point once they have conducted discovery.

investments designed to allow you to buy or sell without the usual trade settlement period for individual stock transactions. Your ownership is measured in units of the fund instead of shares of stock. . . .

This fund seeks to increase the value of your investments over the long term by investing in the common stock of your company. Under normal circumstances, this fund primarily invests in Grace stock as well as in short-term investments. The amount of short-term investments is based upon a target established by the Company, but the actual amount of short-term investments on any given business day will vary with the amount of cash awaiting investment and with participant activity in the fund (contributions, payments, investment transfers, withdrawals, etc.). The value of your investment will vary depending on the performance of the Company, the overall market, and the performance and amount of short-term investments held by the fund, less any expenses accrued against the fund. Investing in a non-diversified single stock fund involves more risk than investing in a diversified fund.

The Investment and Benefits Committee (or its designee) manages the Grace Common Stock Fund by purchasing shares of Grace common stock and selling these shares to the extent necessary to obtain cash for payments and transfers from this fund."

2002 SPD, GR000196. *See also* 1998 Salaried SPD (attached hereto as Exhibit I), GR000013;

2001 Hourly SPD, GR000066; 2004 Plan, GR001729.

**Company Contributions**

51. The Company provided matching contributions to the Plan as a benefit for participants. *See generally* Section 4 of the 2004 Plan; 1997 Master Plan Document – Reflecting 2002 Merger of Plans (attached hereto as Exhibit J), GR001548.

52. During at least part of the Class Period, the Company matched 100 percent of participants' savings, up to the first 6 percent of pay you save." *See e.g.*, 1998 Salaried SPD, GR000008.

53. The Board of Directors, along with the Investment and Benefits Committee, was responsible for managing the Company match:

16

> Important!  The current dollar-for-dollar Company match, up to the
> first 6 percent of pay you save, has been authorized by Grace's
> Board of Directors for the two-year period from January 1, 2001
> through December 31, 2002.  You'll be advised before the end of
> this two-year period whether or not any changes to the Company
> match will be made.

2001 Salaried SPD, GR000126.  *See also*, 2002 SPD, GR000191 (making same announcement

for the period up through December 31, 2003).

54.    From the beginning of the Class Period to January 1, 2001, Company Matching

Contributions were made to the portion of the Trust purporting to be an Employee Stock

Ownership Plan ("ESOP").   As such, Company Matching Contributions were made in Grace

stock or made with cash used to purchase Grace stock.  2004 Plan, GR001704.

55.    Nonetheless, the Plan also provided that "[t]he Trustee may also invest the assets

of the ESOP portion of the Trust Fund in such other investments as the Investment and Benefits

Committee deems appropriate or desirable or such assets may be held temporarily in cash."

2004 Plan, GR001732; *Cf.* 1998 Salaried SPD, GR00017.

56.    Company matching contributions were originally – during the period delineated

above -- invested in Grace stock in the "Company Contribution Fund."   "The Company

contributions credited to your account are deposited in the Company Contribution Fund, which

invests primarily in Grace common stock.  Dividends earned in this fund may be reinvested in

Grace common stock or paid to participants as directed by the Board of Directors."   1998

Salaried SPD, GR000017.

57.    Further, at the beginning of the Class Period, participants were not permitted to

remove their Company contributions in Grace stock from the Company Contribution Fund.  "If

you're **age 50 or older**, *once each calendar year* you may elect to transfer all or part of the

Company  contributions  and  related  earnings  credited  to  your  account  in  the  Company

17

Contribution Fund . . . . If you're under age 50, Company contributions and related earnings credited to your account may **not** be transferred out of the Company Contribution Fund or the Sealed Air Funds." (emphasis original). 1998 Salaried SPD, GR000018.

58.     After January 1, 2001, however, Company Matching Contributions were made to the Savings Plan portion of the Trust, and were allocated to participants' investment funds in accordance with participants' investment elections. 2001 Salaried SPD, GR001703. "As of January 1, 2001, the Company contributions that are credited to your account are invested according to the investment elections you have made for your own savings. . . . Before January 1, 2001, the Company contributions that were credited to your account were deposited in the Company Contribution Fund, which primarily invested in Grace common stock or paid to participants as directed by the Board of Directors." 2001 Salaried SPD, GR000139. *See also* 2002 SPD, GR000206; 2004 SPD, GR000328.

