these accusations, the Environmental Protection Agency ("EPA") has worked with forensic accountants at the Justice Department to determine whether or not the Company moved assets to its newly formed corporations.

**Asbestos-Related Litigation**

98.    Individuals with asbestos-related illnesses often take 20 years or more after exposure to exhibit symptoms.  This is normally well after the individual is removed from whatever exposed himself/herself to asbestos in the first place.

99.    Typically in asbestos-related litigation, plaintiffs will file suit against multiple defendants.  The litigation often lists 10 to 20 or more corporations that either produced asbestos or used it in products they manufactured.   The rising tide of asbestos-related personal injury suits, caused in part by the time delay for the illness to manifest itself, caused 26 companies to file for Chapter 11 bankruptcy protection between 1982 and 2001.

100.    By November 1999, more than 250,000 individual asbestos-related suits had been filed against Grace.  In April 2001, the number of asbestos-related suits had risen to over 325,000 and had cost the Company nearly $2 billion.[13]

101.    Unlike many other asbestos suits where the manufacturer/distributor of the product that may have exposed an individual to asbestos is not clearly identifiable, Grace was the principle defendant in numerous asbestos-related suits where it was clearly the primary, if not only, defendant. For example, Grace was the primary supplier of asbestos-tainted vermiculite for "Zonolite" attic insulation, which was used in as many as 2 million homes around the United

---

[13] It is estimated that, during the course of asbestos-related illness, it can cost a person between $300,000 to $500,000 for hospitalization, oxygen, medication and home care (notably these figures are 2001 estimates).  Due to the high costs of health care for individuals with asbestos-related illness, financial claims against a company can quickly climb into the tens of millions of dollars even if only a relatively small number of people were exposed. Unfortunately for Grace, the number of people that it potentially exposed to its asbestos-tainted products number in the thousands.

States. Hence, Grace is the principle defendant in suits brought by the homeowners who used Zonolite, as well as the employees who worked at vermiculite plants around the U.S.

102.    Additionally, Grace was the primary defendant in suits brought by miners and other employees of companies that processed vermiculite. A prime example of this is Grace's Libby, Montana vermiculite mines which it operated from 1963 to 1990. Health problems related to the Libby mine first began to surface in 1999. In 2001, the federal government conducted a health screening of the 6,114 people who live, or lived, in or near Libby during the Class Period. Analysis of the first 1,067 examinations showed that 30% of the people screened exhibited signs of asbestos-related disease.

103.    In 2003, a federal judge ordered Grace to repay the federal government the $54.5 million that the government spent investigating and cleaning up the asbestos-riddled town of Libby. Noting the magnitude of the payment, the Justice Department announced that it was the largest post-trial judgment ordered in the history of the federal Superfund law.[14]  Grace also agreed to spend $2.75 million to create a fund to provide additional health care for Libby residents with asbestos-related diseases. As of 2003, asbestos contamination had been blamed for 200 deaths and the health problems of further hundreds of Libby area residents.

**Effects of the Asbestos-related Suits on the Asbestos Industry**

104.    On June 23, 1999, the United States Supreme Court issued its opinion in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), overturning a circuit court ruling that would have enabled asbestos defendants to manage their liability exposure by settling claims on a global scale. That decision followed by two years the Court's rejection of another, earlier global

---

[14] "Superfund" is the better-known name for the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) passed by Congress in 1980. Under this law, parties found responsible for polluting a site must clean up the contamination or reimburse the EPA for doing so. Liability is strict, retroactive, joint and several.

settlement, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). These Supreme Court decisions ended the ability of asbestos defendants, such as Grace, to limit their asbestos-related liability exposure without filing for bankruptcy.[15]

105.   Given the avalanche of liability arising from individual asbestos suits that these Supreme Court decisions unleashed upon the asbestos industry, since at least the beginning of the Class Period, Grace and the other Defendants knew or should have known that asbestos liability threatened Grace's future, and that investing in Grace stock was an inherently losing proposition.[16]

106.   Indeed, in the months following the Supreme Court's *Ortiz* decision, many corporate asbestos defendants abandoned settlement efforts, and instead chose to file for bankruptcy to avoid their massive liability. However, Defendants stood by idly and did nothing to protect Plan assets even as numerous companies involved in the manufacture and production of asbestos-related products toppled into bankruptcy under the staggering liability of individual-based asbestos suits.

