EXHIBIT B

EXPERT REPORT OF
JOHN J. MULLIGAN, JR.

**Expert Report of John J. Mulligan, Jr.**

**Bunch v. W.R. Grace & Co.**

## A.    Qualifications and Experience

1. My name is John J. Mulligan, Jr.

2. I graduated from the United States Coast Guard Academy with a B.S. degree in 1968. In 1983, I received an M.B.A. degree from Emory University.

3. I am the President of Retirement Plan Strategies, Inc., a consulting company specializing in serving providers to the defined contribution plan industry.

4. Retirement Plan Strategies, Inc. serves banks, mutual fund companies, investment management firms and insurance companies in regard to marketing strategy, product development, operations and resourcing strategies for their defined contribution product lines.

5. From 1985 to 1993, I was a Vice President and later a Senior Vice President at State Street Bank and Trust Company. When I worked there, State Street was the world's largest trustee and custodian. I worked in the Benefit Plan Services Division, which had responsibility for all defined contribution plan services. From 1985 to 1989, I was the Director of Maketing for these services and from 1989 to 1993, I was the General Manager for this division of the bank. From 1988 until the spring of 1993, I was the lead executive for Trustee services for Employee Stock Ownership Plans ("ESOPs"). During this time, the bank handled approximately 60 leveraged ESOP transactions ranging in size from $20 million to $750 million. The bank was also trustee for over 200 non-leveraged ESOPs and numerous company stock funds in participant directed plans. Total employer securities were over $60 billion.

6. Based on my experience at State Street Bank and Trust and various consulting assignments with Retirement Plan Strategies, Inc., I am familiar with industry procedures, standards and practices followed by skilled fiduciaries for 401(k) plans and other similar qualified retirement plans. I sometimes refer to those procedures, standards and practices in this report as industry practices.

7. Although Plan fiduciaries previously have retained my services to consult and offer opinions concerning company stock, I have not testified on employer securities matters in the past four years. I have no publications in the last ten years. I am being compensated at a rate of $330.00 per hour for my work on this case.

**B.    Subject of Testimony**

8.  I have been asked to provide expert testimony and consulting services regarding the procedures, standards and practices employed by W.R. Grace & Co. as the sponsor of the W.R. Grace Savings and Investment Plan and State Street Bank and Trust Co. as the investment manager of the Grace Stock Fund in the plan. Based on my experience and familiarity with industry practice, I have been asked specifically to review the process employed by, and the performance of W.R. Grace & Co. in discharging its duties as the plan sponsor in the selection and monitoring of State Street as investment manager of the Grace Stock Fund. I have also been asked specifically to review the process employed by and the performance of State Street Bank & Trust Co. in discharging its duties as the investment manager for the Grace Stock Fund.

**C.    Data and Facts Considered**

9.  In connection with my preparation of this report, I reviewed the following documents:

- Plaintiffs' First Amended Complaint
- The engagement agreements for State Street Bank and Trust and Duff & Phelps
- State Street Fiduciary Committee Meeting Minutes 12/11/03, 1/29/04, 2/23/04, 4/7/04
- IFG presentations to the Fiduciary Committee 12/11/03, 2/23/04, 4/6/04
- Duff & Phelps presentations and weekly valuation reports
- State Street Global Advisors notices to participants 1/26/04, 2/27/04, 4/19/04
- SSBT 000001 – SSBT 002930
- Form 5500 Plan Year 2004 for State Street's Salary Savings Plan
- S&I Summary Plan Description 2003 (GR 000243-000303)
- W. R. Grace & Co. Savings & Investment Plan Summary Sept. 29, 2003 - Sept. 30, 2003 (GR 005096-005103)
- GR 0075440-007559
- Plan amendment (attachment to Doc. 151 filed 2/23/07, pages 2-4, GR 001659, GR 001789, GR 001790)
- W. R. Grace & Co. Savings & Investment Plan - Invest Policy Statement (adopted March 1, 2004 - GR 006600-006603)
- W. R. Grace & Co. Savings & Investment Plan - Invest Policy Statement (adopted March 1, 2004 - GR 006604-006607)
- US 401K Balance Reports - Fidelity - 12/01-2002 (GR 004988-005042)
- W. R. Grace & Co. Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004, GR 006604-006607)
- Fidelity Investment - W. R. Grace Stock Fund (GR 004781-004860)
- Asset Allocation by Fund (GR 004978-004987)
- W. R. Grace Savings & Investment Plan - Account Summary (GR 005096-005103)

