<u>EXHIBIT D</u>

EXPERT REPORT OF
JEFFERY E. SCHAFF

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## CONSOLIDATED CASE NO. 04-11380-WGY

**Lawrence W. Bunch, et al.**

*Plaintiffs*

v.

**W.R. Grace & Co., et al.**

*Defendants*

WRITTEN REPORT OF EXPERT OPINION

*prepared by*

JEFFERY E. SCHAFF AND MICHELE L. SCHAFF

ARDOR FIDUCIARY SERVICES, LTD.
ONE NORTHFIELD PLAZA, SUITE 300
NORTHFIELD, ILLINOIS 60093
1.847.441.3228

# TABLE OF CONTENTS

NOTES REGARDING OPINION CONTENT .................................................. 3

OPINION ................................................................................................. 4

    CONCLUSION OF OPINION .......................................................... 4

    SUMMARY OF OPINION ............................................................. 4

    DETAILED ANALYSIS OF OPINION ............................................ 8

FACTS, CIRCUMSTANCES AND TESTIMONY ...................................... 20

SOURCES OF INFORMATION ............................................................... 27

ABOUT THE EXPERTS ......................................................................... 32

SIGNATURES OF AUTHORS ................................................................. 35

# NOTES REGARDING OPINION CONTENT

## SCOPE OF OPINION

Our analysis with regard to this case involved, generally, an evaluation of the investment fiduciary processes used by each of the Defendants with regard to claims made by Plaintiffs. More specifically, our focus was on the events that led to the sale of the Grace Common Stock from the Grace Stock Fund of the W.R. Grace Savings & Investment 401(k) Plan.

## LEGAL REFERENCES

References to laws (i.e. ERISA) and related cases (e.g. DiFelice v. U.S. Airways) herein are not intended by the authors to suggest that this report offers legal opinions or advice. The authors are not attorneys. As experts in investment fiduciary responsibility, the authors are familiar with laws relevant to their areas of expertise. In order to educate its AIFA designees with the legal substantiations for its Prudent Practices and CEFEX Assessments, the Center for Fiduciary Studies incorporates such legal references and explanations in its accreditation processes. Legal references are offered in the context of the authors' experience and education, including training and continuing education related to their Accredited Investment Fiduciary Analyst certification, and in the context of what an investment fiduciary should be knowledgeable.

## TERMS

W.R. Grace & Company shall hereafter be commonly referred to as "Grace", trading on the NYSE under the symbol GRA.

The W.R. Grace & Co. Savings and Investment Plan shall hereafter be commonly referred to as "Plan".

The Grace Stock Fund shall hereafter be commonly referred to as "Stock Fund".

W.R. Grace & Co. common stock shall hereafter be commonly referred to as "Common Stock".

State Street Bank and Trust Company and State Street Global Advisors shall hereafter be commonly referred to as "State Street".

Employee Retirement Income Security Act shall hereafter be commonly referred to as "ERISA".

# OPINION

## CONCLUSION OF OPINION

During the period in which State Street served as the investment manager of the Stock Fund of the Plan, it is my opinion that the continued holding of the Common Stock in the Stock Fund of the Plan would not have been inconsistent with the provisions of ERISA within the meaning of §404(a)(1)(D) and that the Common Stock held in the Stock Fund should not have been liquidated.

## SUMMARY OF OPINION

First and foremost, the Plan was a participant-directed 401(k) plan, not an Employee Stock Option Program (ESOP). Furthermore, according to the Summary Plan Description, the Plan qualified under ERISA §404(c) for safe harbor, which affords the plan sponsor a relief of liability for the investment decisions of individual participants and the consequences resulting therefrom. Thusly, the duty to diversify the individual participant accounts of the Plan was delegated categorically to the participants. Distinctly divergent from the prudence standard applicable to an ESOP, the prudence standard applicable to the continued offering of company stock as an investment option in a 404(c) qualified 401(k) plan depends largely on the other options available to plan participants, the ability of plan participants to diversify their account holdings with the aforementioned options, and the ability of plan participants to make reasonably timely changes to their investment allocations.

> The Plan offered participants a well-diversified menu of investments spanning a wide risk/return spectrum, of which the Common Stock was a choice. Per the 2003 Summary Plan Description, the options included a Fixed Income Fund, the Stock Fund, and 26 Mutual Funds.[1]

> Plan fiduciaries provided to Plan participants accurate information about the particular risk/return characteristics of the Company Stock in general, and additional information about the specific risks surrounding the asbestos litigation liabilities and bankruptcy proceedings and how the specific risks may impact the market price of the Common Stock.

> State Street sent to Plan participants the most explicit communication, entitled Notice To Participants In Grace Stock Fund, dated 26 January 2004, in which it issued the following words of warning: "Finally, as a reminder, each participant should continue to consider carefully the advisability of his or her continued investment in the Grace Stock Fund, particularly given the high degree of risk and potential volatility of an investment in stock of a company that is in the middle of

a bankruptcy proceeding. Each participant should carefully evaluate whether the investment of his or her accounts in the Grace Stock Fund adequately reflects these risks and, in light of his or her particular situation, provides adequate diversification from an investment perspective."[2]

Plan participants had the unfettered ability to diversify their account holdings and purge their shares of Common Stock held in the Stock Fund if they so desired. In fact, Plan participants were able to liquidate their Grace stock on a real-time trading basis.

Plan participants were free in the allocation of their 401(k) accounts to make reasonably informed decisions that reflected their individual suitability profiles, including investing in their employer through the Plan's Stock Fund. Plan participants were notified in the Summary Plan Description that the Plan was a participant-directed 404(c) plan under ERISA and that "fiduciaries of the [P]lan may be relieved of liability for any losses that are the direct and necessary result of investment instructions given by participant or beneficiary."[3]

Participants who invested in the Stock Fund were not warned prior to purchasing that they could be prevented from reaping the reward for the investment risk taken by making such an investment if the Plan's fiduciaries choose in the future to remove the Stock Fund option in the Plan or sell the participants' holdings in the Stock Fund without authorization from the participant.

Plan participants holding the Common Stock acted of their own volition when they placed their assets at risk by investing in and maintaining their investment in the Stock Fund. When the Plan participants' control over their investment decisions with respect to the Stock Fund was seized from them and the shares of Common Stock held in the Stock Fund were sold without their consent, Plan participants lost out on the potential to benefit from the risks that they had already paid the price for taking. As expressed by Ron Brennan in his letter to Brian McGowan, dated 09 March 2004, "Offered here is the position of many employees who believe that all possible losses regarding the value of the 'Fund' have been realized, and failing that, additional losses would not have any real consequence considering the magnitude of the degradation already incurred. In short, many employees who have seen stock prices in excess of $30.00 share in the past five years and as high as $6.00 share within the past fifteen months, are now being told that their stock will be sold at whatever price and time the new trustee feels appropriate. ... The employee sees a 'lose, lose' position and no control of his investment."[4]

Therefore, it is my opinion that the decision of when to sell the Common Stock held in the Plan's Stock Fund should not have been usurped by State Street or the Plan's fiduciaries. By removing the participants' ability to direct their own investments in a manner that conflicts with appropriate standards of fiduciary care, the Plan loses the 404(c) safe harbor protection that it would have otherwise been afforded. Each

participant should have retained the right to choose when to sell the Common Stock held in the Stock Fund of his Plan account.

