**REBUTTAL EXPERT REPORT OF STEVEN R. GRENADIER**

I have been asked by counsel for former and current employees of W. R. Grace & Company to read and comment upon the expert report of Christopher M. James. I will focus my comments on Dr. James' discussion of damages in Section E of his expert report. Limiting my discussion to these points should not be construed as implying my agreement with other statements in his report that are not discussed here.

**I.    I disagree with Dr. James' contention that damages to the Plan participants from the sale of the Grace stock fund should be zero.**

- In paragraph 51 of the James report, Dr. James argues that since the Grace stock was sold at market value, the participants were not damaged.
- As I shall discuss below, even if one assumes that the Grace stock was sold at market value, this argument does not imply zero damages.
- Dr. James makes an error in logic in that he does not consider that the participants were denied their original investment opportunity set.
- Let me offer a few hypothetical examples to make clear that the sale of a plan asset at market price, **combined with its removal from the plan**, can indeed be harmful.
    1. "Good Fund – Bad Fund Example." Suppose a plan were composed of a good mutual fund and a bad mutual fund (i.e., the bad fund had high fees and poor managerial performance). The plan administrator decides to sell the good mutual fund and through its sale receives the true net asset value (NAV) of the fund. The proceeds (which represent

1

the fair value of the good fund shares) are now placed into the plan's bad fund. Would Dr. James argue that the participants are not harmed? Obviously they are, as they are now no longer able to hold funds in the good fund, and the remaining fund does not provide a replica of the eliminated fund.

2. "All Good Funds Example." Consider a plan with a wide variety of good funds. Now suppose the plan administrator decides to remove the plan's emerging market fund. Also, assume it liquidates the emerging market fund at fair market value, and the funds are reinvested in the plan's remaining funds. However, participants no longer have the opportunity to hold funds in the emerging market asset class in this plan. Dr. James would seem to argue that the participants are not harmed. However, they are harmed, since they are denied the opportunity to hold funds in this asset class. There are no perfect substitutes for this asset class in the plan. Thus, the participants are now clearly made worse off.

3. "Unique Asset Example." Again, consider a plan with a wide variety of reasonable funds. Also included is a unique asset. This asset has several unique qualities: it is not replicated by any of the other available funds, participants have legal inside information about the future prospects of the asset, and the asset provides them with a voice in their own company's affairs. If this asset were sold for fair market value, again it would be clear that the plan participants are harmed.

> They no longer have access to any asset with the aforementioned unique characteristics that were clearly desirable to some participants. Dr. James' argument that the sale at market value would not be harmful ignores the lost opportunities to the participants.

- Obviously, Example 3 is not all that hypothetical: it is an apt description of the liquidation of the Grace Stock Fund from the plan.
- As these three examples show, it isn't the recovery of the fair market value of the Grace stock that prevents damages from occurring; it is the concomitant impact of the removal of the opportunity for participants to hold Grace stock as part of their overall portfolio.

II. **I disagree with Dr. James' statement that since the investors did not take the risk associated with stock ownership, they should not be compensated with the reward of stock ownership.**

- At the end of paragraph 51 in his report, Dr. James states: "In order to be entitled to any additional return from holding Grace stock, participants would have had to take the risk associated with such stock ownership. Since Plan participants did not take such a risk, they are not entitled to any corresponding return."
- I disagree with this statement on two grounds.
- First, they did take a risk of stock ownership, through precisely holding the Grace stock in their retirement portfolio. Unfortunately, this was undermined when the firm sold their stock. Thus, while their stock holdings demonstrated

3

that they fully intended to take on the risk of the stock, this willingness was denied.

- Second, with the Grace stock removed from the plan, and with no comparable security available in the plan, they had no opportunity to take the risk of stock ownership.
- Dr. James implies that participants could take the risk of Grace stock ownership through purchases outside the plan. For many participants, this is likely easier said than done.

    1.   First, it is not clear just how many employees would have the disposable income to purchase Grace stock outside their Grace retirement account. Paragraph 56 of Dr. James' report quotes testimony from David Mueller. Although Mr. Mueller contends that he purchased Grace stock outside the plan, he also stated that he had to borrow money to pay for this investment. Clearly, buying stock and buying stock on margin are two very different investment choices; the latter one with significantly greater risk.

    2.   Second, if one needed to finance this outside stock purchase by removing money from the plan, the participant would face a substantial penalty of 10% and 20% immediately withheld for taxes. The original amount invested would be taxed immediately as ordinary income and any appreciation potentially as short-term capital gains versus long-term capital gains. Thus the participant would have at

4

most only 70% of his original investment immediately available to reinvest outside of the plan.

    3.    Third, if the stock were purchased and held in a non-retirement account, the stock's returns going forward would be subject to significantly different tax treatment than if held in the tax-deferred retirement account.

**III.** **I disagree with Dr. James' contention that providing participants with the stock returns that were denied is not an appropriate measure of damages.**

- As I have shown, in all three of my examples in Section I of this report, the plan participants were damaged.
- The appropriate remedy, at the time of damage, would have been to reverse the damage by undoing the sale of the liquidated fund. In Example 1, the participants should have had the money reinvested in the "good fund." In Example 2, the participants should have had the money reinvested in the emerging market fund. In Example 3, the participants should have had the money reinvested in the "unique asset."
- Continuing this analogy, if the defendants were to be found liable as a consequence of selling the Grace stock in the plan, then the appropriate remedy would be to replace the participant's Grace stock holdings at the time of damage.
- Although we cannot go back in time and actually do this (that is, give the participants back their Grace stock shares at the time of damage), it is clear

5

from my damage calculation precisely what would be the financial consequences of this appropriate remedy.

June 26, 2007

Steven R. Grenadier