**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KERI EVANS, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>JOHN F. AKERS, et al., )<br><br>Defendants. )<br>_____ )<br>LAWRENCE W. BUNCH, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>W. R. GRACE & CO., et al., )<br><br>Defendants. )<br>_____ ) | **Consolidated Under**<br>**Case No. 04-11380-WGY** |

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF THE GRACE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants W. R. Grace & Co., W. R. Grace & Co. Investment and Benefits Committee,

John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Paul

J. Norris, Thomas A. Vanderslice, Fred E. Festa, and Robert M. Tarola (collectively, "Grace

Defendants"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 56 and

Local Rule 56.1, submit this statement of undisputed material facts in support of their motion for

summary judgment.

1.      Since at least 1976, W. R. Grace & Co. ("Grace") sponsored the W. R. Grace & Co. Employees Savings and Investment Plan ("Plan"),[1] which is a defined contribution plan commonly known as a 401(k) plan.  Ex. 9, Plan.[2]  Grace matched 100% of each participant's contribution to the Plan up to 6% of his or her salary.  Ex. 9, Plan 42.  Fidelity Management Trust Company was the Plan's trustee.  Ex. 10, Summary Plan Description ("SPD") 56; Ex. 5, McGowan Dep. 21.

2.      During the class period, Robert Tarola, Grace's Chief Financial Officer, and Brian McGowan, its Senior Vice President of Administration, were the members of the Plan's Investment and Benefits Committee ("IBC").  Ex. 8, Tarola Dep. 15; Ex. 5, McGowan Dep. 10-11, 35.  The IBC was responsible for selecting and changing the investment options offered under the Plan.  Ex. 9, Plan 126.

3.      The IBC's goal was to select investment options for the Plan that were appropriate for a retirement plan generally and that would provide participants with a wide variety of options, having various risk and reward characteristics, from which they could create a diversified portfolio.  Ex. 5, McGowan Dep. 50-52.

4.      The Plan offered participants 28 different investment options, including various stock funds, bond funds, index funds, and lifecycle funds, as well as the Grace Stock Fund, which was invested in Grace stock.  Ex. 9, Plan 68-71; Ex. 10, SPD 14-24.

5.      Until April 21, 2003, Plan participants were responsible for deciding where to invest their contributions and Grace's matching contributions, and they could transfer their

---

[1]  Effective January 1, 2002, Grace combined the Savings and Investment Plan that it sponsored for hourly employees with its Savings and Investment Plan for salaried workers.  Ex. 9, Plan 24.  References to the "Plan" will include its predecessor plans, if relevant.

[2]  References to "Ex. __" refer to the exhibits attached to the Declaration of Counsel in Support of the Grace Defendants' Motion for Summary Judgment filed concurrently herewith.

existing money in the Plan between and among the various funds.  Ex.10, SPD 14, 26; Ex. 5, McGowan Dep. 49.

6.      Effective April 21, 2003, the Plan was amended to provide that participants could no longer direct any new contributions into the Grace Stock Fund, nor could they transfer money into the Grace Stock Fund from other Plan investments.  Ex. 9, Plan 81; Ex. 5, McGowan Dep. 52-56.

7.      McGowan notified the participants in writing of this impending change to the Grace Stock Fund on March 17, 2003.  Ex. 11, 3/17/03 Participant Communication.

8.      Also on March 17, 2003, McGowan notified the participants in writing that Grace was "seriously consider[ing]" appointing an independent fiduciary to manage the Grace Stock Fund, which "would avoid any possible conflict of interest between Grace management's and the Grace Board's role in negotiating a plan of reorganization, and their role as fiduciaries of the [Plan]."  Ex. 11, 3/17/03 Participant Communication.  The participants were advised that if an independent fiduciary were appointed, it "would perform its own analysis of the company's situation and the prospects for Grace's stock, which would include interviewing management, financial and investment professionals, and other stakeholders" and "would have sole discretion, based on its analysis, to . . . sell Grace shares . . . ."  Ex. 11, 3/17/03 Participant Communication.

9.      Grace explained the potential conflict in one of its pleadings seeking bankruptcy court authorization to hire State Street:

> As the Debtors' chapter 11 cases progress, the Corporate Fiduciaries may be
> inhibited from applying the standards under ERISA with respect to decisions
> regarding Grace Stock within the Savings Plan.  Specifically, it may be difficult
> for the Corporate Fiduciaries to discharge fiduciary duties under ERISA section
> 404(a) with regard to (a) whether and to what extent Grace Stock should be
> retained within the Savings Plan at the same time certain Corporate Fiduciaries
> are participating in the negotiation and formation of a plan of reorganization and
> (b) sharing or acting upon information regarding the plan or reorganization

3

process, which may not be public information, but which may be material to
investment decisions regarding Grace Stock within the Savings Plan.

