## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____ )
KERI EVANS,                             )
                                        )
                   Plaintiff,           )
                                        )
v.                                      )
                                        )
JOHN F. AKERS, et al.                   )
                                        )
                   Defendants.          )
_____ )


_____ )          **Consolidated**
LAWRENCE W. BUNCH, et al.,              )          **Case No. 04-11380-WGY**
                                        )
                                        )          **ORAL ARGUMENT**
                   Plaintiffs,          )          **REQUESTED**
                                        )
v.                                      )
                                        )
W. R. GRACE & CO., et al.               )
                                        )
                   Defendants.          )
_____ )


## MEMORANDUM OF LAW IN SUPPORT OF THE BUNCH
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

BACKGROUND ...........................................................................................2

    Throughout the Relevant Period, Grace Remained a Vibrant Company ................2

    The Plan Structure, Its Aim, and Other Retirement Benefits Available
    to the Class Members ...............................................................................5

    Grace Admits that Retention of the Grace Stock Fund was Consistent
    with ERISA ...........................................................................................6

    State Street Eliminates the Grace Stock Fund on Fear and Speculation
    and the Belief that the Market was Incapable of Assessing the Future
    Value of Grace .......................................................................................6

    State Street Failed to Fulfill its Fiduciary Duty by Ignoring the Plan's
    Other Investment Options and the Purposes of the Plan ..........................7

    Grace Failed to Monitor State Street Despite Extraordinary Circumstances .........9

    The Premature Sale of the Stock Fund Injured the Plan ........................11

ARGUMENT ...............................................................................................11

    I.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE
       RETENTION OF GRACE STOCK IN THE STOCK FUND WAS
       CONSISTENT WITH ERISA AS A MATTER OF LAW .............................11

       A.    THE FACT THE GRACE STOCK TRADED IN AN EFFICIENT
           MARKET ESTABLISHES THAT RETENTION OF THE GRACE
           STOCK FUND WAS CONSISTENT WITH ERISA .............................11

       B    THE LAW PRESUMES THAT RETENTION OF THE GRACE
           STOCK FUND WAS CONSISTENT WITH ERISA .............................13

       C.    DEFENDANTS FAILED TO CONSIDER ALL RELEVANT
           FACTS AND CIRCUMSTANCES WHEN STATE STREET
           DECIDED TO ELIMINATE THE GRACE STOCK FUND ..................14

       D.    THE GRACE DEFENDANTS ARE LIABLE FOR
           ADMITTEDLY FAILING TO MONITOR STATE STREET
           AND AS CO-FIDUCIARIES ................................................................18

      E.     PLAINTIFFS ARE ENTITLED TO DAMAGES CALCULATED
              BY DETERMING THE AMOUNT THE PLAN WOULD HAVE
              EARNED BUT FOR DEFENDANTS' BREACH.................................19

CONCLUSION...........................................................................................................20

CERTIFICATE OF SERVICE ........................................................................21

## INTRODUCTION

Plaintiffs are pursuing this class action and Summary Judgment to recover for the W.R. Grace Retirement and Savings Plan (the "Plan") and therefore the Plan Participants the loss in excess of $100 million that the Plan suffered when Defendants[1], between February 2004 and April 2004, improperly sold approximately 7.2 million shares of Grace common stock from the Grace Stock Fund. The beneficiaries of this action are the approximate 3,500 present and former employees of W. R. Grace & Co. ("Grace" and/or "Company"), who participated in the Plan, and comprise the class.[2] The Class Members ultimately, with the encouragement and support of Grace, invested their retirement savings, through payroll deductions, to acquire and hold 12% of the Company's stock.

The basis for this motion is that State Street, as an ERISA[3] Investment Manager and fiduciary, violated its duty by engaging in speculation and conjecture when it eliminated the Grace Stock Fund. The record is clear that State Street sold the Grace common stock fearing that at some unknown future time the stock might lose substantial value. Grace is liable because it admittedly failed to monitor State Street.

State Street's reaction to the uncertainty was unfounded and amounted to an unjustified "second guessing" of an efficient market that already included in the market price any uncertainty of future events. According to Grace's General Counsel, "[o]ur stock currently reflects the uncertainty. It's trading at a fraction of what the value would

---

[1] The Defendants are Fred E. Festa, Robert M. Tarola, John F. Akers, Henry Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Thomas A. Vanderslice, Paul J. Norris, W. R. Grace Investment and Benefits Committee, and W. R. Grace & Co. (the "Grace Defendants" or "Grace"), and State Street Bank and Trust Company and State Street Global Advisors ("State Street" and "State Street Global Advisors" collectively referred to as "State Street").

[2] On March 1, 2007, the Court certified the following class: "All W.R. Grace Stock Plan participants and entities who owned shares of W.R. Grace's publicly traded common stock through the Grace Stock Plan at any time from April 14, 2003 through April 30, 2004." Order, March 1, 2007, Docket No. 152 at 2.

[3] Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1101 *et. seq.*

1

be if it didn't have asbestos liability and we weren't in bankruptcy."[4] Additionally, the undisputed evidence reveals that Grace, despite being in bankruptcy reorganization, was achieving solid earnings, was performing well, and possessed a substantial cash surplus. Based on these undisputed facts, the retention of the Grace Stock Fund in the Plan remained consistent with ERISA as a matter of law.

