# EXHIBIT A

0001

March 13, 2003

1   PAUL NORRIS: Good morning, everyone. Thanks for joining
2   me today. A couple of topics before we get started. First,
3   safety. Most importantly, given the situation in the world, I
4   think extra security, extra vigilance will be important,
5   certainly here and everywhere around the world. Secondly if
6   everybody would take a moment during the day and remember our
7   service people around the world. Can I get your attention,
8   please? So, please take a moment, remember all the service
9   people, men and women that we have around the world, keep them
10  in your thoughts and your prayers during a very difficult time.
11  And on a more parochial note, we continue to have difficulty in
12  safety; we've had 15 or more reportables in the first quarter.
13  That's 50 percent more than we had last year. So think about
14  safety, security, and please think about our troops around the
15  world.
16  This morning what I want to do is try and bring together a
17  number of issues that have come up over the last couple of
18  months, particularly talk about the savings and investment plan
19  the letter that I sent out earlier. And also talk about our
20  pension plan, the status of our pension plan in the U.S., its
21  funding, and some discussion about the creditor's claims
22  process. I'll do that. First, let's take the savings and
23  investment plan. As you may or may not know, the savings and

0002

1   investment plan is a plan under the government act, the Employee
2   Retirement Insurance Act, ERISA. So under that provision, the
3   people who act on your behalf under that plan are fiduciaries on
4   your behalf. That means that they must do things with your best
5   interest in mind as they make adjustments to that plan.
6   This gives rise to some unusual circumstances to a company
7   like Grace which has historically provided employees with a
8   match of their 401K funds in stock, which as you remember in
9   January of 2001 change, so that the match went from 50 percent
10  to 100 percent and the match went from stocks, all cash. At the
11  same time we took away all restrictions about people's ability
12  to sell grade stock at any time during the plan. The plan has
13  basically been operating in that mode since that time. There
14  are 30 investment options in this plan, it's a very broad plan,
15  and the grade stock fund obviously is one of those options.
16  As I said many times during our conversations,
17  unfortunately our stock no longer trades on the fundamentals of
18  our business performance, it trades on people's speculation as
19  to the outcome of the Chapter 11 performance, specifically on
20  how we're going to management our liabilities and the size of
21  the liabilities, specifically the size of our asbestos
22  liabilities. So periodically, and I think people said, why, why
23  are you doing this now versus some other time? And the answer

0003

1   to that is, because 96 months ago we can do it sometime in the
2   future. We chose to do it now because we made the decision that
3   it's appropriate to do it now. And we have studied this issue,
4   have discussed it with our Board, have discussed it with outside
5   experts, and they all agree that this is an appropriate time for

GRA-B2 006086

CONFIDENTIAL

112233

6   us to make a change which will restrict people from putting new
7   funds into Grace stock through our savings and investment plan.
8   Obviously they're not restricted if they want to go into an open
9   market funded by and buy Grace stock.
10   And the reason we're doing it is several-fold. One is the
11   continuance and sort of speculative nature of our stock based on
12   the liabilities and Chapter 11 process. And secondly is that
13   fact that we hope and expect that during the next year we're
14   going to get into very serious discussions about our
15   reorganization plan. And the consequence of that plan on
16   shareholders is really undetermined. As I said, it would be
17   very good for shareholders, or it could end up with our
18   shareholders having no equity in the new company. And there
19   isn't any way for us to product the outcome at this time.
20   So in order for me and the management team and ht Board of
21   Directors to be out of conflict, where on the one hand we need
22   to look out for the interests of the people who own the stock in
23   the S&I plan, and on the other hand we are obligated to disclose
0004

March 13, 2003

1   information as soon as we know it, that's relevant to the
2   market. That puts us in a direct conflict. Because if we knew
3   that a plan was going to be this advantageous to our existing
4   shareholders, and we're also responsible to make sure that the
5   people in the 401K plan make a good decision based on all the
6   information that we have, we would be forced into an impossible
7   conflicting situation. Because from a personal perspective, I
8   could either break the laws of ERISA or I could break the laws
9   of the SEC and trade for insider information. Neither one of
10   those is appealing to me or my family. And the Board is
11   supportive in this.
12   So I want to show this. I don't know anything more than I
13   knew when we published our annual report and filed it with the
14   SEC last week. There's a foreign 10K that contains a lot of
15   financial information and a lot of disclosure information, and
16   it is significant in the fact that it makes us, make sure that
17   all the information that we know at the time that we publish it
18   is available. So you can rest assured that if we knew something
19   definitive, we would have inserted it in our 10K. And so one of
20   the reasons for the timing is that we filed our 10K, everybody
21   knows everything that they should know. We have a date coming
22   up at the end of this month, which is a bar date, which means
23   that anybody who has a claim against the company needs to submit
0005

March 13, 2003

1   that claim by March 31 for any activity that happened before we
2   filed for Chapter 11 in April 1st, 2000 -- April 2nd of 2001.
3   So that means that in the next few weeks or months we will be
4   getting a compilation all of the claims all of the people think
5   that they have against the company, a significant amount of
6   information that we have today. And that again will provide us
7   with a conflict situation versus our responsibilities under the
8   401K.
9   So that's the reason we've chosen to do it now versus some
10   other time. Probably one of the reasons why we didn't do it
11   either is because I fundamentally don't like telling people what
12   they should be able to do or not do with their own money. And

GRA-B2 006087

**CONFIDENTIAL**

**112234**

13    unfortunately as an obligation under the plan, as a fiduciary,
14    we're required to do that. We're required to decide what's in
15    your best interest and make that decision, and we don't like
16    that. And as we go forward, as I said, we're going to be in a
17    conflict and that's going to make it even more difficult.
18    So we made the one decision which is to say that
19    effectively April 21 or April 16 we won't allow any new
20    contributions to be made, or new stock, Grace stock, new Grace
21    stock, to be purchased in 401K. You can still sell. Up until
22    then, you can still make decisions. I realize that the Fidelity
23    site, the Fidelity website, is not operating in accordance with

0006
      March 13, 2003
1     our instructions at the moment, but that will be fixed.
2     Somebody did try to make a change yesterday and Fidelity
3     wouldn't let them, so I would say that most things in Six Sigma,
4     it's just as wrong to be early as it is to be late. In this
5     case we don't we want them to be precisely on the date that we
6     said. So we'll get that, we'll get that fixed.
7     The next issue was determining whether or not we should
8     appoint someone else, some other entity to become the fiduciary
9     for looking out for the interests of the participants in the
10    plan. And we had that conversation with people; there are
11    obvious advantages. Number one, it certainly takes us out of
12    the conflict position, because those people would make
13    independent decisions based on the information that's available
14    to all investors, and that's very important. Secondly they have
15    only one interest, and that would be the interest of the people
16    in the plan who own Grace stock. So they have no conflict, no
17    possible conflict situation.
18    And third, they may be able to join with the Equity
19    Committee and represent the interests of the people in the S&I
20    plan who own Grace stock, which gives the people in the plan a
21    separate and distinct voice from all of the other stakeholders,
22    which obviously could also be positive. On the other hand, they
23    could make a decision that they wanted to sell the Grace stock

