# EXHIBIT I

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2    - - - - - - - - - - - - - - - - -+
                                        |     ORIGINAL
 3   KERI EVANS,                        |
                                        |
 4              Plaintiff,              |
                                        |
 5      vs.                             |
                                        |
 6   JOHN F. AKERS, et al.,             |  Consolidated as
                                        |
 7              Defendants.             |  Case No.:
                                        |
 8    - - - - - - - - - - - - - - - - -+  04-11380-WGY
                                        |
 9   LAWRENCE W. BUNCH, et al.,         |
                                        |
10              Plaintiffs,             |
                                        |
11   vs.                                |
                                        |
12   W.R. GRACE & CO., et al.,          |
                                        |
13              Defendants.             |
                                        |
14   --------------------------------x
15          Deposition of ROBERT M. TAROLA, CPA
16                   Washington, D.C.
17                    May 10th, 2007
18                     10:00 a.m.
19
20   Job No. 1-102403
21   Pages 1 - 174
22   Reported by:  Laurie Bangart-Smith
```


L.A.D. REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

28

1   A   I can't answer that yes or no at this stage.
2   It's too vague of a question.
3   Q   During the time that you have served as a
4   Chief Financial Officer of W.R. Grace, has any error
5   occurred with respect to the financial numbers in any
6   filing that you've signed?
7   A   Yes.
8   Q   And did the company then take steps to
9   correct those errors?
10  A   Yes.
11  Q   And are those errors found in the amended
12  filings that are denominated with an "A" following the
13  filing?
14  A   Yes.
15  Q   Other than those amended filings, has any
16  error come to your attention that has not been
17  corrected with a public filing?
18  A   Any error?
19  Q   Any material error.
20  A   No.
21  Q   So as you sit here today, the Form 10-Ks,
22  plus the 10KA's, plus the amendments, properly

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

78

1 record is clear.

2     THE WITNESS: May I say my recollection is

3 that I agreed with the quote at the time. I was

4 looking for confirming information, and I haven't read

5 this completely. I agreed at the time.

6 BY MR. CUMMINS:

7     Q    And then the sentence that follows reads,

8 "We are also making progress in the evaluation of our

9 Chapter 11 claims which has resulted in the adjustment

10 of certain liability estimates in the fourth quarter."

11 Do you see that?

12     A    Yes.

13     Q    So there were some estimates that Mr. Norris

14 was referring to that had been done in the last

15 quarter of 2003 by W.R. Grace & Company, right?

16     A    Yes.

17     Q    And those changes are reflected in the

18 consolidated balance sheet that's attached to the

19 press release on Page 11; is that correct?

20     A    That's correct.

21     Q    And the asbestos-related liability is

22 slightly higher in 2003 than it was in 2002, right?

1    A    Almost $20 million higher.

2         (Exhibit No. 26 was marked for

3    identification and attached to the deposition

4    transcript.)

5  BY MR. CUMMINS:

6    Q    I'm going to hand you now what's been marked

7  for identification as Plaintiffs' Deposition Exhibit

8  26.  I just have a couple of questions about

9  Mr. Norris' comments, the quote at the bottom of the

10 first paragraph.

11   A    Yes.

12   Q    In my words, he's pretty upbeat about the

13 financial performance of the company in the first

14 quarter of 2004, isn't he?

15   A    He states they were very good.

16   Q    Did you agree with that statement at the

17 time he made it?

18   A    Yes.

19   Q    In fact, the operating performance of the

20 company was improving in the first quarter of 2004,

21 was it not?

22   A    Relative to the first quarter of 2003, yes.

101

1   Investment Benefits Committee thought that one of the
2   choices was underperforming, that it would make some
3   recommendation to make a change?  Is that correct?
4        A    We would evaluate the situation.
5        Q    And with respect to your service on the
6   Investment Benefits Committee, do you recall ever
7   making a change in the investment options that were
8   made available to the plan participants?
9        A    Yes.
10       Q    Other than the stock fund options?
11       A    Yes.
12       Q    There were some other changes or additional
13  opportunities made?
14       A    Yes.
15       Q    And I think you would agree with me, the way
16  the plan is constructed, the decision as to where a
17  plan participant's money would go was exclusively the
18  plan participant's; is that correct?
19       A    That's correct.
20       Q    And it never changed so long as you were on
21  the Investment Benefits Committee?
22       A    I would like to make one clarification.

121

1  correct?

2      MS. FLOWE: I'm going to object to the

3  extent that you're asking him for a legal conclusion,

4  but you can answer if you can.

5  BY MR. CUMMINS:

6     Q   You're not a lawyer, are you?

7     A   No.

8      MR. CUMMINS: Okay. I'm asking for his --

9  yeah, I'll restate the question.

10 BY MR. CUMMINS:

11    Q   At the time you signed this document, is it

12 correct that you believed you had no responsibility

13 with respect to State Street's decision on its

14 handling of the Grace stock fund?

