# EXHIBIT M

```
                                                              1

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - - - X

 4     KERI EVANS,                     :

 5              Plaintiff,             :   Consolidated as

 6     vs.                             :   Case No.:

 7     JOHN F. AKERS, et al.,          :   04-11380-WGY

 8              Defendants.            :

 9     - - - - - - - - - - - - - - - - X

10     LAWRENCE W. BUNCH, et al.,      :

11              Plaintiffs,            :

12     vs.                             :

13     W. R. GRACE & CO., et al.,      :

14              Defendants.            :

15     - - - - - - - - - - - - - - - - X             ORIGINAL

16          Deposition of WILLIAM BRIAN MCGOWAN

17                    Washington, D.C.

18                 Monday, April 30, 2007

19                      10:13 a.m.

20     Job No.:   1-102400

21     Pages:     1 - 173

22     Reported by:   Dana C. Ryan, RPR
```



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

1    Q    When did Mr. Festa become CEO?

2    A    Mr. Festa became CEO June of '05.

3    Q    Does Mr. Norris retain any titles at Grace
4  at this time?

5    A    Mr. Norris is the chairman of the board.

6    Q    Does he hold any executive positions at this
7  time?

8    A    No.

9    Q    He has ceased having an executive position
10 as of June 2005?

11   A    That is correct.

12   Q    The reason, of course, that we are here
13 today is to discuss issues relating to the W. R. Grace
14 Savings and Investment Plan.  I assume that you're
15 familiar with that plan?

16   A    That is correct.

17   Q    What is your responsibilities in connection
18 with the plan?

19   A    I am a fiduciary of the plan.  As it is a
20 benefit of employees, I'm involved with the plan.

21   Q    In terms of the administration of the plan,
22 what are your responsibilities?

1    A    The people present at -- at the meetings
2    would be Bob Tarola and myself as fiduciaries, John
3    Forgach as our ERISA legal counsel, and various
4    members of the treasury function who report on the
5    investment returns, as well as occasionally Mike
6    Piergrossi, who works for me, and Mike is a VP of HR.
7    Q    Okay.  In addition to the 401(k) or the
8    defined contribution plan, does Grace offer its
9    employees other retirement benefits, and I'm not
10   referring to medical benefits -- I think a defined --
11   a pension plan?
12   A    We have a defined --
13   Q    Benefit --
14   A    -- benefits plan.
15   Q    -- that's the word I was looking for.  A
16   defined benefits plan; is that correct?
17   A    That's correct.
18   Q    And who is entitled to -- who receives the
19   benefits from the defined benefit plan?
20   A    I'm going to -- all my statements are going
21   to relate to the U.S. employees; okay?
22   Q    That's fine.

25

1    A    All salaried employees participate in the
2    W. R. Grace Retirement Plan for Salaried Employees, as
3    well as the union employees have their separate
4    defined benefit plans, but they change from union to
5    union, so they're not consistent across the company.
6    Q    Okay. With regard to the union employees,
7    who manages those plans?
8    A    They also come underneath my responsibility.
9    Q    In terms of breakdown between -- I'll call
10   them union employees and salaried employees; does that
11   make sense to you?
12   A    That makes sense.
13   Q    How many salaried employees are there
14   versus -- well, how many salaried employees are there
15   at Grace?
16   A    I believe the number is approximately 2,200
17   in the U.S.
18   Q    Okay. And approximately how many union
19   employees are there?
20   A    About a thousand.
21   Q    That makes sense. And can you describe --
22   give a brief description as to the benefits that the

26

1 defined benefit plan provides to salaried employees,
2 if there's a formula that's used in order to calculate
3 what their ultimate retirement benefit will be?
4     A    The formula is based on -- takes into
5 consideration years of service; it takes into
6 consideration your final average salary, which is the
7 average of the last five years.  And as a multiplier,
8 for every year of credited service you get
9 1.5 percent.  So, therefore, if someone had -- would
10 have ten years of service, they would have a
11 15 percent benefit times their average salary.
12     Q    Okay.  And, if you know, does the union
13 pension plan vary -- I know it was several different
14 union plans; you indicated that a moment ago.  But do
15 you have a general understanding if the formula varies
16 much from the formula you just described to me?
17     A    Yes.
18     Q    How does it vary?
19     A    The union plans are typically just based on
20 years of service times a fixed dollar amount.  For
21 example, for every year of service -- some of them
22 today have $50 a month of a benefit, so if you have

28

1  me -- is that at some point Grace expanded the
2  investment options to that number; that it wasn't
3  always 20 or so options -- in excess of 20 options; is
4  that correct?
5     A    That is correct.
6     Q    Do you recall approximately when Grace
7  expanded its options to what it currently offers?
8     A    I cannot recall the exact date or even the
9  approximate date.  Several years ago, but --
10    Q    Were you involved in that decision-making
11 process?
12    A    Yes, I was.
13    Q    Can you briefly explain the reason why Grace
14 expanded the number of investment options available to
15 its participants in the 401(k) plan?
16    A    The number was expanded in order to give its
17 participants a broader range of investment options
18 to -- to invest their money in.
19    Q    And why did Grace and you as a fiduciary
20 want to increase -- provide a broader range of
21 investment options for the participants in which to
22 participate -- to invest in?

