# EXHIBIT S

**ORIGINAL**  1

**CONFIDENTIAL TESTIMONY, PAGE 46**

```
                         Volume:    1
                         Pages:     1 - 195
                         Exhibits:  See Index
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                         Case No. 04-11380-WGY
                         Judge William G. Young
```

-------------------------------------
                                         )
LAWRENCE W. BUNCH, et al.,               )
                Plaintiffs,              )
        v.                               )
                                         )
W.R. Grace & CO., et al.,                )
                Defendants.              )
                                         )
-------------------------------------

DEPOSITION OF **KELLY Q. DRISCOLL**, a Witness called on behalf of the Plaintiffs, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Maureen Nashawaty, a Notary Public within and for the Commonwealth of Mass., held at State Street Financial Center, One Lincoln Street, Boston, MA, on Fri., June 1, 2007, commencing at 9:15 a.m.

*COPLEY COURT REPORTING, Inc.*
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

**DISK ENCLOSED**

1    Q.    In connection with a company stock fund
2 that is part of a 401K that offers a variety of
3 different investment options, does State Street
4 or your group consider the diversification of the
5 stock fund in connection with the other
6 investments offered to plan participants?
7    A.    Not if the company stock funding the
8 company stock investment is exempt from
9 diversification on ERISA.
10    Q.    So in connection with the other assets
11 or other investments that the plan may have --
12 State Street doesn't consider the other
13 investment options, is that correct?
14    A.    Not unless our role were, you know,
15 specifically, contractually said we would look at
16 that, but other than that, no, generally it would
17 not come into our consideration.
18    Q.    It looks at the stock fund independent
19 of any other investments that the plan may have,
20 is that correct?
21    A.    Could you rephrase that.
22    Q.    Certainly, let's make it very specific
23 to Grace.
24        In connection with the Grace Company

1   stock fund, when State Street made its
2   determination in connection with the Grace stock
3   fund, did State Street consider the other
4   investment options available to plan
5   participants?
6       A.   No, and in Grace our role as Investment
7   Manager for the company stock fund was to
8   determine whether that investment within that
9   fund was consistent with ERISA.
10      Q.   And in making that determination it
11  didn't consider the remaining assets of the plan,
12  is that correct?
13      A.   That's correct.
14      Q.   Do you have an understanding as to what
15  percentage of the plan's assets the Grace stock
16  fund comprised?
17      A.   I don't recall.
18      Q.   Was that a factor?
19      A.   In making our decision to sell?
20      Q.   Yes.
21      A.   Not that I recall, no.
22              (Short Pause.)
23      Q.   In connection with whether, let me go
24  back a step, let's talk about the Grace stock

1   fund and your understanding of it.
2           Was -- did plan participants, were plan
3   participants obligated to participate in the
4   Grace stock fund?
5       A.   I don't recall.
6       Q.   Whether the plan participants had or
7   were obligated.  I will strike that question and
8   I will try to phrase it so that you can
9   understand it.
10          Was whether Grace participants were
11  obligated to participate in the Grace stock fund
12  a consideration that the committee and State
13  Street analyzed in connection with its decision
14  whether retention of the company stock fund was
15  consistent with ERISA?
16      A.   I don't recall that being a factor or a
17  consideration.
18      Q.   Was any of the Grace, strike that.
19          Were any of the plan participants
20  matching funds or company match given to
21  participants in the form of company stock?
22      A.   I don't recall.
23      Q.   Was that a factor that State Street
24  considered in connection with determining whether

110

1    the valuation of Grace stock as a plan of
2    investment, do you see that?
3        A.    Yes.
4        Q.    It identifies 3.
5              During the time that State Street was
6    providing services in connection with the Grace
7    stock plan, did State Street believe that these
8    variables were priced into the Grace common
9    stock?
10       A.    In the public market?
11       Q.    Yes.
12       A.    I don't recall.
13       Q.    Were any of these variables unknown or
14   were any of these variables, not the amount of
15   the variables, but were these issues unknown to
16   the market?
17             MR. FLICKER:  Objection.
18       A.    I don't know what the market knew but
19   we based our determination on publicly available
20   data which would have been accessible to
21   investors in the public market.
22                    (Short Pause.)
23       Q.    Miss Driscoll, I have handed to you
24   what was previously marked as Johnson Exhibit

