**EXHIBIT 1**

*Bunch, et al*
*vs.*
*W.R. Grace, et al*

*Deposition of Kelly Driscoll*
*June 1, 2007*

Copley Court Reporting, Inc.
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
Tel: 617.423.5841

### Page 86

1   Q.  How did you base your understanding as
2  to what the investment guidelines were for State
3  Street in connection with its services for W. R.
4  Grace company?
5   A.  I don't recall if I read it or if I
6  understood it through my staff and counsel, legal
7  counsel.
8   Q.  Turn to I believe the next Page 1279.
9   A.  Yes.
10  Q.  This relates to certain fee limits, do
11 you see that?
12  A.  Yes.
13  Q.  Did you have any involvement in
14 determining the amount of fees that State Street
15 would charge Grace?
16  A.  This is actually the limit on legal
17 expenses.
18  Q.  Okay.
19  A.  So these aren't State Street's fees.
20  Q.  Let me go back a step.
21  A.  Okay.
22  Q.  In connection with the fees that State
23 Street would charge Grace, did you have any
24 involvement in coming up with that number?

### Page 87

1   A.  I don't recall.
2   Q.  And the next page of this document, I
3  said the next page, let me identify it for you,
4  beginning on Page 1284 is the engagement with
5  Duff & Phelps, do you see that?
6   A.  Yes.
7   Q.  Who made the decision to engage Duff &
8  Phelps?
9   A.  I don't recall.
10  Q.  Were you involved in that decision?
11  A.  I don't recall.
12  Q.  Did you have authority -- did your
13 department, the independent Fiduciary Group have
14 the authority to engage any financial advisor it
15 chose or was there a limitation as to who was an
16 appropriate financial advisor?
17     MR. FLICKER:  I am going to object to
18 that question.  It is compound.
19  A.  We had several financial advisors we
20 typically use and there may have been a list of
21 approval financial advisors but Duff & Phelps was
22 definitely one of the financial advisors we had
23 historically used and would have been on an
24 approved list if there was an approved list.

### Page 88

1   Q.  Who else was on that approved list?
2   A.  If there was an approved list at this
3  time but the financial advisors we typically have
4  used was Duff & Phelps, Houlihan Lokey, Howard
5  and Zukin, at this time, a firm either Willamette
6  or the group later moved to Stout Resius.
7     Those were the firms that we
8  predominantly used.
9   Q.  Approximately how many times in the
10 past had you used Duff & Phelps?
11  A.  I don't remember the number of times,
12 but I could say frequently throughout the late
13 '80's, '88, '89, certainly '89 through this time.
14  Q.  How about Houlihan & Lokey?
15  A.  I would say frequently also in the same
16 time frame, maybe starting the early '90s, late
17 '80's.
18  Q.  The other two firms that you said?
19  A.  Willamette which then later at some
20 point in time became the group that the firm
21 moved to -- to a group called Stout Resius,
22 occasionally.
23  Q.  Were there particular areas of
24 expertise or different types of particular

### Page 89

1  companies that you would chose Duff & Phelps for?
2   A.  No, Duff & Phelps provided financial
3  advice on a wide range of industries.
4   Q.  Do you know whether Duff & Phelps had
5  any particular expertise with the chemical
6  industry?
7   A.  I don't recall.
8   Q.  Do you know whether Duff & Phelps had
9  any particular expertise in connection with
10 companies that were in bankruptcy?
11  A.  I don't recall.
12  Q.  Do you know whether Duff & Phelps had
13 any particular expertise with regard to companies
14 facing asbestos liabilities?
15  A.  I believe they did.
16  Q.  What is the basis for that belief?
17  A.  We worked with them on another prior
18 engagement that involved asbestos liabilities.
19  Q.  Would that have been the Federal Mogul
20 situation?
21  A.  That is not the one that I am thinking
22 of right now.
23  Q.  What is the one that you are thinking
24 of?

Page 90

1   A.   That is the one that we have a
2   confidentiality agreement -- the deal that didn't
3   happen.
4   Q.   When was that again -- when did that
5   occur -- just the time frame -- you gave it to me
6   before, but I don't recall.
7   A.   Somewhere between 2000 and 2003 -- the
8   end of 2003 -- somewhere in that time frame.
9   Q.   Without getting into specifics, can you
10  tell me what that company did, what business it
11  was in or what industry it was in -- make it what
12  industry it was in?
13  A.   I would rather not.
14       MR. FLICKER:  If you think that the
15  answer might reveal the identity of the
16  company --
17       THE WITNESS:  Yes, it would.
18  Q.   What is the nature of the
19  confidentiality agreement there?  Is it a court
20  order?
21  A.   No, it was contractual.
22       MR. GOODMAN:  I won't pursue it that
23  the moment but we will reserve rights in
24  connection with that inquiry.

