**EXHIBIT 2**

*Bunch, et al*
*vs.*
*W.R. Grace, et al*

*Deposition of Monet Ewing*
*Vol. 1*
*May 30, 2007*

Copley Court Reporting, Inc.
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
Tel: 617.423.5841

Page 142

1  than a weekly analysis. I don't know. I just
2  think they used to say what week it was and this
3  was the range for the week but I don't see any
4  parameters here to say what range or what week we
5  are talking about.
6      Q.  Okay. The thing has the date on the
7  second page.
8          It says equity valuation summary as of
9  1/30/2004 in terms of dating.
10     A.  Okay.
11     Q.  And the range is set out in that gray
12 line. It is a little hard to read.
13     A.  Yes, it is.
14     Q.  But it goes $.95, $2.10 and $3.24?
15     A.  Okay.
16     Q.  Okay, somehow information was going
17 from Duff & Phelps to the State Street group --
18     A.  On a weekly basis.
19     Q.  On a weekly basis with some attention
20 to what was going on in the Grace bankruptcy,
21 Grace world?
22     A.  Absolutely.
23     Q.  Okay, and so far as we know, this may
24 be one of the elements of that information of

Page 143

1  distribution, is that true?
2      A.  It could be, yes, absolutely.
3          (Exhibit No. 14, Email dated 2/17/04,
4              was so marked.)
5      Q.  I am going to hand you what has been
6  marked for identification as Deposition Exhibit
7  14.
8          Is this the same kind of update
9  material that Duff & Phelps was providing to
10 State Street during the first quarter of 2004?
11     A.  It looks like it. This was dated.
12 This one wasn't.
13     Q.  Okay, I see, okay.
14         And this is the kind of presentation
15 that Duff & Phelps did on a weekly basis, is that
16 right?
17     A.  Yes, it would be done on a weekly
18 basis.
19     Q.  Was this information conveyed to the
20 investment committee each week?
21         MR. FLICKER: Objection.
22     A.  I don't know.
23     Q.  Now, at some point, in the first
24 quarter or very shortly thereafter, a contact was

Page 144

1  made to State Street by an interested purchaser
2  of the Grace block then held by State Street, is
3  that correct?
4      A.  Yes.
5      Q.  Prior to that contact, State Street had
6  through its investment committee --
7          MR. CUMMINS: Don't pass them yet.
8          MR. GOODMAN: Okay.
9      Q.  Prior to that contact, State Street's
10 investment committee had made a decision to sell
11 a portion of its holdings, correct?
12         MR. FLICKER: Objection.
13     Q.  Let me give you some background and
14 maybe it will give the question I ask a little
15 context.
16         Is it not correct that some shares were
17 sold, some Grace shares were sold by State Street
18 in recognition of the restrictions of Rule 144?
19     A.  If State Street made a decision to
20 sell, it was because it was imprudent to hold the
21 stock. It would not have only been because of
22 the size of the fund.
23     Q.  And the size of the transaction was in
24 part, I'm sorry, let me withdraw the question.

Page 145

1          And the size of a sale transaction was
2  in part based upon the trading restrictions
3  imposed upon the stock held by Rule 144 of the
4  Securities and Exchange Commission, correct?
5      A.  Yes, it was subject to 144.
6      Q.  And it was subject to Rule 144 if the
7  block represented a certain percentage of the
8  then outstanding common stock, is that correct?
9          MR. FLICKER: Objection. It calls
10 for a legal conclusion.
11     A.  Among lots of others factors.
12     Q.  Including the trading volumes?
13     A.  Trading volumes, connection with the
14 company, there are lots of factors that deem you
15 an affiliate or not.
16     Q.  During the early course of 2004, did
17 State Street take any action to reduce the Grace
18 stock holding so that that holding and
19 State Street were no longer subject to the
20 restrictions of Rule 144?
21     A.  The investment committee made a
22 decision to sell the stock because it was
23 imprudent to hold and filed a 144 and sold
24 pursuant to that.

