**EXHIBIT 3**

```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3   - - - - - - - - - - - - - - - - -X

 4   KERI EVANS,                       :

 5              Plaintiff,             :   Consolidated as

 6   vs.                               :   Case No.:

 7   JOHN F. AKERS, et al.,            :   04-11380-WGY

 8              Defendants.            :

 9   - - - - - - - - - - - - - - - - -X

10   LAWRENCE W. BUNCH, et al.,        :

11              Plaintiffs,            :

12   vs.                               :

13   W. R. GRACE & CO., et al.,        :   Volume I

14              Defendants.            :

15   - - - - - - - - - - - - - - - - -X

16              Deposition of JOHN P. FORGACH

17                     Washington, D.C.

18                  Monday, April 30, 2007

19                       3:54 p.m.

20   Job No.: 1-102400

21   Pages:   1 - 41

22   Reported by: Dana C. Ryan, RPR
```


L.A.D. REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

**Page 9**

1  States Naval Academy Alumni Association.
2  Q  Very good.
3  A  Even though I didn't go there.
4  Q  Okay. Very good. When did you graduate
5  from Georgetown law school?
6  A  1982.
7  Q  And when did you first start your employment
8  at Grace?
9  A  I believe it was 1990.
10  Q  And what did you do besides get a lot of
11  degrees between 1981 -- 1982 and 1990?
12  A  I worked -- I initially, when I graduated
13  law school, I worked for a short period of time for a
14  law firm in Pittsburgh, Pennsylvania, and then I
15  worked for -- clerked for a judge in Pittsburgh,
16  Pennsylvania, a state court judge, Richard G. Zeleznik
17  Z-E-L-E-Z-N-I-K. And then I went to work for an
18  insurance company in Worcester, Massachusetts, which
19  is something like W-O-R-C-E-S-T-E-R, Worcester,
20  Massachusetts and also Pittsburgh, Pennsylvania, the
21  same insurance company. Then I took a job with a law
22  firm in New York City, Seward & Kissell, and then from

**Page 10**

1  there -- and that was probably about 19 -- I don't
2  know, maybe '87, something like that. And then I took
3  the job with Grace in, like I said, 1990 -- maybe even
4  '91, but right around there.
5  Q  What was your initial position at Grace?
6  A  Benefits counsel.
7  Q  And for the uneducated, what does the
8  benefits counsel mean?
9  A  The benefits counsel means that you -- well,
10  for W. R. Grace it generally means that you provide
11  legal advice to the corporation with respect to
12  benefits issues, including drafting plan documents for
13  the corporation and reviewing, you know, issues from
14  the point of view of the corporation, legal -- legal
15  issues involving benefit plans, medical plans, pension
16  plans, 401(k) plans, life insurance plans, et cetera.
17  Q  Did your title ever change?
18  A  Yes.
19  Q  When did that occur?
20  A  I became senior benefits counsel -- oh, boy,
21  I can't remember quite when; probably mid-'90s at some
22  point.

**Page 11**

1  Q  Okay. And did it change -- what's your
2  title today?
3  A  I'm senior benefits counsel.
4  Q  To whom do you report?
5  A  My direct report today is to Steve Ahern,
6  A-H-E-R-N, and he is -- I believe his title -- and I'm
7  not quite sure -- but I think he's an associate
8  general counsel.
9  Q  Now, you said as of today. How about in the
10  time frame of 2001 through 2004?
11  A  I -- at that time I reported to Mark
12  Shelnitz, S-H-E-L-N-I-T-Z, and he was at the time --
13  and, again, I may not have his title down right, but
14  he was either assistant or associate general counsel,
15  and he is our current general counsel.
16  Q  Okay. He replaced Mr. Siegel?
17  A  Yes.
18  Q  I believe that was around 2005 or --
19  A  Somewhere around 2005, yeah. I can't
20  remember what it was exactly, early -- somewhere
21  around there. It could have been late 2004, something
22  like that.

**Page 12**

1  Q  Does Mr. Siegel have any relationship or
2  perform any services for Grace anymore?
3  A  I believe he does, but he does not -- but
4  I'm not familiar with those services. I just happen
5  to know that if you read our 10-K there was a
6  reference to him having a consulting arrangement with
7  Grace.
8  Q  Okay. As part of your responsibilities at
9  Grace, do you have involvement with the W. R. Grace
10  Savings and Investment Plan?
11  A  Yes.
12  Q  And what is your involvement?
13  A  Generally to provide the corporation with
14  legal advice with respect to issues regarding that
15  plan, including drafting of plan amendments, et
16  cetera.
17  Q  Okay. Did you have any special training in
18  the area of being a fiduciary?
19  A  No.
20  Q  Okay. There are degrees associated -- are
21  you familiar with whether the degrees exist regarding
22  fiduciaries at the graduate business level?

DEPOSITION OF JOHN P. FORGACH - VOLUME I
CONDUCTED ON MONDAY, APRIL 30, 2007
Case 1:04-cv-11380-WGY    Document 181-4    Filed 08/17/2007    Page 4 of 17

10 (Pages 37 to 40)

**37**

1  investment advice to plan participants?
2  A  Specific investment advice, my answer to
3  that would be no.
4  Q  It was limited generally to the information
5  contained in the summary plan description; is that
6  correct?
7  A  There were other mailings that went out to
8  employees over the course of time that came from
9  Fidelity and also from Grace, perhaps, but -- but I
10 don't recall any specific investment advice.
11 Q  Okay.
12    MR. GOODMAN: All right. This is
13 actually a good stopping point for me at this moment
14 if that's okay with everybody else.
15    MS. FLOWE: Okay.
16
17
18
19    (Signature having not been waived, the
20 Deposition of John P. Forgach was adjourned at
21 4:35 p.m.)
22

**39**

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2     I, Dana C. Ryan, Registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken
7  by me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I
9  am neither counsel for, related to, nor employed by
10 any of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 6th day of
14 May 2007.
15 My Commission expires:
16 July 14, 2010
17
18
19 _____
20 NOTARY PUBLIC IN AND FOR THE
21 DISTRICT OF COLUMBIA
22

**38**

1    ACKNOWLEDGMENT OF DEPONENT
2     I, John P. Forgach, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections
7  appear on the attached Errata sheet signed by me.
8
9
10 _____  _____
11   (DATE)        (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

