**EXHIBIT 5**

```
                                                              1
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - - X

 4    KERI EVANS,                      :

 5              Plaintiff,             :   Consolidated as

 6    vs.                              :   Case No.:

 7    JOHN F. AKERS, et al.,           :   04-11380-WGY

 8              Defendants.            :

 9    - - - - - - - - - - - - - - - - X

10    LAWRENCE W. BUNCH, et al.,       :

11              Plaintiffs,            :

12    vs.                              :

13    W. R. GRACE & CO., et al.,       :

14              Defendants.            :

15    - - - - - - - - - - - - - - - - X

16          Deposition of WILLIAM BRIAN MCGOWAN

17                  Washington, D.C.

18               Monday, April 30, 2007

19                     10:13 a.m.

20    Job No.:  1-102400

21    Pages:   1 - 173

22    Reported by:  Dana C. Ryan, RPR
```



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007
Case 1:04-cv-11380-WGY    Document 181-6    Filed 08/17/2007    Page 3 of 15

3 (Pages 9 to 12)

9

1   Q   Okay. Well, the purpose of the deposition
2   today is for me to ask you a series of questions
3   regarding the lawsuit that has been brought by
4   Mr. Bunch and others against Grace and State Street,
5   and as a result of that, I'm going to ask you
6   questions; hopefully you'll have some information for
7   me.
8       I understand you've had your deposition
9   taken, but I'm just going to quickly go through a very
10  few grounds rules, and that is please understand the
11  question when I ask it. If you don't understand it,
12  let me know so we can rephrase it. I only want you to
13  answer questions that you understand. Two, let me
14  finish my question before you begin to answer it,
15  because although the court reporter is very good, she
16  can only take down one series of conversations, one
17  person speaking at a time. Also, I'm going to try to
18  let you finish your answers before I start to ask you
19  another question.
20      If you need to take a break at any time,
21  that is fine. This is not supposed to be an endurance
22  contest. Do you understand those few rules and

10

1   regulations and do you think you can comply with them?
2   A   Yes.
3   Q   Okay. Would you briefly give me your
4   post-high school education?
5   A   I have a BS degree in accounting from Marist
6   College and an MBA in finance from St. John's
7   University.
8   Q   Do you have any other special designations
9   or licenses of any kind?
10  A   No.
11  Q   You don't have a CPA?
12  A   No.
13  Q   Okay. When did you start working at Grace?
14  A   February 5th, 1979.
15  Q   And have you been at Grace continuously
16  since then?
17  A   Yes.
18  Q   And very briefly can you tell me what your
19  responsibilities have been since you've been at Grace?
20  A   I started at Grace in the finance
21  department. I was -- became the controller of the
22  company, and in 1990 -- December of 1990 I was

11

1   moved -- I became the senior vice president of
2   administration, the position I hold today.
3   Q   What does a senior vice president of
4   administration do?
5   A   The functions that I am responsible for are
6   information technology, human resources, supply chain,
7   real estate.
8   Q   Anything else?
9   A   A few miscellaneous, but those are the main
10  ones.
11  Q   I'm sure it keeps you very busy.
12      In terms of human resources, what does that
13  entail?
14  A   I'm responsible for the human resources of
15  the company including compensation, career
16  development, benefits, policies and procedures that
17  apply to all employees around the world.
18  Q   How many employees does Grace have around
19  the world right now?
20  A   Approximately 6,500.
21  Q   Has that number remained steady since around
22  2001?

12

1   A   Yes.
2   Q   Out of curiosity, how many of those
3   employees are outside of the United States?
4   A   It's approximately split 50/50 within the
5   U.S. and outside the U.S., give or take a hundred or
6   so.
7   Q   Okay. In what country outside the United
8   States does Grace have the most employees?
9   A   Germany.
10  Q   You indicated a moment ago that one of your
11  responsibilities was benefits. Does that also include
12  the retirement benefits?
13  A   That is correct.
14  Q   And is that for both salaried and
15  nonsalaried employees?
16  A   That is correct.
17  Q   Since 2001 -- all right. I'm sorry.
18  Around -- since April 2nd, 2001 who have you reported
19  to?
20  A   I -- in 2001 I reported to Paul Norris who
21  was the CEO at the time. I currently report to Fred
22  Festa who is the now current CEO.

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007
Case 1:04-cv-11380-WGY    Document 181-6    Filed 08/17/2007    Page 4 of 15

6 (Pages 21 to 24)

**Page 21**

1    MS. FLOWE: That's what I could tell
2    from the numbers at the top, but I just wanted to make
3    the point since this is the first time we've seen one.
4    MR. GOODMAN: Okay. That's fine.
5    BY MR. GOODMAN:
6    Q  Now, is the plan that we're referring to
7    both in Exhibit 1 and Exhibit 2 a defined contribution
8    plan?
9    A  Yes.
10   Q  What is a defined contribution plan?
11   A  Defined contribution plan is where it's a
12   set amount that the employees -- the employees
13   contribute into it and the company is -- has agreed to
14   match that -- those monies up to a certain limit, and
15   at the end of their employment with Grace, the monies
16   that they invested as well as the company match, in
17   addition to any investment gains, is their monies to
18   take with them or leave in the plan and take it out as
19   they see fit.
20   Q  Okay. In connection with the defined
21   contribution plan, I think you already indicated
22   earlier that you had a role as a fiduciary to the plan

