**EXHIBIT 6**

```
 1            UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3
      ---------------------------------
 4    KERI EVANS, et al.,            :
                                     :
 5         Plaintiffs,               :
                                     :
 6    vs.                            :
                                     :
 7    JOHN F. AKERS, et al.,         :
                                     :
 8         Defendants.               :
                                     : CONSOLIDATED
 9    --------------------------------- UNDER CASE NO.
      LAWRENCE W. BUNCH, et al.,     : 04-11380-WGY
10                                   :
           Plaintiffs,               :
11                                   :
      vs.                            :
12                                   :
      W.R. GRACE & CO., et al.,      :
13                                   :
           Defendants.               :
14                                   :
      ---------------------------------
15
16    Deposition of:  JOHN J. MULLIGAN, JR.
17    Taken:     By the Defendants
                 Pursuant to Agreement
18
      Date:      July 11, 2007
19
      Time:      Commencing at 9:07 a.m.
20
      Place:     Waite, Schneider, Bayless &
21               Chesley Co., LPA
                 Suite 1513 Fourth & Vine Tower
22               One West Fourth Street
                 Cincinnati, Ohio  45202
23
      Before:    Linda S. Mullen, RMR, CRR
24               Notary Public - State of Ohio
25
```

Page 5

1    JOHN J. MULLIGAN, JR.
2 of lawful age, a witness herein, being first duly
3 sworn as hereinafter certified, was examined and
4 deposed as follows:
5    CROSS-EXAMINATION
6 BY MR. FLICKER:
7    Q. Good morning, Mr. Mulligan. My name is
8 Scott Flicker. I'm counsel for State Street. Could
9 you please state your full name for the record?
10    A. My full name is John Joseph Mulligan,
11 Junior.
12    Q. And where are you employed?
13    A. Retirement Planning Strategies.
14    Q. What's the business address of that
15 entity?
16    A. It's 5304 Matoaka Road, M-a-t-o-a-k-a,
17 Richmond, Virginia.
18    Q. What's your business telephone number?
19    A. It's (804) 673-0770.
20    Q. You were at one time employed by State
21 Street Bank and Trust Company, is that right?
22    A. That's correct.
23    Q. What was the position that you held when
24 you left that company?
25    A. The position that I held when I left was a

Page 6

1 position called division executive.
2    Q. What were the years in which you worked at
3 State Street?
4    A. From the spring of 1985 until the end of
5 February 1993.
6    Q. What was the highest position that you
7 held in terms of ranking at State Street?
8    A. It was a position called division head.
9    Q. Is that an officer position?
10    A. Yes, it was a senior vice president,
11 management committee level position.
12    Q. Is State Street experienced in the field
13 of providing investment management services?
14    A. Yes.
15    Q. Does State Street have any expertise in
16 providing investment management services for ERISA
17 plans, just ERISA plans?
18    A. Yes.
19    Q. And does State Street have expertise in
20 providing investment management services for --
21 particularly for company stock funds in ERISA plans?
22    A. Yes.
23    Q. Would you rank State Street in the top ten
24 in the nation in terms of companies that have
25 expertise in providing investment management services

Page 7

1 for company stock funds in ERISA plans?
2    A. I would.
3    Q. Do you know Mr. Dan Brown at State Street?
4 I'm sorry, Mr. Mark Brown at State Street?
5    A. No, I don't.
6    Q. Do you know Mr. Peter Leahy?
7    A. No, I don't.
8    Q. Do you know Sean Johnson?
9    A. No.
10    Q. Do you know Mitchell Shames?
11    A. I kind of know of Mitchell Shames.
12    Q. Do you know John Kirby?
13    A. No.
14    Q. Do you know Kelly Driscoll?
15    A. Yes.
16    Q. How do you know Ms. Driscoll?
17    A. When I was at State Street, the division
18 that served defined contribution plans was called
19 benefit plan services. Kelly, while she was
20 attending law school, worked in the compliance area
21 of benefit plan services, and when she graduated from
22 law school she joined the ERISA legal staff at State
23 Street and she was one of the attorneys that was
24 assigned to benefit plan services.
25    Q. Do you know if Ms. Driscoll is experienced

Page 8

1 in the field of providing investment management
2 advice to company stock funds in ERISA plans?
3    A. I believe she is. During the period that
4 I knew and worked with Kelly Driscoll, that was not
5 her role, her role was as a legal advisor. From a
6 distance, I'm aware of what Kelly has done since
7 then.
8    Q. And that's the basis for your belief that
9 she's experienced in --
10    A. That's correct.
11    Q. -- that area? Okay. Do you have any --
12 of those individuals that I mentioned at State
13 Street, do you have any view of whether those other
14 individuals are or are not experienced in the same
15 field?
16    A. I do not.
17    Q. Tell me, what is Retirement Plan
18 Strategies?
19    A. Retirement Plan Strategies is principally
20 a consulting company that serves what are called a
21 provider community in the defined contribution
22 industry. We consult in regard to product
23 development, business strategies, resourcing
24 strategies. We've consulted to firms in regard to
25 fiduciary and trust matters.

