**EXHIBIT 7**

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3
          ----------------------------------
 4   KERI EVANS, et al.,          :
                                  :
 5       Plaintiffs,              :
                                  :
 6   vs.                          :
                                  :
 7   JOHN F. AKERS, et al.,       :
                                  :
 8       Defendants.              :
                                  : CONSOLIDATED
 9   ---------------------------------- UNDER CASE NO.
     LAWRENCE W. BUNCH, et al.,   : 04-11380-WGY
10                                :
         Plaintiffs,              :
11                                :
     vs.                          :
12                                :
     W.R. GRACE & CO., et al.,    :
13                                :
         Defendants.              :
14                                :
     ----------------------------------
15
16              VOLUME II
17   Deposition of: JEFFERY E. SCHAFF
18   Taken:    By the Defendants
               Pursuant to Agreement
19
         Date:     July 12, 2007
20
         Time:     Commencing at 9:09 a.m.
21
         Place:    Waite, Schneider, Bayless &
22                 Chesley Co., LPA
                   Suite 1513 Fourth & Vine Tower
23                 One West Fourth Street
                   Cincinnati, Ohio  45202
24
         Before:   Linda S. Mullen, RMR, CRR
25                 Notary Public - State of Ohio
```

103

1  here, and -- are there particular standards that
2  you're relying on that come from these texts or from
3  the Center for Fiduciary Studies?
4      A.   The -- none of those texts will give a
5  case example with the exact fact pattern of this
6  case.  They will, however, include descriptions on
7  processes for delegation, processes for adhering to
8  plan documents, processes for searching, selecting
9  and engaging consultant or investment managers, as
10 well as for monitoring.
11         The training itself also covered the
12 meaning of duties of prudence and loyalty.  And in
13 combination, based on that, based on a review and
14 understanding of the materials included throughout
15 the end notes, which do include also the Center for
16 Fiduciary Studies' materials, in combination that's
17 where I would come up with the opinion.
18     Q.   All right.  Let's continue.  You would
19 agree, wouldn't you, that it was legal for Grace to
20 amend the plan to preclude any new money going into
21 the Grace stock fund?
22     A.   I have not considered what they did prior
23 to that point, so I did not generate an opinion with
24 regard to that question.
25     Q.   You have no opinion about whether that was

104

1  legal or not?
2      A.   I have not considered it in the slightest
3  as for new money going in.
4      Q.   Couldn't Grace simply have amended the
5  plan to remove Grace stock as an option altogether?
6      A.   Yes, absolutely.  That would be a decision
7  they could do from the plan.  What to do in terms of
8  what options to offer or not offer is a plan
9  decision.
10     Q.   So they could have done that, that would
11 have been perfectly legal?
12     A.   Not that I would give legal opinions, but
13 that would be my understanding, yes.
14     Q.   At the bottom of page 5 in your opinion,
15 you say, "By removing the participants' ability to
16 direct their own investments in a manner that
17 conflicts with appropriate standards of fiduciary
18 care, the Plan loses the 404(c) safe harbor
19 protection that it would have otherwise been
20 afforded."  Do you see that?
21     A.   I do.
22     Q.   Tell me what you mean by that.
23     A.   The 404(c) requires that the plan
24 participants have control over their options and
25 their decisions.  That control extends to decisions

105

1  to buy and sell but also includes control over
2  voting.  And to the extent that the -- the
3  participants were denied that control, it is my
4  understanding of DOL regulation 404(c) that they --
5  that 404(c) would no longer apply.
6      Q.   Did you analyze whether this plan
7  satisfies all the requirements of the 404(c)
8  regulations in the first instance?
9      A.   I have not sought to make a full
10 determination.  I did look at the aspects of the
11 stock plan.  I saw in the summary plan description
12 that they didn't announce to the plan participants
13 that the plan was intended to be 404(c), and the
14 responsibility for the decisions were -- was up to
15 the participants.
