# EXHIBIT 8

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2    - - - - - - - - - - - - - - -+

 3    KERI EVANS,                   |         COPY

 4              Plaintiff,          |

 5       vs.                        |

 6    JOHN F. AKERS, et al.,        |   Consolidated as

 7              Defendants.         |   Case No.:

 8    - - - - - - - - - - - - - - -+   04-11380-WGY

 9    LAWRENCE W. BUNCH, et al.,    |

10              Plaintiffs,         |

11    vs.                           |

12    W.R. GRACE & CO., et al.,     |

13              Defendants.         |

14    --------------------------------x
15            Deposition of ROBERT M. TAROLA, CPA
16                    Washington, D.C.
17                     May 10th, 2007
18                       10:00 a.m.
19
20    Job No. 1-102403
21    Pages 1 - 174
22    Reported by:  Laurie Bangart-Smith
```



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

Case 1:04-cv-11380-WGY   Document 181-9   Filed 08/17/2007   Page 3 of 14
DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

4 (Pages 13 to 16)

**Page 13**

1  A   It was a subset of the total T. Rowe Price
2  group of funds.
3  Q   What were the characteristics of that
4  subset?
5  A   They ranged from money market funds to bond
6  funds to equity funds.
7  Q   Were any of them international funds?
8  A   Yes.
9  Q   What did you do for the T. Rowe Price group
10 of funds, you particularly?
11 A   I was the engagement audit partner on
12 those -- on the financial statement audits of those
13 mutual fund entities.
14 Q   So that the record is clear, it was not the
15 audit of the investment adviser, it was the audit of
16 the fund itself that you were working on; is that
17 correct?
18 A   That's correct.
19 Q   During the time that you worked on that
20 mutual fund audit for T. Rowe Price -- let me go back.
21 Were any of the funds in the T. Rowe Price group
22 diversified under the SEC Investment Company Act

**Page 14**

1  categories?
2  A   They were most all diversified.
3  Q   And what is your understanding, present
4  understanding of the diversification requirement of
5  the Investment Company Act of 1940 as it applied to
6  the T. Rowe Price group; do you recall?
7  A   Just in general terms, a fair amount of
8  separate investments, I think no one of which would be
9  more than five percent.
10 Q   And to the extent that a mutual fund was
11 able to limit its concentration in any one issue to
12 less than five percent, it could qualify as a
13 diversified mutual fund; isn't that correct?
14 A   I don't want to -- you're -- it's my general
15 understanding.
16 Q   Okay.  What is your general understanding of
17 the concept of this diversification that is required
18 of mutual funds, diversified mutual funds, generally?
19 A   A way to invest in -- a way to pool assets,
20 invest in a strategy with a significant amount of
21 risk-spreading and risk-sharing among individual
22 investments and investors.

**Page 15**

1  Q   And is the concept of diversification this
2  concept of not having too much invested in one single
3  issuer?
4  A   Yes.
5  Q   And why is that important to the operation
6  or the management of a mutual fund?
7  A   Generally to reduce the risk of any one
8  investment inordinately affecting the fund in an
9  adverse way.
10 Q   Do you serve on the -- can you just trace
11 your employment history at W.R. Grace by describing
12 the positions that you held since you joined W.R.
13 Grace & Company.
14 A   The only position I've held since I joined
15 is Senior Vice President and Chief Financial Officer.
16 Q   Could you remind me again.  I think you said
17 it.  When did you join the firm?
18 A   May of 1999.
19 Q   And have you served continuously in that
20 position to the present date?
21 A   Yes, sir.
22 Q   And during your employment at W.R. Grace &

**Page 16**

1  Co, you also served on various committees related to
2  the benefit plans of W.R. Grace & Co; is that correct?
3  A   Please be specific.
4  Q   There are benefit plans at W.R. Grace,
5  correct?
6  A   Yes.
7  Q   There are various committees that are
8  responsible or have some duties with respect to those
9  plans whose members are employees of W.R. Grace; isn't
10 that correct?
11     MS. FLOWE:  I'm going to object that it
12 assumes facts not in existence, but you can answer.
13     THE WITNESS:  I'm not sure -- when you say
14 "various committees," I'm not sure what various
15 committees you're referring to.
16 BY MR. CUMMINS:
17 Q   In the management structure of W.R. Grace,
18 are there, in fact, working groups that are
19 denominated as committees?
20 A   The only committee that oversees the benefit
21 programs of W.R. Grace is the Investment and Benefits
22 Committee, one committee.

---

Page 53

1  was made "based on historical facts and circumstances
2  prior to April 2nd, 2001."
3       Q   And then the sentence that follows indicates
4  that as of March 5, 2004, Grace does not expect to
5  adjust this estimate unless certain developments occur
6  in the Chapter 11 proceeding. Is that generally what
7  that sentence means?
8       A   Correct.
9       Q   Okay. I think you wanted to clarify a
10 second point.
