# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KERI EVANS,

                Plaintiff,

v.

JOHN F. AKERS, *et al.*

                Defendants.

LAWRENCE W. BUNCH, *et al.*

                Plaintiffs,

v.

W.R. GRACE & CO., *et al.*

                Defendants.

Consolidated as:
Case No. 04-11380-WGY

## MEMORANDUM IN SUPPORT OF STATE STREET BANK AND TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY OF ARGUMENT........................................... 1

II.  SUMMARY OF UNDISPUTED MATERIAL FACTS............................................ 3

    A.  Grace's Bankruptcy and the Grace Stock.............................................. 3

    B.  State Street's Engagement ...................................................................... 4

    C.  State Street's Deliberative Process and Decision to Sell the Grace Stock ............ 4

III.  THE ERISA "PRUDENT PERSON" STANDARD .......................................... 10

IV.  ARGUMENT ..................................................................................................... 13

    A.  State Street's Thorough Evaluation Strictly Complied With ERISA.................. 13

    B.  Plaintiffs' "Collateral Attacks" On State Street's Investment Decision Are Contrary To Settled ERISA Law. .................................................................. 15

    C.  State Street Is Also Entitled To Summary Judgment On Plaintiffs' Self-Dealing And Conflict Of Interest Claims. ...................................................... 19

V.  CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Agway Inc. Employees' 401 (k) Thrift Investment Plan, et al.,*
  409 F.Supp.2d 136 (N.D.N.Y. 2004) ................................................................. 17

*Alves v. Harvard Pilgrim Healthcare Inc.,*
  204 F. Supp 2d 198, 210 (D. Mass. 2002) ......................................................... 20

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 247 (1986) ............................................................................... 2, 15

*Beddall v. State Street Bank & Trust Co.,*
  137 F.3d 12, 18 (1st Cir. 1998) .................................................................... 11, 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 322 (1986) ...................................................................................... 3

*Cody v. Donovan,* 469 U.S. 1072 (1984)) ............................................................ 12

*DiFelice v. U.S. Airways, Inc.,*
  2007 WL 219289 (4th Cir. August 01, 2007) ........................................ 12, 16, 18

*Donovan v. Cunningham,*
  716 F.2d 1455, 1467 (5th Cir.1983) .................................................................. 1, 12

*Donovan v. Mazzola,*
  716 F.2d 1226 (9th Cir.1983), *cert. denied,* 464 U.S. 1040 (1984) ............... 1, 13

*FDIC v. Municipality of Ponce,*
  904 F.2d 740, 742 (1st Cir. 1990) ........................................................................ 3

*Fink v. Nat'l Sav. & Trust Co.,*
  772 F.2d 951, 956 (D.C. Cir. 1985) .................................................................... 17

*Graden v. Conexant Systems Inc.,*
  2007 WL 2177170 (3d Cir. July 31, 2007) ........................................................ 16

*In re Unisys Sav. Plan Litig.,*
  74 F.3d 420, 438-41 (3d Cir. 1996) .................................................................... 18

*Katsaros v. Cody,*
  744 F.2d 270, 279 (2d Cir. 1984) ....................................................................... 12

*Keri Evans, et al. v. John F. Akers, et al.,*
  No. 05-11602, consolidated as No. 04-11380-WGY, (D. Mass. filed Aug. 1,
  2005) .................................................................................................................... 16

*LaLonde v. Textron, Inc.,*
  369 F.3d 1 (1st Cir. 2004) (ESOP) .................................................................... 16

*Langbecker v. Electronic Data Systems Corp.,*
  476 F.3d 299, 308 n.18 (5th Cir. 2007) ............................................................. 18

*Lanka v. O'Higgins,*
  810 F. Supp. 379, 387 (N.D.N.Y. 1992)) ........................................................... 12

*Medina-Munoz v. R.J. Reynolds Tobacco Co.,*
  896 F.2d 5, 7-8 (1st Cir. 1990) ............................................................................. 3

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248, 251 (1993) .................................................................................. 11

*Metzler v. Graham*,
    112 F.3d 207, 209 (5th Cir. 1997) .................................................................. 12

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*,
    57 F.3d 1317, 1323 (4th Cir. 1995) ................................................................ 15

*Ulico Casualty Co. v. Clover Capital Mgmt., Inc.*,
    335 F. Supp. 2d 335, 340 (N.D.N.Y. 2004) ..........................................1, 12, 13

*United States v. Mason Tenders District Council of Greater New York*,
    909 F. Supp. 882, 886 (S.D.N.Y. 1995) ......................................................... 12

*Vartanian v. Monsanto*,
    131 F.3d 264, 268 (1st Cir. 1997) .................................................................. 20

