**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KERI EVANS, <br><br> Plaintiff, <br><br> v. <br><br> JOHN F. AKERS, *et al.* <br><br> Defendants. <br><br> ──────────────── <br><br> LAWRENCE W. BUNCH, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> W.R. GRACE & CO., *et al.* <br><br> Defendants. | Consolidated as: <br> Case No. 04-11380-WGY |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF STATE STREET BANK
AND TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, defendant State Street Bank and Trust Company ("State Street") submits the following Statement of Undisputed Facts in support of its Motion for Summary judgment:

*The Grace Plan and Provisions Governing*
*Appointment of an Independent Investment Manager*

| Undisputed Fact | Cite |
|---|---|
| 1. The Grace Plan,[1] originally established by Grace in 1976, amended in 1983 to allow participants to make salary deferrals as permitted under the Internal Revenue Code Section 401(k), and again amended in 1989 to provide an employee stock ownership plan ("ESOP") within the original Plan. | McGowan Ex. 1 at SSBT-002085 (authentication at McGowan Dep. at 16:16 – 17:14).[2] |
| 2. The Grace Plan's ESOP provision allowed for the investment in Grace common stock through a separate investment option, among over twenty other investment options or funds made available to participants, permitting participants, as of 1989, to invest their account assets directly in Grace common stock through the Grace Stock Fund. | McGowan Dep. at 27:10-20, 94:15-95:4 and McGowan Ex. 1 at SSBT-002085. |
| 3. Under the Plan, the Investment Committee is empowered to appoint an Independent Investment Manager "who shall have the authority and discretion to manage" the Grace Stock Fund. | McGowan Dep. at 18:12-19:13 and McGowan Ex. 2 at GR001789 (authentication at McGowan Dep. at 17:16 – 18:16). |

---

[1] All capitalized terms in this Statement are defined terms, having the same meaning as their use in the Memorandum of Law accompanying defendant State Street's Motion for Summary Judgment.

[2] All deposition excerpts and exhibits cited herein are true and accurate copies of the transcripts and exhibits. See Declaration of Scott M. Flicker, submitted in support of defendant State Street's Motion for Summary Judgment.

| | |
|---|---|
| 4.     The Plan further provides that, "[n]otwithstanding any other provision of the Plan to the contrary, during any such appointment, the Independent Investment Manager shall have" among its authorities and duties "the continuous authority and duty to determine the extent that the continued retention of shares of Grace Stock within the Grace Stock Fund is not consistent with the applicable provisions of [ERISA], and to take actions in this regard that it deems appropriate; including the authority to dispose of Grace Stock held with in the Grace Stock Fund and to close the Grace Stock Fund to participant trading[.]" | McGowan Ex. 2 at GR-001789, GR-001789-90. |

*Grace's Bankruptcy and the Grace Stock*

| Undisputed Fact | Cite |
|---|---|
| 5.   On April 2, 2001, Grace and most of its domestic subsidiaries filed voluntary petitions for reorganization in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the United States Bankruptcy Code. | PACER Docket No. 1, (Voluntary Ch. 11 Petition), *In re W.R. Grace & Co.*, No. 01-01139-JKF (Bankr. D. Del. filed Apr. 2, 2001). |
| 6.   Grace filed for bankruptcy in ". . . in response to a sharply increasing number of asbestos-related bodily injury claims." | (W.R. GRACE & CO Form 10-k (Year 2003) (hereinafter "2003 Form 10-k"), at Part I, p. 1, available at http://investor.grace.com). |
| 7.   In bankruptcy, Grace intended to address "all of its pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization" through the possible establishment of a trust. | (2003 Form 10-k, at Part I, pp. 2-3). |
| 8.   In Grace's 2003 Annual Report, Grace stated:<br><br>It is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted or cancelled under a plan of reorganization. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through the Bankruptcy Court proceedings. | (2003 Form 10-k, at Part I, p. 3). |

