IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KERI EVANS,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JOHN F. AKERS, *et al.*<br><br>　　　　　Defendants.<br><br>LAWRENCE W. BUNCH, *et al.*<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>W.R. GRACE & CO., *et al.*<br><br>　　　　　Defendants. | Consolidated as:<br>Case No. 04-11380-WGY |

## DECLARATION OF DANIEL D. BAYSTON

I, Daniel D. Bayston, declare:

1. I am employed by Duff & Phelps, LLC ("Duff & Phelps"). My position is Managing Director. I am over the age of eighteen, and if called as a witness, would and could competently testify as follows:

2. Duff & Phelps was engaged, effective November 24, 2003, by and among (i) State Street Bank and Trust Company ("State Street"), as Investment Manager for the W. R. Grace & Co. Retirement Plan (the "Plan"); (ii) the Investment and Benefits Committee of W. R. Grace & Co. (the "Committee"); and (iii) W. R. Grace & Co. ("Grace" or the "Company"), to

provide independent financial advisory services to State Street with respect to the shares of Grace common stock ("Grace Stock") that were at that time held on behalf of the Plan. In that role, Duff & Phelps reviewed the fundamental and financial outlook for Grace and developed a Financial and Valuation Analysis, including an equity value range for the Company by which Duff & Phelps provided its opinion to State Street on the appropriate equity value per share of the Grace Stock. I played the lead role in this engagement for Duff & Phelps. A true and correct copy of the Financial and Valuation Analysis of W. R. Grace & Co. prepared by Duff & Phelps, dated as of March 19, 2004 (the "March 19, 2004 Valuation Report"), is attached hereto as Exhibit 1. (An initial version of Duff & Phelps' financial and valuation analysis report was provided to State Street on January 29, 2004, and it was supplemented several times. The most recent report (excluding subsequent valuation updates) was provided on March 19, 2004.)

3. A significant factor in establishing an appropriate equity value per share of the Grace Stock was estimating the size of the future, contingent asbestos liabilities resulting from both pending and potential litigation against Grace, which had filed for bankruptcy in large part due to the unknown and unknowable amount of those liabilities facing the Company.

4. In late 2003 and early 2004, working with attorneys experienced in bankruptcy and asbestos liability issues from the law firm of Goodwin Procter, which had been retained by State Street, Duff & Phelps developed a model to analyze and estimate a present value for these contingent liabilities. This model evaluated three factors that State Street, Goodwin Procter and Duff & Phelps collectively determined were pertinent to Grace's future, contingent liabilities from asbestos litigation:

(a) A valuation of the contingent liability Grace faced for pending and future asbestos bodily injury claims ("Bodily Injury Claims");

(b) The estimated financial implications of the Fairness in Asbestos Injury Resolution ("FAIR") Act, a piece of proposed federal legislation that, if passed, might have limited certain types of asbestos liabilities; and

(c) A valuation of the contingent liability Grace faced for a collection of class actions pertaining to a Grace product called Zonolite Attic Insulation (the "ZAI Claims").

### Analysis of Liability for the Bodily Injury Claims

5. At the time we undertook this analysis, Grace had reserved $964.6 million as "asbestos-related liability subject to comprise." W. R. Grace & Co., Form 10-Q, for the period ending September 30, 2003 (November 10, 2003) ("Grace 10Q for Sept. 30, 2003") at I-13, attached hereto as Exhibit 2. In that filing, Grace noted that this figure was based on pre-filing estimates and that, aside from claims administration and allowable defense costs,

> "[o]ther adjustments to the recorded liability will be based on developments in the [bankruptcy]. Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, or its ultimate plan of reorganization." *Id.*, Exhibit 2.

6. Grace further noted that that, due to the bankruptcy filing and "the uncertainties of asbestos-related litigation," Grace's actual liability for asbestos bodily injury claims "could differ materially from the recorded liability." *Id.*, Exhibit 2.

