Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the allowance of contingent or disputed claims.

I-10

The Debtors' Chapter 11 expenses for the three-month and nine-month periods ended September 30, 2003 and 2002 consist of:

| (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Legal and financial advisory fees | $ 2.3 | $ 8.8 | $ 12.0 | $ 21.8 |
| Interest income | (0.1) | (0.2) | (0.3) | (0.4) |
| Chapter 11 expenses, net | $ 2.2 | $ 8.6 | $ 11.7 | $ 21.4 |

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against Chapter 11 expenses.

Condensed financial information of the Debtors is presented below:

W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES
DEBTOR-IN-POSSESSION STATEMENT OF OPERATIONS
(Dollars in millions) (Unaudited)

| | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2003 | 2002 |
| Net sales, including intercompany | $ 761.5 | $ 746.2 |
| Other income | 44.3 | 46.6 |
| | 805.8 | 792.8 |
| Cost of goods sold, including intercompany, exclusive of depreciation and amortization shown separately below | 525.6 | 474.2 |
| Selling, general and administrative expenses | 165.7 | 161.6 |
| Research and development expenses | 29.6 | 31.5 |
| Depreciation and amortization | 46.2 | 45.8 |
| Net pension expense | 36.1 | 16.2 |
| Interest expense and related financing costs | 12.3 | 14.8 |
| Provision for environmental remediation | 52.5 | 19.2 |
| | 868.0 | 763.3 |
| (Loss) income before Chapter 11 expenses, income taxes, and equity in net income of non-filing entities | (62.2) | 29.5 |
| Chapter 11 expenses, net | (11.7) | (21.4) |
| Benefit from (provision for) income taxes | 6.2 | (19.9) |
| Equity in net income of non-filing entities | 62.0 | 59.4 |
| NET (LOSS) INCOME | $ (5.7) | $ 47.6 |

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
===========================================================
W. R. GRACE & CO. - CHAPTER 11 FILING
ENTITIES
DEBTOR-IN-POSSESSION CONDENSED
STATEMENT OF CASH FLOWS
(Dollars in millions)                    NINE MONTHS ENDED
(Unaudited)                                SEPTEMBER 30,
===========================================================
                                           2003       2002
                                         -------    -------

OPERATING ACTIVITIES
Net (loss) income......................  $ (5.7)   $  47.6
Reconciliation to net cash provided
  by (used for) operating activities:
Non-cash items, net....................    53.6       56.7
Changes in other assets and
  liabilities, excluding the effect
  of businesses acquired/divested......    56.7      (36.1)
                                         -------    -------
NET CASH PROVIDED BY OPERATING
  ACTIVITIES...........................   104.6       68.2

NET CASH USED FOR INVESTING ACTIVITIES    (38.8)     (40.3)

NET CASH USED FOR FINANCING ACTIVITIES    (17.3)     (21.3)
                                         -------    -------

NET INCREASE IN CASH AND CASH
  EQUIVALENTS..........................    48.5        6.6
Cash and cash equivalents, beginning
  of period............................    56.8       38.0
                                         -------    -------
Cash and cash equivalents, end of
  period............................... $ 105.3    $  44.6
===========================================================


===========================================================
W. R. GRACE & CO. - CHAPTER 11
FILING ENTITIES
DEBTOR-IN-POSSESSION BALANCE
SHEET
(Dollars in millions)                  SEPTEMBER 30,  DECEMBER 31,
(Unaudited)                                2003           2002
===========================================================
ASSETS
CURRENT ASSETS
Cash and cash equivalents ......  $       105.3    $      56.8
Accounts and other
  receivables, net .............          118.2          114.7
Receivables from non-filing
  entities, net ................           55.6           43.4
Inventories ....................           80.2           70.5
Other current assets............           55.3           53.0
                                         ------         ------
  TOTAL CURRENT ASSETS .........          414.6          338.4

