Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - X

KERI EVANS,                              :

       Plaintiff,                 : Consolidated as

vs.                                      : Case No.:

JOHN F. AKERS, et al.,                   : 04-11380-WGY

       Defendants.                :

- - - - - - - - - - - - - - - - X

LAWRENCE W. BUNCH, et al.,               :

       Plaintiffs,                :

vs.                                      :

W. R. GRACE & CO., et al.,               :

       Defendants.                :

- - - - - - - - - - - - - - - - X

Deposition of WILLIAM BRIAN MCGOWAN

Washington, D.C.

Monday, April 30, 2007

10:13 a.m.

Job No.: 1-102400

Pages:    1 - 173

Reported by: Dana C. Ryan, RPR

Page 14

1   A   What do you mean by "administration"?
2   Q   How it operates in terms of day-to-day
3   activities to make certain that the monies are in
4   their accounts, it's being administered in terms of
5   just people getting their retirement benefits they're
6   supposed to receive and that sort of thing. I'm not
7   referring at this moment to the investment aspect of
8   it, just the day-to-day administrative component.
9   A   On a day-to-day basis -- personally I'm not
10  involved with the day-to-day operations of the plan.
11  People underneath me are, but I don't get involved
12  with that personally.
13  Q   So if a significant issue arises, though,
14  ultimately that would go up to you because the people
15  are underneath you; is that correct?
16  A   Correct.
17  Q   Very good. And who is the person
18  responsible for administering the day-to-day
19  activities of the plan?
20  A   Allison MacKenzie.
21  Q   Okay. What is Ms. MacKenzie's title?
22  A   She's a manager of employee benefits.

Page 15

1   Q   A minute ago we mentioned the W. R. Grace
2   Savings and Investment Plan. Could you briefly
3   describe what it is?
4   A   It's a 401(k) plan that all U.S. employees
5   are eligible to participate in, and based on their
6   savings, the company matches up to -- at the current
7   time the company matches 100 percent up to 6 percent
8   of their savings, which includes both base salary and
9   annual incentive compensation.
10  Q   And that is for both salaried and
11  nonsalaried employees?
12  A   By "nonsalaried," are you including union --
13  Q   Yes.
14  A   -- in that?
15      For the most part, yes. I'm just -- I'm not
16  sure if all unions -- it's been offered to them. I'm
17  not sure if all unions are participating.
18  Q   Is that because -- well, you said it's been
19  offered to them. That's part of -- for certain unions
20  there were certain negotiated contract provisions and
21  the 401(k) is a contract provision in certain union
22  contracts?

Page 16

1   A   Some of the unions have declined to accept
2   it. I'm just not sure if they all have it, okay?
3   Q   But is that because it's a negotiated
4   provision in union contracts?
5   A   That's correct.
6   Q   I'm going to hand you what the court
7   reporter will hopefully mark as Exhibit Number 1.
8       MR. GOODMAN: And because it was big,
9   I'm sorry, I didn't make an extra copy for you. I got
10  copies of -- extra things for almost everything else,
11  but I didn't want to lug this one that much, so . . .
12      (Plaintiff's Deposition Exhibit Number 1 was
13  marked for identification and attached to the
14  transcript.)
15  BY MR. GOODMAN:
16  Q   Mr. McGowan, the court reporter handed you
17  what's been marked as Plaintiff's Exhibit Number 1.
18  Could you please identify Plaintiff's Exhibit Number 1
19  for the Record?
20  A   (Witness reviews document.)
21      MS. FLOWE: Terry, do you want him to
22  literally read through the whole thing?

Page 17

1       MR. GOODMAN: No, no, no, I just want
2   to make sure that he can understand what it is
3   intended to be.
4       MS. FLOWE: Or what it appears to be?
5       MR. GOODMAN: That's fine, what it
6   appears to be and that it appears to be complete as of
7   to at least a certain date.
8       THE WITNESS: It appears to be the
9   document that controls the 401(k) plan at W. R. Grace
10  BY MR. GOODMAN:
11  Q   Okay. That is actually through -- let me be
12  clear regarding that. That is through April 17th,
13  2003; is that correct?
14  A   That's what it says on here.
15  Q   Okay. And then --
16      MR. GOODMAN: Could you mark this as
17  Exhibit Number -- Plaintiff's Exhibit Number 2,
18  please?
19      (Plaintiff's Deposition Exhibit Number 2 was
20  marked for identification and attached to the
21  transcript.)
22      MS. FLOWE: For the Record, Terry, this

