UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
***************************
LAWRENCE W. BUNCH, et al,  )
               Plaintiff,  )
                           )Consolidated as
     VS.                   )Case No.:04-11380-WGY
                           )
W.R. GRACE & CO., et al,   )
               Defendant.  )
***************************
```

DEPOSITION OF SHAWN JOHNSON, a witness called

on behalf of the Plaintiffs, taken pursuant to

the provisions of the Federal Rules of Civil

Procedure, before Lisa W. Starr, a Registered

Professional Reporter/Certified Realtime Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at the offices of State Street

Bank & Trust Company, One Lincoln Street, Boston,

Massachusetts, on May 23, 2007, commencing at

9:06 a.m.

**Page 30**

1   A.  I'm trying to think about that to give
2   you some reasonable answer.  I'm trying to do
3   math in my head.
4        Less than a third, or somewhere around a
5   third.  That's an approximation.
6   Q.  Okay.  I take it, therefore, that it's a
7   relatively important responsibility that Ms.
8   Driscoll has; is that correct?
9        MR. FLICKER:  Objection: Vague.
10  A.  I think it's important.  That's kind of a
11  judgmental question.
12  Q.  When did that -- I'm going to apologize,
13  it's called --
14  A.  The Fiduciary Group.
15  Q.  When did that come into existence, if you
16  know?
17  A.  Well, it's had different names over the
18  years.  But when really since the beginning of
19  ERISA, a group was created to oversee company
20  stock.  It used to exist prior to 2000, which is
21  the CitiStreet joint venture date, in a business
22  unit at State Street called Retirement Investment
23  Services, RIS.  That was basically a business set
24  up to do 401(K) plans.

**Page 31**

1        When we created CitiStreet, the company
2   stock oversight was moved out of, it wasn't part
3   of the joint venture, if you will, and was
4   created under SSgA at that point.  It was moved
5   into its own and reported up to John Serhant, who
6   was the prior chairman of the Investment
7   Committee.
8   Q.  Okay, that's helpful.  Why is there a
9   need for there to be separate fiduciaries?  Why
10  did State Street view there was a need or service
11  it could provide for company stock?
12  A.  I'm not quite sure I understand the
13  question.  If the question is --
14  Q.  Well, let me rephrase the question.  You
15  don't need to guess at my questions.
16  A.  Okay.
17  Q.  Obviously, CitiStreet -- I'm sorry.
18  State Street provides services in connection with
19  company stock?
20  A.  Yes.
21  Q.  And my question is why did CitiStreet
22  determine that those services were valuable to
23  customers who would purchase these services?
24       MR. FLICKER:  Objection.

**Page 32**

1   A.  Under ERISA, you have to basically have a
2   trustee to oversee the whole 401(K) plan.  State
3   Street provides trustee services as a core
4   business.
5        Within company stock, there are some
6   uniquenesses in ERISA as it relates to company
7   stock.  We had discussed earlier in your question
8   about diversification; there is an exemption
9   under ERISA.  The exemption is that that stock
10  does not have to be diversified so long as the
11  investment is deemed prudent.
12       So, you have an obligation, if you will,
13  to insure that that investment is a prudent
14  investment.
15  Q.  Okay.
16  A.  So, why you have to have an oversight
17  function is because of the way the regulations or
18  laws govern 401(K) plans.
19  Q.  Let me see if I can go back a step.  As I
20  was going through documents and reviewing things,
21  I saw a couple of different phrases -- maybe you
22  can identify them for me -- one of which was
23  Fiduciary Committee, I've seen the term
24  Independent Fiduciary Group.  Are you familiar

**Page 33**

1   with those terms?
2   A.  Yes.
3   Q.  Are they different and distinct, or are
4   they one and the same?
5        MR. FLICKER:  Just for clarification
6   because I know you're asking it this way, you
7   mean with respect to how State Street's business
8   is set up?
9        MR. GOODMAN:  Correct.  Thank you.
10  A.  The Independent Fiduciary Group would be
11  Kelly Driscoll's business, the people on her
12  team.  The committee that you referred to, we
13  have a committee, which the Fiduciary Group would
14  make a presentation to such that a decision, a
15  fiduciary decision, could be made.
16       So, again, there's senior, again, people
17  outside of the direct business.  Senior
18  executives sit on that committee to make a
19  determination when the group presents an issue
20  for resolution or discussion.
21  Q.  Okay.  So, the composition of the
22  Fiduciary Committee -- well, is the composition
23  of the Fiduciary Committee, does it include
24  members of the Independent Fiduciary Group?

**9 (Pages 30 to 33)**

**Page 34**

1   A.   That would be one; Kelly Driscoll sits on
2   the committee. But I sit on that committee, but
3   the chair of that committee, again, this is the
4   way we govern ourselves, is not in the line of
5   business. The chair is somebody different, Mark
6   Brown.
7       Q.   So, the Independent Fiduciary Group
8   headed by Ms. Driscoll, when something has to be
9   voted upon, is my guess --
10      A.   Exactly, correct.
11      Q.   -- brings the issue to the Fiduciary
12  Committee, who consists of her and other senior
13  management, one of which is yourself and Mark
14  Brown, who was not involved, I don't know what
15  his role is, but he's not involved in this line
16  of business?
17      A.   That's correct.
18      Q.   What is Mr. Brown's role?
19      A.   Current role is Chief Marketing Officer,
20  I believe.
21      Q.   How many people sit on the committee?
22      A.   Let me see if I can do the members.
23  Would that be okay? Kelly Driscoll, myself, Mark
24  Brown, Mitch Shames, whose general counsel to the

**Page 35**

1   committee, Eric Brandhorst, who is one of our
2   investment, out of the investment group. Liz
3   Shea out of compliance, and another guy from the
4   fixed income side whose name is escaping me.
5   That's the committee.
6       Q.   Is the Fiduciary Group also known as the
7   Department of Institutional Fiduciary Services?
8       A.   The Department —
9       Q.   Or something else similar to that?
10      A.   Well, the collection of businesses is
11  called Institutional Fiduciary Services, the
12  three businesses that I spoke of.
