STATE STREET GLOBAL ADVISORS
SSgA

FIDUCIARY COMMITTEE MEETING MINUTES

| | |
|---|---|
| Date: | Fiduciary Committee Meeting of January 29, 2004 |
| Subject: | W.R. Grace |
| Committee Members Present: | Kelly Driscoll, Shawn Johnson, John Kirby, Mitch Shames |
| Attendees: | Monet Ewing, Melissa Smith, - SSgA<br>Jack Cleary, Dan Glosband, Legal Counsel – Goodwin Procter ("GP")<br>Dan Bayston, Paul Trost, Financial Advisors – Duff & Phelps ("D&P") |

W.R. Grace

Discussion: D. Bayston presented D&P's financial and valuation analysis of W.R. Grace ("Grace") to the Committee. D. Bayston explained that, as a starting point, D&P established reasonable values for Grace's operations, disregarding the impact of the various contingencies discussed below. It then adjusted that figure for the several material contingencies to which Grace is exposed. Grace's first quarter earnings have increased and the stock is currently trading at $3.48 a share. Its current trading activity is similar to other bankrupt asbestos companies. D. Bayston described the multiples that were examined and the comparable companies that were used. Grace sold two companies, Sealed Air and Fresenius, prior to the bankruptcy filing; however, there are charges of fraud relating to these transactions, that will result in significant recoveries by Grace. The average daily trading volume is approximately 520,000 shares; the four-week average trading volume for purpose of Rule 144 is approximately 2.5 million shares. The equity value per share appears to be highly sensitive to the market's perception of Grace's asbestos-related liability exposure. Due to the bankruptcy filing, analysts currently do not cover the Company.

A settlement has been reached with the insurance companies regarding the amount of coverage to be provided for asbestos liability. It provides for the payment to Grace of approximately $270 million. S. Johnson asked whether the insurance companies are viable entities. D. Bayston stated that D&P was comfortable with the carriers and their ability to pay. He also noted that the Company has reserved $70 million for certain environmental liabilities.

Grace has two primary contingent liabilities outstanding. The first potential liability relates to asbestos-related personal injury claims which is their most high profile potential liability. These claims are not yet subject to a bar date in the bankruptcy proceeding. There were 130,000 such claims pending against Grace as of its bankruptcy

LIBB/1268114.2



SSBT-002744
CONFIDENTIAL



Page 2

filing date. D&P anticipates that as many as 325,000 additional claims may be filed. Progress in this litigation has been delayed due to attempts to disqualify the judge. This liability exposure could be materially mitigated by the FAIR Act legislation (the "Act") currently being considered by Congress. If enacted, the Act would establish a trust to manage the asbestos liabilities of all manufacturers. If the Act is enacted in its current proposed form, Grace's estimated projected liability would be approximately $530 million, payable over 27 years. The present discounted value of this obligation is approximately $225 million. S. Johnson expressed concern regarding the actual funding needed for any such general trust. D. Bayston acknowledged that the correct figure is still uncertain but noted that, in order to be conservative in performing its valuation, D&P had doubled Grace's expected liability in performing its valuation in the scenarios in which it is assumed that the Act becomes law. Even this conservative (i.e., high) amount is still substantially less than what Grace's liability would likely be if the Act is not passed. There has been some opposition to the Act, including a generally negative response from the labor unions. The trial lawyers are also strongly opposed.

Grace's second material liability exposure relates to the Zonolite Attic Insulation product ("ZAI") and represents a much larger potential liability to Grace. Grace estimates its potential liability to be approximately $3 billion, plaintiff's estimate that figure to be closer to $40 billion and the EPA estimates it at $150 billion. It is yet to be determined whether the ZAI product contained asbestos materials in sufficient quantity and of a type to provide a basis for liability. A trial on this science aspect of the case is scheduled, but has already been delayed several times. GP believes that there is a possibility that this litigation will be settled on a basis that will not wipe out Grace's equity value. If Grace were to lose the ZAI litigation, then it would lose all equity value.

In analyzing the contingent liabilities described above, D&P examined and, with input from GP, assigned probabilities to several potential outcomes and scenarios, such as if the ZAI litigation goes to trial and Grace loses, or Grace wins, ZAI settles with favorable terms to Grace and/or the passage of the Fair Act. The best scenario would be Grace winning ZAI and the Fair Act passing.

State Street currently manages approximately one million shares of the Grace stock on behalf of the Grace plan. The Committee considered whether State Street should reduce this holding, particularly given its size. J. Cleary explained that, in making any such decision, State Street must consider all relevant facts and circumstances including the particular context in which the decision is being made. Under the agreement pursuant to which it has been engaged, State Street is to sell shares of Grace stock only if it determines that failing to sell such shares would be inconsistent with the requirements of ERISA in that particular context.

J. Kirby asked D&P if the ZAI claims were affecting the stock price. D. Bayston replied that the ZAI claim is not as high profile as the personal injury asbestos claims and therefore does not seem to have much impact, even though it is potentially a greater liability. D. Glosband updated the Committee generally with respect to other

LIBB/1268114.2

SSBT-002745
CONFIDENTIAL



Page 3

companies in bankruptcy due to asbestos claims. Grace and USG are the only two companies to date that have not eliminated equity; all of the others have indicated publicly that their pre-bankruptcy equity holders will not have any interest post-bankruptcy.

The Committee discussed the risks involved in both holding and selling the Grace stock. K. Driscoll reminded the Committee that it was important to consider how long it would take to sell the block, especially since the plan currently holds a block that exceeds 10% of the outstanding Grace stock. The size of the holding likely makes the plan an "affiliate" under the federal securities law which imposes additional limitations (i.e., Rule 144) on the ability to sell such shares. K. Driscoll also pointed out that State Street can discontinue the selling program at any time. The Committee discussed generally past instances when it became necessary to override the plan document. One such instance was when there was an imminent threat of bankruptcy. In the case of Grace, the company is already in bankruptcy.

M. Shames requested that the IFG provide the Committee with a summary of the factors supporting a decision to initiate a selling program with respect to the Grace stock. Once this summary has been provided to the Committee, then the matter can be discussed further and ultimately brought to a vote.

Monet Ewing informed the Committee that a communication had been sent out to the plan participants highlighting the nature and risk of the investment in Grace stock.

D. Glosband provided an update on the asbestos claims to the Committee and informed the Committee that the period for filing a plan of reorganization has been continued for another six months. The issue of whether or not someone should sit on the Equity Committee to represent the block of Grace stock held by the plan was also discussed. D. Glosband stated that, at this time, he could see no added value since State Street has access currently to all public information. The Committee was of the view that it would not be opposed, in principle, to having someone sit on the Equity Committee if it was deemed appropriate in the future. It was noted, however, that in order to preserve State Street's ability to sell the stock, such person would be required to separated entirely (i.e., subjected to a firewall) and would not be allowed to participate in any other aspect of the Fiduciary Committee process or decision-making. D. Glosband reiterated that the relevant public information is already available and that State Street would not obtain any more input that could be used in deciding whether to hold or sell the Grace stock by sitting on the Equity Committee.

LIBB/1268114.2

SSBT-002746
CONFIDENTIAL