**Page 1**

HIGHLY CONFIDENTIAL TESTIMONY, PAGE 31

Volume:

Pages:    1 - 174
Exhibits:  See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 04-11380-WGY
Judge William G. Young

-------------------------------------
                                     )
LAWRENCE W. BUNCH, et al.,           )
                      Plaintiffs,    )
          v.                         )
                                     )
W.R. GRACE & CO., et al.,            )
                      Defendants.    )
                                     )
-------------------------------------

DEPOSITION OF MONET I. EWING, a Witness

called on behalf of the Plaintiffs, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Maureen

Nashawaty, a Notary Public within and for the

Commonwealth of Mass., held at State Street

Financial Center, One Lincoln Street, Boston, MA,

on Wed., May 30, 2007,commencing at 9:10 a.m.

COPLEY COURT REPORTING, Inc.
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

**Page 10**

1 Exhibit No. 1 and ask you to review it for just a
2 minute.
3      Have you ever seen this document prior
4 to today?
5   **A.  No.**
6   Q.  You are aware that the deposition that
7 we are engaged in here this morning is in the
8 case of Bunch versus W. R. Grace, correct?
9   **A.  Yes.**
10   Q.  Are you at least generally familiar
11 with the nature of the case?
12   **A.  Yes.**
13   Q.  And can you tell me generally what you
14 did to prepare for this deposition this morning?
15   **A.  I met with Mr. Flicker last week.**
16   Q.  Okay.
17   **A.  And talked generally about preparing**
18 **for the deposition.**
19   Q.  Did you speak to anyone else other than
20 Mr. Flicker about this deposition?
21   **A.  My colleagues just in anticipation.**
22   Q.  In terms of preparation, reviewing
23 facts, reviewing documents, did you speak to
24 anyone else other than Mr. Flicker?

**Page 11**

1   **A.  No.**
2   Q.  During the course of your speaking to
3 Mr. Flicker, did you have occasion to review any
4 documents?
5   **A.  Yes.**
6   Q.  And can you just generally describe
7 what those documents were that you reviewed?
8   **A.  Engagement agreements, fiduciary**
9 **committee data documents that I probably helped**
10 **in preparing. Just generally documents**
11 **associated with the case.**
12   Q.  Okay. In connection with this
13 litigation you were also asked to, I believe to
14 provide an affidavit, is that correct?
15   **A.  That's correct.**
16      **(Exhibit No. 2, Declaration of Monet**
17        **Ewing, was so marked.)**
18   Q.  I am handing you what has now been
19 marked for this deposition as Ewing Exhibit
20 No. 2, I'm sorry, it is the wrong one. Okay, now
21 this is 2.
22      Would you take a look at it please and
23 let me know if this document is familiar to you?
24   **A.  Yes.**

**Page 12**

1   Q.  And what is this document?
2   **A.  Declaration prepared for this case.**
3   Q.  Calling your attention to Paragraph No.
4 2 of this declaration, it indicates there that
5 you currently hold a position of and this is a
6 quote, "Principal at SSgA in the independent
7 fiduciary group, do you see that?
8   **A.  Yes.**
9   Q.  Do you still hold that position today?
10   **A.  The equivalent, our titles have been**
11 **changed to Vice President from Principal to Vice**
12 **President.**
13   Q.  And generally for the record, would you
14 just indicate what your duties and
15 responsibilities are as a Vice President of SSgA
16 in the independent fiduciary group?
17   **A.  The independent fiduciary group is the**
18 **group that is in charge with the oversight of**
19 **company stock accounts. Vice President just**
20 **means I have signing authority for the bank.**
21   Q.  And by oversight of the company's stock
22 accounts I think you said, what does that mean?
23   **A.  Retirement plans that hold company**
24 **stock.**

**Page 13**

1   Q.  And what tasks does State Street
2 perform in this concept of oversight of the
3 company accounts?
4   **A.  It would depend on the engagement.**
5 **Each engagement is different.**
6   Q.  And could you give me a couple of
7 examples of what types of engagements might be
8 included in the concept of oversight?
9   **A.  Director Trustee and Investment**
10 **Manager.**
11   Q.  And these would be accounts generally
12 that were set up by a company as a part of a
13 benefit program, is that correct?
14   **A.  That's correct.**
15   Q.  Is it fair to say that your work is
16 focused exclusively on company sponsored benefit
17 plans?
18   **A.  Yes.**
19   Q.  And with respect to the relationship
20 between State Street and the company, how do you
21 describe that relationship generally?
22   **A.  Which company?**
23   Q.  Are there many different relationships
24 is that it?

**4 (Pages 10 to 13)**

**Page 38**

1 relationship between Grace and State Street?
2   **A.  This document was completed just trying**
3 **to put some time lines around getting the**
4 **engagement setup, I would agree.**
5   Q.  And I understood you to say that the
6 engagement process, the negotiations of the
7 engagement took a considerable period of time is
8 that what you said approximately?
9   **A.  Yes.**
10   Q.  And about how long did it take?
11   **A.  Well, I don't know.  However, from**
12 **here -- June to we were engaged in December so**
13 **that is the time.**
14   Q.  That is a reasonable estimate of the
15 time?
16   **A.  Yes.**
17   Q.  Did you have any contact with the
18 representatives of W. R. Grace in connection with
19 the possible engagement of State Street by Grace?
20   **A.  Of course.**
21   Q.  Were you the principal contact at
22 State Street for engaging this relationship?
23   **A.  I am on the business side I am not the**
24 **principal contact for negotiations but I was**

**Page 39**

1 **involved in the negotiations.**
2   Q.  And were you involved in the
3 negotiations?
4   **A.  Yes.**
5   Q.  Before State Street was involved, did
6 you have occasion to meet with representatives of
7 Grace?
8   **A.  Yes.**
9   Q.  And did you have occasion to have
10 discussions with Grace about what the parameters
11 of the project would be?
12   **A.  Yes.**
13   Q.  And did you -- during the course of
14 these negotiations, did you have occasion to do
15 any due diligence about the bankruptcy side of
16 the W. R. Grace business activity?
17   **A.  I am not sure what you are asking.**
18   Q.  Okay.  Let me withdraw the question.
19     Did you or anyone at State Street
20 examine the bankruptcy status of Grace during the
21 time of these negotiations?
22   **A.  Yes, we knew Grace was in bankruptcy,**
23 **of course.**
24   Q.  Did anyone review the pleadings or the

