**Page 1**

CONFIDENTIAL TESTIMONY, PAGE 46

Volume:   1
Pages:    1 - 195
Exhibits: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 04-11380-WGY
Judge William G. Young

```
----------------------------------------
                                        )
LAWRENCE W. BUNCH, et al.,              )
                         Plaintiffs,    )
        v.                              )
                                        )
W.R. Grace & CO., et al.,               )
                         Defendants.    )
                                        )
----------------------------------------
```

DEPOSITION OF KELLY Q. DRISCOLL, a Witness
called on behalf of the Plaintiffs, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Maureen
Nashawaty, a Notary Public within and for the
Commonwealth of Mass., held at State Street
Financial Center, One Lincoln Street, Boston, MA,
on Fri., June 1, 2007,commencing at 9:15 a.m.

COPLEY COURT REPORTING, Inc.
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

**Page 30**

1 Committee -- does Miss Ewing report to you?
2 **A. Yes, she does.**
3 Q. And maybe I am misunderstanding
4 something so let me go back a step.
5     In the Agway, was State Street involved
6 in connection with the ESOP plan?
7 **A. The company securities fund and 401K**
8 **plan.**
9 Q. And in a different capacity, did State
10 Street serve on the Creditors Committee?
11 **A. State Street served on the Creditors**
12 **Committee in its independent fiduciary capacity**
13 **on behalf of the company's securities fund in the**
14 **401K plan.**
15 Q. Was the company securities fund
16 considered, therefore, a creditor of Agway?
17 **A. The company's securities fund invested**
18 **in some Agway debt.**
19 Q. Okay.
20 **A. And, therefore, it was a creditor.**
21 Q. What was your employment history
22 subject to your graduation from, I believe,
23 Catholic University?
24 **A. I was -- I worked for a contracting**

**Page 31**

1 **firm in the National Center for -- I am not going**
2 **to remember the specific name, but it was the**
3 **information center in the Department of Energy.**
4 Q. Okay. Then what? How long did you
5 work there?
6 **A. I started working there before I**
7 **graduated from college, and then a full year**
8 **after I graduated from college.**
9 Q. Okay. And then in 1982 what happened?
10 **A. I took a job with State Street.**
11 Q. Doing what?
12 **A. In the small plan I.R.A. Keough area**
13 **initially, and then eventually moved into the**
14 **401K area, and then when I graduated from law**
15 **school, into the legal division, and then**
16 **eventually back to the business side.**
17 Q. Okay. Now you indicated that you
18 worked in the 401K area.
19     Do you recall that testimony?
20 **A. Yes.**
21 Q. What did you do in the 401K area?
22 **A. In the initial job?**
23 Q. Yes, yes.
24 **A. I was -- I did some compliance work and**

**Page 32**

1 **supported the legal division or actually I should**
2 **say I supported a lawyer, an attorney, at times**
3 **he was on the business side and then moved into**
4 **the legal division.**
5 Q. Now you indicated a moment ago that
6 there was a business side. What do you mean by
7 that?
8 **A. My initial years at State Street I**
9 **worked in the business areas, the I.R.A., Keough**
10 **and then the 401K business area that provided**
11 **services to 401K plans, and then I moved into the**
12 **legal division which you would not consider being**
13 **on the business side, and then after seven or**
14 **eight years in the legal division, I moved back**
15 **into a business position which is primarily the**
16 **position that I still have today.**
17 Q. Okay. And when you use business side
18 or business position, my impression, and tell me
19 if I am wrong, is the business side actually
20 generated, is a revenue generating side for
21 entities for State Street, is that correct?
22 **A. That's correct.**
23 Q. Whereas legal division provides
24 services for the business side, is that correct?

**Page 33**

1 **A. That's correct.**
2 Q. Who was your employer, well, I have
3 seen several different entities as I have read
4 documents and taken several depositions. Let's
5 see if you can clarify them for me.
6     There is State Street Global Advisors,
7 correct?
8 **A. State Street Global Advisors is an area**
9 **of State Street Bank and Trust Company. So my**
10 **employer from '82 through current is State Street**
11 **Bank and Trust Company although I work in the**
12 **area of State Street Global Advisors but it is**
13 **really one employer.**
14 Q. Have you ever provided any services for
15 an entity called CitiStreet?
16 **A. No.**
17 Q. What is CitiStreet?
18 **A. CitiStreet is a joint venture that**
19 **provides defined contribution plan services**
20 **primarily in the marketplace, to the marketplace.**
21 Q. What is your current position?
22 **A. Senior Managing Director of State**
23 **Street Global Advisors.**
24 Q. What are your responsibilities?

**9 (Pages 30 to 33)**

**Page 34**

1    A.    I head up the Fiduciary Group.
2    Q.    What is the Fiduciary Group?
3    A.    It is the group here that performs
4    company stock, fiduciary services, and oversight,
5    primarily for company stock investments in ERISA
6    plans.
7    Q.    *And what does that all mean?  In
8    other words, what is the primary purpose that an
9    entity would hire State Street in connection with
10   company stock --
11        MR. FLICKER:  Objection.
12   Q.    -- or fiduciary services?
13        MR. FLICKER:  Objection.
14   A.    Could you repeat the question.
15        (The preceding *question was read
16        back by Stenographer.)
17   A.    The primary is we get hired by clients
18   to provide fiduciary services for company stock
19   in a role as Investment Manager or independent
20   fiduciary with respect to overseeing investments
21   of company stock investments, of company stock in
22   401K plans or ESOPs, and it also on occasion
23   involves transactions where we are brought in to
24   make a determination with respect to potential

**Page 35**

1    transaction or a proxy vote or a merger decision
2    or a tender offer.
3        My group also oversees the company
4    stock investments and ERISA plans where State
5    Street serves as Director Trustee.
6    Q.    I have seen that term before.  What is
7    a Director Trustee?
8    A.    In the way that we use the terminology,
9    it is a trustee who is receiving directions from
10   another fiduciary or investment managers, and/or
11   investment managers.
12   Q.    As a Director Trustee, is it a Director
13   Trustee in connection with company stock plans?
14   A.    That is where my group comes in, yes,
15   only with respect to company stock investment in
16   those Director Trustee relationships.
17   Q.    *And as a Director Trustee, is it an
18   obligation or a responsibility of State Street to
19   determine whether retention of company stock
20   remains consistent with ERISA?
21   A.    Could you read that back please?
22        (The preceding *question was read
23        back by Stenographer.)
24        MR. FLICKER:  Objection.

**Page 36**

1    A.    It is generally our responsibility as a
2    Director Trustee to determine if the directions
3    that we are receiving are proper or if ERISA
4    would otherwise require us not to follow those
5    directions.
6    Q.    And in the event that you determine
7    that ERISA requires you not to follow the
8    directions, what steps does State Street take?
9        MR. FLICKER:  Objection.
10   A.    It really depends on the situation.
11   Q.    Is the analysis that State Street
12   employs in connection with determining whether
13   retention of company stock is consistent with
14   ERISA as a Director Trustee similar, the same as
15   the analysis that State Street performs when it
16   is serving as an Investment Manager for a company
17   stock plan?
18        MR. FLICKER:  If I could ask a
19   clarifying question, if you don't mind.
20        When you say analysis, do you mean the
21   procedural steps taken?
22        MR. GOODMAN:  Yes.
23   A.    I would say the process in overseeing
24   the investments from an investment perspective

**Page 37**

1    are the same whether we serve as an Investment
2    Manager, Director Trustee or independent
3    fiduciary.  So the procedures we follow in
4    monitoring those investments are the same.
5    Q.    If the conclusions are the same, in
6    other words, if the conclusion is the same in
7    each instance that retention of company stock is
8    inconsistent with ERISA, does State Street take
9    the same actions whether it is a Director Trustee
10   or whether it is an Investment Manager?
11        MR. FLICKER:  Objection that is an
12   incomplete hypothetical.  It calls for
13   speculation.
14   A.    Again, it is very fact specific.  It
15   depends upon each situation.
16   Q.    And as a Director Trustee, does
17   State Street have the authority to override the
18   directions of the entity that hired -- let me
19   rephrase the question.
20        As a Director Trustee, does
21   State Street have the authority to override plan
22   documents and to override the directions of the
23   trustee in connection with the company stock
24   plan?

Page 54

1    **A.   It might have been 2002 or 2003.**
2    Q.   Okay.
3    **A.   I'm not sure.  Those are the two that I**
4    **recall.**
5    Q.   What company if you recall took place
6    around 2000 or prior to 2000?
7    **A.   I mentioned that this is all public**
8    **information.**
9        MR. FLICKER:  Now we are under
10   confidentiality unless you have court ordered
11   confidentiality agreement, you should answer.
12       THE WITNESS:  All right.
13   **A.   Crystal Brands.**
14       MS. HEERMANS:  I'm sorry, I didn't
15   hear you.
16   **A.   Crystal Brands.**
17   Q.   Was that a publicly traded company?
18   **A.   Yes.**
19   Q.   Was it in bankruptcy?
20   **A.   Probably we sold prior to their**
21   **bankruptcy filing.**
22   Q.   What industry is Crystal Brands in if
23   you know?
24   **A.   They were in clothing and jewelry.  I**

Page 55

1    can't remember what else, but that is generally
2    what they were in.
3    Q.   Okay.  Maybe I should ask the question
4    a little more broadly to get the time frame.
5        Prior to May of 2004, other than Grace
6    and other than United Airlines and other than
7    Crystal Brands, had your group made a
8    recommendation to sell the company stock because
9    retention of company stock was inconsistent with
10   ERISA?
11   **A.   We sold out of Enron but we were hired**
12   **after the bankruptcy filing so I am not sure if**
13   **you were trying to limit your question to pre-or**
14   **post or just general.**
15   Q.   No, just general?
16   **A.   Enron, and again it is prior to what**
17   **year, 2004?**
18   Q.   Well, prior to May 1st, 2004, I am
19   trying to find out what transpired, the reason I
20   chose May is obviously we all know that this
21   Grace stock fund sold all of its shares out by at
22   least that, May 1st of 2004 which would have more
23   or less terminated your relationship with Grace,
24   so what I want to know is prior to your

