

# M E M O R A N D U M

| | |
|---|---|
| To | Kelly Driscoll<br>Monet Ewing<br>Randall J Carrigan<br>Daniel D. Bayston<br>Paul Trost |
| CC | John J. Cleary, P.C.<br>Shepard M. Remis, P.C<br>Jeffrey C. Hadden, P.C.<br>U. Gwyn Williams<br>Peter D. Bilowz<br>Courtney A. Clark |
| From | Daniel M. Glosband, P.C. |
| Re | Meetings at W.R.Grace, November 24, 2003 |
| Date | November 26, 2003 |

This memorandum will summarize the more important aspects of a November 24, 2003 meeting with W.R. Grace & Co. ("Grace") executives. The meeting at Grace headquarters in Columbia, MD was attended by Monet Ewing of State Street, Dan Glosband and Shep Remis of Goodwin Procter, Dan Bayston and Paul Trost of Duff & Phelps, and Dave Siegel (Senior VP and General Counsel), Brian McGowan (Senior VP) and Bob Tarola (CFO) of Grace.

1. The two categories of liability which could have the most significant impact on the valuation of Grace are (a) the Zonolite Attic Insulation ("ZAI") litigation and (b) asbestos bodily injury claims. For different reasons, neither is likely to reach a conclusive stage for a number of months. No "bar date" has been set for the filing of claims by either ZAI or asbestos bodily injury claimants. Bar dates have been set and have passed for the other categories of Liabilities Subject to Compromise as reported in Grace's financials and discussed in our November 21, 2003 memorandum.

2. The asbestos bodily injury issue could be resolved extrinsically to the chapter 11 case if Congress passes the Fairness in Asbestos Injury Resolution Act ("FAIR Act") introduced by Senator Hatch in May of 2003. As proposed, the FAIR Act would impose an annual charge on

LIBC/1847091.2

SSBT-003054
CONFIDENTIAL

Grace and other companies with asbestos bodily injury exposure for contribution to a fund which would underwrite all claims as processed through a newly-created national asbestos court. Grace's liability for contributions would be significantly less than the $964.6 million estimate of asbestos-related liability reported in Grace's financials. By way of example, based on the proposed statutory formula, Grace's contribution over the 27-year life of the fund would total approximately $530 million. Senate Majority Leader Frist has said that the FAIR Act would not be acted upon this year but would be scheduled for consideration by the end of March 2004.

3. Because of arcane bankruptcy jurisdictional issues, the Grace chapter 11 case, while filed in the United States Bankruptcy Court for the District of Delaware, has been assigned to Judge Alfred M. Wolin, a senior United States District Judge who sits in Newark, NJ. He has retained the asbestos bodily injury matters and the Fresenius and Sealed Air fraudulent transfer litigation (described in our prior memoranda) and has assigned other bankruptcy matters, including the ZAI Litigation to United States Bankruptcy Judge Judith Fitzgerald of the Western District of Pennsylvania (who is technically sitting in Wilmington, DE for the purposes of this case). Both Judge Wolin and Judge Fitzgerald have been similarly assigned several other asbestos-related chapter 11 cases.

4. If Grace were liable to remediate all homes with Zonolite insulation at the EPA's estimated maximum remediation cost, its liability would be in the range of $150 billion, it would be grossly insolvent at any plausible enterprise value and its shareholders would likely receive no value under any Plan of Reorganization ("POR"). Grace's position is that it has no liability.[1] Judge Fitzgerald decided to hear the "science" issues on which liability would turn before setting a bar date for ZAI claimants, because a bar date would be superfluous if Grace is found not to have liability. A hearing on dispositive motions on the science issues had been scheduled for September 16, 2003 but has been postponed to February 9-10, 2004 while the parties explore settlement.

