Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------------------
KERI EVANS, et al.,                 :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :
                                    :
JOHN F. AKERS, et al.,              :
                                    :
        Defendants.                 :
                                    :  CONSOLIDATED
                                    :  UNDER CASE NO.
------------------------------------   04-11380-WGY
LAWRENCE W. BUNCH, et al.,          :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :
                                    :
W.R. GRACE & CO., et al.,           :
                                    :
        Defendants.                 :
                                    :
------------------------------------
```

Deposition of:  JOHN J. MULLIGAN, JR.

Taken:          By the Defendants
                Pursuant to Agreement

Date:           July 11, 2007

Time:           Commencing at 9:07 a.m.

Place:          Waite, Schneider, Bayless &
                    Chesley Co., LPA
                Suite 1513 Fourth & Vine Tower
                One West Fourth Street
                Cincinnati, Ohio 45202

Before:         Linda S. Mullen, RMR, CRR
                Notary Public - State of Ohio

**Page 6**

1  position called division executive.
2  Q. What were the years in which you worked at
3  State Street?
4  A. From the spring of 1985 until the end of
5  February 1993.
6  Q. What was the highest position that you
7  held in terms of ranking at State Street?
8  A. It was a position called division head.
9  Q. Is that an officer position?
10 A. Yes, it was a senior vice president,
11 management committee level position.
12 Q. Is State Street experienced in the field
13 of providing investment management services?
14 A. Yes.
15 Q. Does State Street have any expertise in
16 providing investment management services for ERISA
17 plans, just ERISA plans?
18 A. Yes.
19 Q. And does State Street have expertise in
20 providing investment management services for --
21 particularly for company stock funds in ERISA plans?
22 A. Yes.
23 Q. Would you rank State Street in the top ten
24 in the nation in terms of companies that have
25 expertise in providing investment management services

**Page 7**

1  for company stock funds in ERISA plans?
2  A. I would.
3  Q. Do you know Mr. Dan Brown at State Street?
4  I'm sorry, Mr. Mark Brown at State Street?
5  A. No, I don't.
6  Q. Do you know Mr. Peter Leahy?
7  A. No, I don't.
8  Q. Do you know Sean Johnson?
9  A. No.
10 Q. Do you know Mitchell Shames?
11 A. I kind of know of Mitchell Shames.
12 Q. Do you know John Kirby?
13 A. No.
14 Q. Do you know Kelly Driscoll?
15 A. Yes.
16 Q. How do you know Ms. Driscoll?
17 A. When I was at State Street, the division
18 that served defined contribution plans was called
19 benefit plan services. Kelly, while she was
20 attending law school, worked in the compliance area
21 of benefit plan services, and when she graduated from
22 law school she joined the ERISA legal staff at State
23 Street and she was one of the attorneys that was
24 assigned to benefit plan services.
25 Q. Do you know if Ms. Driscoll is experienced

**Page 8**

1  in the field of providing investment management
2  advice to company stock funds in ERISA plans?
3  A. I believe she is. During the period that
4  I knew and worked with Kelly Driscoll, that was not
5  her role, her role was as a legal advisor. From a
6  distance, I'm aware of what Kelly has done since
7  then.
8  Q. And that's the basis for your belief that
9  she's experienced in --
10 A. That's correct.
11 Q. -- that area? Okay. Do you have any --
12 of those individuals that I mentioned at State
13 Street, do you have any view of whether those other
14 individuals are or are not experienced in the same
15 field?
16 A. I do not.
17 Q. Tell me, what is Retirement Plan
18 Strategies?
19 A. Retirement Plan Strategies is principally
20 a consulting company that serves what are called a
21 provider community in the defined contribution
22 industry. We consult in regard to product
23 development, business strategies, resourcing
24 strategies. We've consulted to firms in regard to
25 fiduciary and trust matters.

**Page 9**

1  Q. Now, you say that this entity, Retirement
2  Plan Strategies, serves the provider community. How
3  do you define the provider community?
4  A. That would be principally banks, mutual
5  fund companies, insurance companies, any entity in
6  the pension marketplace that endeavors to serve the
7  defined contribution -- defined contribution plan
8  sponsors.
9  Q. So any entity in the pension market that
10 serves defined contribution plan sponsors, is that
11 right?
12 A. For instance, the -- there are some
13 entities, other than a typical service provider, who
14 have developed interests in plans like 401(k)s. So,
15 for instance, one of my current customers is Bosher
16 Associates, very well known in the defined benefit
17 business, this would be their first time out in
18 401(k)s. So the nature of the marketplace, on the
19 fringes anyways, has changed, anyways, and there are
20 some non-traditional providers emerging.
