UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
-----------------------------------
KERI EVANS, et al.,                 :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :
                                    :
JOHN F. AKERS, et al.,              :
                                    :
        Defendants.                 :
                                    :  CONSOLIDATED
-----------------------------------  UNDER CASE NO.
LAWRENCE W. BUNCH, et al.,          :  04-11380-WGY
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :
                                    :
W.R. GRACE & CO., et al.,           :
                                    :
        Defendants.                 :
                                    :
-----------------------------------
```

VOLUME II

Deposition of:  JEFFERY E. SCHAFF

Taken:          By the Defendants
                Pursuant to Agreement

Date:           July 12, 2007

Time:           Commencing at 9:09 a.m.

Place:          Waite, Schneider, Bayless &
                    Chesley Co., LPA
                Suite 1513 Fourth & Vine Tower
                One West Fourth Street
                Cincinnati, Ohio  45202

Before:         Linda S. Mullen, RMR, CRR
                Notary Public - State of Ohio

**Page 204**

1  describes what most engagements would refer to,
2  engagements generally.  The actual instance for each
3  particular engagement and the needs for monitoring
4  would depend on the needs of that engagement.
5      Q.   And the last sentence, do you continue to
6  agree that "With that said, care must be taken to not
7  micromanage or second-guess the daily routine of the
8  delegatees"?
9      A.   Yes.
10     Q.   Moving on to page 4, do you also continue
11  to agree that "ERISA is a process standard" and "That
12  liability does not hinge on investment performance"?
13     A.   Yes.
14     Q.   I think I'm going to be done.
15         MR. FLICKER:  But I'm not.
16         MR. GOODMAN:  There was a section -- you
17     don't have to put this on the record.
18         (Off the record.)
19            CROSS-EXAMINATION
20  BY MR. FLICKER:
21     Q.   Mr. Schaff, as you know, my name is Scott
22  Flicker, I'm counsel for State Street in this matter.
23  Good afternoon.
24     A.   Good afternoon.
25     Q.   I would like to question you about

**Page 205**

1  portions of your report, and I would like to direct
2  you first to page 13.
3      A.   One moment.  I'm there.
4      Q.   Your heading is, "State Street failed to
5  properly determine the appropriate standard of
6  prudence regarding whether holding the Common Stock
7  was not consistent with ERISA."  What, in your
8  opinion, was the appropriate standard of prudence?
9      A.   Considering the facts and circumstances,
10  which were that this was a participant-directed plan
11  seeking 404(c) safe harbor.  That the stock -- that
12  the stock fund was written to invest in Grace stock
13  exclusively.  That as long as the nine point
14  checklist in 404(c) was -- was adhered to, that the
15  plan had satisfied its prudence duties by offering
16  the stock fund in a manner that was consistent with
17  404(c), and therefore protect the plan from any sort
18  of liability for the participants' investments in
19  that Grace stock plan.
20         Thus the facts and circumstances that it's
21  a 404(c) self-directed plan would be a material
22  distinction in what is or is not prudent with regard
23  to the sale of the stock.
24     Q.   And you are not saying, of course, that
25  State Street did not have access to or read the plan,

**Page 206**

1  correct?  State Street did read the plan.
2      A.   It's my understanding that they did.
3      Q.   And State Street hired legal counsel
4  experienced in ERISA to advise it regarding the terms
5  of the plan, is that correct?
6      A.   I don't know that advise it on the terms
7  of the plan were the primary purpose of the
8  engagement, but they did hire Goodwin Procter, and
9  Goodwin Procter provided both -- attorneys who are
10  both experienced in bankruptcy and experienced with
11  ERISA matters.
12     Q.   And you are aware that the attorney
13  experienced in ERISA matters was present and
14  participated in the meetings of the fiduciary
15  committee of State Street?
16     A.   I believe that to be the case, yes.
17     Q.   And it's your recollection that that
18  attorney, in fact, provided views to the fiduciary
19  committee on the requirements of ERISA in the context
20  of this engagement, correct?
21     A.   Frankly, Mr. Flicker, I do not recall
22  which of the attorneys at Goodwin Procter had which
23  experience and background.  I have no reason to
24  expect that that was incorrect, however.
25     Q.   Well, first of all, you know that the

**Page 207**

1  attorneys that Goodwin Procter provided for the
2  engagement included attorneys experienced in ERISA
3  in bankruptcy and asbestos litigation, correct?
4      A.   Yes.
5      Q.   Okay.
6      A.   Thank you.
7      Q.   And if you would, with me, take a look at
8  the December 11, 2003 minutes of the fiduciary
9  committee?  You read those in connection with
10  preparing your report, correct?
