**Page 1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
----------------------------------
KERI EVANS, et al.,                :
                                   :
        Plaintiffs,                :
                                   :
   vs.                             :
                                   :
JOHN F. AKERS, et al.,             :
                                   :
        Defendants.                :
                                   : CONSOLIDATED
-----------------------------------  UNDER CASE NO.
LAWRENCE W. BUNCH, et al.,         : 04-11380-WGY
                                   :
        Plaintiffs,                :
                                   :
   vs.                             :
                                   :
W.R. GRACE & CO., et al.,          :
                                   :
        Defendants.                :
                                   :
----------------------------------
```

Deposition of: HARVEY S. ROSEN, Ph.D.

Taken: By the Defendants Pursuant to Agreement

Date: July 10, 2007

Time: Commencing at 9:32 a.m.

Place: Waite, Schneider, Bayless & Chesley Co., LPA
Suite 1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202

Before: Linda S. Mullen, RMR, CRR
Notary Public - State of Ohio

Page 74

1  got $445 million of liability.
2  Q. And do you know how they arrived at that
3  number?
4  A. The 445?
5  Q. Yes.
6  A. I don't recall how they arrived at that
7  number. I know how they arrived at the 1.816,
8  because that's spelled out. I don't remember them
9  spelling out where the 445 came from.
10 Q. Let me direct your attention to page 12 of
11 the report.
12 A. That's right, okay. So they did the
13 discounted value because I did mention that in my
14 report.
15 Q. So your understanding is that, in fact,
16 Duff & Phelps did an analysis to try to evaluate what
17 Grace's liability would be for bodily injury asbestos
18 cases if the FAIR Act passed, is that correct?
19 A. Correct. And that, I assume, was their
20 evaluation of the contribution rates that were
21 contained within the FAIR Act.
22 Q. And --
23 A. That part's fine, and that's a good kind
24 of analysis to do. It's the next step that's
25 bothering me.

Page 75

1  Q. Which is, how do you determine whether the
2  FAIR Act is going to pass or not?
3  A. Yeah.
4  Q. Well, what do you do to determine whether
5  a piece of legislation that will cap liability, to
6  determine the probability that it would pass or not?
7  A. Putting a probability on a political
8  process is a very difficult thing to do. They're
9  flipping a coin. Is that better or not? It may be
10 better than not, but whoever's using this report must
11 be aware that it's a -- that it's a coin toss and not
12 a hard factual number.
13 Q. Because nobody can know what the hard
14 factual number would be, is that right?
15 A. You can't know, that is absolutely
16 correct. And then you look at why there's the
17 discrepancy between the two. The numbers that Grace
18 were batting about were far different than this. But
19 again, you know, it may not have contained the
20 Zonolite estimate.
21 Q. And, in fact, it didn't contain the
22 Zonolite, isn't that correct?
23 A. Again, you've asked me that three or four
24 times and I -- I keep coming back to that. I don't
25 believe it did, but I would have to go back and check

Page 76

1  to see if it did or not.
2      I know the company's position was there
3  was no liability. It's logical they may not have put
4  anything into their estimate.
5  Q. In fact, if you looked at the company's
6  2003 10-Q for this period of time, it very clearly
7  says that the company is not estimating an amount for
8  Zonolite liability, isn't that right?
9  A. If you will show me the document that says
10 that, so it will save me from having to go back and
11 check it out, then if it says that, I would agree
12 with you.
13 Q. This is the -- I probably have another
14 copy of this somewhere -- Grace form 10-Q for the
15 period ending September 30, 2003. I'll direct your
16 attention to the top of what is paginated on this
17 document as I13, and direct your attention to
18 discussion in the first paragraph. There is -- the
19 part that I'm interested in is "At this time." But
20 you can read any other part that you want.
21 A. Okay. Well, that certainly would be
22 consistent with the position that they took.
23 Q. Which is that they didn't include an
24 amount for potential Zonolite liability in their
25 $960 million estimate, correct?

Page 77

1  A. Correct.
2  Q. And you said earlier that Mr. Tarola had
3  testified that it was an all in number, but in fact
4  Mr. Tarola made clear in his deposition that it
5  covered only the bodily injury liability, is that
6  right?
7  A. You would have to pull Tarola out. I'm
8  not -- I'm satisfied that it did not, but I don't
9  recall. I do recall the passage where he said it was
10 all inclusive, and that may have been a property
11 damage and bodily, excluding the ZAI litigation.
