

# Form 10-K

## W R GRACE & CO - GRA

Filed: March 05, 2004 (period: December 31, 2003)

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART I

ITEM 1.    BUSINESS
ITEM 2.    PROPERTIES
ITEM 3.    LEGAL PROCEEDINGS
ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.
ITEM 6.    SELECTED FINANCIAL DATA
ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND
ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
ITEM 9A.   CONTROLS AND PROCEDURES

## PART III

ITEM 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 11.   EXECUTIVE COMPENSATION
ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES

## PART IV

ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K
SIGNATURES

EX-10.6 (Material contracts)

EX-10.27 (Material contracts)

EX-10.28 (Material contracts)

EX-10.29 (Material contracts)

EX-21 (Subsidiaries of the registrant)

EX-24 (Power of attorney)

EX-31.1 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)

EX-31.2 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)

EX-32 (Certifications required under Section 906 of the Sarbanes-Oxley Act of 2002)

================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
-------------------------------
FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934


For the fiscal year ended December 31, 2003     Commission file number 1-13953


W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|  | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS | WHICH REGISTERED |
| ------------------- | ---------------- |
| Common Stock, $.01 par value       } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights    } |  |


SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common
equity held by non-affiliates as of June 30, 2003 (the last business day of the
registrant's most recently completed second fiscal quarter) was $239,410,239.

At February 20, 2004, 65,614,064 shares of W. R. Grace & Co. Common Stock, $.01
par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

None.

================================================================================

TABLE OF CONTENTS

PART I...................................................................1

    Item 1.   Business .....................................................1
              AVAILABILITY OF SEC REPORTS..............................1
              PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION.........1
              CHAPTER 11 FILING........................................2
              BUSINESS OVERVIEW........................................3
              PRODUCTS AND MARKETS.....................................4
              INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES...............9
              ENVIRONMENTAL, HEALTH AND SAFETY MATTERS.................9
    Item 2.   Properties...................................................10
    Item 3.   Legal Proceedings............................................11
    Item 4.   Submission of Matters to a Vote of Security Holders............18

PART II..................................................................18

    Item 5.   Market for Registrant's Common Equity and Related
          Shareholder Matters..........................................18
    Item 6.   Selected Financial Data......................................19
    Item 7.   Management's Discussion and Analysis of Results of
          Operations and Financial Condition...........................19
    Item 7A.  Quantitative and Qualitative Disclosures About Market Risk......20
    Item 8.   Financial Statements and Supplementary Data....................20
    Item 9.   Changes in and Disagreements with Accountants on
          Accounting and Financial Disclosure..........................20
    Item 9A   Controls and Procedures.......................................20

PART III.................................................................20

    Item 10.  Directors and Executive Officers of the Registrant.............20
    Item 11.  Executive Compensation........................................22
    Item 12.  Security Ownership of Certain Beneficial Owners and
          Management and Related Stockholder Matters....................30
    Item 13.  Certain Relationships and Related Transactions.................32
    Item 14   Principal Accounting Fees and Services........................32

PART IV..................................................................33

    Item 15.  Exhibits, Financial Statement Schedules, and Reports on
          Form 8-K.....................................................33

SIGNATURES...............................................................38

PART I

ITEM 1. BUSINESS

AVAILABILITY OF SEC REPORTS

     W. R. Grace & Co.(1) maintains an Internet website at www.grace.com. Grace makes available, free of charge through its website, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the Securities and Exchange Commission ("SEC"). These reports may be accessed through the website's investor information page.

PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION

     This Report contains, and other communications by Grace may contain, projections or other "forward-looking" information. Forward-looking information includes all statements regarding Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Like any other business, Grace is subject to risks and other uncertainties that could cause its actual results to differ materially from any projections or that could cause other forward-looking information to prove incorrect. Grace does not undertake any obligation to update any forward-looking information that may be contained in this Report.

     Most significantly, Grace filed for protection under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on April 2, 2001 as a result of a sharply increasing number of asbestos bodily injury claims. See the discussion below, in Item 3 of this Report, and Notes 1, 2 and 3 to Grace's Consolidated Financial Statements as of December 31, 2003 and December 31, 2002, and for each of the three years ended December 31, 2003, 2002 and 2001 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report, for a more detailed discussion of risks related to Grace's asbestos liabilities.

     In addition to general economic, business and market conditions, Grace is also subject to other risks and uncertainties, including the following:

o    developments in and the outcome of the Chapter 11 proceedings, including but not limited to the determination of the cost of resolution of pending and future asbestos-related claims and the time required to confirm and implement a plan of reorganization;

o    the loss of senior management and other key employees as a result of the Chapter 11 proceedings;

o    the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

o    greater than expected liabilities with respect to environmental remediation (see Item 3);

o    an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

o    a decline in worldwide oil consumption or the development of new methods of oil refining;

o    increases in prices of raw materials and energy costs;

-------------------
(1) As used in this Report, the term "Grace" or the "Company" refers to W. R. Grace & Co., a Delaware corporation and, in certain cases, one or more of its subsidiaries and/or their respective predecessors.

o   the consolidation of major customers, which could increase customer
    purchasing power, thereby putting pressure on operating profits;

o   an inability to gain customer acceptance, or slower than anticipated
    acceptance, of new products or product enhancements;

o   changes in environmental regulations or societal pressures that make
    Grace's business operations more costly or that change the types of
    products used by customers, especially petroleum-based products;

o   slower than anticipated economic advances in less developed countries;

o   foreign currency devaluations in developing countries or other adverse
    changes in currency exchange rates (including, in particular, the U.S.
    dollar to Euro exchange rate);

o   technological breakthroughs rendering a product, a class of products or a
    line of business obsolete;

o   an inability to adapt to continuing technological improvements by
    competitors or customers; and

o   the acquisition (through theft or other means) and use by others of Grace's
    proprietary technology and other know-how.

See Notes 1, 2, 3, 4, 5, 10, 13 and 14 to the Consolidated Financial Statements
and "Management's Discussion and Analysis of Results of Operations and Financial
Condition" in the Financial Supplement for additional information concerning
risks and uncertainties.

CHAPTER 11 FILING

    On April 2, 2001, W. R. Grace & Co. and 61 of its United States
subsidiaries and affiliates filed voluntary petitions for reorganization under
Chapter 11 in the United States Bankruptcy Court for the District of Delaware.
The cases were consolidated for the purpose of joint administration and were
assigned case numbers 01-01139 through 01-01200. Grace's non-U.S. subsidiaries
and certain of its U.S. subsidiaries were not included in the filing.

    The filing was made in response to a sharply increasing number of
asbestos-related bodily injury claims. Under Chapter 11, Grace is operating its
businesses as debtor-in-possession under court protection from its creditors and
claimants, while using the Chapter 11 process to develop and implement a plan
for addressing the asbestos-related claims against it.

    Prior to 2000, Grace was able to settle asbestos-related claims through
direct negotiations. The filing of claims had stabilized, and annual cash flows
were manageable and fairly predictable. In 2000, the litigation environment
changed with an unexpected 81% increase in bodily injury claims, which Grace
believes was due to a surge in unmeritorious claims. Trends in claims filing and
settlement demands showed no signs of returning to historic levels and were
exacerbated by the Chapter 11 filings of several co-defendants in asbestos
bodily injury litigation. These trends greatly increased the risk that Grace
would not be able to resolve its pending and future asbestos-related claims
under the state court system.

    Grace concluded that a federal court-supervised Chapter 11 filing provides
the best forum available to achieve predictability and fairness in the claims
resolution process. By filing under Chapter 11, Grace expects to be able both to
obtain a comprehensive resolution of the claims against it and to preserve the
inherent value of its businesses.

    As a consequence of the filing, pending litigation against Grace is
generally stayed (subject to certain exceptions in the case of governmental
authorities), and no party may take any action to realize its pre-petition
claims except pursuant to an order of the Bankruptcy Court. Since the filing,
all motions necessary to conduct normal business activities have been approved
by the Bankruptcy Court.

    Grace intends to address all of its pending and future asbestos-related
claims and all other pre-petition

2

claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted or cancelled under a plan of reorganization. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through the Bankruptcy Court proceedings.

Grace's asbestos-related litigation and Chapter 11 filing are discussed in more detail in Item 3 of this Report, and in Notes 1, 2 and 3 to the Consolidated Financial Statements, and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

BUSINESS OVERVIEW

Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace operates in the following two business segments:

o    Davison Chemicals manufactures catalysts and silica-based products. Davison Chemicals' catalysts include (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities; and (3) polyolefin catalysts and catalyst supports that are essential components in the manufacture of high density and linear low density polyethylene resins, and polypropylene resins, used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison Chemicals' silica gels, colloidal silicas, precipitated silicas, and zeolite adsorbents are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical segments, such as ink jet paper, paints, toothpastes, precision investment casting, rubber compounds, insulated glass and separations/chromatography, as well as in edible oil refining and petrochemical processes. Davison Chemicals accounted for approximately 52% of Grace's 2003 sales.

o    Performance Chemicals produces (1) specialty construction chemicals, including performance-enhancing concrete admixtures, cement additives and additives for masonry products; (2) specialty building materials, including fireproofing and waterproofing materials and systems; and (3) sealants and coatings for packaging that protect food and beverages from bacteria and other contaminants, extend shelf life and preserve flavor. Performance Chemicals accounted for approximately 48% of Grace's 2003 sales.

Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone 410/531-4000. As of year-end 2003, Grace had approximately 6,300 full-time employees worldwide.

Information concerning the net sales, pretax operating income and total assets of Grace's continuing operations by business segment and information by geographic area for 2003, 2002 and 2001 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report.

Strategic Objectives and Actions. Grace's strategy has been, and will continue to be, to enhance enterprise value by profitably growing its specialty chemicals businesses globally and achieving high levels of

financial performance. To achieve these objectives, Grace plans to (i) invest in research and development activities, with the goals of introducing new high-performance products and services and enhancing manufacturing processes; (ii) implement process and productivity improvements and cost-management initiatives (including the use of Six Sigma processes), such as rigorous controls on working capital and capital spending, and programs for procurement and materials management; and (iii) pursue selected acquisitions and alliances. These plans are designed to make Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

PRODUCTS AND MARKETS

   Specialty Chemicals Industry Overview. Specialty chemicals, such as those produced by Grace, are high-value-added products used as catalysts, intermediates, components or additives in a wide variety of products and processes. They are generally produced in relatively small volumes (compared to commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of the end products and catalysts for the processes in which they are used; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

   Grace's management believes that in specialty chemicals businesses technological leadership (resulting from continuous innovation through research and development), combined with product differentiation and superior customer service, deliver increased value to customers and lead to higher operating margins. Grace believes that these factors reward it for the research and development and customer service costs associated with its strategy.

   Davison Chemicals Business Segment (Catalysts and Silica-Based Products). Davison, founded in 1832, is composed of two primary product groups: (i) catalysts and (ii) silica products and adsorbents. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical/nutraceutical companies. Grace believes that Davison's technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

   Catalysts. Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into transportation fuels (such as gasoline and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the FCC unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline and, as an alternative technology, membranes which, when employed in a pervaporation system, will remove sulfur from refinery streams. Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's product mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs. To better serve its customers, Davison has designed a user-specific website, e-Catalysts.com.

   Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives and other products that reduce environmental emissions.

Davison's business is affected by the capacity utilization of customers' processing units - as capacity utilization increases, the customer frequently uses a disproportionately greater amount of catalysts. Consolidation in the refining industry may affect Davison's catalyst sales and margins, as the purchasing power of its customers may increase, and the gain or loss of a customer may have a greater impact on Davison's sales.

Davison operates its hydroprocessing catalyst business through Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company that combines Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum catalyst and distillate catalyst business. In 2002, ART acquired an exclusive license in most of the world for the hydroprocessing technology of Japan Energy Corporation and its subsidiary, Orient Catalyst Company, which expanded Davison's position in residuum and distillate hydroprocessing technologies. In response to increased demand for lower sulfur transportation fuels, ART has recently introduced new hydroprocessing catalyst technologies for sulfur reduction in gasoline and diesel fuels.

Grace believes that Davison is one of the world leaders in refinery catalysts and the largest supplier of FCCs in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price. Davison's two principal global competitors in FCCs are Engelhard Corporation and Akzo Nobel. Davison has several regional competitors for FCC additives and hydroprocessing catalysts.

Davison is also a major producer of polyolefin catalysts and catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins, and polypropylene resins, that are in turn used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison catalysts and catalyst supports are used in manufacturing nearly half of all such supported polyethylene resins produced worldwide. The polyolefin catalyst business is technology-intensive and focuses on providing products formulated to meet customer specifications. There are many manufacturers of polyolefin catalysts, and most compete on a worldwide basis. Competition has recently intensified because of evolving technologies, particularly the use of metallocene catalysts, which allow manufacturers to design polymers with exact performance characteristics. In January 2002, Davison acquired the polyolefin catalyst manufacturing assets of Borealis A/S, giving Davison access to new polyolefin catalyst and catalyst carrier technologies. In addition, Davison produces other chemical catalysts for a wide variety of uses, including environmental control, petrochemical synthesis and pharmaceutical applications.

Silicas and Adsorbents. Silica products and zeolite adsorbents produced by Davison are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical applications. Davison manufactures silica gels, colloidal silicas and precipitated silicas. These silicas have different physical properties, such as particle size, surface area, porosity, and surface chemistry, which give each type of silica unique characteristics that make it appropriate for specific applications. Davison has multiple competitors in each silicas/adsorbents segment in which it participates. Competition is based on product performance and quality, customer service, and price.

Silica gels are used in coatings as matting agents (i.e., to reduce gloss), in plastics to improve handling, in pharmaceuticals as a formulating agent, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, and in the purification of edible oils and beer stabilization. Davison is leveraging its materials science expertise, both internally and through acquisitions, to develop and introduce new silica materials and technologies, particularly for the higher-growth segments of digital media, industrial coatings, and biotechnology separations applications. Davison recently has developed a new colloidal-based product as well as other silica formulations for ink jet paper coatings to provide both glossy and matte functionality, expanding its portfolio of digital media solutions for ink jet papers, photos, and commercial wide-format printing. Davison has also introduced new products for industrial coatings (where silica is used

5

to reduce gloss), such as for thin film applications, industrial wood coatings, radiation-cured coatings, and anti-corrosion coatings.

Davison has recently focused on expanding its separations business to take advantage of higher growth opportunities in the drug discovery, purification and manufacturing processes. During 2003, Davison introduced several new products, including new higher-performing silica gel media for separations and, through two small acquisitions, high-performance chromatography columns and custom column packing services.

Davison's colloidal silicas are used primarily as binders in precision investment casting and refractory applications. They have also recently been introduced for use in ink jet printing of digital media, such as digital photographs. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Zeolites, while not silica-based products, are based on related silica/alumina technology. Zeolite adsorbents are used between the two panes of insulating glass to adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

The silicas and adsorbents business has a large, fragmented customer base, reflecting the diverse markets served by its products. To better serve these customers, the business uses a direct sales force as well as a distribution network, and has introduced web-based initiatives. Web-based offerings include technical service, literature access, customer feedback tools, and process design formulas to assist customers in determining their needs. Approximately half of Davison's silica and adsorbent sales are in Europe.

Davison Financial and Other Business Information. Davison's net sales were $1,040 million in 2003, $939 million in 2002, and $868 million in 2001; 38% of Davison's 2003 net sales were generated in North America, 40% in Europe, 17% in Asia Pacific, and 5% in Latin America. Sales of catalysts accounted for 37% of total net sales of Grace in 2003 and 2002, and 36% in 2001. Sales of silica products and zeolite adsorbents accounted for 15% of Grace's total net sales in 2003 and 2002, and 14% in 2001.

At year-end 2003, Davison employed approximately 3,100 people worldwide in 16 facilities. Davison has a direct selling force and distributes most of its products directly to approximately 12,000 customers (500 for catalysts and more than 11,000 for silicas/adsorbents), the largest of which accounted for approximately 4% of Davison's 2003 sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources. In some instances, Davison produces its own raw materials and intermediates. Natural gas and petroleum-based raw materials are two of the principal materials used in Davison's manufacturing process. World events and other economic factors have caused volatility in the price of these materials, which have impacted Davison's operating margins. Seasonality does not have a significant overall effect on Davison's business. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. Silica products and polyolefin catalysts are the product lines most sensitive to general downturns in economic activity.

Performance Chemicals Business Segment (Specialty Construction Chemicals, Specialty Building Materials, and Sealants and Coatings). Grace's Performance Chemicals businesses include: (1) specialty construction chemicals and building materials, in which Grace is a leading supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair segment; and (2) a sealants and coatings product line operated under the Darex(R) brand.

6

Construction Chemicals and Building Materials. Specialty construction chemicals (principally concrete admixtures, cement additives and additives for masonry products) improve durability and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall and paving systems.

Grace has introduced a number of new construction chemicals products and product enhancements in recent years. These include: an additive that improves cement processing efficiency and product quality; new polymeric fiber reinforcements for concrete that can substitute for secondary metal reinforcements; an automated system to improve the reliability and accuracy of adding fibers to concrete production; an admixture system for producing self-consolidating concrete (which improves the concrete's conformity to the shape of a structure); and a liquid pigment admixture and dispensing system for concrete. Grace seeks to continuously improve and adapt these products for different applications.

Grace's strategy is also to extend its product portfolio and geographic reach through acquisitions. In 2003, Grace acquired the assets of Tricosal Beton-Chemie GmbH & Co. KG, which significantly expanded Grace's presence in Germany and Eastern Europe.

Specialty building materials prevent structural water damage (for example, water- and ice-barrier products for residential use and waterproofing systems for commercial structures), and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that protection from ice and wind-driven rain; enhancements to spray-on fireproofing products that improve applicator productivity; and, through an acquisition in 2000, firestops. Firestops are caulk and sealant systems that retard the spread of heat, flame and smoke through walls, ceiling joints, and openings for wiring and piping. The spray-on fire protection product line recently has been adversely affected by the adoption in the U.S. of new international building codes. These codes require less fire protection materials for structural steel used in commercial buildings.

In addition to new product introductions, product enhancements and acquisitions, Grace looks for growth opportunities in developing countries, where increases in construction activity and sophistication of construction practices can increase demand for Grace's higher-performance construction chemicals and building materials products.

Construction chemicals and building materials are marketed under the Grace(R) brand to a broad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block manufacturers, building materials distributors and other industrial manufacturers, as well as to architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors.

In view of this diversity, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Performance Chemicals maintains a separate sales and technical support team for each of its product groups. These sales and support teams sell products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. Consequently, Grace competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, particularly in markets outside of the U.S., thereby increasing the importance of servicing the global customers. Competition in these businesses is based largely on technical support and service, product performance, adaptability of the product and price.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions. Grace seeks to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Grace's construction business, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002 and the first half of 2003.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses. Recent higher petroleum-based raw material costs and other supply/demand disruptions have negatively impacted the operating margins of these product lines.

Sealants and Coatings. The Darex(R) sealants and coatings business consists primarily of four product lines: can sealants for rigid containers, sealants for metal and plastic bottle closures, coatings for metal packaging, and specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces, and to provide base coats for inks and for decorative purposes. These products are principally sold to container manufacturers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are principally sold to manufacturers of oriented polypropylene films for food packaging.

Grace is seeking to expand its Darex(R) product offerings and improve sales growth by extending its technology to new markets, such as its oxygen-scavenging compounds (which absorb oxygen to increase shelf life) and high barrier materials that limit gas transmission into plastic packaging. Grace is also looking to improve sales of closure sealants for plastic bottles, and can sealants and coatings through niche opportunities in metal packaging and continued growth in developing countries. However, sales growth has been impacted, and will likely continue to be impacted in the future, by the trend toward increasing use of plastic packaging. Grace will continue to focus on improving the profitability and cash flows of this business through worldwide productivity and strategic sourcing initiatives.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality and reliability, the ability to offer environmentally friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining relationships with leading container manufacturers, canners and bottlers, and assisting them as they re-engineer processes are key elements for success.

Although raw materials used in the sealants and coatings business, including resins, rubber and latices, are generally available from multiple sources, many raw materials are purchased from single source suppliers. Some raw materials are also subject to pricing pressures from time to time, particularly oil-based specialty and commodity materials such as resins and solvents. Also, currency devaluations versus the U.S. dollar and Euro in developing countries may adversely affect raw material costs and the prices the business may charge for its products. The business is focused on managing raw material costs and sourcing

8

opportunities to alleviate some of these pressures. Since Darex is a global business, the impact of seasonality is not significant.

Performance Chemicals Financial and Other Business Information. Net sales of Grace's Performance Chemicals segment in 2003 totaled $940 million (52% in North America, 28% in Europe, 14% in Asia Pacific, and 6% in Latin America), versus $881 million in 2002 and $855 million in 2001. Sales of specialty construction chemicals accounted for 23% of Grace's total net sales in 2003, and 22% in 2002 and 2001; sales of specialty building materials accounted for 12% of Grace's total net sales in 2003, 13% in 2002, and 14% in 2001; and sales of Darex(R) products accounted for 13% of Grace's total net sales in 2003 and 2002, and 14% in 2001.

At year-end 2003, Grace employed approximately 3,000 people at 62 Performance Chemicals production facilities. Most of Performance Chemicals' sales are direct sales to the customer. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for further information regarding the Davison and Performance Chemicals business segments.

INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications. Grace also benefits from legally protectable know-how and other proprietary information relating to many of its products and processing technologies. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products based on technological developments being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance, however, that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while also focusing on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $52 million in 2003 and 2002, and $50 million in 2001. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations

9

and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2004 and 2005, for (i) the operation and maintenance of environmental facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation:

| | (i)<br>Operation of<br>Facilities and<br>Waste Disposal | (ii)<br>Capital<br>Expenditures | (iii)<br>Site<br>Remediation |
|---|---|---|---|
| | -------------- | ------------ | ----------- |
| | | (in $ millions) | |
| 2001 | $33 | $4 | $27 |
| 2002 | 38 | 6 | 14 |
| 2003 | 46 | 8 | 7 |
| 2004 (est.) | 47 | 12 | 38 |
| 2005 (est.) | 48 | 15 | 7 |

The decline in site remediation costs since 2001 reflects reduced spending at non-owned sites due to Grace's Chapter 11 status. The $38 million in estimated site remediation expenditures in 2004 includes a potential $22 million payment to transfer liability with respect to a non-owned site to a third party; such payment is subject to the approval of the Bankruptcy Court. The $38 million does not include possible additional spending or reimbursement of remediation costs related to Grace's former vermiculite mining and processing activities.

Grace continuously seeks to improve its environmental, health and safety performance. To the extent applicable, Grace extends the basic elements of the American Chemistry Council's Responsible Care(R) program to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, Grace has implemented key elements of the new Responsible Care(R) Security Code for its operations and systems. It has completed a review of existing company security (including cyber-security) vulnerability, and is in the process of taking actions to enhance security systems and protect company assets.

For additional information, see Item 3 of this Report, and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.


ITEM 2. PROPERTIES

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit. Grace owns all of its major manufacturing facilities. Substantially all of its U.S. properties are subject to security interests under Grace's debtor-in-possession borrowing facility. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Davison Chemicals operates out of 16 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 11 |
| Europe | 3 |
| Latin America | 1 |
| Asia Pacific | 1 |

Its largest facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany.

Performance Chemicals operates out of 62 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 26 |
| Europe | 12 |
| Latin America | 6 |
| Asia Pacific | 18 |

Its largest facilities are located in Cambridge, Massachusetts; Chicago, Illinois; Slough, England; Epernon, France; and Singapore. Because of the nature of its products, Performance Chemicals requires a greater number of facilities to service its customers than Davison. Also, these facilities are generally smaller and less capital intensive than Davison's facilities.


ITEM 3. LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. In most of the bodily injury lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace.

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Seventeen of such lawsuits involve claims for property damage, nine relating to Grace's former Zonolite attic insulation ("ZAI") product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also involve ZAI). The remainder of such lawsuits involve 129,191 claims for bodily injury.

The plaintiffs in property damage lawsuits generally seek to have the defendants pay the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through April 2, 2001, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases for a total of $86.1 million (one of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI, a product formerly sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. After Lindholm was filed, nine additional purported class action ZAI lawsuits were initiated

11

against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm. As a result of the Chapter 11 filing, all of these cases have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

The plaintiffs in the ZAI lawsuits assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at Grace's expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The parties have completed discovery with respect to these threshold issues and have filed motions asking the Bankruptcy Court to resolve a number of important legal and factual issues regarding the ZAI claims. Grace expects the Bankruptcy Court to establish a schedule for determining the pending motions following the next status conference in May 2004. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

As part of the Chapter 11 process, the Bankruptcy Court established a bar date of March 31, 2003 for submission of asbestos-related property damage claims. (The bar date did not apply to asbestos-related bodily injury claims or claims related to ZAI.) Approximately 4,000 additional property damage claims were filed prior to the bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims failed to provide sufficient information to permit an evaluation. With respect to the remainder of such claims, based on its experience in valuing property damage claims, Grace estimates the cost to resolve such claims to be $30 million. This estimate is subject to change based on the receipt of additional information or other developments in the Chapter 11 proceeding.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and analysis of trends in asbestos bodily injury litigation, Grace has endeavored to project the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. Grace has accrued $992 million at December 31, 2003 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all pending property damage cases (including the additional claims filed prior to the bar date described above) for which sufficient information is available to form a reasonable estimate of the cost of resolution. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. Grace does not expect to adjust this estimate (other than for normal costs of continuing claims administration) unless developments in the Chapter 11 proceeding provide a reasonable basis for a revised estimate. Grace intends to use the Chapter 11 process to determine the validity and ultimate amount of its aggregate liability for asbestos-related claims. Due to the uncertainties of asbestos-related litigation and the Chapter 11 process, Grace's ultimate liability could differ materially from the recorded liability.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic

12

insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $1.054 billion prior to 2001, as well as payments totaling $78.8 million in 2001, $10.8 million in 2002, and $13.2 million in 2003. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $269.4 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

Since its Chapter 11 filing, Grace is aware that asbestos bodily injury lawsuits have continued to be filed against co-defendant companies, and at higher than historical rates. As asbestos bodily injury claims are typically filed against numerous defendants, Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. Libby, Montana and Vermiculite-Related Remediation From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of alleged contaminated buildings, the excavation and removal of alleged contaminated soil, health screening of Libby residents and former mine workers, and investigation and

13

monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. Grace has appealed the court's ruling.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former Grace plant in Minneapolis, which processed vermiculite from the Libby mine. This case has been stayed as a result of Grace's Chapter 11 filing. The EPA has commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 properties, the EPA has taken action at 252, and has not obtained access to the remaining 17. As of December 31, 2003, the EPA had spent $3.4 million on residential cleanup actions. While Grace has not completed its investigation of the claims in Chase, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's remediation costs. The EPA also has remediated industrial property in the area, including the former vermiculite expanding plant, at a cost of $650,000. The EPA has submitted a claim for $7.9 million for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or around the former plant site.

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or processed concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants currently or formerly operated by Grace. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective actions or investigations at six of these sites. The EPA has filed claims for 10 of these sites (exclusive of Libby, Montana) in the amount of $16 million. In addition, another governmental agency has commenced a separate investigation at 28 of the 245 facilities, 22 of which are currently or were formerly operated by Grace. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

As a result of the ruling by the District Court in Montana, and Grace's evaluation of probable remediation costs at vermiculite processing sites, Grace estimates its total liability for vermiculite-related remediation at $181 million. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, and analysis of other information made available from the EPA. However, the EPA's cost estimates have changed regularly and increased substantially over the course of its cleanup. Consequently, Grace's estimate may change materially as more information becomes available. Any such additional information could have a material effect on Grace's liability for this matter and on its Consolidated Financial Statements. Any payments to the EPA would be subject to the outcome of the Chapter 11 proceedings.

Libby Private Property Owners' Lawsuit. In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing

14

operations. The complaint seeks remediation, property damages and punitive damages. This case has been stayed as a result of Grace's Chapter 11 filing. However, as described above, the EPA has been conducting remediation activities in and around Libby, which includes the remediation of private real property. While Grace has not completed its investigation of the claims in Tennison, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's recoverable costs for cleanup activities around Libby.

Proceedings in which Grace is a Potentially Responsible Party. Grace (together, in most cases, with many other companies) has been designated a "potentially responsible party" ("PRP") by the EPA with respect to paying the costs of investigating and remediating pollution at various sites. At year-end 2003, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace does not expect to participate (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where it is a PRP. Grace's expected liability with respect to these sites is included in an aggregate $151 million liability for environmental remediation (excluding liability related to Grace's former vermiculite mining and processing activities as described above); however, Grace's ultimate liability with respect to many of such sites will be determined as part of its Chapter 11 proceeding.

Other Proceedings. Grace is also a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials.

Determination of Other Environmental Liabilities. Based on its analysis of environmental-related claims submitted prior to the March 31, 2003 bar date and other available information, Grace increased its aggregate estimated liability for environmental remediation, other than remediation related to its former vermiculite mining and processing operations (discussed above), by $20 million in the fourth quarter of 2003 to an estimated aggregate liability of $151 million. These environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. The estimated aggregate liability could change materially as additional information becomes available or circumstances change. Grace does not have sufficient information to determine how the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

Environmental Insurance Litigation. Grace is a party to three pending environmental insurance coverage actions. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed in 1988). This litigation involves Grace's coverage claims against a primary-level carrier, Continental Casualty Company, for environmental property damage. In 2001, Grace appealed certain rulings by the U.S. District Court for the Southern District of New York. In June 2003, the U.S. District Court of Appeals for the Second Circuit affirmed certain rulings dismissing Grace's claims for coverage of defense costs under certain policy years, but vacated the District Court's ruling dismissing coverage for defense costs under the last policy year at issue. The case was remanded to the District Court for further proceedings. A trial on the remaining issues has been scheduled for the fourth quarter of 2004. The second case, entitled Uniguard v. W. R. Grace, was filed in 1997 in the U.S. District Court for the Southern District of New York. This declaratory judgment

15

action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. This case has been stayed as a result of Grace's Chapter 11 filing. In June 2000, a separate lawsuit was filed in the U.S. District Court for the Southern District of New York against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining and processing operations. This case has been stayed as a result of Grace's Chapter 11 filing. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

For further information, see "Environmental, Health and Safety Matters" under Item 1 above, Note 14 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Litigation Related to Former Packaging and Medical Care Businesses. In September 2000, Grace was named in a purported class action suit filed in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. Since Abner, and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of Grace's estate. On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $487 million as of December 31, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement has not been agreed to by Grace and remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Upon the effectiveness of these settlements the Abner and all similar actions will be dismissed. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Tax Claims. Grace has received the examination report from the Internal Revenue Service (the "IRS") for tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments, including accrued interest. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period was under the jurisdiction of the IRS Office of Appeals ("IRS Appeals"), where Grace filed a protest. IRS Appeals has returned the audit to the examination team for further review of the proposed adjustments as well as several affirmative tax claims raised by Grace. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. In addition, Grace will be required to report the additional taxable income (and the related accrued interest)

16

resulting from IRS adjustments to state and local tax jurisdictions upon resolution of the Federal tax audit. Grace believes that the impact of probable tax return adjustments are adequately recognized as liabilities at December 31, 2003. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued additional assessments aggregating $40.1 million for the 1996 through 1998 tax periods. The statute of limitations has expired with respect to the 1999 tax year. Grace has a right to indemnification for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998 from its former partner in the business. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

Other Claims Received Prior to the Bar Date. The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to ZAI, which will be dealt with separately. Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage (discussed above), and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim have been filed after the bar date.

17

The medical monitoring claims were made by individuals due to alleged exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. Based on the number and expected value of such claims, Grace does not believe such claims will have a material effect on its Consolidated Financial Statements.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views certain of these claims as contingent and does not plan to address them until a later date in the Chapter 11 proceeding. In addition to claims for environmental remediation or indemnification (discussed above), the remaining non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; leases and other executory contracts rejected in the Bankruptcy Court; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos related litigation; and non-asbestos related personal injury.

Grace's initial analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2003, Grace had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). As of December 31, 2003, orders had been entered expunging 890 claims, and 177 of the objections had been withdrawn on the basis of responses received from the claimants. Grace expects to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses.

At this time, Grace believes that its recorded liabilities are sufficient to cover the remaining types of claims. However, because of the uncertainties of the Chapter 11 and litigation process, the in-progress state of Grace's investigation of submitted claims, and the lack of documentation submitted in support of many claims, the amounts required to satisfy all such claims may exceed such recorded liabilities. As claims are resolved, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.


ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2003.


PART II


ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-35); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the caption "Market price of common stock" (page F-34); and in Note 15 to the Consolidated Financial Statements (page F-27).

On March 31, 1998, the Company paid a dividend of one Preferred Stock Purchase Right ("Right") on each share of the Company's Common Stock. Subject to prior redemption by the Company for $.01 per Right, Rights will become exercisable on the earlier of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the outstanding Common Stock or (b) 10

business days (or a later date fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the Common Stock. Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights do not have voting or dividend rights.

Generally, each Right not owned by an Acquiring Person (i) will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"); (ii) will entitle such holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right; and (iii) may be exchanged by the Company for one share of Common Stock or one hundredth of a share of Junior Preferred Stock, subject to adjustment. Generally, if there is an Acquiring Person and the Company is acquired, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the Right.

Each share of Junior Preferred Stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Common Stock whenever such dividend is declared. In the event of liquidation, holders of Junior Preferred Stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Common Stock. Each share of Junior Preferred Stock will have 100 votes, voting together with the Common Stock. Finally, in the event of any business combination, each share of Junior Preferred Stock will be entitled to receive an amount equal to 100 times the amount received per share of Common Stock. These rights are protected by customary antidilution provisions.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights. The Rights are currently scheduled to expire on March 31, 2008. As a result of Grace's Chapter 11 filing, the rights could be modified in a plan of reorganization.

This summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as Exhibit 4.1 to the Company's Form 8-K filed on April 8, 1998.


ITEM 6. SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-35 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-20, and F-22 through F-27 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-50) of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1999-2003.


ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND
        FINANCIAL CONDITION

The information called for by this Item appears on pages F-36 to F-48 of the Financial Supplement, which is incorporated herein by reference.

19

ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

     The information called for by this Item appears in Notes 12 and 13 to the
Consolidated Financial Statements (pages F-23 and F-24 of the Financial
Supplement), which is incorporated herein by reference.


ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

     See the Index to Consolidated Financial Statements and Financial Statement
Schedule and Exhibit on page F-2 of the Financial Supplement, which is
incorporated herein by reference.


ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE

     This Item is inapplicable, as no such changes or disagreements have
occurred.


ITEM 9A.  CONTROLS AND PROCEDURES

     The information called for by this Item appears under the heading "Report
on Internal Controls and Procedures" on page F-51 of the Financial Supplement,
which is incorporated herein by reference.


                              PART III


ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

     The Company's current directors and executive officers are listed below.
The Company's Certificate of Incorporation provides for the division of the
Board of Directors into three classes, each to serve for a three-year term or
until their respective successors are elected. In view of the Chapter 11 filing,
the directors are expected to continue to serve beyond the expiration of their
respective current terms. Executive officers are elected to serve until the next
annual meeting of the Company's Board of Directors or until their respective
successors are elected. Each of the directors, other than the Chief Executive
Officer, meets the independence standards of the New York Stock Exchange.

| Name and Age | Office | First Elected |
| ------------ | ------ | ------------- |
| John F. Akers (69) | Class II Director | 05/09/97 |
| H. Furlong Baldwin (72) | Class I Director | 01/16/02 |
| Ronald C. Cambre (65) | Class III Director | 09/01/98 |
| Marye Anne Fox (56) | Class I Director | 05/10/96 |
| John J. Murphy (72) | Class II Director | 05/09/97 |
| Paul J. Norris (56) | Class III Director (Chairman) | 01/01/99 |
|  | Chief Executive Officer | 11/01/98 |

                                 20

| Name and Age | Office | First Elected |
| --- | --- | --- |
| Thomas A. Vanderslice (72) | Class I Director and Lead Director | 05/10/96 |
| Robert J. Bettacchi (61) | Senior Vice President | 04/01/97 |
| William M. Corcoran (54) | Vice President | 05/11/99 |
| Alfred E. Festa (44) | President and Chief Operating Officer | 11/17/03 |
| W. Brian McGowan (54) | Senior Vice President | 12/06/90* |
| David B. Siegel (54) | Senior Vice President, General Counsel and Chief Restructuring Officer | 09/01/98* |
| Robert M. Tarola (53) | Senior Vice President and Chief Financial Officer | 05/11/99 |

*  Designated an Executive Officer on July 9, 1998

    Mr. Akers served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is also a director of Hallmark Cards, Inc., Lehman Brothers Holdings, Inc., The New York Times Company and PepsiCo, Inc.

