**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

LAWRENCE W. BUNCH, et al.,    )
            Plaintiffs,    )
      vs.    )Case No. 04-11380-WGY
W.R. GRACE & CO., et al.,    )
            Defendants.    )

      The 30(b)(6) deposition of Duff & Phelps, LLC, by DANIEL D. BAYSTON, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, before ANDREA L. CARTER, CSR No. 84-3722, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3700, 35 West Wacker Drive, Chicago, Illinois, on the 31st day of May, A.D. 2007, at 9:34 a.m.

Page 22

1   Q.   Anybody else?
2   A.   No, I think that's the primary contact.
3   Q.   Is it Ms. Bluth?
4   A.   Ms. Bluth.
5   Q.   Did she work on the Grace project at all?
6   A.   She did not.
7   Q.   Is it fair to say that you were the lead
8   or the responsible person on this State Street Grace
9   project?
10   A.   That is correct.
11       MR. BOWERS: Objection to the form.
12       (WHEREUPON, a certain document was
13       marked Bayston Plaintiffs'
14       Deposition Exhibit No. 2, for
15       identification, as of 5/31/07.)
16   BY MR. CUMMINS:
17   Q.   I am now going to hand you what has been
18   marked for identification as Bayston Exhibit 2, and
19   ask you if you can identify it. Take a minute and
20   look through it.
21       Okay. Going back to the previous line of
22   questions, you indicated that someone other than you
23   is the person at Duff & Phelps most knowledgeable in
24   the various projects that Duff & Phelps had worked

Page 23

1   on in conjunction with Goodwin Procter; is that
2   correct?
3   A.   That is correct.
4       MR. CUMMINS: I am going to ask your counsel
5   then to -- very shortly here because this is a
6   30(b)(6) deposition, that you and I need to confer
7   about whether we need to take a deposition of
8   someone else or you will simply provide the
9   information in some confidential way for the
10   purposes of this case. I think it's not a big deal
11   here. It is just important that we know exactly
12   what the Duff & Phelps projects are.
13       MR. BOWERS: Okay.
14   BY MR. CUMMINS:
15   Q.   If you will take a look now at what has
16   been marked as Exhibit 2 to the Bayston deposition,
17   are you familiar with this document?
18   A.   Yes, I am.
19   Q.   Did you play any role in negotiating its
20   terms?
21   A.   Yes, I did.
22   Q.   And generally tell me what the
23   negotiations -- how the negotiations were conducted.
24       MR. BOWERS: Objection to form.

Page 24

1   BY THE WITNESS:
2   A.   We provided State Street with an initial
3   draft of our engagement letter. Most of my
4   negotiations with State Street related to the amount
5   of the professional fees that would be charged.
6   BY MR. CUMMINS:
7   Q.   Did you play any role in negotiating the
8   scope of the duties of Duff & Phelps with respect to
9   this project?
10   A.   Yes, I did.
11   Q.   And did you have -- you will note that
12   there are three addressees of this Exhibit 2 this
13   document, addressees that would be State Street,
14   Investment and Benefits Committee of W.R. Grace, and
15   W.R. Grace.
16       Do you see that? It's up as the
17   addressee.
18   A.   Yes.
19   Q.   And did you have any contact with anyone
20   at W.R. Grace in the process of negotiating this
21   agreement?
22   A.   Not that I recall.
23   Q.   So it was done so far as you recall
24   exclusively with representatives of State Street; is

Page 25

1   that right?
2   A.   As far as my --
3       MR. BOWERS: Objection, form. Sorry.
4   BY THE WITNESS:
5   A.   As far as my specific interaction, it was
6   with State Street and probably -- and also Goodwin
7   Procter.
8   BY MR. CUMMINS:
9   Q.   Okay. If you will, please, I am going to
10   direct your attention to -- it's actually the second
11   sentence of the first paragraph. It begins with the
12   phrase "It is our understanding."
13       I am going to read that sentence into the
14   record: "It is our understanding that the
15   investment manager has investment management
16   oversight for the company stock held by the plan
17   subject to the provisions of its engagement
18   agreement, including the investment guidelines
19   attached thereto."
20       Do you see that?
21   A.   Yes, I do.
22   Q.   Okay. This indicates that you were at
23   least aware of the engagement agreement between
24   State Street and W.R. Grace, does it not?

