**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **KERI EVANS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **JOHN F. AKERS, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| | |
| **LAWRENCE W. BUNCH, et al.** ) | **Consolidated** |
| ) | **Case No. 04-11380-WGY** |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | |
| **W. R. GRACE & CO., et al.** ) | |
| ) | |
| **Defendants.** ) | |

**THE BUNCH PLAINTIFFS' REPLY TO DEFENDANTS' RULE 56.1
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' RULE 56.1
COUNTERSTATEMENT OF UNCONTESTED FACTS**

The Bunch Plaintiffs, pursuant to Local Rule 56.1, submit the following Reply to Defendants' submissions of Undisputed Facts and Plaintiffs' Counterstatement of Uncontested Facts.

**1.   THE BUNCH PLAINTIFFS' REPLY TO THE GRACE DEFENDANT'S STATEMENT OF UNCONTESTED FACTS.**

Plaintiffs contest the following Grace Statement of Uncontested Facts:

12.     A team that consisted of IBC members Tarola and McGowan, John Forgach, Senior Benefits Counsel at Grace, David Siegel, Grace's then-General Counsel and, sometimes Paul Norris, who was then the Company's Chief Executive Officer, President, and Chairman of the Board of Directors at the time, worked on the independent fiduciary matter.

**BASIS OF OBJECTION: This statement is vague and unclear as to the time period involved. The record is clear that a "team" did not work on the matter after State Street came on board.** *See e.g.,* **Tarola Deposition at 149, Exhibit "A" (after State Street was hired, Grace did not provide information to State Street or Duff & Phelps).** *See also*, **Plaintiffs' Statement of Uncontested Facts, below. In particular, see Plaintiffs' Statements 1, 2, 3, 7, and 8.**

19.     State Street's materials described the process it would use if it became independent fiduciary to the Grace Stock Fund, which would include, among other things, hiring independent legal and financial advisors, reviewing Plan documents and participant communications, interviewing members of the Grace Management, becoming familiar with Grace's bankruptcy, investigating Grace's asbestos and environmental liabilities, gathering information about and evaluating the Company's current and projected financial picture. Representatives from State Street and Grace discussed State Street's due diligence process.

**BASIS OF OBJECTION: Although Grace claims the materials describe the "process", neither the materials nor the testimony state that the described process was the precise process that State Street would employ. Indeed, the next section of the exhibit identifies State Street representatives who would work on the project, but many of the identified representatives did not work on the project. Additionally, Ex. 12 identified in Grace Uncontested Fact No. 19 claims that State Street would serve on the Equity**

**Committee and review participant activity.** *See,* **GR008104, Exhibit B. State Street never did either of these activities, and Plaintiffs note that State Street failed to mention these activities in its discussion of Ex. 12. Additionally, Ex. 12 is only a summary and does not provide detail sufficient to establish that Grace understood what State Street would use as a process.**

28. Grace executives, including Tarola, Siegel, and Norris, and Senior Benefits Counsel John Forgach, had several meetings and telephone calls with members of the State Street team (including Duff & Phelps and Goodwin Procter representatives), and answered questions on such matters as Grace's bankruptcy proceedings, finances, asbestos liabilities and available insurance.

**BASIS OF OBJECTION: This statement is vague and unclear as to the time period involved. Indeed, most of the contacts occurred before December 15, 2003, the date the engagement commenced. Furthermore, the facts and deposition testimony do not support this statement. For example, Robert Tarola, State Street's Vice President, Chief Financial Office, and the senior member of the IBC expressly testified that he was unaware what service Duff & Phelps was to perform. Tarola Deposition at 47, Exhibit "A".** *See,* **Plaintiffs' Statement of Uncontested Facts, No. 1, below. The statement also is incomplete in that it fails to state that Grace did not provide information to State Street.** *See,* **Plaintiffs' Statement of Uncontested Facts, No. 7, below. It also fails to adequately inform the reader that Grace did not initiate the few telephone communications.** *See,* **Plaintiffs' Statement of Uncontested Facts, No. 2 and 8, below.**

II. **THE BUNCH PLAINTIFFS' REPLY TO THE STATE STREET DEFENDANT'S STATEMENT OF UNCONTESTED FACTS.**

Plaintiffs contest the following State Street Statement of Uncontested Facts:

3

29. State Street's committee structure and procedures for the oversight of company stock fund investments are consistent with industry standards and ERISA's requirements.

