# EXHIBIT A

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2   - - - - - - - - - - - - - - - -+
                                    |        ORIGINAL
3   KERI EVANS,                     |
                                    |
4             Plaintiff,            |
                                    |
5      vs.                          |
                                    |
6   JOHN F. AKERS, et al.,          |   Consolidated as
                                    |
7             Defendants.           |   Case No.:
                                    |
8   - - - - - - - - - - - - - - -+   04-11380-WGY
                                    |
9   LAWRENCE W. BUNCH, et al.,      |
                                    |
10            Plaintiffs,           |
                                    |
11  vs.                             |
                                    |
12  W.R. GRACE & CO., et al.,       |
                                    |
13            Defendants.           |
                                    |
14  -------------------------------x
15        Deposition of ROBERT M. TAROLA, CPA
16              Washington, D.C.
17              May 10th, 2007
18               10:00 a.m.
19
20  Job No. 1-102403
21  Pages 1 - 174
22  Reported by:  Laurie Bangart-Smith


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

47

1    available that is accessible depends on the actual

2    claims that are presented, correct?

3        A    Yes.

4        Q    Okay.  Now let me skip forward a second, and

5    I'm taking this out of order, but I think it may make

6    some sense here.

7            Are you aware that State Street hired a firm

8    called Duff & Phelps to assist it in the performance

9    of its duties?

10       A    Yes, I am.

11       Q    Are you aware that Duff & Phelps attempted

12   to make some analysis of certain values of the W.R.

13   Grace & Co common stock over projections and other

14   calculations?

15       A    No, I'm not.

16       Q    At no time during the period January 1,

17   2003, to the present day were you aware that Duff &

18   Phelps was calculating certain numbers relative to the

19   projected value of W.R. Grace common stock?

20       A    No.

21       Q    Have you ever had any conversations with any

22   representative of Duff & Phelps?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

49

1    subject matter of the discussions?

2         A    I don't recall exactly.

3         Q    Did they talk about asbestos liability?

4         A    I don't recall.

5         Q    Did they ask you any questions about

6    asbestos exposure?

7         A    To the best of my recollection, they didn't

8    ask me anything about asbestos.

9         Q    Did they ask you anything about insurance

10   coverage available for asbestos claims?

11        A    I don't recall.

12        Q    To the best of your recollection as you sit

13   here today, did you instruct anyone at W.R. Grace &

14   Company to discuss insurance coverages with Duff &

15   Phelps?

16        A    Not to my recollection.

17        Q    Do you know of anybody, any other employee

18   of W.R. Grace & Company, who had communications with

19   Duff & Phelps other than you?

20        A    No.

21        Q    Is it possible that someone other than you

22   did speak to Duff & Phelps' representatives?  Let me

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

50

1    withdraw the question.  Is it possible that some other

2    employee of W.R. Grace & Company spoke to a Duff &

3    Phelps representatives in the period of fourth quarter

4    of 2003 through 2004?

5         A    Anything is possible.

6         Q    Under whose control would the disclosure of

7    financial information to Duff & Phelps have been?

8         A    Under my control.

9         Q    So isn't it fair to say that you would have

10   known if someone was going to disclose financial

11   information to Duff & Phelps?

12        A    That's fair.

13        Q    So as far as you know, no one other than you

14   on behalf of W.R. Grace & Company spoke to Duff &

15   Phelps; is that correct?

16        A    No, I didn't say that.

17        Q    I'm sorry.  What is it that I have misstated

18   there?

19             THE WITNESS:  May I clarify?

20             MS. FLOWE:  Go ahead.

21   BY MR. CUMMINS:

22        Q    Sure.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

79

1      A    Almost $20 million higher.

2           (Exhibit No. 26 was marked for

3      identification and attached to the deposition

4      transcript.)

5  BY MR. CUMMINS:

6      Q    I'm going to hand you now what's been marked

7  for identification as Plaintiffs' Deposition Exhibit

8  26.  I just have a couple of questions about

9  Mr. Norris' comments, the quote at the bottom of the

10 first paragraph.

