# EXHIBIT G

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3    - - - - - - - - - - - - - - - - - X
 4    KERI EVANS,                       :
 5                    Plaintiff,        :  Consolidated as
 6    vs.                               :  Case No.:
 7    JOHN F. AKERS, et al.,            :  04-11380-WGY
 8                    Defendants.       :
 9    - - - - - - - - - - - - - - - - - X
10    LAWRENCE W. BUNCH, et al.,        :
11                    Plaintiffs,       :
12    vs.                               :
13    W. R. GRACE & CO., et al.,        :
14                    Defendants.       :
15    - - - - - - - - - - - - - - - - - X
16            Deposition of WILLIAM BRIAN MCGOWAN
17                      Washington, D.C.
18                   Monday, April 30, 2007
19                         10:13 a.m.
20    Job No.:   1-102400
21    Pages:     1 - 173
22    Reported by:  Dana C. Ryan, RPR
```

**ORIGINAL**



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

61

1           MS. FLOWE:  Objection, asked and
2  answered.
3           THE WITNESS:  Based on our fiduciary
4  responsibilities, we just did not think that there was
5  a need to -- that the monies could be left there at
6  that time.
7  BY MR. GOODMAN:
8      Q    What about your fiduciary responsibilities
9  told you that it was appropriate to allow them to
10 continue -- to leave their money in there at that
11 time?
12     A    Could you repeat that?
13     Q    You just used the expression fiduciary
14 duties in connection with allowing them to maintain
15 their money in the fund at that time.
16     A    Right.
17     Q    What I'm trying to understand is why you
18 stopped them from trading -- from making future
19 investments in the fund but why you continued to allow
20 them to keep their money in the fund?
21     A    Because we believed that those were two
22 independent steps, not necessarily the action needed

62

1  to be taken together.
2      Q    Was allowing plan participants to keep their
3  money in the Grace Stock Fund at that time
4  inconsistent with the goals of Grace to allow plan
5  participants to have a diversified 401(k) portfolio?
6           MS. FLOWE:  Objection, asked and
7  answered, I think, but I'm not sure I even understood
8  the question.  Did you understand that question?
9           THE WITNESS:  I believe I did.
10          MS. FLOWE:  There was at least one
11 double negative.
12 BY MR. GOODMAN:
13     Q    Why don't you answer the question.  And if
14 I've confused you, I apologize; I'll be more than
15 willing to try to rephrase the question.
16     A    At this point in time we thought it was
17 still appropriate to let people keep the monies that
18 they had but prohibit any future investments into the
19 fund.
20     Q    And by being appropriate, does that mean it
21 was consistent with the goals of the plan to allow a
22 diversified portfolio?

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

69

1    Q    At any time between 2000 and December 15th,
2  2003, did you believe that maintaining money in the
3  Grace Stock Fund had become an imprudent investment
4  option?
5    A    I can't recall if I ever thought that at
6  that time.
7    Q    Sitting here now, at any time -- if at any
8  time between 2001 and December 15, 2003 participants
9  maintained money in the Grace Stock Fund, would you
10 have considered that an imprudent investment?
11           MS. FLOWE: I'm going to object on the
12 grounds of relevance, but you can answer.
13           THE WITNESS: I don't think I can
14 answer that question.
15 BY MR. GOODMAN:
16   Q    If at any time between 2001 and December 15,
17 2003 you as a fiduciary to the plan had believed that
18 retaining an investment in the Grace Stock Fund had
19 become an imprudent investment, what obligations were
20 there on you?
21   A    As a fiduciary it would have been my
22 obligation to -- to discuss this matter to -- to

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

71

1    allowing plan participants to continue to keep money

2    invested in the Grace Stock Fund between 2001 and

3    December 15th, 2003 was imprudent?

4        A    No.

5        Q    As we sit here now, do you believe that

6    allowing Grace plan participants to continue to keep

7    money in the Grace Stock Fund between 2001 and

8    December 15, 2003 was an imprudent investment vehicle?

9             MS. FLOWE:  Objection, relevance, asked

10   and answered.  You can answer it if you can.

11            THE WITNESS:  I cannot answer.

12   BY MR. GOODMAN:

13       Q    Why not?

14       A    I believe it's irrelevant.

15       Q    Well, aside from that, why can't you answer?

16       A    I think you're asking me to sit here three

17   years, four years after the fact and saying what I --

18   what I think now about facts -- about circumstances

19   back then.

20       Q    Exactly.  That's what I would like you to

21   answer.  As you sit here now as a fiduciary to the

22   investment and benefits committee, savings plan, I

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

72

1   want you to answer the question, was it an imprudent
2   investment -- was it imprudent to allow plan
3   participants to maintain funds or their money in the
4   Grace Stock Fund between 2001 and December 15th, 2003?
5        A    Based on the facts and circumstances as we
6   knew them during that period of time, 2000 and 2003, I
7   have the same answer; that it was -- the committee did
8   not take any action.  I think that was the appropriate
9   position to take at that time.
