# EXHIBIT I

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3      - - - - - - - - - - - - - - - -+
 4  KERI EVANS,                        |
 5                                     |   Consolidated
 6                      Plaintiff      |   Case No.:
 7      vs.                            |   04-11380-WGY
 8  JOHN F. AKERS, et al,              |
 9                  Defendants.        |
10      - - - - - - - - - - - - - - - -+
11  LAWRENCE W. BUNCH, et al,          |
12                  Plaintiffs,        |
13      vs.                            |
14  W.R. GRACE & CO., et al,           |
15      -------------------------------x
16              Deposition of Thomas D. Hogan
17                    Washington, D.C.
18              Tuesday, July 17th, 2007
19                       9:30 a.m.
20
21
22
23  Job No. 1-107693
24  Pages 1 - 214
25  Reported by:  Laurie Bangart-Smith
0002
 1                      Deposition of
 2                    THOMAS D. HOGAN
 3
 4  Held at the offices of:
 5          PAUL, HASTINGS, JANOFSKY & WALKER
 6          875 15th Street, NORTHWEST
 7          Washington, D.C.  20005
 8          (202)551-1700
 9
10
11
12
13
14
15
16
17
18
19          Taken pursuant to the Federal Rules of Civil
20      Procedure, by notice, before Laurie
21      Bangart-Smith, Registered Professional Reporter,
22      Certified Realtime Reporter, and Notary public in
23      and for the District of Columbia.
24
25
0003
 1                  A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4          TERRENCE L. GOODMAN, ESQUIRE
```

3      A    They were administered by my -- they were
4   administered within my area of responsibility.
5      Q    What does that mean in terms of your
6   responsibility?  Were you ultimately responsible for
7   those plans?
8      MR. FLICKER:  Objection.
9      THE WITNESS:  I was ultimately responsible
10     for those plans, just as I would have been
11     ultimately responsible for anybody's, any
12     company's 401-K or ESOP plan.
13  BY MR. GOODMAN:
14     Q    Did you ever consider whether -- let me go
15  back some.  At Crestar did you have any responsibility
16  for an ESOP or 401-K, the company's --
17     A    The bank was the trustee of the ESOP and the
18  401-K, and they were administered within my area of
19  responsibility.
20     Q    Okay, and was there both an ESOP and an
21  401-K?
22     A    We had both.
0056
1      Q    And in connection -- let me go back a step.
2   At the Dallas Bank did you -- similarly, was there a
3   401-K or ESOP?
4      A    I don't recall.  I don't recall there was an
5   ESOP.  There was -- I don't recall that there was a
6   ESOP.  There was a 401-K, and it was administered in
7   my area of responsibility until we went bankrupt.
8      Q    At the Dallas Bank before you went bankrupt,
9   did the 401-K permit people to invest or receive
10  company stock?
11     A    Yes.
12     Q    Did you in your responsibilities for that
13  401-K ever stop individuals from investing or from
14  receiving company stock?
15     A    No.
16     Q    Did the company stock have value after it
17  went into bankruptcy?
18     MR. FLICKER:  Objection.
19     THE WITNESS:  Under banking regulations it
20     actually -- I misspoke.  It actually didn't go
21     into bankruptcy.  The Fed declares it
22     non-operating and sells it overnight, so it never
0057
1      actually went into bankruptcy.  I misspoke.
2   BY MR. GOODMAN:
3      Q    Before the Fed went in there, was the stock
4   publicly traded?
5      A    Yes.
6      Q    Did the stock -- prior to the Fed taking
7   over the bank, did the stock -- what did the stock
8   trade at from the year before to the year after?
9      A    I, I don't recall.
10     Q    Was there a reason why -- did you have the
11  authority to eliminate -- how was that -- was it a
12  stock fund that people could invest in in the 401-K?
13     A    It was a company stock fund with a 401-K.

```
14          Q    Did you have authority as being responsible
15    at the bank for eliminating that as an investment
16    option?
17                MR. FLICKER:  Objection.
18                THE WITNESS:  My authority was whatever the
19          bank -- was whatever responsibility the bank had.
20          I was the overseer and the manager of that
21          responsibility.
22    BY MR. GOODMAN:
0058
1           Q    Did you ever consider eliminating that as an
2     investment option?
3           A    I don't recall.
4           Q    Were you concerned that the stock might
5     become worthless at some point?
6           A    Was I personally concerned?
7           Q    I'm talking about personally.  In your role
8     as an -- your role -- since the bank was a
9     fiduciary -- was the bank a fiduciary to that 401-K
10    plan?
11          A    Yes.
12          Q    And you were the person responsible at the
13    bank for that?
14                MR. FLICKER:  Objection.
15                THE WITNESS:  I was ultimately responsible.
16          I was the overall senior fiduciary person.
17    BY MR. GOODMAN:
18          Q    Did you ever direct anyone to consider
19    whether it was appropriate for the bank to continue to
20    offer stock fund in the 401-K?
21          A    I just don't remember.
22          Q    Did you ever consider whether you should
0059
1     eliminate the stock fund as an investment option in
2     the 401-K?
3           A    I just don't remember.
4           Q    What percentage of the 401-K's assets were
5     in the company stock fund?
6           A    Sitting here today, I have no idea.
7           Q    How many investment options were available
8     to people in the 401-K?
9           A    I have -- I don't know the exact number.
10    I'd say something less than 12.
11          Q    Do you believe it wasn't prudent to permit
12    bank employees to continue to invest in the stock fund
13    in the 401-K at the bank?
14                MR. FLICKER:  Objection.
15                THE WITNESS:  I believe it was imprudent.
16          To try and recall that -- I don't recall at the
17          time, and to consider that I'd have to consider
18          all the facts and circumstances, and I just can't
19          pull all that back out of my head.  I'm sorry.
20    BY MR. GOODMAN:
21          Q    At any time while you were at the Dallas
22    Bank do you believe you breached your fiduciary duty
0060
1     by allowing individuals to invest in a company stock
```

```
22    litigation is still pending.  I know the -- the last I
0075
 1    know, the summary judgment motions were denied in
 2    January, and I just don't know, so I'm a little
 3    reluctant to go into that.
 4         Q    That's fine.  Did the case involve any
 5    issues of eligible individual account plans?
 6         A    Not that I recall.
 7         Q    What is an eligible individual account plan?
 8         A    It's a plan defined by ERISA which provides
 9    that the accounting basically done, instead of a
10    comingled accounting of a plan or a fund, is done by
11    each individual participant.
12         Q    So you have individual accounts essentially?
13         A    Uh-huh.
14         Q    Okay.  When was the second deposition that
15    you gave?
16         A    We're going backwards.  It was in 2002.
17         Q    What did that involve?
18         A    It was a situation where a family had
19    created a trust for the benefit of their children and
20    contributed a large amount of stock in the
21    mid-seventies.  The bank in question at that point in
22    time had -- and this basically covered a 20-year
0076
 1    period -- basically held the stock, and in their
 2    dealings with what to do with the trust, dealt with
 3    the grantor of the stock who didn't have any authority
 4    over it.  It was an irrevocable trust.
 5              In the mid-nineties the company ran into
 6    financial difficulty, and the beneficiaries sued the
 7    bank for not following or not completing his fiduciary
 8    duties for breach of fiduciary duty, and it was
 9    settled.  I was engaged on behalf of the
10    beneficiaries.  My opinion was that the bank did
11    breach its fiduciary duties.
12         Q    Is that the Cranwell, Moore & Burlington
13    case?
14         A    That was the law firm.  Yes, it's that case.
15         Q    Who was the attorney with whom you worked?
16         A    David Bullington, one of the guys out in
17    western Virginia.
18              (Discussion was held off the record.)
19    BY MR. GOODMAN:
20         Q    I also understand that you have represented
21    or have been involved in litigation involving State
22    Street in the Polaroid litigation; is that correct?
0077
 1         A    That's correct.
 2         Q    And I think you said you've given a --
 3    provided a report and a rebuttal; is that correct?
 4         A    Correct.
 5         Q    Have you testified in that case?
 6         A    Have not.
 7         Q    Do you have an understanding as to what
 8    happened in that case?
 9         A    I received a phone call in January that it
```

