# EXHIBIT P-1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE POLAROID ERISA LITIGATION | MASTER FILE: 03 CV 8335 (WHP) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## AMENDED CONSOLIDATED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA

### PREFATORY NOTES

- On or about October 12, 2001, Primary PDC, Inc. formerly known as Polaroid Corporation ("Polaroid" or the "Company") filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. As such, this action is stayed as to Primary PDC, Inc. ("Polaroid") unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs (as defined below) are not prosecuting this action vis-a-vis Polaroid.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Polaroid, Plaintiffs will notify the Court and will seek to name Polaroid as a defendant in this action.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiffs, which are partially based on personal knowledge. As of the date of this Amended Consolidated Complaint ("Complaint"), Plaintiffs have received only limited materials from Defendants in response to formal and informal discovery requests. As a result, it is likely that, once the discovery process begins in earnest, the roles of the additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiffs will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

- All exhibits referenced herein are attached to the Declaration of Joseph H. Meltzer filed herewith.

Plaintiffs Robert Correia ("Correia"), John Hudson ("Hudson"), Otis D. Powers

("Powers") and Bradford W. Pires ("Pires") (collectively "Plaintiffs"), participants in the

Polaroid Retirement Savings Plan (the "Plan"), on behalf of themselves and a class of all others

1

similarly situated, allege as follows:

## INTRODUCTION

1. This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries.

2. 401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio. Polaroid common stock is one of the investment alternatives in the Plan.

3. Plaintiffs are/were employees of Polaroid and participants in the Plan. Plaintiffs' retirement investment portfolio includes Polaroid stock.

4. Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to them and to other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Polaroid stock.

5. During the Class Period, Defendants knew or should have known that Polaroid stock was an imprudent investment alternative for the Plan, whether for individual or Company matching contributions.

6. Prior to the Company's downward spiral into bankruptcy, Polaroid common stock holdings represented the largest single investment of the Plan. Polaroid stock is now essentially worthless; thus, the Plan and concomitantly the Plan participants have suffered massive losses as a result of Defendants' fiduciary breaches.

7. Defendants are liable under ERISA to restore losses sustained by the Plan participants as a result of their breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331

and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

### Plaintiffs

10. Plaintiff Robert Correia ("Correia") worked for Polaroid and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7). Plaintiff Correia held Polaroid shares in his retirement investment portfolio during the relevant Class Period.

11. Plaintiff John Hudson ("Hudson") worked for Polaroid and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7). Plaintiff Hudson held Polaroid shares in his retirement investment portfolio during the relevant Class Period.

12. Plaintiff Otis D. Powers ("Powers") worked for Polaroid and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7). Plaintiff Powers held Polaroid shares in his retirement investment portfolio during the relevant Class Period.

13. Plaintiff Bradford W. Pires ("Pires") worked for Polaroid and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7). Plaintiff Pires held Polaroid shares in his retirement investment portfolio during the relevant Class Period.

14. Plaintiffs Correia, Hudson, Powers and Pires are hereafter collectively referred to as "Plaintiffs."

### Defendants

15. Polaroid Corporation ("Polaroid"), a Delaware corporation with its principle place of business at 784 Memorial Drive, Cambridge, Massachusetts 02139, was the leading instant imaging company in the world and was the only manufacturer of traditional chemical-based,

instant cameras and film in the United States.  During the first half of 2002, Polaroid changed its corporate name to Primary PDC, Inc. ("Primary PDC"), but retained its public image as Polaroid. Polaroid and Primary PDC are hereafter collectively referred to as "Polaroid."  As previously stated, Polaroid filed for bankruptcy protection on or about October 12, 2001.  Consequently, Plaintiffs are not currently prosecuting this action against Polaroid unless and until such time as relief from the bankruptcy stay is granted.

16. During the bankruptcy proceedings, Polaroid agreed to sell substantially all of its assets to OEP Imaging Corporation ("OEP Imaging"), a majority-owned subsidiary of One Equity Partners, LLC ("OEP").  After the sale, which was approved by the bankruptcy court on or about July 3, 2003, OEP owned 65% of the Company with Primary PDC owning the remaining 35% pending final distribution by the bankruptcy court.  On January 15, 2003 Primary PDC put forth a reorganization plan for Polaroid with Polaroid existing for the "limited purpose of distributing the assets of Debtors' [Polaroid's] estates to the various creditors of the Debtors."  See Form 8-K filed with the Securities and Exchange Commission ("SEC") on January 21, 2003.

**CEO Defendant**

17. Defendant Gary T. DiCamillo ("DiCamillo") served as Polaroid's Chairman of the Board of Directors and Chief Executive Officer ("CEO") during the Class Period.  Defendant DiCamillo stepped down from his position as CEO on July 1, 2002.  According to the Plan documents, DiCamillo was tasked with the appointment of the Plan Administrators and Fund Managers.[1]  These persons served at Defendant DiCamillo's leisure.  Defendant DiCamillo exercised these fiduciary responsibilities repeatedly during the Class Period.  DiCamillo was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority

---

[1]  The fiduciary powers of the CEO were transferred to the Company under the July 2002 amended and restated Plan.  Notably, this coincides with Defendant DiCamillo's resignation from his position as CEO of the Company.

4

with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. In addition, throughout the Class Period, Defendant DiCamillo made numerous statements to Plan participants regarding their retirement savings, including statements regarding the Company's stock. These statements, which were made in, among places, company bulletins and letters sent to all employees, were made in an ERISA fiduciary capacity because they contained information about the likely future of Plan benefits, in particular the value and prudence of the Plan's largest single investment, Polaroid stock; and, thus were acts of Plan administration. DiCamillo also exercised final decision-making authority regarding the Plan, which is further evidence of his status as a Plan Fiduciary.

18. Defendant DiCamillo is hereafter referred to as the "CEO Defendant."

**Plan Administrator Defendants**

19. According to the Plan documents, the Plan Administrator "shall be responsible for the administration and interpretation of the Plan." *See* 1997 Plan Documents §14.2. The Plan Administrator was comprised of one chairman and at least two other members. The Plan Administrator's duties included (i) the development of policies and procedures for the administration of the Plan, *id.* at §14.2(c), (ii) appointment of the Plan Manager, *id.* at §14.2(f), and (iii) notifying "the Trustee in writing of all actions the Plan Administrator desires of the Trustee…," *id.* at §14.2(h). The scope of the Plan Administrator's fiduciary duty thus encompassed discretionary authority and control over the plan as well as the Plan assets. Upon information and belief, the members of the Plan Administrator served from mid-year to mid-year. Hence, the 1999 Plan Administrators served from June/July 1999 to June/July 2000.

