# EXHIBIT P-2

148.    On March 28, 2000 the Company filed its annual report, on Form 10-K, with the

SEC. The Company's Form 10-K, signed by Defendants DiCamillo, Lueders and Boynton,

among others, reaffirmed its previously announced financial results.

149.    On April 20, 2000, the Company announced its financial results for the first

quarter of 2000. More specifically, the Company reported an operating profit of $9.2 million for

the first quarter of 2000 and revenues of $403.4 million for the first quarter. Commenting on the

results, Defendant DiCamillo stated:

> *I'm very gratified with our first quarter performance.  It reflects the*
> *momentum generated by our new products, the stability of our*
> *traditional business and excellent execution throughout the*
> *organization.*  Unit sales of instant film increased about 20 percent and
> instant camera units grew 90 percent over the same quarter last year.
>
> * * *
>
> *We now have a strong foundation to support the growth of our business*
> *over the longer term.*  As we look to the second quarter and the balance of
> 2000, we have confidence that our sales momentum is sustainable and that
> our new products will continue to drive growth for the company.
> (emphasis added).

150.    On May 16, 2000, the Company filed with the SEC, on Form 10-Q, its results for

the first quarter of 2000. The Company's Form 10-Q, signed by Defendant Boynton, reaffirmed

its previously announced results.

151.    On July 20, 2000, the Company announced its financial results for the second

quarter of 2000. More specifically, the Company reported an operating profit of $51 million for

the second quarter of 2000 and that net earnings for the quarter totaled $27 million.

Commenting on the results, Defendant DiCamillo stated:

> *I'm very satisfied with the state of the business and our positive*
> *momentum.*  We sold 65 percent more instant cameras and seven percent
> more instant film during the second quarter than we did during the same
> period last year.  And our revenues from new products totaled $98 million
> for the second quarter of 2000.

34

* * *

We continue to target high-single to low-double digit revenue growth behind the strength of our new instant products and the digital products now being launched. We are excited about the trade's early reception of our new digital products, especially the digital printer and the digital printing camera, and *we expect double-digit growth in digital product sales for the next several years.* (emphasis added).

152.    On August 14, 2000, the Company filed its report for the second quarter of 2000, on Form 10-Q, with the SEC. The Company's Form 10-Q, signed by Defendant Boynton, confirmed its previously announced financial results.

153.    While the CEO Defendant was touting the performance of Polaroid and its future prospects, in reality the financial condition of the Company was rapidly deteriorating and becoming dire.

154.    From October 2000 through February 2001, the decline in the Company's true prospects accelerated, and, yet, the Company continued to paint a knowingly, unrealistic and inaccurate picture of its ability to survive.

155.    Despite repeated expressions of confidence, the situation continued to deteriorate leading Polaroid on two separate occasions between February and June 2001 to announce major global restructuring efforts.

156.    The first such effort was revealed on February 22, 2001, when the Company issued a press release announcing a "comprehensive global restructuring plan," to reduce overhead, realign the Company's resources and accelerate implementation of its digital strategy. Pursuant to the plan, approximately 950 jobs, about 11 percent of the global workforce, would be eliminated. The restructuring program, was expected to be completed in about 12 months, and was expected to realize approximately $60 million in cost savings on an annualized basis.

157.    On June 13, 2001, the Company announced a second major global restructuring plan designed to reduce debt and return the company to profitability. The new plan was to phase out approximately 2,000 positions, or 25 percent of the global workforce of 8,000 over the next

35

18 months.  The restructuring program was expected to realize total annual cost savings of between $175 million and $200 million by the end of 2003, and the company would take a series of restructuring charges in 2001 and 2002 to reduce its cost base.   These charges were expected to total between $150 million and $175 million.  In addition to significant reductions in personnel, the restructuring was to involve a reduction and reconfiguration of Polaroid's global operations.

### (iii)    Polaroid Reveals the True Depth of Its Financial Troubles

158.    The restructuring efforts that the Company touted, in fact, failed to salvage the Company, and on July 11, 2001, Polaroid issued a press release announcing that it would not make certain upcoming interest payments on its bonds and intended to begin negotiations with its bondholders regarding a potential restructuring of the Company's debt with the objective of developing a capital structure that would better support its long-term business objectives.  Upon this news, shares of the Company fell $0.82 per share to close at $1.88 per share.

159.    On July 18, 2001, Polaroid issued a press release announcing its financial results for the second quarter of 2001.  The Company reported an operating loss for the quarter of $52 million.  Defendant DiCamillo, commenting on the results, stated that the Company continued to be focused on liquidity, cash generation and managing its debt.  He continued, in pertinent part, as follows:

> First, we received waivers from our U.S. and European bank groups through October 12, 2001.  This will allow us to proceed with our operational restructuring and continue dealing with our vendors and customers on a business-as-usual basis.  Second, we announced that we would forgo bond interest payments in July and August with the objective of developing a capital structure that better supports our long-term business plans.  We intend to begin good faith negotiations with our bondholders in August. Finally, we announced that Polaroid would be exploring strategic alternatives with the assistance of our investment bankers.

160.    On August 9, 2001, Polaroid filed its Form 10-Q for the second quarter 2001, the

period ending July 1, 2001, with the SEC which confirmed the previously-announced financial results and was signed by Defendant Flaherty. The Form 10-Q contained financial statements for the second quarter 2001. In the filing, KPMG questioned whether the Company could continue as a going concern. Upon this news, shares of the Company fell $0.29 per share to close at $1.45 per share.

