# EXHIBIT U

Case 1:04-cv-11380-WGY    Document 189-23    Filed 08/31/2007    Page 1 of 4



GOODWIN PROCTER DRAFT: 8/12/04

## Fiduciary Committee Meeting Minutes

| | |
|---|---|
| **Date:** | February 23, 2004 |
| **Subject:** | Appleton, W.R. Grace, Deutsche Bank, Enron |
| **Committee Members:** | Marc Brown, Kelly Driscoll, John Kirby, Shawn Johnson, Peter Leahy, Mitch Shames |
| **Attendees:** | Sydney Marzeotti, Melissa Smith, Julio Fuentes, Kathleen Mann, Jack Moore – SSgA |
| | Jack Cleary, Dan Glosband, Legal Counsel with respect to W.R. Grace – Goodwin Procter |
| | Dan Bayston, Paul Trost Financial Advisor with respect to W.R. Grace – Duff & Phelps |
| | Bob Socol, Scott Levine, Financial Advisor with respect to Appleton – Willamette |

**Appleton**

**W.R. Grace**

J. Cleary, D. Glosband, D. Bayston and P. Trost joined the meeting for the discussion regarding W.R. Grace.

**Discussion:** K. Driscoll informed the Committee that the IFG had completed its due diligence and analysis, and confirmed its determination to recommend that a selling program be commenced with respect to the W.R. Grace stock held in the W.R. Grace Retirement Savings Plan (the "Plan"); however, since the Committee had requested additional information with respect to one particular issue, she would recap the specific findings. The Committee had inquired as to the capacity in which State Street held shares of W.R. Grace, outside of the IFG engagement. Upon researching the matter, it was determined that State Street held all of those shares in the Russell 2000 and Russell 3000 funds. P. Leahy observed that both of these funds are so-called index funds which, as a general matter, means that the funds will continue to hold the stock as long as it continues to be included in the relevant index. M. Brown inquired as to the relevance of this information. K. Driscoll explained that it was appropriate to review State Street's rationale for continuing to hold the W.R. Grace stock in that other capacity and to evaluate whether it was relevant to the decision whether the W.R. Grace stock held in the Plan should be sold. P. Leahy added that holding the W. R. Grace stock as part of a diversified fund is fundamentally different than holding the same stock as a very large concentrated holding in the W.R. Grace retirement plan. S. Johnson added that, as a general matter, a diversified fund's continued investment in W.R. Grace stock could be a prudent investment even though a fund invested exclusively in a very large block of that stock may not be prudent. S. Johnson asked if ERISA applied to the commingled funds the same as the stock fund in the plan. M. Shames responded that the

LIBB/1282261.2

SSBT-000713
CONFIDENTIAL


STATE STREET GLOBAL ADVISORS
SSgA

Page 2

W.R. Grace stock fund is governed by the plan document whereas the Russell funds are governed by the fund declarations. M. Shames also stated that, given the special nature of index funds, he was comfortable that the Russell funds' holding W.R. Grace stock was not particularly relevant to the decision whether the Plan should commence a selling program.

M. Brown asked if one of the reasons for the selling program was to get below the 10% ownership level under Rule 144. K. Driscoll acknowledged that one of the motivations for commencing the selling program was to get below the 10% ownership level and thereby free the Plan from the restrictions of Rule 144. More generally, there was a desire to increase the Plan's ability to respond to market developments by significantly reducing the Plan's holdings. In any event, IFG has determined that the market price of the W.R. Grace stock is not a good indication of long-term value because of the speculative and volatile nature of stock valuations of companies undergoing a bankruptcy proceeding involving significant contingencies such as the asbestos litigation and potential asbestos litigation faced by W.R. Grace. This general view is consistent with the fact that the stock is currently trading above the high end of the Duff & Phelp value range, an additional fact that supports the recommendation to commence a selling program. Based on the foregoing and its consideration of all of the relevant facts and circumstances, IFG has confirmed its determination that it is no longer consistent with ERISA for the Plan to continue holding its current position of W.R. Grace stock and that a selling program should be commenced. K. Driscoll noted that IFG would monitor this decision on an ongoing basis and that the selling program could, and if appropriate would, be suspended at any time that circumstances changed in any material respect.

S. Johnson followed up with a question regarding what would happen to a participant's holdings in stock when the stock is sold. J. Cleary responded that the cash automatically goes into the Plan's stable value fund and then the participant has the option of moving the money out of that fund into the other investment options offered under the Plan. K. Driscoll informed the Committee that, if IFG's recommendation is approved, a draft participant communication that had been reviewed by counsel will be sent to W.R. Grace today. M. Brown asked what IFG thought the reaction would be from participants and whether receiving the communication would likely cause participants to sell the stock on their own. J. Cleary observed that past communications have not triggered much participant activity. S. Johnson asked if there were any conflicts regarding SEC and ERISA notice requirements. J. Cleary stated that the best course of action would be to notify the SEC and participants at the same time.

S. Johnson raised a concern regarding the reaction that the market will likely have once the Plan begins selling the W.R. Grace stock since the Plan is the largest shareholder. K. Driscoll stated that if the price falls drastically, the selling program could be suspended. M. Shames suggested that the Committee delegate authority to IFG to sell as long as the share price is above the mid-point of the range provided by Duff & Phelps. Under his suggested approach, IFG would be required to cease trading if the price drops below that level. P. Leahy agreed that IFG should be required to come back to the Committee before selling at prices below the mid-point of the D&P range. In addition, it was the consensus view that IFG should come back to the Committee in the event of any significant developments relating to the Zonolite litigation or the FAIR Act legislation.

It was agreed that IFG would provide a revised recommendation reflecting the foregoing discussion to the Committee via email. The Committee will then render a vote on that revised recommendation. J. Cleary, D. Glosband, D. Bayston and P. Trost left the meeting at this point.

SSBT-000714
CONFIDENTIAL

**STATE STREET GLOBAL ADVISORS**

**SSgA**

Page 3

**Revised Recommendation (circulated by e-mail):** IFG recommends that the Committee authorize and direct IFG to commence a selling program with respect to the W.R. Grace stock held by the Plan but that all such sales should be at a price no lower than the midpoint of D&P's valuation range, which is currently at $1.88 per share. In addition, the IFG will provide prompt notice of the commencement of the selling program to participants in the Plan.

**Vote:** M. Shames, K. Driscoll, M. Brown, J. Kirby and P. Leahy voted to approve the IFG recommendation. S. Johnson did not vote. *(Vote was via email)*

SSBT-000715
CONFIDENTIAL