**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KERI EVANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JOHN F. AKERS, et al. ) | |
| ) | |
| Defendants. ) | |
| | |
| LAWRENCE W. BUNCH, et al. ) | Consolidated |
| ) | Case No. 04-11380-WGY |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| W. R. GRACE & CO., et al. ) | |
| ) | |
| Defendants. ) | |

**BUNCH PLAINTIFFS' OPPOSITION TO MOTIONS OF THE
GRACE DEFENDANTS AND THE STATE STREET DEFENDANTS
FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs brought this action because Defendants, in violation of their admitted fiduciary duty, eliminated the Grace Stock Fund. Defendants try to minimize their conduct by asserting that Plan Participants only complained when Grace common stock experienced a rapid rise in its price. Defendants know that their revisionist history is untrue. Several Plan Participants, when they learned of the sale and before the price of

Grace common stock climbed from $3 a share up to $27 a share, challenged the appropriateness of Defendants' conduct.[1] Of course, the rapid price appreciation has added salt to the wound and further upset members of the class.

Despite Defendants' desperate attempt to draw attention from their misconduct, this case does not involve Plaintiff's conduct or motivations; they are passive victims. Instead, the action involves the failure of all Defendants to perform their fiduciary duty.

The pending motions involves undisputable evidence State Street's decision to ignore the Plan's structure and to second guess an efficient market and eliminate a viable and attractive investment option that always remained consistent with ERISA requirements.[2] The motions further involve the Grace Defendants' uncontested admission through its Chief Financial Officer that they refused to monitor its appointed fiduciary, State Street.

> Q. Didn't you think you had some responsibility as a member of the committee to monitor what State Street was doing after its engagement?
>
> …
>
> A. Responsibility to do what? Other than understanding the number of shares in the plan, I didn't understand any other responsibility.[3]

**BACKGROUND**

On December 15, 2003, the day that State Street became the Investment Manager for the Grace Stock Fund, the Grace Defendants unequivocally believed that retention of the Fund was consistent ERISA. (Plaintiffs' Uncontested Fact No. 9). During the four

---

[1] *See,* McGowan Deposition at 157-58; Tarola Deposition at 112-13.
[2] Fiduciary Committee Meeting Minutes, February 23, 2004, SSBT-000713-000715 at 000714, attached as Exhibit "J"; Johnson Deposition testimony at 25-27.
[3] Tarola Deposition at 154-55.

2

months that State Street served as Investment Manager, Grace's financial and operational conditions were solid and improving. (Plaintiffs' Uncontested Fact No. 10).

Although the price of Grace common stock fluctuated while State Street served, the price never fell below $2.54. (Plaintiffs' Uncontested Fact No. 23). During the three years subsequent to Grace's bankruptcy, the price of Grace common stock increased by 16.1%. (Plaintiffs' Uncontested Fact No. 26). Also, during the period, the Grace Stock Fund was one of the top performing investment options in the Grace Plan. (Plaintiffs' Uncontested Fact No. 27).

Grace common stock traded in an efficient market. The market factored into the price of Grace common stock all available public information incluidng the uncertainty surrounding the Company's bankruptcy and contingent liabilities. (Plaintiffs' Uncontested Fact No. 22). State Street admits "the market is the best determinant on any day as to what the shares are worth." (Plaintiffs' Uncontested Facts No. 22). In fact, less uncertainty surrounded Grace after it entered bankruptcy than the period before bankruptcy. (Plaintiffs' Uncontested Fact No. 19).

The Grace Defendants, in November 2003, hired State Street as the Investment Manager for the Grace Stock Fund. (Plaintiffs' Uncontested Fact No. 28). State Street's sole responsibility was to determine whether the Plan's retention of the Grace Stock Fund was "not consistent with ERISA." (Plaintiffs' Uncontested Fact No. 28). State Street performed an analysis by depending heavily on the work of Duff & Phelps. (State Street Statement of Undisputed Facts Nos. 51, 53-55, 60, 62, 66, 67, 69, 70, and 77).

