**EXHIBIT 3 TO FLICKER DECLARATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -+
                              |
KERI EVANS,                   |
                              |
           Plaintiff,         |
                              |
  vs.                         |
                              |
JOHN F. AKERS, et al.,        |   Consolidated as
                              |
           Defendants.        |   Case No.:
                              |
- - - - - - - - - - - - - - -+   04-11380-WGY
                              |
LAWRENCE W. BUNCH, et al.,    |
                              |
           Plaintiffs,        |
                              |
vs.                           |
                              |
W.R. GRACE & CO., et al.,     |
                              |
           Defendants.        |
                              |
- - - - - - - - - - - - - - - - - - - - - - - - -x

Deposition of ROBERT M. TAROLA, CPA

Washington, D.C.

May 10th, 2007

10:00 a.m.

Job No. 1-102403

Pages 1 - 174

Reported by:  Laurie Bangart-Smith

1    wrong?

2         A    They're wrong because these obligations were

3    subject to Chapter 11 proceedings which had not

4    progressed to the point where any change could be made

5    to these figures.

6         Q    So as of May 7, 2004, there was no

7    information available to W.R. Grace that would change

8    its assessment of its asbestos-related liability; is

9    that correct?

10        A    No.

11        Q    It had information that would allow it to

12   change?

13        A    No.

14        Q    Okay.  How is that incorrect?

15        A    It's incorrect, because these -- the list of

16   these obligations are in the Bankruptcy Court.

17   They're subject to the decisions of the Bankruptcy

18   Court.  They are recorded at amounts that reflect, at

19   this point in time, information that was relevant to

20   the measurement that we had but did not reflect

21   information that could be relevant to the measurement

22   that we did not have.  And for the most part, the

```
 1    information that we did not have were significant
 2    rulings that we asked the Bankruptcy Court to make
 3    about compensable claims and cost per claims that the
 4    Bankruptcy Court has yet to make, so we still don't
 5    know the parameters under which these obligations will
 6    be resolved.
 7         Q    Does W.R. Grace make any periodic filings to
 8    the Securities and Exchange Commission currently?
 9         A    Yes.
10         Q    Has the number called "asbestos-related
11    liability" changed in any material way from the
12    $990 million?
13         A    Yes.
14         Q    And how has that number changed?
15         A    It's increased.
16         Q    To what number if you recall?
17         A    To $1.7 billion.
18         Q    And when did that change occur?  In what
19    filing, approximately?
20         A    It occurred in connection with a
21    court-mandated requirement to file a Plan of
22    Reorganization.
```

```
 1        Q     And when was that filed?

 2        A     Roughly November of 2004.

 3        Q     November of 2004.  As of May 7 -- so was

 4   that the first time that there was any public

 5   information about the new assessment being increased

 6   by about $800 million?

 7        A     Yes.

 8        Q     Prior to the filing in November of 2004, at

 9   what point did W.R. Grace come to the conclusion that

10   its assessment of its asbestos-related liability

11   should be increased from $900 million to approximately

12   $1.7 billion?

13              MS. FLOWE:  I'm going to object to the form

14   of your question, because, as he's explained at some

15   length, you're mischaracterizing the 900 number, and

16   there's paragraph after paragraph in this exhibit that

17   you have in front of him that explains precisely what

18   that number is.

19   BY MR. CUMMINS:

20        Q     Okay, maybe you misunderstood my question.

21   I'll withdraw it and say it again.  I want to know

22   when anybody at W.R. Grace determined that the
```

1    asbestos-related liability number should be

2    $1.7 billion.

3        A    The determination of the $1.7 billion

4    occurred just shortly before the filing of the Plan of

5    Reorganization, and it was primarily a number that we

6    decided we would be willing to pay to resolve the

7    bankruptcy case.

8        Q    And how did that -- what was the process by

9    which W.R. Grace & Company came to that number,

10   $1.7 billion?

11       MS. FLOWE:    I'm going to object and instruct

12   you to answer only to the extent that you can do so

13   without revealing any privileged communications with

14   counsel or work product relating to pending or

15   anticipated litigation.

16       THE WITNESS:    I shouldn't comment then.

17   BY MR. CUMMINS:

18       Q    Okay.  So as I understand it, the

19   $1.7 billion is a result of some confidential

20   privileged communication between W.R. Grace and its

21   counsel; is that correct?

