**EXHIBIT 5 TO FLICKER DECLARATION**



# FORM 10-Q

## W R GRACE CO - GRA

**Filed: November 10, 2003 (period: September 30, 2003)**

Quarterly report which provides a continuing view of a company's financial position

## PART II.

OTHER INFORMATION

**ITEM 2.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND

**ITEM 3.** QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**ITEM 4.** CONTROLS AND PROCEDURES

**ITEM 1.** LEGAL PROCEEDINGS

**ITEM 6.** EXHIBITS AND REPORTS ON FORM 8-K

SIGNATURE

EXHIBIT INDEX

EX-15 (Letter regarding unaudited interim financial information)

EX-31.1 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)

EX-31.2 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)

EX-32 (Certifications required under Section 906 of the Sarbanes-Oxley Act of 2002)

--------------------------------------------------------------------------------

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)

[X]      QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
              OF THE SECURITIES EXCHANGE ACT OF 1934

         FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2003

                              OR

[ ]         TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
               OF THE SECURITIES EXCHANGE ACT OF 1934

                 Commission File Number 1-13953

                      W. R. GRACE & CO.

         Delaware                              65-0773649
------------------------------------       ----------------------------
     (State of Incorporation)               (I.R.S. Employer
                                             Identification No.)

                      7500 Grace Drive
                  Columbia, Maryland 21044
                      (410) 531-4000
          -------------------------------------------
              (Address and phone number of principal
                       executive offices)

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.

             Yes  X                      No
                  ------                      ------

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act).

             Yes  X                      No
                  ------                      ------

65,558,510 shares of Common Stock, $0.01 par value, were outstanding at October
31, 2003.

--------------------------------------------------------------------------------

W. R. GRACE & CO. AND SUBSIDIARIES

Table of Contents
------------------

|  |  |  | Page No. |
|---|---|---|---|
| PART I. | FINANCIAL INFORMATION |  |  |
| Item 1. |  | Financial Statements |  |
|  |  | Report of Independent Accountants | I - 1 |
|  |  | Consolidated Statements of Operations | I - 2 |
|  |  | Consolidated Statements of Cash Flows | I - 3 |
|  |  | Consolidated Balance Sheets | I - 4 |
|  |  | Consolidated Statements of Shareholders' Equity (Deficit) | I - 5 |
|  |  | Consolidated Statements of Comprehensive Income (Loss) | I - 5 |
|  |  | Notes to Consolidated Financial Statements | I - 6 to I - 21 |
| Item 2. |  | Management's Discussion and Analysis of Results of Operations and Financial Condition | I - 22 to I - 36 |
| Item 3. |  | Quantitative and Qualitative Disclosures About Market Risk | I - 37 |
| Item 4. |  | Controls and Procedures | I - 37 |
| PART II. | OTHER INFORMATION |  |  |
| Item 1. |  | Legal Proceedings | II - 1 |
| Item 6. |  | Exhibits and Reports on Form 8-K | II - 1 |

REPORT OF INDEPENDENT ACCOUNTANTS

To the Shareholders and Board of
Directors of W. R. Grace & Co.:

We have reviewed the accompanying consolidated balance sheet of W. R. Grace &
Co. and its subsidiaries as of September 30, 2003, and the related consolidated
statements of operations and of comprehensive income (loss) for each of the
three-month and nine-month periods ended September 30, 2003 and September 30,
2002, and the consolidated statements of shareholders' equity (deficit) for the
three-month and nine-month periods ended September 30, 2003 and the consolidated
statements of cash flows for the nine-month periods ended September 30, 2003 and
September 30, 2002. These interim financial statements are the responsibility of
the Company's management.

We conducted our review in accordance with standards established by the American
Institute of Certified Public Accountants. A review of interim financial
information consists principally of applying analytical procedures and making
inquiries of persons responsible for financial and accounting matters. It is
substantially less in scope than an audit conducted in accordance with generally
accepted auditing standards, the objective of which is the expression of an
opinion regarding the financial statements taken as a whole. Accordingly, we do
not express such an opinion.

Based on our review, we are not aware of any material modifications that should
be made to the accompanying consolidated interim financial statements for them
to be in conformity with accounting principles generally accepted in the United
States of America.

The accompanying consolidated interim financial statements have been prepared
assuming that the Company will continue as a going concern. As discussed in Note
1 to the consolidated interim financial statements, on April 2, 2001, the
Company and substantially all of its domestic subsidiaries voluntarily filed for
protection under Chapter 11 of the United States Bankruptcy Code, which raises
substantial doubt about the Company's ability to continue as a going concern in
its present form. Management's intentions with respect to this matter are also
described in Note 1. The accompanying consolidated interim financial statements
do not include any adjustments that might result from the outcome of this
uncertainty.

We previously audited in accordance with auditing standards generally accepted
in the United States of America, the consolidated balance sheet as of December
31, 2002, and the related consolidated statements of operations, of cash flows,
of shareholders' equity (deficit) and of comprehensive loss for the year then
ended (not presented herein). Our report, which was modified as to a matter
raising substantial doubt about the Company's ability to continue as a going
concern, was dated January 29, 2003. In our opinion, the information set forth
in the accompanying consolidated balance sheet as of December 31, 2002, is
fairly stated in all material respects in relation to the consolidated balance
sheet from which it has been derived.

