individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

FINANCIAL ASSURANCES

At September 30, 2003, Grace had gross financial assurances issued and outstanding of $249.4 million, comprised of $135.0 million of gross surety bonds issued by various insurance companies, and $114.4 million of standby letters of credit and other financial assurances issued by various banks. Of the standby letters of credit, $19.0 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $230.4 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. Of the net amount of $230.4 million of financial assurances, $9.4 million were issued by non-Debtor entities and $221.0 million were issued by the Debtors. Of the amounts issued by the Debtors, $192.5 million were issued before the Filing Date, with the remaining $28.5 million being issued subsequent to the Filing, of which $25.8 million was issued under the DIP facility.

ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheet as of September 30, 2003. The amounts of these liabilities, as ultimately determined through the Chapter 11 proceedings, could be materially different from amounts recorded by Grace at September 30, 2003.

--------------------------------------------------------------------------------
13. BUSINESS SEGMENT INFORMATION
--------------------------------------------------------------------------------

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Davison Chemicals produces a variety of catalyst and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for the three-month and nine-month periods ended September 30, 2003 and 2002. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

| BUSINESS SEGMENT DATA (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NET SALES | | | | |
| Davison Chemicals...... | $ 267.0 | $ 246.5 | $ 767.7 | $ 703.0 |
| Performance Chemicals.. | 254.0 | 233.5 | 701.5 | 662.0 |
| TOTAL................. | $ 521.0 | $ 480.0 | $ 1,469.2 | $1,365.0 |
| PRE-TAX OPERATING INCOME | | | | |
| Davison Chemicals...... | $ 32.5 | $ 35.4 | $ 80.1 | $ 99.2 |
| Performance Chemicals.. | 38.6 | 30.1 | 76.5 | 76.9 |
| TOTAL................. | $ 71.1 | $ 65.5 | $ 156.6 | $ 176.1 |

The table below presents information related to the geographic areas in which Grace operated for the three months and nine months ended September 30, 2003 and 2002.

| GEOGRAPHIC AREA DATA (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| NET SALES | | | | |
| United States........ | $ 214.9 | $ 210.7 | $ 604.6 | $ 619.5 |
| Canada and Puerto Rico............... | 23.2 | 16.3 | 57.0 | 38.0 |
| Europe............... | 171.3 | 149.3 | 501.2 | 416.4 |
| Asia Pacific......... | 83.1 | 76.8 | 228.4 | 211.0 |
| Latin America........ | 28.5 | 26.9 | 78.0 | 80.1 |

```
TOTAL.................   $ 521.0  $480.0   $1,469.2  $1,365.0
======================================================================
```

The pre-tax operating income for Grace's business segments for the three-month
and nine-month periods ended September 30, 2003 and 2002 is reconciled below to
income before Chapter 11 expenses, income taxes, and minority interest presented
in the accompanying Consolidated Statements of Operations.

I-20

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
========================================================
RECONCILIATION OF
BUSINESS SEGMENT DATA
TO FINANCIAL              THREE MONTHS        NINE MONTHS
STATEMENTS                   ENDED               ENDED
(Dollars in millions)     SEPTEMBER 30,       SEPTEMBER 30,
========================================================
                         2003    2002        2003    2002
                         ---------------------------------
```

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Pre-tax operating income – business segments............. | $ 71.1 | $ 65.5 | $ 156.6 | $ 176.1 |
| Add back: | | | | |
| Minority interest ..... | (0.7) | 1.4 | (0.2) | 2.3 |
| | 70.4 | 66.9 | 156.4 | 178.4 |
| Interest expense and related financing costs................ | (4.1) | (4.8) | (12.4) | (15.2) |
| Interest income........ | 0.9 | 0.9 | 3.4 | 2.5 |
| Corporate costs........ | (20.8) | (12.6) | (59.2) | (32.8) |
| Other, net............. | (54.1) | (11.3) | (68.4) | (17.3) |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest .......... | $ (7.7) | $ 39.1 | $ 19.8 | $ 115.6 |

Corporate costs include expenses of corporate headquarters functions incurred in
support of core operations, such as corporate financial and legal services,
human resources management, communications and regulatory affairs. This item
also includes certain pension and postretirement benefits, including the
amortization of deferred actuarial losses, that are considered a core operating
cost but not allocated to business segments. Other includes a $50.0 million
pre-tax charge to adjust Grace's estimated liability for claims by the EPA for
recovery of environmental cleanup costs around Libby, Montana.

I-21

Source: W R GRACE & CO, 10-Q, November 10, 2003

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND
FINANCIAL CONDITION
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------
DESCRIPTION OF BUSINESS
--------------------------------------------------------------------------------

W. R. Grace & Co. and its subsidiaries are engaged in specialty chemicals and
specialty materials businesses on a global basis. Its business segments are
Davison Chemicals, which produces catalyst and silica products, and Performance
Chemicals, which produces construction chemicals, building materials and
sealants and coatings.

As used herein, the term "Company" refers to W. R. Grace & Co. The term "Grace"
refers to the Company and/or one or more of its subsidiaries and, in certain
cases, their respective predecessors.

--------------------------------------------------------------------------------
VOLUNTARY BANKRUPTCY FILING
--------------------------------------------------------------------------------

In response to a sharply increasing number of asbestos-related bodily injury
claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. and 61 of its
United States subsidiaries and affiliates, including W. R. Grace & Co.-Conn.
(collectively, the "Debtors"), filed voluntary petitions for reorganization (the
"Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or
the "Bankruptcy Code") in the United States Bankruptcy Court for the District of
Delaware (the "Bankruptcy Court"). The cases were consolidated and are being
jointly administered under case number 01-01139 (the "Chapter 11 Cases").
Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not
included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse
developments in its asbestos-related litigation, including: a significant
increase in bodily injury claims, higher than expected costs to resolve bodily
injury and certain property damage claims, and class action lawsuits alleging
damages from a former attic insulation product. (These claims are discussed in
more detail in Note 3 to the Consolidated Financial Statements.) After a
thorough review of these developments, the Board of Directors of Grace concluded
on April 2, 2001 that a federal court-supervised Chapter 11 process provided the
best forum available to achieve predictability and fairness in the claims
settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a
comprehensive resolution of the claims against it and preserve the inherent
value of its businesses. Under Chapter 11, the Debtors expect to continue to
operate their businesses as debtors-in-possession under court protection from
their creditors and claimants, while using the Chapter 11 process to develop and
implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation
against the Debtors for pre-petition matters is generally stayed (subject to
certain exceptions in the case of governmental authorities), and no party may
take action to realize its pre-petition claims except pursuant to an order of
the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related
claims and all other pre-petition claims in a plan of reorganization. Such a
plan of reorganization may include the establishment of a trust through which
all pending and future asbestos-related claims would be channeled for
resolution. However, it is currently impossible to predict with any degree of
certainty the amount that would be required to be contributed to the trust, how
the trust would be funded, how other pre-petition claims would be treated or
what impact any reorganization plan may have on the shares of common stock of
the Company. The interests of the Company's shareholders could be substantially
diluted or cancelled under a plan of reorganization. The formulation and
implementation of the plan of reorganization is expected to take a significant
period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to
conduct normal business activities have been approved by the Bankruptcy Court.
In addition, the Debtors have received approval from the Bankruptcy Court to pay
or otherwise honor certain of its pre-petition obligations in the ordinary
course of business, including employee wages and benefits, customer programs,
shipping charges, and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to
propose a plan of reorganization for a 120-day period following the Filing Date.
