# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2      - - - - - - - - - - - - - - - - -+
                                          |   ORIGINAL
 3      KERI EVANS,                       |
                                          |
 4                  Plaintiff,            |
                                          |
 5        vs.                             |
                                          |
 6      JOHN F. AKERS, et al.,            |   Consolidated as
                                          |
 7                  Defendants.           |   Case No.:
                                          |
 8      - - - - - - - - - - - - - - - - -+   04-11380-WGY
                                          |
 9      LAWRENCE W. BUNCH, et al.,        |
                                          |
10                  Plaintiffs,           |
                                          |
11      vs.                               |
                                          |
12      W.R. GRACE & CO., et al.,         |
                                          |
13                  Defendants.           |
                                          |
14      - - - - - - - - - - - - - - - - - - x

15              Deposition of ROBERT M. TAROLA, CPA
16                      Washington, D.C.
17                       May 10th, 2007
18                         10:00 a.m.
19
20      Job No. 1-102403
21      Pages 1 - 174
22      Reported by:  Laurie Bangart-Smith
```



L.A.D. REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

104

1  and the Board of Directors to be out of conflict

2  where, on the one hand, we need to look out for the

3  interests of the people who own the stock in the S&I

4  Plan and, on the other hand, we are obligated to

5  disclose information as soon as we know it that's

6  relevant to the market, that puts us in a direct

7  conflict."  Do you see that?

8      A   Yes.

9      Q   Now, did you understand the conflict that

10 Mr. Norris was describing to the employees?

11     A   Yes.

12     Q   Did you agree with Mr. Norris that there was

13 a conflict like that?

14     A   I perceive that hypothetically a conflict

15 could exist, yes.

16     Q   And how was the conflict eliminated or

17 mitigated -- sorry.  Let me withdraw the question.

18 How is the conflict mitigated by restricting the plan

19 participants from putting more money into the Grace

20 stock plan?

21     A   That was only one step.  The real step in

22 mitigating the conflict was to sign over full

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

110

1  BY MR. CUMMINS:
2      Q    Not quite.
3      A    No again.
4      Q    You would agree with me, would you not, that
5  you did have in your possession or in your knowledge
6  base non-public financial information about how W.R.
7  Grace was doing during that same period, correct?
8      A    May I answer with a bit of an explanation?
9      Q    Sure.
10     A    W.R. Grace filed financial statements with
11 the Bankruptcy Court every month.  Those financial
12 statements updated public information every 30 days,
13 so the longest period of time I could have non-public
14 information was about 30 days.
15     Q    Fine, and did you communicate -- and you
16 already said you didn't communicate any of that
17 non-public information to State Street?
18     A    Correct.
19     Q    So this is that same conflict that
20 Mr. Norris was referring to in general in that Exhibit
21 16, isn't it?
22          MS. FLOWE:  Objection.  How could he know

DEPOSITION OF ROBERT M. TAROLA, CPA
CONDUCTED ON THURSDAY, MAY 10, 2007

143

1  Shaw company; is that right?

2  A   No, that's not right. What I mean to say is
3  that I received a call from State Street indicating
4  that there was a potential for a block trade, and they
5  wanted to ask me some questions.

6  Q   Okay, and they did ask you -- someone from
7  State Street apparently asked you some questions?

8  A   Someone from the State Street team.

9  Q   What were the questions?

10 A   To the best of my recollection, it was just
11 is there anything that they need to know before they
12 make a decision, anything I know that they might need
13 to know before making a decision.

14 Q   And how did you respond to that question?

15 A   I said everything I know is in the public
16 domain.

17 Q   But that wasn't correct, was it?

18 A   Sure it was.

19 Q   You knew nothing about Grace's --

20 A   All material information was in the public
21 domain.

22 Q   And you knew nothing, for example, at this

1   call about Grace's work on its Plan of Reorganization;
2   is that correct?
3      A    That's correct.
4      Q    Because you didn't do anything on the Plan
5   of Reorganization, is that right, in the first quarter
6   of 2004?
7      A    Correct.
8      Q    Grace had not even started on the Plan of
9   Reorganization; is that correct?
10     A    Correct.
11     Q    You didn't know anything about the financial
12  performance of Grace that had not been disclosed to
13  the public; is that correct?
14     A    Again, the only time frame where there might
15  have been financial information would have been
16  roughly one month's time.
17     Q    And you did not disclose that information to
18  the State Street inquiry?
19     A    I don't -- I don't recall disclosing any
20  non-public information to the State Street inquiry,
21  nor did I believe I had any material non-public
22  information.