**The Plan's Investment in Grace Securities**

59.     The Plan offered participants the opportunity to invest in Grace common stock throughout almost all of the Class Period. After the Company stopped investing Company matching contributions in Grace stock, participants were still permitted (and encouraged) to invest in Grace via the Grace Common Stock Fund.

60.     According to the 1998 Salaried SPD (GR000013), the Grace Common Stock Fund "seeks long-term capital growth, current income, and growth of income by investing primarily in Grace common stock. The fund invests a small portion of its assets in money-market instruments for liquidity purposes. Dividends earned in this fund (if any) are automatically reinvested in Grace common stock." 1998 Salaried SPD, GR000013. "The Investment and Benefits Committee (or its designee) manages the Grace Common Stock

Fund...." *Id.* at GR000014.

61.    Eventually, the Company permitted participants to divest their Company matching contributions out of Grace stock into other investments, if they so wished. "We're pleased to announce that, as of January 1, 2000, you'll be able to choose the investment of matching company contributions the same way as you can your own savings. That is, you'll be able to invest all or part of the matching contributions credited to your account in any available investment option, including the Company Contribution Fund. You may not, however, invest matching company contributions in the Grace Stock Fund – this fund is only available for the investment of your own savings." *See* January 2000 Grace Benefit News (attached hereto as Exhibit K), GR001820.

62.    "We also changed the requirement that the Company match be provided in the form of Grace stock. In the future, you will be able to self direct the Grace matching contributions in the same manner as you direct your own savings. These changes become effective on January 1, 2001, and the 100% match will last for two years. These special enhancements come as a consequence of market uncertainty surrounding companies, like Grace, that have significant asbestos liabilities. When our stock traded on market fundamentals, employees realized good growth in the Grace stock funds. These enhancements are intended to provide you with greater investment flexibility and, in some respect, to help restore the investment potential of the Plan." *See* December 15, 2000 letter to Plan participants from Defendant Norris (attached hereto as Exhibit L), GR001833.

63.    Nonetheless and despite this lukewarm and completely insufficient fiduciary communication, participants were *still* permitted to invest in Grace stock. "Participants will, however, continue to be permitted to transfer money from the Company Contribution Fund to

other available investment options, and will continue to have the ability to invest in Grace common stock as described above." *See* Summary Material Modification, effective January 1, 2001 (attached hereto as Exhibit M), GR001834.

64.    Too late for the Plan, the fiduciaries finally began to admit the absolute imprudence of maintaining Plan investments in Company stock. "Effective as of the close of business April 9, 2003, the short term investments in the Grace Common Stock Fund and the ESOP shall be liquidated and the proceeds immediately transferred to the Fixed Income Fund, and credited to each Savings Plan Account, on a pro-rata basis, in accordance with the interest in those Funds, of each affected Participant, Inactive Participant or former Participant, as of that date. Effective April 10, 2003, all transactions involving the Grace Common Stock Fund and the ESOP shall be suspended. During such suspension, these two Funds shall be merged into one fund, called the "Grace Stock Fund." 2004 Plan, GR001741.

65.    Notably, the Plan's heavy investment in Grace stock during the Class Period resulted in devastating losses to participants' retirement accounts. For example for the year ended December 31, 1999, the Hourly Plan and the Salaried Plan, combined, held approximately 9,328,844 shares of Grace stock worth a then-current market value of approximately $62,835,218. However, by the year ended December 31, 2002, the Plan held 23,703,537 shares of Grace stock worth a then-current market value of merely $24,101,477, representing a 38% decrease in *gross* value, notwithstanding a 40% increase in the *gross **number*** of shares held by the Plan.

66.    In a March 17, 2003[10] memo to all participants in Plan (attached hereto as Exhibit

---

[10] In addition, during this time period, the fiduciaries initiated a "blackout" period, lasting several weeks, when Plan participants were unable to divest their holdings of Grace stock, irrespective of their wishes to do so. *See* March 26, 2003 letter to Plan participants from Defendant McGowan (attached hereto as Exhibit O), GR001851.