107.   For example, on February 22, 2000, citing the mounting rise in asbestos-related suits against the company, Babcock & Wilcox ("B&W") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District of Louisiana in New Orleans. In reaction to this news, Grace's stock dropped from $11.62, on February 22, 2000, to $10.63 on

---

[15] Section 524(g) of the Bankruptcy Code (the "Code") was specifically adopted by Congress in 1994 to help resolve current and future asbestos liabilities through Code provisions. Use of the provision, however, requires the debtor(s) to relinquish a majority of the company's equity value to a trust created to pay asbestos claims. This aspect of the Code essentially guarantees that shareholders at the time of Grace's bankruptcy filing, such as the Plan, would lose virtually all of the value of their equity investments.

[16] On July 1, 1999, the beginning of the Class Period, Grace stock was trading at $19.19 per share. Unfortunately for the Plan participants, Grace's stock price would never rise above $19 per share after September 3, 1999 for the remainder of the Class Period and would instead spiral downward, losing more than 85% of its value before even starting to recover.

February 24, 2000, the next day of trading. In this one day drop, the Company's stock lost approximately 8.52% of its value.

108.    The growing uncertainty surrounding the full effects of this tidal wave of asbestos litigation on affected companies drove the price for Grace stock down throughout the summer and fall of 2000.

109.    Furthering the uncertainty regarding Grace's economic future, on October 5, 2000, the world's largest manufacturer of fiberglass insulation, Owens Corning Corporation ("Owens Corning"), filed for Chapter 11 bankruptcy protection.[17] At the time of its bankruptcy filing, Owens Corning had revenues exceeding $5 billion per year, making it one of the wealthiest corporations to ever be afforded bankruptcy protection by U.S. courts. Indeed, Owens Corning's bankruptcy, to that date, was the largest filed in 2000 and the second largest filed since 1995. In reaction to this news, Grace's stock dropped from $4.56 on October 5, 2000 to $3.81 on October 6, 2000. In this one day drop, the Company's stock lost approximately 16.45% of its value.

110.    Also citing the growing number of asbestos-related claims, still another asbestos company, Armstrong World Industries ("Armstrong") filed for Chapter 11 bankruptcy protection on December 6, 2000.[18] In reaction to this news, Grace's stock dropped from $1.75 on December 6, 2000 to $1.31 on December 7, 2000. In this one day drop, the Company's stock lost a further 25.14% of its value.

111.    Consequently, by early 2001, Grace and its affiliates were among the few "deep

---

[17] According to news reports, at the time of its bankruptcy filing, Owens Corning had received over 460,000 asbestos-related personal injury claims and had paid or agreed to pay over $5 billion in asbestos-related awards and settlements, legal expenses and claims processing fees.

[18] At the time of its bankruptcy filing, Armstrong faced more than 170,000 asbestos-injury lawsuits resulting its past sales and installation of asbestos insulation.

pocket" defendants left who were potentially subject to joint and several liability. Thus, the number of asbestos claims against them increased dramatically. Despite continued efforts to forge a legislative solution (prior efforts in 1981, 1982, 1984, and 1991 had all failed), bankruptcy relief remained the most viable means for defendants such as Grace to resolve their liability. As one CEO later told Fortune magazine, "We should've filed for bankruptcy on the day after the Georgine settlement was overturned by the Supreme Court. Every asbestos defendant should've done the same thing." The *Ortiz* decision finished what the *Georgine* decision began, sealing the fate of global settlements and, ultimately, asbestos defendants.

**Grace's Improper Accounting of Asbestos-Related Claims**

112.    In 1996, Grace began accruing funds for all then-current asbestos-related bodily injury claims and those that were expected to be asserted over the following five-year period.

113.    In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related bodily injury claims. Grace explained the reasons behind this change in its 1999 10-K filed with the SEC on March 28, 2000. Specifically, the Company stated:

> Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury cases and claims then pending (except for the Lindholm case referenced above with respect to Grace's attic fill insulation, which was not filed until February 2000 and for which insufficient information exists to estimate any potential liability), as well as all bodily injury claims expected to be filed in the future.

114.    In Grace's 2000 10-K filed with the SEC on April 16, 2001, the Company stated, in relevant part:

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.

* * *

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending (except for the cases and claims related to Grace's attic fill litigation as described above), as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.)

115.    Contrary to what was reported in the Company's 10-K, and as the Company later admitted, Grace failed to properly account for the increasing number of Chapter 11 filings by its asbestos-related litigation "co-defendants" and its effect on Grace as being one of the few remaining "deep pockets" not under bankruptcy protection. The growing number of plaintiffs turning to Grace for joint and several liability led directly to the Company's filing for Chapter 11 bankruptcy protection and the significant devaluation one of the Plan's primary assets, principally Grace common stock.