- W. R. Grace Investment Review by Fidelity (GR 005292-005390)
- W. R. Grace Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004, GR 005747-005750)
- W. R. Grace Summary of U.S. Defined Contribution Assets for period ending December 31, 2003 (GR 005751-005753)
- W. R. Grace Summary of U.S. Defined Contribution Assets for period ending March 31, 2004 (GR 005754-005759)
- Annual Return/Report of Employee Benefit Plan for 2000 - Form 5500 (GR 000467-000536)
- Schedule A of Form 5500 for 2002 (GR 000809-000882)
- Annual Return/Report of Employee Benefit Plan for 2003 - Form 5500 (GR 000883-000970)
- Annual Return/Report of Employee Benefit Plan for 2004 - Form 5500 (GR 001993-002120)
- State Street Bank & Trust Company letter dated November 24, 2003, signed by Monet Ewing, Vice-President, to Investment & Benefits Committee of W. R. Grace and W. R. Grace & Co. (GR 001298-001330)
- Statement of Investment Policy for W. R. Grace & Co. U.S. Pension Plan Trust, adopted December 18, 1997, Amended January 1, 2004 (GR 001331-001332)
- W. R. Grace & Co. Savings & Investment Plan, amended through July 1, 2004 (GR 001654-001819)
- The Baltimore Sun article dated October 24, 2002 re: W. R. Grace's earnings decline despite 6.8% increase in sales (GR 007431-007442)
- Meeting notes dated March 13, 2003 (GR 007541-007579)
- Meeting/Speaker notes dated October 24, 2003 (GR 007568-007579)
- Letter from State Street Global Advisors signed by Monet Ewing, dated January 6, 2004 to John Forgach of W. R. Grace (GR 007605-007606)
- Request to Investment & Benefits Committee of W. R Grace for Approval of Plan Amendments (GR 007607-007609)
- Notice to Participants in Grace Company Stock Fund, dated April 19, 2004 (GR 007610)
- Letter from John Forgach to Monet Ewing of State Street, dated May 3, 2004 (GR 007611)
- Letter from State Street signed by Monet Ewing to Investment & Benefits Committee & W. R. Grace & Co. (GR 007612-007627)
- Letter from John Forgach to Monet Ewing of State Street, dated December 22, 2003 (GR 007628-007638)
- Letter from State Street signed by Monet Ewing to Investment & Benefits Committee & W. R. Grace & Co. (GR 007612-007627)
- Letter from John Forgach to Monet Ewing of State Street, dated December 22, 2003 (GR 007628-007638)
- Email dated April 12, 2004 from John Forgach to Monet Ewing, et. al. re: Additional Fidelity Contacts (GR 007661-007662)
- Email from Melissa Smith to Jeff Whitaker re: W.R Grace Final Participant Notice and Q&A Revised (GR 007667, 007667A-007667E)
- Email from Melissa Smith to John Forgach (GR 007668-007672)