Separately, Grace's plan document specifically established the Stock Fund, a fixed income fund and a diversified selection of mutual funds as investment options from which participants could select in the allocation of their respective Plan accounts.[5] The Summary Plan Description also demonstrated the intention to have an employer investment option in the Plan.[6] When the governing legal instrument of a 401(k) plan specifically establishes as an investment option a means for employees to invest in the stock of their employer, preference should be given to maintaining the option except in the unusual event that doing so would violate the provisions of ERISA. ERISA §404(a)(1)(D) allows for the possibility of contravening a plan document in the event that it becomes clearly imprudent to continue following the document.

> According to Grace's McGowan, the Common Stock was a prudent investment at the time they delegated the management of the Stock Fund to State Street.[7]

> During the period in which State Street served as the investment manager of the Stock Fund, Grace's financial performance and outlook improved. The net amount of Grace's asbestos litigation liabilities were better defined and understood, and the FAIR legislation that could have substantially reduced remaining asbestos litigation liabilities regained momentum.

> The stock market was aware of Grace's bankruptcy and asbestos litigation liabilities during the period in which State Street served as the investment manager of the Stock Fund, and yet continually maintained a value for the Common Stock. In fact, the price for the Common Stock increased during this period despite the Plan's Rule 144 filing in which it reported its intent to sell Common Stock and the selling of Common Stock, both of which would reasonably be expected to cause a decrease in price.

> Exhibit II of the engagement agreement between Grace and State Street affirms that "State Street is required by Section 404(a)(1)(D) of ERISA to act in accordance with such provisions of the Plan except to the extent that State Street determines that such provisions of the Plan are not consistent with the provisions of ERISA. Accordingly, State Street shall instruct the Trustee to sell Common Stock held in the [Stock Fund] if, and only if, State Street determines that the continued holding of such Common Stock is not consistent with the provisions of ERISA (within the meaning of Section 404(a)(1)(D) of ERISA)…"[8]

Therefore, it is my opinion that the continued holding of Common Stock in the Stock Fund of the Plan would _not_ have been inconsistent with the provisions of ERISA within the meaning of §404(a)(1)(D), as the threshold of imprudence was not crossed. In view of the fact that State Street was only authorized to sell the Common Stock held in the Stock Fund if, and only if, the continued holding of such shares was not consistent with the provisions of ERISA, State Street should not have sold the Common Stock.

Lastly, ERISA imposes the highest fiduciary standards of care on ERISA fiduciaries. Not only are ERISA fiduciaries required to understand their responsibilities, they are required to act prudently in the performance of their duties. In the name of prudence, plan fiduciaries must delegate only when the delegation follows a prudent selection process. Furthermore, safe harbor protection from the failures of a delegated fiduciary requires prudence in the delegation to and in the regular monitoring of the delegated fiduciary. Although a fiduciary can delegate a function, a fiduciary cannot abrogate his responsibility to another.

> As the Plan sponsor, Grace bears the ultimate responsibility for the management of the Plan.

> Grace did not express that the purpose for delegating the investment management of the Stock Fund to State Street was the possibility that the Common Stock could become worthless.

> The engagement agreement between Grace and State Street does not appoint State Street as an independent fiduciary, but as an investment manager.[9]

> The engagement agreement between Grace and State Street maintains that the purpose of the engagement is to "determine … the appropriateness of the [Stock Fund's] retention or sale of the respective shares of [Common Stock] …", not to serve as the Stock Fund's independent fiduciary representing the interests of the participants.[10]

> State Street is a fiduciary of the Stock Fund and to each of the Plan's participants, regardless of whether they considered the engagement to be that of a transaction or of an independent fiduciary representing the Plan's participants who hold investments in the Stock Fund.

> Grace has not produced evidence, to our knowledge, that it properly followed prudent investment fiduciary processes in its delegation of the management of the Plan's Stock Fund to State Street, in its search and selection of an independent fiduciary, or in its monitoring of State Street.

> According to Tarola, Grace's CFO, by delegating the management of the Stock Fund to State Street, Grace had no responsibility with respect to State Street's management of the Stock Fund, and had virtually wiped its hands of any responsibility to the Plan participants invested in it.[11] In fact, when asked about whether he thought that he had some responsibility to monitor what State Street was doing during the engagement, Mr. Tarola replied, "Responsibility to do what? Other than understanding the number of shares in the plan, I didn't understand any other responsibility."[12]

Therefore, it is my opinion that selling the Common Stock in the Plan's Stock Fund was a failure by both Grace and State Street to manage the Plan prudently and in the best interests of the Plan's participants. This failure by Grace and State Street in performing their fiduciary duties suggests either a lack of understanding of those duties or an

insufficient commitment to satisfying those duties. In my opinion, Grace failed to adequately satisfy its fiduciary duties with respect to delegating the management of its Stock Fund to State Street and thereby cannot absolve itself of the ultimate responsibility for State Street's actions. However, the fact that Grace cannot absolve itself does not absolve State Street of its responsibility for it actions.

## DETAILED ANALYSIS OF OPINION

**Grace failed to exercise prudence in its decision to delegate to an independent fiduciary.**

As the sponsor of its retirement plan, a company must ensure that its plan and plan fiduciaries comply with the fiduciary standards of care set forth in ERISA.[13, 14] Among the requisite responsibilities is to first understand the applicable fiduciary duties and then to discharge the duties solely in the interest of the participants and beneficiaries, exclusively for the purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.[15]

If a plan believes that it would be prudent and in the best interest of its plan participants to delegate specific fiduciary functions and follows a prudent process in doing so, it may delegate to a co-fiduciary.[16] In deciding whether to delegate and in the scope and terms of the resulting engagement, the plan's named fiduciaries must act with loyalty and prudence.[17]

In evaluating whether or not Grace satisfied its fiduciary duties by following a prudent process in considering whether to delegate the investment management of the Plan's Stock Fund, I note a distinct lack of plan centered inquiry and deliberation. As described by Grace's McGowan, the idea of hiring an independent fiduciary sprang from conversations between members of the Plan's investment committee (Tarola, McGowan and Forgach) and other members of senior Grace management (including CEO Paul Norris). Per McGowan, the issue contemplated was the possibility of receiving non-public information regarding negotiations of asbestos liabilities in the bankruptcy proceedings. No examination appears to have been made with regard to the Plan's 404(c) status or the extent to which risk disclosures could cure the Plan's liability.[18] I also note a distinct lack of substantiation supporting a prudent process for the decision to delegate.

In my opinion, had Grace exercised sufficient inquiry and deliberation regarding the potential delegation of the investment management duties of the Stock Fund to an independent fiduciary, Grace may well have decided differently about whether to delegate or about the appropriate scope of or terms for the delegation.

In coming to this opinion, I have considered the rationales given by Grace as cause to delegate: avoiding conflicts of interest and protecting the Plan's participants from market volatility.

With regard to expressions of concern over conflicts of interest, it is noteworthy that the specific conflicts causing the concern should be evaluated. Any question about whether Grace should delegate the management of the Stock Plan to an independent fiduciary in order to avoid conflicts of interest should be considered within the framework of the appropriateness for the Plan. As an example noted above, such consideration could have included the impact of risk disclosures and the possibility that disclosures may be able to cure the liability arising from the specific conflicts of concern for a plan claiming 404(c) status. Furthermore, any decision to delegate should take into account the merits of that decision's benefit to Plan participants.[19]    I see no evidence of these criteria being weighed.