Ex. 16, Response Brief 4.

10.    Grace amended the Plan, effective December 15, 2003, to give the IBC the
authority to appoint an independent investment manager for the Grace Stock Fund and to make
clear that "[t]he [IBC] shall not retain the authority to manage the Grace Stock Fund, to the
extent that an Independent Investment Manager has been retained to manage that Fund, in
accordance with Section 12.04(b)."  Ex. 9, Plan 128.

11.    The December 15, 2003 amendment further provided:

[T]he Independent Investment Manager shall have the following authority and duties:

(i) the continuous authority and duty to determine the extent that the continued
retention of shares of Grace Stock within the Grace Stock Fund is not consistent
with the applicable provisions of [ERISA], and to take actions in this regard that it
deems appropriate; including the authority to dispose of Grace Stock held within
the Grace Stock Fund and to close the Grace Stock Fund to participant trading.

Ex. 9, Plan 128-29.

12.    A team that consisted of IBC members Tarola and McGowan, John Forgach,
Senior Benefits Counsel at Grace, David Siegel, Grace's then-General Counsel, and sometimes
Paul Norris, who was the Company's Chief Executive Officer, President, and Chairman of the
Board of Directors at the time, worked on the independent fiduciary matter.  Ex. 8, Tarola Dep.
166-69; Ex. 5, McGowan Dep. 86-87, 91-92; Ex. 3, Forgach Dep. 95.

13.    The Grace team identified firms that were in the business of serving as
independent fiduciaries for retirement plans and then contacted several companies, including
Fidelity, U.S. Trust, Aon Fiduciary Counselors, Inc. ("Aon"), and State Street Bank and Trust
Company ("State Street"), to see whether they would be interested in serving as fiduciary of the
Grace Stock Fund.  Ex. 5, McGowan Dep. 90-91; Ex. 3, Forgach Dep. 11, 53.

14.     The team decided to proceed with two – Aon and State Street.  Ex. 5, McGowan Dep. 92.

15.     Representatives from Aon met with the Grace team and made oral and written presentations about Aon's experience and qualifications and answered questions.  Ex. 5, McGowan Dep. 91-92; Ex. 3, Forgach Dep. 69-70, 95.

16.     Grace fiduciaries initially decided to select Aon to be the independent fiduciary for the Grace Stock Fund but subsequently determined that Aon's independent fiduciary business, which had just spun off from its parent company, had insufficient insurance levels or other financial backing to support the risk it would be undertaking.  Ex. 8, Tarola Dep. 168; Ex. 5, McGowan Dep. 44.

17.     Members of the Grace team met personally with State Street representatives on more than one occasion about the possibility of State Street being appointed independent fiduciary of the Grace Stock Fund.  Ex. 5, McGowan Dep. 103; Ex. 3, Forgach Dep. 96; Ex. 8, Tarola Dep. 54.

18.     State Street provided the Grace team with written materials about State Street generally, its independent fiduciary services, and the State Street personnel who would be working on the matter.  Ex. 12, State Street Materials; Ex. 3, Forgach Dep. 81.

19.     State Street's materials described the process it would use if it became independent fiduciary of the Grace Stock Fund, which would include, among other things, hiring independent legal and financial advisors, reviewing Plan documents and participant communications, interviewing members of Grace management, becoming familiar with Grace's bankruptcy, investigating Grace's asbestos and environmental liabilities, and gathering information about and evaluating the Company's current and projected financial picture.

Representatives from State Street and Grace discussed State Street's due diligence process.  Ex. 12, State Street Materials GR008102-8110; Ex. 3, Forgach Dep. 82-83.

20.     Concluding that State Street "was a very competent organization with experience in this area and . . . adequate financial backing," Grace fiduciaries decided to go forward with having State Street appointed as the independent investment manager for the Grace Stock Fund. Ex. 3, Forgach Dep. 78-79.

21.     Plaintiffs' expert, Mulligan, testified that State Street ranks within the top ten in the nation in terms of companies that have expertise in providing investment management services for company stock funds in ERISA plans.  Ex. 6, Mulligan Dep. 6, 7.

22.     On December 8, 2003, McGowan notified the Plan participants about State Street's retention as investment manager for the Grace Stock Fund effective December 15, 2003, and described State Street's qualifications:

> State Street was selected in part because of its financial stability and its experience managing assets in general, and company stock funds in particular. State Street is an industry leader in providing independent fiduciary and investment management services to employee retirement plans.  State Street is a leading financial services provider worldwide, with over $8.8 trillion in assets under custody and over $965 billion in assets under management.  State Street is also the largest fiduciary for company stock assets, with over $72 billion of employer securities managed for qualified retirement plans, including many 401(k) plans (like the S&I Plan).