The fundamental question for the Court is whether retention of Grace common stock was consistent with ERISA. Grace authorized State Street to sell stock <u>only</u> if retention of the stock was inconsistent with ERISA. "State Street shall instruct the trustee to sell Common Stock held in the Company Stock Fund, if and only if, State Street determines that **the continued holding of such Common Stock is not consistent with the provisions of ERISA**…[5] (Emphasis added.)

The law is settled that absent evidence of impending collapse, the holding of company stock in a diversified 401(k) plan, even if the stock is volatile and highly risky, is consistent with ERISA and a prudent investment.[6] Accordingly, the Plan and the Participants' continued retention of the Grace common stock remained consistent with ERISA, and Plaintiffs are entitled to judgment as a matter of law.

## BACKGROUND

### Throughout the Relevant Period, Grace Remained a Vibrant Company

The undisputed evidence establishes that Grace, throughout the relevant period, was not on the verge of collapse. The daily closing price of Grace common stock during the class period remained above $2.00 and occasionally exceeded $5.00 a share. During

---

[4] Statement of Grace General Counsel David Siegel at Town Hall meeting, March 13, 2003, GRA-B2 006089, Attached as Exhibit "A".
[5] *See* Engagement Agreement between Grace and State Street attached as Exhibit 'B'. In particular, *see* Exhibit II to the Agreement at SSBT-001278.
[6] *Summers v. State Street Bank & Trust*, 453 F.3d 404, 409 (7th Cir. 2006).

2

State Street's tenure, the daily closing price ranged between $2.54 on December 22, 2003 and $3.70 on January 12, 2004.[7]

Grace always represented to the investing public that it would survive the reorganization and that its shareholders would receive equity. Almost simultaneous with State Street's precipitous elimination of the Grace Stock Fund, Paul Norris, the Company's Chairman, President and Chief Executive Officer, reaffirmed that Grace would survive the bankruptcy and continue to operate and thrive. "Let me be clear: Grace is **not** going out of business…We expect no changes in day-to-day operations, nor do we anticipate any management changes, plant closings or asset sales."[8] Mr. Norris explained that Grace was strong and would emerge a vibrant concern. "We expect that, given our Company's leadership in its major markets, inherent value and strong cash flow, we can emerge from Chapter 11 as a strong, financially strong enterprise…"[9]

Grace further represented that the bankruptcy was not diminishing its strength. "Over the past five years, Grace has remained a financially strong enterprise. The company has continued to invest in its business and make small, easily integrated acquisitions with the support of the creditors committee and the Bankruptcy Court."[10]

Grace repeatedly expressed these sentiments to Plan Participants.    For example, at a March 13, 2003 "Town Hall Meeting", Grace executives, Paul Norris, CEO, and David Siegel, General Counsel, spoke to Grace employees.    They told

---

[7] *See*  Chart of Grace daily closing prices attached hereto as Exhibit "C".
[8]  Letter from Paul Norris, May 5, 2004, http://svco0053/reorganize/, attached as Exhibit "D" (emphasis in original).
[9]  Letter from Paul Norris, May 5, 2004, http://svco0053/reorganize/, attached as Exhibit "D". *See* November 24, 2003 Memorandum from Goodwin & Procter to State Street, at SSBT-0003056, attached as Exhibit "E" ("Grace believes that it has enterprise value in excess of its liabilities…(a) Grace believes that the company would emerge intact as opposed to being split, with portions awarded to different constituencies.")
[10]  Grace Financial Reorganization, 2006, http://www.grace.com/About/Reorganization.aspx, attached as Exhibit "F".

Participants in response to questions concerning the continued holding of shares, that shareholders could receive "substantial" value at the end of the reorganization.[11]  Mr. Norris, the Company's CEO and Chairman, emphasized that it is not a "foregone conclusion" that the stock would go to zero.[12]  To the contrary, Mr. Norris believed that the shareholders likely would receive "significant equity"[13] in the reorganization.

Grace's financial and operating success supported the optimism.  On January 29, 2004 Grace announced its fourth quarter 2003 results and year end results. Mr. Norris proclaimed that the company was very satisfied. "I am very pleased with our fourth quarter and second half operating results…We completely reversed disappointing operating performance in the first half of 2003."[14]

Grace's success continued throughout the class period. On April 20, 2004 Grace announced its first quarter results. Again, Mr. Norris was pleased. "Our first quarter operating results were very good, with strong sales from each product line and a record first quarter profit from our Performance Chemicals segment…Our strategic and operating initiatives are delivering positive results, allowing us to capitalize on stronger economic activity worldwide."[15] Robert Tarola, the Chief Financial Officer, agreed that Grace's operating results during the class period were "very good."[16] In its quarterly announcement, Grace also announced that it had cash assets of over $400 million and

---

[11] Statement of Grace General Counsel David Siegel at Town Hall meeting, March 13, 2003, GRA-B2 006089, attached as Exhibit "A".
[12] Statement of Grace CEO and Chairman Paul Norris at Town Hall meeting, March 13, 2003, GRA-B2 006092, attached as Exhibit "A".
[13] Statement of Grace CEO and Chairman Paul Norris at Town Hall meeting, March 13, 2003, GRA-B2 006092, attached as Exhibit "A".
[14] Grace Form 8-K, filed January 29, 2004, attached as Exhibit "G".
[15] Grace Press Release, April 20, 2004, GR008800, attached as Exhibit "H".
[16] Tarola deposition at 79, attached as Exhibit "I".

access to a $250 million line of credit and could continue to operate throughout the bankruptcy.[17]