0007
      March 13, 2003
1     in the Plan, independently, and none of us could challenge that
2     decision. I guess we could challenge it, but we really can't
3     stop it because we've given them the atuhro8ty as independent
4     fiduciaries to make good decisions that they think is in the
5     best interests of all of the participants in the plan.
6     I will say that there will be significant restrictions on
7     what they can do, because they also must file public statements,
8     and they are limited as to how much they can do in any short
9     period of time. So it's not like they could come in based on
10    what we know and do something dramatic overnight. They need to
11    make filings and they'd have to follow a prescribed process. And
12    we are investigating that seriously because that may be the best
13    alternative. We hope to have that concluded in the next four to
14    six weeks, and if we make that decision, we'll obviously come
15    back and communicate that.
16    So I think that's basically the status, some of the logic
17    and the thinking. This is an important issue for all of the
18    people in the plan, all of the people that are in the plan and
19    own Grace stock. We didn't take it lightly; we've examined all

GRA-B2 006088

CONFIDENTIAL

112235

20    of the alternatives thoroughly, and this is our best and most
21    appropriate response at this point.
22    Having said, that, before we answer questions, I'm going to
23    ask Dave Siegel if he would come up to the podium and give you
0008
March 13, 2003
1     some idea of the reorganization plan process and what that means
2     to shareholders. And I think you're going to hear something
3     that you've heard consistently over a long period of time, about
4     the opportunity, or potential, for shareholders.
5     DAVE SIEGEL: Good morning. The most likely result in an
6     asbestos-related bankruptcy is that the plan is going to include
7     something called the 524G Trust. And 524G is a provision of the
8     Bankruptcy Code that's directed superficially to asbestos.
9     Under 524G, 50 percent of the Company's stock has to be at risk.
10    And what that means is that the value has to be available to pay
11    asbestos liability in the future if it's needed. What's
12    happened in the other asbestos bankruptcies that have gone
13    through is that at least 50 percent of the stock has actually
14    just been owned by the trust. In fact, in most cases it's been
15    closer to 100 percent, or it has been 100 percent; shareholders
16    got nothing.
17    And example of a recent plan that we look to see what's
18    going on would be Armstrong World Industries. It's a
19    functioning business. It has a good business. In their case,
20    50 percent of the stock is going to the asbestos trust, and the
21    other 50 percent is going to their other creditors, the
22    bondholders, and their other unsecured creditors, and
23    shareholders are getting nothing or next to nothing.
0009
March 13, 2003
1     Now, every one of these situation is different. Our
2     situation is different. Our stock currently reflects the
3     uncertainty. It's trading at a fraction of what the value would
4     be if it didn't have asbestos liability and we weren't in
5     bankruptcy. But the big question in trying to figure out what
6     the stock is worth is the one Paul mentioned before. It's how
7     big are our liabilities? And we're first now starting on the
8     process of figuring out how big those liabilities are and
9     challenging them as part of the bankruptcy process. If we're
10    very successful and we get the liabilities down to where we
11    think they are, there could be value for shareholders that would
12    be substantial. If we're not that successful, the shares could
13    be worth again, nothing, or next to nothing.
14    At this point it's very, very speculative because we
15    probably have a better view of what our liabilities are than
16    anybody in the world, and we don't know where this is going to
17    come out. So when outside investors make this call and they try
18    to figure it out, they're guessing, and essentially gambling.
19    And that makes it a very speculative investment, and
20    unfortunately the stock price at this point doesn't really
21    reflect our effort in running the businesses and how well we do.
22    So until we get to the point where we have a process for
23    evaluating the liabilities, we put some definition around that,
0010
March 13, 2003
1     we use that to negotiate a plan that our creditors will vote on

GRA-B2 006089

CONFIDENTIAL          112236

2   and support, we really won't have a good feel for what
3   shareholders are going to get.
4   PAUL NORRIS: Thanks, Dave. Our view is really not any
5   different than it was two years ago. Our positioning in the
6   court is not any different, and the outcome is no more or lesser
7   than it was, but we are about to embark on what we think is a
8   period of time when it's going to be much more volatile, and we
9   hope to get into serious negotiations with our creditors. But
10  we're not there; I don't have anything that I could tell you or
11  any other investor. And that's good and bad. It's good in the
12  sense that everybody has the same information and it's bad
13  because we haven't made as much progress as we'd like but we're
14  about, I think during the next year, we will make real progress
15  on our case. That's much more important for us as employees and
16  participants in the business, because that's how we maintain the
17  health and welfare of our business. And I think that's in the
18  very best interest of all of us.
19  So having giving you that background, I'm going to ask Mike
20  Ferigrossi to ask the questions that have come in, and I'll try
21  and give you answers. This is a very complicated set of issues;
22  so if I call on some experts here, bear with me.
0011

March 13, 2003
1   MIKE FERIGROSSI: Paul, we have about 15 locations that are
2   on the air with us this morning. We'll take questions regarding
3   the S&I plan first. I have a few that came in, and then we'll
4   poll a few of the locations around the U.S. for S&I questions.
5   Following that, as Paul said, we'll then treat the issue
6   concerning the Grace extension plans and the proof of claim
7   process.
8   Paul, the first question, why the extension on the S&I plan
9   today, so close to the bar date? This could have been done
10  months ago.
11  PAUL NORRIS: Well, as I said, the bar date is one factor.
12  The appropriateness is based on our view of what was going to
13  happen in the future as well as what's happened in the past. We
14  can make this decision later; we could have made it earlier. We
15  studied it; we felt that this was an appropriate time to do it.
16  There's really no magic to this date. It did seem like there
17  were a number of things that came together that made this the
18  most appropriate time to do it.
19  MIKE FERIGROSSI: The second one, this isn't really a
20  question. It's a statement. And I think it's reflective of the
21  opinion of a number of our employees. I know a number of
22  employees have asked me this already. I understand the
23  company's concern about the value of a stock, but it's not right
0012

March 13, 2003
1   to stop employees from moving balances in and out of the Grace
2   common stock market. I'm fine with the allocation of all new
3   money going into the fixed income fund, but if the stock begins
4   to rise after April 21, you're doing an injustice to the
5   employees of Grace by taking away the opportunity for employees
6   to regain money that they may have already lost. We are
7   responsible adults; we should be given the opportunity to manage
8   our funds to the best of our ability. Please respond.
9   PAUL NORRIS: As I said, I personally agree with that