15    A   That's absolutely correct.

16    Q   And you believed at the time that you had

17 virtually wiped your hands of any responsibility to

18 the plan participants, in the vernacular?

19     MS. FLOWE: Same objection.

20     THE WITNESS: That's correct.

21 BY MR. CUMMINS:

22    Q   And you were told that somewhere or was that

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

126

1   the first quarter, calendar quarter of 2004, related

2   to that conflict.  You described this conflict concept

3   as "hypothetical."  In the first quarter of 2004 did

4   you think that there was an actual conflict between

5   your duties as the CFO and your service as a member of

6   that committee?

7       A    No.

8       Q    And during the first two weeks of April did

9   you think that there was an actual conflict between

10  your duties as the CFO and your service as a member of

11  that committee?

12      A    April 2004?

13      Q    Uh-huh.

14      A    No.

15      Q    We talked a little bit about the ranking by

16  Fidelity of the various spectrum of the investment

17  opportunities offered to the plan participants.  If

18  you can pull out the exhibit that's marked Number 12.

19  Have you seen Exhibit 12 prior to today?

20      A    May I review it?

21      Q    Please.  I'm going to ask you two questions.

22  One is:  Is this a document you ever received?  You

128

BY MR. CUMMINS:

Q   This report is, on its cover page, dated February 20, 2004. Do you have it?

A   That's what I have, yes.

Q   And then if you will, please, turn to Page 22 of the report. For the clarity of the record, can you describe your understanding of what this Page 22 headed "Investment Options Spectrum" is intending to convey to the members of the committee?

A   I believe it's intended to convey the offerings under the investment -- I'm sorry -- the savings and investment plan portrayed in terms of risk/reward on the risk/reward spectrum.

Q   The investment option to the far left is headed "Money Market for Short Term." Do you see that?

A   Yes.

Q   And then the investment option to the right is headed "Company Stock," and underneath it's just one, "W.R. Grace Stock." Do you see that?

A   Yes.

Q   Is this your understanding of what the risk

129

1   spectrum was to the plan participants as of
2   February 20, 2004?
3       A    Again these are the offerings set under
4   various asset class categories portrayed along a risk
5   spectrum as presented by Fidelity.
6       Q    And it was your, you and Mr. McGowan's,
7   responsibility through the delegated authority from
8   the board to provide such a spectrum to the plan
9   participants, was it not?
10      A    Offerings within an appropriate spectrum I
11  think is the investment policy.
12      Q    And as of February 20, 2004, that Page 22
13  was the offering, so far as you know?
14      A    I believe these were the offerings, yes.
15           (Exhibit No. 29 was marked for
16           identification and attached to the deposition
17           transcript.)
18  BY MR. CUMMINS:
19      Q    Handing you now what's been marked for
20  identification Number 29 --
21      A    Jim, just a minute.
22      Q    Do you want to clarify something?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

131

1  interrupt you.
2      A    I believe we did act on that advice to a
3  certain degree.  We put a number of measured
4  restrictions in to minimize the likelihood that other
5  employees might invest in that asset class and put
6  retirement funds at risk beyond what may have been
7  appropriate.
8      Q    Let me refer you to the date of this.  This
9  is February of 2004, and I'd ask you to recall that
10 somewhere in December of 2003, according to your
11 testimony, you had moved the responsibility for making
12 a decision off to State Street with regard to the
13 stock fund.
14     A    My only point is that the Grace stock was on
15 the far right for years before this, and as a result,
16 we had another adviser telling us that you need to
17 look at that for concerns over whether or not it was
18 appropriate for a retirement plan.  That's all I
19 wanted to point out.
20     Q    This is February of 2004 when Fidelity was
21 telling you about that?
22     A    Well, I believe -- my recollection is we

Case 1:04-cv-11380-WGY    Document 180-10    Filed 08/17/2007    Page 12 of 12
DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

132

1   were made aware of that before February of 2004.  We

2   had periodic meetings with Fidelity.

3       Q   Remind me again if you will.  Somewhere in

4   2001, Grace filed its bankruptcy petition, correct?

5       A   Correct.

6       Q   Am I not correct that the benefits committee

7   continued to offer the opportunity for plan

8   participants to remain owners of that stock from '01

9   through whenever State Street sold the stock?

10      A   That's correct.

11      Q   There was no restriction on continuing to

12  own, correct?

13      A   Correct.

14      Q   So the investment decisions that the plan

15  participants were making from December of 2001 to

16  continue to hold the stock was really the

17  responsibility of the plan participants, right?

18      A   Correct.

19      Q   And as of February 2004 your plan wasn't

20  even offering an opportunity to invest in the stock

21  fund, right?  No new money, basically?

22      A   I don't remember the exact dates, but that