31

1    A    Yes, we've had other ones come in to give us
2 an assessment of the nonfixed asset funds in the plan.
3 From time to time we've used other people. I cannot
4 recall the names at this time.
5    Q    Okay. Was the purpose of offering -- was
6 one of the purposes of offering all these investment
7 options to plan participants -- I think you indicated
8 risk and foreign versus domestic investments. Was
9 part of that basically to allow the plan participants
10 to have diversified investments?
11    A    That is correct.
12    Q    Okay. And that's considered to be called
13 diversification?
14    A    That is correct.
15    Q    And what is your understanding of what
16 diversification is?
17    A    Diversification in this sense would be not
18 to put all your money in one place, and it also
19 depends on the age of the participants where they
20 would put money in what funds.
21    Q    Now, you indicated a moment ago that one of
22 the purposes also was risk. So does risk have a

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

62

1  to be taken together.

2      Q    Was allowing plan participants to keep their
3  money in the Grace Stock Fund at that time
4  inconsistent with the goals of Grace to allow plan
5  participants to have a diversified 401(k) portfolio?

6           MS. FLOWE:  Objection, asked and
7  answered, I think, but I'm not sure I even understood
8  the question.  Did you understand that question?

9           THE WITNESS:  I believe I did.

10          MS. FLOWE:  There was at least one
11 double negative.

12 BY MR. GOODMAN:

13     Q    Why don't you answer the question.  And if
14 I've confused you, I apologize; I'll be more than
15 willing to try to rephrase the question.

16     A    At this point in time we thought it was
17 still appropriate to let people keep the monies that
18 they had but prohibit any future investments into the
19 fund.

20     Q    And by being appropriate, does that mean it
21 was consistent with the goals of the plan to allow a
22 diversified portfolio?

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

69

1    Q    At any time between 2000 and December 15th,
2    2003, did you believe that maintaining money in the
3    Grace Stock Fund had become an imprudent investment
4    option?
5    A    I can't recall if I ever thought that at
6    that time.
7    Q    Sitting here now, at any time -- if at any
8    time between 2001 and December 15, 2003 participants
9    maintained money in the Grace Stock Fund, would you
10   have considered that an imprudent investment?
11              MS. FLOWE:  I'm going to object on the
12   grounds of relevance, but you can answer.
13              THE WITNESS:  I don't think I can
14   answer that question.
15   BY MR. GOODMAN:
16   Q    If at any time between 2001 and December 15,
17   2003 you as a fiduciary to the plan had believed that
18   retaining an investment in the Grace Stock Fund had
19   become an imprudent investment, what obligations were
20   there on you?
21   A    As a fiduciary it would have been my
22   obligation to -- to discuss this matter to -- to

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

71

1    allowing plan participants to continue to keep money
2    invested in the Grace Stock Fund between 2001 and
3    December 15th, 2003 was imprudent?
4        A    No.
5        Q    As we sit here now, do you believe that
6    allowing Grace plan participants to continue to keep
7    money in the Grace Stock Fund between 2001 and
8    December 15, 2003 was an imprudent investment vehicle?
9             MS. FLOWE:  Objection, relevance, asked
10   and answered.  You can answer it if you can.
11            THE WITNESS:  I cannot answer.
12   BY MR. GOODMAN:
13       Q    Why not?
14       A    I believe it's irrelevant.
15       Q    Well, aside from that, why can't you answer?
16       A    I think you're asking me to sit here three
17   years, four years after the fact and saying what I --
18   what I think now about facts -- about circumstances
19   back then.
20       Q    Exactly.  That's what I would like you to
21   answer.  As you sit here now as a fiduciary to the
22   investment and benefits committee, savings plan, I

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

72

1  want you to answer the question, was it an imprudent

2  investment -- was it imprudent to allow plan

3  participants to maintain funds or their money in the

4  Grace Stock Fund between 2001 and December 15th, 2003?

5      A    Based on the facts and circumstances as we

6  knew them during that period of time, 2000 and 2003, I

7  have the same answer; that it was -- the committee did

8  not take any action.  I think that was the appropriate

9  position to take at that time.

10     Q    Now, you indicated that you're vice

11 president for administration at Grace; is that

12 correct?

13     A    Senior vice president.

14     Q    Senior vice president.  But you -- in that

15 position do you have an understanding of the financial

16 affairs of Grace?

17     A    General.

18     Q    Okay.  As part of your responsibilities are

19 you responsible for periodically reviewing financial

20 information?