152

1   A.   I see that.
2   Q.   Did you believe that Duff & Phelps
3   range was a better estimate as to the value of
4   the stock than the current market price?
5             MR. FLICKER: Objection.
6   A.   I think Duff & Phelps range was based
7   on a traditional valuation but generally the
8   market price is the market price, so I am not, I
9   don't think that their range is any more accurate
10  than the actual current market price that the
11  market is setting.
12  Q.   Okay. Okay, now let's turn to the last
13  page of this which is 2861, and I believe Page
14  17. And I would like to look at the first
15  bullet, the recommendation and vote and it is to
16  authorize the I.F.G. working with State Street GA
17  trading desk to commence selling and that is the
18  relevant language at a price no lower than the
19  midpoint of D & P's valuation range current
20  midpoint is $1.88 per share, do you see that?
21  A.   I see that.
22  Q.   Why was there a restriction? Why did
23  you put in, well, the authors of this report of
24  which you were one of them?

1   Roger Petrin and perhaps some people in his
2   group, myself and Monet Ewing, we may have
3   discussed it with other people including Shawn
4   Johnson, but I'm not sure.
5   Q.   Do you have an understanding of who or
6   what D. E. Shaw was or is?
7   A.   I understood at some point during this
8   process that they were I believe a hedge fund.
9   Q.   Had you heard of D.E. Shaw prior to it
10  contacting State Street in connection with the
11  Grace stock fund?
12  A.   I don't recall.
13  Q.   Did you have an understanding as to the
14  reason why D. E. Shaw was interested in
15  purchasing Grace stock?
16  A.   No.
17  Q.   Okay. I would like to hand to you what
18  I just received.
19              (Exhibit No. 6, Handwritten document
20                 dated 4/6/04, was so marked.)
21  Q.   Miss Ewing, the Court Reporter has
22  handed to you what is marked as Driscoll 6 which
23  are handwritten notes that Mr. Flicker handed to
24  me this morning and I believe these are your

1    A.    I see that.
2    Q.    Do you recall any discussion regarding
3 that D.E. Shaw may be sensing some positive
4 development?
5    A.    I don't specifically.  I want to go
6 back on your previous questions about who else we
7 talked to before, I may have made the incorrect
8 assumption that you were asking me about people I
9 talked to at State Street.
10   Q.    Actually that was not the incorrect
11 assumption.  That is what I intended.
12   A.    Okay.
13         In general, I do remember that we
14 thought about what else might be motivating D.E.
15 Shaw or what other information they might have
16 that we didn't have, and one of the reasons we
17 turned to our advisors was to see was there some
18 additional information that we had not considered
19 that was publicly available or known to our
20 advisors.
21   Q.    And do you recall anybody raising the
22 issue that D.E. Shaw may be sensing some positive
23 development?
24   A.    I don't specifically know what that is

1   amount of stock that we sold on behalf of the
2   plan.
3       Q.    You said it better than I did. That is
4   what I wanted, your general assessment to that
5   point?
6       A.    Yes.
7       Q.    Okay. Let me just reflect and I think
8   we are almost done. I don't want to end without
9   looking at one more thing.
10              (Short Pause. )
11      Q.    *Did you have an understanding based on
12  a percentage likelihood that as a result of the
13  bankruptcy reorganization, shareholders would
14  receive less or little or no value for their
15  shares of stock?
16      A.    Would you read that back?
17              (The preceding *question was read
18                  back by Stenographer.)
19          MS. HEERMANS:   Less or no value?
20              (The preceding *question was read
21                  back by Stenographer.)
22      A.    We believe that the shareholders would
23  receive little or no value is highly likely to
24  receive little or no value but the percentage is