Page 91

1   Q.   What was your involvement -- if you
2   take a look at Johnson Exhibit No. 1.
3        I am handing to you what was previously
4   marked as Johnson Exhibit No. 1.  Do you have that
5   in front of you?
6   A.   I do.
7   Q.   And there is a time line or a projected
8   time line -- do you agree with that?
9   A.   Do I agree with what?
10  Q.   That this is a projected time line?
11  A.   I agree that that is what it says on
12  the document.
13  Q.   Okay.  Did you have any involvement in
14  creating this document?
15  A.   I don't recall.
16  Q.   What was your involvement in
17  connection, at least early on, prior to the
18  actual engagement, what involvement did you have
19  in connection with the possible retention of
20  State Street by W. R. Grace?
21  A.   I recall that I went on the
22  presentation and I do recall generally, I had
23  discussions with Monet Ewing, but I don't
24  specifically recall what those discussions

Page 92

1   entail.
2   Q.   Okay.  Who made the presentation?
3   A.   I believe it was Monet Ewing and
4   myself.
5   Q.   Who did the primary speaking?
6   A.   I don't recall who did the primary
7   speaking at Grace.
8   Q.   Who was responsible for the account,
9   the Grace account?
10  A.   Monet Ewing was I would say the primary
11  person on the account.
12  Q.   At law firms sometimes a person
13  responsible for the account gets a bigger portion
14  of the proceeds regarding payment, compensation,
15  did that work in this case, or is compensation
16  all based on responsibility for an account at
17  State Street?
18  A.   No.
19       (Off the record.)
20       (Driscoll Exhibit No. 1, Memo dated
21        11/21/03, was so marked.)
22  Q.   Miss Driscoll, the Court Reporter
23  handed to you what has been marked as Exhibit No.
24  1 which is a memorandum addressed to you from

Page 93

1   Mr. Glosband, do you have that in front of you?
2   A.   I do.
3   Q.   And that is dated November 21st, 2003?
4   A.   Yes.
5   Q.   Okay.  And who was Mr. Glosband?
6   A.   An attorney at Goodwin Procter.
7   Q.   And Goodwin Procter is who or what?
8   A.   Goodwin Procter was State Street's
9   counsel with respect to the Grace engagement and
10  fulfilling our role as fiduciary.
11  Q.   And when we looked at Exhibit No. -- or
12  the engagement agreement a few moments ago, I
13  apologize, there was a page that you indicated it
14  would be the limitations on legal fees.  Do you
15  recall that?
16  A.   I recall that.
17  Q.   Okay.  Who paid the legal fees to
18  Goodwin Procter in connection with the Grace
19  engagement?
20  A.   I don't specifically recall if we paid
21  and then Grace reimbursed or if Grace paid
22  directly but Grace was responsible within the
23  limitations of the contract of paying Goodwin
24  Procter's fees.

Page 118

1  Q. Do you agree that by December 11th,
2  2003, the independent Fiduciary Group had already
3  completed substantial due diligence?
4  A. I believe we had completed substantial
5  due diligence, I seem to recall a significant
6  amount of work with the attorneys, I recall that
7  Monet had done quite a bit of work up until this
8  point of getting ready for the engagement, and
9  Duff & Phelps had done some work getting up to
10 the point where we were going to prepare for the
11 engagement.
12 Q. Okay.
13    MR. GOODMAN: I am done with the
14 document and it is 12:30. I don't mind
15 continuing on.
16    MR. FLICKER: It is your deposition
17 and I will let you call the breaks.
18    MR. GOODMAN: Would you like one?
19    MR. FLICKER: Yes.
20    MR. GOODMAN: We will take one now.
21
22
23
24    (Lunch recess was taken from