Page 146

1     MR. FLICKER: I think you said the
2  investment committee made a --
3     A.  The Fiduciary Committee.
4     MR. FLICKER: Okay.
5     Q.  The Fiduciary Committee then after it
6  filed its -- completed that transaction, it made
7  a filing under Rule 144 as to that transaction,
8  right?
9     A.  To begin selling, yes.
10    Q.  And then after it completed that
11 proposed sale under 144, the remaining block was
12 no longer subject to a Rule 144, isn't that
13 correct?
14    A.  At some point it became not subject to
15 144 -- I don't know.
16    Q.  That was because of the then remaining
17 holding size of the block?
18    A.  Usually if you are under 10 percent,
19 yes.
20    Q.  So as result of one transaction,
21 State Street was able to drop the size of the
22 remaining holding to a size so that that block
23 wasn't subject to Rule 144 trading restrictions,
24 isn't that correct?

Page 147

1     A.  Not as a result of one transaction, no.
2  We sold over a period of time.
3     Q.  Oh, a series of transactions?
4     A.  Yes.
5     Q.  You indicated that the group just prior
6  to the commencement of that first group of sales,
7  had determined that it was imprudent to hold
8  Grace stock, correct?
9     A.  Yes.
10    Q.  And what was the basis of that
11 decision?
12    MR. FLICKER: Objection. It assumes
13 facts not in evidence.
14    A.  The committee made the decision based
15 on the facts and circumstances presented at that
16 meeting.
17    Q.  Were you in attendance at that meeting?
18    A.  Yes.
19    Q.  What were the facts and circumstances
20 that were discussed at that meeting with respect
21 to the sale of the Grace stock?
22    A.  Dan's materials, the legal scenarios as
23 far as the cases facing Grace, the asbestos
24 liability, the volatility of the stocks, the risk

Page 148

1  to the participants of holding such a volatile
2  stock.
3     I think the minutes will speak for
4  themselves.
5     Q.  And when you said Dan's analysis, you
6  mean Duff & Phelps' analysis?
7     A.  Yes.
8     Q.  So the committee relied on the
9  Duff & Phelps analysis, and some reports from
10 Goodwin Procter, anything else?
11    A.  Their independent analysis, their own
12 substantive due diligence understanding the
13 issues.
14    Q.  Members of the committee's due
15 diligence?
16    A.  Yes.
17    Q.  And other than what was provided to the
18 committee by your group, investment group, what
19 else did they have available to them?
20    A.  They had their own investment
21 understanding.
22    Q.  Okay. What other documents or
23 information did they have?
24    A.  They have only what we give them and

Page 149

1  only what we talk about.
2     Q.  Okay. Now, at some point after the
3  State Street initial transactions were made known
4  to the public, someone at State Street was
5  contacted by an investment banking house with
6  respect to possible sale of the remaining block,
7  is that correct?
8     MR. FLICKER: Objection.
9     A.  That is my understanding.
10    Q.  Okay. And do you know who at
11 State Street was first contacted?
12    A.  Roger Petrin.
13    Q.  Who is Roger Petrin?
14    A.  He is in charge of the Institutional
15 Trading Desk at SSgA.
16    Q.  And the contact came from whom?
17    A.  A brokerage firm.
18    Q.  Lehman Brothers?
19    A.  I believe so, yes.
20    Q.  When did you first found out that a
21 contact had been made to Mr. -- is it Perron?
22    A.  Petrin.
23    Q.  Mr. Petrin?
24    A.  Yes.

Page 174

1
          CERTIFICATE
2
3
4   COMMONWEALTH OF MASSACHUSETTS
5   Norfolk, ss.
6
7        I, Maureen Nashawaty, a Registered
8   Professional Reporter and Notary Public in and
9   for the Commonwealth of Massachusetts, do hereby
10  certify that the foregoing transcript of the
11  deposition of MONET I. EWING, having been duly
12  sworn, on Wednesday, May 30, 2007, is true and
13  accurate to the best of my knowledge, skill and
14  ability.
15       IN WITNESS WHEREOF, I have hereunto set
16  my hand and seal this 31st day of May, 2007.
17
18

19       _____
         Maureen R. Nashawaty
         Registered Professional Reporter
20
21
22  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
    DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
23  ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
    DIRECTION OF THE CERTIFYING REPORTER.
24

45 (Page 174)

03844ea4-a514-417f-9fbc-0e4679eb34d3