**40**

1      E R R A T A  S H E E T
2  IN RE: LAWRENCE W. BUNCH, et al. v. W. R. GRACE &
3  CO., et al.
4  RETURN BY: _____
5  PAGE   LINE        CORRECTION AND REASON
6  ____   ____        _____
7  ____   ____        _____
8  ____   ____        _____
9  ____   ____        _____
10 ____   ____        _____
11 ____   ____        _____
12 ____   ____        _____
13 ____   ____        _____
14 ____   ____        _____
15 ____   ____        _____
16 ____   ____        _____
17 ____   ____        _____
18 ____   ____        _____
19 ____   ____        _____
20 ____   ____        _____
21 ____   ____        _____
22 (DATE)             (SIGNATURE)

```
                                                              42
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - - -X
 4   KERI EVANS,                       :
 5              Plaintiff,             :  Consolidated as
 6   vs.                               :  Case No.:
 7   JOHN F. AKERS, et al.,            :  04-11380-WGY
 8              Defendants.            :
 9   - - - - - - - - - - - - - - - - -X
10   LAWRENCE W. BUNCH, et al.,        :
11              Plaintiffs,            :
12   vs.                               :
13   W. R. GRACE & CO., et al.,        :  Volume II
14              Defendants.            :
15   - - - - - - - - - - - - - - - - -X
16              Deposition of JOHN P. FORGACH
17                     Washington, D.C.
18                   Tuesday, May 1, 2007
19                        10:05 a.m.
20   Job No.:   1-102402
21   Pages:     42 - 155
22   Reported by:  Dana C. Ryan, RPR
```

COPY



1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF JOHN P. FORGACH - VOLUME II
CONDUCTED ON TUESDAY, MAY 08, 2007
Case 1:04-cv-11380-WGY   Document 183   Filed 08/17/2007   Page 6 of 17

3 (Pages 50 to 53)

Page 50

1  Q  Okay.
2  A  Yes.
3  Q  Now, I understand that your principal role
4  at Grace is that of an attorney; is that correct?
5  A  Yes.
6  Q  And I also understand from certain
7  objections and from what you told me that you are not
8  attorney for the 401(k) or the defined contribution
9  plan; is that correct?
10  A  Yes. My -- my -- I am senior benefits
11  counsel, W. R. Grace & Co. and I represent W. R.
12  Grace.
13  Q  Who is the attorney, if you know, for the
14  defined contribution plan?
15  A  It -- it retains no attorney on a regular
16  basis.
17  Q  Are you aware of any attorney that's been
18  retained in the past in connection with issues?
19  A  No.
20  Q  Okay. Do you know whether there was an
21  attorney that was retained in connection with the
22  establishment of an investment manager for the Grace

Page 51

1  Stock Fund?
2  A  For the plan, no.
3  Q  Okay. Did Grace hire an attorney or engage
4  an attorney to consult with in connection with
5  establishment of an investment manager for the Grace
6  Stock Fund?
7         MS. FLOWE: Asked and answered. Are
8  you asking a different question?
9         MR. GOODMAN: I think so, yes. I'm
10  intending to, yes.
11         THE WITNESS: I cannot -- I do not know
12  because I don't know exactly what the intent was of --
13  of upper management, but we did consult Kirkland &
14  Ellis at the time we hired an independent investment
15  manager.
16  BY MR. GOODMAN:
17  Q  Do you know the name of the individual at
18  Kirkland & Ellis?
19  A  Vicky Hood.
20  Q  Do you know which office at Kirkland &
21  Ellis?
22  A  Chicago.

Page 52

1  Q  Yesterday when I was asking Mr. McGowan some
2  questions and as I reviewed certain materials, I came
3  to the understanding that you had some role in
4  connection with the engagement of hiring -- some role
5  in the process of hiring an independent fiduciary for
6  the Grace Stock Fund; is that correct?
7  A  Yes.
8  Q  What was your role?
9  A  My role was essentially to provide legal
10  services to Mr. McGowan in his capacity as senior vice
11  president of W. R. Grace, and others for Grace, in
12  reviewing documents, rendering legal advice with
13  respect to hiring an independent fiduciary for the
14  plan and -- and, as Mr. McGowan said, making an
15  initial contact phone call to potential independent
16  fiduciaries.
17  Q  Which leads to my next question, which --
18  first of all, how did you determine potential
19  independent fiduciaries?
20  A  I can't recall.
21  Q  Did you consult with anyone regarding the
22  selection of an independent fiduciary?

Page 53

1  A  I can't recall. Although, it is likely that
2  I did, but I cannot recall.
3  Q  Okay. Do you recall with whom you made
4  contact?
5  A  No.
6  Q  Can you identify anybody? I'm not referring
7  now to individuals particularly; I'm referring to
8  potential independent fiduciaries.
9  A  I contacted the -- as I recall, I contacted
10  at least four entities; State Street, Aon, I believe
11  an entity by the name of U.S. Trust, and Fidelity.
12  Q  As we sit here now, does that refresh your
13  memory at all as to whether you may have contacted
14  anybody else?
15  A  No, I -- I'm not -- I may have contacted
16  others. I just can't recall contacting any others
17  sitting here today.
18  Q  Okay. I'm going to go in reverse order here
19  because obviously the last one I'm going to discuss
20  with you is State Street, but let's go step by step.
21  First of all, did you contact these that you recall,
22  these entities, approximately at the same time, or was

DEPOSITION OF JOHN P. FORGACH - VOLUME II
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 7 of 17
CONDUCTED ON TUESDAY, MAY 8, 2007

4 (Pages 54 to 57)

**Page 54**

1  it a series based -- of contacts based on the results
2  of your initial contact?
3     A  My initial contact I believe was essentially
4  the same time.
5     Q  Okay. And let's go reverse order.
6  Fidelity: Obviously State Street had an ongoing
7  relationship with Fidelity because Fidelity was
8  performing services in connection with the defined
9  contribution plan?
10       MS. FLOWE: You mean Grace?
11       THE WITNESS: Grace.
12       MS. FLOWE: You said, "State Street."
13       MR. GOODMAN: I stand corrected and
14 duly admonished. Yes. I apologize. Grace.
15 BY MR. GOODMAN:
16    Q  Let me go back to where I was. Grace had an
17 ongoing relationship with State Street in connection
18 with the defined contribution plan; is that correct?
19    A  With Fidelity.
20       MS. FLOWE: It's early.
21       MR. GOODMAN: No. I apologize.
22 BY MR. GOODMAN:

**Page 55**

1     Q  I'm going to ask this question, even though
2  everybody understands it, for my own ability. Grace
3  had an ongoing relationship with Fidelity in
4  connection with the defined contribution plan; is that
5  correct?
6     A  Yes.
7     Q  Okay. I want you to explain that
8  relationship quickly.
9     A  Fidelity essentially performed
10 record-keeping and administrative services related to
11 our defined contribution plan, the 401(k) plan.
12    Q  How long had Fidelity been working with
13 Grace, if you know?
14    A  I think I -- I am not sure of the exact
15 length of time, but it was approximately ten years, I
16 think, before, say, 2003.
17    Q  Where was the contact from Fidelity?
18    A  Are you asking me who I contacted?
19    Q  No, what -- well, you indicated that you
20 were a liaison with Fidelity earlier, so, yeah, who
21 was your contact?
22    A  The account manager at that time with

**Page 56**

1  Fidelity was Chris Muns, M-U-N-S, I believe.
2     Q  Do you know where he was located?
3     A  He was in Massachusetts.
4     Q  And the primary reason I ask that is if you
5  notice those -- if you reviewed any of the statements
6  that I went over yesterday with Mr. McGowan -- I don't
7  have to go through them now, but I just happened to
8  notice that they all emanated from Cincinnati, so I
9  didn't know if there was a connection. There's a
10 large Fidelity office in Cincinnati that might be his
11 responsibility.
12    A  I did not notice that, and I don't think
13 Chris was in Cincinnati.
14    Q  I'm just trying to give my hometown a plug
15 for the day. Now, when you wanted to -- when you were
16 in -- looking into the possibility of engaging
17 State -- engaging Fidelity to serve as independent --
18 as investment manager, did you initially contact
19 Mr. Muns?
20    A  I can't recall, but it's likely I did.
21    Q  Okay. And whoever you contacted, what
22 transpired next in connection with the potential

**Page 57**

1  hiring of Fidelity as an investment manager?
2     A  I can't recall.
3     Q  Obviously Grace did not engage Fidelity to
4  be the investment manager. Do you have an
5  understanding as to the reason why?
6     A  No, I can't recall.
7     Q  Approximately how many conversations -- let
8  me go back a step. Did anybody else other than
9  yourself from Grace have any conversations with
10 Fidelity to the extent that you know regarding the
11 potential engagement of Fidelity as an investment
12 manager?
13    A  I do not know.
14    Q  Let's take the next one. I believe it was
15 U.S. Trust. How did you come in contact with U.S.
16 Trust?
17    A  I can't recall.
18    Q  Okay. Did you have any meetings or
19 conversations with anyone at U.S. Trust in connection
20 with U.S. Trust possibly becoming an investment
21 manager?
22    A  Yes.

DEPOSITION OF JOHN P. FORGACH - VOLUME II
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 8 of 17
CONDUCTED ON TUESDAY, MAY 8, 2007

5 (Pages 58 to 61)

Page 58

1  Q  Do you recall the name of the individual?
2  A  No.
3  Q  Did anybody at Grace other than yourself
4  have conversations with anyone from U.S. Trust?
5  A  I do not know.
6  Q  Was there a meeting or was it by telephone,
7  if you know?
8  A  My contact was by telephone.
9  Q  And do you recall generally what occurred on
10 that telephone conversation?
11 A  Generally, my vague recollection is that I
12 asked an individual if they would be interested in
13 exploring the possibility of becoming an independent
14 fiduciary for Grace's stock account within its 401(k)
15 plan, and that's pretty much all I can recall from the
16 conversation.
17 Q  Was there any interest from U.S. Trust?
18 A  My recollection was that later I was
19 contacted by telephone and somebody at U.S. Trust said
20 they were not interested in exploring that.
21 Q  Did that person provide a reason as to
22 the -- as to why U.S. Trust did not have an interest?

Page 59

1  A  I -- I can't recall -- I can't recall, A,
2  whether they provided a reason and, B, if they did,
3  what the reason was.
4  Q  Do you recall whether if anyone from
5  Fidelity or U.S. Trust asked any questions as to why
6  you thought you needed an investment manager?
7  A  That's a natural question, but I cannot
8  recall any conversations with respect to that issue --
9  Q  Okay.
10 A  -- with those two.
11 Q  So, just so I'm clear, you don't recall
12 raising the issue -- do you recall raising the issue
13 as to the reasons why Grace may want an investment
14 manager?
15 A  No, I do not recall raising the issues, but
16 I -- I would assume that I did, but I cannot recall
17 doing it.
18 Q  What was your understanding at that time as
19 to the reason why Grace was considering the engagement
20 of an investment manager?
21    MS. FLOWE:  Let me caution you to stick
22 to facts and not your legal advice.

Page 60

1  (Cell phone interruption.)
2  (Pause in proceedings.)
3  (The Record was read as requested.)
4     THE WITNESS:  Grace and its executives
5  were concerned that their duties under ERISA would be
6  difficult to -- to fulfill given the current state of
7  the Chapter 11 issues at that time.
8  BY MR. GOODMAN:
9  Q  And did you have an understanding as to the
10 current issues of the Chapter 11 at that time?
11 A  No.
12 Q  Okay.  Going back to U.S. Trust, do you
13 recall if it was one communication or -- obviously it
14 had to be at least two based on what you told me, your
15 initial inquiry and then the response that, sorry,
16 we're not interested -- U.S. Trust is not interested.
17 Were there any other communications that you can
18 recall?
19 A  I cannot recall.
20 Q  Yesterday I asked Mr. McGowan regarding
21 this, and he indicated that you may have been the
22 person -- and I think you're answering the question

Page 61

1  now that you would have been the person responsible
2  for trying to locate possible independent -- or
3  investment managers.  In that process did you send out
4  a request for bids?
5  A  No.
6  Q  Okay.  So it was simply whatever process you
7  used to locate -- locate potential investment
8  managers, and at this moment you can recall contacting
9  four; is that correct?
10 A  That's true.
11 Q  Okay.  And we've discussed U.S. Trust and
12 Fidelity, and then the next one working on back
13 towards State Street is Aon, and the relationship with
14 Aon became more involved, is my assumption, than what
15 occurred with Fidelity and U.S. Trust; is that
16 correct?
17 A  Yes.
18 Q  Okay.  And do you recall how -- well, going
19 through this -- I think you answered it earlier that
20 you don't necessarily know how you came across Aon,
21 but I'm going to ask the question again, not to be
22 asked and answered, but because maybe your memory has