**Page 22**

1    but did not get involved actually in the day-to-day
2    activities managing the plan and that was primarily
3    the responsibility of Ms. MacKenzie; is that correct?
4    A  That is correct.
5    Q  How much of your time is devoted to the
6    defined contribution plan in terms of -- we can do it
7    percentage-wise on a monthly basis. Well, let me ask
8    the question differently. When do you get involved in
9    connection with the defined contribution plan?
10   A  Well, I get involved in -- in overseeing the
11   investments in the plan. I get involved with the --
12   if any changes are going to be made to the plan or
13   suggested changes that might come up. I get involved
14   if -- if there are any issues that might be raised
15   by -- whether it be the administrative committee; or
16   if employees raise an issue on it, I get involved at
17   that time.
18   Q  And on an annual basis, how many hours -- if
19   you can estimate, how many hours does it take a year?
20   A  I really cannot estimate. It all depends on
21   facts and circumstances. I mean, there's a -- there's
22   a set base amount, but depending on, you know, if

**Page 23**

1    we're making changes to the plan, if there potentially
2    could be any issues with the plan, it can vary, and
3    I'd really hate to -- I will not state a number
4    because it wouldn't be appropriate from year to year.
5    Q  I think you said there's a set amount. What
6    does that mean?
7    A  Well, what I said was there's always -- you
8    always have meetings on the plan, you know, quarterly,
9    semi-annual, annual meetings to review the
10   investments, to review the -- any potential changes to
11   the plan, so ...
12   Q  Well, I think you helped answer me to a
13   certain extent. You indicate you have quarterly and
14   semi-annual meetings; is that correct?
15   A  Typically we have those. I would not say
16   that every quarter we have it or every six months we
17   have them. We have them -- we have -- we have general
18   meetings to review the plan, the investments --
19   returns of the plans, the investments that are in the
20   plan.
21   Q  You say we have the meetings; who is the
22   "we"?

**Page 24**

1    A  The people present at -- at the meetings
2    would be Bob Tarola and myself as fiduciaries, John
3    Forgach as our ERISA legal counsel, and various
4    members of the treasury function who report on the
5    investment returns, as well as occasionally Mike
6    Piergrossi, who works for me, and Mike is a VP of HR.
7    Q  Okay. In addition to the 401(k) or the
8    defined contribution plan, does Grace offer its
9    employees other retirement benefits, and I'm not
10   referring to medical benefits -- I think a defined --
11   a pension plan?
12   A  We have a defined --
13   Q  Benefit --
14   A  -- benefits plan.
15   Q  -- that's the word I was looking for. A
16   defined benefits plan; is that correct?
17   A  That's correct.
18   Q  And who is entitled to -- who receives the
19   benefits from the defined benefit plan?
20   A  I'm going to -- all my statements are going
21   to relate to the U.S. employees; okay?
22   Q  That's fine.

**33**

1 might have outside the plan.
2    Q   In addition to potential inheritances and a
3 spouse that may be working with another retirement
4 plan, but those are all factors; correct?
5    A   Those are all factors as well as others, I'm
6 sure, that the individuals have to take into
7 consideration.
8    Q   And the reason that you had varying degrees
9 of risk was that would allow each plan participant to
10 make his or her own individual decision as to how to
11 invest in the 401(k) plan?
12    A   That is correct.
13        MR. GOODMAN: I hate to do this. Can I
14 take a quick break? My phone was ringing, and I don't
15 know why someone was calling me.
16        (Recess -- 10:43 a.m.)
17        (After recess -- 10:47 a.m.)
18 BY MR. GOODMAN:
19    Q   I'm sorry for the quick interruption we had
20 a moment ago. We were talking about investment
21 options, and does the plan have an investment policy
22 statement?

**34**

1    A   Yes, it does.
2    Q   When was that created?
3    A   I cannot recall.
4        (Plaintiff's Deposition Exhibit Number 3 was
5 marked for identification and attached to the
6 transcript.)
7 BY MR. GOODMAN:
8    Q   The court reporter has handed to you what's
9 been marked as Plaintiff's Exhibit Number 3. Do you
10 have that in front of you?
11    A   Yes, I do.
12    Q   And this says it was adopted on March 1st,
13 2004. Do you see that?
14    A   Yes.
15    Q   Did Grace have an investment policy
16 statement prior to March 1st, 2004?
17    A   I believe we did, but I cannot state.
18    Q   Typically if one had been existing before
19 that, would this one -- instead of saying adopted,
20 would it indicate that it was amending a preexisting
21 investment policy statement?
22    A   It might have; it might not have.

**35**

1    Q   Who was responsible for creating this policy
2 statement?
3    A   The benefits committee.
4    Q   And that consisted, I think, at the last
5 page -- consisted of yourself and Mr. Tarola; is that
6 correct?
7    A   That is correct.
8    Q   Was there anybody else on the investments
9 benefits committee?
10    A   No one else on the benefits committee.
11    Q   And how long did you serve on the investment
12 and benefits committee?
13    A   I believe I started in the late 1990s,
14 around '98, '99.
15    Q   And how long was Mr. Tarola on the
16 investment and benefits committee, if you can recall?
17    A   I believe he started on it when he was
18 employed with the company in '99.
19    Q   Well, do you recall approximately both of
20 you starting about the same time on the committee?
21    A   I might have been on it earlier; I'm not
22 sure.

**36**

1    Q   Okay. If we could take a look at this
2 document, and particularly if we could look at the
3 Plan Structure, and I'm going to ask you a few
4 questions regarding the following parts of a sentence.
5 So it says, The plan offers a variety of investment
6 alternatives intended to provide a sound and flexible
7 means for each participant to consider both potential
8 returns and the degree of risk in his or her selection
9 of alternatives for his or her plan account.
10        Do you see that?
11    A   Yes.
12    Q   Briefly can you explain to me what you
13 intended this to mean?
14    A   (Witness reviews document.) That sentence
15 means that the investments that were being put in the
16 plan were sound investments but offered the
17 participants a flexibility to consider both returns of
18 those investments as well as the degree of risk that
19 they would take or not take with certain investments.
20    Q   And whose decision was it regarding amount
21 of risk that a participant should take?
22    A   The individual.