149

1   A.  No.
2   Q.  Would you say it was a prudent selection?
3   A.  Yes.
4   Q.  And it's your opinion, isn't it, that
5   Grace did an above average job of providing
6   diversification opportunities to the participants in
7   the plan?
8   A.  Yes.
9   Q.  In fact, starting in 2000, there were 28
10  investment options, weren't there?
11  A.  There were.
12  Q.  In your opinion, then, the plan as so
13  constituted satisfied ERISA diversification
14  requirements?
15  A.  Yes.
16  Q.  Were all 28 options necessary for that
17  purpose?
18  A.  No.
19  Q.  Could Grace or a plan fiduciary have
20  removed one or more of those investment options
21  without causing the plan to flunk ERISA's
22  diversification requirement?
23  A.  They could.
24  Q.  And nothing in ERISA requires the sponsor
25  of a 401(k) plan to offer employer stock as an

150

1   investment option, does it?
2   A.  Not unless it's an ESOP.
3   Q.  It's purely a settlor function in the
4   first instance, other than in an ESOP?
5   A.  Correct.
6   Q.  And, in fact, Grace as the plan sponsor
7   could and in fact did amend the plan to preclude any
8   new money from going into the Grace stock fund,
9   right?
10  A.  That's correct.
11  Q.  And that was legal?
12  A.  Yes.
13  Q.  Is there any reason that Grace couldn't
14  have also amended the plan to simply eliminate the
15  Grace stock fund altogether?
16  A.  They could do that.
17  Q.  Legally, they could do that?
18  A.  Absolutely.
19  Q.  I want to back up a little bit and ask
20  about your experience some. You testified about your
21  consulting work and so forth. Do you have experience
22  dealing with and consulting with regard to bankrupt
23  companies?
24  A.  No.
25  Q.  Have you had any experience dealing with

151

1   companies with large contingent liabilities, like
2   mass tort liabilities?
3   A.  Let me think. Some of the large leveraged
4   ESOPs we did in some of the company situations. I
5   think the answer is no.
6   Q.  Do you want to think about it some more?
7   A.  No, I'll say no.
8   Q.  I don't want to cut you off.
9   A.  No.
10  Q.  In your report -- I apologize, I'm jumping
11  around a little bit, but that's what happens when
12  you're picking up after somebody.
13  A.  That's all right.
14  Q.  In your report, you say that you have not
15  testified on employer securities matters in the past
16  four years. Have you testified on any matters in the
17  last four years?
18  A.  No.
19  Q.  You say also in your report that in your
20  experience, it's highly unusual that -- to consider
21  the valuation techniques for determining the value of
22  a publicly-traded stock. What experience is that
23  that makes you think that's highly unusual?
24  A.  It's my experience at State Street Bank
25  and my experience in the expert work that I do, and

152

1   general experience around the industry, that
2   typically an investment manager for a company stock
3   fund or discretionary or non-discretionary trustee
4   for a company stock fund, for a publicly-traded
5   company that's widely held, doesn't need to rely on a
6   valuation firm to help it to value the security.
7   Q.  But didn't you just tell me that you
8   didn't have experience in dealing with bankrupt
9   companies?
10  A.  That's correct.
11  Q.  And Grace is in bankruptcy, right?
12  A.  That's correct.
13  Q.  And are you aware that while it's been in
14  bankruptcy, that analysts haven't been covering it?
15  A.  I'm aware of that.
16  Q.  So there isn't the same kind of or quality
17  of information available as most non-bankrupt,
18  publicly-held companies?
19  A.  That's correct.
20  Q.  And you've also told me that you're not
21  experienced in dealing with companies that have large
22  contingent liabilities, right?
23  A.  Correct.
24  Q.  And Grace also has a large contingent
25  liability, right?

153

1  A. Correct.
2  Q. If you would turn, please, to, I think
3  it's Exhibit 8, which is your report, and go to page
4  9, please, paragraph 25. The first sentence there
5  says, "In my opinion it should have been unacceptable
6  to Grace as a fiduciary to Plan Participants" --
7  A. Yes.
8  Q. What is the basis for your reference to
9  Grace as a fiduciary?
10 A. For Grace as the -- as the plan sponsor.
11 Q. So you really meant to say, Grace as the
12 plan sponsor?
13 A. Well, as a plan sponsor, they're also a
14 fiduciary, are they not?
15 Q. I think I'm asking the questions.
16 Actually, plan sponsors are not automatically
17 fiduciaries, no, they aren't. And I don't know that
18 there's any evidence yet in this case that Grace was
19 a fiduciary. A plan sponsor in and of itself doesn't
20 have fiduciary obligations, right?
21 A. It's not who they are, it's what they do.
22 Q. Correct. Well, this paragraph says, "it
23 should have been unacceptable to Grace as a fiduciary
24 to Plan Participants to know that State Street as the
25 Plan's investment manager for the Grace Stock Fund