16         I saw the variety of options chosen, which
17 in my view do cover a representative range of risk
18 return options.  To my understanding, they had full
19 opportunity to buy and sell at any point, not just
20 quarterly, but every single day.
21         I've seen nothing that suggests to me that
22 they would not otherwise qualify for 404(c).  So
23 notwithstanding the fact that I didn't make a
24 separate determination, I have not seen anything that
25 suggested that they otherwise would not qualify.

106

1      Q.   You would agree, would you not, that it's
2  very difficult for a plan to qualify under 404(c)?
3      A.   There -- it's a long list.  I guess
4  difficult would be in the eye of the beholder.
5      Q.   And few plans actually comply with the
6  404(c) regulations, isn't that right?
7      A.   I've seen no study that quantified the
8  percentage of plans attempting to qualify under
9  404(c) that do indeed qualify.
10     Q.   So you've looked at the range of options
11 that existed under the Grace plan, correct?
12     A.   Yes, ma'am.
13     Q.   Would you say that that's an -- that Grace
14 more than satisfied the requirement to provide
15 diversified options?
16     A.   Yes, that would be my opinion.
17     Q.   And were all 28 of those funds or options
18 required to satisfy diversification?
19     A.   No, 404(c) doesn't require 28.
20     Q.   So they could have removed one or more and
21 still satisfied the requirements of 404(c)?
22     A.   Yes, ma'am.
23     Q.   And ERISA's diversification requirement?
24     A.   All things being equal, yes.
25     Q.   And so is there any limits on when a

### 107

1 fiduciary can eliminate an investment option?
2  A. The first part of your sentence again?
3  Q. Are there limits on when a fiduciary can
4 eliminate an investment option?
5  A. They can do so as frequently as they want.
6 But with regard to limits, you would have to look to
7 the purpose of the plan, the terms of the plan,
8 general duties of the rules, regulations, et cetera.
9 So they're not free to do so willy-nilly, but as long
10 as they do so in a prudent way, they can -- I'm aware
11 of no limits to the number of times or frequency.
12  Q. And, in fact, plan fiduciaries do
13 regularly change investment options in a 401(k) plan,
14 right?
15  A. I'm aware of no study that shows how
16 frequently, but I do know that yes, that does happen.
17  Q. For example, they might change for one
18 family of funds to another family of funds, for
19 example?
20  A. That's an example, yes.
21  Q. And that's perfectly legal for them to do
22 that?
23  A. Unto itself, yes.
24  Q. You note in your report that the Grace
25 stock fund was established by the plan document.

### 108

1 You're aware, aren't you, that the plan document was
2 also amended to give State Street the right to sell
3 the Grace stock if continuing to hold was
4 inconsistent with ERISA?
5  A. Yes, ma'am.
6  Q. You note in your report that according to
7 Mr. McGowan, a Grace executive, the stock was prudent
8 when Grace delegated this responsibility to State
9 Street, correct?
10  A. Yeah, I believe that's on page 82 of his
11 deposition, that he -- it was his opinion that no
12 time in the years preceding the delegation was it
13 imprudent.
14  Q. And that was December 15th, 2003, correct?
15  A. The engagement was December 15th, 2003.
16  Q. And the decision made by State Street to
17 sell was several months later, correct?
18  A. Correct.
19  Q. So the time period during which
20 Mr. McGowan was expressing an opinion was a different
21 time period than the time when State Street made its
22 decision, right?
23  A. Yes, ma'am.
24  Q. Even assuming that it was the exact same
25 time period, isn't it possible for two prudent

### 109

1 fiduciaries to form different opinions about the
2 prudence of a particular investment without either of
3 them being wrong?
4  MR. GOODMAN: So I'm sure, are you
5 referring to the Grace stock fund or just
6 generally?
7  Q. Do you understand the question?
8  A. I do. And, actually, the answer I was
9 going to give is, if one is speaking generally, that
10 is possible, yes.