11      A   Yes. Around the questioning just before we
12 broke about what I may have said to people at Duff &
13 Phelps, I just wanted to say that I don't recall any
14 names or any persons specifically. I did have
15 conversations with people that were part of the State
16 Street team, and therefore when you asked for specific
17 Duff & Phelps, I don't recall.
18      Q   Okay, so can I just summarize what I think
19 you've just said? You don't recall any contacts with
20 Duff & Phelps representatives; is that correct?
21      A   No. I said I don't know who they
22 represented. I do recall -- I do recall conversations

Page 54

1  with the State Street team. I don't know at the time
2  if they were State Street or Duff & Phelps.
3       Q   I understand, and do you have a recollection
4  of when that discussion occurred?
5       A   Well, I do recall talking to the State
6  Street team before they assumed the independent
7  fiduciary obligation and periodically as they were
8  performing that job, just as I would talk to any other
9  significant investor.
10      Q   You did not disclose to the State Street
11 team any non-public information, did you?
12      A   That's correct.
13      Q   So everything that was public you discussed,
14 or you could discuss, correct?
15      A   Correct.
16      Q   Nothing that was non-public was discussed by
17 you with State Street or, as you characterized it,
18 "the State Street team"; is that correct?
19      A   That's correct.
20      Q   It's fair to say that you did have, in the
21 normal course of the discharge of your duties,
22 non-public information at that time, correct?

Page 55

1       A   I don't recall. At what particular time?
2       Q   Let me go back. In the performance of your
3  duties as Chief Financial Officer, from time to time
4  you have non-public financial information that is
5  contained within W.R. Grace & Company and has not been
6  publicly disclosed; isn't that right?
7       A   That's right.
8       Q   Almost always you have that circumstance,
9  don't you?
10      A   Regularly, yes.
11      Q   And it's more frequently than not that you
12 are in possession of non-public information, because
13 it's your job to work with that information; isn't
14 that right?
15      A   Every day information changes, and we report
16 periodically, so every -- the days between periodic
17 reports I may have information.
18      Q   Well, you do have information, not "may."
19 I'm not trying to quibble about the words, but that's
20 your job, isn't it, to have the information, whether
21 it's public or not? I'm not trying to argue with you.
22 It's just that your job as Chief Financial Officer is

Page 56

1  know what the financial condition and performance of
2  the company is more frequently than the quarterly or
3  annual filings that the company makes with the SEC; is
4  that correct?
5       A   That's correct.
6       Q   And in the performance of your
7  responsibilities, almost on a daily basis you come in
8  contact with financial information that isn't public;
9  isn't that correct?
10      A   That's correct.
11      Q   And your testimony is that you never
12 disclosed to State Street or the State Street team any
13 of that non-public information?
14          MS. FLOWE: Objection; asked and answered
15 twice before, but you can answer again.
16          THE WITNESS: That's correct.
17 BY MR. CUMMINS:
18      Q   Do you still have -- anything else on
19 Exhibit 24 that you want to discuss? Okay. Just one
20 little detail, and it's slightly out of order again,
21 but I can look at it. If you look at Page 31 of that
22 10-K, it discloses certain positions that you own

Page 105

1  fiduciary obligation to a third party.
2  Q  I agree with that. I don't agree with the
3  rationale for it, but I think that's the sequence of
4  events, but let's go back to March of '03 where
5  management and the board restricted plan participants
6  from putting new money in more Grace stock and stock
7  plan. Let's just focus on that time frame.
8      At that time Mr. Norris described the
9  conflict between -- as he perceived it, as on the one
10 hand having an obligation to represent the best
11 interests of the plan participants, and on the other
12 hand having access to non-public financial information
13 about W.R. Grace & Company. Do you agree with that
14 description of the conflict?
15 A  Yes.
16 Q  When did you first join the Investment
17 Benefits Committee, approximately?
18 A  May of 1999.
19 Q  From May of 1999 -- are you still on it?
20 A  Yes.
21 Q  Until the present day, members of the S&I or
22 benefits committee still have the same conflict, do

Page 106

1  they not?
2  A  Relative to Grace stock? Is that your
3  question?
4  Q  Yes.
5  A  No. The plan no longer holds Grace stock.
6  Q  And when was the conflict eliminated?
7  A  When the fiduciary obligations were assumed
8  by a third party.
9  Q  And not when the Grace stock was sold by the
10 plaintiff; is that correct?
11 A  No, the conflict was eliminated with the
12 assignment of -- with the transfer of fiduciary
13 obligations to a third party.
14 Q  And are you referring there, that transfer
15 being the State Street activity?
16 A  Yes.
17 Q  So from the period of March 13, 2003, to the
18 effective date of that transfer of authority, that
19 same conflict situation existed; agreed?
20 A  Would I agree with that, yes.
21 Q  And it's your position that somehow by
22 hiring State Street, the Investment Benefits Committee

Page 107

1  eliminated that conflict; is that correct?