### STATUTES

29 C.F.R. § 2550.404(b) ........................................................................................ 19

29 C.F.R. § 2550.404a-1(b)(1) .............................................................................. 11

29 U.S.C. § 1002(21)(A) ....................................................................................... 11

29 U.S.C. § 1104(a)(1)(B) .............................................................................. 11, 13

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

In this action, Plaintiffs claim that State Street Bank & Trust Company ("State Street"), an independent investment manager to the Grace Stock Fund of the W. R. Grace & Co. Employee Savings and Investment Plan (the "Plan"), violated the prudent investment requirements of the Employee Retirement Income Security Act ("ERISA") by deciding, after a thorough and deliberate evaluation, to divest the Plan of what State Street concluded was a volatile and risky investment:  the common stock of W.R. Grace & Co. ("Grace"), a corporation in Chapter 11 bankruptcy facing massive potential liabilities for asbestos litigation claims.  But for the fact that the Grace stock price began to increase months after the sale, this action would never have been brought.  Although none of the material facts pertaining to State Street's engagement or its evaluation is in dispute, Plaintiffs have asked this Court to second-guess, in hindsight, the outcome of State Street's decision-making process.

However, "ERISA's test of prudence is one of *conduct*, and not a test of the result of performance of the action taken by the fiduciary.  The focus of the inquiry is what steps the fiduciary took before making the decision to act, and not whether the action succeeded or failed." *Ulico Casualty Co. v. Clover Capital Mgmt., Inc.,* 335 F. Supp. 2d 335, 340 (N.D.N.Y. 2004) (citing  *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983) (internal quotation and citation omitted), *cert. denied,* 467 U.S. 1251 (1984).  "The right inquiry, therefore, is whether the fiduciary, prior to making the challenged transactions, employed appropriate methods to investigate the merits [] of the actions to be taken." *Id.* (citing *Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir.1983), *cert. denied,* 464 U.S. 1040 (1984)).

Measured against this standard and the undisputed record, State Street is entitled to summary judgment.  Plaintiffs *concede* that State Street was fully qualified to act as investment

-1-

manager to the Grace Stock Fund of the Plan. Plaintiffs do not dispute the substantial record evidence showing that State Street undertook a formal and detailed process to review the Plan's Grace stock investment; indeed, Plaintiffs *concede* that State Street's process met the standards of prudence required under the ERISA. And, though initially they vaguely pled, on "information and belief," self-dealing or other improper benefit, Plaintiffs have adduced absolutely no evidence of wrongdoing by State Street, because there is no such evidence to be had. Nor is there any viable claim that State Street sold the Grace stock at less than fair value. All of the stock, which is freely-traded on the New York Stock Exchange, was sold at or above the market price (and the vast majority was sold at a premium to the market).

State Street acted for no purpose other than to protect the investment interests of the Plan and its participants from the prospect of adverse developments in the Grace bankruptcy that had the potential to wipe out the value of the Grace stock. This is not a case in which, due to the fiduciary's action, any participant lost his or her retirement savings through an imprudent investment. The funds from the sale of the Grace stock were transferred into a fixed income option for participants to reallocate among the other investment options in the Plan. Even a participant who merely elected to leave his or her account invested in the fixed income option would have earned a healthy, positive return. Based on this undisputed record, summary judgment in favor of State Street is not merely appropriate in this case; we respectfully submit that it is compelled.[1]

---

[1] In deciding a motion for summary judgment, a court should grant the motion if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v.*

## II.    SUMMARY OF UNDISPUTED MATERIAL FACTS[2]

### A.    Grace's Bankruptcy and the Grace Stock

On April 2, 2001, Grace and substantially all of its domestic subsidiaries filed voluntary petitions for reorganization in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the United States Bankruptcy Code.  SOF ¶ 5.  According to its Annual Report for 2003, "[t]he filing was made in response to a sharply increasing number of asbestos-related bodily injury claims."[3]  Grace "intends to address all of its pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization.  Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution."  SOF ¶¶ 6, 7.  However, Grace warned:

> it is currently *impossible to predict with any degree of certainty* the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or *what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted **or cancelled** under a plan of reorganization.*  The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through the Bankruptcy Court proceedings." SOF ¶ 8.  (Emphasis added).

---

*Catrett,* 477 U.S. 317, 322 (1986); *FDIC v. Municipality of Ponce,* 904 F.2d 740, 742 (1st Cir. 1990); *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 7-8 (1st Cir. 1990).

[2] For a complete recitation of the undisputed facts supporting this motion, with record cites and appendices, please refer to the Statement of Undisputed Material Facts ("SOF") filed herewith.

[3] Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing, including 129,191 claims for bodily injury.    SOF ¶ 9.

On the date Grace filed for bankruptcy, the price of a share of Grace stock closed at $1.52.  SOF ¶ 11.  This was down from a high on July 1, 1999 of $19.19 per share.  SOF ¶ 10.