| | |
|---|---|
| 9.   As of April 2, 2001, "Grace was a defendant in 65,656 asbestos-related lawsuits:  seventeen involved claims for property damage, nine related to Grace's former Zonolite attic insulation ("ZAI") product (one of which has since been dismissed) and eight related to a number of former asbestos-containing products (two of which also involve ZAI). The remaining lawsuits involved 129,191 claims for bodily injury." | (2003 Form 10-k, at Part I, Item 3, p. 11). |
| 10.   On July 1, 1999, the closing price of a share of Grace stock was $19.19. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com |
| 11.   On April 2, 2001, the closing price of a share of Grace stock was $1.52. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com |
| 12.   On February 24, 2004, the closing price of a share of Grace stock was $3.07. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com. |
| 13.   On April 13, 2004, the closing price of a share of Grace stock was $2.78. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com |

*State Street's Engagement*

| Undisputed Fact | Cite |
|---|---|
| 14.   Effective December 15, 2003, State Street was engaged by Grace and the Grace Investment Committee as an investment manager for the Grace Stock Fund. | McGowan Dep. at 119:18-120:15 and McGowan Ex. 9 at GR001298 (authentication at McGowan Dep. at 119:18 – 120:3); Ewing Dep. at 72:23-73:10. |

| | |
|---|---|
| 15. The Engagement Agreement provided that, in acting as a fiduciary under ERISA "with respect to" the Company Stock Fund:<br><br>State Street [would] exercise independent discretionary judgment in the performance of its obligations hereunder in accordance with the fiduciary requirements set forth in Part 4 of Subtitle B of Title I of ERISA. | McGowan Ex. 9 at GR001299. |
| 16. The Investment Guidelines attached to the Engagement Agreement stated, in pertinent part:<br><br>The Plan provides that all assets held in the Grace Stock Fund (the "Company Stock Fund") under the Plan are to be invested in shares of Common Stock. In addition, each Plan participant having an interest in the Company Stock Fund is entitled to transfer all or any portion of such interest to one or more of the other investment funds available under the Plan at any time. As investment manager with respect to the Company Stock Fund, State Street is required by Section 404(a)(1)(D) of ERISA to act in accordance with such provisions of the Plan except to the extent that State Street determines that such provisions of the Plan are not consistent with the provisions of ERISA. | McGowan Ex. 9 at GR001308. |
| 17. The Investment Guidelines also provided:<br><br>State Street shall instruct the Trustee to sell Common Stock held in the Company Stock Fund if, and only if, State Street determines that the continued holding of such Common Stock is not consistent with the provisions of ERISA (within the meaning of Section 404(a)(1)(D) of ERISA) and, in any such event, only to the extent that such sales are permitted under applicable securities laws or any other applicable federal law. | McGowan Ex. 9 at GR001308. |

6

*State Street's Qualifications and Committee Structure*

| Undisputed Fact | Cite |
|---|---|
| 18. According to an April 2003 presentation made to Grace, State Street is the industry leader in providing independent fiduciary services with over $55 billion in company stock assets under its management. | McGowan Ex. 6 (authenticated at McGowan Dep. at 101:5-19). |
| 19. State Street has experience in providing investment advice to ERISA-governed company stock funds. | Mulligan Dep. at 6:12-22. |
| 20. State Street ranks among the top ten in the Nation in providing investment management advice to company stock funds under ERISA. | Mulligan Dep. at 6:23-7:2. |
| 21. State Street's Independent Fiduciary Group ("IFG") monitors and administers ERISA company stock funds under State Street's management. | Driscoll Dep. at 34:1-6; Ewing Dep. at 12:13-24; Johnson Dep. Vol. 1 at 39:10-40:4. |
| 22. The IFG is headed by Kelly Driscoll, who has over 20 years of experience providing independent fiduciary services for ERISA company stock funds. | Driscoll Dep. at 31:9-16, 32:8-16, 33:2-34:6. |
| 23. The IFG advises and reports to the State Street Fiduciary Committee, which consists of senior officers of the company with decades of experience in the field of investment management. | Johnson Dep. Vol. 1 at 33:21-34:17. |
| 24. The Fiduciary Committee meets on a regular basis to evaluate and make decisions as to those company stock investments recommended by the IFG for heightened oversight and specific action. | Driscoll Dep. at 67:3-68:4, 68:20-70:4. |
| 25. The Fiduciary Committee monitors and evaluates the performance of company stock funds under its management and the suitability of that stock as an investment for ERISA retirement plans. | Driscoll Dep. at 57:17-60:5. |