7. To arrive at an estimated valuation of Grace's contingent liability for Bodily Injury Claims, we used the following inputs: (a) <u>Total Bodily Injury Claims to be Resolved</u>. Grace disclosed that it had 130,000 claims pending as of its bankruptcy filing date and had settled 194,000 claims prior to bankruptcy, for a total of 324,000 claims experienced as of the date of the estimate. *See* March 19, 2004 Valuation Report, Exhibit 1, at 32. A report from the Rand Institute issued at the time estimated that, at best, half of all asbestos bodily injury claims have come forward. *Id.*, Exhibit 1, at 32, n.1. Accordingly, in addition to the 130,000 claims then pending against Grace, we assumed based on the Rand Institute estimate that another 324,000 claims would be filed against Grace, for a total of 454,000 claims. *Id.*, Exhibit 1. (b) <u>Average Liability per Claim</u>. We used Grace's average disposition cost per case of $4000. This yielded a total maximum liability for Bodily Injury Claims of $1.816 billion, against which we applied a probability analysis as described below. *Id.*, Exhibit 1 at 32.

**Analysis of Liability in the Event of Passage of the Proposed FAIR Act**

8. The version of the FAIR Act then being considered by the Senate Judiciary Committee would establish a trust fund to compensate asbestos claimants, funded in part by insurers and companies with asbestos liability. Next action on the legislation was expected in the Spring of 2004. March 19, 2004 Valuation Report, Exhibit 1, at 10. While the Senate bill was supported by industry and the insurance companies, there was considerable opposition from organized labor, among others. *Id.*, Exhibit 1, at 11. If legislation of this type were enacted, claimants would no longer be permitted to recover damages from the companies and their insurers. We thus assumed that, if the FAIR Act passed, Grace's total obligation for Bodily Injury Claims would be capped at the amount Grace would be required to contribute to the trust fund. We calculated Grace's contribution obligations over 27 years under the most

recent detailed version of the proposed legislation then available (from July 2003). The present value of this total was $229.3 million. *Id.*, Exhibit 1, at 12. To be conservative, because the actual contribution formula was not known, we increased this estimate to $445 million as the maximum liability that Grace would face for Bodily Injury Claims if the FAIR Act passed. *Id.*, Exhibit 1, at 35, n.2. We then subjected this calculation to a probability analysis as described below.

### Analysis of Liability for the ZAI Claims

9. According to Grace's securities filings, the Company was a defendant in class action lawsuits filed on behalf of owners of homes containing ZAI seeking damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs asserted that ZAI is installed in millions of homes throughout the United States, and that the cost of removal could be several thousand dollars per home. Grace asserted that ZAI was safe and posed no health hazard. Accordingly, Grace did not include any reserves on its accounting statements for potential ZAI liability, pending a "science trial" to determine if ZAI contained asbestos at levels that could pose a threat. *See* Grace 10Q for Sept. 30, 2003, Exhibit 2, at I-13. A negative finding for Grace in the science trial would likely mean that the Company was liable for removing ZAI from affected homes. No date had been set for the science trial, expected in 2004, although pretrial hearings were scheduled for November 2003, and then postponed. *See,* March 19, 2004 Valuation Report, Exhibit 1, at 3.

10. To determine the liability Grace would face if required to remove ZAI from affected homes, we examined three estimates. Grace estimated that 1,000,000 homes contained ZAI and that the cost to remediate each was $3,000, for a total of $3 billion. Plaintiffs

estimated 4,000,000 homes and remediation costs of $10,000 each, for a total of $40 billion. The Environmental Protection Agency estimated 15,000,000 homes at a cost of $10,000 each, for a total of $150 billion. March 19, 2004 Valuation Report, Exhibit 1, at 34. It is notable that even Grace's own estimate of $3 billion – the lowest of the three – exceeded the assets of the Company available to satisfy claims, which were about $2.9 billion. We thus used $2.9 billion as the maximum potential liability faced by the Company from the ZAI claims, and subjected this amount to a probability analysis, described below. *Id.*, Exhibit 1, at 34, n. 4.