Properties and equipment, net...          387.0          389.7
Cash value of life insurance
  policies, net of policy
  loans.........................           90.5           82.4
Deferred income taxes ..........          567.2          567.0
Asbestos-related insurance
  expected to be realized
  after one year................          271.6          282.6
Loans receivable from
  non-filing entities, net ....           416.6          444.4
Investment in non-filing
  entities ....................           267.9          244.7
Other assets ..................           102.5           92.2
                                         ------         ------
  TOTAL ASSETS ................. $      2,517.9    $   2,441.4
===========================================================
```

I-11

Source: W R GRACE & CO, 10-Q, November 10, 2003

| (Dollars in millions) (Unaudited) | SEPTEMBER 30, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | |
| Current liabilities | $ 89.6 | $ 99.3 |
| Other liabilities | 217.3 | 229.6 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE | 306.9 | 328.9 |
| LIABILITIES SUBJECT TO COMPROMISE | 2,385.1 | 2,334.7 |
| TOTAL LIABILITIES | 2,692.0 | 2,663.6 |
| SHAREHOLDERS' EQUITY (DEFICIT) | (174.1) | (222.2) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | $ 2,517.9 | $ 2,441.4 |

In addition to Grace's financial reporting obligations as prescribed by the U.S. Securities and Exchange Commission ("SEC"), the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

3.  ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. On April 2, 2001, Grace filed voluntary petitions for reorganization under Chapter 11 to use the court-supervised reorganization process to develop and implement a plan for addressing pending and future asbestos-related claims. (See Note 1 for further discussion.)

As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for bodily injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Additional asbestos-related claims will be subject to the Chapter 11 process established by the Bankruptcy Court. Separate creditors' committees representing the interests of property damage and bodily injury claimants have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through proceedings in the Bankruptcy Court and negotiations with each of the official committees appointed in the Chapter 11 Cases and a legal representative of future asbestos claimants, which negotiations are expected to provide the basis for a plan of reorganization.

PROPERTY DAMAGE LITIGATION

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all outstanding property damage cases for which sufficient information is available to form a reasonable estimate of such exposure. (See "Asbestos-Related Liability" below.)

Out of 380 asbestos property damage cases filed prior to the Filing Date, 141 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million;

and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also involve ZAI). Approximately 4,000 additional asbestos property damage claims were filed prior to the March 31, 2003 bar date established by the Bankruptcy Court. The Debtors are in the process of analyzing the validity and potential liability related to these additional claims.

The ZAI cases were filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes containing ZAI. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes throughout the U.S. and that the

I-12

Source: W R GRACE & CO, 10-Q, November 10, 2003

cost of removal could be several thousand dollars per home. As a result of the Filing, these cases have been transferred to the U.S. Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time, Grace is not able to assess the extent of any possible liability related to this matter. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in November of 2003.

BODILY INJURY LITIGATION

Asbestos bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims has been influenced by numerous variables, including the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate, as of the Filing Date, of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos containing products previously manufactured by Grace.

Through the Filing Date, 16,354 asbestos bodily injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlement and judgments) for a total of $645.6 million. (See "Asbestos-Related Liability" below.)

Approximately 1,000 claims for medical monitoring were filed against the Debtors prior to the March 31, 2003 bar date. These claims were made by individuals for medical monitoring, but not bodily injury, due to exposure to asbestos through Grace's products or operations. Based on the number and expected value of such claims, Grace does not believe such claims will have a material effect on the Consolidated Financial Statements.