Page 18

1  appears to be missing the first page. I've got pages
2  2, 3 and 4.
3      MR. GOODMAN: Apparently -- yeah, I
4  got -- this is what was -- the relevant portion, what
5  I'm looking for, is the -- this April 17th part of
6  the -- pages 1659 through 1790.
7      MS. FLOWE: I just would like the
8  Record to reflect the document is incomplete.
9      MR. GOODMAN: Okay.
10 BY MR. GOODMAN:
11   Q   Okay. Can you identify Exhibit Number 2?
12   A   It appears to be some amendment or some
13 sections of the -- of the policy, the document that
14 controls the 401(k) plan --
15   Q   Okay.
16   A   -- but there's no title.
17   Q   Okay. Can you specifically identify as to
18 the amendment referring to -- what the amendment is
19 referring to, and particularly the second paragraph --
20 second full paragraph here, The plan was further
21 amended and restated as set forth effective
22 December 8th, 2008, and then what that amendment

Page 19

1  relates to?
2    A   This amendment relates to the fact that --
3  that the plan was amended to permit the appointment of
4  an independent investment manager --
5    Q   Okay.
6    A   -- with respect to the Grace Stock Fund.
7    Q   Okay. And then specifically, The plan was
8  further amended or set forth on January 1st -- I'm
9  sorry. I take that back.
10      And what were the -- specifically what was
11 the responsibilities of the amendment to allow an
12 investment manager for -- specifically for the Grace
13 Stock Fund?
14   A   I don't understand that question.
15   Q   Okay. We're going to get into this in more
16 detail later on. I just want to have an understanding
17 as to what the responsibilities were of the investment
18 manager pursuant to this plan amendment.
19   A   To manage the Grace stock in the 401(k)
20 plan.
21      MS. FLOWE: Terry, again, I have to
22 make a comment for the Record. I apologize. This

Page 20

1  appears to be a document that was produced for
2  purposes of mediation based on the Bates label at the
3  bottom. Now, this particular document, I'm sure we
4  produced it to you as a part of normal discovery as
5  well, and it also appears from the top of it that it
6  was filed in the court proceeding in maybe more than
7  one context, but I just want to note for the Record
8  that we haven't -- we have not agreed that mediation
9  documents can be used as a discovery response. I'm
10 not going to make an issue of this because I'm sure we
11 produced it otherwise, but I just need to make the --
12      MR. GOODMAN: That's fine, and --
13      MS. FLOWE: -- Record for that.
14      MR. GOODMAN: -- I will tell you
15 that -- because I'm going to use the documents that
16 were produced during mediation because there's nothing
17 that I've seen here that hasn't been produced, and
18 these are the records I have. As for that document,
19 actually, that was a document that you did produce for
20 mediation purposes but was actually attached by State
21 Street in connection with a motion, so just to make
22 that clear.

Page 21

1      MS. FLOWE: That's what I could tell
2  from the numbers at the top, but I just wanted to make
3  the point since this is the first time we've seen one.
4      MR. GOODMAN: Okay. That's fine.
5  BY MR. GOODMAN:
6    Q   Now, is the plan that we're referring to
7  both in Exhibit 1 and Exhibit 2 a defined contribution
8  plan?
9    A   Yes.
10   Q   What is a defined contribution plan?
11   A   Defined contribution plan is where it's a
12 set amount that the employees -- the employees
13 contribute into it and the company is -- has agreed to
14 match that -- those monies up to a certain limit, and
15 at the end of their employment with Grace, the monies
16 that they invested as well as the company match, in
17 addition to any investment gains, is their monies to
18 take with them or leave in the plan and take it out as
19 they see fit.
20   Q   Okay. In connection with the defined
21 contribution plan, I think you already indicated
22 earlier that you had a role as a fiduciary to the plan