13      Q.   Okay.
14      A.   Generally, Kelly's business is referred
15  to as the Fiduciary Group or the Independent
16  Fiduciary Group.
17      Q.   Does Ms. Driscoll's group, the
18  Independent Fiduciary Group, do they provide any
19  services for plans or entities that do not
20  include company stock?
21      A.   I'm trying to make sure I get the
22  question correct. You're saying does she provide
23  any services other than company stock services?
24      Q.   In connection with Independent Fiduciary

**Page 36**

1   Group?
2       A.   Not that I'm aware of, if I'm answering
3   the question correctly.
4       Q.   You may have answered the question
5   earlier, and I just don't have it written down so
6   I'm going to ask it again. Approximately how
7   many companies does State Street, does the
8   independent Fiduciary Group provide services for?
9       A.   How many company stock clients, is that
10  what you're saying?
11      Q.   Yes.
12      A.   Oh, somewhere over a hundred.
13      Q.   And is there a distinction between --
14  let me ask this question.
15          Are some of those ESOP plans?
16      A.   Yes.
17      Q.   And what is an ESOP?
18      A.   Employee Stock Ownership Plan.
19      Q.   But what does that mean?
20      A.   An ESOP is a trust, if you will, that
21  owns shares on behalf of the employees.
22      Q.   And --
23      A.   I'm sure the lawyers, you could ask a
24  lawyer to give you a better definition.

**Page 37**

1       Q.   I'm just looking for what your
2   understanding is at this moment.
3       A.   Yes.
4       Q.   And what -- are their company
5   stockholdings in 401(K) plans?
6       A.   Yes.
7       Q.   What is your understanding of a 401(K)
8   plan?
9       A.   A 401(K) plan is a defined contribution
10  plan where employees deduct contributions from
11  their wages or also have company matches that can
12  potentially go into those plans as well. Then
13  they choose from some investments. For some
14  companies, they have a company stock option in
15  the 401(K) plan.
16      Q.   Is there a distinction between how the
17  Independent Fiduciary Group manages company stock
18  in a 401(K) plan as opposed to an ESOP plan?
19      A.   I think generally the answer would be no.
20  They're both governed by ERISA, have very similar
21  requirements. There may be some technical legal
22  differences there, but you would have to talk to
23  somebody other than me to get the specific
24  differences.

**10 (Pages 34 to 37)**

**Page 38**

1    Q.  Is it your understanding in connection
2  with independent Fiduciary Group that when the
3  group has responsibility for company stock in a
4  401(K) plan that it applies, that it treats --
5  I'm sorry, let me go back a step and rephrase the
6  question.
7        Does the Independent Fiduciary Group when
8  it analyzes company stock in a 401(K) plan
9  consider the other assets or other investment
10  options available to participants in the 401(K)
11  plan?
12        MR. FLICKER:  Objection.
13    **A.  In what way?  I'm confused about that**
14  **question.**
15    Q.  To determine whether company stock is
16  appropriate, is an appropriate investment
17  vehicle?
18    **A.  Whether or not to offer a company stock**
19  **option in a plan, now I'm going to sound like a**
20  **lawyer, is a set law function, if you will.  The**
21  **company decides what to put into the plan as an**
22  **option.  So now, once an option exists, here is a**
23  **company stock, the trustee and the fiduciaries**
24  **that oversee that particular option worry about,**

**Page 39**

1  **you know, look at just that option, not in**
2  **context of the other ten or twenty or thirty**
3  **options that might exist in the plan.**
4    Q.  And let me go back a step so I understand
5  actually what we've talked about.  I think we
6  have a general understanding as to what the
7  Independent Fiduciary Group does in connection
8  with company stock, but I'm not sure I've ever
9  asked you that question.
10        What does Independent Fiduciary Group
11  actually do in connection with the company stock?
12    **A.  Well, A, it manages the money going in**
13  **and out of a company stock fund.  So, if you**
14  **think about that employees putting money in, their job**
15  **is to take that money, buy shares of the stock,**
16  **keep enough liquidity, money movement**
17  **responsibilities.  And they do have requirements**
18  **to try and do as best as they can to track that**
19  **stock because of the mandate of that plan.**
20        **They have a constant review process of**
21  **that stock where they're looking at, you know, is**
22  **there a problem, are there issues with it?  Is**
23  **the company going to go bankrupt, or whatever the**
24  **issue might be.  So, they're constantly**

**Page 40**

1  **monitoring all of the company stock plans that**
2  **they have under their purview.**
3        **So, they are the resident experts for the**
4  **entire corporation in following company stocks.**
5    Q.  Okay.  Now, ultimately, I guess there's a
6  variety of factors here.  Does the ability of the
7  Independent Fiduciary Group with the consent and
8  approval of the Fiduciary Committee, does it have
9  the ability to terminate the company stock
10  available in the 401(K) plan?
11        MR. FLICKER:  Objection:
12  Mischaracterizes the testimony.
13    Q.  Let me go back a step.  We'll take it
14  step by step.
15        The ultimate purpose of monitoring stock
16  is for what?  What is ultimately the goal of
17  monitoring the company stock?
18    **A.  In the capacity that we are engaged in**
19  **that plan, in any company stock plan, we are an**
20  **ERISA fiduciary.  So, what that means is you have**
21  **to follow the rules of what an ERISA fiduciary**
22  **is.**
23        **In company stock, as I mentioned earlier,**
24  **there are unique provisions in ERISA which say**

**Page 41**

1  **you're exempt from diversification within that**
2  **fund, meaning you can just own that stock, so**
3  **long as it is a prudent investment.**
4        **Now, if you're monitoring that stock and**
5  **it goes through our process of review to the**
6  **committee, and you deem it to be imprudent, you**
7  **have no alternative under ERISA except to**
8  **diversify that fund, which means you must sell**
9  **and start to diversify that fund away from a**
10  **single stock.**
11        **So, it's required under the law, if you**
12  **will, if it becomes deemed imprudent.  So the**
13  **purpose to monitor is to say is there anything**
14  **wrong.  You know, do we shut the fund down?  No.**
15  **That is driven by the company that set up the**
16  **plan.  But we can only follow the directions of**
17  **that plan to the extent that it's consistent with**
18  **ERISA.**
19    Q.  If you are an independent fiduciary, in
20  other words, you have authority to do what State
21  Street and the Fiduciary Group thinks is best,
22  does the Independent Fiduciary Group have
23  authority with the appropriate consent of the
24  Fiduciary Committee to liquidate a company stock

**11 (Pages 38 to 41)**

**Page 54**

1  stock become inconsistent with ERISA?