**Page 40**

1 filings on behalf of State Street with respect to
2 this possible engagement?
3   **A.  I didn't, but I am sure our lawyers**
4 **did.**
5   Q.  Okay.  And would those lawyers be
6 people who were in-house lawyers or outside
7 counsel?
8   **A.  Both.**
9   Q.  And who were the outside counsel, what
10 firm was the outside counsel with respect to that
11 work?
12   **A.  Goodwin Procter.**
13   Q.  Did you have occasion to, prior to the
14 actual effective date of the engagement, have
15 occasion to work with representatives of Goodwin
16 Procter on particularly the bankruptcy issues?
17   **A.  Yes.**
18   Q.  And what were the nature of those
19 projects?
20     MR. FLICKER:  Well, before you get
21 into that, I would like to draw a distinction
22 here between any discussions about the terms of
23 engagement of State Street for which we will
24 assert a privilege and any work being done by

**Page 41**

1 State Street pursuant to its engagement as an
2 independent fiduciary for which we will not -- so
3 you can make a distinction.
4     MR. CUMMINS:  Okay.
5     MR. FLICKER:  And I will help you.
6   Q.  In connection with your work as a
7 possible engagement as a fiduciary of this
8 possible plan, did you receive any information
9 from your counsel, Goodwin Procter about the
10 bankruptcy proceeding?
11     MR. FLICKER:  Answer that if you can
12 make that distinction between anything that would
13 pertain to the terms of negotiating your
14 engagement for which we are going to assert
15 privilege versus any due diligence you are doing
16 in connection with the engagement that eventually
17 occurred, is that clear?
18   **A.  That would be impossible to do.**
19     MR. FLICKER:  Given that we are going
20 to have to --
21   Q.  Well, during the course of your due
22 diligence on behalf of State Street, did you come
23 to -- did State Street come to any information
24 about the status of the Grace bankruptcy

**11 (Pages 38 to 41)**

**Page 42**

1  proceeding?
2      MR. FLICKER: That you can answer.
3      **A.   Yes, we were informed by lawyers at all**
4  **times of the bankruptcy.**
5      Q.   And did you -- did State Street in
6  connection with this information gathering
7  process come to learn who the large secured
8  creditors of Grace were at the time?
9      **A.   I can't say specifically but I'm sure**
10  **that that was part of the process.**
11      Q.   In the middle of the first page of this
12  Exhibit 3 it has a projected time line, there
13  were proposed in-person interviews of Grace
14  management. Do you see that?
15      **A.   Yes.**
16      Q.   Did you personally interview the CEO of
17  Grace prior to this engagement?
18      **A.   I don't know if the CEO was present.**
19      Q.   Did you interview the CFO?
20      **A.   I don't know if the CFO was present. I**
21  **remember generally names.**
22      Q.   Do you recall the names of the
23  representatives of Grace who were present?
24      **A.   I am sure John was there.**

**Page 43**

1      Q.   John who?
2      **A.   John Forgach.**
3      Q.   Okay.
4      **A.   I think we talked with Bob Tarola or**
5  **Tortolo.**
6      Q.   Tarola. Anyone else?
7      **A.   Those are the only two that I remember**
8  **specifically.**
9      Q.   Did anyone on behalf of State Street
10  speak to the primary in-house counsel for
11  asbestos litigation at Grace prior to the
12  commencement of the engagement?
13      **A.   Someone on behalf of State Street spoke**
14  **to the in-house counsel.**
15      Q.   Do you know who that was?
16      **A.   On the trip was Dan Glosband and Skip**
17  **Remis so it would have been both -- one or the**
18  **other.**
19      Q.   Those are Goodwin Procter people?
20      **A.   Yes.**
21      Q.   And you indicated there was a trip?
22      **A.   Yes.**
23      Q.   When did a trip occur in connection
24  with the negotiations of this engagement?

**Page 44**

1      **A.   I am not sure of the date but it was,**
2  **I'm not sure of the date but it was definitely**
3  **prior to the signing of the engagement at Remis'**
4  **There was a meeting with them.**
5      Q.   What was the destination of this trip?
6      **A.   I believe we met in Maryland.**
7      Q.   Who went on the trip?
8      **A.   Dan Bayston, myself, Skip, Dan Glosband**
9  **and there was one other person with Dan**
10  **Bayston -- an associate -- I'm not certain.**
11      Q.   Did anyone from Duff & Phelps go on
12  this trip?
13      **A.   That was Dan Bayston and his associate.**
14  **They were bought from Duff & Phelps.**
15      Q.   Did anyone from Goodwin and Procter go
16  on this trip?
17      **A.   Two lawyers.**
18      Q.   And those names were?
19      **A.   Dan Glosband and I think the first name**
20  **was Skip, I am not sure.**
21      Q.   And another representative?
22      **A.   And another representative.**
23      Q.   And you went?
24      **A.   Yes.**

**Page 45**

1      Q.   Did anyone else from State Street
2  travel?
3      **A.   Not that trip.**
4      Q.   There were subsequent trips, is that
5  correct?
6      **A.   Not that I recall, no.**
7      Q.   And this occurred before the
8  engagement, correct?
9      **A.   That is correct.**
10      Q.   And was it in the summer or fall of the
11  year, if you know?
12      **A.   It could have been summer or fall, it**
13  **was warm.**
14      Q.   It was warm?
15      **A.   Yes.**
16      Q.   Is this Exhibit 3 a document that was
17  prepared as part of a presentation to the Grace
18  representatives?
19      **A.   No.**
20      Q.   Have you ever seen a document similar
21  to this in connection with other State Street
22  clients?
23      **A.   Of time lines?**
24      Q.   Yes.