Page 56

1    termination at Grace, other than the now three
2    companies that we know of -- United Airlines,
3    Enron and Crystal Brands -- were there any other
4    companies for whom your group provided fiduciary
5    services where it recommended that the company
6    stock fund sell company stock because of the
7    retention was inconsistent with ERISA?
8    **A.   I don't recall if there were any**
9    **others.**
10   Q.   I am going in a little bit of circles.
11       When a company hires you, meaning your
12   group, to serve as an Investment Manager for the
13   company stock fund, what does State Street view
14   is its responsibilities?
15       MR. FLICKER:  Objection.
16   **A.   It depends on what the contracts say.**
17   **What the contract says, what the investment**
18   **guidelines might say, so the governing documents.**
19   Q.   So State Street's responsibilities may
20   vary regarding -- depending on the engagement
21   agreement?
22   **A.   Right or the investment management**
23   **agreement.**
24   Q.   *Do the steps vary that State Street

Page 57

1    undertakes in connection with determining whether
2    an investment in company stock remains consistent
3    with investment depending on the engagement
4    agreement?
5        MR. FLICKER:  Objection.
6    **A.   I think you want to rehear your**
7    **question.**
8    Q.   Actually I think the question is all
9    right but my tone sounded like the question was
10   going to continue on.
11       I think it will sound better read back.
12   **A.   I don't think it will.**
13       **I think you used investment twice so**
14   **listen to that one.**
15       **(The preceding *question was read**
16           **back by the Stenographer.)**
17   Q.   Well, anyway the gist of the question
18   with the two investments was when State Street
19   serves as an Investment Manager for a company
20   stock fund, does the process it undertakes to
21   determine whether retention of company stock is
22   consistent with ERISA vary depending on the terms
23   of the engagement agreement with the client?
24   **A.   The ultimate standard in determining if**

**15 (Pages 54 to 57)**

**Page 58**

1  the company stock investment, the holding or the
2  purchasing or the selling remains consistent with
3  ERISA is not different, so the -- that ultimate
4  standard and that ultimate decision does not
5  differ.
6      Q.  Does the steps that State Street
7  undertakes to determine if that standard is
8  satisfied differ depending upon the terms of the
9  engagement?
10     A.  Let me just clarify.  The engagement
11 may influence what steps we take during our
12 engagement, for example, if we were a Director
13 Trustee, we may take some additional steps in
14 going back to a fiduciary versus if we are an
15 Investment Manager which is your situation, we
16 may look at a variety of responsibilities we have
17 under the agreement regarding liquidity,
18 regarding what our specific role is but the
19 ultimate decision of whether holding or investing
20 in a company stock is consistent with ERISA is
21 the same regardless of our engagement and the
22 process to get to that decision only varies in
23 the sense that each client's situation may vary
24 so we may perform due diligence in a variety of

**Page 59**

1  areas but the actual process to get to that step,
2  the procedural process, the due diligence does
3  not really vary so the general process does not
4  vary.
5      Q.  Okay, so I am going to be able to ask
6  this question correctly, what is the general
7  process?
8      A.  We certainly read the plan documents to
9  understand what the controlling documents in our
10 agreements and our trust agreement and employee
11 communications may say.  So we do our due
12 diligence sort of from an ERISA document
13 perspective, we do due diligence from an
14 investment oversight from an investment
15 perspective, and that is where there might be a
16 variety of variations of the type of investment
17 due diligence we do depending upon the
18 investment.
19     The process that we utilize outside
20 advisors if necessary, both legal and/or
21 financial advisors is generally the same.  The
22 analysis may differ, again, mostly depending upon
23 the different investments or controlling
24 documents, but we do perform analysis typically,

**Page 60**

1  so due diligence, retaining experts if necessary,
2  analysis, and then coming to conclusions making
3  decisions and those decisions, the fiduciary
4  decisions with respect to company stock are made
5  by a committee at SSgA.
6      Q.  Okay.  Let's take these.
7      You said you read plan documents, is
8  that correct?
9      A.  Typically we read the plan documents.
10     Q.  And would that include?
11     A.  We are now phrasing this in terms of
12 making a company stock investment decision.
13     Q.  Correct.
14     A.  Particularly to sell or to determine if
15 it is consistent.
16     Q.  Okay.
17     A.  To hold or to sell.
18     Q.  Correct.  I am going through the
19 general process that you just described.
20     You said you read the plan documents
21 and also I believe you indicated correspondence
22 or communications with plan participants, is that
23 correct?
24     A.  Often, often, not always but depending

**Page 61**

1  upon the situation, the governing documents may
2  include a summary plan description and/or
3  employee communications.
4      Q.  Those are questions that I was going to
5  ask whether that would include summary plan
6  descriptions, but you beat me to it.
7      A.  Yes, depending upon the role when I say
8  the governing documents, it could include all of
9  those.
10     Q.  And when you read the plan documents,
11 what are you looking for?
12     A.  It really depends on the situation.
13 But a process of our due diligence includes
14 reviewing ERISA documents.
15     Q.  I don't want to make this a fishing
16 expedition because I don't want to waste my time
17 or your time.
18     In terms of when you read the Grace
19 plan documents, what were you looking for?
20     A.  We look for the ability or power to
21 appoint an Investment Manager or independent
22 fiduciary.  We look to how the fund is described
23 or the investment is described and any
24 limitations or restrictions.  We look to the role

**16 (Pages 58 to 61)**

**Page 62**

1  of the trustee particularly in Grace -- what does
2  the trust document say. We may look to see, I
3  don't know if I already said this, to see how the
4  investment is described to the participants.
5      Q.  Do you -- well, I didn't ask the
6  predicate question and Scott would usually object
7  and say foundation. But I am assuming in this
8  case that you are testifying that State Street,
9  meaning your group, did read the plan documents,
10  is that correct?
11      MR. FLICKER:  Now you know why I
12  didn't object.
13      A.  Somebody in my group, yes.
14      Q.  Did you read the plan documents?
15      A.  I may have read some of them.
16      Q.  Did the review of the plan documents
17  also include the summary plan description?
18      A.  I don't know.
19      Q.  Now the next step you said is the
20  investment perspective. We were going through
21  the general process a moment ago.
22      What do you mean by investment
23  perspective?
24      A.  As part of our due diligence, we think

**Page 63**

1  of it as an ERISA documentation, due diligence
2  and also then an investment due diligence, so the
3  investment perspective would be reviewing Grace
4  from an investor's perspective.
5      Q.  Meaning whether, well, I am not going
6  to ask that. Let me ask you that question.
7      What do you mean by an investor's
8  perspective?
9      A.  Meaning the fundamentals of Grace from
10  a financial and investment perspective -- so you
11  are looking at Grace as an investment. You are
12  looking at the fundamentals, the financial
13  fundamentals of the company, and in particular
14  the potential contingent liabilities.
15      Q.  And in connection with that investment
16  prospective, I am assuming that the general
17  process from what you just testified to a moment
18  ago is that State Street engages its services of
19  a financial analyst, is that correct?
20      A.  In the Grace case, State Street engaged
21  the services of a financial advisor and legal
22  counsel to help us with that.
23      Q.  I understand that but I am now going
24  generally not just with Grace?

**Page 64**

1      A.  Right.
2      Q.  In connection with investment
3  perspective when you are reviewing a company
4  stock fund to determine whether it remains --
5  potentially remains consistent with ERISA and you
6  are serving as an Investment Manager, does State
7  Street typically engage the services of an
8  investment advisor?
9      A.  State Street would typically not engage
10  the services of an investment advisor in a
11  publicly traded stock that is not bankrupt.
12      We would engage a financial advisor,
13  typically in a private company stock and a
14  potential bankruptcy situation or here in Grace
15  already was in bankruptcy.
16      Q.  So the circumstances of a bankruptcy
17  either possible bankruptcy or existing bankruptcy
18  is a factor that would generally cause your group
19  to seek the services of a financial advisor, is
20  my understanding correct?
21      A.  Or would often call our group to seek
22  the services of a financial advisor. Also if
23  there was a very complicated transaction
24  decision, so, there are some publicly-traded

**Page 65**

1  situations other than bankruptcy where we might
2  bring in a financial advisor but generally we
3  utilize internal resources for ongoing publicly
4  traded stocks.
5      Q.  What internal resources?
6      A.  Investment analysis within SSgA, and
7  our committee members, several of whom have
8  significant investment expertise.
9      Q.  Okay. Then I believe you said after
10  that outside advisors, there was an analysis that
11  was performed, is that correct?
12      I said I was going through the general
13  process, so you read the plan documents, and you
14  look at investment prospective, and if necessary,
15  you engage the services of a financial advisor
16  and then there is the next step, I believe, is an
17  analysis, is that correct?
18      MR. FLICKER:  Objection, go ahead.
19      A.  Perhaps I should use the term
20  evaluation, so we bring all of the relevant
21  information together, and evaluate.
22      Q.  *How often in connection with a
23  particular company does a particular company
24  stock fund which State Street is serving as an

**17 (Pages 62 to 65)**

Page 66

1  Investment Manager does State Street independent
2  Fiduciary Group meet?
3     A.   Could you read that back please?
4          (The preceding *question was read
5          back by the Stenographer.)
6     A.   The independent Fiduciary Group has
7  bi-weekly meetings scheduled, but how often a
8  particular company comes before the committee or
9  if we schedule additional meetings or don't have
10 a meeting because we don't have an agenda item
11 for the bi-weekly meeting, bi-weekly, every two
12 weeks --
13        MR. FLICKER:  Yes.
14     A.   -- is very dependent upon the company
15 in this situation.
16     Q.   How often does an independent fiduciary
17 committee meet in connection with a company stock
18 fund?
19        MR. FLICKER:  I think you were just
20 answering that question.  You were answering for
21 the committee and not for the group.
22     A.   I'm sorry, I misunderstood the first
23 question again.
24     Q.   Okay, well, believe me, I got totally