4. Progress on the asbestos bodily injury claims has been frozen by attempts to disqualify Judge Wolin in several asbestos-related chapter cases, including the Grace case. The motivations for disqualification appear to vary among the cases, from exposure to a ruling opposed by the moving parties in one case to a desire by non-asbestos creditors in the Grace case to delay the chapter 11 resolution pending possible action on the FAIR Act. The ostensible grounds for disqualification are that expert and supposedly impartial advisors to Judge Wolin represent various constituencies in other asbestos-related cases. Therefore, the impartiality of the advisors and of the Judge has been questioned. The Third Circuit Court of Appeals has scheduled a hearing on this issue for December 12, 2003.

    a. The appointment of a representative for persons who may have future bodily injury claims is a necessary part of the bankruptcy mechanism for resolving asbestos-related chapter 11 cases. Grace delayed seeking appointment of a representative to delay incurring costs for the representative and the representative's professionals and advisors. It recently suggested a

---

[1] Grace says that asbestos was several one-hundredths of a per cent by weight of the product and fell well below levels which might be harmful.

1847091-1
LIBC/1847091.2

SSBT-003055
CONFIDENTIAL

candidate who was one of Judge Wolin's advisors (and who would choose as his counsel another of Judge Wolin's advisors). The suggestion was opposed on the same grounds as the proposed disqualification of Judge Wolin. Judge Fitzgerald has stated that she would never approve the candidate. This part of the processes will be delayed as well.

5. Non-ZAI asbestos-related property damage claims were subject to a bar date. Pre-bankruptcy, Grace faced a total of 372 cases only eight of which were unresolved. The claims derived from a spray-on fire retardant product and acoustical ceiling material and from the process of vermiculate expansion and were for lost profits, reduced property values and remediation. In litigation, Grace won 9 cases, lost 7 (for $60 million) and settled 207 (for $70 million). Grace thought that statutes of limitation had run and that its exposure was largely resolved. Nonetheless, in the bankruptcy, an additional 4,300 claims were filed, 3,300 of them by a single law firm. Within approximately six months, Grace will be able to estimate its exposure for these claims by review of information contained in the filed proof of claim forms. Grace was optimistic about prevailing on the newly-filed claims since similar claims filed by the same lawyers had been withdrawn in other chapter 11 cases. Claimants' lawyers have refused to settle because of concerns about precedential impact on still other cases in which similar claims are pending.

6. Asbestos bodily injury claims derive from (a) exposure during processing of vermiculate which naturally contained small quantities of asbestos (200 pre-bankruptcy claims; 120 unresolved; Grace paying claimants' health insurance; majority of claimants have no disease) and (b) general exposure to asbestos containing products by workers in the steel, construction and heavy industry fields who have asserted claims against Grace and some 50 other defendants (with 130,000 claims pending against Grace on the date of the chapter 11 filing; 250,000 more claims expected; pre-bankruptcy settlements averaging $3,000-$4,000 per claim).

7. The Sealed Air settlement, which would yield between $900 million and $1 billion in cash and stock to Grace, has not been presented for court approval due to an inability to reach agreement on the form of the settlement agreement. The plaintiffs (Grace's asbestos property damage and bodily injury committees) and Sealed Air have just agreed on the document and it is being reviewed by Grace and the other committees. Grace believes that the approval of the settlement will be under the relatively simple bankruptcy rules, not the more complicated class action rules

8. Grace believes that it has enterprise value in excess of its liabilities (assuming favorable resolution of the ZAI Litigation; evidently, U.S.G. is the only other sizeable asbestos-related chapter 11 debtor with a similar view of its value). Therefore, Grace is not prepared to concede ownership of the reorganized company or resolution of the amount of asbestos bodily injury claims to its creditors. Instead, it will seek a binding estimation of the outer limits of asbestos claims and a preservation of some equity for its current shareholders. Constituencies other than the asbestos bodily injury claimants are supportive of such an approach.

    a. Grace believes that the company would emerge intact as opposed to being split, with portions awarded to different constituencies.

1847091-1
LIBC/1847091.2

SSBT-003056
CONFIDENTIAL

9. The only other material category of liability is environmental, where Grace carries an estimate of $244.4 million. This includes litigation concerning Grace's vermiculite mining operations in Montana (discontinued in 1990) in which a U.S. District Judge in Montana recently awarded the U.S. $54.5 million for remediation, plus "all appropriate future costs." This decision is on appeal and Grace has reserved over $100 million for this exposure.