21 Q. You say, among other things, Retirement
22 Plan Strategies assists this community, this provider
23 community in product development. What do you mean
24 by product development? Give me examples, if you
25 could.

**Page 58**

1  materials in connection with this case?
2     A.  No.
3     Q.  Have you reviewed any documents since you
4  submitted this report?
5     A.  No new documents.
6     Q.  Just the ones that you previously listed?
7     A.  Right.
8     Q.  Have you reviewed the expert reports of
9  any experts retained by either party in this case?
10    A.  I reviewed the expert reports for the
11 defendants' experts.
12    Q.  You mean the opening and the rebuttal
13 reports, all four?
14    A.  No, not all four.
15    Q.  Tell me which ones you remember reviewing.
16    A.  I reviewed --
17       MR. GOODMAN:  I think -- just for
18 clarification, I think he was -- he thought
19 there were four experts and you are meaning --
20    Q.  There are two experts, each of whom did an
21 opening and rebuttal, so that's four reports.
22    A.  Okay.  I reviewed those.
23    Q.  Those?  Okay.  And when did you start
24 reviewing those, if you recall?
25    A.  I reviewed the initial expert reports as

**Page 59**

1  soon as I received them.
2     Q.  Which would have been shortly after you
3  were --
4     A.  Which would have been shortly after the
5  15th.
6     Q.  Pardon me, I talked over you and I was
7  apologizing to the court reporter.
8        Okay.  So shortly after the 15th.  Okay.
9  What about the rebuttals?
10    A.  The rebuttal reports again, shortly after
11 receiving them, and I can't remember their exact time
12 frame, but it wasn't very long ago.
13    Q.  Okay.  In connection with your work on
14 this case, did you become familiar with the fiduciary
15 committee structure that has been employed by State
16 Street for company stock fund reviews?
17    A.  I believe so.
18    Q.  I think I know the answer to that, but is
19 that a structure that had been in place when you were
20 at State Street?
21    A.  There was certainly review structure, but
22 it was not the -- it wasn't identical to the
23 structure that's there today.
24    Q.  Were you part of that review structure at
25 State Street when you were there?

**Page 60**

1     A.  I was.
2     Q.  Okay.  What role did you play?
3     A.  The -- it's hard to define an exact
4  analogy.  But as a lead person on the team that --
5  see, we had a different structure back then.  The
6  team -- our version of what today is IFG had maybe a
7  little bit broader representation of -- on it.  To
8  try to put it in comparative terms, IFG may be -- at
9  least on some transactions, was a little bigger and
10 the fiduciary control committee was smaller and less
11 involved.  So it was a somewhat different process
12 back when I was there, because I led the team that
13 did the due diligence and ultimately, ultimately made
14 the decisions on the transactions for which State
15 Street was acting as a discretionary trustee.  My
16 role in contemporary State Street would be most like
17 the Kelly Driscoll role.
18    Q.  So as I understand it, Kelly has a role as
19 head of the business unit that performs the due
20 diligence and it makes recommendations to the
21 fiduciary committee today, is that your understanding
22 as well?
23    A.  That's right.
24    Q.  And then the fiduciary committee is a
25 separate entity, Miss Driscoll sits on that committee

**Page 61**

1  but she does not chair it, and that's the committee
2  that actually renders the decisions on behalf of
3  State Street in its discretionary capacity, is that
4  your understanding?
5     A.  My understanding is that the fiduciary
6  committee approves or disapproves decisions or
7  recommendations that IFG makes.  That the -- there
8  was -- there was much less of a committee
9  approval/disapproval process in place when I was
10 there than there is today.
11    Q.  In other words, the fiduciary control
12 committee entity that you described in your day, was
13 it more of an oversight consultation, supervision
14 role as opposed to the decision-maker on a formal
15 basis?
16    A.  That's correct.
17    Q.  And were you part of the fiduciary control
18 committee or entity that you described?
19    A.  No, I was not.  That kind of control
20 entity was higher level broad in terms of
21 understanding and knowing what our process was like.
22 But the actual decision to go ahead with a
23 transaction was made at my level.
24    Q.  Now, are you here to render an opinion one
25 way or the other of whether the -- is it your opinion

Page 66

1  know your investor's profile, I believe, before you
2  can make decisions on their behalf.
3     Q.   And of the 60 percent of the participants
4  that elected to have holdings in Grace stock, what
5  was the average percentage of their individual
6  account holdings that consisted of Grace stock?
7     A.   Okay. Their average percentage for
8  holdings would be approximately 7 percent.