11     A.   Yes, I believe so.  Do I have a copy here?
12         MR. GOODMAN:  Yes, you do.  I believe it's
13     Exhibit 12.
14     Q.   That's what I thought.  I thought we had
15  marked it.  Turn to Exhibit 12.
16         MR. GOODMAN:  Not to be helpful, but --
17     A.   Here it is, I have it.
18     Q.   Okay.  I would like you to look at the
19  portion of those -- of the minutes after the heading
20  "Discussion."  Do you see that on the first page?
21     A.   Yes.
22     Q.   Do you see that third sentence there,
23  about legal counsel advising the committee about
24  the -- about the circumstances under which State
25  Street should sell the stock?

Page 248

1 cetera, that exceeds the information that was given
2 in the 10-Q. I am not opining that what was put in
3 the 10-Q was sufficient or insufficient.
4     But to the extent that this was given to
5 Goodwin Procter and State Street in order to assist
6 them in understanding the asbestos litigation
7 liabilities, I would fully expect that this
8 information was given on a recently good faith basis.
9     Q. So let me see if I can then understand.
10 What you're saying is that if you were sitting in
11 that room and you heard what was written on the page
12 in Driscoll 2, you would not come away -- you would
13 come away from that meeting and you would not apply a
14 60/40 probability of a positive outcome in this
15 Zonolite trial, is that correct?
16     A. That is correct.
17     Q. Okay. So you are disagreeing with the
18 60/40 probability that was applied to the outcome of
19 Zonolite as a result of what information was provided
20 from Grace, is that correct?
21     A. I am disagreeing with the 60/40
22 probability, yes.
23     Q. And you are not an expert in asbestos
24 litigation, correct?
25     A. No, I am not an expert in asbestos

Page 249

1 litigation.
2     Q. And you are not an expert in valuing
3 contingent liabilities for a company, is that
4 correct?
5     A. That's correct.
6     Q. And I assume you're not a scientific
7 expert on asbestos either, is that right?
8     A. Correct.
9     Q. And are you not the United States
10 Bankruptcy Court for the District of Delaware, is
11 that correct?
12     A. That's correct.
13     Q. Okay. I think we understand each other.
14     Now, you will admit, won't you, that State
15 Street employed a specific process to come to a
16 decision about whether or not to continue to retain
17 the Grace stock in the company stock plan, is that
18 right?
19     A. I don't know if I would agree with the
20 word "specific," but they did follow a process that
21 is chronicled in the documents I was provided.
22     Q. And that process included retaining
23 Goodwin Procter and Duff & Phelps, correct?
24     A. Yes, sir.
25     Q. And that process included having an entity

Page 250

1 called the independent fiduciary group that prepared
2 analysis and recommendations for the fiduciary
3 committee, is that correct?
4     A. Within State Street, yes.
5     Q. And that State Street, in fact, followed
6 this process all the way through, as you can tell
7 from the documentation, correct?
8     MR. GOODMAN: I'm going to object to the
9     extent that you're using the word "this
10     process." I'm not sure "this" has ever been
11     defined, but you may answer.
12     Q. You can answer.
13     A. That's the various activities that State
14 Street and its independent fiduciary group followed
15 or chronicled in the documents that were provided, I
16 would agree.
17     Q. And you would admit, wouldn't you, that
18 there was analysis done by Duff & Phelps regarding
19 Grace's financial condition and performance, is that
20 correct?
21     A. Yes.
22     Q. And that information was presented to
23 State Street, correct?
24     A. Yes.
25     Q. It appears from the document that it was

Page 251

1 considered, correct?
2     A. Yes.
3     Q. And that included both positive
4 information about Grace and some negative information
5 about contingent liabilities, correct?
6     A. Yes.
7     Q. And you will agree that Goodwin Procter
8 provided information to State Street about ERISA,
9 correct? We've established that earlier.
10     A. To the extent that we've discussed it
11 earlier, yes.
12     Q. And that State Street obtained advice from
13 Goodwin Procter regarding the bankruptcy process,
14 correct?
15     A. Yes.
16     Q. And State Street obtained information and
17 advice from Goodwin Procter about Grace's asbestos
18 liabilities, is that correct?
19     A. That is my understanding.
20     Q. And you see from the documents that all
21 that material was gathered and summarized and
22 presented to the fiduciary committee by State Street,
23 correct?
24     A. The investment, yes, it was considered at
25 State Street.

**48 (Pages 248 to 251)**