12 Q. If I direct you to Mr. Tarola's deposition
13 at page 38? To save trees, we won't mark it but I'll
14 show you. The testimony that's underlined on page
15 38, ask if that confirms the understanding that
16 Zonolite was not included in the 900 plus million
17 dollar number of the company?
18 A. Okay. I've read it.
19 Q. So do you agree that Mr. Tarola is saying
20 that the $992 million, at that time, estimate that
21 the company had on its books in December of 2003 was
22 only for bodily injury claims?
23 A. Correct.
24 Q. Okay. So what Duff & Phelps was doing
25 with its number was not simply doubling the company's

Page 110

1  did you ever take the position on behalf of Duff &
2  Phelps that State Street should wait somehow to see a
3  revised analysis before making a decision as to
4  whether to sell the stock? Answer -- there's a
5  couple of interruptions -- we provided State Street
6  with information. They were to make their own
7  independent decision. Then that was the end of the
8  deposition.
9     Q.  Okay. Anything else you can think of in
10 the deposition transcript that you wanted to point
11 out with respect to the clarification of your answer?
12    A.  Other than he didn't remember what they
13 discussed at the meeting.
14    Q.  Was he shown any documents about the
15 meeting in his deposition at that time?
16    A.  I think they showed him the same ones you
17 showed me, the letter from the -- the same couple of
18 exhibits that I believe you showed me, I think that
19 those are the same ones.
20    Q.  On what basis do you say that?
21    A.  One was the fiduciary minutes, I believe.
22    Q.  Right.
23    A.  And the other one, I don't remember if it
24 was -- I thought he was shown Exhibit 4, which was
25 the March 31st, 2004 letter from Monica Ewing -- or

Page 111

1  Monet. And then the April 7th letter, the minutes, I
2  thought that was -- I'm not sure about that one. I
3  think I would have to look again where you're
4  reading. I know he saw the March 31st letter, I'm
5  not sure about the April 7th letter.
6     Q.  Well, in fact, I'll show it to you. He
7  was shown the April 7th fiduciary committee --
8     A.  Okay.
9     Q.  -- minutes but he is not shown the March
10 31st memo by counsel for the plaintiffs, isn't that
11 right?
12    A.  I thought he was, because he said he
13 wasn't a participant in that, unless they just asked
14 him about the meeting.
15    Q.  Okay. In fact, he wasn't present in the
16 April 7th fiduciary committee meeting, so is it
17 possible your recollection about what he didn't
18 participate in related to the April 7 meeting and not
19 to the March 31?
20    A.  That's possible.
21    Q.  I can provide you again with the
22 deposition transcript if you want to peruse it to see
23 if, in fact, I'm right that plaintiff's counsel did
24 not show him the March 31, 2004 memo.
25    A.  I think that's correct, it was the 7th --

Page 112

1     Q.  Right.
2     A.  -- meeting.
3     Q.  Let's take a look at your expert report,
4  Exhibit 1, on page 4.
5     A.  Okay.
6     Q.  I would like to focus on the second full
7  paragraph after the heading "Duff & Phelps, LLC
8  Findings." Do you see that?
9     A.  I do.
10    Q.  It says, "The Duff & Phelps reports
11 provided a comprehensive picture of those factors,"
12 of which I think you mean a fundamental financial
13 outlook for the company, "affecting the common
14 stock."
15    A.  Okay.
16    Q.  All right? So the comprehensive pictures
17 of those factors you referred to in the first
18 sentence, you're saying that the Duff & Phelps report
19 contained a comprehensive discussion of the factors
20 affecting the common stock of Grace, is that right?
21    A.  Correct. They pointed out many of the
22 uncertainties involved here.
23    Q.  And the second sentence, you say, "No
24 reasonable financial analysis of the D&P Reports and
25 valuations would support the conclusion that State

Page 113

1  Street reached as Investment Manager that the stock
2  was destined to become worthless or decline
3  precipitously in value." Do you see that?
4     A.  I do.
5     Q.  Okay. First of all, when you're using the
6  term "destined to become worthless," what time frame
7  are you talking about? What were you looking at in
8  terms of a horizon for that to occur?
9     A.  I think they, when they made their
10 evaluation, provided no information as to a time
11 frame.
12    Q.  So the time horizon that State Street
13 could have been considering here could have been as
14 short as a couple of months from the time they were
15 looking at the analysis to the end of the bankruptcy
16 process, I assume, is that correct?