    Mr. Baldwin served as a director of Mercantile Bankshares Corporation from 1970 to 2003, and as Chairman of the Board from 1984 to 2003. From 1976 to 2001 he served as President and Chief Executive Officer. Mr. Baldwin is a Co-Chairman of NASDAQ Stock Market, Inc., and also a director of Platinum Underwriters Holdings, Ltd. and Allegheny Energy Inc.

    Mr. Cambre is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc., McDermott International, Inc. and Inco Limited.

    Dr. Fox is Chancellor of North Carolina State University and University Distinguished Professor of Chemistry at that institution. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pharmaceutical Product Development, Inc.

    Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of CARBO Ceramics, Inc. and ShawCor Ltd.

    Mr. Norris has been actively engaged in Grace's business for the past five years. He is also a director of Borden Chemical, Inc. In addition, he performs advisory services for Kolberg, Kravis Roberts & Co., the principal shareholder of Borden.

    Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is also a director of ChevronTexaco Corporation. As lead director of Grace's Board, he presides at all executive sessions.

21

Messrs. Bettacchi, McGowan and Siegel have been actively engaged in Grace's business for the past five years.

Mr. Corcoran previously served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's (now Honeywell International Inc.) specialty chemicals business from 1997 until he joined Grace.

Mr. Festa joined Grace from Morganthaler Private Equity Partners, a venture capital and buyout firm, where he was a partner. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer from 1998 until May 1999. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 until 1996, Mr. Tarola was an employee and partner of Price Waterhouse LLP.

Audit Committee. The Company has a standing Audit Committee established in accordance with SEC rules. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, and Thomas A. Vanderslice, each of whom meet the independence standards of the SEC and New York Stock Exchange. The Board of Directors of the Company has determined that all Committee members are audit committee financial experts as defined by SEC regulations.

Compliance with Section 16(a) of the Securities Exchange Act. Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock or other securities of the Company; such persons are also required to furnish the Company with copies of such reports. Based upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2003, except that Mr. Tarola filed a Form 4 Report on March 5, 2003 that was due on February 12, 2003. This transaction involved an inadvertent transfer of 50 shares of Grace common stock (having a value of $130.50) in connection with a rebalancing of Mr. Tarola's 401(k) savings plan portfolio.

Code of Ethics for Principal Officers. The Board of Directors of the Company and its Audit Committee have adopted revised Business Ethics and Conflicts of Interest policies, which apply to all of the Company's directors, officers, and employees, including the Company's principal officers. These policies are accessible through the Company's Internet website, www.grace.com under the "Corporate Governance" heading, and are available in hard copy upon request. The Company granted no waivers to these policies during 2003. Any amendments or waivers to these policies affecting any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions for the Company will be promptly posted on the website.


ITEM 11. EXECUTIVE COMPENSATION

Summary Compensation Table. The following Summary Compensation Table contains information concerning the compensation of (a) Paul J. Norris, Chief Executive Officer; and (b) the other four most highly compensated executive officers of Grace who were serving as such at year-end 2003. Certain information has been omitted from the Summary Compensation Table because it is not applicable or because it is not required under the rules of the SEC.

22

| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | Awards No. of Shares Underlying Options Granted | Payouts LTIP Payouts | All Other Compensation (a) |
|---|---|---|---|---|---|---|---|
| P. J. Norris | 2003 | $1,000,000 | $1,000,000 | --- | --- | --- | $1,349,800 |
| Chairman and Chief Executive | 2002 | 958,333 | 1,010,000 | --- | --- | --- | 587,808 |
| Officer | 2001 | 887,500 | 936,250 | --- | 121,000 | --- | 1,457,298 |
| R. J. Bettacchi | 2003 | 370,667 | 300,000 | --- | --- | --- | 279,663 |
| Senior Vice President | 2002 | 358,000 | 265,000 | --- | --- | --- | 30,597 |
| | 2001 | 345,340 | 275,000 | --- | 35,000 | --- | 366,346 |
| W. M. Corcoran | 2003 | 287,667 | 155,000 | --- | --- | --- | 213,143 |
| Vice President | 2002 | 277,667 | 155,000 | --- | --- | --- | 33,463 |
| | 2001 | 267,333 | 150,000 | --- | 12,300 | --- | 283,428 |
| D. B. Siegel | 2003 | 421,333 | 250,000 | --- | --- | --- | 338,497 |
| Senior Vice President and | 2002 | 408,000 | 265,000 | --- | --- | --- | 244,448 |
| General Counsel | 2001 | 370,000 | 240,000 | --- | 21,800 | --- | 627,915 |
| R. M. Tarola | 2003 | 398,667 | 245,000 | --- | --- | --- | 298,163 |
| Senior Vice President and | 2002 | 388,000 | 250,000 | --- | --- | --- | 33,147 |
| Chief Financial Officer | 2001 | 374,500 | 250,000 | --- | 27,900 | --- | 374,277 |

(a)  The amounts in this column for 2003 consist of the following:

   (i)     retention payments made as follows: Mr. Norris -- $1,235,000; Mr.
           Bettacchi -- $240,933; Mr. Corcoran -- $186,983; Mr. Siegel --
           $273,867; and Mr. Tarola -- $259,133; See "Retention Agreements"
           for a description of the retention arrangements entered into with
           the executive officers, and "Employment Agreements" for a
           description of Mr. Norris's retention arrangements;

   (ii)    payments made to persons whose personal and/or Company
           contributions to Grace's Salaried Employees Savings and
           Investment Plan ("Savings Plan") would be subject to limitations
           under federal income tax law, as follows: Mr. Norris -- $101,550;
           Mr. Bettacchi -- $25,980; Mr. Corcoran -- $13,660; Mr. Siegel --
           $26,880; and Mr. Tarola -- $26,280;

   (iii)   Company contributions to the Savings Plan, as follows: Mr. Norris
           -- $12,000; Mr. Bettacchi -- $12,000; Mr. Corcoran -- $12,000;
           Mr. Siegel -- $12,000; and Mr. Tarola -- $12,000;

   (iv)    the value of Company-provided personal liability insurance, as
           follows: Mr. Norris -- $1,250; Mr. Bettacchi -- $750; Mr.
           Corcoran -- $500; Mr. Siegel -- $750; and Mr. Tarola -- $750; and

   (v)     for Mr. Siegel, $25,000 of forgiveness of indebtedness income
           under the terms of a relocation loan made in April 2002, the
           balance of which was $32,300 as of December 31, 2003.

     Stock Options. Grace granted no stock options during 2003, and no
previously granted options were exercised by the named individuals during 2003.
The following table sets forth the value of unexercised "in-the-money" options
held at December 31, 2003 (the difference between the aggregate purchase price
of all such options held and the market value of the shares covered by such
options at December 31, 2003).

23

| Name | No. of Shares Underlying Unexercised Options at 12/31/03 Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at 12/31/03 Exercisable/Unexercisable |
|---|---|---|
| P. J. Norris ........... | 1,124,692 / 40,334 | $18,553 / $9,277 |
| R. J. Bettacchi ........ | 533,938 / 11,667 | $5,367 / $2,683 |
| W. M. Corcoran ......... | 80,700 / 4,100 | $1,886 / $943 |
| D. B. Siegel ........... | 372,728 / 7,267 | $3,343 / $1,671 |
| R. M. Tarola ........... | 193,600 / 9,300 | $4,278 / $2,139 |

Long-Term Incentive Program. The Company's long-term incentive plans generally are designed to provide key employees with long-term incentives having a value at the 60th percentile of long-term incentives offered by specialty chemical companies of comparable size to Grace. In 2001, the Company's Board of Directors approved a Long-Term Incentive Plan for key employees ("2001 LTIP") for the 2001-2003 period. For each key employee, the targeted value of the 2001 LTIP award was split so that 50% of the value of the award was provided in the form of a stock option grant, and 50% was in the form of cash compensation, payable if the Company achieves certain pretax earnings targets over a three calendar year period. No payments will be made under the cash compensation portion of the 2001 LTIP.

In 2002, the Board and the Bankruptcy Court approved the 2002 LTIP for the 2002-2004 period. The 2002 LTIP operates in substantially the same manner as the 2001 LTIP, except that the targeted value of the 2002 LTIP award is payable 100% in cash, and the pretax earnings targets have been revised. If a key employee becomes entitled to cash compensation under the 2002 LTIP, then such compensation will generally be paid in two installments: one in the first quarter of 2004 (which will be a partial payment based on performance for the first two years of the applicable three-year period), and the other in the first quarter of 2005 (which will consider performance for the complete three-year period and will be offset by the amount of the prior installment). Generally, a key employee will forfeit his or her rights to receive an installment of cash compensation if, prior to the payment of the installment, the employee either voluntarily resigns from the Company or is terminated by the Company for cause.

In 2003, the Board and the Bankruptcy Court approved the 2003 LTIP for the 2003-2005 period. The 2003 LTIP operates in substantially the same manner as the 2002 LTIP, with revised pretax earnings targets. The following table sets forth threshold, targeted and maximum awards under the 2003 LTIP:

| Name | No. of Shares, Units Or Other Rights | Performance or Other Period Until Maturation or Payout | Estimated Future Payouts Under Non-Stock Price-Based Plans | | |
|---|---|---|---|---|---|
| | | | Threshold(a) | Target | Maximum |
| P. J. Norris | $1,452,000 | 2003-2005 | $0 or $24,248 | $1,452,000 | $2,904,000 |
| R. J. Bettacchi | 420,000 | 2003-2005 | $0 or $ 7,014 | 420,000 | 840,000 |
| W. M. Corcoran | 150,000 | 2003-2005 | $0 or $ 2,505 | 150,000 | 300,000 |
| D. B. Siegel | 335,000 | 2003-2005 | $0 or $ 5,595 | 335,000 | 670,000 |
| R. M. Tarola | 335,000 | 2003-2005 | $0 or $ 5,595 | 335,000 | 670,000 |

(a) No payment will be made unless the minimum targeted level of pretax earnings is achieved.

24

Pension Arrangements. Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in the Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and annual incentive compensation (bonus) awards; however, for 2003, federal income tax law limited to $200,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace no longer permits deferrals of base salary or incentive compensation.)

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2003, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| $100,000 | $15,000 | $22,500 | $30,000 | $37,500 | $45,000 | $52,500 |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,100,000 | 165,000 | 247,500 | 330,000 | 412,500 | 495,000 | 577,500 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,300,000 | 195,000 | 292,500 | 390,000 | 487,500 | 585,000 | 682,500 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,500,000 | 225,000 | 337,500 | 450,000 | 562,500 | 675,000 | 787,500 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,700,000 | 255,000 | 382,500 | 510,000 | 637,500 | 765,000 | 892,500 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 1,900,000 | 285,000 | 427,500 | 570,000 | 712,500 | 855,000 | 997,500 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,100,000 | 315,000 | 472,500 | 630,000 | 787,500 | 945,000 | 1,102,500 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |

At December 31, 2003, Messrs. Norris, Bettacchi, Corcoran, Siegel and Tarola had 11.83, 32, 4.56, 26.75 and 4.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.) For purposes of those plans, the 2003 compensation of such executive officers was as follows: Mr. Norris -- $2,010,000; Mr. Bettacchi -- $635,667; Mr. Corcoran -- $442,667; Mr. Siegel -- $686,333; and Mr. Tarola -- $648,667. Messrs. Norris, Corcoran and Tarola are entitled to additional pension benefits under their employment agreements (see "Employment Agreements").

Employment Agreements. Paul J. Norris. Effective January 1, 2003, Mr. Norris entered into a letter agreement with Grace (the "Letter Agreement"), whereby his employment agreement, dated October 26, 1998 (the "1998 Agreement"), was extended beyond its original termination date of December 31, 2002, and was amended as described herein. Under the Letter Agreement, Mr. Norris' employment with Grace will continue until terminated by Grace or Mr. Norris. Except as amended by the Letter Agreement, the provisions of the 1998 Agreement remain applicable to Mr. Norris during his post-2002 employment term with Grace.

Under the 1998 Agreement, during his post-2002 employment term, Mr. Norris will continue to be entitled to an annual base salary of not less than $875,000. In addition, he will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary. (As of January 1, 2004, Mr. Norris' annual base salary is $1,000,000 and his targeted percentage for his annual incentive compensation award is 125%.)

Under the terms of the Letter Agreement, on December 31, 2003, Mr. Norris received a $1,235,000 retention bonus for services performed during 2003. Mr. Norris is eligible to receive, on December 31, 2004, an additional retention bonus of $1,235,000 for services performed during 2004. Pursuant to a separate agreement, Mr. Norris has agreed that 50% of such amount will be paid on December 31, 2004, and the remaining 50% will be subject to the achievement of specified earnings targets for 2004 and, to the extent achieved, will be paid in the first quarter of 2005. Mr. Norris will not receive a 2004 retention bonus if, prior to December 31, 2004, he is terminated by Grace for cause. In addition, Mr. Norris will not receive a 2004 retention bonus, if prior to December 31, 2004, he resigns his employment with Grace, unless such resignation is on the basis of constructive discharge. If Mr. Norris' employment is terminated on the basis of constructive discharge (or as a result of his death or disability) during 2004, then he (or his beneficiary, in the case of death) will be entitled to a payment of a pro-rated portion of the actual retention bonus otherwise payable for such year, based on the portion of such year that he remained an employee of Grace.

Under the 1998 Agreement, during his post-2002 employment term with Grace, if Mr. Norris' employment is terminated by Grace without cause or by Mr. Norris on the basis of constructive discharge, then he will be entitled to receive a severance payment equal to two times the dollar amount that equals 175% of his annual base salary at the time of such termination. Such payment will be made in a lump sum immediately after Mr. Norris' date of termination.

Under the Letter Agreement, Mr. Norris is obligated to provide Grace with at least 180 days written prior notice of his intention to resign his employment with Grace in order to receive certain benefits and payments upon termination, which were originally specified under the 1998 Agreement. Specifically, if Mr. Norris provides such timely notice, he will receive the following benefits and payments upon termination: (1) an award under Grace's annual incentive compensation program for the calendar year of termination, which will be pro-rated based on the portion of such calendar year that he remained an employee of Grace, (2) a supplemental pension payment (described below), (3) principal residence relocation assistance (described below), and (4) a payment of the cash component of any award made to Mr. Norris under Grace's long-term incentive plans, which will be pro-rated based on the portion of the applicable 3-year performance period that he remained an employee of Grace. Under the Letter Agreement, Mr. Norris will also be entitled to these

26

benefits and payments if his employment is terminated by Grace for any reason except cause. If Mr. Norris' employment is terminated for cause, he will not be entitled to those benefits and payments.

If Mr. Norris becomes entitled to a supplemental pension payment as referenced above, then in determining the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, his years of service with Grace and his prior employer will be recognized as if those years were continuous service with Grace, with an offset for any retirement benefits payable from his prior employer's retirement plans. Such payment would be made in a lump sum immediately after Mr. Norris' date of termination.

Also, if Mr. Norris does not receive supplemental retirement benefits under any Grace plan (as a result of any reduction regarding such a plan pursuant to any Chapter 11 proceeding or otherwise), then such supplemental benefits will become payable to Mr. Norris under his employment agreement.

If Mr. Norris becomes entitled to the principal residence relocation assistance referenced above, Grace will provide him with relocation assistance to any location within the continental United States selected by Mr. Norris. Such relocation assistance would include certain cash payments and other relocation assistance, as well as compensation for any loss incurred on the sale of his Maryland home.

The 1998 Agreement also provides for Mr. Norris' participation in other benefits and compensation programs, including benefits and programs generally available to other senior executives of Grace.

The forgoing description of Mr. Norris' employment agreement does not purport to be complete and is qualified in its entirety by reference to the 1998 Agreement, which has been filed with the SEC as Exhibit 10.20 to Grace's 2000 Annual Report on Form 10-K, and by reference to the Letter Agreement, which has been filed with the SEC as Exhibit 10.19 to Grace's 2002 Annual Report on Form 10-K.

William M. Corcoran. Mr. Corcoran had an employment agreement with Grace that expired on May 31, 2002. Under terms of the agreement that survived the expiration date, if Mr. Corcoran is terminated without cause, he will generally be entitled to a severance payment equal to 137% of his annual base salary at the time of termination. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.24 to Grace's 2000 Annual Report on Form 10-K.

Alfred E. Festa. Mr. Festa has a three year employment agreement with Grace dated November 17, 2003, his first day of employment with Grace. Under the agreement, Mr. Festa is entitled to an initial annual base salary of $550,000. He is also entitled to participate in the Company's Annual Incentive Compensation Program. Under the agreement, for 2003 he was entitled to 100% of base salary for the portion of 2003 during which he was actually employed by the Company. For 2004 his targeted award will be 100% of his annual base salary earned during such year;. For 2005 and thereafter, his targeted award will be 75% (or greater, if determined by the Company's Board) of his annual base salary earned during the applicable year.

27

Under the agreement, Mr. Festa will also participate in the Company's currently effective LTIPs for the 2002-2004 and 2003-2005 performance periods. His targeted award under each of the LTIPs is $687,000. However, any award to which he becomes entitled under either of the LTIPs will be pro-rated to reflect the percentage of days that he was an active employee of the Company during the applicable performance period.

Also, under terms of the agreement, if Mr. Festa's employment is terminated by the Company without cause, or by him as a result of constructive discharge, prior to the expiration of his employment agreement, he will be entitled to a severance payment equal to 1.5 times 175% of his annual base salary at the time of his termination. Mr. Festa would also be entitled to such a severance payment if he terminates his employment with the Company in the event that he is not offered the position of Chief Executive Officer upon the departure of Mr. Norris. In addition, the agreement provides that Mr. Festa is eligible to participate in other compensation and benefit plans and programs that are provided to the other senior officers of the Company. The foregoing description of Mr. Festa's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.27 to this Report Form.

David B. Siegel. Under terms of a January 1, 2001 agreement, Mr. Siegel continues to be entitled to an enhanced severance payment equal to two times his annual base salary if his employment is involuntarily terminated without cause under circumstances that would qualify him for severance pay under Grace's severance plan that generally covers salaried employees. In addition, on January 1, 2002, under the terms of such agreement, Mr. Siegel relocated from Florida to Columbia, Maryland, and received the relocation benefits generally available to all Grace employees who relocated to Maryland in conjunction with the relocation of Grace's corporate headquarters. Grace has further agreed to provide Mr. Siegel with post-employment relocation assistance (on the terms of the relocation policy in effect for active employees) under certain conditions; this further agreement has not yet been finalized.

Robert M. Tarola. Mr. Tarola had an employment agreement that expired on November 10, 2002. Under terms of the agreement that survived the expiration date, if Mr. Tarola is terminated without cause, he will generally be entitled to a severance payment equal to 145% of his annual base salary at the time of termination. (However, along with the other executive officers and certain key employees of Grace, Mr. Tarola has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional year of credited service (up to a maximum of 10 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.1 to Grace's Quarterly Report on Form 10-Q for the quarter ended June 30, 1999.

Change-in-Control Severance Agreements. In addition to the severance provisions described under "Retention Agreements" below, Grace has severance agreements with all of its executive officers, which renew automatically unless the Board of Directors of the Company elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means

28

the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the company resulting from such transaction, or the liquidation or dissolution of Grace. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC as Exhibit 10.17 to Grace's 2002 Annual Report on Form 10-K. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition by a trust of Common Stock, established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel (and Mr. Festa, who did not join Grace until November 2003), whose retention arrangements were covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace through December 31, 2002. The retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such officer becomes entitled to severance under both the terms of the retention agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Grace has implemented a new retention program for 2003 and 2004 under which each executive officer (except for Mr. Norris, whose retention arrangement is covered by separate agreements, and Mr. Festa) would be entitled to receive a payment equal to 65% of his base salary if the officer remains employed with Grace for the entire year. The payment of the 2003 retention bonus was made to each eligible executive officer at the end of 2003. For 2004, 50% of the retention bonus is contingent upon the achievement of specified earnings targets for such year. Therefore, 50% of such retention bonus will be paid to each eligible executive at the end of 2004, and the remaining bonus, if any, will be paid during the first quarter of 2005. These retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs.

Executive Salary Protection Plan. All executive officers participate in the Executive Salary Protection Plan ("ESPP"), which provides that, in the event of a participant's disability or death prior to age 70, Grace will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the ESPP may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the ESPP does not purport to be complete and is qualified in its entirety by reference to the text of the ESPP, as amended, which is filed as Exhibit 10.8 to Grace's 2001 Annual Report on Form 10-K.

Effect of Chapter 11 Filing. The U.S. Bankruptcy Court has approved the employment agreements and the continuation of the executive compensation and benefit agreements and programs described above.

29

The continuation of these agreements and programs, and the establishment of new programs may be affected by the Chapter 11 proceedings.

Directors' Compensation. Under the compensation program for nonemployee directors in effect for 2003, each nonemployee director received an annual retainer of $50,000, 50% of which was paid in cash and 50% of which was paid in the form of Common Stock. In addition, directors received $4,000 ($5,000 for directors holding a committee chair) in cash for each meeting date in respect of the Board meeting and all committee meetings held on such date. The same compensation program will be effective during 2004. Grace reimburses nonemployee directors for expenses they incur in attending Board and committee meetings. Grace also maintains business travel accident insurance coverage for them.

Compensation Committee Interlocks and Insider Participation. During 2003, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Baldwin, Cambre, Murphy and Vanderslice, and Dr. Fox. None of such persons is a current or former officer or employee of Grace or any of its subsidiaries, nor did any of such persons have any reportable transactions with Grace or any of its subsidiaries.


ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Security Ownership. The following table sets forth the Common Stock beneficially owned, directly or indirectly, as of January 31, 2004 by (1) each person known to Grace to be the beneficial owner of more than 5% of the outstanding shares of Common Stock, and (2) each current director, each of the executive officers named in the Summary Compensation Table set forth in Item 11 above, and such directors and all executive officers as a group.

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| Peninsula Partners, L.P. (1).................... 404B East Main Street, 2nd Floor Charlottesville, VA 22902 | 10,765,600 | | 16.41% |
| J. F. Akers ................................... | 38,996 | | * |
| | 74,535 | (O) | |
| | 15,196 | (T) | |
| H. F. Baldwin ................................. | 21,918 | | * |
| R. J. Bettacchi .............................. | | | * |
| | 545,605 | (O) | |
| | 24,675 | (T) | |
| R. C. Cambre ................................. | 64,135 | | * |
| W. M. Corcoran ............................... | 10,000 | | * |
| | 84,800 | (O) | |
| | 1,265 | (T) | |
| M. A. Fox .................................... | 41,246 | | * |
| | 8,942 | (T) | |

30

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| J. J. Murphy ................................... | 38,930 | | * |
| | 15,528 | (O) | |
| | 18,629 | (T) | |
| P. J. Norris ................................... | 138,822 | | 1.95% |
| | 1,165,026 | (O) | |
| | 1,071 | (T) | |
| D. B. Siegel ................................... | 15,100 | | * |
| | 379,995 | (O) | |
| | 20,832 | (T) | |
| R. M. Tarola  ................................. | 15,000 | | * |
| | 202,900 | (O) | |
| T. A. Vanderslice ............................. | 39,522 | | * |
| | 69,876 | (O) | |
| | 14,932 | (T) | |
| Directors and executive officers as a group ... | 433,669 | | 4.52% |
| | 2,864,545 | (O) | |
| | 121,960 | (T) | |

*         Indicates less than 1%

(O)       Shares covered by stock options exercisable on or within 60 days after January 31, 2004.

(T)       Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1)       The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

     Equity Compensation Plan Information. The following table sets forth information as of December 31, 2003 with respect to Grace's compensation plans under which shares of Common Stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options. All such plans have been approved by Grace's shareholders.

| Plan category | Number of securities to be issued upon exercise of outstanding options (a) | Weighted-average exercise of outstanding options (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 9,582,789 | $12.02 | 4,474,004 |

31

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Commercial Transactions. During 2003, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was (or will become) a party.

Legal Proceedings; Indemnification. During 2003 there were no legal proceedings pending in which any current officers or directors of the Company were parties adverse to, or had a material interest adverse to, the Company.


ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

The Audit Committee of the Board of Directors of Grace selected PricewaterhouseCoopers LLP ("PwC") to continue to act as Grace's principal independent accountants for 2003. The following table sets forth the fees incurred by Grace for the services of PwC for the years ended December 31, 2003 and 2002:

|                   | 2003       | 2002       |
|-------------------|------------|------------|
| Audit Fees        | $1,763,000 | $1,587,000 |
| Audit-Related Fees| 210,500    | 198,000    |
| Tax Fees          | 133,000    | 160,000    |
| All Other Fees    | -          | 988,000    |
| Total Fees        | $2,106,500 | $2,933,000 |

Audit Services consisted of the audit of Grace's consolidated financial statements, the review of its consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

Audit-Related Services consisted of financial statement audits of Grace's U.S. employee benefit plans and the audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company).

Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns.

All Other Services consisted of expert services related to environmental litigation.

The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of Grace's consolidated financial statements. The policy also provides for general preapproval of certain audit-related, tax and other services, up to a specified dollar amount for each year. Services in excess of such dollar amounts and any other services must be specifically preapproved by the Audit Committee. However, the chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2003, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above.

PART IV

ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

      Financial Statements and Schedules. See the Index to Consolidated Financial
Statements and Financial Statement Schedule and Exhibit on page F-2 of the
Financial Supplement.

      Reports on Form 8-K. The following reports on Form 8-K were filed during
the fourth quarter of 2003: October 24, 2003 - Press release announcing Grace's
financial results for the third quarter of 2003.

      Exhibits. The exhibits to this Report are listed below. Other than exhibits
that are filed herewith, all exhibits listed below are incorporated by
reference. Exhibits indicated by an asterisk (*) are the management contracts
and compensatory plans, contracts or arrangements required to be filed as
exhibits to this Report.

      For purposes of describing these exhibits, "Old Grace" means W. R. Grace &
Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a
predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New
York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a
predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 10-K (filed 3/28/02) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98; SEC File No. 001-13953) |

33

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.6 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed March 13, 2003) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed March 13, 2003)* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed March 13, 2003)* |

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Filed herewith* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |
| 10.9 | W. R. Grace & Co. 1986 Stock Incentive Plan, as amended | Exhibit 10.9 to Form 10-K (filed 3/28/02)* |
| 10.10 | W. R. Grace & Co. 1989 Stock Incentive Plan, as amended | Exhibit 10.10 to Form 10-K (filed 3/28/02)* |
| 10.11 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02)* |
| 10.12 | Forms of Stock Option Agreements | Exhibit 10.15 to Form 10-K (filed 3/29/99)* |
| 10.13 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.14 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98; SEC File No. 001-13953)* |
| 10.15 | Form of 2001-2003 Long Term Incentive Program Award | Exhibit 10.23 to Form 10-K (filed 4/16/01)* |
| 10.16 | Form of 2002-2004 Long-Term Incentive Program Award | Exhibit 10.16 to Form 10-K (filed March 13, 2003)* |
| 10.17 | Form of Executive Severance Agreement between W. R. Grace & Co. and officers | Exhibit 10.17 to Form 10-K (filed March 13, 2003)* |
| 10.18 | Employment Agreement, dated January 1, 2001, by and between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.19 | Amendment dated November 6, 2002 to Employment Agreement between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.19 to Form 10-K (filed March 13, 2003)* |
| 10.20 | Employment Agreement dated May 11, 1999 between W. R. Grace & Co.-Conn. and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |

35

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 10.21 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of W. R. Grace & Co., and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.22 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of W. R. Grace & Co., and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Officers and Directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.24 | Form of Retention Agreement for 2001-2002 | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.25 | Form of Retention Agreement for 2003 | Exhibit 10.25 to Form 10-K (filed March 13, 2003)* |
| 10.26 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed March 13, 2003)* |
| 10.27 | Letter Agreement dated November 17, 2003 between Paul J. Norris, on behalf of W. R. Grace & Co., and Fred Festa | Filed herewith* |
| 10.28 | Form of Retention Agreement for 2004 | Filed herewith* |
| 10.29 | Form of 2003-2005 Long-Term Incentive Program Award | Filed herewith* |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2003 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2003 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 31.1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 31.2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

37

SIGNATURES

          Pursuant to the requirements of Section 13 or 15(d) of the
Securities Exchange Act of 1934, the registrant has duly caused this Report to
be signed on its behalf by the undersigned, thereto duly authorized.

                              W. R. GRACE & CO.


                              By: /s/ Paul J. Norris
                                 -------------------------
                                  Paul J. Norris
                                  (Chairman and
                                  Chief Executive Officer)


                              By: /s/ Robert M. Tarola
                                 -------------------------
                                  Robert M. Tarola
                                  (Senior Vice President and
                                  Chief Financial Officer)

Dated: March 5, 2004

     Pursuant to the requirements of the Securities Exchange Act of 1934, this
Report has been signed below by the following persons on behalf of the
registrant and in the capacities indicated on March 5, 2004.

     Signature                        Title
     ---------                        -----

     J. F. Akers*                 }
     H. F. Baldwin*               }
     R. C. Cambre*                }
     M. A. Fox*                   }    Directors
     J. J. Murphy*                }
     T. A. Vanderslice*           }


   /s/  Paul J. Norris                Chief Executive Officer and Director
------------------------------       (Principal Executive Officer)
      (Paul J. Norris)


    /s/ Robert M. Tarola             Senior Vice President and Chief
------------------------------       Financial Officer (Principal
      (Robert M. Tarola)             Financial Officer and Principal
                                     Accounting Officer)



---------------------------------
*    By signing his name hereto, Mark A. Shelnitz is signing this document on
     behalf of each of the persons indicated above pursuant to powers of
     attorney duly executed by such persons and filed with the Securities and
     Exchange Commission.

                              By: /s/ Mark A. Shelnitz
                                 ------------------------------
                                  Mark A. Shelnitz
                                  (Attorney-in-Fact)


                              38

FINANCIAL SUPPLEMENT


W. R. GRACE & CO.
ANNUAL REPORT ON FORM 10-K
FOR THE YEAR ENDED DECEMBER 31, 2003




FINANCIAL SUPPLEMENT
TO
ANNUAL REPORT ON FORM 10-K FOR THE YEAR
ENDED DECEMBER 31, 2003

W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

Management's Responsibility for Financial Reporting................  F-3
Report of Independent Auditors......................................  F-4
Report of Independent Auditors on Financial Statement Schedule.....  F-5
Consent of Independent Accountants.................................  F-5
Consolidated Statements of Operations for the three years in the
    period ended December 31, 2003.................................  F-6
Consolidated Statements of Cash Flows for the three years in the
    period ended December 31, 2003.................................  F-7
Consolidated Balance Sheets at December 31, 2003 and 2002..........  F-8
Consolidated Statements of Shareholders' Equity (Deficit) for
    the three years in the period ended December 31, 2003..........  F-9
Consolidated Statements of Comprehensive (Loss) Income for
    the three years in the period ended December 31, 2003..........  F-9
Notes to Consolidated Financial Statements.........................  F-10 - F-34
Financial Summary..................................................  F-35
Management's Discussion and Analysis of Results of Operations
    and Financial Condition........................................  F-36 - F-48

Financial Statement Schedule
    Schedule II - Valuation and Qualifying Accounts and Reserves....  F-49

Exhibit 12:  Computation of Ratio of Earnings to Fixed Charges
    and Combined Fixed Charges and Preferred Stock Dividends........  F-50

Report on Internal Controls and Procedures ........................  F-51

The financial data listed above appearing in this Financial Supplement are
incorporated by reference herein. The Financial Statement Schedule should be
read in conjunction with the Consolidated Financial Statements and Notes
thereto. Financial statements of less than majority-owned persons and other
persons accounted for by the equity method have been omitted as provided in Rule
3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement
Schedules not included have been omitted because they are not applicable or the
required information is shown in the Consolidated Financial Statements or Notes
thereto.

MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal controls to assist it in fulfilling its responsibility for financial reporting. These internal controls consist of the control environment, risk assessment, control activities, information and communication, and monitoring. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent auditors to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent auditors. Grace's financial management, internal auditors and independent auditors have direct and confidential access to the Audit Committee at all times.

The independent auditors are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with auditing standards generally accepted in the United States of America. These standards require an assessment of the systems of internal controls and tests of transactions to the extent considered necessary by the independent auditors for purposes of supporting their opinion as set forth in their report.


/s/ Paul J. Norris                      /s/ Robert M. Tarola
Paul J. Norris                          Robert M. Tarola
Chairman and                            Senior Vice President and
Chief Executive Officer                 Chief Financial Officer

March 5, 2004


F-3

REPORT OF INDEPENDENT AUDITORS

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF
W. R. GRACE & CO.

     In our opinion, the accompanying consolidated balance sheets and the
related consolidated statements of operations, of cash flows, of shareholders'
equity (deficit) and of comprehensive income (loss), present fairly, in all
material respects, the financial position of W. R. Grace & Co. and its
subsidiaries at December 31, 2003 and 2002, and the results of their operations
and their cash flows for each of the three years in the period ended December
31, 2003, in conformity with accounting principles generally accepted in the
United States of America. These financial statements are the responsibility of
the Company's management; our responsibility is to express an opinion on these
financial statements based on our audits. We conducted our audits of these
statements in accordance with auditing standards generally accepted in the
United States of America, which require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of
material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements, assessing
the accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for our opinion.

     The accompanying consolidated financial statements have been prepared
assuming that the Company will continue as a going concern. As discussed in Note
1 to the consolidated financial statements, on April 2, 2001, the Company and
substantially all of its domestic subsidiaries voluntarily filed for protection
under Chapter 11 of the United States Bankruptcy Code, which raises substantial
doubt about the Company's ability to continue as a going concern in its present
form. Management's intentions with respect to this matter are also described in
Note 1. The accompanying consolidated financial statements do not include any
adjustments that might result from the outcome of this uncertainty.


/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 27, 2004


                              F-4

REPORT OF INDEPENDENT AUDITORS ON FINANCIAL STATEMENT SCHEDULE

TO THE SHAREHOLDERS AND BOARD OF
DIRECTORS OF W. R. GRACE & CO.

Our audits of the consolidated financial statements referred to in our report
dated January 27, 2004, which was modified as to a matter raising substantial
doubt about the Company's ability to continue as a going concern, appearing on
page F-4 of this 2003 Annual Report on Form 10-K of W. R. Grace & Co. also
included an audit of the Financial Statement Schedule listed on page F-2 in the
Index to Consolidated Financial Statements and Financial Statement Schedule and
Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule
presents fairly, in all material respects, the information set forth therein
when read in conjunction with the related consolidated financial statements.


/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 27, 2004



CONSENT OF INDEPENDENT ACCOUNTANTS


We hereby consent to the incorporation by reference in the Registration
Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509,
333-49511, 333-49513, 333-49515, 333-49703 and 333-49705) of W. R. Grace & Co.
of our report dated January 27, 2004 appearing on page F-4 of this 2003 Annual
Report on Form 10-K of W. R. Grace & Co. We also consent to the incorporation by
reference of our report dated January 27, 2004 relating to the Financial
Statement Schedule, which appears above in this Form 10-K.