Page 74

1  A.  I believe it was.
2  Q.  You attended that meeting?
3  A.  Yes, I did.
4  Q.  Along with a gentleman named Paul Trost
5  of your firm; is that right?
6  A.  That's correct.
7  Q.  Did Mr. Trost also work on the Duff &
8  Phelps engagement with State Street and Grace?
9  A.  Yes, he did.
10  Q.  Did you attend the whole meeting?
11  A.  Yes, I did.
12  Q.  Really you are welcome to read the whole
13  document, but if you just look at the section that's
14  headed in bold type with the word "Discussion," and
15  just familiarize yourself with that, please.
16      Let me know when you are finished.
17  A.  Okay.
18  Q.  Do you know who wrote these minutes?
19  A.  I do not know.
20  Q.  Have you seen these minutes prior to
21  today?
22  A.  Yes, I have.
23  Q.  Were you furnished with a copy of these
24  minutes at or around December 11, 2003?

Page 75

1  A.  Yes, we were.
2  Q.  Did you have occasion to comment on any
3  drafts of these kinds of minutes?
4  A.  I don't recall.
5  Q.  Under that section that I called your
6  attention to "Discussion," the first sentence reads
7  as follows: "State Street's role will be to
8  determine if it is appropriate and consistent with
9  ERISA for the plan to continue to hold the Grace
10  stock."
11      Do you see that?
12  A.  Yes, I do.
13  Q.  Did you hear someone say that?
14  A.  I don't recall.
15  Q.  Okay. The third sentence in that section
16  says: "Legal counsel advised committee members that
17  State Street should sell the stock only if it is
18  inconsistent with ERISA for the plan to continue to
19  hold the stock."
20      Do you see that?
21  A.  Yes, I do.
22  Q.  Do you know which of State Street's legal
23  counsel made that statement?
24  A.  I do not know.

Page 76

1  Q.  Do you remember hearing that statement?
2  A.  I don't recall specifically, but it would
3  be a conversation that would have likely occurred.
4  Q.  Duff & Phelps doesn't hold itself out to
5  be experts in the ERISA law, does it?
6  A.  No, it does not.
7  MR. BOWERS: Objection, form.
8  BY MR. CUMMINS:
9  Q.  So none of your reports, none of your
10  work was expressing any opinion on whether State
11  Street's holding or selling the Grace block would be
12  inconsistent or consistent with ERISA, correct?
13  MR. BOWERS: Objection, form.
14  BY THE WITNESS:
15  A.  We do not opine on those legal issues.
16  BY MR. CUMMINS:
17  Q.  Okay. Now, if you just take a minute,
18  the next paragraph there's a general description of
19  the process, but particularly I would call your
20  attention and will have some questions related to
21  the sentences in the carryover paragraph where there
22  is written the following: "D&P will review all of
23  the relevant factors affecting valuation and provide
24  a share value range based on a probability

Page 77

1  analysis."
2      Can you find that sentence?
3  A.  Yes, I do.
4  Q.  So far as Duff & Phelps understood its
5  assignment, is that a fair characterization of what
6  it thought it was supposed to do?
7  MR. BOWERS: Objection to form.
8  BY THE WITNESS:
9  A.  It's a fair characterization of an aspect
10  of our assignment.
11  BY MR. CUMMINS:
12  Q.  And there were other aspects?
13  A.  Generally, yes.
14  Q.  And what were the other aspects in
15  addition to "reviewing relevant factors affecting
16  valuation and providing a share value range"?
17  A.  Our analysis looked at specific factors
18  that affected W.R. Grace and other similar --
19  similar companies with respect to this -- the
20  asbestos liability. So while we may have termed our
21  analysis a little bit differently, I think her
22  characterization is generally accurate.
23  Q.  And Mr. or Ms. -- Mr. Shames,
24  S-h-a-m-e-s, is reported to have asked a question