**BASIS OF OBJECTION: In its motion, State Street uses this "fact" to state that State Street in connection with the Grace Stock Fund, followed a proper process.** *See,* **State Street Memorandum in Support of Summary Judgment at 13. Mr. Mulligan never made this statement. To the contrary, in his deposition, Mr. Mulligan, for example, testified that the process of hiring Duff & Phelps was reasonable but that State Street was acting inconsistent with industry standards and ERISA by elevating, in its process, the opinions and conclusions of Duff & Phelps above the market.** *See e.g.,* **Mulligan Deposition, Exhibit "C", at 85.**

43. In the course of State Street's four-month engagement, the State Street Fiduciary Committee met four times: December 11, 2003, January 29, 2004, February 23, 2004, and April 7, 2004.

**BASIS OF OBJECTION: This statement of fact technically is incorrect. The engagement began on December 15, 2003-four days after the first meeting.** *See,* **State Street Statement of Fact No. 49.**

46. The IFG also met separately with and received information from outside advisors, Grace personnel and the trustee and administrators of the Grace Plan during State Street's engagement.

**BASIS OF OBJECTION: This statement is vague and unclear as to the time period involved. Indeed, most of the contacts occurred before December 15, 2003, the date the engagement commenced. The statement also is incomplete in that it fails to state that Grace**

did not provide information to State Street. *See,* **Plaintiffs' Statement of Uncontested Facts, No. 7, below.**

66. On February 24, 2004, the Fiduciary Committee unanimously approved the IFG's recommendation to begin selling the Grace stock, provided that all such sales were made at a price no lower than the midpoint of Duff & Phelps valuation range (then at $1.88 per share).

**BASIS OF OBJECTION: The vote was not unanimous. Mr. Johnson, State Street's Chairman of the Investment Committee, did not vote. Johnson Deposition, Volume II, at 35-36, Exhibit "D".**

79. The minutes from the April 7, 2004 meeting of the Fiduciary Committee accurately reflect the events and discussion that occurred.

**BASIS OF OBJECTION: The cited testimony does not support this statement. First, Ms. Ewing, State Street's Vice President in the Investment Fiduciary Group, qualified her statement with the word "probably". Second, Ms. Driscoll, State Street's Senior Managing Director, did not discuss the accuracy of the minutes in her cited testimony.**

82. At the April 7th meeting, Ms. Driscoll reiterated the bases for the Committee's original determination that the Grace stock was an imprudent investment: the bankruptcy status of the company, the uncertainty that equity holders would receive value for the stock and outstanding asbestos liability.

**BASIS OF OBJECTION: This statement is incomplete. State Street also made its initial decision based on its belief that "the market price of the W.R. Grace stock is not a good indication of its long term value…"** *See,* **Plaintiffs' Statement of Uncontested Facts, No. 25, below.**

89. A participant who did nothing and merely left his or her account invested in the Fixed Income Option from March/April 2004 to June 2007 would have earned a substantial positive return during this period.