11     A    Yes.

12     Q    In my words, he's pretty upbeat about the

13 financial performance of the company in the first

14 quarter of 2004, isn't he?

15     A    He states they were very good.

16     Q    Did you agree with that statement at the

17 time he made it?

18     A    Yes.

19     Q    In fact, the operating performance of the

20 company was improving in the first quarter of 2004,

21 was it not?

22     A    Relative to the first quarter of 2003, yes.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

114

1      A      Yes.

2      Q      I take it that neither you nor Mr. McGowan

3   discussed at or about this time the, quote, "climate"

4   of opinion that Mr. Brennan was reporting on?

5      A      In no special way other than sharing

6   communications like this.

7      Q      Did you think that you had some

8   responsibility to respond to a plan participant as a

9   member of that committee?

10     A      No.

11     Q      Who did have that responsibility?

12     A      Well, if anyone did, it was through our

13  Human Resources and administrative organization, not

14  through the finance organization.

15     Q      As I understand what you describe as a

16  "division of responsibility," Human Resources dealt

17  with plan participants in terms of the communication

18  between the plan participants and the company; is that

19  right?

20     A      Yes.

21     Q      And your responsibility as a member of the

22  benefits committee was what then?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

115

1      A      Policy only.

2      Q      Policy?

3      A      Yes.

4      Q      Investment decisions as well?

5      A      All related policy.

6      Q      And did that committee then make

7   recommendations of its policy decisions for adoption

8   by the Board of Directors of the company?

9      A      For the most part, delegation of authority

10   was to the Investment Benefits Committee from the

11   board for most all policy decisions.

12      Q      And what was your understanding of the

13   policy decisions that were delegated to the committee

14   by the board?

15      A      I'm sorry.  I don't -- I don't understand

16   your question specifically.

17      Q      Well, there were certain policy decisions

18   that you just said the Board of Directors delegated to

19   the committee.  I just want to know what the policies

20   were.

21      A      Investment offerings, for the most part.

22   Execution of board decisions around matching, filing,

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

121

1    correct?

2            MS. FLOWE:  I'm going to object to the

3    extent that you're asking him for a legal conclusion,

4    but you can answer if you can.

5    BY MR. CUMMINS:

6        Q    You're not a lawyer, are you?

7        A    No.

8            MR. CUMMINS:  Okay.  I'm asking for his --

9    yeah, I'll restate the question.

10   BY MR. CUMMINS:

11       Q    At the time you signed this document, is it

12   correct that you believed you had no responsibility

13   with respect to State Street's decision on its

14   handling of the Grace stock fund?

15       A    That's absolutely correct.

16       Q    And you believed at the time that you had

17   virtually wiped your hands of any responsibility to

18   the plan participants, in the vernacular?

19           MS. FLOWE:  Same objection.

20           THE WITNESS:  That's correct.

21   BY MR. CUMMINS:

22       Q    And you were told that somewhere or was that

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

122

1    by someone?

2             MS. FLOWE:  Now I object.

3             MR. CUMMINS:  Sorry.

4             MS. FLOWE:  You're getting into

5    attorney/client privilege now.

6    BY MR. CUMMINS:

7        Q    All right.  Other than communications with

8    your counsel, did someone tell you that you would have

9    no responsibility to the plan participants if you

10   simply hired State Street to do whatever they were

11   hired to do?

12       A    You mean anybody?

13       Q    Anybody other than your counsel.  Were you

14   told that by anybody other than your counsel?

15       A    Yes.

16       Q    Who?

17       A    I believe Mr. McGowan told me that, and

18   Mr. Norris told me that, and Mr. -- well, I'll stop

19   there.

20       Q    Okay.  Other than the conflict that

21   Mr. Norris described and we've talked about in a

22   previous exhibit, was there any other reason that

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

124

1    me if I'm wrong -- in order to keep you and

2    Mr. McGowan safe from some legal liability, you

3    allowed State Street to make its decision on

4    eliminating this option; is that correct?