10       Q    Now, you indicated that you're vice
11  president for administration at Grace; is that
12  correct?
13       A    Senior vice president.
14       Q    Senior vice president.  But you -- in that
15  position do you have an understanding of the financial
16  affairs of Grace?
17       A    General.
18       Q    Okay.  As part of your responsibilities are
19  you responsible for periodically reviewing financial
20  information?
21       A    Not of W. R. Grace; only as it relates to my
22  individual functions; department of budgets, for, you

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

105

1    Street before the selection of State Street?

2        A    I don't know if there was one particular

3    person who had principal responsibility for

4    communications.

5        Q    Okay.  How about after the selection of

6    State Street; was there one person who had the most

7    responsibility to communicate with State Street?

8        A    My recollection is our communications was

9    more driven by State Street in terms of requesting

10   information, discussing, you know, matters with Grace

11   management.

12       Q    We'll get back to that in a second.

13            Okay.  Now, at the time you were making

14   inquiries as to the hiring of an independent fiduciary

15   and you had a contact with Aon and State Street, what

16   information in particular did you -- did Grace provide

17   to State Street prior to the selection being made?

18       A    I don't recall -- prior to the selection I

19   don't recall specifically what we would have provided

20   to them other than that we're looking for an

21   independent fiduciary for our plan.

22       Q    Okay.  All right.  And did State Street

DEPOSITION OF WILLIAM BRIAN MCGOWAN
CONDUCTED ON MONDAY, APRIL 30, 2007

111

1      A      I can't recall at this time the specific
2  objections.
3      Q      Okay.  After there was -- after the
4  engagement with State Street, who had -- did you have
5  contact -- did you continue to have contact with State
6  Street?
7      A      If I did, it was very limited.
8      Q      Did Mr. Tarola have -- if you know, have
9  contact with State Street after it was hired?
10     A      I can't answer that.
11     Q      Did the invest -- as an official function of
12 the investments and benefits committee fiduciaries,
13 did you make any inquiry as to State Street regarding
14 any matter after the retention of State Street?
15     A      No.
16     Q      Do you know if Mr. Tarola did?
17     A      I can't answer that.
18     Q      Was there any official action taken by your
19 committee that the two of you -- consisting of the two
20 of you requesting any information from State Street?
21     A      Not that I'm aware of.
22     Q      Do you recall at some point that State

113

1  reason why it was selling the stock?

2      A    Yes.

3      Q    And what was your understanding as to the

4  reason it decided to sell the stock?

5      A    In their capacity as independent

6  fiduciaries, they had determined that it was not an

7  appropriate investment in a retirement fund.

8      Q    Okay. Did you have any understanding as

9  how -- what the reason was for their decision?

10     A    Specifically, no.

11     Q    Did you make any inquiries as to the reason

12 of its decision?

13     A    No.

14     Q    Why not?

15     A    Grace appointed State Street as the

16 independent fiduciary, and in that capacity we passed

17 to them the fiduciary responsibilities to act on the

18 best behalf of the Grace Stock Fund and the

19 participants.

20         (Plaintiff's Deposition Exhibit Number 7 was

21 marked for identification and attached to the

22 transcript.)

115

1  number 19.

2        A     Yes.

3        Q     It says you may contact Brian McGowan or

4  Mr. Forgach. "However, please keep in mind they will

5  only have access to the same information that has

6  already been provided to you." Do you see that?

7        A     Yes.

8        Q     Is that correct? Did you have any access to

9  any other information?

10       A     No.

11       Q     After this was mailed to plan participants

12 and based on item number 19, do you recall any plan

13 participant communicating with you?

14       A     Yes.

15       Q     And approximately how many people

16 communicated with you?

17       A     I would estimate at this time less than a

18 dozen.

19       Q     And of those six or so people who

20 communicated -- spoke to you or -- did they do it

21 through e-mail, letter or telephone conversation?

22              MS. FLOWE:  Object to the

141

1  Q   But 4 percent of the funds remained in the
2  Grace stock plan at about -- prior to the time that
3  State -- that Grace hired State Street; is that
4  correct?
5  A   That is correct.
6  Q   And I think your testimony was that allowing
7  plan participants to continue to have that 4 percent
8  in the Grace Stock Fund as part of the plan was not an
9  imprudent decision?
10 A   That is correct.
11 Q   As of March 31st, 2004, do you have any
12 knowledge that the asbestos liabilities that Grace
13 reported were -- strike that.  You already answered
14 that question.  Before I get an objection, I'm not
15 going to even ask the question.  You've given the
16 answer this morning.
17     By the way, have you ever done an analysis
18 at Grace as to what happens -- how often participants
19 change their investments in the Grace Stock Fund --
20 I'm sorry, not the Grace Stock Fund, in the 401(k)?
21 A   Not that I can recall.
22 Q   Did you ever study -- so you don't have an