```
10    was settled, but I don't know if it's resolved as of
11    today, because those things -- my understanding is
12    from the time you agree to settle to the time that the
13    court approves and all that stuff, so it may still be
14    pending.  I just don't know.
15         Q    What did te allegations involve in that
16    case, Polaroid?
17         A    The allegations -- I'm changing my head
18    here.  The allegations in Polaroid involved a 401-K
19    company stock fund and an ESOP.  Give me just a second
20    to get my head straight about this.
21              Okay, it's coming back.  Hold on.
22              And the allegations dealt with the sale of
0078
1     the company stock by the directed trustee.
2          Q    Was it the sale or the failure to sell?
3          A    Good question.  I think it was the -- I
4     ought to know that.  The delay in the sale.
5          Q    And on whose behalf did you provide
6     consulting services?
7          A    On behalf of the directed trustee, State
8     Street.
9          Q    And you're out here on behalf of State
10    Street in this matter; is that correct?
11         A    That's correct.
12         Q    You also -- let me get the record clear.  We
13    haven't asked that before.  Are you here on behalf of
14    anybody else?
15         A    Today?
16         Q    Yes.
17         A    The Grace defendants.
18         Q    What was State Street's role in the Polaroid
19    matter?
20         A    They were a directed trustee.
21         Q    And what allegations, if you know, were made
22    against State Street?
0079
1          A    My recollection is that the Polaroid stock
2     should have been sold sooner than it was.  I think --
3     that's what I remember.  It's amazing how your mind
4     loads up one of these puppies in your head and there's
5     not enough room for the other.
6          Q    I understand that you've provided a report
7     and a rebuttal; is that correct?
8          A    That's correct.
9          Q    Did you offer an opinion as to whether State
10    Street should have sold the stock sooner than it did?
11         A    No.
12         Q    You did not issue an opinion regarding that?
13         A    That they should have sold it sooner than
14    they did?
15         Q    Well, did you issue a report whether or
16    not -- maybe I missed a "not" in there -- whether or
17    not State Street should have sold sooner than they
18    did?
19         A    Whether or not they should have sold -- yes.
20         Q    What was your opinion?
```

```
21        A    Now, as in the other case, I don't know if
22   this litigation is still pending or not.  They agreed
0080
 1   to settle in January, and I just haven't -- I didn't
 2   think about following it up, so I'm --
 3        Q    Well, you're here on behalf of State Street
 4   also, and unless for some reason you're instructed by
 5   Mr. Flicker or Ms. Heermans not to answer, why don't
 6   you continue on and let me know -- I don't think they
 7   would have an objection as to letting me know what
 8   your opinion was in that case.
 9             MR. FLICKER:  Let's take a break.  Let's go
10        off the record.
11             (Whereupon, a short recess was taken.)
12   BY MR. GOODMAN:
13        Q    A moment ago we took a break, and
14   Mr. Flicker went to verify certain issues regarding
15   whether it would be all right for you to testify
16   regarding what you issued in your -- what your
17   opinions were with the Polaroid litigation.  If you
18   would, to the best you can recall, of course, tell me
19   what your opinions were that you provided in your
20   written report in that litigation.
21        A    The best I can recall is that the first
22   issue was whether or not State Street was a directed
0081
 1   trustee, and my opinion was they were at all times a
 2   directed trustee.  State Street overrode the
 3   directions it received from the plan fiduciary and
 4   sold the Polaroid stock, and it was my opinion that
 5   that was an appropriate decision on their part.
 6        Q    Were there allegations in that case that
 7   State Street waited too long to sell the company
 8   stock?
 9        A    There must have been, but I haven't read the
10   pleadings in a year, and I looked at my report a
11   couple of weeks ago, and I addressed the directed
12   trustee issue, I addressed the decision to override
13   the plan's directions, so that must have been what the
14   allegation was, but I haven't read the pleadings.
15        Q    Did you issue an opinion whether State
16   Street sold the stock at the appropriate time?
17        A    I issued an opinion that State Street's
18   decision to override the directions that they had
19   received was appropriate at the time they made those
20   decisions.
21        Q    Do you recall issuing an opinion -- well,
22   you had indicated a moment ago that you believed that
0082
 1   there must have been allegations against State Street
 2   that it waited too long to sell; is that correct?
 3        A    That's what I said, yes.  Must have been.
 4        Q    And are you -- based on your understanding
 5   today, are you telling me that you did not issue an
 6   opinion regarding that aspect of the case?
 7        A    I issued an opinion that -- and my
 8   recollection is -- and I wish I had the report.  My
```

```
 9    recollection is that I issued an opinion that the
10    decision they made to override the instructions they
11    received was appropriate at the time they made the
12    decision.
13         Q    Did that include a response to allegations
14    from the plaintiffs in that case that State Street
15    should have sold earlier?  In other words -- well, let
16    me ask the question that way.  Let me ask the
17    question.
18              Did that aspect of your report take into
19    account allegations in the Complaint that we believe
20    plaintiffs made that State Street should have made the
21    decision to sell earlier than it did?
22         A    That's a speculation on what we think might
0083
 1    have been in the Complaint.  I'd really rather -- I
 2    mean if you've got a copy of my report, I would be
 3    glad to look at it, but I just don't --
 4         Q    I don't have a copy of the report.  What I
 5    would like to know is whether you ever stated or
 6    responded in your report -- let me ask the question
 7    this way.  In your report you told me that you said
 8    that at the time State Street sold the stock, it was
 9    the appropriate time to sell the stock.
10         A    Right.  Well, at the time -- yes, at the
11    time they decided to override the instructions.
12         Q    Override the instructions, and I am
13    assuming, based on what I've read on that case -- and
14    there is not much that I've been able to read on that
15    case -- that there were allegations -- and I think you
16    would agree with me that there were allegations that
17    State Street should have sold sooner than at the time
18    it sold.
19         A    I said there must have been, but I don't
20    know.
21         Q    And the question I have is not whether it
22    was appropriate -- when you reached your decision that
0084
 1    it was appropriate to sell the stock at the time it
 2    did, I'm assuming that you also considered whether it
 3    would have been appropriate to sell earlier than that
 4    time; is that correct?
 5         A    I don't know.
 6              MR. FLICKER:  Hold on.  Objection;
 7         speculation, assumes facts not in evidence.
 8              THE WITNESS:  I assume I would have,
 9         but . . .
10    BY MR. GOODMAN:
11         Q    All right.
12         A    What I would have looked at was the
13    instructions they received and the process that they
14    looked -- and what they looked at and what they used
15    to determine the extraordinary circumstances that
16    existed which would allow them to override the
17    instructions they received.  They had a very thorough
18    review process.  I went through the review process.
19    It's a very detailed, thorough review process that
```