**2000 Plan Administrators**

20. Defendant Harvey Greenberg ("Greenberg") served as Plan Administrator for 2000. Defendant Greenberg was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan

5

and/or management and disposition of the Plan's assets.

21. Defendant Benjamin C. Byrd, III ("Byrd") was the Company's Tax Director for at least part of the Class Period.  In addition, Defendant Byrd served as Plan Administrator for 2000.  As is more fully explained below, Defendant Byrd also served as Fund Manager for 2001 and 2002.  Defendant Byrd was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22. Defendant John Jenkins ("Jenkins") served as Plan Administrator for 2000. Defendant Jenkins was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23. Defendant Carl L. Lueders ("Lueders") served as Polaroid's Vice President during the Class Period and as the Acting Chief Financial Officer at the beginning of 2001.  In addition, Defendant Lueders served as Plan Administrator for 2000. Defendant Lueders was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24. Defendant W. Kantrowitz ("Kantrowitz") served as Plan Administrator for 2000. Defendant Kantrowitz was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25. Defendant Janet B. Cramer ("Cramer") served as Plan Administrator for 2000 through 2002.  Defendant Cramer was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26. Defendant Deirdre J. Evans ("Evans") served as Plan Administrator for 2000 through 2002. Defendant Evans was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**2001 Plan Administrators**

27. Defendant Neal D. Goldman ("Goldman") served as Executive Vice President, General Counsel and Chief Administrative Officer ("CAO") for at least part of the Class Period. In addition, Defendant Goldman served as Plan Administrator for 2001 through 2002. Effective July 13, 2001, Defendant Goldman was appointed Chairman of the Plan Administrator. Defendant Goldman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Throughout the Class Period, Defendant Goldman made numerous statements to Plan participants regarding their retirement savings, including statements regarding the Company's stock.

28. Defendant Donald M. Halsted, III ("Halsted") served as Polaroid's Vice President and Controller during the Class Period. In addition, Defendant Halsted served as Plan Administrator for 2001 through 2002. Defendant Halsted was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

29. Defendant William R. Hubert ("Hubert"), in addition to serving as Plan Manager for a portion of the Class Period, served as Plan Administrator for 2001. Defendant Hubert was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

30. As previously stated, Defendants Cramer and Evans also served as Plan

Administrators for 2001.

**Fund Manager Defendants**

31. According to the Plan documents, the Fund Manager, consisting of one or more employees appointed by the CEO, is responsible for establishing the number of funds available under the Trust, *see* 1997 Plan Documents §10.2, and reviewing the Company's stock to ensure that it is appropriate investment for Company matches, *id.* The duties of the Fund Manager also include, *inter alia*, (i) the establishment of funding policy guidelines for the Plan and issuing such guidelines to the Trustees regarding investment alternatives available for the Trust, *id.* at §14.5(a), (ii) periodically reviewing the valuation of assets held by the Trust and the earnings of such investments, *id.* at §14.5(b), (iii) appointing, reviewing, and removing the Plan's investment managers, *id.* at §14.5(d). Consequently, the Fund Manager, and members thereof, was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, the members of the Fund Manager served from mid-year to mid-year. Hence, the 1999 Fund Managers served from June/July 1999 to June/July 2000.

**1999-2000 Fund Managers**

32. Defendant Judith G. Boynton ("Boynton") served as Polaroid's Executive Vice President and Chief Financial Officer from the beginning of the Class Period to January 2001. Moreover, effective April 5, 1999 through 2000, Defendant Boynton was the Chairman for the Fund Manager. Consequently, Defendant Boynton was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

33. Defendant Philip Ruddick ("Ruddick") served as the Fund Manager from April 5, 1999 through 2000. Defendant Ruddick was a fiduciary of the Plan within the meaning of

ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

34. Defendant Ralph Norwood ("Norwood") served as the Fund Manager from April 5, 1999 through 2000. Defendant Norwood was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**2001 Fund Managers**

35. Defendant William L. Flaherty ("Flaherty") served as Polaroid's Executive Vice President and Chief Financial Officer from June 2001 to the end of the Class Period. In addition, from July 13, 2001 through 2002, Defendant Flaherty served as the Chairman of the Fund Manager. Defendant Flaherty signed the Company's Form 11-K for fiscal year ending December 31, 2000 and filed with the SEC. Consequently, Defendant Flaherty was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

36. Defendant Patricia R. Weller ("Weller"), from July 13, 2001 through at least the end of 2001, served as the Fund Manager. Defendant Weller was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

37. Defendant Andra S. Bolotin ("Bolotin") served as Fund Manager for 2001 and 2002. Defendant Bolotin was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

38. Defendant Jeffrey S. Miller ("Miller") was the Company's Finance Director for at least part of the Class Period. In addition to being the Plan Manager for part of the Class Period,

Defendant Miller served as Fund Manager for 2001 and 2002. Defendant Miller was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

39. As previously stated, Defendant Byrd, in addition to serving as Plan Administrator for 2000, served as Fund Manager for 2001 and 2002. Consequently, with respect to his service as Fund Manager, Defendant Byrd was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

40. As stated in the Prefatory Notes, there are fiduciaries of the Plan whose identities are currently unknown to Plaintiffs and may include Polaroid, certain Polaroid employees, Plan trustees or sub-trustees. Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

41. For purposes of this Complaint, the CEO Defendant, Plan Administrator Defendants, and Fund Manager Defendants are referred to herein as "the Polaroid Defendants."