161.    On October 12, 2001, Polaroid announced that the Company and its U.S. subsidiaries had filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code. The filings were made in the U.S. Bankruptcy Court in Wilmington, Delaware. The Company stated that it intended to use the Chapter 11 process to restructure its business operations and finances.

162.    Despite the bleak condition of the Company, the precipitous decline in its stock price, the imminent possibility of financial collapse, and ultimately its actual collapse, throughout this time frame, Defendants, in their capacities as Plan fiduciaries, continued to offer Polaroid stock as a Plan investment option for participant contributions, match contributions in Polaroid stock, and itself contribute Polaroid stock to the Plan.

### (iv) The Company Failed to Disclose Complete and Accurate Information to Plan Participants By Failing To "Announce A Going Concern" Qualification At An Earlier Date

163.    By Order dated August 22, 2003, the Bankruptcy Court for the District of Delaware authorized and directed Perry M. Mandarino, CPA, the examiner for the Chapter 11 cases of Polaroid Corporation, to issue a report on alleged accounting improprieties, mismanagement and wrongdoing by Polaroid's management (the "Mandarino Report").

164.    According to the Mandarino Report, Polaroid's financial condition at and after December 31, 2000 through July 31, 2001 may have been more negative than as reflected in the public filings with the SEC and the Individual Defendants knew or should have known that the Company's financial condition was deteriorating at an accelerated rate.

165.     Specifically, the Mandarino Report revealed that KPMG, the Company's auditor, knew as of December 31, 2000, or should have known as early as December 31, 1999, that the deferred tax credits that the Company had reported in its financial statements during the Class Period would be useless since the available evidence indicated that:

    (a)    there was an insufficient basis for relying on Polaroid's forecasted future earnings to support a position that Polaroid would realize its deferred tax assets within a reasonable time;

    (b)    the tax planning strategies suggested by KPMG were lacking in a reasonable basis since KPMG knew, or should have known, that it was highly improbable that Polaroid would be able to generate sufficient future taxable income to realize the deferred tax assets within a reasonable period of time; and

    (c)    Polaroid met four of the five categories of negative evidence that would require a valuation allowance for the deferred tax assets at December 31, 2000, yet no valuation allowance was provided as of that date. The four categories of negative evidence that Polaroid met were:

        (i)    cumulative losses in recent years;

        (ii)    a history of operating loss or tax credit carry forwards expiring unused;

        (iii)    losses expected in early future years; and

        (iv)    unsettled circumstances that, if unreasonably resolved, would adversely affect future operations and profit levels on a continuing basis in future years.

166.     The Mandarino Report also concluded that the Company reported later-than-appropriate reversal of restructuring charges in the fourth quarter of 2000, in order to remain in compliance with certain financial covenants, in violation of accounting principles.  In accordance with the guidance provided by SAB No. 100, the reversal of $5.8 million excess restructuring reserve in the fourth quarter of 2000 would have been more appropriately made by the end of 1999 at the latest.

167.     Moreover, the Mandarino Report also concluded that Polaroid improperly classified the status of certain financial notes.  Specifically, Polaroid should have classified its

2006 and 2007 notes as current at December 31, 2000 or at April 1, 2001 at the latest.  By doing so, it would likely have resulted in the issuance of a going concern qualification by KPMG at an earlier date than the second quarter filing.  According to the report, KPMG's failure to detect these problems resulted from:

> (a)    improperly relying upon Polaroid's investment bankers', Dresdner Kleinwort Wasserstein ("DKW"), representation that there was a 90%+ probability that negotiations to obtain asset-based financing would be successful; and

> (b)    not performing additional procedures to satisfy themselves with regard to the 90%+ assessment by DKW, such as, requesting term sheets, reviewing drafts of the proposed loan documentation and interviewing prospective lenders.

**B.    Defendants Knew or Should Have Known That the Polaroid Funds and/or Polaroid Stock Was Not a Prudent Plan Investment**

168.    At all relevant times, Defendants knew or should have known that Polaroid's *misrepresentations concerning its financial condition and performance* made Polaroid stock an imprudent Plan investment.  It is inconceivable that a Defendant such as Polaroid CEO DiCamillo did not have personal knowledge of, if not a direct role in, the Company's misrepresentations regarding the true financial health of the Company throughout the Class Period.

169.    According to the Company's DEF-14A, which was filed with the SEC and distributed to the Company's shareholders (including the Plan participants), the Company's stock repeatedly under-performed both the S&P 500 Index and a peer group index comprised of the Fortune 500 Scientific, Photographic, and Control Equipment Index (which for fiscal year 2000 included Applied Materials Inc., Beckman Coulter Inc., Eastman Kodak Co., KLA-Tencor Corp., Minnesota, Mining & Manufacturing Co., PE Corp. Biosystems, PerkinElmer Inc.,

39

Polaroid Corp., Tektronix Inc., Teradyne Inc. and Varian Medical Systems Inc.).[13]  As illustrated

by the chart included in the DEF-14A, Polaroid's stock was badly beaten by the other indexes

since 1995:

|  | Polaroid Corp. Stock | S&P 500 Index | Peer Group Fortune 500 Index |
|---|---|---|---|
| December 1995 | $100 | $138 | $100 |
| December 1996 | $93 | $169 | $122 |
| December 1997 | $106 | $226 | $124 |
| December 1998 | $41 | $290 | $133 |
| December 1999 | $43 | $351 | $237 |
| December 2000 | $14 | $232 | $216 |

170.    Yet, despite the abysmal performance of Polaroid stock during the Class Period,

and the information that the Plan fiduciaries had regarding the true condition of the Company,

the Plan Administrator and Fund Manager Defendants failed to take this information into

account when making decisions regarding the investment of Plan assets.