Duff & Phelps, based on publicly available information, devised an "equity value" conclusion. (State Street Statement of Undisputed Facts No. 62). On February 23,

2004, State Street voted to override Plan documents and commence a selling program. (State Street Statement of Undisputed Facts No. 62). State Street relied heavily on a February 17, 2004 Duff & Phelps "equity value" conclusion. On February 17, 2004, Duff & Phelps "equity value" conclusion ranged between $0.73 to $3.02 per share. (State Street Statement of Undisputed Facts No. 62). The Duff & Phelps "equity value" calculation materially was **less** than the market price of Grace common stock. On February 17, 2004, the New York Stock Exchange priced Grace Stock at $3.51 a share. (State Street Statement of Undisputed Fact No. 63).

Duff & Phelps determined its "equity value" calculation by depending on third party information; it did not possess first hand information concerning Grace's asbestos liability and other obligations. (Plaintiffs' Uncontested Fact No. 29). State Street understood that the Duff & Phelps calculation amounted to a "best guess". (Plaintiffs' Uncontested Fact No. 20). Despite the lack of certainty in the Duff & Phelps reports, State Street decided to depend more heavily on Duff & Phelps than the efficient market and decided to override Plan Documents by second guessing the market. According to State Street, "the market price of the W.R. Grace stock is not a good indication of its long term value…" (Plaintiffs' Uncontested Fact No. 25). State Street further used this justification to sell the Fund's remaining 6.2 million shares of Grace common stock to D.E. Shaw in April of 2004. (Plaintiffs' Uncontested Fact No. 30).

State Street not only disregarded the public market price, which had always reflected that Grace stock had value, State Street also ignored clear, unequivocal aspects of the Plan. State Street ignored, as part of its process, the Participants' investment activities and decisios, the Plan's investment options, the amount of Plan assets allocated

4

to the Grace Stock Fund, and whether Plan Participants were required to invest in the Grace Stock Fund. (Plaintiffs' Uncontested Fact No. 18). State Street's refusal to consider the Plan in its entirety is totally at odds with the testimony of State Street's expert, Thomas Hogan. Mr. Hogan testified that he would expect State Street to have considered these facts. "It would be unprudent [sic] to not consider all the facts and circumstances when you're doing it…" (Plaintiffs Uncontested Facts Nos. 16 and 17).

In addition to failing to consider the efficiency of the market, the entirety of the Plan, and the Plan's investment options, State Street's actions also are inconsistent with the conduct and opinions of its expert, Mr. Hogan. On at least two occasions during his career, Mr. Hogan has concluded that the retention of company stock in a retirement plan's company stock fund remained consistent with ERISA when facts and circumstances revealed a business climate that was appreciably more uncertain and more dangerous than the climate that Grace faced.

In contrast to the opinions offered in this case, Mr. Hogan supported the holding of company stock when he served as a fiduciary to his employer's company stock fund at First RepublicBank Corporation. During his tenure as a fiduciary to the fund, First RepublicBank Corporation was in the midst of the banking crisis that affected Texas banks in the late 1980's and early 1990's. Ultimately, the Federal Deposit Insurance Corporation ("FDIC") took over the bank and the stock fund became worthless. The FDIC takeover did not surprise Mr. Hogan. Nonetheless, Mr. Hogan never eliminated the company stock fund. Furthermore, Mr. Hogan does not believe that he violated his fiduciary duties to the fund's participants. (Plaintiffs' Uncontested Fact No.15).

Mr. Hogan's opinions in this case are also at odds with those offered in a different State Street engagement. State Street hired Mr. Hogan to serve as an expert in litigation concerning State Street's role as a directed trustee for the Polaroid retirement plan. Plan Participants brought an action in the United States District Court for the Southern District of New York and named State Street. Plan Participants claimed that State Street should have eliminated the company stock fund. According to the First Amended Complaint in *Polaroid*, the price of Polaroid stock fell from $30 on September 9, 1999 to $.24 on November 12, 2001. On July 16, 2001, Polaroid announced that it may have to file for bankruptcy, on October 12, 2001, Polaroid filed for bankruptcy, and State Street did not begin to sell until November 12, 2001 when the stock had fallen almost $30 a share to a price of $.24. Despite the precipitous decline and information that Polaroid was likely to fail, Mr. Hogan offered the expert opinion that State Street was correct in holding the Polaroid stock during this time. (Plaintiffs' Uncontested Fact No.15).