22       MS. FLOWE:    Object to the form of that.

```
 1        A    Yes.
 2        Q    Okay.  In connection with that quotation,
 3   did you ever show this to Mr. Norris before it was
 4   publicly distributed?
 5        A    Yes.
 6        Q    And at the time that this document was
 7   prepared, did you share Mr. Norris' view about the
 8   fourth quarter and second half operating results that
 9   are described in this Exhibit 5?
10        A    May I reread the entire quote?
11        Q    Oh, of course, or any part of Exhibit 5 that
12   you think you would need to read to answer the
13   question.
14        A    Yes, I agree with the quote.
15        Q    And do you agree with the sentence where he
16   refers to reversing -- do you agree with the sentiment
17   that he was expressing about reversing the operating
18   performance?  The sentence reads, "We completely
19   reversed disappointing operating performances in the
20   first half of 2003."  Do you see that?
21             MS. FLOWE:  Asked and answered.
22             MR. CUMMINS:  I just want to make sure the
```

1    record is clear.

2              THE WITNESS:  May I say my recollection is

3    that I agreed with the quote at the time.  I was

4    looking for confirming information, and I haven't read

5    this completely.  I agreed at the time.

6    BY MR. CUMMINS:

7        Q    And then the sentence that follows reads,

8    "We are also making progress in the evaluation of our

9    Chapter 11 claims which has resulted in the adjustment

10   of certain liability estimates in the fourth quarter."

11   Do you see that?

12       A    Yes.

13       Q    So there were some estimates that Mr. Norris

14   was referring to that had been done in the last

15   quarter of 2003 by W.R. Grace & Company, right?

16       A    Yes.

17       Q    And those changes are reflected in the

18   consolidated balance sheet that's attached to the

19   press release on Page 11; is that correct?

20       A    That's correct.

21       Q    And the asbestos-related liability is

22   slightly higher in 2003 than it was in 2002, right?

1        A     Almost $20 million higher.

2               (Exhibit No. 26 was marked for

3        identification and attached to the deposition

4        transcript.)

5    BY MR. CUMMINS:

6        Q     I'm going to hand you now what's been marked

7    for identification as Plaintiffs' Deposition Exhibit

8    26.  I just have a couple of questions about

9    Mr. Norris' comments, the quote at the bottom of the

10   first paragraph.

11       A     Yes.

12       Q     In my words, he's pretty upbeat about the

13   financial performance of the company in the first

14   quarter of 2004, isn't he?

15       A     He states they were very good.

16       Q     Did you agree with that statement at the

17   time he made it?

18       A     Yes.

19       Q     In fact, the operating performance of the

20   company was improving in the first quarter of 2004,

21   was it not?

22       A     Relative to the first quarter of 2003, yes.

1    Q    And you were able to see that improving
2    performance during the time period from January 1,
3    2004, to March 31, 2004, were you not?
4    A    I don't recall exactly when the performance
5    improvement was first manifested.
6    Q    Well, the performance improvement didn't
7    come to you as a surprise as the Chief Financial
8    Officer after March 31, did it?
9    A    Not after March 31, no.
10    Q    Because you're in daily contact with numbers
11    and figures that relate to the performance for that
12    current period, are you not?
13    A    I'm in regular contact.
14    Q    Regular?  Okay.  If you'll turn to the third
15    page of the release under "Cash Flow and Liquidity,"
16    the first sentence indicates that the cash flow for
17    the first quarter of 2004 was $20.7 million, and it
18    compares to $9.7 million of cash flow for the
19    comparable period of 2003.  Am I understanding that
20    correctly?
21    A    Yes.
22    Q    And that was accurate at the time this press

1    one of those choices was the Grace stock fund,

2    correct?

3        A    At this time, yes.

4        Q    And why is it that -- let me go back.  At

5    this time you served on the Investment Benefits

6    Committee, right?

7        A    Yes.

8        Q    Did the Investment Benefits Committee,

9    during the time you were on it, participate in any way

10   in the selection of the investment choices that would

11   be made available to the plan participants?