/s/ PricewaterhouseCoopers LLP


Baltimore, Maryland
October 23, 2003


I-1

Source: W R GRACE & CO, 10-Q, November 10, 2003

| W. R. GRACE & CO. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| Dollars in millions, except per share amounts | 2003 | 2002 | 2003 | 2002 |
| Net sales................................................ | $ 521.0 | $ 480.0 | $ 1,469.2 | $ 1,365.0 |
| Other income............................................ | 3.1 | 9.0 | 11.0 | 19.8 |
| | 524.1 | 489.0 | 1,480.2 | 1,384.8 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below................... | 336.5 | 300.0 | 962.9 | 854.1 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below........... | 90.0 | 88.6 | 276.4 | 255.7 |
| Depreciation and amortization.......................... | 26.1 | 24.6 | 76.1 | 70.8 |
| Research and development expenses...................... | 11.9 | 13.5 | 40.2 | 39.6 |
| Net pension expense.................................... | 13.2 | 5.0 | 39.9 | 14.6 |
| Interest expense and related financing costs........... | 4.1 | 4.8 | 12.4 | 15.2 |
| Provision for environmental remediation................ | 50.0 | 13.4 | 52.5 | 19.2 |
| | 531.8 | 449.9 | 1,460.4 | 1,269.2 |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest....................... | (7.7) | 39.1 | 19.8 | 115.6 |
| Chapter 11 expenses, net............................... | (2.2) | (8.6) | (11.7) | (21.4) |
| Provision for income taxes............................. | (0.7) | (15.1) | (14.0) | (44.3) |
| Minority interest in consolidated entities............. | 0.7 | (1.4) | 0.2 | (2.3) |
| NET (LOSS) INCOME...................................... | $ (9.9) | $ 14.0 | $ (5.7) | $ 47.6 |
| BASIC (LOSS) EARNINGS PER COMMON SHARE................. | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |
| Average number of basic shares........................ | 65.6 | 65.5 | 65.5 | 65.4 |
| DILUTED (LOSS) EARNINGS PER COMMON SHARE............... | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |
| Average number of diluted shares...................... | 65.6 | 65.5 | 65.5 | 65.5 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

I-2

Source: W R GRACE & CO, 10-Q, November 10, 2003

| W. R. GRACE & CO. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED) | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| Dollars in millions | 2003 | 2002 |
| OPERATING ACTIVITIES | | |
| Income before Chapter 11 expenses, income taxes, and minority interest | $ 19.8 | $ 115.6 |
| Reconciliation to net cash provided by operating activities: | | |
| Depreciation and amortization | 76.1 | 70.8 |
| Interest accrued on pre-petition debt subject to compromise | 8.5 | 11.0 |
| Loss (gain) on disposals of assets | 1.0 | (1.9) |
| Provision for environmental remediation | 52.5 | 19.2 |
| Net income from life insurance policies | (4.1) | (5.3) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | |
| Increase in working capital items | (55.5) | (20.9) |
| Contributions to defined benefit pension plans | (32.8) | -- |
| Expenditures for asbestos-related litigation | (8.1) | (8.2) |
| Proceeds from asbestos-related insurance | 11.0 | 10.8 |
| Expenditures for environmental remediation | (7.4) | (14.0) |
| Expenditures for postretirement benefits | (8.8) | (17.7) |
| Expenditures for retained obligations of discontinued operations | (2.9) | (3.7) |
| Changes in accruals and other non-cash items | 45.4 | 20.0 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 EXPENSES | 94.7 | 175.7 |
| Chapter 11 expenses paid, net | (14.4) | (13.3) |
| Income taxes paid, net of refunds | (16.4) | (20.7) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 63.9 | 141.7 |
| INVESTING ACTIVITIES | | |
| Capital expenditures | (65.7) | (55.4) |
| Businesses acquired in purchase transactions, net of cash acquired | (3.6) | (28.5) |
| Investment in life insurance policies | (11.4) | (16.2) |
| Proceeds from life insurance policies | 10.0 | 13.8 |
| Proceeds from sales of investments | -- | 0.9 |
| Proceeds from disposals of assets | 3.7 | 4.6 |
| NET CASH USED FOR INVESTING ACTIVITIES | (67.0) | (80.8) |
| FINANCING ACTIVITIES | | |
| Net payments of loans secured by cash value of life insurance policies | (2.6) | (4.2) |
| Borrowings under credit facilities, net of repayments | 6.5 | (0.8) |
| Borrowings under debtor-in-possession facility, net of fees | 46.7 | 19.1 |
| Repayments of borrowings under debtor-in-possession facility | (50.0) | (20.0) |
| NET CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES | 0.6 | (5.9) |
| Effect of currency exchange rate changes on cash and cash equivalents | 18.8 | 7.1 |
| INCREASE IN CASH AND CASH EQUIVALENTS | 16.3 | 62.1 |
| Cash and cash equivalents, beginning of period | 283.6 | 191.9 |
| Cash and cash equivalents, end of period | $ 299.9 | $ 254.0 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

I-3

Source: W R GRACE & CO, 10-Q, November 10, 2003

| W. R. GRACE & CO. AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS (UNAUDITED) | SEPTEMBER 30, 2003 | | DECEMBER 31, 2002 |
|---|---|---|---|
| Dollars in millions, except par value and shares | | | |
| **ASSETS** | | | |
| **CURRENT ASSETS** | | | |
| Cash and cash equivalents | $ | 299.9 | $ 283.6 |
| Accounts and other receivables, net | | 361.7 | 316.6 |
| Inventories | | 208.9 | 173.6 |
| Deferred income taxes | | 40.4 | 28.0 |
| Other current assets | | 23.6 | 35.9 |
| TOTAL CURRENT ASSETS | | 934.5 | 837.7 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,170.3 (2002- $1,071.7) | | 635.1 | 622.2 |
| Goodwill | | 69.6 | 65.2 |
| Cash value of life insurance policies, net of policy loans | | 90.5 | 82.4 |
| Deferred income taxes | | 567.1 | 566.7 |
| Asbestos-related insurance receivable | | 271.6 | 282.6 |
| Other assets | | 253.3 | 234.9 |
| TOTAL ASSETS | $ | 2,821.7 | $ 2,691.7 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | | |
| **CURRENT LIABILITIES** | | | |
| Debt payable within one year | $ | 10.9 | $ 4.3 |
| Accounts payable | | 109.0 | 100.3 |
| Income taxes payable | | 12.6 | 11.4 |
| Other current liabilities | | 131.4 | 131.3 |
| TOTAL CURRENT LIABILITIES | | 263.9 | 247.3 |
| Deferred income taxes | | 34.4 | 30.5 |
| Other liabilities | | 312.4 | 301.4 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE | | 610.7 | 579.2 |
| LIABILITIES SUBJECT TO COMPROMISE - NOTE 2 | | 2,385.1 | 2,334.7 |
| TOTAL LIABILITIES | | 2,995.8 | 2,913.9 |
| COMMITMENTS AND CONTINGENCIES | | | |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2003 - 65,558,510 (2002 - 65,466,725) | | 0.8 | 0.8 |
| Paid-in capital | | 432.1 | 433.0 |
| Accumulated deficit | | (121.4) | (115.7) |
| Treasury stock, at cost: shares: 2003 - 11,421,250 (2002 - 11,513,035) | | (135.9) | (137.0) |
| Accumulated other comprehensive loss | | (349.7) | (403.3) |
| TOTAL SHAREHOLDERS' EQUITY (DEFICIT) | | (174.1) | (222.2) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | $ | 2,821.7 | $ 2,691.7 |

The Notes to Consolidated Financial Statements are an integral part of
these statements.