The Debtors have received extensions of their exclusivity period during which to
file a plan of reorganization through February 1, 2004, and extensions of the

Source: W R GRACE & CO, 10-Q, November 10, 2003

Debtors' exclusive rights to solicit acceptances of a reorganization plan through April 1, 2004.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court and, together with a legal representative of future asbestos

I-22

Source: W R GRACE & CO, 10-Q, November 10, 2003

claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

Claims Filings - The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be dealt with separately.

Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim were filed after the bar date. The discussion below refers to claims filed before the bar date.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views these claims as contingent and does not plan to address them until a later date in the Chapter 11 Cases. The other non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; contracts rejected in the Bankruptcy Court; environmental remediation; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos related litigation; and non-asbestos related personal injury.

The Debtors' preliminary analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of September 30, 2003, the Debtors had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). The Debtors expect to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses.

As claims are resolved, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to the Company's consolidated financial position and results of operations. Because of the uncertainties of the Chapter 11 process, the in-progress state of the Debtors' investigation of submitted claims, and the lack of documentation submitted in support of many claims, Grace, at this time, is not able to estimate the value of the claims that may ultimately be determined and allowed by the Bankruptcy Court.

Litigation Proceedings in Bankruptcy Court - In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in November of 2003. (See Note 3 for background information.)

On November 29, 2002, Sealed Air Corporation ("Sealed Air") and Fresenius Medical Care AG ("Fresenius") each announced that they had reached agreements in principle with the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to settle asbestos and fraudulent conveyance claims related to the 1998 transaction involving Grace's former packaging business and Sealed Air, and the 1996 transaction involving Grace's former medical care business and Fresenius, respectively. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $425.1 million as of September 30, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions.

Source: W R GRACE & CO, 10-Q, November 10, 2003

Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of September 30, 2003 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N. A. (the "DIP facility") in the aggregate amount of $250 million. The term of the DIP facility, originally set to expire April 1, 2003, has been extended for up to an additional three years through April 1, 2006.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of September 30, 2003, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise as of September 30, 2003, and December 31, 2002.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

--------------------------------------------------------------------------------
CRITICAL ACCOUNTING ESTIMATES
--------------------------------------------------------------------------------

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o   Contingent liabilities such as asbestos-related matters, environmental
    remediation, income taxes, and retained obligations of divested businesses.
o   Pension and postretirement liabilities that depend on assumptions regarding
    discount rates and/or total returns on invested funds.
o   Depreciation and amortization periods for long-lived assets, including
    property and equipment, intangible, and other assets.
o   Realization values of various assets such as trade receivables,
    inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

--------------------------------------------------------------------------------
CONSOLIDATED OPERATIONS
--------------------------------------------------------------------------------

Set forth below is a chart that lists key operating statistics and percentage changes for the three-month and nine-month periods ended September 30, 2003 and 2002. This chart should be referenced when reading management's discussion and analysis of the results of operations and financial condition. The financial information presented throughout this discussion divides Grace's financial results between

I-24

Source: W R GRACE & CO, 10-Q, November 10, 2003

"core operations" and "noncore activities." Core operations comprise the financial results of Davison Chemicals, Performance Chemicals and the costs of corporate activities that directly or indirectly support business operations. In contrast, noncore activities comprise all other events and transactions not directly related to the generation of operating revenue or the support of core operations.

Neither pre-tax income from core operations nor pre-tax income from core operations before depreciation and amortization purport to represent income or cash flow as defined under generally accepted accounting principles, and should not be considered an alternative to such measures as an indicator of Grace's performance. These measures are provided to distinguish operating results of Grace's current business base from results and related assets and liabilities of past businesses, discontinued products and corporate legacies.

I-25

| ANALYSIS OF CONTINUING OPERATIONS (Dollars in millions) | THREE MONTHS ENDED SEPTEMBER 30, | | | NINE MONTHS ENDED SEPTEMBER 30, | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | % Change Fav (Unfav) | 2003 | 2002 | % Change Fav (Unfav) |
| **NET SALES** | | | | | | |
| DAVISON CHEMICALS | | | | | | |
| Catalyst products......................... $ | 189.6 | $ 179.0 | 5.9% | $ 544.2 | $ 508.0 | 7.1% |
| Silica products........................... | 77.4 | 67.5 | 14.7% | 223.5 | 195.0 | 14.6% |
| TOTAL DAVISON CHEMICALS.................... | 267.0 | 246.5 | 8.3% | 767.7 | 703.0 | 9.2% |
| PERFORMANCE CHEMICALS | | | | | | |
| Construction chemicals.................... | 120.1 | 109.8 | 9.4% | 324.9 | 300.1 | 8.3% |
| Building materials....................... | 65.0 | 60.4 | 7.6% | 178.1 | 177.6 | 0.3% |
| Sealants and coatings.................... | 68.9 | 63.3 | 8.8% | 198.5 | 184.3 | 7.7% |
| TOTAL PERFORMANCE CHEMICALS............... | 254.0 | 233.5 | 8.8% | 701.5 | 662.0 | 6.0% |
| TOTAL GRACE SALES - CORE OPERATIONS.......... $ | 521.0 | $ 480.0 | 8.5% | $ 1,469.2 | $ 1,365.0 | 7.6% |
| PRE-TAX OPERATING INCOME (A): | | | | | | |
| Davison Chemicals (b)..................... $ | 32.5 | $ 35.4 | (8.2%) | $ 80.1 | $ 99.2 | (19.3%) |
| Performance Chemicals.................... | 38.6 | 30.1 | 28.2% | 76.5 | 76.9 | (0.5%) |
| Corporate costs: | | | | | | |
| Support functions..................... | (7.9) | (7.1) | (11.3%) | (23.3) | (21.3) | (9.4%) |
| Pension and other..................... | (12.9) | (5.5) | NM | (35.9) | (11.5) | NM |
| Total Corporate costs................. | (20.8) | (12.6) | (65.1%) | (59.2) | (32.8) | (80.5%) |
| PRE-TAX INCOME FROM CORE OPERATIONS (C)...... | 50.3 | 52.9 | (4.9%) | 97.4 | 143.3 | (32.0%) |
| PRE-TAX LOSS FROM NONCORE ACTIVITIES......... | (54.1) | (11.3) | NM | (68.4) | (17.3) | NM |
| Interest expense........................... | (4.1) | (4.8) | 14.6% | (12.4) | (15.2) | 18.4% |
| Interest income............................ | 0.9 | 0.9 | -- | 3.4 | 2.5 | 36.0% |
| INCOME (LOSS) BEFORE CHAPTER 11 EXPENSES AND INCOME TAXES......................... | (7.0) | 37.7 | (118.6%) | 20.0 | 113.3 | (82.3%) |
| Chapter 11 expenses, net................... | (2.2) | (8.6) | 74.4% | (11.7) | (21.4) | 45.3% |
| Provision for income taxes................. | (0.7) | (15.1) | 95.4% | (14.0) | (44.3) | 68.4% |
| Net (loss) income .......................... $ | (9.9) | $ 14.0 | (170.7%) | $ (5.7) | $ 47.6 | (112.0%) |
| **KEY FINANCIAL MEASURES:** | | | | | | |
| PRE-TAX INCOME FROM CORE OPERATIONS AS PERCENTAGE OF SALES: | | | | | | |
| Davison Chemicals (b).................... | 12.2% | 14.4% | (2.2) pts | 10.4% | 14.1% | (3.7) pts |
| Performance Chemicals.................... | 15.2% | 12.9% | 2.3 pts | 10.9% | 11.6% | (0.7) pts |
| Consolidated............................ | 9.7% | 11.0% | (1.3) pts | 6.6% | 10.5% | (3.9) pts |
| PRE-TAX INCOME FROM CORE OPERATIONS BEFORE DEPRECIATION AND AMORTIZATION (C) $ | 76.4 | $ 77.5 | (1.4%) | $ 173.5 | $ 214.1 | (19.0%) |
| As a percentage of sales............... | 14.7% | 16.1% | (1.4) pts | 11.8% | 15.7% | (3.9) pts |
| **NET SALES BY REGION:** | | | | | | |
| North America............................. $ | 238.1 | $ 227.0 | 4.9% | $ 661.6 | $ 657.5 | 0.6% |
| Europe.................................... | 171.3 | 149.3 | 14.7% | 501.2 | 416.4 | 20.4% |
| Asia Pacific.............................. | 83.1 | 76.8 | 8.2% | 228.4 | 211.0 | 8.2% |
| Latin America............................. | 28.5 | 26.9 | 5.9% | 78.0 | 80.1 | (2.6%) |
| TOTAL..................................... $ | 521.0 | $ 480.0 | 8.5% | $ 1,469.2 | $ 1,365.0 | 7.6% |

NM = Not meaningful

a = Pre-tax operating income for all periods presented reflects a reallocation of the cost of earned pension benefits of active participants from corporate to the respective business segments.