N), Defendant McGowan explained the belated decision to stop the Plan from investing in Grace

stock:

> Over the last few years, in a variety of forums, the point has been made that the price of Grace stock no longer reflects the Company's solid operating results. Instead, the market has been reacting to a number of different issues. Principal among them is, most likely, the speculation surrounding the value of Grace's asbestos liabilities and its effect on the value of shareholders' equity in any Chapter 11 plan of reorganization.
>
> ****
>
> We are now approaching a period when speculation regarding the value of Grace's asbestos liabilities (and other liabilities), and the possible provisions of a plan of reorganization (emergence), will likely increase. Such speculation is inevitable as we approach the March 31, 2003 bar date for filing all claims (except asbestos personal injury and Zonolite attic insulation claims). Also, court proceedings, discussions and other activities, which address the value of the liabilities and a plan of reorganization, are likely to become more intense and are likely to become more intense and consume more time of the Grace Board of Directors and Management.
>
> Following a thorough discussion on this matter with the Grace Board and outside advisors, the Company has determined that it is necessary to implement another change regarding Grace stock within the S&I Plan, which will further limit the participants' exposure to such speculation.
>
> Effective April 21, 2003, participants in the Plan will not be allowed to make transfers of assets from other S&I Plan Funds into the Grace Stock Fund.
>
> Also, payroll contributions to the S&I Plan, which are currently directed to the Grace Stock Fund, will be automatically redirected to the Fixed Income Fund, effective for all salaried and hourly payroll periods that begin on or after April 16, 2003. . . .
>
> ****

---

Plaintiffs reserve their right to amend this Complaint upon discovery targeted towards the decision-making behind and implementation of this "blackout" period.

We will continue to evaluate how best to manage the Grace Stock Fund and the Company Contribution Fund. One approach being seriously considered is the appointment of an independent non-Grace entity (known as an independent fiduciary) to directly manage these two Funds. Such an appointment would avoid any possible conflict of interest between Grace management's and the Grace Board's role in negotiating a plan of reorganization, and their role as fiduciaries of the Funds.

****

Finally, as a general rule, if you have invested in the Grace Stock Fund or the Company Contribution Fund, you should evaluate the appropriateness of Grace stock in your investment portfolio, given market conditions, Grace's Chapter 11 status and your own personal risk tolerance. In this regard, please refer to the 2002 Grace Annual Report on Form 10-K, which was filed with the SEC last week. The 2002 Report is currently available through the Grace website (along with other investor information). The Grace website is www.Grace.com. To access the Reports, click on "Investor Information" as that website, then click on "SEC filings." The 2002 Annual Report will be mailed in April to S&I Plan participants who hold Grace stock.

67.     "Effective April 17, 2003, the Grace Stock Fund shall cease to accept any contributions or allocations to that Fund, whether or not such contribution or allocation is directed by a Participant, Inactive Participant or former Participant, and whether or not such a contribution or allocation is directed to the ESOP Account within the Fund or the other portion of the Fund. As of that date, all contributions designated for, or directed to, the Grace Stock Fund shall be redirected to the Fixed Income Fund." GR001742

68.     Effective April 21, 2003 Grace retained Aon Fiduciary Counselors Inc. as the independent fiduciary for Grace stock in the Plan. 2004 Plan, GR001854.[11]

---

[11] Plaintiffs have not named Aon Fiduciary Counselors, Inc. as a Defendant in this action at this time because it is not possible to tell, from available documentation, the exact breadth of their fiduciary responsibilities and duties during the Class Period. Plaintiffs' will amend to add Aon if discovery dictates that they had discretion over the Plan investments in Grace stock and breached any duty to the Plan and its participants regarding such investment.

69.    Despite the recognition of the imprudence of Grace stock, the Defendants-fiduciaries continued to permit investment in it.  State Street sent a "Notice to Participants in Grace Stock Fund," dated January 26, 2004 (attached hereto as Exhibit P), which stated as follows:

> Finally, as a reminder, each participant should continue to consider carefully the advisability of his or her continued investment in the Grace Stock Fund, particularly given the high degree of risk and potential volatility of an investment in stock of a company that is in the middle of a bankruptcy reorganization proceeding.  Each participant should carefully evaluate whether the investment of his or her accounts in the Grace Stock Fund adequately reflects these risks and, in light of his or her particular situation, provides adequate diversification from an investment perspective.

GR001866.