116.    As the Company noted in its Form 10-K annual report, filed with the SEC on March 28, 2002:

36

> [C]osts to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

**Asbestos Claims Threaten Grace's Financial Health**

117.    As the asbestos claims filed against Grace multiplied exponentially, Grace's management realized that its asbestos reserves were grossly inadequate.

118.    Grace received a total of 26,941 asbestos-related bodily injury claims in 1999. In 2000, the number climbed to 48,786. For the first quarter of 2001 alone, Grace received 16,411 bodily injury claims. By the time Grace filed for bankruptcy, on April 2, 2001, it was a defendant in 65,656 asbestos-related lawsuits.

119.    Despite the Company's bankruptcy filing, the Defendants took no steps to protect the Plan from continued losses stemming from the Plan's heavy investment in Company stock until it was much too late. Indeed, it was not until April 16, 2003, more than two years after Grace filed bankruptcy, that the Defendants first took the most minimal of actions to protect the Plan.[19]

120.    Given that the Company had already filed for bankruptcy, these belated, minimal, actions, taken by Defendants, did not go nearly far enough to protect the Plan. In fact, it was not

until February 27, 2004 that State Street Bank & Trust Company determined that it would be prudent to begin complete divestment of the Plan's holdings of Grace common stock.

121.    Simply put, Defendants' actions were too little too late in terms of protecting the Plan from the massive losses it suffered as a result of its imprudent investment in Grace stock.

**B.    Defendants Knew or Should have Known that the Grace Funds and/or Grace stock were not Prudent Plan Investments**

122.    At all relevant times, Defendants knew or should have known that Grace's accounting for asbestos-related litigation was materially skewed by its failure to account for the growing number of bankruptcy filings by its co-defendants.  The effect of this failure, on top of the industry-crushing weight of asbestos litigation which caused widespread bankruptcy filings and increasing pressure on Grace, was to make Grace stock an indisputably imprudent Plan investment.  It is inconceivable that the high ranking director and officer Defendants named in this Complaint did not have personal knowledge of, if not a direct role in, the Company's accounting of asbestos-related litigation and portrayal/obfuscation of the true financial health of the Company throughout the Class Period.

123.    Defendants clearly failed to conduct an appropriate investigation (or ignored the results of any such investigation) into whether Grace stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with complete and material information regarding Grace's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding the Grace stock held by the Plan, and otherwise failed to protect the Plan and its participants against inevitable and significant losses arising from such investment.

---

[19]    Specifically, commencing on April 16, 2003, Grace prohibited participants from directing further contributions towards Grace stock.  Also, effective April 21, 2003, participants were prohibited from making transfers from other investment options into Grace stock.

124.   All Defendants were aware, or should have been aware, of the serious financial problems facing Grace because of its growing asbestos liability, especially in the wake of the *Ortiz* decision.  By no later than July 1, 1999 (and likely well before), Defendants knew that Grace's asbestos liability threatened Grace's future, and that investing in Grace stock was highly risky.

125.   After *Ortiz* (and likely before), Defendants knew that alternative settlement methods, including global settlement schemes, would likely prove ineffective in resolving their asbestos liability problems efficiently.  As a result of the failure of global and other alternative settlements in resolving asbestos liability, and Congress's consistent rejection of legislative solutions, Defendants knew or should have known that Grace's most likely course to resolve its liability issues was to seek bankruptcy protection.  Defendants further knew, or should have known, that if that course was taken, Grace shareholders, including the Plan and its participants, would lose the great majority of their heavy investment in Grace stock.

126.   An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Grace equities, under these circumstances, was unarguably dangerous and imprudent.  A reasonably and prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made vastly different investment decisions.

127.   Because Defendants knew or should have known that Grace stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Grace stock.

128.   Defendants had available to them several different options for satisfying this duty,

39

including: divesting the Plan of Grace stock at an appropriate time; discontinuing further Company-matching and participant-directed investment contributions in the Grace Funds and/or Grace stock much earlier than they actually did; or resigning as Plan fiduciaries as soon as they became conflicted to the extent that as a result of their employment by Grace they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Grace stock.

**C.    Defendants Regularly Communicated with Plan Participants Concerning Grace Stock Yet Failed to Disclose the Imprudence of Investment of Plan assets in Grace Stock**

129.    Defendants regularly communicated with employees, including Plan participants, about Grace's performance, future financial and business prospects.  Grace stock, for much of the relevant period, was one of the largest single assets in the Plan.  Upon information and belief, during the Class Period, the Defendants fostered a materially inaccurate, misleading and incomplete picture of Grace, and therefore its stock as a Plan investment, and/or allowed Plan participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in the Grace stock.  As such, Plan participants could not appreciate the true risks presented by investments in Grace stock and therefore could not make informed decisions regarding investments in the Plan.