3

- Email from Monet Ewing to John Forgach re: W. R. Grace (GR 007686)
- Email from John Forgach to Monet Ewing re: W. R. Grace engagement letter (GR 007687-007691)
- State Street Analysis re: decision to sell Grace Stock, incl. notes, presentations, meeting minutes from S.S. (GR 007869-008002)
- SSGA Independent Fiduciary Services (GR 008003-008013)
- State Street Global Advisors presentation to W. R. Grace on April 25, 2003 (GR 008089-008094)
- SSGA Independent Fiduciary Services (GR 008096-008100)
- SSGA Process (GR 008102-008105)
- SSGA Determination and Communication (GR 008108-008109)
- SSGA Team Members (GR 008111-008119)
- Grace News - Grace Reports 2003 Fourth Quarter and Full Year Financial Results dated January 27, 2004 (GR 008785-008795)
- Grace News - Grace Reports First Quarter Financial Results dated April 20, 2004 (GR 008800-008807)
- Board of Director minutes dated April 2, 2003 (GR 009337-009343)
- Request to Investment & Benefit Committee for Approval of Plan Amendments dated December 18, 2003 (GR 009359-009365)
- W.R. Grace Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004) (GR 009411-009414)
- Compensation Committee Meeting minutes dated May 2, 2003 (GR 009344-009346)
- Grace News - dated January, 2000 (GR 001820)
- Grace News - dated June, 2000 (GR 001821-001822)
- Letter from William Monroe to Savings & Investment Plan Participants, dated June 16, 2000 (GR 001823-001829)
- Letter from W. B. McGowan to Participants in the Grace Savings & Investment Plan dated March 17, 2003 (GR 001845-001850)
- Letter from W. B. McGowan to Participants in Grace Savings & Investment Plan dated March 26, 2003 (GR 001851-001852)
- Grace Memo to Participants in Grace Savings & Investment Plan from W. B. McGowan dated, April 2, 2003 re: Changes to the Grace Savings & Investment Plan (GR 001853-001862)
- Letter from W. B. McGowan to S&I Plan Participants, dated December 8, 2003 (GR 001865)
- Notice to Participants in Grace Stock Fund, dated January 26, 2004 (GR 001866)
- Grace News - dated February 27, 2004 - Grace Announces Intended Sale of Shares by the Grace 401(k) Plan (GR 001867)
- Notice to Participants in the Grace Company Stock Fund, dated February 27, 2004 (GR 001868-001872)
- Grace News - Grace Announces Sales of Shares by the Grace 401(k) Plan, dated April 12, 2004 (GR 001873)
- Notice to the Participants in Grace Company Stock Fund, dated April 19, 2004 (GR 001874)

- Official Docs of Board of Directors (reports, agendas, minutes) - January 1, 1998-June 2004 (GR 12245-12314)
- The depositions of Messrs. McGowan, Forgach, Tarola, Brayston and Johnson and the depositions of Mses. Driscoll and Ewing.

## D. Analysis and Opinion

10. Based on my experience and review of the documents listed above, I have reached the following opinions relative to this case:

11. The W.R. Grace Savings and Investment Plan (S & I Plan) was specifically designed as a participant directed plan meaning that individual employees can decide how their funds would be allocated to various investment options. Until 2000, employer contibutions were directed to the Grace Stock Fund and employees had no ability to transfer these funds to other investment options until reaching the age of 55.

12. The S & I Plan was upgraded with new features in 2000 including additional investment options and the removal of transfer restrictions for the Grace Stock Fund. The Plan now had 28 investment options, which is an above average number of fund choices, and the employees had total control for the allocation not only of their contributions but the contributions by Grace as well. This included the ability to tranfer or re-allocate prior company contributions out of the Grace Stock Fund. The Plan was later amended again to no longer allow new contributions or balance transfers into the Grace Stock Fund beginning in April 2003.

13. The S & I Plan clearly intended to provide participants the ability to create portfolios consistent with their personal investment objectives and risk tolerance. This is clear from my review of plan features, the Summary Plan Discription and the Investment Policy Statement. Grace successfully established a menu of investment options that in the aggregate created the ability for Plan participants to create diversified portfolios. Grace, as the plan sponsor, intended the company stock fund to be part of the investment options that allowed Plan participants to diversify their individual portfolios. (McGowen deposition testimony at 36-37) The ability to invest in company stock was a reasonable component of the investment options. The testimony of Mr. McGowen further establishes that Grace as the plan sponsor, intended the Plan to provide a diversified array of investment options. (See McGowen testimony at 29 & 32) From my experience, I agree with Mr. McGowen that W.R. Grace did an above average job of providing diversification opportunity to Plan participants.