With regard to expressions of concern over trying to protect participants from market volatility, it is noteworthy that protecting participants from volatility by excluding a volatile investment is not the goal of a 401(k) plan claiming 404(c) safe harbor.[20] The actual effect of eliminating higher risk investment choices may effectively preclude investing in many equity funds that would otherwise have a positive effect on the overall performance of a portfolio. Investment in a risky security as part of a diversified portfolio can, in fact, be an appropriate means of increasing return while minimally increasing overall risk.[21] The goal of a 404(c) plan should be to afford participants the ability to create a diversified portfolio by offering a broad range of investment options, representing a variety of asset classes with varying risk/return characteristics, from which each Plan participant can allocate in whatever ratio he chooses to achieve his specific investment objectives within his risk tolerance.

Grace did not express that the purpose for delegating the investment management of the Stock Fund to State Street was the possibility that the Common Stock could become worthless. In fact, Grace's CEO at the time, Paul Norris, told a Grace employee at a "town-hall meeting" that it was not "at all" a foregone conclusion that the Common Stock would go to zero.[22]

**Grace failed to exercise prudence in its search, selection and implementation of State Street as an independent fiduciary for the Stock Fund directly and Plan participants indirectly.**

As the sponsor of its retirement plan, a company must in its search, selection and implementation of a delegated independent fiduciary first understand the relevant fiduciary duties applicable to the function being delegated, and then discharge its duties with diligence, prudence and objectivity and for the exclusive benefit of beneficiaries.[23]

Since inappropriately delegating or retaining a fiduciary function would not be in the best interests of a plan's participants, a plan sponsor must follow a prudent process in its decision regarding whether to delegate as well as in its search for and in its selection, implementation and retention of a delegated co-fiduciary.[24]

Safe harbor protection from the failures of a delegated fiduciary requires prudence in the delegation to and in the regular monitoring of the delegated fiduciary.[25]

Although a fiduciary can delegate a function, a fiduciary cannot abrogate his responsibility to another.

While plan sponsors commonly rely on competitive proposal processes, such as issuing Requests for Proposal (RFPs), when searching for vendors and service providers, such a process is not specifically required. Regardless of the actual method used, the burden is on the Plan sponsor to search, select and retain co-fiduciaries who are appropriate for the delegation.[26, 27, 28] Lacking such a prudent process, a Plan sponsor would likely have difficulty articulating or defending the appropriateness of the specific delegation engagement.

In evaluating whether or not Grace satisfied its fiduciary duties by following a prudent process in considering to whom it would appoint as an independent fiduciary and delegate the investment management function of the Plan's Stock Fund, I note a lack of inquiry and deliberation according to testimony. I also note a distinct lack of substantiation supporting a prudent process for the search that resulted in the selection of State Street and for the implementation, monitoring and retention of State Street as a delegated co-fiduciary.

According to Grace's Forgach, Grace issued no request for bids. Rather than utilize any competitive process at all, Mr. Forgach contacted two companies with which the Plan had already worked and another two of which he had been aware. Of the four candidates, U.S. Trust and Fidelity declined Mr. Forgach's solicitations of interest. Aon was deemed to have insufficient insurance for the engagement. The sole candidate remaining was State Street, so Grace offered the role of investment manager of the Stock Fund to State Street.[29]

Despite the lack of a prudent process, Grace may have nonetheless selected State Street had Grace followed a prudent process, as State Street is a significant player in the retirement plan industry. However, the terms of the engagement and its effectuation may well have been different had Grace been more diligent in its processes and set a better example for the standards expected in the management of the Plan.

Beyond Grace's lack of prudence in searching for and selecting State Street, it is noteworthy that the terms and scope of State Street's engagement did not comport with Grace's explanation to others that it needed to delegate the investment management of the Plan's Stock Fund to an independent fiduciary on the basis that such a delegation would eliminate conflicts of interest. Instead, the foremost purpose named in Grace's engagement agreement with State Street was the determination of whether to retain or sell the Common Stock held in the Stock Fund.[30]

Far from serving the exclusive purpose of providing benefit to Plan participants, Grace has admitted that it allowed State Street to make the decision to eliminate the Common

Stock Fund from the Plan in order to protect from legal liability members of the Plan's investment committee.[31]

Although the terms of the Plan's plan documents specifically prohibited amendments or modifications that would deprive its participants of a benefit, and whereas the right to vote on tender offers was a right and benefit that the plan document specifically afforded the beneficiaries, Grace's engagement agreement with State Street and Grace's adoption of an amendment in accordance therewith usurped the right of the participants to vote their shares of the Common Stock in the event of a tender offer, thereby denying the participants a specifically named benefit in direct defiance of the Plan's plan document. Furthermore, denying Plan participants the right to vote tender shares may have disqualified the Plan's from its 404(c) status, as the denial of voting rights precluded the Plan's participants from the ability to independently exercise of control over their retirement plan investments.[32, 33, 34]

Thus, Grace appears to have erred in the terms of State Street's engagement in multiple ways, including:  Grace failed to exercise prudence and diligence in delegating to a co-fiduciary; the engagement's terms do not appear to comport with Grace's stated purpose for the engagement; and the engagement inappropriately usurps the voting rights of Plan participants in the case of a tender offer.

Grace's failure to prudently inquire and deliberate over the search, selection, implementation and retention of State Street and failure to reach appropriate terms in the engagement agreement suggests, in my opinion, either a fundamental lack of understanding its fiduciary duties or an insufficient commitment to satisfying those duties.

**State Street failed to exercise prudence in its decisions as the investment manager of the Stock Fund and as a fiduciary to the Plan.**

During the period of 15 December 2003 to 03 May 2004, State Street served as the investment manager of the Stock Fund of Grace's Plan.[35, 36]

According to the engagement agreement, the primary purpose of the engagement was the determination of whether to retain or sell the Common Stock held in the Stock Fund.[37]

According to the engagement agreement, State Street was authorized to sell the Common Stock in the Stock Fund if, and only if, State Street determined that continuing to hold the Common Stock was not consistent with the provisions of Section 404(a)(1)(D) of ERISA.[38]

Grace's Plan was a participant-directed 404(c) plan under ERISA, according to the Summary Plan Description, in which participants were notified of the 404(c) status.[39]

Fiduciaries of a 401(k) plan that qualifies for 404(c) safe harbor are not deemed responsible for losses that are the direct result of investment instructions given by participants.[40]

Safe harbor protections require the diligent discharge of fiduciary duties. Where fiduciary duties have not been properly discharged, there may be no safe harbor protection.[41]

The Plan's plan document specifically included the Stock Fund.[42]

The Plan's plan document accorded the Stock Fund favored status over other investment choices, as participant withdrawals were scheduled according to a prioritization of holdings, with the Stock Fund being reserved as the last withdrawal.[43]

In an effort to fulfill its engagement, State Street retained the legal services of Goodwin Proctor to advise State Street about legal issues regarding Grace's bankruptcy and asbestos litigation liability and the financial advisory services of Duff & Phelps to assist State Street in properly valuing the Common Stock.[44]

### *State Street failed to represent Plan participant interests generally.*

Instead of being engaged as a consultant to provide advice regarding whether Grace should retain or liquidate the Common Stock in the Stock Fund, State Street undertook the larger role of investment manager of the Stock Fund. In its role as delegated investment manager of the Stock Fund, State Street undertook the responsibility for representing the interests of the Plan's participants.[45] The only responsibility specifically excluded from this delegation was the authority, responsibility or obligation to vote any of the shares of Common Stock, as this right belonged to the participant shareholders; except in the event that a vote related to a proposed merger or other substantially similar transaction, in which case State Street was given the discretionary authority to vote all of the shares of Common Stock held in the Stock Fund.