Ex. 19, 12/8/03 Participant Communication.

23.     McGowan reiterated to the participants that "this arrangement allows Grace management to avoid potential conflicts that may arise as a result of the Chapter 11 bankruptcy process by delegating the duty to manage the Grace Stock Fund to an independent expert acting solely in the best interests of participants and beneficiaries."  Ex. 19, 12/8/03 Participant Communication.

24.     State Street became the investment manager of the Grace Stock Fund effective December 15, 2003, with the discretion to determine "the appropriateness of the Trust's retention or sale of the respective shares of Company Stock . . . ."  Ex. 17, Engagement Letter GR 001298; Ex. 22, 1/6/04 Letter from Monet Ewing.

25.     Under the Investment Guidelines attached to its Engagement Letter, State Street could sell the Grace stock "if, and only if, State Street determines that the continued holding of such Common Stock is not consistent with the provisions of ERISA (within the meaning of Section 404(a)(1)(D) of ERISA) . . . ."  Ex. 17, Engagement Letter GR 001308.

26.     State Street notified the Plan participants of its appointment.  Ex. 26, 1/26/04 Participant Communication.  In that notice, State Street advised participants that as investment manager, "State Street has the authority to determine at any time that all or a portion of the shares of Grace stock held in the Grace Stock Fund should be sold, but only if such a sale is necessary in order to comply with the requirements of ERISA, the federal law that governs the Plan."  Ex. 26, 1/26/04 Participant Communication.

27.     State Street hired Duff & Phelps, LLC and Goodwin Procter LLP as its financial and legal advisors, respectively, for the Grace engagement.  Ex. 1, Driscoll Dep. 87, 93.  The attorneys from Goodwin Procter included a lawyer with bankruptcy experience, one with asbestos experience, and a third with ERISA experience.  Ex. 1, Driscoll Dep. 120-21.

28.     Grace executives, including Tarola, Siegel, and Norris, and Senior Benefits Counsel John Forgach, had several meetings and telephone calls with members of the State Street team (including Duff & Phelps and Goodwin Procter representatives), and answered questions on such matters as Grace's bankruptcy proceedings, finances, asbestos liabilities, and available insurance.  Ex. 8, Tarola Dep. 108-09, 139-40; Ex. 3, Forgach Dep. 84-85, 94, 104-08,

134; Ex.1, Driscoll Dep. 146-47, 189-90; Ex. 29, 2/23/04 Presentation SSBT 000859-861; Ex.

18, 11/26/03 Memorandum; Ex. 20, 12/16/03 E-mail; Ex. 24, 1/22/04 E-mail; Ex. 27, 1/27/04 E-

mail.

29.     Grace representatives provided State Street with numerous documents on several

occasions, including Plan-related documents and participant communications.  Ex. 3, Forgach

Dep. 84, 108-09; Ex. 14, 6/26/03 Letter to Monet Ewing; Ex. 13, Document Request List; Ex.

15, 8/5/03 Letter to Monet Ewing; Ex. 21, 12/22/03 Letter to Monet Ewing.

30.     All of the information Grace representatives provided to State Street was publicly

available.  Ex.8, Tarola Dep. 54, 109; Ex. 3, Forgach Dep. 134.

31.     McGowan and Forgach reviewed and commented on State Street's

communications with the participants and worked with Fidelity, the Plan's trustee, to help ensure

that the communications were appropriately distributed.  Ex. 3, Forgach Dep. 135; Ex. 5,

McGowan Dep. 146; Ex. 23, 1/19/04 E-mail; Ex. 25, 1/22/04 E-mail; Ex. 28, 2/18/04 E-mail;

Ex. 31, 2/25/04 E-mail; Ex. 32, 2/25/04 E-mail; Ex. 33, 2/25/04 Email; Ex. 38, 4/8/04 Email

SSBT-001155.

32.     In February 2004, after completing its due diligence and reviewing its advisors'

analyses and reports, State Street determined that the Plan's holding of Grace stock was

inconsistent with ERISA, *i.e.*, imprudent, and decided to start selling some of the Plan's Grace

stock.  Ex. 30, 2/23/04 Minutes.  It gave Grace representatives notice of its decision.  Ex. 5,

McGowan Dep. 112.