### The Plan Structure, Its Aims, and Other Retirement Benefits Available to Class Members

The complete structure of the Plan--including the Grace Stock Fund--afforded class members a meaningful opportunity to invest their wages and to prepare for retirement. The Plan permitted class members, on a daily basis, to change investments.[18] Each class member was fully and immediately vested.[19] Plan Participants made their own investment decisions, and the Plan complied with §404 (c) of ERISA.[20] The Plan allowed participants to create a diversified portfolio[21] from approximately 28 diverse options including the Stock Fund that in the aggregate provided appropriate risk and returns.[22]

The Plan documents specifically identify the Grace Stock Fund as one of the Plan's investment options.[23] The Grace Stock Fund represented only four percent of the Plan's assets,[24] but Participants, through their investment of capital, held 12% of the

---

[17] Grace Form 10-Q for Period ending March 31, 2004 at I-29, attached as Exhibit "J".

[18] *See* The W.R. Grace Savings and Investment Plan Summary Plan Description at 26, GR 000268, Relevant Portions of the Summary Plan Description, attached as Exhibit "K".

[19] *See* the Plan at 84, GR 001745, attached as Exhibit "L".

[20] *See* Summary Plan Description GR 000267, attached as Exhibit "E" ("…the investment plan is intended **to be a participant-directed** plan, as described in Section 404(c) of the Employee Retirement Income and Security Act ("ERISA") and applicable federal regulations) (Emphasis added.)

[21] *See* deposition of W. Brian McGowan at 31, attached as Exhibit "M" ("Was the purpose of offering – was one of the purposes of offering all these investment options to plan participants -- I think you indicated risk and foreign versus domestic investments. Was part of that basically to allow the plan participants to have diversified investments? A. That is correct.") *See also* deposition of Robert Tarola at 101.  A copy of relevant portions of  Mr. Tarola's deposition are attached as Exhibit "I".

[22] Investment Policy Statement at 1, GR006600, attached as Exhibit "N". *See* deposition of W. Brian McGowan at 124-25, attached as Exhibit "M". *See* The W.R. Grace Savings and Investment Plan at 68-71, GR 001729. A copy of relevant portions of the Plan are attached as Exhibit "L".

[23] *See* The W.R. Grace Savings and Investment Plan at 79, Sections 5.11-12. Relevant Portions of the Plan are attached as Exhibit "L".  *See also* Engagement Agreement between Grace and State Street attached as Exhibit 'B", Exhibit II to the Agreement at SSBT-001278, attached as Exhibit "B" ("The Plan provides that all assets held in the Grace Stock Fund…under the Plan are to be invested in shares of Common Stock.").

[24] *See* GR 005314, attached as Exhibit "O".

5

Company's outstanding shares, with the accompanying right to vote the shares. During the relevant time, Grace and State Street repeatedly advised class members of the risk of retaining company stock in the Plan.[25]

**Grace Admits that Retention of the Grace
Stock Fund was Consistent with ERISA**

Grace, without question, always believed that the Grace Stock Fund was an investment opportunity that satisfied the requirements of ERISA. Grace and its directors along with Mr. McGowan ("Grace"), acknowledge that they are fiduciaries to the Plan.[26] As fiduciaries, Grace understood that retention of Grace common stock was consistent with ERISA. According to Mr. McGowan, a member of the Benefits and Investment Committee, the retention of the Grace Stock Fund always remained a prudent investment that satisfied the requirements of ERISA.[27]

**State Street Eliminates the Grace Stock Fund on Fear and Speculation and the
Belief that the Market was Incapable of Assessing the Future Value of Grace**

State Street knew that Grace traded in an efficient market. According to a senior member of its Fiduciary Committee, Shawn Johnson, "the market is the best determinant on any day as to what the shares are worth."[28] The Manager of its Fiduciary Group, Ms. Driscoll, agreed that the public information in the market enabled State Street, and

---

[25] *See e.g.*, January 26, 2004 Notice to Plan Participants at SSBT-003245, attached as Exhibit "P".

[26] *See* deposition of W. Brian McGowan at 13, attached as Exhibit "M". *See also*, Bankruptcy filing GR 007930, attached as Exhibit "Q" ("Presently, the Debtors' Board of Directors (the "Grace Board") and the Grace Investment & Benefits Committee (the "Investment Committee") have responsibility for providing Fiduciary Services (the "Corporate Fiduciaries").

[27] Deposition of W. Brian McGowan at 71-72, attached as Exhibit "M". *See also*, McGowan deposition at 62-62 (retention of Grace stock was consistent with ERISA in April of 2003) McGowan deposition at 69 ("Q. At any time between 2000 and December 15th, 2003, did you believe that maintaining money in the Grace Stock Fund had become an imprudent investment option? A. I can't recall if I ever thought that at that time."); *See* deposition of Robert Tarola at 131-32, attached as Exhibit "I" (Grace, after consultation with Fidelity, considered continued retention of Grace common stock by Grace Stock Plan appropriate).