GRA-B2 006090

**CONFIDENTIAL**    112237

10   statement. And that's the reason why the Plan has operated the
11   way it has operated up until now. But I have looked at my
12   responsibilities and the responsibilities of the Committee as
13   fiduciaries to look after, without any other interest but the
14   interest of the participants, and decided that given our
15   conflict situation and given the speculative nature of our
16   stock, that it's appropriate for us to make changes at this
17   time. And the reason -- I don't like it. Personally I wouldn't
18   like it if I was on the other side. But I feel I'm obligated to
19   make that decision; we think it's the best decision, and we
20   think it's the right decision.
21   MIKE FERIGROSSI: The next question. If we do decide to
22   have an independent fiduciary manage the Grace stock fund, will
0013
     March 13, 2003
1    the independent fiduciary continue to manage the fund after
2    Grace emerges from bankruptcy?
3    PAUL NORRIS: I think it's unclear. Obviously after the
4    reorganization plan, we'll be able to determine much better what
5    would be in the interest of the participants, and we could make
6    that decision at that time, recognizing once we give the
7    responsibility to a fiduciary, the fiduciary has to also agree
8    to give it back to us, because again they have to recognize or
9    agree that that's in the best interest of the plan participants.
10   And anybody who acts as a fiduciary for this plan can only have
11   the interest of the participant as the basis for any decisions
12   that they make. You may not agree with them, but they can only
13   be thinking about the interests of the participant. That's
14   clearly an obligation of an independent, and it's an obligation
15   of anybody from the company as well.
16   MIKE FERIGROSSI: And a follow-up to that, are we aware of
17   any other bankrupt companies who have retained an independent
18   fiduciary?
19   PAUL NORRIS: I believe United Airlines did. Federal Mobil
20   has as well. I would also tell you that this is something that
21   is becoming more common. I don't think it was common at all
22   when we filed. But over the last couple of years it has become
0014
     March 13, 2003
1    more common, more accepted, more fiduciaries, from independent
2    fiduciaries to step into this role.
3    MIKE FERIGROSSI: I think we also know, U.S. Air, and
4    actually American Airlines which I don't believe our impact once
5    again --
6    PAUL NORRIS: I think United and American both decided to
7    go to fiduciaries before they filed, because again of the
8    volatility of their stock and the questions around whether they
9    would file or they wouldn't, and the impact that that had on
10   their stock price.
11   MIKE FERIGROSSI: Here are two questions -- there are two
12   more questions on the S&I plan, and then we'll take questions
13   from the audience. Who can I turn to for advice on whether to
14   convert the shares I have now or hang on, and following that, is
15   it a foregoing conclusion that ultimately this stock will go to
16   zero at some point in the process?
17   PAUL NORRIS: The first question, I can't really give you
18   advice. I can tell you that I normally ask my wife for my

GRA-B2 006091

CONFIDENTIAL            112238

19    advice, but I don't know that she'd give you advice, but you
20    might try her. There is a -- she's done really well over the
21    years. There's a lot of information on the Fidelity website
22    about all of the plans, the returns on all of the plans from the
23    beginning over the last year, and I think you need to decide,
0015

March 13, 2003
1    really, what's your appetite for risk and decide which of those
2    plans or which of those investment vehicles make the most sense
3    to you. So we do have information available, but we really
4    can't give you advice. The second?
5    MIKE FERIGROSSI: Second one, is it a foregone conclusion
6    that the stock will go to zero?
7    PAUL NORRIS: No, I don't think it's a foregone conclusion
8    at all. We have not changed in our process here. If you look
9    at the brief that we filed on the very first day, when we filed
10    for Chapter 11, it said we were going to try and litigate
11    personal injury/asbestos liability, so that only people that
12    were deserving, those people that were sick were those people
13    that truly had exposure to Grace products. We get compensated,
14    and we believe that that happens if there would be significant
15    equity. And we haven't changed in our view and we haven't
16    changed in our position with our creditors. As early as last
17    week, we reiterated that with the Unsecured Creditors Committee.
18    Today all of the conversations that we've had with personal
19    injury, asbestos and ourselves has been, our position is that
20    our liability has been fairly sized, we'll leave equity, and
21    their position is, as it has always been, that there is no
22    equity because personal injury asbestos overwhelms everything
23    else.
0016

March 13, 2003
1    That has not changed. We haven't changed our position;
2    they haven't changed their position. We haven't made any real
3    progress in the courts on this issue. We've had other issues
4    that have been in the courts, but not on this issue. So it's
5    not a question of us knowing more or feeling differently than we
6    did two years ago. It's a recognition of all of the other
7    issues and the fact that we're going to get into a position
8    where we will know more. You should want us to know more during
9    the next year.
10    MIKE FERIGROSSI: Let's take some questions from the floor.
11    Here in this room in Columbia. Yes?
12    The question was, as we go forward, do you expect any other
13    restrictions on the savings and investment for other employee
14    benefits?
15    PAUL NORRIS: No. Now, remember when we filed, we got
16    authorization. All of the benefits that we have today, we were
17    authorized to continue on the first day motions when we filed.
18    On the savings and investment plan, the issue always is whether
19    or not we have the appropriate number of funds and whether we
20    should have one fund more or less. We could make that decision,
21    and clearly the next decision will be whether or not we should
22    have a fiduciary who looks at the Grace stock fund. That's a
0017

March 13, 2003
1    decision that we'll make in the future. But I don't know of any

GRA-B2 006092

CONFIDENTIAL

112239

2    specific ones as we stand here today.
3    MIKE FERIGROSSI: Are there other questions here in this
4    room? Yes.
5    The question is, comparing the performance of Grace stock
6    to what happened at Armstrong, how would you draw that
7    comparison?
8    PAUL NORRIS: I don't that there's -- as Dave said, the
9    facts and circumstances of their liability, the amount of debt
10   that they had, the performance of their businesses, their other
11   creditors, was quite different from ours. So you really -- the
12   difficult thing here in all these bankruptcies is that everybody
13   has such different facts and circumstances it's hard to draw an
14   analogy. As Dave said, nobody has beaten the plaintiffs'
15   lawyers on personal injury and had a significant equity in the
16   past. Both Grace and USG filed briefs with the court that said,
17   we wanted to challenge the way that's been done, and do we have
18   an expectation and hope that we would do something that's
19   different than what's been done in the past. We've said that
20   from the very first day and we continue to believe it and we
21   continue to put that position forward, both in the courts and
22   with the personal injury committee. And I always like it when
23   Dave shakes his head. yes.
0018

     March 13, 2003
1    MIKE FERIGROSSI: How about the Cafeteria Columbia? Thank
2    you, and Building 30 in Columbia?
3    PAUL NORRIS: Well, the management decision would really
4    be, it's not just the decision, but it's knowledge of the
5    reorganization plan. So if we had knowledge of a plan that was
6    going to cause the stock to either go up or down, and as a
7    fiduciary, we should communicate that to the participants in the
8    plan. But under our SEC Fair Disclosure requirements, we can't
9    do that without communicating to everyone. And many times,
10   we'll have information which is confidential; we can't
11   communicate to the outside. But knowing it, we should really
12   use it as a way of making decisions for the savings and
13   investment plan. And it's become clear to us that the two roles
14   that we have, one to get a reorganization plan that's in the
15   best interests of the company and all of its stakeholders, and
16   that includes the employees and the businesses and the
17   creditors, as well as our shareholders, that's a conflict that's
18   untenable. So we're trying to find a way to manage out of that
19   conflict.
20   MIKE FERIGROSSI: Thank you. Let's move to Cambridge. Are
21   there questions from Cambridge?
0019