21     A    Not of W. R. Grace; only as it relates to my

22 individual functions; department of budgets, for, you

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

81

1    Q    December -- I'm sorry.  2000 -- between 2001
2    and December 15th, 2003.
3    A    Yes, we considered the impact on asbestos as
4    it relates to the Grace stock.
5    Q    Okay.  And how did you factor that in?
6    A    I'm not sure what you mean factor in.
7    Q    Okay.  You used the word you considered that
8    in connection with the Grace stock.  How did you
9    consider the asbestos liability?
10   A    We considered the asbestos liability and
11   what impact that would have on the Grace stock and was
12   Grace stock still an appropriate investment option in
13   the 401(k) plan.
14   Q    Okay.  And when doing that, did you believe
15   that the numbers that -- what number did you use
16   regarding Grace's asbestos liability when you made
17   that analysis?
18   A    Used the numbers that were provided by the
19   finance organization that are in the published reports
20   of the company.
21   Q    Okay.  And you believe that was a fair way
22   to assess the asbestos liability, by using those

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

118

1  BY MR. GOODMAN:
2      Q    All right.  Exhibit Number 8.
3      A    These are the annual, referred to by the
4  government, Form 5500, which is the annual return for
5  employee benefit plans.
6      Q    And you signed this approximately
7  October 5th -- October 15, 2004?
8      A    I signed it on October 15th, 2004.
9      Q    Okay.  And if you could turn to what's been
10 Bates stamped as page 940.  This, as far as you know,
11 provides an accurate representation as to the assets
12 in the investment plan as of the end of the year 2003
13 and 2002; is that correct?
14     A    That is correct.
15     Q    And the value of the plan on December 31st,
16 2003 was approximately $476 million?
17     A    That's correct.
18     Q    Of that, approximately $21 million was in
19 the Grace Stock Fund; is that correct?
20     A    Correct.
21     Q    Was this information made available to State
22 Street?

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

124

1  as someone who signed this agreement.
2       A    I would go back to say that State Street was
3  able to sell them if they determined that holding
4  these shares was not in accordance with ERISA.
5       Q    Okay.  And at the time that the letter --
6  the notice, February 27th, I believe it was dated,
7  sent to State Street -- to plan participants
8  describing the fact that State Street was about to
9  start selling portions of the Grace Stock Fund, did
10 you have -- make any -- well, strike that.  I think we
11 went over that.
12           Okay.  If you would also turn now to page 6.
13      A    Yes.
14      Q    Going back a step, in connection with the
15 investment guidelines, did Grace consider the Grace
16 Stock Fund as separate and apart from the
17 investment -- aside and apart part from the 401(k)?
18          (The Reporter asks for clarification.)
19              MR. GOODMAN:  I'm sorry.  Let me ask
20 the question again.
21 BY MR. GOODMAN:
22      Q    Did Grace, or you being a member of the

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

125

1   investment and benefits committee and a fiduciary to
2   the 401(k) plan, consider the Grace Stock Fund as
3   separate and apart from the rest of the plan?
4       A   No.
5       Q   Okay.  If you were to turn to page 6, and
6   regarding the Provision of Information; do you see
7   that?
8       A   (Witness reviews document.)  Okay.
9       Q   Did you understand that Grace had a
10  responsibility to State Street to provide financial
11  information and certain other information to it?
12      A   As requested by State Street.
13      Q   Okay.  And who was, if you recall, the
14  person at Grace who was responsible for filling those
15  requests if made?
16          MS. FLOWE:  Objection, asked and
17  answered.  Go ahead.
18          THE WITNESS:  All financial
19  information, to the best of my knowledge, was provided
20  through Bob Tarola or his office.
21  BY MR. GOODMAN:
22      Q   Did you review the financial information

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

140

1    A    With the uncertainty surrounding the
2  ultimate outcome of the bankruptcy, the Grace stock
3  might not be an appropriate investment in a retirement
4  401(k) plan.
5    Q    At that time did you have any understanding
6  that -- well, it was an appropriate investment -- do
7  you agree that it was an appropriate investment in a
8  401(k) plan prior to the time that Grace sought to
9  delegate the fiduciary -- sought -- prior to the time
10 Grace hired State Street to be independent fiduciary?
11         MS. FLOWE:  Objection.  He asked
12 that -- answered that question at least twice this
13 morning.
14         MR. GOODMAN:  Okay.
15 BY MR. GOODMAN:
16   Q    But I'm trying to understand the distinction
17 here, so please answer it one more time.
18   A    There were actions taken prior to the hiring
19 of State Street, as we discussed before, where we --
20 where we thought it was prudent to eliminate new funds
21 going into the Grace stock plan -- Grace stock and the
22 401(k) plan.

157

1  Goodwin Procter and State Street?

2      A    The best that I can remember, I did not.

3      Q    Do you know anybody at Grace who did?

4      A    I know there were people that met with them,

5  but I don't recall who they were specifically.

6      Q    After the relationship between State Street

7  and Grace ended because State Street made the decision

8  to sell the -- liquidate or sell the stock -- Grace

9  Stock Fund to D.E. Shaw, did Grace perform any review

10 of State Street's performance?

11     A    Not that I'm aware of.

12     Q    Were any critiques done?

13     A    Not that I'm aware.

14     Q    If they were done, it would have been done

15 probably under the auspices of the investment and

16 benefits committee, wouldn't you agree?

17     A    Most likely.

18     Q    Did anybody express disappointment at Grace

19 regarding State Street's decision to liquidate the

20 Grace Stock Fund?

21              MS. FLOWE:  Do you really mean anyone?

22              MR. GOODMAN:  Well, I'm going to go