Page 119

1      AFTERNOON SESSION
2
3  Q. Miss Driscoll, we are back on the
4  record after our lunch break, and I am going to
5  hand to you what was previously marked I believe
6  as Ewing Exhibit No. 9, and you should have that
7  in front of you, is that correct?
8  A. Yes.
9  Q. And this appears, if I have the right
10 one in front of me, this looks like an email from
11 Steven Remis to Randolph Kerrigan?
12 A. Shepard Remis.
13 Q. Oh, Shepard Remis to Randolph Kerrigan
14 and others including yourself.
15    Do you see that?
16 A. Yes, I do.
17 Q. This is dated December 16th, 2003, is
18 that correct?
19 A. Yes, that's correct.
20 Q. And who is Shepard Remis?
21 A. Shepard Remis was one of the attorneys
22 at Goodwin Procter who worked with us on the
23 Grace engagement.
24 Q. Prior to the Grace engagement, had you

Page 120

1  ever worked with Mr. Remis?
2  A. I don't know that I have.
3  Q. Had you ever worked with Mr. Grosband?
4  A. Glosband.
5  Q. Glosband.
6  A. I don't think that I have.
7  Q. Do you know have you ever worked with
8  other attorneys from Goodwin Procter in
9  connection with the independent Fiduciary Group
10 and company stock prior to the Grace engagement?
11 A. Yes.
12 Q. Okay. Do you happen to know why
13 Mr. Remis and Mr. Glosband were chosen to work on
14 this assignment?
15 A. Shep Remis had asbestos expertise and
16 experience and Glosband was a bankruptcy lawyer.
17 Q. Did you work with any other attorneys
18 from Goodwin Procter?
19 A. Jack Cleary -- on the Grace case?
20 Q. Yes.
21 A. Jack Cleary.
22 Q. What expertise, if any, do you know
23 that Mr. Cleary had?
24 A. ERISA, and appears from this memo, but

Page 121

1  I don't specifically recall, Jeff Haddon.
2  Q. Who had the primary contact with
3  lawyers in connection with this assignment on
4  behalf of State Street?
5  A. I would say that that was shared Monet
6  Randy Kerrigan and myself all had contact
7  directly with the lawyers.
8  Q. *Were there any particular issues that
9  you recall that you had contact with the lawyers
10 about?
11 A. We had --
12 Q. When I am referring to you, I am
13 referring particularly to yourself?
14 A. Could you repeat that?
15    (The preceding *question was read
16       back by Stenographer.)
17 A. Yes, I had discussions and/or meetings
18 with the lawyers including Shep, including Dan
19 Glosband including Jack Cleary on the Grace
20 matter and specific issues on asbestos bankruptcy
21 and ERISA.
22 Q. Particularly with ERISA, what was the
23 topic, what was the nature, why were you seeking
24 the meetings, why -- what issues regarding ERISA

Page 146

1   A. I see that.
2   Q. Did you attend that meeting?
3   A. I don't remember.
4   Q. Do you recall ever going to visit Grace
5   other than I believe we discussed this April
6   meeting of 2003?
7   A. I believe I did attend another meeting
8   but I don't recall specifically when or who --
9   Q. Well --
10  A. -- or what the meeting was about.
11  Q. I am just guessing but if I am assuming
12  that it was the December 24th meeting -- you
13  might recall it being Christmas Eve?
14  A. Oh, I didn't notice the date. I
15  actually may have been there on the 24th. That
16  sounds a little familiar.
17  Q. Do you recall with whom from senior
18  management you met?
19  A. I don't remember.
20  Q. During that meeting do you recall if
21  anyone ever asked whether Grace felt that it had
22  properly assessed its asbestos liability?
23  A. No, I don't remember this meeting
24  really. I mean I remember that I went to a

Page 147

1   meeting, I believe but besides the presentation
2   meeting and when you point that out, I seem to
3   recall I did go to a meeting for some client on
4   Christmas Eve at one point in my career and it
5   might have been this one and I just don't
6   remember anything like that though.
7   Q. If I told you what the weather was like
8   in Baltimore that day --
9   A. No, I just don't recall.
10  Q. Do you recall attending a meeting
11  around that time in which Mr. Forgach was
12  present? You can take a look at him. We will
13  put an exhibit sticker on him.
14  A. I didn't recognize him -- I believe
15  Mr. Forgach was at both of the meetings that I
16  attended.
17  Q. If you would turn to Page 12 which is
18  Bates stamped 2856.
19      It is an analysis on the top of the
20  page. Do you see that?
21  A. Yes.
22  Q. It is discussing the Fair Act
23  legislation, do you see that?
24  A. Yes.