DEPOSITION OF JOHN P. FORGACH - VOLUME II
CONDUCTED ON TUESDAY, MAY 1, 2007
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 9 of 17

7 (Pages 66 to 69)

Page 66

1  A  I can't recall whether she was my initial
2  contact.
3  Q  Do you recall ever discussing with
4  Ms. Quasada the possibility that Aon could serve as an
5  investment manager?
6  A  No.
7  Q  Okay. Well, you initially contacted someone
8  at Aon and you had more than one conversation; is that
9  correct?
10  A  Yes.
11  Q  Did anybody else at Grace have conversations
12  or communications with Aon regarding the possibility
13  of it becoming an investment manager for the Grace
14  Stock Fund?
15  A  I do not know.
16  Q  How many conversations, approximately, did
17  you have with Aon?
18  A  I do not know.
19  Q  Over what time period?
20  A  I do not know, but it was certainly before
21  we retained anybody as an investment manager, but I
22  just can't recall the period of time or how long the

Page 67

1  period of time was.
2  Q  Okay. That was -- I won't ask that
3  question, then, either.
4      Were there any face-to-face meetings?
5  A  Yes.
6  Q  And where did those face-to-face meetings
7  occur?
8  A  I know at least one face-to-face meeting
9  occurred between Grace executives and an Aon
10  representative in Columbia, Maryland at Grace's
11  headquarters.
12  Q  Who were the Grace executives who attended
13  that meeting?
14  A  I cannot recall a complete list at this
15  time; however, I'm pretty sure that Mr. McGowan and
16  Mr. Tarola were in the initial meeting.
17  Q  And you were also present?
18  A  I believe I was present, yes.
19  Q  And do you recall who the Aon representative
20  was?
21  A  Yes.
22  Q  Who was that?

Page 68

1  A  Nell Hennessy, and it's N-E-L-L, and I don't
2  know how to spell Hennessy.
3      MS. FLOWE:  H-E-N-N-E-S-S-Y; no E
4  before the Y.
5      MR. GOODMAN:  Shoot. I was so close.
6  I was close. I just had an E before the Y.
7  BY MR. GOODMAN:
8  Q  And how did Nell Hennessy -- how did you
9  come in contact -- were you the one that initially had
10  contact with Nell Hennessy on behalf of Grace?
11  A  Yes.
12  Q  And how, if you recall --
13  A  To my knowledge.
14  Q  Okay. How did you come in contact with Nell
15  Hennessy?
16  A  I believe I called her --
17  Q  Okay.
18  A  -- over the telephone.
19  Q  And somebody gave you that name?
20  A  I can't recall whether I knew independently
21  from my own knowledge that Ms. Hennessy might be
22  interested in heading up an independent fiduciary

Page 69

1  relationship with the stock fund or whether or not
2  Rachel Quasada spoke first to Ms. Hennessy.
3  Q  All right. Ms. Hennessy came in for a
4  meeting, and I believe you just testified that you
5  believe you were present, but you're not 100 percent
6  certain; is that correct?
7  A  Yes.
8  Q  So if I ask you what -- I'm going to ask
9  you -- if I asked you what occurred during that
10  meeting, I'm going to guess that you don't recall
11  because you don't recall being there necessarily?
12  A  Well, actually this is one time where I
13  would say, since we're talking about the subject, I
14  have a little bit better recollection than I did
15  perhaps three minutes ago.
16  Q  Okay.
17  A  I believe I was at that meeting.
18  Q  Okay.
19  A  And I believe that Ms. Hennessy did a
20  presentation indicating her background, experience,
21  other factors -- and I cannot recall those other
22  factors -- and that she answered questions from the

DEPOSITION OF JOHN P. FORGACH - VOLUME II
CONDUCTED ON TUESDAY, MAY 1, 2007
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 10 of 17

8 (Pages 70 to 73)

**Page 70**

1 Grace executives that were present.
2  Q  Did Ms. Hennessy indicate what information
3 Aon would require in order to determine -- in order to
4 perform its job?
5  A  I can't recall whether she mentioned any
6 information she would eventually need from Grace.
7  Q  Do you recall any comments Ms. Hennessy may
8 have made regarding the necessity that Grace engage
9 the services of an investment manager?
10  A  No.
11  Q  Do you recall what, if anything, Mr. Tarola,
12 Mr. McGowan or any other Grace executive said
13 regarding the reason why Grace might want to engage an
14 investment manager?
15  A  No.
16  Q  Do you have an understanding as to how long
17 that meeting lasted?
18  A  Not specifically or exactly, but the meeting
19 lasted less than one full day.
20  Q  Okay. Did you participate in a discussion
21 with Grace executives after the meeting regarding
22 Ms. Hennessy's presentation?

**Page 71**

1  A  I'm certain I did, but I can't recall.
2  Q  Okay. Do you have any recollection as to
3 what any of the Grace executives said regarding the
4 possible engagement of U.S. Trust after --
5    MS. FLOWE: I assume you mean Aon
6 rather than U.S. Trust.
7    MR. GOODMAN: I do mean that. I
8 apologize.
9    MS. FLOWE: But I'm also going to
10 object to the extent that that question would elicit
11 facts provided to you by the executives for purposes
12 of seeking your legal advice, okay?
13    THE WITNESS: (Nods head.) Based on
14 that advice, I won't answer the question, but I
15 don't --
16 BY MR. GOODMAN:
17  Q  Let me see if I can go around it so that --
18 let's first do it this way. Were you present when
19 Mr. -- when the Grace executives were discussing the
20 potential hiring of Aon in which they were talking
21 with each other as opposed to directing questions to
22 you?