**Page 41**

1  Q  And as part of this plan summary, Grace
2  identified the type of fund or investment option that
3  was available; in other words, if you take a look at
4  the fixed income fund, it says that this is a stable
5  value fund; do you see that?
6  A  Correct.
7  Q  And what was the purpose of providing that
8  description?
9  A  So that the participants knew exactly what
10 the fund was made up of and where they might invest
11 their money in.
12 Q  Okay. And did Grace use -- attempt to
13 accurately define and describe each of the investment
14 options?
15 A  That was the intent.
16 Q  Did anybody ever complain to Grace that the
17 descriptions that Grace provided were inaccurate?
18      MS. FLOWE: If you know.
19 BY MR. GOODMAN:
20 Q  If you know.
21 A  Not to the best of my knowledge.
22 Q  It wasn't a subject that the investment and

**Page 42**

1  benefits committee ever undertook, that plan
2  participants contended that they didn't understand the
3  investments they were making?
4  A  To my knowledge, we never heard that.
5  Q  Okay. And, quite frankly, it appears to me
6  that Grace tried to create a plan that allowed plan
7  participants with maximum flexibility, and what I mean
8  by that is that plan participants could get in and out
9  of any investment almost at any time; is that correct?
10 A  Correct.
11 Q  They -- plan participants -- what were the
12 rules, in fact, regarding -- if you recall during this
13 time frame from 2001 through 2004 regarding how a plan
14 participant could either make an investment or change
15 an investment?
16 A  I believe that by that time the participants
17 could almost make daily changes in their investment,
18 move money around whenever they desired.
19 Q  And how could they do that?
20 A  They could call up Fidelity or do it on --
21 I'm not sure if you could do it online then, but you
22 can now, but basically contact Fidelity.

**Page 43**

1  Q  Were there any instructions that Fidelity,
2  if you know, put on regarding timing, market timing?
3  A  Not that I am aware of.
4  Q  Okay. Do you understand what I mean by
5  "market timing"?
6  A  Yes.
7  Q  Okay. And that's when someone tries to time
8  investments to try to get the benefit of fluctuations
9  that they have, late day trades or that sort of thing;
10 is that your understanding?
11 A  Yes.
12 Q  Okay. Also on page 257 --
13 A  What page?
14 Q  I'm sorry. I apologize. Page 15.
15      MS. FLOWE: He's referring to the Bates
16 stamp number.
17 BY MR. GOODMAN:
18 Q  I was referring to the wrong number -- well,
19 it was the right number, but the wrong way to identify
20 it because I was mixing apples and oranges with page
21 numbers.
22      Page 15 it says that, Aon Fiduciary

**Page 44**

1  Counselors, Inc., is the independent fiduciary for the
2  Grace stock. Do you see that?
3  A  I haven't found that yet.
4  Q  The last paragraph.
5  A  Yes, okay.
6  Q  Based on my understanding, Aon actually
7  never became a fiduciary for the Grace Stock Fund; is
8  that correct?
9  A  That is correct.
10 Q  What happened? Why did Grace -- not Grace.
11 Why didn't Aon become an independent fiduciary for the
12 Grace Stock Fund?
13 A  Aon in the end did not come -- become the
14 fiduciary, because after we selected them, they were
15 part of Aon, but then they were -- Aon was spinning
16 off the business into a separate entity, and the
17 separate entity, which was going to be fiduciaries,
18 did not have the backing of the parent, nor could Aon
19 provide insurance levels that we believe were prudent
20 on a timely basis by the time we wanted to make a
21 decision.
22 Q  And what do you mean by "insurance levels"?

**Page 49**

1  Q  So it's an individual investment decision?
2  A  That's correct.
3  Q  Now, the next -- the last sentence -- and I
4  think we discussed this, but I want to make sure I
5  understand it. This is a participant-directed plan;
6  do you see that?
7       MS. FLOWE: You mean the last
8  paragraph?
9       MR. GOODMAN: Yes. Yes, I'm sorry.
10      THE WITNESS: Yes.
11 BY MR. GOODMAN:
12 Q  As a participant-directed plan, what is
13 that?
14 A  It means the participant chooses where to
15 invest the money.
16 Q  Now, earlier we -- let's discuss briefly
17 the -- the plan options in their entirety. We briefly
18 described -- discussed earlier that there were 20 --
19 more than 20 investment options available to plan
20 participants from which to choose when directing how
21 their money will be invested in the defined
22 contribution plan; is that correct?

**Page 50**

1  A  Correct.
2  Q  And you indicated that you made those
3  selections by -- in consultation with Dwight, Fidelity
4  and possibly others; is that correct?
5  A  Correct.
6  Q  What were -- but generally what was Grace
7  looking for, meaning primarily you and Mr. Tarola,
8  when deciding on the -- the investment options that
9  are identified in this exhibit which I'm referring to,
10 the summary plan description, Exhibit Number 4?
11 A  What investment options were we looking for?
12 Q  No, no. What were you looking for when you
13 selected -- and particularly if you want to take a
14 look, I think it starts on page 14 and goes through
15 24.
16      MS. FLOWE: I'm going to object again
17 that you've already asked him this question and he's
18 already responded, but you can answer again.
19      MR. GOODMAN: I'm trying to get a
20 little more detail, but that's fine.
21      THE WITNESS: We were -- we were
22 looking to put options into the plan that were options

**Page 51**

1  that were appropriate as this was a retirement plan,
2  but also options, if -- if they were appropriate, did
3  have a range of risks and rewards available to the
4  participant to choose from.
5  BY MR. GOODMAN:
6  Q  Okay. And when deciding the range of risks
7  and rewards for the participant from which to -- that
8  the participant could choose, how did -- what factors
9  entered into your decision-making process to develop
10 the mix? And the reason I ask that is you have in
11 this plan -- it appears to be a very wide, diverse
12 number of selections, including, I think, target
13 mutual funds and things such as that. What I'm trying
14 to understand -- and maybe I'm not asking the question
15 as clearly as I'd like, but what I'm trying to
16 understand is how you developed the mix in terms of
17 between mutual funds that offered international mutual
18 funds and mutual funds that were devoted to domestic
19 investments and those that were investing in the Bond
20 Index Fund; how -- what factors did Grace consider
21 when it came up with the mix of investment options
22 available in its plan?