154

1  was making decisions that were inconsistent with
2  Grace's analysis." Was it really Grace's analysis
3  concerning whether retention of company stock was
4  consistent with ERISA?
5  A. It was Grace's decision that it was
6  consistent with ERISA up until December 15th.
7  Q. That was Grace's decision?
8  A. That's correct.
9  Q. The company's decision?
10 A. That's correct.
11 Q. That's your testimony?
12 A. It was the investment committee.
13 Q. Well, is it the investment Committee or
14 the company, which?
15 A. The investment committee.
16 Q. Okay. So should this sentence say, "to
17 the investment committee" rather than "to Grace"?
18 I'm trying to clarify what your opinion is.
19 A. Well, it -- there may be more than one
20 fiduciary here, I'm not sure. I believe the
21 investment committee also did some reporting and also
22 took some direction from the board of Grace, if I
23 recall. So there may be multiple fiduciaries here.
24 And I used the term "at Grace" -- and I used the term
25 "Grace" as a general term here in this report.

155

1  Q. So when you use the term "Grace," should
2  we read the fiduciaries of the Grace plan?
3  A. That's fine.
4  Q. Now, you say here -- you quote some
5  testimony from Brian McGowan's deposition in this
6  paragraph. He's being asked about the period from
7  2001 to December 2003, right?
8  A. That's correct.
9  Q. And State Street's sale of the stock was
10 several months later, right?
11 A. That's correct.
12 Q. So State Street's determination several
13 months later that continuing to hold the stock was
14 not prudent was not necessarily inconsistent with
15 Mr. McGowan's testimony about what the situation was
16 from 2001 through December 15th, 2003, right?
17 A. Could you repeat your question?
18 Q. State Street's determination that
19 continuing to hold the stock was not prudent was not
20 necessarily inconsistent with Mr. McGowan's testimony
21 about what the situation was from 2001 through
22 December 15th, 2003, right?
23 A. Okay. So it wasn't necessarily, or on
24 face value, inconsistent, correct.
25 Q. Because they were made at different times?

156

1  A. Right.
2  Q. And even assuming that they were made at
3  the same time, is it not possible for two fiduciaries
4  to reach different conclusions about the prudence of
5  a particular investment?
6  A. I suppose that's possible.
7  Q. Are you aware that the investment
8  committee decided to appoint an independent fiduciary
9  because, among other things, they believed they were
10 facing a potential conflict of interest?
11 A. I am.
12 Q. And would you agree that if fiduciaries
13 have a potential conflict of interest, it's prudent
14 to appoint an independent fiduciary to undertake
15 their responsibilities?
16 A. Yes.
17 Q. So you're not rendering an opinion here
18 that there was anything inappropriate about the
19 committee's decision to appoint an independent
20 fiduciary?
21 A. That's correct.
22 Q. I want to go back to your opinion. It is
23 your opinion -- do I understand correctly that it's
24 your opinion that Grace failed properly to monitor
25 State Street in this situation?

201

1  A. How relevant and deep, that's correct.
2  MR. FLICKER: Okay. Now I'm really done.

7  _____
   JOHN J. MULLIGAN, JR.

9  - - -
10 DEPOSITION CONCLUDED AT 4:14 P.M.
11 - - -

202

1  C E R T I F I C A T E
2  STATE OF OHIO    :
                    : SS
3  COUNTY OF CLERMONT :
4      I, Linda S. Mullen, RMR, CRR, the undersigned,
5  a duly qualified and commissioned notary public
6  within and for the State of Ohio, do hereby certify
7  that before the giving of his aforesaid deposition,
8  JOHN J. MULLIGAN, JR. was by me first duly sworn to
9  depose the truth, the whole truth and nothing but the
10 truth; that the foregoing is the deposition given at
11 said time and place by JOHN J. MULLIGAN, JR.; that
12 said deposition was taken in all respects pursuant to
13 stipulations of counsel; that I am neither a relative
14 of nor employee of any of the parties or their
15 counsel, and have no interest whatever in the result
16 of the action; that I am not, nor is the court
17 reporting firm with which I am affiliated, under a
18 contract as defined in Civil Rule 28(D).
19     IN WITNESS WHEREOF, I hereunto set my hand and
20 official seal of office at Batavia, Ohio, this ____
21 day of _____, 2007.
22
23     _____
   My commission expires:  Linda S. Mullen, RMR, CRR
24 October 13, 2008    Notary Public - State of Ohio
25