11  Q. On page 7 of your report, you say -- this
12 is the fourth paragraph, "The engagement agreement
13 between Grace and State Street does not appoint State
14 Street as an independent fiduciary, but as an
15 investment manager." What is the difference, in your
16 opinion?
17  A. In this, if I -- I'll tell what I was
18 referring to, and frankly right now I think I might
19 have phrased it a bit differently. If you look at
20 ERISA 402(c)(2) versus (c)(3), a plan can engage a
21 person to simply give fiduciary advice or to take
22 responsibility with the discretion as an investment
23 manager. This particular engagement with State
24 Street specifies that they're an investment manager.
25 The point was that if the -- if it was only for the

### 110

1 question of whether to sell or not, they could
2 certainly have hired State Street or any other
3 fiduciary consultant to research and find that answer
4 and deliver that answer without having to take
5 discretionary control over the stock fund.
6  Q. But, in fact, State Street did take
7 discretionary control over the Grace stock fund,
8 didn't they?
9  A. Yes.
10  Q. And they were an independent fiduciary,
11 right?
12  A. Yes, I believe that the parlance used
13 would be correct.
14  Q. You refer in here to the Grace investment
15 committee, and you appear to believe that John
16 Forgach was a member of that committee. What was the
17 basis for that belief?
18  A. Actually, that -- I saw Mr. Hogan's
19 rebuttal and went back and checked. And he was quite
20 correct, Mr. Forgach is not a member of that -- was
21 not a member of that committee, it was just
22 Messrs. McGowan and Tarola. And I had indeed seen
23 the part of, I believe it was Mr. McGowan's testimony
24 as well as Mr. Forgach's testimony, that stated
25 that -- and I should not have included that on the, I

111

1 think page 5, parenthetical note.
2  Q. I'm sorry, on page 5 you shouldn't have
3 included?
4  A. I think there is a page 5 parenthetical
5 note that I -- where did it go? Maybe not page 5.
6 There is a point -- there it is -- no. There is a
7 point in there that I indicate that he was, but --
8  Q. I believe that's page 8.
9  A. Page 8, okay.
10    MR. GOODMAN: Yes.
11  A. Oh, there is it is. It should not have
12 been put on there, it should have simply read Tarola
13 and McGowen.
14  Q. So that was a mistake?
15  A. That's true, I agree.
16  Q. Now, you say on page 8 that the issue in
17 appointing State Street was non-public information,
18 and that there was no examination made of the plan's
19 404(c) status or the extent to which disclosures,
20 quote, could cure the plan's liability, end quote. I
21 want to focus on that and ask some questions.
22    Are you aware that the Grace fiduciaries
23 were concerned about a potential conflict of
24 interest?
25  A. Yes.

112

1  Q. And are you aware that Tarola was a key
2 player in Grace's reorganization proceeding?
3  A. I don't know how to characterize the word
4 key player, but I realize as CFO he was involved.
5  Q. And are you aware that Grace was about to
6 begin negotiations for a plan of reorganization?
7  A. I don't know "about to," but I realize
8 that that was coming.
9  Q. Do you have any experience or knowledge
10 about what that involves, negotiating a plan of
11 reorganization?
12  A. Experience, knowledge, no.
13  Q. So you're not aware that that involves
14 negotiating with all the various constituencies in
15 the bankruptcy, including the equity holders?
16  A. I am aware of that, but you asked about
17 experience and knowledge.
18  Q. And wearing his hat as a representative of
19 the debtor, Tarola had fiduciary obligations to the
20 company's creditors, didn't he?
21  A. Yes.
22  Q. And in that capacity, he's potentially
23 adverse to the company's equity holders, isn't he?
24  A. Potentially.
25  Q. Wearing his plan fiduciary hat, Tarola

113

1 owed a fiduciary duty to the participants, correct?
2  A. Absolutely.
3  Q. So the circumstances could have put him on
4 both sides of the bargaining table?
5  A. Could have.
6  Q. In your opinion, would it have been
7 appropriate for him to continue serving as a
8 fiduciary in those circumstances?