2  A  Yes.
3  Q  When you served -- in your service as a
4  member of the Investment Benefits Committee, did you
5  have an understanding of having that fiduciary -- I'm
6  sorry -- that "duty," as Mr. Norris describes it, to,
7  quote, "look out for the interests of the people who
8  own the stock in the S&I Plan," end quote?
9  A  Yes.
10 Q  And do you understand that to be a
11 description in one way in layman's terms of a
12 fiduciary duty to the plan participants?
13 A  Yes.
14 Q  Would you agree with me that there were
15 times during the period of your service on the
16 committee that, in fact, you had non-public financial
17 information about the activities of W.R. Grace &
18 Company?
19 A  Give me a time frame.
20 Q  Anytime during your service as a member of
21 the committee.
22 A  Until today?

Page 108

1  Q  Yes.
2  A  Yes, until today.
3  Q  Would you agree with me that you also had
4  non-public information from '03 -- March 13 of '03
5  through December 1 of '03?
6  A  Could you repeat that.
7  Q  Yeah. Did you have any non-public financial
8  information about W.R. Grace during the period
9  March 31, 2003, to December 1, 2003?
10 A  Any? The answer to "any" is probably yes.
11 The answer to "material," no. Any material
12 information would have been made public under
13 securities laws.
14 Q  Periodically?
15 A  As required.
16 Q  Fair enough.
17     After State Street was engaged to perform
18 its work pursuant to the engagement agreement, what
19 communications did you -- you, personally -- have with
20 State Street or its representatives?
21 A  To the best of my recollection, there may
22 have been a type of investor call that I would take

---

Page 109

1  from any significant investor.
2  Q  And what would you do with that?
3  A  I would generally answer their questions to
4  the extent they relate to public information, clarify
5  public information if they're not understanding it
6  clearly, what I would call an investor relations call.
7  Q  And what would you do with your knowledge of
8  financial information about W.R. Grace? Let me
9  withdraw the question.
10     After State Street appeared on the scene
11  around December of 2003, you were still a member of
12  the benefits committee, correct?
13  A  Yes.
14  Q  And you were still responsible for whatever
15  the benefits committee was responsible for, correct?
16  A  Yes.
17  Q  Did you ever discuss with members of the
18  State Street team -- after it was engaged --
19  non-public financial information of which you became
20  aware?
21  A  No.
22     MS. FLOWE: Objection; asked and answered.

Page 110

1  BY MR. CUMMINS:
2  Q  Not quite.
3  A  No again.
4  Q  You would agree with me, would you not, that
5  you did have in your possession or in your knowledge
6  base non-public financial information about how W.R.
7  Grace was doing during that same period, correct?
8  A  May I answer with a bit of an explanation?
9  Q  Sure.
10  A  W.R. Grace filed financial statements with
11  the Bankruptcy Court every month. Those financial
12  statements updated public information every 30 days,
13  so the longest period of time I could have non-public
14  information was about 30 days.
15  Q  Fine, and did you communicate -- and you
16  already said you didn't communicate any of that
17  non-public information to State Street?
18  A  Correct.
19  Q  So this is that same conflict that
20  Mr. Norris was referring to in general in that Exhibit
21  16, isn't it?
22     MS. FLOWE: Objection. How could he know

Page 111

1  what Mr. Norris was referring to?
2  BY MR. CUMMINS:
3  Q  You didn't understand what Mr. Norris was
4  referring to in Exhibit 16 about the conflicts; yes or
5  no?
6  A  I believe I understood, yes.
7  Q  Well, your counsel didn't think you did.
8  That's all I asked you. Is that generally the same
9  conflict that Mr. Norris was referring to in Exhibit
10  16?
11  A  No, I think Mr. Norris was referring to a
12  conflict around claims, speculation on claims
13  resolution that may or may not ever materialize, that
14  could be an issue for a fiduciary of a benefit plan
15  but not an issue for an officer of a company. I think
16  that's the conflict.
17  Q  And yet, you and Mr. McGowan remained as
18  fiduciaries of the plan, correct?
19  A  Yes.
20     (Exhibit No. 27 was marked for
21     identification and attached to the deposition
22     transcript.)

Page 112

1  BY MR. CUMMINS:
2  Q  I'm going to hand you what has been marked
3  for identification as Exhibit 27 to this deposition.
4  I'll just represent to you this document was sent to
5  us last evening by your counsel as part of, I guess --
6  and counsel can correct me -- your continuing
7  obligation to make production.
8     MS. FLOWE: Correct.
9     (Discussion was held off the record.)
10  BY MR. CUMMINS:
11  Q  Have you had a chance to look at Number 27?
12  A  Yes, sir.
13  Q  Do you know Mr. Ron Brennan?
14  A  No, sir.
15  Q  Have you ever seen this document prior to
16  today?
17  A  I recall seeing it, yes.
18  Q  Do you recall seeing it on or about March of
19  2004?
20  A  By virtue of the date of the e-mail, I would
21  have to say yes.