### B.    State Street's Engagement

Over two and a half years after Grace filed for bankruptcy, the Grace Investment Committee engaged State Street as Independent Investment Manager for the Grace Stock Fund.[4]  SOF ¶ 14.  The engagement became effective December 15, 2003, upon approval of the bankruptcy court.  SOF ¶ 42.  According to its presentation to Grace in April 2003, State Street is an industry leader in providing independent fiduciary services, with (at that time) over $55 billion in company stock assets under its management.  SOF ¶ 18.  Indeed, Plaintiffs concede that State Street was well-qualified to serve as Independent Investment Manager for the Grace Stock Fund, with experience managing the company stock funds of ERISA-governed plans, and with a ranking among other investment management companies among the top ten in the Nation. SOF ¶ 20.

### C.    State Street's Deliberative Process and Decision to Sell the Grace Stock

For several months leading up to its formal engagement and thereafter, State Street employed a comprehensive and professional process to investigate and evaluate the prudence of the Grace stock investment held by the Grace Stock Fund before determining that the Plan's continued holding of that investment was not consistent with ERISA's prudence requirements

---

[4] The Plan provides, "*Notwithstanding any other provision of the Plan to the contrary*," Independent Investment Manager "shall have…the continuous authority and duty to determine the extent that the continued retention of shares of Grace Stock within the Grace Stock Fund is not consistent with the applicable provisions of [ERISA], and to take actions in this regard that it deems appropriate; *including the authority to dispose of Grace Stock held with in the Grace Stock Fund . . . .*"  SOF ¶ 4 (emphasis added).

and directing its sale. *See* SOF ¶¶19 - 102. *None* of the material facts pertaining to this process and investigation is disputed by the Plaintiffs.

State Street fulfills company stock engagements using a formal committee structure. State Street has a dedicated Independent Fiduciary Group ("IFG") which monitors and administers State Street's ERISA company stock fund engagements. The IFG is headed by Kelly Driscoll, who has over 20 years of experience providing independent fiduciary services for ERISA company stock funds. SOF ¶ 22. The IFG advises and reports to the State Street Fiduciary Committee, which consists of senior officers of the company with decades of experience in the field of investment management. SOF ¶ 23. The Fiduciary Committee meets on a regular basis to evaluate and make decisions as to those company stock investments identified by the IFG for heightened oversight and specific action. SOF ¶ 24. In those instances, such as here, in which a particular company stock fund has been placed on a heightened monitoring status, State Street often will retain qualified outside consultants, including valuation experts and outside counsel, to advise the IFG and the Fiduciary Committee in its determination as to whether continued retention of that stock in the company stock fund is prudent under ERISA. SOF ¶ 28. Because Grace was already in bankruptcy when State Street was engaged as Independent Investment Manager, State Street placed the stock on heightened status from the outset. SOF ¶ 30.

State Street retained an independent financial advisor, Duff & Phelps LLC, to review the fundamental and financial outlook for the Grace stock held by the Plan. SOF ¶ 31. State Street also retained the law firm of Goodwin Procter LLP, which assigned attorneys with expertise in all three areas of relevance to the Grace Stock Fund engagement: bankruptcy, asbestos litigation

liabilities, and ERISA.  SOF ¶ 33.   Plaintiffs do not contest the qualifications or engagement of either advisory firm.  SOF ¶¶ 36, 37.

Beginning in October 2003, prior to the effective date of State Street's engagement, the IFG, along with Duff & Phelps and Goodwin Procter, conducted due diligence on Grace and the Grace stock.  State Street's (and its advisors') due diligence and analysis were then summarized in presentations by the IFG to the Fiduciary Committee.  SOF ¶ 38.  During the due diligence process, the IFG, Duff & Phelps and Goodwin Procter identified three primary factors that could affect the size of Grace's contingent asbestos liabilities and thus the ultimate equity value of the company:   the asbestos-related bodily injury claims currently filed and to be filed against Grace; the outcome of the Zonolite attic insulation ("ZAI") class action litigation pending against Grace; and legislation pending in Congress (the Fairness in Asbestos Injury Resolution Act of 2003 (the "FAIR Act"), which, if it had passed, could have had the effect of reducing or capping Grace's liability for asbestos bodily injury claims.  SOF ¶ 47.

The Fiduciary Committee met four times during the course of the Grace engagement, on December 11, 2003 (four days prior to the effective date of the engagement), January 29, 2004, February 23, 2004 and April 7, 2004, to receive information and analysis and to make determinations regarding the prudence of the Grace Plan's investment in Grace stock.  SOF ¶ 43. At these meetings, the Fiduciary Committee received presentations from the IFG regarding the Grace Plan; the Grace bankruptcy; the financial performance and outlook of the company and its industry sector; factors affecting the Grace stock; Grace's unliquidated, contingent asbestos liabilities; insurance coverage for those liabilities; SEC requirements and restrictions pertaining to sale of the company stock; communications made to the Plan participants; the prospect of

having State Street appoint a representative to the equity holders' committee in the Grace

bankruptcy; and the risks generally to the Plan of both holding and selling the Grace stock.[5]  SOF

¶ 45.  The IFG, Goodwin Procter and Duff & Phelps all made several written and oral

presentations to the Fiduciary Committee.  SOF ¶ 44.