| | |
|---|---|
| 26. State Street will place a company stock fund into heightened monitoring status for a number of reasons, including when State Street detects unusual trading activity in the stock or learns of adverse financial developments affecting the company or the industry in which it does business. | Driscoll Dep. at 69:7-70:23. |
| 27. Information that a company might file for bankruptcy is also a factor that may cause State Street to place a company's stock on heightened monitoring status. | Driscoll Dep. at 70:18-23. |
| 28. When the IFG recommends that a particular company stock fund be placed on a heightened monitoring status, State Street often retains qualified outside consultants, including valuation experts and outside counsel, to advise the IFG and the Fiduciary Committee within the scope of State Street's engagement. | Driscoll Dep. at 64:2-65:4; Johnson Dep. Vol. 1 at 56:6-21. |
| 29. State Street's committee structure and procedures for the oversight of company stock fund investments are consistent with industry standards and ERISA's requirements. | Mulligan Dep. at 61:24-62:4. |
| 30. Because Grace was already in bankruptcy at the time State Street was engaged as Independent Investment Manager for the Grace Stock Fund, State Street placed that fund on heightened status from the outset. | Driscoll Dep. at 70:5-23. |
| 31. State Street retained an independent financial advisor, Duff & Phelps LLC, to review the fundamental and financial outlook for the Grace stock held by the Plan. | Driscoll Dep. at 87:2-24; Ewing Dep. at 76:20-24; Bayston Ex. 2 at SSBT-001825 (authentication at Bayston Dep. at 22:17-23:3; 23:15-18). Bayston Decl. at ¶ 2. |
| 32. Duff & Phelps has over 20 years of experience in the investment banking and financial advisory industry. | Driscoll Dep. at 88:9-13. |
| 33. State Street also retained the law firm of Goodwin Procter LLP to advise the Fiduciary Committee on three areas of relevance to the Grace Stock Fund engagement: bankruptcy, asbestos litigation liabilities, and ERISA. | Driscoll Ex. 1 at SSBT-003234 (authentication at Driscoll Dep. at 92:22 – 93:4). |

| | |
|---|---|
| 34. Goodwin Procter assigned attorneys with experience in each of these areas to the engagement. | Schaff Dep. Vol. 2 at 206:3-16. |
| 35. State Street had a prior working relationship with Duff & Phelps and Goodwin Procter. | Driscoll Dep. at 89:12-18, 119:24-120:20. |
| 36. Plaintiffs do not challenge State Street's engagement of Duff & Phelps. | Mulligan Dep. at 85:22-86:3. |
| 37. Goodwin Proctor was qualified to perform its engagement for State Street regarding the Grace Stock Fund. | Schaff Dep. Vol. 2 at 206:3-11. |

***State Street's Deliberative Process and Decision to Sell the Grace Stock***

| | |
|---|---|
| 38. Prior to the effective date of State Street's engagement, the IFG, along with Duff & Phelps and Goodwin Procter, conducted due diligence on Grace and the Grace stock, which the IFG summarized in presentations to the Fiduciary Committee. | Ewing Dep. at 38:10-40:17, 42:5-44:24; Johnson Ex. 4 (authenticated at Johnson Dep. Vol. 1 at 90:23-93:5) and Johnson Ex. 5 (authenticated at Johnson Dep. Vol. 1 at 100:15-24). |
| 39. State Street and Goodwin Procter reviewed the Plan documents and discussed the scope of the engagement with Grace's internal ERISA counsel. | Ewing Dep. at 39:9-40:17, 43:9-20. |
| 40. State Street and its advisors met with senior management of Grace to discuss public information regarding the bankruptcy case and the asbestos-related litigation facing Grace. | Ewing Dep. at 43:9-22; Mulligan Dep. at 157:21-158:9; Johnson Ex. 5; Ewing Ex. 7 at SSBT-003054 (authentication at Ewing Dep. at 97:5 -22). |
| 41. Goodwin Procter memorialized the information gleaned from these meetings, as well as other information and advice derived from the firm's independent research, in several legal memoranda to State Street. | Driscoll Ex. 1 at SSBT-003234-003238 and Driscoll Ex. 2 at SSBT-003054-003057 (authentication at Driscoll Dep. at 96:14-23). |