**Probability Analysis**

11. At the time of our valuation work, Grace's liabilities for Bodily Injury Claims and ZAI Claims were subject to at least two contingencies, the outcomes of which would not be known for some time: (a) whether the FAIR Act would pass (which would have the effect of limiting Grace's maximum liability for the Bodily Injury Claims) and (b) whether Grace would win the ZAI science trial (which could essentially eliminate any requirement that the Company spend billions in remediation costs). Working with State Street and Goodwin Procter, we developed the following probabilities to account for these contingencies. First, we assumed that the likelihood the FAIR Act would eventually pass was 50% in favor and 50% against. (Note that applying this probability to the maximum liability estimate for Grace's Bodily Injury Claims yielded an estimate of contingent liability for such claims of about $908 million, in the range of the Company's own estimate of $964 million at the time.) Second, we assumed that Grace had a 60% likelihood of prevailing in a ZAI science trial. March 19, 2004 Valuation Report, Exhibit 1, at 33.

12. These assumptions yielded four probability scenarios that we applied to the maximum liability estimates (*Id.*, Exhibit 1, at 35):

(a) a 20% probability both that Grace would lose the ZAI science trial and that the FAIR Act would not pass (40% times 50%), an outcome that would yield liability in excess of Grace's total available assets. Thus, this outcome would result in a total liability exposure of $2.908 billion (the total assets of the Company available to satisfy it) and in an implied equity value per share of $0.

(b) a 30% probability that Grace would win the ZAI science trial, but that the FAIR Act would not pass (60% times 50%), an outcome that would yield liability of $1.866 billion (the maximum value of Grace's liability for the Bodily Injury Claims, plus $50 million in litigation costs to fully resolve the ZAI claims.

(c) a 20% probability that Grace would lose the ZAI science trial, but that the FAIR Act would pass (40% times 50%), an outcome that would yield liability in excess of Grace's total available assets. Thus, this outcome would also result in a total liability exposure of $2.908 billion (the total assets available to satisfy it) and would also result in an implied equity value per share of $0.

(d) a 30% probability both that Grace would win the ZAI science trial and that the FAIR Act would pass (60% times 50%). This outcome would yield total liability of $495 million, consisting of the $445 million conservatively calculated as the present value of Grace's FAIR Act contribution and $50 million in litigation costs to resolve the ZAI claims.

13. Adding together the probabilities and weighted liabilities for the four possible outcomes yielded a total value of Grace's contingent exposure for asbestos liability of $1.87 billion. This calculation was derived as follows:

(a) 20% of $2.908 billion for scenario one is $581.6 million;

(b) 30% of $1.866 billion for scenario two is $559.8 million;

(c) 20% of $2.908 billion for scenario three is $581.6 million;

(d) 30% of $495 million for scenario four is $148.4 million; and

(e) The sum of all four probabilities (for a total of 100%) is $1,871.4 billion. That is the figure, rounded to $1.9 billion, Duff & Phelps used in our equity valuation summary for Grace. *See* March 19, 2004 Valuation Report, Exhibit 1, at 30.

**Available Insurance Proceeds**

14. In our equity valuation summary, we included among Grace's assets the expected proceeds available from the Company's insurers to satisfy any asbestos liability. In its securities filings, Grace listed available insurance proceeds as $272 million. In discussions with Company officers, Goodwin Procter confirmed that the $272 million figure used by Grace assumed a settlement with the Company's insurers to pay approximately 30% of any asbestos liability imposed on Grace. Accordingly, we estimated available insurance proceeds at $570 million (30% of $1.9 billion). *See* March 19, 2004 Valuation Report, Exhibit 1, at 30, 32.