ASBESTOS-RELATED LIABILITY

Asbestos-related litigation is stayed by the Chapter 11 Cases. Ongoing costs are generally limited to claims administration costs and to defense costs incurred in connection with litigation permitted by the Bankruptcy Court. Other adjustments to the recorded liability will be based on developments in the Chapter 11 Cases. Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, or its ultimate plan of reorganization.

For periods prior to and as of the Filing Date, Grace's estimated property damage and bodily injury liabilities were based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities covered indemnity and defense costs for pending property damage cases for which sufficient information was available, and for pending and projected future bodily injury claims. However, due to the Filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability. Since the Filing, Grace is aware that bodily injury claims have continued to be filed against co-defendant companies, and at higher than historical rates. Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

The total asbestos-related liability balances as of September 30, 2003 and December 31, 2002 were $964.6 million and $973.2 million, respectively. The decrease in the liability is primarily due to the payment of normal post-Filing administrative costs relating to claims management and defense costs in connection with litigation permitted by the Bankruptcy Court. The recorded asbestos-related liability is included in "liabilities subject to compromise."

ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to

I-13

Source: W R GRACE & CO, 10-Q, November 10, 2003

Grace. Grace believes that certain of these settlements may cover ZAI claims, as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements are based on the recorded amount of the asbestos-related liability and are only collectible as liabilities are satisfied. In the event that Grace's ultimate asbestos-related liability is determined to exceed recorded amounts, insurance exists to cover a portion of such incremental liability, but generally in a lower proportion than the currently recorded insurance receivable bears to the currently recorded liability.

---

4   ACQUISITIONS AND JOINT VENTURES

---

In 2003, Grace completed two business combinations for a total cash cost of $3.6 million as follows:

o   In April 2003, Grace, through its subsidiary The Separations Group, acquired the business and assets of MODcol Corporation, a manufacturer of preparative chromatography columns and provider of custom column packaging services.

o   In July 2003, Grace acquired the chromatography business of Argonaut Technologies, Inc., which had been marketed under the Jones Chromatography name.

Goodwill recognized in those transactions amounted to $0.7 million, which was assigned to Davison Chemicals.

In 2002, Grace completed three business combinations for a total cash cost of $28.5 million as follows:

o   In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S.

o   In March 2002, Grace acquired the business and assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada.

o   In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company ("Chevron"), acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company.

Goodwill recognized in those transactions amounted to $3.8 million, $0.9 million of which was assigned to Davison Chemicals and $2.9 million of which was assigned to Performance Chemicals.

Pro forma results of operations have not been presented because the effects of these acquisitions were not material on either an individual or aggregate basis.

---

5.   OTHER INCOME

---

Components of other income are as follows:

| OTHER INCOME (Dollars in millions) | THREE MONTHS SEPTEMBER 30, | | NINE MONTHS SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Investment income (loss) | $ (0.2) | $ 0.5 | $ 4.1 | $ 5.3 |
| Interest income | 0.9 | 0.9 | 3.4 | 2.5 |
| Net (loss) gain on dispositions of assets | (0.1) | 2.3 | (1.0) | 1.9 |
| Tolling revenue | 0.2 | 1.8 | 0.9 | 2.7 |
| Foreign currency | 0.4 | 0.6 | (3.2) | 0.6 |
| Other miscellaneous income | 1.9 | 2.9 | 6.8 | 6.8 |
| Total other income | $ 3.1 | $ 9.0 | $ 11.0 | $ 19.8 |

Source: W R GRACE & CO, 10-Q, November 10, 2003

Source: W R GRACE & CO, 10-Q, November 10, 2003

6. OTHER BALANCE SHEET ACCOUNTS

| (Dollars in millions) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| **ACCOUNTS AND OTHER RECEIVABLES, NET** | | |
| Trade receivables, less allowance of $4.2 (2002 - $3.7) | $ 344.1 | $ 302.8 |
| Other receivables, less allowances of $1.7 (2002 - $1.7) | 17.6 | 13.8 |
| | $ 361.7 | $ 316.6 |
| **INVENTORIES** | | |
| Raw materials | $ 49.2 | $ 39.2 |
| In process | 35.1 | 30.3 |
| Finished products | 130.8 | 110.8 |