**Page 26**

1  defined benefit plan provides to salaried employees,
2  if there's a formula that's used in order to calculate
3  what their ultimate retirement benefit will be?
4      A    The formula is based on -- takes into
5  consideration years of service; it takes into
6  consideration your final average salary, which is the
7  average of the last five years. And as a multiplier,
8  for every year of credited service you get
9  1.5 percent. So, therefore, if someone had -- would
10 have ten years of service, they would have a
11 15 percent benefit times their average salary.
12     Q    Okay. And, if you know, does the union
13 pension plan vary -- I know it was several different
14 union plans; you indicated that a moment ago. But do
15 you have a general understanding if the formula varies
16 much from the formula you just described to me?
17     A    Yes.
18     Q    How does it vary?
19     A    The union plans are typically just based on
20 years of service times a fixed dollar amount. For
21 example, for every year of service -- some of them
22 today have $50 a month of a benefit, so if you have

**Page 27**

1  ten years of service, you would get $500 a month in a
2  pension benefit.
3      Q    Okay. You indicated a moment ago that you
4  periodically have, either quarterly or semi-annually,
5  meetings regarding the Grace Defined Contribution Plan
6  or the 401(k) plan, and one of the issues that you
7  discussed, I believe, is investment options that are
8  available; is that correct?
9      A    Correct.
10     Q    Historically, if you take -- well, we can go
11 through this, but the benefit -- this plan that we've
12 marked as Plaintiff's Exhibit Number 1, in it
13 identifies approximately 26 or 27 investment options
14 available to plan participants; do you agree with that
15 statement?
16     A    I would agree that it's approximately that
17 number. I don't know the exact amount.
18     Q    That's fine, but we're in agreement it's
19 over 20?
20     A    Correct.
21     Q    Okay. And my understanding -- and I could
22 be incorrect so I'm going to ask you to clarify for

**Page 28**

1  me -- is that at some point Grace expanded the
2  investment options to that number; that it wasn't
3  always 20 or so options -- in excess of 20 options; is
4  that correct?
5      A    That is correct.
6      Q    Do you recall approximately when Grace
7  expanded its options to what it currently offers?
8      A    I cannot recall the exact date or even the
9  approximate date. Several years ago, but --
10     Q    Were you involved in that decision-making
11 process?
12     A    Yes, I was.
13     Q    Can you briefly explain the reason why Grace
14 expanded the number of investment options available to
15 its participants in the 401(k) plan?
16     A    The number was expanded in order to give its
17 participants a broader range of investment options
18 to -- to invest their money in.
19     Q    And why did Grace and you as a fiduciary
20 want to increase -- provide a broader range of
21 investment options for the participants in which to
22 participate -- to invest in?

**Page 29**

1      A    It's -- it was just -- to some degree was in
2  reaction to external factors, what the law was saying
3  that -- what you should do with a plan to make sure
4  that people have a wide range of investment options to
5  put their money into in terms of risk, in terms of
6  geographic -- you know, U.S. versus foreign
7  investments. So it was -- it was more doing with what
8  was being done on the rest of the outside world, and
9  Grace wanted to make sure it was in compliance with
10 with that.
11     Q    Did Grace consult with anyone outside of
12 Grace to decide which investment options to offer?
13     A    Yes.
14     Q    What --
15     A    All of our investments -- we do not only do
16 it internally; we get investment advice from our
17 outside managers of the plan.
18     Q    And who is that?
19     A    At this moment I can't recall. We've used
20 more than one, but I can't recall the names at this
21 time.
22     Q    Did Fidelity provide you any assistance in

**Page 94**

1  contacted, the five firms I mentioned we contacted at
2  the same time.
3    Q   Did Grace have a previous relationship with
4  Aon?
5    A   Yes, Aon -- we are involved -- we have a
6  relationship with Aon. They are our plan actuarials
7  for our pension plan and provide some other services
8  to us.
9    Q   Okay. And that was the pension plan that we
10 discussed at the very beginning today?
11   A   It's the qualified salary and the hourly
12 union pension plans.
13   Q   Okay. Let me go off subject for just a
14 little bit while it's still fresh in my mind.
15 Previously at some point Grace also had an ESOP plan;
16 is that correct?
17   A   Yes, we did.
18   Q   Okay. And briefly, so that I understand it,
19 what is an ESOP plan?
20   A   ESOP plan holds company stock in it,
21 participant shares of company stock.
22   Q   And the ESOP plan was -- well, I think it