2      MR. FLICKER:  Objection: Calls for
3  speculation.
4      **A.  It would depend on the facts and**
5  **circumstances, of course.**
6      Q.  Provide me with the facts and
7  circumstances in which you believe on behalf of
8  State Street Independent Fiduciary Group that an
9  investment in company stock becomes inconsistent
10  with ERISA?
11      MR. FLICKER:  Objection. Calls for
12  speculation, incomplete hypothetical,
13  speculative.
14      **A.  Again, it would depend.  I'm starting to**
15  **sound like an economist.  It depends would be the**
16  **answer.**
17      Q.  Depends on what?
18      MR. FLICKER:  Same objection.
19      **A.  Facts and circumstances.**
20      Q.  I understand.  But particularly, based on
21  the experience that you've had at State Street,
22  what facts and circumstances?
23      MR. FLICKER:  Objection: Calls for
24  expert opinion.  Incomplete hypothetical.

**Page 55**

1      **A.  You know, you'd have to be more specific**
2  **because I'm not quite sure I know the best way to**
3  **answer that.**
4      Q.  Okay.  Does the threat of imminent
5  bankruptcy cause the retention of company stock
6  to be inconsistent with ERISA?
7      MR. FLICKER:  Same objections.
8      **A.  It would simply be one factor.  An**
9  **important one, but one factor.**
10      Q.  What about an assessment that the company
11  can no longer be operated as a going concern?
12      MR. FLICKER:  Same objection.
13      **A.  Again, a factor.  It's a holistic point**
14  **of view.  You would have to look at all of it.**
15      Q.  What about if the company is in a
16  distressed industry?
17      MR. FLICKER:  Same objection.
18      **A.  You know, again, a factor.  I mean,**
19  **again, something to consider.  Wholesale industry**
20  **is going bankrupt, that would be something you**
21  **would want to consider.**
22      Q.  Assuming the company is facing imminent
23  bankruptcy, what factors would mitigate against
24  the sale of company stock?

**Page 56**

1      MR. FLICKER:  Same objection.
2      **A.  It would depend on the analysis you**
3  **undertook.  One would be do you anticipate that**
4  **the shares would be worth anything post**
5  **bankruptcy would be another factor.**
6      Q.  How does State Street determine whether
7  it thinks shares may be worth something post
8  bankruptcy?
9      **A.  Generally, we hire experts in whatever it**
10  **is.  We review ether research that we can find,**
11  **public documents, reports.  Sometimes companies**
12  **articulate that we expect post bankruptcy that**
13  **the shares will be wiped out.  They'll issue**
14  **press releases like that occasionally.**
15      **So, numbers of types of things.**
16      Q.  Which type of experts does State Street
17  hire?
18      **A.  Generally, the ERISA experts.  When you**
19  **decide you have some issue, you might engage**
20  **outside counsel for ERISA or outside financial**
21  **experts.**
22      Q.  Why does State Street with all of its
23  financial expertise find it necessary to hire
24  outside financial experts?

**Page 57**

1      MR. FLICKER:  Objection:
2  Argumentative.
3      **A.  Simply part of the process would be my**
4  **answer.**
5      Q.  Why is it part of the process?
6      **A.  It's independent.  That's a good thing.**
7  **We might not have the best expertise in-house**
8  **depending on the facts and circumstances.**
9      Q.  You said for one thing it's good because
10  it's independent.
11      **A.  Just somebody else to give us a point of**
12  **view.**
13      Q.  Isn't State Street independent?
14      **A.  Yeah.**
15      Q.  Prior to -- when did State Street --
16  when did Grace, if you know, engage State Street
17  to serve as a fiduciary for your Grace plan?
18      **A.  I don't know the date, and I can't ask,**
19  **so I don't know.**
20      Q.  Well, barring that date, do you have a
21  general understanding as to the relative time
22  period?  If I told you it was approximately
23  December 15th of 2003, would that refresh your
24  recollection?

**15 (Pages 54 to 57)**

**Page 62**

1  obviously Goodwin Procter?
2    A.  Um-hmm.
3    Q.  Lockhart?
4    A.  Kirkpatrick & Lockhart.  There are
5  others, but lawyers is not my expertise.
6    Q.  Who creates the list?
7    A.  They're both sort of reviewed by general
8  counsel for SSgA.  So, he would say, yes, these
9  law firms are okay.  Financial advisors also
10  would be me and Kelly, and general counsel would
11  review that list as well.
12    Q.  Do you recall any other financial
13  advisors being used by the IFG in the past, other
14  than the two that we just discussed?
15    A.  Yeah, there are other ones.  I can't
16  recall who they are, but I know we've used firms
17  other than those two.
18    Q.  Are those two -- do you recall how many
19  times in the past that the IFG has used Duff &
20  Phelps?
21    A.  Yes.  We used Duff & Phelps on other
22  accounts.
23    Q.  Approximately how many times?
24    A.  Some of them are ongoing.

**Page 63**

1    Q.  Who is used with Federal Mogul?
2    A.  Don't recall.
3    Q.  Do you know who was used with United
4  Airlines?
5    A.  Boy, I don't want to get that wrong.  I
6  can't recall the financial advisor off the top of
7  my head.  I think it was Charlie Smith at
8  Kirkpatrick & Lockhart that did the legal, I
9  think.  Again, Kelly probably had a better
10  recollection.
11    Q.  Is one of the approved law firms O'Melvey
12  & Myers [sic]?