**12 (Pages 42 to 45)**

**Page 46**

1    A.    Yes.
2    Q.    Why is this time line prepared
3 generally?
4    A.    Well, in our situation, the client and
5 State Street want to get an idea of how long it
6 will take to get engaged or to work in process we
7 may collectively put a time line in place which
8 it looks like this is.
9    Q.    Okay. Now, if you will turn to the
10 third page, it is a blank page actually, it is
11 Bates Number 003016, it says Exhibit A -- one
12 page prior, 016?
13    A.    Okay.
14    Q.    Looking at the pages that follow
15 Exhibit A, that Bates page, is it fair to assume
16 that the materials that follow were somehow a
17 part of this time line work?
18    A.    No.
19    Q.    No?
20    A.    No.
21    Q.    Why not?
22    A.    Because I remember working on the time
23 line, I believe it is Exhibit A, it has something
24 to do with the bankruptcy filing for our

**Page 47**

1 engagement.
2    Q.    What do you think this Exhibit A is
3 part of?
4    A.    Of what we had to file with the
5 bankruptcy court to become engaged.
6    Q.    The bankruptcy court's approval was
7 required with respect to Grace hiring you, is
8 that right?
9    A.    That's correct.
10    Q.    And you believe that Exhibit A is part
11 of the bankruptcy filing, is that right?
12    A.    Yes.
13    Q.    Okay. If you will turn to the Bates
14 page marked or numbered 003018, do you see that?
15    A.    Yes.
16    Q.    It lists under vendors certain entities
17 that State Street appears to be reporting as
18 vendors to it, to State Street.
19       Do you see that?
20    A.    Yes.
21    Q.    Did you have anything to do with the
22 preparation of that document?
23    A.    No.
24    Q.    Beneath that on the same page is a list

**Page 48**

1 of legal counsel indicating that State Street
2 receives legal services from law firms listed
3 below.
4       Do you see that?
5    A.    Yes.
6    Q.    Do you in the course of your work with
7 State Street have any occasion to receive legal
8 services from any of the five firms listed on
9 that Page 003018?
10    A.    Someone put it here so I would assume
11 that that is correct. I don't have any
12 independent knowledge of this document.
13    Q.    No, I mean of the firms -- do you have
14 contact with those firms personally?
15       MR. FLICKER: You mean in the work
16 that she does in the independent fiduciary group?
17       MR. CUMMINS: Yes.
18    A.    Of these five firms, we have worked
19 specifically with Pachulski Stang.
20    Q.    That is a bankruptcy firm, correct?
21    A.    Well --
22    Q.    Principally -- no?
23    A.    Well, yes.
24    Q.    Okay, and with respect to the group of

**Page 49**

1 vendors listed above, does your investment group
2 have any relationship with those entities?
3    A.    Not that I know of, no.
4    Q.    Do you perform any services for, does
5 State Street perform any services for any of
6 those entities?
7    A.    Well, I think we perform services for
8 Wachovia that I know of.
9    Q.    What kind of services?
10    A.    We vote their proxies for some of their
11 funds. I don't recognize anyone else.
12    Q.    Now, when you say you vote their
13 proxies, do you have, does State Street have some
14 business relationship with Wachovia mutual funds,
15 is that what you meant?
16    A.    I don't know who the contract is
17 specifically with. That is not my account.
18    Q.    Okay. Any of these, does State Street
19 have any other -- let me go back then.
20       Are you familiar with the business
21 entity called CitiStreet?
22    A.    That's correct.
23    Q.    What is that?
24    A.    It is a joint venture between Citigroup

**13 (Pages 46 to 49)**

**Page 70**

1  unsecured creditors committee and the secured
2  creditors committee are looking after their own
3  constituent members of that type of group?
4      MR. FLICKER: Objection. It calls
5  for opinion testimony and lacks foundation.
6  **A.  Generally in bankruptcy that is their**
7  **purpose.**
8      Q.  Okay. And you don't have any
9  information that would lead you to believe that
10  the Grace bankruptcy was being conducted in any
11  other way other than what I have just asked you
12  about in terms of that, correct?
13  **A.  No.**
14      Q.  If you look at Page 003038, it
15  indicates a list of State Street's client, do you
16  see that?
17  **A.  Yes.**
18      Q.  According to this list State Street at
19  the time that it was serving the Grace stock plan
20  was providing various services to Wachovia Bank
21  of North Carolina, correct?
22  **A.  Yes.**
23      Q.  And it was receiving services according
24  to that previous page we looked at as well?

**Page 71**

1  **A.  Yes.**
2      Q.  What kind of services was State Street
3  providing to Wachovia Bank of North Carolina?
4  **A.  I have no idea.**
5      Q.  And similarly with respect to the Chase
6  Manhattan Bank, one of the top 20 secured
7  creditors of Grace, State Street was providing
8  various services to the Chase Manhattan Bank,
9  right?
10      MR. FLICKER: Objection, lacks
11  foundation.
12      Q.  According to this document?
13  **A.  Yes.**
14      Q.  And similarly with respect to the
15  Wachovia Bank and Trust Company NA, State Street
16  was providing services to that entity as well?
17      MR. FLICKER: Same objection.
18      Q.  According to this document?
19  **A.  Again it has a different name so I**
20  **don't even think according to this document.**
21  **This is Wachovia Bank and our list was Wachovia**
22  **Bank, North Carolina.**
23      Q.  Okay. All right. Then if you will
24  turn to Page 003039, I'm sorry, do you have page

**Page 72**

1  003039?
2  **A.  Yes.**
3      Q.  If you look at capital letter B, could
4  you read that into the record?
5  **A.  State Street as the investment manager**
6  **for Agway's Company Securities Fund is a Chairman**
7  **of the Agway Unsecured Creditors Committee which**
8  **has employed Pachulski, Stang, Ziehl, Young and**
9  **Jones as its counsel.**
10      Q.  So State Street according to this
11  document was performing services for an Agway
12  Unsecured Creditors Committee, is that correct?
13  **A.  That's correct.**
14      Q.  And the firm of Pachulski Stang was
15  rendering legal services to that committee of
16  which State Street was the Chairman, is that
17  correct?
18  **A.  That's correct.**
19      MR. CUMMINS: Okay. This might be a
20  good time to take a break.
21      (Short Pause.)
22      MR. CUMMINS: Back on the record.
23      Q.  Handing you now what has been marked
24  for identification as Johnson Deposition Exhibit