Page 67

1  confused between committees and groups and who is
2  what, but I think I understand it now.
3        What you just described a moment ago is
4  that every two weeks the independent fiduciary
5  committee meets?
6     A.   Yes.
7     Q.   And if an agenda items includes a
8  particular company stock, it would be addressed
9  at that meeting, is that correct?
10     A.   We have regularly scheduled meetings,
11 and if there is no particular issue to go to the
12 committee, we might not have a meeting.  If we
13 have a need to have more frequent meetings.  We
14 would call a meeting, so it is really dependent
15 upon what we might have to go before the
16 committee.  And how often a particular company
17 gets in front of the committee is very dependent
18 on what might be happening or what might not be
19 happening with that particular investment.
20     Q.   Okay, who puts the, who makes the
21 determination as to whether an item should be
22 brought before the committee?
23     A.   My group typically makes that decision
24 and there are also some procedures that we follow

Page 68

1  where items might periodically on a periodic
2  basis come before the committee.  We are talking
3  about the independent fiduciary committee here?
4     Q.   Correct.
5     A.   Yes.
6     Q.   And your group meaning the independent
7  Fiduciary Group?
8     A.   Yes, the independent Fiduciary Group,
9  right.
10     Q.   *In connection with determining whether
11 the retention of company stock is appropriate in
12 a stock fund, does State Street utilize a
13 monitoring process for the company?
14     A.   Could you read that back please?
15        (The preceding *question was read
16        back by the Stenographer.)
17     A.   State Street utilizes a monitoring
18 process for our company stock investments where
19 we are an Investment Manager or Director Trusted.
20     Q.   What does the monitoring process
21 entail?
22     A.   It varies.  If it is publicly-traded
23 stock or a private company stock so should we
24 focus on publicly traded.

Page 69

1     Q.   You read my mind.
2     A.   Okay.  It involves monitoring the stock
3  price, and any relevant and/or significant news
4  that might come out on that stock or that company
5  and that is done by an investment officer who is
6  assigned to a particular company account.
7        If there is significant price
8  fluctuation, particularly negative towards a
9  comparable group or benchmark for each company,
10 or, and/or there are other significant events
11 that may be happening with that company, that
12 would impact the investment in a negative
13 perspective, and then also if there is an
14 unusually high increase in the stock price
15 compared to its peer group, and the company stock
16 price compared to its peer group would be
17 evaluated over I believe it is a rolling
18 four-week period, then an investment officer
19 brings these -- this news or these stock
20 movements to the attention of a fiduciary officer
21 and may also come before a, what we call a stock
22 review committee.  So we have the investment
23 officer, potential fiduciary officer, potentially
24 a stock review committee, if a stock goes on a

18 (Pages 66 to 69)

**Page 70**

1  stock review committees list that gets reported
2  to the fiduciary committee on a periodic basis as
3  well as the investment committee at State Street
4  Global Advisors.
5      Q.   Okay, was this process used in
6  connection with Grace?
7      A.   No, the Grace process was more akin to
8  what we would call a transaction. It was coming
9  to the committee from the beginning. So it was
10  not sort of the same process where an investment
11  officer is involved, may be involved and may only
12  be involved -- this came to the highest level of
13  fiduciary review immediately.
14      Q.   Why was that?
15      A.   Because Grace was already in
16  bankruptcy.
17      Q.   Okay.
18      A.   And the process that I just previously
19  described was to help us identify stocks that we
20  may be concerned about going into bankruptcy, and
21  then they get all of this, all heightened
22  fiduciary attention. Grace came into that
23  heightened fiduciary status immediately.
24      Q.   Other than Grace and Enron I think you

**Page 71**

1  testified to, are there any other companies
2  which State Street as an Investment Manager
3  immediately placed on heightened status?
4      A.   I'm sorry, was the question where we
5  served as Investment Manager?
6      Q.   Yes.
7      A.   The only situation -- I can't think of
8  any particular clients, but any situation where
9  we may have been just hired once the company was
10  troubled, and I can't think of too much where we
11  came in as an Investment Manager where we didn't
12  have any prior relationship, for example, United
13  Airlines, we were a Director Trustee and then we
14  became Investment Manager once they were troubled
15  so when we got the Investment Manager role they
16  were already heightened and even at a Director
17  Trustee they had reached a heightened awareness
18  status, but I can't think of too many where we
19  came in to trouble situations where we were an
20  Investment Manager other than Enron where we were
21  a very broad fiduciary and that also was already
22  in bankruptcy.
23      Q.   How about as -- in another capacity,
24  you used the word Director Trustee, are there any

**Page 72**

1  other --
2      A.   There may have been some companies
3  where we were hired as a Director Trustee of a
4  company that was already troubled. I am just not
5  recalling any specifically.
6      Q.   All right. Now, in connection with a
7  troubled company such as Grace, does the stock
8  price have an impact on, let me go back a step.
9      Earlier you indicated that one of the
10  monitoring process was that you periodically or
11  that you regularly monitored the stock prices, is
12  that correct?
13      A.   That's correct.
14      Q.   And what is the reason that State
15  Street monitored the stock price?
16      A.   Because we had so many clients, we were
17  looking for significant movements in stock price,
18  stock performance that might indicate to us
19  stocks that need further fiduciary review and
20  attention.
21      Q.   Okay.
22      As the stock fluctuates that may
23  indicate to you that the company is heading
24  towards being a troubled company, is that

**Page 73**

1  correct? It may be an indication?
2      A.   That would be one factor. If it is
3  fluctuating versus, you know, significantly
4  fluctuating to the negative, for example, in
5  particular versus its peer group.
6      There could be other situations where
7  there is an industry issue -- where it wouldn't
8  be significantly fluctuating within its peer
9  group -- the industry has an issue.
10      There could be other factors such as
11  significant contingent liabilities.
12      Q.   Okay.
13      A.   Significant financial restatements
14  being announced before the market maybe has an
15  opportunity to react to the news.
16      So things other than stock price which
17  I mentioned before.
18      Q.   *Okay, in connection with troubled
19  companies, does stock price play a factor or role
20  in determining whether retention of company stock
21  remains consistent with ERISA?
22      A.   I'm sorry, could you repeat it.
23      (The preceding *question was read
24      back by Stenographer.)

**Page 86**

1    Q.   How did you base your understanding as
2  to what the investment guidelines were for State
3  Street in connection with its services for W. R.
4  Grace company?
5    **A.   I don't recall if I read it or if I**
6  **understood it through my staff and counsel, legal**
7  **counsel.**
8    Q.   Turn to I believe the next Page 1279.
9    **A.   Yes.**
10    Q.   This relates to certain fee limits, do
11  you see that?
12    **A.   Yes.**
13    Q.   Did you have any involvement in
14  determining the amount of fees that State Street
15  would charge Grace?
16    **A.   This is actually the limit on legal**
17  **expenses.**
18    Q.   Okay.
19    **A.   So these aren't State Street's fees.**
20    Q.   Let me go back a step.
21    **A.   Okay.**
22    Q.   In connection with the fees that State
23  Street would charge Grace, did you have any
24  involvement in coming up with that number?

**Page 87**

1    **A.   I don't recall.**
2    Q.   And the next page of this document, I
3  said the next page, let me identify it for you,
4  beginning on Page 1284 is the engagement with
5  Duff & Phelps, do you see that?
6    **A.   Yes.**
7    Q.   Who made the decision to engage Duff &
8  Phelps?
9    **A.   I don't recall.**
10    Q.   Were you involved in that decision?
11    **A.   I don't recall.**
12    Q.   Did you have authority -- did your
13  department, the independent Fiduciary Group have
14  the authority to engage any financial advisor it
15  chose or was there a limitation as to who was an
16  appropriate financial advisor?
17      MR. FLICKER:  I am going to object to
18  that question.  It is compound.
19    **A.   We had several financial advisors we**
20  **typically use and there may have been a list of**
21  **approval financial advisors but Duff & Phelps was**
22  **definitely one of the financial advisors we had**
23  **historically used and would have been on an**
24  **approved list if there was an approved list.**

**Page 88**

1    Q.   Who else was on that approved list?
2    **A.   If there was an approved list at this**
3  **time but the financial advisors we typically have**
4  **used was Duff & Phelps, Houlihan Lokey, Howard**
5  **and Zukin, at this time, a firm either Willamette**
6  **or the group later moved to Stout Resius.**
7      **Those were the firms that we**
8  **predominantly used.**
9    Q.   Approximately how many times in the
10  past had you used Duff & Phelps?
11    **A.   I don't remember the number of times,**
12  **but I could say frequently throughout the late**
13  **'80's, '88, '89, certainly '89 through this time.**
14    Q.   How about Houlihan & Lokey?
15    **A.   I would say frequently also in the same**
16  **time frame, maybe starting the early '90s, late**
17  **'80's.**
18    Q.   The other two firms that you said?
19    **A.   Willamette which then later at some**
20  **point in time became the group that the firm**
21  **moved to -- to a group called Stout Resius,**
22  **occasionally.**
23    Q.   Were there particular areas of
24  expertise or different types of particular

**Page 89**

1  companies that you would chose Duff & Phelps for?
2    **A.   No, Duff & Phelps provided financial**
3  **advice on a wide range of industries.**
4    Q.   Do you know whether Duff & Phelps had
5  any particular expertise with the chemical
6  industry?
7    **A.   I don't recall.**
8    Q.   Do you know whether Duff & Phelps had
9  any particular expertise in connection with
10  companies that were in bankruptcy?
11    **A.   I don't recall.**
12    Q.   Do you know whether Duff & Phelps had
13  any particular expertise with regard to companies
14  facing asbestos liabilities?
15    **A.   I believe they did.**
16    Q.   What is the basis for that belief?
17    **A.   We worked with them on another prior**
18  **engagement that involved asbestos liabilities.**
19    Q.   Would that have been the Federal Mogul
20  situation?
21    **A.   That is not the one that I am thinking**
22  **of right now.**
23    Q.   What is the one that you are thinking
24  of?