9     Q.   Were there any participants who had 100
10 percent of their 401(k) account in the --
11    A.   There's insufficient information in the
12 material, which is not to say that that information
13 is not obtainable by simply making a request of a
14 record keeper.
15    Q.   Is it your opinion that there is no
16 circumstance in which it would be appropriate to sell
17 company stock when the demographics of the stock
18 holdings in the plan are such as they were in this
19 case?
20    A.   The only circumstance that I can think of
21 is where the investment manager has compelling
22 information. And we're talking about a stock that's
23 widely traded, publicly traded -- widely held,
24 publicly traded stock, there's an efficient market
25 for the stock. The investment manager would have to

Page 67

1  have such compelling information that was not in the
2  market. To be compelling, it would have to affect
3  the stock price significantly. And if everybody in
4  the market knew it, it would have already happened.
5  So compelling seems to indicate insider information,
6  and that's a problem.
7     Q.   It's a problem because?
8     A.   Because now there's all kinds of
9  securities issues.
10    Q.   Did you take into account, when looking at
11 the demographics of the percentage of assets held in
12 the plan, the fact that a new investment into the
13 plan had been closed since March of 2003?
14       MR. GOODMAN: When you're referring to the
15    plan, you're referring to the Grace stock fund?
16       MR. FLICKER: Thank you.
17    Q.   In the company stock fund?
18    A.   Yes, I understand that.
19    Q.   And do you agree with me that that would
20 have the effect of actually causing a lower than
21 otherwise percentage of holdings to be in the company
22 stock?
23    A.   What I believe would happen, I believe
24 it's not that simple since percentages can change
25 because the price of the security changes. But

Page 68

1  over time, if a fund receives no new contributions
2  and is only allowable for a transfer out, unless the
3  market price of the security rises significantly, it
4  will gradually become a smaller percentage of the
5  plan as a whole.
6     Q.   So at least two of the factors that
7  contributed to the lower percentage in this case were
8  that the fund had been closed to new investment and
9  that the stock price was lower than its historical
10 experience?
11    A.   Actually, I looked principally from -- if
12 we look at the period from the year 2000 to 2004 --
13 which was when the restrictions on the company stock
14 fund were lifted. And if you go back and look at the
15 company stock price from 2000 to 2004, it remained
16 within a fairly narrow range and was worth about the
17 same amount in that period as it was in the first
18 quarter of 2004.
19       I also, from reviewing the 5500s, did not
20 see a significant amount of change in the number of
21 shares in the company stock fund from the time it was
22 closed to new investment to 2004. So if at one point
23 in time there had been a lot more than 4 percent of
24 the plan in the company stock fund, it was long
25 before 2003, as indicated by the 5500s.

Page 69

1     Q.   So what you're saying is, you were not
2  seeing a lot of transfer out by participants --
3  transfers out of the company stock fund at the time
4  that the restrictions were placed on it, is that
5  correct?
6     A.   Right. The company stock fund was a small
7  percentage of the plan before 2003. And the 5500s,
8  have go back to around 2000 -- around 2000, as I
9  recall. So I can't tell from current information
10 if -- how big this Grace stock fund ever was at its
11 peak. But the -- the numbers don't let me agree with
12 you that the transfer restriction is what --
13    Q.   Accounts?
14    A.   -- accounts for -- my guess is when the
15 restrictions were lifted in 2000, that that had a lot
16 more to do with it than the closing the fund to new
17 investment in 2003.
18    Q.   Do you believe that State Street had an
19 obligation to examine individual participant's
20 diversification in investments to make a
21 determination about whether or not to sell the stock
22 out of this fund?
23    A.   Not on an individual basis, but I believe
24 at least on an aggregate basis, and I believe that's
25 easily done.

18 (Pages 66 to 69)

Page 82

1  reasonable fiduciary would sell in the face of that
2  circumstance?
3     A. Everything depends on facts and
4  circumstances. In this particular case, the facts
5  and circumstances, the decision to continue to hold
6  has been made by the plan participant. And let's
7  keep in mind that it's their money, and those
8  participants have received a lot of appropriate
9  information from senior people at W.R. Grace, from
10 the benefits department at W.R. Grace and from State
11 Street themselves to review their appetite for
12 holding a security that has -- risk is all due -- and
13 perhaps in Grace's circumstance, more risk.
14       And we talked about the fact that
15 investors, because of liability situations,
16 that there's a certain amount of -- there's more
17 speculation in the Grace -- from the pricing of the
18 Grace stock than there would be in the company in
19 other circumstances.
20       There was speculation, in my opinion, in
21 the price of every single company stock. What the
22 market is pricing the stock at today is on what it
23 knows about recent operating performance and what it
24 thinks about future operating performance and future
25 liabilities. And that's all in the stock price.