17    A.  Well, that's difficult to say, as they
18 didn't put any time frame on it, other than present
19 the facts that were in evidence at that time. Most
20 of it from public sources, few that were not, but --
21 well, the report was based primarily on public
22 sources, but I'm not sure I can answer that question
23 for you.
24        There was no time frame attached to it,
25 nor was there any precautionary calculation in any of

**Page 122**

1 range of 73 cents to $3.02 per share." Do you see
2 that?
3  A. I do.
4  Q. And do you believe that the Duff & Phelps
5 report doesn't adequately support that Duff & Phelps
6 determination of the current value of Grace stock?
7  A. That was just one of many outcomes. All
8 that is based on assumptions of the 1.9 million in
9 liability -- billion, excuse me -- in liability.
10  Q. Well, plus the valuation of the company's
11 enterprise value that Duff & Phelps did?
12  A. The valuation of the enterprise value, I
13 had no -- I can't recall that at all. I think I've
14 said it several times already, that the big factor --
15 well, when I say the enterprise value, we're talking
16 about the top line that they began with as they
17 worked their way down through the analysis. I didn't
18 have any -- I had no problem with that. It was
19 primarily the adjustment for the liability.
20  Q. And, in fact, when one is trying to
21 determine the value of an entity facing large
22 contingent liabilities like asbestos liabilities,
23 it's appropriate to take an enterprise value and then
24 try to estimate what those liabilities would be, is
25 that correct?

**Page 123**

1  A. I have no problem with that.
2  Q. In fact, what's a closed case valuation
3 analysis?
4  A. Well, a closed case is the type that we
5 did in the picture that evolved around establishing,
6 based on historical data, what claims that have in
7 fact been paid are worth, taking into account a
8 variety of different factors that would affect the
9 outcome of those payments.
10  Q. When is a closed claims analysis used?
11 When, typically, is a closed case analysis used when
12 you're conducting an evaluation?
13  A. When is it used?
14  Q. Yeah.
15  A. I believe it's used when you're doing a
16 more thorough and complete analysis of the -- of the
17 liability facing someone.
18  Q. Do you believe that the stock price of
19 Grace at the time that Duff & Phelps was doing its
20 analysis reflected the market's judgment on the
21 outcome of the asbestos liabilities?
22  A. It would have been based on whatever
23 public information was available to them. They would
24 not have had detailed information that could have
25 been found in a closed case analysis, that was not

**Page 124**

1 public information.
2  Q. Yeah. This is a separate question, which
3 is simply, is it your opinion that the stock price of
4 Grace at the time that this analysis was being done
5 reflected -- took into account the contingent
6 liabilities of Grace?
7  A. Based upon whatever information was
8 available at that time, I would agree with that.
9  Q. Do you have a view one way or the other
10 whether the market for Grace stock was efficient at
11 that time?
12  A. I have no opinion with respect to whether
13 or not this was an efficient market. I understand
14 that other people have been asked to look at that, I
15 have not been.
16  Q. Do you agree with the observation that at
17 that time in 2004 the price of Grace stock was
18 trading or reflected more the characteristics of an
19 option than the enterprise value of the company?
20  A. Well, I suppose -- I haven't thought about
21 it that way and I've not heard it described that way.
22 I suppose somebody might be able to make an argument
23 in favor of that observation. Options are -- have
24 different characteristics than the trading of stock
25 itself. An option is the right to buy or sell

**Page 125**

1 depending on whether it's a put or a call. Whereas
2 owning a share of stock here gave one claim to the
3 equity itself.
4   So there are some substantial differences.
5 Options have a limited life, they have an exercise
6 price, they don't generally pay any kind of return
7 other than giving the holder the right to buy. So in
8 that regard, they're quite different. So I'm not
9 sure what the characterization of that would be or
10 why it would be characterized that way.
11  Q. You would agree that the Grace stock was
12 not trading based upon the fundamental enterprise
13 value of the company at this time in 2004, is that
14 correct?
15  A. I would agree with that.
16  Q. You would agree that the high end of the
17 Duff & Phelps valuation range in February of 2004 was
18 about 13 percent lower than the current market price
19 of the stock, is that correct?
20  A. Where are you reading, on page?
21  Q. 13.
22  A. 2857?
23  Q. Yes, sir.
24  A. I didn't compute it, but I assume the
25 arithmetic is correct.