/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
March 5, 2004


F-5

CONSOLIDATED FINANCIAL STATEMENTS

```
================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS              YEAR ENDED DECEMBER 31,
--------------------------------------------------------------------------------
In millions, except per share amounts
                                              2003       2002       2001
                                           ---------  ---------  ---------
Net sales......................................  $ 1,980.5  $ 1,819.7  $ 1,722.9
Other income...................................     16.7       22.5       30.8
                                           ---------  ---------  ---------
                                             1,997.2    1,842.2    1,753.7
Cost of goods sold, exclusive of depreciation and
   amortization shown separately below............  1,289.8    1,148.1    1,076.3
Selling, general and administrative expenses,
   exclusive of net pension expense (income)
   shown separately below........................    365.6      345.1      343.6
Depreciation and amortization.....................    102.9       94.9       89.2
Research and development expenses.................     52.0       51.5       49.5
Net pension expense (income)......................     52.7       19.5       (9.5)
Interest expense and related financing costs.......    15.6       20.0       37.1
Provision for environmental remediation...........    142.5       70.7        5.8
Provision for asbestos-related litigation.........     30.0       --         --
                                           ---------  ---------  ---------
                                             2,051.1    1,749.8    1,592.0
                                           ---------  ---------  ---------
(Loss) income before Chapter 11 expenses, income
   taxes, and minority interest...................    (53.9)      92.4      161.7
Chapter 11 expenses, net..........................    (14.8)     (30.1)     (15.7)
Benefit from (provision for) income taxes.........     12.3      (38.0)     (63.7)
Minority interest in consolidated entities........      1.2       (2.2)      (3.7)
                                           ---------  ---------  ---------
   NET (LOSS) INCOME..............................  $  (55.2)  $   22.1   $   78.6
================================================================================
BASIC (LOSS) EARNINGS PER SHARE:
   Net (loss) income..............................  $  (0.84)  $   0.34   $   1.20

Weighted average number of basic shares...........     65.5       65.4       65.3

DILUTED (LOSS) EARNINGS PER SHARE:
   Net (loss) income..............................  $  (0.84)  $   0.34   $   1.20

Weighted average number of diluted shares.........     65.5       65.5       65.4
================================================================================
```

The Notes to Consolidated Financial Statements
are an integral part of these statements.

```
================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS            YEAR ENDED DECEMBER 31,
--------------------------------------------------------------------------------
In millions

                                                  2003       2002       2001
                                                 ---------------------------------


OPERATING ACTIVITIES
(Loss) income before Chapter 11 expenses, income
   taxes, and minority interest....................  $  (53.9)  $   92.4  $  161.7
Reconciliation to cash provided by operating activities:
   Depreciation and amortization.......................   102.9      94.9      89.2
   Interest accrued on pre-petition debt subject to
      compromise.......................................    11.2      14.5      23.2
   Loss (gain) on sales of investments and disposals
      of assets........................................     1.5      (1.9)     (9.7)
   Provision for environmental remediation.............   142.5      70.7       5.8
   Provision for asbestos-related litigation...........    30.0       --        --
   Net income from life insurance policies.............    (5.6)     (4.7)     (5.4)
   Changes in assets and liabilities, excluding effect
      of businesses acquired/divested and foreign
      currency translation:
      Working capital items............................   (22.5)     22.2     (63.5)
      Contributions to defined benefit pension plans..   (60.5)    (10.2)    (10.6)
      Contributions to postretirement benefit plans...   (12.6)    (21.5)    (22.3)
      Expenditures for asbestos-related litigation....   (10.4)    (13.1)   (109.6)
      Proceeds from asbestos-related insurance........    13.2      10.8      78.8
      Expenditures for environmental remediation......   (11.2)    (20.8)    (28.9)
      Expenditures for retained obligations of
         discontinued operations......................    (1.3)     (4.5)     (9.1)
      Increase in accounts receivable due to
         termination of securitization program........     --        --      (65.3)
      Changes in other accruals and non-cash items....    32.2      25.6      20.0
                                                         ---------------------------------
   NET CASH PROVIDED BY OPERATING ACTIVITIES BEFORE
      INCOME TAXES AND CHAPTER 11 EXPENSES.............   155.5     254.4      54.3
Chapter 11 expenses paid, net.........................   (17.5)    (27.1)    (11.8)
Income taxes paid, net of refunds.....................   (27.2)    (31.8)    (27.9)
                                                         ---------------------------------
   NET CASH PROVIDED BY OPERATING ACTIVITIES..........   110.8     195.5      14.6
                                                         ---------------------------------

INVESTING ACTIVITIES
Capital expenditures..................................   (86.4)    (91.1)    (62.9)
Businesses acquired, net of cash acquired.............   (26.9)    (28.5)    (84.4)
Investment in life insurance policies.................   (11.6)    (16.4)    (17.6)
Proceeds from life insurance policies.................    11.9      19.4      18.0
Proceeds from sales of investments and disposals of
   assets.............................................     3.9       5.9      15.5
                                                         ---------------------------------
   NET CASH USED FOR INVESTING ACTIVITIES.............  (109.1)   (110.7)   (131.4)
                                                         ---------------------------------

FINANCING ACTIVITIES
Net change in loans secured by cash value of life
   insurance..........................................    (3.1)     (5.1)     33.7
Borrowings under credit facilities, net of repayments.     2.3      (2.8)     94.1
Borrowings under debtor-in-possession facility, net of
   fees...............................................    46.1      18.7      71.5
Repayments of borrowings under debtor-in-possession
   facility...........................................   (50.0)    (20.0)    (75.0)
Purchase of common stock..............................     --        --       (0.6)
                                                         ---------------------------------
   NET CASH (USED FOR) PROVIDED BY FINANCING
      ACTIVITIES .....................................    (4.7)     (9.2)    123.7
                                                         ---------------------------------

Effect of currency exchange rate changes on cash and
   cash equivalents...................................    28.6      16.1      (6.9)
```

```
   INCREASE IN CASH AND CASH EQUIVALENTS.............      25.6        91.7        --
Cash and cash equivalents, beginning of period........     283.6       191.9      191.9
                                                        ----------------------------------
Cash and cash equivalents, end of period.............  $  309.2   $  283.6  $  191.9
                                                        ==================================
```

The Notes to Consolidated Financial Statements
are an integral part of these statements.

F-7

```
===============================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS                              DECEMBER 31,
-------------------------------------------------------------------------------
In millions, except par value and shares                2003          2002
                                                   ----------------------------
ASSETS
CURRENT ASSETS

Cash and cash equivalents..................................  $   309.2   $  283.6
Accounts and other receivables, net........................      347.5      316.6
Inventories................................................      214.6      173.6
Deferred income taxes......................................       29.8       20.6
Other current assets.......................................       27.8       35.9
                                                           ----------------------------
    TOTAL CURRENT ASSETS....................................      928.9      830.3

Properties and equipment, net of accumulated depreciation
  and amortization of $1,216.9 (2002 - $1,071.7)...........      656.6      622.2
Goodwill...................................................       85.2       65.2
Cash value of life insurance policies, net of policy loans.       90.8       82.4
Deferred income taxes......................................      587.1      574.1
Asbestos-related insurance expected to be realized after
  one year.................................................      269.4      282.6
Other assets...............................................      256.2      234.9
                                                           ----------------------------
    TOTAL ASSETS...........................................  $ 2,874.2   $2,691.7
                                                           ============================


LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)
LIABILITIES NOT SUBJECT TO COMPROMISE
CURRENT LIABILITIES
Debt payable within one year...............................  $     6.8   $    4.3
Accounts payable...........................................      101.8      100.3
Income taxes payable.......................................       16.6       11.4
Other current liabilities..................................      145.6      131.3
                                                           ----------------------------
    TOTAL CURRENT LIABILITIES..............................      270.8      247.3

Deferred income taxes......................................       35.3       30.5
Other liabilities..........................................      286.4      301.4
                                                           ----------------------------
    TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE............      592.5      579.2

LIABILITIES SUBJECT TO COMPROMISE - NOTE 2.................    2,465.3    2,334.7
                                                           ----------------------------
    TOTAL LIABILITIES......................................    3,057.8    2,913.9
                                                           ----------------------------

COMMITMENTS AND CONTINGENCIES

SHAREHOLDERS' EQUITY (DEFICIT)
Common stock issued, par value $0.01; 300,000,000 shares
  authorized; outstanding: 2003 - 65,558,510 (2002 -
  65,466,725)..............................................        0.8        0.8
Paid-in capital............................................      432.1      433.0
Accumulated deficit........................................     (170.9)    (115.7)
Treasury stock, at cost: shares: 2003 - 11,421,250; (2002 -
  11,513,035)..............................................     (135.9)    (137.0)
Accumulated other comprehensive loss.......................     (309.7)    (403.3)
                                                           ----------------------------
    TOTAL SHAREHOLDERS' EQUITY (DEFICIT)...................     (183.6)    (222.2)
                                                           ----------------------------
    TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)....  $ 2,874.2   $2,691.7
===============================================================================
```

The Notes to Consolidated Financial Statements
are an integral part of these statements.

```
================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)
--------------------------------------------------------------------------------
```

| In millions | Common Stock and Paid-in Capital | Retained Earnings (Accumulated Deficit) | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 2000 | $ 433.0 | $ (216.4) | $ (136.4) | $ (151.5) | $ (71.3) |
| Net income................ | -- | 78.6 | -- | -- | 78.6 |
| Purchase of common stock . | -- | -- | (0.6) | -- | (0.6) |
| Shares issued under stock plans.................... | 0.8 | -- | -- | -- | 0.8 |
| Other comprehensive loss.. | -- | -- | -- | (149.2) | (149.2) |
| BALANCE, DECEMBER 31, 2001 | $ 433.8 | $ (137.8) | $ (137.0) | $ (300.7) | $ (141.7) |
| Net income................ | $ -- | $ 22.1 | $ -- | $ -- | $ 22.1 |
| Other comprehensive loss.. | -- | -- | -- | (102.6) | (102.6) |
| BALANCE, DECEMBER 31, 2002 | $ 433.8 | $ (115.7) | $ (137.0) | $ (403.3) | $ (222.2) |
| Net loss.................. | $ -- | $ (55.2) | $ -- | $ -- | $ (55.2) |
| Stock plan activity....... | (0.9) | -- | 1.1 | -- | 0.2 |
| Other comprehensive income | -- | -- | -- | 93.6 | 93.6 |
| BALANCE, DECEMBER 31, 2003 | $ 432.9 | $ (170.9) | $ (135.9) | $ (309.7) | $ (183.6) |

```
================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(LOSS)                                          YEAR ENDED DECEMBER 31,
--------------------------------------------------------------------------------
```

| In millions | 2003 | 2002 | 2001 |
|---|---|---|---|
| NET (LOSS) INCOME................................ | $(55.2) | $ 22.1 | $ 78.6 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | |
|   Foreign currency translation adjustments....... | 75.3 | 45.1 | (24.8) |
|   Minimum pension liability adjustments, net of income taxes................................. | 18.3 | (147.7) | (124.4) |
|   Total other comprehensive income (loss)........ | 93.6 | (102.6) | (149.2) |
| COMPREHENSIVE INCOME (LOSS)..................... | $38.4 | $ (80.5) | $ (70.6) |

The Notes to Consolidated Financial Statements
are an integral part of these statements.

F-9

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

--------------------------------------------------------------------------------
1.    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING AND FINANCIAL
      REPORTING POLICIES
--------------------------------------------------------------------------------

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals
and specialty materials businesses on a worldwide basis. These businesses
consist of catalyst and silica products ("Davison Chemicals") and construction
chemicals, building materials, and sealants and coatings ("Performance
Chemicals").

W. R. Grace & Co. conducts substantially all of its business through a direct,
wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn.
owns substantially all of the assets, properties and rights of W. R. Grace & Co.
on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term
"Grace" refers to the Company and/or one or more of its subsidiaries and, in
certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING: In response to a sharply increasing number of
asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W.
R. Grace & Co. and 61 of its United States subsidiaries and affiliates,
including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions
for reorganization (the "Filing") under Chapter 11 of the United States
Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States
Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The
cases were consolidated and are being jointly administered under case number
01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of
its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse
developments in its asbestos-related litigation, including: a significant
increase in bodily injury claims, higher than expected costs to resolve bodily
injury and certain property damage claims, and class action lawsuits alleging
damages from a former attic insulation product. (These claims are discussed in
more detail in Note 3 to the Consolidated Financial Statements.) After a
thorough review of these developments, the Board of Directors of Grace concluded
on April 2, 2001 that a federal court-supervised Chapter 11 process provided the
best forum available to achieve predictability and fairness in the claims
settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a
comprehensive resolution of the claims against it and preserve the inherent
value of its businesses. Under Chapter 11, the Debtors expect to continue to
operate their businesses as debtors-in-possession under court protection from
their creditors and claimants, while using the Chapter 11 process to develop and
implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation
against the Debtors for pre-petition matters is generally stayed (subject to
certain exceptions in the case of governmental authorities), and no party may
take action to realize its pre-petition claims except pursuant to an order of
the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related
claims and all other pre-petition claims in a plan of reorganization. Such a
plan of reorganization may include the establishment of a trust through which
all pending and future asbestos-related claims would be channeled for
resolution. However, it is currently impossible to predict with any degree of
certainty the amount that would be required to be contributed to the trust, how
the trust would be funded, how other pre-petition claims would be treated or
what impact any reorganization plan may have on the shares of common stock of
the Company. The interests of the Company's shareholders could be substantially
diluted or cancelled under a plan of reorganization. The value of Grace common
stock following a plan of reorganization, and the extent of any recovery by
non-asbestos-related creditors, will depend principally on the ultimate value
assigned to Grace's asbestos-related claims, which will be addressed through the
Bankruptcy Court proceedings. The formulation and implementation of the plan of
reorganization is expected to take a significant period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to
conduct normal business activities have been approved by the Bankruptcy Court.
In addition, the Debtors have received approval from the Bankruptcy Court to pay
or otherwise honor certain of its pre-petition obligations in the ordinary
course of business, including employee wages and benefits, customer programs,
shipping charges, and a limited amount of claims of essential trade creditors.

As provided in a description above, the Debtor has the exclusive right to propose a plan of reorganization

F-10

for a 120-day period following the Filing Date. The Debtors have received extensions of their exclusivity period during which to file a plan of reorganization through February 1, 2004, and extensions of the Debtors' exclusive right to solicit acceptances of a reorganization plan through April 1, 2004. The Debtors have filed a motion with the Bankruptcy Court to further extend the exclusivity periods for an additional six months.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court and, together with a legal representative of future asbestos claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees and of the future asbestos claimants representative, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

Claims Filings - The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be dealt with separately.

Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim were filed after the bar date. The discussion below refers to claims filed before the bar date.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views certain of these claims as contingent and does not plan to address them until a later date in the Chapter 11 proceeding. The other non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; leases and other executory contracts rejected in the Bankruptcy Court; environmental remediation; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos-related litigation; and non-asbestos related personal injury.

The Debtors' preliminary analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2003, the Debtors had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). The Debtors expect to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses. However, based on its initial claims analysis and other available information, Grace increased its aggregate estimated liability for environmental remediation and asbestos-related litigation as discussed in Notes 3 and 14. No other changes to Filing Date liabilities was deemed warranted at this time.

The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. However, based on the number and expected cost of such claims, Grace does not believe such claims will have a material effect on its Consolidated Financial Statements. No specific liability has been established for these claims.

Grace believes that its recorded liabilities represent a reasonable estimate of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate their merit and estimate the cost of the claim. However, because of the uncertainties of the Chapter 11 and litigation process, the in-progress state of Grace's investigation of submitted claims, and the lack of documentation in support of many claims, such recorded liabilities may prove to be insufficient to satisfy all of such claims. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial

F-11

statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

Litigation Proceedings in Bankruptcy Court - In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The Debtors' expect the Bankruptcy Court to establish a schedule for determining pending motions following a status conference in May 2004. (See Note 3 for background information.)

In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. ("Fresenius") and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation ("Sealed Air") were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Fresenius and Sealed Air on behalf of the Debtors' estates.

On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Debtors' estate as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock (valued at $487.3 million as of December 31, 2003), as directed by the Bankruptcy Court upon confirmation of Debtors' plan of reorganization. The Sealed Air settlement has not been agreed to by the Debtors and remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. The Debtors are unable to predict how these settlements may ultimately affect their plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2003 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The term of the DIP facility expires on April 1, 2006.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2003, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted for changes in facts and circumstances, new information obtained in the claims review process, and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the

expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

PRINCIPLES OF CONSOLIDATION: The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

RECLASSIFICATIONS: Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2003 presentation.

EFFECT OF NEW ACCOUNTING STANDARDS: In December 2003, the Financial Accounting Standards Board ("FASB") revised Statement of Financial Accounting Standards ("SFAS") No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits," to require additional disclosure about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit plans and other postretirement plans. Grace adopted the provisions of SFAS No. 132 in December 2003. (See Note 18.)

In January 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). Grace adopted the provisions of FIN 46 in 2002. The adoption of FIN 46 required Grace to consolidate Advanced Refining Technologies LLC, a joint venture between Grace and Chevron Products Company. The impact of this consolidation did not result in a material change to Grace's Consolidated Financial Statements.

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements of Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"). Grace adopted FIN 45 in the first quarter of 2003. FIN 45 did not have a material effect on the Consolidated Financial Statements. (See Note 14.)

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS No. 146 addresses issues related to the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. Grace adopted SFAS No. 146 in 2003. SFAS No. 146 did not have a material effect on the Consolidated Financial Statements.

STOCK INCENTIVE PLANS: SFAS No. 123 permits the Company to follow the measurement provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the fair value methodology prescribed by SFAS No. 123, the Company's net (loss) income and related (loss) earnings per share for the years ended December 31, 2003, 2002 and 2001 would have been reduced to the pro forma amounts indicated below:

PRO FORMA EARNINGS
  UNDER SFAS NO. 123

|  | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| (In millions, except per share amounts) | 2003 | 2002 | 2001 |
| Net (loss) income, as reported............... | $ (55.2) | $ 22.1 | $ 78.6 |
| Deduct: | | | |
| Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects................ | (1.4) | (4.2) | (7.4) |
| Pro forma net (loss) income  (1)............ | $ (56.6) | $ 17.9 | $ 71.2 |
| Basic (loss) earnings per share: | | | |
| As reported................................. | $ (0.84) | $ 0.34 | $ 1.20 |
| Pro forma net (loss) income  (1)............ | (0.86) | 0.27 | 1.09 |
| Diluted (loss) earnings per share: | | | |
| As reported................................. | $ (0.84) | $ 0.34 | $ 1.20 |
| Pro forma net (loss) income  (1)............ | (0.86) | 0.27 | 1.09 |

(1) These pro forma amounts may not be indicative of future (loss) income and

(losss earnings per share would have a greater diluting.

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001:

```
=============================================
OPTION VALUE ASSUMPTIONS             2001
---------------------------------------------
Dividend yield.................     -- %
Expected volatility............     61%
Risk-free interest rate........      5%
Expected life (in years).......      4
=============================================
```

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001. There were no option grants in 2003 and 2002.

<div align="center">F-13</div>

USE OF ESTIMATES: The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o    Contingent liabilities such as asbestos-related matters (see Note 3), environmental remediation (see Note 14), income taxes (see Note 14), and retained obligations of divested businesses.

o    Pension and postretirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds. (See Note 18.)

o    Depreciation and amortization periods for long-lived assets, including property and equipment, intangible, and other assets.

o    Realization values of various assets such as net deferred tax assets (see Note 4), trade receivables, inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

CASH EQUIVALENTS: Cash equivalents consist of liquid instruments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

SALE OF ACCOUNTS RECEIVABLE: Prior to the Filing, Grace entered into a program to sell certain of its trade accounts receivable and retained a subordinated interest and servicing rights. Net losses on the sale of receivables were based on the carrying value of the assets sold, allocated in proportion to their fair value. Retained interests were carried at fair value and were included in "other current assets" in the Consolidated Balance Sheets. Grace generally estimated fair value based on the present value of expected future cash flows less management's best estimate of uncollectible accounts receivable. Grace maintained an allowance for doubtful accounts receivable based upon the expected collectibility of all trade receivables, including receivables sold. The allowance was reviewed regularly and adjusted for accounts deemed uncollectible by management. Expenses and losses associated with the program were recognized as a component of interest expense and related financing costs. As a result of the Filing, which constituted an event of default under the program, outstanding balances were satisfied through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

INVENTORIES: Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and, for substantially all U.S. inventories, last-in/first-out. Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value.

PROPERTIES AND EQUIPMENT: Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL: Goodwill arises from certain purchase business combinations. With respect to business combinations completed prior to June 30, 2001, goodwill was amortized through December 31, 2001 using the straight-line method over appropriate periods not exceeding 40 years. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. The provisions of SFAS No. 141 "Business Combinations" were applied to goodwill and intangible assets acquired after June 30, 2001.

REVENUE RECOGNITION: Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a

rebate and product credit programs when sales occur, estimating selling price adjustments at the time of sale. Grace regularly reviews

F-14

rebate accruals based on actual and anticipated sales patterns.

RESEARCH AND DEVELOPMENT COSTS: Research and development costs are charged to expense as incurred.

INCOME TAXES: Grace recognizes deferred tax assets and liabilities with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION: Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while their revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "accumulated other comprehensive loss" section of the Consolidated Balance Sheets. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "net income (loss)" in the Consolidated Statements of Operations.

FINANCIAL INSTRUMENTS: From time to time, Grace enters into interest rate swap agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. At December 31, 2003, Grace did not hold and had not issued any derivative financial instruments.

--------------------------------------------------------------------------------
2.    CHAPTER 11 RELATED FINANCIAL INFORMATION
--------------------------------------------------------------------------------

As a result of the Filing, Grace's Consolidated Balance Sheets separately identify the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the accrual of interest on pre-petition debt at the pre-petition contractual rate; 3) accruals for employee-related programs; and 4) changes in estimates related to pre-petition contingent liabilities.

Condensed financial information and components of liabilities subject to compromise of the Debtors are presented below:

| W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION STATEMENTS OF OPERATION (In millions) (Unaudited) | JANUARY 1, 2003 TO DECEMBER 31, 2003 | January 1, 2002 to December 31, 2002 | April 2, 2001 to December 31, 2001 |
|---|---|---|---|
| Net sales, including intercompany.................. | $ 1,031.9 | $  979.4 | $   763.0 |
| Other income..................................... | 66.3 | 61.2 | 45.5 |
| | 1,098.2 | 1,040.6 | 808.5 |
| Cost of goods sold, including intercompany, exclusive of depreciation shown separately below.............. | 714.8 | 626.6 | 474.5 |
| Selling, general and administrative expenses, exclusive of net pension expense (income) shown separately below........................................... | 217.8 | 214.0 | 154.1 |
| Research and development expenses.................. | 38.0 | 41.4 | 30.6 |
| Depreciation and amortization ..................... | 61.1 | 60.6 | 43.4 |
| Net pension expense (income)...................... | 47.6 | 22.6 | (3.3) |
| Interest expense and related financing costs....... | 15.3 | 19.5 | 26.9 |
| Provision for environmental remediation........... | 142.5 | 70.7 | 5.8 |
| Provision for asbestos-related litigation......... | 30.0 | -- | -- |
| | 1,267.1 | 1,055.4 | 732.0 |
| (Loss) income before Chapter 11 expenses, income taxes, and equity in net income of non-filing entities.. | (168.9) | (14.8) | 76.5 |
| Chapter 11 expenses, net .......................... | (14.8) | (30.1) | (15.7) |
| Benefit from (provision for) income taxes......... | 45.4 | (3.3) | (34.3) |
| (Loss) income before equity in net income of non-filing entities........................................ | (138.3) | (48.2) | 26.5 |
| Equity in net income of non-filing entities ....... | 83.1 | 70.3 | 37.4 |

| (In millions) | DECEMBER 31,2003 | December 31, 2002 | Filing Date (Unaudited) |
|---|---|---|---|
| Debt, pre-petition plus accrued interest........... | $    550.3 | $    538.8 | $    511.5 |
| Asbestos-related liability........................ | 992.3 | 973.2 | 1,002.8 |
| Income taxes ..................................... | 217.9 | 227.8 | 210.1 |
| Environmental remediation......................... | 332.4 | 201.1 | 164.8 |
| Postretirement benefits other than pension........ | 134.3 | 147.2 | 185.4 |
| Special pension arrangements...................... | 69.5 | 74.9 | 70.8 |
| Retained obligations of divested businesses....... | 57.0 | 55.3 | 75.5 |
| Accounts payable.................................. | 31.9 | 32.4 | 43.0 |
| Other accrued liabilities......................... | 79.7 | 84.0 | 102.1 |
| TOTAL LIABILITIES SUBJECT TO COMPROMISE........... | $  2,465.3 | $  2,334.7 | $  2,366.0 |

F-15

```
========================================================================================
W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES       JANUARY 1, 2003   January 1, 2002    April 2, 2001
DEBTOR-IN-POSSESSION CONDENSED STATEMENTS OF CASH FLOWS       TO             to                to
(In millions) (Unaudited)                            DECEMBER 31, 2003  December 31, 2002  December 31, 2001
========================================================================================

OPERATING ACTIVITIES
(Loss) income before Chapter 11 expenses, income taxes,
  and equity in net income of non-filing entities..... .......  $ (168.9)     $  (14.8)       $   76.5
Reconciliation to net cash provided by (used for)
  operating activities:
    Non-cash items, net.......................................     237.9         140.5            67.0
    Contributions to defined benefit pension plans.............    (52.9)         (4.3)           (6.8)
    Increase in accounts receivable due to termination of
      securitization program..................................       --            --            (98.4)
    Decrease in subordinated interest of accounts
      receivable sold.........................................       --            --             33.1
    Changes in other assets and liabilities, excluding
      the effect of businesses acquired/divested..............    (14.1)        (36.1)          (15.3)
                                                              ------------   ------------    ------------
NET CASH PROVIDED BY OPERATING ACTIVITIES....................      2.0          85.3            56.1

NET CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES.........     68.7         (60.1)          (21.5)

NET CASH USED FOR FINANCING ACTIVITIES.......................     (7.0)         (6.4)           (5.2)
                                                              ------------   ------------    ------------
NET INCREASE IN CASH AND CASH EQUIVALENTS....................     63.7          18.8            29.4
Cash and cash equivalents, beginning of period...............     56.8          38.0             8.6
                                                              ------------   ------------    ------------
Cash and cash equivalents, end of period.....................  $ 120.5       $  56.8         $  38.0
========================================================================================
```

Set forth below is a reconciliation of the changes in pre-filing date liability
balances for the period from the Filing Date through December 31, 2003.

```
==============================================================
(In millions) (Unaudited)                        Cumulative Since
                                                     Filing
--------------------------------------------------------------

Balance, Filing Date...............................  $  2,366.0
Cash disbursements and/or reclassifications under
  Bankruptcy Court orders:
    Freight and distribution order..................      (5.7)
    Trade accounts payable order....................      (9.1)
    Other court orders including employee wages and
      benefits, sales and use tax, and customer
      programs......................................    (183.6)
Expense/(income) items:
    Interest on pre-petition debt...................      46.7
    Current period employee-related accruals........      19.5
    Change in estimate of asbestos-related property
      damage contingencies..........................      30.0
    Change in estimate of environmental contingencies    219.0
    Change in estimate of income tax contingencies...      6.9
    Balance sheet reclassifications.................     (24.4)
                                                     --------------------
Balance, end of period.............................  $  2,465.3
==============================================================
```

```
================================================================================
W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES
DEBTOR-IN-POSSESSION BALANCE SHEETS                          DECEMBER 31,
                                                      --------------------------
(In millions) (Unaudited)                               2003            2002
================================================================================

ASSETS
CURRENT ASSETS
Cash and cash equivalents................................  $    120.5   $     56.8
Accounts and other receivables, net......................       105.6        114.7
Receivables from non-filing entities, net................        46.2         43.4
Inventories..............................................        81.2         70.5
Other current assets.....................................        47.9         45.6
                                                          --------------------------
TOTAL CURRENT ASSETS.....................................       401.4        331.0

Properties and equipment, net............................       383.9        389.7
Cash value of life insurance policies, net of policy loans       90.8         82.4
Deferred income taxes....................................       587.9        574.4
Asbestos-related insurance expected to be realized after
  one year...............................................       269.4        282.6
Loans receivable from non-filing entities, net...........       448.0        444.4
Investment in non-filing entities........................       283.8        244.7
Other assets.............................................        92.7         92.2
                                                          --------------------------
TOTAL ASSETS.............................................  $  2,557.9   $  2,441.4
                                                          ==========================

LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)
LIABILITIES NOT SUBJECT TO COMPROMISE
Current liabilities......................................  $     94.6   $     99.3
Other liabilities........................................       181.6        229.6
                                                          --------------------------
TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE..............       276.2        328.9

LIABILITIES SUBJECT TO COMPROMISE........................     2,465.3      2,334.7
                                                          --------------------------
TOTAL LIABILITIES........................................     2,741.5      2,663.6
                                                          --------------------------
SHAREHOLDERS' EQUITY (DEFICIT) ..........................      (183.6)      (222.2)
                                                          --------------------------
TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) .....  $  2,557.9   $  2,441.4
================================================================================
```

Additional liabilities subject to compromise may arise due to the rejection of
executory contracts or unexpired leases, or as a result of the Bankruptcy
Court's allowance of contingent or disputed claims.

The Debtors' Chapter 11 expenses for 2003, 2002, and 2001 consist of:

```
================================================================================
(In millions)                        2003          2002          2001
--------------------------------------------------------------------------------

Legal and financial advisory fees........  $   15.4   $   30.6   $   16.6
Interest income..........................      (0.6)      (0.5)      (0.9)
                                           -------------------------------------
Chapter 11 expenses, net.................  $   14.8   $   30.1   $   15.7
================================================================================
```

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must
be offset against Chapter 11 expenses.

In addition to Grace's financial reporting obligations as prescribed by the U.S.
Securities and Exchange Commission ("SEC"), the Debtors are also required, under
the rules and regulations of the Bankruptcy Code, to periodically file certain
statements and schedules and a monthly operating report with the Bankruptcy
Court. This information is available to the public through the

Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

--------------------------------------------------------------------------------
3.    ASBESTOS-RELATED LITIGATION
--------------------------------------------------------------------------------

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for bodily injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Additional asbestos-related claims will be subject to the Chapter 11 process established by the Bankruptcy Court. Separate creditors' committees representing the interests of property damage and bodily injury claimants have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through proceedings in the Bankruptcy Court and negotiations with each of the official committees appointed in the Chapter 11 Cases and a legal representative of future asbestos claimants, which negotiations are expected to provide the basis for a plan of reorganization.

PROPERTY DAMAGE LITIGATION

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs. Grace has recorded a liability for all outstanding property damage cases for which sufficient information is available to form a reasonable estimate of the cost to resolve such litigation. (See "Asbestos-Related Liability" below.)

Out of 380 asbestos property damage cases filed prior to the Filing Date, 141 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also involve ZAI).

Approximately 4,000 additional property damage claims were filed prior to the March 31, 2003 claims bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims contained insufficient information to permit an evaluation. (See "Asbestos-Related Liability" below for further discussion.)

The ZAI cases were filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes containing ZAI. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. As a result of the Filing, these cases have been transferred to the U.S. Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The parties have completed discovery with respect to these threshold issues and have filed motions asking the Bankruptcy Court to resolve a number of important legal and factual issues regarding the ZAI claims. The Debtors expect the Bankruptcy Court to establish a schedule for determining the pending motions following the next status conference in May 2004. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

BODILY INJURY LITIGATION

Asbestos bodily injury claims are generally similar to each other (differing

primarily in the type of asbestos-related injury alleged to have suffered by the plaintiff). However, Grace's estimated liability for such claims has been influenced by numerous variables, including the

F-17

solvency of other former producers of asbestos containing products, cross-claims
by co-defendants, the rate at which new claims are filed, the jurisdiction in
which the claims are filed, and the defense and disposition costs associated
with these claims. Grace's bodily injury liability reflects management's
estimate, as of the Filing Date (adjusted for post-Filing defense and claims
administration costs), of the number and ultimate cost of present and future
bodily injury claims expected to be asserted against Grace given demographic
assumptions of possible exposure to asbestos containing products previously
manufactured by Grace.

Cumulatively through the Filing Date, 16,354 asbestos bodily injury lawsuits
involving approximately 35,720 claims were dismissed without payment of any
damages or settlement amounts (primarily on the basis that Grace products were
not involved), and approximately 55,489 lawsuits involving approximately 163,698
claims were disposed of (through settlement and judgments) for a total of $645.6
million. (See "Asbestos-Related Liability" below.)

Approximately 1,000 claims for medical monitoring were filed against the Debtors
prior to the bar date. These claims were made by individuals for medical
monitoring, but not bodily injury, due to exposure to asbestos through Grace's
products or operations. Based on the number and expected value of such claims,
Grace does not believe such claims will have a material effect on the
Consolidated Financial Statements.

ASBESTOS-RELATED LIABILITY

Asbestos-related litigation is stayed by the Chapter 11 Cases. Ongoing costs are
generally limited to claims administration costs and to defense costs incurred
in connection with litigation permitted by the Bankruptcy Court. Other
adjustments to the recorded liability will be based on developments in the
Chapter 11 Cases including additional information or developments related to the
new property damage claims submitted, and the assessment process.

For periods prior to and as of the Filing Date, Grace's estimated
asbestos-related property damage and bodily injury liabilities were based on its
experience with, and recent trends in, asbestos litigation. Its recorded
liabilities covered indemnity and defense costs for pending property damage
cases for which sufficient information was available, and for pending and
projected future bodily injury claims. Since the Filing, Grace is aware that
bodily injury claims have continued to be filed against co-defendant companies,
and at higher than historical rates. Grace believes that had it not filed for
Chapter 11 reorganization, it likely would have received thousands more claims
than it had previously projected.

The total asbestos-related liability balances as of December 31, 2003 and 2002
were $992.3 million and $973.2 million, respectively. The increase in the
liability during 2003 reflects a $30.0 million pre-tax charge taken in the
fourth quarter for new asbestos-related property damage claims, net of defense
and claims administration costs. The pre-tax charge was based on an initial
review, completed in the fourth quarter of 2003, of more than 4,000 new claims
submitted prior to the March 31, 2003 claims bar date. Each claim is unique as
to property, product in question, legal status of claimant, potential cost of
remediation, and other factors. Such claims were reviewed in detail by Grace,
categorized into claims with sufficient information to be evaluated or claims
that require additional information and, where sufficient information existed,
the cost of resolution was estimated. (Grace's revised estimate of liability
does not include any amounts for approximately 170 claims for which sufficient
information was not available to evaluate potential liability.) However, due to
the Filing and the uncertainties of asbestos-related litigation, the actual
amount of Grace's asbestos-related liability could differ materially from the
recorded liability. The recorded asbestos-related liability is included in
"liabilities subject to compromise."

Recently, federal legislation has been proposed to address asbestos-related
bodily injury litigation. In addition, several states have enacted or proposed
legislation affecting asbestos-related bodily injury litigation. At this time,
Grace cannot predict what impact any such legislation would have on Grace's
asbestos-related bodily injury liability, or its ultimate plan of
reorganization.

ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its
asbestos-related lawsuits and claims. Insurance coverage for asbestos-related
liabilities has not been commercially available since 1985. Grace has settled
with and has been paid by all of its primary insurance carriers with respect to
both property damage and bodily injury cases and claims. Grace has also settled
with its excess insurance carriers that wrote policies available for property
damage cases; those settlements involve amounts paid and to be paid to Grace.
Grace believes that certain of these settlements may cover ZAI claims, as well

as other property damage claims. In addition, we believe that additional
coverage for ZAI claims may exist under excess

F-18

insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements are based on the recorded amount of the asbestos-related liability and are only collectible as liabilities are satisfied. In the event that Grace's ultimate asbestos-related liability is determined to exceed recorded amounts, insurance exists to cover a portion of such incremental liability, but generally in a lower proportion than the currently recorded insurance receivable bears to the currently recorded liability.

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES (In millions) | 2003 | 2002 |
|---|---|---|
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year ... | $ 282.6 | $ 293.4 |
| Proceeds received under asbestos-related insurance settlements ............................................. | (13.2) | (10.8) |
| Asbestos-related insurance receivable, end of year expected to be realized after one year ........................... | $ 269.4 | $ 282.6 |

4.    INCOME TAXES

The components of (loss) income from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2003, 2002, and 2001 are as follows:

| INCOME TAXES - CONSOLIDATED OPERATIONS (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| (Loss) income before income taxes: | | | |
| Domestic.................................................. | $ (175.7) | $ (44.6) | $ 67.1 |
| Foreign................................................... | 126.2 | 104.8 | 75.7 |
| Intercompany eliminations................................. | (18.0) | (0.1) | (0.5) |
| | $ (67.5) | $ 60.1 | $ 142.3 |
| Benefit from (provision for) income taxes: | | | |
| Federal - current........................................ | $ 9.9 | $ 8.1 | $ (7.7) |
| Federal - deferred....................................... | 34.5 | (11.0) | (27.5) |
| State and local - current................................ | 3.8 | (1.0) | (3.2) |
| Foreign - current........................................ | (34.3) | (27.6) | (22.2) |
| Foreign - deferred....................................... | (1.6) | (6.5) | (3.1) |
| | $ 12.3 | $ (38.0) | $ (63.7) |

At December 31, 2003 and 2002, the tax attributes giving rise to deferred tax
assets and liabilities consisted of the following items:

| DEFERRED TAX ANALYSIS (In millions) | 2003 | 2002 |
|---|---|---|
| Liability for asbestos-related litigation.................... | $ 347.3 | $ 340.6 |
| Net operating loss/credit carryforwards...................... | 141.4 | 155.1 |
| Deferred state taxes......................................... | 126.1 | 117.7 |
| Liability for environmental remediation...................... | 116.4 | 70.4 |
| Other postretirement benefits................................ | 47.0 | 51.5 |
| Deferred charges............................................. | 42.9 | 46.1 |
| Reserves and allowances...................................... | 28.8 | 27.1 |
| Research and development..................................... | 34.6 | 35.0 |
| Pension liabilities.......................................... | 83.1 | 94.6 |
| Foreign loss/credit carryforwards............................ | 20.0 | 14.8 |
| Other........................................................ | 9.8 | 12.4 |
| Total deferred tax assets.................................... | 997.4 | 965.3 |
| Asbestos-related insurance receivable........................ | (100.6) | (103.6) |
| Pension assets............................................... | (14.2) | (13.7) |
| Properties and equipment..................................... | (72.4) | (71.7) |
| Other........................................................ | (60.8) | (60.4) |
| Total deferred tax liabilities............................... | (248.0) | (249.4) |
| Deferred state taxes......................................... | (126.1) | (117.7) |
| Net operating loss/credit carryforwards...................... | (23.7) | (23.7) |
| Foreign loss carryforwards................................... | (18.5) | (11.1) |
| Total valuation allowance ................................... | (168.3) | (152.5) |
| Net deferred tax assets...................................... | $ 581.1 | $ 563.4 |

The valuation allowance shown above arises from uncertainty as to the
realization of certain deferred tax assets, primarily foreign tax credit
carryforwards and foreign, state and local net operating loss carryforwards.
Based upon anticipated future results, Grace has concluded that it is more
likely than not that the balance of the net deferred tax assets, after
consideration of the valuation allowance, will be realized. Because of the
nature of the items that make up this balance, the realization period is likely
to extend over a number of years and the outcome of the Chapter 11 process could
materially impact the realization period.