Page 78

1  about -- it's recorded in that next sentence. I
2  will read the sentence into the record just so you
3  can focus on it: "M. Shames asked who performed the
4  asbestos-related liability estimates that have been
5  provided by the company in connection with its
6  bankruptcy filings."
7      Do you see that?
8  A.  Yes.
9  Q.  Do you remember that question being
10 asked?
11 A.  I do not.
12 Q.  The next sentence reads: "D. Bayston
13 replied that Grace's own auditors, since they have
14 the background knowledge, have provided these
15 estimates."
16     Do you see that?
17 A.  Yes, I do.
18 Q.  At the time -- did you make that
19 statement?
20 A.  I assume -- I don't recall specifically,
21 but there's no reason why I would believe that I did
22 not make the statement if these are in these notes.
23 Q.  Okay. Now, in the course of the work
24 that Duff & Phelps performed for State Street, did

Page 79

1  anyone from Duff & Phelps have occasion to make
2  contact with Grace's auditors?
3  A.  No, we did not.
4  MR. BOWERS:  Objection.
5  BY MR. CUMMINS:
6  Q.  So far as you know, did Goodwin Procter
7  make any contact with Grace's auditors?
8  A.  Not to my knowledge.
9  Q.  At the time you made that statement about
10 Grace's own auditors, did you believe that that
11 statement was correct?
12 MR. BOWERS:  Objection, form.
13 BY THE WITNESS:
14 A.  Yes, I did.
15 BY MR. CUMMINS:
16 Q.  Did anything come to your attention
17 during the course of your engagement that would lead
18 you to believe that the -- that Grace's auditors'
19 estimates were incorrect?
20 MR. BOWERS:  Objection, form.
21 BY THE WITNESS:
22 A.  Duff & Phelps arrived at different
23 estimates than the auditors had in the course of our
24 analysis.

Page 80

1  BY MR. CUMMINS:
2  Q.  So said another way, whatever Grace's
3  auditors had provided in estimates of
4  asbestos-related liability, you found to be
5  incorrect; is that right?
6  A.  I would characterize it differently in
7  that it is that Duff & Phelps had a different
8  opinion in what the estimated liability would be.
9  MR. BOWERS:  Objection.
10 BY MR. CUMMINS:
11 Q.  Did State Street ever ask you to contact
12 Grace's auditors to understand the background of the
13 auditor's formulation of the asbestos -- of Grace's
14 asbestos liability? No?
15 A.  Not that I recall.
16 MS. HEERMANS:  I'm sorry. I couldn't hear that
17 question.
18     (WHEREUPON, the record was read by
19     the reporter.)
20 BY MR. CUMMINS:
21 Q.  And what about anyone from Grace asking
22 you to contact the Grace auditors to find out what
23 that background information was on those estimates?
24 A.  No, they did not.

Page 81

1  Q.  Now, the next paragraph is a report from
2  Mr. Remis about aggregate liability exposure.
3      Do you see that?
4  A.  Yes.
5  Q.  Do you know who Mr. Remis is or was?
6  A.  If you look at the front of the memo
7  under attendees, Mr. Remis is listed and is listed
8  as legal counsel to Goodwin Procter.
9  Q.  As a lawyer at Goodwin Procter you mean?
10 MR. BOWERS:  Objection.
11 BY THE WITNESS:
12 A.  The heading says legal counsel --
13 BY MR. CUMMINS:
14 Q.  Let me do it this way. From your own
15 knowledge, have you ever met Mr. Remis?
16 A.  Yes, I have.
17 Q.  Did he hold himself out to be a lawyer?
18 A.  Yes, he did.
19 Q.  Did you understand that he was a lawyer
20 associated with Goodwin Procter?
21 A.  Yep.
22 Q.  Now, the aggregate liability that
23 Mr. Remis reported -- reports is summarized here as
24 between $1.1 and $1.5 billion.