**BASIS OF OBJECTION: Dr. Grenadier never described the return as "substantial". To the contrary, if Dr. Grenadier's testimony is read in its entirety, he clearly states that the return in the Fixed Income Fund is substantially less than the return if Defendants had retained the Grace Stock Fund.** *See,* **Grenadier Deposition at 11, Exhibit "E".**

III. THE BUNCH PLAINTIFFS' COUNTERSTATEMENT OF UNCONTESTED FACTS IN RESPONSE TO DEFENDANTS' RULE 56.1 FACTS:

| Undisputed Facts: | Cite |
|---|---|
| 1. Grace admittedly failed to monitor State Street and did not believe that it had an obligation to monitor State Street. | <ul><li>Tarola Deposition at 47, Exhibit "A", (unaware that Duff & Phelps was to make analysis of Grace stock values);</li><li>Tarola Deposition at 121-22, Exhibit "A", (after hiring State Street, Grace "wiped its hands" of any responsibility to Plan Participants);</li><li>Tarola Deposition at 154, Exhibit "A", ("Responsibility to do what? Other than understanding the number of shares in the plan, I didn't understand any other responsibility.");</li><li>Tarola Deposition at 156, Exhibit "A", (Grace felt it was "off limits" to determine the analysis that State Street used);</li><li>Tarola Deposition at 157, Exhibit "A", (Grace believed that it was assigning "total" responsibility to State Street);</li><li>Tarola Deposition at 157, Exhibit "A", (Tarola never asked State Street how it made its decision);</li><li>February 27, 2004 State Street Notice to Participants regarding the sale of Grace Stock, GR001868-72, Exhibit "F", ("You may contact Brian McGowen or John Forgach at W.R.</li></ul> |

|    |                                                                                                                                                                                                                                  |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
|----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    |                                                                                                                                                                                                                                  | Grace. However, keep in mind, they will only have access to the same information that has already been provided to you."); <br>▪ McGowan's, State Street Senior Vice President of Administration, Deposition at 111, Exhibit "G", ("Q. … as an official function of the investments and benefits committee fiduciaries, did you make any inquiry as to State Street regarding any matter after the retention of State Street? A. No."); <br>▪ McGowan Deposition at 113, Exhibit "G", (Grace did not know reason for State Street's decision and did not inquire); <br>▪ McGowan Deposition at 115, Exhibit "G", (Grace did not know reason for State Street's decision). |
| 2. | Grace did not initiate contacts with State Street after the engagement began.                                                                                                                                                     | ▪ McGowan Deposition at 105, Exhibit "G".                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 3. | State Street, prior to the commencement of its engagement with Grace on December 15, 2003, already had performed most of its due diligence and only sought minimal communication from Grace.                                      | ▪ State Street Fiduciary Committee Meeting Minutes, December 11, 2003, SSBT000682-SSBT000684 at SSBT000682, Exhibit "H", ('The Independent Fiduciary Group', working with D&P [Duff & Phelps] and GP [Goodwin Proctor], has already completed substantial due diligence with respect to Grace.")                                                                                                                                                                                                                                                                                                                                         |
| 4. | The Investment Benefits Committee believed that it did not have responsibility to respond to Plan Participants.                                                                                                                   | ▪ Tarola Deposition at 114-15, Exhibit "A".                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
| 5. | The reason that Grace hired State Street was to protect members of the Investment and Benefits Committee (McGowan and Tarola) from potential liability.                                                                           | ▪ Tarola Deposition at 124, Exhibit "A", (in order to keep members of the Committee safe from liability Grace hired State Street to make its decision on the Grace Stock Fund)                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| 6. | An actual conflict never arose between Grace and Plan Participants.                                                                                                                                                              | ▪ Tarola Deposition at 144, Exhibit "A", (during period that State Street served as Investment Manager, Grace had not even started on the Plan of Reorganization); <br>▪ Tarola Deposition at 125-26, Exhibit "A", ("Q. Before the break we talked about the conflict, and you described it as a "hypothetical conflict," but I think we have a common understanding of how the elements of the conflict are described, but I have a question about -- directing your attention to the first                                                                                                                                            |