5            MS. FLOWE:  Same objection.

6            You can answer.

7    BY MR. CUMMINS:

8        Q    Is that correct?

9        A    That's correct.

10           (Discussion was held off the record.)

11           MS. FLOWE:  Do you want to break for lunch?

12           MR. CUMMINS:  Yes.

13           MS. FLOWE:  How much more time do you think

14   you're going to have?

15           MR. CUMMINS:  An hour.

16           (Whereupon, the lunch recess was taken.)

17           MR. CUMMINS:  Did you want to make a

18   statement?

19           MS. FLOWE:  Oh, yes.  I'm sorry.  Bob did

20   want to actually clarify something from his testimony.

21   BY MR. CUMMINS:

22       Q    Go ahead.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

125

1          A          There's a sense that I may have left the

2     impression that the only time I would have non-public

3     information is during these 30-day reporting periods.

4     I could have had non-public information relative to

5     bankruptcy negotiations that would extend beyond those

6     periods, but as to business performance, business

7     financial information, generally we update that every

8     30 days.

9          Q          Do I understand it that what you're trying

10     to clarify is that there would be information that

11     came to you in the development -- during this period

12     of time, in '03 and part of '04 -- about a development

13     of the Plan of Reorganization that was not public?  Is

14     that part of the category of information that you're

15     describing?

16          A          That could have been one of the, one of the

17     categories.

18          Q          Before the break we talked about the

19     conflict, and you described it as a "hypothetical

20     conflict," but I think we have a common understanding

21     of how the elements of the conflict are described, but

22     I have a question about -- directing your attention to

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

126

1    the first quarter, calendar quarter of 2004, related

2    to that conflict.  You described this conflict concept

3    as "hypothetical."  In the first quarter of 2004 did

4    you think that there was an actual conflict between

5    your duties as the CFO and your service as a member of

6    that committee?

7         A    No.

8         Q    And during the first two weeks of April did

9    you think that there was an actual conflict between

10   your duties as the CFO and your service as a member of

11   that committee?

12        A    April 2004?

13        Q    Uh-huh.

14        A    No.

15        Q    We talked a little bit about the ranking by

16   Fidelity of the various spectrum of the investment

17   opportunities offered to the plan participants.  If

18   you can pull out the exhibit that's marked Number 12.

19   Have you seen Exhibit 12 prior to today?

20        A    May I review it?

21        Q    Please.  I'm going to ask you two questions.

22   One is:  Is this a document you ever received?  You

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

131

1    interrupt you.

2        A    I believe we did act on that advice to a

3    certain degree.  We put a number of measured

4    restrictions in to minimize the likelihood that other

5    employees might invest in that asset class and put

6    retirement funds at risk beyond what may have been

7    appropriate.

8        Q    Let me refer you to the date of this.  This

9    is February of 2004, and I'd ask you to recall that

10   somewhere in December of 2003, according to your

11   testimony, you had moved the responsibility for making

12   a decision off to State Street with regard to the

13   stock fund.

14       A    My only point is that the Grace stock was on

15   the far right for years before this, and as a result,

16   we had another adviser telling us that you need to

17   look at that for concerns over whether or not it was

18   appropriate for a retirement plan.  That's all I

19   wanted to point out.

20       Q    This is February of 2004 when Fidelity was

21   telling you about that?

22       A    Well, I believe -- my recollection is we

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

132

1    were made aware of that before February of 2004.  We

2    had periodic meetings with Fidelity.

3        Q    Remind me again if you will.  Somewhere in

4    2001, Grace filed its bankruptcy petition, correct?

5        A    Correct.

6        Q    Am I not correct that the benefits committee

7    continued to offer the opportunity for plan

8    participants to remain owners of that stock from '01

9    through whenever State Street sold the stock?

10       A    That's correct.

11       Q    There was no restriction on continuing to

12   own, correct?