```
20    they looked at in monitoring the Polaroid stock, and
21    they followed that process until they reached the
22    conclusion that it was no longer proper to follow the
0085
 1    directions that they were receiving.
 2         Q    How long was State Street the directed
 3    trustee in that case?
 4         A    A while.
 5         Q    During the time it was -- it was part of the
 6    process that State Street review the price that the
 7    stock traded at?
 8         A    Yes.  It was part of their process.  They
 9    did that daily.
10         Q    And when State Street started its process,
11    what was Polaroid stock trading at?
12         A    I have no idea.
13         Q    What did it go down to before, at the time
14    it sold?
15         A    I don't recall.
16         Q    Were there allegations in the case that
17    there were inappropriate accounting treatments taking
18    place to the financial records of Polaroid?
19         A    I don't believe so.  I don't recall, but I
20    don't believe so.
21         Q    And was there analysis in the case -- do you
22    recall whether State Street made an analysis whether
0086
 1    Polaroid could continue operating as a going concern?
 2         A    Could you read the question back.
 3              (Whereupon, reporter reads requested
 4         material.)
 5              THE WITNESS:  I think in making their
 6         decision, as a directed trustee, to override the
 7         instructions they were receiving, I think at that
 8         point in time they determined that the company
 9         was probably not viable on a long-term basis, and
10         so if that meets your definition of the analysis
11         of an ongoing company, then yes.
12    BY MR. GOODMAN:
13         Q    Do you know whether State Street reached a
14    conclusion that, prior to the time it sold or at the
15    time it sold, that Polaroid was likely to -- was in
16    imminent collapse?
17         A    At the time Polaroid sold, my recollection
18    is the company had made an announcement that -- had
19    filed for bankruptcy and had made an announcement that
20    there was likely to be no residual value for equity
21    holders.
22         Q    What was the stock trading at at that point?
0087
 1         A    I don't recall.
 2         Q    Did it become almost worthless?
 3         A    I don't have any idea.
 4         Q    Was that a factor that you reviewed in
 5    considering whether State Street acted appropriately?
 6         A    Well, it seems to me that when I looked -- I
 7    looked at the point in time they made their decision,
```

8    so I think your question is asking what happened after
9    that, and I didn't follow up on that.
10        Q    No, no.  My question was:  At the time State
11   Street made its decision, what was the price of the
12   stock?
13        A    And I said I didn't know that.
14        Q    Okay.  Do you know how far the stock had
15   dropped from the time --
16        A    I don't have any recollection of that.
17   State Street monitored the price daily, and I mean at
18   the time that information was in the materials that I
19   reviewed, but I just don't -- I have no reason -- I
20   just don't recall what the price was, but their
21   process looked at it daily.
22        Q    Do you have an understanding as to the
0088
1    reason why State Street looked at the price daily?
2         A    They had a very detailed process that caused
3    them, when they were responsible for a company stock,
4    to look at the price daily.  They had a portfolio
5    manager assigned to the company.  When they decided
6    that it would go on a "watch list," which was their
7    term -- when it went on the watch list, the portfolio
8    manager would look at the stock daily, and certain
9    criteria were met as defined in the charter that they
10   had issued.  Then it would be escalated to the
11   fiduciary committee, so that was part of their
12   process.
13        Q    What purpose -- what was hoped to be
14   accomplished by monitoring the price daily?
15            MR. FLICKER:  Objection.
16   BY MR. GOODMAN:
17        Q    What was your understanding, reviewing the
18   process, as to what function monitoring the price
19   daily --
20        A    My recollection was that they looked at a
21   three-week average of the stock price to determine as
22   one benchmark in the process of deciding what should
0089
1    be on the watch list or escalated to the fiduciary
2    committee.  I'd have to go back and read the charters
3    to understand the detail of the process, but it was
4    part of their -- my recollection, once it was on the
5    watch list, they reviewed it that frequently.
6         Q    What did changes in the price indicate as
7    part of the review process?
8         A    Well, it was only one factor.  It was not
9    certainly -- that wasn't all they did.  They had a set
10   of criteria that they looked at to decide -- when a
11   company was on the watch list or to put it on the
12   watch list, I don't remember which, but they had a set
13   of criteria that they looked at, and that was just one
14   of them, and I was responding to your question about
15   what was the price, so that's --
16        Q    No, I understand that, and it was part of
17   the process, as I understand it, to monitor the daily
18   price of Polaroid stock; is that correct?

```
19          A    Correct, and they also monitored the other
20     factors about the company.  They looked at the news,
21     you know, any SEC filings.  I mean they had a daily
22     monitoring of the stock.
0090
 1          Q    I understand that, and apparently when you
 2     reviewed the process, you would have understood as to
 3     what reason they were monitoring the price; is that
 4     correct?
 5               MR. FLICKER:  Objection.  You're asking and
 6          framing the question in a way that may not have
 7          an answer.  You're assuming a fact that's not in
 8          evidence.
 9     BY MR. GOODMAN:
10          Q    Well, let me ask this question.  Do you have
11     an understanding as to the reason -- maybe I can ask
12     it this way.  Do you have an understanding as to the
13     reason why State Street, as part of its monitoring
14     process, believed it was useful to monitor the daily
15     stock price of Polaroid?
16               MR. FLICKER:  Objection.
17               THE WITNESS:  They were looking at all the
18          factors that affected Polaroid every day, and the
19          stock price was one of them which they looked at
20          in addition with news and other information.  I
21          assume they were looking at it to give them any
22          indication if the public perception -- i.e., the
0091
 1          market price -- had any fluctuation based on what
 2          was going on in the marketplace, because the
 3          analysts were following it and producing analyst
 4          reports.  They were reading those.  It was just
 5          one of the things they did.  If you were assigned
 6          to that account, you had certain things you did
 7          every day, and that was just one of them.  They
 8          did it for all of the people who were either
 9          going to be on the watch list or were on the
10          watch list.
11     BY MR. GOODMAN:
12          Q    Do you have an understanding of what
13     information State Street could glean by monitoring the
14     stock price on a daily basis?
15          A    It's one of the factors that indicates how
16     the public perceives the stock, because that's what
17     sets the market price.
18          Q    And is public perception therefore -- strike
19     that.  Now, going back --
20          A    Excuse me.  Perceives the company, not the
21     stock.
22          Q    I understand.  Now, in connection -- I think
0092
 1     you indicated that you believe that State Street had
 2     been -- for some time been the directed trustee for
 3     the Polaroid stock, for the Polaroid investment; is
 4     that correct?
 5          A    Yeah, I don't recall them just coming in and
 6     being -- I don't recall the time frame.
```