**Trustee Defendant**

42. Defendant State Street Bank and Trust Company ("State Street") was at all relevant times a Plan Trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), because State Street is named as a Sub-Trustee in the Polaroid Retirement Savings Plan Sub-Trust Agreement, dated December 1, 1997 ("State Street Trust Agreement"), with express authority and control over the assets of the ESOP, and on information and belief, the Company Stock Fund in the 401(k) portion of the Plan (attached hereto as Exhibit 5). Thus, at all relevant times, State Street was a fiduciary of the Plan within the meaning of ERISA, in that it exercised authority or control respecting management or disposition of the assets of the ESOP and the Company Stock Fund. Additional allegations regarding State Street's fiduciary status and functions are set forth in

10

Paragraphs 108-115, and 192-208 below.

## THE PLAN

43. The Polaroid Retirement Savings Plan is a "defined contribution plan," as defined by § 3(34) of ERISA. The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

44. The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action Plaintiffs, who are described above, seek relief that is "plan-wide."

45. The Plan, over the course of the Class Period (as defined herein), has been amended and restated at least three times. Consequently, there are at least three versions of the Plan for the relevant time period; the Plan effective December 1, 1997 (the "1997 Plan"); the Plan effective June 22, 2001 (the "2001 Plan"); the Plan effective January 1, 2002 (the "January 2002 Plan"). For purposes of this Complaint, Plaintiffs will treat the various versions of the Plan as one, simply noting where they diverge.

46. According to the 1997 Plan, the "purpose of the 401K Portion of the Plan is to enable Participants to defer income taxes and *save for retirement*." *See* 1997 Plan Documents, MB00096 (emphasis added).

47. According to the Company's Form 11-K filed with the Securities and Exchange Commission ("SEC") on June 29, 2001 for Fiscal Year 2000 (the "2000 11-K"), Polaroid is the Plan's Sponsor.

48. The Plan and Plan assets were managed and administered by high-level Polaroid officers and directors appointed by the Polaroid CEO who comprised the Plan Administrator and Fund Manger Defendants. As a consequence of the high-level positions of each of the persons

11

who served as Plan Administrators and Fund Managers, had access to and thus knowledge of the true state of affairs at Polaroid, and awareness of the serious and substantial problems that caused the Company's bankruptcy.

49. A separate account is established for each Plan participant at the time of enrollment in the Plan. The participant's contribution is credited in accordance with the directions given by the participant in one or more of a number of investment alternatives. Among the investment alternatives is the Polaroid Corporation Common Stock Fund ("Common Stock Fund" or "Company Stock Fund").

50. As of January 1, 1998, the Plan had four primary components. They were (i) the "Voluntary Contribution" portion; (ii) the 401(k) portion; (iii) the Employee Stock Ownership Plan ("ESOP") portion[2] and (iv) the 3% Savings Account portion of the Plan.

51. The ESOP account is separately maintained, with the assets being held in the "Polaroid ESOP Stock Fund."

52. According to the Company's 2000 Form 11-K, Plan participants may make elective pre-tax contributions of up to 14% of their pre-tax compensation through payroll deductions, up to a limit of $170,000.[3] Plan participants may also voluntarily elect to make after-tax contributions of up to 10% of their compensation through payroll deductions, up to a limit of $170,000.[4]

53. Also according to the Company's 2000 Form 11-K, the Plan's assets were held under

---

[2]  The ESOP portion of the Plan was originally a separate plan entitled the "Polaroid Stock Equity Plan" and became effective January 1, 1988. It was created to successfully fight a hostile takeover attempt by Shamrock Acquisitions, III, Inc. For a history of the Polaroid Stock Equity Plan, *see Herman v. Nationsbank Trust Co.*, 126 F.3d 1354 (11th Cir. 1997). The Stock Equity Plan was merged into the Plan effective December 1, 1997.

[3]  Upon information and belief, this portion of a participant's contribution was allocated to the 401K part of the Plan.

[4]  Upon information and belief, this portion of a Plan participant's contribution was allocated to the "Voluntary Account."

a master trust, with the Trustee being Boston Safe Deposit and Trust Company (now known as Mellon Trust of New England, N.A.). Fidelity Investments served as the sub-trustee of the Plan for the Plan's assets and State Street Bank served as sub-trustee of the shares of the Company's stock held in both the Polaroid ESOP Stock Fund and the Polaroid Common Stock Fund.

54. According to the "Trust Agreement for the Polaroid Profit Sharing Retirement Plan,"[5] the "Plan Administrator, Fund Manager, Trustee and Sub-Trustee(s) are 'Fiduciaries' under the Trust." *See* Trust Agreement for the Polaroid Profit Sharing Retirement Plan ("Trust Agreement") §3.02 (attached hereto as Exhibit 1). Upon information and belief, the fiduciaries for this trust were also "named fiduciaries" for the Plan.

55. The Plan's investment advisors, according to the Company's 2000 Form 11-K, were Fidelity Investments, Merganser Capital Management Corporation, and Mellon Bank, N.A.

**The Voluntary Account Portion of the Plan**

56. An Active Participant, at his/her election, was eligible to make contributions to his/her "Voluntary Account." *See* 1997 Plan Documents §3.1.

57. The "Voluntary Account" portion of the Plan permitted a Plan participant to make voluntary contributions, via payroll deductions, to their "Voluntary Account." *Id.* at §3.2. The amount allocated to the participant's "Voluntary Account shall equal the amount of Voluntary Contributions that the Participant elected to contribute..." *Id.* at §3.3

58. The rules governing "Voluntary Contributions" to a Plan participant's "Voluntary Account" were, according to the 1997 Plan, established and applied by the Plan Administrator. *Id.* at §3.1.

59. A Plan participant was always fully vested in his/her Voluntary Account. *Id.* at §3.4. These contributions were separate and apart from the participants' 401(k) contributions.

---

[5]    The Polaroid Profit Sharing Retirement Plan was amended and restated with the Polaroid Retirement Savings Plan, effective December 1, 1997.

60. Upon information and belief, the Polaroid Common Stock Fund was offered to Participants as an investment option for the Voluntary account Portion of the Plan.

**The 401(k) Portion of the Plan**

61. The 401(k) portion of the Plan, according to the 1997 Plan, is "intended to be a profit sharing plan with a qualified cash or deferred arrangement, within the meaning of Section 401(k) of the [Internal Revenue Service Code of 1986]." The 401(k) portion of the Plan permitted Active Participants to defer a portion of his/her total compensation into their 401(k) account. *See* 1997 Plan Document §4.1.