171.    Indeed, the Plan Administrator and Fund Manager Defendants failed to conduct

an appropriate investigation into whether the Polaroid Funds and/or Polaroid stock was a prudent

investment for the Plan and, in connection therewith, failed to provide the Plan participants with

information regarding Polaroid's true financial health, such that other fiduciaries and the Plan

participants could make informed decisions regarding the Polaroid Funds and/or Polaroid stock

in the Plan, and otherwise failed to protect the Plan and its participants against inevitable losses.

172.    Defendant DiCamillo's failure in this regard is particularly acute.  As a result of

---

[13] Notably, the Peer Group Fortune 500 Index included the Company's stock.  Hence, had the
Company's stock not been included in the Peer Group Fortune 500 Index, the Index would have
outperformed the Company's stock by that much more.

his role as Polaroid's CEO, DiCamillo simply had to have known, and at least tacitly approved of, the Company's improper practices yet, upon information and belief, despite his obligation to properly and materially inform Plan participants of the true risks involved with holding Polaroid stock, he remained silent.

173.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in the Polaroid Funds and/or Polaroid stock, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

174.    Indeed, according to a notice sent to Polaroid ESOP participants, dated December 18, 2001 and signed by Defendant Goldman, "[a]n independent valuation advisor hired by the trustee concluded that the [Company's] *stock would most likely have no value*.  As a result, State Street as trustee decided that it was in the *best interests of the participants to sell the shares*." *See* Notice to Participants in the Polaroid ESOP Fund (attached hereto as Exhibit 2) (emphasis added).  Consequently, State Street liquidated the fund, selling a total of 7,266,057 shares at an average price of $0.0946 per share.  *Id.*

175.    These developments regarding the ESOP shares were discussed amongst the Plan Administrator Defendants, Goldman, Halsted, Cramer and Evens.  *See* DRAFT Plan Administrator Meeting Minutes November 14, 2001.  The meeting minutes noted that "State Street concluded that a steady and planned sale" should begin immediately and that since November 12th State Street had been selling 250,000 shares per day.  *Id.*

176.    Furthermore, even after State Street informed the Company that Polaroid stock would most likely have *no value*, Defendants continued to maintain the Plan's holdings in Polaroid stock in the Common Stock Fund in obvious breach of their duty under ERISA to ensure that only *prudent* investment options are available to participants and maintained by the

41

Plan.

177.    At any rate, because Defendants knew or should have known that the Polaroid

Funds and/or Polaroid stock was not a prudent investment option for the Plan even before State

Street initiated the sale of ESOP shares of Polaroid stock, they had an obligation to protect the

Plan and its participants from unreasonable and entirely predictable losses incurred as a result of

the Plan's investment in the Polaroid Funds and/or Polaroid stock.

178.    Defendants had available to them several different options for satisfying this duty,

including: making appropriate public disclosures as necessary; divesting the Plan of Polaroid

stock; discontinuing further matching and investment contributions in the Polaroid Funds and/or

Polaroid stock; consulting independent fiduciaries regarding appropriate measures to take in

order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries

to the extent that as a result of their employment by Polaroid they could not loyally serve Plan

participants in connection with the Plan's acquisition and holding of Polaroid  stock.

179.    Instead of taking any of these actions, however, Defendants stood idly by as the

Plan's largest asset, Polaroid stock, became essentially worthless.  Even worse, certain

Defendants, including the CEO Defendants, through their public and company-wide statements,

encouraged participants, on a Plan-wide basis, to remain invested in Polaroid stock.

**C.**     **Defendants Regularly Communicated with Plan Participants Concerning Purchases
of the Polaroid Funds and/or Polaroid Stock, One of the Plan's Largest Assets, Yet
Failed to Disclose the Imprudence of Investment in the Polaroid Funds and/or
Polaroid Stock**

180.    Polaroid regularly communicated with employees, including Plan participants,

about Polaroid's performance, future financial and business prospects, and the Polaroid Funds

and/or Polaroid stock, upon information and belief, one of the largest single assets in the Plan.

These communications included, *inter alia*, emails, website notices, written notices, press

releases and SEC filings.  During the Class Period, the Company fostered a positive attitude

toward the Polaroid Funds and/or Polaroid stock as a Plan investment, and/or allowed Plan

42

participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in the Polaroid Funds and/or Polaroid stock. As such, Plan participants could not appreciate the true risks presented by investments in the Polaroid Funds and/or Polaroid stock and therefore could not make informed decisions regarding investments in the Plan.

**D.    Defendants Suffered From Conflicts of Interest**

181.    Polaroid's SEC filings, including 10-K annual reports, during the Class Period make clear that a significant percentage of corporate Director and Executive Officer compensation is in the form of stock grants or stock option grants. For example, as of April 2, 2001, Defendant DiCamillo had been granted options to purchase 859,500 shares of Polaroid stock.