Throughout State Street's engagement in this matter, Grace intentionally "buried its head in the sand" and limited its contact with State Street. (Plaintiffs' Uncontested Facts Nos. 2 and 3; Grace Defendants' Statement of Facts Nos. 18 and 29). Grace did nothing when it learned in February of 2004, that State Street was intending to sell stock from the Grace Stock Fund. (Grace Defendants' Statement of Fact No. 32). In late March or April of 2004, State Street told Grace that it intended to sell the Fund's remaining 6.2 million shares to D.E. Shaw, a hedge fund. (Plaintiffs' Uncontested Fact No. 5). Again, Grace failed to take any action.

No members of the Investment and Benefits Committee of Grace ever contacted State Street after the beginning of the engagement. (Plaintiffs' Uncontested Facts No. 5).

Additionally, Robert Tarola, the senior member of the Committee and Grace's Chief Financial Officer who controlled distribution of the Grace's financial information, testified that Grace, after hiring State Street, never provided any additional or supplemental information to State Street or Duff & Phelps. (Plaintiffs' Uncontested Fact No. 7).

During State Street's tenure, Grace admits that it took the position that it was entitled to do nothing regarding the monitoring of State Street and that it was "off limits" to monitor State Street to ensure that State Street's performance complied with the terms of the Plan and statutory standards, and satisfied the needs of the Plan. (Plaintiffs' Uncontested Fact No. 1). Indeed, despite believing that the Grace Stock Fund was prudent and consistent with ERISA and despite improving operating results and possible favorable federal legislation concerning asbestos liability, Grace's response to State Street's decision to eliminate the Stock Fund was disinterest. (Plaintiffs' Uncontested Fact No. 1).

According to Robert Tarola, Grace's Chief Financial Officer and senior member of the Investment and Benefits Committee, Grace after it hired State Street "wiped its hands" of any responsibility to Plan Participants. Mr. Tarola further testified that Grace's only monitoring responsibility was to understand "the number of shares in the plan"; he "didn't understand any other responsibility." (Plaintiffs' Uncontested Fact No. 1). An actual conflict of interest, moreover, never arose that justified Grace avoiding its responsibility to monitor.[4] (Plaintiffs' Uncontested Fact No. 4).

---

[4] Plaintiffs do not accept the Grace Defendants' unsupported argument that a conflict of interest somehow permits an ERISA fiduciary to avoid performing its monitoring obligation.

Grace's failure to monitor is a clear violation of ERISA. Thomas Hogan, Grace's retained expert testified that Grace had the absolute obligation to monitor State Street. "I think Grace had an obligation to monitor State Street's performance as a fiduciary." (Plaintiffs' Uncontested Fact No. 9).

## ARGUMENT

**I.   SUMMARY JUDGMENT IN FAVOR OF STATE STREET IS INAPPROPRIATE BECAUSE STATE STREET FAILED TO FOLLOW A PROPER PROCESS WHEN IT ELIMINATED THE GRACE STOCK FUND**

### A.   State Street Ignored Important Facts and Circumstances When It Made its Decision.

Plaintiffs, in their memorandum in support of its motion for summary judgment (Doc. No. 180), discussed the law concerning the obligation of ERISA fiduciaries to rely on the efficient market as opposed to second guessing the market. Plaintiffs also discussed the obligation of ERISA Fiduciaries to review the Plan and its investment options when deciding if a company stock and has become inconsistent with ERISA. Accordingly, Plaintiffs will not repeat their legal analysis. Instead, Plaintiffs will discuss the record including the testimony of State Street's retained experts to demonstrate that State Street failed to follow a proper process when it second-guessed an efficient market, and it ignored the Plan and its investments.

When State Street made its determination, it primarily emphasized, based on the Duff & Phelps reports, "the bankruptcy status of the company, the uncertainty that equity holders would receive value for the stock and outstanding asbestos litigation." (State Street Statement of Undisputed Fact No. 82). These factors were well known, and Grace identified the same factors in numerous public securities filings. (Plaintiffs' Uncontested

8

Fact No. 31). The price of Grace common stock reflected these factors. (Plaintiffs' Uncontested Fact No. 22). State Street, nonetheless, overrode the Plan documents by concluding "that the market price of the W.R. Grace stock is not a good indication of its long term value…" (Plaintiffs' Uncontested Fact No. 25).