12       A    From the time I joined Grace up until around

13   this point in time, I don't think the investment

14   options changed in any significant way, so they were

15   basically the same choices the employees had before I

16   joined, as they were around this time.

17       Q    Would it be fair to say, though, that it was

18   the responsibility of the Investment Benefits

19   Committee to review the choices and the performance of

20   those choices?

21       A    Yes, that's fair.

22       Q    And then is it fair to say that if the

1    Investment Benefits Committee thought that one of the

2    choices was underperforming, that it would make some

3    recommendation to make a change?  Is that correct?

4        A    We would evaluate the situation.

5        Q    And with respect to your service on the

6    Investment Benefits Committee, do you recall ever

7    making a change in the investment options that were

8    made available to the plan participants?

9        A    Yes.

10       Q    Other than the stock fund options?

11       A    Yes.

12       Q    There were some other changes or additional

13   opportunities made?

14       A    Yes.

15       Q    And I think you would agree with me, the way

16   the plan is constructed, the decision as to where a

17   plan participant's money would go was exclusively the

18   plan participant's; is that correct?

19       A    That's correct.

20       Q    And it never changed so long as you were on

21   the Investment Benefits Committee?

22       A    I would like to make one clarification.

1      Q    Of course.

2      A    I believe that for a time during which I was

3  on the Investment Benefits Committee, there were other

4  restrictions as to what could be done with Grace

5  stock.

6      Q    About whether you could buy it, sell it,

7  hold it; is that what you mean?

8      A    Yes, depending on age, yes.

9      Q    Other than that particular restriction --

10      A    Other than that, I believe it was up to the

11  participant.

12      Q    And is that the basis, as you understand

13  Mr. Norris' remarks in this transcript, for him

14  responding to that question about you need to make

15  your own analysis of your risk tolerance or however he

16  described it?

17      A    I think that's fair, yes.

18      Q    Now, could you turn to Page 112234.  And

19  from the context of these remarks, are you able to

20  determine, from your background at W.R. Grace, what it

21  was that prompted Mr. Norris to have to address some

22  restriction that was being imposed upon the plan

1      A      Correct.

2      Q      Nor, so far as you know, did Mr. McGowan;

3   isn't that correct?

4      A      As far as I know, that's correct.

5      Q      That just wasn't part of the plan, agree?

6      A      Correct.

7      Q      Now, if you will turn to the very last part

8   of the policy statement that's Exhibit 28, there is a

9   statement that's got an asterisk before it, begins

10  with the word "notwithstanding."  Do you see that?

11     A      Yes.

12     Q      What did you mean when you said the Grace

13  stock fund within the plan is, quote, "not within the

14  consideration of the committee," end quote?

15     A      What that was meant to state is that the

16  Grace stock fund was under the control of another

17  fiduciary, not under the control of the Investment and

18  Benefits Committee.

19     Q      And you at the time believed that you had

20  nothing at all -- sorry -- that you had absolutely no

21  responsibility with respect to State Street's decision

22  on its dealings with this Grace stock fund; is that

1   correct?

2         MS. FLOWE:  I'm going to object to the

3   extent that you're asking him for a legal conclusion,

4   but you can answer if you can.

5   BY MR. CUMMINS:

6       Q    You're not a lawyer, are you?

7       A    No.

8         MR. CUMMINS:  Okay.  I'm asking for his --

9   yeah, I'll restate the question.

10  BY MR. CUMMINS:

11      Q    At the time you signed this document, is it

12  correct that you believed you had no responsibility

13  with respect to State Street's decision on its

14  handling of the Grace stock fund?

15      A    That's absolutely correct.

16      Q    And you believed at the time that you had

17  virtually wiped your hands of any responsibility to

18  the plan participants, in the vernacular?

19        MS. FLOWE:  Same objection.

20        THE WITNESS:  That's correct.

21  BY MR. CUMMINS:

22      Q    And you were told that somewhere or was that

1    by someone?

2            MS. FLOWE:  Now I object.

3            MR. CUMMINS:  Sorry.

4            MS. FLOWE:  You're getting into

5    attorney/client privilege now.

6    BY MR. CUMMINS:

7        Q    All right.  Other than communications with

8    your counsel, did someone tell you that you would have

9    no responsibility to the plan participants if you

10   simply hired State Street to do whatever they were

11   hired to do?