I-4

Source: W R GRACE & CO, 10-Q, November 10, 2003

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT) (UNAUDITED)

| Dollars in millions | Common Stock and Paid-in Capital | | Accumulated Deficit | | Treasury Stock | | Accumulated Other Comprehensive Loss | | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) | |
|---|---|---|---|---|---|---|---|---|---|---|
| BALANCE, JUNE 30, 2003............. | $ | 432.9 | $ | (111.5) | $ | (136.0) | $ | (353.9) | $ | (168.5) |
| Net loss ......................... | | -- | | (9.9) | | -- | | -- | | (9.9) |
| Stock plan activity ............... | | -- | | -- | | 0.1 | | -- | | 0.1 |
| Other comprehensive income......... | | -- | | -- | | -- | | 4.2 | | 4.2 |
| BALANCE, SEPTEMBER 30, 2003...... | $ | 432.9 | $ | (121.4) | $ | (135.9) | $ | (349.7) | $ | (174.1) |
| BALANCE, DECEMBER 31, 2002.......... | $ | 433.8 | $ | (115.7) | $ | (137.0) | $ | (403.3) | $ | (222.2) |
| Net loss........................... | | -- | | (5.7) | | -- | | -- | | (5.7) |
| Stock plan activity ............... | | (0.9) | | -- | | 1.1 | | -- | | 0.2 |
| Other comprehensive income......... | | -- | | -- | | -- | | 53.6 | | 53.6 |
| BALANCE, SEPTEMBER 30, 2003...... | $ | 432.9 | $ | (121.4) | $ | (135.9) | $ | (349.7) | $ | (174.1) |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS) (UNAUDITED)

| Dollars in millions | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NET (LOSS) INCOME.................................................. | $ (9.9) | $ 14.0 | $ (5.7) | $ 47.6 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | | |
| Foreign currency translation adjustments.......................... | 4.2 | (9.5) | 53.6 | 22.9 |
| COMPREHENSIVE INCOME (LOSS) ....................................... | $ (5.7) | $ 4.5 | $ 47.9 | $ 70.5 |

The Notes to Consolidated Financial Statements are an integral part of
these statements.

I-5

Source: W R GRACE & CO, 10-Q, November 10, 2003

W. R. GRACE & CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

--------------------------------------------------------------------------------
1. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING AND
FINANCIAL REPORTING POLICIES
--------------------------------------------------------------------------------

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals
and specialty materials businesses on a worldwide basis. These businesses
consist of catalyst and silica products ("Davison Chemicals") and construction
chemicals, building materials and sealants and coatings ("Performance
Chemicals").

W. R. Grace & Co. conducts substantially all of its business through a direct,
wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn.
owns substantially all of the assets, properties and rights of W. R. Grace &
Co., either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term
"Grace" refers to the Company and/or one or more of its subsidiaries and, in
certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING: In response to a sharply increasing number of
asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W.
R. Grace & Co. and 61 of its United States subsidiaries and affiliates,
including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions
for reorganization (the "Filing") under Chapter 11 of the United States
Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States
Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The
cases were consolidated and are being jointly administered under case number
01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of
its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse
developments in its asbestos-related litigation, including: a significant
increase in bodily injury claims, higher than expected costs to resolve bodily
injury and certain property damage claims, and class action lawsuits alleging
damages from a former attic insulation product. (These claims are discussed in
more detail in Note 3 to the Consolidated Financial Statements.) After a
thorough review of these developments, the Board of Directors of Grace concluded
on April 2, 2001 that a federal court-supervised Chapter 11 process provided the
best forum available to achieve predictability and fairness in the claims
settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a
comprehensive resolution of the claims against it and preserve the inherent
value of its businesses. Under Chapter 11, the Debtors expect to continue to
operate their businesses as debtors-in-possession under court protection from
their creditors and claimants, while using the Chapter 11 process to develop and
implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation
against the Debtors for pre-petition matters is generally stayed (subject to
certain exceptions in the case of governmental authorities), and no party may
take action to realize its pre-petition claims except pursuant to an order of
the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related
claims and all other pre-petition claims in a plan of reorganization. Such a
plan of reorganization may include the establishment of a trust through which
all pending and future asbestos-related claims would be channeled for
resolution. However, it is currently impossible to predict with any degree of
certainty the amount that would be required to be contributed to the trust, how
the trust would be funded, how other pre-petition claims would be treated or
what impact any reorganization plan may have on the shares of common stock of
the Company. The interests of the Company's shareholders could be substantially
diluted or cancelled under a plan of reorganization. The formulation and
implementation of the plan of reorganization is expected to take a significant
period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to
conduct normal business activities have been approved by the Bankruptcy Court.
In addition, the Debtors have received approval from the Bankruptcy Court to pay
or otherwise honor certain of its pre-petition obligations in the ordinary
course of business, including employee wages and benefits, customer programs,
shipping charges, and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to
propose a plan of reorganization for a 120-day period following the Filing Date.
The Debtors have received extensions of their exclusivity

I-6

Source: W R GRACE & CO, 10-Q, November 10, 2003

period during which to file a plan of reorganization through February 1, 2004, and extensions of the Debtors' exclusive rights to solicit acceptances of a reorganization plan through April 1, 2004.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court and, together with a legal representative of future asbestos claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

Claims Filings - The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be dealt with separately.

Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim were filed after the bar date. The discussion below refers to claims filed before the bar date.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views these claims as contingent and does not plan to address them until a later date in the Chapter 11 Cases. The other non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; contracts rejected in the Bankruptcy Court; environmental remediation; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos related litigation; and non-asbestos related personal injury.

The Debtors' preliminary analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of September 30, 2003, the Debtors had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). The Debtors expect to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses.

As claims are resolved, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to the Company's consolidated financial position and results of operations. Because of the uncertainties of the Chapter 11 process, the in-progress state of the Debtors' investigation of submitted claims, and the lack of documentation submitted in support of many claims, Grace, at this time, is not able to estimate the value of the claims that may ultimately be determined and allowed by the Bankruptcy Court.