b = Davison Chemicals pre-tax operating income excludes minority interest related to the Advanced Refining Technologies joint venture.

c = Neither pre-tax income from core operations nor pre-tax income from core operations before depreciation and amortization purport to represent income or cash flow as defined under generally accepted accounting principles, and should not be considered as an alternative to such measures as an indicator of the Company's performance. These measures are provided to distinguish operating results of Grace's current business base from results and related assets and liabilities of past businesses, discontinued products and corporate legacies.

I-26

COSTS OF DOING BUSINESS IN CHAPTER 11

Although it is difficult to measure precisely how Chapter 11 has impacted Grace's overall financial performance, there are certain added costs that are directly attributable to operating under the Bankruptcy Code. Net reorganization expenses of $11.7 million in the first nine months of 2003 and $21.4 million in the first nine months of 2002 consist primarily of legal, financial and consulting fees incurred by Grace and three creditors' committees. In addition, for the nine months ended September 30, 2003 and 2002, Grace's pre-tax income from core operations included expenses of $14.2 million and $8.1 million, respectively, for Chapter 11-related compensation charges. Poor stock price performance in the period leading up to and after the Filing diminished the value of Grace's stock option program to current and prospective employees, which caused Grace to change its long-term incentive compensation program into a cash-based program. Grace has also sought to address employee retention issues by providing added compensation to certain employees and increasing Grace's contribution to its retirement savings and investment plan.

There are numerous other indirect costs to manage Grace's Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including directors and officers liability insurance; and lost business and acquisition opportunities due to the complexities of operating under Chapter 11.

NET SALES

The following tables identify the increase or decrease in sales attributable to changes in product volume, product price and/or mix, and the impact of foreign currency translation for the three-month and nine-month periods ended September 30, 2003, respectively.

| NET SALES VARIANCE ANALYSIS | THREE MONTHS ENDED SEPTEMBER 30, 2003 AS A PERCENTAGE INCREASE (DECREASE) FROM THREE MONTHS ENDED SEPTEMBER 30, 2002 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | TRANSLATION | TOTAL |
| Davison Chemicals | 0.4% | 3.2% | 4.7% | 8.3% |
| Performance Chemicals | 4.8% | 0.2% | 3.8% | 8.8% |
| Net sales | 2.5% | 1.8% | 4.2% | 8.5% |
| By Region: | | | | |
| North America | 2.3% | 2.1% | 0.5% | 4.9% |
| Europe | 2.9% | (0.5%) | 12.3% | 14.7% |
| Asia Pacific | 17.4% | (10.9%) | 1.7% | 8.2% |
| Latin America | (25.7%) | 33.1% | (1.5%) | 5.9% |

Grace's third quarter sales totaled $521.0 million compared with $480.0 million in the prior year quarter, an 8.5% increase. Favorable currency translation effects from a weaker U.S. dollar accounted for about half of the increase. Revenue from added volume in certain product lines was also a contributing factor. In addition, acquisitions contributed $4.7 million or 1.0 percentage point of the sales volume growth, all of which related to Davison.

| NET SALES VARIANCE ANALYSIS | NINE MONTHS ENDED SEPTEMBER 30, 2003 AS A PERCENTAGE INCREASE (DECREASE) FROM NINE MONTHS ENDED SEPTEMBER 30, 2002 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | TRANSLATION | TOTAL |
| Davison Chemicals | 1.0% | 2.1% | 6.1% | 9.2% |
| Performance Chemicals | 1.5% | 0.6% | 3.9% | 6.0% |
| Net sales | 1.2% | 1.4% | 5.0% | 7.6% |
| By Region: | | | | |
| North America | (1.8%) | 2.0% | 0.4% | 0.6% |
| Europe | 5.4% | (1.6%) | 16.6% | 20.4% |
| Asia Pacific | 12.5% | (6.8%) | 2.5% | 8.2% |
| Latin America | (11.9%) | 20.2% | (10.9%) | (2.6%) |

Grace's year-to-date sales totaled $1,469.2 million compared with $1,365.0 million in the prior year period, a 7.6% increase. Currency translation accounted for 5.0 percentage points of the increase. Added volume in certain product lines was also a contributing factor. Acquisitions contributed $20.9 million or 1.5 percentage points of the sales volume growth, most of which related to Davison.

PRE-TAX INCOME FROM CORE OPERATIONS

Pre-tax income from core operations comprises the business segment results of Davison Chemicals and Performance Chemicals offset by corporate costs. Pre-tax income from core operations in the third quarter of 2003 was $50.3 million, compared with $52.9 million in the third quarter of 2002, a 4.9% decrease. Lower profits from the Davison Chemicals group and higher U.S. pension costs were partially offset by a record quarter from the Performance Chemicals businesses, which delivered a 28.2% increase in operating earnings on an 8.8% increase in sales. Pre-tax income from core operations was $97.4 million for the nine months ended September 30, 2003, compared with $143.3 million for the prior year period, a 32.0% decrease. Year-to-date pre-tax operating margin was 6.6%, 3.9 percentage points lower than the prior year. The decline in year-to-date operating profit and margins was caused by higher costs for pensions, certain raw materials, natural gas and plant maintenance, together with higher sales of lower margin products.

Corporate costs for the third quarter of 2003 were $20.8 million, an $8.2 million increase from the prior year quarter. Corporate costs for the nine months ended

I-27

September 30, 2003 were $59.2 million, a $26.4 million increase from the prior year period. Corporate costs include corporate functional costs (such as financial and legal services, human resources, communications and information technology), the cost of corporate governance (including directors and officers liability insurance) and pension costs related to both corporate employees and to the effects of changes in assets and liabilities for all Grace pension plans. The increase is primarily attributable to added costs for pension benefits to account for the negative financial market factors that have impacted the funded status of defined benefit pension plans in recent years, and to higher director and officer liability insurance premiums.

PRE-TAX LOSS FROM NONCORE ACTIVITIES

Pre-tax loss from noncore activities comprises all events and transactions not directly related to the generation of revenue or the support of core operations. Expense from noncore activities totaled $54.1 million for the third quarter of 2003, compared with expense of $11.3 million for the prior year period. For the nine months ended September 30, 2003, expense from noncore activities totaled $68.4 million, compared with $17.3 million for the prior year period.

The increase in expense from noncore activities in both the three-month and nine-month periods ended September 30, 2003 was primarily attributable to a $50 million pre-tax charge to adjust Grace's estimated liability resulting from a court ruling against Grace, which requires Grace to reimburse the EPA for cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana. Higher pension expense related to employees of former businesses, as well as higher insurance costs also contributed to the increase. These expenses were offset by income from Grace's life insurance policies.