70.    Not until February 27, 2004, did Plan fiduciaries inform participants that, as they knew during the Class period, investment in Grace stock was clearly imprudent, as described in a press release – "W.R. Grace & Co. . . . today announced that State Street Bank & Trust Company, which acts as investment manager and independent fiduciary for the Grace stock fund in Grace's Savings and Investment Plan . . ., has determined that it is no longer consistent with [ERISA] for the Plan to continue to hold all of the shares of Grace common stock currently in the stock fund.  State Street has advised the company that it is commencing a selling program of Grace shares in the fund, and has filed a Form 144 with the Securities and Exchange Commission." *See* Exhibit Q attached hereto, GR001867.

71.    In a February 27, 2004 communication to the Plan's participants, State Street notified participants that, as investment manager for the Grace Stock Fund, it determined that "it is no longer consistent with ERISA for the Plan to continue to hold all of the shares of Grace stock currently in the Grace Stock Fund."  Thus, State Street commenced a program to sell Grace

23

stock. *See* Exhibit R attached hereto, GR001868.

72.    The February 27, 2004 communication included a "Questions and Answers" form

that provided, in part, as follows:

> **6)    The Plan document states that the Grace Stock Fund should be invested in Grace Stock, doesn't that prevent State Street from selling?**
>
> Under ERISA, a plan document is controlling only to the extent that the plan document is consistent with ERISA. Thus, the plan document cannot override the ERISA fiduciary and investment requirements. The United States Department of Labor has stated very clearly that a plan document may not be relied upon to avoid other ERISA requirements.
>
> **7)    These are my shares, shouldn't I be able to decide what happens to them?**
> State Street has determined that it is not consistent with ERISA to continue to have the Grace Stock Fund invested in such a large block of Grace stock. Therefore, it has decided to commence sales of Grace stock from the fund regardless of whether participants wish to remain invested in Grace stock. Currently, you may at any time transfer all or part of your account balance in the Grace Stock Fund to other investment options available under the Plan. However as indicated in the enclosed notice to participants, State Street could determine that all participant transfers should be suspended in the best overall interests of the Plan and its participants. You will be notified of any decision by State Street to suspend participant transfers, however, we may be unable to do so in advance of such restriction.

WRG001870.

73.    On April 12, 2004, Grace announced in a press release that State Street sold the

substantial remainder of all Grace shares to a single buyer at $3.50 per share. *See* Exhibit S,

GR001873.

74.    "As of April 21, 2003, no deposits into the Grace Stock Fund were permitted. As

of April 15 and 16, 2004, all stock within this fund was sold at the direction of State Street Bank

& Trust Company, the fund's investment manager. After the three-day settlement period related

to these sales, all proceeds from the sale of the stock were deposited into the plan's Fixed Income Fund. As of April 19, 2004, the Grace Stock Fund ceased to exist." 2004 SPD, GR000327.

## DEFENDANTS' FIDUCIARY STATUS

75.    During the Class Period Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

76.    During the Class Period, all of the Defendants acted as "Named" or *de facto* fiduciaries of the Plan pursuant to Section 3(21)(A) of ERISA, 29 U.S.C. Section 1002(21)(A), and the law interpreting that section.

77.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The Plan's operative documents during the Class Period describe the Investment and Benefits Committee and the Administrative Committee as named fiduciaries of the Plan.

78.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, Grace chose to internalize at least some of these fiduciary functions. Indeed, until appointing State Street, the Grace Defendants maintained all fiduciary responsibility for the Plan's investment in Grace stock.

**Director Defendants**

79.    The Director Defendants are given a number of fiduciary oversight responsibilities and duties regarding the Plan and its assets, as described in numerous sections herein, including discretion over Company matching contributions.

80.    In addition, the Director Defendants held the power to appoint/remove the members, and monitor the activities of, the functions of the Investment and Benefits Committee,

25

the Administrative Committee, and State Street.

81.    Director Defendants, including Defendant Norris as described above, communicated, on a Plan-wide basis, with participants regarding the prudence of investing in Grace stock.

**Investment and Benefits Committee**

82.    The Investment and Benefits Committee is a Named Fiduciary of the Plan as that term is understood pursuant to ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). "The duties and responsibilities of the Committee include: Developing, reviewing and revising Plan investment policies; Evaluating mutual fund or investment advisor performance, as appropriate; Selecting and eliminating mutual fund alternatives; Appointing/discharging investment managers and consultants; and Evaluating and recommending investment suggestions from investment advisors and others." W.R. Grace & Co. Savings & Investment Plan Investment Policy Statement, Adopted March 1, 2004 (attached hereto as Exhibit T), GR001329. These duties are described in more detail above.