130.    SEC filings, Company statements and other releases and communications issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plan and its participants to purchase, and to hold and maintain, Plan investments in Grace stock.

**D.    Defendants Suffered From Conflicts of Interest**

131.    Grace's SEC filings, including 10-K annual reports, during the Class Period make it clear that a number of the corporate Directors and Executive Officers compensation is in the

form of stock grants or stock option grants.

132.    Because the compensation of at least some Defendants, and likely others, was significantly tied to the price of Grace stock, Defendants had incentive to keep the Plan's assets heavily invested in Grace stock on a regular, ongoing basis, at least prior to the Company's Chapter 11 filing.    Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Grace stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Grace stock, resulting in lower compensation for the Defendants.

133.    Some Defendants may have had no choice in tying their compensation to Grace stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Grace stock, or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

134.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

### CLAIMS FOR RELIEF UNDER ERISA

135.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

137.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

138.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

139.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things,

   a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

   b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

   c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

140.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## <u>COUNT I</u>

**Failure to Prudently and Loyally Manage the Plan's Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

141.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

143.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investments, including those involving Grace securities and equity.

144.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that

43

investment options made available to participants or utilized by employers under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in Grace securities in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

145. In addition, Defendants failed to conduct an appropriate investigation of the merits of continued investment in Grace securities even in the face of obvious red flags that, at a minimum, raised questions regarding the risks of continued investment in Grace securities, including, among other information, reports of Grace's disappointing financial performance, loss in competitive advantage and concerns about its ability to survive as a going concern. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to investment in Grace securities.

146. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries. *Herman v. NationsBank Trust Co. (Georgia)*, 126 F.3d 1354, 1369 (11th Cir. 1997). Also, a fiduciary cannot allow others, including those whom they direct or who are directed by the plan, including plan trustees, to follow plan documents if to do so would also harm plan participants.

147. The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that Grace

securities were not suitable and appropriate investments for the Plan as described herein. Investment in Grace securities during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to such future "savings." Despite all of this, these fiduciaries continued to offer the Grace securities as a very significant investment vehicle for the Plan and to direct and approve the investment in Grace securities, instead of cash or other prudent investments.

148.    Similarly, at times during the Class Period, these fiduciaries permitted Company matching/employer contributions to be made in Grace securities, including Grace preferred and common stock in the Grace ESOP Stock Fund.  In so doing, Defendants further breached their fiduciary duties.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take *any meaningful* steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in the Grace securities, including through the Company's matching/employer contributions in Grace securities.  Further, given that such a high concentration of the assets of the Plan were invested in the securities of a single company – Grace -- Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.  All categories of Defendants failed to implement any such strategy.

149.    Moreover, the fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

150.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal the failure to prudently

and loyally manage the Plan's assets with respect to offering Company stock as an investment option in the Plan; providing and maintaining Company matching/employer contributions in Grace securities, including Grace preferred and common stock, despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage Plan assets with respect to the Plan's investments, including the match as a result of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

151.    Specifically, at least some of the Defendants had actual knowledge of the Company's precarious financial position and/or constructive knowledge of this condition due to their high-ranking positions at the Company. Despite this knowledge, they participated in each others' failure to prudently manage the Plan's assets and knowingly concealed such failures by not informing participants that the Plan's vast holdings of Grace securities were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Grace securities, despite inarguably having knowledge of such breaches.

152.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Grace securities, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Grace securities.

153.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would

have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

154.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Monitor the Investment and Benefits Committee Defendants and State Street Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Director Defendants[20])

155.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

156.    At all relevant times, as alleged above, the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

157.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.

158.    The duty to monitor entails both giving information to and reviewing the actions of the "monitored fiduciaries" (the Committee Defendants and State Street). In this case, that means that the monitoring fiduciaries, the Director Defendants had the duty to:

---

[20]    As to monitoring/informing State Street, this claim also lies against the Investment and Benefits Committee, which is considered a "monitoring fiduciary" for this count. Upon information and belief, the Investment and Benefits Committee had at least some power to appoint investment managers during the relevant period.

(1)     Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(3)     Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(4)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(5)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)     Ensure that the monitored fiduciaries report regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

159.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

48

160.    The monitoring fiduciaries breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company securities and equity an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in undiversified investment funds which was made up primarily of Company securities, an investment that was imprudent and subject non-market risks peculiar to its own precarious corporate situation.  The monitoring fiduciaries knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the Grace Common Stock Fund as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Grace Common Stock and ESOP Fund in Grace securities when it no longer was prudent to do so.  Despite this knowledge, they failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

161.    In addition, the monitoring fiduciaries, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Grace that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

162.    The monitoring fiduciaries are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the Individual Defendants, they enabled the breaches by these Defendants, and they failed to make any effort to remedy

49

these breaches, despite having knowledge of them.