14. Company stock is a unique investment option in participant directed plans. It offers employees the opportunity to further align their interests with those of the company and allows them to participate in the company's long term results. Participants also have the opportunity to vote their shares and thus have a say in

important matters. Indeed, in this case I noted that Plan participants possessed over 10% of the company's outstanding shares of stock. However, because these funds are invested in a single security company stock funds are risky. Yet, the risk associated with company stock, especially when disclosed to participants, does not render company stock a bad or unreasonable investment option. Participants who hold company stock in a 401(k) plan that offers the opportunity to create a diverse portfolio face less risk because they have the right and ability to invest in many other funds as well. I note that Shawn Johnson of State Street came to an identical conclusion as noted in the minutes of the February 23, 2004 meeting of State Street's Fiduciary Committee. "S. Johnson added that, as a general matter, a diversified fund's continued investment in W. R. Grace stock could be a prudent investment..." (SSBT-000713) Mr. Johnson was referring to several of State Street's index funds. It is my understanding that index managers employed "prudency screens" many years ago but discontinued the practice when it caused them to miss the Chrysler turnaround. I believe this indicates the difficulty of forecasting the future value of a security, even a distressed security.

15. S & I Plan participants had ample opportunity to adjust their portfolios in regard to their allocation, if any, to Grace stock from 2000 to 2004. In addition to having unrestrained transfer opportunity, participants received notices from both Grace and State Street advising them to consider their personal risk tolerance in regard to holding a position in Grace stock. The same advice was delivered by Mr. Norris during the town hall meeting in March of 2003. I further note that State Street in a January 26, 2004 Notice to Plan Participants provided a similar cautionary note when it came on board.

> Finally, as a reminder, each participant should continue to consider carefully the advisability of his or her continued investment in the Grace Stock Fund, particularly given the high degree of risk and potential volatility of an investment in stock of a company that is in the middle of a bankruptcy reorganization proceeding. Each participant should carefully evaluate whether the investment of his or her accounts in the Grace Stock Fund adequately reflects these risks and in light of his or her particular situation, provides adequate diversification from an investment perspective. (SSBT-003245)

By early 2004, the Plan's allocation to Grace stock was a mere 4%. In my experience this is in sharp contrast to the much larger allocations typically seen when a company offers its own stock as an option in a participant directed plan. For example, the allocation to company stock in State Street's own Salary Savings Plan during the same period was 37%.

16. State Street Bank and Trust Co. was engaged as the fiduciary investment manager of the Grace Stock Fund as of December 15, 2003, with the mission of deciding on an ongoing basis if the plan's holdings of Grace common stock was in

compliance with the requireents of ERISA. The investment guidelines that are part of the engagement agreement recognize the Plan's provision for participant direction and states that "State Street is required by Section 404(a)(1)(D) of ERISA to act in accordance with such provisions of the Plan except to the extent that State Street determines that such provisions of the Plan are not consistent with the provisions of ERISA."

17. A prudent investment manager would have worked to understand the context of Grace common stock holdings by considering the Grace employees' overall retirement plan situation including participation in defined benefit plans and their allocations to all of the other S & I Plan investments in determining whether the S & I Plan's holding of Grace common stock complied with the requirements of ERISA. State Street failed in this regard. For instance, Ms. Ewing testified that she had no knowledge that the proceeds from State Street's sale of Grace stock were transferred to; (Ewing deposition testimony at 115); Mr. Johnson testified that he was unaware whether the Plan in the aggregate was diversified, how the Plan's assets were allocated or whether or not there were any restrictions on participant investments in the Grace stock fund, Johnson deposition testimony at 68; and, Ms. Driscoll could not recall the percentage of plan assets allocated to Grace stock. (Driscoll deposition testimony at 76) In my view, context is important in making fiduciary decisions.