Despite the fact that Grace was in bankruptcy and that Plan participants with holdings in the Stock Fund were eligible for representation on the equity committee of Grace's bankruptcy proceeding.[46] State Street chose not to represent the interests of Plan participants in bankruptcy court proceedings.[47]

In my opinion, representation before the bankruptcy court was important to Plan participants. The Common Stock held in the Stock Fund represented approximately 12% of the total outstanding shares of Grace and collectively would have represented a significant interest on the committee. As a fiduciary to the Plan's participants with Common Stock in the Stock Fund, State Street should have been an advocate for the beneficiaries it represented. The interests that State Street could have furthered on behalf of Plan participants included maintaining the value of the Common Stock as well as issues that affected Grace, their employer, and ultimately their jobs.

According to depositions of State Street personnel related to this case, State Street based its evaluation of whether to represent Plan participants on the equity committee of the bankruptcy court on the nature of the information that State Street might obtain by being on the committee, not on the merits of representing the interests of Plan participants.[48] In my opinion, this decision reflects the failure of diligence and prudence in representing the interests of Plan participants and beneficiaries.

According to depositions of State Street personnel related to this case, State Street cites as an additional basis for not joining the equity committee the potential receipt of material inside information.[49]   However, the Department of Labor has issued advice to plans that, even in the more limited role of directed trustee of an ESOP, the co-fiduciary would have a duty to act on material non-public information affecting the plan for which it has responsibility.[50]   In my opinion, State Street's decision reflects the failure of diligence and prudence in understanding applicable fiduciary duties.

It is my opinion that State Street's basis for choosing not to represent the interests of Plan participants before the bankruptcy court is not valid.  State Street should have diligently represented the Plan participants for whom it was a fiduciary.

***State Street failed to properly determine the appropriate standard of prudence regarding whether holding the Common Stock was not consistent with ERISA.***

In order to determine whether or not continuing to hold the Common Stock had become inconsistent with the provisions of, State Street needed to take into account the facts and circumstances relative to the Plan that would affect that decision.  In particular, State Street needed to understand the fundamental nature of the Stock Fund, particularly within the context of the Plan as a whole.

The Stock Fund was not an Employee Stock Option Plan (ESOP), but rather one investment option among a broad selection of investment options offered in a participant-directed 401(k) plan.  The Stock Fund option invested in the Common Stock of Grace, the employer of the Plan participants.

The court ruling in DiFelice v. U.S. Airways references Kuper v Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995) with the following description: "ESOPs are designed to consist primarily of company stock, and thus the prudence standard that applies to the decision to retain company stock in an ESOP is of a different nature than the decision to continue to offer company stock as an investment option in a 401(k) plan.  Unlike ESOPs, the prudence of continuing to offer company stock as an investment option in a 401(k) plan will depend largely on the other investment options offered to participants, and the participants' ability to diversify their account assets among those investment options."[51]

State Street did not differentiate between the prudence standard of an ESOP holding and a 401(k) holding.[52]   Indeed, Shawn Johnson, the State Street member on the Grace team with the highest seniority, testified that there was generally no distinction between how State Street's Independent Fiduciary Group manages company stock in a 401(k) plan as opposed to an ESOP.[53]

State Street's actions were based on the errant premise that State Street need not consider the specific nature of the Plan.

In my opinion, State Street erred in its analysis of what prudence standard to apply in its role as fiduciary of the Stock Fund of the Plan sponsored by Grace, which contributed to the fundamentally flawed reasoning for State Street's actions.

*The Common Stock held in the Stock Fund option of the Plan sponsored by Grace was appropriate for the Plan.*

As articulated by the court in the matter of DiFelice v. U.S. Airways:  Investment vehicles containing company stock are favored by ERISA, and fiduciaries are entitled to some latitude when they include them as a single option in an otherwise diversified pool of investment options in a 401(k) plan.  Thus, a fiduciary may continue to offer employee stock as an investment option in a 401(k) Plan as long as the fiduciary also provides Plan participants, with:  (1) a range of investment options; (2) true and accurate information regarding the risk/return characteristics of those investment options; and (3) the unfettered ability to trade in and out of the various investment options.  Compliance with these requirements enables participants to construct a diversified portfolio of investments while participating in the ownership of their employer, and in a plan that allows participants to direct their own investments, that is the extent of the fiduciary's duty under ERISA.[54]

In my opinion, the Grace Plan satisfied the DiFelice test described above, as:

> (1) The Plan offered a suitably broad range of investment options, which could be combined to create portfolios spanning a wide range of risk/return preferences. Per the 2003 Summary Plan Description, there were a total of 28 options, included a Fixed Income Fund, the Stock Fund, and 26 Mutual Funds representing a wide range of asset classes and investment styles.

> (2) The Plan provided to its plan participants true and accurate information regarding the risk/return characteristics of the investment options, including the special risks applicable to the Stock Fund due to Grace's bankruptcy and ongoing asbestos litigation liabilities.[55, 56, 57]

> (3) The Plan allowed its participants to sell their shares of Common Stock held in the Stock Fund portion of their Plan accounts using a real-time trading platform and without losing any company matched contribution.

During the period of State Street's investment management, the Common Stock held in the Stock Fund of the Plan represented only approximately 4% of the total value of the Plan.

Grace had taken the step of excluding the Stock Fund option from new contributions to the Plan as of 17 April 2003.[58]

Plan participants demonstrated a clear preference for holding the Common Stock by continuing to maintain their allocation to the Stock Fund, despite the fact that the price of the Common Stock had fallen in response to the asbestos litigation liability and bankruptcy, despite Grace's ban on new contributions to the Stock Fund, and despite ongoing risk disclosures.

Plan participants continued to intentionally expose their Plan accounts to the risk of loss by retaining the Common Stock. They had ample opportunity to dispose of their shares and had been adequately warned of the financial risks being experienced by Grace.

State Street's liquidation of the Common Stock effectively took away from Plan participants the opportunity to recover prior losses and the opportunity to reap any possible reward for the risk that they had accepted in deciding to make and maintain their respective investments in the Stock Fund.[59]

Various benefits of continued Common Stock ownership, benefits for which Plan participants had already paid the price through continued holding of the investment despite its risks and loss of value, were lost when State Street sold the Common Stock. In losing their portion of ownership in their employer, the Plan participants lost their potential seat on the equity committee of the bankruptcy court and their right to vote on issues that affected their employer, Plan and jobs.

***When State Street divested the Stock Fund of its Common Stock holdings, the Common Stock remained a viable investment.***

Grace was not accused of defrauding or otherwise intentionally misleading its investors, nor was it accused of having errors in its financial statements, as was the case with Enron and multiple other companies at the time.

At no time during State Street's investment management of the Stock Fund did Grace, State Street or State Street's co-fiduciaries (Goodwin Proctor and Duff & Phelps) believe that Grace was in imminent danger of losing its viability as a going concern.[60]

The stock market was aware of Grace's bankruptcy and asbestos litigation liabilities during the period in which State Street served as the investment manager of the Stock Fund, and yet continually maintained a value for the Common Stock. In fact, the price for the Common Stock increased during this period despite the Plan's Rule 144 filing in which it reported its intent to sell Common Stock and the selling of Common Stock, both of which would reasonably be expected to cause a decrease in price.