33.     State Street sent Forgach a draft notice to participants about its decision.  Forgach

reviewed the notice and suggested that State Street include a telephone number in the

communication so that participants could contact someone at State Street "who is prepared with

any comments and information that [State Street] deems appropriate." Ex. 31, 2/25/04 E-mail; Ex. 5, McGowan Dep. 112.

34.     Grace fiduciaries were aware that State Street took steps to comply with federal securities laws during State Street's selling program. Ex. 34, Form 144; Ex. 36, 3/8/04 E-mail; Ex. 2, Ewing Dep.145-47; Ex. 8, Tarola Dep. 158.

35.     On February 27, 2004, State Street notified the participants of its decision, stating that "State Street has determined, in light of all of the relevant facts and circumstances, it is no longer consistent with ERISA for the Plan to continue to hold all of the shares of Grace stock currently in the Grace Stock Fund," and that "State Street will continue to monitor and review the situation and may determine at any time to discontinue or suspend the selling program." Ex. 35, 2/27/04 Participant Notice.

36.     The Grace fiduciaries did not ask State Street the basis for its decision to sell the Grace stock. Ex. 8, Tarola Dep. 155; Ex. 5, McGowan Dep. 112-13.

37.     Tarola believed that it was "off limits" for him to contact State Street about the analysis underlying its decision because of the potential conflict of interest. Ex. 8, Tarola Dep. 155.

38.     After State Street had begun its selling program, it received an inquiry from Lehman Brothers on behalf of a client, D.E. Shaw, about buying the Plan's remaining block of stock. Ex. 37, 4/7/04 Letter.

39.     A State Street representative called Tarola, advised him of the inquiry State Street had received for a block sale at a price between $3.00 and $3.50 per share, and asked him if there was anything State Street should know about Grace before it made a decision whether to sell the

remaining stock.  Tarola responded that all material information about Grace was in the public

domain.  Ex. 8, Tarola Dep. 142-44.

40.     After learning of State Street's sale of the Plan's Grace stock, "there was . . .

feeling among the leadership within Grace that this gave the participants a chance to get some

cash and move on from what was a real speculative situation."  Ex. 8, Tarola Dep. 147.

41.     State Street sold substantially all of the remaining shares of Grace stock in the

Plan to D.E. Shaw on April 12, 2004, at a price of $3.50 per share.  Ex. 40, 4/12/04 E-mail.  The

market value of the stock at that time was $2.96.  *See* http://quicktake.morningstar.com/

StockNet/Price4.aspx?Country=USA&Symbol=GRA.  The few remaining shares in the Grace

Stock Fund were sold to D. E. Shaw on April 19, 2004.  Ex. 4, Johnson Dep. 76; Ex. 1, Driscoll

Dep. 181.

42.     Forgach worked with State Street and Fidelity to make sure the Grace fiduciaries

knew when the proceeds would be deposited into participants' Plan accounts and when

participants would be able to reallocate the proceeds into other investment option(s).  Ex. 40,

4/12/04 E-mail.

43.     With input from McGowan and Forgach, State Street notified the participants of

the sale.  Ex. 42, 4/19/04 Participant Communication; Ex. 5, McGowan Dep. 146; Ex. 41,

4/19/04 E-mail; Ex. 38, 4/8/04 E-mail; Ex. 39, 4/8/04 E-mail.

Dated:  August 17, 2007                    Respectfully Submitted,


                                           /s/ Carol Connor Cohen_____
                                           William W. Kannel (BBO# 546724)
                                           (wkannel@mintz.com)
                                           Matthew C. Hurley (BBO# 643638)
                                           (mchurley@mintz.com)
                                           MINTZ, LEVIN COHN, FERRIS, GLOVSKY and
                                           POPEO, P.C.

One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241

- and -

Carol Connor Cohen
(cohen.carol@arentfox.com)
Nancy S. Heermans
(heermans.nancy@arentfox.com)
Caroline Turner English
(english.caroline@arentfox.com)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 857-6054
Facsimile: (202) 857-6395

*Counsel for Defendants W. R. Grace & Co., W. R. Grace & Co. Investment and Benefits Committee, John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Paul J. Norris, Thomas A. Vanderslice, Fred E. Festa and Robert M. Tarola*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **KERI EVANS, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JOHN F. AKERS, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) **Consolidated Under** |
| | ) **Case No. 04-11380-WGY** |
| **LAWRENCE W. BUNCH, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **W. R. GRACE & CO., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2007, I filed the Rule 56.1 Statement of Undisputed Material Facts in Support of the Grace Defendants' Motion for Summary Judgment through the ECF system.  It was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies were sent to those indicated as non-registered participants on August 17, 2007.

/s/ Carol Connor Cohen