[28] Johnson deposition transcript at 84, attached as Exhibit "R".

therefore, the market to value Grace common stock.[29] Despite this belief, State Street surprisingly ignored the market and "determined that the market price of the W.R. Grace stock is not a good indication of its long term value…"[30] State Street simply speculated that the stock would lose substantial value.[31]

### State Street Failed to Fulfill its Fiduciary Duty by Ignoring the Plan's Other Investment Options and the Purposes of the Plan

State Street's responsibility for the Stock Fund commenced on December 15, 2003 and ended approximately April 15, 2004.[32] During the period, the Grace Stock Fund represented only 4% of the Plan's $476 million portfolio.[33]

The trustee for the Plan, Fidelity, categorized the Grace Stock Fund on the continuum of the Plan's investment options as an option that permitted participants to accept risk. Grace always believed that Grace Stock Fund remained an appropriate investment.[34] Despite the interrelationship between the investment options, State Street ignored the options. Mr. Shawn Johnson, of State Street's Independent Fiduciary Group

---

[29] *See* Driscoll deposition transcript at 110 and 152, attached as Exhibit "S".
[30] Fiduciary Committee Meeting Minutes, February 23, 2004, SSBT-000713-000715 at 000714, attached as Exhibit "J". *See* Johnson deposition testimony at 25-27. Relevant portions of the Johnson deposition are attached as Exhibit "R".
[31] *See* Johnson deposition at 110. Relevant portions of the Johnson deposition are attached as Exhibit "R". (State Street did not have specific probability or time of the stock losing value.)
[32] *See* Engagement Agreement between Grace and State Street attached as Exhibit 'B'. In particular, *see* Exhibit II to the Agreement at SSBT-001278.
[33] McGowen deposition at 118, attached as Exhibit "M".
[34] *See* Tarola deposition at 128-29. A copy of the Tarola deposition is attached as Exhibit "I" *See also* McGowan deposition at 28, attached as Exhibit "M". *See also* McGowan deposition at 28, attached as Exhibit "M".

> **By giving people more options, then depending on the options, there are options in the risk spectrum;** more aggressive options, more conservative options. The most conservative would be the fixed income versus -- you know, you might say that a foreign, a**ll-stock-based fund would be more aggressive, i.e., more risky**. And we have the whole spectrum so that -- every individual is different, their circumstances are different, what they have outside the plan is different, so we wanted to make sure they had sufficient options in the plan to fit their individual needs, which includes their age and what investments they have outside the plan. (Emphasis added.)

that decided to eliminate the Fund, testified that State Street failed to consider the Plan's investment options.[35]

Curiously, Mr. Johnson acknowledges that if State Street had considered the Plan's entire portfolio, State Street would have determined that the Grace Stock Fund was consistent with ERISA. The February 23, 2004 minutes of the State Street Independent Fiduciary Committee note Mr. Johnson as saying that retention of Grace common stock as part of a diversified portfolio is reasonable and prudent. "S. Johnson added that a diversified fund's investment in W.R. Grace would be a prudent investment; however, a fund invested solely in the stock would not."[36]

Ms. Kelly Driscoll, the manager of the Independent Fiduciary Group, also testified that State Street only considered the Grace Stock Fund.[37] Ms. Driscoll surprisingly testified that State Street was unaware that: (1) the Grace Stock Fund constituted only 4% of the assets of the Plan,[38] (2) Plan participants voluntarily assumed the risk of investing in the Grace Stock Fund, that State Street, (3) how Grace made its matching 401(k) contributions and whether it used Grace stock to make the match (it did not), and (4) the Plan provided participants the right to vote the Grace common shares in the Grace Stock Fund.[39]

Aside from the public information, State Street possessed significant nonpublic information. It knew that a major and sophisticated hedge fund investor, D. E. Shaw, was eager to pay <u>above</u> the market price to purchase over 6 million shares of Grace common

---

[35] Johnson deposition at 110.  Relevant portions of the Johnson deposition are attached as Exhibit "R".
[36] February 23, 2004 Fiduciary Committee Meeting Minutes at SSBT-000713, attached as Exhibit "T".  *See* Johnson deposition, Volume 2, transcript at 19-21, and at 56, attached as Exhibit "R".
[37] Driscoll deposition at 75-76. Relevant portions of the Driscoll deposition are attached as Exhibit "S".
[38] Driscoll deposition at 76, attached as Exhibit "S".
[39] Driscoll deposition at 76-77, attached as Exhibit "S".

stock from the Grace stock fund. Although large investors often seek to "low ball" when negotiating, D.E. Shaw was willing to pay above market price. Shawn Johnson found this development noteworthy. According to Johnson, "often, if somebody is going to buy a large block, they might offer a discount to the existing market price."[40] Other than speculating that D. E. Shaw required shares to cover a short position, neither Mr. Johnson nor anyone else at State Street sought to determine why a sophisticated investor was willing to pay a "premium" for 6.2 million shares in the Grace Stock Fund.[41] In fact, Ms. Driscoll guessed that D. E. Shaw might possess information that State Street lacked.[42] Despite knowledge that a sophisticated investor was eager to pay above market value because D.E. Shaw "may be sensing some positive development,"[43] State Street jumped at the opportunity to end its involvement in this controversial engagement and overrode the Plan documents and the investment choice of Participants and sold the entire block of Grace common stock.

### Grace Failed to Monitor State Street Despite Extraordinary Circumstances

When Grace hired State Street, Grace knew that the Grace Stock Fund was a prudent investment consistent with ERISA.[44] As part of its prudence and ERISA analysis,

---

[40]Johnson deposition, Volume 2, at 53, attached as Exhibit "R". *See* Johnson deposition, Volume 2, transcript at 56 ("I said, well, maybe they're short. Other than that, you know, there was not a lot of additional analysis done. It was above the current price.")