     March 13, 2003
1    Thank you. Curtis Bay, we have a number of hook-ups down
2    there. The Admin Building at Curtis Bay? Thank you. Their
3    Tech Center at Curtis Bay?
4    Dave's not know for painting a rosy picture, but I will say
5    that we are clearly trying to do something in an asbestos
6    bankruptcy that has not been done in the past. We clearly
7    understood that when we filed; we understood it as we made
8    decisions about what kind of debt to have and whether or not we
9    could secure our debt; there were a lot of decisions that we've
10   made that prepared us to go into the court and argue this to

GRA-B2 006093

CONFIDENTIAL          112240

11    fight this battle. USG did a similar thing in the sense that
12    they also looked at the timing of when they filed, their other
13    liability, and the decision of whether or not they actually had
14    equity remaining of their liabilities were fairly valued. In
15    the case of the other recent bankruptcies, they either secured
16    all their debt, they borrowed significantly, they were already
17    paying to asbestos at a significantly greater rate, and so when
18    they even internally fairly valued all their liabilities they
19    didn't see any equity left. In fact in the case of Armstrong
20    Mobile, Federal Mobile, and Owens Corning, I don't believe that
21    the management proposed a plan that had significant equity for
22    the existing shareholders.
0020

March 13, 2003
1    So their facts and circumstances were so different. So I
2    don't know that I can paint a rosier picture, other than to say
3    that our picture, we believe, is different. And if that
4    difference holds up, then the outcome for our existing
5    shareholders will be different. But it is by nature highly
6    speculative, and I think I've talked about Grace stock and an
7    analogy to gamble. So I think it's always been that way, and
8    we're in this situation now where we're getting to the point
9    where we're really going to have to get down and get serious.
10    We believe some things are going to happen in our case in the
11    next six to nine months that are going to allow us to really get
12    serious and negotiate, and that as I said, puts us in a position
13    that makes us untenable relative to our obligation for the 401K
14    participants of Grace and Grace stock.
15    MIKE FERIGROSSI: Any other questions at the Tech Center?
16    Thank you. The Cafeteria at Curtis Bay? Thank you. Lake
17    Charles?
18    What is the status of getting Congress to rule on any new
19    asbestos rules?
20    PAUL NORRIS: Well, I'm encouraged as I've ever been. Many
21    of you know that Senator Hatch is the head of the Judiciary
22    Committee. We had a hearing in March. There is a proposal in
23    front of the Congress in the Senate that calls for medical
0021

March 13, 2003
1    criteria for people who allege personal injury asbestos. We
2    think that will significantly change; the litigation will
3    significantly change, the value of people's asbestos liability.
4    There is another proposal, potentially about the formation of a
5    Global Trust Fund. There was recently a Supreme Court case,
6    where the justices, although they said it was okay to award
7    people money for fear of cancer, they also said that the
8    Congress needs to act to make changes in asbestos litigation.
9    So I think this is the most positive environment that we've
10    had for asbestos litigation reform. I am continuing to be
11    optimistic. If I had one area where I was optimistic, it would
12    be this area. We continue to be actively engaged in the
13    process. I will send out a note, an e-mail today, asking people
14    to contact their Senators and Congressmen about asbestos
15    litigation, and recognize that this is the opportunity to move
16    that forward. So there's a lot that's happening in litigation
17    reform. I believe Texas has a bill to change the laws in the
18    State of Texas, which would have an implication that would be

GRA-B2 006094

CONFIDENTIAL        112241

19   positive. All of these things would be positive for us, because
20   this would say what our liability would be if we were outside
21   Chapter 11. So all of that I think is as positive as it has
22   been, but still, I consider this to be sort of 50/50 or less
23   than 50/50 chance to get the Congressman and the Senators to

0022
     March 13, 2003
1    stand up against the trial bar, a very strong trial bar in the
2    United States is very difficult. But I think we've made some
3    real progress in the last year.
4    Bill Corcoran leads this effort for us; I think he's done a
5    terrific job. If you see Bill in the hallway, you ought to
6    congratulate him on the one hand and encourage him to do better
7    on the other hand.
8    MIKE FERIGROSSI: Thank you, Lake Charles. Let's move to
9    Chattanooga?
10   BILL: I have one question. Are there any parallels that
11   you can draw between as you compare it to the Dow Corning
12   situation; are there any parallels between the two or connected?
13   PAUL NORRIS: In the case of Dow Corning, Dow Corning is
14   owned by Dow and by Corning. Those two companies will own Dow
15   Corning at the conclusion of their reorganization plan. I can't
16   tell you the equity if you will, value, that remains in Dow
17   Corning compared to the equity value that was there before they
18   filed for Chapter 11. It's not available in a simple form of
19   stock price. Their financial information is publicly available
20   at DowCorning.com. It's pretty hard to figure out the answer to
21   that question, so if you get a conclusion, please give me an e-
22   mail.

0023
     March 13, 2003
1    MIKE FERIGROSSI: Thanks, Bill. Boca Raton, are there
2    questions?
3    BOCA RATON: No questions.
4    Are there questions from any of our remote locations? I'm
5    told that the first one that pushes the button gets through; you
6    do not cancel each other out.
7    UNKNOWN: Due to the fact that this (inaudible), would that
8    impact (inaudible) the global (inaudible)?
9    PAUL NORRIS: No, I think that -- that's a good point; I'd
10   like to reiterate. The Chapter 11 process protects the
11   businesses, and as such protects the employees, because it
12   allows us to have funding, to continue to operate as normal.
13   What happens at the end is the decision about whether our equity
14   belongs to our shareholders, or whether our equity needs to go
15   to our creditors in order to satisfy our obligation, either our
16   asbestos obligations, our bank obligations or trade obligations.
17   And so, in any case, the company will be owned by people who
18   have an interest in the company continuing to succeed. And it
19   will only succeed if it continues to have employees who are
20   energized and engaged. And we're only going to have energized
21   and engaged employees if we pay them fairly and we give them
22   benefits that are comparable to the benefits they can get other
23   places. And that's the biggest protection that we have on any

0024
     March 13, 2003
1    of these things, is that the owners, whether they're personal

GRA-B2 006095

CONFIDENTIAL          112242

2   injury, asbestos, the banks or other independent shareholders;
3   ourselves, or people who just buy stocks, they need us to
4   continue to perform at this level in order to create the value
5   that is there to satisfy this obligation. And I don't think
6   you'll see them do anything that's going to put, make a problem
7   in us continuing to operate successfully. We've increased our
8   capital spending in Chapter 11; we've continued to make
9   acquisitions; we've increased our commercial expenses; we've
10  spent more money on R&D. So this is a, where you have to
11  separate the company and what's good for the company versus the
12  owners. And it's difficult, but the owners are not necessarily
13  directly aligned with the company in this case, because any
14  number of people can own our stock, but the company will still
15  be operating as an independent entity.
16  MIKE FERIGROSSI: Dave, do you have a follow-up?
17  DAVE SIEGEL: Just to prove, I want to say something.
18  Someone before made the point that at the beginning of the
19  bankruptcy we held Dow Corning up as an example. And one of the
20  main reasons that we did that was Dow Corning is an example of a
21  business that had a terrible litigation problem; it wasn't
22  asbestos in that case, but they had a terrible litigation
23  problem. And yet they've been able to operate the business for
0025