Page 148

1   Q. What is your understanding as to what
2   the Fair Act legislation was?
3   A. My general understanding is that the
4   Fair Act legislation would have provided some
5   potential relief to companies who had asbestos
6   liabilities.
7   (Attorney William Connolly left the deposition.)
8   Q. Other than material presented to you by
9   Duff & Phelps and Goodwin Procter, did you
10  receive any other materials related to the Fair
11  Act legislation?
12  A. At this time, with respect to Grace?
13  Q. With respect to Grace during the time
14  period?
15  A. Not that I recall.
16  Q. Were you under -- do you have any
17  knowledge of whether states had imposed, were
18  contemplating or had drafted legislation on their
19  own to limit asbestos, potential asbestos
20  liabilities for companies?
21  A. I don't recall.
22      MR. FLICKER: Need a couple of
23  minutes when you reach a good spot.
24      MR. GOODMAN: Sure, when I finish up

Page 149

1   this document, that will be perfect.
2       MR. FLICKER: Okay.
3   Q. Did State Street or anyone on behalf of
4   the Grace stock fund consult with any lobbyists
5   involved in the Fair Act legislation?
6   A. Not that I am aware of.
7   Q. Did anyone suggest that potentially
8   someone should consult with lobbyists?
9   A. Not that I am aware of.
10  Q. Did anyone consult with Grace
11  concerning the Fair Act legislation?
12  A. I don't recall.
13  Q. Do you know if anybody, whether State
14  Street asked anyone to consult with Grace in
15  connection with the Fair Act legislation?
16  A. I don't recall.
17  Q. If you take a look at the fourth bullet
18  under Fair Act legislation, as initially
19  proposed, the liability would be substantially
20  lower than Grace's estimated liability and would
21  be spread over 27 years, do you see that?
22  A. If the Fair Act legislation is enacted?
23  Q. Yes.
24  A. I see that.

### Page 178

1  A. That's correct.
2  Q. Okay. Do you have an understanding as
3  to the reason why Duff & Phelps was not present?
4  A. I don't recall.
5  Q. Now, at that time, the contract and
6  agreement with Duff & Phelps had expired, is that
7  correct?
8  A. I believe so. I don't know if it was
9  in discussion at that time though.
10 Q. Okay.
11 A. It may have been in discussion at that
12 time because they were continuing to provide us
13 with these weekly updates.
14 Q. During the -- do you recall at this
15 fiduciary committee meeting discussing Grace's
16 current most recent financial information,
17 financial statements?
18 A. Not specifically other than to inform
19 the committee that we had discussed with Duff &
20 Phelps the day before the developments with
21 respect to the stock, yes, and in particular the
22 recent offer.
23 Q. Did anybody if you recall because I
24 don't see it in the minutes, do you recall if

### Page 179

1  anybody in this meeting. Let me go back.
2  Do you have a general recollection of
3  what occurred during this April 7th, 2004
4  meeting?
5  A. Other than what is indicated in the
6  minutes?
7  Q. Yes.
8  A. No, not anything other than what is
9  already here.
10 Q. Do you recall whether anyone inquired
11 at the meeting as to the reason why D. E. Shaw
12 may be interested in purchasing the block of
13 shares from the Grace plan?
14 A. I recall it being a discussion that I
15 believe with Shawn Johnson but I don't know if it
16 was at the meeting or conversation prior to the
17 meeting, you know, in previous conversation. It
18 might not have taken place at the meeting.
19 Q. *As of April 7th, 2004, did State
20 Street conclude that Grace would be unable to
21 survive as a going concern?
22 MR. FLICKER: Objection.
23 A. I'm sorry, could you repeat that?
24 (The preceding *question was read

### Page 180

1  back by Stenographer.)
2  A. I am not sure exactly what you mean.
3  Q. Let me put it this way.
4  Did anyone at State Street conclude
5  that as a result of the bankruptcy, Grace's
6  common shares would become worthless?
7  A. I think we concluded that it was likely
8  that the value of the Grace stock would be based
9  on input from our financial advisors and our
10 legal advisors would be worth less than we were
11 able to sell it at and particularly worth very
12 little to zero -- I believe if I recall
13 correctly -- significantly below the 350 price we
14 were being offered.
15 Q. Was that based entirely, not entirely,
16 but was that valuation based on the Duff & Phelps
17 reports?
18 A. I think I indicated based on input and
19 analysis from both our financial advisor and from
20 our legal counsel.
21 Q. Did State Street adjust on its own any
22 of the numbers in terms of calculating anything
23 in terms of making calculations as to the value
24 of Grace stock?