**Page 72**

1  A  I can't recall.
2  Q  Do you know whether -- well, did you -- did
3 the Grace executives come to the conclusion that they
4 were satisfied with the services that Aon could
5 provide?
6    MS. FLOWE: I'm going to object, but
7 instruct you that you can answer to the extent that
8 you can answer yes or no or I don't know. But if you
9 know --
10    THE WITNESS: Yes, with a
11 qualification.
12 BY MR. GOODMAN:
13  Q  Okay.
14  A  The answer is yes. The qualification is
15 that Aon had the appropriate financial backing -- the
16 Aon Fiduciary group, for lack of a better term, had
17 the appropriate financial backing.
18  Q  What do you mean by "appropriate financial
19 backing"?
20  A  Financial resources that would be available
21 if some issue came up that might require the
22 expenditure of financial resources, for instance, the

**Page 73**

1 main one being insurance, fiduciary liability
2 insurance.
3  Q  Was there a minimum amount that Grace
4 required?
5  A  I do not know. I do not know.
6  Q  What was the reason that -- I think this is
7 calling for a legal advice. What was the reason that,
8 if you have an understanding, as to the reason Grace
9 and Aon Fiduciary did not come to an agreement?
10  A  As I understand it, Grace determined that
11 Aon Fiduciary group, at the time they would have taken
12 over responsibility for the management of the Grace
13 Stock Fund, did not have the appropriate insurance
14 coverages in place that made the Grace executives feel
15 comfortable with an arrangement with that group.
16  Q  Take a look at Plaintiff's Exhibit Number 4
17 for a second. Yesterday we -- do you have that in
18 front of you?
19  A  Yes.
20  Q  Yesterday we discussed that you had some
21 involvement in connection with this document; is that
22 correct?

Page 78

1  A  Yes.
2  Q  And do you have any recollection as to the
3  reason why State Street indicated that it might be
4  interested in serving as an investment manager?
5  A  No, I do not know their reasons why they
6  would be interested in serving as an investment
7  manager.
8  Q  Aside from pecuniary reasons?
9  A  Yes. And you're asking me do I know their
10 reasons. The answer is no.
11 Q  Let me go back a step, then. I'm not asking
12 for their reasons because you're doing a better job
13 than I am -- you're answering better than I'm asking.
14 Do you have an understanding as to the reason why it
15 thought -- well, let me ask this question. Do you
16 have an understanding as to the reason why Grace
17 thought that State Street might be qualified to serve
18 as an investment manager?
19 A  Why Grace thought State Street would be
20 qualified to serve as an investment manager?
21 Q  Yes.
22 A  By the end of the process that led to the

Page 79

1  retention of State Street, I believe the Grace
2  executives believed that State Street was a very
3  competent organization with experience in this area
4  and had adequate financial backing.
5  Q  Certain things had to take place, though,
6  before Grace executives came to that conclusion; is
7  that correct?
8  A  Certain things did occur before Grace
9  executives came to that conclusion.
10 Q  Okay. And I assume that Grace attempted to
11 undertake its own due diligence to ascertain whether
12 State Street was an appropriate choice; is that
13 correct?
14 A  Grace looked into State Street's
15 qualifications, but I don't know whether or not I
16 would use the term "due diligence."
17 Q  What did Grace do to look into State
18 Street's qualifications?
19 A  I cannot answer for all of Grace. I can
20 tell you that certain executives were familiar with
21 State Street as an entity. State Street provided
22 Grace with a considerable amount of information

Page 80

1  through presentations, both written and verbal. That
2  is all I can recall.
3  Q  Did you -- let me ask you this question.
4  Did you seek any referrals, meaning you individually,
5  first, regarding State Street?
6  A  I cannot recall.
7  Q  Do you know whether -- if any of the Grace
8  executives sought any referrals regarding State Street
9  as an independent -- as an investment manager?
10 A  I do not know.
11 Q  Could you take a look at Exhibit Number 6,
12 please?
13     MS. FLOWE:  You put them in numerical
14 order, so . . .
15 BY MR. GOODMAN:
16 Q  Have you seen any of the materials that are
17 included in Exhibit Number 6 in the past?
18 A  Just leafing through, I can't recall
19 specifically, but I believe I have.
20 Q  And how -- in what context do you believe
21 that you have seen at least some of the materials that
22 are included in Exhibit Number 6?

Page 81

1  A  I believe that these were materials that
2  State Street provided to Grace as part of Grace's
3  research with respect to whether or not to retain
4  State Street as an independent fiduciary for its stock
5  fund.
6  Q  Okay. And generally can you describe what
7  Exhibit Number 6 consists of?
8     MS. FLOWE:  Page by page?
9     MR. GOODMAN:  I said, "generally" --
10 no, not page by page -- if he's capable.
11    THE WITNESS:  It consists of a
12 photocopy of a whole bunch of documents that deal with
13 State Street's financial background; their processes
14 for certain things; its -- its independent fiduciary
15 services; an overview of itself; a few photocopies of
16 business cards; background on individuals that
17 would -- that State Street, I believe, was proposing
18 would be involved with the services they were going to
19 provide; and a considerable amount of other
20 information including financial statements of State
21 Street.
22 BY MR. GOODMAN:

DEPOSITION OF JOHN P. FORGACH - VOLUME II
Case 1:04-cv-11380-WGY   Document 181   Filed 08/21/2007   Page 12 of 17
CONDUCTED ON TUESDAY, MAY 1, 2007

11 (Pages 82 to 85)

Page 82

1  Q  Okay. If you would turn to -- towards the
2  middle -- I'm sorry, more towards the back of
3  Exhibit -- of this exhibit at 8102 -- Bates
4  stamp 8102.
5  A  Okay.
6  Q  And it is a document -- it is part of this
7  document it calls -- it's labeled Process; is that
8  correct?
9  A  Yes.
10  Q  And I'm going to make an assumption, so you
11  may or may not be able to -- I'm making an assumption
12  that you attended meetings where State Street made
13  presentations and -- made presentations; is that
14  correct? Well, let me ask you the question. Did you
15  attend meetings with Grace executives where State
16  Street was present?
17  A  Yes.
18  Q  And was one of the items discussed at these
19  meetings the process State Street might use in
20  connection with its role as an investment manager?
21  A  I cannot recall, but if I were a betting
22  man, I would say yes.