**Page 52**

1  A  (Witness reviews document.) I thought it
2  might be covered in here. But it was looking at
3  different investment options and based on whether they
4  were conservative in nature; that were income-driven
5  preservation of capital; that were more in the equity
6  market; more in the bond market; domestic bond;
7  foreign bond; domestic stock; foreign stock.
8  Q  Okay. And based on your consultants, your
9  own experience, was it your belief that if you offered
10 these wide range of investment options, it would
11 permit the plan participants to direct their
12 investments in a manner that would allow
13 diversification of their portfolio?
14 A  That was the goal.
15 Q  And was one of the investment options at
16 this time in 2003 to decide -- to enter into that mix
17 of a diversified portfolio of the Grace Stock Fund?
18 Let me ask the question a little bit different. Did
19 you consider the Grace Stock Fund as part of the mix
20 of investment options that permitted diversification?
21 A  If you refer to page 14, there's an
22 important statement in the second paragraph there.

Case 1:04-cv-11380-WGY   Document 181-6   Filed 08/17/2007   Page 8 of 15
DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

14 (Pages 53 to 56)

### Page 53

1  Q  Okay. Why -- is that yes? How does that
2  lead -- describe the answer for me.
3  A  At this time it says, You may not invest
4  future savings of company contributions in the Grace
5  Stock Fund and you may not transfer current balances
6  into the fund.
7  Q  But the fund still existed; is that correct?
8  A  The fund still existed at this time, yes.
9  Q  And people were invested in the fund at that
10 time?
11 A  People still could have money in the fund at
12 this time, yes --
13 Q  And --
14 A  -- but no future money could go in.
15 Q  I understand that. I understand that. But
16 at that time people who had money invested in the
17 fund, was that still part -- the reason that Grace
18 continued to still offer that as an option was it was
19 part of -- a factor in a diversified portfolio?
20 A  The account was still open, but it was no
21 longer an option to put any future funds in nor
22 transfer funds into?

### Page 54

1  Q  But it was still an option to keep money
2  there or an option to take the funds and put it
3  someplace else?
4  A  That is correct.
5  Q  So if someone still had money in the Grace
6  Stock Fund, did Grace consider that to be part of a
7  selection process to allow a participant to have a
8  diversified portfolio?
9     MS. FLOWE: Objection. I'm not sure
10 how he could know what Grace considered, but you can
11 answer the question if you know.
12    THE WITNESS: I'm not sure I understand
13 the question.
14 BY MR. GOODMAN:
15 Q  Okay. In 2003 when this summary plan
16 description was drafted under your auspices --
17    Is that correct?
18 A  That is correct.
19 Q  -- Grace still permitted plan participants
20 to maintain money in the Grace -- maintain investments
21 in the Grace Stock Fund; is that correct?
22 A  Correct.

### Page 55

1  Q  And the Grace Stock Fund remained a portion
2  of the investment options available to plan
3  participants; is that correct?
4  A  Correct.
5     MS. FLOWE: Asked and answered.
6  BY MR. GOODMAN:
7  Q  Pardon? Is that correct?
8  A  Correct.
9  Q  Okay. And as part of those -- as an
10 investment option, that was part of the mix that Grace
11 had at this time to allow participants in the
12 aggregate to have a diversified portfolio; is that
13 correct?
14    MS. FLOWE: Objection, asked and
15 answered. You can answer.
16    THE WITNESS: At this time when this
17 document was put out in '03, the Grace Stock Fund
18 could accept no future monies from participants;
19 therefore, on a going-forward basis the position was
20 that this was not an investment option to
21 participants.
22 BY MR. GOODMAN:

### Page 56

1  Q  Isn't it an investment option to
2  participants to the extent that they're allowed to
3  maintain portions of their 401(k) funds in the Grace
4  Stock Fund?
5  A  I wouldn't necessarily say that.
6  Q  It's not an option?
7  A  It's not a going-forward option.
8  Q  It's an existing option; is that correct?
9     MS. FLOWE: I think the terminology is
10 what is causing the problem here.
11    MR. GOODMAN: That's what I'm trying to
12 clarify.
13    THE WITNESS: I do not -- I do not view
14 it as an option.
15 BY MR. GOODMAN:
16 Q  Okay.
17 A  It's still in the plan. You could continue
18 to have your money there, but it's no longer an option
19 open to the individual other than withdrawal, other
20 than taking money out of it, so I don't view it as an
21 option at that time.
22 Q  In 2003 whenever this document was

Case 1:04-cv-11380-WGY Document 181-6 Filed 08/17/2007 Page 9 of 15
DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

22 (Pages 85 to 88)

85

1 Q Okay. Who first raised the subject?
2 A My recollection is, is that John Forgach
3 started some conversations on it.
4 MS. FLOWE: Let me just caution you to
5 not discuss what your counsel said to you, but the
6 fact that he --
7 THE WITNESS: Raised it.
8 MS. FLOWE: -- raised topics is fine.
9 THE WITNESS: Okay.
10 MS. FLOWE: Sorry.
11 MR. GOODMAN: No, I understand.
12 BY MR. GOODMAN:
13 Q And what was your response? Let me go back
14 a step. At this moment there's some issue of law
15 regarding whether his conversations are confidential
16 or not. I'm not going to get into that issue right
17 now, but what I would like to know is, besides
18 yourself, who else did Mr. Forgach raise the issue
19 with?
20 A I believe it was the benefits committee.
21 Q And that would have been you and Mr. Tarola?
22 A Correct.