9  A. In my opinion, the -- all things being
10 equal, delegating for the purposes of avoiding a
11 conflict of interest is a perfectly reasonable cause
12 for delegating.
13  Q. And was it here?
14  A. There's a couple of things. One, in terms
15 of what the plan documents allowed at the time. Two,
16 State Street's engagement letter didn't seem to
17 specify that they were primarily interested in
18 representing the needs of the plan participants,
19 which would be required as inherent in wearing that
20 other hat that Mr. Tarola was no longer wearing.
21    And the actual milieu of where that
22 conflict of interest would take place, which would be
23 the bankruptcy court, it does not appear from reading
24 the documents that State Street actually sought to
25 represent the Grace plan participants on the equity

114

1 of the bankruptcy court and thus never actually in
2 fact sought to wear that hat of Mr. Tarola's. So the
3 answer would be no.
4  Q. You began that answer by saying there's a
5 couple of things. One, in terms of what the plan
6 documents allowed at that time. What does that mean?
7 What did you mean by that?
8  A. I don't have the plan document in front of
9 me, but the plan document dated, I believe, April
10 2003, if I recall correctly, on section 12 the
11 investment committee had the ability to delegate, I
12 think, the fixed income, but I don't recall if the
13 plan document allowed for the delegation of the stock
14 fund, so as of that time.
15  Q. You have a pile of exhibits there in front
16 of you, Mr. Schaff. Would you please look at
17 Plaintiff's Expert Exhibit Number 15?
18    MR. GOODMAN: It should be towards the
19 back.
20  A. I have it.
21  Q. Okay. And this is a copy of the Grace
22 savings and investment plan document, correct?
23  A. Dated July 1st, 2004, yes.
24  Q. Right. Do you want to show me what -- the
25 provision to which you were referring in your

### Page 119

1 breach of fiduciary duty for recommending a plan
2 amendment?
3   A.  No.
4   Q.  Let's take a break for a few minutes.
5       (A recess was taken from 10:38 to 10:53.)
6   Q.  Mr. Schaff, we were talking about why you
7 believe that the delegation here was inappropriate,
8 and we talked about your view of what the plan
9 documents allowed. And now the next item that you
10 mentioned was State Street's engagement letter didn't
11 seem to specify that they were primarily interested
12 in representing the needs of the plan participants.
13 Isn't that required by law?
14   A.  It would be inherent in the duties of an
15 investment manager to look out for the plan
16 participants that it's representing.
17   Q.  So why does it have to say that in the
18 engagement letter? What does it matter if it does or
19 not?
20   A.  It would be equally required by law, in
21 using your terms, that if something was inconsistent
22 with ERISA, that it need not be -- they could
23 override the terms of the plan, that need not be
24 included in the engagement letter, to state that
25 considering selling it is one of the primary purposes

### Page 120

1 then -- or putting it in the engagement letter gives
2 the appearance that is one of the primary purposes.
3   Q.  In your opinion?
4   A.  Exactly.
5   Q.  It seems to me that you may have a
6 fundamental misunderstanding about the nature of the
7 conflict. And I want to just ask you a few questions
8 about that. You agree, I believe, that a plan
9 fiduciary has a continuing obligation to determine
10 whether any investment option has become imprudent to
11 continue holding, correct?
12   A.  Yes.
13   Q.  So Mr. Tarola and Mr. McGowan, as the
14 investment committee at Grace responsible for the
15 investments -- menu of investments in the Grace stock
16 plan, had a continuing obligation to ascertain
17 whether continuing to hold Grace stock, among other
18 things, was or was not prudent, right?
19   A.  Yes.
20   Q.  And having that duty, given that they have
21 that duty, would it not be inappropriate for them to
22 be in the position of making that continuing
23 determination if they have a conflict of interest?