22  Q  Okay. What is your understanding of what

Case 1:04-cv-11380-WGY  Document 181-9  Filed 08/17/2007  Page 7 of 14
DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

35 (Pages 137 to 140)

137

1  portfolio. This is a plan.
2  Q  Okay. This plan has less than five percent
3  invested in the Grace stock account, right?
4  A  The participants in this plan have less --
5  have four percent of the total assets of the plan
6  invested in Grace stock. This is not a portfolio.
7  It's not even close to the same analogy.
8  Q  And the way you would look at what a
9  portfolio is with respect to this plan is you would
10 have to look at the individual plan participant's
11 portfolio, right, to look at diversification or --
12 A  You would have to look at the entire asset
13 holdings of an individual, not just within the 401-K
14 plan.
15 Q  And that would then determine whether they
16 were taking -- they had a diversified or a
17 concentrated position in Grace stock; is that right?
18 You would look at their individual portfolios, both in
19 the plans and elsewhere; is that right?
20 A  The way I would say it is that to understand
21 the degree to which an individual has exposure to
22 Grace stock or any other investment, you'd have to

138

1  look at their entire assets, across all spectrums,
2  cash to real estate, and examine it that way.
3  Q  And during your service on the committee you
4  did not take upon yourself the exercise to examine
5  what you've just described on a plan participant
6  level; isn't that right?
7  A  That's correct.
8  Q  Nor did Mr. McGowan; isn't that correct?
9  A  To the best of my knowledge.
10    (Exhibit No. 30 was marked for
11    identification and attached to the deposition
12    transcript.)
13 BY MR. CUMMINS:
14 Q  Handing you now what has been marked for
15 identification as Deposition Exhibit Number 30, if you
16 just take a minute and familiarize yourself with that.
17 A  Would you like me to read it? Because I
18 don't believe I've seen this before.
19 Q  That's fine. Can we just -- no, no, you
20 don't have to. If you can just identify the document.
21 It seems to be something dated -- on the second
22 page -- February 2004. Do you see that?

139

1  A  Yes, I see that.
2  Q  The reason I showed this to you is a
3  question that relates to Page 7 of the document. I
4  understand you haven't seen it. The sixth bullet
5  point --
6  A  Seven in the little box?
7  Q  Yes. Sorry. Seven. There's a bullet point
8  that reads as follows: "December 24th, due diligence
9  meeting with senior management of Grace." Do you see
10 that?
11 A  Yes.
12 Q  This is Christmas Eve on December 2003. Did
13 you meet with any representative of State Street on or
14 about December 24, 2003?
15 A  I recall a meeting that would have been in
16 and around this time, yes.
17 Q  What did State Street ask in that meeting,
18 ask about? Did they -- let me withdraw. Did anybody
19 from State Street ask any questions to those
20 assembled?
21 A  I don't recall the meeting very vividly. My
22 best recollection is I would characterize it as a

140

1  meeting with potential investors. We often had
2  meetings with portfolio managers and the like who
3  would ask questions, all within the relevant domain of
4  public information, and my recollection is that was
5  the nature of the meeting.
6  Q  Who else attended on behalf of Grace?
7  A  Again I don't recall vividly, but normally
8  those meetings were attended by Mr. Norris, myself,
9  Mr. Siegel, and maybe our investor relations director.
10 Q  Did Mr. McGowan generally attend those
11 meetings?
12 A  No.
13 Q  Now, at the time you attended that meeting
14 you were a member of the benefits committee, correct?
15 A  Yes.
16    (Exhibit No. 31 was marked for
17    identification and attached to the deposition
18    transcript.)
19 BY MR. CUMMINS:
20 Q  I'm handing you what has been now been
21 marked for identification as Deposition Exhibit Number
22 31. Have you had a chance to generally familiarize

Case 1:04-cv-11380-WGY  Document 181-9  Filed 08/17/2007  Page 8 of 14
DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

36 (Pages 141 to 144)

Page 141

1  yourself -- well, let me ask you this question: Have
2  you ever seen this document prior to today?
3    A  No, sir.
4    Q  Can you just for the record then indicate
5  what the date on Bates Number 000877 is.
6    A  The date is April 7, 2004.
7    Q  Okay. Now I would like to ask you to look
8  at Page 13 in the box or Bates Number 000891, and take
9  your time to read that if you will, please, to
10 yourself.
11   A  I'm finished reading.
12   Q  Okay. At the very top of -- the page is
13 headed "Due Diligence," and then there is the first
14 clause, "In view of the block trade inquiry." Do you
15 see that?
16   A  Yes.
17   Q  Do you know what block trade inquiry this
18 document may be referring to?
19   A  I'm speculating that's refers to --
20      MS. FLOWE: Don't speculate.
21      THE WITNESS: I'm not speculating.
22 BY MR. CUMMINS:

Page 142

1    Q  Are you familiar with any block trade
2  inquiry at or about this time?
3    A  May I say, after I read the first page of
4  the document, it looks like the block trade related to
5  D.E. Shaw hedge fund.
6    Q  Thank you. When did you first become aware
7  of D.E. Shaw's interest in the plan's holdings of
8  Grace common stock?
9    A  When I received a phone call from someone
10 from the State Street team.