In a detailed, 88-page report first presented to the Fiduciary Committee on January 29,

2004, Duff & Phelps provided a financial and valuation analysis of Grace, including a

determination of "a reasonable pricing range for the [Grace] stock given the factors we believe

should impact the value to equity investors."  SOF ¶ 53.  As of February 17, 2004, Duff &

Phelps valued the Grace stock at a midpoint of $1.88 per share, within a range of $0.73 to $3.02

per share.  SOF ¶ 62.  On that date, the closing price on the New York Stock Exchange for Grace

stock was $3.51.  SOF ¶ 63.

At the January 29, 2004 meeting, the IFG recommended that State Street begin selling the

Grace Stock Fund's holdings of Grace stock.  SOF ¶ 58.  The Fiduciary Committee requested

that the IFG prepare a formal summary supporting this recommendation.  SOF ¶ 62.  The

Committee also asked the IFG to provide additional information on Grace stock held in other

investment funds managed by State Street.  SOF ¶ 59.  At the February 23, 2004 meeting of the

Fiduciary Committee the IFG reaffirmed its earlier recommendation.  Duff & Phelps and

Goodwin Procter attended the meeting.  In a formal presentation, the IFG provided an overview

---

[5] At the December 11 meeting, held just before State Street's engagement became effective, the
Fiduciary Committee received presentations from the IFG, Duff & Phelps and Goodwin Procter,
discussed Grace's asbestos liability exposure and its potential impact on the Grace stock, and
determined, not to take action regarding the Grace stock pending further monitoring, analysis
and evaluation.  SOF ¶ 51.

of the due diligence and analysis conducted to date, including the following summary of its

recommendation:

> Unresolved asbestos litigation and potential asbestos legislation
> will affect the determination of whether Grace stock remains a
> prudent investment. The uncertainty and consequence of
> unfavorable events occurring as a result of litigation probabilities
> or of legislation not being enacted timely or at all, has resulted in
> the IFG recommendation that the Committee **override** Plan
> documentation and begin to reduce the holdings of Grace stock.

> The recommendation to commence a selling program is based
> upon the IFG's determination that the continued holding by the
> Trust of all of its shares of Grace stock would be imprudent and
> therefore inconsistent with the requirements of Section
> 404(a)(1)(B) of ERISA. Such determination reflects the input of
> [Duff & Phelps] and Goodwin [Procter], and has been made after
> careful consideration of all of the facts and circumstances
> determined to be relevant by IFG ….

SOF ¶ 60.[6]

On February 24, 2004 the Fiduciary Committee unanimously approved the IFG's

recommendation to begin selling the Grace stock, provided that all such sales were made at a

price no lower than the midpoint of Duff & Phelp's valuation range (then at $1.88 per share).

SOF ¶ 66. Between February 25, 2004 and April 6, 2004, State Street sold approximately

900,000 shares of Grace stock from the Grace Stock Fund (just about 13% of the Fund's total

---

[6] Ms. Driscoll also reported that the shares Grace stock managed by State Street outside the
Grace Stock Fund were held in diversified "index" investment funds unrelated to the Grace Plan.
SOF ¶ 64. An index fund holds a portfolio of investments that is intended to mirror the
performance of a specific stock index. Grace stock is a component of the Russell 2000 and 3000
stock indices. *See, e.g.,* http://www.russell.com/indexes/pdf/membership/R2000.pdf. The
Committee concluded that those other holdings were not relevant to its determination of whether
the Grace stock was a prudent investment for the Grace Plan because "holding the W. R. Grace
stock as part of a diversified fund is fundamentally different than holding the same stock as a
very large concentrated holding in the W. R. Grace retirement plan." SOF ¶ 65.

holdings) in open-market transactions at the then-prevailing New York Stock Exchange trading prices, ranging from $2.86 to $3.09 per share. SOF ¶ 69. During this period, State Street continued to monitor the Grace stock and received regular updates from Duff & Phelps as to its equity valuation conclusion for Grace. *See e.g.*, SOF ¶ 67.

On April 2, 2004, State Street received an unsolicited contact from Lehman Brothers, acting on behalf of a party interested in purchasing the remaining block of Grace stock held by the Grace Stock Fund, an amount that represented approximately 85% of the Plan's original position. State Street subsequently learned that the interested party was a hedge fund established by D.E. Shaw & Co. State Street has no relationship with D.E. Shaw, as a client or otherwise. SOF ¶ 71. The price offered by D.E. Shaw was $3.50 per share, representing an 8% premium over the April 1 closing price of $3.24 per share. SOF ¶ 78. As of March 31, 2004, the mid-point of Duff & Phelps' equity valuation for Grace Stock was $1.36 per share. SOF ¶ 70.