| | |
|---|---|
| 42. State Street's retention was subject to the approval of the Bankruptcy Court. | Ewing Dep. at 47:4-9. |
| 43. In the course of State Street's four-month engagement, the State Street Fiduciary Committee met four times: December 11, 2003, January 29, 2004, February 23, 2004, and April 7, 2004. | Driscoll Dep. at 110:23-111:8, 131:2-10 and 143:12-144:2, 176:23-177:12; Johnson Exs. 5, 10 (authentication at Johnnson Dep. Vol. 1 at 123:24 – 125:2), 11 (authentication at Johnnson Dep. Vol. 1 at 123:24 – 125:2), 13 (authentication at Johnnson Dep. Vol. 2 at 9:28 – 10:23) and 19 (authentication at Johnnson Dep. Vol. 2 at 67:15 - 18). |
| 44. During the Fiduciary Committee's meetings, the Committee received information and analysis to assist the IFG, Duff & Phelps, and Goodwin Procter in making determinations regarding the scope of State Street's engagement, including several written and oral presentations by the IFG, Goodwin Procter, and Duff & Phelps. | Johnson Exs. 4, 5, 10, 11, 12 ((authentication at Johnnson Dep. Vol. 2 at 138:12 - 23), 13, 18 (authentication at Johnnson Dep. Vol. 2 at 57:4 - 12) and19; Bayston Exs. 4 (authenticated at Bayston Dep. at 68:9-17), 7 (authenticated at Bayston Dep. at 101:6 - 15), 9 (authenticated at Bayston Dep. at 120:2-6), 10 (authenticated at Bayston Dep. at 124:12-17), 11 (authenticated at Bayston Dep. at 129:6-12), 12 (authenticated at Bayston Dep. at 129:19-24), 13 (authenticated at Bayston Dep. at 132:12 – 133:23) and 14 (authenticated at Bayston Dep. at 141:2 - 21); Schaff Dep. Vol. 2 at 249:13-251:25. |

| | |
|---|---|
| 45. The IFG's reports to the Fiduciary Committee analyzed numerous factors; including: the Grace bankruptcy; the financial performance and outlook of the company and its industry sector; factors affecting the Grace Stock's value; Grace's unliquidated, contingent asbestos liabilities; insurance coverage for those liabilities; SEC requirements and restrictions pertaining to sale of the company stock; communications made to the Plan participants; the prospect of having State Street appoint a representative to the equity holders' committee in the Grace bankruptcy; and the risks generally to the Plan of both holding and selling the Grace stock. | Johnson Dep. Vol. I at 90:23-91:21; Johnson Exs. 4, 5, 10, 11, 12, 13, 18 and 19. |
| 46. The IFG also met separately with and received information from the outside advisors, Grace personnel and the trustee and administrators of the Grace Plan during State Street's engagement. | Driscoll Dep. at 123:7-15; Ewing Dep. at 138:16-17; Johnson Exs. 4, 5, 10, 11, 12, 13, 18 and 19; Bayston Ex. 4, 7 and 9-14. |
| 47. During State Street's engagement, the IFG, Duff & Phelps and Goodwin Procter identified factors that could affect the size of Grace's contingent asbestos liabilities: the asbestos-related bodily injury claims currently filed and to be filed against Grace; the outcome of the Zonolite attic insulation class action litigation pending against Grace; and legislation pending in Congress (the Fairness in Asbestos Injury Resolution Act of 2003 (the "FAIR Act"), which, if it had passed, could have had the effect of reducing or capping Grace's liability for asbestos bodily injury claims. | Bayston Dep. at 76:17-78:6; Johnson Ex. 10 at SSBT-002744-002745 and Johnson Ex. 11. at SSBT-00675-00676; Bayston Ex. 7 at 00205-00206; Bayston Decl. at ¶ 4. |
| 48. On December 11, 2003, the State Street Fiduciary Committee held its first meeting regarding the Grace engagement. | Johnson Ex. 5. |