**Duff & Phelps' Valuation Analysis**

15. To derive a valuation for Grace (and the Grace Stock), we started with three ranges (low, mid and high) for the value Grace's core operations, derived using standard techniques, including examining Grace's financial performance (which reflected improvement at the time compared to prior quarters) and the performance of comparable companies. We then added the value of Grace's nonoperating assets (including cash, the proceeds from a claim settlement, and an amount representing Grace's available asbestos insurance proceeds described above) and subtracted Grace's nonoperating liabilities (including the $1.9 billion amount calculated to represent Grace's continent liability for asbestos claims described above). This yielded a total value for Grace's equity, as of March 19, 2004, ranging from $4 million (low) to $79 million (midpoint) to $154 million (high). When divided by the 65.61 million common shares of Grace Stock then outstanding, this yielded an equity value per share of between $0.06 (low) to $1.20 (midpoint) to $2.34 (high). *See* March 19, 2004 Valuation Report, Exhibit 1, at 30. (As of February 17, 2004, we valued the equity of Grace at a midpoint of $1.88 per share, within a range of $0.73 to $3.02 per share. *See* Equity Valuation Summary as of Feb. 17, 2004, attached as Exhibit 3 hereto.)

**Comments on Plaintiffs' Expert Reports**

16. I have reviewed the expert reports submitted by the "Bunch" plaintiffs in the above-captioned litigation and have the following comments.

17. As the foregoing discussion shows, Duff & Phelps' did not "evaluate[]" W.R. Grace's potential asbestos liability by doubling Grace's reported amount," as claimed in the Expert Report of John J. Mulligan ("Mulligan Rep.") (¶ 20) and in the Expert Report of

Jeffery and Michele Schaff ("Schaff Rep.") at 16. Nor did Duff & Phelps "assume[] a liability of $1.7 billion by accepting the Rand Institutes [sic] estimate and doubling it,[]" or "merely double[] the Company's estimated liabilities" as claimed in the Expert Report of Harvey S. Rosen, Ph.D ("Rosen Rep.") at 5.

18. Duff & Phelps' probability analysis cannot be fairly read to reflect "only a 20% chance of Grace being wiped out by the ZAI litigation." Schaff Rep. at 16. In fact, the probability assigned to a negative outcome in the ZAI litigation, which would result in liability estimated at a minimum to exceed all of Grace's assets available to satisfy that liability, was 40%. An additional 30% probability was assigned to an outcome that would result in liability of over $1.8 billion.

19. Duff & Phelps did not "value[] the [Grace] Common Stock at $13.79 per share assuming a total asbestos litigation liability of $1.0 billion." Schaff Rep. at 17. Nor did Duff & Phelps' valuation of Grace's equity value per share "range[] between $3.49 per share to $14.92 per share as of March 19, 2004[.]" Rosen Rep. at 5. Plaintiffs' experts mischaracterize an equity value sensitivity assessment produced by Duff & Phelps as an actual equity valuation. Duff & Phelps's valuation estimates were reflected in its equity valuation summaries, which consistently reflect the $1.9 billion contingent asbestos liability figure explained above. As our March 19, 2004 Valuation Report clearly states, we valued the equity of Grace at a midpoint of $1.20 per share (as of that date), within a range of $0.06 to $2.34 per share. *See* March 19, 2004 Valuation Report, Exhibit 1, at 30.

20. Duff & Phelps did not "understate[]" the amount of insurance coverage available for Grace's asbestos liability. Rosen Rep. at 7. As explained above, we incorporated

the terms of the settlement reported by Grace with its insurers to cover 30% of eventual liabilities, a figure that yielded the $570 million used in our valuation analysis, based on estimated total liabilities of $1.9 billion.

21. Duff & Phelps' valuation analysis did not remain "qualified" after April 6, 2004, when my team met with State Street and Goodwin Procter. During that meeting, we discussed reports that the FAIR Act might be brought to the Senate floor for debate (something our original analysis took into account) and the offer for the Plan's Grace Stock made by D.E. Shaw. Duff & Phelps did not determine a need to revise its valuation summaries after the April 6 meeting took place.

I declare under the penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed this 27 day of June, 2007

_____
Daniel D. Bayston