| General merchandise | 30.1 | 26.8 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis | (36.3) | (33.5) |
| | $ 208.9 | $ 173.6 |
| **OTHER ASSETS** | | |
| Deferred pension costs | $ 109.8 | $ 104.2 |
| Deferred charges | 40.2 | 38.7 |
| Long-term receivables, less allowances of $0.8 (2002 - $0.8) | 7.9 | 2.0 |
| Patents, licenses and other intangible assets, net | 65.4 | 63.4 |
| Pension-unamortized prior service cost | 26.4 | 26.4 |
| Investments in unconsolidated affiliates and other | 3.6 | 0.2 |
| | $ 253.3 | $ 234.9 |
| **OTHER CURRENT LIABILITIES** | | |
| Accrued compensation | $ 39.5 | $ 40.0 |
| Accrued interest | 7.1 | 6.4 |
| Deferred tax liability | 1.2 | 0.8 |
| Customer volume rebates | 21.9 | 21.2 |
| Accrued commissions | 7.8 | 6.0 |
| Accrued reorganization fees | 6.8 | 9.4 |
| Other accrued liabilities | 47.1 | 47.5 |
| | $ 131.4 | $ 131.3 |
| **OTHER LIABILITIES** | | |
| Pension-underfunded plans | $ 304.3 | $ 295.1 |
| Other accrued liabilities | 8.1 | 6.3 |
| | $ 312.4 | $ 301.4 |

7. LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $90.5 million and $82.4 million at September 30, 2003 and December 31, 2002, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years. The following table summarizes activity in these policies for the nine months ended September 30, 2003 and 2002, and components of the net cash value at September 30, 2003 and December 31, 2002:

| LIFE INSURANCE – ACTIVITY SUMMARY (Dollars in millions) | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2003 | 2002 |
| Earnings on policy assets.... | $ 28.9 | $ 31.2 |
| Interest on policy loans..... | (24.8) | (25.9) |
| Policy loan repayments....... | 2.6 | 4.2 |
| Annual premiums.............. | 2.4 | 2.5 |
| Net investing activity....... | (1.0) | (0.1) |
| Change in net cash value... | $ 8.1 | $ 11.9 |
| Tax-free proceeds received... | $ 10.0 | $ 13.8 |

| COMPONENTS OF NET CASH VALUE | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| Gross cash value............. | $ 470.7 | $ 471.3 |
| Principal – policy loans..... | (365.8) | (365.4) |
| Accrued interest – policy loans...................... | (14.4) | (23.5) |
| Net cash value............ | $ 90.5 | $ 82.4 |
| Insurance benefits in force.. | $ 2,212.4 | $ 2,240.8 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

8. DEBT

On September 30, 2003, and December 31, 2002, Grace's debt was as follows:

| COMPONENTS OF DEBT (Dollars in millions) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| DEBT PAYABLE WITHIN ONE YEAR | | |
| DIP facility ................. | $ -- | $ -- |
| Other short-term borrowings... | 10.9 | 4.3 |
| | $ 10.9 | $ 4.3 |
| DEBT PAYABLE AFTER ONE YEAR | | |
| DIP facility ................. | $ -- | $ -- |
| DEBT SUBJECT TO COMPROMISE | | |
| Bank borrowings .............. | $ 500.0 | $ 500.0 |
| Other borrowings ............. | 1.2 | 1.0 |
| Accrued interest ............. | 46.3 | 37.8 |
| | $ 547.5 | $ 538.8 |
| Annualized weighted average interest rates on total debt ....................... | 2.1% | 2.8% |

In April 2001, the Debtors entered into the DIP facility for a two-year term in the aggregate amount of $250 million. The DIP facility is secured by a priority lien on substantially all assets of the Debtors, and bears interest based on LIBOR. The Debtors have extended the term of the DIP facility for up to an additional three years through April 1, 2006, and modified certain other provisions. Grace had no outstanding borrowings under the DIP facility as of September 30, 2003; however, $25.8 million of standby letters of credit were issued and outstanding under the facility. The letters of credit, which reduce available funds under the facility, were issued mainly for trade-related matters such as

I-15

performance bonds, and certain insurance and environmental matters.

---

## 9. SHAREHOLDERS' EQUITY (DEFICIT)

The Company is authorized to issue 300,000,000 shares of common stock. Of the common stock unissued on September 30, 2003, approximately 9,904,795 shares were reserved for issuance pursuant to stock option and other stock incentive plans. In the first nine months of 2003 and the year ended December 31, 2002, Grace did not grant any stock options.

For additional information, see Notes 15 and 17 to the Consolidated Financial Statements in Grace's 2002 Form 10-K.

---

## 10. (LOSS) EARNINGS PER SHARE

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings per share.

| EARNINGS PER SHARE (Dollars in millions, except per share amounts) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **NUMERATORS** | | | | |
| Net (loss) income | $ (9.9) | $ 14.0 | $ (5.7) | $ 47.6 |
| **DENOMINATORS** | | | | |
| Weighted average common shares -- basic calculation | 65.6 | 65.5 | 65.5 | 65.4 |
| Dilutive effect of employee stock options and restricted shares | -- | -- | -- | 0.1 |