**Page 95**

1  was, but if I'm wrong, that's what I'm going to ask
2  you for. Did Grace somehow convert the ESOP plan to
3  be part of the 401(k) plan that we've been talking
4  about?
5    A   I'm not sure.
6    Q   Could you go to Exhibit Number 1? Please
7  turn to page 10 and then also page 11 where it's
8  talking about ESOP and see if that refreshes your
9  memory as to what occurred.
10       MS. FLOWE: I object to the
11 characterization.
12       THE WITNESS: (Reviews document.)
13 Okay.
14 BY MR. GOODMAN:
15   Q   Does that provide you with any additional
16 understanding as to what happened to the ESOP plan?
17   A   Reading this, no.
18   Q   Okay. Did part of the ESOP plan -- if you
19 recall, now, because maybe I misunderstood what
20 happened. Did part of the ESOP plan become part of --
21 get converted all under the 401(k) plan?
22   A   Based on this paragraph here, it seems to me

**Page 96**

1  that part of the 401(k) plan contained an ESOP
2  section.
3    Q   And then that ESOP section for that plan
4  ended up being changed into -- or became part of the
5  Grace Stock Fund?
6        MS. FLOWE: I'm going to instruct you
7  not to speculate or guess. If you know the answer,
8  that's fine, but I don't think Mr. Goodman will want
9  you to be speculating either.
10 BY MR. GOODMAN:
11   Q   No, don't guess.
12   A   I can't answer based on that.
13   Q   Okay. When you were a part of -- from 1999,
14 approximately, when you became on the investment and
15 benefits committee, do you recall dealing with ESOP
16 issues?
17   A   I cannot remember any specific issues that
18 we dealt with.
19   Q   Okay. Let's go back to State Street. Now,
20 you were telling me a moment ago that -- but the --
21 you had -- you met with Aon and you also met with
22 State Street and you think possibly after you met with

**Page 97**

1  Aon; is that right?
2    A   I believe that was the case.
3    Q   Okay. And it was Mr. Forgach that had, I
4  think, the primary contact with -- dealing with State
5  Street and obtaining information from State Street; is
6  that correct?
7    A   John was the initial person that contacted,
8  whether it be State Street, Aon, Fidelity, but, you
9  know, once we started moving down the road, then
10 communications with these -- this -- whether it be
11 State Street or Aon were done by several members of
12 the team.
13   Q   Were you one of those members of the team
14 who had communications with State Street?
15   A   I had -- I would say my -- my conversations
16 with State Street were limited in nature.
17   Q   Limited to what?
18   A   Limited to administrative-type details of,
19 you know, who they performed this for, just getting
20 general information about State Street.
21   Q   Did State Street provide -- who -- other
22 than yourself, then, who else had communication --

**Page 98**

1  other than Mr. Forgach -- who else of the team, I
2  think is how we referred to it before -- who else had
3  communication with State Street on what type of
4  info -- well, who else had contact with State Street?
5      A   My recollection, it would have been Bob
6  Tarola and Dave Siegel.
7      Q   What information -- or what was the reason
8  that you understand Mr. Tarola was communicating with
9  State Street?
10         MS. FLOWE:  If you have an
11 understanding.
12         THE WITNESS:  I do not have an
13 understanding.
14 BY MR. GOODMAN:
15     Q   Do you have an understanding as to why, I
16 think, Mr. Siegel would have been communicating with
17 State Street?
18     A   I cannot specifically say what he might have
19 been talking to them about.
20     Q   Did you have conversations with Mr. Tarola
21 regarding his contacts with State Street?
22     A   Not that I can recall.

**Page 99**

1      Q   How was the decision made initially to
2  engage Aon; in other words, was it a vote; did someone
3  say -- did Mr. Tarola say or did you say, I think we
4  should do -- that we should engage -- hire Aon, and
5  everybody else generally agreed?  I guess what I'm
6  trying to find out is who ultimately made the decision
7  to first try to select Aon as independent fiduciary?
8      A   To the best of my recollection, it was a
9  team decision.  It was no -- no one in particular, but
10 it was everyone agreed that Aon would be an
11 appropriate fiduciary for the plan.
12     Q   How about with State Street; same thing?
13     A   Same thing.
14     Q   Did anybody voice concern about hiring Aon?
15     A   Initially, no.
16     Q   Other than the fiduciary -- other than the
17 insurance issue, did anybody raise concerns about
18 hiring Aon?
19     A   Not to my recollection.
20     Q   Did anybody issue -- raise concerns about
21 hiring State Street?
22     A   Not that I recall.