13    A.  I don't recall.
14        MS. HEERMANS:  O'Melveny.
15    A.  I've heard the firm, but...
16    Q.  Does an attorney by the name of Mr.
17  Eckles (sp.) ring a bell?
18    A.  No.
19    Q.  Prior to the engagement with Grace, did
20  State Street in any of its capacities own or
21  manage any Grace stock?
22    A.  Just to clarify, do you mean within the
23  401(K) plan?
24    Q.  No, I mean very generally throughout all

**Page 64**

1  of State Street's various organizations that you
2  manage?
3    A.  Yes, we would have owned Grace stock
4  somewhere.
5    Q.  Where, if you know?
6    A.  Grace is in the Russell 2000, and thus
7  the Russell 3000 Index.  So, our index business,
8  which would own all two thousand or three
9  thousand companies within that index, would own
10  Grace's stock.
11    Q.  Who is responsible for determining the
12  amount of shares of a particular stock that would
13  be owned in an index fund?
14    A.  Well, the index provider determines the
15  weight of the security in the index.  So, it
16  would, in the case of Russell, they're market cap
17  weighted.  You take all the market caps of all of
18  the securities, put them altogether and say,
19  okay, this particular security is .05 percent of
20  the index.  So, if you're running a hundred
21  million dollars, .05 times the hundred million
22  dollars is how much you would put into the
23  shares.
24    Q.  Okay.  Does the way that the index is

**Page 65**

1  operated at State Street, those two index funds,
2  and potentially other index funds, does the
3  manager of that fund have the ability to deviate
4  from that weighting process?
5    A.  No, not in the index funds, no.
6    Q.  Other than the Russell 2000 and 3000, are
7  there any other holdings that Grace -- I'm
8  sorry, that State Street had of Grace holdings?
9    A.  Not that I'm aware.  We looked across --
10  as I mentioned in the funds, you have an index
11  fund, you have an enhanced fund.  The enhanced
12  group has a process where they put a security in
13  global jail.  What does that mean?  The index
14  funds are built using a quantitative process.  If
15  a company is bankrupt, the quantitative process
16  does not apply very well.  So, it would be
17  flagged as you're not going to have an opinion on
18  that stock; you can just own what's in the index.
19        Likewise, when you move to the active
20  funds, where you're taking much more risk and
21  you're trying to beat a benchmark with a fewer
22  number of securities, they have not owned Grace
23  in that strategy at all since 2000.
24    Q.  Okay.

**17 (Pages 62 to 65)**

**Page 82**

1    A.  Okay.
2    Q.  This appears to me to be an Engagement
3    Letter with Duff & Phelps.  Do you see that?
4    A.  Yes.
5    Q.  And it says "Attention:  Monet T. Ewing."
6    Do you see that?
7    A.  Yes.
8    Q.  Is one of the responsibilities that Ms.
9    Ewing would have as a fiduciary officer to engage
10   financial advisors?
11   A.  Yes, in connection with something like
12   this.
13   Q.  So, it would be consistent with her
14   responsibilities to engage Duff & Phelps; is that
15   correct?
16   A.  Yes.
17   Q.  Have you ever seen an Engagement Letter
18   between Grace, Duff & Phelps, and State Street?
19   In other words, have you ever seen this letter
20   before?
21   A.  No.
22   Q.  What did you understand Duff & Phelps'
23   responsibility to be in connection with this
24   assignment, meaning the Grace stock fund?

**Page 83**

1    A.  To provide us financial advice on the
2    company stock, the company, its stock, what the
3    situations were related to Grace, to be our
4    financial expert.
5    Q.  Okay.  And particularly, what financial
6    information did you as a member of the
7    independent Fiduciary Committee seek from Duff &
8    Phelps?
9    A.  Insight as to the company.  Some of the
10   questions actually you asked earlier, going
11   concern kind of questions, value, what the
12   prospective value of the company would be, or of
13   the shares.  These are the kind of things we
14   anticipated to get from Phelps.
15   Q.  You said the prospective value of the
16   shares; is that correct?
17   A.  You know, what do they think it's worth.
18   Q.  Why was Duff & Phelps in a better
19   position than the market itself to determine the
20   value of the shares?
21          MR. FLICKER:  Objection:
22   Foundation.
23   A.  It's, again, to give us an alternative
24   view than what we see in the marketplace.

**Page 84**

1    Q.  Let me ask the question slightly
2    different.  Did you believe that Duff & Phelps
3    was in a better position than the market to
4    determine the price of the Duff & Phelps shares?
5          MR. FLICKER:  Objection.
6    A.  Duff & Phelps was in a good position to
7    give us advice as to what the shares were worth,
8    but the market is the best determinant on any day
9    as to what the shares are worth.
10   Q.  And again, why was it necessary to hire
11   Duff & Phelps as opposed to do this in-house at
12   State Street?
13   A.  Again, our general process is to engage
14   somebody outside.  Dealing with bankrupt stocks
15   is not necessarily something we do a lot of here.
16   So, while we have a lot of financial expertise,
17   bankruptcy is probably not something I would rely
18   solely on our inside resources for anyway.
19   Q.  I'm sorry, I interrupted you.  We were
20   talking about the financial advice Duff & Phelps
21   was offering and how State Street would use it
22   or, in particular, how you used it as a member of
23   the Independent Fiduciary Committee.  You said
24   you wanted insight regarding a couple of areas,

**Page 85**

1    at least, going concern and the value of a stock.
2    Any other issues?
3    A.  You know, an understanding of asbestos
4    issues as it related to Grace, liabilities,
5    things like that.
6    Q.  How did you get the information that Duff
7    & Phelps prepared?  In other words, how did you
8    understand what Duff & Phelps was coming up with?
9    A.  They made a presentation to the
10   committee.
11          (Discussion Materials by
12   Duff & Phelps was marked as Johnson Exhibit No. 3
13   for identification).
14   Q.  Mr. Johnson, I've handed to you what the
15   court reporter marked as Johnson Exhibit No. 3.