**Page 73**

1  No. 2, take a minute if you will and just look
2  through it and familiarize yourself with it,
3  please.
4  **A.  Yes.**
5      Q.  Okay. Generally, can you describe
6  generally for the record what this is?
7  **A.  An engagement agreement.**
8      Q.  Between or among which firms?
9  **A.  Between the Benefits Committee,**
10  **W. R. Grace and State Street.**
11      Q.  And also, if you will turn a couple
12  more pages to get to a Bates Page 001284, take a
13  look at that one if you would please?
14  **A.  Engagement agreement between**
15  **Duff & Phelps, the committee and W. R. Grace and**
16  **State Street.**
17      Q.  And if you will just look at the back
18  of that document -- the signature pages?
19      MR. FLICKER: Of the Duff & Phelps?
20      MR. CUMMINS: Yes.
21  **A.  Yes.**
22      Q.  On Bates Page 001289, do you see your
23  signature -- 1289?
24  **A.  Yes.**

**19 (Pages 70 to 73)**

**Page 74**

1   Q.   That is your signature?
2   A.   Yes.
3   Q.   And you signed on behalf of the
4   State Street Bank and Trust Company, Investment
5   Manager of the W. R. Grace & Company Salaried
6   Employees Savings and Investment Plan, is that
7   correct?
8   A.   That's correct.
9   Q.   Now I notice that you did not sign in
10  your capacity as the Investment Manager of the
11  Grace stock plan, isn't that correct?
12  A.   That is what the language says, yes.
13  Q.   Okay. So the Duff & Phelps -- all
14  right, did you play any role in the negotiation
15  of the terms of this document?
16  A.   No.
17  Q.   And by this document I mean the Duff &
18  Phelps engagement letter dated November 24th,
19  2003?
20  A.   I might have given input. These
21  documents were negotiated by the lawyers.
22  Q.   And the lawyers for the -- for
23  State Street in its capacity as the manager of
24  the W. R. Grace salaried employees savings and

**Page 75**

1   investment plan were whom, I can say it much
2   simpler, couldn't I?
3   A.   The plan?
4   Q.   Who were the plan's lawyers for this
5   document?
6   A.   Goodwin Procter represents State Street
7   in its capacity as investment manager for the
8   plan.
9   Q.   And is it that firm that negotiated the
10  terms on behalf of State Street for this
11  document?
12  A.   That firm and Randy Kerrigan who is
13  internal counsel.
14  Q.   At State Street?
15  A.   Yes.
16  Q.   Okay. Now with respect to paragraph
17  with the No. 1 -- the numbered 1 paragraph -- it
18  begins "D & P is engaged", would you just take a
19  look at that. I have a question about it.
20  A.   So this is the Duff & Phelps engagement
21  letter?
22  Q.   Yes. It begins -- maybe I can do it
23  with Bates again -- 001285.
24  A.   Yes.

**Page 76**

1   Q.   Just look at Paragraph No. 1, and
2   review the first paragraph if you will, please?
3   A.   Okay.
4   Q.   In the description of what
5   Duff & Phelps was undertaking, the sentence,
6   there are two sentences that I want to read into
7   the record and ask you about your understanding
8   of their responsibilities, the first one is the
9   second sentence in that Paragraph No. 1. It
10  reads as follows, "As part of this review, D & P
11  will examine the current market price of the
12  stock taking into account third party assessments
13  of any liabilities and potential obligations that
14  may have contributed to the current bankruptcy
15  proceedings. It is understood that D & P will not
16  be conducting an independent financial of these
17  liabilities and obligations".
18       Do you see that?
19  A.   Yes.
20  Q.   Now, what is your understanding of what
21  Duff & Phelps was supposed to do pursuant to the
22  term of this engagement letter?
23  A.   Help State Street value the stock,
24  advise.

**Page 77**

1   Q.   Okay. Did you have contact with
2   representatives of Duff & Phelps during the
3   course of the engagement?
4   A.   Prior to the engagement -- during the
5   engagement?
6   Q.   During the course of the engagement?
7   A.   Yes.
8   Q.   And did you have contact with one or
9   more of the people at Duff & Phelps?
10  A.   Probably two primarily.
11  Q.   And which two were those?
12  A.   Dan Bayston and I want to say the guy's
13  name is Paul Trost, his assistant.
14  Q.   Now, there is a specific litigation
15  indicated in the second sentence that I read.
16  That advises that Duff & Phelps was not going to
17  conduct any independent financial, I think they
18  mean analysis of these liabilities and
19  obligations -- do you see that?
20  A.   Yes.
21  Q.   There is a word missing?
22  A.   Assessment.
23  Q.   Assessment, sorry. Who was supposed to
24  -- was anyone supposed to do that task in

**20 (Pages 74 to 77)**

Page 138

1  document?
2  **A.   It appears to be a document prepared by**
3  **Duff & Phelps that would have been attached to**
4  **the presentation, a presentation or it would have**
5  **been provided to the Fiduciary Committee.**
6  Q.   And did you have anything to do with
7  the preparation of this Exhibit 12 or was it
8  exclusively, let me withdraw the question.
9  Was the preparation and writing of
10  Exhibit 12 exclusively the work of Duff & Phelps?
11  **A.   That's correct.**
12  Q.   And during the course of its
13  preparation, did you have any contact with
14  Duff & Phelps about the content or nature or
15  scope of this --
16  **A.   Throughout the engagement we were in**
17  **constant contact with Duff & Phelps.**
18  Q.   Did you provide them any information
19  about the asbestos liability exposure of Grace?
20  MR. FLICKER: By "you" you mean
21  State Street?
22  MR. CUMMINS: Yes, State Street.
23  **A.   He had asked us for the same**
24  **information that we were being given.**

Page 139

1  Q.   Okay.  On Page 000209 --
2  **A.   Uh huh.**
3  Q.   Do you agree that at this point of
4  January 29th, 2004, the date of the report, that
5  Duff & Phelps felt that the possible implied
6  equity value of Grace was $13.79 per share if the
7  company's assessment of its asbestos liability
8  was less than $1,000,000,000.00?
9  MR. FLICKER: Objection.  The
10  documents speaks for itself, foundation.
11  **A.   This looks like a range that**
12  **Duff & Phelps was relying on.**
13  Q.   And would you agree with me that the
14  variable in this report on this page was the size
15  of the asbestos liability?
16  **A.   This one isn't taking into account**
17  **Zonalite or Fair Act legislation so based upon, I**
18  **guess, the 9 -- what this says, they are only**
19  **taking into account one count of the asbestos**
20  **liability, yes.**
21  Q.   What do you base that on?
22  **A.   It doesn't say it.  It just says**
23  **related to asbestos liability.**
24  Q.   Right, this says sensitivity of equity