**23 (Pages 86 to 89)**

## Page 90

1  A.  That is the one that we have a
2  confidentiality agreement -- the deal that didn't
3  happen.
4  Q.  When was that again -- when did that
5  occur -- just the time frame -- you gave it to me
6  before, but I don't recall.
7  A.  Somewhere between 2000 and 2003 -- the
8  end of 2003 -- somewhere in that time frame.
9  Q.  Without getting into specifics, can you
10 tell me what that company did, what business it
11 was in or what industry it was in -- make it what
12 industry it was in?
13 A.  I would rather not.
14     MR. FLICKER:  If you think that the
15 answer might reveal the identity of the
16 company --
17     THE WITNESS:  Yes, it would.
18 Q.  What is the nature of the
19 confidentiality agreement there?  Is it a court
20 order?
21 A.  No, it was contractual.
22     MR. GOODMAN:  I won't pursue it that
23 the moment but we will reserve rights in
24 connection with that inquiry.

## Page 91

1  Q.  What was your involvement -- if you
2  take a look at Johnson Exhibit No. 1.
3      I am handing to you what was previously
4  marked as Johnson Exhibit No. 1. Do you have that
5  in front of you?
6  A.  I do.
7  Q.  And there is a time line or a projected
8  time line -- do you agree with that?
9  A.  Do I agree with what?
10 Q.  That this is a projected time line?
11 A.  I agree that that is what it says on
12 the document.
13 Q.  Okay.  Did you have any involvement in
14 creating this document?
15 A.  I don't recall.
16 Q.  What was your involvement in
17 connection, at least early on, prior to the
18 actual engagement, what involvement did you have
19 in connection with the possible retention of
20 State Street by W. R. Grace?
21 A.  I recall that I went on the
22 presentation and I do recall generally, I had
23 discussions with Monet Ewing, but I don't
24 specifically recall what those discussions

## Page 92

1  entail.
2  Q.  Okay.  Who made the presentation?
3  A.  I believe it was Monet Ewing and
4  myself.
5  Q.  Who did the primary speaking?
6  A.  I don't recall who did the primary
7  speaking at Grace.
8  Q.  Who was responsible for the account,
9  the Grace account?
10 A.  Monet Ewing was I would say the primary
11 person on the account.
12 Q.  At law firms sometimes a person
13 responsible for the account gets a bigger portion
14 of the proceeds regarding payment, compensation,
15 did that work in this case, or is compensation
16 all based on responsibility for an account at
17 State Street?
18 A.  No.
19     (Off the record.)
20     (Driscoll Exhibit No. 1, Memo dated
21     11/21/03, was so marked.)
22 Q.  Miss Driscoll, the Court Reporter
23 handed to you what has been marked as Exhibit No.
24 1 which is a memorandum addressed to you from

## Page 93

1  Mr. Glosband, do you have that in front of you?
2  A.  I do.
3  Q.  And that is dated November 21st, 2003?
4  A.  Yes.
5  Q.  Okay.  And who was Mr. Glosband?
6  A.  An attorney at Goodwin Procter.
7  Q.  And Goodwin Procter is who or what?
8  A.  Goodwin Procter was State Street's
9  counsel with respect to the Grace engagement and
10 fulfilling our role as fiduciary.
11 Q.  And when we looked at Exhibit No. -- or
12 the engagement agreement a few moments ago, I
13 apologize, there was a page that you indicated it
14 would be the limitations on legal fees.  Do you
15 recall that?
16 A.  I recall that.
17 Q.  Okay.  Who paid the legal fees to
18 Goodwin Procter in connection with the Grace
19 engagement?
20 A.  I don't specifically recall if we paid
21 and then Grace reimbursed or if Grace paid
22 directly but Grace was responsible for the
23 limitations of the contract of paying Goodwin
24 Procter's fees.

Page 94

1    Q.    Okay, now, Driscoll Exhibit No. 1 is a
2   memorandum and it is identified as being sent to
3   you along with others at State Street, is that
4   correct?
5    **A.    And Dan Bayston at Duff & Phelps.**
6    Q.    Okay, and do you recall reviewing and
7   receiving this memo?
8    **A.    At this time I don't specifically**
9   **recall having received this memo but it appears**
10  **that I did receive this memo.**
11   Q.    If you return to the second page which
12  is Bates stamped 3235.
13   **A.    Okay.**
14   Q.    Okay. If you take a look at -- it is
15  actually the second full paragraph but the third
16  paragraph down starting with "If there is" --
17   **A.    Yes.**
18   Q.    And the sentence reads, "If there is a
19  credible possibility that Grace is solvent, then
20  the common shareholders will have a right to
21  participate in the distribution of value under a
22  POR", and I understand POR to mean plan of
23  reorganization.
24        Did I read that correctly? Do you

Page 95

1   understand that?
2    **A.    You read that correctly.**
3    Q.    During the time that Grace, I am sorry
4   during the time that State Street provided
5   services for Grace, did you have an understanding
6   as to what Grace -- whether Grace thought that
7   Grace was a solvent company?
8    **A.    I don't recall at this point.**
9    Q.    Do you have an understanding as to
10  whether Grace believed that the common
11  shareholders would have the right to participate
12  in the distribution of value under a plan of
13  reorganization?
14   **A.    I don't recall.**
15   Q.    Was that information that the
16  independent Fiduciary Group sought to obtain from
17  Grace?
18   **A.    I don't recall.**
19   Q.    Is that information regarding what the
20  company's thoughts were as to what may occur in a
21  plan of reorganization a factor that the
22  independent fiduciary group should consider in
23  determining whether retention of company stock is
24  appropriate?

Page 96

1        MR. FLICKER: Objection.
2    **A.    If that information was publicly**
3   **available it may be a factor in our analysis.**
4    Q.    How would the independent Fiduciary
5   Group and State Street factor that information
6   into its analysis?
7    **A.    It would just be one factor.**
8    Q.    At this time you don't recall whether
9   State Street, however, factored that information
10  into its analysis, is that correct?
11   **A.    That's correct.**
12        **(Driscoll Exhibit No. 2, Memo dated**
13        **11/26/03 was so marked.)**
14   Q.    Miss Driscoll, the Court Reporter
15  handed you what has been identified as Driscoll
16  Exhibit No. 2. And do you have that in front of
17  you?
18   **A.    I do.**
19   Q.    And this appears to be a November 26th,
20  2003 memorandum from Mr. Glosband again to
21  yourself and several other people, is that
22  correct?
23   **A.    That's correct.**
24   Q.    Okay. And this relates to a November

Page 97

1   24th, 2003 meeting at W. R. Grace, do you see
2   that under the regarding portion of the memo?
3    **A.    I do.**
4    Q.    And the first paragraph, first of all,
5   do you recall seeing this memorandum in the past
6   or at any time?
7    **A.    I recall seeing this yesterday.**
8    Q.    Before yesterday, do you recall seeing
9   this before?
10   **A.    I don't recall.**
11   Q.    Do you have any reason to believe that
12  you didn't receive it in the past?
13   **A.    No. Actually going back to Exhibit 1,**
14  **too, I did see this yesterday, I don't know if**
15  **you asked me. I received it at that point but I**
16  **did see it yesterday.**
17   Q.    Okay. Thank you.
18        As I reviewed the second sentence, I
19  believe, the first paragraph it identifies
20  individuals who attended a meeting at Grace on
21  November 24th, 2003 and I notice that your name
22  is not, does not appear there, is that right?
23   **A.    Yes, I see that.**
24   Q.    Or don't see it?

**25 (Pages 94 to 97)**

**Page 110**

1  the valuation of Grace stock as a plan of
2  investment, do you see that?
3  **A.  Yes.**
4  Q.  It identifies 3.
5     During the time that State Street was
6  providing services in connection with the Grace
7  stock plan, did State Street believe that these
8  variables were priced into the Grace common
9  stock?
10  **A.  In the public market?**
11  Q.  Yes.
12  **A.  I don't recall.**
13  Q.  Were any of these variables unknown or
14  were any of these variables, not the amount of
15  the variables, but were these issues unknown to
16  the market?
17     MR. FLICKER: Objection.
18  **A.  I don't know what the market knew but**
19  **we based our determination on publicly available**
20  **data which would have been accessible to**
21  **investors in the public market.**
22     (Short Pause.)
23  Q.  Miss Driscoll, I have handed to you
24  what was previously marked as Johnson Exhibit

**Page 111**

1  No. 5 which are fiduciary committee meeting
2  minutes of December 11th, 2003.
3     Are those in front of you?
4  **A.  Yes.**
5  Q.  And it indicates, first of all, have
6  you seen these minutes before?
7  **A.  Yes, I reviewed these minutes**
8  **yesterday.**
9  Q.  And aside from yesterday, do you as a
10  member of the independent fiduciary committee,
11  did you review the minutes after they were
12  prepared and after the meeting took place?
13  **A.  I don't specifically recall.**
14  Q.  Well, I am not asking you about these
15  particular minutes but generally?
16  **A.  Generally -- generally I would have**
17  **reviewed the minutes at some point, yes.**
18  Q.  Who prepares the minutes?
19  **A.  I believe for this meeting Melissa**
20  **Smith.**
21  Q.  Okay. Melissa Smith is one of the
22  individuals that you identified earlier today as
23  someone with whom you spoke about regarding your
24  deposition and as someone who is in your

**Page 112**

1  department, is that correct?
2  **A.  That's correct.**
3  Q.  And what is Miss Smith's title?
4  **A.  I believe her title is Marketing**
5  **Officer.**
6  Q.  And what is the purpose for which she
7  attends independent fiduciary meetings?
8  **A.  I believe during this time Melissa took**
9  **the minutes for our meetings during this period**
10  **of time.**
11  Q.  And does -- based on your experience,
12  are the minutes for meetings typically do you
13  believe accurate as to what occurred during the
14  meetings?
15  **A.  In general I would say so, I do recall**
16  **yesterday looking at some Goodwin Procter**
17  **revisions to some minutes that made it into the**
18  **final minutes that perhaps didn't as accurately**
19  **describe a specific in a meeting that maybe was**
20  **more accurately described in the draft.**
21  Q.  Okay. We can get to that in a little
22  bit.
23  **A.  I am not sure if it was these minutes.**
24  Q.  All right. Let's take a look at this.