Page 83

1     Q. Now, the opinion that you're rendering
2  today is inconsistent with the positions taken by the
3  Department of Labor in courts across the country in
4  connection with suits alleging that the failure to
5  sell breached ERISA fiduciary duties, is that
6  correct?
7     A. I'm not aware of that.
8     Q. Okay. So you're not aware that the
9  Department of Labor has taken the position that a
10 fiduciary has an obligation to sell a stock if they
11 believe that the company's -- the investment is
12 imprudent?
13    A. The cases that I'm familiar with, like
14 Worldcom, as an example, the directed trustee as a
15 fiduciary -- I believe the way that case came out was
16 that -- and I think it was Merrill Lynch -- was in
17 effect, exonerated.
18       I mean, I don't believe there's a ruling
19 by the Department at all that's asking trustees or
20 other plan fiduciaries to predict the future value of
21 securities.
22    Q. No, but the Department of Labor has taken
23 the position that the fiduciary has a fiduciary
24 obligation to sell if they believe that the continued
25 holding of the stock is imprudent, correct?

Page 84

1     A. Is this for company stock funds?
2     Q. Yes.
3     A. I'm totally unaware of that.
4     Q. Okay.
5     A. I'm totally unaware of that.
6     Q. All right. And you're totally unaware of
7  any court which has held that that is the law?
8     A. That's correct.
9     Q. Setting aside the question of the
10 demographics questions that we have been discussing,
11 is it your opinion that no reasonable fiduciary with
12 the information that State Street had would conclude
13 that the stock was an imprudent investment in
14 isolation? In other words, it was an investment that
15 carried a significant risk of losing all value?
16    A. Because of my feeling about facts and
17 circumstances, I don't want to respond to a question
18 about Grace stock in isolation.
19    Q. Well, you have rendered some opinions in
20 this case saying that it was imprudent for State
21 Street to determine that the stock should be sold in
22 light of information that -- the valuation
23 information from Duff & Phelps, is that correct?
24    A. My opinion included that and other factors
25 to include improved operating performance of Grace.

Page 85

1  And depending on where we are in my opinion, it may
2  or may not include new information relative to the
3  availability of insurance coverage, it may not
4  include new information relative to restarting
5  legislation on the FAIR Act. The -- I'm sorry, I
6  rambled so much I forgot the first part of your
7  question.
8     Q. What I'm trying to do is, I'm trying to
9  determine if you have an opinion here that, for
10 example, the Duff & Phelps valuation report was --
11 did not provide an appropriate basis for State Street
12 to make a decision to sell?
13    A. Yeah, I would say that. I would value the
14 way the market was pricing the security more than
15 what I saw in the Duff & Phelps reports. The Duff &
16 Phelps reports, in terms of models for contingent
17 liabilities, that's speculation, too.
18    Q. So it was not appropriate in your view for
19 the independent fiduciary to hire a valuation expert
20 to engage in some evaluation of contingent
21 liabilities?
22    A. No, I think that's perfectly appropriate
23 to hire and to have that information. And that's the
24 question, of what do you do with it. And depending
25 on what it is and how it's presented, it may be

Page 86

1 inappropriate to rely on it to make a decision about
2 a security in this particular circumstance.
3 Perfectly reasonable to have hired Duff & Phelps.
4   Q.  Okay. So you have --
5   A.  But Duff & Phelps doesn't tell the trustee
6 what -- the investment manager what to do.
7   Q.  In fact, nobody has taken that position
8 here?
9   A.  Right.
10   Q.  You agree with that?
11   A.  I do.
12   Q.  And so having hired Duff & Phelps and
13 Goodwin Proctor, was State Street entitled to rely on
14 their work in making its own independent
15 determination of the prudence of the stock?
16   A.  It would -- they would determine -- they
17 were -- it was okay to consider it. It was not okay
18 to rely on it. My understanding of rely is, I take
19 your work and act on it. I don't examine it, think
20 it over and decide -- put it another way. If I
21 totally rely on Duff & Phelps, then in fact Duff &
22 Phelps is telling me what to do.
23   Q.  Okay.
24   A.  And that is not the case; consider, not
25 rely.

Page 87

1   Q.  So you don't think that State Street
2 relied on Duff & Phelps, you think they considered
3 Duff & Phelps, correct?
4   A.  I don't know whether they -- if State
5 Street is indicating that Duff & Phelps' valuation --
6 well, I think -- I know that Duff & Phelps would take
7 the position that their customers consider their
8 reports, they don't rely on their reports. So I
9 think, at the end of the day, State Street's
10 responsible for its decisions. So whether it thinks
11 it considered or relied, it's responsible for the
12 decisions that they made.