At December 31, 2003, there were $213.7 million of U.S. federal net operating
loss carryforwards, representing deferred tax assets of $74.8 million, with
expiration dates through 2023; $6.2 million of foreign tax credit carryforwards
with expiration dates through 2006; $15.8 million of general business credit
carryforwards with expiration dates through 2008; and $44.6 million of
alternative minimum tax credit carryforwards with no expiration dates.

The difference between the benefit from (provision for) income taxes at the
federal income tax rate of 35% and Grace's overall income tax provision are
summarized as follows:

| INCOME TAX BENEFIT (PROVISION) ANALYSIS (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Tax benefit (provision) at federal corporate rate.................... | $ 23.6 | $ (21.0) | $ (49.8) |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses............................. | (0.6) | (1.0) | (1.6) |
| State and local income taxes, net of federal income tax benefit .... | 2.5 | (0.7) | (1.7) |
| Federal and foreign taxes on foreign operations..................... | (3.6) | 1.6 | 1.3 |
| Chapter 11 expenses (non-deductible)................................ | (4.3) | (10.5) | (5.5) |
| Tax and interest relating to tax deductibility of interest on life insurance policy loans (See Note 14)......................... | (5.3) | (6.4) | (6.4) |
| Income tax benefit from (provision for) continuing operations........ | $ 12.3 | $ (38.0) | $ (63.7) |

Federal, state, local and foreign taxes have not been accrued on approximately
$371.0 million of undistributed earnings of certain foreign subsidiaries, as
such earnings are expected to be retained indefinitely by such subsidiaries for
reinvestment. However, Chapter 11 and/or changes in the tax laws could affect
this expectation in the future. The distribution of these earnings would result
in additional foreign withholding taxes of approximately $17.3 million and
additional federal income taxes to the extent they are not offset by foreign tax
credits. It is not practicable to estimate the total tax liability that would be
incurred upon such a distribution.

--------------------------------------------------------------------------------
5.    ACQUISITIONS AND JOINT VENTURES
--------------------------------------------------------------------------------

In 2003, Grace completed three business combinations for a total cash cost of
$26.9 million as follows:

o    In April 2003, Grace, through its subsidiary The Separations Group,
     acquired the business and assets of MODcol Corporation, a manufacturer of
     preparative chromatography columns and provider of custom column packaging
     services.

o    In July 2003, Grace acquired the chromatography business of Argonaut
     Technologies, Inc., which had been marketed under the Jones Chromatography
     name.

o    In October 2003, Grace through its German subsidiary, acquired certain
     assets of Tricosal Beton - Chemie GmbH & Co. KG, a leading supplier
     of specialty chemicals and materials to the European construction industry.

Goodwill recognized in those transactions amounted to $12.0 million, of which
$1.3 million was assigned to Davison Chemicals and $10.7 million was assigned to
Performance Chemicals.

In 2002, Grace completed three business combinations for a total cash cost of
$28.5 million as follows:

o    In January 2002, Grace, through its Swedish subsidiary, acquired the
     catalyst manufacturing assets of Borealis A/S.

o    In March 2002, Grace acquired the business and assets of Addiment,
     Incorporated, a leading supplier of specialty chemicals to the concrete
     paver and masonry industries in the U.S. and Canada.

o    In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture
     between Grace and Chevron Products Company ("Chevron"), acquired an
     exclusive license for the hydroprocessing catalyst technology of Japan
     Energy Corporation and its subsidiary Orient Catalyst Company.

Goodwill recognized in those transactions amounted to $3.8 million, $0.9 million
of which was assigned to Davison Chemicals and $2.9 million of which was
assigned to Performance Chemicals.

--------------------------------------------------------------------------------
6.    OTHER INCOME
--------------------------------------------------------------------------------

Components of other income are as follows:

| OTHER INCOME (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Investment income............................................. | $ | 5.6 | $ | 4.7 | $ 5.4 |
| Interest income............................................... | | 4.3 | | 3.9 | 4.6 |
| Gain on sale of investments................................... | | -- | | 1.2 | 7.9 |
| Net (loss) gain on dispositions of assets.................... | | (1.5) | | 0.7 | 1.8 |
| Tolling revenue............................................... | | 1.0 | | 3.1 | 3.1 |
| Foreign currency.............................................. | | (4.4) | | (1.1) | 0.9 |
| Other miscellaneous income ................................... | | 11.7 | | 10.0 | 7.1 |
| Total other income........................................... | $ | 16.7 | $ | 22.5 | $ 30.8 |

--------------------------------------------------------------------------------
7.  GOODWILL AND OTHER INTANGIBLE ASSETS
--------------------------------------------------------------------------------

Grace adopted SFAS No. 142, "Goodwill and Other Intangible Assets" on January 1,
2002 and ceased the amortization of goodwill. The pro forma impact on pre-tax
income and earnings per share was immaterial. SFAS No. 142 requires that
goodwill and indefinite life intangible assets be tested for impairment on at
least an annual basis. For the purpose of measuring impairment under the
provisions of SFAS No. 142, Grace has identified its reporting units as catalyst
products and

silica products (Davison Chemicals), and construction chemicals, building
materials, and sealants and coatings (Performance Chemicals). In connection with
the adoption of SFAS No. 142 and as of November 30, 2003, Grace evaluated its
goodwill and other intangible assets that have indefinite useful lives, with no
impairment charge required.

At December 31, 2003 and December 31, 2002, Grace had goodwill balances of $85.2
million and $65.2 million, respectively. The carrying amount of goodwill
attributable to each reporting unit and the changes in those balances during the
year ended December 31, 2003 are as follows:

| (In millions) | Davison Chemicals | Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2002 ........................... | $ 17.0 | $ 48.2 | $ 65.2 |
| Goodwill acquired during the year........................... | 1.3 | 10.7 | 12.0 |
| Foreign currency translation adjustment..................... | 2.5 | 5.5 | 8.0 |
| BALANCE AS OF DECEMBER 31, 2003............................. | $ 20.8 | $ 64.4 | $ 85.2 |

Grace's book value of other intangible assets at December 31, 2003 and December
31, 2002 was $65.1 million and $63.3 million, respectively, including
unamortizable intangible assets (primarily trademarks) of $6.9 million in 2002.
The composition of the remaining net amortizable intangible assets of $65.1
million and $56.4 million as of December 31, 2003 and December 31, 2002,
respectively, was as follows:

| (In millions) | AS OF DECEMBER 31, 2003 | |
|---|---|---|
| | GROSS CARRYING AMUUONT | ACCUMULATED AMORTIZATION |
| Technology ............................................... | $ 38.1 | $ 10.8 |
| Patents................................................... | 15.3 | 15.2 |
| Customer lists............................................ | 29.8 | 5.8 |
| Other..................................................... | 15.7 | 2.0 |
| Total..................................................... | $ 98.9 | $ 33.8 |

| (In millions) | As of December 31, 2002 | |
|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization |
| Technology ............................................... | $ 34.6 | $ 4.6 |
| Patents................................................... | 15.3 | 13.6 |
| Customer lists............................................ | 24.1 | 3.3 |
| Other..................................................... | 5.0 | 1.1 |
| Total..................................................... | $ 79.0 | $ 22.6 |

At December 31, 2003, estimated future annual amortization expenses were:

ESTIMATED AMORTIZATION EXPENSE
(In millions)

| | |
|---|---|
| 2004....................................................... | $ 6.0 |
| 2005....................................................... | 5.9 |
| 2006....................................................... | 5.7 |
| 2007....................................................... | 5.1 |
| 2008....................................................... | 5.0 |

8.    COMPREHENSIVE INCOME (LOSS)

The table below presents the deferred tax components included in other comprehensive income (loss) for the years ended December 31, 2003, 2002 and 2001:

| YEAR ENDED DECEMBER 31, 2003 (In millions) | Pre-Tax Amount | Tax Expense | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ 28.2 | $ (9.9) | $ 18.3 |
| Foreign currency translation adjustments | 75.3 | -- | 75.3 |
| Other comprehensive income | $ 103.5 | $ (9.9) | $ 93.6 |

| YEAR ENDED DECEMBER 31, 2002 (In millions) | Pre-Tax Amount | Tax Expense | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (227.2) | $ 79.5 | $ (147.7) |
| Foreign currency translation adjustments | 45.1 | -- | 45.1 |
| Other comprehensive loss | $ (182.1) | $ 79.5 | $ (102.6) |

| YEAR ENDED DECEMBER 31, 2001 (In millions) | Pre-Tax Amount | Tax Expense | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (191.4) | $ 67.0 | $ (124.4) |
| Foreign currency translation adjustments | (24.8) | -- | (24.8) |
| Other comprehensive loss | $ (216.2) | $ 67.0 | $ (149.2) |

| COMPOSITION OF ACCUMULATED OTHER COMPREHENSIVE LOSS (In millions) | 2003 | 2002 |
|---|---|---|
| Minimum pension liability | $ (265.4) | $ (283.7) |
| Foreign currency translation | (44.3) | (119.6) |
| Accumulated other comprehensive loss | $ (309.7) | $ (403.3) |

Grace is a global enterprise which operates in over 40 countries with local currency generally deemed to be the functional currency for accounting purposes. The foreign currency translation amount represents the adjustment necessary to translate the balance sheets valued in local currencies to the U.S. dollar as of the end of each year presented. The decline in foreign currency translation over 2003 is due to the weakening of the U.S. dollar against most other reporting currencies.

F-21

The decline in equity market returns in 2000-2002, coupled with a decline in interest rates, created a shortfall between the accounting measurement of Grace's obligations under certain of its qualified pension plans for U.S. employees and the market value of dedicated pension assets. This condition required Grace to record a minimum pension liability for these plans equal to the funding shortfall and to offset related deferred costs against shareholders' equity (deficit) at December 31, 2003 and 2002. Market returns in 2003 (22.5% for Grace's domestic pension plan assets) and contributions of $48.5 million to under-funded domestic plans were not sufficient to eliminate the minimum pension liability. (See Note 18.)

---

9.    OTHER BALANCE SHEET ACCOUNTS

---

| (In millions) | 2003 | 2002 |
|---|---|---|
| **ACCOUNTS AND OTHER RECEIVABLES, NET** | | |
| Trade receivables, less allowance of $4.6 (2002 - $3.7) .......... | $ 331.5 | $ 302.8 |
| Other receivables, less allowances of $1.7 (2002 - $1.7) ........ | 16.0 | 13.8 |
| | $ 347.5 | $ 316.6 |
| **INVENTORIES (1)** | | |
| Raw materials ............................................... | $ 53.5 | $ 39.2 |
| In process .................................................. | 35.8 | 30.3 |
| Finished products ........................................... | 134.0 | 110.8 |
| General merchandise ......................................... | 29.4 | 26.8 |
| Less:  Adjustment of certain inventories to a last-in/first-out (LIFO) basis (2)...................................... | (38.1) | (33.5) |
| | $ 214.6 | $ 173.6 |

(1)    Inventories valued at LIFO cost comprised 49.2% of total inventories at December 31, 2003 and 48.4% at December 31, 2002
(2)    During 2002, a reduction in U.S. LIFO inventory levels resulted in product valued at costs pertaining to prior years being reflected in 2002 cost of sales. This so-called LIFO liquidation had the effect of increasing pre-tax income for the Davison segment and Grace by $0.5 million.

| | 2003 | 2002 |
|---|---|---|
| **OTHER ASSETS** | | |
| Deferred pension costs........................................ | $ 115.9 | $ 104.2 |
| Deferred charges............................................. | 45.7 | 38.7 |
| Long-term receivables, less allowances of $0.7 (2002 - $0.8) ..... | 9.2 | 2.0 |
| Patents, licenses and other intangible assets, net .............. | 65.1 | 63.3 |
| Pension-unamortized prior service cost ......................... | 19.8 | 26.4 |
| Investments in unconsolidated affiliates and other.............. | 0.5 | 0.3 |
| | $ 256.2 | $ 234.9 |
| **OTHER CURRENT LIABILITIES** | | |
| Accrued compensation ........................................ | $ 44.8 | $ 40.0 |
| Deferred tax liability ........................................ | 0.5 | 0.8 |
| Customer volume rebates ..................................... | 28.1 | 21.2 |
| Accrued commissions ......................................... | 9.8 | 6.0 |
| Accrued reorganization fees .................................. | 6.9 | 9.4 |
| Other accrued liabilities ..................................... | 55.5 | 53.9 |
| | $ 145.6 | $ 131.3 |
| **OTHER LIABILITIES** | | |
| Pension-underfunded plans ................................... | $ 278.5 | $ 295.1 |
| Other accrued liabilities .................................... | 7.9 | 6.3 |
| | $ 286.4 | $ 301.4 |

---

10.    PROPERTIES AND EQUIPMENT

---

| (In millions) | 2003 | 2002 |
|---|---|---|

| | | |
|---|---:|---:|
| Land.............................................................. | $   21.3 | $   20.5 |
| Buildings......................................................... | 416.1 | 367.2 |
| Information technology and equipment.............................. | 107.2 | 99.8 |
| Machinery, equipment and other................................... | 1,304.0 | 1,140.2 |
| Projects under construction...................................... | 24.9 | 66.2 |
| | | |
| Properties and equipment, gross.................................. | 1,873.5 | 1,693.9 |
| Accumulated depreciation and amortization........................ | (1,216.9) | (1,071.7) |
| | | |
| Properties and equipment, net.................................... | $   656.6 | $   622.2 |

Interest costs are capitalized for significant, extended construction projects. Capitalized interest cost was insignificant for the periods presented. Depreciation and lease amortization expense relating to properties and equipment amounted to $96.2 million in 2003, $89.8 million in 2002, and $84.2 million in 2001. Grace's rental expense for operating leases amounted to $15.4 million in 2003, $14.9 million in 2002, and $14.2 million in 2001. (See Note 14 for information regarding contingent rentals.)

At December 31, 2003, minimum future non-cancelable payments for operating leases were:

====================================================================================
MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES
(In millions)
------------------------------------------------------------------------------------

| | | |
|---|---|---|
| 2004............................................................ | $ | 16.7 |
| 2005............................................................ | | 13.5 |
| 2006............................................................ | | 12.6 |
| 2007............................................................ | | 7.3 |
| 2008............................................................ | | 6.3 |
| Thereafter...................................................... | | 10.7 |
| | | ----------- |
| Total minimum lease payments.................................... | $ | 67.1 |

====================================================================================

The above minimum non-cancelable lease payments are net of anticipated sublease income of $1.6 million in 2004, $1.5 million in 2005, $1.4 million in 2006, $1.4 million in 2007, and $0.9 million in 2008.

------------------------------------------------------------------------------------
11.   LIFE INSURANCE
------------------------------------------------------------------------------------

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $90.8 million and $82.4 million at December 31, 2003 and 2002, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years. The following table summarizes activity in these policies for 2003, 2002 and 2001:

```
========================================================================
LIFE INSURANCE - ACTIVITY SUMMARY
(In millions)                                        2003      2002      2001
------------------------------------------------------------------------

Earnings on policy assets........................  $   38.7  $   39.4  $   40.3
Interest on policy loans.........................     (33.1)    (34.7)    (34.9)
Premiums.........................................       2.4       2.4       2.5
Proceeds from policy loans.......................       --        --       (48.7)
Policy loan repayments...........................       3.1       5.1      15.0
Net investing activity...........................      (2.7)     (5.4)     (2.9)
                                                   ------------------------------
Change in net cash value.........................  $    8.4  $    6.8  $  (28.7)
                                                   ==============================
Gross cash value.................................  $  478.5  $  471.3  $  477.5
Principal - policy loans.........................    (365.3)   (365.4)   (377.6)
Accrued interest - policy loans .................     (22.4)    (23.5)    (24.3)
                                                   ------------------------------
Net cash value...................................  $   90.8  $   82.4  $   75.6
                                                   ==============================
Insurance benefits in force......................  $2,213.1  $2,240.8  $2,291.0
                                                   ==============================
Tax-free proceeds received.......................  $   11.9  $   19.4  $   18.0
========================================================================
```

Grace's financial statements display income statement activity and balance sheet
amounts on a net basis, reflecting the contractual interdependency of policy
assets and liabilities. See Note 14 for tax contingencies regarding certain of
these life insurance policies.

--------------------------------------------------------------------------
12.  DEBT
--------------------------------------------------------------------------

```
=========================================================================
COMPONENTS OF DEBT
(In millions)                                             2003      2002
=========================================================================

DEBT PAYABLE WITHIN ONE YEAR
Other short-term borrowings (1)...................... $    6.8  $    4.3
                                                      --------------------
                                                      $    6.8  $    4.3
                                                      ====================
DEBT PAYABLE AFTER ONE YEAR
DIP facility (2)..................................... $     --  $     --

DEBT SUBJECT TO COMPROMISE
Bank borrowings (3).................................. $  500.0  $  500.0
Other borrowings (4).................................      1.3       1.0
Accrued interest (5).................................     49.0      37.8
                                                      --------------------
                                                      $  550.3  $  538.8
                                                      ====================
Full-year weighted average interest rates on total debt ..........  2.1%      2.8%
=========================================================================
```

(1)  Represents borrowings under various lines of credit and other
     miscellaneous borrowings.
(2)  In April 2001, the Debtors entered into a debtor-in-possession
     post-petition loan and security agreement with Bank of America, N.A. (the
     "DIP facility") in the aggregate amount of $250 million. The DIP facility
     is secured by priority liens on substantially all assets of the Debtors,
     and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. The
     Debtors have extended the term of the DIP facility through April 1, 2006.
     As of December 31, 2003, the Debtors had no outstanding borrowings under
     the DIP facility. However, $25.6 million of standby letters of credit were
     issued and outstanding under the facility as of December 31, 2003, which
     were issued mainly for trade-related matters such as performance bonds, as
     well as certain insurance and environmental matters. The outstanding
     amount of standby letters of credit issued under the DIP facility reduces
     the borrowing availability by a corresponding amount. Under the DIP
     facility, the Debtors are required to maintain $50 million of liquidity, a
     combination of cash, cash equivalents and the cash value of life insurance
     policies. As of December 31, 2003, the cash value of life insurance
     policies exceeded the $50 million requirement.
(3)  Under bank revolving credit agreements in effect prior to the Filing,
     Grace could borrow up to $500 million at interest rates based upon the

proceeding during 1998 and 1999 and tax contingencies. Of this amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4)   Miscellaneous borrowings primarily consisting of U.S. mortgages.

(5)   Grace is continuing to accrue interest expense on its pre-petition debt at the pre-petition contractual rate of LIBOR plus 100 basis points.

Interest payments amounted to $4.2 million in 2003, $1.1 million in 2002, and $9.5 million in 2001.

--------------------------------------------------------------------------------
13.   FINANCIAL INSTRUMENTS
--------------------------------------------------------------------------------

DEBT AND INTEREST RATE SWAP AGREEMENTS

Grace was not a party to any derivative financial instruments at December 31, 2003 and December 31, 2002.

FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS

At December 31, 2003, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $6.8 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2003, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is undeterminable; the ultimate value of such debt will be determined by the outcome of the Chapter 11 proceedings.

SALE OF ACCOUNTS RECEIVABLE

Prior to the Filing, Grace sold, on an ongoing basis, approximately a $100 million pool of its eligible trade accounts receivable to a multi-seller receivables company (the "conduit") through a wholly owned special purpose subsidiary (the "SPS"). Upon sale of the receivables, the SPS held a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables were added to the pool as collections reduced previously sold receivables. Grace serviced, administered and collected the receivables on behalf of the SPS and the conduit. The proceeds were used for the reduction of other short-term obligations and are reflected as operating cash flows in the Consolidated Statement of Cash Flows for the year ended December 31, 2001. Grace recorded a net loss of $1.2 million in 2001 from the corresponding sales to the conduit. As a result of the Filing, which constituted an event of default under the program, the amount

outstanding under the program, approximately $65.3 million, was satisfied
through the use of pre-petition trade receivables collected by the SPS during
the period from the Filing Date to early May 2001. The program was terminated
effective May 14, 2001.

CREDIT RISK

Trade receivables potentially subject Grace to credit risk. Concentrations of
credit to customers in the petroleum and construction industries represent the
greatest exposure. Grace's credit evaluation policies, relatively short
collection terms and history of minimal credit losses mitigate credit risk
exposures. Grace does not generally require collateral for its trade accounts
receivable.

--------------------------------------------------------------------------------
14.  COMMITMENTS AND CONTINGENT LIABILITIES
--------------------------------------------------------------------------------

ASBESTOS-RELATED LITIGATION - SEE NOTE 3

ENVIRONMENTAL REMEDIATION

General Matters and Discussion

Grace is subject to loss contingencies resulting from extensive and evolving
federal, state, local and foreign environmental laws and regulations relating to
the generation, storage, handling, discharge and disposition of hazardous wastes
and other materials. Grace accrues for anticipated costs associated with
investigative and remediation efforts when an assessment has indicated that a
probable liability has been incurred and the cost can be reasonably estimated.
These accruals do not take into account any discounting for the time value of
money.

Grace's environmental liabilities are reassessed whenever circumstances become
better defined or remediation efforts and their costs can be better estimated.
These liabilities are evaluated based on currently available information,
including the progress of remedial investigation at each site, the current
status of discussions with regulatory authorities regarding the method and
extent of remediation at each site, existing technology, prior experience in
contaminated site remediation and the apportionment of costs among potentially
responsible parties. Grace expects that the funding of environmental remediation
activities will be affected by the Chapter 11 proceedings; any such effect could
be material. Grace's environmental liabilities are included in "liabilities
subject to compromise" as of December 31, 2003.

At December 31, 2003, Grace's estimated liability for environmental
investigative and remediation costs totaled $332.4 million, as compared with
$201.1 million at December 31, 2002. This liability covers both vermiculite and
non-vermiculite related matters. The amount is based on funding and/or
remediation agreements in place and Grace's best estimate of its cost for sites
not subject to a formal remediation plan.

For the years ended December 31, 2003 and 2002, Grace recorded pre-tax charges
of $142.5 million and $70.7 million, respectively, for environmental matters.
Approximately $180.0 million of the pre-tax charges for these two years were in
connection with a cost recovery lawsuit brought by the U.S. government relating
to Grace's former vermiculite mining near Libby, Montana, and Grace's evaluation
of probable remediation costs at vermiculite processing sites currently or
formerly operated by Grace, as described below. The remainder of the pre-tax
charges were primarily attributable to the ongoing review of bankruptcy claims.

Cash expenditures charged against previously established reserves for the years
ended December 31, 2003, 2002 and 2001 were $11.2 million, $20.8 million and
$28.9 million, respectively.

Vermiculite Related Matters

From the 1920's until 1990, Grace and previous owners conducted vermiculite
mining and related activities near Libby, Montana. The vermiculite ore that was
mined contained varying amounts of asbestos as a contaminant, almost all of
which was removed during processing. Expanded vermiculite from Libby was used in
products such as fireproofing, insulation and potting soil. In November 1999,
Region 8 of the Environmental Protection Agency ("EPA") began an investigation
into alleged excessive levels of asbestos-related disease in the Libby
population related to these former mining activities. This investigation led the
EPA to undertake additional investigative activity and to carry out response
actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S.
District Court for the District of Montana, Missoula Division (United States v.
W. R. Grace & Company et al.) under the Comprehensive Environmental Response,

Compensation and Liability Act) for the response costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents

F-24

and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the clean-up. Grace has appealed the court's ruling.

As a result of such ruling, Grace recorded a pre-tax charge of $50.0 million in the third quarter of 2003. During the fourth quarter of 2003, Grace recorded a $70.0 million pre-tax charge for estimated remediation costs in and around Libby, Montana, and at vermiculite processing sites currently or formerly operated by Grace. Grace's estimated liability for vermiculite-related matters at December 31, 2003 and 2002 was $181.0 million and $62.7 million, respectively. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have changed regularly and increased substantially over the course of this clean-up. Consequently, Grace's estimate may change materially as more information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

Non-Vermiculite Related Matters

At December 31, 2003 and 2002, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $151.4 million and $138.4 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. During the fourth quarter of 2003, Grace recorded a $20.0 million increase in its estimated environmental liability for non-vermiculite related sites as part of the Chapter 11 claims review process. Grace's revised estimated liability is based upon claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

Insurance Matters

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

CONTINGENT RENTALS

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $123.8 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by current tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that any loss from these lease obligations would be immaterial. Grace has rejected certain of these leases as permitted by the Bankruptcy Code, the financial impacts of which are insignificant.

TAX MATTERS

Grace has received the examination report from the Internal Revenue Service (the "IRS") for tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments, including accrued interest. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other

proposed certain adjustments with Grace's contention that regarding issues of tax credits, research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996

F-25

tax period was under the jurisdiction of the IRS Office of Appeals, where Grace filed a protest. The IRS Office of Appeals has returned the audit to the examination team for further review of the proposed adjustments as well as several affirmative tax claims raised by Grace. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. In addition, Grace will be required to report the additional taxable income (and the related accrued interest) resulting from IRS adjustments to state and local tax jurisdictions upon resolution of the Federal tax audits. Grace believes that the impact of probable tax return adjustments are adequately recognized as liabilities at December 31, 2003. Any cash payment as a result of such adjustment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued additional assessments aggregating $40.1 million for the 1996 through 1998 tax periods. The statute of limitations has expired with respect to the 1999 tax year. Grace has a right to indemnification for approximately 36% of any tax liability (including interest thereon) for the period from July, 1996 through December, 1998 from its former partner in the business. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options. Grace does not expect the resolution of this matter to have significant adverse impact on its Consolidated Financial Statements.

PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial position.

GUARANTEES AND INDEMNIFICATION OBLIGATIONS

Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

o    Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including

F-26

environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o   Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o   Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

o   Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

o   Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

FINANCIAL ASSURANCES

Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2003, Grace had gross financial assurances issued and outstanding of $249.2 million, comprised of $136.8 million of surety bonds issued by various insurance companies, and $112.4 million of standby letters of credit and other financial assurances issued by various banks. Of the standby letters of credit, $19.0 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $230.2 million. Of this net amount of financial assurances, approximately $8.8 million were issued by non-Debtor entities and $221.4 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $191.3 million were issued before the Filing Date, with the remaining $30.1 million being issued subsequent to the Filing, of which $25.6 million was issued under the DIP facility.

ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2003.

--------------------------------------------------------------------------------
15.   SHAREHOLDERS' EQUITY (DEFICIT)
--------------------------------------------------------------------------------

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2003, approximately 9,582,784 shares were reserved for issuance pursuant to stock options and other stock incentives. The Company has not paid a dividend on its common stock since 1998. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $0.01 par value, none of which has been issued. Of the total, 3,000,000 shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

In November 2001, 56,911 shares of restricted stock were reclassified as

treasury shares that received dividends in mavocument 18, Grasso and Iraj and Chief Executive Officer, under a Bankruptcy Court approved employment agreement.

F-27

---
16.  (LOSS) EARNINGS PER SHARE
---

The following table shows a reconciliation of the numerators and denominators
used in calculating basic and diluted (loss) earnings per share.

| (LOSS) EARNINGS PER SHARE (In millions, except per share amounts) | 2003 | 2002 | 2001 |
|---|---|---|---|
| NUMERATORS | | | |
| Net (loss) income............................................... | $ (55.2) | $ 22.1 | $ 78.6 |
| DENOMINATORS | | | |
| Weighted average common shares - basic calculation................ | 65.5 | 65.4 | 65.3 |
| Dilutive effect of employee stock options and restricted shares... | -- | 0.1 | 0.1 |
| Weighted average common shares - diluted calculation............. | 65.5 | 65.5 | 65.4 |
| BASIC (LOSS) EARNINGS PER SHARE.................................. | $ (0.84) | $ 0.34 | $ 1.20 |
| DILUTED (LOSS) EARNINGS PER SHARE................................ | $ (0.84) | $ 0.34 | $ 1.20 |

Stock options that could potentially dilute basic (loss) earnings per share
(that were excluded from the computation of diluted (loss) earnings per share
because their exercise prices were greater than the average market price of the
common shares) averaged approximately 9.4 million in 2003, 11.5 million in 2002,
and 14.2 million in 2001. As a result of the 2003 net loss of $55.2 million,
approximately 100,000 of employee compensation-related shares issuable under
stock options were excluded from the diluted loss per share calculation in 2003
because their effect would have been antidilutive.

---
17.  STOCK INCENTIVE PLANS
---

Each stock option granted under the Company's stock incentive plans has an
exercise price equal to the fair market value of the Company's common stock on
the date of grant. Options become exercisable at the time or times determined by
the Compensation Committee of the Company's Board of Directors and may have
terms of up to ten years and one month. The following table sets forth
information relating to such options during 2003, 2002 and 2001:

| STOCK OPTION ACTIVITY | 2003 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year............. | 10,440,417 | $ 11.94 |
| Options exercised........................ | (15,831) | 2.40 |
| Options terminated or cancelled.......... | (841,802) | 11.24 |
| Balance at end of year................... | 9,582,784 | 12.02 |
| Exercisable at end of year............... | 9,227,438 | $ 12.39 |
| | 2002 | |
| Balance at beginning of year............. | 12,772,431 | $ 11.88 |
| Options exercised........................ | (1,266) | 2.40 |
| Options terminated or cancelled.......... | (2,330,748) | 11.60 |
| Balance at end of year................... | 10,440,417 | 11.94 |
| Exercisable at end of year............... | 8,973,964 | $ 12.58 |
| | 2001 | |
| Balance at beginning of year............. | 14,005,209 | $ 12.70 |
| Options granted.......................... | 1,339,846 | 2.53 |
| Options terminated or cancelled.......... | (2,572,624) | 11.46 |

```
Balance at end of year...................    12,772,431           11.88
=====================================================================
Exercisable at end of year..............     9,586,993        $ 12.64
=====================================================================
```

Currently outstanding options expire on various dates through November 2011. At
December 31, 2003, 4,474,004 shares were available for additional stock option
or restricted stock grants.

Following is a summary of stock options outstanding at December 31, 2003:

```
===========================================================================
STOCK OPTIONS OUTSTANDING
---------------------------------------------------------------------------

                         Weighted-
                          Average     Weighted-              Weighted-
  EXERCISE                Remaining    Average                Average
   PRICE       Number    Contractual  Exercise     Number    Exercise
   RANGE     Outstanding Life (Years)  Price     Exercisable   Price
           ----------------------------------------------------------------
$1  - $8     2,300,702      5.23     $   4.17     1,945,356   $   4.49
$8  - $13    2,974,756      4.81        12.30     2,974,756      12.30
$13 - $18    2,791,126      7.44        14.14     2,791,126      14.14
$18 - $21    1,516,200      6.02        19.47     1,516,200      19.47
             ---------                            ---------
             9,582,784      5.87        12.02     9,227,438      12.39
===========================================================================
```

At December 31, 2001, restrictions on all prior grants of restricted stock, net
of forfeitures, totaled 55,000 shares; these restrictions lapsed in 2002. The
quoted market value of the restricted shares at the date of grant was amortized
to expense ratably over the restriction period.

```
---------------------------------------------------------------------------
18.  PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS
---------------------------------------------------------------------------
```

Grace maintains defined benefit pension plans covering employees of certain
units who meet age and service requirements. Benefits are generally based on
final average salary and years of service. Grace funds its U.S. pension plans
("domestic plans") in accordance with U.S. federal laws and regulations.
Non-U.S. pension plans ("foreign plans") are funded under a variety of methods,
as required under local laws and customs, and therefore cannot be summarized.

Grace provides certain other postretirement health care and life insurance benefits for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees (depending on their dates of hire) who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

An amendment to the structure of the retiree-paid premiums for postretirement medical benefits was approved by the Company's Board in November 2001. The amendment became effective January 1, 2002, and requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 40% of the calculated premium for that coverage. Also, during 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

At December 31, 2003 and 2002 the accounting measure of the accumulated benefit obligation for certain of the domestic and foreign plans exceeded the fair value of dedicated plan assets. As a result, Grace's accumulated other comprehensive loss, reflected as a reduction of shareholders' equity (deficit), includes the recognition of a minimum pension liability as of December 31, 2003 and 2002 of $408.3 million ($265.4 million, net of tax) and $436.5 million ($283.7 million, net of tax), respectively. These amounts include offsets of related deferred pension costs.

The following summarizes the changes in benefit obligations and fair value of retirement plan assets during 2003 and 2002 (Grace uses a December 31 measurement date for the majority of its plans):

F-29

| | PENSION | | | | | | OTHER POST-RETIREMENT PLANS | |
| | U.S. | | NON-U.S. | | TOTAL | | | |
| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS (In millions) | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
|---|---|---|---|---|---|---|---|---|
| **CHANGE IN PROJECTED BENEFIT OBLIGATION** | | | | | | | | |
| Benefit obligation at beginning of year....... | $ 870.2 | $ 776.6 | $ 233.7 | $ 196.1 | $ 1,103.9 | $ 972.7 | $ 123.8 | $ 136.0 |
| Service cost................................... | 9.8 | 8.5 | 5.3 | 4.3 | 15.1 | 12.8 | 0.6 | 0.6 |
| Interest cost.................................. | 56.4 | 55.1 | 14.4 | 12.5 | 70.8 | 67.6 | 8.1 | 8.7 |
| Plan participants' contributions.............. | -- | -- | 0.9 | 0.4 | 0.9 | 0.4 | -- | -- |
| Amendments..................................... | -- | 5.6 | -- | 2.4 | -- | 8.0 | -- | (31.1) |
| Acquisitions................................... | -- | -- | 0.2 | -- | 0.2 | -- | -- | -- |
| Change in discount rates and other assumptions | 53.7 | 93.6 | 18.9 | 2.8 | 72.6 | 96.4 | 7.1 | 31.1 |
| Benefits paid.................................. | (72.0) | (69.2) | (13.6) | (11.1) | (85.6) | (80.3) | (12.6) | (21.5) |
| Currency exchange translation adjustments..... | -- | -- | 34.1 | 26.3 | 34.1 | 26.3 | -- | -- |
| Benefit obligation at end of year............. | $ 918.1 | $ 870.2 | $ 293.9 | $ 233.7 | $ 1,212.0 | $ 1,103.9 | $ 127.0 | $ 123.8 |
| | | | | | | | | |
| **CHANGE IN PLAN ASSETS** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 557.2 | $ 689.5 | $ 159.2 | $ 167.3 | $ 716.4 | $ 856.8 | $ -- | $ -- |
| Actual return on plan assets.................. | 120.0 | (67.8) | 20.8 | (21.4) | 140.8 | (89.2) | -- | -- |
| Employer contribution......................... | 52.9 | 4.3 | 7.6 | 5.9 | 60.5 | 10.2 | 12.6 | 21.5 |
| Acquisitions.................................. | -- | 0.4 | 0.1 | 1.8 | 0.1 | 2.2 | -- | -- |
| Plan participants' contribution............... | -- | -- | 0.9 | 0.4 | 0.9 | 0.4 | -- | -- |
| Benefits paid................................. | (72.0) | (69.2) | (13.6) | (11.1) | (85.6) | (80.3) | (12.6) | (21.5) |
| Currency exchange translation adjustment...... | -- | -- | 18.2 | 16.3 | 18.2 | 16.3 | -- | -- |
| Fair value of plan assets at end of year...... | $ 658.1 | $ 557.2 | $ 193.2 | $ 159.2 | $ 851.3 | $ 716.4 | $ -- | $ -- |
| | | | | | | | | |
| Funded status................................. | $(260.0) | $(313.0) | $(100.7) | $ (74.5) | $ (360.7) | $ (387.5) | $(127.0) | $(123.8) |
| Unrecognized transition obligation............ | -- | -- | 0.1 | 0.5 | 0.1 | 0.5 | -- | -- |
| Unrecognized actuarial loss................... | 423.4 | 463.6 | 108.0 | 90.6 | 531.4 | 554.2 | 55.4 | 51.9 |
| Unrecognized prior service cost/(benefit)..... | 20.6 | 26.1 | 3.6 | 3.8 | 24.2 | 29.9 | (62.7) | (75.3) |
| Net amount recognized......................... | $ 184.0 | $ 176.7 | $ 11.0 | $ 20.4 | $ 195.0 | $ 197.1 | $(134.3) | $(147.2) |
| | | | | | | | | |
| **AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEET CONSIST OF:** | | | | | | | | |
| Prepaid pension costs......................... | $ 6.3 | $ 5.3 | $ 109.6 | $ 98.9 | $ 115.9 | $ 104.2 | $ -- | $ -- |
| Pension obligation............................ | (240.2) | (290.7) | (108.8) | (79.3) | (349.0) | (370.0) | (134.3) | (147.2) |
| Intangible asset.............................. | 19.8 | 26.2 | -- | 0.2 | 19.8 | 26.4 | N/A | N/A |
| Accumulated other comprehensive loss......... | 398.1 | 435.9 | 10.2 | 0.6 | 408.3 | 436.5 | N/A | N/A |
| Net amount recognized......................... | $ 184.0 | $ 176.7 | $ 11.0 | $ 20.4 | $ 195.0 | $ 197.1 | $(134.3) | $(147.2) |
| | | | | | | | | |
| (Decrease) Increase in Minimum Liability Included in Other Comprehensive Income (Loss)................................ | $ (37.8) | $ 227.5 | $ 9.6 | $ (0.3) | NM | NM | NM | NM |
| | | | | | | | | |
| **WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE BENEFIT OBLIGATIONS AS OF DECEMBER 31** | | | | | | | | |
| Discount rate................................. | 6.25% | 6.75% | 5.32% | 5.72% | NM | NM | 6.25% | 6.75% |
| Rate of compensation increase................. | 4.25% | 4.25% | 3.50% | 3.84% | NM | NM | NM | NM |

| WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE NET PERIODIC BENEFIT COST FOR YEARS ENDED DECEMBER 31 | U.S. ---- 2004 ---- | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Discount rate..................... | 6.25% | 6.75% | 7.25% | 5.72% | 5.87% | NM | NM | 6.75% | 7.25% |
| Expected return on plan assets...... | 8.00% | 8.25% | 9.00% | 8.16% | 8.67% | NM | NM | NM | NM |
| Rate of compensation increase...... | 4.25% | 4.25% | 4.25% | 3.84% | 4.08% | NM | NM | NM | NM |

| | 2003 | | | 2002 | | | 2001 | | |
| COMPONENTS OF NET PERIODIC BENEFIT COST (INCOME) (Dollars in millions) | U.S. | NON-U.S. | OTHER | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
|---|---|---|---|---|---|---|---|---|---|
| Service cost.................................. | $ 9.8 | $ 5.3 | $ 0.6 | $ 8.5 | $ 4.3 | $ 0.6 | $ 7.9 | $ 3.8 | $ 0.7 |
| Interest cost................................. | 56.4 | 14.4 | 8.1 | 55.1 | 12.5 | 8.7 | 55.3 | 11.2 | 9.8 |
| Expected return on plan assets................ | (44.5) | (13.3) | -- | (59.1) | (14.8) | -- | (69.1) | (15.9) | -- |
| Amortization of transition obligation (asset). | -- | 0.5 | -- | 0.7 | 0.4 | -- | (10.0) | -- | -- |
| Amortization of prior service cost (benefit).. | 5.5 | 0.6 | (12.7) | 5.2 | 0.6 | (12.7) | 7.6 | 0.5 | (8.3) |
| Amortization of unrecognized actuarial loss... | 18.4 | 4.4 | 3.7 | 9.7 | 1.8 | 3.0 | 2.4 | 0.2 | 0.1 |
| Net curtailment and settlement loss.......... | -- | 0.6 | -- | -- | -- | -- | -- | 0.2 | -- |
| Net periodic benefit cost (income).............. | $ 45.6 | $ 12.5 | $ (0.3) | $ 20.1 | $ 4.8 | $ (0.4) | $ (5.9) | $ -- | $ 2.3 |

NM  - Not meaningful
N/A - Not applicable

| PENSION PLANS WHERE ACCUMULATED BENEFIT OBLIGATIONS EXCEED PLAN ASSETS (In millions) | U.S. | | NON-U.S. | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Projected benefit obligation................... | $ 909.6 | $ 867.1 | $ 121.0 | $ 95.6 | N/A | N/A |
| Accumulated benefit obligation (1)............ | 887.8 | 841.9 | 111.3 | 82.1 | $ 127.0 | $ 123.8 |
| Fair value of plan assets..................... | 647.6 | 551.2 | 5.3 | 3.3 | -- | -- |

N/A - Not applicable
(1)  The accumulated benefit obligation for all domestic plans was $896.2
     million and $845.0 million at December 31, 2003 and 2002, respectively.