21 (Pages 78 to 81)

### Page 98

1  10-K certificate with that number in it. Would you
2  assume that he knew the basis for that number?
3  **A. That's what I said. We can assume. I**
4  **don't have any specific knowledge.**
5  Q. What you are saying basically is this
6  December 11 estimate of 1.14 to $1.5 billion was not
7  the estimate that Duff & Phelps used in its
8  analysis; is that right?
9  **A. It is not the estimate that we used in**
10  **our analysis.**
11  Q. Did Duff & Phelps take into account the
12  act of the Texas legislature referred to in
13  Mr. Remis's e-mail that's Exhibit 6?
14  **A. Duff & Phelps was provided with the**
15  **information that was provided in this e-mail.**
16  Q. That is, Duff & Phelps was provided with
17  the number of claims that Grace estimated would come
18  from Texas?
19  **A. I believe we were provided with the**
20  **information that was laid out in this e-mail.**
21  Q. Okay. Let me just do generally.
22  Are you saying Duff & Phelps made a
23  state-by-state analysis of Grace's liability under
24  its asbestos claims?

### Page 99

1  MR. BOWERS: Objection.
2  BY THE WITNESS:
3  **A. Never said that.**
4  BY MR. CUMMINS:
5  Q. Okay. So they did not do that -- Duff &
6  Phelps did not do a state-by-state analysis of
7  Grace's liability exposure, correct?
8  **A. We did not and at no time did I suggest**
9  **we did do that.**
10  Q. Okay. So in terms of the Duff & Phelps
11  analysis of the liability exposure, what one state
12  legislature did or did not do was not deemed
13  relevant by Duff & Phelps; is that right?
14  MR. BOWERS: Objection, form.
15  BY MR. CUMMINS:
16  Q. Is that right?
17  **A. That is incorrect.**
18  Q. How is that incorrect?
19  **A. We take all information that is provided**
20  **to us and assess whether or not that information, as**
21  **a whole, what that information provides to us with**
22  **respect to our estimate of the liability exposure.**
23  Q. Did Duff & Phelps have available to it
24  any entity -- any person or company's estimate of

### Page 100

1  Grace's state-by-state liability exposure?
2  **A. No, we were not.**
3  Q. So as far as you know, Goodwin Procter
4  did not perform such an analysis?
5  MR. BOWERS: Objection.
6  BY THE WITNESS:
7  **A. I don't have any knowledge of whether**
8  **they did or not.**
9  BY MR. CUMMINS:
10  Q. Okay. But is it fair to say that you
11  knew that Grace had done a state-by-state analysis
12  of its possible exposure?
13  MR. BOWERS: Objection.
14  BY THE WITNESS:
15  **A. Other than what they generally disclosed**
16  **in conversations with Mr. Remis or what they**
17  **publicly had disclosed to the investment community,**
18  **we had no specific knowledge of specific analyses**
19  **that they had performed.**
20  BY MR. CUMMINS:
21  Q. Okay.

### Page 101

1  (WHEREUPON, a certain document was
2  marked Bayston Plaintiffs'
3  Deposition Exhibit No. 7, for
4  identification, as of 5/31/07.)
5  BY MR. CUMMINS:
6  Q. I am handing you now what has been marked
7  as Bayston Deposition Exhibit No. 7. If you will
8  take a minute to and review it. This is a document
9  with the Bates numbers 0001 through 00025.
10  **A. Okay.**
11  Q. Do you know what this document is?
12  **A. This is a document that we prepared for**
13  **State Street on January 29th in connection with**
14  **their holdings of the W.R. Grace stock and the W.R.**
15  **Grace & Company saving and investment plan.**
16  Q. On page 2 there appears to be a summary
17  of what Duff & Phelps had done up to the date of
18  this report. There isn't any mention of any contact
19  with the -- with Grace's independent public
20  accounting firm.
21  I just wanted to make certain that that
22  wasn't an inadvertent omission in this report. So
23  the question pending then is --
24  MR. BOWERS: Objection.