7

|  | quarter, calendar quarter of 2004, related to that conflict. You described this conflict concept as "hypothetical." In the first quarter of 2004 did you think that there was an actual conflict between your duties as the CFO and your service as a member of that committee? A. No. Q. And during the first two weeks of April did you think that there was an actual conflict between your duties as the CFO and your service as a member of that committee? A. April 2004? Q. Uh-huh. A. No.");<br>▪ Tarola Deposition at 143-45, Exhibit "A", (Grace did not work on its Plan of Reorganization during period that State Street served as Investment Manager for the Grace Stock Fund);<br>▪ Hogan Deposition at 150-151, Exhibit "I", (during period that State Street served as Investment Manager, Grace did not file its Plan of Reorganization). |
|---|---|
| 7. Grace knew that D.E. Shaw had made an offer to purchase over 6 million shares of Grace common stock from the Grace Stock Fund before State Street consummated the sale. | ▪ Tarola Deposition at 142-47, Exhibit "A", (Tarola informed McGowan and General Counsel of the D.E. Shaw offer before the sale) |
| 8. The Chairman of the Investment Benefits Committee and Grace's Chief Financial Officer believed that Grace did not provide information to State Street and that State Street acquired everything it needed from the internet. | ▪ Tarola Deposition at 149, Exhibit "A", ("Q. What information did Grace provide to State Street with respect to State Street's work? A. To the best of my recollection, we didn't provide them anything. They got it all online.");<br>▪ Tarola Deposition at 49-50, Exhibit "A", (unaware of anyone at Grace who communicated with Duff & Phelps and Tarola controlled dissemination of financial information) |
| 9. Grace and the Investment and Benefits Committee did not contact State Street during State Street's engagement | ▪ Tarola Deposition at 153, Exhibit "A". |
| 10. According to Grace's retained expert, Thomas Hogan, Grace had a continuing obligation to monitor State Street. | ▪ Hogan Deposition at 217, Exhibit "I", ("I think Grace had an obligation to monitor State Street's performance as a fiduciary.") |
| 11. Grace's business operations and financial conditions were good and improving. | ▪ Grace Form 8-K, Exhibit "J", filed January 29, 2004; a Grace Press Release, April 20, 2004, GR008800, Exhibit "K";<br>▪ Tarola deposition at 79, Exhibit "A"; |

| | |
|---|---|
| | ▪ Grace Form 10-Q for Period ending March 31, 2004 at I-29, Exhibit "L", (Grace possessed cash assets of over $400 million and access to a $250 million line of credit and could continue to operate throughout the bankruptcy.) |
| 12. Grace through its retained expert Thomas Hogan acknowledges that it had an obligation to take action if its appointed fiduciary violated its duty. | ▪ Hogan Deposition at 222, Exhibit "I". |
| 13. Grace through its retained expert Thomas Hogan acknowledges that it possessed the ability to terminate State Street. | ▪ Hogan Deposition at 236-37, Exhibit "I". |
| 14. The Investment and Benefits Committee of W.R. Grace served as a fiduciary to the Participants of the Grace Savings and Investment Plan. | ▪ Grace Pleading in the Bankruptcy proceeding, GR007929-37, at GR007930, Exhibit "M" (Investment and Benefits Committee has responsibility for providing fiduciary services to the Plan); <br> ▪ The Grace Savings and Investment Plan at ¶¶ 12.03, 12.04, GR 001788-89, Exhibit "N", (Investment and Benefits Committee is responsible for exercising authority and discretion over the Plan); <br> ▪ November 24, 2003 engagement agreement between The Investment and Benefits Committee and State Street, GR001298-GR001313 at GR001299, Exhibit "O", ("The Committee represents and warrants that it is a 'named fiduciary' with respect to the control or management of the assets of the Plan…"). |
| 15. Defendants, through their retained expert, Thomas Hogan, admit, based on Hogan's experience and opinions that retention of a company stock fund is consistent with ERISA even if the company is very distressed and faces complete devastation; its stock price is rapidly falling in value to near zero, and ultimately the company stock fund becomes essentially worthless. | ▪ Hogan Deposition at 56-68, Exhibit "I", (a fiduciary to his employer's company stock fund at First Republic Bank Corporation, Hogan testifies at page 60 that he doesn't believe that he ever breached his fiduciary duty at First Republic Bank despite allowing Plan Participants to continue to hold stock in a company stock fund where the FDIC took over the bank and the stock became worthless. Hogan was not surprised that the FDIC took over the Bank); <br> ▪ Hogan Deposition at 77-97, Exhibit "I", (Hogan served as an expert for State Street in the *Polaroid ERISA Litigation* and opined that |