13       A    Correct.

14       Q    So the investment decisions that the plan

15   participants were making from December of 2001 to

16   continue to hold the stock was really the

17   responsibility of the plan participants, right?

18       A    Correct.

19       Q    And as of February 2004 your plan wasn't

20   even offering an opportunity to invest in the stock

21   fund, right?  No new money, basically?

22       A    I don't remember the exact dates, but that

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

135

1    periodically.

2        Q    Could you turn to the last page -- the

3    second to the last page of the document, and I'd call

4    your attention to Line 63.

5        A    Yes.

6        Q    This page indicates, does it not, that the

7    three-year average return for Grace stock during the

8    period that it was in bankruptcy up to March 31, 2004,

9    was 10.7 percent on an annualized basis?  Is that what

10   this piece of paper says?

11       A    Well, the three-year average return should

12   cover the period from April 1, 2001, '2, '3 and '4.

13   Yes, that column should reflect the annualized return

14   over that three-year period.

15       Q    Do you have any reason to believe that that

16   three-year rate of return is, as recorded here, is

17   inaccurate?

18       A    Not offhand, no.

19       Q    And if you'll look at the second page of

20   that exhibit, looking at Line 11 -- let's do it this

21   way.  Do you agree with me that from Line 6 to Line 14

22   is a presentation of the total market value of the

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

142

1      Q    Are you familiar with any block trade

2  inquiry at or about this time?

3      A    May I say, after I read the first page of

4  the document, it looks like the block trade related to

5  D.E. Shaw hedge fund.

6      Q    Thank you.  When did you first become aware

7  of D.E. Shaw's interest in the plan's holdings of

8  Grace common stock?

9      A    When I received a phone call from someone

10  from the State Street team.

11      Q    And approximately when was that?

12      A    I don't recall exactly the date.

13      Q    Was it in February, March?  Do you have a

14  month in mind?

15      A    No.  I don't recall the date.

16      Q    Well, let's do it in context.  Had State

17  Street sold any position to D.E. Shaw at the time of

18  this telephone conversation?

19      A    I don't recall.

20      Q    So it's your testimony, as I understand it,

21  you don't know that the first phone call you got from

22  State Street occurred before or after the sale to the

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

143

1  Shaw company; is that right?

2      A    No, that's not right.  What I mean to say is

3  that I received a call from State Street indicating

4  that there was a potential for a block trade, and they

5  wanted to ask me some questions.

6      Q    Okay, and they did ask you -- someone from

7  State Street apparently asked you some questions?

8      A    Someone from the State Street team.

9      Q    What were the questions?

10     A    To the best of my recollection, it was just

11  is there anything that they need to know before they

12  make a decision, anything I know that they might need

13  to know before making a decision.

14     Q    And how did you respond to that question?

15     A    I said everything I know is in the public

16  domain.

17     Q    But that wasn't correct, was it?

18     A    Sure it was.

19     Q    You knew nothing about Grace's --

20     A    All material information was in the public

21  domain.

22     Q    And you knew nothing, for example, at this

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

143

1    Shaw company; is that right?

2        A    No, that's not right.  What I mean to say is

3    that I received a call from State Street indicating

4    that there was a potential for a block trade, and they

5    wanted to ask me some questions.

6        Q    Okay, and they did ask you -- someone from

7    State Street apparently asked you some questions?

8        A    Someone from the State Street team.

9        Q    What were the questions?

10       A    To the best of my recollection, it was just

11   is there anything that they need to know before they

12   make a decision, anything I know that they might need

13   to know before making a decision.

14       Q    And how did you respond to that question?

15       A    I said everything I know is in the public

16   domain.

17       Q    But that wasn't correct, was it?

18       A    Sure it was.

19       Q    You knew nothing about Grace's --

20       A    All material information was in the public

21   domain.

22       Q    And you knew nothing, for example, at this

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

144

1    call about Grace's work on its Plan of Reorganization;

2    is that correct?