```
 7        Q    And I'm assuming that particularly even --
 8   at some point that you issued a Rebuttal Report; is
 9   that correct?
10        A    Correct.
11        Q    And I'm assuming that one of the issues that
12   you rebutted -- correct me if I'm mistaken about my
13   assumption -- is that there were points of time along
14   the line where plaintiffs' counsel in their expert
15   reports stated that State Street should have sold
16   earlier than the time that it did.  Am I correct?
17        A    I don't recall that being what their experts
18   opined about.  They had two experts.  One was an
19   attorney who had never, as I recollect, never served
20   as a fiduciary for an ERISA plan, and the other was an
21   investment manager actually just in the investment
22   business, not in the fiduciary business.  His name was
0093
 1   Cummins, and his biggest focus was the 13-step process
 2   in investment management.
 3             And he, in my opinion, was outlining or
 4   putting forth an investment management process that
 5   Fidelity or any other investment manager would use to
 6   manage a mutual fund or any diversified portfolio, and
 7   he was saying that State Street didn't follow that
 8   13-point process.  In my rebuttal I pointed out that
 9   State Street followed 12 of those 13 points, but it
10   was not a diversified portfolio, and they were not the
11   investment manager, and that was the gist of their
12   expert report.
13        Q    So you don't recall, as we sit here today,
14   responding at any point or making -- issuing an
15   opinion in response to an allegation that State Street
16   should have sold earlier; is that correct?
17        A    I don't recall that sitting here today,
18   no -- can you read the question back.  I want to make
19   sure I gave you the right answer.
20             (Whereupon, reporter reads requested
21        material.)
22             THE WITNESS:  I gave you the right answer.
0094
 1   BY MR. GOODMAN:
 2        Q    All right, and you thought that State Street
 3   sold at an appropriate time; is that correct?
 4        A    I thought they followed an appropriate
 5   process, and in their process they reached an
 6   appropriate conclusion at the appropriate time.
 7        Q    And at the appropriate time, as I
 8   understand, the stock had fallen to near -- had fallen
 9   quite a bit; is that correct?
10             MR. FLICKER:  Objection.
11             THE WITNESS:  I don't know what the price
12        was, so I can't say "quite a bit."
13   BY MR. GOODMAN:
14        Q    Let's go back a bit.  The stock was at a
15   very low value, publicly traded?
16             MR. FLICKER:  Objection.
17             THE WITNESS:  I just don't recall where the
```

```
18          stock was.  I don't remember the price.
19     BY MR. GOODMAN:
20          Q    It was also at the time that the company had
21     issued a statement it was going into bankruptcy and it
22     was likely that there would not be any residual value
0095
1      for equity holders?
2          A    That's my recollection.
3          Q    And that happened approximately at the same
4      time State Street sold the stock, correct?
5          A    That's my recollection.
6          Q    In connection with your work on that
7      Polaroid case, do you ever recall thinking that it may
8      have been appropriate to -- well, strike that
9      question.
10              I also understand that you reviewed
11     documents in connection with Northern Trust and Enron;
12     is that correct?
13         A    That's correct.
14         Q    Who retained you in that case?
15         A    Fulbright and Jaworski on behalf of Northern
16     Trust.
17         Q    What was Northern Trust -- well, let me go
18     back a step.  What were the allegations, if you
19     recall, in that matter?
20         A    I never even got close to reaching an
21     opinion, because they called and said it settled
22     before I really got into it.  They sent me a box of
0096
1      documents, and I really just never -- the big issue I
2      recall was the blackout period in the 401-K.  There
3      was a blackout period as Northern Trust turned over
4      the 401-K Wilmington trust, and some people thought it
5      was a non-opportune time, but that's, that's all I can
6      remember.
7          Q    In connection with going back to Polaroid
8      for a second --
9          A    Sure.  You're just trying to see how fast my
10     brain moves.
11         Q    No, we're going to take a snapshot and leave
12     it there.
13              MS. HEERMANS:  Right.
14              THE WITNESS:  You've been planning that one
15         for a long time?
16              MS. HEERMANS:  Yeah, he's been planning.
17              THE WITNESS:  He thought about it on the
18         plane and got excited.
19     BY MR. GOODMAN:
20         Q    Do you have an understanding as to the
21     reason, what caused Polaroid's financial difficulties
22     that ultimately resulted in the statement that
0097
1      Polaroid made at the time State Street sold the stock?
2          A    As I recollect, they just weren't making
3      enough money.
4          Q    In your professional capacity or at any
5      time, do you have any experience in valuing companies
```

```
 6    with significant contingent asbestos liabilities?
 7         A    No.
 8         Q    Have you ever valued a company that was in
 9    bankruptcy?
10         A    When I was at Crestar there was a department
11    that reported to me that valued companies.  I don't
12    know whether or not they ever valued a company in
13    bankruptcy.
14         Q    Do you have any specific training in
15    connection with the valuation of companies?
16         A    No.
17         Q    Have you ever valued a company on your own?
18         A    You mean all the financial analysis and
19    stuff?
20         Q    Well, let me put it this way:  Have you ever
21    oversaw someone who valued a company?
22         A    As I said, at Crestar there was a department
0098
 1    of people who valued companies for fees, and they
 2    reported to me.
 3         Q    Did you ever critique their work?
 4         A    I perhaps critiqued maybe the way they dealt
 5    with customers or something like that at some time,
 6    but not the details of their valuation.
 7         Q    You didn't interject yourself into the
 8    valuation process?
 9         A    No.
10         Q    Have you ever been asked to make an
11    investment decision concerning a company in
12    bankruptcy?
13         A    I don't recall.  I may have or may not have.
14    I just don't recall.
15              (Exhibits 1 and 2 was marked for
16              identification and attached to the deposition
17              transcript.)
18    BY MR. GOODMAN:
19         Q    Mr. Hogan, the court reporter has been kind
20    enough to hand you what she has marked as Exhibit
21    Number 1 and also to hand you what she has marked as
22    Hogan Exhibit Number 2.  Could you identify what
0099
 1    Exhibit Number 1, please.
 2         A    Exhibit Number 1 appears to be the report
 3    that I issued in this case.
 4         Q    And what does Exhibit Number 2 appear to be?
 5         A    It appears to be the supplemental report I
 6    issued in this case.
 7         Q    Or the rebuttal report?
 8         A    Or the rebuttal report.
 9         Q    As you said, "supplemental," so your phrase,
10    of course, is better than mine.
11              Who first approached you on behalf of the
12    defendants?
13         A    Mr. Flicker.
14         Q    And when did that happen?
15         A    Sometime towards the end of April of this
16    year.
```