62. Active participants were able to elect to defer their compensation only through payroll deductions. *Id.* at §4.2(a).

63. Polaroid matched participant contributions in an amount equal to each participant's contribution.

64. "The amount allocated to a Participant's 401K Account shall equal the amount the Participant elected to defer during the period . . . which such 401K Contributions are made." *Id.* at §4.3.

65. A participant is always fully vested in his/her 401(k) account. *Id.* at §4.4.

66. Upon information and belief the Polaroid Common Stock Fund was offered to Participants as an investment option for the 401(k) Portion of the Plan.

**ESOP Portion of the Plan**

67. Beginning on January 1, 1998, the Company made a contribution equal to "5% of the Compensation earned by all Active Participants during the period...." *See* 1997 Plan Documents §5.3. These contributions were made "as soon as practicable following the second payday of each month..." *Id.* The funds were allocated "among the ESOP accounts of all Active Participants during such Allocation Period in the same proportion that the Ratio of his or her Compensation for the Allocation Period bears to the Compensation of all Active Participants of

such Allocation Period." *Id.* at §5.6.

68. The Company's ESOP contributions to the Plan were "made in cash or in treasury or authorized but unissued Common Stock." *See* 1997 Plan Documents §5.4. Cash contributed to the Plan were first used to satisfy any current obligations of the Trust and then used to acquire Company stock. *Id.* However, the Trustee "in its discretion, after satisfying Current Obligations, may hold such amounts in cash, consistent with its obligations as Trustee, as it deems advisable in accordance with the provisions of the trust agreement." *Id.*

69. According to the 1997 Plan, "[t]he ESOP Portion of the Plan shall be invested *primarily* in Employer Securities." *Id.* at §5.7(a). Because the Plan did not require the fiduciaries to invest ESOP contributions exclusively in Polaroid stock, and because the ESOP portion of the Plan also was designed to allow the Plan to hold cash, the fiduciaries possessed significant discretion regarding how to invest ESOP contributions.

70. According to the 2001 Plan, "[e]ffective January 1, 2001, forty percent (40%) of each ESOP Contribution made for an active Participant...shall be immediately subject to the diversification provisions of subsection (c)..."[6] *See* 2001 Plan Documents §5.8(a). The diversification provision permitted Plan participants to direct the Trustee to transfer any or all of the ESOP eligible for diversification to any other fund available under the Plan. *Id.* at §5.8(c).. This has two pertinent consequences. First it establishes that the ESOP portion of the Plan was designed to allow investments *other than* Polaroid stock. Second, it establishes that 60% of the ESOP contributions were restricted, and participants exercised no control over the investment of this portion of the ESOP portion of the Plan

71. As was disclosed to Plan participants via a Company bulletin, effective January 2001, the Company's 5% common stock contribution, which previously went to the ESOP, was now

---

[6] Previously, Plan participants with at least 10 years of membership in the Plan and who were over the age of 55 were able to direct the Trustee to diversify up to 25% of their ESOP account. *See* 1997 Plan Document §5.1 (sic), MB00111.

divided into a 3% contribution to the ESOP and a 2% contribution to Common Stock Fund.  It was this 2% contribution which could be immediately transferred (up to 500 shares of Company stock per day) to any one of the other investment options available under the Plan.

72. Again demonstrating that the ESOP portion of the Plan was designed to allow investments other than Polaroid stock, the Company claimed that "[n]otwithstanding any such diversification, the diversified investments shall remain a part of the ESOP Portion of the Plan." *See* 2001 Plan Documents §5.8(c).

73. The ESOP portion of the Plan was terminated with the implementation of the January 2002 Plan. *See* January 2002 Plan Documents, PRD0006.  The assets of the ESOP portion of the Plan were transferred to other accounts in the Plan.[7]  *Id.*

**3% Savings Account Portion of the Plan**

74. Beginning January 1, 1998, the Company made a "3% Savings Contribution" each month "in an amount equal to 3% of Compensation earned by all Active Participants during such Allocation Period." *See* 1997 Plan Documents §6.3.

75. Each "Active Participant" of the Plan was entitled to this 3% Savings Contribution. *Id.* at §6.1.

76. The 3% Savings Contribution was allocated to each Active Participant's "3% Savings Account" in the "same portion that the ratio of his or her Compensation for the Allocation Period bears to the Compensation of all Active Participants for such Allocation Period." *Id.* at §6.5. This cash contribution by the Company was invested in the funds that were chosen by the Plan participant.

---

[7] As is more fully described below, Plan participants were notified in a letter, from Defendant Goldman, that after an independent advisor determined that the Company's stock would "likely have no value," State Street Bank, the trustee for the ESOP stock, began selling the stock on November 12, 2001 and completed the sale of all the stock before December 18, 2001.  *See* Notice to Participants in the Polaroid ESOP Fund (attached as Exhibit 2). For Plan participants, the Common Stock Fund remained as an ongoing portion of the Plan.  However, Defendants continued to offer the Common Stock Fund as an investment option for the Plan.

77. A Plan participant was not permitted to contribute to his/her 3% Savings Account. *Id.* at §6.6.

78. A Plan participant was always fully vested in his/her 3% Savings Account. *Id.* at §6.7.

79. According to the 2001 Plan, the Company ceased making the 3% Savings Contributions on June 22, 2001. *See* 2001 Plan Documents §6.8.

**Plan's Holding of Company Stock**

80. Based on the Plan Documents, the Plan acquired company stock in several ways. First, Polaroid stock was offered as an investment option for the Voluntary Investment, 401(k) Account Portions of the Plan. Second, the Company matched participant contributions in company stock to the extent that participants directed their own contributions to the Common Stock Fund. Third, the Company made ESOP contributions in the form of cash for the purchase of Polaroid stock, or in Polaroid stock directly.

81. As a consequence of continually offering Polaroid stock as an investment option for participant contributions, and matching in Polaroid stock regardless of the prudence of the investment, the Plan amassed an enormous amount of Polaroid stock.