182.    Moreover, according to the DEF-14A, as of December 31, 2000, Defendants DiCamillo was the beneficial owner of 103,454 shares of Polaroid stock and Defendant Boynton, was the beneficial owners of 40,667 shares of Polaroid stock.

183.    Because the compensation of at least some of the Defendants was significantly tied to the price of Polaroid stock, Defendants had incentive to keep the Plan's assets heavily invested in Polaroid stock on a regular, ongoing basis. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for Polaroid stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Polaroid stock, resulting in lower compensation for the Defendants.

184.    Indeed, as the Company continued its decent into bankruptcy, several Defendants realized that their stock-based compensation would be inadequate given the Company's bleak financial outlook. Consequently, they decided to add additional cash based incentives. For example, at the January meeting of the Human Resources Committee, Defendant Ford presented a proposed bonus plan that would allow for a mid-year bonus payout. *See* Minutes Human

Resources Committee January 22, 2001. Consequently, an additional $5 million was added to the bonus program in order to retain employees deemed "essential" by management. *Id.* Similar discussions regarding the virtual worthlessness of Company stock as a incentive devise were conducted at the September meeting of the Human Resources Committee, with Defendant Kelly leading the discussion. *See* Minutes Human Resources Committee September 10, 2001.

185.    In July of 2001, less than three months before the Company filed for bankruptcy, the Board of Directors gave Defendant DiCamillo a "special bonus" of $1.4 million and an additional $25,000 to pay for legal expenses related to "protecting his interests in a potential bankruptcy filings."

186.    A month later, five Board members received payments ranging from $63,000 to $272,000. These payments were deferred compensation and were made just six weeks before the bankruptcy filing. Notably, in the Q&A distributed to Plan participants with Defendant DiCamillo's letter of July 13, 2001, employees were told that income deferred by employees was not guaranteed by the Company, inferring that the employees may loose this income. Apparently, the same was not true for the Board members who deferred their compensation.

187.    In total, in the months leading up to the Company's filing for bankruptcy, Polaroid paid senior executives and directors, including at least some of the Defendants, a total of $6.3 million in bonuses, consulting fees and lump-sum pension payouts.

188.    Although some Defendants may have had no choice in tying their compensation to Polaroid stock (because compensation decisions were out of their hands), Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Polaroid stock or whether to properly inform participants of the true risks of continuing to invest in and hold shares of soon to be worthless Polaroid stock.

189.    Indeed, although Defendants determined that the Company's stock would be virtually useless as a long-term incentive goal and compensation tool for themselves, they,

nevertheless, continued to permit Plan participants to invest in Company stock.

190.    Moreover, from January 1, 2001 to September 30, 2001 as the Company slid into financial oblivion and the Company's stock became increasingly worthless, the Defendants issued $184.1 million in treasury stock to the ESOP and an additional $18.1 million to compensation and stock incentive plans. *See* Mandarino Report at 80. Apparently, while the Defendants decided that the Company's stock was imprudent as a long-term source of financial stability for themselves, the Defendants decided that the Company's stock would still be a prudent investment for the Plan participants.

191.    The conflicts of interest described above put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

**E.    State Street breached its fiduciary duties by failing to exercise its discretion to sell the Plan's holdings of Polaroid Stock in a timely and diligent manner and by implementing directions to make and maintain investments in Polaroid Stock that it knew or should have known were imprudent**

192.    As alleged elsewhere herein, the Polaroid Defendants had responsibility under ERISA to ensure that the Plan's investments, including the Plan's investment in Polaroid stock, were prudent. However, as the Trustee for the ESOP and the Company Stock Fund with express discretion to sell the Plan's holdings of Polaroid stock if prudent to do so, State Street undeniably was a Plan fiduciary with authority, control and discretion respecting the management and disposition of the Polaroid stock in the Plan.

193.    Furthermore, to the extent that State Street acted pursuant to the direction of other named fiduciaries, it was duty bound under ERISA to disregard directives that it knew or should have known were contrary to the Plan or ERISA, such as directions to invest in Polaroid stock when State Street knew or should have known that Polaroid stock no longer was a prudent investment for participants' retirement savings.

194.    Here, by (1) failing to exercise its discretion to divest the Plan of its holdings of Polaroid stock at the point that it reasonably knew or should have known that Polaroid stock had become an imprudent and unduly risky investment for the Plan, and instead, waiting until the stock had essentially no value to take any action; and (2) by continuing to implement directions to make and maintain investments in Polaroid stock for the Plan long after State Street knew or should have known that Polaroid stock had become an imprudent investment, State Street violated its fiduciary duties to the Plan.

195.    At all relevant times, State Street had two internal groups to monitor the financial performance of client companies: the Watchlist Committee and the Fiduciary Committee. Both committees monitored Polaroid. According to its guidelines, the Watchlist Committee "represents senior officers within the Company Stock group as well as a CitiStreet Compliance officer. . . . The purpose of the committee is to monitor the financial performance of client companies and gain an understanding of their current situation, considering public news that affects the company on all stocks where State Street is the investment manager." (Attached hereto as Exhibit 8, SSP009379). The Fiduciary Committee's purpose is "to provide fiduciary guidance and an oversight function for CitiStreet's Company Stock Management Group." The responsibilities of the Fiduciary Committee include:

- Analyzing, reviewing and making appropriate decisions regarding the prudency (sic) of the employer security investment

- Reviewing certain issues relating to the voting of employer securities

- Making appropriate decisions regarding the prudency (sic) of following plan provisions and/or participant voting direction in pass through voting situations; and

- Exercising voting discretion, where appropriate.