State Street's conclusion that the market price failed to function as a good indication of the stock's long-term value is surprising and inconsistent with the testimony and opinions of its retained expert. Christopher James specifically stated that the market price **did** reflect the stock's long-term value. "I think that its prospects were reflected in the market price in which it sold." (Plaintiffs' Uncontested Fact No. 22).

State Street's conduct and process further is questionable because State Street relied on the analysis of its retained consultants despite understanding that the market was the best indicator of the value of Grace common stock and despite understanding that the analysis of the consultants amounted to "best guesses". In fact, Shawn Johnson, State Street's Chairman of the Fiduciary Committee, testified to both of these points. First, he stated that the market price was the best evidence of the value of Grace common stock. According to Johnson, "the market is the best determinant on any day as to what the shares are worth." (Plaintiffs' Uncontested Fact No. 22). Second, Mr. Johnson testified that the consultants had to make guesses when they performed their analysis. (Plaintiffs' Uncontested Fact No. 20). Clearly, the testimony of Dr. James and the record establishes that State Street failed to follow a proper ERISA process when it choose to second guess the market and accept the valuations of Duff & Phelps as the basis for eliminating the Grace Stock Fund.

The testimony of State Street's retained expert Thomas Hogan further demonstrates that State Street failed to follow a proper process when it ignored Plan Documents, Participant investment activities, and investment options available to Plan Participants. (Plaintiffs' Uncontested Fact No. 18). Mr. Hogan testified that State Street had the responsibility to consider all of the facts and circumstances and that the facts and circumstances included the Plan and the Participants' investment activities. (Plaintiffs' Uncontested Facts Nos. 16 and 17).

> **B.    The Fact that Plaintiffs claim that State Street Breached its ERISA duty by Selling as Opposed to Holding Company Stock does not lessen State Street's Fiduciary Obligation or Liability.**

State Street notes that Plaintiffs cannot cite to an opinion in which a court has found an ERISA fiduciary liable for selling company stock. State Street Memorandum (Doc. No. 184) at 16. Plaintiffs always have conceded that this case is unique in that it involves the sale of company stock as opposed to retention of company stock. The issue, however, in either situation is the same: is the retention of company stock consistent with ERISA. (Plaintiffs' Uncontested Fact No. 28). Ultimately, the answer depends on the same analysis.

In this case, the testimony of Mr. Tarola and Mr. McGowan from Grace and the testimony from Defendant's retained expert, Thomas Hogan, demonstrate that retention of the Grace Stock Fund remained consistent with ERISA. Prior to hiring State Street on December 15, 2003, Grace claims to have undertaken an analysis regarding whether the retention of the Stock Fund was consistent with ERISA. According to both members of the Investment and Benefits Committee, Mr. Tarola and Mr. McGowan, the Grace Stock Fund was consistent with ERISA from April 2, 2001 through December 15, 2003.

(Plaintiffs' Uncontested Fact No. 10). Additionally, the record is devoid of any evidence that materially changes the ERISA analysis. During the four months that State Street served, Grace's financial outlook was improving. (Plaintiffs' Uncontested Fact No. 11).

Similarly, the experience and opinions of Defendants' retained expert, Thomas Hogan, strongly support the conclusion that retention of the Grace Stock Fund was consistent with ERISA. Mr. Hogan testified that ERISA fiduciaries act consistent with their ERISA obligations when they retain company stock in situations vastly more uncertain and financially dangerous than the situation facing Grace. Mr. Hogan testified that he acted consistent with ERISA when he permitted First RepublicBank Corporation employees to hold stock in the company stock fund. According to Mr. Hogan, the retention remained prudent despite his knowledge that the Bank faced serious financial concerns and a Federal takeover. Ultimately, the stock fund became worthless. (Plaintiffs' Uncontested Fact No. 15).

Mr. Hogan also testified that State Street acted consistent with ERISA when it permitted Polaroid to maintain a company stock fund.[5] Mr. Hogan testified that retention remained prudent despite Polaroid facing imminent financial collapse and a rapidly declining stock price. Indeed, before State Street sold the stock fund, the company entered bankruptcy, announced that it could not survive and the stock fell from $30 on September 9, 1999 to $.24 on November 12, 2001. (Plaintiffs' Uncontested Facts No. 15). Certainly, if Mr. Hogan, in his expert capacity, opined that State Street acted in conformity with ERISA when it retained the stock fund as Polaroid's business collapsed and the stock headed toward zero, State Street's retention of the Grace Stock Fund, under significantly better conditions remained consistent with ERISA.