12       A    You mean anybody?

13       Q    Anybody other than your counsel.  Were you

14   told that by anybody other than your counsel?

15       A    Yes.

16       Q    Who?

17       A    I believe Mr. McGowan told me that, and

18   Mr. Norris told me that, and Mr. -- well, I'll stop

19   there.

20       Q    Okay.  Other than the conflict that

21   Mr. Norris described and we've talked about in a

22   previous exhibit, was there any other reason that

1    A    There's a sense that I may have left the

2  impression that the only time I would have non-public

3  information is during these 30-day reporting periods.

4  I could have had non-public information relative to

5  bankruptcy negotiations that would extend beyond those

6  periods, but as to business performance, business

7  financial information, generally we update that every

8  30 days.

9    Q    Do I understand it that what you're trying

10  to clarify is that there would be information that

11  came to you in the development -- during this period

12  of time, in '03 and part of '04 -- about a development

13  of the Plan of Reorganization that was not public?  Is

14  that part of the category of information that you're

15  describing?

16    A    That could have been one of the, one of the

17  categories.

18    Q    Before the break we talked about the

19  conflict, and you described it as a "hypothetical

20  conflict," but I think we have a common understanding

21  of how the elements of the conflict are described, but

22  I have a question about -- directing your attention to

1   the first quarter, calendar quarter of 2004, related

2   to that conflict.  You described this conflict concept

3   as "hypothetical."  In the first quarter of 2004 did

4   you think that there was an actual conflict between

5   your duties as the CFO and your service as a member of

6   that committee?

7        A    No.

8        Q    And during the first two weeks of April did

9   you think that there was an actual conflict between

10  your duties as the CFO and your service as a member of

11  that committee?

12       A    April 2004?

13       Q    Uh-huh.

14       A    No.

15       Q    We talked a little bit about the ranking by

16  Fidelity of the various spectrum of the investment

17  opportunities offered to the plan participants.  If

18  you can pull out the exhibit that's marked Number 12.

19  Have you seen Exhibit 12 prior to today?

20       A    May I review it?

21       Q    Please.  I'm going to ask you two questions.

22  One is:  Is this a document you ever received?  You

1    don't have to answer it yet.  The second question

2    is -- I'm going to ask you to look at Page 22.

3         A    I've seen documents like this.

4         Q    Let me go through the questioning then.  I

5    was just trying to give you a preview.  From time to

6    time did the Investments and Benefits Committee

7    receive a report like Exhibit 12 for its analysis or

8    review?

9         A    Yes.

10         Q    And why did the committee feel that it would

11    like to receive such a report?  The committee is just

12    you and Mr. McGowan, isn't it?

13         A    Yes.

14         Q    Why did you and Mr. McGowan feel that you

15    wanted to receive a report like Exhibit 12?

16              MS. FLOWE:  Objection; lack of foundation.

17              You can answer.

18              THE WITNESS:  To get a periodic assessment

19    of the portfolio of options available to our

20    participants and to periodically reassess whether any

21    changes should be made.

22

1   BY MR. CUMMINS:

2       Q    This report is, on its cover page, dated

3   February 20, 2004.  Do you have it?

4       A    That's what I have, yes.

5       Q    And then if you will, please, turn to Page

6   22 of the report.  For the clarity of the record, can

7   you describe your understanding of what this Page 22

8   headed "Investment Options Spectrum" is intending to

9   convey to the members of the committee?

10      A    I believe it's intended to convey the

11  offerings under the investment -- I'm sorry -- the

12  savings and investment plan portrayed in terms of

13  risk/reward on the risk/reward spectrum.

14      Q    The investment option to the far left is

15  headed "Money Market for Short Term."  Do you see

16  that?

17      A    Yes.

18      Q    And then the investment option to the right

19  is headed "Company Stock," and underneath it's just

20  one, "W.R. Grace Stock."  Do you see that?

21      A    Yes.

22      Q    Is this your understanding of what the risk

1    spectrum was to the plan participants as of

2    February 20, 2004?

3        A    Again these are the offerings set under

4    various asset class categories portrayed along a risk

5    spectrum as presented by Fidelity.

6        Q    And it was your, you and Mr. McGowan's,

7    responsibility through the delegated authority from

8    the board to provide such a spectrum to the plan

9    participants, was it not?