Litigation Proceedings in Bankruptcy Court - In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in November of 2003. (See Note 3 for background information.)

On November 29, 2002, Sealed Air Corporation ("Sealed Air") and Fresenius Medical Care AG ("Fresenius") each announced that they had reached agreements in principle with the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to settle asbestos and fraudulent conveyance claims related to the 1998 transaction involving Grace's former packaging business and Sealed Air, and the 1996 transaction involving Grace's former medical care business and Fresenius, respectively. Under the

I-7

Source: W R GRACE & CO, 10-Q, November 10, 2003

terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $425.1 million as of September 30, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of September 30, 2003 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N. A. (the "DIP facility") in the aggregate amount of $250 million. The term of the DIP facility, originally set to expire April 1, 2003, has been extended for up to an additional three years through April 1, 2006.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of September 30, 2003, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise as of September 30, 2003, and December 31, 2002.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

BASIS OF PRESENTATION: The interim Consolidated Financial Statements presented herein are unaudited and should be read in conjunction with the Consolidated Financial Statements presented in the Company's 2002 Annual Report on Form 10-K. Such interim Consolidated Financial Statements reflect all adjustments that, in the opinion of management, are necessary for a fair presentation of the results of the interim periods presented; all such adjustments are of a normal recurring nature. Potential accounting adjustments discovered during normal reporting and accounting processes are evaluated on the basis of materiality, both individually and in the aggregate, and are recorded in the accounting period discovered, unless a restatement of a prior period is necessary. All significant intercompany accounts and transactions have been eliminated.

The results of operations for the three-month and nine-month interim periods ended September 30, 2003 are not necessarily indicative of the results of operations for the year ending December 31, 2003.

RECLASSIFICATIONS: Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2003 presentation.

I-8

Source: W R GRACE & CO, 10-Q, November 10, 2003

EFFECT OF NEW ACCOUNTING STANDARDS: In January 2003, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). Grace early adopted the provisions of FIN 46 in the fourth quarter of 2002. The adoption of FIN 46 required Grace to consolidate Advanced Refining Technologies LLC, a joint venture between Grace and Chevron Products Company. The impact of this consolidation was not material.

In December 2002, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation - Transition and Disclosure, an amendment of SFAS Statement No. 123." SFAS No. 148 amends SFAS No. 123 to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based compensation. In addition, SFAS No. 148 amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The disclosure provisions of SFAS No. 148, which Grace adopted in December 2002, are incorporated below.

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements of Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"). Grace adopted FIN 45 in the first quarter of 2003. FIN 45 did not have a material effect on the Consolidated Financial Statements. (See Note 13 for required disclosures.)

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS No. 146 addresses significant issues relating to the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. Grace adopted SFAS No. 146 in the first quarter of 2003. SFAS No. 146 did not have a material effect on the Consolidated Financial Statements.

In August 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." SFAS No. 143 requires the accrual of asset retirement obligations by increasing the initial carrying amount of the related long-lived asset, and systematically expensing the cost of such obligations over the asset's useful life. Grace adopted SFAS No. 143 in the first quarter of 2003. SFAS No. 143 did not have a material effect on the Consolidated Financial Statements.

STOCK INCENTIVE PLANS: SFAS No. 123 permits the Company to follow the measurement provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the fair value methodology prescribed by SFAS No. 123, the Company's net (loss) income and related (loss) earnings per share for the three-month and nine-month periods ended September 30, 2003 and 2002 would have been reduced to the pro forma amounts indicated below:

| PRO FORMA EARNINGS UNDER SFAS NO. 123 (Dollars in millions, except per share amounts) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net (loss) income, as reported | $ (9.9) | $ 14.0 | $ (5.7) | $ 47.6 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (0.4) | (1.0) | (1.1) | (3.1) |
| Pro forma net (loss) income (1) | $ (10.3) | $ 13.0 | $ (6.8) | $ 44.5 |
| Basic (loss) earnings per share: | | | | |
| As reported | $ (0.15) | $ 0.21 | $(0.09) | $ 0.73 |
| Pro forma net (loss) income (1) | $ (0.16) | $ 0.20 | $(0.10) | $ 0.68 |
| Diluted (loss) earnings per share: | | | | |
| As reported | $ (0.15) | $ 0.21 | $(0.09) | $ 0.73 |
| Pro forma net (loss) income (1) | $ (0.16) | $ 0.20 | $(0.10) | $ 0.68 |

(1)   These pro forma amounts may not be indicative of future income (loss) and earnings (loss) per share due to Grace's Chapter 11 Filing.

Source: W R GRACE & CO, 10-Q, November 10, 2003

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001 and 2000:

| OPTION VALUE ASSUMPTIONS | 2001 | 2000 |
|---|---|---|
| Dividend yield...................... | --% | --% |
| Expected volatility.................. | 61% | 59% |
| Risk-free interest rate.............. | 5% | 7% |
| Expected life (in years)............. | 4 | 4 |

I-9

Source: W R GRACE & CO, 10-Q, November 10, 2003

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001 and $6.86 per share for 2000.

USE OF ESTIMATES: The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o   Contingent liabilities such as asbestos-related matters, environmental
    remediation, income taxes, and retained obligations of divested businesses.
o   Pension and postretirement liabilities that depend on assumptions regarding
    discount rates and/or total returns on invested funds.
o   Depreciation and amortization periods for long-lived assets, including
    property and equipment, intangible, and other assets.
o   Realization values of various assets such as trade receivables,
    inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

--------------------------------------------------------------------------------
2. CHAPTER 11 RELATED FINANCIAL INFORMATION
--------------------------------------------------------------------------------

As a result of the Filing, Grace's Consolidated Balance Sheet separately identifies the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the accrual of interest on pre-petition debt at the pre-petition contractual rate; 3) accruals for employee-related programs; and 4) changes in estimates related to pre-petition contingent liabilities and assets.