CHAPTER 11 EXPENSES

Net reorganization expenses of $2.2 million and $11.7 million for the three-month and nine-month periods ended September 30, 2003, and $8.6 million and $21.4 million for the three-month and nine-month periods ended September 30, 2002, consisted primarily of legal, financial and consulting fees incurred by Grace and three creditors' committees related to the Chapter 11 Filing. Grace believes that reorganization expenses will range between $2 million and $6 million per quarter for the foreseeable future.

INTEREST

Net interest expense for the three months ended September 30, 2003 was $4.1 million, down from $4.8 million in 2002. Net interest expense for the nine months ended September 30, 2003 was $15.2 million, down from $15.2 million in 2002. The decrease in both periods was attributable to a lower contractual interest rate on pre-petition debt subject to compromise. Average debt levels were $519.8 million in the first nine months of 2003 and $508.0 million in the first nine months of 2002. Payment of interest accrued on pre-petition debt is subject to the outcome of Grace's Chapter 11 proceedings. Weighted average interest rates for September 30, 2003 and 2002 were 2.1% and 2.7%, respectively.

INCOME TAXES

Grace's provision for income taxes at the federal corporate rate of 35% was $2.9 million for the nine months ended September 30, 2003. The primary difference between this amount and the overall provision for income taxes of $14.0 million is attributable to current period interest on tax contingencies and the non-deductibility of certain Chapter 11 expenses.

DAVISON CHEMICALS

Business Description

Davison Chemicals is a leading global supplier of catalyst and silica products. Catalyst products represented approximately 36% of Grace's 2003 third quarter sales (37% - 2002). This segment includes fluid cracking catalysts and additives used in petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; hydroprocessing catalysts, which upgrade heavy oils and remove certain impurities; polyolefin catalysts, which are essential components in the manufacture of polyethylene and polypropylene used in products such as plastic film, high-performance plastic pipe and other plastic products; and chemical catalysts, which are used in a variety of chemical processes. Silica products, which represented 15% of Grace's 2003 third quarter sales (14% - 2002), are used in a wide range of industrial and consumer applications, such as coatings, food processing, plastics, adsorbents, personal care products and biotechnology separations.

Recent Acquisitions and Joint Ventures

In July 2003, Grace acquired the chromatography business of Argonaut Technologies, Inc., which had been marketed under the Jones Chromatography name.

Source: W R GRACE & CO, 10-Q, November 10, 2003

Source: W R GRACE & CO, 10-Q, November 10, 2003

In April 2003, Grace, through its subsidiary The Separations Group, acquired the business and assets of MODcol Corporation, a manufacturer of preparative chromatography columns and provider of custom column packaging services.

In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company, acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company.

In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S. This acquisition has been integrated into Grace's polyolefin catalysts business.

Three Months Ended September 30, 2003

Third quarter sales for the Davison Chemicals segment were $267.0 million, up 8.3% from the prior year quarter. Excluding the effects of favorable currency translation, sales were up 3.6% for the quarter. Acquisitions accounted for $4.7 million or 1.9 percentage points of sales growth. Operating income of the Davison Chemicals segment was $32.5 million, 8.2% lower than the 2002 third quarter; operating margin of 12.2% was 2.2 percentage points lower than the prior year quarter. Although strong sales in silica products helped to increase profitability, operating income and margins in the third quarter of 2003 continued to be negatively affected by higher manufacturing costs, primarily from higher natural gas prices and maintenance requirements at certain production facilities, and from a product and regional sales mix that resulted in lower average margins.

Sales of catalyst products, which include refining catalysts, polyolefin catalysts and other chemical catalysts, were $189.6 million, up 5.9% compared with the prior year quarter, primarily attributable to currency effects and an acquisition completed in Japan in August 2002. Catalyst sales increased by 6.7% in North America compared to the third quarter of 2002 due to higher sales in the hydroprocessing catalyst business. Sales of silica products were $77.4 million, up 14.7% compared with the prior year quarter. Excluding favorable currency effects, sales were up 5.8%, primarily due to growth programs in digital printing and separations applications, and higher sales of adsorbents and precipitated silica products.

Sales were up in all regions, with increases of 6.4% in North America, 11.5% in Europe, 7.6% in Asia Pacific, and 2.4% in Latin America. In Europe, the increase in sales was attributable to growth in both the catalyst and silica product lines, as well as favorable currency translation. In Asia Pacific, the increase in sales was primarily attributable to growth within the catalyst product line, while silica sales decreased 4.9%. The sales increases in North America and Latin America were due to volume growth in both the catalyst and silica product lines.

Nine Months Ended September 30, 2003

Year-to-date sales for the Davison Chemicals segment were $767.7 million, up 9.2% from 2002 (excluding currency translation impacts, sales were up 3.1%). Acquisitions accounted for $20.5 million or 2.9 percentage points of the sales growth. Year-to-date operating income was $80.1 million, compared with $99.2 million for the prior year, a 19.3% decrease. Year-to-date operating results reflect a sluggish U.S. economy, and higher utilities, raw materials and other manufacturing costs.

Sales of catalyst products were up 7.1% compared with the prior year period, as a result of currency effects and acquisitions in the polyolefin and hydroprocessing catalyst businesses, partially offset by lower sales in North America caused by a decrease in demand. Sales of silica products were up 14.6% for the period, primarily from currency translation impacts, growth programs in coatings, digital printing, and separations applications, and added volume in North America and Europe.

Sales in North America, Europe, and Asia Pacific were up 3.9%, 18.5%, and 7.3%, respectively. Sales in Latin America were down 8.8%. In North America, the increase in sales was primarily due to growth in both the catalyst and silica product lines. In Europe, the increase in sales was primarily due to favorable currency translation impacts and growth in both the catalyst and silica product lines. The increase in Asia Pacific reflects growth within the catalyst product line, as well as the effect of favorable currency translation, offset by a slight decline in the silica product line. The decrease in Latin America was attributable to lower demand in both the catalyst and silica product lines.

PERFORMANCE CHEMICALS

Business Description

The major product groups of the Performance Chemicals segment are (1) specialty construction chemicals and specialty building materials, which are used primarily by the nonresidential construction

Source: W R GRACE & CO, 10-Q, November 10, 2003

industry; and (2) container sealants and coatings for food and beverage packaging, and other related products. Specialty construction chemicals, which represented 23% of Grace's 2003 and 2002 third quarter sales, add strength, control corrosion, and enhance the handling and application of concrete, and reduce the manufacturing cost and improve the quality of cement. Specialty building materials, which represented 13% of Grace's 2003 and 2002 third quarter sales, prevent water damage to structures and protect structural steel against collapse caused by fire. Sealants and coatings products, which represented 13% of Grace's 2003 and 2002 third quarter sales, are used to seal beverage and food cans, glass and plastic bottles, and protect metal packaging from corrosion and package contents from the influences of the metal.

Recent Acquisitions and Joint Ventures

On October 1, 2003, Grace, through a German subsidiary, acquired the construction products business and certain assets of Tricosal Beton-Chemie GmbH & Co. KG. Tricosal Beton-Chemie was a leading supplier of specialty chemicals and materials to the European construction industry. The business is being integrated into the construction chemicals product line.

In March 2002, Grace acquired the business and the assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada. This business has been integrated into the construction chemicals product line.