83.    In addition, the Investment and Benefits Committee had the power to appoint investment monitors, and thus had the duty to monitor its appointees, including State Street.

**Administrative Committee**

84.    The Administrative Committee served as a fiduciary of the Plan for at least part of the Class Period. "The general administration of the Plan and the responsibility for carrying out its provisions (excluding any decisions as to investment and reinvestment of the Trust Fund) shall be placed in an Administrative Committee (or any appropriate designee of that Committee) consisting of not less than three persons who shall be appointed from time to time by the Board of Directors of Grace (or its designee) to serve at its pleasure. . . . Effective June 14, 1995, the

26

Administrative Committee shall be the Investment and Benefits Committee as created by the Board of Directors as of that date." 2004 Plan, GR001791.

**State Street**

85.    A December 8, 2003 letter to Plan participants from W. Brian McGowan, Senior Vice President, Administration (attached hereto as Exhibit U), informed participants that, "[b]eginning December 15, State Street [Bank & Trust Company], rather than Grace, will have the responsibility to determine whether the continued investment in Grace stock is consistent with the law governing retirement plans, [ERISA]." GR001865. However, even if Grace successfully delegated some of its fiduciary duties to State Street, the fiduciary entities at Grace retained overarching fiduciary duties to the Plan, including the duties of prudence and monitoring.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

86.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

87.    During the Class Period, Defendants' direct and indirect communications with the Plan's participants included statements about the Company and its securities which caused the Plan, Plaintiff and members of the Class to purchase, and to hold and maintain, investments in Grace securities, and to accept at face value investments in Grace's securities. These

27

communications included, but were not limited to, Company SEC filings, including, but not limited to, those incorporated through the Company's September 29, 2000 S-8 filing, annual and quarterly reports, press releases and other communications from the Defendants-fiduciaries to the Plan's participants.    Defendants provided this information to participants, encouraged participants to review the information in these communications when evaluating the merits of investment in Grace securities and also acted as fiduciaries to the extent of this activity.

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between July 1, 1999[12] and April 19, 2004 (the "Class Period") and whose accounts included investments in Grace stock.

89.    The members of the Class are so numerous that joinder of all members is impracticable.    While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

90.    Common questions of law and fact exist as to the Plan and all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Plan and Class are:

---

[12] Plaintiffs note that discovery may very well reveal that the Plan's fiduciaries, including certain Defendants, knew or should have known of the imprudence of investing Plan assets in Grace stock before July 1999. Plaintiffs reserve the right to amend the class period, through amendment of this Complaint and/or a motion for class certification, upon uncovering of this information in discovery.

(a)      whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs and members of the Class;

(b)      whether Defendants breached their respective fiduciary duties to the Plan, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)      whether Defendants violated ERISA; and

(d)      whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

91.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

92.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

93.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate

29

equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

**A.    Grace Stock Was an Imprudent Investment for the Plan Background**

94.    Grace is a global supplier of catalysts and silica products, specialty construction chemicals and building materials, and container products. It currently has annual sales of approximately $2 billion, over 6,000 employees and worldwide operations in nearly 40 countries.

95.    In 1954, Grace entered the specialty chemicals industry when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company.

96.    From 1970 through 1989, Grace sold Monokote® 4 and Monokote® 5, which were spray-applied fireproofing materials used to protect structural steel in a variety of commercial/industrial construction. As explained more fully below, these products contained trace amounts of naturally occurring asbestos. These products, in addition to other Grace products containing asbestos sold during the 1960s, 1970s and 1980s, would expose Grace to a raft of asbestos-related litigation from the 1980s through the present.

97.    In 1995, Grace began to divest its interest in many of its larger business lines, a continuation of a series of corporate reorganizations that it began at the beginning of the decade. According to an article appearing on www.seattlepi.nwsource.com, lawyers in the asbestos-related litigation against Grace claim that these corporate reorganizations were effectuated to conceal assets and cloud the corporate lines of responsibility. Although the Company has denied

30