163.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

164.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Provide Complete and Accurate Information
### to Plan Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA by the
### Investment and Benefits Committee, Administrative Committee
### and the Director Defendants)

165.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

166.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

167.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

168.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information

50

that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding Plan investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Grace stock (and, derivatively, Grace preferred stock intrinsically tied to the value of Grace common stock).

169. Because investment in the Plan was not diversified (i.e. the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in Grace securities), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Grace securities, including within the Grace Common Stock Fund.

170. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Grace stock, the Company's precarious financial condition, public misrepresentations and inflated forecasts regarding the likelihood of the Company's recovery, and the consequent artificial inflation of the value of Grace stock and, generally, by conveying inaccurate information regarding the soundness of Grace stock and the prudence of investing retirement contributions in Grace equity. These failures were particularly devastating to the Plan and the participants; a heavy percentage of the Plan's assets were invested in Grace securities, including common stock, during the Class Period and, thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

171. These actions and failures to act were uniform and caused the participants and

beneficiaries of the Plan to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the participants and beneficiaries did not have complete and accurate information concerning their investments. Plaintiffs and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding Grace stock.

172. Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Grace stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

173. Specifically, Defendants named in this count knew or should have known that incomplete information had been provided by one another and the Plan's other fiduciaries, yet failed to undertake any action to remedy this breach. In addition, the appointing fiduciaries named in this count, through their own failure to prudently monitor their appointees, enabled their co-fiduciaries named in this count to fail to provide complete and accurate information regarding Grace stock and the true risks that it presented as an investment for Plan participants' retirement investments.

174. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements,

acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Grace Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Grace stock during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

175.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

176.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT IV

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA by All Defendants)**

177.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

178.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

53

179.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

180.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the Grace securities; failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made Grace securities an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plan's investment in Company securities.

181.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's otherwise participants and beneficiaries, lost a significant portion of their retirement investment.

182.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

183.    The Plan suffered a loss, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in Grace securities during the Class Period in violation of the Defendants' fiduciary duties.

184.    As to contributions invested in the Grace Common Stock Fund, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

185.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

186.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding investment of their contributions in Grace stock under the Plan. Accordingly, participants failed to exercise the requisite independent control over their investment in Grace stock in the Plan.

187.    In addition, § 404(c) does not apply to any portion of the Plan deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does

not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997). Nor can § 404(c) apply to any losses that result from the Company's matching/employer contributions in the Grace ESOP Stock Fund, as participants did not exercise any control over these investments.

188.   The Defendants' liability to Plaintiff for relief stemming from the Plan's imprudent investments in Grace stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## CAUSATION

189.   The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Grace securities during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in diminished Plan trust master account balances as well as the account balances of the Plan's participants.

190.   Defendants are responsible for losses caused by participant direction of investment in the Grace Common Stock Fund and/or Grace securities because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants failed to apprise Plaintiff of the growing precarious financial state of the Company regarding the true health and ongoing viability of the Company, thereby misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the

Grace Common Stock Fund and/or Grace securities, and Defendants remain liable under ERISA for losses caused by such investment.

191.    Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in the Grace ESOP Stock Fund and/or Grace stock during the Class Period, as Defendants controlled the investment and the investment was imprudent.

192.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning the financial viability of the Company and the corresponding prudence of investment in the Grace Common Stock Fund and/or Grace securities, the elimination of the Grace Common Stock Fund and/or Grace securities as investment alternatives when they became imprudent, and the divesture of the Plan from the Grace Common Stock Fund and/or Grace securities (including investments in the Grace ESOP Fund) when maintaining such investments became imprudent, the Plan would have avoided a substantial portion of the losses that they suffered through their continued investment in the Grace securities.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

193.    The Defendant-fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Grace equity.

194.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

195.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

196.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

197.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

198.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Grace securities maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Grace stock and other Grace securities held by the Plan during the Class Period;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable monetary relief against the defendants.

Respectfully submitted this 31st day of May, 2007.

GILMAN PASTOR

By: /s/ David Pastor
**GILMAN AND PASTOR, LLP**
225 Franklin Street, 16th Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Katherine B. Bornstein
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

**SLEVIN & HART, P.C.**
Thomas J. Hart
1625 Massachusetts Avenue, N.W.
Suite 450
Washington, D.C. 20036
Telephone: (202) 797-8700

60