18. It is my experience and my opinion that many ERISA plans invest in higher risk asset classes such as high yield bonds, venture capital, private equity and hedge funds as a matter of routine. These higher risk asset classes provide an opportunity for higher returns. The prudence in this process is about asset allocation. That is, the extent to which plan assets are exposed to higher risk investments. As an example, the California State Pension fund has $ 31 billion dedicacted to private equity and has made a $10 billiom profit in this sector since 1990.

19. In my experience it is highly unusual for fiduciaries to consider valuation techniques for determining the value of a publicly traded, widely held security other than the market itself. This is standard industry practice, as the market is efficient. Both Mr. Johnson and Ms. Driscoll acknowledged that the market was in the best position to fairly evaluate the value of Grace stock. According to Mr. Johnson, "the market is the best determinant on any day as to what the shares are worth." (Johnson deposition at 84) According to Ms. Driscoll, "I think Duff & Phelps range was based on a traditional valuation but generally the market price is the market price, so I am not, I don't think that their range is any more accurate than the actual current market price that the market is setting." (Driscoll deposition at 152)

20. In this case, State Street appears to have principally relied on a valuation model developed by Duff & Phelps that evaluated W.R. Grace's potential asbestos liablity by doubling Grace's reported amount even though Duff & Phelps

admitted that Grace had more detailed claims information than Phelps. This was approximately $1 billion and contributed significantly to lower projected price ranges as developed by Duff & Phelps. It was an error for State Street to discount Graces's projections in favor of Duff & Phelps'. This is especially true because the market was continuing to value the company in a manner that reflected that the company had value. Additionaly, Grace believed that it had fairly disclosed its asbestos liability. (McGowen deposition testimony at 89)

21. During the period of State Street's engagement, W.R. Grace reported improved operating results for the fourth quarter of 2003 and the first quarter of 2004. There was also positive news regarding the possibilities for the introduction of the FAIR Act and increased estimates of insurance coverage for asbestos claims. In his deposition, Mr. McGowan indicated that by early 2004 Grace was making progress on the evaluation of asbestos claims and improving operating performance. (McGowen deposition testimony at 75-76)

22. It is my opinion that State Street breached its fiduciary duties as the investment manager of the Grace Stock fund when it began a sell program in February 2004 that was contrary to participant direction by failing to take into account the holistic nature of Grace employees retirement benefits, by relying on a flawed and speculative valuation model for the value of Grace stock, and, by its failure to consider the value of positive financial information about W.R. Grace that was in the public domain.

23. Fiduciaries of pension plans that invest in employers securities should not sell these securities in reaction to increased volatility in the stock price or adverse market or economic conditions. Acting on speculation on the future value of a security would be imprudent in these types of pension plans. Speculation is inherently risky. As an example, while I was at State Street, the bank was the directed trustee for Mitchell Energy's defined contribution plan, which had significant investment in a company stock fund. In the mid 1980's, Mitchell Energy's stock price fell precipitously due to economic problems in the oil industry. The stock was falling so fast that Mitchell Energy made additional employer contributions to make up for the change in value of an employee's account that occurred just between the time a layoff occurred and the few weeks it took to prepare a distribution. This pension plan held its investment, the oil industry recovered, Mitchell Energy prospered and in 2002 Devon Energy bought the company for approximately $3.5 billion. Speculative selling in this instance would have locked in very large losses for plan participants. Benefit plans are not designed to market time, or trade in and out of employer securities based on speculation. Rather, they are designed to allow employees to share in the long term fortunes of the employer.

24. It is also my opinion that State Street once again breached its fiduciary duty in April 2004 when it decided to sell over 6 million remaining shares to D. E. Shaw. Given Grace's continuing improved operational performance, recent positive

information in State Street's possession concerning the amount of insurance that may be available to Grace, positive news about the possiblities for the introduction of the FAIR Act, and, now this interest on the part of a sophisticated hedge fund investor, State Street should have reconsidered the prudence of selling any more Grace stock at all.  The decision to liquidate all of the remaining shares totally eliminated the Plan participants' opportunity to participate in Grace's continuing recovery.