Grace showed improved financials from operations during State Street's appointment as investment manager of the Stock Fund.[61] In fact, Duff & Phelps reported to State Street: "Grace's core operating business continues to be reasonably well-positioned within its industry markets. Product revenue and operating margins should benefit from an expanding domestic economy. Cash flow from operations continues to be reasonably strong compared to industry peers."[62]

During the period in which State Street served as the Stock Fund's investment manager, Grace developed a better understanding of the net amount of its asbestos litigation liabilities, and Grace received settlements from Sealed Air and Fresenius in excess of prior estimates.

During the period in which State Street served as the Stock Fund's investment manager, FAIR legislation, which would have substantially reduced remaining asbestos litigation liabilities, regained momentum.[63]

It is my opinion that the Common Stock remained a viable investment, particularly as a small part of a diversified portfolio.

***State Street failed to prudently assess or understand the reasonably expectable amount of asbestos litigation liabilities and the impact thereof on Grace and the Common Stock.***

State Street believed that Grace's asbestos litigation liabilities were a major factor affecting the value of the Common Stock. Specifically, State Street considered the ZAI (attic insulation) litigation and the asbestos bodily injury claims to be the most significant risks to Grace.[64, 65]   In fact, State Street cited Grace's asbestos litigation liabilities as the primary determinant in their decision to liquidate the Common Stock in the Stock Fund of the Plan.[66]

With regard to the ZAI (attic insulation) claims, Grace felt strongly that it had no liability because "that asbestos was several one-hundredths of a per cent by weight of the product and fell well below levels which might be harmful."[67]  Even so, State Street assumed that there was only a 60% chance that Grace would prevail in a science trial; and should Grace fail to prevail in a science trial, State Street assumed that the Grace shares would be wiped out.[68, 69]  However, State Street's pessimistic assumptions and analysis were not supported by data that Grace provided.

With regard to the asbestos bodily injury claims, State Street maintained a liability estimate that was double Grace's estimate, notwithstanding Grace's clarification that "the financial statement number is a better estimate of its potential future exposure than a calculation based purely on historical averages."[70, 71]

State Street understood that the Common Stock would have value in the market even utilizing State Street's inflated figures.  Duff & Phelps provided its range of values to State Street through a weekly update.  Hence State Street realized, or should have realized, that Grace offered value to its shareholders even under the pessimistic scenario of doubling what Grace believed to be a good estimate of the asbestos litigation liability.

The potential loss of the ZAI claims was the only happenstance in which State Street, as expressed by its financial advisor Duff & Phelps, envisioned Grace not being viable. In estimating the probability of this set of circumstances, Duff & Phelps prepared, based upon inputs from State Street and Goodwin Proctor, a matrix that calculated a 60% likelihood of succeeding at a science trial, a 50% probability of the FAIR Act passing, and only a 20% chance of Grace being wiped out by the ZAI litigation.[72]

It is important to bear in mind that prudence is a function of how one handles actual and reasonably expectable facts and circumstance and is not a function of manufacturing a draconian confluence of the most negative imaginable series of events and then acting on them.

Even with the exaggerated risk of loss portended by State Street, a 20% probability of loss based on conservative calculations and pessimistic methodologies does not equate to a foregone conclusion that, absent State Street's intervention, the Plan's participants would surely lose the value of their accounts allocated to the Stock Fund. In coming to its conclusion to sell, however, the most senior member of the State Street team handling the Grace engagement, Shawn Johnson, declared that there was a "high probability" of the Common Stock becoming worthless.[73]

***State Street failed to prudently determine or understand the meaning or significance of the data that it had collected.***

The stock market is a superior instrument in fairly valuing the Common Stock over the analysis of Duff & Phelps.[74] Regardless of the accuracy or prescience of Duff & Phelps' pricing valuations, the question of whether the Common Stock was worth more or less than its price in the open stock market was a matter for consideration by Plan participants and had no bearing with regard to the determination of whether the Common Stock or Stock Fund was prudent or imprudent for the Plan to retain.[75]

Contrary to the testimony of State Street personnel, the Duff & Phelps reports did not conclude that there was a high probability that the Common Stock would become worthless.[76] To the extent that the Duff & Phelps analysis included estimations of possible negative outcomes that could further injure or eliminate the value of the Common Stock, the data used to compile such estimates were already in the public realm and already priced into the stock.[77] Moreover, the Duff & Phelps estimates were based on assumptions that asbestos litigation liabilities would be approximately double the rate that Grace felt was reasonable.[78]

State Street was aware of the improvements to Grace's financial condition and ongoing prognosis. In one communication, Goodwin Proctor attorney Shepard Remis specifically advised State Street that Grace's estimate of $964.6 million was a more appropriate estimate of asbestos litigation liabilities than Goodwin Proctor's initial estimate of $1.14 to $1.52 billion.[79] To place this in context, Duff & Phelps' valued the Common Stock at $13.79 per share assuming a total asbestos litigation liability of $1.0 billion.[80] On the date of Mr. Remis' communication to State Street, the Common Stock closed at a price of $2.85 per share.

State Street failed to adequately consider the implication of being offered an above market price for the remainder of the Common Stock. The buyer was hedge fund D.E. Shaw, a sophisticated investor. Normally, the seller of a large block of stock would expect to receive a discount to the prevailing market price. D.E. Shaw, however, offered State Street more than the market trading price of the Common Stock for the remainder of the Common Shares held in the Stock Fund.[81] The supposition by State Street personnel that perhaps D.E. Shaw was willing to pay more than the market price for the Common Stock, rather than negotiate a price below the market, because the hedge fund was short the shares lacks merit.[82, 83] State Street did not provide any evidence that they had researched this possibility by determining the number of outstanding shares short, which would be expectable if that had been their presumption, as it would be imprudent

of a fiduciary to act on a hypothesis. If the purpose was to cover a short position, the Common Stock would have benefited by the effect of D.E. Shaw's rush to replace the shorted shares with shares purchased in the open market had State Street not sold shares to D.E. Shaw. In my opinion, the offer by D.E. Shaw represented a clear indication that the Common Stock was becoming more attractive and viable in the market ... not less.

**Grace failed to monitor State Street, a delegated fiduciary for the Stock Fund.**

As the sponsor of its retirement plan, a company must in its monitoring and retention of a delegated independent fiduciary first understand the relevant fiduciary duties applicable to the function being delegated, and then discharge its duties with diligence, prudence and objectivity and for the exclusive benefit of beneficiaries.[84]

Since the inappropriate retention of a delegated co-fiduciary would not be in the best interests of a plan's participants, a Plan sponsor must follow a prudent process in its monitoring of a delegated service provider and in its decision regarding whether to retain the delegated co-fiduciary.[85] Such consideration should be marked by a level of prudence and expertise normally reflected by other plan sponsors in similar situations.[86]

Safe harbor protection from the failures of a delegated fiduciary requires prudence in the regular monitoring of the delegated fiduciary.[87]

Grace believed that it had no ongoing duty to monitor State Street. According to Tarola, Grace's CFO, by delegating the management of the Stock Fund to State Street, Grace had no responsibility with respect to State Street's management of the Stock Fund, and had virtually wiped its hands of any responsibility to the Plan participants invested in it.[88] In fact, when asked about whether he thought that he had some responsibility to monitor what State Street was doing during the engagement, Mr. Tarola replied, "Responsibility to do what? Other than understanding the number of shares in the plan, I didn't understand any other responsibility."[89] Grace's failure to understand the fundamental duty to monitor delegated fiduciary functions, in my opinion, suggests a lack of understanding requisite fiduciary duties under ERISA.