[41] Johnson deposition, Volume 2, at 54-55, attached as Exhibit "R". *See* Driscoll deposition transcript at 169, attached as Exhibit "S".

[42] Driscoll deposition at 171, attached as Exhibit "S".

[43] Handwritten notes of Monet Ewing, attached as Exhibit "U".

[44] Deposition of W. Brian McGowan at 71-72, attached as Exhibit "M". *See* McGowan deposition at 140:

    Q.        But 4 percent of the funds remained in the Grace stock plan at about -- prior to the time that State -- that Grace hired State Street; is that correct?

    A.    That is correct.

    Q.        And I think your testimony was that allowing plan participants to continue to have that 4 percent in the Grace Stock Fund as part of the plan was not an imprudent decision?

    A.        That is correct.

in continuing to hold Grace stock in the Fund, the Committee extensively considered Grace's asbestos liability and its impact on its stock.[45]

During the four months that State Street served as investment manager, Grace's financial condition was improving--not deteriorating--and Grace was confident that it understood the extent of its asbestos liability.[46]    Despite these very positive developments, Grace never monitored State Street to determine the reason that the Grace Stock Fund suddenly became inconsistent with ERISA. Robert Tarola, a member of the Investment and Benefits Committee and the Company's Chief Financial Officer, explained that Grace, after hiring State Street, "wiped its hands" and became disinterested in the Grace Stock Fund!

> Q. …At the time you signed this document [Engagement letter], is it correct that you believed you had no responsibility  with respect to State Street's decision on its handling of the Grace stock fund?
> A.        That's absolutely correct.
> Q.    And you believed at the time that you had **virtually wiped your hands of any responsibility** to the plan participants, in the vernacular?...
> THE WITNESS:  That's correct.[47] (Emphasis added.)

Mr. McGowan similarly admitted that Grace never reviewed or evaluated State Street's decisions or performance.[48]

Importantly, Grace did not avoid its monitoring responsibility because of a conflict of interest. Mr. Tarola admitted that an actual conflict of interest never existed during the four months that State Street served as Investment Manager.[49]

---

[45] McGowan deposition at 81, attached as Exhibit "M".
[46] Tarola deposition at 78-79, attached as Exhibit "I". (Grace making progress assessing its asbestos liability).
[47] Tarola deposition at 121, attached as Exhibit "I".
[48] McGowan deposition at 157, attached as Exhibit "M".
[49] Tarola deposition at 126, attached as Exhibit "I".

**The Premature Sale of the Stock Fund Injured the Plan**

During the four months (December 15, 2003-April 15, 2004) that State Street was responsible for the Grace Stock Fund, State Street sold approximately 7.2 million shares of Grace common stock from the Grace Stock Fund.[50]   In exchange, the Plan received approximately $3.00 per share or approximately $22 million dollars. If the Plan continued to hold the 7.2 million shares, the value of the Plan, as of August 15, 2007, based on an approximate price of $20 a share,[51] would have been approximately $120 million more than its current value.

## ARGUMENT

I.     **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE RETENTION OF GRACE STOCK IN THE STOCK FUND WAS CONSISTENT WITH ERISA AS A MATTER OF LAW.**

A.     **THE FACT THAT GRACE STOCK TRADED IN AN EFFICIENT MARKET ESTABLISHES THAT RETENTION OF THE GRACE STOCK FUND WAS CONSISTENT WITH ERISA.**

Defendants always have contended that Grace common stock traded in an efficient market.[52] Accordingly, Grace's stock price reflected the risks of reorganization and the company's liabilities.[53]   Under these circumstances, the market, as a matter of law "provides the best estimate of the value of stocks."[54]

In *Summers v. State Street Bank & Trust Co.*,[55] the United States Court of Appeals for the Seventh Circuit reviewed a district court's holding that State Street's

---

[50] Driscoll deposition at 188, attached as Exhibit "S".

[51] *See* Grace webpage, http://investor.grace.com/phoenix.zhtml?c=112313&p=irol-stockquote, attached as Exhibit "V".

[52] *See* State Street's Motion to take Judicial Notice, filed February 2, 2007, Doc. No. 145.

[53] Statement of Grace General Counsel David Siegel at Town Hall meeting, March 13, 2003, GRA-B2 006089, attached as Exhibit "A".  *See* Johnson deposition at 84, attached as Exhibit "R" and Driscoll deposition at 110 and 152, attached as Exhibit "S".

[54] *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 409 (7th Cir. 2006).

[55]  453 F.3d 404 (7th Cir. 2006).

decision to retain company stock in the United Airlines ESOP plan was consistent with ERISA. In *Summers*, plan participants alleged that State Street violated its duty by failing to sell United stock until the eve of United's bankruptcy filing.[56] During the class period, the price of United's stock precipitously fell. Ultimately, the value of the stock was a slight fraction of its value at the beginning of the period.

The Court of Appeals, in *Summers*, held that a plan fiduciary when determining whether to retain company stock <u>acts irrationally if it seeks to "second guess" the market</u>.

> Some investors, it is true, consistently beat the market, but few of them are trustees; **it would be *hubris* for a trust company like State Street to think it could predict United's future more accurately than the market could**…[57] (Emphasis added.)

Despite recognizing that the market efficiently valued Grace stock, State Street in an act of hubris "determined that the market price of the W.R. Grace stock is not a good indication of its long term value…"[58] By taking this action, State Street applied an inappropriate process, breached its fiduciary duty, and unreasonably concluded that retention of the Grace Stock Fund was inconsistent with ERISA.