March 13, 2003
1   many, many years in bankruptcy, suing the protection of
2   bankruptcy, but still be very, very successful in the business,
3   providing rewarding employment for their employees, good
4   benefits, and basically make it a good place to work, despite
5   the fact that they were using Chapter 11 to deal with litigation
6   problems. That's really why we use Dow Corning, and I think we
7   are trying very hard to do the same thing here with Grace and
8   make this a good place to work and provide good jobs for people
9   and benefits and everything that they're expecting, while we
10  deal with the litigation.
11  MIKE FERIGROSSI: Thank you. Are there questions from any
12  other remote locations? Okay, I think we're about ready now to
13  start dealing with the pension issues and the proof of claims
14  issues.
15  PAUL NORRIS: The next issue I want to talk about was our
16  pension fund. And to try and help -- this is again, a very
17  complicated issue, that we have a lot of people who have
18  studied. And I'm going to try and simplify it, and if your
19  questions are too complex, I'm going to call on an expert to
20  help me. But I think there's a couple of things you need top
21  understand. First, the pension fund is an independent fund; it
22  is managed by a trustee; it is not accessible by the company or
23  by any of our creditors or by anybody else. It is truly
0026

March 13, 2003
1   protected and it's there for the people who have the right to
2   the pension. Today that value is about $524 million, and it
3   covers about 15,000 people, including our 3,000 active U.S.
4   employees. So obviously there's about 9,000 pensioners, and
5   there's people who are no longer with the company and they're
6   not pensioners but they have rights in the pension plan because
7   of prior service. So it covers a large group. And the
8   difficulties that we have in our pension plan are primarily the

GRA-B2 006096

**CONFIDENTIAL**          112243

```
 9        difficulties that every company in the U.S. has today, which has
10        a large pension plan and has a large number of retirees. And
11        that is that the equity market returns have declined
12        dramatically, as we all know from our own 401Ks over the last
13        three years. And in fact, last year the return on our plan was
14        down about 10 percent, and we are invested in things like the
15        Wiltshire 10000. We follow the Indexes, so our plan is invested
16        65 percent in equities; 35 percent in stock. And it, the stock
17        that we're in is in the Index. So we're not betting on any
18        particular stock; we're following the entire market, which is
19        the best thing to do to spread your risk. So we're just at the
20        risk of the entire equity market. We have a position in
21        international and U.S.; it's a balanced position; we have
22        experts who give us advice. But I would say it's conservatively
23        invested, as it should be when it's invested for retirement
```
0027
```
          March 13, 2003
 1        fund. But like the rest of the market, our funds have declined.
 2        We have to make payments out of our pension plan for the next 30
 3        to 50 years. So that means that 10-year swings are not
 4        necessarily indicative; 3 years are certainly not indicative.
 5        This is a very long-term, both funding and payment obligation
 6        requirement.
 7        So today when we look at our plan, if we assume that the
 8        plan continues, in other words, the company stays around, if the
 9        businesses stay around, we will be making payments, we will be
10        continuing to have people gain service, and so requirements on
11        our pension plan will be going up and we will be making out
12        payments and we'll be putting in contribution over a very long
13        period of time. And the assumptions about what the return on
14        the plan will be over this long period of time, and what the
15        defeasance rate is, or what it will cost us to give people their
16        benefits have a big impact on whether or not we consider
17        ourselves funded or not funded, and there are a lot of
18        government obligations about how you develop these calculations.
19        The important thing to recognize is when we do the
20        calculations, we assume that the plan will go on indefinitely;
21        in other words, we won't stop any day and just pay out and never
22        put any more money in the plan, just the assumption that every
23        ongoing business makes, because that's our intention. And even
```
0028
```
          March 13, 2003
 1        if you think about this plan being divided up by all the
 2        operating units around the world or in the U.S. if it's a U.S.
 3        plan, that means those operations will continue in some fashion.
 4        Whether the company has a different owner or not doesn't mean
 5        that the operations won't continue.
 6        Today, on a reasonable set of assumptions, and that's an
 7        assumption I think we -- we have an assumption that our plan
 8        will make 8.25 percent in the future, and we have a discount
 9        rate which for all our financial analysts in the room will be
10        6.25 percent. And those are the same assumptions that you're
11        likely to find in the Fortune 500; not any different or any
12        worse. And by the way, over the last 13 years we have really
13        earned 8.25 percent on our plan assets. In other words, so if
14        you said, what was the return on your assets over the last 13
15        years, it would be over 8 percent. If you look at it over the
```

GRA-B2 006097

CONFIDENTIAL        112244

16    last three years, it's obviously declined.
17    So these are all the calculations that, that go into trying
18    to figure out whether we are funded, not funded, whether we have
19    to take a charge on our balance sheet or we don't. When you do
20    all of that, and you calculate what we think of as the real
21    obligation, we're about $120 million under budget. Now, we have
22    put together a plan which we have discussed with our Board of
23    Directors and which we've gotten approval from our Board of
0029

March 13, 2003
1    Directors and which we have discussed with the Creditor's
2    Committees and which we will submit to the Court. And that plan
3    is to put in about $40 million of cash this year and for the
4    next several years until our funding status becomes fully
5    funded.
6    This is again, not, this isn't any different than most
7    other companies; this is the approach that we would take if we
8    were out of bankruptcy, or this is no different. We wouldn't
9    say, this year let's put the 120 in; remember, we got 30 to 50
10    years. We look at this over a period of time; next year returns
11    could be better and we may need more or less. But we look at a
12    $40 million a year over the next several years, or maybe it
13    could be 50. If we don't do anything this year -- and I can
14    assure you that we're going to make the strongest possible
15    motion with the strongest possible support to the bankruptcy
16    court to fund in accordance with the program that we would fund
17    normally. Under the government obligations, next year we would
18    need to make a contribution of about $90 million. That will be
19    a government-required contribution. Again, we would do that if
20    for some reason we were not able to do the plan that we want to
21    do. It makes sense to me to do this over a number of years
22    rather than wait and do it more next year.
0030

March 13, 2003
1    So we have gotten approval; we got approval recently to
2    fund the Curtis Bay hourly plan. So the Creditors' Committees
3    have supported this in the past, and I think they will support
4    it again. The most important thing for people to think about in
5    a pension plan is two things: we have a pension benefit, a
6    defined pension plan, defined benefit plan, because it's
7    required to give people compensation that's consistent with the
8    people that we compete with. In other words, if we don't have a
9    pension plan that's very similar to the plan that we have, most
10    people would rather leave here and go to work for someplace that
11    has a pension plan that's pretty consistent with ours. And this
12    is a required benefit. And so if we're going to become and
13    remain a healthy company, if we're going to continue in business
14    as a healthy company, we're going to have a pension plan.
15    Otherwise we're not going to be able to keep, attract and
16    motivate employees. And our stakeholders recognize that as
17    well. So although they are always prepared to be contentious
18    over any given issue, at the end of the day the thing that's
19    going to be compelling is this a competitive benefit; we're
20    going to offer it to be competitive because we have strong
21    businesses; we have good, capable employees; we need to continue
22    to have those people here and we need to continue to have
0031