### Page 181

1  Did it at any time adjust the numbers
2  Duff & Phelps provided?
3  A. Did we adjust the numbers that Duff &
4  Phelps provided --
5  Q. Yes.
6  A. -- did we change their numbers?
7  Q. Yes.
8  A. No, we took into consideration the
9  numbers that they provided us -- we took into
10 consideration by April 7th that we had commenced
11 the selling program and thought that it was
12 imprudent to continue to hold the stock and that
13 we had commenced a selling program and since we
14 were being offered a price to buy the whole block
15 at a premium over the market price, we thought it
16 would be prudent to sell and that it might be
17 imprudent not to sell at a premium above market
18 considering the fact that we had made the
19 determination and continued to believe it was the
20 correct determination that it was no longer
21 prudent to hold Grace stock at that point.
22 Q. Did State Street perform any analysis
23 as to the likelihood that Grace common stock
24 would continue to trade after the plan of

Page 186

1   Q.  And do you agree that generally these
2  two numbers added together the 930 and the
3  6,254,000 indicates the number of shares that
4  State Street was responsible for selling out of
5  the Grace stock plan during the time that it
6  served as Investment Manager for the Grace stock
7  fund?
8   A.  I have no idea.
9   Q.  Is there a reason why you question
10 those numbers?
11      MR. FLICKER: Objection.
12  A.  I don't know what you are referring
13 back to. I have not reviewed the numbers. I am
14 not sure if -- I am not sure I understand
15 understood the question actually.
16  Q.  Well, let me ask the question.
17      I am just generally trying to determine
18 the general number of shares that State Street
19 was responsible for selling from the Grace stock
20 fund, and it appears to me that according to this
21 notice from State Street to plan participants
22 that under the selling program that was commenced
23 on approximately February 23rd, 2004, that Grace
24 sold just over 930,000 shares according to this

Page 187

1  document and then in connection with the D.E.
2  Shaw sale in the third paragraph it indicates
3  that 6254117000 shares were told, do you see
4  those numbers?
5   A.  I see those numbers.
6   Q.  And general math indicates to me that
7  if I added those two numbers together I would
8  come up with the approximate number of shares of
9  Grace stock from the Grace stock fund that were
10 sold under the direction of State Street as
11 Investment Manager during the time frame in which
12 State Street served as Investment Manager, do you
13 understand?
14  A.  I don't know if the 930,000 is a
15 reference to the shares we sold before the Shaw
16 offer in the open market or if that might have
17 included the 20,000 share hold back that we
18 subsequently sold.
19      So I am not sure if the 20,000 is
20 included in the 930,000 or not.
21  Q.  Okay, but within -- okay.
22      All right.
23  A.  So in general, I would agree that these
24 numbers are intended to reflect the overall

Page 188

1  amount of stock that we sold on behalf of the
2  plan.
3   Q.  You said it better than I did. That is
4  what I wanted, your general assessment to that
5  point?
6   A.  Yes.
7   Q.  Okay. Let me just reflect and I think
8  we are almost done. I don't want to end without
9  looking at one more thing.
10      (Short Pause.)
11  Q.  *Did you have an understanding based on
12 a percentage likelihood that as a result of the
13 bankruptcy reorganization, shareholders would
14 receive less or little or no value for their
15 shares of stock?
16  A.  Would you read that back?
17      (The preceding *question was read
18       back by Stenographer.)
19      MS. HEERMANS: Less or no value?
20      (The preceding *question was read
21       back by Stenographer.)
22  A.  We believe that the shareholders would
23 receive little or no value is highly likely to
24 receive little or no value but the percentage is

Page 189

1  more likely that they would receive little or no
2  value based on at all of the information and the
3  analysis, the potential outcomes of the
4  contingent factors, and therefore we thought it
5  was I am prudent to continue to hold when we
6  could be selling at prices higher than we might
7  otherwise get as a result of these factors in the
8  reorganization.
9   Q.  Was there ever that highly likely, the
10 phrase that you used, was that ever quantified in
11 terms of a percentage -- what that actually
12 means?
13  A.  That terminology maybe is inappropriate
14 terminology. It is based on the input from our
15 financial advisors and some of their probability
16 models, but those are my terms but they actually
17 assign problem built tease to those various
18 scenarios, as well as the input received from our
19 legal counsel.
20  Q.  Did anyone during any time on the State
21 Street team meaning Goodwin Procter, State Street
22 or Duff & Phelps have any access to any other
23 information that was isn't available to the
24 market?