Page 83

1  Q  Okay. And as you take a look at -- this
2  starts -- it says the Bates stamp number, but there is
3  a specific number identified as page 10 if you see it
4  on the -- you see the SSgA on the right-hand bottom --
5  A  Yes.
6  Q  -- this is 10. So if you take a look at
7  pages 10, 11, 12, 13 and 14, do you recall that these
8  issues, and particularly the engagement and due
9  diligence and those issues -- were they discussed by
10  State Street at meetings that you attended?
11       THE WITNESS: I'm sorry. Would you
12  repeat the question -- read the question, please?
13     (The Record was read as requested.)
14       THE WITNESS: I can't recall the
15  substance of the meetings, but as to general
16  categories that you mentioned, I believe those were
17  discussed.
18  BY MR. GOODMAN:
19  Q  Okay. For example, let's talk about due
20  diligence, and you can look at this or not, but did
21  you have an understanding as to how -- after your
22  meetings and after all your discussions you had with

Page 84

1  State Street, did you have an understanding as to how
2  State Street was going to conduct due diligence?
3  A  No, I did not have an understanding of all
4  of the aspects of State Street's due diligence. I
5  knew one aspect of that due diligence was they were
6  going to request certain information from Grace.
7  Q  Did you have an understanding as to which
8  information it was going to request from Grace?
9  A  At the time they were doing presentations?
10  Q  Well, let's do it both ways. I think that's
11  a fair way to go about it. First of all, at the time
12  it was doing presentations.
13  A  I can't recall, but I do not believe so.
14  Q  Okay. Since we're discussing it now, did
15  you have an understanding after State Street had been
16  hired by Grace what information it was going to seek?
17  A  I do not believe I had a full understanding
18  of all information they were going to ask for from
19  Grace, but I knew of some of the information because I
20  believe they made some specific requests.
21  Q  Do you know what information specifically
22  was requested?

Page 85

1  A  I cannot recall, but I believe one piece of
2  specific information was Grace's public financial
3  statements.
4  Q  Okay. Anything else?
5  A  I cannot recall --
6  Q  Okay.
7  A  -- but I know there was more.
8  Q  Okay. Did the contacts come to you for
9  information?
10  A  Some contacts came to me, yes.
11  Q  Who was the contact person at State Street?
12  A  I cannot recall, but it was probably either
13  Kelly Driscoll or Monet Ewing.
14  Q  Okay. And do you recall -- I apologize. I
15  think you answered the question, but I don't remember
16  the answer, quite frankly. Do you recall other than
17  the public financial statements any other information
18  that was sought?
19  A  I can recall no further information, but I
20  am certain there was more information --
21  Q  Do you recall approximately --
22  A  -- requested.

DEPOSITION OF JOHN P. FORGACH - VOLUME II
CONDUCTED ON TUESDAY, MAY 9, 2007
Case 1:04-cv-11380-WGY    Document 181-4    Filed 08/17/2007    Page 13 of 17

14 (Pages 94 to 97)

Page 94

1  A  That Grace received materials similar to
2  this or maybe this exhibit?
3  Q  Yes.
4  A  That's correct.
5  Q  Okay. And you indicated that there was at
6  least one meeting where representatives of State
7  Street met with representatives -- with Grace and its
8  executive; is that correct?
9  A  Yes.
10 Q  Do you recall if there was more than one
11 meeting?
12 A  You mean face-to-face meeting?
13 Q  Yes.
14 A  I cannot -- I actually -- yes, there was
15 more than one meeting. Yes, there was.
16 Q  How many meetings were there?
17 A  I can't recall, but I know now after
18 thinking about it there was more than one.
19 Q  Okay. Where was the first meeting held?
20 A  In -- I believe, the meetings I'm familiar
21 with, the meeting occurred in Columbia, Maryland at
22 Grace's headquarters.

Page 95

1  Q  Who was in attendance?
2  A  I cannot recall a complete list of
3  attendees, but I believe that I was there, Brian
4  McGowan, Bob Tarola. I also believe, but am a little
5  less certain, that Dave Siegel was there and perhaps
6  even Paul Norris. And there was representatives from
7  State Street there, and I cannot recall who those
8  people were, but I believe that Kelly Driscoll was at
9  least one of them.
10 Q  Do you know whether the State Street
11 representatives were males, females, one of each, more
12 than one?
13 A  I believe there was more than one, and I
14 believe one was female.
15 Q  Leaving the other one to potentially be
16 male; is that correct?
17 A  It -- I wish I had a better recollection of
18 these events, but I just don't. Sorry.
19 Q  How long did that meeting last? And we're
20 talking about the first meeting.
21 A  I can't recall the exact length of the
22 meeting, but I believe it was less than a full day.

Page 96

1  Q  Okay. And was that before or after, if you
2  recall, the -- that State Street -- I'm sorry, that
3  Grace had decided that Aon didn't have the financial
4  responsibility to serve as investment manager?
5  A  I cannot recall whether the first meeting
6  with State Street was before or after Aon -- after the
7  issue you mentioned with Aon's insurance.
8  Q  Okay. You indicated a moment ago that there
9  was a second meeting; is that correct?
10 A  Yes, there was at least one other meeting
11 that I am familiar with, face-to-face meeting with
12 State Street.
13 Q  Where did that take place?
14 A  That also took place at Grace's headquarters
15 in Columbia.
16 Q  Do you recall approximately how long -- how
17 much time was between the first meeting and this
18 meeting?
19 A  No. It was at least -- although, my best
20 recollection is it was more -- it was more than a
21 week.
22 Q  Okay. What was the purpose of the first

Page 97

1  meeting?
2  A  The purpose of the first meeting was to
3  explore the possibility of State Street becoming the
4  investment manager for the Grace Stock Fund within the
5  401(k) plan.
6  Q  What was the purpose of the second meeting?
7  A  Probably the same purpose.
8  Q  Who attended the second meeting?
9  A  I have no specific recollection, but I
10 believe the individuals I named for the first meeting
11 who -- are the same individuals that I would name for
12 the second meeting.
13 Q  Who attended for State Street?
14 A  Again, I don't recall a second meeting,
15 but -- specifically, but meetings -- both Monet Ewing
16 and Kelly Driscoll and others from State Street
17 attended meetings.
18 Q  Okay.
19 A  But I cannot recall whether it was a second
20 meeting or a third meeting or, for that matter, even
21 the first meeting, but those people did attend
22 meetings.