86

1 Q And what was your understanding as to the
2 reason to hire -- when these conversations began, a
3 reason to hire an independent fiduciary?
4 MS. FLOWE: I'm going to object to the
5 form of that question. I think that you're asking --
6 in the way you phrased it, I think it's going to
7 elicit privileged communications. Maybe you could
8 rephrase it in a way that --
9 MR. GOODMAN: Okay.
10 BY MR. GOODMAN:
11 Q At some point did you start to inquire
12 among -- did you and Mr. Tarola begin to discuss the
13 hiring of an independent fiduciary?
14 A I would say that it was not only myself and
15 Bob Tarola, but it was other members of senior
16 management of Grace that started the discussions.
17 Q Okay. And aside from yourself and
18 Mr. Tarola, who else at Grace participated in those
19 discussions?
20 A To my recollection, it would have been Dave
21 Siegel and Paul Norris.
22 Q Mr. Siegel is, of course, general counsel

87

1 and Mr. Norris was CEO?
2 A CEO at that time.
3 Q Was he also president?
4 A He was the -- at that time was he the
5 president? Yes, I believe he was still president, CEO
6 and chairman at that time.
7 Q And when you were discussing this issue,
8 did -- what was your understanding as to the reason to
9 hire or to inquire into whether to have an independent
10 fiduciary?
11 A The reasons we started to discuss it as a
12 team was that we believed that there were certain
13 activities starting to happen in the bankruptcy that
14 might put Bob Tarola and myself in a position that we
15 really couldn't be put into. As fiduciaries to the
16 plan, our responsibility is to the plan participants;
17 but as senior executives of the company, we also had
18 involvement in the bankruptcy proceeding and some
19 of -- a lot of which was nonpublic information that
20 could put -- could have -- could have put us at odds
21 between our fiduciary responsibility for the plan and
22 insider information with regard to what was taking

88

1 place in the bankruptcy.
2 Q Specifically what type -- not getting into
3 specifics, but specifically what type of insider
4 information were you referring to? Categories is what
5 I'm getting into now.
6 A What impact would the bankruptcy have, the
7 outcome of the bankruptcy, outcome of the negotiations
8 have on the value of Grace stock.
9 Q How would the bankruptcy and the
10 negotiations in the bankruptcy impact the value of
11 Grace stock?
12 A Like all bankruptcies, the ultimate outcome
13 of the bankruptcy determines the value of the
14 underlying equity of the company.
15 Q But what's -- that's correct. But what
16 types of issues or negotiations that you were going to
17 be involved in -- and, again, I'm talking about
18 categories -- would ultimately impact the outcome or
19 impact the ultimate value of Grace stock?
20 A The ultimate liabilities of the company.
21 Q Referring to asbestos liabilities?
22 A That is correct.

**Page 89**

1  Q   And at any time -- well, but at that time
2  you felt that the financial statements accurately
3  reflected the ultimate asbestos liability, did you
4  not?
5  A   At that point in time we believed that it
6  was the best assessment of what the liabilities --
7  which what we believed, the company believed, was the
8  best assessment of the liabilities.
9  Q   And you personally didn't have any
10 information at that time to suggest that the company
11 had done anything wrong in connection with assessing
12 its asbestos liabilities; is that correct?
13       MS. FLOWE:  Objection.  You've already
14 asked him that question and he's already answered it,
15 but you can answer it again.
16       THE WITNESS:  Correct.
17 BY MR. GOODMAN:
18 Q   Other than asbestos liabilities and
19 negotiations related to that, was there anything else
20 that you felt put you in a situation where you may
21 have divided loyalties?
22 A   No.

**Page 90**

1  Q   Now, what role did you have in connection
2  with the hiring of an independent fiduciary for the
3  Grace Stock Fund?
4  A   I was a member of the team that looked into
5  the qualifications, went through a -- I'll call it an
6  interview process, met with potential independent
7  fiduciaries for the purpose of retaining one.
8  Q   Did you put out a -- I guess it's called a
9  request for bids in connection with the selection of
10 an independent fiduciary?
11 A   No.
12 Q   And how did the team go about selecting
13 individual -- groups, entities or somebody to
14 interview in connection with the selection of
15 independent fiduciaries?
16 A   Well, the first step was to identify who
17 were the potential players in this field.
18 Q   How did you do that?
19 A   By looking at various documents and seeing
20 who -- you know, based on information from firms, who
21 were independent fiduciaries for companies.
22 Q   And which names did you -- I don't want all

**Page 91**

1  the names you came across, but what names did you
2  actually end up having meetings with?
3  A   To the best of my knowledge, the only ones
4  that we had face-to-face meetings with was Aon and
5  State Street.
6  Q   Was there a Northern Trust group?
7  A   Yes.
8  Q   And did you have any meetings with Northern
9  Trust?
10 A   I do not believe we had any meetings with
11 Northern Trust, but I could be mistaken.
12 Q   How did it come out that you primarily
13 focused in on Aon and State Street?
14 A   We contacted a variety of companies.  U.S.
15 Trust was one of them that you mentioned, Fidelity and
16 Northern Trust; and Aon and State Street, based on
17 their input, were the ones that were amenable to the
18 prospect of taking on this responsibility.
19 Q   You mentioned a moment ago that there was a
20 team and you identified the members of the team.
21 A   Right.
22 Q   I think it was basically four people who