24   A.  As I testified before, delegating for the
25 avoidance of a potential conflict of interest, all

### Page 121

1 other things being equal, and assuming that the plan
2 does indeed allow for it, includes a process for such
3 delegation. It is, in my view and my opinion,
4 certainly an appropriate cause of delegation.
5   Q.  And delegating in that circumstance would
6 be in the interests of the plan participants because
7 it would provide them with an unconflicted
8 decision-maker, right?
9   A.  Delegating for the purpose of avoiding
10 potential conflicts of interest provides the
11 potential benefit to the plan participants, yes.
12   Q.  And so why is doing so not a plan centered
13 decision?
14       MR. GOODMAN: Now I'm confused. Just to
15   make sure I understand. When you mean a plan
16   centered, how are you using the term plan?
17   Q.  I'm actually quoting from Mr. Schaff's
18 report.
19   A.  Can you tell me what page, so I make sure.
20   Q.  Page 8, the third line of the second to
21 last full paragraph. Would you like me to repeat the
22 question?
23   A.  No. You told me what part and I just went
24 to find that part, and if you will give me a moment,
25 I'll take a look and be happy to answer your

### Page 122

1 question. Yeah. The -- that sentence has a specific
2 meaning, and that is with regard to not the conflict
3 of interest aspect -- well, even with regard to that,
4 come to think of it. The first and foremost question
5 ought to have been, one, is delegation itself a
6 benefit, does it serve the purpose of helping the
7 participants. Two, is it considering the facts and
8 circumstances of the plan, that 404(c) plan, where
9 the participant has been given the right and
10 responsibility for allocating their own investments.
11       Given all the facts and circumstances, is
12 such delegation appropriate? To the extent that the
13 delegation -- and what I'm saying now has to do more
14 with other parts of the report -- to the extent that
15 that delegation, the engagement agreement was more
16 specific to selling the stock, then I would disagree
17 that that was -- that that was an appropriate
18 approach.
19       If it's simply a matter of delegating for
20 the possibility of avoiding a potential conflict of
21 interest, there could have been other solutions to
22 avoiding that conflict. But unto itself, all things
23 being equal, avoiding a conflict of interest is a
24 perfectly reasonable cause for delegation.
25   Q.  What were the other solutions to avoiding

279

1  understanding that that investment policy statement
2  then becomes part and parcel to the entirety of the
3  plan, even though it's not named in this document.
4     Q. So let me just be very clear. In your
5  professional expert opinion, section 12.04(b) of the
6  Grace plan does not comply with 75-8FR-14?
7     A. As a written process for the method of
8  delegation, that's my opinion.
9        MS. COHEN: Okay, I think we're done.
10       MR. FLICKER: Nothing further from me.
11
12       _____
                JEFFERY E. SCHAFF
13
14
15       - - -
16  DEPOSITION CONCLUDED AT 4:30 P.M.
17       - - -



280

1            CERTIFICATE
2  STATE OF OHIO    :
                    : SS
3  COUNTY OF CLERMONT :
4     I, Linda S. Mullen, RMR, CRR, the undersigned,
5  a duly qualified and commissioned notary public
6  within and for the State of Ohio, do hereby certify
7  that before the giving of his aforesaid deposition,
8  JEFFERY E. SCHAFF was by me first duly sworn to
9  depose the truth, the whole truth and nothing but the
10 truth; that the foregoing is the deposition given at
11 said time and place by JEFFERY E. SCHAFF; that said
12 deposition was taken in all respects pursuant to
13 stipulations of counsel; that I am neither a relative
14 of nor employee of any of the parties or their
15 counsel, and have no interest whatever in the result
16 of the action; that I am not, nor is the court
17 reporting firm with which I am affiliated, under a
18 contract as defined in Civil Rule 28(D).
19    IN WITNESS WHEREOF, I hereunto set my hand and
20 official seal of office at Batavia, Ohio, this ____
21 day of _____, 2007.
22
23       _____
   My commission expires: Linda S. Mullen, RMR, CRR
24 October 13, 2008        Notary Public - State of Ohio
25