11   Q  And approximately when was that?
12   A  I don't recall exactly the date.
13   Q  Was it in February, March? Do you have a
14 month in mind?
15   A  No. I don't recall the date.
16   Q  Well, let's do it in context. Had State
17 Street sold any position to D.E. Shaw at the time of
18 this telephone conversation?
19   A  I don't recall.
20   Q  So it's your testimony, as I understand it,
21 you don't know that the first phone call you got from
22 State Street occurred before or after the sale to the

Page 143

1  Shaw company; is that right?
2    A  No, that's not right. What I mean to say is
3  that I received a call from State Street indicating
4  that there was a potential for a block trade, and they
5  wanted to ask me some questions.
6    Q  Okay, and they did ask you -- someone from
7  State Street apparently asked you some questions?
8    A  Someone from the State Street team.
9    Q  What were the questions?
10   A  To the best of my recollection, it was just
11 is there anything that they need to know before they
12 make a decision, anything I know that they might need
13 to know before making a decision.
14   Q  And how did you respond to that question?
15   A  I said everything I know is in the public
16 domain.
17   Q  But that wasn't correct, was it?
18   A  Sure it was.
19   Q  You knew nothing about Grace's --
20   A  All material information was in the public
21 domain.
22   Q  And you knew nothing, for example, at this

Page 144

1  call about Grace's work on its Plan of Reorganization;
2  is that correct?
3    A  That's correct.
4    Q  Because you didn't do anything on the Plan
5  of Reorganization, is that right, in the first quarter
6  of 2004?
7    A  Correct.
8    Q  Grace had not even started on the Plan of
9  Reorganization; is that correct?
10   A  Correct.
11   Q  You didn't know anything about the financial
12 performance of Grace that had not been disclosed to
13 the public; is that correct?
14   A  Again, the only time frame where there might
15 have been financial information would have been
16 roughly one month's time.
17   Q  And you did not disclose that information to
18 the State Street inquiry?
19   A  I don't -- I don't recall disclosing any
20 non-public information to the State Street inquiry,
21 nor did I believe I had any material non-public
22 information.

**Page 145**

1  Q  You were a member of the committee, the
2  benefits committee at the time State Street called
3  you?
4  A  Yes.
5  Q  What did you learn about the nature of the
6  Shaw deal in that phone call?
7  A  Best of my recollection, I learned that they
8  were interested in buying the remaining shares held
9  within the S&I Plan, that the negotiations were
10 somewhere between $3.00 and $3.50 a share, and that
11 State Street was considering it.
12 Q  What, if anything, did you say in response
13 to that information?
14 A  I don't recall saying anything other than
15 answering questions.
16 Q  The only question I think you indicated that
17 they asked you was, was there anything they needed to
18 know that you knew that they didn't?  Anything else?
19 A  I don't recall any other specific questions.
20 Q  I thought you said it was a phone call from
21 State Street?
22 A  That's what I recall, yes.

**Page 146**

1  Q  Did you during this period have any
2  face-to-face meetings with State Street
3  representatives about this issue, about the Shaw
4  issue?
5  A  I don't recall a face-to-face meeting.
6  Q  And after you learned that there was an
7  expression of interest, I think you said, what did you
8  do with that information?
9  A  You mean once I learned about it?
10 Q  Yeah, after State Street told you we had an
11 expression of interest.
12 A  My recollection was I was the first one in
13 the company to become aware of it as a result of this
14 phone call, and I related this phone call to
15 Mr. Norris, this information to Mr. Norris, for sure,
16 and quite likely Mr. Siegel and Mr. McGowan.
17 Q  And how did Mr. Norris react to it?
18 A  To the best of my recollection, his reaction
19 was that it would be good for the participants to get
20 some, some cash out of their holdings at this point in
21 time.
22 Q  Did he say words to that effect?

**Page 147**

1  A  Yes.
2  Q  And what did Mr. McGowan say?
3  A  I think there was similar feeling among the
4  leadership within Grace, that this gave the
5  participants a chance to get some cash and move on
6  from what was a real speculative situation.
7  Q  Mr. Siegel is the company counsel, isn't he?
8  A  Yes.
9  Q  Did you ask Mr. Siegel for any advice?
10    MS. FLOWE:  Objection.
11 BY MR. CUMMINS:
12 Q  I'm only asking you if you asked Mr. Siegel
13 for any advice, not what the advice was with regard to
14 this phone call.
15    MS. FLOWE:  So you can answer yes or no and
16 nothing else.
17 BY MR. CUMMINS:
18 Q  Follow her direction.
19 A  No.
20 Q  Okay.  After that phone call from State
21 Street, when did you next learn something about the
22 status of the Shaw interest in the holdings of the --

**Page 148**

1  with regard to Grace stock?