On April 7, 2004, the Fiduciary Committee met to discuss the D.E. Shaw offer, which had been lowered to $3.25 per share. SOF ¶ 80. Goodwin Procter once again reviewed for the Committee both the status of the FAIR Act legislation and Grace's exposure to asbestos liabilities. SOF ¶ 81. Ms. Driscoll reiterated and reaffirmed the bases for the Committee's original determination that the Grace stock was an imprudent investment: the bankruptcy status of the company, the uncertainty that equity holders would receive value for the stock and outstanding asbestos litigation. SOF ¶ 82. The Committee discussed whether it would be in the best interest of the participants and beneficiaries to sell the remaining shares at a premium above the current market value. SOF ¶ 84. Finding that the fundamentals pertaining to the stock remained the same notwithstanding the D.E. Shaw offer, the Committee affirmed its conclusion

that the stock remained an imprudent investment and unanimously voted to sell the remaining

shares to D.E. Shaw for not less than $3.50 per share, provided that the Trust incur no

commission expense.  SOF ¶ 85.  Accordingly, the remaining Grace stock in the Grace Stock

Fund (over 6.2 million shares or over 85% of the Fund's original holdings) was sold to D.E.

Shaw in two transactions on April 12 and April 19, 2004 for the agreed-upon $3.50 per share, a

premium of approximately *18%* over the market closing price on those days.[7]

All shares divested prior to the D.E. Shaw sale were sold in the open market at the then-

prevailing price.  SOF ¶ 87.  All sales were made to third parties unaffiliated with State Street,

and all were conducted above the mid-point of Duff & Phelps' then-current equity valuation

range for Grace stock.  Participant accounts whose holdings were transferred out of the Grace

Stock Fund as a result of these sales were credited with an equivalent value of units in the Plan's

Fixed Income Option.  SOF ¶ 88.  There is no dispute in this case that the Fixed Income Option

was a prudent investment alternative.  Participants were free to reallocate those funds to any of

the other available investment options within the Plan.  SOF ¶ 88.  A participant who did nothing

and merely left his or her account invested in the Fixed Income Option from March/April 2004

to June 2007 would have earned a significant, positive return during that period.  SOF ¶ 89.

## III.    THE ERISA "PRUDENT PERSON" STANDARD

ERISA, a "comprehensive and reticulated statute," governs employee benefit plans,

including retirement plans.  *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993) (internal

---

[7] On February 23, 2004, the day after State Street decided to commence selling Grace stock from the Plan, the New York Stock Exchange closing price was $3.07.  SOF ¶ 68.  On April 12, 2004, the date that State Street sold most of the shares to D.E. Shaw for $3.50 per share, the closing price was $2.96.  SOF ¶ 86.  On April 19, 2004, the date that State Street sold the last of the Grace stock to D.E. Shaw for $3.50 per share, the closing price was $3.03.  SOF ¶ 87.

quotation marks omitted). Under ERISA, plan fiduciaries "are assigned a number of detailed

duties and responsibilities," including "the proper management, administration and investment of

plan assets[.]" *Id.* ERISA requires that a fiduciary "must employ within the defined domain 'the

care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use.'" *Beddall v. State Street Bank*

*& Trust Co.,* 137 F.3d 12, 18 (1st Cir. 1998) (quoting 29 U.S.C. § 1104(a)(1)(B)). Under

ERISA, a person is a plan fiduciary "only 'to the extent' that he possesses or exercises the

requisite discretion and control" over the plan or its assets. *Id.,* 137 F.3d at 18 (quoting 29

U.S.C. § 1002(21)(A)). The Department of Labor, charged with enforcing ERISA, has

promulgated regulations interpreting ERISA's "prudence" standard in the context of investment

determinations by fiduciaries:

> With regard to an investment or investment course of action taken
> by a fiduciary of an employee benefit plan pursuant to his
> investment duties, the requirements of section 404(a)(1)(B) of the
> Act … are satisfied if the fiduciary (i) has given appropriate
> consideration to those facts and circumstances that, given the scope
> of such fiduciary's investment duties, the fiduciary knows or
> should know are relevant to the particular investment or
> investment course of action involved, including the role the
> investment or investment course of action plays in that portion of
> the plan's investment portfolio with respect to which the fiduciary
> has investment duties; and (ii) has acted accordingly.

29 C.F.R. § 2550.404a-1(b)(1).

ERISA's prudent person standard "is one of conduct, and not a test of the result of

performance of action taken by the fiduciary." *Ulico Casualty Co. v. Clover Capital Mgmt.,* 335

F. Supp. 2d 335, 340 (N.D.N.Y. 2004) (citing *Donovan v. Cunningham,* 716 F.2d 1455, 1467

(5th Cir.1983) (internal quotation and citation omitted), *cert. denied,* 467 U.S. 1251 (1984).