| | |
|---|---|
| 49.  At the December 11th meeting, which was held just before State Street's engagement became effective, the Fiduciary Committee received presentations from the IFG, Duff & Phelps and Goodwin Procter, discussed Grace's asbestos liability exposure and its potential impact on the Grace stock, and determined not to take action regarding the Grace stock pending further monitoring, analysis and evaluation. | Johnson Exs. 3 (authenticated at Johnson Dep. Vol. 1 at 85:14 – 23), 4 and 5. |
| 50.  The Committee discussed the scope of State Street's engagement at the December 11th meeting. | Johnson Ex. 3 and 5. |
| 51.  Duff & Phelps compiled fundamental financial information about Grace, the specialty chemicals industry and other companies facing significant asbestos liabilities and prepared a background report. | Johnson Dep. Vol. 1 at 84:19-85:5; Johnson Ex. 5; Bayston Dep. at 76:17-78:6; Bayston Ex. 4. |
| 52.  On January 29, 2004, State Street's Fiduciary Committee held its second meeting regarding the Grace engagement. | Johnson Exs. 10-11. |
| 53.  At the January 29th meeting, Duff & Phelps presented an 88-page financial valuation and analysis of Grace that assigned value ranges and percentage probabilities to all components of Grace's contingent asbestos-related liabilities, including a determination of "a reasonable pricing range for the [Grace] stock given the factors we believe should impact the value to equity investors," as well at analysis of each of the factors utilized in reaching its equity value conclusion for Grace | Johnson Exs. 10-11; Bayston Dep. at 101:6-15, 102:18-105:3; Bayston Ex. 7 at SSBT-000198; Bayston Decl. at ¶ 2. |
| 54.  To arrive at an equity valuation conclusion for Grace, Duff & Phelps began by ascertaining a "normalized enterprise value" for Grace's core operating business, taking into account recent financial performance data for Grace and comparable companies. | Bayston Ex. 7 at SSBT-000198; Bayston Decl. at ¶ 15. |

| | |
|---|---|
| 55. Duff & Phelps then added to the enterprise value the estimated value of Grace's nonoperating assets and subtracted the value of Grace's nonoperating liabilities, including an estimate of Grace's outstanding asbestos liabilities. | Bayston Ex. 7 at SSBT-000198; Bayston Decl. at ¶ 15. |
| 56. In addition to discussing "the risks involved in both holding and selling the Grace stock," the Committee also discussed at the January 29th meeting certain Securities law issues limiting how much stock they would be able to sell at one time, and the permissible timing of these possible sales. | Johnson Ex. 10 at SSBT-002746 and Johnson Ex. 11 at SSBT-000676. |
| 57. The Committee also discussed whether State Street should seek to appoint a representative to the Grace Bankruptcy Equity Committee at the January 29th meeting and decided they would consider doing so in the future if it was deemed an appropriate course of action:<br><br>The issue of whether or not someone should sit on the Equity Committee to represent the block of Grace Stock held by the plan was also discussed. D. Glosband stated that, at this time, he could see no added value since State Street has access currently to all public information. The Committee was of the view that it would not be opposed, in principle, to having someone sit on the Equity Committee if it was deemed appropriate in the future. It was noted, however, that in order to preserve State Street's ability to sell the stock, such person would be required to [be] separated entirely . . . and would not be allowed to participate in any other aspect of the Fiduciary Committee process or decision-making. | Johnson Ex. 10 at SSBT-002746 and Johnson Ex. 11 at SSBT-000676; Driscoll Dep. at 138:19-140:4. |
| 58. At the January 29, 2004 meeting of the Fiduciary Committee, the IFG recommended to the Fiduciary Committee that it vote to begin reducing the Grace Stock Fund's holdings of Grace stock. | Johnson Ex. 13. |
| 59. The Fiduciary Committee also asked the IFG, after the January 29th meeting, to provide additional information supporting its sale recommendation and on Grace stock held in other investment funds managed by State Street. | Johnson Dep. Vol. 1 at 136:16-137:5; Johnson Exs. 10, 11 and 12. |