| Weighted average common shares diluted calculation | 65.6 | 65.5 | 65.5 | 65.5 |
| BASIC (LOSS) EARNINGS PER SHARE | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |
| DILUTED (LOSS) EARNINGS PER SHARE | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |

As a result of loss incurred during the three months and nine months ended September 30, 2003, employee compensation shares of approximately 200,000 and 100,000, respectively, were excluded from the diluted loss per share calculation because their effect would be antidilutive.

---

## 11. COMPREHENSIVE INCOME (LOSS)

Grace's other comprehensive income (loss) consists entirely of foreign currency translation adjustments. The table below presents the pre-tax, tax and after-tax amounts of Grace's other comprehensive income (loss) for the three months and nine months ended September 30, 2003 and 2002:

| (Dollars in millions) | Pre-Tax Amount | Tax Benefit | After-Tax Amount |
|---|---|---|---|
| THREE MONTHS ENDED: | | | |
| September 30, 2003 | $ 4.2 | $ -- | $ 4.2 |
| September 30, 2002 | $ (9.5) | $ -- | $ (9.5) |
| NINE MONTHS ENDED: | | | |
| September 30, 2003 | $ 53.6 | $ -- | $ 53.6 |
| September 30, 2002 | $ 22.9 | $ -- | $ 22.9 |

Source: W R GRACE & CO, 10-Q, November 10, 2003

The table below presents the components of Grace's accumulated other comprehensive loss at September 30, 2003 and December 31, 2002:

| COMPONENTS OF ACCUMULATED OTHER COMPREHENSIVE LOSS (Dollars in millions) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| Foreign currency translation | $ (66.0) | $ (119.6) |
| Minimum pension liability | (283.7) | (283.7) |
| Accumulated other comprehensive loss | $ (349.7) | $ (403.3) |

## 12. COMMITMENTS AND CONTINGENT LIABILITIES

ASBESTOS-RELATED LITIGATION - SEE NOTE 3

ENVIRONMENTAL REMEDIATION

General Matters and Discussion

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

At September 30, 2003, Grace's liability for environmental investigative and remediation costs related to continuing and discontinued operations totaled $244.4 million, as compared to $201.1 million at December 31, 2002. This estimate of

Source: W R GRACE & CO, 10-Q, November 10, 2003

environmental cost is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan. This estimate does not include possible additional liability related to new claims for remediation costs filed against the Debtors by governmental authorities and private parties prior to the March 31, 2003 bar date. One of such claims for approximately $100 million relates to a discontinued operation at a current operating site. Grace is evaluating such claims and is engaged in discussions with the U.S. Environmental Protection Agency (the "EPA") and other parties with respect to such claims. At this time, Grace is not able to determine whether the amount of liability related to such claims is likely to be material or to require adjustment to Grace's recorded liability.

The amounts of cash expenditures below have been charged against previously established reserves for the periods presented.

| (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Continuing operations | $ 1.9 | $ 3.3 | $ 7.4 | $ 14.0 |
| Discontinued operations | 1.3 | 0.3 | 1.8 | 0.5 |
| Total | $ 3.2 | $ 3.6 | $ 9.2 | $ 14.5 |

During the three-month and nine-month periods ended September 30, 2003, Grace recorded pre-tax charges of $50.0 million and $52.5 million, respectively, for environmental matters. Approximately $50.0 million of these charges were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining and processing activities near Libby, Montana. (See discussion under "Vermiculite Related Matters" below.)

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings; any such effect could be material. Grace's environmental liabilities are included in "liabilities subject to compromise" as of September 30, 2003.

Vermiculite Related Matters

From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as a contaminant, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the EPA began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. Grace has appealed the court's ruling.

As a result of such ruling, Grace recorded a pre-tax charge of $50 million, bringing its total estimated

I-17

liability for Libby-related reimbursable costs to $110 million. Grace's estimate of expected reimbursable costs is based solely on public information about the EPA's spending plans. However, the EPA's cost estimates have increased substantially over the course of its cleanup. Consequently, Grace's estimate may change materially as more current public information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" and any payments would be subject to the outcome of the Chapter 11 proceedings.