**Page 100**

1      Q   Did Grace have any relationship with State
2  Street prior to the selection of State Street as
3  independent fiduciary?
4      A   I can't answer that.  None -- none in my
5  areas of responsibility.
6      Q   What did you understand State Street -- did
7  you have any knowledge of State Street before the
8  selection process?
9      A   I certainly knew who State Street was.
10     Q   How did you know that?
11     A   Reading the business papers, listening to
12 CNBC.  They're a very large institution.
13     Q   And what did you -- what did you understand
14 State Street to be?
15     A   A first-class organization.
16     Q   A first-class organization that does what?
17     A   It's in the -- it's in the banking area and
18 all the banking investments, similar to the other big
19 financial institutions.
20         MR. GOODMAN:  Can we mark this as --
21 which exhibit is this?  This is 6?
22         THE COURT REPORTER:  Uh-huh.

**Page 101**

1      (Plaintiff's Deposition Exhibit Number 6 was
2  marked for identification and attached to the
3  transcript.)
4  BY MR. GOODMAN:
5      Q   Mr. McGowan, the court reporter has handed
6  you what she has marked as Exhibit Number 6, which is
7  materials that begin with the first page that seems to
8  be dated December 31st, 2002 from State Street.
9      A   Yes.
10     Q   Do you recall seeing -- and I know I've just
11 given them to you, so feel free to look them over, but
12 do you recall seeing this material before?
13     A   I do not recall seeing this.  I do not
14 recall seeing this specific package.
15     Q   Okay.  Do you recall reviewing material from
16 State Street regarding the services it could offer to
17 you in connection with -- in connection with serving
18 as an independent fiduciary?
19     A   Yes.
20     Q   And, let me see, if you could turn to
21 page -- turn to what's been marked Bates stamp
22 number 8112.

**Page 118**

1  BY MR. GOODMAN:
2   Q   All right. Exhibit Number 8.
3   A   These are the annual, referred to by the
4  government, Form 5500, which is the annual return for
5  employee benefit plans.
6   Q   And you signed this approximately
7  October 5th -- October 15, 2004?
8   A   I signed it on October 15th, 2004.
9   Q   Okay. And if you could turn to what's been
10 Bates stamped as page 940. This, as far as you know,
11 provides an accurate representation as to the assets
12 in the investment plan as of the end of the year 2003
13 and 2002; is that correct?
14  A   That is correct.
15  Q   And the value of the plan on December 31st,
16 2003 was approximately $476 million?
17  A   That's correct.
18  Q   Of that, approximately $21 million was in
19 the Grace Stock Fund; is that correct?
20  A   Correct.
21  Q   Was this information made available to State
22 Street?

**Page 119**

1   A   I cannot recall if they requested that. If
2  they requested it, it would have been made available
3  to them.
4   Q   There wasn't any reason why Grace wouldn't
5  have provided this information to State Street?
6   A   It's public information.
7   Q   In fact, you can --
8   A   They could get it without asking us.
9   Q   You can get it off a Web site; is that
10 correct?
11  A   That's correct.
12  Q   Here's the missing document that I couldn't
13 find earlier, so I apologize.
14     (Plaintiff's Deposition Exhibit Number 9 was
15 marked for identification and attached to the
16 transcript.)
17 BY MR. GOODMAN:
18  Q   Mr. McGowan, I've handed to you Exhibit
19 Number 9. Take time to look at it, but are you
20 generally familiar with this exhibit?
21  A   Yes.
22  Q   What is it?

**Page 120**

1   A   This is the engagement letter for State
2  Street to act as the independent fiduciary for the
3  Grace Stock Fund and the 401(k) plan.
4   Q   And it's on State Street Bank & Trust
5  Company letterhead; is that correct?
6   A   That is correct.
7   Q   And it was entered into on November 24th --
8  or it was sent to you on November 24th, 2003; is that
9  correct?
10     MS. FLOWE: By "you," you mean the
11 company?
12     MR. GOODMAN: Yes.
13     MS. FLOWE: And the investment and
14 benefits committee?
15     THE WITNESS: Yes.
16 BY MR. GOODMAN:
17  Q   And if you turn to page 9 of this letter --
18  A   I don't see page numbers.
19  Q   It's on the top.
20     MS. FLOWE: It's up at the top.
21     THE WITNESS: Oh, yeah. Okay. There
22 it is. Yes.