16   This appears to be discussion materials regarding
17   Grace prepared by Duff & Phelps and is dated
18   December 11, 2003, Bates stamp 3714.  Do you have
19   that in front of you?
20   A.  Yes.
21   Q.  Have you seen this document before?
22   A.  Yeah.  I believe it was presented to the
23   committee.
24   Q.  I'm going to go back to another issue

**22 (Pages 82 to 85)**

Page 90

1    A.  Again, I'm trying to recall several years
2  back.  So that's kind of difficult, and I look at
3  many, many companies.  But as I recall, it
4  generated cash flow.  That's what I recall.
5    Q.  In consideration of whether to sell
6  company stock, does the factor how does the
7  ability to conduct normal business activities
8  factor in?
9      MR. FLICKER:  Objection.  Calls for
10  an opinion.
11    Q.  In your capacity being a member of -- in
12  your capacity as a member of the Independent
13  Fiduciary Committee, did you consider the ability
14  of Grace to conduct normal business activities
15  when you decided, when the committee decided to
16  sell Grace stock?
17      MR. FLICKER:  Objection.
18    A.  I don't recall.
19      (W.R. Grace Investment
20  Manager Engagement - Savings and Investment Plan
21  was marked as Johnson Exhibit No. 4 for
22  identification).
23    Q.  Mr. Johnson, I'm handing to you what the
24  court reporter has marked as Johnson Exhibit

Page 91

1  No. 4.  Do you see that?
2    A.  Yes.
3    Q.  It's a presentation to a Fiduciary
4  Committee on W.R. Grace Investment Manager
5  Engagement and Savings and Investment Plan,
6  December 11, 2003, Bates stamp 8031.  Do you see
7  all of that?
8    A.  Yes.
9    Q.  Do you recall ever seeing this document
10  before?
11    A.  Can I look at it?
12    Q.  Take as much time as you need.
13    A.  I want to say this was presented to one
14  of the committee meetings at one point.  I seem
15  to recall that.  I can't remember if I was
16  actually at that meeting or just got the
17  presentation, but I seem to recall this.
18    Q.  Okay.  Generally, do you receive
19  materials similar to this before a committee
20  meeting; is that correct?
21    A.  Yes, sometimes.
22    Q.  And what did you do with information if
23  you received it before a committee meeting?
24    A.  Usually, print it and read it if I can

Page 92

1  before I go to the committee.
2    Q.  Is this sent to you through e-mail then?
3    A.  Often, or sometimes it's dropped off.
4    Q.  Physically, because this is an impressive
5  facility I'm sitting in now in terms of size and
6  everything else, where in location to your office
7  is the Independent Fiduciary Group?
8    A.  I'm on the 35th floor, which is the
9  executive floor; they're on the 24th floor.
10    Q.  They're all in the same physical --
11    A.  They're all in this building, yes.
12  Correction.  Some of the company stock folks that
13  sort of trade the securities are in a building in
14  Quincy.  But Kelly and her direct reports are
15  here.
16    Q.  And you said you tried to review this
17  before attending the meeting; is that correct?
18    A.  Yes.
19    Q.  Is there any particular information you
20  would focus in on to try to assist you in
21  preparing for the meeting?
22    A.  No.
23    Q.  Is this the PowerPoint presentation you
24  were discussing earlier?

Page 93

1    A.  Yeah, I believe the one where it said,
2  okay, we're being engaged to do this thing for
3  Grace, this is kind of what I remember.  I don't
4  remember this meeting, December 11.  It could
5  have been that meeting; I don't recall that.
6    Q.  If you take a look on page 4, which is
7  Bates stamped 804, if you take a look at the
8  second bullet point, do you see that?
9    A.  Yes.
10    Q.  "State Street's role is to evaluate
11  whether Grace's stock is a prudent investment and
12  determine whether it is appropriate to remain
13  invested in Grace stock or sell any or all of the
14  IBM stock for cash."
15      IBM, I'm assuming, doesn't have any
16  relationship to this, is that correct?
17    A.  Yes, it's a typo.
18    Q.  I'm assuming IBM is another company for
19  which State Street provides fiduciary services?
20      THE WITNESS:  Am I allowed to answer
21  that?
22      MR. FLICKER:  We're going to
23  designate this entire transcript as confidential.
24    A.  Yes, we have done some fiduciary stock

**Page 98**

1  Q.  What experience, if you know, did Duff &
2  Phelps have in connection with asbestos issues?
3  **A.  I'm trying to recall now because we did**
4  **have some discussions about that. I believe they**
5  **had some knowledge of the chemicals industry and**
6  **what was going on in asbestos at the time. I**
7  **can't be more specific than that.**
8  Q.  If you would turn to page 6, which is
9  806. This is talking again about Duff & Phelps'
10  preliminary analysis.
11  I assume this -- well, is this
12  consistent with your understanding that Duff &
13  Phelps provided Grace with a general
14  introduction, provided State Street, I'm sorry,
15  with a general introduction to Grace's business
16  divisions?
17  **A.  Yes.**
18  Q.  Let's go to page 7. You were talking
19  about unsettled variables that affect the
20  valuation of Grace stock. Do you see that?
21  **A.  Yes.**
22  Q.  It mentions basically asbestos-related
23  issues.
24  **A.  Yes.**

**Page 99**

1  Q.  At this time, did State Street believe
2  that these variables were priced into the stock
3  price?
4  **A.  Hard for me to recall, at least at this**
5  **point, what we thought at that point. We just**
6  **knew that those were substantive issues that we**
7  **needed to understand relative to evaluating the**
8  **stock.**
9  Q.  Do you believe that the market had the
10  same concerns? The market certainly knew --
11  **A.  Certainly, the market knew that these**
12  **were concerns, yes. This is public information.**
13  Q.  Did State Street ever have access to
14  nonpublic information regarding Grace?
15  **A.  No.**
16  Q.  If you would go to the conclusion on page
17  810, it states that, the last phrase here, "We
18  recommend that the committee not override plan
19  documentation and continue to hold Grace stock."
20  Do you see that?
21  **A.  Yes.**
22  Q.  What information -- well, that's the
23  recommendation. We can talk about this when we
24  get to something else. Is that consistent with

**Page 100**

1  your understanding?