Page 140

1  value per share to asbestos liability, right?
2  **A.   Yes.**
3  Q.   Now, did you have occasion to discuss
4  this $13.79 equity value with members of the
5  investment committee?
6  MR. FLICKER: Objection.
7  **A.   This report generally was discussed**
8  **with the Equity Committee.**
9  **I don't know what page they focused on**
10  **or did not focus on.**
11  Q.   Okay, let me see if I can make this a
12  little simpler.
13  At some point after the January 29
14  presentation Duff & Phelps as part of its
15  assignment was giving to the committee or to the
16  group weekly updates about its pricing
17  conclusions, is that correct?
18  **A.   They were giving a range and a**
19  **midpoint.**
20  **(Exhibit No. 13, Email dated 2/3/04,**
21  **was so marked.)**
22  Q.   Okay, I am going to hand you what has
23  been marked for identification as Exhibit 13 and
24  ask you if this is one of the reports that you

Page 141

1  have just referred to about range and midpoint?
2  **A.   This does not look like the report that**
3  **they were giving.**
4  Q.   What does it look like?
5  **A.   It looks like an update that they**
6  **corrected something or gave us more information**
7  **but normally they would send us an email saying**
8  **what the range was.**
9  **I don't know if this is it.  This**
10  **doesn't look like the format that it would come**
11  **in.  Maybe it is -- I don't know.**
12  Q.   Well, in terms of content, if you look
13  at the second paragraph, "As a result of the
14  changes, we have increased our estimates."
15  **A.   Yes.**
16  Q.   Are you saying that their -- that they
17  may have conveyed this weekly evaluation change
18  in some other form?
19  **A.   No, I am saying this says an updated**
20  **equity value summary.  I thought the e-mails used**
21  **to say the weekly something analysis.**
22  **This e-mail does not look like the**
23  **first page that they used to attach to their**
24  **weekly analysis.  This may have come separately**

**36 (Pages 138 to 141)**

**Page 142**

1 than a weekly analysis. I don't know. I just
2 think they used to say what week it was and this
3 was the range for the week but I don't see any
4 parameters here to say what range or what week we
5 are talking about.
6    Q.   Okay. The thing has the date on the
7 second page.
8        It says equity valuation summary as of
9 1/30/2004 in terms of dating.
10   A.   Okay.
11   Q.   And the range is set out in that gray
12 line. It is a little hard to read.
13   A.   Yes, it is.
14   Q.   But it goes $.95, $2.10 and $3.24?
15   A.   Okay.
16   Q.   Okay, somehow information was going
17 from Duff & Phelps to the State Street group --
18   A.   On a weekly basis.
19   Q.   On a weekly basis with some attention
20 to what was going on in the Grace bankruptcy,
21 Grace world?
22   A.   Absolutely.
23   Q.   Okay, and so far as we know, this may
24 be one of the elements of that information of

**Page 143**

1 distribution, is that true?
2    A.   It could be, yes, absolutely.
3        (Exhibit No. 14, Email dated 2/17/04,
4        was so marked.)
5    Q.   I am going to hand you what has been
6 marked for identification as Deposition Exhibit
7 14.
8        Is this the same kind of update
9 material that Duff & Phelps was providing to
10 State Street during the first quarter of 2004?
11   A.   It looks like it. This was dated.
12 This one wasn't.
13   Q.   Okay, I see, okay.
14        And this is the kind of presentation
15 that Duff & Phelps did on a weekly basis, is that
16 right?
17   A.   Yes, it would be done on a weekly
18 basis.
19   Q.   Was this information conveyed to the
20 investment committee each week?
21        MR. FLICKER: Objection.
22   A.   I don't know.
23   Q.   Now, at some point, in the first
24 quarter or very shortly thereafter, a contact was

**Page 144**

1 made to State Street by an interested purchaser
2 of the Grace block then held by State Street, is
3 that correct?
4    A.   Yes.
5    Q.   Prior to that contact, State Street had
6 through its investment committee --
7        MR. CUMMINS: Don't pass them yet.
8        MR. GOODMAN: Okay.
9    Q.   Prior to that contact, State Street's
10 investment committee had made a decision to sell
11 a portion of its holdings, correct?
12        MR. FLICKER: Objection.
13   Q.   Let me give you some background and
14 maybe it will give the question I ask a little
15 context.
16        Is it not correct that some shares were
17 sold, some Grace shares were sold by State Street
18 in recognition of the restrictions of Rule 144?
19   A.   If State Street made a decision to
20 sell, it was because it was imprudent to hold the
21 stock. It would not have only been because of
22 the size of the fund.
23   Q.   And the size of the transaction was in
24 part, I'm sorry, let me withdraw the question.

**Page 145**

1        And the size of a sale transaction was
2 in part based upon the trading restrictions
3 imposed upon the stock held by Rule 144 of the
4 Securities and Exchange Commission, correct?
5    A.   Yes, it was subject to 144.
6    Q.   And it was subject to Rule 144 if the
7 block represented a certain percentage of the
8 then outstanding common stock, is that correct?
9        MR. FLICKER: Objection. It calls
10 for a legal conclusion.
11   A.   Among lots of others factors.
12   Q.   Including the trading volumes?
13   A.   Trading volumes, connection with the
14 company, there are lots of factors that deem you
15 an affiliate or not.
16   Q.   During the early course of 2004, did
17 State Street take any action to reduce the Grace
18 stock holding so that holding and
19 State Street were no longer subject to the
20 restrictions of Rule 144?
21   A.   The investment committee made a
22 decision to sell the stock because it was
23 imprudent to hold and filed a 144 and sold
24 pursuant to that.