**Page 113**

1     Do you agree under the discussion there
2  is a sentence, "Legal counsel advised committee
3  members that State Street should sell the stock
4  only if it is inconsistent with ERISA for the
5  plan to continue to hold the stock".
6     Do you see that sentence?
7  **A.  I'm sorry, where are you?**
8  Q.  Under the discussion?
9  **A.  Yes.**
10  Q.  Midway through that paragraph I believe
11  it is the third sentence, and I will repeat what
12  I read "Legal counsel advised committee members
13  that State Street should sell the stock only if
14  it is inconsistent with ERISA for the plan to
15  continue to hold the stock".
16     Do you see that?
17  **A.  I do see that.**
18  Q.  Do you agree with that statement -- let
19  me go back a step.
20     Do you agree that what this implication
21  from legal counsel that State Street should sell
22  the stock only if it is inconsistent with ERISA
23  for the plan to continue to hold the stock?
24  **A.  I agree in general that was our**

**29 (Pages 110 to 113)**

**Page 118**

1   Q.  Do you agree that by December 11th,
2  2003, the independent Fiduciary Group had already
3  completed substantial due diligence?
4   **A.  I believe we had completed substantial**
5  **due diligence, I seem to recall a significant**
6  **amount of work with the attorneys, I recall that**
7  **Monet had done quite a bit of work up until this**
8  **point of getting ready for the engagement, and**
9  **Duff & Phelps had done some work getting up to**
10  **the point where we were going to prepare for the**
11  **engagement.**
12   Q.  Okay.
13      MR. GOODMAN:  I am done with the
14  document and it is 12:30. I don't mind
15  continuing on.
16      MR. FLICKER:  It is your deposition
17  and I will let you call the breaks.
18      MR. GOODMAN:  Would you like one?
19      MR. FLICKER:  Yes.
20      MR. GOODMAN:  We will take one now.
21
22
23
24          (Lunch recess was taken from

**Page 119**

1      A F T E R N O O N   S E S S I O N
2
3   Q.  Miss Driscoll, we are back on the
4  record after our lunch break, and I am going to
5  hand to you what was previously marked I believe
6  as Ewing Exhibit No. 9, and you should have that
7  in front of you, is that correct?
8   **A.  Yes.**
9   Q.  And this appears, if I have the right
10  one in front of me, this looks like an email from
11  Steven Remis to Randolph Kerrigan?
12   **A.  Shepard Remis.**
13   Q.  Oh, Shepard Remis to Randolph Kerrigan
14  and others including yourself.
15      Do you see that?
16   **A.  Yes, I do.**
17   Q.  This is dated December 16th, 2003, is
18  that correct?
19   **A.  Yes, that's correct.**
20   Q.  And who is Shepard Remis?
21   **A.  Shepard Remis was one of the attorneys**
22  **at Goodwin Procter who worked with us on the**
23  **Grace engagement.**
24   Q.  Prior to the Grace engagement, had you

**Page 120**

1  ever worked with Mr. Remis?
2   **A.  I don't know that I have.**
3   Q.  Had you ever worked with Mr. Grosband?
4   **A.  Glosband.**
5   Q.  Glosband.
6   **A.  I don't think that I have.**
7   Q.  Do you know have you ever worked with
8  other attorneys from Goodwin Procter in
9  connection with the independent Fiduciary Group
10  and company stock prior to the Grace engagement?
11   **A.  Yes.**
12   Q.  Okay.  Do you happen to know why
13  Mr. Remis and Mr. Glosband were chosen to work on
14  this assignment?
15   **A.  Shep Remis had asbestos expertise and**
16  **experience and Glosband was a bankruptcy lawyer.**
17   Q.  Did you work with any other attorneys
18  from Goodwin Procter?
19   **A.  Jack Cleary — on the Grace case?**
20   Q.  Yes.
21   **A.  Jack Cleary.**
22   Q.  What expertise, if any, do you know
23  that Mr. Cleary had?
24   **A.  ERISA, and appears from this memo, but**

**Page 121**

1  **I don't specifically recall, Jeff Haddon.**
2   Q.  Who had the primary contact with
3  lawyers in connection with this assignment on
4  behalf of State Street?
5   **A.  I would say that that was shared Monet**
6  **Randy Kerrigan and myself all had contact**
7  **directly with the lawyers.**
8   Q.  *Were there any particular issues that
9  you recall that you had contact with the lawyers
10  about?
11   **A.  We had --**
12   Q.  When I am referring to you, I am
13  referring particularly to yourself?
14   **A.  Could you repeat that?**
15      (The preceding *question was read
16        back by Stenographer.)
17   **A.  Yes, I had discussions and/or meetings**
18  **with the lawyers including Shep, including Dan**
19  **Glosband including Jack Cleary on the Grace**
20  **matter and specific issues on asbestos bankruptcy**
21  **and ERISA.**
22   Q.  Particularly with ERISA, what was the
23  topic, what was the nature, why were you seeking
24  the meetings, why -- what issues regarding ERISA

**31 (Pages 118 to 121)**

**Page 122**

1 did you have the communications with the Goodwin
2 Procter firm?
3        MR. FLICKER: Before you answer that,
4 at this time it would make sense to put on the
5 record that these communications are subject to
6 the attorney/client privilege.
7        I will not prevent you from exploring
8 them but I think we should at least ensure that
9 it is understood that this is an attorney/client
10 communication.
11       MR. GOODMAN: Okay.
12   **A.   Goodwin Procter was our legal counsel**
13 **to help us fulfill our fiduciary responsibilities**
14 **with respect to the Grace engagement so we looked**
15 **to their expertise on a variety of issues**
16 **including the ones that I have already mentioned**
17 **and they worked together with us as a team to**
18 **help us evaluate and perform our -- evaluate the**
19 **Grace situation, perform our due diligence and**
20 **advise us with respect to the factors involving**
21 **our decision, our process, and our actual**
22 **decision.**
23   Q.   Specifically though, could you, you
24 have identified 37 specific areas of

**Page 123**

1 communication that you had with attorneys from
2 Goodwin Procter and I think one was bankruptcy
3 and one was asbestos, and the third was ERISA and
4 were there particular ERISA topics that you had
5 discussions with Goodwin Procter about and again
6 I am meaning you specifically?
7   **A.   I would say Goodwin Procter as a team**
8 **helped us in all of these areas, and so Jack**
9 **Cleary who was the ERISA lawyer was involved in**
10 **quite a few of our what I will call team**
11 **discussions.  He also gave us advice and was**
12 **involved in helping us form our recommendation**
13 **for the committee, and advising us on generally**
14 **as an ERISA fiduciary, general advise as to**
15 **fulfilling our duty under the Grace engagement.**
16   Q.   Okay, you also at one time in a former
17 life served as an ERISA attorney, did you not?
18   **A.   Yes.**
19   Q.   And that was at State Street?
20   **A.   Yes.**
21   Q.   Did you understand the responsibility,
22 did you understand ERISA's fiduciary
23 responsibilities without needing -- on your own
24 based on your previous experience and education?

**Page 124**

1        MR. FLICKER: Are you talking about
2 in connection with this engagement?
3        MR. GOODMAN: Prior to this
4 engagement.
5        MR. FLICKER: I am going to object to
6 that. It seems at the very least it is vague and
7 general.
8   Q.   Well, let me rephrase the question.
9        Without the need for Goodwin Procter,
10 did you have a general understanding based on
11 your previous experience as to what the
12 responsibilities and duties were of an ERISA
13 fiduciary?
14       MR. FLICKER: In connection with this
15 engagement?
16       MR. GOODMAN: In connection with this
17 engagement.
18   **A.   I have a general understanding of what**
19 **an ERISA fiduciary's duties are with respect to**
20 **company stock and the Grace type of engagement**
21 **yes.**
22   Q.   And did you receive any specific advise
23 from Goodwin Procter that was different than your
24 understanding as to the general responsibilities

**Page 125**

1 of a fiduciary in connection with company stock
2 and in connection with this assignment?
3   **A.   Not that I recall specifically, but it**
4 **was not unusual for us to have legal advice and**
5 **lawyers as part of our fiduciary team in an**
6 **engagement particularly such as Grace.**
7   Q.   Did any unique ERISA issues arise,
8 legal issues arise in connection with this
9 assignment and when I mean unique ERISA issues, I
10 am referring to matters other than what you
11 referred to as bankruptcy and asbestos?
12   **A.   Well, the situation itself is unique so**
13 **the engagement, each engagement is different.**
14      **The factors to consider depend, you**
15 **know, in any engagement depend upon the unique**
16 **circumstances and situation with respect to the**
17 **company and the type of transaction, and I can't**
18 **recall any unique ERISA issues that we, that**
19 **arose during the Grace engagement that we didn't**
20 **already generally understand or know.**
21   Q.   If you turn back to the exhibit that I
22 had in front of you before I distracted your
23 attention, I am particularly interested in the
24 second paragraph. I am going to start reading in

**32 (Pages 122 to 125)**

**Page 130**

1  interests if it appears that there may be some
2  value left for shareholders.
3      Q.   Is it, do you have an understanding as
4  to whether the Equity Committee may be involved
5  in the negotiation concerning the ultimate plan
6  of reorganization?
7      A.   I understand that generally that if
8  there is perhaps some value or the equity holders
9  have some leverage in the bankruptcy, I
10  understand that there is often no equity
11  committees in bankruptcy situations.
12     Q.   Do you have an understanding of whether
13  there was an Equity Committee in the Grace
14  bankruptcy situation?
15     A.   I did understand that, yes.
16     Q.   That is fine.  You can put that away.
17          If you recall earlier today we looked
18  at minutes and presentation to the December 11th
19  committee, December 11th meeting of the
20  independent Fiduciary Committee, do you recall
21  that?
22     A.   I do.
23     Q.   And in that committee, obviously,
24  meeting Grace was discussed, is that correct?