13   Q.  Why don't you -- there's a pile of
14 documents with stickers in front of you, why don't
15 you pull out the one that has number 7? It should be
16 at the bottom of that pile.
17   A.  Do you want me to do that?
18   Q.  Yeah, please do that. First of all, take
19 a look at page 12 -- first of all, have you seen this
20 document before?
21   A.  Yes.
22   Q.  So you understand this to be a
23 presentation made around February 23, 2004 by the
24 IFG to the fiduciary committee regarding the Grace
25 stock, is that correct?

Page 88

1   A.  Right. What page do you want me to turn
2 to?
3   Q.  Well, I would like you to take a look at
4 page 12.
5       MR. GOODMAN: For your ease, try Bates
6    stamp number 2856, I believe.
7   Q.  Do you see that conclusion at the bottom
8 there?
9   A.  I do.
10   Q.  Okay. It says, "Unresolved asbestos
11 litigation and potential asbestos legislation will
12 affect the determination of whether Grace stock
13 remains a prudent investment. The uncertainty and
14 consequence of unfavorable events occurring as a
15 result of litigation probabilities or of legislation
16 not being enacted timely or at all has resulted in
17 the IFG recommendation that the committee override
18 plan documentation and begin to reduce the holdings
19 of Grace stock." Do you see that?
20   A.  I do.
21   Q.  All right. And you believe this
22 recommendation is inconsistent with ERISA?
23   A.  Under the facts and circumstances of the
24 State Street's engagement and the demographics of the
25 Grace plan, yes, I do.

Page 89

1   Q.  Okay. So if, in fact, these unfavorable
2 events occurred and the stock were wiped out, it
3 would be your opinion that the fiduciaries bore no
4 liability or risk for that, is that correct?
5   A.  That's right.
6   Q.  Okay. Turn to the next page, please,
7 number 13. You'll see at the beginning there, it
8 says that "The recommendation to commence a selling
9 program is based upon IFG's determination that the
10 continued holding by the trust of all of its shares
11 of Grace stock would be imprudent and therefore
12 inconsistent with the requirements of section
13 404(a)(1)(B) of ERISA. Such determination reflects
14 the input of D&P and Goodwin and has been made after
15 careful consideration of all the facts and
16 circumstances determined to be relevant by IFG,
17 including without limitation the following:" and then
18 there are several bullet points after that. Do you
19 see that?
20   A.  I do.
21   Q.  Does that confirm that, in fact, the IFG's
22 recommendation to the fiduciary committee was not
23 made solely on the basis of the Duff & Phelps report,
24 would you agree with that?
25   A.  I would agree with that, but I would point

23 (Pages 86 to 89)

**Page 134**

1  A. And then it falls again.
2  Q. Right. But that -- the fact is, it went
3  up after the announcement and then it fell, correct?
4  A. I believe it went down after the
5  announcement and climbed and fell again.
6  Q. All right. But the amount that it went
7  down, according to this chart, is at most a few
8  cents, not anything like a 20 percent drop or 30
9  percent drop, correct?
10 A. Depends on where we look at the chart. I
11 mean -- it looks to me on this chart, the initial
12 drop goes down to something like $2.70.
13 Q. If that's the case, that's the lose, it's
14 less than a 10 percent drop, it's more like an 8
15 percent drop?
16 A. What I'm saying, there's another document
17 in the file that contradicts that.
18 Q. The news report that -- you can't point
19 out to me right now where that news report is?
20    MR. GOODMAN: I object to that.
21 A. That's right.
22    (Plaintiff's Expert Exhibit 14 was marked
23    for identification.)
24 Q. Plaintiff's Exhibit 14, this is a March 1
25 Duff & Phelps e-mail update. Do you see that? You

**Page 135**

1  see that, right? And this chart, in fact, shows that
2  the stock price was at $2.85 on Friday, February
3  27th, isn't that correct?
4  A. It says that in the body of the e-mail.
5  Q. Uh-huh.
6  A. When it says last Friday, Friday was
7  the --
8  Q. I'll tell you that February 27th, '04 was
9  a Friday.
10 A. Okay.
11 Q. So on Friday, when Grace announced the
12 sale, the stock closed at $2.85, correct?
13 A. If that was the day that Grace announced
14 it.
15 Q. Well, according to this document, it was,
16 correct? Do you see the little then chart?
17 A. Okay. It says -- this says that State
18 Street announced it.
19 Q. Yes.
20 A. The document I'm referring to says that
21 Grace announced it.
22 Q. Say that again.
23 A. The news report I'm referring to says that
24 Grace announced it.
25 Q. I see. Do you have any information that

**Page 136**

1  Grace and State Street announced on different days?
2  A. I don't. But I don't have an announcement
3  by State Street, but I did see the news report of the
4  announcement by Grace.