The target allocation of investment assets for 2004, the actual allocation at
December 31, 2003 and 2002, and the expected long-term rate of return by asset
category for Grace's domestic plans are as follows:

| ASSET CATEGORY | TARGET ALLOCATION | PERCENTAGE OF PLAN ASSETS DECEMBER 31, | | WEIGHTED-AVERAGE EXPECTED LONG-TERM RATE OF RETURN |
|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2003 |
| U.S. stock................................ | 45% | 45% | 42% | 4.01% |
| Non-U.S. Stock............................ | 15% | 16% | 20% | 2.39% |
| Short-term fixed income................... | 10% | 7% | --% | --% |
| Intermediate-term fixed income............ | 30% | 32% | 38% | 1.85% |
| Total..................................... | 100% | 100% | 100% | 8.25% |

The investment goal for the domestic plans is to earn a long-term rate of return
consistent with the long-term funding requirements of the underlying benefit
obligation and cash flow profile. Plan amendments, assumptions and demographics
are considered in determining the necessary level of returns.

The domestic pension plans have assets managed by six investment managers. Some
of the general restrictions on their investments are summarized as follows:

o    For fixed income securities: single issuers are limited to 5% of the
     portfolio's market value (with the exception of U.S. government and agency
     securities); the average credit quality of the portfolio shall be at least A
     rated; no more than 15% of the market value of the portfolio shall be
     invested in non-dollar denominated bonds; and privately placed securities
     are limited to no more than 50% of the portfolio's market value.

o    For U.S. equity securities; the portfolio is entirely passively managed
     through investment in the Wilshire 5000 index.

o    For non-U.S. equity securities; no individual security shall represent more
     than 5% of the portfolio's market value at any time, investment in U.S.
     common stock securities is prohibited (with the exception of American
     Depository Receipts) and emerging market securities may represent up to 30%
     of the total portfolio's market value. Currency futures and forward
     contracts may be held for the sole purpose of hedging existing currency risk
     in the portfolio.

For 2004, the expected long-term rate of return on assets for domestic plans is
8.0% (8.25% in 2003). Average annual returns over one, three, five, ten and
fifteen year periods were 22.57%, 0.98%, 3.28%, 7.12%, and 8.50%, respectively.
The change in the expected rate is due to the reallocation of targeted equity
from 65% stocks/35% bonds to 60% stocks/40% bonds in December 2003. Grace
reallocated the assets due to the volatility in the equity markets and to
maintain an investment portfolio more in line with the profile of the domestic
plan participants, a significant portion of whom are drawing current benefits.

Non-U.S. pension plans accounted for approximately 22% of total global pension
assets at December 31, 2003 and 2002, respectively. Each of these plans, where
applicable, abide by local requirements and regulations. Some of the local
requirements include the establishment of a local pension committee, a formal
statement of investment policy and procedures, and routine plan valuations by
hired plan actuaries.

Subject to the approval of the Bankruptcy Court, Grace expects to contribute

approximately $40.0 million to its domestic defined benefit pension plans and approximately $12.0 million to its other postretirement plans in 2004. Of the approximately $40.0 million expected to be contributed to the domestic pension plans during 2004, approximately $33.0 million is estimated to be needed to satisfy minimum funding requirements under the Employee Retirement Income Security Act of 1984. Grace intends to contribute the additional $7.0 million to help fund the shortfall between the accounting

measurement of Grace's U.S. qualified pension obligations and the market value
of dedicated pension assets. The entire contribution to fund the other
postretirement benefit plans is discretionary, as the plans are not subject to
any minimum regulatory funding requirements.

For 2003 measurement purposes, the per capita cost of covered retiree health
care benefits for pre-age 65 and post-age 65, respectively, were assumed to
increase at rates of 8.25% and 8.65%, respectively. The rate is assumed to
decrease gradually to 5.3% through 2007 and remain at that level thereafter. A
one percentage point increase or decrease in assumed health care medical cost
trend rates would have a negligible impact on Grace's postretirement benefit
obligations.

--------------------------------------------------------------------------------
19.   BUSINESS SEGMENT INFORMATION
--------------------------------------------------------------------------------

Grace is a global producer of specialty chemicals and specialty materials. It
generates revenues from two business segments: Davison Chemicals and Performance
Chemicals. Davison Chemicals produces a variety of catalyst and silica products.
Performance Chemicals produces specialty construction chemicals, building
materials and sealants and coatings. Intersegment sales, eliminated in
consolidation, are not material. The table below presents information related to
Grace's business segments for 2003, 2002, and 2001. Only those corporate
expenses directly related to the segment are allocated for reporting purposes.
All remaining corporate items are reported separately and labeled as such.

| BUSINESS SEGMENT DATA (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| **NET SALES** | | | |
| Davison Chemicals..................... | $ 1,039.9 | $ 939.3 | $ 868.3 |
| Performance Chemicals................ | 940.6 | 880.4 | 854.6 |
| Total................................ | $ 1,980.5 | $ 1,819.7 | $ 1,722.9 |
| **PRE-TAX OPERATING INCOME** | | | |
| Davison Chemicals..................... | $ 118.9 | $ 129.4 | $ 123.8 |
| Performance Chemicals................ | 107.9 | 98.8 | 96.7 |
| Total................................ | $ 226.8 | $ 228.2 | $ 220.5 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Davison Chemicals..................... | $ 67.6 | $ 61.7 | $ 58.5 |
| Performance Chemicals................ | 33.1 | 32.0 | 29.6 |
| Total................................ | $ 100.7 | $ 93.7 | $ 88.1 |
| **CAPITAL EXPENDITURES** | | | |
| Davison Chemicals..................... | $ 68.1 | $ 59.5 | $ 39.3 |
| Performance Chemicals................ | 16.5 | 27.9 | 22.8 |
| Total................................ | $ 84.6 | $ 87.4 | $ 62.1 |
| **TOTAL ASSETS** | | | |
| Davison Chemicals..................... | $ 797.1 | $ 734.1 | $ 687.2 |
| Performance Chemicals................ | 609.2 | 528.7 | 498.8 |
| Total................................ | $ 1,406.3 | $ 1,262.8 | $ 1,186.0 |

The table below presents information related to the geographic areas in which
Grace operated in 2003, 2002 and 2001.

| GEOGRAPHIC AREA DATA (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| **NET SALES** | | | |
| United States........................... | $ 804.3 | $ 827.1 | $ 829.7 |
| Canada and Puerto Rico.................. | 78.9 | 56.1 | 40.3 |
| Germany................................. | 92.2 | 70.9 | 61.8 |
| Europe, other than Germany.............. | 584.7 | 490.0 | 417.6 |
| Asia Pacific............................ | 312.7 | 269.0 | 266.7 |
| Latin America........................... | 107.7 | 106.6 | 106.8 |
| Total................................... | $ 1,980.5 | $ 1,819.7 | $ 1,722.9 |

PROPERTIES AND EQUIPMENT

| | | | |
|---|---|---|---|
| United States........................... | $ 386.4 | $ 392.0 | $ 386.7 |
| Canada and Puerto Rico................... | 19.4 | 18.5 | 20.1 |
| Germany.................................. | 120.7 | 89.6 | 77.7 |
| Europe, other than Germany.............. | 72.3 | 63.7 | 41.6 |
| Asia Pacific............................ | 46.8 | 47.4 | 49.1 |
| Latin America........................... | 11.0 | 11.0 | 15.1 |
| Total................................... | $ 656.6 | $ 622.2 | $ 590.3 |

Pre-tax operating income, depreciation and amortization, capital expenditures
and total assets for Grace's business segments are reconciled below to amounts
presented in the Consolidated Financial Statements.

F-32

| RECONCILIATION OF BUSINESS SEGMENT DATA TO FINANCIAL STATEMENTS (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Pre-tax operating income - business segments................. | $ 226.8 | $ 228.2 | $ 220.5 |
| Minority interest.............................................. | (1.2) | 2.2 | 3.7 |
| (Loss) gain on sale of investments and disposal of assets..... | (1.5) | 1.9 | 9.7 |
| Provision for environmental remediation...................... | (142.5) | (70.7) | (5.8) |
| Provision for asbestos-related litigation.................... | (30.0) | -- | -- |
| Interest expense and related financing costs................. | (15.6) | (20.0) | (37.1) |
| Corporate costs.............................................. | (78.1) | (47.4) | (33.0) |
| Other, net................................................... | (11.8) | (1.8) | 3.7 |
| (Loss) income from operations before Chapter 11 expenses, income taxes, and minority interest.............. | $ (53.9) | $ 92.4 | $ 161.7 |
| Depreciation and amortization | | | |
|   - business segments....................................... | $ 100.7 | $ 93.7 | $ 88.1 |
|   - corporate............................................... | 2.2 | 1.2 | 1.1 |
| Total depreciation and amortization | $ 102.9 | $ 94.9 | $ 89.2 |
| Capital Expenditures | | | |
|   - business segments....................................... | $ 84.6 | $ 87.4 | $ 62.1 |
|   - corporate............................................... | 1.8 | 3.7 | 0.8 |
| Total capital expenditures................................... | $ 86.4 | $ 91.1 | $ 62.9 |
| Total assets | | | |
|   - business segments....................................... | $1,406.3 | $1,262.8 | $1,186.0 |
|   - corporate............................................... | 581.6 | 551.6 | 558.1 |
| Asbestos-related receivables................................. | 269.4 | 282.6 | 283.7 |
| Deferred tax assets.......................................... | 616.9 | 594.7 | 525.4 |
| Total assets................................................. | $2,874.2 | $2,691.7 | $2,553.2 |

F-33

---
20. QUARTERLY SUMMARY AND STATISTICAL INFORMATION (UNAUDITED)
---

QUARTERLY SUMMARY AND STATISTICAL INFORMATION (Unaudited)
(In millions, except per share)

|  | March 31 | June 30 | September 30 | December 31(1) |
|---|---|---|---|---|
| **2003** | | | | |
| Net sales.................................... | $ 444.8 | $ 503.4 | $ 521.0 | $ 511.3 |
| Cost of goods sold............................ | 296.7 | 329.7 | 336.5 | 326.9 |
| Net (loss) income............................. | (2.3) | 6.5 | (9.9) | (49.5) |
| | | | | |
| Net (loss) income per share: (2) | | | | |
|   Basic earnings per share: | | | | |
|     Net (loss) income...................... | $ (0.04) | $ 0.10 | $ (0.15) | $ (0.75) |
|   Diluted earnings per share: | | | | |
|     Net (loss) income...................... | (0.04) | 0.10 | (0.15) | (0.75) |
| | | | | |
| Market price of common stock: (3) | | | | |
|   High......................................... | $ 2.89 | $ 4.41 | $ 5.52 | $ 3.84 |
|   Low.......................................... | 1.48 | 1.65 | 2.57 | 2.34 |
|   Close........................................ | 1.48 | 4.41 | 3.10 | 2.57 |
| | | | | |
| **2002** | | | | |
| Net sales.................................... | $ 413.2 | $ 471.8 | $ 480.0 | $ 454.7 |
| Cost of goods sold............................ | 259.9 | 294.2 | 300.0 | 294.0 |
| Net income (loss)............................. | 12.4 | 21.2 | 14.0 | (25.5) |
| | | | | |
| Net income (loss) per share: (2) | | | | |
|   Basic earnings per share: | | | | |
|     Net income (loss)...................... | $ 0.19 | $ 0.32 | $ 0.21 | $ (0.39) |
|   Diluted earnings per share: | | | | |
|     Net income (loss)...................... | 0.19 | 0.32 | 0.21 | (0.39) |
| | | | | |
| Market price of common stock: (3) | | | | |
|   High......................................... | $ 2.47 | $ 3.75 | $ 3.05 | $ 2.50 |
|   Low.......................................... | 1.56 | 2.13 | 1.46 | 0.99 |
|   Close........................................ | 2.20 | 3.00 | 1.60 | 1.96 |

(1) Fourth quarter 2003 net loss includes $120.0 million for pre-tax charges to adjust Grace's estimated liability for environmental remediation and asbestos-related property damage. Fourth quarter 2002 net loss includes a $51.0 million pre-tax charge to adjust Grace's estimate of defense and other probable costs to resolve cost recovery claims by the EPA for clean-up of vermiculite in and around Libby, Montana.

(2) Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.

(3) Principal market: New York Stock Exchange.

```
==================================================================================
FINANCIAL SUMMARY (1)
(In millions, except per share amounts)
----------------------------------------------------------------------------------
                                          2003       2002       2001       2000       1999
----------------------------------------------------------------------------------

STATEMENT OF OPERATIONS
Net sales .....................................  $ 1,980.5  $ 1,819.7  $ 1,722.9  $ 1,597.4  $ 1,550.9
(Loss) income from continuing operations before Chapter 11
   expenses, income taxes, and minority interest (2).....   (53.9)      92.4      161.7      (19.7)     203.4
(Loss) income from continuing operations (2)..............   (55.2)      22.1       78.6      (89.7)     130.2
Income from discontinued operations (2) .................     --         --         --         --         5.7
Minority interest in consolidated entities................    1.2       (2.2)      (3.7)      --         --
Net (loss) income ........................................   (55.2)      22.1       78.6      (89.7)     135.9

FINANCIAL POSITION
Current assets (3) .......................................  $  928.9  $  830.3  $  741.3  $  773.9  $  779.8
Current liabilities (3)...................................    270.8     247.3     236.1    1,092.9     769.4
Properties and equipment, net.............................    656.6     622.2     590.3     601.7     617.3
Total assets (3)..........................................  2,874.2   2,691.7   2,521.1   2,584.9   2,475.1
Total debt not subject to compromise (3)..................      6.8       4.3       6.9     421.9     136.2
Liabilities subject to compromise.........................  2,465.3   2,334.7   2,311.5      --         --
Shareholders' equity (deficit)............................   (183.6)   (222.2)   (141.7)    (71.3)    111.1

CASH FLOW
Operating activities (3) .................................  $  110.8  $  195.5  $   14.6  $ (143.7) $  130.5
Investing activities .....................................   (109.1)   (110.7)   (131.4)    (94.0)     89.4
Financing activities (3)..................................     (4.7)     (9.2)    123.7     239.9     (80.9)
Net cash flow (3).........................................     25.6      91.7       --        (7.9)    134.5

DATA PER COMMON SHARE (DILUTED)
(Loss) income from continuing operations (2)..............  $  (0.84) $   0.34  $   1.20  $  (1.34) $   1.76
Net (loss) income ........................................    (0.84)     0.34      1.20     (1.34)     1.84
Average common diluted shares outstanding (thousands).....   65,500    65,500    65,400    66,800    73,800

OTHER STATISTICS
Capital expenditures......................................  $   86.4  $   91.1  $   62.9  $   64.8  $   82.5
Common stock price range..................................  $1.48-5.52 $0.99-3.75 $1.31-4.38 $1.94-14.94 $11.81-21.00
Common shareholders of record.............................   10,734    11,187    11,643    12,240    13,215
Number of employees - continuing operations...............    6,300     6,400     6,400     6,300     6,300
==================================================================================
```

(1) Certain prior-year amounts have been reclassified to conform to the 2003
    presentation.

(2) Amounts contain a provision for environmental remediation of $142.5 million
    and a provision for asbestos-related claims of $30.0 million for 2003.
    Amounts contain a provision for environmental remediation of $70.7 million
    for 2002. Amounts for 2000 also contain a provision for asbestos litigation,
    net of expected insurance recovery, of $208.0 million.

(3) 2001 results are retroactively restated to reflect the full consolidation of
    Advanced Refining Technologies LLC, previously reported as an equity method
    joint venture. This restatement had no effect on reported sales or net
    income.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS
AND FINANCIAL CONDITION

--------------------------------------------------------------------------------
DESCRIPTION OF CORE BUSINESS
--------------------------------------------------------------------------------

W. R. Grace & Co. and its subsidiaries are engaged in specialty chemicals and
specialty materials businesses on a global basis. Its business segments are
Davison Chemicals, which produces catalyst and silica products, and Performance
Chemicals, which produces specialty construction chemicals, building materials
and sealants and coatings.

The table below shows the Grace business segments and product groups as a
percentage of total Grace sales.

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Catalyst products..................... | 37% | 37% | 36% |
| Silica products...................... | 15% | 15% | 14% |
| DAVISON CHEMICALS.................... | 52% | 52% | 50% |
| Construction chemicals............... | 23% | 22% | 22% |
| Building materials................... | 12% | 13% | 14% |
| Sealants and coatings................ | 13% | 13% | 14% |
| PERFORMANCE CHEMICALS................ | 48% | 48% | 50% |
| TOTAL................................ | 100% | 100% | 100% |

Catalyst products includes: fluid cracking catalysts ("FCC") and additives used
in petroleum refineries to convert distilled crude oil into transportation fuels
and other petroleum-based products; hydroprocessing catalysts, also used in
refining, to upgrade heavy oils and remove certain impurities; polyolefin
catalysts, which are essential components in the manufacture of polyethylene and
polypropylene resins used in products such as plastic film, high-performance
plastic pipe and other plastic parts; and chemical catalysts, which are used in
a variety of chemical processes. Key external drivers for catalysts are the
refining industry, specifically the impacts of fuel and petrochemical demand,
and crude oil supply, and the plastics industry, where demand generally
correlates with general economic factors such as consumer confidence.

Silica products are used in a wide range of industrial and consumer applications
such as paper, wood and coil coatings, food processing, plastics, adsorbents,
personal care products and biotechnology separations. Apart from high growth
segments such as coatings used for ink jet printing applications, and
biotechnology, silica products' performance is largely affected by general
economic conditions.

Construction chemicals and building materials are used primarily by the
nonresidential construction industry. Construction chemicals add strength,
control corrosion, and enhance the handling and application of concrete, and
reduce the manufacturing cost and improve the quality of cement. Performance for
this product group is driven by non-residential construction activity and, to a
lesser extent, residential construction activity, which tend to lag the general
economy in both decline and recovery. Building materials prevent water damage to
structures and protect structural steel against collapse due to fire. Building
materials performance is also driven by non-residential construction activity,
with greater lags than construction chemicals, reflecting longer lead times for
large projects. Other important external factors affecting business performance
include residential re-roofing activity and a decline in fire protection demand
due to changes in building codes. Since building materials is largely a North
American product group, it is most strongly affected by U.S. construction
activity.

Sealants and coatings are used to seal beverage and food cans, and glass and
plastic bottles, and to protect metal packaging from corrosion and the contents
from the influences of metal. Although this product group is affected by general
economic conditions, there is an ongoing shift in demand from metal and glass to
plastic packaging for foods and beverages. This shift is driving a decline in
can sealant usage and providing some opportunities in closure sealants for
plastic bottles and other containers.

--------------------------------------------------------------------------------
VOLUNTARY BANKRUPTCY FILING
--------------------------------------------------------------------------------

See Note 14 to the consolidated financial statements for a discussion of SPI's
Voluntary Bankruptcy Filing.

--------------------------------------------------------------------------------
CRITICAL ACCOUNTING ESTIMATES
--------------------------------------------------------------------------------

The preparation of financial statements in conformity with U.S. generally
accepted accounting principles requires that management make estimates and
assumptions affecting the assets and liabilities reported at the date of the
Consolidated Financial Statements, and the revenues and expenses reported for
the periods presented. Actual amounts could differ from those estimates. Changes
in estimates are recorded in the period identified. Grace's accounting
measurements that are most affected by management's estimates of future events
are:

o    Contingent liabilities such as asbestos-related matters (see Note 3 to the
     Consolidated Financial Statements), environmental remediation (see Note 14
     to the Consolidated Financial Statements), income taxes (see Note 14

                                  F-36

to the Consolidated Financial Statements), and retained obligations of
divested businesses.

o    Pension and postretirement liabilities that depend on assumptions regarding
     discount rates and/or total returns on invested funds. (See Note 18 to the
     Consolidated Financial Statements.)

o    Depreciation and amortization periods for long-lived assets, including
     property and equipment, intangible, and other assets.

o    Realization values of various assets such as net deferred tax assets (see
     Note 4 to the Consolidated Financial Statements), trade receivables,
     inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the
uncertainties arising under the Chapter 11 Cases.

--------------------------------------------------------------------------------
CONSOLIDATED OPERATIONS
--------------------------------------------------------------------------------

Set forth below is a chart that lists key operating statistics, and dollar and
percentage changes for the years ended December 31, 2003, 2002, and 2001. The
chart should be referenced when reading management's discussion and analysis of
the results of operations and financial condition. The chart, as well as the
financial information presented throughout this discussion, divides Grace's
financial results between "core operations" and "noncore activities." Core
operations comprise the financial results of Davison Chemicals, Performance
Chemicals and the costs of corporate activities that directly or indirectly
support business operations. In contrast, noncore activities comprise all other
events and transactions not directly related to the generation of operating
revenue or the support of core operations and generally relate to Grace's former
operations and products.

Neither pre-tax income from core operations nor pre-tax income from core
operations before depreciation and amortization purport to represent income or
cash flow as defined under generally accepted accounting principles, and should
not be considered an alternative to such measures as an indicator of Grace's
performance. These measures are provided to distinguish operating results of
Grace's current business base from results and related assets and liabilities of
past businesses, discontinued products, and corporate legacies.

| ANALYSIS OF CONSOLIDATED OPERATIONS (In millions) | 2003 | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) | 2001 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|---|---|---|
| NET SALES: | | | | | | | |
| Davison Chemicals...................... | $ 1,039.9 | $ 939.3 | $ 100.6 | 10.7% | $ 868.3 | $ 71.0 | 8.2% |
| Performance Chemicals.................. | 940.6 | 880.4 | 60.2 | 6.8% | 854.6 | 25.8 | 3.0% |
| TOTAL GRACE SALES - CORE OPERATIONS........ | $ 1,980.5 | $ 1,819.7 | $ 160.8 | 8.8% | $ 1,722.9 | $ 96.8 | 5.6% |
| PRE-TAX OPERATING INCOME: (1) | | | | | | | |
| Davison Chemicals (2)................ | $ 118.9 | $ 129.4 | $ (10.5) | (8.1%) | $ 123.8 | $ 5.6 | 4.5% |
| Performance Chemicals.................. | 107.9 | 98.8 | 9.1 | 9.2% | 96.7 | 2.1 | 2.2% |
| Corporate costs: | | | | | | | |
| Support functions.................. | (30.2) | (31.1) | 0.9 | 2.9% | (38.0) | 6.9 | 18.2% |
| Pension and other.................. | (47.9) | (16.3) | (31.6) | (193.9%) | 5.0 | (21.3) | NM |
| Total Corporate costs.................. | (78.1) | (47.4) | (30.7) | (64.8%) | (33.0) | (14.4) | (43.6%) |
| PRE-TAX INCOME FROM CORE OPERATIONS........ | 148.7 | 180.8 | (32.1) | (17.8%) | 187.5 | (6.7) | (3.6%) |
| PRE-TAX (LOSS) INCOME FROM NONCORE | | | | | | | |
| ACTIVITIES............................ | (190.1) | (74.5) | (115.6) | NM | 3.0 | (77.5) | NM |
| Interest expense...................... | (15.6) | (20.0) | 4.4 | 22.0% | (37.1) | 17.1 | 46.1% |
| Interest income...................... | 4.3 | 3.9 | 0.4 | 10.3% | 4.6 | (0.7) | (15.2%) |
| (LOSS) INCOME BEFORE CHAPTER 11 | | | | | | | |
| EXPENSES AND INCOME TAXES............ | (52.7) | 90.2 | (142.9) | NM | 158.0 | (67.8) | NM |
| Chapter 11 expenses, net.............. | (14.8) | (30.1) | 15.3 | 50.8% | (15.7) | (14.4) | (91.7%) |
| Benefit from (provision for) income taxes.. | 12.3 | (38.0) | 50.3 | NM | (63.7) | 25.7 | NM |
| NET (LOSS) INCOME.......................... | $ (55.2) | $ 22.1 | $ (77.3) | NM | $ 78.6 | $ (56.5) | NM |
| KEY FINANCIAL MEASURES: | | | | | | | |
| PRE-TAX INCOME FROM CORE OPERATIONS AS A PERCENTAGE OF SALES: | | | | | | | |
| Davison Chemicals.................... | 11.4% | 13.8% | NM | (2.4) pts | 14.3% | NM | (0.5) pts |
| Performance Chemicals................ | 11.5% | 11.2% | NM | 0.3 pts | 11.3% | NM | (0.1) pts |
| Total Core Operations................ | 7.5% | 9.9% | NM | (2.4) pts | 10.9% | NM | (1.0) pts |
| PRE-TAX INCOME FROM CORE OPERATIONS BEFORE DEPRECIATION AND | | | | | | | |
| AMORTIZATION........................ | $ 251.6 | $ 275.7 | $ (24.1) | (8.7%) | $ 276.7 | $ (1.0) | (0.4%) |
| AS A PERCENTAGE OF SALES............. | 12.7% | 15.2% | NM | (2.5) pts | 16.1% | NM | (0.9) pts |
| NET CONSOLIDATED SALES BY REGION: | | | | | | | |
| North America......................... | $ 883.2 | $ 883.2 | $ -- | --% | $ 870.0 | $ 13.2 | 1.5% |
| Europe................................ | 676.9 | 560.9 | 116.0 | 20.7% | 479.4 | 81.5 | 17.0% |
| Asia Pacific.......................... | 312.7 | 269.0 | 43.7 | 16.2% | 266.7 | 2.3 | 0.9% |
| Latin America......................... | 107.7 | 106.6 | 1.1 | 1.0% | 106.8 | (0.2) | (0.2%) |
| TOTAL................................. | $ 1,980.5 | $ 1,819.7 | $ 160.8 | 8.8% | $ 1,722.9 | $ 96.8 | 5.6% |

NM = Not meaningful

(1) Pre-tax operating income for all periods presented reflects a reallocation of the cost of earned pension benefits of active participants from corporate to the respective business segments.

(2) Davison Chemicals pre-tax operating income includes minority interest related to the Advanced Refining Technologies joint venture.

```
--------------------------------------------------------------------------------
GRACE OVERVIEW
--------------------------------------------------------------------------------
```

NET SALES

The following table identifies the year-over-year increase or decrease in sales
attributable to changes in product volume, product price and/or mix, and the
impact of foreign currency translation.

| NET SALES VARIANCE ANALYSIS | 2003 AS A PERCENTAGE INCREASE (DECREASE) FROM 2002 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | CURRENCY TRANSLATION | TOTAL |
| Davison Chemicals.................. | 1.7% | 2.8% | 6.2% | 10.7% |
| Performance Chemicals.............. | 2.4% | 0.1% | 4.3% | 6.8% |
| Net sales.......................... | 2.0% | 1.5% | 5.3% | 8.8% |
| BY REGION: | | | | |
| North America..................... | (2.1%) | 1.7% | 0.4% | --% |
| Europe............................ | 5.7% | (1.4%) | 16.4% | 20.7% |
| Latin America..................... | (1.0%) | 9.6% | (7.6%) | 1.0% |
| Asia Pacific...................... | 14.4% | (1.4%) | 3.2% | 16.2% |

| | 2002 AS A PERCENTAGE INCREASE (DECREASE) FROM 2001 | | | |
|---|---|---|---|---|
| Davison Chemicals.................. | 5.9% | 1.4% | 0.9% | 8.2% |
| Performance Chemicals.............. | 4.7% | (0.7%) | (1.0%) | 3.0% |
| Net sales.......................... | 5.3% | 0.4% | (0.1%) | 5.6% |
| BY REGION: | | | | |
| North America..................... | 0.3% | 1.2% | --% | 1.5% |
| Europe............................ | 14.5% | (0.9%) | 3.4% | 17.0% |
| Latin America..................... | 2.5% | 13.2% | (15.9%) | (0.2%) |
| Asia Pacific...................... | 8.4% | (7.6%) | 0.1% | 0.9% |

Grace's 2003 sales were favorably impacted by currency translation, improved
volume, product mix and revenue from acquisitions in silica products and
construction chemicals. Acquisitions contributed $27.1 million or 1.5 percentage
points of the sales volume growth. The impact from foreign currency translation
occurred primarily from European sales, reflecting the strengthening of the Euro
against the U.S. dollar.

In 2003 and 2002, both business segments experienced volume growth. In 2003, the
volume growth in Davison Chemicals was primarily driven by acquisitions, while
Performance Chemicals' volume growth was primarily driven by the construction
chemicals product group. The most significant volume increases were experienced
in Asia Pacific, primarily attributable to construction chemicals and catalyst
products.

In 2002, catalyst volumes were strong due to increased refining catalyst demand.
Silica products sales reflect the addition of two acquisitions during the first
quarter of 2001 and volume increases of products used in coating applications.
Construction chemicals volume growth in Europe was driven by the acquisition of
Pieri S.A. in July 2001. In 2002, the most significant volume increases were
experienced in Europe, primarily attributable to the Borealis A/S and Pieri S.A.
acquisitions.

Reported net sales from Grace's non-U.S. operations were positively impacted by
foreign currency translation in 2003, with minor impact in 2002. For countries
in which Grace operates, weighted average foreign currency exchange rates
appreciated approximately 8.9% in 2003 relative to the U.S. dollar, and
depreciated approximately 0.1% in 2002.

PRE-TAX INCOME FROM CORE OPERATIONS

The decline in 2003 operating profit and margins was principally caused by
higher costs for pensions, natural gas, and certain raw materials. A change in
regional and product sales mix from North America to other regions, particularly
in the first half of 2003, also contributed to the decrease.

Operating income in 2002 was adversely affected by: weakness in the global
economy and in U.S. commercial construction activity; product mix; higher
expenses to support growth initiatives; and higher costs for pensions, medical
benefits, insurance and other operating costs. Higher sales and lower energy

costs could fluctuate if plan assets affected by changing interest rates.

Corporate costs include corporate functional costs (such as financial and legal services, human resources, communications and information technology), the cost of corporate governance (including directors and officers ("D&O") liability insurance) and pension costs related to both corporate employees and to the effects of changes in assets and liabilities for all Grace pension plans. Corporate costs for the year ended December 31, 2003 increased over 2002 primarily due to: (1) added costs for pension benefits to account for the negative equity market returns in 2000-2002 that have impacted the funded status of defined benefit pension plans; and (2) higher D&O liability insurance premiums. The total return on pension assets in 2003 (22.5% for Grace's domestic pension plan assets versus an assumed rate of 8.25%) were not recognized in income in 2003 under the deferral method of accounting for pension costs. These actual-to-assumed performance differences will be recognized in earnings over a period ranging from 12-24 years.

The increase in corporate costs from 2001 to 2002 was primarily attributable to an increase in pension costs and D&O liability insurance premiums, offset by lower support function expenses. Pension costs rose $29.1

F-39

million and $17.6 million in 2003 and 2002, respectively, reflecting the accounting effects of negative returns on pension assets from 2000 to 2002, and certain plan formula changes.

During 2003 and 2002, Grace continued to focus on productivity improvements to partially offset adverse market and cost factors. The results of its productivity initiatives are reflected in: (1) sales - through added plant capacity resulting from improved production processes; (2) costs - through efficiency gains and purchasing synergies; and (3) capital avoidance - by maximizing asset utilization.

Grace values its U.S. inventories under the last-in/first-out method ("LIFO"), and its non-U.S. inventories under the first-in/first-out ("FIFO") method. LIFO was selected in 1974 for U.S. financial reporting and tax purposes because it generally results in a better matching of current revenue with current costs. Grace cannot elect LIFO for its non-U.S. inventories due to statutory restrictions. However, if Grace valued its U.S. inventories using the FIFO method, consistent with non-U.S. subsidiaries, pre-tax income from core operations would have been approximately 4.0% and 3.0% higher for each of the years ended December 31, 2003 and 2002, respectively, and approximately 2.0% lower for the year ended December 31, 2001.

PRE-TAX LOSS FROM NONCORE ACTIVITIES

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Environmental provision - vermiculite mining... | $(122.5) | $ (68.0) | $ (5.7) |
| Environmental provision - all other sites...... | (20.0) | (2.6) | (1.7) |
| Provision for asbestos-related litigation...... | (30.0) | -- | -- |
| COLI income, net................................ | 5.6 | 4.7 | 5.4 |
| D&O insurance cost............................. | (6.8) | (3.4) | (3.0) |
| Pension and postretirement benefit costs....... | (9.0) | (6.2) | 4.6 |
| Other.......................................... | (7.4) | 1.0 | 3.4 |
| | $(190.1) | $ (74.5) | $ 3.0 |

The 2003 pre-tax loss from noncore activities was higher than 2002 primarily due to pre-tax charges to adjust Grace's estimated liabilities for pre-Chapter 11 contingencies. Grace increased its estimated liability for environmental clean-up related to previously operated vermiculite mining and processing sites by $122.5 million to a total of $181.0 million at December 31, 2003. Grace also recorded a $20.0 million increase in its estimated liability for non-vermiculite related environmental risks identified and measured as part of the Chapter 11 claims review process. In addition, Grace recorded a $30.0 million increase in its estimated liability for asbestos-related litigation to account for the estimated cost of resolving new asbestos-related property damage claims received through the Chapter 11 claims solicitation process.