**Page 102**

1  BY MR. CUMMINS:
2    Q.  -- during the course of Duff & Phelps'
3  work, did it have -- did it have any contact with
4  Grace's independent public accountants?
5    A.  I believe I already testified to that,
6  but we did not.
7    Q.  Calling your attention to page 36 of the
8  report that's Bates 000209, what is -- what is this
9  "Equity Value Conclusion"?
10   A.  I don't believe this --
11   MR. BOWERS: Objection. I believe --
12  BY THE WITNESS:
13   A.  -- page says that there's "Equity Value
14  Conclusion."
15  BY MR. CUMMINS:
16   Q.  I'm sorry.
17   A.  Page 36?
18   Q.  Look at the top of that. No, at the very
19  top, the header. I just picked that as a way to
20  describe it.
21   A.  In the section.
22   Q.  This is the sensitivity of the equity
23  value per share to asbestos liabilities. Is that
24  what this is?

**Page 103**

1    A.  That is correct.
2    Q.  Can you explain what that means in lay
3  terms?
4    A.  In lay terms is that the applied equity
5  value per share is highly dependent upon your
6  assessment of the overall asbestos liabilities for
7  W.R. Grace.
8    Q.  Okay. And how -- how was this implied
9  equity value -- first of all, let me go back.
10       Implied equity value per share is what?
11  What is it?
12   A.  It's what would be calculated --
13   MR. BOWERS: Objection.
14  BY THE WITNESS:
15   A.  It's what would be calculated based upon
16  an estimate of what the operating business for W.R.
17  Grace is worth and what the assets and liabilities
18  that would impact that overall enterprise value to
19  come up with an estimate of what the share value
20  might be under certain assumptions.
21  BY MR. CUMMINS:
22   Q.  Okay. With respect to that calculation
23  of the share value, what's the variable that -- on
24  this page that produces five different equity

**Page 104**

1  values?
2    MR. BOWERS: Objection, form.
3  BY THE WITNESS:
4    A.  This analysis shows an implied equity
5  value based upon the change of just one variable,
6  and that is the overall asbestos liability exposure.
7  BY MR. CUMMINS:
8    Q.  And if -- I just want to make sure that
9  the record is clear as to how to read this table.
10  If the asbestos liability is 1.1 -- I don't mean to
11  make it so hard. Let me withdraw the question.
12       If the asbestos liability of Grace is $1
13  billion, what's the equity value per share as Duff &
14  Phelps calculated it?
15   MR. BOWERS: Objection, form.
16  BY THE WITNESS:
17   A.  If the asbestos liability estimate of $1
18  billion is an accurate reflection of their asbestos
19  exposure, assuming all other variables in our
20  valuation analysis remain unchanged, that would give
21  us an implied value of $13.79.
22  BY MR. CUMMINS:
23   Q.  And if the asbestos liability is $1.5
24  billion, then the implied equity value per share of

**Page 105**

1  the Grace common stock is $6.17 according to this
2  Duff & Phelps analysis?
3    A.  According to this Duff & Phelps analysis.
4    MR. BOWERS: Objection.
5  BY MR. CUMMINS:
6    Q.  Now, was the estimate of $1 billion or
7  any of those asbestos liability numbers -- let me
8  withdraw the question.
9         Was the asbestos liability number
10  expressed in this chart net of available insurance?
11  Do you know what I mean by that?
12   MR. BOWERS: Objection, form.
13  BY THE WITNESS:
14   A.  Yes, it was.
15  BY MR. CUMMINS:
16   Q.  And how is it that you determined that?
17   A.  If you go to page 30 of our report --
18   MR. BOWERS: Objection. Determine what?
19  BY MR. CUMMINS:
20   Q.  Determine that it was net of insurance.
21   A.  If you go to page 30 of our report, you
22  will see that as of this particular -- as of January
23  29th of 2004, our analysis of the -- of the equity
24  value we followed a similar type of analysis and