| | |
|---|---|
| | State Street properly determined that retention of Polaroid stock in the Company Stock Fund was consistent with ERISA during the period that State Street served as a directed trustee. At page 94, Hogan testified as follows: "Q. All right and you thought that State Street sold at an appropriate time; is that correct?  A.  I thought they followed an appropriate process, and in their process they reached an appropriate conclusion at the appropriate time.";<br>▪ Amended Consolidated Complaint for Breach of Fiduciary Duty Under ERISA, *In re: Polaroid ERISA Litigation*, 03 CV 8335 (S.D.N.Y.) at 45-50, Exhibit "P" (before State Street sold Polaroid the price of Polaroid stock fell from $30 on September 9, 1999 to $.24 on November 12, 2001. On July 16, 2001, Polaroid announced that it may have to file for bankruptcy.  On October 12, 2001, Polaroid filed for bankruptcy, and State Street did not begin to sell until November 12, 2001 when the stock had fall almost $30 a share to a price of $.24). |
| 16.  Defendants' retained expert Thomas Hogan testified that a fiduciary fails to perform a proper process unless the fiduciary considers all facts and circumstances. | ▪ Hogan Deposition at 143, Exhibit "I",  ("…it would be unprudent [sic] to not consider all the facts and circumstances when you're doing it…"). |
| 17.  Plan fiduciaries, as part of a prudent process, should review Plan Documents, Participant investment activities, and investment options available to Plan Participants. | ▪ Hogan Deposition at 159-60, Exhibit "I";<br>▪ Hogan Deposition at 228-29, Exhibit "I", (Hogan believes that State Street as part of a prudent process examined Participants investment options). |
| 18. State Street ignored as part of its process, the Participant investment activities, the Plan's investment options, the amount of Plan assets allocated to the Grace Stock Fund, and whether Plan Participants were required to invest in the Grace Stock Fund. | ▪ Johnson Deposition, Volume 1 at 68, Exhibit "D", ("Q.  Did the rest of the plan factor into your analysis? A.  Not that I'm aware of, no. Q.  Do you have an understanding as to how the plan's assets were allocated? A.   No…");<br>▪ Johnson Deposition, Volume 1 at 71, Exhibit "D", ("Q.  Are you aware whether -- as part of your process of working with the Grace stock fund, did you or anyone at State Street, if you know, determine whether the plan made diversified options available to plan |

10

| | |
|---|---|
| | participants? No, I don't know that. Q. Do you know whether the plan is a 404(C) plan? A. I don't recall, but it wouldn't surprise me if it was…"); <br> ▪ Driscoll Deposition at 75, Exhibit "Q", ("Q. In connection with a company stock fund that is part of a 401K that offers a variety of different investment options, does State Street or your group consider the diversification of the stock fund in connection with the other investments offered to plan participants? A. Not if the company stock funding the company stock investment is exempt from diversification on ERISA.") <br> ▪ Driscoll Deposition at 75-76, Exhibit "Q", ("Q. In connection with the Grace Company stock fund, when State Street made its determination in connection with the Grace stock fund, did State Street consider the other investment options available to plan participants? A. No…"); <br> ▪ Driscoll Deposition at 76, Exhibit "Q", (did not consider percentage of Plan's assets invested in Grace Stock Fund); <br> ▪ Driscoll Deposition at 77, Exhibit "Q", (State Street did not consider whether Grace required Plan Participants to invest in the Grace Stock Fund or whether they received matching fund in the Grace Stock Fund). |
| 19. The uncertainty surrounding a company in bankruptcy is less than a company that faces imminent bankruptcy. | ▪ Johnson Deposition, Volume 1 at 131, Exhibit "D", ("So, it's one of the things one would want to consider, that's all, as opposed to imminent to bankruptcy you don't exactly know what is going to come next, so, okay, what does that mean. There's a lot less known in the imminent bankruptcy.") |
| 20. Duff & Phelps was making its "best guess" when it provided an analysis. | ▪ Johnson Deposition, Volume 1, at 146-147, Exhibit "D", ("and even in their analysis, there's lots of uncertainty in the way it was done, meaning you have to make best guesses at some of these things…"). |
| 21. During the period that State Street served as Investment Manager, State Street did not consider whether Grace was on the verge of collapse. | ▪ Hogan Deposition at 200-01, Exhibit "I". |