3         A    That's correct.

4         Q    Because you didn't do anything on the Plan

5    of Reorganization, is that right, in the first quarter

6    of 2004?

7         A    Correct.

8         Q    Grace had not even started on the Plan of

9    Reorganization; is that correct?

10        A    Correct.

11        Q    You didn't know anything about the financial

12   performance of Grace that had not been disclosed to

13   the public; is that correct?

14        A    Again, the only time frame where there might

15   have been financial information would have been

16   roughly one month's time.

17        Q    And you did not disclose that information to

18   the State Street inquiry?

19        A    I don't -- I don't recall disclosing any

20   non-public information to the State Street inquiry,

21   nor did I believe I had any material non-public

22   information.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

145

1    Q    You were a member of the committee, the

2    benefits committee at the time State Street called

3    you?

4    A    Yes.

5    Q    What did you learn about the nature of the

6    Shaw deal in that phone call?

7    A    Best of my recollection, I learned that they

8    were interested in buying the remaining shares held

9    within the S&I Plan, that the negotiations were

10   somewhere between $3.00 and $3.50 a share, and that

11   State Street was considering it.

12   Q    What, if anything, did you say in response

13   to that information?

14   A    I don't recall saying anything other than

15   answering questions.

16   Q    The only question I think you indicated that

17   they asked you was, was there anything they needed to

18   know that you knew that they didn't?  Anything else?

19   A    I don't recall any other specific questions.

20   Q    I thought you said it was a phone call from

21   State Street?

22   A    That's what I recall, yes.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

146

1        Q    Did you during this period have any

2    face-to-face meetings with State Street

3    representatives about this issue, about the Shaw

4    issue?

5        A    I don't recall a face-to-face meeting.

6        Q    And after you learned that there was an

7    expression of interest, I think you said, what did you

8    do with that information?

9        A    You mean once I learned about it?

10       Q    Yeah, after State Street told you we had an

11   expression of interest.

12       A    My recollection was I was the first one in

13   the company to become aware of it as a result of this

14   phone call, and I related this phone call to

15   Mr. Norris, this information to Mr. Norris, for sure,

16   and quite likely Mr. Siegel and Mr. McGowan.

17       Q    And how did Mr. Norris react to it?

18       A    To the best of my recollection, his reaction

19   was that it would be good for the participants to get

20   some, some cash out of their holdings at this point in

21   time.

22       Q    Did he say words to that effect?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

147

1    A    Yes.

2    Q    And what did Mr. McGowan say?

3    A    I think there was similar feeling among the

4  leadership within Grace, that this gave the

5  participants a chance to get some cash and move on

6  from what was a real speculative situation.

7    Q    Mr. Siegel is the company counsel, isn't he?

8    A    Yes.

9    Q    Did you ask Mr. Siegel for any advice?

10    MS. FLOWE:  Objection.

11  BY MR. CUMMINS:

12    Q    I'm only asking you if you asked Mr. Siegel

13  for any advice, not what the advice was with regard to

14  this phone call.

15    MS. FLOWE:  So you can answer yes or no and

16  nothing else.

17  BY MR. CUMMINS:

18    Q    Follow her direction.

19    A    No.

20    Q    Okay.  After that phone call from State

21  Street, when did you next learn something about the

22  status of the Shaw interest in the holdings of the --

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

149

1    one point in time.

2         Q    Okay, and other than that arrangement -- I'm

3    sorry -- that occurrence with Mr. McGowan -- let me go

4    back.  Did Mr. McGowan share this with you before or

5    after he had signed it?

6         A    To the best of my recollection, it was

7    likely tabbed in before.

8         Q    Could you turn to -- do you know what this

9    is?

10        A    Looks like the engagement agreement with

11   State Street Bank over the independent fiduciary role.

12        Q    Turn to Page 6 of the letter, which is Bates

13   stamped 001303, particularly the paragraph that says

14   "provision of information."

15        A    Yes.

16        Q    What information did Grace provide to State

17   Street with respect to State Street's work?

18        A    To the best of my recollection, we didn't

19   provide them anything.  They got it all online.