```
20          doing their analysis, considering all the facts
21          and circumstances, they determined it was more
22          likely than not that they would receive more now
0142
 1          than they would at a later date.
 2     BY MR. GOODMAN:
 3          Q    And based on your understanding of ERISA and
 4     its fiduciary responsibilities, is that a sufficient
 5     basis to justify the sale of company stock, company
 6     stock fund?
 7               MR. FLICKER:  Objection.  It assumes that
 8          that statement was the sufficient basis to
 9          justify the sale, which was a fact not in
10          evidence.
11               THE WITNESS:  In my opinion, that was one of
12          the things they considered in reaching their
13          conclusion that it was not prudent to hold the
14          stock.
15     BY MR. GOODMAN:
16          Q    Would that fact -- that is, more likely than
17     not -- and I want to make sure I get the fact correct,
18     so if I'm wrong -- is it more likely than not that
19     they could receive more for the shares now than they
20     might be able to in the future?  Did I state that
21     correctly?
22          A    That sounded right.
0143
 1          Q    Was that fact in and of itself a sufficient
 2     basis for a fiduciary to sell stock from a company
 3     stock fund?
 4               MR. FLICKER:  Objection; incomplete
 5          hypothetical.
 6               THE WITNESS:  There were a lot of other
 7          facts and circumstances that had to be
 8          considered.
 9     BY MR. GOODMAN:
10          Q    I understand that.  Would that fact by
11     itself -- based on your review and understanding of
12     ERISA as an expert -- is that fact sufficient in and
13     of itself to justify this elimination of a company
14     stock fund from a 401-K plan?
15          A    I don't know how -- the determination was
16     prudence, and in prudence -- I don't know how you
17     could limit prudence to only considering the one part
18     of it.  You have to consider everything to decide
19     whether it's prudent or not.  It would be unprudent to
20     not consider all the facts and circumstances when
21     you're doing it, so what you're asking is for an
22     imprudent determination of a prudence determination.
0144
 1          Q    I think were you suggesting then if that
 2     was -- what else is your -- I'm going to go through
 3     these step by step.  I understand that there's a whole
 4     process, but what factors as a result of that process
 5     do you believe supports State Street's conclusion that
 6     retention of the company stock fund was inconsistent
 7     with ERISA?
```

7    and April of 2004, are you aware of any evidence that
8    Grace was on the verge of an impending collapse?
9            MR. FLICKER:  Objection.
10           THE WITNESS:  Evidence that they were on the
11       verge of an impending collapse?  Are you asking
12       my opinion of how I would have viewed it then or
13       my opinion of how the marketplace viewed it then?
14       I'm not -- can you help me with that.
15   BY MR. GOODMAN:
16       Q    Well, you are an experienced banker.  What I
17   want you to tell me -- and someone with fiduciary
18   experience.
19       A    Right.
20       Q    I want you to be able to tell me, on
21   whatever basis there is, whether you found evidence in
22   the record of things that you reviewed, that there was
0150
1    evidence during that time period that Grace was on the
2    verge of an impending collapse.
3        A    And "verge of an impending collapse" means?
4        Q    Well, however people in your field review
5    it.
6            MR. FLICKER:  Hold on.  Objection.  Since
7        there really isn't a term of art there in the
8        field, I'll object to that as vague.
9            THE WITNESS:  We never talked about things
10       being on the verge of collapse, so . . .
11   BY MR. GOODMAN:
12       Q    Let me ask it this way:  Was there any
13   evidence that -- was there any evidence that within a
14   six-month period Grace was going to be unable to
15   continue to function as a going concern?
16       A    Well, at the time Grace was in bankruptcy.
17   There were significant uncertainty around contingent
18   liabilities.  Things could have happened in a day, a
19   week, a month, a year, two years or never, so I'm not
20   sure I know how to answer your question.
21       Q    Did you have an understanding as to when
22   Grace was going to come out of bankruptcy?
0151
1        A    No.  At the time frame you've asked about, I
2    don't even believe they filed their Plan of
3    Reorganization.
4        Q    As a banker, if you had evidence that a
5    company was unlikely to be able to continue to operate
6    as a going concern, would you continue to provide a
7    line of credit to that company?
8            MR. FLICKER:  Objection; hypothetical,
9        incomplete.
10           THE WITNESS:  I've never been that kind of
11       banker.  I'm on the investment management
12       fiduciary side, so I've never looked at credit to
13       provide loans.
14   BY MR. GOODMAN:
15       Q    Did you have an understanding as to the
16   amount of line of credit that Grace had available to
17   it?

18          A    My recollection is that they had -- the
19    number I recall was a $250 million line from Bank of
20    America.
21          Q    Is that your understanding?
22          A    That's what I recall from somewhere.
0152
1          Q    Does that indicate to you, having some
2    knowledge of banking, that Bank of America had some
3    belief that Grace was going to continue to be able to
4    operate?
5               MR. FLICKER:  Objection.
6               THE WITNESS:  My 28 years of banking would
7          say that banks make lots of loans, and lots of
8          them don't get paid back, especially in my
9          experience in Texas where a couple of industries
10         had problems and loans didn't get paid back, but
11         certainly anytime that a bank makes a loan or
12         extends a line of credit, they believe they're
13         going to get paid back, but there is no
14         certainty, just because they make a line of
15         credit and make a loan, that they will get paid
16         back.
17    BY MR. GOODMAN:
18         Q    Did you have any contact -- I think you said
19    at one point one of the banks you were involved with
20    ended up being affiliated with Bank of America; is
21    that correct?
22         A    The First Republic, when the Feds shut it
0153
1    down, was bought by NCNB Texas, which was part of
2    NCNB, which became Nations Bank which became Bank of
3    America.
4         Q    Do you have any familiarity with working at
5    Bank of America at any time?  Not directly for Bank of
6    America, but did you have any contact with Bank of
7    America?
8         A    Other than the fact that I worked for
9    their -- Bank of America by the name, I worked for
10    their predecessor bank for three months after the Feds
11    shut it down and it was bought by NCNB Texas, and I'm
12    a member of their pension plan.
13         Q    Have you ever sat on any loan committees?
14         A    No.
15         Q    Did you review any documents in connection
16    with the Bank of America loan with W.R. Grace in
17    connection with this litigation?
18         A    That was not within the scope of what I was
19    looking at, no.
20         Q    When State Street decided to sell the stock,
21    are you aware of any evidence as to when State Street
22    may have believed the bankruptcy proceedings would
0154
1    terminate?
2               THE WITNESS:  Could you repeat that back,
3          please.
4               (Whereupon, reporter reads requested
5          material.)

```
 6              THE WITNESS:  I don't recall anything that
 7         indicated that there was any belief of when the
 8         bankruptcy -- states any belief as to when the
 9         bankruptcy would terminate.  The plan of
10         organization hadn't been filed.  It seemed that
11         there was a long way to go, and I guess we're
12         still going or they're still going.
13    BY MR. GOODMAN:
14         Q     Turn to Paragraph 33.
15         A     In my report?
16         Q     Yes.
17         A     Okay.
18         Q     When you discussed Kelly Driscoll and her
19    experience and background, are you doing this based on
20    having met her in the past?
21         A     This -- I have had two phone conversations
22    with her, but this was information I believe that came
0155
 1    from her deposition and from the presentation that was
 2    made to W.R. Grace in April of 2003.
 3         Q     When have you spoken to Kelly Driscoll?
 4         A     I spoke with her yesterday and sometime
 5    prior to that, a month ago, maybe.  It was probably
 6    around June the 15th.
 7         Q     What did you discuss with her yesterday?
 8         A     I didn't discuss anything with her.
 9    Mr. Flicker just I think talked about the depositions
10    that were taken last week, the expert depositions and
11    any comment she had about that.
12         Q     What about June 15th?
13         A     We talked a little bit about their
14    processes, you know, to make sure I understood some of
15    their processes and thoughts, and basically my
16    recollection of, when I walked away from that
17    conversation, was the reinforcement that everything
18    they did, they did on the best interest of the plan
19    participants, and that was it.
20         Q     Now, you had contact with State Street in
21    the past in connection with the Polaroid litigation;
22    is that correct?
0156
 1         A     I never had any contact with State Street,
 2    no.
 3         Q     Who were the people at State Street that
 4    were involved with Polaroid?
 5         A     I think a woman named Denise Sisk was
 6    involved.  I'd have to go back and look at my report.
 7         Q     Were any of the individuals involved in
 8    Polaroid individuals that had involvement with Grace?
 9         A     I don't believe so.  The subsidiary at that
10    time of State Street that was involved with Polaroid
11    was the City Street subsidiary.
12         Q     Now, you indicated in Paragraph 33 -- not
13    indicate -- you actually said that Ms. Driscoll has
14    written a chapter for a book published by the National
15    Center for Employee Ownership.  Do you see that?
16         A     I do.
```