82. In fact, in the years before Polaroid's downward spiral into bankruptcy, Polaroid common stock holdings represented the largest single investment of the Plan. As seen in the table below, Plan participants have suffered massive losses from the inherently risky single equity "wager" for the Plan's retirement savings portfolio.

| Date | Shares of Polaroid Common Stock Held by the Plan | Value of Polaroid Common Stock Held by the Plan |
|---|---|---|
| 12/31/98 | 7,265,046 | $135,759,974 |
| 12/31/99 | 7,353,988 | $138,346,897 |
| 12/31/00 | 7,870,238 | $45,745,761 |

17

83. Plaintiffs do not yet have data for subsequent years; however in light of the Trustees' eventual sale of the stock in the ESOP portion of the Plan at 9 cents per share, and Polaroid's bankruptcy which eliminated any and all value of any remaining shares in the Common Stock Fund, it is clear that the Plan's entire investment in Polaroid stock was, in effect, a complete loss. This loss could have been avoided had Defendants prudently and loyally managed the Plan's holdings of Polaroid stock.

### CLASS ACTION ALLEGATIONS

84. Plaintiffs brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> **All persons who were participants in or beneficiaries of the Plan at any time between October 1, 1999 and January 15, 2003 (the "Class Period") and whose accounts included investments in Polaroid Stock.**

85. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

86. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

    (b)    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

    (c)    whether Defendants violated ERISA; and

    (d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

88. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

89. Class action status in this ERISA action is warranted under Rule 23(b) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

90. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

91. During the Class Period, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

92. During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**Polaroid**

93. As previously stated, Polaroid is the Plan's sponsor. *See* 2000 11-K. The Company directed the use of cash dividends paid to the Trust for participants' ESOP accounts. *See* 1997 Plan Documents §5.7(b). As explained above, Plaintiffs are not prosecuting this action against Polaroid due to Polaroid's bankruptcy filing and subsequent bankruptcy protection.

**CEO Defendant[8]**

94. According to the 1997 Plan, the "Chief Executive Officer shall have the ability to appoint members to the Plan Administrator and to remove members of the Plan Administrator at any time with or without cause." *See* 1997 Plan Documents §14.1.

95. In addition, the CEO "shall have the authority to appoint members to the Fund Manager and to remove members of the Fund Manager at any time with or without cause. *Id.* at §14.4.

96. Indeed, Defendant DiCamillo exercised these fiduciary powers throughout the Class Period. For instance, with regards to the appointment of Fund Managers and contained in a document signed by Defendant DiCamillo, DiCamillo states:

> I, Gary T. DiCamillo, Chairman and Chief Executive Officer of Polaroid Corporation, appoint the following individuals listed below as Fund Managers for all Polaroid Employee Benefit Plans governed by the Employee Retirement Income Security Act of 1974 . . .

*See* PRD00151; *see also* PRD00152 (DiCamillo appointing Plan Administrators in his capacity as CEO).

97. In addition, throughout the Class Period, Defendant DiCamillo made numerous statements to Plan participants regarding their retirement savings, including statements regarding the Company's stock. These statements, which were made in, among places, company bulletins and letters sent to all employees, were made in an ERISA fiduciary capacity because they

---

[8]  The powers enumerated in this subsection were removed from the CEO's control when the Plan was amended and restated in July 2002.

20

contained information about the likely future of Plan benefits, in particular the value and prudence of the Plan's largest single investment, Polaroid stock; and, thus were acts of Plan administration. DiCamillo also exercised final decision-making authority regarding the Plan which is further evidence of his status as a Plan Fiduciary.

98. These aforementioned powers of the CEO clearly demonstrate the CEO was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan.[9]

**Plan Administrator Defendants**

99. According to the 1997 Plan, the Plan Administrator "shall consist of a Chairman and at least two other members appointed by the Chief Executive Officer of the Company." *See* 1997 Plan Documents §14.1. The Plan Administrator, according to the Plan, "shall be responsible for the administration and interpretation of the Plan." *Id.* at §14.2.

100. The Plan Administrator had broad authority and discretion over the Plan and Plan assets. This authority and discretion included the development of policies and procedures for the administration of the Plan, appointing the Plan Manager, consulting with counsel, accountants, and specialists that the Plan Administrator deems necessary to administer the Plan, and directing the Trustee in writing regarding all actions the Plan Administrator determined the Trustee should take.

101. Moreover, during the Class Period, at least one Plan Administrator communicated to the Plan participants regarding the future prospects of the Company and/or the Company's stock as an investment alternative under the Plan. However, these communications were

---

[9] Despite these clear fiduciary acts performed by Defendant DiCamillo during the Class Period, counsel for Defendant DiCamillo wrote to Plaintiffs on January 22, 2004 stating that "[t]his is to put you on notice, pursuant to Rule 11 of the Federal Rules of Civil Procedure, that . . . Gary DiCamillo, was not and has never been a fiduciary of the Polaroid Retirement Savings Plan." Based on the aforementioned fiduciary acts performed by Defendant DiCamillo during the Class Period, Plaintiffs take a contrary position and proffer Defendant DiCamillo as a proper Defendant in this action.

inadequate and failed to provide participants with complete and accurate information about Polaroid stock in a timely manner. By the time the Plan Administrator Defendants provided any real indication of the dire circumstances affecting the merits of investment in Polaroid stock, it was too late to serve any useful purpose. Indeed, upon information and belief, the first such indication came in an written letter from Defendant Goldman, Chairman of the Plan Administrator, in which he informed participants that the sub-Trustee of the ESOP Fund, had determined that the Company's stock would "*likely have no value,*" and, therefore, had liquidated the fund's holdings of Polaroid stock. *See* Notice to Participants in the Polaroid ESOP Fund (attached as Exhibit 2).

102.    Throughout the Class Period, the Plan Administrators were intimately aware of their fiduciary responsibilities and their meeting minutes illustrate this point. For instance, at the first meeting of the Plan Administrator with new members, counsel and the chairman of the Plan Administrator "reviewed the definition of Fiduciary responsibilities." *See* Plan Administrator Minutes Meeting October 6, 2000. Furthermore, at the January 2002 meeting of the Plan Administrator, "[t]here was full and complete discussion regarding the Plan Administrator's role to ***act in the best interest of the plan participants.***" *See* Minutes Polaroid Corporation Plan Administrator January 9, 2002 (emphasis added).[10]

103.    In light of the Plan Administrator's broad management and administration powers and duties, and its specific responsibilities with respect to Plan assets, the Plan Administrator had and exercised discretionary authority and control respecting management and administration of the Plan and disposition of assets.