(Attached hereto as Exhibit 8, SSP009377).

196.    State Street monitored publicly-available information concerning the downward-

46

spiraling performance of Polaroid stock, starting in at least April of 1999. In April 1999, the "Watchlist Committee" noted in its report, "During the next 12-18 months, the company will continue to experience declining core business, with the added pressure of ramping up its new product line at the same time." (Attached hereto as Exhibit 9, SSP009113). The Watchlist Committee's notes contained the exact same foreboding language through January 2000 (attached hereto as Exhibit 9).

197.    On February 14, 2000, the State Street Watchlist Committee's report noted that Polaroid's "share price trended downward for the last six months" from a high of $30 on September 9, 1999 to a low of $17.25 on December 13, 1999 (attached hereto as Exhibit 9 SSP009280). Downward trends "for the last six months" or for the last year were noted on a monthly basis in the Watchlist Committee's reports from July 20, 2000 until Polaroid filed for bankruptcy in October 2001 (attached hereto as Exhibit 9).

198.    On November 13, 2000, the Watchlist Committee noted that "Low sales visibility, bloated inventories, forecasting issues and high operating leverage make for a potentially dangerous combination going into the critical fourth quarter." This sentiment was reiterated repeatedly in subsequent Watchlist Recommendations. For example, in February of 2001, when the stock price was $6.70, the Watchlist noted, "Low sales visibility, higher inventories, lower cash flows for 2001 with a leverage balance sheet in an economy bordering on no growth creates a *potentially dangerous operating environment*." (Attached hereto as Exhibit 9, SSP009310) (emphasis added).

199.    On March 1, 2001, a Watchlist Committee Report noted the following analyst comments about Polaroid:

- *"It's a disaster,"*
- *"Technology is dying,"* and
- *"It will likely continue to do poorly."*

47

*Id.* (emphasis added) (attached hereto as Exhibit 9, SSP009522).

200.    The March 1, 2001 Report was sent to State Street Watchlist and Fiduciary Committee Members Susan Daniels, Denise Sisk and Christine Walsch one week later . At the time, the stock was trading at $4.82. By the end of the month, the stock was trading at $4.42.

201.    In June 2001, the Watchlist observed, "Weak instant film sales, a leveraged balance sheet in a slowing economy and the competitiveness of its digital printing products create *too many uncertainties.*" *Id.* (emphasis added)  (attached hereto as Exhibit 9, SSP009331). At that time, the stock was trading at $3.53.  By the end of the month, the stock was at $2.59.

202.    Disturbingly, *three months before Polaroid filed for bankruptcy*, in a State Street "Fiduciary Committee Update" dated July 16, 2001, it was noted that on July 11, 2001 *"Polaroid reported that it may file for bankruptcy-court protection." Id.* (emphasis added) (attached hereto as Exhibit 9, SSP009426).  Yet, even in the face of the Polaroid Defendants' own breaches of fiduciary duty and failure to prudently direct the Trustees, as alleged herein, State Street did nothing to protect Plan assets or inform other Plan fiduciaries or participants of the looming collapse.

203.    Thus, as early as July 2001, State Street's own internal committees tasked with monitoring Polaroid stock determined that Polaroid's bankruptcy was an acknowledged possibility.  In compliance with its fiduciary duties, particularly in light of the Polaroid Defendants' breaches of fiduciary duty as alleged herein, State Street should have taken prompt action, but failed to do so.

204.    Similarly, the State Street Watchlist Committee warned on August 13, 2001 that "Bankruptcy filing is a possibility." August 13, 2001 Watchlist Committee Report (attached hereto as Exhibit 9, SSP009339). At the time, the Polaroid stock price was $1.46.  Still, even though State Street was fully aware the Polaroid stock had ceased to be a prudent investment,

and of the Polaroid Defendants' breaches of fiduciary duty as alleged herein, State Street did nothing to protect the Plan.

205. Polaroid filed for bankruptcy protection on or about October 12, 2001. Even then State Street failed to take any meaningful action to protect the Plan. Instead, despite its own expertise, and the obvious fact that Polaroid stock likely would have no future value given that Polaroid already had filed for bankruptcy protection, State Street hired an independent consultant, Willamette Management Associates, to "determine the fair market value of the Polaroid common stock owned by the ESOP and the CS [Company Stock] Fund." Willamette Management Associates Analysis, November 12, 2002 ("Willamette Report") at 1 (attached hereto as Exhibit 10). Not surprisingly, the report concluded that Polaroid stock was essentially worthless. *Id.*

206. Finally, on November 12, 2001, with Polaroid stock trading at $0.24 per share, the Fiduciary Committee voted to begin selling shares held in the ESOP. Over the following thirty days, State Street liquidated the Polaroid stock in the ESOP at an average per share price of *$.0946*. This action was taken far too late to be of any real value to participants. Remarkably, State Street did not divest the Company Stock Fund of its holdings of Polaroid stock at that time notwithstanding its knowledge of the Polaroid Defendants' own fiduciary breaches as alleged herein. On information and believe, State Street sold the shares in the Company Stock Fund in late December 2002 at a per share price of $.010.