---

[5] *In Re: Polaroid ERISA Litigation*, 362 F. Supp.2d 461 (S.D.N.Y. 2005).

State Street also challenges the *Bunch* Plaintiffs because they seek to hold State Street liable for selling company stock and the *Evans* Plaintiffs seek to hold Grace liable for retaining the Grace Stock Fund. State Street suggests that the cases are incompatible.[6] The positions are not inconsistent. Indeed, if anyone is taking an inconsistent position it is Grace. Grace is claiming that it was consistent with ERISA to hold the Stock Fund when Grace's fortunes were more uncertain, and it was entering bankruptcy. However, Grace is taking a contrary position that it was inconsistent with ERISA to hold the Stock Fund when its conditions were improving.

The differences between the period before bankruptcy that forms the basis of the *Evans* action, and the period post bankruptcy that forms the basis of this action are substantial.[7] Thus, the cases are based on different facts and circumstances. First, as Shawn Johnson acknowledged, less uncertainty existed after the filing. (Plaintiffs' Uncontested Fact No. 15). Second, the price of Grace stock, before bankruptcy was rapidly falling from $19.19 on July 1, 1999 to $1.52 on April 2, 2001. (State Street Statement of Undisputed Facts Nos. 10 and 11). On the other hand, during the relevant period post bankruptcy, Grace common stock experienced an increase of 16.1%. (Plaintiffs' Uncontested Fact No. 15). Also, during State Street's tenure, the daily closing price ranged between $2.54 on December 22, 2003 and $3.70 on January 12, 2004. (Plaintiffs' Uncontested Fact No. 15). Throughout the three years post bankruptcy, the Grace Stock Fund was one of the best performing investment options available to Plan Participants, and the Grace Stock Fund had a rolling 12 month Return of 110%, fiscal

---

[6] The *Bunch* Plaintiffs have not analyzed and cannot take a position whether the *Evans'* allegations are correct.

[7] The Bunch Plaintiffs have not undertaken sufficient discovery to form a position regarding the merits of the *Evans* case.

year to date return of 21.4% and a three year average return of 10.7%. (Plaintiffs' Uncontested Fact No. 27). Third, during the period that State Street served as the Investment Manager, Grace was experiencing solid and improving operating results. (Plaintiffs' Uncontested Fact No. 11).

### C. Questions of Fact Preclude this Court from Granting Summary Judgment on Plaintiffs "Self-Dealing Claims

During the four months that State Street was managing the Grace Stock Fund, it also was managing a number of index funds and other investment vehicles that owned Grace common stock. Indeed, many of the State Street managed investments purchased and sold Grace common stock. Although in most instances, the investment was passive-State Street purchased and sold based on a mathematical formula that allowed State Street to replicate certain indexes-State Street also actively managed accounts that allowed State Street to purchase Grace common stock without the restrictions that the formulas placed on State Street. (Plaintiffs' Uncontested Facts No. 33). Accordingly, State Street benefited from the sale of Grace common stock because it made more shares of Grace available for purchase.

## II. GRACE IS LIABLE BECAUSE IT DID NOT MONITOR STATE STREET

### A. Grace Had a Duty to Monitor.

Grace has taken inconsistent positions. Grace suggests that it monitored State Street, but because of a potential conflict of interest its duty to monitor was limited and basically nonexistent.[8] Grace simply is wrong when it suggests that it possessed only a limited obligation to monitor. First, Grace has failed to cite any law that supports the argument. Second, Grace has admitted that it did not have an actual conflict of interest.

---

[8] *See* Grace Memorandum (Doc. No. 178) at 14 ("A delegation of duties for this reason [potential conflict of interest] necessarily involves a more limited duty to monitor…").

13

(Plaintiffs' Uncontested Fact No. 6). Third, its expert, Mr. Hogan testified that "Grace had an obligation to monitor State Street's performance as a fiduciary." (Plaintiffs' Uncontested Fact No. 6).