10       A    Offerings within an appropriate spectrum I

11   think is the investment policy.

12       Q    And as of February 20, 2004, that Page 22

13   was the offering, so far as you know?

14       A    I believe these were the offerings, yes.

15            (Exhibit No. 29 was marked for

16       identification and attached to the deposition

17       transcript.)

18   BY MR. CUMMINS:

19       Q    Handing you now what's been marked for

20   identification Number 29 --

21       A    Jim, just a minute.

22       Q    Do you want to clarify something?

```
 1        A    I do.  I want to make a point about that
 2   schedule.  The Grace stock was on the far right.  I
 3   recall being advised by Fidelity that it should be
 4   considered as unacceptable for the program.
 5        Q    When were you so advised?
 6        A    I believe in the context of reviewing this
 7   report.
 8        Q    And why did they say it was unacceptable?
 9        A    Because it was a bankruptcy stock.
10        Q    Any other reason?
11        A    Not to my knowledge.
12        Q    Do you mean it was a stock where the company
13   was in bankruptcy; is that it?
14        A    I think the issue was that because the
15   company was in bankruptcy, that the stock was far more
16   speculative than a retirement program should hold, and
17   we were advised to consider that.
18        Q    And you didn't do anything about that, did
19   you?  You didn't act on that advice, did you?
20        A    Well, actually I believe we did.  We stopped
21   investment.  We --
22        Q    Excuse me.  Go ahead.  I didn't mean to
```

1    interrupt you.

2        A    I believe we did act on that advice to a

3    certain degree.  We put a number of measured

4    restrictions in to minimize the likelihood that other

5    employees might invest in that asset class and put

6    retirement funds at risk beyond what may have been

7    appropriate.

8        Q    Let me refer you to the date of this.  This

9    is February of 2004, and I'd ask you to recall that

10   somewhere in December of 2003, according to your

11   testimony, you had moved the responsibility for making

12   a decision off to State Street with regard to the

13   stock fund.

14       A    My only point is that the Grace stock was on

15   the far right for years before this, and as a result,

16   we had another adviser telling us that you need to

17   look at that for concerns over whether or not it was

18   appropriate for a retirement plan.  That's all I

19   wanted to point out.

20       Q    This is February of 2004 when Fidelity was

21   telling you about that?

22       A    Well, I believe -- my recollection is we

132

1    were made aware of that before February of 2004.  We

2    had periodic meetings with Fidelity.

3         Q    Remind me again if you will.  Somewhere in

4    2001, Grace filed its bankruptcy petition, correct?

5         A    Correct.

6         Q    Am I not correct that the benefits committee

7    continued to offer the opportunity for plan

8    participants to remain owners of that stock from '01

9    through whenever State Street sold the stock?

10        A    That's correct.

11        Q    There was no restriction on continuing to

12   own, correct?

13        A    Correct.

14        Q    So the investment decisions that the plan

15   participants were making from December of 2001 to

16   continue to hold the stock was really the

17   responsibility of the plan participants, right?

18        A    Correct.

19        Q    And as of February 2004 your plan wasn't

20   even offering an opportunity to invest in the stock

21   fund, right?  No new money, basically?

22        A    I don't remember the exact dates, but that

1    may be the case.

2         Q     Well, recall that that transcript where

3    Mr. Norris was talking was in March of '03, and that's

4    I believe approximately; isn't that right?

5         A     Yes.

6         Q     When the cutoff, the opportunity to buy more

7    stock, to the plan participants, right?

8         A     Right.  I believe those dates are correct.

9         Q     So here is what I'm trying to clarify for

10   the record.  Fidelity was, you say, advising your

11   committee that in 2004 that offering the stock fund

12   was no longer an appropriate investment choice, but,

13   in fact, the company had already taken away the right

14   of the plan participants to buy it in 2003?

15        A     I was just pointing out that in this report

16   Fidelity was ranking the Grace stock in the highest

17   risk category.  I believe it had been ranked in that

18   category from the time we filed for Chapter 11, which,

19   from my fiduciary point of view, was an indication

20   that we were offering an asset class that may not have

21   been appropriate for retirement program.  That's all I

22   wanted to point out.