Components of liabilities subject to compromise are as follows:

| (Dollars in millions) (Unaudited) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| Debt, pre-petition plus accrued interest............ $ | 547.5 | $ 538.8 |
| Asbestos-related liability | 964.6 | 973.2 |
| Income taxes................. | 238.3 | 227.8 |
| Environmental remediation..... | 244.4 | 201.1 |
| Postretirement benefits other than pension ........ | 139.0 | 147.2 |
| Special pension arrangements ............... | 76.5 | 74.9 |
| Retained obligations of divested businesses ........ | 57.6 | 55.3 |
| Accounts payable ........... | 32.2 | 32.4 |
| Other accrued liabilities .... | 85.0 | 84.0 |
| | $ 2,385.1 | $ 2,334.7 |

Set forth below is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through September 30, 2003.

| (Dollars in millions) | Cumulative Since Filing |
|---|---|
| Balance, Filing Date........................... $ | 2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Freight and distribution order............. | (5.7) |
| Trade accounts payable order.............. | (9.1) |
| Other court orders including employee wages and benefits, sales and use tax, and customer programs.......................... | (167.9) |
| Expense/(income) items: | |
| Interest on pre-petition debt.............. | 44.0 |
| Current period employee-related accruals................................. | 25.8 |
| Change in estimate of environmental contingencies........................... | 129.0 |
| Change in estimate of income tax | |

```
      contingencies...........................    26.7
Balance sheet reclassifications...............    (23.7)
                                                 ------------------
Balance, end of period........................$   2,385.1
                                                 ==================
```

Source: W R GRACE & CO, 10-Q, November 10, 2003

Additional liabilities subject to compromise may arise due to the rejection of
executory contracts or unexpired leases, or as a result of the allowance of
contingent or disputed claims.

I-10

The Debtors' Chapter 11 expenses for the three-month and nine-month periods
ended September 30, 2003 and 2002 consist of:

| (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Legal and financial advisory fees............ | $  2.3 | $  8.8 | $  12.0 | $ 21.8 |
| Interest income .......... | (0.1) | (0.2) | (0.3) | (0.4) |
| Chapter 11 expenses, net .. | $  2.2 | $  8.6 | $  11.7 | $ 21.4 |

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must
be offset against Chapter 11 expenses.

Condensed financial information of the Debtors is presented below:

W. R. GRACE & CO. - CHAPTER 11
FILING ENTITIES
DEBTOR-IN-POSSESSION STATEMENT OF
OPERATIONS
(Dollars in millions) (Unaudited)

| | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2003 | 2002 |
| Net sales, including intercompany.. | $   761.5 | $   746.2 |
| Other income...................... | 44.3 | 46.6 |
| | 805.8 | 792.8 |
| Cost of goods sold, including intercompany, exclusive of depreciation and amortization shown separately below.......... | 525.6 | 474.2 |
| Selling, general and administrative expenses......... | 165.7 | 161.6 |
| Research and development expenses...................... | 29.6 | 31.5 |
| Depreciation and amortization ..... | 46.2 | 45.8 |
| Net pension expense ............... | 36.1 | 16.2 |
| Interest expense and related financing costs................. | 12.3 | 14.8 |
| Provision for environmental remediation ..................... | 52.5 | 19.2 |
| | 868.0 | 763.3 |
| (Loss) income before Chapter 11 expenses, income taxes, and equity in net income of non-filing entities ............ | (62.2) | 29.5 |
| Chapter 11 expenses, net .......... | (11.7) | (21.4) |
| Benefit from (provision for) income taxes ................... | 6.2 | (19.9) |
| Equity in net income of non-filing entities ............. | 62.0 | 59.4 |
| NET (LOSS)  INCOME  ........... | $   (5.7) | $   47.6 |

```
=================================================================
W. R. GRACE & CO. - CHAPTER 11 FILING
ENTITIES
DEBTOR-IN-POSSESSION CONDENSED
STATEMENT OF CASH FLOWS
(Dollars in millions)                   NINE MONTHS ENDED
(Unaudited)                               SEPTEMBER 30,
=================================================================
                                       2003        2002
                                    -----------------------

OPERATING ACTIVITIES
Net (loss) income.................. $  (5.7)  $   47.6
Reconciliation to net cash provided
  by (used for) operating activities:
Non-cash items, net................    53.6       56.7
Changes in other assets and
  liabilities, excluding the effect
  of businesses acquired/divested....  56.7      (36.1)
                                    -----------------------
NET CASH PROVIDED BY OPERATING
  ACTIVITIES.......................   104.6       68.2

NET CASH USED FOR INVESTING ACTIVITIES (38.8)    (40.3)

NET CASH USED FOR FINANCING ACTIVITIES (17.3)    (21.3)
                                    -----------------------

NET  INCREASE IN CASH AND CASH
  EQUIVALENTS......................    48.5        6.6
Cash and cash equivalents, beginning
  of period........................    56.8       38.0
                                    -----------------------
Cash and cash equivalents, end of
  period........................... $ 105.3   $   44.6
=================================================================
```

```
=================================================================
W. R. GRACE & CO. - CHAPTER 11
FILING ENTITIES
DEBTOR-IN-POSSESSION BALANCE
SHEET
(Dollars in millions)          SEPTEMBER 30,  DECEMBER 31,
(Unaudited)                        2003           2002
=================================================================
ASSETS
CURRENT ASSETS
Cash and cash equivalents ...... $  105.3   $    56.8
Accounts and other
  receivables, net ............     118.2       114.7
Receivables from non-filing
  entities, net ...............      55.6        43.4
Inventories ...................      80.2        70.5
Other current assets...........      55.3        53.0
                                 --------------------------
  TOTAL CURRENT ASSETS ........     414.6       338.4

Properties and equipment, net...    387.0       389.7
Cash value of life insurance
  policies, net of policy
  loans........................      90.5        82.4
Deferred income taxes .........     567.2       567.0
Asbestos-related insurance
  expected to be realized
  after one year...............     271.6       282.6
Loans receivable from
  non-filing entities, net ....     416.6       444.4
Investment in non-filing
  entities ....................     267.9       244.7
Other assets ..................     102.5        92.2
                                 --------------------------
  TOTAL ASSETS ............... $  2,517.9   $  2,441.4
=================================================================
```