Three Months Ended September 30, 2003

Third quarter sales for the Performance Chemicals segment were $254.0 million, up 8.8% from the prior year quarter, reflecting favorable currency translation, strong demand for concrete admixtures and waterproofing products, and continued success of growth programs in coatings. Operating income for the Performance Chemicals segment was $38.6 million, up 28.2% versus $30.1 million in the prior year quarter. Operating margin of 15.2% was 2.3 percentage points higher than the prior year period, primarily reflecting sales growth and cost containment programs.

Sales of specialty construction chemicals, which include concrete admixtures, cement additives and masonry products, were up 9.4% versus the prior year quarter (5.0% excluding currency translation impacts). Sales were strong in Europe and Asia, reflecting the success of new product programs and sales initiatives in key economies worldwide. Sales were also up in North America, reflecting growth programs as well as good construction weather, which allowed a catch-up in project activity delayed due to poor weather earlier in the year. Also, there are indications that the significant decline in U.S. construction activity since early 2001 may be slowing or leveling, in line with recent industry projections. Sales of specialty building materials, which include waterproofing and fire protection products, were up 7.6% (5.8% before translation impacts) compared with the third quarter of 2002. This improvement reflects good construction weather in North America and the leveling of the decline in U.S. construction activity, offset by the effects of new building codes that permit less fire protection materials for structural steel used in commercial buildings. Sales of specialty sealants and coatings, which include container sealants, coatings and polymers, were up 8.8% compared with the third quarter of 2002 (4.3% before the effect of currency translation), mainly reflecting coatings growth programs in Latin America and Asia.

Sales were up 3.8% in North America, mainly reflecting an increase in demand for waterproofing products and concrete admixture. In Europe, a sales increase of 20.0% reflected favorable currency translation as well as growth programs in concrete admixtures, waterproofing and coatings. Asia Pacific sales were up 9.1%, mainly reflecting growth in concrete admixtures and favorable currency translation. Sales increased by 8.9% in Latin America, reflecting growth programs in coatings and closure sealants, offset by unfavorable currency translation impacts.

Nine Months Ended September 30, 2003

Sales for the Performance Chemicals segment for the nine months ended September 30, 2003 were $701.5 million, up 6.0% from the prior year period, driven by favorable currency translation impacts, as well as increases in construction chemicals and sealants and coatings. Operating margin of 10.9% was 0.7 percentage points unfavorable to the prior year period, and operating income of $76.5 million was down 0.5%; these results reflected a strong third quarter, which offset a weak first half caused by soft construction activity and weather-delayed projects in the U.S.

Sales of construction chemicals were up 8.3%, reflecting favorable currency translation impacts and the success of new product programs and sales initiatives in key economies worldwide. Sales of building materials were essentially flat, as favorable currency translation impacts and growth programs in waterproofing were offset by the effects of new building codes that permit less fire protection materials for structural steel used in commercial buildings, as

Source: W R GRACE & CO, 10-Q, November 10, 2003

I-30

well as weak U.S. construction activity. Sales of sealants and coatings were up
7.7%, reflecting favorable currency translation impacts in Europe and growth
initiatives in coatings and closure sealants, particularly in Latin America and
Europe, offset by unfavorable currency exchange in Latin America.

Sales in Europe, Asia Pacific and Latin America were up 23.4%, 9.5% and 3.1%,
respectively, while sales in North America were down 1.8%. In Europe, higher
sales were due to favorable foreign currency translation and growth in all
product groups, primarily concrete admixtures. Sales in Asia Pacific increased
from the effects of favorable foreign currency, as well as volume growth in
construction chemicals. The increase in Latin America reflects growth programs
in coatings and closure sealants, offset by unfavorable foreign currency
translation. The decline in North America was primarily caused by the effects of
new building codes that permit less fire protection materials for structural
steel used in commercial buildings, as well as weak U.S. construction activity.

FINANCIAL POSITION AND CASH FLOWS

The following chart sets forth Grace's net asset position supporting its core
operations and its net cash flows from core operations.

| CORE OPERATIONS (Dollars in millions) | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| BOOK VALUE OF INVESTED CAPITAL | | |
| Receivables..................... $ | 358.9 | $ 313.7 |
| Inventory...................... | 208.9 | 173.6 |
| Properties and equipment, net.. | 629.0 | 616.0 |
| Pension accounts and other..... | 557.1 | 604.6 |
| ASSETS SUPPORTING CORE OPERATIONS................... | 1,753.9 | 1,707.9 |
| Accounts payable and accruals.. | (327.2) | (313.5) |
| CAPITAL INVESTED IN CORE OPERATIONS................... $ | 1,426.7 | $ 1,394.4 |
| Pre-tax return on average invested capital (trailing twelve months)................ | 9.6% | 12.8% |

| NET CASH FLOWS FROM CORE OPERATIONS: | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2003 | 2002 |
| Pre-tax operating income....... $ | 97.4 | $ 143.3 |
| Depreciation and amortization.. | 76.1 | 70.8 |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION. | 173.5 | 214.1 |
| Working capital and other changes...................... | (59.3) | (8.3) |
| CASH FLOW BEFORE INVESTING..... | 114.2 | 205.8 |
| Capital expenditures........... | (65.7) | (55.4) |
| Businesses acquired............ | (3.6) | (28.5) |
| NET CASH FLOW FROM CORE OPERATIONS................... $ | 44.9 | $ 121.9 |

Grace had a net asset position supporting its core operations of $1,426.7
million at September 30, 2003, compared with $1,394.4 million at December 31,
2002 (including the cumulative translation account reflected in Shareholders'
Equity (Deficit) of $66.0 million for 2003 and $119.6 million for 2002). The
change in invested capital supporting core operations was primarily due to:

a)  An increase in receivables of $45.2 million, which was due to the
    seasonality of Grace's businesses. In addition, $14.9 million was
    attributable to currency translation, primarily of European and Asian
    receivables, reflecting a weaker dollar.

b)  An overall increase in inventory of $35.3 million, consisting of increases
    in catalyst inventory to satisfy expected fourth quarter deliveries, as
    well as $9.1 million attributable to currency translation impacts,
    primarily in European and Asian inventories, reflecting a weaker dollar.

c)  A decline in pension accounts and other of $47.5 million caused primarily
    by net pension expense of $39.9 million, as well as an overall decline in
    the cumulative translation adjustment.

The pre-tax return (trailing twelve months) on capital invested in core
operations decreased by 3.2 percentage points in the nine months ended September

30, 2003, due to a 32.0% decline in pre-tax operating income. In addition, net cash flows from core operations decreased due to the decline in pre-tax operating income, an increase in capital spending and a decrease in working capital, offset by a decline in cash invested in business acquisitions.

Source: W R GRACE & CO, 10-Q, November 10, 2003

```
--------------------------------------------------------------------------------
FINANCIAL CONDITION
--------------------------------------------------------------------------------
```

EFFECT OF CHAPTER 11

As described under "Voluntary Bankruptcy Filing," the Company and its principal
U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the
Bankruptcy Code. Grace's non-U.S. subsidiaries, although not part of the Filing,
are owned directly or indirectly by the Company's principal operating subsidiary
or other filing entities. Consequently, it is likely that a Chapter 11
reorganization plan will involve the combined value of Grace's global businesses
and its other assets to fund (with cash and/or securities) Grace's obligations
as adjudicated through the bankruptcy process. Grace has analyzed its cash flow
and capital needs to continue to fund its businesses and believes that, while in
Chapter 11,

I-31

Source: W R GRACE & CO, 10-Q, November 10, 2003

sufficient cash flow and credit facilities are available to support its business strategy.

The following sections address Grace's financial condition in more detail and describe the major contingencies that are being addressed as part of the Chapter 11 process. Grace's ability to present a plan of reorganization to the Bankruptcy Court depends largely on the timing of resolution of these contingencies.