25. In my opinion it should have been unacceptible to Grace as a fiduciary to Plan participants to know that State Street as the Plan's investment manager for the Grace Stock Fund was making decisions that were inconsistent with Grace's analysis concerning whether retention of company stock was consistent with ERISA.

> Q.    Sitting back then, do you have any recollection of believing that allowing Plan participants to continue to keep money invested in the Grace Stock Fund between 2001 and December 15th, 2003 was imprudent?

> A.    No.

> (McGowen deposition at 70-71)

It is important to keep in mind, moreover, that State Street commenced the sale of Grace stock within approximately two months of its appointment.  During those two months Grace understood that its financial condition appeared to be improving.  However, Grace failed to inquire as to the reason that State Street began its plan of liquidation.

26. Plan sponsors have a fiduciary obligation to monitor all of the investment managers they have selected to serve an ERISA plan on an ongoing basis.  Based on my experience, the monitoring process is escalated and there is considerably higher scrutiny for any manager or fund that has been placed on a watch list.  In my opinion, Grace failed in this duty to Plan participants by failing to monitor State Street.

> Q. During the time that State Street came on board around, I believe, December 15th, 2003 through the time the sale of the stock was consummated in April of 2004, did you ever inquire of State Street – meaning, first, you individually, of State Street why retention of the Grace  Stock Fund was inconsistent with ERISA?

> A. No.

> (McGowen deposition at 147)

Q. Okay. And after you learned that State Street may be selling assets from the Grace Stock Fund, did you take any action to determine – let's go to this – if we could go to the next page, 7669, it says, The purpose of this notice is to inform you that State Street has determined, in light of all the relevant facts and circumstances, it is no longer consistent with ERISA for the plan to continue to hold all the shares of Grace stock currently in the Grace Stock Fund. Do you see that sentence?

A. Yes.

Q. Did you undertake any investigation of State Street as to how it came to that Conclusion?

A. No.

(Forgach at 138)

Q. Okay. Did you ever make an inquiry of anyone at State Street as to why – how State Street made the decision to sell the remaining shares in the Grace Stock Fund to D.E. Shaw?

A   I – I don't – no. I think the answer is no. I do not recall all conversations I had with State Street, but I think the answer is no.

Q. Okay. Do you ever recall having any discussion with State Street that involved D.E. Shaw?

A. No.

Q. Do you know whether anyone at State Street – I'm sorry, at Grace ever had conversations with anyone at State Street regarding the sale of the shares to D.E. Shaw?

A.   I am not aware of any conversations

(Forgach at 147)

Q. Didn't you think you had some resonsibility as a member of the committee to monitor what State Street was doing after its engagement?

>   MS. FLOWE: Same objection. You're asking him for a legal conclusion.

>   MR. CUMMINS: I am asking him for whether he thought he had some responsibility. He's not a lawyer. I understand that.

10

BY MR. CUMMINS:
Q.      Could you answer the question please?

MS. FLOWE: You can answer it as – if you thought- if you had a thought about it, you could answer it, but factually.

THE WITNESS:  May I ask a question?

BY MR. CUMMINS:
Q.      Yeah, sure.  I think you can.  Your counsel is going to have to –

A.      Responsibility to do what?  Other than understanding the number of shares in the plan, I didn't understand any other responsibility.

Q.      Okay. Did you think that somehow you thought you should find out what they were doing with respect to the analysis or thoughts about the stock in that stock plan?

A.      Actually, I felt it was off limits.

(Tarola at 154-155)

27. I reserve the right to modify my opinion, if necessary, to reflect any additional information received and analyzed in the future.

This is the report of  John J. Mulligan, Jr.

Signed on _____6/15/07_____

By: _____