In my opinion, it was imprudent for Grace to accept State Street's ultimate decision to liquidate the Common Stock in the Stock Fund without having monitored the processes that led State Street to its determination. Proper monitoring of the State Street engagement could have materially affected State Street's actions. Amongst others, had Grace properly monitored the activities of State Street, Grace could have brought to State Street's attention the need for the Plan participants to be represented on the equity committee of the bankruptcy court, and Grace could have alerted State Street of the fact that State Street was estimating Grace's asbestos litigation liabilities at approximately double the rate expected at the time.

When State Street alerted Grace that it intended to sell the Common Stock, Grace should have inquired about State Street's reasonable basis for such a conclusion. While it would have been inappropriate to usurp State Street's independence in the engagement by demanding a specific finding, it was wholly expectable that Grace determine the basis

upon which State Street believed that continuing to hold the Common Stock had become inconsistent with ERISA since that was the condition for selling as set forth in the engagement. It was imprudent for Grace to accept the determination without confirming that maintaining the Common Stock in the Stock Fund had become inconsistent with ERISA, the required criteria for selling, as specified in the engagement agreement. Lacking appropriate oversight, Grace could neither articulate nor defend the appropriateness of the specific course of action announced by State Street.

In my opinion, considering Grace's view that it was prudent to hold the Common Stock at the outset of State Street's engagement, the material improvements of Grace during the period of State Street's delegation, the stock market's absorption of the shares sold by the Plan and the emergence of a sophisticated investor who was willing to purchase the balance of Common Stock at an above-market rate when a below-market rate would have been expected for trading the large block of stock, even an average investor with common sense would have demanded an explanation for the determination to sell.[90] It is my opinion that Grace's failure to make such an inquiry defies the prudence standards of ERISA.

# FACTS, CIRCUMSTANCES AND TESTIMONY

1    S&I Plan Summary Plan Description 2003 (GR 000256-000266)

2    State Street's January 26, 2004 Notice To Participants In Grace Stock Fund (GR 001866)

3    S&I Plan Summary Plan Description 2003 (GR 000267)

4    Tarola deposition, Exhibit 27

5    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan SSBT 001834

6    S&I Plan Summary Plan Description 2003 (GR 000256-000258)

7    McGowan deposition, pages 62-65

8    State Street's Engagement Agreement, Exhibit II (SSBT 001278)

9    State Street's Engagement Agreement (SSBT 001268)

10    State Street's Engagement Agreement (SSBT 001268)

11    Tarola deposition pages 120-121

12    Tarola deposition pages 154-155

13    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 002085-002093, 002097-002098)

14    S&I Plan Summary Plan Description 2003 (GR 000247)

15    ERISA §404(a) Prudent man standard of care

(1) Subject to sections 1103 (c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A) for the exclusive purpose of:

        (i) providing benefits to participants and their beneficiaries; and

        (ii) defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

(2) In the case of an eligible individual account plan (as defined in section 1107 (d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107 (d)(4) and (5) of this title).

16    ERISA §402(c)(3) [Any employee benefit plan may provide] that a person who is a named fiduciary with respect to control or management of the assets of the plan may appoint an investment manager or managers to manage (including the power to acquire and dispose of) any assets of a plan.

17    ERISA §404(a)

18    McGowan deposition, pages 77-82

19    ERISA §404(a)

20    ERISA §404(c)

21    DiFelice v U.S. Airways, Inc.  E.D. Va., 2006 (No. 1:04 CV 889), page 789 [Source: Westlaw]

22    March 13, 2003 "Town Hall Meeting" page 15 (GR 007547)

23    ERISA §404(a)

24    ERISA §405(c)(2) If a plan expressly provides for a procedure described in paragraph (1), and pursuant to such procedure any fiduciary responsibility of a named fiduciary is allocated to any person, or a person is designated to carry out any such responsibility, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that--

(A) the named fiduciary violated section 1104(a)(1) of this title--

(i) with respect to such allocation or designation,

(ii) with respect to the establishment or implementation of the procedure under this paragraph (1), or

(iii) in continuing the allocation or designation; or

(B) the named fiduciary would otherwise be liable in accordance with subsection (a) of this section.

25    ERISA §405(a) Circumstances giving rise to liability

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

26    "As with any designation of a service provider to a plan, the designation of persons to provide investment educational services or investment advice to plan participants and beneficiaries is an exercise of discretionary authority or control with respect to management of the plan; therefore, persons making the designation must act prudently and solely in the interest of the plan participants and beneficiaries, both in making the designation(s) and in continuing such designation(s)." (DOL Interpretive Bulletin 96-1, 29 CFR §2509.96-1)

27    "[I]n choosing among service providers, as well as in monitoring and deciding whether to retain a service provider, the [responsible fiduciary] must objectively assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided." [DOL Information Letter, Qualified Plan Services (07/28/1998)

28    DOL Information Letter, Service Employee's International Union (02/19/1998)]

29    Forgach deposition, pages 7-25

30    State Street's Engagement Agreement (SSBT 001268)

31    Tarola deposition, pages 122-124

32    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 001902)

33    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 001909-001910)

34    State Street's Engagement Agreement (SSBT 001270)

35    State Street's Engagement Agreement (SSBT 001270)

36    May 3, 2004 Letter from Grace's Forgach to State Street's Ewing (GR 007611)

37    State Street's Engagement Agreement (SSBT 001270)

38    State Street's Engagement Agreement, Exhibit II (SSBT 001278)

39    S&I Plan Summary Plan Description 2003 (GR 000267)

40    ERISA §404(c)

41    ERISA §405

42    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 002085-002093, 002097-002098)

43    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 001880)

44    Driscoll deposition (pages 87, 93)

45    State Street's Engagement Agreement (SSBT 001268)

46    December 29, 2004 Memorandum from Goodwin Proctor's Doherty (SSBT 000281-000283)

47    Driscoll deposition (pages 138-141)

48    Driscoll deposition (pages 138-141)

49    Driscoll deposition (pages 138-142)

50    DOL Field Assistance Bulletin 2004-03

51    source:  Westlaw; DiFelice v U.S. Airways, Inc. E.D. Va., 2006, *788

52    Johnson deposition, Vol. II, pages 8-9

53    Johnson deposition, Vol. I, page 27

54    source:  Westlaw; DiFelice v U.S. Airways, Inc. E.D. Va., 2006, *789

55    June 16, 2000 New Investment Options Guide (GR  001825)

56    March 17, 2003 Letter from McGowan (Grace) to Plan participants:  "We are now approaching a period when speculation regarding possible provisions of a plan of reorganization (emergence) will likely increase." (GR 001845)

57    January 26, 2004 State Street Notice To Participants In Grace Stock Fund: "Finally, as a reminder, each participant should continue to consider carefully the advisability of his or her continued investment in the Grace Stock Fund, particularly given the high degree of risk and potential volatility of an investment in stock of a company that is in the middle of a bankruptcy proceeding.  Each participant should carefully evaluate whether the investment of his or her accounts in the Grace Stock Fund adequately reflects these risks and, in light of his or her particular situation, provides adequate diversification from an investment perspective." (GR 001866)

58    April 17, 2003 W.R. Grace & Co. Savings and Investment Plan (SSBT 001761)

59    Tarola deposition, Exhibit 27

60    Tarola deposition pages 74-75

61    Tarola deposition pages 77-78

62    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. (SSBT 000224)