The Fourth Circuit, in *DiFelice,* recently warned that the premature elimination of a company stock fund is dangerous, causes injury to plan participants and is an action that

---

[56] 453 F.3d at 407.
[57] 453 F.3d at 408.
[58] Fiduciary Committee Meeting Minutes, February 23, 2004, SSBT-000713-000715 at 000714, attached as Exhibit 'T'.  *See* Johnson deposition at 25-27, attached as Exhibit "R".

is not in the best interest of plan participants.[59]  This case is similar and deserves a similar finding.

### B.     THE LAW PRESUMES THAT RETENTION OF THE GRACE STOCK FUND WAS CONSISTENT WITH ERISA.

The law is settled that retention of company stock in a retirement plan is presumed consistent with ERISA.[60] The United States District Court for the Southern District of New York, in fact, recently applied the presumption in *In re: Polaroid ERISA Litigation.*[61] In *Polaroid*, the District Court held that a presumption exists that the "retention of employer's securities is reasonable and prudent."[62]

Plaintiffs recognize that most, if not all of the authority that has addressed the presumption, did so in cases where the price of the company stock fell ("stock drop" cases), and plaintiffs alleged that the ERISA fiduciaries should have sold the stock. The logic behind the presumption, however, equally applies in this case where Plaintiffs allege that the fiduciaries should have retained the company stock. In both situations, the law should presume that overriding Plan documents by selling company stock based on conjecture and speculation is unwise. The law, accordingly, holds that the presumption can be overcome by showing:

> (1) that there was a "precipitous decline" in the price of the stock and (2) that the fiduciary had "knowledge of its impending collapse."[63]

---

[59] *DiFelice v. U.S. Airways, Inc.*, 436 F.Supp.2d 756, 782 (E.D. 2006) *affirmed* --- F.3d ----,  at *8, 2007 WL 2192896 (4th Cir. August 1, 2007).

> If the PIC had been correct, holding Group stock could have been a very profitable venture and one that would have been in the best interest of participants. Furthermore, if U.S. Airways had closed the Company Fund prematurely, and Group stock had rebounded further, the PIC would have succeeded only in locking in participant losses and *precluding* Plan participants from benefiting from the increase in stock price.

[60] *See Kuper v. Iovenko*, 66 F.3d 1447, 1459, 19 Employee Benefits Cas. 1969, 1995 Fed.App. 0302P, Pens. Plan Guide (CCH) P 23913R ("we will presume that a fiduciary's decision to remain invested in employer securities was reasonable").

[61] 362 F. Supp.2d 461 (S.D.N.Y. 2005).

[62] 362 F. Supp.2d at 474 (S.D.N.Y. 2005).

[63] 362 F. Supp.2d at 475 (S.D.N.Y. 2005).

Defendants cannot establish any set of facts necessary to rebut the presumption. First, Grace common stock, during the class period, did not experience a precipitous decline.[64] Second, the record lacks any evidence that either Grace or its stock was headed toward an impending collapse. To the contrary, the evidence reveals that Grace was positioned to operate into the future. Grace's financial results demonstrated strength,[65] its cash position demonstrated a prolonged ability to continue its daily activities,[66] and it publicly announced that it expected to survive the reorganization in tact.[67] Additionally, an efficient market positively valued Grace, and a sophisticated investor, D.E. Shaw, agreed to purchase over six million shares at an above market price. These facts establish that Grace was not headed toward impending collapse. As a result, the retention of the Grace Stock Fund is presumed consistent with ERISA as a matter of law.

### C.  DEFENDANTS FAILED TO CONSIDER ALL RELEVANT FACTS AND CIRCUMSTANCES WHEN STATE STREET DECIDED TO ELIMINATE THE GRACE STOCK FUND.

In *DiFelice v. U.S. Airways, Inc.*,[68] the United States Court of Appeals for the Fourth Circuit reviewed a claim that U.S. Airways breached its fiduciary duty by continuing to maintain a company stock fund in a 401(k) plan. The Fourth Circuit affirmed the trial court's decision that approved the retention of the company stock fund.

---

[64] *See* Chart of Grace stock price from April 15, 2003-April 30, 2004, http://finance.yahoo.com/q/hp?s=GRA&a=03&b=15&c=2003&d=03&e=30&f=2004&g=d, attached as Exhibit "L".

[65] Grace Form 8-K, filed January 29, 2004, attached as Exhibit "G".

[66] Grace Form 10-Q for Period ending March 31, 2004 at I-29, attached as Exhibit "J".

[67] Letter from Paul Norris, May 5, 2004, http://svco0053/reorganize/, attached as Exhibit "D". *See* November 24, 2003, Memorandum from Goodwin & Procter to State Street, at SSBT-0003056, attached as Exhibit "E" ("Grace believes that it has enterprise value in excess of its liabilities…(a) Grace believes that the company would emerge intact as opposed to being split, with portions awarded to different constituencies.")

[68] --- F.3d ----, 2007 WL 2192896 (4th Cir. August 1, 2007).