GRA-B2 006098


CONFIDENTIAL    112245

March 13, 2003

1   motivating. And that is the strongest logic for our continuing
2   to fund and to maintain our pension plan.
3   That logic would be the same logic if we were out of
4   Chapter 11. We would have the same discussion we just were
5   having with our Board about whether this is the appropriate
6   thing to do; we just wouldn't have to go the next steps of
7   having it with the Creditors' Committees and the bankruptcy
8   court. But we have the same discussion; we have the same rights
9   as we have today. Bankruptcy just makes it a little more
10  complicated; it makes life a little more difficult It requires
11  some of the people that are sitting up in the front row to do a
12  lot more work. But trust me, it's okay. I think they can
13  handle it. And we've been able to get all the things that we've
14  needed to get to run the company; we'll do this as well.
15  Now, so then you say, with all of that said, what are we
16  doing when we're talking about whether or not people should file
17  a claim as part of the bankruptcy court process, particularly
18  for the qualified pension plan -- which as I just told you, we
19  expect to fund, and we don't expect there to be an issue. And
20  this gets back to the same kind of fiduciary discussion we had
21  earlier. There is some remote, very remote -- I don't know what
22  the probability is; I don't have a probability on it --
23  possibility that what I just said isn't going to happen. And I

0032

March 13, 2003

1   wouldn't tell anybody on that basis that they shouldn't use belt
2   suspenders, double belts, double suspenders, and put a claim in.
3   And I've also been advised by our bankruptcy attorneys that I
4   can't give you advice as to whether you should put a claim in or
5   not; I'm not supposed to do that. I'm not going to do that.
6   However, I can tell you that there's nobody in the company,
7   who, where there's no downside putting in a claim. And as I
8   said on the website, I'm going to put a claim in; I have some
9   different issues. But I'm going to put one in; I think a lot of
10  people on the leadership team are. And our view on this is no
11  harm, no foul. And so if you want to put a claim in to have a
12  place, you should certainly do that; there's no reason why you
13  shouldn't. Nobody in the company will feel badly about you;
14  this will not impact your participation, your performance, your
15  view in any way. I want to make that very, very clear. And I
16  don't know how, again, whether this is going to be precise or
17  not precise. The thing you ought to understand is once we exit
18  from bankruptcy, if the plan survives Chapter 11 reorganization,
19  you won't have a claim, nobody will have a claim, because we're
20  now out on the outside world. So the period of time when there
21  is any possibility of exposure is until we get a plan confirmed.
22  As I said, I don't see how we can have an ongoing viable company
23  without offering people a pension plan. And I can assure you

0033

March 13, 2003

1   that, like me, everybody here would be very disappointed if some
2   benefit that they earned previously was taken away. And your
3   previous benefit is earned and it is protected at the level of,
4   as it is at the time that you earned it. So as of today, the
5   PBGC, which gets to the issue, what's this Pension Benefit
6   Guaranty Corporation all about? It's the backstop for all these

**GRA-B2 006099**

**CONFIDENTIAL**

**112246**

```
 7    plans. If for some reason we couldn't go forward and be viable
 8    -- in other words, if we were going to liquidate the company and
 9    not reorganize the company, if we didn't have enough funds to
10    keep going, then there is some possibility that we could
11    terminate the plan, and that's when the Pension Benefit Guaranty
12    Corporation steps in and says, I'm going to take care of the
13    benefit and their benefit, if you're 65 ands you've got 30 years
14    of service and you made up to $100,000, they would guarantee all
15    your benefits. Having said that, the formula of trying to
16    figure out what that means and you've got 50 years' of service
17    and you're 48, it's very difficult. And I wouldn't try to tell
18    you about it. Again, I think it's extremely, extremely remote,
19    but I wouldn't want anybody not to file a claim because they
20    said well, Paul Norris told me, don't worry about it. That's
21    the most important, I don't want you to say, I told you not to
22    do it, so don't worry. I'm telling you everything that I know.
0034

      March 13, 2003
 1    Now, with that I'm going to try to take questions. And I
 2    hope that we can get people to focus on whatever it is that they
 3    need to do personally, take 15 minutes and do that. Whether you
 4    think you think you should file one or not file one, go ahead;
 5    it's about a 15-minute process. I think you know the name of
 6    the company. As a result of some of the questions, I'm going to
 7    send out a note this afternoon, an e-mail that gives you some
 8    basic information. I'm not going to tell you whether you should
 9    file one or you shouldn't, but if you did want to, there would
10    be some basic information so that you wouldn't have to go
11    scurrying around to find it, and recognize that at the end of
12    the day, it's placeholder. And so I just think that you have to
13    decide whether you want to put a placeholder in or not. But if
14    I can at least provide you the basic information, I will. I'll
15    probably give you some advice that's wrong, but I'm going to do
16    it anyway. So take a look at it; decide what you want, and what
17    you want to do. So with that, I'd like to try to take some
18    questions and try to diffuse this issue as best I can. Because
19    I don't think this should be the issue that's so concerting that
20    people are consumed with it. As I said, the best thing we can
21    do for ourselves is to keep our business as healthy and to make
22    money and to get cash. Because then al of our stakeholders want
23    to do things that make us happy, and we're not asking them to do
0035

      March 13, 2003
 1    anything that's different than they would do for any other
 2    company in order to be competitive. Just remember that. You
 3    know, our benefits here are good, but they're competitive, and
 4    if we want to be in business and continue to be successful --
 5    and I look around, we got great businesses; they're going to be
 6    around a long time. The only way they're going to be successful
 7    is if we've got people like you who are interested and engaged
 8    and active, and you're not going to be that unless you get
 9    compensated fairly, unless you've got fair benefits. And you're
10    going to have those, one way or the other, because otherwise the
11    company won't be successful. And the stakeholders know that,
12    and that's the best protection you've got.
13    MIKE FERIGROSSI: Well, we have a few questions on pension
14    and the claims process. I think you addressed most of them.
```

GRA-B2 006100

CONFIDENTIAL                    112247

15      One question, at what rate will Grace contribute to the pension
16      fund to get it fully funded again?
17      PAUL NORRIS: I think if we do this over a period of time,
18      for $40 million a year, that would be what we would propose to
19      do if we were out. I think that's a good funding plan. Bob
20      Tarolle and his team did a lot of work trying to figure out what
21      the alternatives were, what the legal obligations were, what
22      made the most sense for us, given our overall cash flow. And
23      this is the proposal that we would make if we were not in
0036