Page 190

1  A. Not that I am aware of. There is only
2  publicly available information that we would base
3  our determination on.
4      MR. GOODMAN: I don't have any
5  further questions. Thank you.
6      THE WITNESS: Thank you.
7      MR. FLICKER: Wait, stay.
8      THE WITNESS: Oh, you have some
9  questions.
10     MR. FLICKER: Two.
11
12 CROSS EXAMINATION
13 BY MR. FLICKER:
14  Q. Let me find Johnson Exhibit 10 for you.
15 And we will get through this quickly.
16     MR. FLICKER: Do you have Johnson
17 Exhibit 10.
18     MR. GOODMAN: What is Johnson Exhibit
19 10?
20     MR. FLICKER: The January 29
21 fiduciary committee minutes.
22     MR. GOODMAN: Okay.
23  Q. Miss Driscoll, do you recall that you
24 were asked by Mr. Goodman whether in connection

Page 191

1  with the Grace engagement State Street ever
2  evaluated other companies that went into
3  bankruptcy due to products liability?
4      Do you remember that question?
5   A. I do.
6   Q. Do you recall him asking whether you
7  knew that Goodwin Procter or Duff & Phelps ever
8  evaluated other companies that went into
9  bankruptcy due to products liability?
10  A. I recall the question.
11  Q. Okay. And I want to direct your
12 attention to some portion of this minutes and the
13 question will be whether these minutes reflect
14 any evaluation by Goodwin or Duff & Phelps of
15 other companies that went into bankruptcy due to
16 product liability, okay?
17  A. Okay.
18  Q. All right, so first I would like to
19 direct your attention to page -- bottom of
20 Page 2, the top of Page 3 -- 2745 to 2746.
21     Can you read the sentence that begins
22 "D. Glosband updated", the bottom of the page?
23 You can read it into the record.
24  A. "D. Glosband updated the committee

Page 192

1  generally with respect to other companies in
2  bankruptcy due to asbestos claims".
3   Q. Would that reflect Goodwin and Procter
4  evaluating other companies that went into
5  bankruptcy due to product liability?
6      MR. GOODMAN: Objection.
7   A. More specifically due to asbestos
8  claims.
9   Q. Okay. I also want to direct your
10 attention to Page 1 about five lines down the
11 very first page of these notes, this first
12 paragraph reflects a presentation by Mr. Bayston,
13 is that right, to the committee?
14  A. Yes.
15  Q. Do you see about five lines down there
16 is a sentence that begins, "Its current trading
17 activities", referring to Grace's, "is similar
18 to other bankrupt asbestos companies".
19     Do you see?
20  A. I do see that.
21  Q. Is it your view that Goodwin Procter
22 and Duff & Phelps evaluated other companies that
23 went into bankruptcy due to product liability?
24  A. It is based on these minutes, yes.

Page 193

1      MR. FLICKER: I have nothing further.
2  Thank you.
3      MR. GOODMAN: Thank you.
4
5
6
7
8
9
10
11
12     (Whereupon at 3:35 p.m.,
13     the deposition ended.)
14
15
16
17
18
19
20
21
22
23
24

Copley Court Reporting, Inc.
617.423.5841

11103b74-26f1-4e38-b928-4d64313aecfa

Page 194

1      CERTIFICATE
2
3    I, KELLY Q. DRISCOLL, do hereby certify that
     I have read the foregoing transcript of my
4    testimony given on June 1, 2007, and I further
     certify that said transcript is a true and
5    accurate record of said testimony (with the
     exception of the following corrections listed
6    below):
7    Page    Line    Correction
8
9
10
11
12
13
14
15
16
17
18
19   Signed this _____ day of _____, 2007.
20
21       KELLY Q. DRISCOLL
22   Signed under the pains and penalties of perjury.
23
24

Page 195

1      CERTIFICATE
2
3    COMMONWEALTH OF MASSACHUSETTS
4    Norfolk, ss.
5
6        I, Maureen Nashawaty, a Registered
7    Professional Reporter and Notary Public in and
8    for the Commonwealth of Massachusetts, do hereby
9    certify that the foregoing transcript of the
10   deposition of KELLY Q. DRISCOLL, having been duly
11   sworn, on Friday, June 1, 2007, is true and
12   accurate to the best of my knowledge, skill and
13   ability.
14       IN WITNESS WHEREOF, I have hereunto set
15   my hand and seal this 3rd day of June, 2007.
16
17
         _____
18       Maureen R. Nashawaty
         Registered Professional Reporter
19
20
21   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
22   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
     DIRECTION OF THE CERTIFYING REPORTER.
23
24