DEPOSITION OF JOHN P. FORGACH - VOLUME II
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 14 of 17
CONDUCTED ON TUESDAY, MAY 8, 2007

16 (Pages 102 to 105)

**102**

1  A   Yes.
2  Q   Now, let me see -- what I'm trying to do is
3  break down -- and this -- do you agree with me that on
4  November 24th, 2003, the formal relationship between
5  State Street and Grace and the investment and benefits
6  committee came to fruition?
7  A   I don't know what you mean by that, because
8  it's true that this document is dated November 24th,
9  but it's effective as of December the 1st, at least
10 that's what it seems to say in the first paragraph.
11 Q   And I defer to you because you're correct.
12 But this is the formal document as of November 24th
13 that established the legal relationship between State
14 Street and Grace; is that correct?
15 A   It is certainly one of them, but I don't
16 have a recollection of this entire -- entire event, so
17 there may have been other documents, also.
18 Q   Okay.
19 A   But this is certainly one document that
20 established a relationship --
21 Q   Okay. And --
22 A   -- between the parties involved in the

**103**

1  document.
2  Q   And I'm going to try to put this in a time
3  frame, and I'll represent to you that generally around
4  November 24th of each year is Thanksgiving. Would you
5  generally agree with that?
6  A   Yes.
7  Q   Okay. And the reason I'm doing this is I'm
8  trying to put into context potential meetings you may
9  have had with State Street. So obviously you had
10 meetings with State Street that took place before this
11 document or agreement was entered into, and my next
12 question is did you have any face-to-face meetings
13 with representatives from State Street after this
14 agreement was entered into?
15 A   I believe the answer is yes, and the only
16 reason why I say, "I believe," is because I can't be
17 telling you specifically about the dates of the
18 meetings.
19 Q   Okay. Well, one of the issues -- if we take
20 a look at page 6 of this agreement --
21 A   Yes.
22 Q   -- regarding the Provision of Information --

**104**

1  do you see that in the middle of the page?
2  A   Yes.
3  Q   And I believe that this contract required or
4  this agreement required Grace to provide certain
5  information to State Street if requested; is that
6  correct?
7  A   Yes, whatever the language of the document
8  says, I believe that's what it means, but I haven't
9  read the whole document, but, yes.
10 Q   And do you recall attending any meetings
11 where there was information exchanged between State
12 Street and Grace?
13 A   Yes.
14 Q   And do you recall -- do you recall
15 approximately how many meetings you attended where
16 information was exchanged between State Street and
17 Grace?
18 A   I attended -- and, again, you're talking
19 about face-to-face meetings?
20 Q   Yes, sir.
21 A   I mean, if there were phone calls and other
22 things between people, I would not know. I

**105**

1  attended -- it depends on how you define the word
2  "meetings," but from my -- the way I'm going to use
3  the word "meeting," about four meetings.
4  Q   Okay. And those are face-to-face meetings?
5  A   They were face-to-face meetings between
6  State Street and Grace executives.
7  Q   Okay. And approximately how many of those
8  meetings were for the purposes of Grace executives
9  providing information to State Street?
10 A   The four that I'm referring to now, as
11 opposed to other meetings that were before these four
12 meetings, would be -- I'm sorry. What's the question
13 again?
14 Q   Well, let me summarize what I think your
15 testimony is, and if I misstate it, by all means
16 correct me. The earlier meetings we were discussing
17 primarily took place for purposes other than providing
18 information from Grace to State Street; is that
19 correct?
20 A   The main purpose -- you're right; that is
21 correct.
22 Q   Okay. And subsequently or at some point you

DEPOSITION OF JOHN P. FORGACH - VOLUME II
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 15 of 17
CONDUCTED ON TUESDAY, MAY 8, 2007

17 (Pages 106 to 109)

Page 106

1 recall attending approximately four meetings where you
2 understood a significant purpose was for Grace to
3 provide information to State Street; is that correct?
4  A  Yes.
5  Q  Okay. And those four meetings, did they
6 occur at Grace's headquarters?
7  A  Yes. And as I recall, the --
8      MS. FLOWE: John, the question was did
9 it occur at Grace headquarters.
10     THE WITNESS: Yes.
11 BY MR. GOODMAN:
12  Q  Okay. And do you recall when those meetings
13 took place?
14  A  No.
15  Q  Do you recall whether they took place before
16 the thanks -- around the Thanksgiving time when this
17 agreement was signed?
18  A  I'm sorry. I really don't, no.
19  Q  Do you recall -- all right. There were four
20 meetings -- okay. We've got four meetings where the
21 exchange of information was one of the purposes;
22 correct?

Page 107

1  A  Yes.
2  Q  And let's take them one by one, and we won't
3 put them in a time frame at the moment, and I'm not
4 looking to stretch your memory beyond its
5 capabilities, but what I'm just generally trying to
6 understand is what took place at those meetings. Did
7 the same people attend those meetings from Grace?
8  A  No.
9  Q  Do you recall who attended the first
10 meeting?
11  A  I haven't a recollection of all the
12 participants, but I believe the first meeting was --
13 from Grace was Mr. McGowan, Mr. Tarola, Mr. Siegel.
14 That is all I can recall.
15  Q  And do you recall who from State Street?
16  A  No.
17  Q  Okay. Do you recall what information State
18 Street was seeking at that time?
19  A  Not specifically, no.
20  Q  Do you recall whether at that meeting State
21 Street requested any information regarding how --
22 regarding -- well, regarding the investment options

Page 108

1 available to plan participants?
2  A  I have no specific recollection of what
3 State Street requested.
4  Q  Okay. Do you recall that after those
5 meetings one of your responsibilities was to gather
6 information specifically requested by State Street?
7  A  Not exactly. My responsibilities, as I
8 recall, were merely to provide -- to put into the mail
9 documents that already existed that State Street had
10 requested; for instance, the plan document.
11  Q  Okay. So -- and I think that's what I
12 anticipated. I didn't necessarily -- well, I'm glad
13 you cleared it up, so I'm going to be clear now. You
14 never created any specific document or created a table
15 or memo or summary of information that State Street
16 requested; is that correct?
17  A  Not that I recall. I may have created a
18 cover letter.
19  Q  Okay. And the information you provided to
20 State Street was those documents that already existed
21 at Grace; is that correct?
22  A  That is my recollection of what I provided

Page 109

1 to State Street.
2  Q  Okay. And was that in response to each of
3 the four meetings?
4  A  No.
5  Q  Okay. Approximately how many times did you
6 provide documents -- gather and provide documents to
7 State Street?
8  A  You mean how many separate mailings of
9 documents --
10  Q  Yes.
11  A  -- or how many separate times I actually may
12 have even given them documents in person?
13  Q  (Indicated affirmative.)
14  A  No, I can't recall that.
15  Q  Okay. At any time did you -- do you recall
16 providing documents that relate to investment options
17 available to plan participants?
18     MS. FLOWE: You mean other than the
19 plan documents he already testified that he provided
20 them with?
21     MR. GOODMAN: He indicated a moment
22 ago, I believe, that he provided them with a plan