**Page 92**

1  were on the team.  Was there anyone who was in charge
2  of that team?
3  A   I -- no.
4  Q   Was there anyone responsible for primarily
5  obtaining information regarding either Aon or State
6  Street in making initial contacts?
7  A   The initial contacts with the firms to the
8  best of my knowledge was done by John Forgach.
9  Q   Okay.  Was he also a member of the team?
10 A   Yes.
11 Q   Okay.  So it was Mr. Forgach, Mr. Tarola,
12 Mr. Siegel, yourself.  Anybody else?
13 A   I believe Mr. Norris was involved, and when
14 we had the people come in, he was -- he was -- he met
15 the prospective fiduciaries.
16 Q   Of the people you -- that State Street
17 contacted or entities, I believe from your testimony,
18 my assumption is that primarily there were two
19 entities that expressed interest and that was Aon and
20 State Street; is that correct?
21 A   They were the two that we -- we selected to
22 come in and further go to the next step with.

Case 1:04-cv-11380-WGY   Document 181-6   Filed 08/17/2007   Page 11 of 15

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

26 (Pages 101 to 104)

**101**

1    (Plaintiff's Deposition Exhibit Number 6 was
2    marked for identification and attached to the
3    transcript.)
4    BY MR. GOODMAN:
5      Q   Mr. McGowan, the court reporter has handed
6    you what she has marked as Exhibit Number 6, which is
7    materials that begin with the first page that seems to
8    be dated December 31st, 2002 from State Street.
9      A   Yes.
10     Q   Do you recall seeing -- and I know I've just
11   given them to you, so feel free to look them over, but
12   do you recall seeing this material before?
13     A   **I do not recall seeing this. I do not**
14   **recall seeing this specific package.**
15     Q   Okay. Do you recall reviewing material from
16   State Street regarding the services it could offer to
17   you in connection with -- in connection with serving
18   as an independent fiduciary?
19     A   Yes.
20     Q   And, let me see, if you could turn to
21   page -- turn to what's been marked Bates stamp
22   number 8112.

**102**

1          MS. FLOWE: It's towards the back.
2          THE WITNESS: Uh-huh.
3    BY MR. GOODMAN:
4      Q   First of all, do you recall seeing the names
5    Kelly Driscoll, Monet Ewing, Sydney Marzeotti, Roger
6    Petrin, Christopher Rice and the others at some point?
7      A   **The ones I'm most familiar with are just**
8    **Kelly Driscoll and Monet Ewing.**
9      Q   Do you recall -- did you participate -- did
10   you attend a meeting with State Street representatives
11   on more than one occasion? Well, let's go back some.
12   When you were thinking of hiring State Street as an
13   independent fiduciary, do you recall attending any
14   meetings where State Street representatives made
15   presentations to you?
16     A   Yes.
17     Q   And who made the presentations for State
18   Street?
19     A   **The two people that I can recall being there**
20   **were Kelly and Monet.**
21     Q   Okay. Did you meet with them on more than
22   one occasion -- more than one time?

**103**

1      A   I believe so, yes.
2      Q   Before selecting State Street as an
3    independent fiduciary?
4      A   **We met with them at least once before**
5    **selecting them.**
6      Q   And who did you understand would be
7    responsible -- after you hired State Street, who did
8    you have an understanding would be the person
9    responsible at State Street for serving as independent
10   fiduciary?
11     A   **I'm not sure I had an understanding that it**
12   **would be one particular person.**
13     Q   Okay. Which individuals, if there was more
14   than one, do you recall?
15     A   **I -- the only thing I can say is our main**
16   **contacts were Kelly and Monet.**
17     Q   After State Street was engaged, did you
18   continue to -- "you" being Mr. McGowan, continue to
19   maintain contact with State Street?
20     A   **You said after we retained them?**
21     Q   Yes.
22     A   **If I did, it was on a very limited basis.**

**104**

1      Q   Okay. Before you retained State Street, did
2    you individually, meaning "you," Mr. McGowan, have --
3    maintain communication directly with State Street?
4          MS. FLOWE: Objection, asked and
5    answered. Go ahead.
6          THE WITNESS: I did have contacts with
7    Kelly and Monet.
8    BY MR. GOODMAN:
9      Q   Okay. And who did you principally have
10   contact with?
11     A   **Of the two, I would say Monet.**
12     Q   When you spoke with Ms. Driscoll, what was
13   the reason you communicated with her?
14     A   **I can't recall at this time.**
15     Q   When you spoke with Ms. Ewing, do you recall
16   the reason why you would have communication with her?
17     A   **Just general questions about the -- the**
18   **logistics, the procedure that was going to be taking**
19   **place, you know.**
20     Q   Who at -- of the members of the team that we
21   discussed earlier, who had -- if you know, who had
22   principal communication responsibilities with State

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

109

1  A  No.
2  Q  Did you attend meetings with representatives
3  of State Street where they sought to acquire
4  information regarding Grace?
5  A  To the best of my recollection, I cannot.
6  Q  Okay. You indicated earlier you thought
7  that Mr. Norris attended meetings where State Street
8  attended -- with State Street; is that correct?
9        MS. FLOWE: I object to the
10  characterization of his prior testimony. You can
11  answer his question.
12       THE WITNESS: I believe what I said,
13  that Mr. Norris attended meetings as did Brian
14  McGowan, Bob Tarola and Dave Siegel during the process
15  of interviewing State Street as the independent
16  fiduciary.
17  BY MR. GOODMAN:
18  Q  Okay. Fair enough. Who at Grace had the
19  primary responsibility for interacting with State
20  Street when State Street wanted information?
21  A  To the best of my knowledge, it was Bob
22  Tarola on financial matters and Dave Siegel as it

110

1  related to asbestos-related information.
2  Q  Were there any restrictions on the type of
3  information that Grace, if you know, was willing to
4  provide to State Street?
5  A  The only thing that was provided to State
6  Street was -- was information that was in the public
7  domain.
8  Q  Did you review any of the material that --
9  well, strike that. You indicated that a moment ago.
10       Okay. There was a time that you also
11  assisted State Street in connection with filing
12  appropriate documents so that the bankruptcy court
13  would approve the appointment of State Street; is that
14  correct?
15  A  That is correct.
16  Q  And there were some objections by, I think,
17  the creditors committee regarding the retention of
18  State Street; is that correct?
19  A  I believe that there were objections by one
20  or two of the committees.
21  Q  Do you have an understanding as to the basis
22  of those objections?