2  A  Again to the best of my recollection, which
3  is admittedly vague several years later, I don't, I
4  don't believe I heard anything until they executed the
5  transaction.
6  Q  And then after the transaction was executed,
7  what steps did you take to advise the plan
8  participants that that had occurred?
9  A  I had not taken any steps.
10 Q  Did you think it was important to the plan
11 participants?
12 A  It wasn't my job.
13 Q  And who did that?
14 A  I'm not sure -- it would have been
15 Mr. McGowan's job, and I'm not sure -- I don't recall
16 the correspondence.
17 Q  Okay.  Can you pull out of the pile of the
18 old exhibits the exhibit that's been marked Number 9.
19 Have you seen that document prior to today?
20 A  May I page through it?
21 Q  Yes.  Do you have that?
22 A  I recall Mr. McGowan sharing this with me at

Page 153

1  sell.
2  Q  So now referring to this engagement letter,
3  at least in the terms of the sentence that I read
4  about the time period when State Street could make
5  inquiry, there was -- did State Street ever make
6  inquiry of the company after January 1st, 2004, and
7  before the due diligence phone call that you referred
8  to between State Street and you?
9  A  I don't recall any inquiry about -- I don't
10 believe there was an inquiry during that time period.
11 Q  Okay. Did you ever contact a State Street
12 representative during the period December 1, 2003, to
13 March -- I'm sorry -- to April 15th, 2004, on your own
14 initiative?
15 A  Never.
16 Q  Did Mr. McGowan, so far as you know?
17 A  As far as I know, he would not have.
18 Q  Was there an effort by you and Mr. McGowan
19 intentionally not to speak to State Street about this
20 stock situation?
21 A  I can't speak for Mr. McGowan.
22 Q  Speak for yourself if you could, please.

Page 154

1  A  My idea was State Street was a significant
2  investor. We would be respectful to them as a
3  significant investor, answer questions that were
4  appropriate to answer, but we wouldn't call
5  significant investors just to see how they were doing.
6  Q  I understand that, but you were a member,
7  and in your capacity as a member of the Investment
8  Benefits Committee, didn't you think you had some
9  obligation to monitor what they were -- what State
10 Street was doing?
11     MS. FLOWE: I'm going to object that you are
12 asking him for a legal conclusion.
13     MR. CUMMINS: Okay. I'll withdraw the
14 question.
15 BY MR. CUMMINS:
16 Q  Didn't you think you had some responsibility
17 as a member of the committee to monitor what State
18 Street was doing after its engagement?
19     MS. FLOWE: Same objection. You're asking
20 him for a legal conclusion.
21     MR. CUMMINS: I'm asking him for whether he
22 thought he had some responsibility. He's not a

Page 155

1  lawyer. I understand that.
2  BY MR. CUMMINS:
3  Q  Could you answer the question, please.
4     MS. FLOWE: You can answer it as -- if you
5  thought -- if you had a thought about it, you could
6  answer it, but factually.
7     THE WITNESS: May I ask a question?
8  BY MR. CUMMINS:
9  Q  Yeah, sure. I think you can. Your counsel
10 is going to have to --
11 A  Responsibility to do what? Other than
12 understanding the number of shares in the plan, I
13 didn't understand any other responsibility.
14 Q  Okay. Did you think that somehow you
15 thought you should find out what they were doing with
16 respect to the analysis or thoughts about the stock in
17 that stock plan?
18 A  Actually, I felt that was off limits.
19 Q  Okay. If you could turn to the -- I'll do
20 it by Bates number -- 001308 in this Exhibit 9.
21 There's a sentence -- take your time to look at it.
22 I'm going to ask you about the sentence that begins

Page 156

1  "accordingly."
2  A  May I read the whole thing?
3  Q  Yes.
4  A  I'm finished reading.
5  Q  Okay. I pointed you to that one sentence I
6  want to ask you about. Let me just read it into the
7  record so we know what your testimony is referring to.
8     "Accordingly, State Street shall instruct
9  the trustee to sell common stock held in the company
10 stock fund. If, and only if, State Street determines
11 that the continued holding of such common stock is not
12 consistent with the provisions of ERISA (within the
13 meaning of Section 404A1D of ERISA), and in such
14 event, only to the extent that such sales are
15 permitted under applicable securities laws or any
16 other applicable Federal law."
17     Assuming I read it correctly, when you
18 engaged State Street did you understand that the sole
19 determination that you were assigning to State Street
20 was to determine that the continued holding of such
21 common stock was not consistent with the provisions of
22 ERISA?

Case 1:04-cv-11380-WGY   Document 181-9   Filed 08/17/2007   Page 11 of 14
DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

40 (Pages 157 to 160)

**157**

1  A  No, that's not the whole understanding.
2  Q  What else was it that you thought you were
3  assigning to State Street?
4  A  I thought we were assigning total fiduciary
5  responsibility and liability for making decisions
6  about that portfolio offering within the S&I Plan of
7  W.R. Grace, but that the only reason to sell the stock
8  in that portfolio was if, in their judgment,
9  continuing to hold the stock would not conform with
10  the provisions of ERISA.