-11-

Thus, a fiduciary charged with making investment decisions on behalf of a retirement plan is required "(1) to employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions." *Id.,* (citing *United States v. Mason Tenders District Council of Greater New York,* 909 F. Supp. 882, 886 (S.D.N.Y. 1995); *Lanka v. O'Higgins,* 810 F. Supp. 379, 387 (N.D.N.Y. 1992)). In evaluating whether a fiduciary acted prudently under ERISA, "the court should inquire whether the fiduciaries 'at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Ulico,* 335 F. Supp. 2d at 340 (quoting *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir. 1984), *cert. denied sub nom, Cody v. Donovan,* 469 U.S. 1072 (1984)). "ERISA fiduciaries with responsibility for selecting and terminating plan investment options for plan participants are required to exercise investment judgment in the context of constantly changing, complex financial markets. In doing so, these fiduciaries are entitled to substantial latitude and their judgments must not be assessed using 20/20 hindsight." *DiFelice v. U.S. Airways, Inc.,* 397 F. Supp. 2d 758, 773 (E.D. Va. 2005) (citing *Ulico, supra,* 335 F. Supp. 2d at 340), *aff'd* 2007 WL 2192896, No. 06-1892 (4th Cir. Aug. 1, 2007). See also *Metzler v. Graham,* 112 F.3d 207, 209 (5th Cir. 1997) (Because ERISA fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), their actions are to be "evaluated at the time of the investment without the benefit of hindsight").

IV.    **ARGUMENT**

A.    **State Street's Thorough Evaluation Strictly Complied With ERISA.**

There is no genuine issue for trial in this case.  The record is undisputed that State Street undertook a careful, thorough process in evaluating the prudence of the Grace stock investment. State Street retained qualified legal and financial advisors.  Supported by the professionals in State Street's own Independent Fiduciary Group, the Fiduciary Committee (itself consisting of highly-qualified investment professionals) properly identified and considered the material factors affecting the value of the Grace stock and its suitability as an investment for the Plan.  Having given appropriate consideration to these factors, State Street acted accordingly.  The decision State Street was called upon to make (whether Grace's common stock was a prudent investment for the Grace Stock Fund in light of its purpose as a retirement fund) was complex and subject to substantial uncertainties.  To make this decision, State Street brought to bear methods and procedures that the Plaintiffs' experts have conceded met the standards of the investment management industry.  SOF ¶ 29.  There simply is no question on the undisputed record that, prior to determining that the Grace stock investment was no longer prudent and should be sold, State Street "employed appropriate methods to investigate the merits" of that action.  *Ulico, supra,* 335 F. Supp. 2d at 340; *Donovan v. Mazzola,* 716 F.2d at 1227.  In doing so, State Street satisfied its obligations to the Grace Plan participants.  ERISA does not require more.

Disregarding the professional, diligent process employed by State Street, Plaintiffs aim thinly-veiled hindsight attacks at the outcome of that process.  Plaintiffs focus almost exclusively on Duff & Phelps, arguing that its analysis painted an unduly gloomy picture of Grace's asbestos liabilities and the prospects for the Grace stock.  These criticisms raise no genuine issue material

-13-

to the adequacy of State Street's decision making process in this case.  As an initial matter, Plaintiffs do not challenge the qualifications or the engagement of State Street's advisors, including Duff & Phelps.  SOF ¶ 36.  Moreover, Plaintiffs' expert Harvey Rosen flatly *conceded* that the Duff & Phelps reports "provided a comprehensive picture of those factors affecting the common stock" SOF ¶ 90.  In light of these concessions, and given that no material facts as to State Street's deliberative process are in dispute, Plaintiffs seek nothing other than to have this Court re-weigh the factors relied upon by State Street in reaching its decision in order to second-guess, in hindsight, the outcome of that decision.

In any event, the specific criticisms leveled by Plaintiffs' experts cannot be supported on any reasonable reading of the Duff & Phelps analysis and the undisputed testimony of the witnesses who conducted and relied upon that analysis.  In one glaring example, Plaintiffs' experts faulted Duff & Phelps for allegedly "doubling" Grace's estimate of asbestos liabilities in arriving at its valuation for Grace stock.  When deposed, however, Plaintiffs' expert Harvey Rosen conceded that the Grace estimates, contained in strongly-caveated SEC filings, did not include any amount for Grace's potential ZAI litigation liability, a claim that, if successful, had the potential to wipe out Grace's equity value.  SOF ¶ 91.  Each criticism asserted by Plaintiffs' experts is similarly and conclusively refuted in the Declaration of Daniel Bayston, Managing Director of Duff & Phelps who led the Grace stock valuation effort, which was provided to Plaintiffs during discovery.  In that declaration, Mr. Bayston explained in detail the methodology used by Duff & Phelps to arrive at its equity valuation conclusions for Grace.   See e.g., SOF

¶¶ 54-55.[8]  Plaintiffs cannot avoid summary judgment merely by asserting that the facts are other than what the unrebutted evidence establishes.  "[T]he mere existence of some disputed facts does not require that a case go to trial," rather, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict."  *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,* 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Liberty Lobby,* 477 U.S. at 256).