| | |
|---|---|
| 60.  On February 23, 2004, the Fiduciary Committee held its third meeting regarding the Grace Stock Fund engagement, with Duff & Phelps and Goodwin Procter in attendance. | Johnson Ex. 13. |
| 61.  At that February 23, 2004, the IFG provided an overview of the due diligence and analysis conducted to date:<br><br>Unresolved asbestos litigation and potential asbestos legislation will affect the determination of whether Grace stock remains a prudent investment. The uncertainty and consequence of unfavorable events occurring as a result of litigation probabilities or of legislation not being enacted timely or at all, has resulted in the IFG recommendation that the Committee **override** Plan documentation and begin to reduce the holdings of Grace stock.<br><br>The recommendation to commence a selling program is based upon the IFG's determination that the continued holding by the Trust of all of its shares of Grace stock would be imprudent and therefore inconsistent with the requirements of Section 404(a)(1)(B) of ERISA. Such determination reflects the input of [Duff & Phelps] and Goodwin [Procter], and has been made after careful consideration of all of the facts and circumstances determined to be relevant to the IFG …. | Johnson Ex. 12 at 002856-002857 (emphasis in original). |
| 62.  At the February 23rd meeting, the IFG considered Duff & Phelps' equity value conclusion for Grace, valuing the shares at a midpoint of $1.88 per share, within a range of $0.73 to $3.02 per share, as of February 17, 2004. | Bayston Ex. 7; Bayston Decl. at ¶ 15. |
| 63.  On February 17, 2004, the closing price on the New York Stock Exchange for Grace Stock was $3.51. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com. |

| | |
|---|---|
| 64. At the February 23, 2004 meeting of the Fiduciary Committee, Ms. Driscoll, on behalf of the IFG, reported that the shares of Grace stock managed by State Street outside the Grace Stock Fund were held in diversified "index" funds unrelated to the Grace Plan. | Johnson Dep. Vol. 1 at 64:6-23 and Johnson Ex. 13 at SSBT-000713-000714. |
| 65. At the February 23, 2004 meeting of the Fiduciary Committee, the Committee concluded that State Street's management of Grace stock in index funds was not relevant to its determination whether the Grace stock was a prudent investment for the Grace Plan because "holding the W. R. Grace stock as part of a diversified fund is fundamentally different than holding the same stock as a very large concentrated holding in the W. R. Grace retirement plan" and "as a general matter, a diversified fund's continued investment in W. R. Grace stock could be a prudent investment even though a fund invested exclusively in a very large block of that stock may not be prudent." | Johnson Ex. 13 at SSBT-000713. |
| 66. On February 24, 2004 the Fiduciary Committee unanimously approved the IFG's recommendation to begin selling the Grace stock, provided that all such sales were made at a price no lower than the midpoint of Duff & Phelp's valuation range (then at $1.88 per share). | Driscoll Dep. at 143:12-144:22; Ewing Dep. at 145:16-146:3; Johnson Dep. Vol. 1 at 150:4-151:3 and Johnson Ex. 14 at SSBT-000853 (authenticated at Johnson Dep. Vol. 2 at 10:3 – 23). |
| 67. After February 23, 2004, State Street monitored the market price for Grace stock and received regular updates from Duff & Phelps as to its equity valuation conclusion for Grace. | Ewing Dep. at 140:13-19; Johnson Ex. 16 at SSBT-00652 (authenticated at Johnson Dep. Vol. 2 at 44:1 - 7); Bayston Dep. at 129:19-24; Bayston Exs. 9-14. |
| 68. On February 24, 2004, the New York Stock Exchange closing price for Grace stock was $3.07. | "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com . |