The EPA is also evaluating environmental risks at vermiculite processing sites throughout the U.S. that processed vermiculite from Libby, Montana, and has made claims against Grace to carry out or fund remediation activities. Grace is reviewing the EPA's actions and cost claims to determine whether they are justified and reasonable and, in several instances, Grace has remediated or agreed to remediate certain sites. Costs associated with the above are included in "provision for environmental remediation" included in the Consolidated Statements of Operations.

Insurance Matters

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

TAX MATTERS

Grace has received the examination report from the Internal Revenue Service (the "IRS") on tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is under the jurisdiction of the IRS Office of Appeals, where Grace has filed a protest. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. Grace believes that the impact of probable tax return adjustments would not have a material adverse effect upon Grace's financial position. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business

I-18

Source: W R GRACE & CO, 10-Q, November 10, 2003

for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued assessments aggregating $40.1 million for the 1996 through 1998 tax periods and Grace expects the IRS will make additional assessments for the 1999 tax period. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius and the 1998 reorganization involving a predecessor of Grace and Sealed Air were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of the Debtors' estates.

On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $425.1 million as of September 30, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial position.

GUARANTEES AND INDEMNIFICATION OBLIGATIONS

Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

- Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

- Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

- Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

- Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

- Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the

Source: W R GRACE & CO, 10-Q, November 10, 2003

individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

FINANCIAL ASSURANCES

At September 30, 2003, Grace had gross financial assurances issued and outstanding of $249.4 million, comprised of $135.0 million of gross surety bonds issued by various insurance companies, and $114.4 million of standby letters of credit and other financial assurances issued by various banks. Of the standby letters of credit, $19.0 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $230.4 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. Of the net amount of $230.4 million of financial assurances, $9.4 million were issued by non-Debtor entities and $221.0 million were issued by the Debtors. Of the amounts issued by the Debtors, $192.5 million were issued before the Filing Date, with the remaining $28.5 million being issued subsequent to the Filing, of which $25.8 million was issued under the DIP facility.

ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheet as of September 30, 2003. The amounts of these liabilities, as ultimately determined through the Chapter 11 proceedings, could be materially different from amounts recorded by Grace at September 30, 2003.

13. BUSINESS SEGMENT INFORMATION

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Davison Chemicals produces a variety of catalyst and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for the three-month and nine-month periods ended September 30, 2003 and 2002. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

| BUSINESS SEGMENT DATA (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NET SALES | | | | |
| Davison Chemicals | $ 267.0 | $ 246.5 | $ 767.7 | $ 703.0 |
| Performance Chemicals | 254.0 | 233.5 | 701.5 | 662.0 |
| TOTAL | $ 521.0 | $ 480.0 | $ 1,469.2 | $ 1,365.0 |
| PRE-TAX OPERATING INCOME | | | | |
| Davison Chemicals | $ 32.5 | $ 35.4 | $ 80.1 | $ 99.2 |
| Performance Chemicals | 38.6 | 30.1 | 76.5 | 76.9 |
| TOTAL | $ 71.1 | $ 65.5 | $ 156.6 | $ 176.1 |

The table below presents information related to the geographic areas in which Grace operated for the three months and nine months ended September 30, 2003 and 2002.

| GEOGRAPHIC AREA DATA (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NET SALES | | | | |
| United States | $ 214.9 | $ 210.7 | $ 604.6 | $ 619.5 |
| Canada and Puerto Rico | 23.2 | 16.3 | 57.0 | 38.0 |
| Europe | 171.3 | 149.3 | 501.2 | 416.4 |
| Asia Pacific | 83.1 | 76.8 | 228.4 | 211.0 |
| Latin America | 28.5 | 26.9 | 78.0 | 80.1 |

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
TOTAL.................  $ 521.0   $480.0    $1,469.2  $1,365.0
================================================================
```