**Page 121**

1  BY MR. GOODMAN:
2   Q   And you've signed this twice; correct?
3   A   That is correct.
4   Q   Okay. You signed it as being a member of
5  the investment and benefits committee and as senior
6  vice president at W. R. Grace & Company; is that
7  correct?
8   A   That's correct.
9   Q   Okay. Prior to signing this document, did
10 you need approval from anybody?
11  A   Yes.
12  Q   And who was that?
13  A   Initially from -- the management team within
14 Grace agreed, you know, the Paul Norris, the Tarola,
15 the Brian McGowan, the Dave Siegel; and official
16 approval to retain them from the Grace Board of
17 Directors and also the bankruptcy court.
18  Q   And if you were to look at what's been Bates
19 stamped as an exhibit to this -- it's Exhibit
20 Number II, but the Bates stamp number is 1308.
21  A   1308. Yes.
22  Q   These are investment guidelines; correct?

**Page 142**

1 understanding as to how frequently, if at all,
2 participants reallocate their assets in the plan?
3   A   I could not answer you specifically. It
4 might have been general information provided to us,
5 but I don't recall.
6   Q   What's your understanding generally
7 regarding that if you have any understanding?
8   A   People do move money from fund to fund.
9   Q   What happened to the Grace Stock Fund
10 proceeds after they were sold in April of 2004?
11   A   The funds were initially put in the fixed
12 income fund and followed that the participants could
13 move it to whatever fund they so desired.
14   Q   Do you know whether the participants
15 actually did reallocate those funds?
16   A   I have no idea.
17       (Plaintiff's Deposition Exhibit Number 15 was
18 marked for identification and attached to the
19 transcript.)
20       THE WITNESS: Okay.
21 BY MR. GOODMAN:
22   Q   Sure. Could you identify what Exhibit

**Page 143**

1 Number 15 is again, please?
2   A   Exhibit 15 is a summary of the 401(k) plan,
3 the allocation by account as of June 30th, 2004.
4   Q   Does this reflect at all what the
5 participants did with the proceeds from the Grace
6 Stock Fund sale? If you want to, please look at
7 Exhibit Number 4 -- or 14. Let me just do this. Do
8 you have Exhibit Number 14 in front of you?
9   A   I'm looking at both of them.
10   Q   And if you take a look at the fixed income
11 fund as of March 31st, 2004, what percentage of the
12 fund is that -- of the plan?
13   A   50.7 percent.
14   Q   And if you take a look at the percentage of
15 it in the fixed income fund as of June 30th, 2004,
16 what percent of it?
17   A   54.2 percent.
18   Q   And during that time approximately 4 percent
19 of the plan's assets were sold and put in the fixed
20 income fund; is that correct?
21   A   That is correct.
22   Q   And does that indicate to you at all whether

**Page 144**

1 the participants as of June 30th, 2004 can -- had
2 continued to maintain their funds in the fixed income
3 fund as opposed to distributing them someplace else?
4   A   By looking at the absolute numbers, it would
5 look as if the money was put into the fixed income
6 fund and stayed there, but also during that period of
7 time new contributions were being made and new
8 matching gifts were made by the company, so it does
9 not -- cannot draw a conclusion that it all went into
10 the fixed income fund and stayed there.
11   Q   Do you have any recollection -- but you --
12 as an investment and benefits committee member, did
13 you perform any analysis to determine whether that's
14 what occurred?
15   A   No.
16   Q   Okay. Did you learn at some point that
17 State Street intended to sell the plan's assets -- not
18 the plan's, I'm sorry, the Grace stock -- sell --
19 liquidate the Grace Stock Fund and sell it to a
20 company known as D.E. Shaw?
21   A   Yes.
22   Q   How did you learn that?