2  **A.  Yes. At this point, we needed to do more**
3  **work is basically what we wanted to do there.**
4  Q.  If you would turn to page 13, which
5  happens to also coincide with page 813, it says,
6  the last bullet point: "SSgA representative
7  attended bankruptcy hearing regarding State
8  Street's retention." Do you see that?
9  **A.  Yes, I did.**
10  Q.  Do you know who that representative was?
11  **A.  No, I do not.**
12          (Bates numbers 000682
13  **through 684 were marked as Johnson Exhibit No. 5**
14  **for identification).**
15  Q.  Mr. Johnson, the court reporter handed to
16  you what's been marked as Exhibit No. 5. This
17  purports to be a Fiduciary Committee meeting of
18  December 11, 2003, Bates stamp numbered 682. Do
19  you see that?
20  **A.  Yes, I do.**
21  Q.  And it indicates here that committee
22  members, and it has Ms. Driscoll, your name, Mr.
23  Kirby, Mr. Leahy, Mitch Shames.
24  **A.  Yes.**

**Page 101**

1  Q.  First of all, does this refresh your
2  memory whether you attended the December 11, 2003
3  meeting?
4  **A.  No.**
5  Q.  Why is that?
6  **A.  It doesn't refresh my memory.**
7  Q.  Does that indicate -- if you had not
8  attended, would that be noted?
9  **A.  Yes, I think they would put on there not**
10  **attending, or they would put in somebody in their**
11  **place, I can't think of the name. A proxy.**
12  Q.  Do you generally review Fiduciary
13  Committee meeting minutes or notes after a
14  meeting takes place?
15  **A.  I personally don't spend a lot of time on**
16  **that, no.**
17  Q.  Let's go back a few steps if we could
18  here. Based on what you just told me a moment
19  ago, I'm assuming, therefore, that since it
20  wasn't noted that you didn't attend that in all
21  likelihood you did attend; is that correct?
22  **A.  Yeah, and I could probably confirm that**
23  **if I went to look at my calendar back in 2003.**
24  Q.  If you go through the history of W.R.

**26 (Pages 98 to 101)**

**Page 134**

1 you may then have access to information which
2 then might prohibit us from selling stock if we
3 thought that was the right thing to do for the
4 plan. So that potential was an issue for us, and
5 I think we decided, okay, we won't sit on the
6 Equity Committee because of that.
7   Q. Because you were afraid it might be a
8 complicated --
9   A. We might have access to information, and
10 that might prohibit us from acting in the best
11 interest of that plan.
12   Q. Now, going back a step, Grace hired State
13 Street to serve as an investment manager; is that
14 correct?
15   A. I believe that's correct, yes.
16   Q. Do you have an understanding as to the
17 reason why Grace hired State Street to function
18 as an investment manager?
19   A. You know, companies do it. They don't
20 have a business of doing it. I think it's a good
21 practice in the industry to have an investment
22 manager for company stock plans. So, they may
23 have concluded the same thing. But I can't
24 comment on their motivations.

**Page 135**

1   Q. You didn't have any discussion with
2 anybody at State Street to understand why Grace
3 actually engaged your services, its motivations?
4   A. I mean, other than to try and figure out
5 how we might structure that agreement. We talked
6 about that earlier, the process of is this an
7 engagement we would be willing to take. Those
8 are the kind of discussions I would have had with
9 Kelly.
10   Q. Now, I don't believe any action was taken
11 at this meeting regarding whether to sell any
12 company stock; is that correct?
13   A. I'm trying to -- I think there is a
14 committee meeting minute. Maybe we'll get to it
15 here at some point, where we actually did
16 authorize the group to sell.
17   Q. Correct.
18   A. But I don't believe it was at this
19 meeting.
20   Q. By the time of this meeting, you had now
21 received additional information from Duff &
22 Phelps; is that correct?
23   A. Yes, I believe we had some information
24 from Duff & Phelps.

**Page 136**

1   Q. Additional information from Duff & Phelps
2 --
3   A. That's this meeting.
4   Q. Correct. And in that information,
5 Exhibit 10, for example, you know that you asked
6 a question regarding insurance; is that correct?
7   A. Yeah.
8   Q. And then on the next paragraph, Duff &
9 Phelps, under Mr. Bayston, indicated a range, a
10 conservative range for asbestos liability; is
11 that correct?
12     MR. FLICKER: Objection. The
13 document speaks for itself.
14   A. It says what it says. That's the way I
15 would answer that question.
16   Q. And based on that information, why didn't
17 the committee at that time decide to initiate
18 sale of Grace stock?
19   A. I don't recall specifically, but I can
20 point to the minutes where Mitch Shames requested
21 the IFG provide the committee with a summary of
22 the factors to support initiating a selling
23 program. Once the summary is provided, then we
24 can discuss further and ultimately bring a vote.

**Page 137**

1 So, I think he wanted sort of on one
2 piece of paper the relevant facts so we could
3 have a broader discussion prior to a vote. So
4 that was a specific request from one of the
5 committee members.
6   Q. Were there any factors that you sitting
7 there at that time recall that you felt were
8 lacking?
9   A. No. I don't recall whether or not I felt
10 anything was lacking. There had been a lot of
11 analysis done. One, in particular, I think --
12 again, I'm just trying to recall what I thought
13 two years ago or however long this is -- the one
14 that sticks out in my mind as being
15 extraordinarily important is in paragraph, page
16 2745, first full paragraph, second sentence:
17 "Grace estimates its potential liability at three
18 billion. Plaintiffs' estimate is closer to 40
19 billion. The EPA estimate, which is arguably the
20 most independent, is at 150 billion."
21 So, I do recall my reaction to that
22 number as being very important.
23   Q. And did you undertake any requests to get
24 additional information regarding that particular

**35 (Pages 134 to 137)**

Page 150

1 to paraphrase it, is so that it's not dumped at
2 one time and lower the price?
3    A.  Yes.
4    Q.  Let's go to the recommendations and vote
5 on the last page, I believe, of this document.