Page 146

1       MR. FLICKER: I think you said the
2   investment committee made a --
3   **A.   The Fiduciary Committee.**
4       MR. FLICKER: Okay.
5   Q.   The Fiduciary Committee then after it
6   filed its -- completed that transaction, it made
7   a filing under Rule 144 as to that transaction,
8   right?
9   **A.   To begin selling, yes.**
10  Q.   And then after it completed that
11  proposed sale under 144, the remaining block was
12  no longer subject to a Rule 144, isn't that
13  correct?
14  **A.   At some point it became not subject to**
15  **144 -- I don't know.**
16  Q.   That was because of the then remaining
17  holding size of the block?
18  **A.   Usually if you are under 10 percent,**
19  **yes.**
20  Q.   So as result of one transaction,
21  State Street was able to drop the size of the
22  remaining holding to a size so that that block
23  wasn't subject to Rule 144 trading restrictions,
24  isn't that correct?

Page 147

1   **A.   Not as a result of one transaction, no.**
2   **We sold over a period of time.**
3   Q.   Oh, a series of transactions?
4   **A.   Yes.**
5   Q.   You indicated that the group just prior
6   to the commencement of that first group of sales,
7   had determined that it was imprudent to hold
8   Grace stock, correct?
9   **A.   Yes.**
10  Q.   And what was the basis of that
11  decision?
12      MR. FLICKER: Objection. It assumes
13  facts not in evidence.
14  **A.   The committee made the decision based**
15  **on the facts and circumstances presented at that**
16  **meeting.**
17  Q.   Were you in attendance at that meeting?
18  **A.   Yes.**
19  Q.   What were the facts and circumstances
20  that were discussed at that meeting with respect
21  to the sale of the Grace stock?
22  **A.   Dan's materials, the legal scenarios as**
23  **far as the cases facing Grace, the asbestos**
24  **liability, the volatility of the stocks, the risk**

Page 148

1   **to the participants of holding such a volatile**
2   **stock.**
3       **I think the minutes will speak for**
4   **themselves.**
5   Q.   And when you said Dan's analysis, you
6   mean Duff & Phelps' analysis?
7   **A.   Yes.**
8   Q.   So the committee relied on the
9   Duff & Phelps analysis, and some reports from
10  Goodwin Procter, anything else?
11  **A.   Their independent analysis, their own**
12  **substantive due diligence understanding the**
13  **issues.**
14  Q.   Members of the committee's due
15  diligence?
16  **A.   Yes.**
17  Q.   And other than what was provided to the
18  committee by your group, investment group, what
19  else did they have available to them?
20  **A.   They had their own investment**
21  **understanding.**
22  Q.   Okay. What other documents or
23  information did they have?
24  **A.   They have only what we give them and**

Page 149

1   **only what we talk about.**
2   Q.   Okay. Now, at some point after the
3   State Street initial transactions were made known
4   to the public, someone at State Street was
5   contacted by an investment banking house with
6   respect to possible sale of the remaining block,
7   is that correct?
8       MR. FLICKER: Objection.
9   **A.   That is my understanding.**
10  Q.   Okay. And do you know who at
11  State Street was first contacted?
12  **A.   Roger Petrin**
13  Q.   Who is Roger Petrin?
14  **A.   He is in charge of the Institutional**
15  **Trading Desk at SSgA.**
16  Q.   And the contact came from whom?
17  **A.   A brokerage firm.**
18  Q.   Lehman Brothers?
19  **A.   I believe so, yes.**
20  Q.   When did you first found out that a
21  contact had been made to Mr. -- is it Perron?
22  **A.   Petrin.**
23  Q.   Mr. Petrin?
24  **A.   Yes.**

**38 (Pages 146 to 149)**

**Page 154**

1  instructions from someone at State Street,
2  right?
3  **A.  Find out what the offer is.**
4  Q.  For what piece of property?
5  **A.  For Grace stock.**
6  Q.  For the block?
7  **A.  For the block.**
8  Q.  All right.  So someone had instructed
9  him that the block might be for sale?
10  **A.  No, no one called him.  They called us.**
11  Q.  I'm sorry.  No one in at State Street
12  instructed Mr. Petrin that the block was even
13  considered for sale?
14  **A.  There was no discussion of the block**
15  **being for sale.  Lehman contacted Roger.  They**
16  **were the national contacts.**
17  Q.  Okay.  So Mr. Petrin was instructed to
18  call Lehman Brothers back?
19  **A.  Yes.**
20  Q.  Did he do so?
21  **A.  I would say, yes, because this is how**
22  **this all came about.**
23  Q.  All right.  So Mr. Petrin then was
24  dealing with whom at State Street with regard to

**Page 155**

1  this transaction?
2       MR. FLICKER:  You mean at
3  State Street or at Lehman?
4       MR. CUMMINS:  State Street.
5  **A.  Mr. Petrin would communicate with**
6  **probably Kelly and I.**
7  Q.  And when Mr. Petrin had spoken to
8  Lehman Brothers that second time, what did he
9  tell Kelly or you -- what tell you about that
10  second conversation?
11  **A.  I don't know exactly what he told us.**
12  **I do know that we got a call.  Roger went back to**
13  **find out what they were offering.  We got the**
14  **price and we brought it to our committee.  That**
15  **is the process.**
16  Q.  And that occurred within a very short
17  period of time, correct?
18  **A.  Probably, yes.**
19       **(Exhibit No. 15, Letter dated 4/7/04,**
20               **was so marked.)**
21  Q.  Okay.  I am handing you what has been
22  marked as Deposition Exhibit No. 15.
23       Is this the formal letter in which an
24  offer is made by the whole block from

**Page 156**

1  State Street -- I'm sorry, let me tell you I am
2  only talking about Bates Page 000896?
3       MR. FLICKER:  Yes.
4  Q.  Even though there are two other pages
5  attached, and while they are in the Bates
6  sequence, we believe that they are not part of
7  the letter, but if you could confirm that, then
8  we can -- I don't mess with exhibits any more,
9  but I just want to be sure that you would concur
10  that --
11  **A.  Yes, they are not.**
12  Q.  So 897 and 898 are not part of the
13  letter of April 7th from D.E. Shaw to you, is
14  that correct?
15  **A.  That's correct.**
16  Q.  Now Mr. Holmes is writing to you at
17  State Street, do you see that?
18  **A.  Yes.**
19  Q.  This is Exhibit 15?
20  **A.  Yes.**
21  Q.  How did you know to whom he should
22  address this offer letter, if you know?
23       MR. FLICKER:  Please don't speculate.
24  **A.  I don't really know.**