**Page 131**

1      A.   That's correct.
2      Q.   And then my next indication is that the
3  next meeting of the investment independent
4  management committee, not management committee --
5  independent fiduciary committee took place on
6  January 29th which I am going to hand you Johnson
7  Exhibit No. 10.  It is actually two exhibits that
8  deal with that meeting -- Johnson Exhibit 10 and
9  11, and before we get to those, let me ask you
10  two questions.
11          First of all, do you recall whether
12  there was any meetings of the independent
13  fiduciary committee that discussed Grace between
14  December 11th and January 29th of 2004?
15     A.   I don't recall.
16     Q.   How would this, how would Grace be
17  placed on the agenda for the December, I'm sorry,
18  for the January 29th, 2004 meeting of the
19  fiduciary committee?
20     A.   I am not sure what you mean how would
21  it be placed.
22     Q.   Why was -- why, what factors would lead
23  to the fiduciary committee discussing Grace on
24  January 29th, 2004?

**Page 132**

1      A.   Well, if I recall the previous minutes,
2  the recommendation was to hold as we continued to
3  complete due diligence and have Duff & Phelps
4  complete some additional analysis.
5      Q.   So it was the fact that certain due
6  diligence had been completed, did that
7  precipitate the discussion of Grace at the
8  January 29th, 2004 meeting?
9      A.   I am not sure what precipitated, but
10  between the first meeting and this meeting we
11  were engaged, so we became the Investment
12  Manager, and I would expect that we were coming
13  back now that we were engaged and had completed
14  some additional due diligence, we were ready to
15  report back to the committee.
16     Q.   Who -- do you recall what your
17  involvement was between December 11th, 2003 and
18  January 29th, 2004 in connection with the
19  completion of additional due diligence?
20     A.   I don't specifically recall.
21     Q.   If you turn to Exhibit No. 10 which --
22  Johnson Exhibit Number 10, I apologize?
23     A.   Yes.
24     Q.   It indicates that Grace's first quarter

**Page 133**

1  earnings have increased and the stock is
2  currently trading at $3.48 a share, its current
3  trading activity is similar to other bankrupt
4  asbestos companies.  Do you see that sentence
5  that I just read?
6      A.   Yes.
7      Q.   Did you have any independent knowledge
8  as to the trading activity of other bankrupt
9  asbestos companies?
10     A.   I don't recall.
11     Q.   Do you have an understanding as to
12  which bankrupt asbestos companies this notation
13  is referring to?
14     A.   I don't recall.
15     Q.   If you go back to the next paragraph,
16  in the middle of it, it says, "S. Johnson asked
17  whether the insurance companies are viable
18  entities.  D. Bayston stated that D. P. was
19  comfortable with the carriers and their ability
20  to pay."
21          Do you see that?
22     A.   I see that.
23     Q.   Do you have an understanding as to the
24  reason why Mr. Bayston was comfortable with the

**34 (Pages 130 to 133)**

1  that?

2  **A.    I do not know.**

3  Q.    Do you know whether Duff & Phelps did

4  that?

5  **A.    I do not know.**

6  Q.    Did State Street ask either Duff &

7  Phelps or Goodwin Procter to undertake that type

8  of investigation?

9  **A.    I do not recall.**

10  Q.    Did you -- strike that.

11      If you go to the last paragraph please,

12  and there is a discussion of whether or not

13  someone should sit on the Equity Committee to

14  represent the block of Grace stock held by the

15  plan.

16      Do you have a recollection regarding a

17  discussion concerning the Equity Committee?

18  **A.    Yes.**

19  Q.    Okay.  Did you have a particular

20  position regarding whether, meaning you

21  individually whether someone should sit on the

22  Equity Committee on behalf of the plan?

23  **A.    At this point in January, January 29th?**

24  Q.    Yes.

1  **A.    I think that I thought that if we**

2  **decided to hold the stock, we might consider**

3  **being on the Equity Committee if we could clearly**

4  **understand these potential fire wall issues, but**

5  **if we were going to sell the stock, then it would**

6  **not make sense for us to be on the committee, and**

7  **in addition, I know I wanted to make sure if we**

8  **were seriously considering being on the**

9  **committee, we wanted to make sure that that**

10  **didn't, that didn't restrict our ability in any**

11  **way to sell at some future point.**

12  Q.    Okay.

13  **A.    So we wanted to make sure that we**

14  **preserved our ability to act in the best interest**

15  **of the plan even if it meant selling at some**

16  **point in time that would hinder that ability so I**

17  **remember I wanted to make sure that we addressed**

18  **those issues as we revisited this decision.**

19  Q.    You indicated fire wall issues a moment

20  ago, what were those?

21  **A.    Well, that if somebody on the Equity**

22  **Committee ever received inside information, then**

23  **that may preclude us from selling the stock and**

24  **could that person be separate, separated so that**

1  **there would be no such preclusion of our ability**

2  **to act on behalf of the plan if we thought it was**

3  **in the best interest to sell the stock at some**

4  **point.**

5  Q.    In the past, members of the independent

6  Fiduciary Group have served on bankruptcy

7  committees, is that correct?

8  **A.    That's correct.**

9  Q.    At lease Agway?

10  **A.    Agway, yes.**

11  Q.    Any others?

12  **A.    Bankruptcy committees, yes, Enron.**

13  Q.    Was there a fire wall in connection

14  with those bankruptcies?

15  **A.    Enron we were an employee-related**

16  **issues committee. We were not on an Equity**

17  **Committee or Creditors Committee, and Agway, we**

18  **were on the Creditors Committee since the plan**

19  **held debt but those instruments were not publicly**

20  **traded so we didn't have the same type of**

21  **potential issues that may have been here in**

22  **Grace.**

23  Q.    Okay.

24  **A.    But there was no market for those**

1  instruments.

2  Q.    Are you aware of, according to, based

3  on my, I am surmising but let me know if I am

4  incorrect in my assumption, I am assuming,

5  therefore, that State Street has never served on

6  a bankruptcy committee in which it was necessary

7  to create some kind of a fire wall between the

8  participant and -- the participant on the

9  committee and the rest of the independent

10  Fiduciary Group in the independent fiduciary

11  committee, is that correct?

12      MR. FLICKER:  Objection, it

13  mischaracterizes the testimony.

14  **A.    There may have been some fire wall or**

15  **some limited restrictions imposed on the Agway**

16  **representation so Monet Ewing was on the**

17  **Creditors Committee of Agway, there may have been**

18  **some with respect to certain other activities**

19  **that were being pursued on behalf of Agway that**

20  **didn't involve selling the securities.**

21  Q.    Do you know whether that occurred?

22  **A.    I don't specifically remember. I am**

23  **saying there may have been some with respect to**

24  **litigation activity.**

**Page 142**

1     **Can I actually correct that?**
2   Q.  Certainly.
3     **A.  Maybe not with respect to the**
4 **litigation but some fire wall so some**
5 **confidential or non-public information wasn't**
6 **passed beyond Monet.**
7   Q.  Okay. Now, if you take a look at
8 Johnson Exhibit 10. At this time, in particular
9 Exhibit Number 10, Page 3, Page 2746, and I am in
10 the middle of a document on this page, M. Shames
11 requested that IFG provide the committee with a
12 summary of factors supporting a decision to
13 initiate a selling program with respect to the
14 Grace stock.
15     Once this summary has been provided to
16 the committee, then the matter can be discussed
17 further and ultimately brought to a vote.
18     Do you see that?
19   **A.  I see that.**
20   Q.  Okay. Prior to coming to this meeting,
21 did the independent Fiduciary Group not the
22 committee but the group, had it created -- had it
23 received sufficient information to create a
24 recommendation whether or not in its mind whether

**Page 143**

1 or not a selling program should begin?
2     MR. FLICKER: Objection.
3   **A.  I just don't recall the timing.**
4   Q.  At this point did you have a belief
5 whether the selling program should begin?
6   **A.  I don't recall.**
7   Q.  What additional information, if you can
8 recall, did you need in order to make a
9 recommendation?
10   **A.  I just don't recall the timing, I don't**
11 **recall.**
12   Q.  Let's go to what I believe is February
13 23rd, 2004 meeting which is Johnson Exhibit No.
14 12.
15   **A.  Yes.**
16   Q.  This appears to be Johnson Exhibit
17 No. 12 appears to be a presentation to the
18 fiduciary committee and I see three names as
19 being presented by Miss Ewing, Miss Smith and
20 yourself.
21     Do you see that?
22   **A.  I do.**
23   Q.  And prior to presenting this material,
24 would you have reviewed what is contained in

**Page 144**

1 Exhibit No. 12?
2   **A.  Most likely I would have, yes.**
3   Q.  If you take a look at Page 4, 2848, and
4 if you would review the third bullet, "State
5 Street's role is to evaluate whether Grace stock
6 is a prudent investment and determine whether,
7 1., it is consistent with ERISA to remain
8 invested in Grace stock or 2., it is necessary to
9 sell any or all of the Grace stock".
10     Do you see that?
11   **A.  I do.**
12   Q.  Is that your understanding as to what
13 State Street's role was?
14   **A.  Yes, I think that if we made a decision**
15 **to sell and started selling the stock and**
16 **determined that it was prudent to continue to**
17 **hold, we might not have sold all of it but we**
18 **could decide to stop selling, so yes, I would**
19 **agree with that, with that additional explanation**
20 **which I think we had discussed previously in the**
21 **previous minute. The minutes indicate that we**
22 **discussed that at the previous meeting.**
23   Q.  So does this relate -- from what I
24 understand is the conversation that you are

**Page 145**

1 referring to is when you and I discussed that at
2 some point Grace started a selling program, not
3 Grace, I'm sorry -- State Street started a
4 selling a program but under -- if certain
5 circumstances occurred, it could stop the
6 program, is that correct?
7   **A.  That's correct.**
8   Q.  Was what State Street was trying to do,
9 however, was trying to determine whether Grace
10 stock was a prudent investment, is that correct?
11   **A.  Yes, that is the first step, more on**
12 **whether it is consistent with ERISA to remain**
13 **invested and then, if so, to start selling or**
14 **2, if it was necessary to sell any or all -- I**
15 **would say the any is if somewhere along the**
16 **selling, if we had not sold all of it and we**
17 **decided it was prudent to continue to hold it, we**
18 **would not have to sell all of it.**
19   Q.  Turn to Page 7 dealing with due
20 diligence.
21   **A.  Yes.**
22   Q.  The last bullet, the second to last
23 bullet, December 24th, due diligence meeting with
24 senior management Grace -- do you see that?