5  Q. So on the day that State Street announced
6  it, the stock closed at $2.85, and when State Street
7  sold to D.E. Shaw, it sold for $3.50, is that
8  correct?
9  A. That's correct.
10 Q. Okay. And it's still your testimony that
11 the sale by State Street to D.E. Shaw was not for
12 adequate consideration?
13 A. I didn't -- I didn't testify to that. I
14 made reference to the reported drop on the Grace
15 announcement, which if we don't have it, we can't
16 reconcile it.
17 Q. Do you think the fact that D.E. Shaw was
18 interested in buying the stock from State Street
19 should have been considered by State Street as
20 evidence that the stock was going to go up?
21 A. I think State Street -- nobody knows
22 whether the stock was going to go up or not. I think
23 State Street should have considered the fact that it
24 was interesting they had a sophisticated investor
25 that was interested in acquiring such a large block

**Page 137**

1  of Grace stock and was willing to pay a premium over
2  current market.
3  Q. Yes. You don't have any information to
4  suggest that -- well, first of all, let's put it this
5  way. It's your opinion, then, that if a
6  sophisticated investor is interested in buying the
7  stock, that the seller needs to take that into
8  account to determine that means the stock might go
9  up?
10 A. I think in this case if the seller -- and
11 the seller, again, is making a decision to override a
12 plan provision, should consider the fact that a
13 sophisticated investor apparently has a positive
14 outlook for the stock.
15 Q. How is that consistent with your view that
16 you shouldn't -- you should sell on speculation?
17 A. The -- well, I don't know that that's
18 speculation if -- I think that -- I'm not speculating
19 one way or another. I'm saying that if a
20 sophisticated investor comes along and approaches
21 State Street to block buy approximately 7 million
22 shares at a premium, that State Street as a fiduciary
23 has to at least consider that to be very interesting
24 information about somebody's view for the outlook for
25 this stock.

**Page 138**

1  Q. And you're aware that, in fact, State
2  Street did consider that? In other words, did
3  evaluate why D.E. Shaw would be interested in bulk,
4  correct?
5  A. I'm aware that there was some discussion.
6  I don't think State Street was ever able to evaluate
7  D.E. Shaw's interest.
8  Q. Because, of course, that couldn't be
9  known?
10  A. It wasn't divulged.
11  Q. Correct. That's common, isn't it, in
12  these kinds of transactions?
13  A. Absolutely.
14  Q. But State Street did look and see whether
15  there were any other indicia out there in the
16  marketplace that could have motivated a buyer like
17  D.E. Shaw to want to buy, correct?
18  A. I believe -- I don't know I understood
19  your term correctly. I believe it caused State
20  Street to consider if there was any other news out in
21  the marketplace, that D.E. Shaw might have --
22  Q. Right.
23  A. -- that State Street did not.
24  Q. Yeah, that's what I mean. So you're aware
25  of that. Do you have any knowledge that D.E. Shaw

**Page 139**

1  was at all, you know, affiliated with or had any
2  relationship with State Street?
3  A. No, none.
4  Q. Was D.E. Shaw a client of State Street at
5  the time you were there?
6  A. No, not that I'm aware of.
7      (A recess was taken from 2:10 to 2:15.)
8          CROSS-EXAMINATION
9  BY MS. COHEN:
10  Q. For the record, Mr. Mulligan, I am Carol
11  Connor Cohen and I represent all the defendants in
12  this case other than the State Street defendants. In
13  other words, I represent the Grace defendants. I'm
14  going to pick up where Mr. Flicker left off, same
15  rules apply to this part of the deposition. You're
16  not a lawyer, right?
17  A. That's correct.
18  Q. You don't have legal training?
19  A. That's correct.
20  Q. Are you familiar with what role the
21  Department of Labor has with respect to employee
22  benefit plans and fiduciary responsibility?
23  A. I am.
24  Q. And tell me what your understanding is of
25  that role.

**Page 140**

1  A. The Department of Labor is one of the
2  regulatory entities that applies itself to employee
3  benefit plans, both types, health and welfare,
4  retirement plans, et cetera. The Department produces
5  regulations as well as some other departments, like
6  Internal Revenue, relative to employee benefit plans.
7  And the Department also provides interpretations of
8  its ruling. It provides advisory opinions. It
9  performs a regulatory function and from time to time
10  the Department may issue exemptions in certain
11  circumstances.
12  Q. So basically the DOL is responsible for
13  administering and enforcing the part of ERISA that
14  deals with fiduciary responsibility, right?