Expense from noncore activities for 2002 included $70.7 million for Grace's defense and other probable costs to resolve pending environmental litigation (primarily relating to former vermiculite mining operations in Libby, Montana).

The pre-tax income from noncore activities for 2001 included $7.7 million from the sale of Grace's remaining cost-based investment in Cross Country Staffing, offset by accruals for legal and environmental matters primarily related to Grace's former vermiculite mining operations in Libby, Montana.

CHAPTER 11 EXPENSES

Although it is difficult to measure precisely how Chapter 11 has impacted Grace's overall financial performance, there are certain added costs that are directly attributable to operating under the Bankruptcy Code. Net Chapter 11 expenses consist primarily of legal, financial and consulting fees incurred by Grace and three creditors' committees. The decrease of Chapter 11 expenses in 2003 is related to reduced advisory activity compared with 2002. The increase in Chapter 11 expenses in 2002 compared with 2001 was due to a full year of costs and more activity in the Chapter 11 Cases. Grace believes that Chapter 11 expenses will range between $2 million and $6 million per quarter for the foreseeable future.

In addition, for 2003, 2002 and 2001, Grace's pre-tax income from core operations included expenses of $8.0 million, $7.8 million, and $10.0 million respectively, for Chapter 11-related compensation charges. Poor stock price performance in the period leading up to and after the Filing diminished the value of Grace's stock option program to current and prospective employees, which caused Grace to change its long-term incentive compensation program into a cash-based program. Grace has also sought to address employee retention issues by providing added compensation to certain employees and increasing Grace's contribution to its retirement savings and investment plan.

There are numerous other indirect costs to manage Grace's Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including D&O liability insurance premiums; and lost business and acquisition opportunities due to the complexities of operating under Chapter 11.

F-40

INTEREST

The decrease in net interest expense over the last three years was primarily
attributable to a lower contractual interest rate on pre-petition debt subject
to compromise. The payment of interest accrued on pre-petition debt is subject
to the outcome of Grace's Chapter 11 proceedings.

INCOME TAXES

Grace's benefit from (provision for) income taxes at the federal corporate rate
of 35% for the years ended December 31, 2003, 2002 and 2001 was $23.6 million,
($21.0 million), and ($49.8 million), respectively. The primary differences
between these amounts and the overall benefit from and provision for income
taxes is attributable to current period interest on tax contingencies and the
non-deductibility of certain Chapter 11 expenses.

--------------------------------------------------------------------------------
BUSINESS SEGMENT OVERVIEW
--------------------------------------------------------------------------------

DAVISON CHEMICALS

| NET SALES BY PRODUCT LINE (In millions) | 2003 | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| Catalyst products.............. | $ 734.9 | $ 678.0 | $ 56.9 | 8.4% |
| Silica products................ | 305.0 | 261.3 | 43.7 | 16.7% |
| TOTAL DAVISON CHEMICALS........ | $1,039.9 | $ 939.3 | $ 100.6 | 10.7% |

| | 2002 | 2001 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| Catalyst products.............. | $ 678.0 | $ 621.8 | $ 56.2 | 9.0% |
| Silica products................ | 261.3 | 246.5 | 14.8 | 6.0% |
| TOTAL DAVISON CHEMICALS........ | $ 939.3 | $ 868.3 | $ 71.0 | 8.2% |

| NET SALES BY REGION (In millions) | 2003 | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| North America.................. | $ 395.2 | $ 388.1 | $ 7.1 | 1.8% |
| Europe......................... | 418.3 | 354.2 | 64.1 | 18.1% |
| Asia Pacific................... | 177.7 | 146.7 | 31.0 | 21.1% |
| Latin America.................. | 48.7 | 50.3 | (1.6) | (3.2%) |
| TOTAL DAVISON CHEMICALS........ | $1,039.9 | $ 939.3 | $ 100.6 | 10.7% |

| | 2002 | 2001 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| North America.................. | $ 388.1 | $ 362.3 | $ 25.8 | 7.1% |
| Europe......................... | 354.2 | 303.8 | 50.4 | 16.6% |
| Asia Pacific................... | 146.7 | 149.9 | (3.2) | (2.1%) |
| Latin America.................. | 50.3 | 52.3 | (2.0) | (3.8%) |
| TOTAL DAVISON CHEMICALS........ | $ 939.3 | $ 868.3 | $ 71.0 | 8.2% |

Recent Acquisitions and Joint Ventures

See Note 5 to the Consolidated Financial Statements for a description of
acquisitions and joint ventures completed in 2003 and 2002.

Sales

The increase in sales for the Davison Chemicals segment in 2003 compared with
2002 was primarily attributable to the favorable impact of acquisitions,
currency translation, and product mix. Acquisitions accounted for $20.9 million
or 2.2 percentage points of the sales growth. The increase in sales of catalyst
products was a result of favorable currency effects and acquisitions in the
polyolefin and hydroprocessing catalyst businesses, partially offset by lower
sales volumes in North America caused by a decrease in demand. Increased sales

of silica additives were attributable to added volume from favorable foreign
translation impacts, and from growth programs for products used in coatings,
digital printing, and separations applications.

In Europe, the increase in sales was primarily due to favorable currency
translation and acquisitions, as well as volume growth in silica products. The
increase in Asia Pacific reflects volume growth and acquisition sales within the
catalyst product line.

Sales for the Davison Chemicals segment in 2002 increased over 2001 due to
increased demand, acquisitions and favorable foreign currency translation.
Acquisitions accounted for $26.5 million or 3.1 percentage points of the sales
growth. The increase in sales of catalyst products was primarily due to added
revenue from acquisitions and joint ventures in the polyolefin and
hydroprocessing catalyst businesses, and increased FCC volumes. Sales of silica
products increased due to acquisition sales, as well as growth programs in
coating applications and added volume in Europe and Asia Pacific.

In North America, the increase was primarily attributable to favorable order
patterns of hydroprocessing catalysts, offset by a decrease in sales of chemical
catalysts. In Europe, the increase was driven by refining catalysts and silica
coating applications, along with sales from the Borealis A/S acquisition.

Operating Income

The decline in pre-tax operating income in 2003 compared with 2002 reflects a
sluggish U.S. economy and higher energy, raw materials, and other manufacturing

F-41

costs. Manufacturing costs were higher in the first half of 2003 due to maintenance and process problems at certain production facilities. Second half comparisons improved as the U.S. economy strengthened, and manufacturing costs and operating expenses were reduced.

Pre-tax operating income in 2002 was higher than 2001, due to year-over-year sales growth and the positive effects of acquisitions. Increased gross margin from higher sales was partially offset by higher expenses to support growth initiatives and increases in employee benefits (including pension), insurance and other operating costs.

PERFORMANCE CHEMICALS

| NET SALES BY PRODUCT LINE (In millions) | 2003 | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| Construction chemicals......... | $ 448.1 | $ 405.4 | $ 42.7 | 10.5% |
| Building materials............. | 231.0 | 230.2 | 0.8 | 0.3% |
| Sealants and coatings.......... | 261.5 | 244.8 | 16.7 | 6.8% |
| TOTAL PERFORMANCE CHEMICALS.... | $ 940.6 | $ 880.4 | $ 60.2 | 6.8% |

| | 2002 | 2001 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| Construction chemicals......... | $ 405.4 | $ 373.5 | $ 31.9 | 8.5% |
| Building materials............. | 230.2 | 239.1 | (8.9) | (3.7%) |
| Sealants and coatings.......... | 244.8 | 242.0 | 2.8 | 1.2% |
| TOTAL PERFORMANCE CHEMICALS.... | $ 880.4 | $ 854.6 | $ 25.8 | 3.0% |

| NET SALES BY REGION (In millions) | 2003 | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| North America.................. | $ 488.0 | $ 495.1 | $ (7.1) | (1.4%) |
| Europe......................... | 258.6 | 206.7 | 51.9 | 25.1% |
| Asia Pacific................... | 135.0 | 122.3 | 12.7 | 10.4% |
| Latin America.................. | 59.0 | 56.3 | 2.7 | 4.8% |
| TOTAL PERFORMANCE CHEMICALS.... | $ 940.6 | $ 880.4 | $ 60.2 | 6.8% |

| | 2002 | 2001 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|
| North America.................. | $ 495.1 | $ 507.7 | $ (12.6) | (2.5%) |
| Europe......................... | 206.7 | 175.6 | 31.1 | 17.7% |
| Asia Pacific................... | 122.3 | 116.8 | 5.5 | 4.7% |
| Latin America.................. | 56.3 | 54.5 | 1.8 | 3.3% |
| TOTAL PERFORMANCE CHEMICALS.... | $ 880.4 | $ 854.6 | $ 25.8 | 3.0% |

Recent Acquisitions and Joint Ventures

See Note 5 to the Consolidated Financial Statements for a description of acquisitions and joint ventures completed in 2003 and 2002.

Sales

The increase in sales for the Performance Chemicals segment in 2003 compared with 2002 was primarily attributable to favorable foreign currency translation and volume increases. Acquisitions accounted for $6.2 million, or 0.7 percentage points of the sales growth, all related to construction chemicals. The increase in sales of construction chemicals reflected favorable currency translation impacts, the success of new product programs and sales initiatives in key economies worldwide, and the acquisition of the assets of Tricosal Beton-Chemie, completed during the fourth quarter of 2003. Sales of building materials were essentially flat, as favorable currency translation impacts and growth in waterproofing were offset by declines in fire protection materials. Sales from fire protection materials declined as a result of the effects of new building codes that permit less fire protection materials for structural steel used in commercial buildings, as well as weak U.S. commercial construction activity. Sales of sealants and coatings increased, reflecting favorable currency translation impacts in Europe and growth initiatives in coatings and closure

sealants. Although overall sales to Latin America totally unchanged due to
currency exchange in Latin America.

In Europe, higher sales were due to favorable foreign currency translation and
volume growth in all product groups, particularly concrete admixtures. Sales in
Asia Pacific increased from the effects of favorable foreign currency, as well
as volume growth in construction chemicals.

The increase in Performance Chemicals segment sales in 2002 versus 2001 was primarily driven by acquisitions in construction chemicals, which accounted for $20.0 million, or 2.4 percentage points, of the sales growth. Sales of construction chemicals increased despite reduced U.S. commercial construction activity, reflecting sales from the Pieri acquisition, an increase in construction activity outside North America, and the success of new product programs and sales initiatives. Sales of building materials, which are largely based in North America, were down due to softness in U.S. commercial construction and re-roofing activity. The increase in sales of sealants and coatings reflected continued positive results from growth programs in coatings and closure compounds, particularly in Europe.

F-42

The decline in North America reflected the impact of weak U.S. commercial construction activity on sales of construction chemicals and building materials. In Europe, the increase in sales was primarily attributable to the Pieri acquisition and volume growth in all three product groups.

Operating Income

Pre-tax operating income was higher in 2003 compared with 2002, reflecting favorable foreign currency translation, sales increases and successful productivity programs, partially offset by increases in raw material and energy costs. The second half of 2003 was significantly stronger than the first half, which was affected by soft construction activity and weather-delayed projects in the U.S. In the second half, U.S. construction weather improved, allowing for a catch-up in project activity, and there was some leveling of the decline in overall U.S. construction activity. Intensified focus on productivity programs and discretionary expense control also contributed to improved profitability in the second half.

The increase in pre-tax operating income in 2002 versus 2001 reflects the impact of acquisitions in construction chemicals and growth programs across all product groups, offset by the impact of weak U.S. commercial construction activity on sales of fire protection materials, a decrease in sales of roofing underlayments due to the effect of a mild U.S. 2001-02 winter on re-roofing activity and costs for facility rationalizations and restructuring in building materials and sealants and coatings.

FINANCIAL POSITION

The following charts set forth the Davison Chemicals and Performance Chemicals total asset position and pre-tax return on average total assets for 2003 and 2002.

| DAVISON CHEMICALS (In millions) | 2003 | 2002 | $ Change (excluding currency translation) Fav (Unfav) | % Change (excluding currency translation) Fav (Unfav) |
|---|---|---|---|---|
| Receivables................................... | $ 146.3 | $ 137.6 | $ (2.7) | (2.0%) |
| Inventory..................................... | 133.6 | 111.0 | 13.0 | 11.7% |
| Other current assets.......................... | 2.1 | 3.0 | (0.9) | (30.0%) |
| Total current assets.......................... | 282.0 | 251.6 | 9.4 | 3.7% |
| Properties and equipment, net................. | 444.0 | 413.9 | 5.3 | 1.3% |
| Goodwill and other intangible assets.......... | 65.8 | 64.2 | (5.0) | (7.8%) |
| Other assets.................................. | 5.3 | 4.4 | 0.4 | 9.1% |
| Total assets.................................. | $ 797.1 | $ 734.1 | $ 10.1 | 1.4% |
| Pre-tax return on average total assets........ | 15.4% | 17.5% | | (2.1) pts |

Davison Chemicals' total assets increased by $63.0 million compared with the prior year, of which $52.9 million was attributable to currency translation, reflecting the weaker U.S. dollar. The remainder of such increase was primarily due to increased inventories, offset by a decrease in receivables. The increase in inventory was primarily in North America and was due to a build-up for 2004 sales, increased inventory costs and acquisitions. The decline in receivables was caused by improved collections as well as changes in customer and product mix.

The pre-tax return on average total assets decreased by 2.1 percentage points, due to an 8.1% decline in pre-tax operating income.

| PERFORMANCE CHEMICALS (In millions) | 2003 | 2002 | $ Change (excluding currency translation) Fav (Unfav) | % Change (excluding currency translation) Fav (Unfav) |
|---|---|---|---|---|
| Receivables.................................... | $ 196.2 | $ 172.8 | $ 8.0 | 4.6% |
| Inventory...................................... | 80.9 | 62.6 | 12.0 | 19.2% |
| Other current assets........................... | 5.9 | 5.2 | 0.5 | 9.6% |

```
Total current assets.....................      348.4        240.6        20.5        8.8%
Properties and equipment, net ...........      203.2        193.4       (2.4)      (1.2%)
Goodwill and other intangible ...........       84.5         64.3       11.0        17.1%
Other assets.............................       38.5         30.4        6.7        22.0%
                                            -------------------------------------------
Total assets.............................   $  609.2     $  528.7    $   35.8        6.8%
                                            ===========================================
Pre-tax return on average total assets...      18.7%        18.6%                   0.1  pts
                                            ===================================================================
```

F-43

Performance Chemicals' total assets increased by $80.5 million compared with the prior year, of which $44.7 million was attributable to currency translation reflecting the weaker U.S dollar. The remainder of such increases was primarily due to receivables, inventory and goodwill and other intangible assets. The increase in receivables was caused primarily by a shift in the regional sales mix toward regions outside North America where, on average, the standard terms of sale are longer. The increase in inventory was due primarily to advance purchases of key raw materials to secure favorable pricing. The change in goodwill and other intangible assets was primarily due to acquisitions.

The pre-tax return on average total assets for 2003 was consistent with 2002.

--------------------------------------------------------------------------------
FINANCIAL CONDITION
--------------------------------------------------------------------------------

EFFECT OF CHAPTER 11

As described in Note 1 to the Consolidated Financial Statements, the Company and its principal U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the Bankruptcy Code. Grace's non-U.S. subsidiaries, although not part of the Filing, are owned directly or indirectly by the Company's principal operating subsidiary or other filing entities. Consequently, it is likely that a Chapter 11 reorganization plan will involve the combined value of Grace's global businesses and its other assets to fund (with cash and/or securities) Grace's obligations as adjudicated through the bankruptcy process. Grace has analyzed its cash flow and the capital needs of its businesses, and believes that, while in Chapter 11, sufficient cash flow and credit facilities are available to support its business strategy.

The following sections address Grace's financial condition in more detail and describe the major contingencies that are being addressed as part of the Chapter 11 process. Grace's ability to present a plan of reorganization to the Bankruptcy Court depends largely on the timing of resolution of these contingencies.

LIABILITIES AND CONTINGENCIES

Grace has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. The following table summarizes net noncore liabilities at December 31, 2003 and 2002:

| | DECEMBER 31, | |
| NET NONCORE LIABILITIES (In millions) | 2003 | 2002 |
|---|---|---|
| NET NONCORE LIABILITIES: | | |
| Asbestos-related liabilities.................. | $ (992.3) | $ (973.2) |
| Asbestos-related insurance receivable......... | 269.4 | 282.6 |
| Asbestos-related liability, net............... | (722.9) | (690.6) |
| Environmental remediation..................... | (332.4) | (201.1) |
| Postretirement benefits....................... | (134.3) | (147.2) |
| Retained obligations and other................ | (57.0) | (55.3) |
| NET NONCORE LIABILITY......................... | $ (1,246.6) | $ (1,094.2) |

The resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of such estimates will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2003.

ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 2003, Grace had net receipts of $2.8 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, including amounts received under settlements with insurance carriers, compared with net expenditures in 2002 of $2.3 million. At December 31, 2003, Grace's balance sheet reflects a gross asbestos-related liability of $992.3 million ($722.9 million net of insurance). This liability represents management's estimate, based on facts and circumstances existing prior to the Filing, of the

undiscounted, nominal dollar cost necessary to dispose of its pending property
damage claims for which sufficient information is available, and its pending and
projected future bodily injury claims. In the fourth quarter of 2003, Grace
recorded a $30.0 million pre-tax charge to its estimated liability for
asbestos-related litigation to account for the estimated cost of resolving new
asbestos-related property damage claims received through the Chapter 11 claims
solicitation process. The pre-tax charge was based on an initial review,
completed in the fourth quarter of 2003, of more than 4,000 new claims submitted

prior to the March 31, 2003 claims bar date. Each claim is unique as to property, product in question, legal status of claimant, potential cost of remediation, and other factors. Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the cost of resolution was estimated. Grace's revised estimate of liability does not

F-44

include any amounts for approximately 170 claims for which sufficient information was not available to evaluate potential liability. Any further changes to the recorded amount of such liability will be based on additional Chapter 11 developments and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court.

Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, related insurance coverage, or its ultimate plan of reorganization.

The Consolidated Balance Sheet at December 31, 2003 includes total amounts due from insurance carriers of $269.4 million pursuant to settlement agreements with those insurance carriers. The recovery of amounts due from insurance carriers is dependent upon the timing, character and exposure periods of asbestos-related claims. Grace's Chapter 11 proceedings and proposed federal legislation could also affect the timing and amounts of Grace's recovery.

Grace intends to address all of its pending and future asbestos-related claims as part of a plan of reorganization under Chapter 11. Grace will seek to have the Bankruptcy Court establish a process to assess and appropriately quantify the numerous property damage and bodily injury claims against it. Measurement of Grace's asbestos-related liabilities will be materially affected by Bankruptcy Court rulings, the outcome of litigation and negotiations among interested parties.

ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years for (1) the operation and maintenance of environmental facilities and the disposal of wastes; (2) capital expenditures for environmental control facilities; and (3) site remediation.

| (In millions) | OPERATION OF FACILITIES AND WASTE | CAPITAL EXPENDITURES | SITE REMEDIATION |
|---|---|---|---|
| 2003 | $ 46.1 | $ 8.1 | $  7.0 |
| 2002 | 38.0 | 5.6 | 13.7 |
| 2001 | 33.0 | 3.8 | 26.6 |

At December 31, 2003, Grace's recorded liability for environmental investigation and remediation costs totaled $332.4 million, as compared with $201.1 million at December 31, 2002. This liability covers both vermiculite and non-vermiculite related matters. The amount is based on funding and/or remediation agreements in place, together with Grace's best estimate of its cost for sites not subject to a formal remediation plan. The increase in the liability is primarily attributable to pre-tax charges relating to former vermiculite mining operations in Libby, Montana, as described below.

Grace's estimated liability for vermiculite-related remediation at December 31, 2003 and 2002 was $181.0 million and $62.7 million, respectively. Based on a previous ruling by the U.S. District Court of Montana, Grace is required to reimburse the EPA for all appropriate costs expended for clean-up activities in and around Libby, Montana, related to its former mining activities. As a result of such ruling, Grace recorded a pre-tax charge of $50.0 million in the third quarter of 2003. During the fourth quarter of 2003, Grace recorded a $70.0 million pre-tax charge based on additional information from the EPA and its evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have changed regularly and increased substantially over the course of this clean-up. Consequently, Grace's estimate may change materially as more information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

At December 31, 2003 and 2002, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $151.4 million and $138.4 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. During the fourth quarter of 2003, Grace recorded a $20.0 million increase in its estimated environmental liability for non-vermiculite

related estimated liability as management will continue to review such claims. Grace's estimated liability is based upon claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

See Note 14 to the Consolidated Financial Statements for a background description of Grace's Vermiculite and Non-Vermiculite Related Matters.

F-45

POSTRETIREMENT BENEFITS

Grace provides certain health care and life insurance benefits for retired
employees, a large majority of which pertain to retirees of previously divested
businesses. These plans are unfunded, and Grace pays the costs of benefits under
these plans as they are incurred. Effective January 1, 2002, Grace's
postretirement medical plan was amended to increase the contribution required to
be paid by the retirees to a minimum of 40% of the calculated premium. Also,
during 2002, per capita costs under the retiree medical plans exceeded caps on
the amount Grace is required to contribute under a 1993 amendment to the plan.
As a result, for 2003 and future years, retirees will bear 100% of any increase
in premium costs. Grace's share of benefits under this program was $12.6 million
during 2003, compared with $21.5 million in 2002. Grace's recorded liability for
postretirement benefits of $134.3 million at December 31, 2003 is stated at net
present value discounted at 6.25%. The continuing payment of these benefits has
been approved by the Bankruptcy Court; however, the program would still be
subject to the terms of a Chapter 11 reorganization plan.

TAX MATTERS

The net deferred tax asset was $581.1 million and $563.4 million as of December
31, 2003 and 2002, respectively. Based upon anticipated future results, Grace
has concluded that it is more likely than not that the balance of the net
deferred tax assets (including the valuation allowance) will be realized.
Because of the nature of the items that make up this balance, the realization
period is likely to extend over a number of years and the outcome of the Chapter
11 process could materially impact the realization period.

See Note 14 to the Consolidated Financial Statements for a discussion of Grace's
other tax-related contingencies.

OTHER CONTINGENCIES

See Note 14 to the Consolidated Financial Statements for a discussion of Grace's
other contingent matters.

--------------------------------------------------------------------------------
LIQUIDITY AND CAPITAL RESOURCES
--------------------------------------------------------------------------------

CASH RESOURCES AND AVAILABLE CREDIT FACILITIES

At December 31, 2003, Grace had $400.0 million in cash and cash-like assets on
hand ($309.2 million in cash and cash equivalents and $90.8 million in cash
value of life insurance). In addition, Grace had access to committed credit
facilities aggregating $250.0 million under the DIP facility, of which $215.9
million (net of borrowings, letters of credit, and holdback provisions) was
available at December 31, 2003. The term of the DIP facility expires April 1,
2006. Grace believes that these funds and credit facilities will be sufficient
to finance its business strategy while in Chapter 11.

CASH FLOW

```
================================================================================
                                                     DECEMBER 31,
CORE OPERATIONS                                  -------------------------------
(In millions)                                     2003       2002       2001
--------------------------------------------------------------------------------
CASH FLOWS:
Pre-tax operating income.......................  $ 148.7    $ 180.8    $ 187.5
Depreciation and amortization..................    102.9       94.9       89.2
                                                 -------------------------------
PRE-TAX EARNINGS BEFORE DEPRECIATION AND
     AMORTIZATION..............................    251.6      275.7      276.7
Working capital and other changes..............    (63.4)      24.1      (50.6)
                                                 -------------------------------
CASH FLOW BEFORE INVESTING.....................    188.2      299.8      226.1
Capital expenditures...........................    (86.4)     (91.1)     (62.9)
Businesses acquired............................    (26.9)     (28.5)     (84.4)
                                                 -------------------------------
NET CASH FLOW FROM CORE OPERATIONS.............  $  74.9    $ 180.2    $  78.8
================================================================================
```

Grace's net cash flow from core operations before investing decreased due to
lower pre-tax operating income and increased investment in working capital and
other items. The lower pre-tax operating income in 2003 resulted primarily from
higher costs for pensions, certain raw materials, and natural gas. The increased
investment in working capital and other items was due to a shift in regional
sales mix outside North America where standard terms of sale are longer and
advanced purchasing of key raw materials is often necessary. Capital
expenditures were consistent year-over-year with a substantial portion of these

expenditures will go toward business consolidation, routine capital
replacements and construction of new catalyst production capacity at the Lake
Charles, Louisiana site.

Grace expects to continue to invest excess cash flow and/or other available
capital resources in its core business base. These investments are likely to be
in the form of added plant capacity, product line extensions and geographic
market expansions, and/or acquisitions

F-46

for similar strategic purposes. Investments that are outside the ordinary course of business may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review.

| NONCORE ACTIVITIES (In millions) | DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| CASH FLOWS: | | | |
| Pre-tax (loss) income from noncore activities... | $(190.1) | $(74.5) | $ 3.0 |
| Non-cash charges............................... | 189.2 | 81.1 | 6.4 |
| Cash spending for: | | | |
|   Asbestos-related litigation, net of insurance recovery........................ | 2.8 | (2.3) | (30.8) |
|   Environmental remediation.................... | (11.2) | (20.8) | (28.9) |
|   Postretirement benefits...................... | (12.6) | (21.5) | (22.3) |
|   Retained obligations and other............... | (1.3) | (4.5) | (9.1) |
| NET CASH OUTFLOW FOR NONCORE ACTIVITIES ........ | $ (23.2) | $(42.5) | $(81.7) |

Expenditures for environmental remediation were lower in 2003, due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments were also lower in 2003 due to changes in cost sharing under retiree medical plans. Payments for retained obligations of divested businesses and other contingencies were lower in 2003 due to the stay of litigation and to the one-time nature of these matters. These cash outflows were partially offset by asbestos-related cash inflows where insurance proceeds exceeded continuing administrative costs of claims administration.

See the "Consolidated Statements of Cash Flows" included in the Consolidated Financial Statements for investing and financing activities for the years ended December 31, 2003, 2002 and 2001.

LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $90.8 million at December 31, 2003. This net cash surrender value is composed of $478.5 million in policy gross cash value offset by $387.7 million of policy loans. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flows (primarily tax-free) over an extended period. Certain of these policies are of the type that has received recent judicial and legislative attention including proposals to tax benefit proceeds under certain circumstances. Pending rulings and proposed reforms could adversely affect the availability of these policies as a funding source for Grace's noncore liabilities. Grace is evaluating whether to continue the policies that may be affected by these developments or to terminate them for their cash value.

PENSION BENEFITS UNDER U.S. QUALIFIED PLANS

The decline in value of the U.S. and global equity markets from 2000-2002, coupled with a decline in interest rates during 2001 and 2002, created a shortfall between accounting measurements of Grace's obligations under certain of its qualified pension plans and the market value of dedicated pension assets. A balance sheet adjustment of $147.7 million was recorded (net of tax) to reduce shareholders' equity (deficit) at December 31, 2002, to recognize the pension shortfall and to fully reserve deferred pension losses. Market returns in 2003 (22.5% for Grace's domestic pension plan assets) and contributions of $48.5 million to under-funded domestic plans served to lower, but were not sufficient to eliminate this shortfall. The increase in pension assets over 2003 resulted in a balance sheet adjustment of $18.3 million to increase shareholders' equity (deficit) at December 31, 2003. The market returns experienced in 2003 are not fully recognized in 2003 under the deferral method of accounting required under generally accepted accounting principles. These gains, along with other differences between assumed and actual returns, will be recognized into earnings over a period ranging from 12-24 years. Grace has lowered its assumed return on plan assets for 2004 to 8.0%, down from 8.25% for 2003 and 9.0% for 2002. The new rate of return is comparable to the average long-term rate of return Grace has experienced since 1990.

Under ERISA Grace will be required to make additional contributions to certain of its U.S. qualified pension plans in the future. The amount and timing of contributions could be affected by Grace's Chapter 11 proceedings.

DEBT AND OTHER CONTRACTUAL OBLIGATIONS

===============================================================================
CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE

|                                      | Payments due by Period | | | |
|--------------------------------------|-------|------------------|------------|------------|
| (In millions)                        | Total | Less than 1 Year | 1-3 Years  | Thereafter |
| Operating commitments (1)............ | $ 14.2 | $ 13.8 | $  0.4 | $   -- |
| Debt................................. | 6.8    | 6.8    | --     | --     |
| Operating leases..................... | 67.1   | 16.7   | 33.4   | 17.0   |
| Capital leases....................... | 3.2    | 0.5    | 1.9    | 0.8    |
| Pension funding requirements per ERISA.. | 33.0 | 33.0 | --   | --     |
| TOTAL CONTRACTUAL CASH OBLIGATIONS...... | $124.3 | $ 70.8 | $ 35.7 | $ 17.8 |

(1)  Amounts do not include open purchase commitments which are routine in
     nature and normally settle within 90 days.

Total debt outstanding at December 31, 2003 was $557.1 million, including $49.0
million of accrued interest on pre-petition debt. As a result of the Filing,
Grace is now in default on $501.3 million of pre-petition debt, which, together
with accrued interest thereon, has been included in "liabilities subject to
compromise" as of December 31, 2003. The automatic stay provided under the
Bankruptcy Code prevents Grace's lenders from taking any action to collect the
principal amounts as well as related accrued interest. However, Grace will
continue to accrue and report interest on such debt during the Chapter 11
proceedings unless further developments lead management to conclude that it is
probable that such interest will be compromised.

See Note 14 to the Consolidated Financial Statements for a discussion of
financial assurances.

-------------------------------------------------------------------------------
INFLATION
-------------------------------------------------------------------------------

The financial statements are presented on a historical cost basis and do not
fully reflect the impact of prior years' inflation. While the U.S. inflation
rate has been modest for several years, Grace operates in international
economies with both inflation and currency risks. The ability to pass on
inflation costs is an uncertainty due to general economic conditions and
competitive situations. The cost of replacing Grace's property and equipment
today is estimated to be greater than its historical cost. Accordingly,
depreciation expense would be greater if the expense were stated on a current
cost basis.

-------------------------------------------------------------------------------
ACCOUNTING PRONOUNCEMENTS
-------------------------------------------------------------------------------

See Note 1 of Consolidated Financial Statements for a discussion of recent
accounting pronouncements and their effect on Grace.

-------------------------------------------------------------------------------
FORWARD-LOOKING STATEMENTS
-------------------------------------------------------------------------------

The forward-looking statements contained in this document are based on current
expectations regarding important risk factors. Actual results may differ
materially from those expressed. In addition to the uncertainties referred to in
Management's Discussion and Analysis of Results of Operations and Financial
Condition, other uncertainties include: the impact of worldwide economic
conditions; pricing of both Grace's products and raw materials; customer outages
and customer demand; factors resulting from fluctuations in interest rates and
foreign currencies; the impact of competitive products and pricing; the
continued success of Grace's process improvement initiatives; the impact of tax,
legislation and other regulations in the jurisdictions in which Grace operates;
and developments in and the outcome of the Chapter 11 proceedings discussed
above. Also, see "Introduction and Overview - Projections and Other
Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form
10-K.

```
                           W. R. GRACE & CO. AND SUBSIDIARIES
                         VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
                                        (In millions)
```

### FOR THE YEAR 2003

| | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/(credited) to costs and expenses | Other net (1) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $   5.4 | $   0.9 | $  -- | $   6.3 |
| Allowances for long-term receivables...................... | 0.8 | (0.1) | -- | 0.7 |
| Valuation allowance for deferred tax assets............... | 152.5 | 15.8 | -- | 168.3 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $  55.3 | $  -- | $  1.7 | $  57.0 |

### FOR THE YEAR 2002

| | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/(credited) to costs and expenses | Other net (2) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $   7.6 | $  (2.2) | $  -- | $   5.4 |
| Allowances for long-term receivables...................... | 0.6 | 0.2 | -- | 0.8 |
| Valuation allowance for deferred tax assets............... | 158.0 | (5.5) | -- | 152.5 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $  80.5 | $  -- | $ (25.2) | $  55.3 |

### FOR THE YEAR 2001

| | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/(credited) to costs and expenses | Other net (1) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $   4.4 | $   3.2 | $  -- | $   7.6 |
| Allowances for long-term receivables...................... | 0.8 | (0.2) | -- | 0.6 |
| Valuation allowance for deferred tax assets............... | 179.1 | (21.1) | -- | 158.0 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $  78.1 | $  -- | $  2.4 | $  80.5 |

(1) Various miscellaneous adjustments against reserves established for divested
    business.
(2) $25.2 million represents net spending offset by a reclass of an $18.0
    million tax receivable relating to Grace's divested packaging business.

EXHIBIT 12

W. R. GRACE & CO. AND SUBSIDIARIES
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (1)
(In millions, except ratios)
(Unaudited)

|  | YEARS ENDED DECEMBER 31, (2) | | | | |
|---|---|---|---|---|---|
|  | 2003 (3) | 2002 (4) | 2001 | 2000 (5) | 1999 |
| Net (loss) income from continuing operations.......... | $ (55.2) | $ 22.1 | $ 78.6 | $ (89.7) | $ 130.2 |
| (Benefit from) provision for income taxes.............. | (12.3) | 38.0 | 63.7 | 70.0 | 73.2 |
| Minority interest in income (loss) of majority owned subsidiaries................................... | 1.2 | (2.2) | (3.7) | -- | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned companies................................. | 0.7 | 0.1 | -- | (0.5) | (0.2) |
| Interest expense and related financing costs, including amortization of capitalized interest....... | 17.5 | 22.3 | 39.5 | 30.6 | 18.8 |
| Estimated amount of rental expense deemed to represent the interest factor................................. | 5.1 | 4.9 | 4.7 | 4.7 | 5.2 |
| (Loss) income as adjusted.............................. | $ (43.0) | $ 85.2 | $ 182.8 | $ 15.1 | $ 227.2 |
| Combined fixed charges and preferred stock dividends: Interest expense and related financing costs, including capitalized interest..................... | $ 18.0 | $ 21.8 | $ 36.6 | $ 29.1 | $ 17.0 |
| Estimated amount of rental expense deemed to represent the interest factor..................... | 5.1 | 5.0 | 4.7 | 4.7 | 5.2 |
| Fixed charges......................................... | 23.1 | 26.8 | 41.3 | 33.8 | 22.2 |
| Combined fixed charges and preferred stock dividends... | $ 23.1 | $ 26.8 | $ 41.3 | $ 33.8 | $ 22.2 |
| Ratio of earnings to fixed charges.................... | (6) | 3.18 | 4.43 | (6) | 10.23 |
| Ratio of earnings to combined fixed charges and preferred stock dividends............................ | (6) | 3.18 | 4.43 | (6) | 10.23 |

(1)  Grace's preferred stocks were retired in 1996.

(2)  Certain amounts have been restated to conform to the 2003 presentation.

(3)  Amounts include $172.5 million for pre-tax charges to adjust Grace's estimated liability for environmental remediation and asbestos-related property damage.

(4)  Amounts contain a provision for non-operating environmental remediation of $70.7 million.

(5)  Includes a pre-tax provision of $208.0 million for asbestos-related liabilities net of insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(6)  As a result of the losses incurred for the years ended December 31, 2003 and 2000, Grace was unable to fully cover the indicated fixed charges (a shortfall of $66.1 million and $18.7 million, respectively).

```
                    W. R. GRACE & CO. AND SUBSIDIARIES
                  REPORT ON INTERNAL CONTROLS AND PROCEDURES
```

General Statement Of Responsibility.
------------------------------------

The management of Grace is responsible for the preparation, integrity and
objectivity of the Consolidated Financial Statements and the other information
included in this report. The financial statements have been prepared in
conformity with accounting principles generally accepted in the United States of
America and accordingly include certain amounts that represent management's best
estimates and judgments. Actual amounts could differ from those estimates.
Management maintains internal controls to assist it in fulfilling its
responsibility for financial reporting. These internal controls consist of the
control environment, risk assessment, control activities, information and
communication, and monitoring. A chartered Disclosure Committee oversees Grace's
public financial reporting process and key managers are required to confirm
their compliance with Grace's policies and internal controls. While no system of
internal controls can ensure elimination of all errors and irregularities,
Grace's internal controls, which are reviewed and modified in response to
changing conditions, have been designed to provide reasonable assurance that
assets are safeguarded, policies and procedures are followed, transactions are
properly executed and reported, and appropriate disclosures are made. The
concept of reasonable assurance is based on the recognition that there are
limitations in all systems of internal control and that the costs of such
systems should not exceed their benefits.


Evaluation Of Disclosure Controls And Procedures.
-------------------------------------------------

As of December 31, 2003, Grace carried out an evaluation of the effectiveness of
the design and operation of its disclosure controls and procedures pursuant to
Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange
Act"). Based upon that evaluation, Grace's Chief Executive Officer and Chief
Financial Officer concluded that the Company's disclosure controls and
procedures are effective in ensuring that information required to be disclosed
in the Company's periodic filings under the Exchange Act is accumulated and
communicated to such officers to allow timely decisions regarding required
disclosures. There was no significant change in the Company's internal control
over financial reporting that has materially affected, or is reasonably likely
to materially affect, the Company's internal control over financial reporting.