**Page 126**

1  A. That is correct.
2  Q. Now, what is it that was contained in the
3  analysis that Grace did to create a $960 million
4  liability that Duff & Phelps thought was wrong by a
5  factor of two?
6  MR. BOWERS: Objection.
7  BY THE WITNESS:
8  A. As I have testified previously today, we
9  were not provided with the analysis that supported
10 the approximately $960 million figure that was in
11 the W.R. Grace financial statements. So I cannot
12 answer your question on the differences.
13 BY MR. CUMMINS:
14 Q. Okay. So you don't know what the
15 difference is between your 1.9 billion and the
16 company's 960 million, right?
17 MR. BOWERS: Objection.
18 BY THE WITNESS:
19 A. That is correct.
20 BY MR. CUMMINS:
21 Q. Did you ever make -- did Duff & Phelps
22 ever make the comment that it thought that Grace's
23 financial statements were -- with respect to the
24 asbestos liability were wrong by a factor of two

**Page 127**

1  times?
2  MR. BOWERS: Objection.
3  BY THE WITNESS:
4  A. We never made that specific comment.
5  BY MR. CUMMINS:
6  Q. But don't your weekly reports imply that?
7  MR. BOWERS: Objection.
8  BY THE WITNESS:
9  A. Our estimate of the asbestos liability is
10 higher than the estimate that is on the company's
11 financial statements, yes, it is.
12 BY MR. CUMMINS:
13 Q. And did anyone at State Street ask Duff &
14 Phelps for an explanation of why Duff & Phelps was
15 rejecting the company's assessment of its asbestos
16 liabilities?
17 MR. BOWERS: Objection, form.
18 BY THE WITNESS:
19 A. I believe we did have conversation with
20 State Street with respect to how we arrived at our
21 estimate.
22 BY MR. CUMMINS:
23 Q. Did anyone at State Street ask you the
24 question are you disbelieving what the Grace company

**Page 128**

1  filed?
2  A. I don't recall.
3  Q. You would have recalled something like
4  that, would you not?
5  A. Not necessarily.
6  MR. BOWERS: Objection.
7  BY MR. CUMMINS:
8  Q. That is if someone at State Street had
9  said: "You mean you don't believe the chief
10 financial officers and the company's public filings
11 statement," you wouldn't have remembered a question
12 like that?
13 MR. BOWERS: Objection, speculation.
14 BY THE WITNESS:
15 A. If someone had asked me that specific
16 question, I probably would have remembered it. I
17 don't remember somebody phrasing a question that
18 way.
19 BY MR. CUMMINS:
20 Q. Now, at this time March 12, 2004,
21 according to your analysis, the company still had
22 value per share in the range 79 cents to $3.08,
23 right?
24 A. That is correct.

**Page 129**

1       (WHEREUPON, a certain document was
2       marked Bayston Plaintiffs'
3       Deposition Exhibit No. 11, for
4       identification, as of 5/31/07.)
5  BY MR. CUMMINS:
6  Q. This is Exhibit 11. This is slightly out
7  of order. This is just another one of the current
8  updates, is it not, that Duff & Phelps did for
9  Grace?
10 A. That is correct.
11 Q. For State Street I guess?
12 A. For State Street, yes.
13 Q. At any of this time period -- no.
14      (WHEREUPON, a certain document was
15      marked Bayston Plaintiffs'
16      Deposition Exhibit No. 12, for
17      identification, as of 5/31/07.)
18 BY MR. CUMMINS:
19 Q. I am going to hand you what has been
20 marked for identification as Exhibit 12 to the
21 Bayston deposition.
22     Now, this exhibit is another of the
23 weekly updates; is that right?
24 A. Yes, it is.