11

| | |
|---|---|
| 22. Grace common stock traded in an efficient market that included in it market price the uncertainty of future events. | ▪ Statement of Grace General Counsel David Siegel at Town Hall meeting, March 13, 2003, GRA-B2 006089, Exhibit "R", ("[o]ur stock currently reflects the uncertainty. It's trading at a fraction of what the value would be if it didn't have asbestos liability and we weren't in bankruptcy.");<br>▪ Johnson Deposition at 84, Exhibit "D", ("the market is the best determinant on any day as to what the shares are worth.");<br>▪ Driscoll Deposition at 110 and 152, Exhibit "Q";<br>▪ State Street's Motion to take Judicial Notice, filed February 2, 2007, Doc. No. 145;<br>▪ James Deposition at 96, Exhibit "S", (speaking of Grace common stock during the relevant period, "I think that its prospects were reflected in the market price in which it sold.") |
| 23. The daily closing price of Grace common stock during the class period remained above $2.00 and occasionally exceeded $5.00 a share. During State Street's tenure, the daily closing price ranged between $2.54 on December 22, 2003 and $3.70 on January 12, 2004. | ▪ Chart of Grace daily closing prices, Exhibit "T". |
| 24. Defendants understood that D.E. Shaw was a hedge fund that utilized sophisticated investment tools. | ▪ Johnson Deposition, Volume 2 at 50, Exhibit "D", ("Q. Are you familiar with D.E. Shaw's reputation? A. What I know of D.E. Shaw is that they are a quantitative hedge fund. And what does that mean? A. Meaning that, generally speaking, they write algorithms to try and determine the direction of asset prices, whether stocks or bonds or currencies or whatever, and they invest their money based on their algorithms.");<br>▪ Hogan Deposition at 203, Exhibit "I", (Hedge funds typically are sophisticated investors) |
| 25. State Street ignored the market and "determined that the market price of the W.R. Grace stock is not a good indication of its long term value…" | ▪ Fiduciary Committee Meeting Minutes, February 23, 2004, SSBT-000713-000715 at 000714, Exhibit "U";<br>▪ Johnson Deposition at 25-27, Exhibit "D". |
| 26. During the period after Grace entered bankruptcy and as of March 19, 2004, Grace common stock experienced an increase of 16.1%. | ▪ Hogan Deposition at 197-98, Exhibit "I", ("Q. That's correct, but during the approximate three years it had been in bankruptcy, this stock had actually gone up 16.1 percent; is |