20        Q    About halfway down that paragraph a sentence

21   begins, "In addition, at least once on an annual

22   basis" -- can you find that sentence?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

153

1    sell.

2       Q    So now referring to this engagement letter,

3    at least in the terms of the sentence that I read

4    about the time period when State Street could make

5    inquiry, there was -- did State Street ever make

6    inquiry of the company after January 1st, 2004, and

7    before the due diligence phone call that you referred

8    to between State Street and you?

9       A    I don't recall any inquiry about -- I don't

10   believe there was an inquiry during that time period.

11      Q    Okay.  Did you ever contact a State Street

12   representative during the period December 1, 2003, to

13   March -- I'm sorry -- to April 15th, 2004, on your own

14   initiative?

15      A    Never.

16      Q    Did Mr. McGowan, so far as you know?

17      A    As far as I know, he would not have.

18      Q    Was there an effort by you and Mr. McGowan

19   intentionally not to speak to State Street about this

20   stock situation?

21      A    I can't speak for Mr. McGowan.

22      Q    Speak for yourself if you could, please.

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

154

1      A    My idea was State Street was a significant

2    investor.  We would be respectful to them as a

3    significant investor, answer questions that were

4    appropriate to answer, but we wouldn't call

5    significant investors just to see how they were doing.

6      Q    I understand that, but you were a member,

7    and in your capacity as a member of the Investment

8    Benefits Committee, didn't you think you had some

9    obligation to monitor what they were -- what State

10   Street was doing?

11          MS. FLOWE:  I'm going to object that you are

12   asking him for a legal conclusion.

13          MR. CUMMINS:  Okay.  I'll withdraw the

14   question.

15   BY MR. CUMMINS:

16     Q    Didn't you think you had some responsibility

17   as a member of the committee to monitor what State

18   Street was doing after its engagement?

19          MS. FLOWE:  Same objection.  You're asking

20   him for a legal conclusion.

21          MR. CUMMINS:  I'm asking him for whether he

22   thought he had some responsibility.  He's not a

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

156

1    "accordingly."

2         A    May I read the whole thing?

3         Q    Yes.

4         A    I'm finished reading.

5         Q    Okay.  I pointed you to that one sentence I

6    want to ask you about.  Let me just read it into the

7    record so we know what your testimony is referring to.

8              "Accordingly, State Street shall instruct

9    the trustee to sell common stock held in the company

10   stock fund.  If, and only if, State Street determines

11   that the continued holding of such common stock is not

12   consistent with the provisions of ERISA (within the

13   meaning of Section 404A1D of ERISA), and in such

14   event, only to the extent that such sales are

15   permitted under applicable securities laws or any

16   other applicable Federal law."

17             Assuming I read it correctly, when you

18   engaged State Street did you understand that the sole

19   determination that you were assigning to State Street

20   was to determine that the continued holding of such

21   common stock was not consistent with the provisions of

22   ERISA?

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

157

1       A    No, that's not the whole understanding.

2       Q    What else was it that you thought you were

3  assigning to State Street?

4       A    I thought we were assigning total fiduciary

5  responsibility and liability for making decisions

6  about that portfolio offering within the S&I Plan of

7  W.R. Grace, but that the only reason to sell the stock

8  in that portfolio was if, in their judgment,

9  continuing to hold the stock would not conform with

10  the provisions of ERISA.

11      Q    When State Street phones you and advised you

12  that they had received an inquiry as to the possible

13  sale, did you ask the person who called you from State

14  Street what the basis was -- whether State Street had

15  concluded that holding the stock was no longer

16  consistent with the provisions of ERISA?

17      A    I do not recall asking that question.

18      Q    At any time did State Street ever express to

19  you, so far as you know, to anyone at Grace, that they

20  had formed the conclusion that holding, continuing to

21  hold the Grace stock in the stock fund was not

22  consistent with the provisions of ERISA?