```
17      Q     Have you read that book?
18      A     I have not.
19      Q     Have you read the chapter?
20      A     I have not.
21      Q     Have you ever -- do you know what the
22  subject matter of that chapter was?
0157
1       A     Steps for fiduciaries to consider when they
2   have responsibility for company stock investments.
3       Q     Okay, and that's based on her deposition
4   testimony; is that correct?
5       A     That's correct.
6       Q     Do you have any involvement with the
7   National Center for Employee Ownership?
8       A     I do not.
9       Q     Do you know what it is?
10      A     I've visited their website and I've done
11  some surfing around there, but other than that, no.
12      Q     Did you do that prior to the engagement in
13  this case?
14      A     I had been on that website before, yes.
15      Q     When?
16      A     I don't recall.  Just kind of surfing
17  around.
18      Q     Do you know anybody who is involved with the
19  National Center for Employee Ownership?
20      A     I don't know if I do or not.  I mean no name
21  comes to mind, but I don't know everybody that's
22  involved with it, so I couldn't compare it against my
0158
1   list, so . . .
2       Q     So you're unaware of whether the steps
3   outlined in Ms. Driscoll's chapter were actually
4   followed by State Street in this case; is that
5   correct?
6       A     That's correct.
7       Q     Do you know when she wrote that book or that
8   chapter?
9       A     I do not.
10      Q     Do you know with whom she wrote that book,
11  if anyone, that chapter?
12      A     I do not.
13      Q     Prior to your engagement in this case, had
14  you ever heard of Ms. Driscoll before?
15      A     I have not, that I recall.
16      Q     In Paragraph 38 you described in some detail
17  your understanding as to the process that State Street
18  followed; is that correct?
19      A     This is the process they outlined that they
20  would be following in the presentation on
21  April 23rd to W.R. Grace to the investment benefits
22  committee.
0159
1       Q     What was your understanding as to Item III
2   under "Due Diligence" regarding "review plan
3   documents"?  What was the purpose of reading the plan
4   documents?
```

```
 5        A    I think if you're going to be a fiduciary,
 6   you need to read the plan documents to understand the
 7   context in which you are serving.
 8        Q    How about Item V; what kind of participant
 9   activity is State Street referring to, if you know,
10   under Item V, saying "review participant activity post
11   petition"?
12        A    I think that's the activity in the plan
13   since the bankruptcy was filed, but I mean I, I have
14   what it says there, so, you know, I don't -- that's my
15   interpretation of that.
16        Q    Do you have an understanding as to the
17   reason why it would be necessary to review participant
18   activity post petition?
19        MR. FLICKER:   Objection.
20        THE WITNESS:   I think you want to always
21     look at what the participants have been doing to
22     get a feel for what's going on in the plan and
0160
 1     what's been going on in the plan, what
 2     redemptions, what investments, those kinds of
 3     things, so I don't think that's anything out of
 4     the ordinary.
 5   BY MR. GOODMAN:
 6        Q    What would be the reason you would want to
 7   get a feel for what the participants are doing?
 8        A    I think you would want to see how many
 9   people have invested in the company.  Since they are
10   responsible for the company stock fund, you would want
11   to see monies that had gone into the company stock
12   fund and monies that had gone out.
13        Q    And what would that show a fiduciary?
14        A    It would just show monies that went into the
15   stock fund and monies that came out.
16        Q    And how would that help the fiduciary
17   perform his or her job?
18        A    It's just another fact and another piece of
19   information that you would just put in your hopper as
20   a fiduciary for whatever purpose you might need it
21   for.
22        Q    Now, under "B" there's an "Analysis"
0161
 1   section.  Do you see that?
 2        A    I do.
 3        Q    It's talking about valuation issues and
 4   restructuring plan impact and all those sort of
 5   things, correct?
 6        A    Correct.
 7        Q    Now, just receiving information regarding --
 8   and part of the process I understood that State Street
 9   used in connection with this process was the hiring of
10   outside consultants; is that correct?
11        A    Yes, that's right.
12        Q    And advice and information received from
13   outside consultants is helpful to -- I'm assuming in
14   this case it was supposedly helpful to State Street
15   performing its function; is that correct?
```

```
 9    likelihood of that bill getting through the Congress
10    in any form that looked like that one would not be
11    great, but it hadn't been entered in -- at the time
12    the bill had not come up in, had not been introduced
13    in 2004, so you didn't know -- wouldn't know what the
14    terms would be, so it's hard to answer your question.
15        Q    Exactly, and you couldn't answer it now,
16    necessarily, based on that information, and you
17    couldn't answer it back in 2004; is that correct?
18        A    Correct.
19        Q    Looking at the Duff & Phelps report if you
20    need to in connection with this, do you know whether
21    Duff & Phelps ever made a finding in its report that
22    Grace stock was actually experiencing precipitous
0197
 1    decline?
 2        A    I'll be glad to look through the report if
 3    you'd like me to.
 4             MR. FLICKER:  My objection will be that the
 5    report speaks for itself.
 6    BY MR. GOODMAN:
 7        Q    Please turn to Page 42 if you would?
 8        A    Okay.  That would be helpful.
 9             I'm on Page 42, and your question is what?
10        Q    Let's take a look at this.
11        A    Okay.
12        Q    As of July 19, 2004, the year-to-date Grace
13    stock had increased, based on this -- I'm looking at
14    the last line.
15        A    You meant March 19.  You said "July 19."
16        Q    Yes.
17        A    That's okay.  I just want to make sure we're
18    on the same page.
19        Q    Grace stock from year to date was up
20    3.9 percent.  Do you see that?
21        A    I do.
22        Q    Then it had a one-month change of
0198
 1    21.5 percent, a three-month change of six percent, and
 2    a one-year change of 24 percent.  Do you see that?
 3        A    I do.
 4        Q    Since the day before bankruptcy filing, it's
 5    gone up 16.1 percent; is that correct?
 6        A    That's what the number says.
 7        Q    And of course, there was -- prior to that
 8    there was almost an 80 percent decrease in the 12
 9    months prior to the bankruptcy filing.  Do you see
10    that?
11        A    Correct.  Change since 12 months prior to
12    the bankruptcy filing.
13        Q    That's correct, but during the approximate
14    three years it had been in bankruptcy, this stock had
15    actually gone up 16.1 percent; is that correct?
16        A    That's what the number showed.
17        Q    Is there any evidence that you saw where
18    Duff & Phelps made the conclusion, or you can infer
19    from the Duff & Phelps report, as a reasonable
```