---

[10] According to the meeting minutes, Bob Gallagher, an attorney from Groom & Associates, led the Plan Administrator's discussion regarding "the fiduciary responsibilities of the Plan Administrator." *Id.* Consequently, it is inconceivable that the Plan Administrator and members thereof, throughout the Class Period, were not fully aware of their fiduciary responsibilities under ERISA to the Plan participants.

**Fund Manager Defendants**

104.    According to the 1997 Plan, the Fund Manager "shall be one or more Employees of the Company familiar with investments designated by the Chief Executive Officer of the Company." *See* 1997 Plan Documents §14.4. Fund managers, therefore, were required to be knowledgeable, and, indeed given their high-level positions at the Company were, in fact, knowledgeable concerning Polaroid stock, which was one of the investments "designated by the Chief Executive Officer."

105.    The fiduciary duties of the Fund Manager included establishing the funding policy guidelines for the Plan and issuing such guidelines to the Trustees regarding investment alternatives available for the Trust, reviewing the valuation of assets held by the Trust and the earnings of such investments, reviewing the performance of the Trustee and making recommendations to the Board of Directors regarding the removal of the Trustee or appointment of additional Trustees, appointing, reviewing, and removing the Plan's investment managers and together with the Plan Administrator, prudently directing the Plan Trustees.

106.    In addition, the Fund Manager was responsible for selecting different fund options available in the Plan and with respect to the Company Stock Fund, in particular, ensuring that, among other things an independent fiduciary is appointed in the event that the Fund Manager determines that there exists the "potential for undue Employer influence upon Participants or Beneficiaries with regard to the direct or indirect exercise of shareholder rights associated with Participant or Beneficiary investment in the Common Stock Fund." *Id.* at §10.2(b)(iv).

107.    In light of the broad and important fiduciary duties, and the Fund Managers' specific authority and control over the Plan's assets, the Fund Managers had and exercised discretionary authority and control with respect to the management and administration of the Plan and Plan assets.

**Defendant State Street**

108.    Defendant State Street was a Trustee for the ESOP and the Company Stock Fund

23

in the 401(k) portion of the Plan, and was charged with fiduciary responsibilities respecting the management and disposition of the assets of both funds.  While, as alleged elsewhere in the Complaint, the Polaroid Defendants had the responsibility to ensure that Plan investments were prudent, and to prudently direct the investment of Plan assets, as Trustee, State Street had a duty to act prudently and loyally, and to the extent directed by other named fiduciaries, to disregard directions that it knew or should have known were contrary to the Plan or ERISA.  *See* ERISA § 403(a)(1), 29 U.S.C. 1103(a)(1) (providing that a trustee who is "subject to the direction of a named fiduciary who is not a trustee ... shall be subject to proper directions of such fiduciary *which are made in accordance with the terms of the plan and which are not contrary to ERISA*.") (emphasis added).

109.    These duties are reflected in the State Street Trust Agreement, which assigned specific fiduciary powers to State Street, and required State Street to discharge its powers "*with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity who is familiar with such matters would use in dealing with an enterprise of like character and with like aims*."  Polaroid Retirement Savings Plan Sub-Trust Agreement, at § 6.01 (attached hereto as Exhibit 5) (emphasis added) .  Accordingly, State Street was bound to abide by core ERISA fiduciary duties including the duties of loyalty and prudence.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

110.    Moreover, the State Street Trust Agreement granted State Street important discretionary authority respecting the management and disposition of the assets it held in trust.  As set forth in the State Street Trust Agreement:

> **3.05 Powers of the Sub-Trustee.**  In addition to, and not in limitation of, the powers now, or which may later become vested in it[,] *the Sub-Trustee shall have the following powers, which it may exercise in its discretion*:
>
> a) *To sell, exchange, convey, transfer, dispose of and grant options with respect to any property at any time held by it,* and any sale may be

made by private contract or by public auction, for cash or upon credit, or partly for cash and partly upon credit . . . ;

\* \* \*

d) *To sue or defend suits or legal proceedings to enforce or protect any interest of the Sub-Trust; and to represent the Sub-Trust in all suits or legal proceedings in any court* or before any other administrative agency, body or tribunal;

\* \* \*

h) *To employ legal counsel, brokers and other advisors, agents or employees to perform services for the Sub-Trust or to advise it with respect to its duties and obligations under this Agreement and in connection with the Sub-Trust*, and to pay them from the Sub-Trust such compensation as it deems reasonable and appropriate;

State Street Trust Agreement, Art. III (emphasis added).

111.   Moreover, the State Street Trust Agreement provided State Street with express authority to dispose of or transfer shares of Polaroid stock held by the Plan. "[i]f the Sub-Trustee *deems it necessary or appropriate* [to do so]." *Id.* at § 3.08.

112.   In addition, under the heading "General Powers," the State Street Trust Agreement provided: "Notwithstanding anything herein to the contrary, the Sub-Trustee may take such action or refuse to take such action if the Sub-Trustee reasonably determined in its sole discretion that such action or inaction is necessary in order for the Sub-Trustee to fulfill its fiduciary responsibilities hereunder." *Id.* at § 3.10 (emphasis added).

113.   State Street has acknowledged that the scope and extent of its fiduciary duties included the discretion to divest the Company Stock Fund of its holdings of Polaroid stock. According to a December 30, 2002, email from Christine Walsh, Vice President at State Street, to Kevin Pond of Primary PDC ("December 30, 2002 Walsh Email"), "[a]s Sub-Trustee of the Polaroid Retirement Savings Plan, State Street is a fiduciary under ERISA and has the power under ERISA and under the trust agreement to sell the shares." (Attached hereto as Exhibit 6).

114.   Similarly, State Street has acknowledged that the scope and extent of its fiduciary

25

duties included the discretion to divest the ESOP of its shares of Polaroid stock. In a February 6, 2002 letter to the Honorable Peter J. Walsh, U.S. Bankruptcy Court in Delaware, responding to questions raised regarding its sale of the ESOP's shares of Polaroid stock ("State Street Bankruptcy Letter"), State Street explained that "*State Street had the responsibility for determining whether the Polaroid common stock held in the ESOP should have been sold.*" State Street Bankruptcy Letter at 1 (attached hereto as Exhibit 7) (emphasis added).