207. In summary, throughout the period of precipitous decline in the price of Polaroid stock, ever more critical reports regarding the performance and future prospects of Polaroid that were prepared by *State Street itself*, and the Polaroid Defendants' own breaches of fiduciary duty, State Street failed to protect the Plan from further losses by exercising its discretion to divest the ESOP and Company Stock Fund of any or all of its holdings of Polaroid stock.

208. Instead, during Polaroid's long downward spiral, State Street merely monitored

49

the Company's stock until it declared bankruptcy and the stock was virtually worthless. Had State Street appropriately exercised its discretion and acted prudently and diligently as ERISA requires, it would have divested the Plan of Polaroid stock much earlier, thereby sparing the Plan of millions of dollars of losses. By standing idly by and doing nothing meaningful to protect the Plan while Polaroid's financial condition was deteriorating, its failure was looming, its stock price was plummeting, and the Polaroid Defendants were breaching their fiduciary duties to the Plan, State Street breached its fiduciary duties under ERISA.

### THE LAW UNDER ERISA

209.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

210.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

211.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to *a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

212.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They

entail, among other things,

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Polaroid Common Stock Fund and the ESOP Stock Fund, both of which invested in Polaroid stock, to ensure that each investment is a suitable option for the plan.

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

(c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

213.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

. . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: *(A)* if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; *(B)* if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or *(C)* if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

**Failure to Prudently and Loyally Manage Plan Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404)**
**(Against the CEO Defendant, Plan Administrator Defendants, Fund Manager Defendants**
**and Trustee Defendant)**

214.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

51

Consolidated Complaint as if fully set forth herein.

215.    At all relevant times, as alleged above, the CEO Defendant, Plan Administrator Defendants, and Fund Manager Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

216.    As alleged above the Defendants were all responsible, in the manner and to the extent described herein, for the selection, maintenance and monitoring of the Plan's investment options, including the option of Company Stock.

217.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in the Polaroid Common Stock Fund in the Plan were prudent, and are liable for losses incurred as a result of such investments being imprudent.

218.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

219.    The Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that Polaroid stock was not a suitable and appropriate investment for the Plan as described herein for either (1) Polaroid stock purchased through participant contributions to the Plan, or (2) Polaroid stock accumulated by the Plan through Company matching contributions and or through Company

"ESOP" contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the Polaroid stock as an investment option for the Plan and to direct and approve Plan investments in Polaroid stock, instead of in cash or other investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Polaroid stock.

220.    Moreover, they failed to take such steps despite the precipitous decline in value of Polaroid stock during the Class Period, and evidence that the Company was being seriously mismanaged and that the Company, as confirmed by its bankruptcy petition, was on the brink of financial collapse.

221.    The Plan Administrator and Fund Manager Defendants' decision to continue offering Polaroid stock as a Plan investment option, match employee contributions in Polaroid stock, and itself contribute shares of the stock to the ESOP portion of the Plan during the Class Period was an abuse of their discretion as ERISA fiduciaries. Indeed, because under the circumstances described herein, investment in Polaroid stock clearly was improvident, reasonably prudent fiduciaries would have made a different investment decision, and, in fact, would have converted the Plan's holdings of Polaroid stock to cash or other short-term less risky investment options made available to the participants by the Plan.

222.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

223.    State Street, as the Trustee for the ESOP and the Company Stock Fund in the 401(k) portion of the Plan, with admitted authority and control over Plan investments in Polaroid stock, also failed to prudently and loyally discharge its fiduciary obligations respecting the Plan's

53

investment in Polaroid stock.  As set forth above, using publicly-available information, State Street, knew that continued investment in Polaroid stock was imprudent in light of Polaroid's dire financial condition, grave doubts about its future viability as a going concern, and the precipitous decline in value of its stock.

224.    Yet, despite State Street's knowledge of these facts and circumstances, State Street did nothing to stem the tide as Polaroid collapsed, and the value of Polaroid stock plunged. Indeed, State Street waited a month after the Company filed for bankruptcy protection before initiating the sale of the stock in the ESOP portion of the Plan, and over a year before initiating the sale of the stock in the Company Stock Fund.  A reasonably prudent fiduciary under the circumstances then prevailing would have acted far sooner.

225.    In addition, State Street violated its fiduciary duties as a Trustee by continuing  to implement directions to make and maintain substantial investment of Plan assets in Polaroid stock, despite the fact that State Street knew or should have known that the Polaroid Defendants had not properly monitored or investigated the Plan's investment in Polaroid stock, and knew from its own analysis of Polaroid's financial condition, that Polaroid stock no longer was a prudent investment for participants' retirement savings.  A reasonably prudent fiduciary under the circumstances then prevailing would have disregarded imprudent directions to continue making and maintaining investment in Polaroid stock, taken appropriate action itself to protect the Plan, and would have informed the Plan's other fiduciaries, participants, and appropriate regulatory agencies, including the DOL, of the need for and basis of such actions.

226.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in and knowingly undertaking to conceal, and failing to undertake any effort to remedy their fellow Defendants' failure to prudently and loyally manage Plan assets despite knowing that such failures were breaches of their ERISA-mandated fiduciary duties, and by enabling their co-fiduciaries' breaches through their own failure to exercise the

specific fiduciary duties assigned to them by the Plan and ERISA regarding the prudent management of Plan assets.