Aside from any authority that supports its creative conclusion that a nonexistent conflict of interest limited its duty to monitor, the authority cited by Grace establishes that Grace had a duty to monitor State Street. Grace principally relies on *Leigh v. Engle*[9] and *In re: Polaroid ERISA Litigation*.[10] Neither of these authorities supports Grace. In *Leigh*, the Seventh Circuit expressly held that appointing fiduciaries cannot insulate themselves from liability. According to the *Leigh* court, appointing fiduciaries "could not insulate themselves from all fiduciary liability by limiting their roles in the administration of the trust."[11] Similarly, the *Polaroid* court held that although ERISA does not require an appointing fiduciary to examine every action taken, ERISA does require the appointing fiduciary "to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations."[12] Additionally, Grace acknowledges that 29 C.F.R. § 2509.75, FR-17 required it to monitor State Street to ensure that State Street's "performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."

    **B.    Grace Failed to Take Any Action to Determine Whether State Street's Performance was Appropriate.**

Grace claims that this "is not a case where the Grace fiduciaries appointed State Street as investment manager of the Grace Stock Fund and simply washed their hands of

---

[9] 727 F.2d 113 (7th Cir. 1984).
[10] 362 F. Supp. 2d 461 (S.D.N.Y. 2005)/
[11] 727 F.2d at 135.
[12] 362 F. Supp. 2d at 477.

the matter."[13] Yet, this is exactly a case where Grace "washed its hands of the matter." In fact, Robert Tarola, Grace's Chief Financial Officer and a member of the Investment and Benefits Committee, has used almost the precise words to describe Grace's lack of monitoring.

> Q. At the time you signed this document [State Street engagement letter], is it correct that you believed you had no responsibility with respect to State Street's decision on its handling of the Grace stock fund?
>
> A. That's absolutely correct.
>
> **Q. And you believed at the time that you had virtually wiped your hands of any responsibility to the plan participants, in the vernacular?**
>
>   MS. FLOWE:  Same objection.
>
>   THE WITNESS:  **That's correct.**

(Plaintiffs' Uncontested Fact No. 1).  According to Mr. Tarola, Grace only possessed the limited responsibility to know the number of shares in the Plan, and it lacked any additional responsibility to monitor State Street.

> **Q. Didn't you think you had some responsibility as a member of the committee to monitor what State Street was doing after its engagement?**
>
>   MS. FLOWE:  Same objection.  You're asking him for a legal conclusion.
>
>   MR. CUMMINS:  I'm asking him for whether he thought he had some responsibility.  He's not a lawyer.  I understand that.
>
>   BY MR. CUMMINS:
>
> Q. Could you answer the question, please.
>
>   MS. FLOWE:  You can answer it as -- if you thought -- if you had a thought about it, you could answer it, but factually.

---

[13] Grace Memorandum (Doc. No. 178) at 14.

>           THE WITNESS: May I ask a question?
>
>           BY MR. CUMMINS:
>
> Q.        Yeah, sure. I think you can. Your counsel is going to have to --
>
> **A.        Responsibility to do what? Other than understanding the number of shares in the plan, I didn't understand any other responsibility.**

(Plaintiffs' Uncontested Fact No. 1). Indeed, Grace admits that Mr. Tarola believed it was "off-limits" to question State Street (Grace Statement of Fact No. 37), and that Grace had assigned "total" responsibility to State Street. (Plaintiffs' Uncontested Fact No. 1).

Accordingly, Grace never initiated contact with State Street. (Plaintiffs' Uncontested Fact No. 1), and Mr. Tarola never learned or understood what documents, if any, Grace provided to State Street and Duff & Phelps. (Plaintiffs' Uncontested Fact No. 8). Surprisingly, Mr. Tarola was unaware of Duff & Phelps' role. (Plaintiffs' Uncontested Fact No. 1). Neither member of the Investment and Benefits Committee ever sought to understand whether State Street fulfilled its fiduciary duty when it eliminated the Grace Stock Fund. Neither member made an effort to determine the State Street's rationale for concluding that retention of the Stock Fund suddenly became inconsistent with ERISA. (Plaintiffs' Uncontested Fact No. 1). As demonstrated above, to the extent that Grace had contact with State Street, State Street initiated the contact, the contact was minimal, and most of the contact occurred before the engagement.

**C.   The Investment and Benefits Committee is Not Entitled to Summary Judgment.**

Defendant the Investment and Benefits Committee seeks summary judgment by claiming that it is not "person" within the definition of ERISA. Plaintiffs acknowledge that the United States District Court for the Middle District of North Carolina in T*atum v.*

16

*R. J. Reynolds Tobacco Co.*,[14] held that a committee was not an ERISA "person". However, the facts in this case demonstrate that the holding should not apply because it would place form over substance and defeat the equitable principles of ERISA.