I-11

Source: W R GRACE & CO, 10-Q, November 10, 2003

| (Dollars in millions)<br>(Unaudited) | SEPTEMBER 30,<br>2003 | DECEMBER 31,<br>2002 |
|---|---|---|
| LIABILITIES AND SHAREHOLDERS'<br>EQUITY (DEFICIT)<br>LIABILITIES NOT SUBJECT TO<br>COMPROMISE | | |
| Current liabilities .......... | $    89.6 | $    99.3 |
| Other liabilities ............ | 217.3 | 229.6 |
| TOTAL LIABILITIES NOT<br>SUBJECT TO COMPROMISE....... | 306.9 | 328.9 |
| LIABILITIES SUBJECT TO<br>COMPROMISE................. | 2,385.1 | 2,334.7 |
| TOTAL LIABILITIES........... | 2,692.0 | 2,663.6 |
| SHAREHOLDERS' EQUITY<br>(DEFICIT) ................. | (174.1) | (222.2) |
| TOTAL LIABILITIES AND<br>SHAREHOLDERS'<br>EQUITY (DEFICIT) .......... | $  2,517.9 | $  2,441.4 |

In addition to Grace's financial reporting obligations as prescribed by the U.S. Securities and Exchange Commission ("SEC"), the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

--------------------------------------------------------------------------------
3.  ASBESTOS-RELATED LITIGATION
--------------------------------------------------------------------------------

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. On April 2, 2001, Grace filed voluntary petitions for reorganization under Chapter 11 to use the court-supervised reorganization process to develop and implement a plan for addressing pending and future asbestos-related claims. (See Note 1 for further discussion.)

As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for bodily injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Additional asbestos-related claims will be subject to the Chapter 11 process established by the Bankruptcy Court. Separate creditors' committees representing the interests of property damage and bodily injury claimants have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through proceedings in the Bankruptcy Court and negotiations with each of the official committees appointed in the Chapter 11 Cases and a legal representative of future asbestos claimants, which negotiations are expected to provide the basis for a plan of reorganization.

PROPERTY DAMAGE LITIGATION

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building has provided meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all outstanding property damage cases for which sufficient information is available to form a reasonable estimate of such exposure. (See "Asbestos-Related Liability" below.)

Out of 380 asbestos property damage cases filed prior to the Filing Date, 141 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million;

Source: W R GRACE & CO, 10-Q, November 10, 2003

and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also involve ZAI). Approximately 4,000 additional asbestos property damage claims were filed prior to the March 31, 2003 bar date established by the Bankruptcy Court. The Debtors are in the process of analyzing the validity and potential liability related to these additional claims.

The ZAI cases were filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes containing ZAI. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes throughout the U.S. and that the

I-12

cost of removal could be several thousand dollars per home. As a result of the Filing, these cases have been transferred to the U.S. Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time, Grace is not able to assess the extent of any possible liability related to this matter. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in November of 2003.

BODILY INJURY LITIGATION

Asbestos bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims has been influenced by numerous variables, including the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate, as of the Filing Date, of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos containing products previously manufactured by Grace.

Through the Filing Date, 16,354 asbestos bodily injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlement and judgments) for a total of $645.6 million. (See "Asbestos-Related Liability" below.)

Approximately 1,000 claims for medical monitoring were filed against the Debtors prior to the March 31, 2003 bar date. These claims were made by individuals for medical monitoring, but not bodily injury, due to exposure to asbestos through Grace's products or operations. Based on the number and expected value of such claims, Grace does not believe such claims will have a material effect on the Consolidated Financial Statements.

ASBESTOS-RELATED LIABILITY

Asbestos-related litigation is stayed by the Chapter 11 Cases. Ongoing costs are generally limited to claims administration costs and to defense costs incurred in connection with litigation permitted by the Bankruptcy Court. Other adjustments to the recorded liability will be based on developments in the Chapter 11 Cases. Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, or its ultimate plan of reorganization.

For periods prior to and as of the Filing Date, Grace's estimated property damage and bodily injury liabilities were based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities covered indemnity and defense costs for pending property damage cases for which sufficient information was available, and for pending and projected future bodily injury claims. However, due to the Filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability. Since the Filing, Grace is aware that bodily injury claims have continued to be filed against co-defendant companies, and at higher than historical rates. Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

The total asbestos-related liability balances as of September 30, 2003 and December 31, 2002 were $964.6 million and $973.2 million, respectively. The decrease in the liability is primarily due to the payment of normal post-Filing administrative costs relating to claims management and defense costs in connection with litigation permitted by the Bankruptcy Court. The recorded asbestos-related liability is included in "liabilities subject to compromise."

ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to

Source: W R GRACE & CO, 10-Q, November 10, 2003

Grace. Grace believes that certain of these settlements may cover ZAI claims, as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements are based on the recorded amount of the asbestos-related liability and are only collectible as liabilities are satisfied. In the event that Grace's ultimate asbestos-related liability is determined to exceed recorded amounts, insurance exists to cover a portion of such incremental liability, but generally in a lower proportion than the currently recorded insurance receivable bears to the currently recorded liability.

---

4    ACQUISITIONS AND JOINT VENTURES

---

In 2003, Grace completed two business combinations for a total cash cost of $3.6 million as follows:

o    In April 2003, Grace, through its subsidiary The Separations Group, acquired the business and assets of MODcol Corporation, a manufacturer of preparative chromatography columns and provider of custom column packaging services.

o    In July 2003, Grace acquired the chromatography business of Argonaut Technologies, Inc., which had been marketed under the Jones Chromatography name.

Goodwill recognized in those transactions amounted to $0.7 million, which was assigned to Davison Chemicals.

In 2002, Grace completed three business combinations for a total cash cost of $28.5 million as follows:

o    In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S.

o    In March 2002, Grace acquired the business and assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada.

o    In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company ("Chevron"), acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company.

Goodwill recognized in those transactions amounted to $3.8 million, $0.9 million of which was assigned to Davison Chemicals and $2.9 million of which was assigned to Performance Chemicals.

Pro forma results of operations have not been presented because the effects of these acquisitions were not material on either an individual or aggregate basis.