LIABILITIES AND CONTINGENCIES

Grace has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. The following table summarizes the net noncore liability at September 30, 2003 and December 31, 2002 and the net cash flow from noncore activities for the nine months ended September 30, 2003 and 2002:

NONCORE ACTIVITIES

| (Dollars in millions) NET NONCORE LIABILITIES: | SEPTEMBER 30, 2003 | December 31, 2002 |
|---|---|---|
| Asbestos-related liabilities.... | $ (964.6) | $ (973.2) |
| Asbestos-related insurance receivable ................... | 271.6 | 282.6 |
| Asbestos-related liability, net | (693.0) | (690.6) |
| Environmental remediation....... | (244.4) | (201.1) |
| Postretirement benefits......... | (139.0) | (147.2) |
| Retained obligations and other.. | (57.6) | (55.3) |
| NET NONCORE LIABILITY........... | $(1,134.0) | $(1,094.2) |

| NET CASH FLOWS FROM NONCORE ACTIVITIES: | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2003 | 2002 |
| Pre-tax loss from noncore activities.................... | $ (68.4) | $ (17.3) |
| Non-cash changes................ | 68.4 | 23.8 |
| Cash spending for: | | |
| Asbestos-related litigation, net of insurance recovery.... | 2.9 | 2.6 |
| Environmental remediation..... | (9.1) | (14.5) |
| Postretirement benefits....... | (8.8) | (17.7) |
| Retained obligations and other....................... | (1.2) | (3.2) |
| NET CASH FLOW FROM NONCORE ACTIVITIES ................... | $ (16.2) | $ (26.3) |

As described under "Voluntary Bankruptcy Filing," the resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of such estimates will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at September 30, 2003.

ASBESTOS-RELATED MATTERS

During the three months and nine months ended September 30, 2003, Grace had net payments of $3.1 million and net receipts of $2.4 million, respectively, for the defense and disposition of asbestos-related property damage and bodily injury litigation, including amounts received under settlements with insurance carriers. This compared to net payments of $1.3 million and net receipts of $2.6 million during the three months and nine months ended September 30, 2002, respectively. At September 30, 2003, Grace's balance sheet reflected a gross asbestos-related liability of $964.6 million ($693.0 million net of insurance). This liability represents management's estimate, based on facts and circumstances existing prior to the Filing, of the undiscounted net cash outflows necessary to satisfy Grace's pending property damage claims for which sufficient information is available, and its pending and projected future bodily injury claims. Changes to the recorded amount of such liability will be based on Chapter 11 developments and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, related insurance coverage, or its ultimate plan of reorganization.

Source: W R GRACE & CO, 10-Q, November 10, 2003

The Consolidated Balance Sheet at September 30, 2003 includes total amounts due from insurance carriers of $271.6 million pursuant to settlement agreements with those insurance carriers. The recovery of amounts due from insurance carriers is dependent upon the timing, character and exposure periods of asbestos-related claims. Grace's Chapter 11 proceedings and proposed federal legislation could also affect the timing and amounts of Grace's recovery.

Grace intends to address all of its pending and future asbestos-related claims as part of a plan of reorganization under Chapter 11. Grace will seek to have the Bankruptcy Court establish a process to assess and appropriately quantify the numerous property damage and bodily injury claims against it. Measurement of Grace's asbestos-related liabilities could be materially affected by Bankruptcy Court rulings, the outcome of litigation and negotiations among interested parties. Grace's ultimate liability for asbestos-related liabilities could be materially higher than the amounts recorded.

I-32

ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving
federal, state, local and foreign environmental laws and regulations. Grace has
expended substantial funds to comply with such laws and regulations and expects
to continue to do so in the future. At September 30, 2003, Grace's recorded
liability for environmental investigation and remediation costs related to both
continuing and discontinued operations totaled $244.4 million, as compared with
$201.1 million at December 31, 2002. This estimate of environmental costs is
based on funding and/or remediation agreements in place, together with Grace's
best estimate of its cost for sites not subject to a formal remediation plan.
This estimate does not include possible additional liability related to new
claims for remediation costs filed against the Debtors by governmental
authorities and private parties prior to the March 31, 2003 bar date. One of
such claims for approximately $100 million relates to a discontinued operation
at a current operating site. Grace is evaluating such claims and is engaged in
discussions with the U.S. Environmental Protection Agency (the "EPA") and other
parties with respect to such claims. At this time, Grace is not able to
determine whether the amount of liability related to such claims is likely to be
material or to require adjustment to Grace's recorded liability.

From the 1920's until 1990, Grace and previous owners conducted vermiculite
mining and related activities near Libby, Montana. The vermiculite ore that was
mined contained varying amounts of asbestos as a contaminant, almost all of
which was removed during processing. Expanded vermiculite from Libby was used in
products such as fireproofing, insulation and potting soil. In November 1999,
Region 8 of the EPA began an investigation into alleged excessive levels of
asbestos-related disease in the Libby population related to these former mining
activities. This investigation led the EPA to undertake additional investigative
activity and to carry out response actions in and around Libby. On March 30,
2001, the EPA filed a lawsuit in U.S. District Court for the District of
Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under
the Comprehensive Environmental Response, Compensation and Liability Act for the
recovery of costs allegedly incurred by the United States in response to the
release or threatened release of asbestos in the Libby, Montana area relating to
such former mining activities. These costs include cleaning and/or demolition of
contaminated buildings, the excavation and removal of contaminated soil, health
screening of Libby residents and former mine workers, and investigation and
monitoring costs. In this action, the EPA also sought a declaration of Grace's
liability that would be binding in future actions to recover further response
costs.

In connection with its defense, Grace conducted its own investigation to
determine whether the EPA's actions and cost claims were justified and
reasonable. However, in December 2002, the District Court granted the United
States' motion for partial summary judgment on a number of issues that limited
Grace's ability to challenge the EPA's response actions. In January 2003, a
trial was held on the remainder of the issues, which primarily involved the
reasonableness and adequacy of documentation of the EPA's cost recovery claims
through December 31, 2001. On August 28, 2003, the District Court issued a
ruling in favor of the United States that requires Grace to reimburse the
government for $54.5 million in costs expended through December 2001, and for
all appropriate future costs to complete the cleanup. Grace has appealed the
court's ruling.

As a result of such ruling, Grace recorded a pre-tax charge of $50 million,
bringing its total estimated liability for Libby-related reimbursable costs to
$110 million. Grace's estimate of expected reimbursable costs is based solely on
public information about the EPA's spending plans. However, the EPA's cost
estimates have increased substantially over the course of its cleanup.
Consequently, Grace's estimate may change materially as more current public
information becomes available. Grace's liability for this matter is included in
"liabilities subject to compromise" and any payments would be subject to the
outcome of the Chapter 11 proceedings.

The EPA is also evaluating environmental risks at vermiculite processing sites
throughout the U.S. that processed vermiculite from Libby, Montana, and has made
claims against Grace to carry out or fund remediation activities. Grace is
reviewing the EPA's actions and cost claims to determine whether they are
justified and reasonable and, in several instances, Grace has remediated or
agreed to remediate certain sites. Costs associated with the above are included
in "provision for environmental remediation" included in the Consolidated
Statements of Operations.

POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits
for retired employees, a large majority of which pertain to retirees of
previously divested businesses. These plans are unfunded, and Grace pays the
costs of benefits under these plans as they are incurred. Spending under this
program during the nine months ended September 30, 2003 was $8.8 million,
compared with $17.7 million in

I-33

2002. Grace's recorded liability for postretirement benefits of $139.0 million at September 30, 2003 is stated at net present value discounted at 6.75%. The continuing payment of these benefits has been approved by the Bankruptcy Court; however, the program would still be subject to the terms of a Chapter 11 reorganization plan.