63    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. (SSBT 000667)

64    State Street's December 11, 2003 Fiduciary Committee Meeting minutes regarding Grace's Retention of State Street:  "A major factor affecting the valuation of Grace is the foregoing personal injury claims as well as the other ongoing asbestos litigation.  The ZAI (attic insulation) litigation and the asbestos bodily injury claims present the most significant risks to Grace at this time." (SSBT 000683)

65    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. "Grace's common stock, however, does not trade based upon the performance of its core operating businesses.  The value of its stock is almost totally dependent upon a favorable resolution of the SAI claims and an acceptable and timely legislative solution to the asbestos bodily claims." (SSBT 000224)

66    Johnson deposition, Vol. I, pages 144-147

67    "Grace's position is that it has no liability. (on ZAI claims)"  footnote:  "Grace says that asbestos was several one-hundredths of a per cent by weight of the product and fell well below levels which might be harmful." (SSBT 003055)

68    "Based upon joint discussion with State Street and its legal counsel, the following table assumes that the probability that a global legislative solution will be agreed upon by all parties is 50 and the probability of a favorable outcome for Grace in the ZAI science trial is 60%." (SSBT 000206)

69    "If Grace loses the (ZAI) science trial, we assume the liability would be equal to the remaining value of the Company" (SSBT 000208)

70    Duff & Phelps' Financial and Valuation Analysis of W.R. Grace & Co. (January 29, 2004) Asbestos Bodily Injury Claims valued at $1,816 (assuming $4,000 per claim times Rand Institute report's estimate "at best, half of all asbestos bodily injury claims have come forward.") (SSBT 000205)

71    December 16, 2003 e-mail from Goodwin & Proctor's Remis to State Street: (SSBT 000134).

72    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. "Based upon joint discussion with State Street and its legal counsel, the following table assumes that the probability that a global legislative solution will be agreed upon by all parties is 50 and the probability of a favorable outcome for Grace in the ZAI science trial is 60%." (SSBT 000206)

73    Johnson deposition, Vol. I, page 146 and Vol. II, pages 14-16

74    Johnson deposition, Vol. II, page 84

75    ERISA §404(c)

76    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. (SSBT 000206)

77    Bayston deposition, page 64

78    Bayston deposition, pages 125-128

79    December 16, 2003 e-mail from Goodwin Proctor's Remis to State Street: "Therefore, Grace bellieves (sic) that the financial statement number is a better estimate of its potential future exposure than a calculation based purely on historical averages." (SSBT 000134)

80    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. (SSBT 000209)

81    April 7, 2004 letter from DE Shaw & Co. to State Street's Ewing (SSBT 000896)

82    Johnson deposition Vol. II, page 55

83    Duff & Phelps' January 29, 2004 Financial and Valuation Analysis of W.R. Grace & Co. (SSBT 000216-000218)

84    ERISA §404(a), §402 and §405

85    ERISA §405(2)(A)(iii)

86    ERISA §404(a)

87    ERISA §405

88    Tarola deposition pages 120-121

89    Tarola deposition pages 154-155

90    McGowan deposition, pages 62-65

# SOURCES OF INFORMATION

## DOCUMENTS

GR 000243-000303 (S&I Summary Plan Description 2003)

GR 005096-005103 (W. R. Grace & Co. Savings & Investment Plan Summary Sept. 29, 2003 - Sept. 30, 2003

GR 0075440-007559

Disk produced 4/17/07 labeled "SSBT 000001-SSBT 002930"

Plan amendment (attachment to Doc. 151 filed 2/23/07, pages 2-4, GR 001659, GR 001789, GR 001790

W. R. Grace & Co. Savings & Investment Plan - Invest Policy Statement (adopted March 1, 2004 - GR 006600-006603

W. R. Grace & Co. Savings & Investment Plan - Invest Policy Statement (adopted March 1, 2004 - GR 006604-006607)

US 401K Balance Reports - Fidelity - 12/01-2002 (GR 004988-005042)

W. R. Grace & Co. Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004, GR 006604-006607)

Fidelity Investment - W. R. Grace Stock Fund - GR 004781-004860

Asset Allocation by Fund (GR 004978-004987)

W. R. Grace Savings & Investment Plan - Account Summary (GR 005096-005103)

W. R. Grace Investment Review by Fidelity (GR 005292-005390)

W. R. Grace Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004, GR 005747-005750)

W. R. Grace Summary of U.S. Defined Contribution Assets for period ending December 31, 2003 (GR 005751-005753)

W. R. Grace Summary of U.S. Defined Contribution Assets for period ending March 31, 2004 (GR 005754-005759)

Annual Return/Report of Employee Benefit Plan for 2000 - Form 5500 (GR 000467-000536)

Schedule A of Form 5500 for 2002 (GR 000809-000882)

Annual Return/Report of Employee Benefit Plan for 2003 - Form 5500 (GR 000883-000970)

Annual Return/Report of Employee Benefit Plan for 2004 - Form 5500 (GR 001993-002120)

State Street Bank & Trust Company letter dated November 24, 2003, signed by Monet Ewing, Vice-President, to Investment & Benefits Committee of W. R. Grace and W. R. Grace & Co. (GR 001298-001330)

Statement of Investment Policy for W. R. Grace & Co. U.S. Pension Plan Trust, adopted December 18, 1997, Amended January 1, 2004 (GR 001331-001332)

W. R. Grace & Co. Savings & Investment Plan, amended through July 1, 2004 (GR 001654-001819)

The Baltimore Sun article dated October 24, 2002 re: W. R. Grace's earnings decline despite 6.8% increase in sales (GR 007431-007442)

Meeting notes dated March 13, 2003 (GR 007541-007579)

Meeting/Speaker notes dated October 24, 2003 (GR 007568-007579)

Letter from State Street Global Advisors signed by Monet Ewing dated January 6, 2004 to John Forgach of W. R. Grace (GR 007605-007606)

Request to Investment & Benefits Committee of W. R Grace for Approval of Plan Amendments (GR 007607-007609)

Notice to Participants in Grace Company Stock Fund dated April 19, 2004 (GR 007610)

Letter from John Forgach to Monet Ewing of State Street dated May 3, 2004 (GR 007611)

Letter from State Street signed by Monet Ewing to Investment & Benefits Committee & W. R. Grace & Co. (GR 007612-007627)

Letter from John Forgach to Monet Ewing of State Street dated December 22, 2003 (GR 007628-007638)

Email dated April 12, 2004 from John Forgach to Monet Ewing, et. al. re: Additional Fidelity Contacts (GR 007661-007662)

Email from Melissa Smith to Jeff Whitaker re: W.R Grace Final Participant Notice and Q&A Revised (GR 007667, 007667A-007667E)

Email from Melissa Smith to John Forgach (GR 007668-007672)

Email from Monet Ewing to John Forgach re: W. R. Grace (GR 007686)

Email from John Forgach to Monet Ewing re: W. R. Grace engagement letter (GR 007687-007691)

State Street Analysis re: decision to sell Grace Stock, incl. notes, presentations, meeting minutes from S.S. (GR 007869-008002)

SSGA Independent Fiduciary Services (GR 008003-008013)

State Street Global Advisors presentation to W. R. Grace on April 25, 2003 (GR 008089-008094)

SSGA Independent Fiduciary Services (GR 008096-008100)

SSGA Process (GR 008102-008105)