In *DiFelice*, U.S. Airways faced severe economic challenges. Similar to other airlines, the September 11, 2001 attack dramatically affected the company.[69] The company hoped to survive through cost cutting measures, government assistance, and its cash reserves. Its efforts failed, and on June 27, 2002 the company announced that it would have to file for bankruptcy protection or undertake another form of reorganization. From June 27, 2002 until the filing of the bankruptcy, participants voluntarily sold 1,615,051 shares of the plan's holdings of 2,027,500 shares.[70]

The Fourth Circuit, in *DiFelice,* discussed some of the elements of the process that a fiduciary must consider when deciding whether to retain a company stock fund. According to the Fourth Circuit, a fiduciary should consider the totality of the circumstances, including, but not limited to:

> the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability.[71]

Similarly, the Fifth Circuit has held that process is not general but depends "on the **character and aim of the particular plan** and decision at issue and the circumstances prevailing at the time."[72] (Emphasis added.)

In this case, State Street ignored the first element: the plan structure and aims. The record also is clear that State Street minimized the remaining elements.

The Plan, as a participant directed plan, offered a large number of diverse options. Grace selected the Plan's investment options to provide, in the aggregate, the opportunity

---

[69] *Id.* at *3.
[70] *DiFelice v. U.S. Airways, Inc.*, 436 F.Supp.2d at 782.
[71] --- F.3d ----, 2007 WL 2192896 at *5.
[72] *Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286, 299 (5th Cir.2000).

to structure a diverse portfolio that offered risk and return.[73]

Despite the obvious importance of understanding the Plan's investment options, State Street ignored the options.[74] State Street also failed: (1) to consider that Grace structured the Plan to permit Participants to assume the risk of the stock fund, (2) to know how Grace made its company match, (3) to know the percentage of Grace Stock in the Plan's portfolio, and (4) that the Plan permitted employees to vote the stock. If State Street had considered these facts and the Plan's diverse portfolio, it necessarily would have determined that retention of the Fund was consistent with ERISA. According to State Street's minutes, Mr. Johnson believed "a diversified fund's investment in W.R. Grace would be a prudent investment; however, a fund invested solely in the stock would not."[75]

The precise facts and circumstances that State Street ignored are the facts that the Fourth Circuit highlighted in *DiFelice*. The Fourth Circuit noted that U.S. Airways offered twelve diversified, and less risky, alternatives and allowed participants to transfer investments freely, always allowing participants to remove funds from the Company Fund without restriction. The Court further recognized that U.S. Airways did not place conditions on "matched" funds, except to *disallow* investment in company stock. Furthermore, U.S. Airways repeatedly discussed the risks associated with a non-diversified retirement portfolio in general, and the Company Fund in particular.[76] By

---

[73] Investment Policy Statement at 1, GR006600, attached as Exhibit "N". *See* McGowan deposition at 28, attached as Exhibit "M".
[74] Johnson deposition at 110, attached as Exhibit "R".
[75] February 23, 2004 Fiduciary Committee Meeting Minutes at SSBT-000713, attached as Exhibit "T". *See* Johnson deposition, Volume 2, at 19-21, attached as Exhibit "R". *See* Johnson deposition, Volume 2, at 56.
[76] --- F.3d ----, 2007 WL 2192896 at *7.

ignoring these facts, State Street predetermined the outcome of its decision and breached its fiduciary duty.

Additionally, State Street violated its duty to consider the Modern Portfolio Theory. The Modern Portfolio Theory is an essential component of ERISA.[77] The Modern Portfolio Theory "teaches that an investment in a risky security as part of a diversified portfolio is, in fact, an appropriate means to increase return while minimizing risk."[78] State Street admits that it failed to examine the Plan's options. State Street, therefore, lacked the ability to determine whether the Grace Stock Fund, as part of a diversified portfolio, constituted an appropriate investment to increase the participants' rate of return while minimizing risk.

Although the Fourth Circuit, in *DiFelice,* held the Modern Portfolio Theory "standing alone"[79] cannot convert an inappropriate investment into one that is consistent with ERISA, the court recognized that fiduciaries need to consider other investment options when determining whether a particular option is prudent. The Fourth Circuit noted that the U.S. Airlines' 401(k) offered participants the right to invest in twelve diversified and less risky investment alternatives. [80]

The Seventh Circuit, in *Summers,* further highlighted that a diversified retirement portfolio justifies the prudence of offering and retaining an inherently risky

---

[77] *See In re Cardinal Health, Inc. ERISA Litig.,* 424 F.Supp.2d 1002, 1020 (S.D.Ohio 2006) ("[A] fiduciary with investment duties must act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard, which examined each investment with an eye toward its individual riskiness."). *See also DiFelice v. U.S. Airways, Inc.,* 436 F.Supp.2d 756, 786 (E.D. 2006) *affirmed* --- F.3d ----, 2007 WL 2192896 (4th Cir. August 1, 2007), *DiFelice v. U.S. Airways, Inc.,* --- F.3d ----, *9 2007 WL 2192896 (4th Cir. August 1, 2007) ("modern portfolio theory has been adopted in the investment community and, for the purposes of ERISA, by the Department of Labor. *See* 29 C.F.R. § 2550-404a-1").

[78] *DiFelice v. U.S. Airways, Inc.,* --- F.3d ----, *9 2007 WL 2192896 (4th Cir. August 1, 2007).

[79] --- F.3d ----, *10 2007 WL 2192896 (4th Cir. August 1, 2007).