March 13, 2003
1      Chapter 11, and we're going to ask the Court what the strongest
2      possible language to support that.
3      MIKE FERIGROSSI: Here's one on the Pension Benefit
4      Guaranty Corporation. If for some reason the Grace pension
5      obligation is turned over to the PBGC, Pension Benefit Guaranty
6      Corporation, is our pension rolled into all the other plans that
7      the PBGC administers, or does it retain its own identity?
8      PAUL NORRIS: As I understand it, our plan would retain its
9      own identity. I have to say that this is not the place where
10     I'd be spending a lot of time and energy, trying to figure out
11     what the benefit would be under the variety of circumstances. I
12     think if you have any concern at all, it's best just to file a
13     claim. That benefit, whatever happens with the PBGC, is what it
14     is. The only thing I can tell you for sure is, the longer you
15     work, the better it is. So if you work until you're 65 and
16     you've got 40 years of service, you're in good shape.
17     MIKE FERIGROSSI: Concerning the claims forms; there are a
18     couple here now. Does the filled out form need to arrive by the
19     31st, or is proof of postmark on the 31st good enough?
20     PAUL NORRIS: Well, again, in the belt and suspenders, the
21     postmark is what you need. You need to prove that you mailed
22     it. But when I sent in my taxes, and I have great confidence in
23     the Post office, I get one of those return receipt requested
0037

March 13, 2003
1      things, and I don't know, it's $5, but I feel a lot better. And
2      I've had them call me and say, no, you didn't get it -- they've
3      actually called my wife. And she says, oh, no, I've got my
4      thing here, and it's stamped and I can prove it. And that did
5      save us one time. So if you're going to go so far as to go
6      belt, suspenders, and double britches or whatever, I think I'd
7      get it certified. That's personal; I can't give you advice, but
8      that would be what I'd do personally.
9      MIKE FERIGROSSI: More on the detail. What attachments do
10     we need to attach the form as supporting document concerning the
11     pension plan?
12     PAUL NORIS: I'm going to send a note out, but my
13     understanding is again, that simple works here to get you sort
14     of a place in line. I can't imagine that the company is going
15     to reject that claim, sine I just described it. And I think, my
16     personal op9iniohn is that a court is pretty favorably disposed
17     to employees and pensioners. And so that's my belief, and so
18     some reasonable information is probably appropriate. Again, I'm
19     going to ask John Forgass. We're going to send out an e-mail
20     that's sort of justifying the basic information that people
21     ought to know; in other words, what's the legal entity, what's

GRA-B2 006101

CONFIDENTIAL      112248

22      the case number, what's the plan. I saw somebody, a retiree,
23      sent something in that said, the company knows all of this. I'm
0038
        March 13, 2003
1       not going to waste my time trying to figure out an amount, nor
2       am I going to attach a 100-page document when the guy tat I'm
3       submitting a claim to has a lot more people and information than
4       I have. So maybe you wrote that down. That'd be your opinion
5       anyway.
6       MIKE FERIGROSSI: How do I get this form?
7       PAUL NORRIS: Well, I did go back and look, and we did send
8       a letter out in June. And at the time, even though it was
9       legalese, I think we said -- we gave you a form, we said, you
10      ought to think about whether you need to put one in. Having
11      said that, I think the HR departments have one. And if they
12      don't, I'm sure they're going to be scurrying to get one after
13      this phone call. But we're going to try to make them available
14      locally so that people could pick them up and don't have to --
15      but you can get them online; again, I don't know whether there's
16      form over substance here, but I would sorry more about the
17      substance than I would the form.
18      MIKE FERIGROSSI: And where do I send them; the address is
19      on the form?
20      PAUL NORRIS: I will -- the address is on the form, but
21      again we'll try to make it a little bit clearer. Again, I have
22      to say -- I mean, I'm on both sides. I like to do this for
23      people as people. We've been instructed as a company that we
0039
        March 13, 2003
1       really shouldn't, can't. So what we're going to try to do is
2       give you enough help so that you have basic information, and I
3       would find somebody that did one already and copy theirs. I
4       didn't say that, but that's what I -- retirees have lots of time
5       and they have lots of forms.
6       MIKE FERIGROSSI: What happens if I don't file a claim?
7       PAUL NORIS: Well, I think that under this extremely remote
8       circumstance, where something happens and we're in this period
9       of time between now and the time that we reorganize and emerge
10      from bankruptcy, there is this extremely remote risk that there
11      would be an obligation that you might have that you won't have.
12      Now recognize it if you file a claim it only makes you a general
13      creditor, so it just means that you get in line with all the
14      other creditors and you get your share of whatever the Court
15      decides is available to general creditors. So if they get a
16      dollar, dollar for dollar you get a dollar. If they get 50
17      cents on the dollar, you get 50 cents. But in any case your
18      claim's not liquidated because you haven't retired yet. I mean,
19      it gets pretty complicated in terms of whether or not, how
20      valuable this is. But at the same time, I would never want
21      anybody to say, hey, Paul told me, don't worry about it; don't
22      file a claim. I think if it helps you sleep better at not, file
23      one. I hope you do it in the evening, but in any case -- or
0040
        March 13, 2003
1       early in the morning. No, but I think if it makes you rest
2       better, you should file one. I don't really know, I just --
3       it's hard for me to imagine that this is going to be the issue,

**112249**

**GRA-B2 006102**

**CONFIDENTIAL**

4 but I would also not want to have somebody come to me and say,
5 hey, I didn't file one because you told me I didn't need to.
6 MIKE FERIGROSSI: Besides the pension plan, are other
7 benefits at risk --
8 PAUL NORRIS: -- and I've been fooled before in this
9 process.
10 MIKE FERIGROSSI: -- are there other plans at risk besides
11 the pension plan and do I need to fill out a separate form for
12 each benefit?
13 PAUL NORIS: Well, this is like the government; when in
14 doubt, more paper is better. But I don't -- that's my advice.
15 On the second one, remember that most of the benefits that we
16 have as employees are at the discretion of the company. I mean,
17 we could change our benefits almost at any time. They're not an
18 entitlement. We don't change our benefits; we keep our benefits
19 where they are because it's competitive, because that's the only
20 way we can have the people that we need to run the businesses,
21 to do all the things that we need to do to generate all the
22 economic value. That's the case with every company; it's no
23 different for us in bankruptcy than out of bankruptcy. I mean,
0041

March 13, 2003
1 our medical benefits as you know, are here as a benefit as part
2 of your compensation process. It's a very important part, but
3 it's also a very competitive part. When people look around at
4 the opportunities to be here versus other places, that's one of
5 the things that they look at; what sort of package, what's the
6 compensation, what are my benefits? So when you think about
7 whether or not you should file a form, you should only do one
8 where you think you have a vested interest that you have a legal
9 right that somebody couldn't take it away from you. And pension
10 is clearly that kind of a right; you have a vested and earned
11 right protected under law in your pension. So that's why if
12 there was any discrepancy between that and what the law made
13 available, you could have a claim because you have a vested
14 legal right. Other benefits you need to think about whether you
15 have a vested legal right. There aren't many, unfortunately.
16 MIKE FERIGROSSI: Paul, that leads right into the next
17 question. I'm currently not vested in the pension plan, but I
18 may be before we emerge. Should I file a claim?
19 PAUL NORRIS: Well, I would never say don't. I don't know
20 how old you are, but that may not be the biggest issue you have.
21 MIKE FERIGROSSI: Let's go, questions from the floor. Any
22 here in Columbia in this room? Yes.
23 UNKNOWN: (Inaudible).
0042