**134**

1    Q  Are you aware of whether Grace ever provided
2 to State Street any information that wasn't available
3 to the public?
4    A  No.
5       MS. FLOWE: You --
6 BY MR. GOODMAN:
7    Q  You're not aware or --
8    A  I'm sorry. Am I aware of -- am I aware
9 whether -- that Grace provided any information to
10 State Street that was not public?
11    Q  Correct.
12    A  No, I believe all the -- I believe all the
13 information that Grace provided to State Street was
14 public information.
15       MR. GOODMAN: Even I picked up on that
16 one for you.
17       MS. FLOWE: (Indicating affirmatively.)
18 BY MR. GOODMAN:
19    Q  How did you become aware that State Street
20 was going to sell assets from the Grace Stock Fund?
21    A  I can't recall, but I think somebody from
22 State Street called me or -- although -- I can't

**135**

1 recall. They may have called somebody else at Grace
2 and I may have found out that way. I simply can't
3 recall.
4    Q  When you heard -- after you heard that
5 Grace -- that the Grace Stock Fund assets, at least
6 some of them were going to be sold, did you have any
7 responsibility in connection with that?
8    A  No, except perhaps making sure that
9 administratively it was possible to do. And when I
10 say, "making sure," simply making sure that Fidelity
11 could effectuate what State Street wanted to do, and
12 that may not have been me either, but other than that,
13 no.
14    Q  And what did you mean "administratively"; is
15 that something -- it was administratively possible to
16 do?
17    A  Well, first, it would not have been my
18 responsibility to make -- to actually effectuate a
19 decision of State Street.
20    Q  Right. I understand.
21    A  But I may have made a contact with Fidelity
22 saying, are you in touch with State Street with

**136**

1 respect to State Street's decisions, because Fidelity
2 was the trustee that actually held the stock. So
3 other than -- so I may have made that sort of contact,
4 but that would have been the -- that's what I would
5 have been administratively, simply to feel comfortable
6 that it could happen, but it really wasn't my
7 responsibility to do.
8       (Plaintiff's Deposition Exhibit Number 21 was
9 marked for identification and attached to the
10 transcript.)
11 BY MR. GOODMAN:
12    Q  I've handed to you what the court reporter
13 has marked as Exhibit 21; do you see that?
14    A  Yes.
15    Q  Can you identify that for the Record,
16 please?
17    A  That's an e-mail from someone named Melissa
18 Smith to me with a group of cc's on it, including some
19 cc's to some attorneys, I guess, at Goodwin Procter,
20 at least some people at Goodwin Procter. And it's an
21 e-mail from her that says, John, we anticipate
22 receiving a vote tomorrow morning from our fiduciary

**137**

1 committee to commence selling W. R. Grace stock held
2 within the plan, and then it goes on.
3    Q  Does this refresh your memory as to how you
4 learned that State Street might be selling assets from
5 the Grace Stock Fund?
6    A  No.
7    Q  Do you know who Melissa Smith is?
8    A  No.
9    Q  Do you recall having contact with her?
10    A  I -- I certainly must have had some contact
11 with her because she sent me an e-mail, but I do not
12 recall any contact with her.
13    Q  Okay. Do you recall what, if anything, you
14 did with the attachment to this e-mail?
15    A  I cannot recall what I did, but I believe
16 based on a handwritten note on the right-hand side of
17 this that I probably forwarded a copy to Brian McGowan
18 and to Mark Shelnitz.
19    Q  Okay. Who is Mark Shelnitz?
20    A  He was who I reported to on legal services
21 staff. He was the -- at the time assistant general
22 counsel or associate general counsel.

DEPOSITION OF JOHN P. FORGACH - VOLUME II
CONDUCTED ON TUESDAY, MAY 1, 2007
Case 1:04-cv-11380-WGY   Document 181-4   Filed 08/17/2007   Page 17 of 17

28 (Pages 150 to 153)

**Page 150**

1 you have that in front of you?
2   A   Yes.
3   Q   Okay. Does this refresh your memory as to
4 when you may have learned that State Street was going
5 to sell the remaining assets in the Grace Stock Fund?
6   A   **Yes, it helps me narrow the time frame.**
7   Q   Do you recall whether you had notice of the
8 sale before April 19th, 2004?
9   A   **No, but certainly no later than April 19th,**
10 **and maybe before.**
11   Q   All right. After this notice went out on
12 April 19th, approximately, 2004, do you recall
13 receiving any communication from any plan participants
14 regarding the notice or the subject matter contained
15 in the notice?
16   A   No.
17   Q   Do you know whether anybody at Grace
18 received comments from plan participants after this
19 notice went out on or about April 19th, 2004?
20   A   No.
21       MR. GOODMAN: Mr. Forgach, at this
22 moment I don't have any further questions. To the

**Page 151**

1 extent I find there's something additional or
2 additional discovery, I'm going to claim -- I'm going
3 to contend that the deposition remains open. At this
4 moment, though, I don't anticipate asking you to
5 appear again. I appreciate your cooperation,
6 assistance and thank you very much.
7       THE WITNESS: You are welcome.
8       MS. FLOWE: We want to read.
9       THE WITNESS: And I hope you enjoy your
10 trip to our nation's capital.
11
12
13
14       (Signature having not been waived, the
15 Deposition of John P. Forgach was concluded at
16 12:29 p.m.)

**Page 152**

1       ACKNOWLEDGMENT OF DEPONENT
2       I, John P. Forgach, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony, and the same is a true,
5 correct and complete transcription of the
6 testimony given by me and any corrections
7 appear on the attached Errata sheet signed by me.

10 _____    _____
11     (DATE)                    (SIGNATURE)

**Page 153**

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Dana C. Ryan, Registered Professional
3 Reporter, the officer before whom the foregoing
4 proceedings were taken, do hereby certify that the
5 foregoing transcript is a true and correct record of
6 the proceedings; that said proceedings were taken
7 by me stenographically and thereafter reduced to
8 typewriting under my supervision; and that I
9 am neither counsel for, related to, nor employed by
10 any of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 6th day of
14 May 2007.
15 My Commission expires:
16 July 14, 2010

19 _____
20 NOTARY PUBLIC IN AND FOR THE
21 DISTRICT OF COLUMBIA