111

1  A  I can't recall at this time the specific
2  objections.
3  Q  Okay. After there was -- after the
4  engagement with State Street, who had -- did you have
5  contact -- did you continue to have contact with State
6  Street?
7  A  If I did, it was very limited.
8  Q  Did Mr. Tarola have -- if you know, have
9  contact with State Street after it was hired?
10  A  I can't answer that.
11  Q  Did the invest -- as an official function of
12  the investments and benefits committee fiduciaries,
13  did you make any inquiry as to State Street regarding
14  any matter after the retention of State Street?
15  A  No.
16  Q  Do you know if Mr. Tarola did?
17  A  I can't answer that.
18  Q  Was there any official action taken by your
19  committee that the two of you -- consisting of the two
20  of you requesting any information from State Street?
21  A  Not that I'm aware of.
22  Q  Do you recall at some point that State

112

1  Street had decided in February of 2004 to start
2  selling stock from the Grace Stock Fund; do you recall
3  that?
4  A  I recall that.
5  Q  Let me see if I can find this document. How
6  did you learn of it?
7  A  As I recall, State Street called us just to
8  give us advanced notice.
9  Q  Okay. And who did they call? Was it you or
10  do you know who?
11  A  I don't recall who it was.
12  Q  Did anybody from Grace, to the best of your
13  knowledge, have any conversations with State Street
14  regarding the decision to sell the stock?
15  A  I did not.
16  Q  Do you know if any -- officially, did
17  anybody from the investment and benefits committee
18  communicate with State Street regarding the decision
19  to sell the stock?
20  A  I know I did not talk to them, and I can't
21  speak for anyone else what they might have done.
22  Q  Did you have an understanding as to the

**Page 113**

1   reason why it was selling the stock?
2   A   Yes.
3   Q   And what was your understanding as to the
4   reason it decided to sell the stock?
5   A   In their capacity as independent
6   fiduciaries, they had determined that it was not an
7   appropriate investment in a retirement fund.
8   Q   Okay. Did you have any understanding as
9   how -- what the reason was for their decision?
10  A   Specifically, no.
11  Q   Did you make any inquiries as to the reason
12  of its decision?
13  A   No.
14  Q   Why not?
15  A   Grace appointed State Street as the
16  independent fiduciary, and in that capacity we passed
17  to them the fiduciary responsibilities to act on the
18  best behalf of the Grace Stock Fund and the
19  participants.
20      (Plaintiff's Deposition Exhibit Number 7 was
21  marked for identification and attached to the
22  transcript.)

**Page 114**

1   BY MR. GOODMAN:
2   Q   The court reporter has handed to you what's
3   been marked as Exhibit Number 7. Do you have that in
4   front of you?
5   A   Yes.
6   Q   Do you recall ever seeing this document
7   before?
8   A   Yes.
9   Q   And when did you see it?
10  A   To the best of my knowledge, I got it when
11  all other participants got it. I might have gotten it
12  a day or so earlier just as a heads-up, but it was
13  prepared by State Street and passed on to the company.
14  Q   Did you read it?
15  A   Back then?
16  Q   Yes.
17  A   Yes.
18  Q   Did you have any comments or concerns -- did
19  you have any concerns regarding anything that was
20  written in this document?
21  A   No.
22  Q   Let me turn to actually the last item,

**Page 115**

1   number 19.
2   A   Yes.
3   Q   It says you may contact Brian McGowan or
4   Mr. Forgach. "However, please keep in mind they will
5   only have access to the same information that has
6   already been provided to you." Do you see that?
7   A   Yes.
8   Q   Is that correct? Did you have any access to
9   any other information?
10  A   No.
11  Q   After this was mailed to plan participants
12  and based on item number 19, do you recall any plan
13  participant communicating with you?
14  A   Yes.
15  Q   And approximately how many people
16  communicated with you?
17  A   I would estimate at this time less than a
18  dozen.
19  Q   And of those six or so people who
20  communicated -- spoke to you or -- did they do it
21  through e-mail, letter or telephone conversation?
22      MS. FLOWE: Object to the

**Page 116**

1   characterization. He said, "less than a dozen."
2       MR. GOODMAN: Okay. That's a half
3   dozen. That's fine.
4   BY MR. GOODMAN:
5   Q   Of those people who communicated with you,
6   how was that communication made?
7   A   It was made in -- for the most part I
8   believe it was via e-mail.
9   Q   And do you recall what the topic was of
10  those e-mails?
11  A   The general sense of the communication was
12  questioning why State Street could sell their stock.
13  Q   Did you get the impression that these less
14  than dozen individuals were upset with the decision?
15  A   Since it was in writing, I really didn't get
16  an impression. They were just making inquiries of and
17  wanted to know why they could do that.
18  Q   And what did you tell them, if anything?
19  A   They were -- all questions that came in were
20  responded to and giving them the -- the reasons and
21  the -- what an independent fiduciary is and the -- the
22  responsibilities of an independent fiduciary.