11  Q  When State Street phones you and advised you
12  that they had received an inquiry as to the possible
13  sale, did you ask the person who called you from State
14  Street what the basis was -- whether State Street had
15  concluded that holding the stock was no longer
16  consistent with the provisions of ERISA?
17  A  I do not recall asking that question.
18  Q  At any time did State Street ever express to
19  you, so far as you know, to anyone at Grace, that they
20  had formed the conclusion that holding, continuing to
21  hold the Grace stock in the stock fund was not
22  consistent with the provisions of ERISA?

**158**

1  A  I recall that State Street made that
2  conclusion and began selling stock out of the plan on
3  a sort of as-permitted basis under the securities
4  laws.
5  Q  Under Rule 144, you mean?
6  A  Yes.
7  Q  But how did you learn that they had formed
8  this conclusion that the continued holding wasn't
9  consistent with ERISA?
10  A  I don't recall how I learned that.
11  Q  Did you ever see anything in writing from
12  anyone, State Street or otherwise, that expressed
13  State Street's conclusion that the continued holding
14  was no longer consistent with the provisions of ERISA?
15  A  I frankly don't recall.
16     (Exhibit No. 32 was marked for
17     identification and attached to the deposition
18     transcript.)
19  BY MR. CUMMINS:
20  Q  I'm going to hand you what has been marked
21  for this deposition, Deposition Exhibit 32. I think
22  for the record Mr. Goodman can explain why we've

**159**

1  marked this as Exhibit 32.
2     MR. GOODMAN:  I understand this to be the
3  more complete version for the relevant time period,
4  and it was also the one that Grace counsel thought it
5  was appropriate to use with our plaintiff, so I
6  figured I would make sure it's an accurate copy.
7     MS. FLOWE:  It certainly has a later date.
8     MR. CUMMINS:  And I think what the reference
9  is -- is it Defendant's Exhibit 1 to the Bunch
10  deposition?
11     MR. GOODMAN:  Yeah, of the Plaintiffs'.
12     MR. CUMMINS:  And we used an earlier --
13     MR. GOODMAN:  A different version.
14     MR. CUMMINS:  -- version and marked it as
15  something else?
16     MS. FLOWE:  Plaintiffs' Exhibit 1.
17     MR. CUMMINS:  No, I believe when -- oh,
18  thank you. Okay. Now we believe that Plaintiffs'
19  Exhibit 32 is a more complete copy of Plaintiffs'
20  Exhibit 1, or a later version. We don't plan to
21  retake the deponent who testified as to Exhibit 1
22  unless she insists.

**160**

1     MS. FLOWE:  I do not insist.
2  BY MR. CUMMINS:
3  Q  I have only two questions that relate to it.
4  You may, in fact, be familiar enough with the general
5  concept of the plan without referring to the plan. If
6  not, I can point you to the sections that I think will
7  help you answer.
8     First, with respect to the voting rights
9  that were accompanied or were a part of the common
10  stock held by the stock plan, would you agree with me
11  that the right to vote resided in the plan participant
12  who owned those shares beneficially?
13  A  I believe that the participants had all the
14  rights of shareholders.
15  Q  Including the right to vote?
16  A  That's my understanding, yes.
17  Q  And I believe that's expressed in Section
18  5.06 of this plan if you want to double-check it.
19     MS. FLOWE:  Page 73.
20  BY MR. CUMMINS:
21  Q  I'll read the one sentence just to make
22  sure. It says, "Grace shall request from each such

Page 165

1  priority of withdrawal section that we're looking at
2  now, the last investments to come out of a plan
3  participant's were those that carried with it the
4  right to express, by voting, his or her -- the plan
5  participant's -- view of management and the active
6  governance of the company; isn't that correct?
7     A  Given the priority list, it looks like Grace
8  common stock or holdings in the ESOP would remain in
9  the plan the longest.
10    Q  Would you dig out of the previous exhibit
11 pile numbers 13, 14 and 15.
12       (Discussion was held off the record.)
13       MR. CUMMINS: Could the witness please be
14 handed all of them, 13, 14 and 15.
15 BY MR. CUMMINS:
16    Q  I asked that you be handed Exhibits 13, 14
17 and 15 that have been previously marked in another
18 deposition in this case. Is this something that was
19 prepared by Grace?
20    A  Yes.
21    Q  And who at Grace would have prepared this?
22    A  I believe it's prepared within our treasury

Page 166

1  group, and Mr. Lapidario generally had responsibility
2  for this.
3     Q  And on the second page of -- second
4  following pages of each exhibit, rates of return for
5  other plan options are recorded. Wouldn't
6  Mr. Lapidario also be responsible for accumulating
7  that data and putting it into this presentation?
8     A  For accumulating and embodying it in this
9  presentation, yes, but not for calculating.
10    Q  And to whom were these reports distributed
11 at Grace?
12    A  Mr. McGowan and myself and others within our
13 treasury group and perhaps some other senior
14 executives.