**B.    Plaintiffs' "Collateral Attacks" On State Street's Investment Decision Are Contrary To Settled ERISA Law.**

Having no facts with which to condemn State Street's thorough analysis, Plaintiffs attack the investment decision on two collateral grounds, both of which can be rejected as a matter of settled ERISA law.

First, Plaintiffs posit, through their expert John Mulligan, a blanket exception to ERISA's general prudence obligation for certain types of company stock funds.  Specifically, Mr. Mulligan claims that the fiduciaries of an ERISA company stock fund are never (or perhaps almost never) authorized to terminate that investment option and sell the company stock when the following factors are present:  (i) the plan is a participant-directed 401(k) plan; (ii) the company stock is publicly-traded on a large exchange and is widely held; (iii) there are provisions in the plan that allow participants to freely allocate their funds and move their

---

[8] Plaintiffs deposed Mr. Bayston and were given a full and fair opportunity to solicit his testimony and cross examine him regarding Duff & Phelps' valuation analysis.  However, they studiously avoided asking him to explain that analysis, preferring instead to file "expert" reports that flatly mischaracterize and misconstrue the work that Duff & Phelps performed.  Those reports raise no genuine issue for trial in this case.

balances out of the company stock fund; and (iv) there are no indications that material information is being concealed from the market.  SOF ¶ 92.  Applying those factors to this case, Mr. Mulligan contends that State Street's determination that the Grace stock should be sold was improper "speculation" and inconsistent with the participants' "right" under the terms of the Grace Plan to allocate their 401(k) accounts among the investment options provided as they saw fit.  SOF ¶ 92.

Even setting aside the fact that the Plan expressly authorized State Street to sell the Grace stock (*see* footnote 4, *supra*), Plaintiffs' theory runs directly counter to ERISA, the Department of Labor's regulations and guidance, and decades of ERISA case law.  Plaintiffs have cited no case in which a court has sustained a claim of ERISA breach against a fiduciary who divested the company stock from a 401(k) plan in an arms-length transaction for fair market value, following the fiduciary's determination that the stock was an imprudent investment for the plan.  There certainly has been no such case in which, as here, the company in question was in Chapter 11 bankruptcy and facing massive liability claims with the potential to wipe out the value of the company's equity.  By contrast, and as typified by the companion *Evans* action that was filed in this Court,[9] there have been dozens of cases throughout the country brought by participants claiming that ERISA fiduciaries should be held liable for *failing to divest* retirement plans of company stock, including publicly-traded stock.[10]  The Department of Labor has filed *amicus*

---

[9] *Keri Evans, et al. v. John F. Akers, et al.*, No. 05-11602, consolidated as No. 04-11380-WGY, (D. Mass. filed Aug. 1, 2005) (challenging the prudence of the decision to retain the Plan's Grace stock investment prior to the time State Street voted to sell it) (Court File No. __).

[10] *See, e.g., LaLonde v. Textron, Inc.,* 369 F.3d 1 (1st Cir. 2004) (ESOP); *Graden v. Conexant Systems Inc.*, 2007 WL 2177170, No. 06-2337 (3d Cir. July 31, 2007) (401(k) plan); *DiFelice v. U.S. Airways, Inc.*, 2007 WL 219289 (4th Cir. August 01, 2007) (401(k) plan).

*curiae* briefs in many of those cases, to reiterate its position that fiduciaries have an ongoing obligation, when providing participants with a choice of investment options under individual account retirement plans, to ensure that each option meets ERISA's requirement of prudence.[11]

Plaintiffs' "per se" prudence exception would place fiduciaries in an impossible position with respect to ERISA company stock funds going through uncertain times: if they fail to sell the stock and it loses value, they could face personal liability for the loss under ERISA's prudence requirement, but if they decide to sell the stock and it later rises in value, under the Plaintiffs' proffered theory, they could face personal liability for having usurped the participants' investment decisions. Faced with this untenable dilemma, many employers would be forced to remove company stock investments from their retirement plans, undermining Congress' "strong policy and preference in favor of investment in employer stock." *Fink v. Nat'l Sav. & Trust Co.,* 772 F.2d 951, 956 (D.C. Cir. 1985) (internal quotation marks omitted).

Plaintiffs next contend that State Street should have considered the Grace Stock Fund in the context of the entire portfolio of investment options available in the Grace Plan. In other words, Plaintiffs contend, no matter how risky the Grace Stock Fund might have been when

---

[11] *See, e.g.,* DOL's briefs in *Agway Inc. Employees' 401 (k) Thrift Investment Plan, et al.,* 409 F.Supp.2d 136 (N.D.N.Y. 2004) (brief available at 2004 WL 3522250), at *5 ("[ERISA's requirements] do not permit fiduciaries to ignore grave risks to plan assets and abdicate their responsibilities to plan participants.") and *8 ("[P]lan fiduciaries are obligated to act prudently and solely in the interest of the participants and beneficiaries in deciding whether to purchase or retain employer securities despite language requiring the plan to purchase employer securities."); *See also* Advisory Opinion No. 98-04(A) ("[T]he Department emphasized that the act of designating investment alternatives in an ERISA section 404(c) plan is a fiduciary function to which the limitation on liability provided by section 404(c) is not applicable"); Letter from the Pension and Welfare Benefits Administration, U.S. Dept. of Labor to Douglas O. Kant, 1997 WL 1824017, *2 (Nov. 26, 1997) ("The responsible plan fiduciaries are also subject to ERISA's general fiduciary standards in initially choosing or continuing to designate investment alternatives offered by a 404(c) plan.").