15

| | |
|---|---|
| 69. Between February 25, 2004 and April 6, 2004, State Street sold approximately 900,000 shares of Grace Stock from the Grace Stock Fund (just about 13% of the Fund's total holdings) in open-market transactions at the then-prevailing New York Stock Exchange trading prices, ranging from $2.86 to $3.09 per share, and all sales were made to third parties unaffiliated with State Street and conducted above the mid-point of Duff & Phelps' then-current equity valuation range for Grace Stock. | Johnson Dep. Vol. 2 at 41:2-18; Johnson Exs. 16 at SSBT-000652 and 18; Driscoll Ex. 7 (authenticated at Driscoll Dep. at 182:18 – 183:13); Bayston Exs. 9-14. |
| 70. As of March 31, 2004, the mid-point of Duff & Phelps' equity valuation for Grace stock was $1.36 per share. | Johnson Ex. 16.; Driscoll Dep. at 173:9-174:2; Ewing Dep. at 165:1-4; Bayston Ex. 14 at SSBT-002918. |
| 71. On April 2, 2004, State Street received an unsolicited contact from Lehman Brothers, acting on behalf of a then-unidentified party interested in purchasing the remaining block of Grace Stock held by the Grace Stock Fund (approximately 7.8 million shares). | Ewing Dep. 154:10-16; Driscoll Dep. at 167:16-169:8; Johnson Ex. 19. |
| 72. State Street subsequently learned that the interested party was a hedge fund established by D.E. Shaw & Co. | Driscoll Dep. at 167:19-21; Johnson Ex. 17 (authenticated at Johnson Dep. Vol. 2 at 52:5 - 13). |
| 73. State Street has no relationship with D.E. Shaw, either as an affiliate or client. | Mulligan Dep. at 138:24-139:6; Johnson Dep. Vol. 2 at 48:3-20. |
| 74. The price offered by D.E. Shaw was at $3.50 per share, representing an 8% premium over the April 1 closing price of $3.24 per share. | Mulligan 136:5-9; Ewing Dep. at 159:8-20; Driscoll Ex. 9 at SSBT-003254 (authentication at Driscoll Dep. at 185:4-9). |
| 75. On April 6, 2004, members of the IFG met with Duff & Phelps and Goodwin Procter to discuss the D.E. Shaw offer and other recent developments regarding the Grace stock. | Johnson Exs. 18 and 19; Ewing Dep. at 165:1-15; Bayston Decl. at ¶ 21. |

| | |
|---|---|
| 76.  Ms. Driscoll testified that, at the meeting, "we talked about ... the new developments and if there was anything particularly other than what our lawyers had already reported…." | Driscoll Dep. at 175:24-176:8; Johnson Ex. 18. |
| 77.  Ms. Driscoll further testified that, given the April 6, 2004 discussion with Duff & Phelps and Goodwin Procter, "there would not have been a need for [Mr. Bayston] to re-evaluate" the Duff & Phelps equity valuation for Grace. | Driscoll Dep. at 176:14-19. |
| 78.  On April 7, 2004, the Fiduciary Committee met for the fourth and final time regarding the Grace engagement. | Johnson Ex. 19. |
| 79.  The minutes from the April 7, 2004 meeting of the Fiduciary Committee accurately reflect the events and discussion that occurred. | Driscoll Dep. at 176:23-177:12; Ewing Dep. at 169:12-24. |
| 80.  The primary focus of the April 7, 2004 Fiduciary Committee meeting was the D.E. Shaw offer, which had been lowered by 7% to $3.25 per share. | Driscoll Dep. at 181:8-21; Johnson Exs. 17 and 19 at SSBT-000711. |
| 81.  Goodwin Procter reviewed for the Committee both the status of the FAIR Act legislation and Grace's exposure to asbestos liabilities at the April 7th meeting. | Johnson Ex. 19. |
| 82.  At the April 7th meeting, Ms. Driscoll reiterated the bases for the Committee's original determination that the Grace stock was an imprudent investment: the bankruptcy status of the company, the uncertainty that equity holders would receive value for the stock and outstanding asbestos litigation. | Johnson Exs. 18 and 19. |
| 83.  The Committee also discussed the possibility of D. E. Shaw possessing additional information regarding the value of the Grace stock and its possible motivations for purchasing the Grace stock. | Driscoll Dep. at 170:9-173:8; Ewing Dep. at 165:1-15, 168:21-169:2; Johnson Ex. 19. |
| 84.  The Committee discussed whether it would be in the interest of the participants and beneficiaries to sell the remaining shares at above market value. | Driscoll Dep. at 181:8-21; Johnson Ex. 19 at SSBT-000711. |