The pre-tax operating income for Grace's business segments for the three-month and nine-month periods ended September 30, 2003 and 2002 is reconciled below to income before Chapter 11 expenses, income taxes, and minority interest presented in the accompanying Consolidated Statements of Operations.

I-20

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
===================================================================
RECONCILIATION OF
BUSINESS SEGMENT DATA
TO FINANCIAL             THREE MONTHS        NINE MONTHS
STATEMENTS                  ENDED               ENDED
(Dollars in millions)    SEPTEMBER 30,       SEPTEMBER 30,
===================================================================
                          2003     2002      2003      2002
                         ------   ------    ------    ------
Pre-tax operating
  income - business
  segments..............  $ 71.1  $ 65.5    $ 156.6   $ 176.1
Add back:
Minority interest .....    (0.7)    1.4       (0.2)      2.3
                         ------   ------    ------    ------
                           70.4    66.9      156.4     178.4
Interest expense and
  related financing
  costs................   (4.1)   (4.8)     (12.4)    (15.2)
Interest income........    0.9     0.9        3.4       2.5
Corporate costs........  (20.8)  (12.6)     (59.2)    (32.8)
Other, net.............  (54.1)  (11.3)     (68.4)    (17.3)
                         ------   ------    ------    ------
Income (loss) before
  Chapter 11
  expenses, income
  taxes, and minority
  interest  ...........  $ (7.7) $ 39.1    $ 19.8    $ 115.6
===================================================================
```

Corporate costs include expenses of corporate headquarters functions incurred in support of core operations, such as corporate financial and legal services, human resources management, communications and regulatory affairs. This item also includes certain pension and postretirement benefits, including the amortization of deferred actuarial losses, that are considered a core operating cost but not allocated to business segments. Other includes a $50.0 million pre-tax charge to adjust Grace's estimated liability for claims by the EPA for recovery of environmental cleanup costs around Libby, Montana.

Source: W R GRACE & CO, 10-Q, November 10, 2003

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION
--------------------------------------------------------------------------------

DESCRIPTION OF BUSINESS
--------------------------------------------------------------------------------

W. R. Grace & Co. and its subsidiaries are engaged in specialty chemicals and specialty materials businesses on a global basis. Its business segments are Davison Chemicals, which produces catalyst and silica products, and Performance Chemicals, which produces construction chemicals, building materials and sealants and coatings.

As used herein, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING
--------------------------------------------------------------------------------

In response to a sharply increasing number of asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates, including W. R. Grace & Co.-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims, higher than expected costs to resolve bodily injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product. (These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements.) After a thorough review of these developments, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 process provided the best forum available to achieve predictability and fairness in the claims settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation against the Debtors for pre-petition matters is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of the Company. The interests of the Company's shareholders could be substantially diluted or cancelled under a plan of reorganization. The formulation and implementation of the plan of reorganization is expected to take a significant period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. In addition, the Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations in the ordinary course of business, including employee wages and benefits, customer programs, shipping charges, and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to propose a plan of reorganization for a 120-day period following the Filing Date. The Debtors have received extensions of their exclusivity period during which to file a plan of reorganization through February 1, 2004, and extensions of the

Source: W R GRACE & CO, 10-Q, November 10, 2003