**Page 145**

1   A   A telephone call was made by State Street to
2 Grace. I do not know exactly who got the call. It
3 was more of a -- it was a courtesy call, a heads-up of
4 what was being done just so that we were aware.
5   Q   Who told you, if you recall?
6   A   I don't recall who exactly told me.
7   Q   What did you do, if anything, when you
8 learned that State Street was about to sell the stock
9 to D.E. Shaw?
10   A   What do you mean by what did I do?
11   Q   Well, just exactly that. Did you contact
12 anybody at Grace to discuss the sale?
13   A   The only thing I would have done would be to
14 have communicated it to the appropriate individuals on
15 the Grace leadership team to make sure that the likes
16 of a Paul Norris, Dave Siegel, Mike Piergrossi
17 would -- Bob Tarola, you know, et cetera, that the
18 leadership team knew the sale was taking place, Bill
19 Corcoran.
20   Q   Did you do that?
21   A   To the best of my recollection we made sure
22 that everyone that I mentioned was aware. I'm not

Page 162

1    Q   I think we're almost done.
2    (Plaintiff's Deposition Exhibit Number 17 was
3    marked for identification and attached to the
4    transcript.)
5    BY MR. GOODMAN:
6    Q   Mr. McGowan, I've handed you what's been
7    marked as Exhibit Number 17. Do you have that in
8    front of you?
9    A   Yes.
10   Q   Do you recall seeing this document before?
11   A   Yes.
12   Q   Okay. Do you recall this was sent to plan
13   participants on approximately April 19th, 2004? Do
14   you see that?
15   A   Yes.
16   Q   Approximately how much earlier than
17   April 19th, if you recall, did you learn that State
18   Street intended to sell the shares to an outside party
19   for $3.50 a share?
20   A   Based on my recollection, it was a matter of
21   days.
22   Q   Okay. Prior to that announcement, did you

Page 163

1    know -- had you ever heard of D.E. Shaw?
2    A   Vaguely.
3    Q   Did State -- not State Street. Did Grace
4    have any relationship with D.E. Shaw?
5    A   Not that I'm aware of.
6    Q   What did you vaguely know about D.E. Shaw?
7    A   They were a hedge fund.
8    Q   Okay. What do you understand a hedge fund
9    to be?
10   A   They buy and sell stock for profit, in a lot
11   of cases, speculation.
12   Q   During bankruptcy proceedings, did the price
13   of -- do you have an understanding as to whether the
14   price of Grace stock fluctuated?
15   A   It did.
16   Q   And what were the fluctuations, if you
17   recall?
18   A   Oh, boy. I know the low was about 95 cents
19   a share, and it's gone as high as $30 a share --
20   Q   And that's --
21   A   -- recently.
22   Q   -- recently; is that correct?

Page 164

1    A   Yes.
2    Q   Did you have any input or did anybody from
3    Grace have any input in connection with Exhibit
4    Number 17, the creation and preparation of this?
5    A   No, I didn't. And not that I'm aware.
6    Q   Has anybody ever asked you for a referral
7    regarding State Street's performance?
8    A   Me personally, no.
9    Q   Grace; anybody at Grace been asked to give a
10   referral regarding its satisfaction or the performance
11   that State Street did for Grace?
12   A   I can't answer that.
13   Q   Have you ever been asked to write a
14   recommendation for State Street?
15   A   Personally, no.
16   Q   In referring to "you," I'm referring to
17   Grace.
18   A   Not that I'm aware.
19       MR. GOODMAN: Before I hang this up,
20   give me -- if you want to take a quick break, a couple
21   of minutes, I want to take a quick look at a few
22   things. I think I'm almost done.

Page 165

1    (Recess -- 3:38 p.m.)
2    (After recess -- 3:43 p.m.)
3    BY MR. GOODMAN:
4    Q   Mr. McGowan, I have a couple of more
5    questions. On December 31st, 2004, do you recall what
6    percentage of your 401(k) was invested in the Grace
7    Stock Fund?
8    A   December 31st, 2004?
9    Q   I'm sorry. 2003. I could give you the
10   answer for 2004.
11       MS. KUCHINSKY: I was going to say, you
12   should have the answer for 2004.
13       THE WITNESS: Yeah, that's why I -- I
14   didn't know why you were asking me that question.
15   BY MR. GOODMAN:
16   Q   Because I'm stupid.
17   A   I -- I don't know what percentage. All my
18   money is in the fixed income fund other than the Grace
19   Stock Fund.
20   Q   Okay. That's fine. And I don't need to pry
21   into your net worth, but I will tell you that it was
22   approximately -- my guess is, assuming it was $3 a

42 (Pages 162 to 165)