6 "The recommendation is to authorize and direct
7 the IFG to commence a selling program at a price
8 no lower than the midpoint of D & P's valuation
9 range."
10      Do you see that?
11    A.  Yes.
12    Q.  Why was that caveat put in regarding the
13 price range midpoint?
14    A.  A, it's part of our sort of standard
15 procedure, I think, in these kinds of cases.  B,
16 it's a highly volatile stock.  Part of that might
17 be also a reflection of liquidity, we were
18 talking about it earlier.  Even though we've made
19 estimates of what we can sell, is it selling
20 that's driving the stock price low.
21      Also, if it had dropped below $1.88,
22 which is the midpoint, maybe there was other news
23 we should be reevaluating so we would want them
24 to come back to the committee.

Page 151

1      So, the price was picked at the midpoint
2 of the range, which we thought was essentially a
3 fair value.
4      Also, in ERISA, there are some rules
5 which prohibit us from selling a stock below fair
6 value, so you have that type of an analysis you
7 have to worry about.
8      I think Kelly can give you even better
9 answers to that question.
10    Q.  Are you indicating, therefore, if selling
11 the stock, it might be prudent to sell the stock
12 at $3.40 but imprudent to sell the stock at
13 $1.70?
14    A.  No, simply, it says we authorized up to a
15 particular point.  That's what the committee
16 determined was in the best interests.
17    Q.  The news was the same.  Is there a reason
18 why it's prudent to sell a stock at $3.40, which
19 is the price of the stock on that day, February
20 23, and it was imprudent to sell it at $1.70?
21      MR. FLICKER:  Objection.
22    A.  Again, it was simply the determination of
23 the committee, at what price they were
24 comfortable giving directions to start selling.

Page 152

1      If you read the rest of this, the
2 limitations imposed by federal security laws,
3 balancing objectives against adverse impact of
4 such sales, other relevant market limitations.
5 So, the committee used the midpoint of the
6 shares, of the valuation, as a point at which we
7 were comfortable selling so long as the stock
8 price was there.  If the stock price dropped to
9 a buck, okay, we'll wait, as I said, because it's
10 quite volatile.  If it bounces back up and hits
11 three dollars, then we'll sell more.
12      So, this is about how one -- as I said,
13 there are two decisions we talked about earlier,
14 does one decide to sell, how does one sell.  This
15 is talking about how one sells.  And it's to sell
16 to act in the best interest of the shares or the
17 plan.
18      MR. GOODMAN:  I have one o'clock.
19 My guess is probably forty-five minutes to an
20 hour at most.
21      MR. FLICKER:  We'll continue the
22 deposition until a time to be agreed by other
23 parties.
24 (Whereupon the deposition suspended at 1:00 p.m.)

Page 153

1 COMMONWEALTH OF MASSACHUSETTS  )
2 SUFFOLK COUNTY, ss.          )
3
4      I, SHAWN JEFFERSON, the witness herein,
5 having read the foregoing testimony of the pages
6 of this deposition, do hereby certify it to be a
7 true and correct transcript, subject to the
8 corrections, if any, shown on the attached page.
9          oOo
10
11
12      _____
13      SHAWN JEFFERSON
14
15
16
17 Subscribed and sworn to before me
18 this_____day of_____, 2007.
19 _____.
20
21
22
23
24

**39 (Pages 150 to 153)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LAWRENCE W. BUNCH, et al,  )
              Plaintiff,  )
                     )Consolidated as
   VS.                 )Case No.:04-11380-WGY
                     )
W.R. GRACE & CO., et al,  )
            Defendant.  )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




    CONTINUED DEPOSITION OF SHAWN JOHNSON, a

witness called on behalf of the Plaintiffs, taken

pursuant to the provisions of the Federal Rules

of Civil Procedure, before Lisa W. Starr, a

Registered Professional Reporter/Certified

Realtime Reporter and Notary Public in and for

the Commonwealth of Massachusetts, at the offices

of State Street Bank & Trust Company, One Lincoln

Street, Boston, Massachusetts, on May 29, 2007,

commencing at 11:10 a.m.

| Page 38 |
| --- |

1  before it would be worth anything.
2    Q.  What's your understanding of what
3  constitutes a high probability in terms of
4  percentages?  What do you consider high?
5    A.  Again, it would depend on the facts and
6  circumstances.  That's very difficult to say in
7  all cases, I think this is a high probability,
8  and in all cases I think that's a high
9  probability.  I can't say.
10    Q.  What about in this case with Grace, what
11  did you consider a high probability to be in
12  terms of percentage?
13    A.  I don't recall.  All I do recall is that
14  when you looked at it, it was high, and I don't
15  remember what the numbers were, high probability
16  that it would be zero.  I mean, we can look back
17  at the Duff & Phelps presentation, that might
18  refresh my memory.  But I don't have a here is a
19  hard-and-fast rule as to what high is.
20    Q.  Let's go to the next paragraph where you
21  raise a concern --
22    A.  Are you back on --
23    Q.  Page 2, I'm sorry, 714, especially since
24  714 is a good Babe Ruth number and we're in

| Page 39 |
| --- |

1  Boston --
2        Second to the last paragraph, "S. Johnson
3  raised a concern regarding the reaction that the
4  market will likely have once the plan to begin
5  selling the W.R. Grace stock, since the plan is
6  the largest shareholder."
7    A.  Yes, we talked about that.
8    Q.  And I asked you, does this refresh your
9  memory as to whether you ever made an
10  investigation or determined what happened to the
11  price of stock when it was announced that the
12  Stock Plan was going to sell its shares?
13    A.  I don't remember.  I think, I'm not sure,
14  we could go look as to what happened.  I don't
15  recall what happened.
16    Q.  The next sentence:  "K. Driscoll stated
17  that if the price falls drastically, the selling
18  program could be suspended."  Do you see that?
19    A.  Right.
20    Q.  If it was prudent to sell the stock or
21  inconsistent with ERISA for the Stock Plan to
22  hold the stock, why would the Independent
23  Fiduciary Committee ever cease the selling
24  program?