**Page 157**

1  Q.  He was just guessing?
2  **A.  Well, no, Roger knows who deals with**
3  **Grace.  So he might have given my name or Kelly's**
4  **name.**
5       MR. FLICKER:  And again, please don't
6  speculate.
7       THE WITNESS:  Okay, I'm in trouble
8  now.
9  Q.  On April 7th, 2004, you received this
10  formal offer, agreed?
11  **A.  Yes.**
12  Q.  And if you look at the fax header at
13  the top of the page, is that No. 916 -- that
14  number that ends in 9434 a telephone number that
15  is familiar to you?
16  **A.  Yes, that looks like our fax number.**
17  Q.  Which was faxed?
18  **A.  Yes.**
19  Q.  Okay.  Prior to your receipt of this
20  letter other than the call to Mr. Petrin and
21  Mr. Petrin's call back, were there any other
22  communications between State Street and Lehman?
23  **A.  I do not remember.**
24       **(Exhibit No. 16, Savings and**

**40 (Pages 154 to 157)**

**Page 158**

1          **Investment Plan, was so**
2          **marked.)**
3     Q.   Handing you now what has been marked
4  for identification as you Ewing Deposition Number
5  16, could you take a minute and look through this
6  please.
7          (Short Pause.)
8     Q.   Okay, first, do you recognize this
9  document?
10    **A.   It appears to be a document that went**
11 **to the Fiduciary Committee.**
12    Q.   And what date did this appear to have
13 been presented to the Fiduciary Committee?
14    **A.   The date on it is April 6th.**
15    Q.   And that was one date before the
16 previous exhibit that we looked at 15 -- that
17 offer letter was received by you, is that
18 right?
19    **A.   Yes.**
20    Q.   And the document indicates, does it
21 not, what you just summarized and that is, and
22 this is on Page 4, that an inquiry from a
23 possible hedge fund buyer had been received as to
24 the entire block -- if you look at Page 4 the

**Page 159**

1  last bullet point that would be the sixth bullet
2  point.
3     **A.   Okay.**
4     Q.   Now, is the inquiry that this document
5  refers to the Lehman Brothers contact with
6  Mr. Petrin?
7     **A.   Yes.**
8     Q.   And by April 6th, had a price been
9  received from the prospective buyer of $3.50 per
10 share?
11    **A.   It says that $3.50 per share.**
12    Q.   And it says they had already received
13 an inquiry it says?
14    **A.   Yes.**
15    Q.   Could it have been anything other than
16 the Lehman Brothers/Petrin communications that is
17 referred to in this document?
18    MR. FLICKER:  If you know.
19    **A.   No, I don't know.  I mean that was the**
20 **price that we were offered, $3.50.**
21    Q.   Okay.  And then on -- so I guess then
22 the committee, investment committee according to
23 the last --
24    **A.   Fiduciary Committee.**

**Page 160**

1     Q.   The Fiduciary Committee?
2     **A.   Yes.**
3     Q.   According to the last page of the
4  document then voted based on what it knew at the
5  time to authorize the sale of the block?
6     **A.   Uh huh.**
7     Q.   Do you agree with me on that?
8     **A.   Yes.**
9     Q.   Now, one of the elements of your
10 presentation under analysis is the
11 Duff & Phelps updated analysis, right?
12    MR. FLICKER:  Which page is that?
13    MR. CUMMINS:  I'm sorry, that would
14 be Page 6 or Bates Number 663.
15    Q.   Turning to Page Bates 663 --
16    **A.   Okay.**
17    Q.   The reason that this material is here,
18 I take it is because that was a tool that the
19 Fiduciary Committee was using to make its
20 determination as to whether to sell the stock,
21 right?
22    **A.   They were the financial advisor, yes.**
23    Q.   Who is they?
24    **A.   Duff & Phelps.**

**Page 161**

1     Q.   Okay.  Can I have 27 -- it indicates
2  here, however, "that the Duff & Phelps formal
3  engagement has expired".
4          Do you see that?
5     **A.   Yes.**
6     Q.   So at the time of April 6th, there was
7  no formal relationship between Duff & Phelps and
8  State Street, is that correct, according to this
9  document?
10    **A.   The engagement letter had expired.**
11    Q.   Okay, and did the engagement letter
12 subsequently get -- and what happened between
13 April 6th and April 7th with respect to the
14 Duff & Phelps' formal engagement?
15    **A.   I don't know.  The work continued.**
16    Q.   But their engagement had expired,
17 right?
18    **A.   The engagement letter had expired.**
19 **That doesn't mean the engagement had expired.**
20    Q.   No one from Duff & Phelps attended this
21 meeting, is that correct?
22    **A.   I don't know.**
23    Q.   The minutes would say that?
24    **A.   The minutes would say who was there.**

**41 (Pages 158 to 161)**

1    Q.   Okay.  We will look at those in a
2  minute.
3         MR. CUMMINS: Let's look at number
4  27.
5         (Exhibit No. 17, Valuation Summaries,
6         was so marked.)
7    Q.   I am handing you now what is marked for
8  identification as Ewing Exhibit No. 17.  This is
9  a compilation of pages that appeared to us to
10  have been produced as one document, but if you
11  would take a minute to look through this group of
12  documents, I have the following question.
13       Are these, well, from Bates Number 2897
14  through 2912, are these the weekly updates that
15  Duff & Phelps provided to State Street as you
16  previously testified?
17   A.   They look like weekly updates.
18   Q.   Okay.  Now, if you would turn to the
19  very last page of that exhibit, that would be
20  Bates Page 002913.
21       Would you take a minute and read it
22  please to yourself.
23   A.   Yes.
24   Q.   Can you identify this document, Page

1  002913?
2    A.   It looks like an e-mail from Dan.
3    Q.   Okay.
4         MR. CUMMINS: Would counsel assembled
5  here object if we separated 002913 from the other
6  exhibit and give it a separate number?
7         Does anybody object to that?
8         MR. FLICKER: No, that is fine.  I
9  will note for the record that it is possible what
10  we are looking at here is the contents of the
11  single file given that the first page of the
12  exhibit is a file folder.
13        MR. CUMMINS: Okay, that could be, we
14  identified the first section but everything but
15  the page is Duff & Phelps weekly updates.  I just
16  think this Page 002913 -- it would be easier to
17  understand or more clear if it was separately
18  marked.  That is all.
19        MR. FLICKER: I understand.  I know
20  the subject says 3/31/04, W. R. Grace update and
21  it does provide an update.
22        MR. CUMMINS: Okay, leave it be.
23        I will refer to it as Bates 002913 as
24  part of this exhibit.