**37 (Pages 142 to 145)**

**Page 166**

1  you recall in which Duff & Phelps did not
2  participate?
3  **A.  Over the course of the engagement there**
4  **were lots of calls with just the lawyers and then**
5  **perhaps team calls and then I think the same**
6  **might have happened with Duff & Phelps. We might**
7  **have had a call with them and then eventually get**
8  **back to the broader team.**
9  Q.  Let's talk about the time frame for a
10  moment. That memo is dated March 31st, 2004, is
11  that correct?
12  **A.  That's correct.**
13  Q.  Okay. What was Grace's financial --
14  how did Grace's financial statements look at that
15  time, if you recall?
16  **A.  I don't recall.**
17  Q.  Did you periodically review Grace's
18  financial statements?
19  **A.  We periodically got reports from Duff &**
20  **Phelps. They would update their range.**
21  Q.  Did anybody from State Street
22  independently review Grace's financial
23  statements?
24  **A.  I don't know.**

**Page 167**

1  Q.  I am assuming from that answer that you
2  did not, is that correct?
3  **A.  I did not.**
4  Q.  I hand you Johnson Exhibit No. 17 which
5  is correspondence from D.E. Shaw to Miss Ewing.
6  Do you recall ever seeing before
7  consulting with counsel and preparing for this
8  deposition, do you recall ever seeing this
9  document before?
10  **A.  I do.**
11  Q.  And this generally describes an offer
12  from D. E. Shaw to purchase the remaining shares
13  of stock from the Grace stock funds, is that
14  correct?
15  **A.  That's correct.**
16  Q.  When did you first learn that there may
17  be an interest on the part of D. E. Shaw to
18  purchase Grace stock?
19  **A.  I believe just prior to this letter we**
20  **received indication specifically that D. E. Shaw**
21  **was interested in buying the block of stock.**
22  Q.  Okay. Did -- how did you obtain that
23  information, did somebody call you?
24  **A.  I believe I was informed either through**

**Page 168**

1  **Monet or from our trading desk. I believe our**
2  **trading desk got the call.**
3  Q.  Did you have any conversations with --
4  well, who had the primarily responsibility for
5  speaking to D. E. Shaw regarding this matter?
6  **A.  I don't remember if Roger Petrin spoke**
7  **with them or spoke with one of their agents but I**
8  **know Roger Petrin, Monet and I were all involved**
9  **in the information going back and forth. I just**
10  **don't recall specifically who had direct**
11  **conversations with D. E. Shaw or their agent.**
12  Q.  Mr. Petrin is an individual from the
13  trading desk, is that right?
14  **A.  Yes, Petrin, P-e-t-r-i-n.**
15  Q.  Did you report this -- did either you
16  or Miss Ewing or Mr. Petrin report this to
17  anybody else at State Street regarding this sale
18  prior to discussing it at a forthcoming pension
19  predated meeting of April 6th at the independent
20  fiduciary committee meeting?
21  **A.  I believe I did discuss this and I**
22  **believe initially prior to the April 7th letter**
23  **the initial verbal indication we got was at a**
24  **higher price, and I believe we, in addition to**

**Page 169**

1  **Roger Petrin and perhaps some people in his**
2  **group, myself and Monet Ewing, we may have**
3  **discussed it with other people including Shawn**
4  **Johnson, but I'm not sure.**
5  Q.  Do you have an understanding of who or
6  what D. E. Shaw was or is?
7  **A.  I understood at some point during this**
8  **process that they were I believe a hedge fund.**
9  Q.  Had you heard of D.E. Shaw prior to it
10  contacting State Street in connection with the
11  Grace stock fund?
12  **A.  I don't recall.**
13  Q.  Did you have an understanding as to the
14  reason why D. E. Shaw was interested in
15  purchasing Grace stock?
16  **A.  No.**
17  Q.  Okay. I would like to hand to you what
18  I just received.
19  (Exhibit No. 6, Handwritten document
20  dated 4/6/04, was so marked.)
21  Q.  Miss Ewing, the Court Reporter has
22  handed to you what is marked as Driscoll 6 which
23  are handwritten notes that Mr. Flicker handed to
24  me this morning and I believe these are your

**43 (Pages 166 to 169)**

1 handwritten notes, is that correct?
2    **A.    You said Miss Ewing. I am Miss**
3 **Driscoll.**
4    Q.    I'm sorry, Miss Driscoll.
5    **A.    But I believe these are Miss Ewing's**
6 **handwritten notes.**
7    Q.    These are not your handwritten notes?
8    **A.    No.**
9    Q.    Do you recall attending a meeting on or
10 about April 6th, 2004 where D. E. Shaw was
11 discussed with Mr. Bayston, Mr. Remis,
12 Mr. Cleary, Mr. Glosband, Mr. Trost, and Monet
13 Ewing, and I believe it is KQD which would stand
14 for Kelly Driscoll?
15    **A.    I do recall generally having these**
16 **discussions, having the discussion.**
17    Q.    And during this meeting, did the D.E.
18 Shaw offer come up?
19    **A.    Yes, we were having discussions about**
20 **the D.E. Shaw offer.**
21    Q.    And do you recall if you go down to the
22 fourth line down, it indicates that "D.E. Shaw
23 may be sensing some positive development".
24        Do you see that?

1    **A.    I see that.**
2    Q.    Do you recall any discussion regarding
3 that D.E. Shaw may be sensing some positive
4 development?
5    **A.    I don't specifically. I want to go**
6 **back on your previous questions about who else we**
7 **talked to before, I may have made the incorrect**
8 **assumption that you were asking me about people I**
9 **talked to at State Street.**
10    Q.    Actually that was not the incorrect
11 assumption. That is what I intended.
12    **A.    Okay.**
13        **In general, I do remember that we**
14 **thought about what else might be motivating D.E.**
15 **Shaw or what other information they might have**
16 **that we didn't have, and one of the reasons we**
17 **turned to our advisors was to see was there some**
18 **additional information that we had not considered**
19 **that was publicly available or known to our**
20 **advisors.**
21    Q.    And do you recall anybody raising the
22 issue that D.E. Shaw may be sensing some positive
23 development?
24    **A.    I don't specifically know what that is**

1 **in reference to. We definitely talked about, we**
2 **talked about maybe not just in this meeting but**
3 **with Shawn Johnson about what might be motivatin**
4 **Shaw or what might they know and we wanted to**
5 **make sure that there was additional information**
6 **that was available that we hadn't already taken**
7 **into consideration.**
8    Q.    *Other than positive developments that
9 might be sensing, were there any other reasons
10 that State Street considered as to the reason why
11 D.E. Shaw might be interested in purchasing the
12 remaining stock from the Grace stock fund?
13    **A.    Could you read that back.**
14        **(The preceding *question was read**
15        **back by Stenographer.)**
16    **A.    I believe at one point Shawn Johnson**
17 **thought about what might be motivating a hedge**
18 **fund to make a large investment but nothing very**
19 **specifically that I can recall.**
20    Q.    Did you understand whether D.E. Shaw
21 was a sophisticated investor?
22        MR. FLICKER:  Objection.
23    **A.    My general recollection is that they**
24 **were a hedge fund.**

1    Q.    Did you perform any research in
2 connection -- any research regarding D.E. Shaw,
3 meaning you or meaning anybody in the independen
4 fiduciary team?
5    **A.    Some of the committee members may have**
6 **been more familiar with D.E. Shaw but I don't**
7 **believe we performed any additional analysis of**
8 **the organization.**
9    Q.    I am going to hand you what has been
10 marked as Ewing No. 17 and if you refresh your
11 memory of it, I am particularly interested in the
12 last page to the exhibit. Do you have the last
13 page?
14    **A.    I do.**
15    Q.    Can you state the Bates stamp number
16 for the record, please?
17    **A.    002913.**
18    Q.    And in the last paragraph of that
19 document, well, first of all, do you recall
20 seeing e-mails from Duff & Phelps periodically
21 providing updated ranges of stock value?
22    **A.    Yes, generally I recall.**
23    Q.    Do you recall receiving that e-mail, I
24 believe dated April 5th, 2004?