15  A. That's correct.
16  Q. And in doing that, they do issue
17  pronouncements on the law and those pronouncements
18  are entitled to be deferred to by the courts in most
19  instances?
20  A. Yes.
21  Q. Do you know what an eligible individual
22  account plan is? Are you familiar with that term?
23  A. Vaguely. Do you want me to take a shot at
24  it?
25  Q. Yes, please.

**Page 141**

1  A. I believe that that would refer to plans
2  such as defined contribution plans that qualify under
3  the IRS rules.
4  Q. Are you aware that there's a specific
5  definition in ERISA itself, as opposed to the
6  Internal Revenue Code, of an eligible individual
7  account plan as a plan that is designed to invest in
8  employer stock?
9  A. No, I'm not.
10  Q. So I suppose if I ask you, were you aware
11  that the Grace stock fund was an eligible individual
12  account plan, you wouldn't be able to answer that
13  question?
14  A. That's right.
15  Q. You would agree, wouldn't you, that under
16  the terms of its engagement, State Street was
17  responsible only for the Grace stock fund?
18  A. In terms of its discretionary authority?
19  Q. Right.
20  A. Correct.
21  Q. And you're also aware that ERISA says that
22  when an investment manager is appointed for just a
23  portion of the plan, it's only responsible for the
24  portion of the plan for which it's appointed,
25  correct?

**Page 154**

1 was making decisions that were inconsistent with
2 Grace's analysis." Was it really Grace's analysis
3 concerning whether retention of company stock was
4 consistent with ERISA?
5    A. It was Grace's decision that it was
6 consistent with ERISA up until December 15th.
7    Q. That was Grace's decision?
8    A. That's correct.
9    Q. The company's decision?
10   A. That's correct.
11   Q. That's your testimony?
12   A. It was the investment committee.
13   Q. Well, is it the investment Committee or
14 the company, which?
15   A. The investment committee.
16   Q. Okay. So should this sentence say, "to
17 the investment committee" rather than "to Grace"?
18 I'm trying to clarify what your opinion is.
19   A. Well, it -- there may be more than one
20 fiduciary here, I'm not sure. I believe the
21 investment committee also did some reporting and also
22 took some direction from the board of Grace, if I
23 recall. So there may be multiple fiduciaries here.
24 And I used the term "at Grace" -- and I used the term
25 "Grace" as a general term here in this report.

**Page 155**

1    Q. So when you use the term "Grace," should
2 we read the fiduciaries of the Grace plan?
3    A. That's fine.
4    Q. Now, you say here -- you quote some
5 testimony from Brian McGowan's deposition in this
6 paragraph. He's being asked about the period from
7 2001 to December 2003, right?
8    A. That's correct.
9    Q. And State Street's sale of the stock was
10 several months later, right?
11   A. That's correct.
12   Q. So State Street's determination several
13 months later that continuing to hold the stock was
14 not prudent was not necessarily inconsistent with
15 Mr. McGowan's testimony about what the situation was
16 from 2001 through December 15th, 2003, right?
17   A. Could you repeat your question?
18   Q. State Street's determination that
19 continuing to hold the stock was not prudent was not
20 necessarily inconsistent with Mr. McGowan's testimony
21 about what the situation was from 2001 through
22 December 15th, 2003, right?
23   A. Okay. So it wasn't necessarily, or on
24 face value, inconsistent, correct.
25   Q. Because they were made at different times?

**Page 156**

1    A. Right.
2    Q. And even assuming that they were made at
3 the same time, is it not possible for two fiduciaries
4 to reach different conclusions about the prudence of
5 a particular investment?
6    A. I suppose that's possible.
7    Q. Are you aware that the investment
8 committee decided to appoint an independent fiduciary
9 because, among other things, they believed they were
10 facing a potential conflict of interest?
11   A. I am.
12   Q. And would you agree that if fiduciaries
13 have a potential conflict of interest, it's prudent
14 to appoint an independent fiduciary to undertake
15 their responsibilities?
16   A. Yes.
17   Q. So you're not rendering an opinion here
18 that there was anything inappropriate about the
19 committee's decision to appoint an independent
20 fiduciary?
21   A. That's correct.
22   Q. I want to go back to your opinion. It is
23 your opinion -- do I understand correctly that it's
24 your opinion that Grace failed properly to monitor
25 State Street in this situation?

**Page 157**

1    A. Yes, that's correct.
2    Q. Now, what's the basis for that opinion?
3    A. The basis for that opinion is principally
4 deposition testimony where responsible executives at
5 Grace indicated that they didn't do any monitoring of
6 State Street once State Street was engaged.
7    Q. Well, let me ask you. Are you aware that
8 Grace provided documents to State Street in June of
9 2003?