                                  F-51


</TEXT>
</DOCUMENT>

EXHIBIT 10.6

W. R. GRACE & CO.

1996 STOCK INCENTIVE PLAN

1. Purposes. The purposes of this Plan are (a) to enable Key Persons to have incentives related to Common Stock, (b) to encourage Key Persons to increase their interest in the growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identity of interests of Key Persons with the interests of the Company's stockholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of the most highly qualified individuals.

2. Definitions. When used in this Plan, the following terms shall have the meanings set forth in this section 2.

Board of Directors: The Board of Directors of the Company.

cessation of service (or words of similar import): When a person ceases to be an employee of the Company or a Subsidiary. For purposes of this definition, if an entity that was a Subsidiary ceases to be a Subsidiary, persons who immediately thereafter remain employees of that entity (and are not employees of the Company or an entity that is a Subsidiary) shall be deemed to have ceased service.

Change in Control: Shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20% or more of the outstanding Common Stock of the Company; (b) individuals who are "Continuing Directors" (as defined below) cease to constitute a majority of any class of the Board of Directors; (c) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own more than 60% of the combined voting power of the corporation resulting from such Corporate Transaction; or (d) the stockholders of the Company approve a complete liquidation or dissolution of the Company. Notwithstanding any other provision of this Plan, the distribution of all of the shares of Common Stock of the Company to the Shareholders of W. R. Grace & Co., a New York corporation, shall not be deemed a Change In Control.

Change in Control Price: The higher of (a) the highest reported sales price, regular way, as reported in The Wall Street Journal or another newspaper of general circulation, of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed or on NASDAQ during the 60-day period prior to and including the date of a Change in Control or (b) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, the highest price per share of Common Stock paid in such tender or exchange offer or Corporate Transaction; provided, however, that in the case of Incentive Stock Options, the Change in Control Price shall be in all cases the Fair Market Value of the Common Stock on the date such Incentive Stock Option is exercised. To the extent that the consideration paid in any Corporate Transaction or other transaction described above consists in whole or in part of securities or other noncash consideration, the value of such securities or other noncash consideration shall be determined in the sole discretion of the Board of Directors.

Code: The Internal Revenue Code of 1986, as amended.

Committee: The Compensation, Employee Benefits and Stock Incentive Committee of the Board of Directors of the Company or any other committee designated by the Board of Directors to administer stock incentive and stock option plans of the Company and the Subsidiaries generally or this Plan specifically.

Common Stock: The common stock of the Company, par value $.01 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a Delaware corporation.

Continuing Director: The meaning set forth in the definition of "Change in Control" above.

Corporate Transaction: The meaning set forth in the definition of "Change in Control" above.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Exercise Period: The meaning set forth in section 14(b) of this Plan.

Fair Market Value: (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange composite transactions on

2

the applicable date, as reported in The Wall Street Journal or another newspaper of general circulation, or, if no sales of shares of Common Stock were reported for such date, for the next preceding date for which such sales were so reported, or (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method approved by the Committee.

Incentive Stock Option: A stock option that states that it is an incentive stock option and that is intended to meet the requirements of Section 422 of the Code and the regulations thereunder applicable to incentive stock options, as in effect from time to time.

issuance (or words of similar import): The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

Key Person: An employee of the Company or a Subsidiary who, in the opinion of the Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or one or more Subsidiaries. The grant of a Stock Incentive to an employee shall be deemed a determination by the Committee that such person is a Key Person.

Nonstatutory Stock Option: An Option that is not an Incentive Stock Option.

Option: An option granted under this Plan to purchase shares of Common Stock.

Option Agreement: An agreement setting forth the terms of an Option.

Plan: The 1996 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

service: Service to the Company or a Subsidiary as an employee. "To serve" has a correlative meaning.

Spread: The meaning set forth in section 14(b) of this Plan.

Stock Award: An issuance of shares of Common Stock or an undertaking (other than an Option) to issue such shares in the future.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company, or any other entity designated as such

3

by the Board of Directors; provided, however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) that is also a "subsidiary corporation" as defined in Section 424(f) of the Code and the regulations thereunder, as in effect from time to time.

3. Grants of Stock Incentives. (a) Subject to the provisions of this Plan, the Committee may at any time and from time to time grant Stock Incentives under this Plan to, and only to, Key Persons.

(b) The Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it becomes effective. An agreement or other commitment to grant a Stock Incentive that is to be effective in the future shall not be deemed the grant of a Stock Incentive until the date on which such Stock Incentive becomes effective.

(c) A Stock Incentive may be granted in the form of:

    (i)    a Stock Award, or

    (ii)   an Option, or

    (iii)  a combination of a Stock Award and an Option.

4. Stock Subject to this Plan. (a) Subject to the provisions of paragraph (c) of this section 4 and the provisions of section 8, the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan shall not exceed seven million (7,000,000).

(b) Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary from the recipient of such Stock Incentive, or from the estate of such recipient, for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

(d) Of the total number of shares specified in paragraph (a) of this section 4 (subject to adjustment as specified therein), during the term of this Plan as defined in section 9, (i) no more than 10% may be subject to Options granted to any one Key Person and (ii) no more than 15% may be subject to Stock

4

Incentives granted to any one Key Person.

5. Stock Awards. Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) For purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued pursuant to such Stock Award and whether or not such shares are subject to restrictions affecting their value.

(b) Shares of Common Stock subject to a Stock Award may be issued to a Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for the payment to such Key Person, either in cash or shares of Common Stock, of amounts not exceeding the dividends that would have been payable to such Key Person in respect of the number of shares of Common Stock subject to such Stock Award (as adjusted under section 8) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock subject to such Stock Award may be paid in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares that would otherwise have been issued.

(c) The material terms of each Stock Award shall be determined by the Committee. Each Stock Award shall be evidenced by a written instrument consistent with this Plan. It is intended that a Stock Award would be (i) made contingent upon the attainment of one or more specified performance objectives and/or (ii) subject to restrictions on the sale or other disposition of the Stock Award or the shares subject thereto for a period of three or more years; provided, however, that (x) a Stock Award may include restrictions and limitations in addition to those provided for herein and (y) of the total number of shares specified in paragraph (a) of section 4 (subject to adjustment as specified therein), up to 3% may be subject to Stock Awards not subject to clause (i) or clause (ii) of this sentence.

(d) A Stock Award shall be granted for such lawful consideration as may be provided for therein.

6. Options. Except as otherwise provided in section 12, Stock Incentives in the form of Options shall be subject to the following provisions:

(a) The purchase price per share of Common Stock shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The purchase price and any withholding tax that may be due on the exercise of an Option may be paid in cash, or, if so provided in the Option Agreement, (i) in shares of Common Stock (including shares issued

5

pursuant to the Option being exercised and shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5), or (ii) in a combination of cash and such shares; provided, however, that no shares of Common Stock delivered in payment of the purchase price may be "immature shares," as determined in accordance with generally accepted accounting principles in effect at the time. Any shares of Common Stock delivered to the Company in payment of the purchase price or withholding tax shall be valued at their Fair Market Value on the date of exercise. No certificate for shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full.

(b) If so provided in the Option Agreement, the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price for such shares, or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess, or (iii) pay such excess by a combination of money and shares.

(c) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option Agreement, as determined by the Committee. Unless otherwise provided in the Option Agreement, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of such Option.

(d) Each Option shall be exercisable during the life of the holder only by him and, after his death, only by his estate or by a person who acquires the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the holder ceases to serve: (i) if the holder shall voluntarily cease to serve without the consent of the Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the holder shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the holder ceased to serve unless the Committee shall approve a longer period (which approval may be given before or after cessation of service) not to exceed three years. If the holder shall die or become incapacitated during the three-month period (or such longer period as the Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of

6

this paragraph (d). Notwithstanding the foregoing provisions of this paragraph (d) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Nonstatutory Option is granted for a term of less than ten years and one month, the Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than ten years and one month from the date the Option was granted. Such an extension shall not be deemed the grant of a new Option under this Plan.

(e) No Option nor any right thereunder may be assigned or transferred except by will or the laws of descent and distribution and except, in the case of a Nonstatutory Option, pursuant to a qualified domestic relations order (as defined in the Code), unless otherwise provided in the Option Agreement.

(f) An Option may, but need not, be an Incentive Stock Option. All shares of Common Stock that may be made subject to Stock Incentives under this Plan may be made subject to Incentive Stock Options; provided, however, that (i) no Incentive Stock Option may be granted more than ten years after the effective date of this Plan, as provided in section 9; and (ii) the aggregate Fair Market Value (determined as of the time an Incentive Stock Option is granted) of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted on or after January 1, 1987 (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations) to the Key Person to whom such Incentive Stock Option is granted shall not exceed $100,000.

(g) The material terms of each Option shall be determined by the Committee. Each Option shall be evidenced by a written instrument consistent with this Plan, and shall specify whether the Option is an Incentive Stock Option or a Nonstatutory Option. An Option may include restrictions and limitations in addition to those provided for in this Plan.

(h) Options shall be granted for such lawful consideration as may be provided for in the Option.

7. Combination of Stock Awards and Options. Stock Incentives authorized by paragraph (c)(iii) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions: (a) A Stock Incentive may be a combination of any form of Stock Award and any form of Option; provided, however, that the terms and conditions of such Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such Stock Incentive pertaining to an Option are consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms and conditions as may be specified therein, including without limitation

7

a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof.

(c) The material terms of each combination Stock Incentive shall be determined by the Committee. Each combination Stock Incentive shall be evidenced by a written instrument consistent with this Plan.

8. Adjustment Provisions. (a) In the event that any reclassification, split-up or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

9. Term. This Plan shall be deemed adopted and shall become effective on the date as of which it is approved by W. R. Grace & Co., a New York corporation, as sole shareholder of the Company. No Stock Incentives shall be granted under this Plan after the tenth anniversary of such date.

10. Administration. (a) This Plan shall be administered by the Committee. No director shall be designated as or continue to be a member of the Committee unless he shall at the time of designation and at all times during service as a member of the Committee be an "outside director" within the

8

meaning of Section 162(m) of the Code. The Committee shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Committee by this Plan. Notwithstanding any other provision of this Plan, the Board of Directors may exercise any and all powers of the Committee with respect to this Plan, except to the extent that the possession or exercise of any power by the Board of Directors would cause any Stock Incentive to become subject to, or to lose an exemption from, Section 162(m) of the Code or Section 16(b) of the Exchange Act.

(b) The Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and its directors, officers and employees, and upon their respective legal representatives, beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c) Members of the Board of Directors and members of the Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties, except as otherwise provided by applicable law.

11. General Provisions. (a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance, the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued to him.

(d) In the case of a grant of a Stock Incentive to a Key Person who is employed by a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided, upon the condition or understanding that the Subsidiary will transfer

9

the shares to the Key Person in accordance with the terms of the Stock
Incentive.

(e) In the event the laws of a country in which the Company or a
Subsidiary has employees prescribe certain requirements for Stock Incentives to
qualify for advantageous tax treatment under the laws of that country
(including, without limitation, laws establishing options analogous to Incentive
Stock Options), the Committee, may, for the benefit of such employees, amend, in
whole or in part, this Plan and may include in such amendment additional
provisions for the purposes of qualifying the amended plan and Stock Incentives
granted thereunder under such laws; provided, however, that (i) the terms and
conditions of a Stock Incentive granted under such amended plan may not be more
favorable to the recipient than would be permitted if such Stock Incentive had
been granted under this Plan as herein set forth, (ii) all shares allocated to
or utilized for the purposes of such amended plan shall be subject to the
limitations of section 4, and (iii) the provisions of the amended plan may
restrict but may not extend or amplify the provisions of sections 9 and 13.

(f) The Company or a Subsidiary may make such provisions as either may
deem appropriate for the withholding of any taxes that the Company or a
Subsidiary determines is required to be withheld in connection with any Stock
Incentive.

(g) Nothing in this Plan is intended to be a substitute for, or shall
preclude or limit the establishment or continuation of, any other plan, practice
or arrangement for the payment of compensation or benefits to directors,
officers or employees generally, or to any class or group of such persons, that
the Company or any Subsidiary now has or may hereafter put into effect,
including, without limitation, any incentive compensation, retirement, pension,
group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions. If the Company or any Subsidiary should merge or
consolidate with, or purchase stock or assets or otherwise acquire the whole or
part of the business of, another entity, the Company, upon the approval of the
Committee, (a) may assume, in whole or in part and with or without modifications
or conditions, any stock incentives granted by the acquired entity to its
directors, officers, employees or consultants in their capacities as such, or
(b) may grant new Stock Incentives in substitution therefor. Any such assumed or
substitute Stock Incentives may contain terms and conditions inconsistent with
the provisions of this Plan (including the limitations set forth in paragraph
(d) of section 4), including additional benefits for the recipient; provided,
however, that if such assumed or substitute Stock Incentives are Incentive Stock
Options, such terms and conditions are permitted under the plan of the acquired
entity. For the purposes of any applicable plan provision involving time or a
date, a substitute Stock Incentive shall be deemed granted as of the date of
grant of the original stock incentive.

10

13. Amendments and Termination. (a) This Plan may be amended or terminated by the Board of Directors upon the recommendation of the Committee; provided, however, that, without the approval of the stockholders of the Company, no amendment shall be made which (i) causes this Plan to cease to comply with applicable law, (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 12), (iii) amends the provisions of paragraph (d) of section 4, paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of, respectively, less than the percentage of Fair Market Value specified therein, (iv) amends section 9 to extend the date set forth therein, or (v) amends this section 13.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

14. Change in Control Provisions. (a) Notwithstanding any other provision of this Plan to the contrary, in the event of a Change in Control:

(i) Any Options outstanding as of the date on which such Change in Control occurs, and which are not then exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant; and

(ii) All restrictions and deferral limitations applicable to Stock Incentives shall lapse, and Stock Incentives shall become free of all restrictions and become fully vested and transferable to the full extent of the original grant.

(b) Notwithstanding any other provision of this Plan, during the 60-day period from and after a Change in Control (the "Exercise Period"), unless the Committee shall determine otherwise at the time of grant, the holder of an Option shall have the right, in lieu of the payment of the purchase price for the shares of Common Stock being purchased under the Option, by giving notice to the Company, to elect (within the Exercise Period) to surrender all or part of the Option to the Company and to receive cash, within 30 days after such notice, in an amount equal to the amount by which the Change in Control Price per share of Common Stock on the date of such election shall exceed the purchase price per share of Common Stock under the Option (the "Spread") multiplied by the number of shares of Common Stock subject to the Option as to which the right subject to this Section 14(b) shall have been exercised.

(c) Notwithstanding any other provision of this Plan, if any right granted pursuant to this Plan to receive cash in respect of a Stock Incentive would make a Change in Control transaction ineligible for pooling-of-interests accounting that, but for the nature of such grant, would otherwise be eligible for such accounting treatment, the Committee shall have the ability to substitute for such cash Common Stock with a Fair Market Value equal to the amount of such cash.

11

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

Exhibit 10.27

GRACE

PAUL J. NORRIS
Chairman, President & Chief Executive
Officer

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

(410) 531-4404
Fax: (410) 531-4414
email paul.j.norris@grace.com

November 17, 2003

Mr. Alfred E. Festa
14713 Goddingham Court
Midlothian, VA 23113

Dear Fred:

This letter agreement specifies the terms of your employment with W. R. Grace &
Co. (the "Company") as President and Chief Operating Officer (collectively, the
"COO"), which was approved by the Company's Board of Directors (the "Board") and
Compensation Committee of the Board on November 6, 2003. In addition, this
agreement was authorized by the U. S. Bankruptcy Court with jurisdiction over
the Company's Chapter 11 cases on November 13, 2003.

Also, please note that I have agreed with the Board to relinquish the title of
"President" of the Company, effective as of your first day of employment with
the Company, which is today, November 17, 2003. I am extremely pleased that you
will be joining the Company and believe you will make a valuable contribution to
our future.

If you agree with the terms of this letter agreement, please sign where
indicated below and return one fully executed copy to me. An additional copy of
this letter is also enclosed for your records.

RESPONSIBILITIES

Your employment with the Company begins today, November 17, 2003. (As all other
Company Headquarters employees, you will actually be employed by W. R. Grace &
Co.-Conn., but will be an elected officer of both W. R. Grace & Co. and W. R.
Grace & Co.-Conn.) Your title will be "President and Chief Operating Officer" of
the Company, and you will report directly to me.

Your principal obligations, duties and responsibilities will be those generally
inherent in the office and title of COO. In that regard, each of the Company's
businesses will report directly to you, including Davison Catalysts, Davison
Silicas and Grace Performance Chemicals. Your office will be located at the
Company's Headquarters in Columbia, Maryland.

Alfred E. Festa                November 17, 2003                Page 2

--------------------------------------------------------------------------------

TERM OF AGREEMENT

The term of your employment under this letter agreement will be for a period of
three years, beginning on the date your employment with the Company commences,
November 17, 2003, and ending on November 16, 2006 (such period is referred to
in this agreement as your "Initial Employment Term").

If your employment as COO of the Company (or in any other position) continues
after the Initial Employment Term, and no other contrary arrangements have been
mutually agreed in writing between you and the Board, then the arrangements
described in this agreement will be discontinued and you will be an employee of
the Company "at will" subject to the same requirements as similarly situated
employees of the Company at that time, except as provided under the following
section entitled "Severance Pay Arrangement".

COMPENSATION

1.  Your initial annual base salary as COO will be $550,000.00. Thereafter,
    your base salary will be subject to periodic reviews on the same basis and
    at the same intervals as are applicable to other senior officers of the
    Company.

    Your salary will cease to accrue immediately upon your termination of
    employment with the Company, even if your termination occurs during your
    Initial Employment Term and whether or not your termination is voluntary.
    (Note, however, the provisions under "Severance Pay Arrangement.")

2.  You will be eligible to participate in the Company's Annual Incentive
    Compensation Program. For 2003 and 2004, your targeted award under the
    Program will be 100% of your base salary earned during the applicable
    calendar year. For 2005 and thereafter, your targeted award will be 75% (or
    greater, as determined by the Board) of your annual base salary earned
    during the applicable calendar year. Any payments to you under the Program
    will be made at the same time and in the same manner as payments to other
    participants in the Program. Under the Program, awards for a calendar year
    are generally paid during March of the following calendar year. A Program
    participant is not entitled to payment of an award for a calendar year, if
    the participant is not an active employee of the Company on the date the
    award is actually paid. Awards under this Program are subject to Board
    approval and are contingent upon individual performance and financial
    results of the Company. In general, the amount of award paid to any
    participant may range from 0% to 200% of the participant's targeted award
    for the year, depending on individual performance and the extent to which
    the Company achieves (or surpasses) certain financial goals. These and the
    other provisions of the Program will apply to you in the same manner as
    applicable to other Program participants, except as specified below with
    regard to an award for 2003.

3.  Notwithstanding the foregoing, the award payment you will receive under the
    Annual Incentive Compensation Program for 2003 will not be less than the
    result of the following calculation: your targeted award for that year
    (i.e., 100% of your annual base salary as of December 31, 2003), multiplied
    by a fraction where the numerator is the number of days during 2003 that
    you are an employee of the Company and the denominator is 365. However, as
    indicated above, you will only receive a payment

Alfred E. Festa                 November 17, 2003                 Page 3

--------------------------------------------------------------------------------

under the Program for 2003 if you are an active employee of the Company on the date that the payments for that year are made to all participants in March 2004.

4.  As described in this paragraph, you will be eligible for a targeted award under the Company's currently effective Long-Term Incentive Plans (the "LTIPs") for the following performance periods: 2002-2004 and 2003-2005. The amount of the targeted award applicable to you under each of those LTIPs shall be $687,000 (i.e., 125% of your starting annual base salary). However, any award payment to which you become entitled under any of the LTIPs shall be pro-rated to reflect the percentage of days during the applicable performance period that you were an active employee of the Company.

    In all other respects, the terms of each of your LTIP awards shall be the same as the terms governing the awards of the other participants under the applicable LTIP.

    You shall also be considered for awards under any other stock or cash based incentive programs maintained by the Company during your employment, at such times such awards are considered for other senior officers of the Company or at such other times the Board deems appropriate, at the sole discretion of the Board.

5.  Consistent with your election as an officer of the Company, the Company will enter into an Executive Severance Agreement with you. In general, the terms of that agreement would provide for a severance payment of 3 times the sum of your annual base salary plus your targeted annual incentive compensation award, and certain other benefits, in the event your employment terminates under certain conditions following a change-in-control of the Company.

    The form and provisions of your Executive Severance Agreement will be the same as applicable to other elected officers of the Company. A copy of the Agreement has previously been provided to you.

SEVERANCE PAY ARRANGEMENT

If your employment is terminated by the Company without "Cause" (as defined below) or by you as a result of "Constructive Discharge" (as defined below), during your Initial Employment Term, you will be entitled to the severance payment described in the next sentence. The severance payment will be 1.5 times a dollar amount equal to 175% of your annual base salary at the time your employment is terminated. The severance payment may be made to you in installments, at the same time and in the same manner as salary continuation payments, over a period of 18 months beginning as of the date you are terminated. However, at your option, the entire severance payment may be paid to you in a single lump-sum as soon as practical after your termination (if approved by the Compensation Committee). In all other respects, your severance pay arrangement shall be governed by the terms of the W. R. Grace & Co. Severance Pay Plan for Salaried Employees.

You will also be entitled to the severance payment described in the prior paragraph if you decide to terminate your employment with the Company in the event that the Board does not offer you the position of Chief Executive Officer of the Company following my departure from the Company, and elects another individual as my successor to that position; provided that you comply with the notice requirements specified in the next sentence. In order to be

Alfred E. Festa            November 17, 2003            Page 4

--------------------------------------------------------------------------------

entitled to the severance payment under these circumstances, you must comply
with the following notification requirements: (1) you must deliver to the
Chairman of the Compensation Committee of the Board (the "Comp Committee
Chairman") written notice of your intention to terminate your employment (your
"Termination Notice") no later than 30 days after the date the Company publicly
announces that the Board has elected another individual as my successor as Chief
Executive Officer and (2) your Termination Notice must specify your last date of
employment with the Company, which must be no earlier than 30 days, and no later
than 90 days, after the date your Termination Notice is delivered to the Comp
Committee Chairman. Of course, if and when these circumstances arise, you and
the Board may agree in writing to alternative arrangements regarding your
employment status and the appropriate notice requirements.

You will not, in any event, however, be entitled to the severance payment
described above if, at the time your employment terminates, your employment
terminates as the result of your death, or you are entitled to payments under
your Executive Severance Agreement described above, or to disability income
payments under the Grace "LTD Plan" and/or "ESP Plan" described below.

Also, if you receive a severance payment under this letter agreement, you will
not be entitled to any other severance pay from the Company.

DEFINITION OF CAUSE

"Cause", for purposes of this letter agreement, means:

(i)    Commission by you of a criminal act (i.e., any act which, if successfully
       prosecuted by the appropriate authorities would constitute a crime under
       State or Federal law) or of willful misconduct (including but not limited
       to violating written policies of the Company), which has had or will have
       a direct material adverse effect upon the business affairs, reputation,
       properties, operations or results of operations or financial condition of
       Company,

(ii)   Refusal or failure of you to comply with the mandates of the CEO or the
       Board (unless any such mandates by the CEO or the Board constitute
       Constructive Discharge, and you have determined to terminate your
       employment as a result thereof), or failure by you to substantially
       perform your duties as COO, other than such failure resulting from your
       total or partial incapacity due to physical or mental illness, which
       refusal or failure has not been cured within 30 days after notice has
       been given to you, or

(iii)  Material breach of any of the terms of this agreement by you, which
       breach has not been cured within 30 days after notice has been given to
       you.

DEFINITION OF CONSTRUCTIVE DISCHARGE

"Constructive Discharge," for purposes of this letter agreement, means the
occurrence of any of the following without your prior written consent:

(i)    any demotion from the position of COO of the Company (provided that this
       provision shall not apply if you are appointed or elected to one or more
       other positions within the Company that are in addition to your position
       as COO, at the same time that you retain the COO position);

Alfred E. Festa            November 17, 2003                    Page 5
--------------------------------------------------------------------------------

(ii)    the relocation of your principle office to a location more than 35 miles
        away from the current site of the Company's Headquarters in Columbia,
        Maryland;

(iii)   any material diminution in your level of authority from that of COO or
        any assignment to you of any duties that are not consistent with the
        position of COO; other than authority or duties that (i) may be
        appropriate to another position with the Company that you hold in
        addition to the position of COO, (ii) are assigned to you as a result of
        your election as CEO, (iii) result from any requirement or request from
        the CEO or the Board that is reasonably related to your position as COO
        (or any other position you may hold with the Company at the time you
        retain your position as COO), or (iv) results from an inadvertent failure
        or oversight of the CEO or Board that is remedied within 30 days after
        your written notice thereof has been received by the "Comp Committee
        Chairman" (as defined above);

(iv)    the Company imposes upon you compensation arrangements that do not comply
        with this letter agreement; or

(v)     any material breach of this letter agreement by the Company.

Notwithstanding the forgoing:

o       any termination of employment by you will not be deemed to be a
        termination as a result of Constructive Discharge, unless (i) you provide
        to the Comp Committee Chairman written notice of your decision to
        terminate your employment that sets forth in reasonable detail the
        specific conduct or occurrence that you deem constitutes Constructive
        Discharge and the specific provision of this letter agreement upon which
        you rely and (ii) the Company does not cure such conduct or occurrence
        within 30 days after such notice has been received by the Company;

o       your right to terminate your employment on the basis of Constructive
        Discharge shall be deemed waived by you if you do not provide such notice
        to the Comp Committee Chairman within 60 days after you become aware of
        all material facts regarding the conduct or occurrence that your deem
        constitutes Constructive Discharge.

OTHER BENEFIT PROGRAMS

As a senior officer of the Company, you will also be eligible to participate in
the following benefit plans and programs (subject to the continuation and the
actual provisions of the plans and programs, as amended from time to time):

o       The W. R. Grace & Co. Retirement Plan for Salaried Employees ("Grace
        Salaried Retirement Plan")
o       The W. R. Grace & Co. Supplemental Executive Retirement Plan
o       The W. R. Grace & Co. Salaried Employee Savings & Investment Plan
o       The W. R. Grace & Co. Savings & Investment Plan Replacement Payment
        Program
o       The W. R. Grace & Co. Long-Term Disability Income Plan ("LTD Plan")
o       Executive Salary Protection Plan ("ESP Plan")
o       The W. R. Grace & Co. Voluntary Group Accident Insurance Plan
o       The W. R. Grace & Co. Business Travel Accident Insurance Plan
o       The W. R. Grace & Co. Group Term Life Insurance Program
o       Personal Excess Liability Insurance

Alfred E. Festa                November 17, 2003                    Page 6

--------------------------------------------------------------------------------

o       The W. R. Grace & Co. Group Medical Plan
o       The W. R. Grace & Co. Dental Plan
o       Retiree Medical Coverage


In addition, during your employment with the Company, you shall also be entitled
to participate in all other employee/executive perquisite, pension and welfare
benefit plans and programs made available to the Company's senior level
executives or to its employees generally, as such plans or programs may be in
effect, and amended, from time to time.

INDEMNIFICATION

The Company shall to the extent permitted by applicable law, indemnify you and
hold you harmless from and against any and all losses and liabilities you may
incur as a result of your performance of your duties hereunder in accordance
with the provisions of this letter agreement (except those liabilities that
result from any behavior by you that is enumerated in the "Cause" definition of
this agreement). In addition, the Company shall indemnify and hold you harmless
against any and all losses and liabilities that you may incur, directly or
indirectly, as a result of any third party claims brought against you (other
than by any taxing authority) with respect to the Company's performance of (or
failure to perform) any commitment made to you under this agreement. The Company
shall obtain, if reasonably available, such policy or policies of insurance as
it reasonably may deem appropriate to effect this indemnification.

DISPUTE RESOLUTION

Any dispute, controversy or claim arising out of or relating to this letter
agreement, or a breach thereof, shall be settled by arbitration in accordance
with the laws of the State of Maryland, without respect to the conflict of laws
rules thereof, and the arbitration shall be conducted in Maryland or such other
location as the Company and you may mutually agree in accordance with the
Commercial Arbitration Rules of the American Arbitration Association, as such
rules are in effect in New York, NY on the date of the delivery of a demand for
arbitration, which shall be effectuated by the demanding party providing notice
to the other party in accordance with the provisions below under the heading
"Notices". The parties expressly acknowledge that they are waiving their rights
to seek remedies in court, including without limitation the right (if any) to a
jury trial.

There shall be three arbitrators, one to be chosen by each party at will within
10 business days from the date of delivery of demand for arbitration and the
third arbitrator to be selected by the two arbitrators chosen. If the two
arbitrators are unable to select a third arbitrator within 10 business days
after the last of the two arbitrators is chosen by the parties, the third
arbitrator shall be designated, on application by either party, by the American
Arbitration Association.

The decision of a majority of the arbitrators shall be final and binding on the
parties and their respective heirs, executors, administrators, personal
representatives, successors and assigns. Judgment upon any award of the
arbitrators may be entered in any court of competent jurisdiction, or
application may be made to any such court for the judicial acceptance of the
award and for an order of enforcement.

Alfred E. Festa                    November 17, 2003                    Page 7

--------------------------------------------------------------------------------

RELOCATION

As specified above, your office will be located in Columbia, Maryland, which
will require you to relocate to the Columbia area. Therefore, you will be
entitled to receive principal residence relocation assistance under the
Company's relocation policy applicable to the relocation of active employees. A
copy of that policy has previously been provided to you.

FINANCIAL COUNSELING PROGRAM

As an officer of the Company, you will be eligible to participate in the
Company's Financial Counseling Program. This Program provides you with financial
and estate planning and income tax preparation assistance. The Company will pay
up to $4,000 per calendar year for reasonable, supportable expenses, except that
the maximum amount for the first year of your participation will be $9,000.

COMPANY CAR

The Company will arrange for you to lease, at the Company's expense, an
automobile for use on Company business and for your personal use. The terms of
the coverage will be the same as those provided for other officers of the
Company, including a purchase price cap of $50,000.

EXECUTIVE PHYSICAL PROGRAM

As an officer of the Company, you will be eligible to receive a Company-paid
annual executive physical examination.

NOTICES

Except as otherwise provided herein, you and the Company agree that any notices
and other communications permitted or required under this letter agreement shall
be in writing and shall be given by hand delivery to the other party or sent by
registered or certified mail, return receipt requested, postage prepaid, or by
nationally recognized overnight courier service, addressed as follows:

        If to you:

        Alfred E. Festa
        W. R. Grace & Co.
        7500 Grace Drive
        Columbia, MD 21044

        If to the Company:

        W. R. Grace & Co.
        Attention:  General Counsel
        7500 Grace Drive
        Columbia, MD 21044

--------------------------------------------------------------------------------

or to such other addresses as either party furnishes to the other in writing in accordance with this notice provision. Notices and communications shall be effective when actually received by the addressee.

NO MITIGATION; NO SET OFF

In the event of any termination of employment hereunder, you shall be under no obligation to seek other employment and there shall be no offset against any amounts due to you under this letter agreement on account of any remuneration attributable to any subsequent employment you may obtain. The amounts payable hereunder shall not be subject to setoff, counterclaim, recoupment, defense or other right which the Company may have against you.

SUCCESSORS

Except as otherwise provided herein, this letter agreement is personal to you, and without the prior written consent of the Company shall not be assignable by you other than by will or the laws of descent and distribution. This agreement shall inure to the benefit of and be enforceable by your legal representatives. This agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. Except as provided herein, this agreement shall not be assignable by the Company without your prior written consent. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. "Company" means the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid that assumes and agrees to perform this agreement by operation of law or otherwise.

SURVIVORSHIP

The respective rights and obligations of the parties hereunder shall survive any termination of your employment to the extent necessary to effect those rights and obligations.

VACATION

As an officer of the Company, you shall be entitled to four weeks paid vacation per full calendar year of employment with the Company.

LEGAL FEES

The Company will also reimburse you for reasonable legal expenses, not to exceed $10,000, which you incur with respect to reviewing this letter agreement.

CONFIDENTIALITY AND NON-COMPETE AGREEMENTS

In order to commence employment with the Company, you will be required to sign the Company's standard employment agreement (the "Standard Agreement"), which includes agreements regarding the confidentiality of Company information and non-competition, and similar provisions.

Alfred E. Festa                November 17, 2003                    Page 9

--------------------------------------------------------------------------------

You and the Company agree that, to the extent that the terms the Standard
Agreement differ from the terms of this letter agreement, then the terms of this
letter agreement (and not the Standard Agreement) shall control your employment
relationship with the Company, and that the provisions of item 5 of the Standard
Agreement are not applicable to the terms of this letter agreement, in that the
Standard Agreement does not supercede any terms of this letter agreement. A copy
of the Standard Agreement that you will be required to sign has previously been
provided to you.

MISCELLANEOUS

You and the Company acknowledge this letter agreement, and the other written
agreements referred to herein, contain the entire understanding of the parties
concerning the subject matter hereof. You and the Company acknowledge that this
agreement supersedes any prior agreement between you and the Company concerning
the subject matter hereof. Except as expressly otherwise provided herein, this
agreement shall not adversely affect your right to participate in, or receive
any benefit under, any incentive, severance or other benefit plan or program in
which you may from time to time participate.

If any provision of this agreement is held invalid or unenforceable in whole or
in part, such provision, to the extent it is invalid or unenforceable, shall be
revised to the extent necessary to make the provision, or part hereof, valid and
enforceable, consistent with the intentions of the parties hereto. Any provision
of this agreement that is held invalid or unenforceable, in whole or in part,
shall not affect the validity and enforceability of the other provision of this
agreement, which shall remain if full force and effect.

This letter agreement may be amended, superseded or canceled only by a written
instrument specifically stating that it amends, supersedes or cancels this
agreement, executed by you and the Company.

If you have any questions regarding any expectations of your new position,
please call me.

If you have any questions regarding the compensation and Company benefit plans
and programs, please feel free to call W. Brian McGowan, Senior Vice President,
Administration, at (410) 531-4191.

Alfred E. Festa                November 17, 2003                Page 10
--------------------------------------------------------------------------------


Fred, we are very excited about your joining the Grace organization and look
forward to a productive and mutually rewarding relationship.

Sincerely,


/s/ Paul J. Norris


Paul J. Norris
Chairman, President & Chief Executive Officer
W. R. Grace & Co.

Attachment


cc:   W. B. McGowan



AGREED AND ACCEPTED:


/s/ Alfred E. Festa

-------------------------------
Alfred E. Festa


11/17/2003
-------------------------------
Date



</TEXT>
</DOCUMENT>

Exhibit 10.28

Paul J. Norris
Chairman & Chief Executive Officer

GRACE

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD  21044

Voice: (410) 531-4406
Fax: (410) 531-4414
email: paul.j.norris@grace.com

January 21, 2004

To:

PERSONAL AND CONFIDENTIAL

Dear

In order to continue Grace's successful operating performance in the Chapter 11
environment, it is important to retain key employees by providing compensation
programs that are valued and compete with our industry peers. To that end, Grace
has proposed, and the Court has approved, a special retention program for
certain key employees. At this time, we do not have Court approval to extend
this program beyond 2004.

I am pleased to inform you that you will participate in this retention program.
The total target amount of your retention payment will be [Recommendation] of
your salary throughout 2004. These supplemental payments are subject to the
provisions specified in the attachment to this letter.

In order to build better alignment with financial objectives, fifty-percent of
the payment is at risk and will be based on Grace's 2004 core EBIT performance
against 2003, the same as the Annual Incentive Compensation Plan. This portion
will be paid in March 2005. The other fifty-percent is guaranteed and will be
paid on December 26, 2004.

I realize that cash is not the only reason why an employee should stay with an
organization. At Grace, you should expect to continue to receive opportunities
to experience personal growth, to upgrade your skills, and to engage in
challenging, satisfying work.

Your loyal, dedicated service to Grace is appreciated.  Thanks.

Sincerely,


Paul J. Norris

SPECIAL RETENTION PROGRAM
FOR SELECTED KEY EMPLOYEES

COMMENCING JANUARY 1, 2004
--------------------------

As specified in the letter from Mr. Norris that accompanies this attachment,
selected individuals, including you, will receive supplemental retention
payments, in accordance with a special retention program approved by the Grace
Board and the bankruptcy court (the "Program"). Fifty percent of the
supplemental payment is at-risk, based on Grace's 2004 Core EBIT performance
versus 2003, and fifty percent is guaranteed. This memo specifies some of the
provisions applicable to Program participants.