**Page 130**

1  Q.  And in this case, the value went up a
2  bit. Now the range is $1.07 to $3.35.
3      Have I read that valuation correct?
4  A.  Well, that's what this particular page
5  shows, but you have given me these all out of order.
6  So I don't know whether they have gone up or down.
7  Q.  I did it only by reading your e-mail. It
8  says in the third sentence of your e-mail: "The
9  midpoint of our equity valuation increased slightly
10 to $2.21 from the previous week's level of $2.14."
11 A.  Okay.
12 Q.  So that's how I did it.
13     You advised State Street in this e-mail
14 that you are going to review the company's 10-K?
15 A.  Give me 30 seconds to read the --
16 Q.  I beg your pardon.
17 A.  Okay.
18 Q.  This just indicates, as I understand it,
19 that you are going to make -- Duff & Phelps is going
20 to make an update of its initial financial analysis
21 report after it has occasion to read the 10-K filed
22 by the company.
23     Was that the sense of what you were
24 trying to --

**Page 131**

1  A.  That is correct.
2  Q.  And I take it that the company did file a
3  10-K at or around March 15 or thereabouts 2004?
4  MR. BOWERS: Objection.
5  BY THE WITNESS:
6  A.  No, I believe that on Friday, March 5th
7  they filed their 10-K.
8  BY MR. CUMMINS:
9  Q.  Okay. I beg your pardon. Thank you.
10     As part of -- describe for the record
11 what you -- Duff & Phelps did with respect to the
12 review of the 10-K of Grace that was filed on March
13 5th of 2004?
14 A.  Reviewed the financial statements that
15 were provided in the 10-K. We reviewed the
16 management discussion of operations. We read and
17 reviewed the footnotes that were part of the
18 financial statements.
19 Q.  Did you discuss any of the content of the
20 10-K with any Grace representative?
21 A.  I don't believe we did.
22 Q.  Did you discuss any of the content of the
23 10-K with Goodwin Procter?
24 A.  I don't recall.

**Page 132**

1  Q.  Did you discuss any of the 10-K with the
2  Grace independent public accountants?
3  A.  We did not. As I have testified
4  previously, we did not speak to the accountants on
5  this assignment.
6  Q.  Okay.
7      (WHEREUPON, a certain document was
8      marked Bayston Plaintiffs'
9      Deposition Exhibit No. 13, for
10     identification, as of 5/31/07.)
11 BY MR. CUMMINS:
12 Q.  I have asked that you be handed what has
13 been marked for identification as Bayston Deposition
14 Exhibit No. 13. For the clarity of the record, I
15 believe that it's two separate documents that were
16 provided to us by State Street. One appears to be a
17 document with three pages from Bates number 003062
18 to 003064, and the second document appears to be a
19 different group of pages which is 002933 to 003013.
20 This is the way it was produced to us, and I think
21 assembled by one of our firm staff as a single
22 document.
23     Have you had a chance to just leaf
24 through it generally?

**Page 133**

1  A.  Generally, yes.
2  Q.  With respect to the first three pages, is
3  that just another one of the weekly summaries?
4  A.  That is correct.
5  Q.  And this one is dated March 9th, but
6  it's -- yes, March 19th; is that right?
7  A.  That is correct.
8  Q.  Okay. Now, is this after the Duff &
9  Phelps review of Grace's 10-K?
10 A.  Yes, I believe it is.
11 Q.  And then the second section of this
12 exhibit which begins on 002933 is the updated
13 financial evaluation analysis that that previous
14 exhibit e-mail referred to as a project to take
15 place; is that right?
16 A.  That is correct.
17 Q.  So far as you know, is this financial
18 evaluation analysis which starts on 002933 the last
19 complete analysis that Duff & Phelps did on the
20 Grace common stock?
21 MR. BOWERS: Objection.
22 BY THE WITNESS:
23 A.  Yes, it was.
24