12

| | |
|---|---|
| | that correct? A. That's what the number showed."); <br>• Tarola Deposition at 135, Exhibit "A", (between bankruptcy and March 31, 2004, Grace stock had an annual return of 10%) |
| 27. During the three years post bankruptcy, the Grace Stock Fund was one of the best performing investment options available to Plan Participants. | • W.R. Grace Summary of U.S. Defined Contribution Assets for Period Ending March 31, 2004. GR005754-GR5756, Exhibit "V", (Grace Stock Fund had a rolling 12 month return of 110%, fiscal year to date return of 21.4% and 3 year average return of 10.7%). |
| 28. Grace and its Investment and Benefits Committee for the Grace hired State Street for the specific purpose of determining whether the "continued holding of [Grace common stock in the Grace Stock Fund] is not consistent with ERISA (within the meaning of Section 404(a)(1)(D) of ERISA" | • November 24, 2003 engagement agreement between the Investment and Benefits Committee and State Street, GR001298-GR001313, Exhibit II, Investment Guidelines, GR001308, Exhibit "O". |
| 29. Duff & Phelps performed its analysis by depending on third party analysis and not based on first hand information concerning Grace. | • Duff & Phelps engagement letter, November 24, 2003, SSBT001284-001296 at SSBT001285, Exhibit "W", (Duff & Phelps will not be conducting an independent assessment of any liabilities or obligations of Grace); <br>• Bayston, Duff & Phelps' Managing Director, Deposition at 35-38, Exhibit "X", ("Q. How was it you envisioned in November of 2003 that Duff & Phelps would gain an understanding of the extent and scope and amount of the asbestos liabilities or potential liabilities facing W.R. Grace at that time? A. We would review independent third-party assessments of the asbestos liability issue in general and review independent third-party assessments of those asbestos liability issues that might affect W.R. Grace specifically. Q. Now, are any of the ones of the items that you have described specifically related to the liability -- asbestos liability of W.R. Grace? A. None of the analyses or third-party reports that were reviewed specifically dealt with W.R. Grace alone. They were dealing with the asbestos issue in a much more general – general manner.") |

13

| | |
|---|---|
| 30. State Street decided to sell the remaining 6.2 million shares to D. E. Shaw based on the belief that the $3.50 per share offer was greater than the price that State Street could sell the stock at some unknown future time. | ▪ Driscoll Deposition at 180, Exhibit "Q", ("A. "I think we concluded that it was likely that the value of the Grace stock would be based on input from our financial advisors and our legal advisors would be worth less than we were able to sell it at and particularly worth very little to zero -- I believe if I recall correctly -- significantly below the 3.50 price we were being offered.") |
| 31. In its Securities and Exchange Commission filings, Grace represents that significant uncertainty exists concerning the outcome of the bankruptcy. | ▪ Tarola Deposition, Ex. 24 (W. R.Grace & Co. Form 10-K for period ending December 31, 2003), at 2-3, Exhibit "Y", ("… However, it currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted or cancelled under a plan of reorganization. The value of Grace common stock following a plan of reorganization…will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through Bankruptcy Court proceedings.") |
| 32. State Street held Grace common stock in funds that it actively traded. | ▪ Johnson Deposition at 66-68, Exhibit "D". |
| 33. Grace had the duty to take action when if it knew that State Street was violating its duty. | ▪ Hogan Deposition at 222, Exhibit "I", ("Q. In other words, take some action to try to take the authority away from the investment manager; is that correct?  A.   In extraordinary circumstances, sure.  They have to protect the plan participants.") |

Dated:  August 31, 2007

Respectfully submitted,

**WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.**

*/s/ Jane H. Walker*_____
James R. Cummins
Jane H. Walker
Terrence L. Goodman
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 381-2375
E-mail  jcummins@wsbclaw.com
E-mail:  janehwalker@wsbclaw.com
E-mail:  terrygoodman@wsbclaw.com

**BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO**

*/s/ Jeffrey C. Block*_____
Jeffrey C. Block
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
Email:  jblock@bermanesq.com

*Counsel for Lawrence W. Bunch, Jerry L. Howard, Sr. and David Mueller, Both Individually and Behalf of All Others Similarly Situated*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2007, I filed the Bunch Plaintiffs' Reply to Defendants' Statement of Uncontested Facts in Support of Defendants' Motions for Summary Judgment and Plaintiffs' Counterstatement of Uncontested Facts.  It was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies were sent to those indicated as non-registered participants on August 31, 2007.

*/s/ Jane H. Walker*_____
Jane H. Walker