```
20    fiduciary reviewing the report, that Grace was in
21    imminent collapse, meaning not able to continue to
22    operate?
0199
 1          A    Well, first thing I would note on the chart
 2    that you just referred to on Page 42 is the one-month
 3    change where Grace's stock from February 19 to
 4    March 19 dropped 21 percent, which was in excess of
 5    everybody else in comparison, but your question
 6    relates to the whole report, so may I review the whole
 7    report?
 8          Q    Absolutely.
 9          A    Can you read the question back.
10                (Whereupon, reporter reads requested
11    material.)
12                THE WITNESS:  I think to answer that I'll
13    have to kind of define "imminent collapse,"
14    because "imminent collapse" to you could mean
15    something different than it does to me.
16    BY MR. GOODMAN:
17          Q    What does it mean to you?
18          A    Imminent collapse?
19          Q    Yes.
20          A    Next 30 days those puppies are out of here.
21          Q    Okay.  Let's use that definition.
22          A    Okay.  Well, I probably ought to say
0200
 1    "companies" instead of "puppies."
 2          Q    I understand.
 3          A    I don't recall anything that showed that
 4    there was -- that that would happen.  However, any
 5    determination that was made in the asbestos liability
 6    litigation could have caused that to happen.
 7          Q    Any of the asbestos litigation property
 8    damage?
 9          A    No.  Any of the bodily injury could have.  I
10    suppose property damage could have, because we don't
11    know what it was going to come out.  It was a
12    contingent liability.  It was unknown.  Even though
13    estimates by everybody might have said it was okay, I
14    mean I have no way of knowing.  So your question is
15    imminent collapse, and the answer is:  In any one day
16    you could have gotten up and imminent collapse could
17    have been right there on your doorstep.
18          Q    Could have been, but there wasn't any
19    evidence that at that time, that during that time
20    period that State Street was serving as investment
21    manager for the Grace stock fund, there was evidence
22    that within the next 30 days Grace would have to stop
0201
 1    its operating procedure?
 2          A    I don't know that anybody -- I mean I didn't
 3    see anything where anybody said, oops, let's look and
 4    see if it's in danger of imminent collapse.  I think
 5    what State Street was looking at is whether or not it
 6    was a prudent investment under ERISA, which involved
 7    all facts and circumstances.  So I don't think
```

8    imminent collapse was anything that anybody was
9    looking at.
10        Q    Okay.  Let's talk about D.E. Shaw.  Do you
11   know who D.E. Shaw is?
12        A    I believe -- I don't know who Mr. Shaw is.
13   I think there is a D.E. Shaw hedge fund.
14        Q    That's what I'm referring to, the D.E. Shaw --
15   that's referenced in this case.
16        A    I understand there is a D.E. Shaw hedge
17   fund.
18        Q    And prior to this litigation, had you ever
19   heard of D.E. Shaw before?
20        A    You know, I've gone back and tried to
21   remember if I did or not.  When I first heard the D.E.
22   Shaw hedge fund, it sounded familiar, but it may have
0202
1    been just hearing about those firms in the investment
2    business, so -- and if I had heard about it, it would
3    have just been a hearing that something existed by
4    that name.
5         Q    Have you ever worked with, had any contact
6    with hedge funds?
7         A    Have I ever worked with -- in my
8    professional --
9         Q    Professional or personal.
10        A    I currently have an investment in a hedge
11   fund.
12        Q    Professionally?
13        A    Not that I can recall.
14        Q    When did you make your investment in the
15   hedge fund?
16        A    About 18 months ago.
17        Q    What's your understanding of what a hedge
18   fund is?
19        A    Well, the one I'm invested in is a
20   long/short fund, and what they do is they buy equity
21   securities and then they also short equity securities.
22        Q    Do I understand -- well, is D.E. Shaw a
0203
1    hedge fund, to the best of your knowledge?
2         A    The documents I've reviewed represent that
3    it is.  I have no personal knowledge.  By the way, you
4    asked about my -- back to your first question, when I
5    mentioned earlier that we had sessions with the Trust
6    Management Association, we did have presenters on
7    hedge funds back in the late '90s, so just in dealing
8    professionally with hedge funds.
9         Q    And generally what is a hedge fund?
10        A    It's a fund that, in my mind, that takes a
11   very specific investment goal to try outperform
12   certain market indices, taking a fairly high amount of
13   risk in doing so.
14        Q    Are they generally sophisticated investors?
15             MR. FLICKER:  Objection.
16             THE WITNESS:  My understanding is they're
17        supposed to be sophisticated investors.
18   BY MR. GOODMAN:

```
19        Q    Do hedge funds have any requirements, if you
20   know, regarding filings with Securities and Exchange
21   Commission?
22        A    I'm not -- that's beyond the scope of my
0204
1    knowledge.
2        Q    Are there any qualifications that someone
3    has to have to manage a hedge fund, if you know?
4        A    I have no knowledge.
5        Q    Do you have any knowledge of whether D.E.
6    Shaw had any involvement in connection with the Fair
7    Act legislation?
8        A    I, I have no knowledge.
9        Q    Do you know whether D.E. Shaw had engaged
10   any lobbyists to help it in connection with
11   investments in companies that have asbestos liability?
12        A    I have no knowledge.  That's beyond the
13   scope of what I was looking at.
14        Q    Do you have an understanding as to why D.E.
15   Shaw was interested in purchasing Grace stocks, Grace
16   stock funds entire holdings and Grace common stock?
17        A    I would have no way of knowing what D.E.
18   Shaw was interested in.
19        Q    Do you have any understanding as to what
20   State Street may have thought?
21        A    My recollection is State Street discussed
22   why D.E. Shaw might be interested.  They called Bob
0205
1    Tarola and asked him if there was anything new going
2    on that they might not know about that was public
3    information at that point in time.  I think Shawn
4    Johnson, you know, came up with an idea that it might
5    be because they had a big short position, but I don't
6    think anybody knew exactly why D.E. Shaw wanted --
7        Q    Do you know why it's possible people asked
8    the question at that time in 2004, could State Street
9    have determined what the outstanding short position
10   was in Grace common stock?
11        A    I don't know.
12        Q    Do you think -- if it was possible, do you
13   think it would have been prudent or wise on the part
14   of State Street to determine what the outstanding
15   short position was in D.E. Shaw stock?
16        A    You mean in Grace stock?
17        Q    I mean Grace stock.
18             MR. FLICKER:  Objection.
19             THE WITNESS:  I don't know if they could
20        have determined it, I don't know what they
21        thought why it was relevant.  I don't know if it
22        was a critical determination in their decision
0206
1        about prudence.
2    BY MR. GOODMAN:
3        Q    Do you have an understanding of what would
4    have happened to the price of Grace stock on the
5    market if D.E. Shaw had to cover a short position of
6    six million shares?
```

```
 5            the withdrawal.
 6     BY MR. GOODMAN:
 7            Q      They had the technical ability, based on the
 8     plan documents, to --
 9            A      The plan permitted it.
10            Q      And is there a certainty that the stock
11     would be worth substantially less than the current
12     market price at the end of the --
13            A      There were a lot of -- pretty much
14     everything was uncertain at that point in time.
15            Q      So were there any certainties?
16            A      Well, I'm sure there were, but I mean . . .
17            Q      Could you repeat that answer.
18            A      I'm sure there were some certainties.
19            Q      What were the certainties?
20            MR. FLICKER:  Death and taxes, so far, on my
21     list.  Anything else?
22     BY MR. GOODMAN:
0217
 1            Q      Anything that --
 2            A      Nothing that necessarily is relevant to what
 3     we're talking about today.  Sorry.  I got a little
 4     carried away and got in trouble.
 5            MS. HEERMANS:  It's late in the day.
 6     BY MR. GOODMAN:
 7            Q      Do you agree with the following statement,
 8     that "Grace, during reasonable intervals, should have
 9     reviewed State Street to ensure that State Street's
10     performance was consistent with the terms of the plan
11     and ERISA and satisfied the needs of the plan"?
12            A      It's a long question.  Can you read it back
13     or have her read it back.
14            MR. GOODMAN:  Let's let her read it back.
15            (Whereupon, reporter reads requested
16         material.)
17            THE WITNESS:  I think Grace had an
18         obligation to monitor State Street's performance
19         as a fiduciary.
20     BY MR. GOODMAN:
21            Q      And do you agree with that sentence that I
22     just read to you?
0218
 1            A      I believe I do, yeah.  By the way, I think
 2     they did.
 3            Q      Your report speaks for itself in that
 4     regard.
 5            A      Right.
 6            Q      Are you aware of any evidence that Grace
 7     made any inquiry as to the reason that State Street
 8     concluded that retention of the Grace stock fund was
 9     inconsistent with ERISA?
10            A      ·I'm going to have her read it back if you
11     don't mind.  These long questions, you know, you're
12     reading them.  I've got to come up with an answer.
13            (Whereupon, reporter reads requested
14         material.)
15            THE WITNESS:  I think that Grace, from their
```