115.    Based on the provisions of the State Street Trust Agreement, and State Street's own admissions and actions, State Street unquestionably was a Plan fiduciary, and possessed discretionary authority and control over the Plan's investment in Polaroid Stock.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

116.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. § 1002(21)(A)(I), provides that a person is a fiduciary "to the extent...he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets...." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

117.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

118.    During the Class Period, the Company's direct and indirect communications with Plan participants included material misrepresentations and omissions which caused Plaintiffs and members of the Class to purchase, and to hold and maintain, investments in Company stock, and to accept at face value investments in Company stock. These communications included, but

were not limited to, SEC filings, annual and quarterly reports, press releases, website notices, meetings and Company announcements to Plan participants. The Company, and the individuals acting on the Company's behalf who provided this information to participants and encouraged participants to review the information when evaluating the merits of investment in Polaroid stock also acted as fiduciaries to the extent of this activity.

**<u>DEFENDANTS' CONDUCT</u>**

**Polaroid Stock Was an Imprudent Investment for the Plan**

      **(i)**      **Background**

      119.    Polaroid was the leading instant imaging company in the world and was the only manufacturer of traditional chemical-based, instant cameras and film in the United States. The Company's principal products were instant film, instant and digital cameras, digital peripherals and secure identification systems with software and system solutions. In addition, the Company designed, developed, manufactured and/or marketed hardware accessories for the instant imaging market, as well as conventional 35mm cameras and film and videotapes. *Polaroid filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on or about October 12, 2001.*

      120.    On October 1, 1999, the beginning of the Class Period, the Company's stock was trading at $25.88 per share.

      121.    Throughout the Class Period, the Company and the fiduciary-Defendants issued numerous statements and filed periodic reports with the SEC describing the Company's financial performance. However, on August 22 , 2003, a report issued by a Court-appointed Examiner in the Polaroid bankruptcy proceeding disclosed that Defendants' statements issued throughout the Class Period were inaccurate, incomplete and materially misleading because the Defendants knew or should have known that the Company's financial condition had significantly deteriorated and was much more severe that was being represented to the investing public,

27

including Plan participants, ultimately leading to the Company's bankruptcy filing on October 12, 2001.

122.    Due to Defendants' fiduciary breaches enumerated herein, Plan participants lost tens of millions of dollars in retirement savings. Indeed, in the year preceding the Company's bankruptcy petition, ***the Company's stock lost 98% of its value***. As more fully explained below, rather than protect Plan participants from these staggering losses, Defendant-fiduciaries chose to pillage the Company's coffers and reward themselves with significant cash bonuses citing the virtual worthlessness of their stock bonuses/options as a reason for these awards.

### (ii)    Defendants' Scheme to Mask the Company's Rapidly Deteriorating Financial Condition

123.    Polaroid was once a member of the "Nifty 50" group of fast-growing stocks, with its stock reaching a high of $60.31 in July 1997. However, in the late 1990s, the Company became waylaid with the explosion of one-hour film developing shops, a heavy debt load, and poor decisions by management, leaving the Company trailing the industry in the development of digital photograph technologies.

124.    Seeking to hide the Company's deteriorating financial condition, Defendants set about to engage in a series of schemes that would mask the Company's perilous condition from the market place in general and Plan participants in particular. These schemes included, *inter alia*, the improper use of deferred tax assets, inappropriate restructuring of reserves and reclassification of the Company's debt.[11]

125.    Indeed, the Special Examiner appointed by the United States Trustee and approved by the Bankruptcy Court to review the Company's dramatic decent into bankruptcy found that:

---

[11]  All of these schemes are enumerated, in detail, in the Report of Perry M. Mandarino, CPA, attached hereto as Exhibit 3.

the issues discussed above relating to the timing of the valuation allowance with respect to deferred taxes, timing of the reversal of the restructuring reserve at December 31, 2000, the ability to successfully complete a refinancing and the classification of debt were important elements in the determination of the appropriateness for a going concern opinion at December 31, 2000. Taken individually, perhaps each one could have been overcome by mitigating factors. Nevertheless, the cumulative weight of these issues, taken together, should have been viewed as raising serious issues respecting Polaroid's ability to continue as a going concern through December 31, 2001.

*See* Mandarino Report at 61.

126.    Moreover, even though by early 2001 Defendants knew that two of the Company's main alternatives to stem its deteriorating financial condition were either a sale of the Company or seeking bankruptcy protection, the Defendants failed to take any preventive measures to protect the Plan participants' retirement savings.

**Deferred Tax Assets**

127.    In order to recognize the tax benefits of some of the Company's deferred tax assets and, hence, artificially inflate the Company's financial picture, the Company devised a series of tax schemes.  According to the Mandarino Report, the Company's tax efforts were spearheaded by Defendant Byrd.

128.    As is more fully explained in the Mandarino Report, by the end of 1999, Polaroid's auditor, KPMG, had serious reservations about Polaroid's ability to realize its deferred tax assets. *See* Mandarino Report at 33.  These deferred tax assets represented a substantial share of Polaroid's total assets, 16% or $327.7 million for year 2000.[12] Consequently, whether or not such deferred tax assets would be realized by the Company would have a substantial bearing on the Company's continuing financial health, with KPMG warning Polaroid that it may be required to reduce Polaroid's deferred tax assets. *Id.* at 24.

129.    The realization of deferred tax benefits depends on the existence of adequate

---

[12] *See* Mandarino Report at 23.

taxable income within the carry-back carry-forward time period, with one of the sources being future taxable income. *Id.* at 26.

130.    In 1999, KPMG noted that "Polaroid's track record in forecasting earnings is not very accurate on a historical basis." *See* Exhibit 25 to the Mandarino Report, attached hereto as Exhibit 4.  Indeed, the Mandarino Report found that there was no "evidence supporting a conclusion that an improvement in Polaroid's forecasts could have . . . been relied upon." *See* Mandarino Report at 26.

131.    Consequently, the utilization of tax planning strategies became increasingly important tool for the realization of the deferred tax assets. *See* Mandarino Report at 27. Unfortunately for Polaroid, there were a number of concerns regarding the Company's development of realistic strategies that could legitimately accomplish this goal.