227.    Specifically, each of the Plan Administrator and Fund Manager Defendants, and the CEO Defendant was aware of the dire circumstances the Company faced, and, yet, despite this actual knowledge, they participated in each others failure to prudently manage Plan assets, and knowingly concealed such failures by not informing participants that the Plan's holdings of Polaroid stock were not being prudently managed, and by, as well, providing incomplete and inaccurate information regarding Polaroid stock.  They also failed to remedy one another's breach of the duty to prudently manage the Plan's investment in Polaroid stock, despite knowledge of such breaches.  Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Polaroid stock, or undertake any genuine effort to investigate the merits of such investment, or ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Polaroid stock.

228.    In addition, State Street is liable as a co-fiduciary because it knew that the Polaroid Defendants were failing to prudently and loyally manage the Plan's investment in Polaroid stock, yet, despite this knowledge, State Street took no meaningful action to remedy the Polaroid Defendants' breaches of fiduciary duty.  State Street also participated in the Polaroid Defendants' failure to prudently and loyally manage the Plan's investment in Polaroid stock by knowing the investment had become imprudent, communicating with the Polaroid Defendants regarding the investment, but, together with the Polaroid Defendants, failing to implement prompt and effective action to divest the Plan of its imprudent holdings of Polaroid stock.

229.    Finally, State Street enabled the Polaroid Defendants' failure to prudently and loyally manage the Plan's investment in Polaroid stock through its own breach of its duties to act prudently and loyally with respect to the Plan's investment in Polaroid stock.  By failing to take

prompt and effective action to protect the Plan, State Street left the Plan's enormous holdings of Polaroid stock in the hands of the Polaroid Defendants who State Street knew were not prudently and loyally managing the Plan's investment in the stock. Thus, State Street enabled the Polaroid Defendants' continuing failure to prudently and loyally manage the Plan's investment in Polaroid stock.

230.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

231.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

232.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor and Provide Fiduciary Appointees With Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by the CEO Defendant)**

233.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Complaint as if fully set forth herein.

234.    At all relevant times, as alleged above, the CEO Defendant was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

235.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the CEO Defendant included the responsibility to appoint and remove, and, thus, monitor his appointees. Based on the plain language of the Plan Documents, and, as reflected in minutes and resolutions produced in preliminary discovery, the CEO Defendant was responsible for and did

56

appoint the Plan Administrator and Fund Manager Defendants.14

236.    Under ERISA, a monitoring fiduciary must periodically review the performance of his appointees in order to ensure that they are complying with and satisfying their specific fiduciary duties under the Plan and ERISA. With respect to investment fiduciary appointees, this includes ensuring that they are prudently and loyally carrying out their responsibilities with respect to the Plan and Plan assets. A monitoring fiduciary must also take prompt and effective action to remove and replace fiduciaries whom they replace in the event that, in fact, they are not performing their duties satisfactorily.

237.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

238.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

239.    The CEO Defendant breached his fiduciary monitoring duties by, among other

---

[14] According to the Plan Documents, the Plan Administrator Defendants were charged with responsibility for appointing, removing, and, thus monitoring the Plan Manager, and the Fund Manager Defendants were charged with responsibility for appointing, removing, and, thus, monitoring investment managers. To the extent that information acquired during discovery establishes that the Plan Administrator and Fund Manager Defendants also breached their monitoring duties under ERISA, Plaintiffs will seek leave to amend to add them to this Count as well.

things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above (to the extent such access was lacking), which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in Polaroid stock, an undiversified employer stock fund, given the dire circumstances the Company faced. The CEO Defendant knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the Polaroid stock as a Plan investment, and continuing to invest in Polaroid stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

240.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, the CEO Defendant in connection with his monitoring and oversight duties, was required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of Polaroid (to the extent any one of them did not already possess such information) that he knew or should have known that these Defendants needed to make sufficiently informed decisions. By conveying incomplete and inaccurate information, and standing idly by as his appointees made imprudent investment decisions for the Plan regarding Polaroid stock, the CEO Defendants breached his monitoring duties under the Plan and ERISA.

241.    Defendant named in this Count was unjustly enriched by the fiduciary breaches described in this Count.

242.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

243.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA against the
CEO Defendant, Plan Administrator Defendants, Fund Manager Defendants
and Trustee Defendant)**

244.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Consolidated Complaint as if fully set forth herein.

245.    At all relevant times, as alleged above, Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

246.    At all relevant times, the scope of the fiduciary responsibility of the Defendants

included Plan communications and material disclosures.

247.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

participants, not to mislead them regarding the plan or plan assets, and to disclose information

that participants need in order to exercise their rights and interests under the plan. This duty to

inform participants includes an obligation to provide participants and beneficiaries of the Plan

with complete and accurate information, and to refrain from providing false information or

concealing material information, regarding Plan investment options such that participants can

make informed decisions with regard to the prudence of investing in such options made available

under the Plan.  This duty applies to all Plan investment options, including investment in

Polaroid stock.

248.    Because investment in the Plan was not diversified (*i.e.* the Defendants chose to

invest the Plan's assets, and/or allow those assets to be invested, so heavily in Polaroid stock),

such investment carried with it an inherently high degree of risk.[15] This inherent risk made the

---

[15] *See generally The Danger in a One-Basket Nest Egg Prompts a Call to Limit Stock*, N.Y.
Times, December 19, 2001 (noting the inherent danger of company retirement plans'
overinvestment in the stock of sponsoring companies).

Defendants' duty to provide complete and accurate information particularly important with respect to Polaroid stock.