Here, the record is clear that the Grace Investment and Benefits Committee functions as a "person" and is a fiduciary. In the Bankruptcy proceeding, Grace represented that the Committee was providing fiduciary services to the Plan. (Plaintiffs' Uncontested Fact No. 15). The Grace Savings and Investment Plan provides that the Committee is responsible for exercising authority and discretion over the Plan. (Plaintiffs' Uncontested Fact No. 1). Specifically, in connection with this case, the Committee represented in its engagement letter with State Street that "it is a named fiduciary with respect to the control or management of the assets of the Plan." (Plaintiffs' Uncontested Fact No. 1).

In view of the Committee's fiduciary obligations and responsibility, common sense dictates that the Committee functioned as a person and is covered by ERISA. Certainly, the drafters of ERISA did not intend to permit an admitted fiduciary to escape liability when it violates its duty.

### D.    Grace is Liable as a Co-Fiduciary.

Grace seeks to avoid co-fiduciary liability by ignoring Plaintiffs' evidence that Grace intentionally closed its eyes to State Street's inevitable divestment of Plaintiffs' Grace stock. The record is clear that Grace had knowledge that State Street was breaching its fiduciary duty when it eliminated the Grace Stock Fund. Indeed, State Street notified Grace before it commenced the stock sale in February of 2004 and before it sold the remaining shares to D.E. Shaw in April of 2004. (Plaintiffs' Uncontested Facts No.

---

[14] No. 1:02CV000373, 2007 WL 1612590 (M.D. N.C. 2007)

7). Grace also knew that retention of the Grace Stock Fund was consistent with ERISA. (Plaintiffs' Uncontested Facts No. 11). Grace, moreover, failed to take any action to understand the reason for the sales. (Plaintiffs' Uncontested Facts No. 1). Accordingly, based on the available information, Grace knew that the sales violated ERISA.

The United States Court of Appeals for the First Circuit succinctly articulated when co-fiduciary liability exists.[15] According to the First Circuit, Grace is liable if State Street violated its fiduciary duty in any of the following circumstances:

> ERISA renders a fiduciary vulnerable to liability for breaches committed by other fiduciaries in three situations:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with … the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.[16]

According to the First Circuit, Grace had an obligation when it learned of State Street's impending breach to take action. Of course, Grace admits that it failed to take any action.

Certainly questions of fact exist surrounding the state of Grace's knowledge. Clearly, ERISA's equitable principles do not allow Grace, as a fiduciary, to close its collective eyes to known conduct that is contrary to Grace's analysis and understanding of the facts. Yet, Grace contends that it can escape co-fiduciary duty because it failed to perform its duty to learn and understand the basis of State Street's decision. The Court,

---

[15] *See, Beddall v. State Street Bank and Trust Co.* 137 F.3d 12, 23 (1st. Cir., 1998).
[16] 137 F.3d at 23.

particularly at this stage of the proceedings, should prevent Grace from escaping co-fiduciary liability for failing to perform its fiduciary obligations.

## CONCLUSION

For the reasons contained in this Memorandum, the Court should deny each of the Defendants' Motions for Summary Judgment.

August 31, 2007                                Respectfully submitted,

**WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.**

*/s/ Jane H. Walker*_____
James R. Cummins
Jane H. Walker
Terrence L. Goodman
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 381-2375
E-mail   jcummins@wsbclaw.com
E-mail:  janehwalker@wsbclaw.com
E-mail:  terrygoodman@wsbclaw.com


**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**

*/s/ Jeffrey C. Block*_____
Jeffrey C. Block
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
Email:  jblock@bermanesq.com

*Counsel for Lawrence W. Bunch, Jerry L. Howard, Sr. and David Mueller, Both Individually and Behalf of All Others Similarly Situated*

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 31, 2007, I filed the Bunch Plaintiffs' Opposition to Motions of the Grace Defendants and the State Street Defendants for Summary Judgment. I was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies were sent to those indicated as non-registered participants on August 31, 2007.

                                          */s/ Jane H. Walker*
                                          Jane H. Walker