---

5.    OTHER INCOME

---

Components of other income are as follows:

| OTHER INCOME (Dollars in millions) | THREE MONTHS SEPTEMBER 30, | | NINE MONTHS SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Investment income (loss) | $ (0.2) | $  0.5 | $   4.1 | $  5.3 |
| Interest income .......... | 0.9 | 0.9 | 3.4 | 2.5 |
| Net (loss) gain on dispositions of assets | (0.1) | 2.3 | (1.0) | 1.9 |
| Tolling revenue........... | 0.2 | 1.8 | 0.9 | 2.7 |
| Foreign currency.......... | 0.4 | 0.6 | (3.2) | 0.6 |
| Other miscellaneous income ................. | 1.9 | 2.9 | 6.8 | 6.8 |
| Total other income........ | $   3.1 | $  9.0 | $  11.0 | $ 19.8 |

I-14

Source: W R GRACE & CO, 10-Q, November 10, 2003

---

6.    OTHER BALANCE SHEET ACCOUNTS

---

| (Dollars in millions) | SEPTEMBER 30, 2003 | | December 31, 2002 | |
|---|---|---|---|---|
| **ACCOUNTS AND OTHER RECEIVABLES, NET** | | | | |
| Trade receivables, less allowance of $4.2 (2002 - $3.7) | $ | 344.1 | $ | 302.8 |
| Other receivables, less allowances of $1.7(2002 - $1.7) | | 17.6 | | 13.8 |
| | $ | 361.7 | $ | 316.6 |
| **INVENTORIES** | | | | |
| Raw materials | $ | 49.2 | $ | 39.2 |
| In process | | 35.1 | | 30.3 |
| Finished products | | 130.8 | | 110.8 |
| General merchandise | | 30.1 | | 26.8 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis | | (36.3) | | (33.5) |
| | $ | 208.9 | $ | 173.6 |
| **OTHER ASSETS** | | | | |
| Deferred pension costs | $ | 109.8 | $ | 104.2 |
| Deferred charges | | 40.2 | | 38.7 |
| Long-term receivables, less allowances of $0.8 (2002 - $0.8) | | 7.9 | | 2.0 |
| Patents, licenses and other intangible assets, net | | 65.4 | | 63.4 |
| Pension-unamortized prior service cost | | 26.4 | | 26.4 |
| Investments in unconsolidated affiliates and other | | 3.6 | | 0.2 |
| | $ | 253.3 | $ | 234.9 |
| **OTHER CURRENT LIABILITIES** | | | | |
| Accrued compensation | $ | 39.5 | $ | 40.0 |
| Accrued interest | | 7.1 | | 6.4 |
| Deferred tax liability | | 1.2 | | 0.8 |
| Customer volume rebates | | 21.9 | | 21.2 |
| Accrued commissions | | 7.8 | | 6.0 |
| Accrued reorganization fees | | 6.8 | | 9.4 |
| Other accrued liabilities | | 47.1 | | 47.5 |
| | $ | 131.4 | $ | 131.3 |
| **OTHER LIABILITIES** | | | | |
| Pension-underfunded plans | $ | 304.3 | $ | 295.1 |
| Other accrued liabilities | | 8.1 | | 6.3 |
| | $ | 312.4 | $ | 301.4 |

---

7.  LIFE INSURANCE

---

Grace is the beneficiary of life insurance policies on certain current and
former employees with a net cash surrender value of $90.5 million and $82.4
million at September 30, 2003 and December 31, 2002, respectively. The policies
were acquired to fund various employee benefit programs and other long-term
liabilities and are structured to provide cash flow (primarily tax-free) over an
extended number of years. The following table summarizes activity in these
policies for the nine months ended September 30, 2003 and 2002, and components
of the net cash value at September 30, 2003 and December 31, 2002:

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
==========================================================
LIFE INSURANCE -
ACTIVITY SUMMARY              NINE MONTHS ENDED
(Dollars in millions)          SEPTEMBER 30,
==========================================================
                            2003            2002
----------------------------------------------------------
```

| | 2003 | | 2002 |
|---|---|---|---|
| Earnings on policy assets.... | $ 28.9 | $ | 31.2 |
| Interest on policy loans..... | (24.8) | | (25.9) |
| Policy loan repayments....... | 2.6 | | 4.2 |
| Annual premiums.............. | 2.4 | | 2.5 |
| Net investing activity....... | (1.0) | | (0.1) |
| Change in net cash value... | $ 8.1 | $ | 11.9 |
| Tax-free proceeds received... | $ 10.0 | $ | 13.8 |

| COMPONENTS OF NET CASH VALUE | SEPTEMBER 30, 2003 | | December 31, 2002 |
|---|---|---|---|
| Gross cash value............. | $ 470.7 | $ | 471.3 |
| Principal - policy loans..... | (365.8) | | (365.4) |
| Accrued interest - policy loans...................... | (14.4) | | (23.5) |
| Net cash value........... | $ 90.5 | $ | 82.4 |
| Insurance benefits in force.. | $ 2,212.4 | $ | 2,240.8 |

Grace's financial statements display income statement activity and balance sheet
amounts on a net basis, reflecting the contractual interdependency of policy
assets and liabilities.

---

8.   DEBT

---

On September 30, 2003, and December 31, 2002, Grace's debt was as follows:

| COMPONENTS OF DEBT (Dollars in millions) | SEPTEMBER 30, 2003 | | December 31, 2002 |
|---|---|---|---|
| DEBT PAYABLE WITHIN ONE YEAR | | | |
| DIP facility ................. | $ -- | $ | -- |
| Other short-term borrowings... | 10.9 | | 4.3 |
| | $ 10.9 | $ | 4.3 |
| DEBT PAYABLE AFTER ONE YEAR | | | |
| DIP facility ................. | $ -- | $ | -- |
| DEBT SUBJECT TO COMPROMISE | | | |
| Bank borrowings .............. | $ 500.0 | $ | 500.0 |
| Other borrowings ............. | 1.2 | | 1.0 |
| Accrued interest ............. | 46.3 | | 37.8 |
| | $ 547.5 | $ | 538.8 |
| Annualized weighted average interest rates on total debt ...................... | 2.1% | | 2.8% |

In April 2001, the Debtors entered into the DIP facility for a two-year term in
the aggregate amount of $250 million. The DIP facility is secured by a priority
lien on substantially all assets of the Debtors, and bears interest based on
LIBOR. The Debtors have extended the term of the DIP facility for up to an
additional three years through April 1, 2006, and modified certain other
provisions. Grace had no outstanding borrowings under the DIP facility as of
September 30, 2003; however, $25.8 million of standby letters of credit were
issued and outstanding under the facility. The letters of credit, which reduce
available funds under the facility, were issued mainly for trade-related matters
such as

I-15

performance bonds, and certain insurance and environmental matters.

---

## 9. SHAREHOLDERS' EQUITY (DEFICIT)

---

The Company is authorized to issue 300,000,000 shares of common stock. Of the common stock unissued on September 30, 2003, approximately 9,904,795 shares were reserved for issuance pursuant to stock option and other stock incentive plans. In the first nine months of 2003 and the year ended December 31, 2002, Grace did not grant any stock options.

For additional information, see Notes 15 and 17 to the Consolidated Financial Statements in Grace's 2002 Form 10-K.

---

## 10. (LOSS) EARNINGS PER SHARE

---

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings per share.

| EARNINGS PER SHARE (Dollars in millions, except per share amounts) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NUMERATORS | | | | |
| Net (loss) income.... | $ (9.9) | $ 14.0 | $ (5.7) | $ 47.6 |
| DENOMINATORS | | | | |
| Weighted average common shares - basic calculation.... | 65.6 | 65.5 | 65.5 | 65.4 |
| Dilutive effect of employee stock options and restricted shares.... | -- | -- | -- | 0.1 |
| Weighted average common shares diluted calculation.. | 65.6 | 65.5 | 65.5 | 65.5 |
| BASIC (LOSS) EARNINGS PER SHARE ............ | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |
| DILUTED (LOSS) EARNINGS PER SHARE.... | $ (0.15) | $ 0.21 | $ (0.09) | $ 0.73 |

As a result of loss incurred during the three months and nine months ended September 30, 2003, employee compensation shares of approximately 200,000 and 100,000, respectively, were excluded from the diluted loss per share calculation because their effect would be antidilutive.

---

## 11. COMPREHENSIVE INCOME (LOSS)

---

Grace's other comprehensive income (loss) consists entirely of foreign currency translation adjustments. The table below presents the pre-tax, tax and after-tax amounts of Grace's other comprehensive income (loss) for the three months and nine months ended September 30, 2003 and 2002:

| (Dollars in millions) | Pre-Tax Amount | Tax Benefit | After-Tax Amount |
|---|---|---|---|
| THREE MONTHS ENDED: | | | |
| September 30, 2003....... | $ 4.2 | $ -- | $ 4.2 |
| September 30, 2002....... | $ (9.5) | $ -- | $ (9.5) |
| NINE MONTHS ENDED: | | | |
| September 30, 2003....... | $ 53.6 | $ -- | $ 53.6 |
| September 30, 2002....... | $ 22.9 | $ -- | $ 22.9 |

The table below presents the components of Grace's accumulated other comprehensive loss at September 30, 2003 and December 31, 2002:

| COMPONENTS OF ACCUMULATED OTHER COMPREHENSIVE LOSS (Dollars in millions) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| Foreign currency translation ............... | $ (66.0) | $ (119.6) |
| Minimum pension liability.... | (283.7) | (283.7) |
| Accumulated other comprehensive loss......... | $ (349.7) | $ (403.3) |

---

## 12. COMMITMENTS AND CONTINGENT LIABILITIES

---

ASBESTOS-RELATED LITIGATION - SEE NOTE 3

ENVIRONMENTAL REMEDIATION

General Matters and Discussion

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

At September 30, 2003, Grace's liability for environmental investigative and remediation costs related to continuing and discontinued operations totaled $244.4 million, as compared to $201.1 million at December 31, 2002. This estimate of

I-16

environmental cost is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan. This estimate does not include possible additional liability related to new claims for remediation costs filed against the Debtors by governmental authorities and private parties prior to the March 31, 2003 bar date. One of such claims for approximately $100 million relates to a discontinued operation at a current operating site. Grace is evaluating such claims and is engaged in discussions with the U.S. Environmental Protection Agency (the "EPA") and other parties with respect to such claims. At this time, Grace is not able to determine whether the amount of liability related to such claims is likely to be material or to require adjustment to Grace's recorded liability.

The amounts of cash expenditures below have been charged against previously established reserves for the periods presented.

| (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Continuing operations........ | $ 1.9 | $ 3.3 | $ 7.4 | $ 14.0 |
| Discontinued operations......... | 1.3 | 0.3 | 1.8 | 0.5 |
| Total............... | $ 3.2 | $ 3.6 | $ 9.2 | $ 14.5 |

During the three-month and nine-month periods ended September 30, 2003, Grace recorded pre-tax charges of $50.0 million and $52.5 million, respectively, for environmental matters. Approximately $50.0 million of these charges were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining and processing activities near Libby, Montana. (See discussion under "Vermiculite Related Matters" below.)

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings; any such effect could be material. Grace's environmental liabilities are included in "liabilities subject to compromise" as of September 30, 2003.

Vermiculite Related Matters

From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as a contaminant, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the EPA began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. Grace has appealed the court's ruling.

Source: W R GRACE & CO, 10-Q, November 10, 2003

As a result of such ruling, Grace recorded a pre-tax charge of $50 million, bringing its total estimated

I-17

liability for Libby-related reimbursable costs to $110 million. Grace's estimate of expected reimbursable costs is based solely on public information about the EPA's spending plans. However, the EPA's cost estimates have increased substantially over the course of its cleanup. Consequently, Grace's estimate may change materially as more current public information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" and any payments would be subject to the outcome of the Chapter 11 proceedings.

The EPA is also evaluating environmental risks at vermiculite processing sites throughout the U.S. that processed vermiculite from Libby, Montana, and has made claims against Grace to carry out or fund remediation activities. Grace is reviewing the EPA's actions and cost claims to determine whether they are justified and reasonable and, in several instances, Grace has remediated or agreed to remediate certain sites. Costs associated with the above are included in "provision for environmental remediation" included in the Consolidated Statements of Operations.

Insurance Matters

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

TAX MATTERS

Grace has received the examination report from the Internal Revenue Service (the "IRS") on tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is under the jurisdiction of the IRS Office of Appeals, where Grace has filed a protest. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. Grace believes that the impact of probable tax return adjustments would not have a material adverse effect upon Grace's financial position. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business

I-18

Source: W R GRACE & CO, 10-Q, November 10, 2003

for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued assessments aggregating $40.1 million for the 1996 through 1998 tax periods and Grace expects the IRS will make additional assessments for the 1999 tax period. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius and the 1998 reorganization involving a predecessor of Grace and Sealed Air were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of the Debtors' estates.

On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $425.1 million as of September 30, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial position.

GUARANTEES AND INDEMNIFICATION OBLIGATIONS

Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

o    Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o    Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o    Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

o    Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

o    Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the

I-19

Source: W R GRACE & CO, 10-Q, November 10, 2003