RETAINED OBLIGATIONS OF DIVESTED BUSINESSES

The principal obligations of divested businesses retained by Grace are contractual indemnification and contingent liabilities not passed on to the new owners. At September 30, 2003, Grace had recorded $57.6 million, to satisfy such obligations. Most of these matters are now subject to the automatic stay of the Bankruptcy Court and are expected to be resolved as part of Grace's Chapter 11 proceedings.

TAX MATTERS

Grace has received the examination report from the Internal Revenue Service (the "IRS") on tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is under the jurisdiction of the IRS Office of Appeals, where Grace has filed a protest. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. Grace believes that the impact of probable tax return adjustments would not have a material adverse effect upon Grace's financial position. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued assessments aggregating $40.1 million for the 1996 through 1998 tax periods and Grace expects the IRS will make additional assessments for the 1999 tax period. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

I-34

Source: W R GRACE & CO, 10-Q, November 10, 2003

---
LIQUIDITY AND CAPITAL RESOURCES
---

CASH RESOURCES AND AVAILABLE CREDIT FACILITIES

At September 30, 2003, Grace had $390.4 million in cash and cash-like assets on hand ($299.9 million in cash and cash equivalents and $90.5 million in net cash value of life insurance). In addition, Grace had access to committed credit facilities aggregating $250.0 million under the DIP facility, of which $215.7 million (net of borrowings, letters of credit, and holdback provisions) was available at September 30, 2003. The term of the DIP facility, originally set to expire on April 1, 2003, has been extended for up to an additional three years through April 1, 2006. Grace believes that these funds and credit facilities will be sufficient to finance its business strategy while in Chapter 11.

CASH FLOW

For the nine months ended September 30, 2003, Grace's net cash flow provided by core operations before investing was $114.2 million, compared with $205.8 million for the nine months ended September 30, 2002. Total capital expenditures for the nine months ended September 30, 2003 and 2002 were $65.7 million and $55.4 million, respectively. A substantial portion of these expenditures was directed toward the business segments for routine capital replacements and construction of new catalyst production capacity at the Lake Charles, Louisiana site. Acquisition investments, net of cash acquired, were $3.6 million and $28.5 million for the nine months ended September 30, 2003 and 2002, respectively. For the same periods, pre-tax income from core operations before depreciation and amortization was $173.5 million and $214.1 million, respectively. Grace expects to continue to invest excess cash flow and/or other available capital resources in its core business base. These investments are likely to be in the form of added plant capacity, product line extensions, geographic market expansions and acquisitions. Investments that are outside the ordinary course of business may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review.

The pre-tax cash outflow from noncore activities for the nine months ended September 30, 2003 and 2002 was $16.2 million and $26.3 million, respectively. Expenditures for environmental remediation were lower in the first nine months of 2003, due to the completion of remediation work at certain sites. Postretirement benefits were lower, reflecting higher cost sharing by retirees.

Net cash flows used for investing activities for the nine months ended September 30, 2003 and 2002 were $67.0 million and $80.8 million, respectively. Net cash outflows for investing activities in the first nine months of 2003 consisted primarily of $65.7 million for capital expenditures. Net cash outflows used for investing activities in the first nine months of 2002 consisted primarily of $28.5 million for acquisitions, $55.4 million for capital expenditures, and net investments in life insurance policies of $2.4 million.

Net cash provided by financing activities in the first nine months of 2003 was $0.6 million and net cash used for financing activities in the first nine months of 2002 was $5.9 million. In 2003, net cash inflows were principally composed of $6.5 million of borrowings under the non-debtor and pre-petition credit facilities net of repayments, offset by $3.3 million of fees related to renewal and unused line fees under the DIP facility and $2.6 million in net repayments for loans secured by the cash value of life insurance policies. In 2002, net cash outflows principally consisted of net repayments for loans secured by the cash value of life insurance policies.

The Debtors have received Bankruptcy Court approval to make $48.5 million of contributions to their defined benefit pension plans to address the underfunded status of such plans. Through September 30, 2003, the Debtors contributed a total of $32.8 million to such plans. The Debtors expect to contribute an additional $15.7 million during the fourth quarter of 2003.

DEBT AND OTHER CONTRACTUAL OBLIGATIONS

Total debt outstanding at September 30, 2003 was $558.4 million, including $46.3 million of accrued interest on pre-petition debt. As a result of the Filing, Grace is now in default on $501.2 million of pre-petition debt, which, together with accrued interest thereon, has been included in "liabilities subject to compromise" as of September 30, 2003. The automatic stay provided under the Bankruptcy Code prevents Grace's lenders from taking any action to collect the principal amounts, as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings (unless further developments lead management to conclude that it is probable that such interest will be compromised).

I-35

Source: W R GRACE & CO, 10-Q, November 10, 2003

At September 30, 2003, Grace had gross financial assurances issued and outstanding of $249.4 million, comprised of $135.0 million of gross surety bonds issued by various insurance companies, and $114.4 million of standby letters of credit and other financial assurances issued by various banks. Of the standby letters of credit, $19.0 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $230.4 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. Of the net amount of $230.4 million of financial assurances, $9.4 million were issued by non-Debtor entities and $221.0 million were issued by the Debtors. Of the amounts issued by the Debtors, $192.5 million were issued before the Filing Date, with the remaining $28.5 million being issued subsequent to the Filing, of which $25.8 million was issued under the DIP facility.

FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include: the impact of worldwide economic conditions; pricing of both Grace's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; the continued success of Grace's process improvement initiatives; the impact of tax, legislation and other regulations in the jurisdictions in which Grace operates; and developments in and the outcome of the Chapter 11 proceedings discussed above. Also, see "Introduction and Overview – Projections and Other Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form 10-K.

I-36

Source: W R GRACE & CO, 10-Q, November 10, 2003

ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
--------------------------------------------------------------------

Grace had no outstanding derivative financial instruments on September 30, 2003.
For further information concerning Grace's quantitative and qualitative
disclosures about market risk, refer to Notes 13 and 15 in the Consolidated
Financial Statements in Grace's 2002 Annual Report on Form 10-K.


ITEM 4. CONTROLS AND PROCEDURES
------------------------------------

GENERAL STATEMENT OF RESPONSIBILITY

The management of Grace is responsible for the preparation, integrity and
objectivity of the Consolidated Financial Statements and the other information
included in this report. The financial statements have been prepared in
conformity with accounting principles generally accepted in the United States of
America and accordingly include certain amounts that represent management's best
estimates and judgments. Actual amounts could differ from those estimates.
Management maintains internal control systems to assist it in fulfilling its
responsibility for financial reporting. These systems include business,
accounting and reporting policies and procedures, selection of personnel,
segregation of duties and an internal audit function. In 2002, a Disclosure
Committee was established to oversee Grace's public financial reporting process
and key managers are required to confirm their compliance with Grace's policies
and internal control systems. While no system can ensure elimination of all
errors and irregularities, Grace's systems, which are reviewed and modified in
response to changing conditions, have been designed to provide reasonable
assurance that assets are safeguarded, policies and procedures are followed,
transactions are properly executed and reported, and appropriate disclosures are
made. The concept of reasonable assurance is based on the recognition that there
are limitations in all systems of internal control and that the costs of such
systems should not exceed their benefits.

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

As of September 30, 2003, Grace evaluated the effectiveness of the design and
operation of its disclosure controls and procedures pursuant to Rule 13a-15
under the Securities Exchange Act of 1934, as amended (the "Exchange Act").