SSGA Determination and Communication (GR 008108-008109)

SSGA Team Members (GR 008111-008119)

Grace News - Grace Reports 2003 Fourth Quarter and Full Year Financial Results dated January 27, 2004 (GR 008785-008795)

Grace News - Grace Reports First Quarter Financial Results dated April 20, 2004 (GR 008800-008807)

Board of Director minutes dated April 2, 2003 (GR 009337-009343)

Request to Investment & Benefit Committee for Approval of Plan Amendments dated December 18, 2003 (GR 009359-009365)

W.R. Grace Savings & Investment Plan - Investment Policy Statement (adopted March 1, 2004) (GR 009411-009414)

Compensation Committee Meeting minutes dated May 2, 2003 (GR 009344-009346)

Grace News - dated January, 2000 (GR 001820)

Grace News - dated June, 2000 (GR 001821-001822)

Letter from William Monroe to Savings & Investment Plan Participants dated June 16, 2000 (GR 001823-001829)

Letter from W. B. McGowan to Participants in the Grace Savings & Investment Plan dated March 17, 2003 (GR 001845-001850)

Letter from W. B. McGowan to Participants in Grace Savings & Investment Plan dated March 26, 2003 (GR 001851-001852)

Grace Memo to Participants in Grace Savings & Investment Plan from W. B. McGowan dated April 2, 2003 re: Changes to the Grace Savings & Investment Plan (GR 001853-001862

Letter from W. B. McGowan to S&I Plan Participants dated December 8, 2003 (GR 001865)

Notice to Participants in Grace Stock Fund dated January 26, 2004 (GR 001866)

Grace News - dated February 27, 2004 - Grace Announces Intended Sale of Shares by the Grace 401(k) Plan (GR 001867)

Notice to Participants in the Grace Company Stock Fund dated February 27, 2004 (GR 001868-001872)

Grace News - dated April 12, 2004 - Grace Announces Sales of Shares by the Grace 401(k) Plan (GR 001873)

Notice to the Participants in Grace Company Stock Fund dated April 19, 2004 (GR 001874)

Official Docs of Board of Directors (reports, agendas, minutes) - 1/1/98 - 6/04 (GR 12245-12314)


## DEPOSITIONS

### *WR Grace*

John Forgach (April 30, 2007 & May 1, 2007)

Robert Tarola (May 10, 2007)

William McGowan (April 30, 2007)

### *State Street*

Shawn Johnson (May 23 & 29, 2007)

Monet Ewing (May 30, 2007)

Kelly Driscoll (June 1, 2007)

### *Duff & Phelps*

Daniel Bayston (May 31, 2007)

# FOUNDATION FOR FIDUCIARY STUDIES

Prudent Practices for Investment Stewards

Prudent Practices for Investment Advisors

Legal Memoranda (by Reish Luftman Reicher & Cohen)

# OTHER

Bloomberg L.P.

ERISA

Waite, Schneider, Bayless & Chesley Co., L.P.A.

# ABOUT THE EXPERTS

Ardor Fiduciary Services, Ltd. ("AFS") is owned by Jeffery E. Schaff and Michele L. Schaff. AFS specializes in fiduciary consulting services and offers CEFEX consulting and assessments. AFS also offers expert witness services related to investment fiduciary litigation and ongoing advisory services to assist fiduciaries in properly discharging their fiduciary duties. AFS is a Distribution Partner for the Prudent Practices handbooks, Legal Memoranda and SAFEs of the Center for Fiduciary Studies.

Michele L. Schaff, President of AFS,

> Holds a Master of Professional Accounting degree in the field of Taxation from the University of Texas at Austin and a Bachelor of Business Administration degree in Accounting from the University of Texas at Austin.

> Is a licensed CPA with the Personal Financial Specialist credential from the American Institute of Certified Public Accountants ("AICPA") and is an active member of the AICPA, sitting on the Fiduciary Handbook Taskforce (which serves as the technical editor for the Center for Fiduciary Studies' Prudent Practices handbooks for Investment Stewards and Investment Advisors), the Personal Financial Planning Executive Committee, the Professional and Personal Liability Insurance Products Committee and the editorial advisory board for Planner, the newsletter of the personal financial planning section.

> Has 15 years experience in the financial services industry.

Jeffery E. Schaff, Vice President of AFS,

> Has earned a Bachelor of Arts degree in Philosophy from Northwestern University in Evanston, Illinois.

> Has 20 years experience in the financial services industry.

Additionally, Jeffery and Michele:

> Were two of the nation's first consultants authorized to perform Certified Fiduciary Audits as graduates of the inaugural class of the Center for Fiduciary Studies, affiliated with the Katz Graduate School of Management at the University of Pittsburgh.

> Subsequently earned the Accredited Investment Fiduciary Analyst (AIFA) credential, bestowed upon them by the Center for Fiduciary Studies.

> Sit on the advisory board of The Fee-Only Client Newsletter.

Have authored and provided continuing legal education courses on investment fiduciary duties to attorneys.

Have earned the credential of Certified Investment Management Consultant (CIMC), a designation requiring the mastery of advanced educational coursework in Modern Portfolio Theory and finance.

Own and manage Ardor Investment Management Consulting, Ltd., a registered investment advisory.

## PUBLICATIONS

"Investment Advice Provisions of the 2006 Pension Protection Act", Michele Schaff and Jeffery Schaff, *Planner*, Newsletter of the AICPA Personal Financial Planning Section, January/February 2007

"The Unwitting Fiduciary", Michele Schaff and Jeffery Schaff, *Planner*, Newsletter of the AICPA Personal Financial Planning Section, Spring 2006

"Municipal Bond Market Improprieties and the Potential Brutality of Investing in Bonds", Jeffery Schaff and Michele Schaff, *PIABA Bar Journal*, Summer 2004

"Advanced Analytics- Effectively Portraying the Actual Risk and Return Profile of Your Client's Portfolio", Jeffery Schaff and Michele Schaff, *PIABA Bar Journal*, Fall 2003

"The liabilities for which you least plan cost you the most. Do you know what fiduciary liabilities could be lurking in your firm's retirement plan?", Jeffery Schaff and Michele Schaff, *Perspectives on Professional Liability*, April 2002

"Risk and Effective Diversification", Jeffery Schaff and Michele Schaff, *NSBA News*, March 1999

"Your Clients May Need You More Than You Know", Michele Schaff and Jeffery Schaff, *NSBA News*, February 1999

"Investing Strategies: Active v. Passive", Jeffery Schaff and Michele Schaff, *NSBA News*, January 1999

"The Investment Policy Statement: Essential Tool for Portfolio Management and Potential Defense and Deterrent Against Litigation", Michele Schaff and Jeffery Schaff, *NSBA News*, December 1998

## DEPOSITIONS AND COURT TESTIMONY OVER PRECEDING FOUR YEARS

Estate of Nancy Short Steward, In the Superior Court of the State of California, In and for the County of San Mateo, Case No. 93493. Expert testimony given by Jeffery E. Schaff in deposition and in trial, May 2006.


## COMPENSATION

All compensation related to this engagement is based on actual time expended and is billed at our standard hourly rates: $250 per hour for consulting and other non-testimonial time and $500 per hour for time spent testifying, including depositions and court appearances. Out-of-pocket expenses are billed at cost.

## SIGNATURES OF EXPERTS

We attest that we have prepared this expert opinion.

_____        _____
Jeffery E. Schaff, lead expert              Michele L. Schaff