[80] --- F.3d ----, 2007 WL 2192896 at *7.

company stock fund. "Such a threat would be of little moment to people who held United stock as part of a diversified portfolio, because the risks of the various components of such a portfolio tend to cancel out; that is the meaning and objective of diversification."[81]

> D. **THE GRACE DEFENDANTS ARE LIABLE FOR ADMITTEDLY FAILING TO MONITOR STATE STREET AND AS CO-FIDUCIARIES.**

The testimony of Mr. Tarola and Mr. McGowan, of the Investment and Benefit Committee establishes that Grace did not monitor State Street. Mr. Tarola agreed that Grace "virtually wiped your [its] hands of any responsibility to the plan participants…"[82] when it contracted with State Street. Yet, the law required Grace to monitor. According to Department of Labor Regulations, at reasonable intervals Grace had the duty to review State Street to ensure that State Street's performance complied with the plan's terms and needs and statutory standards.[83]

Courts that have addressed similar situations have held that an ERISA fiduciary *must* monitor. In *Jackson v. Truck Drivers' Union Local 42*,[84] the court concluded that the delegation does not immunize an ERISA fiduciary from liability. According to the *Jackson* court, "[n]otwithstanding a proper delegation of fiduciary duties…**a delegating fiduciary retains an obligation to oversee and monitor the activities of his delegate**."[85] Indeed, prior to holding that a fiduciary has a duty to monitor, the *Jackson* court held that a "fiduciary can be held liable for the acts or omissions of his delegate, if *inter alia*, 'he has knowledge of a breach by such other

---

[81] *Summers v. State Street Bank & Trust*, 453 F.3d 404, 409 (7th Cir. 2006).
[82] Tarola deposition at 121, attached as Exhibit "I".
[83] DOL Reg. §2509.75-8, 29 CFR §2509.75-8(FR-17).
[84] 933 F.Supp. 1124 (D. Mass. 1996).
[85] 933 F.Supp. at 1141 (Emphasis Added.)

fiduciary [or delegate], unless he makes reasonable efforts under the circumstances to remedy the breach.'"[86]

The undisputed facts demonstrate that Grace failed to monitor. Despite knowing that the elimination of the Grace Stock Fund was inconsistent with its view of ERISA, Grace admittedly failed to take any action understand why State Street sold the stock. This failure violated its duty to monitor and constitutes a breach of fiduciary duty.

E.    PLAINTIFFS ARE ENTITLED TO DAMAGES CALCULATED BY DETERMINING THE AMOUNT THE PLAN WOULD HAVE EARNED BUT FOR DEFENDANTS' BREACH.

This Court has held that a breach of fiduciary duty claim is intended to recover for the Plan "any losses …resulting from each such breach."[87] The manner to calculate the loss is simple and requires the Court to ascertain the amount the Plan would have earned but for the breach. "[T]he proper measure of damages is to be calculated by determining what the Plan would have earned had Hancock [the fiduciary] exercised its discretionary authority with respect to its investment and allocation decisions in accordance with its fiduciary duties under ERISA."[88]

In this case, the amount the Plan would have earned is the value of the shares of Grace common stock that State Street sold as of the date of judgment less the proceeds that the Plan received from the sale. Although Plaintiffs, through the work of Stanford University economics Professor Steven Grenadier, have made the calculation,[89] the value of Grace shares changes daily and requires the final calculation of damages to be made

---

[86] 933 F.Supp. at 1141. *See Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984) (duty to determine whether appointed fiduciaries were fulfilling their fiduciary obligations).
[87] W*atson v. Deaconess Waltham Hosp.*, 141 F.Supp.2d 145, 150 (D. Mass., 2001) (WGY).
[88] *Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Co*., 302 F.3d 18, 34 (2nd. Cir. 2002). *See also Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2nd. Cir. 1985).
[89] *See* Plaintiffs Filing of Expert Reports, including the Report of Steven Grenadier, June 15, 2007, Doc. No. 168, and Plaintiffs Rebuttal Report, June 27, 2007, Doc. No. 172.

on the day of the judgment in favor of the Plaintiff Class. Accordingly, Plaintiffs request a Summary Judgment that holds that the proper measure of damages is to determine the value of the Plan if it had retained the Grace Stock Fund.

## CONCLUSION

For the reasons contained in Plaintiffs' motion and memorandum, Plaintiffs request summary judgment on liability against all Defendants and an order that holds that the proper measure of damages is to determine the value of the Plan if it had retained the Grace Stock Fund.

Respectfully submitted,

WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.

/s/ James R. Cummins
James R. Cummins
Jane H. Walker
Terrence L. Goodman
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 381-2375
E-mail:  jcummins@wsbclaw.com
E-mail:  janehwalker@wsbclaw.com
E-mail: terrygoodman@wsbclaw.com

and

BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO

/s/ Jeffrey C. Block
Jeffrey C. Block
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
Email:  jblock@bermanesq.com

**Counsel for Lawrence W. Bunch, Jerry L. Howard, Sr. and David Mueller, Both Individually and Behalf of All Others Similarly Situated**

Dated: August 17, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2007, I filed Memorandum of Law in Support of the Bunch Plaintiffs' Motion for Summary Judgment through the ECF system.  It was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies were sent to those indicated as non-registered participants on August 17, 2007.

Respectfully submitted,
WAITE, SCHNEIDER, BAYLESS
  & CHESLEY CO., L.P.A.

*/s/ Jane H. Walker*
James R. Cummins
Jane H. Walker
Terrence L. Goodman
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 381-2375
E-mail:  jcummins@wsbclaw.com
E-mail:  janehwalker@wsbclaw.com
E-mail:  terrygoodman@wsbclaw.com