March 13, 2003
1 PAUL NORRIS: My opinion is that the company knows the
2 amount, so if the company wants to know it, you should say the
3 company should use its sophisticated resources to calculate the
4 amount.
5 UNKNOWN: But how can the company --
6 PAUL NORRIS: I mean, it is a contingent claim to start
7 with, and the amount changes every day your service changes, and
8 so forth. So again, I just, I don't believe that -- the company
9 wouldn't reject this claim, you know, and I just can't believe
10 that the court would reject it on the basis that you didn't put

GRA-B2 006103

**CONFIDENTIAL**

112250

11      in an amount --
12      UNKNOWN: I (inaudible) --
13      PAUL NORRIS: Again, I'm not even sure how to, without
14      turning the HR department into a benefits calculation
15      department, I'm not sure we can even get you the info. It takes
16      about two weeks after when you want to retire. I don't know how
17      long it actually takes, but it's about a month. So I mean, I
18      think a practical answer is that that's determinable; it's not
19      like it's speculative, so that's what I would -- if I was going
20      to fill one out, that's what I'd put down personally, if the
21      company knows how to do it, just do it. John, is that good
22      advice?
23      JOHN FORGASS: (Inaudible).
0043
        March 13, 2003
1       PAUL NORRIS: I got pretty good from John Forgass; that's
2       the best I get from John. I asked John what time it was, I got
3       a page on how to build a watch.
4       MIKE FERIGROSSI: There's a location that needs to turn
5       their mute button off. Any other questions in this room? How
6       about the cafeteria in Columbia?
7       COLUMBIA CAFETRIA: When (inaudible).
8       PAUL NORRIS: Again, I -- things you don't know, I got to
9       believe you can say you don't know. It's probably appropriate
10      unless you don't know. But indeterminate. I would say in all
11      this stuff if you just -- it's hard to believe this, but I think
12      if you just use common sense and fill this out, that that's a
13      lot -- you're just trying to put something in to hold your
14      place. So I think it has to be more than writing your name on
15      the top, but I don't think it has to be that sophisticated; at
16      least that's my personal view. So if you don't know something
17      and if it takes you more than five minutes to find out, then I
18      probably would put, don't know. Or as I said, ask the company.
19      MIKE FERIGROSSI: How about Building 30 here in Columbia?
20      BUILDING 30: Nothing from 30, thank you.
21      MIKE FERIGROSSI: Thank you. Cambridge?
22      CAMBRIDGE: (Inaudible.)
23      MIKE FERIGROSSI: We will
0044
        March 13, 2003
1       CAMBRIDGE: How does (inaudible)?
2       PAUL NORRIS: I checked the wind this morning before I came
3       in, and I couldn't' detect anything on the wind for us to change
4       our plan from a defined benefit plan to what I believe IBM did
5       was defined contribution plan. We have no plan. As I said, our
6       position in bankruptcy is no different than our position
7       outside; we could always come and make adjustments on the plans
8       going forward. But we have no plans to do that. Obviously,
9       it's an issue; it's a significant issue for companies like us,
10      where our employees have long, long years of service. And the
11      thing that overrides everything is whether or not that would
12      make us more or less competitive to attract the kind of people
13      that we nee3d to be successful. But we have no plans, we have
14      not studied this, I assume that you're not recommend that you
15      study it.
16      MIKE FERIGROSSI: Are there further questions in Cambridge?
17      CAMBRIDGE: (Inaudible.)

GRA-B2 006104

**CONFIDENTIAL**

**112251**

```
18      MIKE FERIGROSSI: Thank you. Moving to Lake Charles? Any
19      pension questions or claim form questions?
20      LAKE CHARLES: I think we got all we need for our retirees,
21      thank you.
22      PAUL NORRIS: Forman, I think that may be a first.
23      LAKE CHARLES: They keep asking good questions.
0045
        March 13, 2003
1       PAUL NORRIS: Yes, they do.
2       MIKE FERIGROSSI: How about Curtis Bay? Let's take the
3       Admin Building at Curtis Bay first.
4       CURTIS BAY ADMIN BUILDING: Nothing.
5       MIKE FERIGROSSI: Thank you. The Tech Center at Curtis
6       Bay.
7       TECH CENTER: Nothing.
8       MIKE FERIGROSSI: Thank you. The cafeteria at Curtis Bay?
9       CAFETERIA: (Inaudible).
10      PAUL NORRIS: The pension plan for Curtis Bay employees
11      following the recent motion, I believe is fully funded. In
12      other words, I say that beaus again the calculation here is very
13      difficult, so 100 percent is a number I can't use on a pension
14      plan at any moment. But that, if it isn't there, it's Six
15      Sigmas; it's pretty close. But I believe it's fully funded.
16      And the court approved our fully funding it, so we have some
17      precedence here.
18      DAVE SIEGEL: Paul, the court approved it, and once we do
19      make that contribution, we'll be fully funded through the advice
20      of getting it up front.
21      PAUL NORRIS: So once -- we will do that -- I don't
22      remember the time, and then it will be fully funded.
23      DAVE SIEGEL: Late June, it will be.
0046
        March 13, 2003
1       PAUL NORRIS: Late June. I don't know why we pick late
2       June.
3       MIKE FERIGROSSI: Any other questions at Curtis Bay
4       Cafeteria? I guess that was a no. Chattanooga?
5       CHATTANOOGA: (Inaudible).
6       MIKE FERIGROSSI: Are there any questions at all from
7       locations that are hooked in here?
8       UNKNOWN: (Inaudible).
9       MIKE FERIGROSSI: I guess that's a wrap. Paul?
10      PAUL NORRIS: Okay. Again I want to thank you all for
11      attending, for your patience. These are very important issues,
12      for us as individuals, or for the company. I want to just say,
13      just reiterate one point, that the thing that really will
14      determine our success, both as individuals and as the company,
15      is our performance. And we shouldn't ever lose sight of that,
16      and please, as you go back, make sure you focus on your boss, be
17      safe, and do what you think is important for you to do as an
18      individual and don't fret over it. There's a lot of things in
19      life that are unpredictable. Certainly our lives as a company
20      may be more unpredictable than most, but I don't think that's
21      the basis for us to be afraid or worried; you just have to
22      accept that and move on. If there's something that we can do,
23      we'd be happy to do that. I think the most important thing to
0047
```

GRA-B2 006105

CONFIDENTIAL

112252

March 13, 2003

1   do is to go back, do our jobs, be safe, please keep all the
2   service people around the world in your thoughts and prayers.
3   So thank you all very much.
4   Grace Teleconferece/pfs/9-7-04
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
2
23

GRA-B2 006106

CONFIDENTIAL

112253