145

1  A  A telephone call was made by State Street to
2  Grace. I do not know exactly who got the call. It
3  was more of a -- it was a courtesy call, a heads-up of
4  what was being done just so that we were aware.
5  Q  Who told you, if you recall?
6  A  I don't recall who exactly told me.
7  Q  What did you do, if anything, when you
8  learned that State Street was about to sell the stock
9  to D.E. Shaw?
10  A  What do you mean by what did I do?
11  Q  Well, just exactly that. Did you contact
12  anybody at Grace to discuss the sale?
13  A  The only thing I would have done would be to
14  have communicated it to the appropriate individuals on
15  the Grace leadership team to make sure that the likes
16  of a Paul Norris, Dave Siegel, Mike Piergrossi
17  would -- Bob Tarola, you know, et cetera, that the
18  leadership team knew the sale was taking place, Bill
19  Corcoran.
20  Q  Did you do that?
21  A  To the best of my recollection we made sure
22  that everyone that I mentioned was aware. I'm not

146

1  sure if I was the one that did it or whether it was
2  Bob Tarola or someone else.
3  Q  After everyone became aware at Grace that it
4  was occurring, did discussions take place at Grace
5  with those -- with the team leaders regarding the
6  imminent sale of the stock fund to D.E. Shaw?
7  A  Not that I'm aware.
8  Q  Did anybody to the best of your knowledge --
9  let me first ask this question. Did you contact or
10  speak with anybody at State Street upon learning of
11  the sale or a pending sale?
12  A  My discussions with State Street -- I had
13  discussions between State Street and Fidelity on the
14  mechanics of how the allocation was going to be done,
15  when it was going to be reflective in people's --  the
16  participants' accounts. And, you know, I was -- I was
17  getting the -- our -- our plan provider, Fidelity and
18  State Street, lined up to make sure that all the
19  logistics were in place for the sale.
20  Q  Okay. Did you have any conversations with
21  anyone at State Street inquiring why retention of the
22  shares had become inconsistent with ERISA?

147

1  A  I did not.
2  Q  Do you know if anybody at Grace had any
3  conversations with anyone at State Street regarding
4  that issue?
5  A  I can't answer that.
6  Q  During the time that State Street came on
7  board around, I believe, December 15th, 2003 through
8  the time the sale of the stock was consummated in
9  April of 2004, did you ever inquire of State Street --
10  meaning, first, you individually, of State Street why
11  retention of the Grace Stock Fund was inconsistent
12  with ERISA?
13  A  No.
14  Q  Do you know if anybody at Grace ever did
15  that?
16  A  I can't speak for others.
17  Q  Was there a discussion in investment and
18  benefits committee meetings where someone suggested,
19  either you or Mr. Tarola or anybody else, that perhaps
20  someone from Grace should speak with someone at State
21  Street to determine why State Street had determined
22  that retention of the Grace Stock Fund was

148

1  inconsistent with ERISA?
2  A  No conversations that I was aware of.
3  Q  Did you ever participate in what I've heard
4  referred to as town meetings?
5  A  Yes.
6  Q  Okay. What is a town meeting?
7  A  Town meeting is -- is where, in this case,
8  the CEO of the company would have a video conference
9  with, for the most part, all major sites around the
10  world that employees could access either through a
11  video or on the telephone, and they were primarily
12  done following the release of our earnings four times
13  a year.
14  Q  Okay. And were you -- let me go back a
15  step. You said that you were familiar with them. Did
16  you generally participate in those or did someone else
17  do the talking?
18  A  The CEO was for the most part the primary
19  and, most times, the only speaker at these meetings.
20  (Plaintiff's Deposition Exhibit Number 16 was
21  marked for identification and attached to the
22  transcript.)

169

1  MS. FLOWE: As far as keeping the
2  deposition open, to the extent there's any time
3  left -- I haven't been keeping exact track, but I
4  would say that we're at almost six hours, at least
5  five and a half.
6  MR. GOODMAN: We can do that. That's
7  fine. I, at this moment, don't anticipate it, but I
8  was just doing it for that purpose. We can argue
9  later on on making a statement for the Record, and I'm
10  not --
11  MS. FLOWE: Got it.
12  MR. GOODMAN: And, quite frankly, if
13  you know me, I'm not going to try to unnecessarily
14  impose on Mr. McGowan again. I promise you that.
15  MS. FLOWE: I do. I do. Let's make
16  that assumption. But I have to make it for the
17  Record.
18  MR. GOODMAN: I understand. That's
19  fine. We'll count hours and -- I understand.
20  (Signature having not been waived, the
21  Deposition of William Brian McGowan was concluded
22  at 3:49 p.m.)

170

1  ACKNOWLEDGMENT OF DEPONENT
2  I, William Brian McGowan, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections
7  appear on the attached Errata sheet signed by me.
8
9
10  _____  _____
11  (DATE)              (SIGNATURE)

171

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2  I, Dana C. Ryan, Registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken
7  by me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I
9  am neither counsel for, related to, nor employed by
10  any of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12  IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 6th day of
14  May 2007.
15  My Commission expires:
16  July 14, 2010
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR THE
21  DISTRICT OF COLUMBIA

172

1  E R R A T A  S H E E T
2  IN RE: LAWRENCE W. BUNCH, et al. v. W. R. GRACE &
3  CO., et al.
4  RETURN BY: _____
5  PAGE   LINE    CORRECTION AND REASON
6  ____   ____    _____
7  ____   ____    _____
8  ____   ____    _____
9  ____   ____    _____
10  ____   ____    _____
11  ____   ____    _____
12  ____   ____    _____
13  ____   ____    _____
14  ____   ____    _____
15  ____   ____    _____
16  ____   ____    _____
17  ____   ____    _____
18  ____   ____    _____
19  ____   ____    _____
20  ____   ____    _____
21  ____   ____    _____
22  (DATE)        (SIGNATURE)