15       (Discussion was held off the record.)
16 BY MR. CUMMINS:
17    Q  Let's go back on the record. Just a few
18 more questions.
19       Do you know who Nell Hennessey is?
20    A  No.
21    Q  Are you familiar with a business entity
22 known as Aon?

Page 167

1     A  Yes.
2     Q  What does it do?
3     A  Well, I believe they do a number of
4  different -- provide a number of different services in
5  the benefit space, from benefits processing to
6  actuarial services to insurance consulting, that kind
7  of thing.
8     Q  And at some point did Grace consider Aon as
9  the delegatee that ultimately State Street became?
10    A  I believe so, yes.
11    Q  Did you have any role, any discussions with
12 Aon with respect to that project?
13    A  I recall talking to Aon, yes.
14    Q  And who at Aon did you talk to?
15    A  I don't recall any names.
16    Q  Were they in-person meetings?
17    A  I recall one in-person meeting, yes.
18    Q  And where was that?
19    A  I believe it was in our offices in Columbia,
20 Maryland.
21    Q  And what was the discussion with Aon?
22    A  To the best of my recollection, it was about

Page 168

1  becoming the independent fiduciary for the Grace stock
2  fund at the time.
3     Q  And this occurred sometime in 2003?
4     A  I believe that would be correct, yes.
5     Q  Aon obviously didn't become the fiduciary,
6  did it?
7     A  Correct.
8     Q  Do you know why?
9     A  I believe there was a problem with them
10 obtaining insurance to support the risk that the
11 independent fiduciary would undertake.
12    Q  Let me put this in context. Is it right
13 that Grace spoke with Aon first and then State Street
14 with regard to this assignment?
15    A  That's my recollection, yes.
16    Q  I take it then that State Street was somehow
17 able to overcome the gap that Aon had with respect to
18 this insurance issue; is that right?
19    A  Apparently that's correct, yeah.
20    Q  Did you make -- did you somehow come to
21 learn that State Street had insurance that you -- let
22 me withdraw the question. Did you somehow come to

169

1 learn that State Street had insurance on this, for
2 this project?
3  A  No. I just understood State Street was
4 willing to take on the obligation.
5  Q  I think I understand it more clearly. Aon
6 declined the project because of some insurance issue;
7 is that right?
8  A  That's my recollection, yes.
9  Q  Do you know who Mr. John Forgach is?
10  A  Yes, I do.
11  Q  During Mr. Forgach's deposition he said that
12 he had contacted Ms. Hennessey, and members of the
13 great management team had interviewed her. Does that
14 refresh your recollection as to whether you met with
15 Ms. Hennessey? I don't believe you said you did.
16  A  As I said, I believe meeting with someone
17 from Aon, I believe it was a woman, but I don't
18 remember the woman's name.
19  Q  Okay. How many times did you meet with a
20 representative of Aon?
21  A  One or two.
22      MR. CUMMINS: That's all the questions I

170

1 have at this time. Any questions from other counsel?
2      Thank you very much.
3      THE WITNESS: Thank you.
4      THE REPORTER: And who wants copies of the
5 deposition?
6      MR. RUST: I do.
7      MS. FLOWE: Yes, absolutely.
8      MR. CUMMINS: We want the original, of
9 course.
10      (Signature having not been waived, the
11      deposition of ROBERT M. TAROLA, CPA, was
12      concluded at 2:25 p.m.)

171

1      ACKNOWLEDGEMENT OF WITNESS
2      I, ROBERT M. TAROLA, CPA, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony, and the same is a true, correct
5 and complete transcription of the testimony given by
6 me, and any corrections appear on the attached Errata
7 sheet signed by me.
8
9
10 _____  _____
11 (DATE)          (SIGNATURE)

172

1      E R R A T A  S H E E T
2 IN RE: BUNCH VS. GRACE
3 RETURN BY:
4 PAGE   LINE          CORRECTION AND REASON
5 ____  ____  _____
6 ____  ____  _____
7 ____  ____  _____
8 ____  ____  _____
9 ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 (DATE)       (SIGNATURE)

```
                            173
 1            E R R A T A   S H E E T
 2   IN RE: BUNCH VS. GRACE
 3   RETURN BY:
 4   PAGE   LINE       CORRECTION AND REASON
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   _____
22   (DATE)     (SIGNATURE)
```

                                                                174
 1  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 2          I, Laurie Bangart-Smith, Registered
 3  Professional Reporter, the officer before whom the
 4  foregoing deposition was taken, do hereby certify that
 5  the foregoing transcript is a true and correct record
 6  of the testimony given; that said testimony was taken
 7  by me stenographically and thereafter reduced to
 8  typewriting under my supervision; and that I am
 9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12
13          IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 19th day of
15  May, 2007.
16  My commission expires: March 14th, 2011
17
18
19  _____
20  LAURIE BANGART-SMITH
21  NOTARY PUBLIC IN AND FOR
22  THE DISTRICT OF COLUMBIA