considered in isolation, under Modern Portfolio Theory, as part of a well-diversified portfolio, the Grace stock was a prudent option under the Plan, and State Street was not permitted to sell it. In an opinion released just over two weeks ago, the United States Court of Appeals for the Fourth Circuit soundly rejected this theory, holding that, under ERISA, "the prudence of investments or classes of investments offered by a plan must be judged individually." *DiFelice v. U.S. Airways,* 2007 WL 219289 (citing *Langbecker v. Electronic Data Systems Corp.,* 476 F.3d 299, 308 n.18 (5th Cir. 2007) and citing *In re Unisys Sav. Plan Litig.,* 74 F.3d 420, 438-41 (3d Cir. 1996)). "That is, a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants.  Here the relevant 'portfolio' that must be prudent is *each* available Fund considered on its own, including the Company Fund, not the full menu of Plan funds." *Id.*  The Fourth Circuit reasoned that "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may *or may not* elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio." *Id.*   To adopt the alternative view, the court held, "would mean that any single-stock fund, in which that stock existed in a state short of certain cancellation without compensation, would be prudent if offered alongside other, diversified Funds. Any participant-driven 401(k) plan structured to comport with section 404(c) of ERISA would be prudent, then, so long as a fiduciary could argue that a participant could, and should, have further diversified his risk." *Id.* (citations omitted).  This result, the court found, "would be perverse in light of the Department of Labor's direction that selection of prudent plan *options* falls within the fiduciary duties of a plan administrator." *Id.*

-18-

The Department of Labor's prudence regulation provides further support for rejecting Plaintiffs' attack on State Street's prudence evaluation here. As Independent Investment Manager for the Grace Stock Fund (as opposed to the entire Grace Plan portfolio), State Street's mandate was to give "appropriate consideration to those facts and circumstances that, *given the scope of such fiduciary's investment duties,* the fiduciary knows or should know are relevant *to the particular investment or investment course of action involved*, including the role the investment plays in *that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties*...." 29 C.F.R. § 2550.404(b) (emphasis added). State Street discharged this mandate in strict accordance with ERISA, the Plan and the scope of its engagement.

### C.    State Street Is Also Entitled To Summary Judgment On Plaintiffs' Self-Dealing And Conflict Of Interest Claims.

Finally, Plaintiffs' claims against State Street for alleged "self-dealing" or conflict of interest must be dismissed. The undisputed evidence shows that State Street sold the Plan's Grace stock to unrelated, third party purchasers unaffiliated with State Street, both in open-market sales and in a negotiated sale with D.E. Shaw. There is *no evidence* of any relationship whatsoever between State Street's determination that Grace stock was no longer a prudent investment option for the Grace Plan, and a limited number of open-market purchases of small amounts of Grace stock by highly-diversified index funds having nothing to do with the Grace Plan. Notably, Plaintiffs concede that State Street possessed no non-public information about the Grace stock, and they do not dispute that it traded in an efficient market. SOF ¶ 93. Plaintiffs nowhere explain what type of "benefit" State Street could possibly have usurped by selling the stock, at or above fair market value, to unrelated purchasers. Nor do Plaintiffs explain how State

Street's other engagements as investment manager for funds unrelated to the Grace Plan could implicate any fiduciary duty under ERISA whatsoever. *See Beddall v. State Street, supra,* 137 F.3d at 14 (bank's activity judged against ERISA only to the extent that it functions as a fiduciary); *Alves v. Harvard Pilgrim Healthcare Inc.,* 204 F. Supp.d 198, 210 (D. Mass. 2002) ("[T]he mere fact that an entity is an ERISA fiduciary 'does not restrict it from pursuing reasonable business behavior'") (quoting *Vartanian v. Monsanto,* 131 F.3d 264, 268 (1st Cir. 1997)).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, State Street respectfully requests that summary judgment be granted in its favor on all claims against it in First Amended Complaint, Court File No. 138.

Dated:  August 17, 2007                    Respectfully submitted,

STATE STREET BANK AND TRUST COMPANY
By its counsel,


    /s/ Sean T. Carnathan
Sean T. Carnathan (BBO #636889)
(scarnathan@ocmlaw.net)
O'CONNOR, CARNATHAN, MACK LLC
8 New England Executive Park, Suite 310
Burlington, MA 01803
Telephone: (781) 359-9000
Facsimile: (781) 359-9001
-and-
Scott M. Flicker
(scottflicker@paulhastings.com)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

-20-