| | |
|---|---|
| 85.   The Fiduciary Committee concluded at the April 7th meeting that the stock remained an imprudent investment, unanimously voting to sell the remaining shares to D.E. Shaw for not less than $3.50 per share, provided that the Trust incur no commission expense. | Driscoll Dep. at 180:3-181:21, Johnson Ex. 19 at SSBT-000710-000711. |
| 86.   On April 12, 2004, State Street sold 6,254,117,000 shares of Grace stock to D.E. Shaw (over 6.2 million shares) was consummated on April 12, 2004 for the agreed-upon price of $3.50 per share, which was 18% higher than the New York Stock Exchange closing price on that day of $2.96. | Driscoll Ex. 9; McGowan Ex. 17 (authentication at McGowan Dep. at 162:6-15); "[Grace] Stock Historical Lookup," *available at* http://investor.grace.com. |
| 87.   A few remaining Grace shares (just over 18,000) were transferred to D.E. Shaw for $3.50 per share on April 19, 2004, above the New York Stock Exchange closing price on that date of $3.03. | Driscoll Ex. 9. |
| 88.   Participant accounts whose holdings were transferred out of the Grace Stock Fund as a result of these sales were credited with an equivalent value of units in the Plan's Fixed Income Option, leaving them free to reallocate those funds to any of the other available investment options within the Plan. | McGowan Dep. at 142:9-13, 143:2-21; Grenadier Dep. at 132:18-133:1-2. |
| 89.   A participant who did nothing and merely left his or her account invested in the Fixed Income Option from March/April 2004 to June 2007 would have earned a substantial positive return during this period. | Grenadier Dep. at 198: 11-17. |
| 90.   Plaintiffs' expert Harvey Rosen stated that the Duff & Phelps reports "provided a comprehensive picture of those factors affecting the common stock." | Rosen Dep. at 112:10-22. |
| 91.   Plaintiffs' expert Harvey Rosen testified that the Grace estimates of its asbestos liabilities, contained in SEC filings, did not include any amount for Grace's potential ZAI litigation liability. | Rosen Dep. at 77:2-23. |

| | |
|---|---|
| 92. Plaintiffs' expert John Mulligan claims that the fiduciaries of an ERISA company stock fund are never (or perhaps almost never) authorized to terminate that investment option and sell the company stock when the following factors are present: (i) the plan is a participant-directed 401(k) plan; (ii) the company stock is publicly-traded on a large exchange and is widely held; (iii) there are provisions in the plan that allow participants to freely allocate their funds and move their balances out of the company stock fund; and (iv) there are no indications that material information is being concealed from the market. | Mulligan Dep. at 66:15-67:9, 71:19-72:20, 78:25-79:11, 183:18-184:12. |
| 93. Plaintiffs do not dispute that State Street possessed no non-public information about the Grace stock, which traded in an efficient market. | Rosen Dep. at 123:18-124:15. |

Dated:  August 17, 2007

Respectfully submitted,

STATE STREET BANK AND TRUST COMPANY

By its counsel,

  /s/ Sean T. Carnathan
Sean T. Carnathan (BBO #636889)
(scarnathan@ocmlaw.net)
O'CONNOR, CARNATHAN, MACK LLC
8 New England Executive Park, Suite 310
Burlington, MA 01803
Telephone: (781) 359-9000
Facsimile: (781) 359-9001

-and-

Scott M. Flicker
(scottflicker@paulhastings.com)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705