| Page 40 |
| --- |

1        MR. FLICKER:  Objection: Incomplete
2  hypothetical.
3    A.  Remember, when we had talked about this
4  last Thursday I said there's the decision to sell
5  or not to sell.  Then there is the how.  And you
6  wouldn't want to damage the plan's assets because
7  you're not a particularly sophisticated seller,
8  like trying to dump 10 percent of the shares on
9  the market in two days.  That would damage the
10  price of the shares in the marketplace and then
11  not allow you to realize the highest amount of
12  money.  However, if you had done it over a longer
13  period of time, you could get a higher price in
14  the marketplace.
15        So, that's what that's referring to.
16    Q.  But why stop if the price, if the market
17  determines that the fair value of the stock is
18  $1.88?
19    A.  Again, when you're, as a fiduciary trying
20  to sell the shares, you don't want to be
21  influencing the market price.  Because you're so
22  large coming to the marketplace, then you're
23  influencing.  It's not separate buyer and seller
24  coming together.  It's an unnatural state in the

| Page 41 |
| --- |

1  marketplace.
2    Q.  What would happen -- did you agree to
3  suspend the selling of the stock if it was within
4  the midpoint of the D & P valuation range?
5    A.  Well, I guess I technically didn't vote.
6  Yes, I would have agreed with that at the time.
7    Q.  Let me go back.  Do you recall voicing
8  any opposition to that analysis?
9    A.  No.  I don't recall voicing any
10  opposition to that analysis, correct.
11    Q.  And if it stopped selling -- if it fell
12  to $1.88, what steps would Independent Fiduciary
13  Committee take then?
14    A.  They would have reconvened the committee,
15  meaning the IFG group would have reconvened the
16  committee to say, okay, what do we do now?  Do we
17  wait for the stock price to go up?  What other
18  action should we take?
19    Q.  So, that would be dependent upon the view
20  that the stock is going to go back up; is that
21  correct?
22        MR. FLICKER:  Objection.
23    A.  No.  In other words, we could say, look,
24  it's $1.88, these events have happened, there

**Page 46**

1  Q.  The third bullet: "As of March 30, State
2  Street has sold approximately 856,800 shares at
3  an average price of about $2.94." Do you see
4  that?
5  A.  Um-hmm.
6  Q.  Did you make any note to yourself -- let
7  me go back.  Why is the $2.94 significant, if at
8  all?
9  A.  I think it's just reporting how much we
10  sold it at and what the average price was.  I
11  don't know that it's significant.
12  Q.  Did you take any note -- do you recall
13  ever seeing this memo, I'm sorry, this e-mail?
14  A.  I'm sure it came to me.  But, no, I don't
15  recall spending a lot of time reading it.
16  Q.  How did you learn that there may be a
17  company interested in buying the remaining shares
18  that the Stock Plan had of W.R. Grace?
19  A.  I don't recall.  I'm guessing Kelly
20  called me.  That's what I'm guessing.
21  Q.  I don't want you to guess at the moment.
22  Let me ask the question this way.
23      At some point did you learn that there
24  was a company interested in purchasing, or

**Page 47**

1  someone, an investor, interested in purchasing
2  the remaining shares of W.R. Grace stock?
3  A.  Yes, I do recall.
4  Q.  And what was that company?
5  A.  Shaw, D.E. Shaw out of New York, I
6  believe.
7  Q.  Had you heard of D.E. Shaw prior to its
8  inquiry regarding --
9  A.  Yes.  It's a known hedge fund-type
10  company.
11  Q.  Other than that, do you know anything
12  about D.E. Shaw?
13  A.  No, not particularly.
14  Q.  *Have you had any contact with anybody
15  from D.E. Shaw prior to 2004?
16  A.  Can I ask him a question?
17  Q.  Sure.
18      MR. FLICKER:  We'll go off the
19  record.
20      (Witness conferred with
21  counsel off the record).
22      *(Question read back as
23  recorded).
24  A.  I have not had any contact with anybody

**Page 48**

1  at D.E. Shaw, that's correct, and didn't during
2  this time frame at all.
3  Q.  Has State Street, to the best of your
4  knowledge, ever had a relationship with D.E.
5  Shaw?
6      MR. FLICKER:  Objection: Vague.
7  What do you mean by "relationship"?
8  Q.  Has State Street ever conducted any
9  business activities with D.E. Shaw?
10  A.  I can't comment on all of State Street.
11  I mean, we're very big, and they're a hedge fund.
12  So, that I can't answer.
13  Q.  Something in the back of my mind
14  indicates that there's been some relationship,
15  some contact.  To the best of your knowledge, has
16  State Street ever had contact with D.E. Shaw?
17  A.  Most certainly in this case, yes.
18  Q.  Other than this?
19  A.  Other than this, I can only say not that
20  I'm aware of.
21  Q.  Has there been any employees from State
22  Street who have gone to D.E. Shaw?
23  A.  Yes.  At some point, Tony Foley, who used
24  to work here, went to D.E. Shaw.  I couldn't tell

**Page 49**

1  you when that was, but probably in, within the
2  last few years.
3  Q.  Do you know if it was before 2004?
4  A.  I don't know the answer to that.  We can
5  probably have somebody get you the answer to
6  that, but I don't believe it was before 2004.
7  Q.  What's Mr. Foley -- what was Mr. Foley's
8  responsibilities at State Street?
9  A.  He was a quantitative research person.
10  He is a math expert.
11  Q.  Did he have any involvement in connection
12  with the assignment regarding Grace?
13  A.  No, he would not have had any
14  involvement.
15  Q.  Has anybody from D.E. Shaw come to State
16  Street?
17  A.  Nobody I'm aware of, so I can't say that
18  there hasn't been, but I don't know of anybody
19  that has.
20  Q.  I understand that you used the phrase
21  "hedge fund" a few moments ago describing D.E.
22  Shaw.  Do you recall that?
23  A.  Yes.
24  Q.  What's your understanding as to what a

**13 (Pages 46 to 49)**