1    Q.   Do you remember receiving this exhibit?
2    A.   I mean --
3    Q.   I'm sorry, let me withdraw the
4  question.
5         Do you recall receiving this e-mail on
6  or about April 5th, 2004?
7    A.   I would have received it, yes.
8    Q.   All right. And in terms of the
9  chronology of events being April 7th receiving a
10  formal offer, and April 6th presenting
11  information to the Fiduciary Committee and this
12  being dated April 5th --
13        MR. FLICKER: This being what, sir?
14        MR. CUMMINS: This meaning 002913
15  being dated April 5th.
16   Q.   Is that a fair understanding of the
17  sequencing of how the Lehman Brothers information
18  and the Grace stock analysis from Duff & Phelps
19  were being dealt with?
20   A.   I don't know if I would agree with your
21  assessment.  I agree that those dates are what is
22  shown on that document.
23   Q.   All right.  Let's do it that way.  That
24  is more simple.

1         It is agreed that according to 002913
2  there was an e-mail sent to you by somebody from
3  Duff & Phelps on April 5th at 4:29 p.m.?
4    A.   Yes.
5    Q.   The second date that I think we can
6  agree on is Exhibit 16 which is a presentation
7  made the next day April 6th to the Fiduciary
8  Committee, correct?
9    A.   Yes.
10   Q.   And then finally the last thing
11  we looked at in connection with this sale
12  consideration was the offer letter that is
13  received by State Street on April 7th,
14  agreed?
15   A.   Yes.
16   Q.   Now, if you look at 002913, as part of
17  Exhibit 27, I'm sorry, part of exhibit --
18        MR. FLICKER: 17.
19        MR. CUMMINS: 17.
20   Q.   17, in the second paragraph,
21  Mr. Bayston says the following, "We qualify our
22  current valuation conclusions on this point since
23  we are not yet in a position to quantify our
24  revised estimate of these liabilities, clearly

**Page 166**

1 the events of the past several weeks (and the
2 coming weeks and months) are important to
3 evaluate any conclusions on the current stock
4 prices".
5     Do you see that?
6  **A.  Yes.**
7  Q.  Had you told Mr. Bayston as of April 5,
8 4:29 p.m. about the inquiry from Lehman Brothers?
9  **A.  I'm sure but I don't know.**
10  Q.  But you think you did?
11  **A.  Yes.**
12  Q.  You did not mention to the Fiduciary
13 Committee the next day that Duff & Phelps had
14 qualified their current valuation conclusions,
15 did you?
16     MR. FLICKER:  Objection.
17  **A.  I don't know what I told the committee**
18 **the next day.**
19  Q.  Well, let's look at the presentation.
20  **A.  Okay.**
21  Q.  Take your time to look.  Page 6 is the
22 Duff & Phelps updated analysis section but maybe
23 you indicate in your presentation something about
24 that Duff & Phelps qualifying its conclusion?

**Page 167**

1  **A.  Duff & Phelps would have reviewed this.**
2 **Whatever is in here is from Duff & Phelps.**
3  Q.  This entire document?
4  **A.  These documents before they are**
5 **distributed to our committee go to Legal and to**
6 **Dan Bayston -- everyone sees these.**
7  Q.  Before April 6th?
8  **A.  Yes, before it goes to our committee.**
9 **That was the team concept.**
10  Q.  Okay.  Anything in here that indicates
11 as far as you can tell that Duff & Phelps was
12 qualifying their valuation conclusions since they
13 were not in a position to quantify revised
14 estimates of liabilities?
15  **A.  I am not sure that that is not in there**
16 **somehow.**
17  Q.  It is not in there?
18     MR. FLICKER:  Well, that is not what
19 the witness said.
20  Q.  Let me do it another way.
21     It would have been important to the
22 committee's deliberations to know that
23 Duff & Phelps had the day before qualified its
24 current valuation conclusions, correct?

**Page 168**

1     MR. FLICKER:  Objection.  It calls
2 for speculation.
3  **A.  The committee at the date of -- on the**
4 **6th, would have known everything they needed to**
5 **know to make an informed decision.**
6  **That was our job.**
7  Q.  And it would have been important to
8 know that Duff & Phelps was qualifying its
9 conclusions?
10  **A.  And they possibly wouldn't have known**
11 **that.**
12  Q.  Okay, but there is nothing so far that
13 you can point to in this exhibit that indicates
14 that you presented that information to the
15 committee?
16     MR. FLICKER:  Objection.  The witness
17 has yet gone through the entire presentation.
18     MR. CUMMINS:  I'm sorry, I thought
19 she had.
20     (Short Pause.)
21  **A.  On Page 13, the bullet says "Evaluated**
22 **with Goodwin Procter and Duff & Phelps the**
23 **current situation, the impact of any changed**
24 **circumstances in the potential for future**

**Page 169**

1 changes".
2  **That was part of the due diligence.**
3  Q.  And where is it that you say to the
4 committee that Duff & Phelps is qualifying their
5 valuation conclusions and they are unable as of
6 April 5th to quantify a revised estimate of
7 liabilities, where do you see that?
8  **A.  Where does it say we didn't?**
9  Q.  Pardon me?
10  **A.  Where does it say we didn't?**
11  Q.  Okay.
12  **A.  This is an oral meeting that happens**
13 **with the fiduciary committee.**
14  Q.  Minutes are taken?
15  **A.  Minutes are taken.**
16  Q.  Okay, so the minutes would reflect what
17 was said?
18  **A.  The minutes would reflected what**
19 **happened probably.**
20  Q.  And if it was important, it would be
21 reflected in the minutes, right?
22     MR. FLICKER:  Objection.
23  **A.  Anything that the committee considered**
24 **would be in the minutes.**

**43 (Pages 166 to 169)**