Page 174

1  A.  I don't recall receiving it but I do
2  generally recall what is described.
3  Q.  Okay.  And towards the bottom of that
4  page, there is an indication that Duff & Phelps
5  is qualifying its estimates, I believe, do you
6  see that?
7  A.  I see that.
8  Q.  Now, did you have an understanding as
9  to the reason why Duff & Phelps was qualifying
10  its estimates?
11  A.  It is noted above -- recent
12  developments on the proposed legislative
13  settlement.
14  Q.  Okay.  Now, Duff & Phelps made that
15  statement and if you would go back if you recall
16  to your exhibit number, I am going to reach over
17  if it is okay.
18  A.  Here it is.
19  Q.  You read my mind.
20      Just go to Exhibit No. 5, talking about
21  legislative developments, but at approximately
22  the same date March 31st, 2004, do you recall
23  that?
24      MR. FLICKER:  What do you mean

Page 175

1  approximately the same date?
2      MR. GOODMAN:  Approximately the same
3  date.
4      MR. FLICKER:  It is a week before.  I
5  think it matters.
6      MR. GOODMAN:  I did correct it.  I
7  said approximately the same date.
8      MR. FLICKER:  Okay.
9  A.  Okay.
10  Q.  And did anybody discuss with Duff &
11  Phelps what took place during the March 31st,
12  2004 conference call?
13  A.  I think I previously indicated that I
14  believe we did have a subsequent conversation
15  with Duff & Phelps, and I believe that that took
16  place on the March 6th date, the day after Duff &
17  Phelps, Dan Bayston sent this memo, and that is
18  actually reflected on here.
19  Q.  Okay.  Now in connection with that --
20  with Ewing No. 17 which is the last page I have
21  handed to you, did you have a discussion with --
22  did that issue come up, the qualifications on the
23  April 6th, 2004 meeting?
24  A.  I generally recall when we had our

Page 176

1  discussions with the entire team, we talked about
2  you know, the new developments and if there was
3  anything particularly other than what our lawyer
4  had already reported, and what Dan had already
5  noted in his e-mail particularly in light of was
6  there additional information that we had not
7  considered as a team, again, that D.E. Shaw, you
8  know, might be basing their offer on.
9  Q.  Did Mr. Bayston at any time, if you
10  recall suggest that he didn't any longer need to,
11  after that meeting or immediately afterwards
12  indicate that he no longer needed to qualify his
13  estimates?
14  A.  I think my recollection is following
15  this meeting, we discussed all of these issues so
16  there would not have been a need for him to
17  re-evaluate, re-issue, because we were all
18  talking at the same time, I believe it was at
19  this meeting at the same time.
20  Q.  If you return to Exhibit No. 19 of
21  Johnson?
22  A.  Okay.
23  Q.  I have handed you what has been marked
24  as Johnson Exhibit No. 19, do you have that,

Page 177

1  Miss Driscoll?
2  A.  I do.
3  Q.  And is dated April 7th, 2004.  Do you
4  see that?
5  A.  I do.
6  Q.  Okay.  And this is a fiduciary
7  committee meeting minutes and this is the
8  minutes, you can take a look at them but this is
9  the minutes in which the independent fiduciary
10  committee agreed to sell the Grace stock in the
11  stock fund to D.E. Shaw, do you recall that?
12  A.  I do.
13  Q.  Okay.  Now, looking at the minutes and
14  who attended, every other time I have will looked
15  at minutes I have noticed that representatives
16  from Duff & Phelps were present.
17      Is there a reason why Duff & Phelps,
18  and I don't see Duff & Phelps as attending this
19  meeting --
20  A.  I don't know if Dan Bayston was
21  available.  We had, I believe actually met with
22  him the day before.
23  Q.  But the independent fiduciary committee
24  did not meet with him the day before, correct?

45 (Pages 174 to 177)

Page 178

1   **A.   That's correct.**
2   Q.   Okay.  Do you have an understanding as
3   to the reason why Duff & Phelps was not present?
4   **A.   I don't recall.**
5   Q.   Now, at that time, the contract and
6   agreement with Duff & Phelps had expired, is that
7   correct?
8   **A.   I believe so.  I don't know if it was**
9   **in discussion at that time though.**
10  Q.   Okay.
11  **A.   It may have been in discussion at that**
12  **time because they were continuing to provide us**
13  **with these weekly updates.**
14  Q.   During the -- do you recall at this
15  fiduciary committee meeting discussing Grace's
16  current most recent financial information,
17  financial statements?
18  **A.   Not specifically other than to inform**
19  **the committee that we had discussed with Duff &**
20  **Phelps the day before the developments with**
21  **respect to the stock, yes, and in particular the**
22  **recent offer.**
23  Q.   Did anybody if you recall because I
24  don't see it in the minutes, do you recall if

Page 179

1   anybody in this meeting.  Let me go back.
2   Do you have a general recollection of
3   what occurred during this April 7th, 2004
4   meeting?
5   **A.   Other than what is indicated in the**
6   **minutes?**
7   Q.   Yes.
8   **A.   No, not anything other than what is**
9   **already here.**
10  Q.   Do you recall whether anyone inquired
11  at the meeting as to the reason why D. E. Shaw
12  may be interested in purchasing the block of
13  shares from the Grace plan?
14  **A.   I recall it being a discussion that I**
15  **believe with Shawn Johnson but I don't know if it**
16  **was at the meeting or conversation prior to the**
17  **meeting, you know, in previous conversation.  It**
18  **might not have taken place at the meeting.**
19  Q.   *As of April 7th, 2004, did State
20  Street conclude that Grace would be unable to
21  survive as a going concern?
22       MR. FLICKER:  Objection.
23  **A.   I'm sorry, could you repeat that?**
24       (The preceding *question was read

Page 180

1        back by Stenographer.)
2   **A.   I am not sure exactly what you mean.**
3   Q.   Let me put it this way.
4        Did anyone at State Street conclude
5   that as a result of the bankruptcy, Grace's
6   common shares would become worthless?
7   **A.   I think we concluded that it was likely**
8   **that the value of the Grace stock would be based**
9   **on input from our financial advisors and our**
10  **legal advisors would be worth less than we were**
11  **able to sell it at and particularly worth very**
12  **little to zero -- I believe if I recall**
13  **correctly -- significantly below the 350 price we**
14  **were being offered.**
15  Q.   Was that based entirely, not entirely,
16  but was that valuation based on the Duff & Phelps
17  reports?
18  **A.   I think I indicated based on input and**
19  **analysis from both our financial advisor and from**
20  **our legal counsel.**
21  Q.   Did State Street adjust on its own any
22  of the numbers in terms of calculating anything
23  in terms of making calculations as to the value
24  of Grace stock?

Page 181

1        Did it at any time adjust the numbers
2   Duff & Phelps provided?
3   **A.   Did we adjust the numbers that Duff &**
4   **Phelps provided --**
5   Q.   Yes.
6   **A.   -- did we change their numbers?**
7   Q.   Yes.
8   **A.   No, we took into consideration the**
9   **numbers that they provided us -- we took into**
10  **consideration by April 7th that we had commenced**
11  **the selling program and thought that it was**
12  **imprudent to continue to hold the stock and that**
13  **we had commenced a selling program and since we**
14  **were being offered a price to buy the whole block**
15  **at a premium over the market price, we thought it**
16  **would be prudent to sell and that it might be**
17  **imprudent not to sell at a premium above market**
18  **considering the fact that we had made the**
19  **determination and continued to believe it was the**
20  **correct determination that it was no longer**
21  **prudent to hold Grace stock at that point.**
22  Q.   Did State Street perform any analysis
23  as to the likelihood that Grace common stock
24  would continue to trade after the plan of

**46 (Pages 178 to 181)**

Page 182

1 reorganization?
2   A.  I think we generally understood that
3 Grace common stock was trading in bankruptcy, and
4 that following a reorganization, the shareholders
5 were either likely to get little or no value and
6 if they got some value, it could be in the form
7 of securities or the creditors might get newly
8 issued Grace stock.
9   Q.  Now, was that based on what the
10 lawyers, Goodwin Procter told you?
11   A.  I think that that was based on
12 generally our understanding of what happens in
13 bankruptcy, our experience and what the lawyers
14 had described to us over the period of the
15 engagement.
16      (Driscoll Exhibit No. 7, Global Trade
17     Report, was so marked.)
18   Q.  Miss Driscoll, I have handed to you
19 what has been marked as Driscoll Exhibit No. 7,
20 and take your time to look at it, but the
21 question I have is does this document accurately
22 reflect the trades that State Street made from
23 the Grace stock fund?
24   A.  I wouldn't know today. This looks like

Page 183

1 the trade report that was produced by our trading
2 area.
3   Q.  And what is a trade report?
4   A.  An indication of the trades that they
5 made during the period.
6   Q.  Okay. And let's see if we can, the
7 account is if you take a look at it it says
8 W. R. Grace savings and investment?
9   A.  Right.
10   Q.  Is that the Grace account, is that the
11 Grace stock fund?
12   A.  Yes, I should clarify, the trade report
13 for this particular account.
14   Q.  Okay. And it indicates, for example,
15 on the last page, shares of 6,254,117,000 and
16 this is actually Bates stamped 3775, is that
17 correct?
18   A.  On the last page or the second to last
19 page?
20   Q.  Yes, on the second to last page.
21   A.  I am just not that familiar with this
22 report.
23   Q.  Okay, let me see if we can help.
24      (Driscoll Exhibit No. 8, Email dated

Page 184

1      4/8/04, was so marked.)
2   Q.  Miss Driscoll, I have handed to you
3 what is marked Driscoll Exhibit 8 which is an
4 April 8th, 2004 from Melissa Smith to several
5 people including yourself, is that correct?
6   A.  Yes, and actually I see now, going way
7 back, Melissa's title was principal.
8   Q.  And this indicates to Joe Herter, that
9 -- well, 6,274,117,000 shares was the position of
10 Grace stock. Do you see that?
11   A.  I see that.
12   Q.  And the total number?
13   A.  Yes.
14   Q.  And it says will trade 6,254,117,000
15 shares. Do you see that?
16   A.  I see that.
17   Q.  And if you take a look at Page 3775 of
18 Driscoll Exhibit No. 7 which is the Global
19 Trading Report --
20   A.  Right.
21   Q.  And if you go to the second to the last
22 page, that reflects the number traded on that
23 transaction is 6,254,117,000, is that correct?
24   A.  Yes, I see that.

Page 185

1      (Driscoll Exhibit No. 9, Notice to
2      Participants dated 4/19/04,
3      was so marked.)
4   Q.  Okay. Miss Driscoll, I have handed to
5 you, the Court Reporter has handed to you what is
6 marked as Driscoll No. 9 which is a notice to
7 plan participants dated April 19th, 2004, do you
8 see that?
9   A.  I see that.
10   Q.  Okay. And if you go to the second to
11 the last paragraph, or go to the first paragraph,
12 it indicates that State Street sold and take your
13 time to review it sold initially before the D.E.
14 Shaw transaction just over 930,000 shares.
15     Do you see that?
16   A.  The first paragraph?
17   Q.  Yes.
18   A.  Yes.
19   Q.  Under the selling program?
20   A.  Yes.
21   Q.  And then it indicates in the third
22 paragraph, that 6,254,117,000 shares were sold,
23 do you see that?
24   A.  I see that.

**47 (Pages 182 to 185)**