10   A. I am.
11   Q. Are you aware that they provided
12 additional documents to State Street in August of
13 2003?
14   A. I am.
15   Q. Are you aware that in the fall of 2003,
16 that Grace received and responded to a lengthy
17 document request from State Street?
18   A. I don't know that I know that it was
19 lengthy, but I know there was information exchanged
20 during that time.
21   Q. And are you aware that in the winter and
22 perhaps early spring -- let me limit it to winter of
23 2003/2004, that there was one or more meetings
24 between State Street representatives and Grace
25 representatives?

Page 158

1  A.  I'm aware of that.
2  Q.  And that Goodwin Procter and Duff & Phelps
3  also participated in those meetings?
4  A.  I'm aware of that.
5  Q.  And that the Grace representatives were
6  able to not only ask questions of the State Street
7  people and their advisors, but also to answer
8  questions that State Street and their advisors had?
9  A.  I'm aware.
10 Q.  And are you aware that there were
11 discussions through the winter by telephone and
12 otherwise among the State Street and Grace
13 representatives about various issues that arose
14 during the course of State Street's due diligence
15 efforts?
16 A.  Well, the winter's kind of indefinite.
17 Q.  December, January.  December 2003, January
18 2004.
19 A.  I'm aware that there was some dialogue.  I
20 don't think there's a lot of documentation regarding
21 State Street's due diligence efforts and Grace's
22 cooperation with that.
23 Q.  Well, you said you read deposition
24 testimony, right?
25 A.  That's right.

Page 159

1  Q.  And there was testimony about that, was
2  there not?
3  A.  There was some limited testimony, did not
4  go into details as to what was discussed.
5  Q.  And are you aware that there was numerous
6  communications back and forth between Grace and State
7  Street through January and February of 2004 about
8  participant communications and other things?
9  A.  There were.  I wouldn't use the term
10 numerous, unless there's documents that I haven't
11 reviewed.
12 Q.  Well, maybe there are.  And are you aware
13 that there were continued communications between
14 State Street and Grace representatives throughout
15 April of 2004?
16 A.  My understanding of the communications in
17 April of 2004 was simply that State Street advised
18 Grace of the D.E. Shaw offer and then advised Grace
19 again of its decision to sell that block of shares.
20 Q.  Are you aware that Brian McGowan reviewed
21 and received a set of questions and answers for
22 participants?
23 A.  Yes, I'm aware of that.
24 Q.  And that State Street requested that Grace
25 agree to extend the Duff & Phelps engagement and that

Page 160

1  they did so?
2  A.  I'm aware of that.
3  Q.  And that there were various discussions
4  regarding other participant communications relating
5  to the D.E. Shaw sale?
6  A.  I'm aware of that.
7  Q.  Are you familiar with what the Department
8  of Labor has to say about the duty to monitor?
9  A.  I have some awareness.
10 Q.  Let me ask the question a little bit
11 better.  In a situation like this one where an
12 independent fiduciary or an investment manager has
13 been appointed, do you know what the Department says
14 about the duties of the appointing fiduciaries to
15 monitor the appointed fiduciary?
16 A.  What I know better than DOL regulation
17 would be standard industry practice in that regard.
18 Q.  Well, I'm really interested in DOL's
19 pronouncements here because I'm interested in what
20 the law requires.
21 A.  Well, as I mentioned, you asked your
22 question earlier, I'm not a lawyer, so I can't answer
23 that question --
24 Q.  Well --
25 A.  -- from that point of view.

Page 161

1  Q.  -- then maybe I don't understand your
2  opinion here.  When you issued the opinion that
3  Grace -- the Grace fiduciaries breached their
4  fiduciary duty by failing to monitor State Street,
5  that wasn't breached their fiduciary duties as a
6  matter of law?
7  A.  I believe it was breached their fiduciary
8  duties as a matter of law, but I reached my opinion
9  by leaning on my experience in terms of standard
10 industry practice of what skilled fiduciaries do
11 probably on as good business practice, but probably
12 under advice of counsel to meet the requirements of
13 the law.
14 Q.  But you don't know that it's on advice of
15 counsel because you don't know what the law is, is
16 that your testimony?
17 A.  You're going to have to ask that question
18 again.
19 Q.  I asked you what the law requires in terms
20 of the duty to monitor, and I believe you told me
21 that you didn't know.
22 A.  What I told you is -- I know that the law
23 requires that fiduciaries who appoint other
24 fiduciaries have a duty to monitor.  That's clear.
25 Q.  Okay.