CALCULATION OF PAYMENT-AT-RISK
Fifty percent of the 2004 retention payment is at-risk and will be paid based on
Grace's Core EBIT performance as shown on the chart below.

```
---------------------------------------------------------------
         % of Target                Grace 2004 Core EBIT
     Payment-at-Risk Paid         Performance against Target
---------------------------------------------------------------
            25%                       80% of 2003 EBIT
---------------------------------------------------------------
            75%                      100% of 2003 EBIT
---------------------------------------------------------------
           100%                      110% of 2003 EBIT
---------------------------------------------------------------
```

The payment-at-risk will be paid in March 2005 and will be calculated based on a
percentage of the participant's base earnings (base salary payments before
income tax withholding and other deductions during the period January 1, 2004 to
December 31, 2004), and based on Grace's Core EBIT Performance in 2004 against
Target. In order to receive the payment, the participant must remain a full-time
employee of Grace through December 31, 2004. Termination of employment prior to
December 31, 2004, whether voluntary or involuntary, will result in no payment
under this program.

CALCULATION OF GUARANTEED PAYMENT

For the 2004 calendar year, each Program participant will receive a supplemental
cash payment on December 31, 2004 - provided that the participant remains a
full-time employee of Grace through that date.

The guaranteed cash payment will be calculated based on a percentage of the
participant's base earnings (base salary payments before income tax withholding
and other deductions) during the relevant period. The guaranteed cash payment
for December 31 will be equal to fifty percent of the total retention payment
amount based on base earnings during the period January 1, 2004 to December 31,
2004 (this payment will be made on December 26).

TAX AND BENEFIT TREATMENT OF ALL RETENTION PAYMENTS

The supplemental payment will, of course, be considered ordinary taxable income; and, therefore, applicable income and other tax withholding will apply to the payment.

The supplemental payment will not be considered for purposes of any Grace benefit plan or program. For example, no portion of the payment will be contributed to Grace's Savings & Investment Plan, nor will the payment be used to determine final average compensation under the Grace Salaried Retirement Plan or the Grace Supplemental Executive Retirement Plan (in this regard, the payments will be considered non-pensionable "special pay"). Also, the payment will not be used to calculate the amount of disability income or life insurance that a participant or beneficiary may become entitled to under any Grace benefit plan.

The Program payment will not be considered for purposes of any Grace compensation plan or program. For example, the payment will not be considered in determining a participant's annual incentive compensation award. Any applicable regular or promotional base salary increase will be calculated without regard to the payment, which means, for instance, that the payment will not be treated as an offset to any regular or promotional base salary increase.

The terms of a Program participant's employment with Grace are not affected by the Program (except for the guaranteed supplemental payment that a participant will receive and the supplemental payment-at-risk under the Program for the 2004 calendar year, while continuing full time employment with Grace). This means, for instance, that the participant's employment with Grace remains "at will" before, during and after the implementation of the Program.

EXAMPLE

Your supplemental retention payment target is 55%. Your salary as of January 1, 2004 is $200,000 and you received a merit increase of $6,000 in May 2004. Grace achieves its EBIT goal of 10% growth. Your total supplemental retention payment under the 2004 program equals $112,200.

On December 26, you would receive a supplement retention payment of $56,100 ($204,000 X 27.5%).

In March 2005, you would receive a supplement retention payment of $56,100 ($204,000 X 27.5% X 100%).

</TEXT>
</DOCUMENT>

Exhibit 10.29

2003-2005 LONG-TERM CASH AWARD

Granted to:                 Name
Effective Date of Grant:    Date
Targeted Award:             $XX,XXX
Performance Period:         January 1, 2003 - December 31, 2005

          Under the long-term incentive program of W.R. Grace & Co (the "Company"), the Compensation Committee (the "Committee") of the Board of Directors of the Company has granted you a Long-Term Cash Award under which you may earn a cash payout in an amount equal to (or, in certain circumstances, greater or less than) the Targeted Award set forth above, over the Performance Period.

          This Targeted Award will be earned by you if the performance objectives described in Annex B for the Performance Period are met. If the performance objectives are only partially achieved or are over-achieved, the amount you actually earn under this Award will be decreased (or eliminated) or increased as set forth in Annex B.

          The award will be calculated and paid to you, net of the applicable taxes.

          The consequences of a change in or termination of your employment status during the Performance Period are described in the attached Administrative Practices (Annex C).

          In all matters regarding the administration of the Long-Term Cash Award, the Committee has full and sole jurisdiction, subject to the provisions of Annex C.

          Long-Term Cash Awards are being granted only to a limited number of key employees of the Company and its subsidiaries. This Award should, consequently, be treated confidentially.

               W.R. Grace & Co


               By:
               Paul Norris
               Chairman, CEO, President

               Acceptance of the foregoing is acknowledged
               this _____ day of _____, 2003.


               ----------------------------------------
               (Signature of Participant)

               ----------------------------------------
               (Please print full name)

Annex B

CALCULATION OF 2003-2005 LTIP
-----------------------------

Your 2003-2005 LTIP award payout will be based on the 3-year compound annual
growth rate (CAGR) in total Grace core earnings before interest and taxes (core
EBIT). Payouts are contingent upon achievement of target CAGR for the 3-year
performance period. The target CAGR is 6%, using 2002 results as the base year.

The core earnings before interest and taxes (core EBIT) in 2002 was $180.8
million. The chart below details six scenarios at different assumed growth
rates. The target growth is highlighted.

--------------------------------------------------------------------------------
                            PERFORMANCE PERIOD

| ASSUMED GROWTH RATES | BASE PERIOD 2002 | 2003 | 2004 | 2005 | TOTAL GROWTH 03-05(1) | LTIP POOL | CUMULATIVE REPORTED EARNINGS(2) |
|---|---|---|---|---|---|---|---|
| 1.50% | 180.8 | 183.5 | 186.3 | 189.1 | 558.9 | 2.9 | 556.0 |
| 3.00% | 180.8 | 186.2 | 191.8 | 197.6 | 575.6 | 5.9 | 569.7 |
| 6.00% | 180.8 | 191.6 | 203.1 | 215.3 | 610.0 | 11.8 | 598.2 |
| 10.00% | 180.8 | 198.9 | 218.8 | 240.6 | 658.3 | 14.3 | 646.5 |
| 15.00% | 180.8 | 207.9 | 239.1 | 275.0 | 722.0 | 17.3 | 710.2 |
| 25.00% | 180.8 | 226.0 | 282.5 | 353.1 | 861.6 | 23.6 | 849.8 |

--------------------------------------------------------------------------------

(1) All results include full recognition/accrual of Annual Incentive
Compensation Program and, for achievement levels above 6% (i.e., 10%, 15%, and
25%), all totals include accruals for Long-Term Incentive Program Payments

(2) Cumulative Reported Earnings represent the 3 year core EBIT earnings
required at the respective assumed growth rates. Up to the first $11.8 million
(target CAGR 6%) is deducted from reported results. Payouts over target ($11.8
million) must be accrued as part of reported earnings.

The Long-Term Cash Award payout will vary with actual results as shown in the chart below:

| CAGR LEVEL ACHIEVED | PAYOUT (ROUNDED TO THE NEAREST WHOLE PERCENTAGE) |
|:---:|:---:|
| 25% | 200% |
| 15% | 147% |
| 10% | 121% |
| 6% | 100% |
| 3% | 50% |
| 1.5% | 25% |

For the 2003-2005 LTIP, cash payments will be made in two installments - 50% of what is earned based on current performance at the end of 2004, but no more than 50% of target, will be paid in March 2005, and the balance will be paid in March 2006.

Example:

A sample calculation of the Long-Term Cash Award Earned is provided below. Assume that your Targeted Award is $20,400. $13,600 would be earned after Year 2 assuming 6% growth per year. Therefore the payment in March 2005 would be $6,800, 50% of what is earned.

| CAGR LEVEL ACHIEVED | PAYOUT IN MARCH 2005 | PAYOUT IN MARCH 2006 | TOTAL PAYOUT |
|:---:|:---:|:---:|:---:|
| 25% | $6,800 | $34,000 | $40,800 |
| 15% | $6,800 | $23,188 | $29,988 |
| 10% | $6,800 | $17,885 | $24,685 |
| 6% | $6,800 | $13,600 | $20,400 |
| 3% | $3,400 | $6,800 | $10,200 |

Annex C

```
                        W. R. GRACE & CO.
          Administrative Practices - Long-Term Cash Award Program
          -------------------------------------------------------
                        2003-2005 Performance Period
                        ----------------------------
```

Definitions
-----------

"Award Payment": An Interim Long-Term Cash Award Payment or Remaining Long-Term Award Payment, as applicable.

"Board of Directors": The Board of Directors of the Company

"Committee": The Compensation Committee of the Board of Directors.

"Company": W. R. Grace & Co., a Delaware Corporation and/or, if applicable in the context, one or more of its Subsidiaries.

"Incomplete Long-Term Cash Awards": A Long-Term Cash Award for which the Performance Period has not been completed as of the date referenced.

"Interim Long-Term Cash Award Payment": As defined on page 4, provided that such payment will not exceed 50% of the Participant's Targeted Award for the first two years, regardless of Company performance at the time of payment.

"Key Employee": An officer or other senior, full-time employee of the Company, who, in the opinion of the Company, can contribute significantly to the growth and successful operations of the Company.

"Long-Term Cash Award Program": An undertaking by the Company to financially reward a Key Employee at the end of a Performance Period, which undertaking is contingent upon or measured by the attainment over the Performance Period of specified performance objectives determined (on a consolidated or unconsolidated basis) by changes in the 3-year average annual growth rate (AAGR) in Total Grace's core earnings before interest and taxes (core EBIT).

"Long-Term Cash Award": A cash award, to be paid in the future, which is granted to Key Employees under the Company's long-term incentive program.

"Long-Term Cash Award Earned": The amount of cash earned by a Participant pursuant to the terms of a Long-Term Cash Award.

"Participant": A Key Employee who is, or who is proposed to be, a recipient of a Long-Term Cash Award.

"Performance Period": Except as provided herein, a period of three calendar years over which a Long-Term Cash Award may be earned, as approved by the Committee. The first Performance Period under this Plan will commence effective January 1, 2003 and

(1)

Annex C

will end on December 31, 2005. Performance Periods with respect to different Long-Term Cash Awards to the same individual may overlap.

"Total Grace Core EBIT": The core earnings before interest and taxes (core EBIT)" of the Company as reported on (and calculated in accordance with) the statement of W. R. Grace & Co. Continuing Operations- Segment Basis.

"Remaining Long-Term Cash Award Payment": As defined on Page 4, the second installment of the Long-Term Cash Award that may be paid after the end of the Performance Period, based on Company performance for the entire Performance Period.

"Subsidiary": A corporation, partnership, limited liability company or other form of business association of which shares of common stock or other ownership interests (i) having more than 50% of the voting power regularly entitled to vote for directors (or equivalent management rights) or (ii) regularly entitled to receive more than 50% of the dividends (or their equivalents) paid on the common stock (or other ownership interests), are owned, directly or indirectly, by the Company.

"Targeted Award": The amount of cash award specified in writing for a Participant as his or her "Targeted Award" for a Performance Period and which is subject to and covered by the terms and conditions of a Long-Term Cash Award. This amount may be different from the Long-Term Cash Award Earned by an individual.

Plan Administration
-------------------

The Plan shall be administered by the Committee, provided that no member of the Committee shall be eligible to receive a Long-Term Cash Award while serving on the Committee.

The Committee shall approve (i) the performance measurements and objectives for each Long-Term Cash Award and (ii) the Performance Period over which a Long-Term Cash Award is to be earned.

The Committee shall approve (i) the Key Employees who are to be granted Long-Term Cash Awards and (ii) the Targeted Award subject to each Long-Term Cash Award.

Long-Term Cash Awards
---------------------

The Committee may, at any time or from time to time, grant Long-Term Cash Awards to Key Employees.

Each Long-Term Cash Award shall be evidenced by a written instrument containing such terms and conditions as the Committee shall approve, provided the instrument is consistent with these practices.

No Long-Term Cash Award, nor any payment or right thereunder, shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except

by will or the laws of descent and distribution, or by the terms of a Participant's Designation of Beneficiary, if any, on file with the Company.

In the case of a Key Employee who becomes a Participant after the beginning of a Performance Period, the Committee may ratably reduce the amount of the Targeted Award covered by such Employee's Long-Term Cash Award or otherwise appropriately adjust the terms of the Long-Term Cash Award to reflect the fact that the Key Employee is to be a Participant for only part of the Performance Period.

It is the intention of the Committee that Long-Term Cash Awards be related to the results of the core operations affected by the management actions taken by the Participants. Subject to the administrative practices that apply to termination or change in employment status and to the amendment or discontinuance of Long-Term Cash Awards, the performance objectives applicable to Long-Term Cash Awards will remain unchanged during the Performance Period except as follows:

o    In the event of the divestment of a Business prior to completion of the Performance Period, both the performance objectives and results pertaining to that Business shall be eliminated for the full year in which the divestment occurs and for any subsequent years.

o    In general, acquisitions will be included in the performance results.

Termination or Change in Employment Status
------------------------------------------

A Participant shall forfeit all rights to any Award Payment, if, prior to the date of payment of such Award Payment, the Participant (1) resigns without the consent of the Committee, (2) retires under a retirement plan of the Company or Subsidiary before age 62 without the consent of the Committee, or (3) is terminated for cause.

If a Participant retires under a retirement plan of the Company or Subsidiary at or after age 62, or ceases employment as a result of death or disability, or ceases employment as a result of an involuntary termination after a Change in Control of the Company (as defined herein), during a Performance Period, then his rights in any Incomplete Long-Term Cash Award related to that Performance Period shall thereupon vest, and he shall be entitled to receive any Award Payment of any Long-Term Cash Award Earned he would otherwise have received (at the time he would have otherwise received the Award Payment), except that the amount of any Long-Term Cash Award Earned shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was not an employee. If a Participant ceases employment with the Company for any of the reasons specified in this paragraph, after the completion of any Performance Period (but before the payment of the Remaining Long-Term Cash Award Payment related to the completed Performance Period), then his rights to any Long-Term Cash Award Earned and to such Award Payment related to the completed Performance Period shall thereupon vest, and he shall be entitled to receive such Award Payment at the time he would have otherwise received the Payment.

If a Participant ceases employment with the Company for any reason other than those indicated in the previous two paragraphs (including by reason of involuntary termination

(3)

Annex C

not for cause, except as provided above with respect to involuntary termination
after a Change in Control of the Company, or transfer of employment to a buyer
of any business unit of the Company), then his rights in any Incomplete
Long-Term Cash Award, and any Award Payment that is unpaid as of the date the
Participant ceases such employment, shall be determined by the Committee (or the
designee of the Committee, which may include the Chief Executive Officer of the
Company) as soon as practicable after the Participant ceases such employment.
All such determinations shall be final and binding on all parties.

Except as modified by the provisions of the second and third paragraphs of this
section, payments due to Participants pursuant to the applicable preceding
paragraphs, above, shall be calculated and made in accordance with the
provisions described under the section entitled "Calculation of Long-Term Cash
Awards Earned: Form of Payment".

A leave of absence, if approved by the Committee, shall not be deemed a
termination or change of employment status for the purposes of this section,
but, unless the Committee otherwise directs, any Long-Term Cash Award Earned
that a Participant would otherwise have received under a Long-Term Cash Award
Program shall be reduced ratably in proportion to the portion of the Performance
Period during which the Participant was on such leave of absence.

Any consent, approval or direction which the Committee may give under this
section in respect of an event or transaction may be given before or after the
event or transaction.

Calculation of Long-Term Cash Awards Earned: Form of Payment
-----------------------------------------------------------

Long-Term Cash Awards Earned will be paid to a Participant in two installments
(1) the first installment shall be paid in March of the third and final year of
the Performance Period and shall be equal to 50% of what is earned based on the
Company's performance for the first two calendar years of the applicable
Performance Period, but no more than 50% of the Participant's Targeted Award
(the "Interim Long-Term Cash Award Payment"), and (2) the balance, if any, of
the Long-Term Cash Award Earned will be paid in March after the end of the third
and final year of the Performance Period (the "Remaining Long-Term Cash Award
Payment").

The Committee shall determine the extent to which the performance objectives of
a Long-Term Cash Award have been achieved during the Performance Period and the
amount of any Long-Term Cash Awards Earned (and the amount of any Award
Payment). All calculations in this regard shall be made in accordance with the
generally accepted accounting principles customarily applied by the Company and
shall be submitted to the Committee for its review and approval. The
determination of the Committee shall be final and binding.

(4)

Annex C

General
-------

Nothing in this document nor in any instrument executed pursuant hereto shall confer upon a Participant any right to continue in the employ of the Company or a Subsidiary, or shall affect the right of the Company or a Subsidiary to terminate his or her employment with or without cause.

The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding or any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Long-Term Cash Award Earned.

Nothing in a Long-Term Cash Award is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to employees generally, or to any class or group of employees, which the Company or a Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, annual bonus, stock purchase, stock bonus or stock option plan; provided, however, that no amounts awarded or paid pursuant to any Long-Term Cash Award shall be included or counted as compensation for the purposes of any employee benefit plan of the Company or a Subsidiary where contributions to the plan, or the benefits received from the plan, are measured or determined in whole or in part, by the amount of the employee's compensation.

The grant of a Long-Term Cash Award to an employee of a Subsidiary shall be contingent on the approval of the Long-Term Cash Award by the Subsidiary and the Subsidiary's agreement that (i) the Company may administer such Award on its behalf and (ii) the Subsidiary will make, or reimburse the Company for, the payments called for by the Long-Term Cash Award. The provisions of this paragraph and the obligations of the Subsidiary so undertaken may be waived, in whole or in the part, from time to time by the Company.

Amendments and Discontinuance
-----------------------------

In the event acquisitions, divestments, substantial changes in tax or other laws or in accounting principles or practices, natural disasters or other extraordinary events render fulfillment of the performance objectives of a Long-Term Cash Award impossible or impracticable, or result in the achievement of the performance objectives without appreciable effort by the Participant, the Committee may, but shall not be obligated to, amend any such Long-Term Cash Award in any appropriate manner so that the Participant may earn Long-Term Cash Awards comparable to those that might have been earned if the extraordinary event had not occurred.

The Chief Executive Officer of the Company may approve such technical changes and clarifications to the Long-Term Cash Award Program as necessary, provided such changes or clarifications do not vary substantially from the terms and conditions outlined in this description.

(5)

Annex C

In the event a Change in Control of the Company (as defined herein) shall occur or the Board of Directors has reason to believe that a Change of Control may occur, the Committee may, with respect to any one or more Long-Term Cash Awards, (i) reduce the length of a Performance Period to not less than one year, (ii) make ratable adjustments to performance objectives and Targeted Awards, (iii) change the methods of measuring the performance objectives, (iv) accelerate the payment of any Long-Term Cash Awards Earned or any Award Payment, and (v) take other action deemed by it to be appropriate and in the best interests of the Company under the circumstances. For the purposes of this paragraph:

(A)  "Change in Control of the Company" means and shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Section 13(d) and 14 (d) of the Securities Exchange Act of 1934), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under such Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the results of a sale of Common Stock by the Company that has been approved by the Board of Directors); or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective); (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective, or (iv) the shareholders of the Company approve a complete liquidation or dissolution of the Company.

(B)  "Continuing Director" means any member of the Board of Directors who was such a member on the date on which this Program was approved by the Board of Directors, and any successor to a Continuing Director who is approved as a nominee or elected to succeed to a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

The granting of Long-Term Cash Awards may be amended or discontinued by the Committee at any time.

(6)

Annex C

No amendment or discontinuance of Long-Term Cash Awards shall, without a
Participant's consent, adversely affect his rights in any Long-Term Cash Awards
theretofore granted to him, except that, if the Committee so directs, all
Incomplete Long-Term Cash Awards may be terminated prospectively with the same
effect as a termination of employment under the second paragraph of the section
entitled "Termination or Change in Employment Status".

(7)

</TEXT>
</DOCUMENT>

Exhibit 21

[X] W. R. GRACE & CO., A DELAWARE CORPORATION
U.S. SUBSIDIARIES
-----------------

12/31/2003

[X]  Chapter 11 Filing - April 2, 2001

| | SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|---|
| [X] | A-1 Bit & Tool Co., Inc. | DE |
| | * Advanced Refining Technologies LLC | DE |
| [X] | Alewife Boston Ltd. | MA |
| [X] | Alewife Land Corporation | MA |
| [X] | Amicon, Inc. | DE |
| [ ] | AP Chem Incorporated | MD |
| [X] | CB Biomedical, Inc. | DE |
| [X] | CCHP, Inc. | DE |
| [X] | Coalgrace, Inc. | DE |
| [X] | Coalgrace II, Inc. | DE |
| [ ] | Construction Products Dubai, Inc. | DE |
| [X] | Creative Food 'N Fun Company | DE |
| [X] | Darex Puerto Rico, Inc. | DE |
| [X] | Del Taco Restaurants, Inc. | DE |
| [X] | Dewey and Almy, LLC | DE |
| [X] | Ecarg, Inc. | NJ |
| [X] | Five Alewife Boston Ltd. | MA |
| [X] | G C Limited Partners I, Inc. | DE |
| [X] | G C Management, Inc. | DE |
| [X] | GEC Management Corporation | DE |
| [X] | GN Holdings, Inc. | DE |
| [X] | GPC Thomasville Corp. | DE |
| [X] | Gloucester New Communities Company, Inc. | NJ |
| [X] | Grace A-B Inc. | DE |
| [X] | Grace A-B II Inc. | DE |
| [ ] | Grace Asia Pacific, Inc. | DE |
| [ ] | Grace Chemicals, Inc. | DE |
| [X] | Grace Chemical Company of Cuba | IL |
| [ ] | Grace Collections, Inc. | DE |
| [X] | Grace Culinary Systems, Inc. | MD |
| [X] | Grace Drilling Company | DE |
| [X] | Grace Energy Corporation | DE |

```
--------------------------------------------------------------
[X]   Grace Environmental, Inc.                    DE
--------------------------------------------------------------


--------------------
* Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace & Co.-Conn.
(#001) and 45% Chevron USA, Inc.; certain enumerated actions of the Executive
Committee require unanimous consent.
```

                                    1

| SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|
| [X]  Grace Europe, Inc. | DE |
| [ ]  Grace Germany Holdings, Inc. | DE |
| [X]  Grace H-G Inc. | DE |
| [X]  Grace H-G II Inc. | DE |
| [X]  Grace Hotel Services Corporation | DE |
| [X]  Grace International Holdings, Inc. | DE |
| [ ]  Grace Latin America, Inc. | DE |
| [ ]  Grace Management Services, Inc. | DE |
| [X]  Grace Offshore Company | LA |
| [X]  Grace PAR Corporation | DE |
| [X]  Grace Petroleum Libya Incorporated | DE |
| [ ]  Grace Receivables Purchasing, Inc. | DE |
| [X]  Grace Tarpon Investors, Inc. | DE |
| [X]  Grace Ventures Corp. | DE |
| [X]  Grace Washington, Inc. | DE |
| [X]  W. R. Grace Capital Corporation | NY |
| [X]  W. R. Grace & Co.-Conn. | CT |
| [X]  W. R. Grace Land Corporation | NY |
| [X]  Gracoal, Inc. | DE |
| [X]  Gracoal II, Inc. | DE |
| [X]  Guanica-Caribe Land Development Corporation | DE |
| [X]  Hanover Square Corporation | DE |
| [X]  Homco International, Inc. | DE |
| [ ]  Ichiban Chemical Co., Inc. | DE |
| [X]  Kootenai Development Company | MT |
| [X]  L B Realty, Inc. | DE |
| [X]  Litigation Management, Inc. | DE |
| [X]  Monolith Enterprises, Incorporated | DC |
| [X]  Monroe Street, Inc. | DE |
| [X]  MRA Holdings Corp. | DE |
| [X]  MRA Intermedco, Inc. | DE |
| [X]  MRA Staffing Systems, Inc. | DE |
| [X]  Remedium Group, Inc. | DE |
| [ ]  Separations Group, The | CA |
| [X]  Southern Oil, Resin & Fiberglass, Inc. | FL |
| [X]  Water Street Corporation | DE |

```
NON-U.S. SUBSIDIARIES
---------------------

--------------------------------------------------
COUNTRY/
SUBSIDIARY NAME
--------------------------------------------------
ARGENTINA
--------------------------------------------------
W. R. Grace Argentina S.A.
--------------------------------------------------
WRG Argentina, S.A.
--------------------------------------------------
AUSTRALIA
--------------------------------------------------
Grace Australia Pty. Ltd.
--------------------------------------------------
BELGIUM
--------------------------------------------------
Grace N.V.
--------------------------------------------------
Grace Silica N.V.
--------------------------------------------------
BRAZIL
--------------------------------------------------
Grace Brasil Ltda.
--------------------------------------------------
Grace Davison Ltda.
--------------------------------------------------
PEADCO-Engenharia, Comercio Industria Ltda.
--------------------------------------------------
CANADA
--------------------------------------------------
GEC Divestment Corporation Ltd.
--------------------------------------------------
Grace Canada, Inc.
--------------------------------------------------
W. R. Grace Finance (NRO) Ltd.
--------------------------------------------------
CHILE
--------------------------------------------------
Grace Quimica Compania Limitada
--------------------------------------------------
CHINA - PEOPLE'S REPUBLIC OF
--------------------------------------------------
Grace China Ltd.
--------------------------------------------------
COLOMBIA
--------------------------------------------------
Grace Colombia S.A.
--------------------------------------------------
W. R. G.  Colombia S.A.
--------------------------------------------------
CUBA
--------------------------------------------------
Envases Industriales y Comerciales, S.A.
--------------------------------------------------
Papelera Camagueyana, S.A.
--------------------------------------------------
FRANCE
--------------------------------------------------
Etablissements Pieri S.A.
--------------------------------------------------
Societe Civile Beau-Beton
--------------------------------------------------
W. R. Grace S.A.
--------------------------------------------------
GERMANY
--------------------------------------------------
Advanced Refining Technologies GmbH
--------------------------------------------------
Grace Bauprodukte GmbH
--------------------------------------------------
Grace Darex GmbH
--------------------------------------------------
Grace GP G.m.b.H.
--------------------------------------------------
Grace Holding G.m.b.H.
```

```
Grace Management GP G.m.b.H.
---------------------------------------------------
Grace Silica GmbH
---------------------------------------------------
```

3

```
--------------------------------------------------------
COUNTRY/SUBSIDIARY NAME
--------------------------------------------------------
GREECE
--------------------------------------------------------
Grace Hellas E.P.E.
--------------------------------------------------------
HONG KONG
--------------------------------------------------------
W. R. Grace (Hong Kong) Limited
--------------------------------------------------------
W. R. Grace Southeast Asia Holdings Limited
--------------------------------------------------------
HUNGARY
--------------------------------------------------------
Grace Ertekesito Kft.
--------------------------------------------------------
INDIA
--------------------------------------------------------
W. R. Grace & Co. (India) Private Limited
--------------------------------------------------------
INDONESIA
--------------------------------------------------------
PT. Grace Specialty Chemicals Indonesia
--------------------------------------------------------
IRELAND
--------------------------------------------------------
Amicon Ireland Limited
--------------------------------------------------------
Grace Construction Products (Ireland) Limited
--------------------------------------------------------
Trans-Meridian Insurance (Dublin) Ltd.
--------------------------------------------------------
ITALY
--------------------------------------------------------
W. R. Grace Italiana S.p.A.
--------------------------------------------------------
JAPAN
--------------------------------------------------------
Advanced Refining Technologies K.K.
--------------------------------------------------------
Grace Chemicals K.K.
--------------------------------------------------------
Grace Japan Kabushiki Kaisha
--------------------------------------------------------
KOREA
--------------------------------------------------------
Grace Korea Inc.
--------------------------------------------------------
MALAYSIA
--------------------------------------------------------
W. R. Grace (Malaysia) Sendiran Berhad
--------------------------------------------------------
W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
--------------------------------------------------------
MEXICO
--------------------------------------------------------
Grace Container, S. A. de C. V.
--------------------------------------------------------
W. R. Grace Holdings, S. A. de C. V.
--------------------------------------------------------
NETHERLANDS
--------------------------------------------------------
Amicon B.V.
--------------------------------------------------------
Denac Nederland B.V.
--------------------------------------------------------
Storm van Bentem en Kluyver B.V.
--------------------------------------------------------
W. R. Grace B.V.
--------------------------------------------------------
NETHERLANDS ANTILLES
--------------------------------------------------------
W. R. Grace N.V.
--------------------------------------------------------
NEW ZEALAND
--------------------------------------------------------
Grace (New Zealand) Limited
--------------------------------------------------------
PHILIPPINES
--------------------------------------------------------
```

---------------------------------------------------------
POLAND
---------------------------------------------------------
Grace Sp. z o.o.
---------------------------------------------------------
RUSSIA
---------------------------------------------------------
Darex CIS LLC
---------------------------------------------------------
SINGAPORE
---------------------------------------------------------
W. R. Grace (Singapore) Private Limited
---------------------------------------------------------
SOUTH AFRICA
---------------------------------------------------------
Grace Davison (Proprietary) Limited
---------------------------------------------------------
W. R. Grace Africa (Pty.) Limited
---------------------------------------------------------

4

```
--------------------------------------------------------
COUNTRY/
SUBSIDIARY NAME
--------------------------------------------------------
SPAIN
--------------------------------------------------------
Grace, S.A.
--------------------------------------------------------
Pieri Especialidades, S.L.
--------------------------------------------------------
SWEDEN
--------------------------------------------------------
Grace AB
--------------------------------------------------------
Grace Catalyst AB
--------------------------------------------------------
Grace Sweden AB
--------------------------------------------------------
SWITZERLAND
--------------------------------------------------------
Pieri S.A.
--------------------------------------------------------
TAIWAN
--------------------------------------------------------
W. R. Grace Taiwan, Inc.
--------------------------------------------------------
THAILAND
--------------------------------------------------------
W. R. Grace (Thailand) Limited
--------------------------------------------------------
UNITED KINGDOM
--------------------------------------------------------
A.A. Consultancy & Cleaning Company Limited
--------------------------------------------------------
Cormix Limited
--------------------------------------------------------
Borndear 1 Limited
--------------------------------------------------------
Borndear 2 Limited
--------------------------------------------------------
Borndear 3 Limited
--------------------------------------------------------
Darex UK Limited
--------------------------------------------------------
Emerson & Cuming (Trading) Ltd.
--------------------------------------------------------
Emerson & Cuming (UK) Ltd.
--------------------------------------------------------
Grace Construction Products Limited
--------------------------------------------------------
Pieri U.K. Limited
--------------------------------------------------------
Servicised Ltd.
--------------------------------------------------------
W. R. Grace Limited
--------------------------------------------------------
VENEZUELA
--------------------------------------------------------
Grace Venezuela, S.A.
--------------------------------------------------------
Inversiones GSC, S.A.
--------------------------------------------------------
```

5

```
</TEXT>
</DOCUMENT>
```

EXHIBIT 24

POWER OF ATTORNEY
-----------------


        The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ,
and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of
signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended
December 31, 2003, and all amendments thereto, to be filed with the Securities
and Exchange Commission. Each of such attorneys-in-fact is appointed with full
power to act without the other.


                                        /s/ John F. Akers
                                        ---------------------
                                          John F. Akers


Dated: March 3, 2004

EXHIBIT 24

POWER OF ATTORNEY
-----------------


        The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ,
and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of
signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended
December 31, 2003, and all amendments thereto, to be filed with the Securities
and Exchange Commission. Each of such attorneys-in-fact is appointed with full
power to act without the other.




                                        /s/ H. Furlong Baldwin
                                        -------------------------
                                            H. Furlong Baldwin



Dated:  March 3, 2004

EXHIBIT 24

POWER OF ATTORNEY
-----------------

    The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.


/s/ Ronald C. Cambre
-------------------------
Ronald C. Cambre


Dated: March 3, 2004

EXHIBIT 24

POWER OF ATTORNEY
-----------------

      The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.


/s/ Marye Anne Fox
----------------------
Marye Anne Fox


Dated: March 3, 2004

EXHIBIT 24

```
                      POWER OF ATTORNEY
                      -----------------


        The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ,
and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of
signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended
December 31, 2003, and all amendments thereto, to be filed with the Securities
and Exchange Commission. Each of such attorneys-in-fact is appointed with full
power to act without the other.




                                      /s/ John J. Murphy
                                      --------------------------
                                          John J. Murphy



Dated: March 3, 2004
```

EXHIBIT 24

POWER OF ATTORNEY
-----------------


     The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.


```
                                 /s/ Thomas A. Vanderslice
                                 ------------------------------
                                     Thomas A. Vanderslice
```

Dated: March 3, 2004




</TEXT>
</DOCUMENT>

EXHIBIT 31.1

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Paul J. Norris, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this report does not contain any untrue statement
   of a material fact or omit to state a material fact necessary to make the
   statements made, in light of the circumstances under which such statements
   were made, not misleading with respect to the period covered by this
   report;

3. Based on my knowledge, the financial statements, and other financial
   information included in this report, fairly present in all material
   respects the financial condition, results of operations and cash flows of
   the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for
   establishing and maintaining disclosure controls and procedures (as
   defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant
   and have:

   (a) designed such disclosure controls and procedures, or caused such
       disclosure controls and procedures to be designed under our
       supervision, to ensure that material information relating to the
       registrant, including its consolidated subsidiaries, is made
       known to us by others within those entities, particularly during
       the period in which this report is being prepared;

   (b) evaluated the effectiveness of the registrant's disclosure
       controls and procedures and presented in this report our
       conclusions about the effectiveness of the disclosure controls
       and procedures, as of the end of the period covered by this
       report based on such evaluation; and

   (c) disclosed in this report any change in the registrant's internal
       control over financial reporting that occurred during the
       registrant's most recent fiscal quarter (the registrant's fourth
       fiscal quarter in the case of an annual report) that has
       materially affected, or is reasonably likely to materially
       affect, the registrant's internal control over financial
       reporting; and

5. The registrant's other certifying officers and I have disclosed, based on
   our most recent evaluation of internal control over financial reporting,
   to the registrant's auditors and the audit committee of the registrant's
   board of directors (or persons performing the equivalent functions):

   (a) all significant deficiencies and material weaknesses in the
       design or operation of internal control over financial reporting
       which are reasonably likely to adversely affect the registrant's
       ability to record, process, summarize and report financial
       information; and

   (b) any fraud, whether or not material, that involves management or
       other employees who have a significant role in the registrant's
       internal control over financial reporting.

Date: March 5, 2004

                                    /s/ Paul J. Norris
                                    ------------------------
                                    Paul J. Norris
                                    Chairman and
                                    Chief Executive Officer

</TEXT>
</DOCUMENT>

EXHIBIT 31.2

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this report does not contain any untrue statement
   of a material fact or omit to state a material fact necessary to make the
   statements made, in light of the circumstances under which such statements
   were made, not misleading with respect to the period covered by this
   report;

3. Based on my knowledge, the financial statements, and other financial
   information included in this report, fairly present in all material
   respects the financial condition, results of operations and cash flows of
   the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for
   establishing and maintaining disclosure controls and procedures (as
   defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant
   and have:

   (a) designed such disclosure controls and procedures, or caused such
       disclosure controls and procedures to be designed under our
       supervision, to ensure that material information relating to the
       registrant, including its consolidated subsidiaries, is made
       known to us by others within those entities, particularly during
       the period in which this report is being prepared;

   (b) evaluated the effectiveness of the registrant's disclosure
       controls and procedures and presented in this report our
       conclusions about the effectiveness of the disclosure controls
       and procedures, as of the end of the period covered by this
       report based on such evaluation; and

   (c) disclosed in this report any change in the registrant's internal
       control over financial reporting that occurred during the
       registrant's most recent fiscal quarter (the registrant's fourth
       fiscal quarter in the case of an annual report) that has
       materially affected, or is reasonably likely to materially
       affect, the registrant's internal control over financial
       reporting; and

5. The registrant's other certifying officers and I have disclosed, based on
   our most recent evaluation of internal control over financial reporting,
   to the registrant's auditors and the audit committee of the registrant's
   board of directors (or persons performing the equivalent functions):

   (a) all significant deficiencies and material weaknesses in the
       design or operation of internal control over financial reporting
       which are reasonably likely to adversely affect the registrant's
       ability to record, process, summarize and report financial
       information; and

   (b) any fraud, whether or not material, that involves management or
       other employees who have a significant role in the registrant's
       internal control over financial reporting.

   Date: March 5, 2004

                                    /s/ Robert M. Tarola
                                    ---------------------------
                                    Robert M. Tarola
                                    Senior Vice President and
                                    Chief Financial Officer

</TEXT>
</DOCUMENT>

EXHIBIT 32

CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Paul J. Norris
------------------------------
Chairman and Chief Executive Officer

/s/ Robert M. Tarola
------------------------------
Senior Vice President and Chief Financial Officer

Date: March 5, 2004

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

</TEXT>
</DOCUMENT>

Created by 10KWizard     www.10KWizard.comSource: W R GRACE & CO, 10-K, March 05, 2004