```
  4        Q    Can you give me an example of an
  5   extraordinary circumstance that you can envision.
  6        A    Market price is three dollars a share, and
  7   they're saying we're going to start selling the stock
  8   at 25 cents.
  9        Q    Okay.  Under those circumstances, what
 10   should a plan fiduciary do?
 11        A    They probably ought to ask:  Why are you
 12   selling it for 25 cents?  What do you know that we
 13   don't know?
 14        Q    And then let's assume that the investment or
 15   plan fiduciary says "you're nuts" and disagrees
 16   with -- that they know anything that they don't know,
 17   what should the plan fiduciary do?
 18        A    Gee, let's see.
 19             MR. FLICKER:  Let me just object that it's
 20        an incomplete hypothetical, but I think it's okay
 21        to pursue the line.
 22             THE WITNESS:  In the instant case, you know,
0222
  1        the investments and benefit committee didn't have
  2        any continuing investment managing responsibility
  3        when they hired State Street.  The plan document
  4        says that.
  5             You look puzzled.
  6   BY MR. GOODMAN:
  7        Q    No, I understand exactly what you're saying.
  8   Section twelve point whatever it is.
  9        A    Let's say in your hypothetical that a
 10   fiduciary -- that an investment manager were going to
 11   go ahead and sell it for 25 cents, and the plan
 12   fiduciary said "you're nuts," then I think they head
 13   for the courthouse and get a injunction.
 14        Q    In other words, take some action to try to
 15   take the authority away from the investment manager;
 16   is that correct?
 17        A    In extraordinary circumstances, sure.  They
 18   have to protect the plan participants.
 19        Q    Why don't you go to Exhibit Number 2, which
 20   is your rebuttal.
 21        A    Okay.
 22        Q    When did you prepare this rebuttal?
0223
  1        A    Between June 15 and June 27.
  2        Q    And how many hours, if you know, did you
  3   spend preparing this?
  4        A    I'd have to go back and check my notes.  I'm
  5   sorry.
  6        Q    That's fine.  I'm not asking you to create
  7   from memory, go through the whole process --
  8        A    I gave you the number of hours that included
  9   this.
 10        Q    I understand.  You told me what you billed
 11   to date and all that sort of thing.
 12        A    So that included this.
 13        Q    I assumed that was the case.
 14             Let's go to -- we already discussed
```

```
13              So as one of the ways of explaining the
14      benefits to a plan participant of an investment
15      manager, I think you agreed that there was some
16      representations or references or comments made to plan
17      participants that this could be an added benefit to
18      them of having an investment -- of having whoever
19      serves as investment manager applying for a position
20      on that committee?
21              MR. FLICKER:  Objection.
22              THE WITNESS:  I think you've gone further,
0234
1           because you're now saying it's a benefit.  As I
2           said earlier, everybody on the equity committee
3           had the same obligation to all the shareholders,
4           and anybody on the equity committee -- let me say
5           that differently.  If someone from the plan had
6           been on the equity committee, their
7           responsibility is to all shareholders.  And if
8           they weren't on the equity committee, all members
9           of the equity committee had the same
10          all-shareholder responsibility to the members of
11          the plan.  So when you put the benefit words in
12          there, I don't remember that Grace said here's a
13          benefit of appointing an independent investment
14          manager.  I just don't remember the --
15      BY MR. GOODMAN:
16          Q    Fine, but you would agree that having your
17      own representative on the equity committee could be a
18      benefit?
19              MR. FLICKER:  Objection; hypothetical.
20              THE WITNESS:  I -- if you -- not
21          necessarily.
22      BY MR. GOODMAN:
0235
1           Q    Strike that question.
2           A    I won't agree with that.
3           Q    You just won't agree with that.  That is
4       fine, but let me ask another question.  Have you ever
5       served on any committees in connection with
6       bankruptcy?
7           A    No.
8           Q    Have you ever authorized any people from the
9       bank ever to serve on equity committees?
10          A    Creditor committees, but not that I recall
11      equity committees.
12          Q    Okay, and why did you want someone to serve
13      on the creditor committee on behalf of the bank?
14          A    We were the primary creditor as the trustee
15      for the bondholders.  We had to represent the
16      bondholders' interests.
17          Q    And could another bondholder have
18      represented the interests just as well?
19          A    There may not have been any other -- we were
20      the trustee for the bondholders.  There may not have
21      been any other bond issues.
22          Q    You don't recall at this time?
0236
```

```
1         A    I don't recall.
2         Q    If there had been other bond -- well, I
3    don't want to get into these hypotheticals.
4         MR. FLICKER:  Hypothetical.
5    BY MR. GOODMAN:
6         Q    But now I'm going to.
7         MS. HEERMANS:  Oh, man.
8         MR. GOODMAN:  Give me a couple of minutes.
9         (Whereupon, a short recess was taken.)
10   BY MR. GOODMAN:
11        Q    Mr. Hogan, after an investment manager has
12   been appointed or named or designated, does a plan
13   fiduciary have the right to discharge that investment
14   manager?
15        A    Well, it depends on the terms of the plan.
16   If they had the right to hire them, they probably had
17   the right to fire them.  It depends on the terms of
18   the plan.
19        Q    There's nothing that indicates -- there's
20   nothing that requires a plan fiduciary to retain an
21   investment manager for infinity, is that correct, for
22   eternity?
0237
1         A    Nothing that I'm aware of that would require
2    that.
3         Q    And one of the considerations that a plan
4    fiduciary may look at -- and there may be a number of
5    considerations a plan fiduciary may consider when it
6    decides whether or not to discharge an investment
7    manager; is that correct?
8         A    That's correct, but back to your prior
9    question, again it depends on the terms of the plan.
10   You talked about infinity.  I guess if it's in the
11   plan, it's in the plan.  If it says there the
12   investment manager, they've got to do it until the
13   plan is changed or whatever the document --
14        Q    Well, let me go back a step, and I defer to
15   your experience.  The mere fact that the plan requires
16   a hiring of an investment manager doesn't necessarily
17   require the hiring of a specific investment manager;
18   is that correct?
19        A    Unless the plan were to say so.
20        Q    I understand that.  In your experience, do
21   plans typically identify a specific investment
22   manager?
0238
1         A    They might for fixed income funds, cash
2    funds, cash fixed income funds or company stock funds.
3    It doesn't matter who the investment manager is.
4         MR. GOODMAN:  All right.  I have no further
5    questions.
6         MR. FLICKER:  Neither do we.  Thank you.
7         (Signature having not been waived, the
8    deposition of THOMAS D. HOGAN was concluded at
9    3:50 p.m.)
10
11
```