132.    These concerns were expressed to Defendant Byrd by at least October 9, 1999. *Id.* at 28.

133.    Indeed, KPMG openly questioned the viability of Defendant Byrd's strategy to utilize the deferred tax assets and the Company's ability to implement the strategies. *Id.* at 27.  In a memo written by KPMG and based on discussions with Defendants Byrd and Leuders, KPMG warned that some of the strategies proffered by Defendant Byrd could violate Polaroid's debt covenants and the Company's tax strategies could not be considered "prudent or feasible" given the Company's situation. *See* Exhibit 25 to the Mandarino Report, attached hereto as Exhibit 4.

**Inappropriate Restructuring of Reserves**

134.    In order to comply with certain covenants in a credit agreement set for December 31, 2000, Polaroid inappropriately reversed a restructuring charge of $5.8 million relating to accrued severance costs from a 1997/1998 restructuring of the Company. *See* Mandarino Report at 39.  Without this reversal of charges, Polaroid would have been in breach of its credit agreement. *Id.*

135.    According to the Mandarino Report, in order to comply with accounting principles, this restructuring of reserves should have been performed in the fourth quarter of 1999, at the latest. *Id.* at 42. Consequently, "[b]y waiting until the fourth quarter of 2000 to reverse the $5.8 million excess restructuring reserve, Polaroid created the appearance that the restructuring reserve was reversed at that later time to avoid earlier defaults under the Credit Agreement debt covenants." *Id.*

**Company's Debt Reclassification**

136.    According to the Company's 2000 10-K, Polaroid had a series of credit agreements which required the Company to maintain financial ratios regarding its debt to minimum interest coverage and earnings before interest, taxes and amortization ("EBITDA"). The 2002, 2006 and 2007 notes contained cross-default provisions regarding the credit agreements. Hence, Polaroid's default under the credit agreement would trigger default on the notes and would mean the notes would become immediately due and payable, if the default was not cured within 30 days.

137.    According to the Mandarino Report, prior to the end of 2000, the Company had determined that it would violate certain provisions of the credit agreements by early 2001. *See* Mandarino Report at 43.

138.    Consequently, the Company took certain steps to hide this fact from the investing public in general and the Plan participants in particular. Indeed, the Company did not want its auditor to issue a "qualified statement" regarding whether the Company was a "going concern" (*i.e.*, able to survive through the end of the year).

139.    According to the Mandarino Report, these efforts included Defendant DiCamillo speaking with then Chairman and CEO of KPMG, Stephen Butler ("Butler"). *See* Mandarino Report at 50. Defendant DiCamillo and Butler had previously served together on a not-for-profit organization's board of directors. *Id.*

31

140.     Moreover, the Company failed to disclose in its 10-Q for the period ending April
1, 2001 that its refinancing advisors had recommended to the Company:

> Given early indications that Q2 will likely miss both Bank and Business
> Unit Plan targets, the refinancing alternative should be abandoned and
> planning for an orderly band and bank debt restructuring, through either a
> prepackaged or preplanned chapter 11 process, should be begin (sic)
> earnest (sic).

*Id.* at 52.

141.     Defendant Lueders, who signed the 10-Q, explained the discrepancy as follows:

> So what I'm saying is that if I had seen this [recommendation], I don't
> know that I would have changed what was in the [10] Q, because this is a
> pretty heavy recommendation. And it needed to be appropriately
> evaluated, discussed, communicated to the appropriate people within the
> company, and assessed, evaluated, before buying into it. *And that kind of
> time frame was not consistent with the [10] Q time frame.*

*See* Mandarino Report at 53 (emphasis added).

142.     Because of the growing likelihood that the Company would have been unable to
meet its debt obligations in 2001, the Mandarino Report found that the 2006 Notes and 2007
Notes "would have been more appropriately classified as current by Polaroid both at April 1,
2001 and July 1, 2001." Mandarino Report at 60. Indeed, since the "Credit agreements and
Notes (under the cross-default provisions) could have become callable during 2001, the
Examiner found that it would have been more meaningful and credible to have classified the
Notes as current at December 31, 2000." *Id.*

### (iii)     Defendants Failed to Provide Complete and Accurate Information to Plan Participants During the Class Period

143.     On January 26, 2000, and throughout the Class Period, the Company failed to
provide complete and accurate information to Plan participants regarding Polaroid stock.
Among other deficiencies, Defendants failed to inform participants and the market in general of
the inappropriate accounting tactics utilized by the Company and the Individual Defendants in an
attempt to artificially shore up earnings/revenue figures.

144.    In addition, throughout the Class Period, Defendants provided incomplete information in an effort to proffer the Company as a "going concern" and, thus, a sound investment for retirement savings.

145.    The Company's top-level officers, including, among others, the CEO Defendant repeatedly assured participants through statements to them directly in internal company-wide communications, and in Company filings and statements to the market, that the Company's future prospects were sound, improving, stable, and secure, and that the Company remained a viable and growing business.  The CEO Defendant also repeatedly expressed confidence in the Company's future prospects, and its strong foundation for "long term growth."

146.    Such statements were made in particular in Company press releases regarding its financial results.

147.    For example, on January 26, 2000, the Company announced its financial results for the fourth quarter and fiscal year 1999.  More specifically, the Company reported net earnings of $29 million, or $.64 per diluted share, for the 1999 fourth quarter, and that net earnings for fiscal year 1999 were $9 million, or $.20 per diluted share.  Commenting on the results, Defendant DiCamillo stated:

> *This was an excellent quarter, capping an increasingly strong year for Polaroid and marking a clear milestone in our turnaround.* We set a new full-year sales record of 9.7 million instant cameras. We also sold more than 400,000 digital cameras, capturing the number-one position in the U.S. mass merchant channel and putting Polaroid among the leaders in total digital camera volume in the United States in 1999. Full year revenues for both instant film and cameras showed solid increases, validating our strategy to re-invigorate the business through new products, new channels and new customers. **These results give us confidence in the future.**
>
> * * *
>
> We are continuing to focus on the areas of highest profitability in our core business and to manage our asset portfolio for shareholder value. (emphasis added).

33