249.    The Defendants breached their duty to disclose information to participants by failing to provide complete and accurate information regarding Polaroid stock and the soundness of Polaroid stock as retirement plan investment to participants.  They also breached this duty by creating an inaccurate impression of the future prospects of the Company in Company-wide and general public statements regarding the Company, thereby causing participants to believe that, in fact, the investment was an appropriate one for participants' retirement Plan accounts.  These failures were particularly devastating to the Plan and the participants; a heavy percentage of the Plan's assets were invested in Polaroid stock during the Class Period and, thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

250.    Defendants knew or should have known that information that they possessed regarding the true financial condition of the Company would have an extreme impact on the Plan, and that participants needed to have the information in order to protect their retirement Plan investments from certain losses.

251.    As a consequence of Defendants failure to satisfy their disclosure obligations under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Polaroid stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by participants, that Polaroid stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.

252.    Defendants' failure to disclose was Plan-wide, in that no participant was provided with complete and accurate information, and the Company's and Defendants' inaccurate accounts of Polaroid's true financial condition were disseminated on a Company-wide basis and to the market as a whole.  Thus, on a Plan-wide basis, and in a manner and extent that was identical for all participants, participants and the Plan relied to their detriment on the incomplete

and inaccurate information provided by the Defendants.

253.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Polaroid stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

254.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

255.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

256.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
(Breaches of Fiduciary Duties in Violation of
ERISA §§ 404 and 405 of ERISA by CEO Defendant, Plan Administrator Defendants,
Fund Manager Defendants)

257.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Complaint as if fully set forth herein.

258.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

259.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

260.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the Polaroid stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Polaroid stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Company Stock.

261.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

262.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

263.    The Plan suffered a loss, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in Polaroid stock during the Class Period in violation of the Defendants' fiduciary duties.

264.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period unless the Plan satisfies the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the

regulations promulgated under it.

265.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions. In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

266.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Polaroid stock in the Plan. Accordingly, participants failed to exercise the requisite independent control over their investment in Polaroid stock in the Plan. Furthermore, upon information and belief, participants were not informed that the Plan intended to qualify as a § 404(c) Plan in the manner required by ERISA and applicable regulations. Therefore, § 404(c) of ERISA does not apply to participants' "investment decisions" regarding Polaroid stock, and Defendants remain liable for losses suffered by participants during the Class Period as a result of such decisions.

267.    In addition, § 404(c) does not apply to any portion of the Plan deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide Plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997), nor can § 404(c) apply to any losses that result from the Company's ESOP contributions in Polaroid stock, as participants did not exercise any control over these investments.

268.    The Defendants' liability to Plaintiffs for relief stemming from imprudent Plan

investments in Polaroid stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## CAUSATION

269.     The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants in Polaroid stock during the Class Period, in breach of Defendants' fiduciary duties.  This loss was reflected in the diminished account balances of the Plan's participants.

270.     Defendants are responsible for losses caused by participant direction of investment in Polaroid stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health, ongoing profitability, and viability of the Company, and misrepresenting its soundness as an investment vehicle.  As a consequence, participants did not exercise independent control over their investments in Polaroid stock, and Defendants remain liable under ERISA for losses caused by such investment.

271.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Polaroid stock, eliminating Polaroid stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Polaroid stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Polaroid stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

272.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . .."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . .."

273.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the plan had been properly administered.

Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

\\

\\

Dated: September 15, 2004

Respectfully submitted:

LAW OFFICES OF CURTIS V. TRINKO, L.L.P.

By: _____
       Curtis V. Trinko (CT-1838)
       16 West 46th Street, 7th Floor
       New York, NY 10036
       Telephone: (212) 490-9550
       Facsimile: (212) 986-0158

Liaison Counsel for Plaintiffs


KELLER ROHRBACK L.L.P.

By: _____
Lynn Lincoln Sarko
Derek W. Loeser (DL-6712)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

*Co-Lead Counsel for Plaintiffs*


SCHIFFRIN & BARROWAY, LLP
Richard S. Schiffrin
Joseph H. Meltzer
Gerald D. Wells, III
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Derek W. Loeser, hereby certify that I caused the foregoing Amended Consolidated

Complaint to be served on September 15, 2004, via electronic and U.S. Mail, upon Defendants'

counsel, listed below.

By: _____

Derek W. Loeser (DL-6712)
Curtis V. Trinko (CT-1838)

David P. Donovan (DD-7012)
Bradley Miller (BM-7282)
WILMER CUTLER PICKERING HALE
   & DORR LLP
1600 Tysons Blvd., Suite 1000
McLean, VA 22101
(703) 251-9700

*Counsel for Defendants Harvey Greenberg,*
*Benjamin C. Byrd, III, John Jenkins, Carl L.*
*Lueders, Warren Kantrowitz, Janet B. Cramer,*
*Deirdre J. Evans, Neal D. Goldman, Donald*
*M. Halsted, III, William Hubert, Judith G.*
*Boynton, Philip Ruddick, Ralph Norwood,*
*William L. Flaherty, Patricia R. Weller, Andra*
*S. Bolotin, and Jeffrey S. Miller*

Harvey J. Wolkoff
Loretta R. Richard
Emily Frug Klineman (EK 1761)
ROPES & GRAY
One International Place
Boston, MA 02110-2624
(617) 951-7000

*Counsel for Defendant Gary T. DiCamillo*

68