Based upon that evaluation, Grace's Chief Executive Officer and Chief Financial
Officer concluded that the Company's disclosure controls and procedures are
effective in ensuring that information required to be disclosed in the Company's
periodic filings under the Exchange Act is accumulated and communicated to such
officers to allow timely decisions regarding required disclosures. There was no
change in the Company's internal control over financial reporting during the
third quarter of 2003 that has materially affected, or is reasonably likely to
materially affect, the Company's internal control over financial reporting.

Source: W R GRACE & CO, 10-Q, November 10, 2003

PART II. OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS
--------------------------------------------------------------------------------

Notes 1, 3 and 12 to the interim consolidated financial statements in Part I of
this Report are incorporated herein by reference.


ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K
--------------------------------------------------------------------------------

    (a)  Exhibits. The following is a list of Exhibits filed as part of
this Quarterly Report on Form 10-Q:

      15    Accountants' Awareness Letter

      31.1  Certification of Periodic Report by Chief Executive Officer
under Section 302 of the Sarbanes-Oxley Act of 2002

      31.2  Certification of Periodic Report by Chief Financial Officer
under Section 302 of the Sarbanes-Oxley Act of 2002

      32    Certification of Periodic Report by Chief Executive Officer
and Chief Financial Officer under Section 906 of the
Sarbanes-Oxley Act of 2002

    (b)  Reports on Form 8-K. The following reports on Form 8-K were filed
during the third quarter of 2003:

July 23, 2003 - Press release announcing Grace's financial
results for the second quarter of 2003.

II-1

Source: W R GRACE & CO, 10-Q, November 10, 2003

SIGNATURE
---------

In accordance with the requirements of the Securities Exchange Act of 1934, the
Registrant caused this Report to be signed on its behalf by the undersigned,
thereunto duly authorized.

                                        W. R. GRACE & CO.
                                        -----------------------
                                            (Registrant)

Date:  November 10, 2003                By /s/ Paul J. Norris
                                           -------------------
                                           Paul J. Norris
                                           Chairman, President and
                                           Chief Executive Officer

Date:  November 10, 2003                By /s/ Robert M. Tarola
                                           --------------------
                                           Robert M. Tarola
                                           Senior Vice President and
                                           Chief Financial Officer
                                           (Principal Accounting Officer)


                            II-2

EXHIBIT INDEX
-------------

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
| ----------- | ---------------------- |
| 15 | Accountants' Awareness Letter |
| 31.1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 |

II-3

```
</TEXT>
</DOCUMENT>
```

Source: W R GRACE & CO, 10-Q, November 10, 2003

EXHIBIT 15

November 10, 2003

Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Commissioners:

We are aware that our report dated October 23, 2003 on our review of interim
financial information of W. R. Grace & Co. (the "Company") for the three-month
and nine-month periods ended September 30, 2003 and September 30, 2002, and
included in the Company's Quarterly Report on Form 10-Q for the quarter then
ended, is incorporated by reference in its Registration Statements on Form S-8
(Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513,
333-49515, 333-49703, and 333-49705).

Very truly yours,

/s/ PricewaterhouseCoopers LLP

Baltimore, Maryland

</TEXT>
</DOCUMENT>

EXHIBIT 31.1

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Paul J. Norris, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of W. R. Grace &
    Co.;

2.  Based on my knowledge, this report does not contain any untrue
    statement of a material fact or omit to state a material fact
    necessary to make the statements made, in light of the circumstances
    under which such statements were made, not misleading with respect to
    the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial
    information included in this report, fairly present in all material
    respects the financial condition, results of operations and cash flows
    of the registrant as of, and for, the periods presented in this
    report;

4.  The registrant's other certifying officers and I are responsible for
    establishing and maintaining disclosure controls and procedures (as
    defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the
    registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such
         disclosure controls and procedures to be designed under our
         supervision, to ensure that material information relating to the
         registrant, including its consolidated subsidiaries, is made
         known to us by others within those entities, particularly during
         the period in which this report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure
         controls and procedures and presented in this report our
         conclusions about the effectiveness of the disclosure controls
         and procedures, as of the end of the period covered by this
         report based on such evaluation; and

    (c)  disclosed in this report any change in the registrant's internal
         control over financial reporting that occurred during the
         registrant's most recent fiscal quarter (the registrant's fourth
         fiscal quarter in the case of an annual report) that has
         materially affected, or is reasonably likely to materially
         affect, the registrant's internal control over financial
         reporting; and

5.  The registrant's other certifying officers and I have disclosed, based
    on our most recent evaluation of internal control over financial
    reporting, to the registrant's auditors and the audit committee of the
    registrant's board of directors (or persons performing the equivalent
    functions):

    (a)  all significant deficiencies and material weaknesses in the
         design or operation of internal control over financial reporting
         which are reasonably likely to adversely affect the registrant's
         ability to record, process, summarize and report financial
         information; and

    (b)  any fraud, whether or not material, that involves management or
         other employees who have a significant role in the registrant's
         internal control over financial reporting.

         Date:  November 10, 2003

                                        /s/ Paul J. Norris
                                        ------------------------
                                        Paul J. Norris
                                        Chairman, President and
                                        Chief Executive Officer

</TEXT>
</DOCUMENT>

EXHIBIT 31.2

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of W. R. Grace &
    Co.;

2.  Based on my knowledge, this report does not contain any untrue
    statement of a material fact or omit to state a material fact
    necessary to make the statements made, in light of the circumstances
    under which such statements were made, not misleading with respect to
    the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial
    information included in this report, fairly present in all material
    respects the financial condition, results of operations and cash flows
    of the registrant as of, and for, the periods presented in this
    report;

4.  The registrant's other certifying officers and I are responsible for
    establishing and maintaining disclosure controls and procedures (as
    defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the
    registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such
         disclosure controls and procedures to be designed under our
         supervision, to ensure that material information relating to the
         registrant, including its consolidated subsidiaries, is made
         known to us by others within those entities, particularly during
         the period in which this report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure
         controls and procedures and presented in this report our
         conclusions about the effectiveness of the disclosure controls
         and procedures, as of the end of the period covered by this
         report based on such evaluation; and

    (c)  disclosed in this report any change in the registrant's internal
         control over financial reporting that occurred during the
         registrant's most recent fiscal quarter (the registrant's fourth
         fiscal quarter in the case of an annual report) that has
         materially affected, or is reasonably likely to materially
         affect, the registrant's internal control over financial
         reporting; and

5.  The registrant's other certifying officers and I have disclosed, based
    on our most recent evaluation of internal control over financial
    reporting, to the registrant's auditors and the audit committee of the
    registrant's board of directors (or persons performing the equivalent
    functions):

    (a)  all significant deficiencies and material weaknesses in the
         design or operation of internal control over financial reporting
         which are reasonably likely to adversely affect the registrant's
         ability to record, process, summarize and report financial
         information; and

    (b)  any fraud, whether or not material, that involves management or
         other employees who have a significant role in the registrant's
         internal control over financial reporting.

Date:  November 10, 2003

                                /s/ Robert M. Tarola
                                -------------------------------------
                                Robert M. Tarola
                                Senior Vice President and
                                Chief Financial Officer

</TEXT>
</DOCUMENT>

EXHIBIT 32

CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Quarterly Report of W. R. Grace & Co. (the "Company") on Form 10-Q for the period ended September 30, 2003, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Paul J. Norris
---------------------------
Chairman, President and Chief Executive Officer

/s/ Robert M. Tarola
---------------------------
Senior Vice President and Chief Financial Officer

Date: November 10, 2003

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

</TEXT>
</DOCUMENT>

Created by 10KWizard   www.10KWizard.com