# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED

APR 0 8 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JERRY R. SUMMERS, GEORGE T.
LENORMAND, JEFFREY D. CRITES,
LOUISE VAN RENSBURG and JAMES E.
SHAMBO, individually and on behalf of all
others similarly situated,

        Plaintiffs,

v.

UAL CORPORATION ESOP
COMMITTEE, MARTY TORRES,
BARRY WILSON, DOUG WALSH, IRA
LEVY, DON CLEMENTS, CRAIG MUSA,
and STATE STREET BANK & TRUST
COMPANY,

        Defendants.

Case No. 03 C 1537

Honorable Samuel Der-Yeghiayan

### MEMORANDUM OF LAW IN SUPPORT OF STATE STREET BANK
### & TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.     INTRODUCTION. ................................................................................................1

II.    BACKGROUND. .................................................................................................3

       A.     The Plan and Trust Agreement. .............................................................3

       B.     State Street Monitored UAL's Financial Condition. .............................4

III.   STATE STREET DID NOT BREACH ITS LIMITED FIDUCIARY DUTY OF
       PRUDENCE AS DIRECTED TRUSTEE. ...........................................................7

       A.     State Street Was Solely A Directed Trustee From The Beginning Of The
              Class Period To August 29, 2002. .........................................................7

       B.     State Street Had A Limited Duty Triggered by Public Information Of
              Imminent Bankruptcy. ...........................................................................7

       C.     UAL Was Not Facing Imminent Bankruptcy On October 17, 2001. ...................9

              1.     Morrison Alone Believes The Goodwin Letter Signified UAL's
                     Bankruptcy Was Imminent. .........................................................9

              2.     The Goodwin Letter's Language And The Context Is Which It
                     Was Sent Do Not Reflect UAL's Bankruptcy Was Imminent. ..............10

              3.     The Events Following The Goodwin Letter Do Not Reflect UAL's
                     Bankruptcy Was Imminent. ......................................................11

IV.    STATE STREET DID NOT BREACH ITS FIDUCIARY DUTY AS INVESTMENT
       MANAGER. ........................................................................................................12

V.     STATE STREET IS NOT LIABLE AS A CO-FIDUCIARY ......................................13

       A.     Defendants Cannot Show The ESOP Committee Is Liable For Breach Of
              Fiduciary Duty; Therefore, State Street Is Not Liable As A Co-Fiduciary. ........13

              1.     The ESOP Committee Did Not Breach Its Duty Of Prudence. ..............13

              2.     The ESOP Committee Is Not Liable For Breach Of The Duty Of
                     Loyalty. ..................................................................................13

       B.     State Street Reasonably Believed The ESOP Committee, Which Had The
              Primary Responsibility For Monitoring Investment Options, Was
              Fulfilling Its Fiduciary Obligations. ...............................................14

i

## TABLE OF CONTENTS (cont.)

                                                                                    **Page**

      C.    By Waiting Until August 2002 To Tell The ESOP Committee That It Had
Placed UAL On Its Internal Watchlist, State Street Did Not Cause The
ESOP Committee Members To Breach Their Fiduciary Duties..........................16

      D.    State Street Had No Reason To Believe the Committee Members Were
Actually Conflicted..........................................................................................17

VI.    CONCLUSION...........................................................................................................17

0041249/003/ 17776v5

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..............................................................................3

Cuddington v. Northern Indiana Public Service Co.,
    33 F.3d 813 (7th Cir. 1994) ................................................................14

DeBruyne v. Equitable Life Assurance Society,
    920 F.2d 457 (7th Cir. 1990) ...............................................................8

Kuper v. Iovenko,
    66 F.3d at 1447 (6th Cir. 1995) ...................................................2, 4, 13

Lalonde v. Texron, Inc.,
    369 F.3d 1, 7 (1st Cir. 2004)................................................................8

Lunini v. Grayeb,
    395 F.3d 761 (7th Cir. 2005) ...............................................................3

Marshall v. Kelly,
    465 F. Supp. 341 (W.D. Okl. 1978)....................................................14

Martin v. Feilen,
    965 F.2d 660 (8th Cir. 1992), cert. denied, 506 U.S. 1054 (1993)......................3

Moench v. Robertson,
    62 F.3d 553 (3d Cir. 1995), cert. denied, 516 U.S. 115 (1996) ....................9, 13

Otto v. Variable Annuity Life Ins. Co.,
    814 F.2d 1127 (7th Cir. 1986) .............................................................7

Skidmore v. Swift & Co.,
    323 U.S. 134 (1944).........................................................................7

Steinman v. Hicks,
    352 F.3d 1101 (7th Cir. 2003) .............................................................4

Tatum v. R.J. Reynolds Tobacco Co.,
    392 F.3d 636 (4th Cir. 2004) ...............................................................9

Trenton v. Scott Paper Co.,
    832 F.2d 806 (3d Cir. 1987)...............................................................14

0041249/003/ 17776v5

## TABLE OF AUTHORITIES (cont.)

**Page**

In re WorldCom ERISA Litig.,
    354 F. Supp. 2d 423 (S.D.N.Y. 2005)................................................................2, 3, 7, 8, 14

Wright v. Or. Metallurgical Corp.,
    360 F.3d 1090 (9th Cir. 2004) ..................................................................................8

### FEDERAL STATUTES

29 U.S.C. § 1102..................................................................................................................4

29 U.S.C. § 1103(a) .........................................................................................................4, 7

29 U.S.C. § 1105(a) ...........................................................................................................13

29 U.S.C. § 1107(d)(6)(A)....................................................................................................1

29 U.S.C. § 1108(c)(3)........................................................................................................14

29 U.S.C. § 1132(a)(2)..........................................................................................................1

Fed. R. Civ. P. 56(c) ...........................................................................................................3

### MISCELLANEOUS

U.S. Department of Labor Employee Benefits Security Administration Field
    Assistance Bulletin No. 2004-03 "Fiduciary Responsibilities of Directed
    Trustees," (December 17, 2004), ..................................................................................7

0041249/003/ 17776v5

## I.  **INTRODUCTION.**

This is a classic case of "Monday morning quarterbacking."  Plaintiffs claim Defendants should have sold the UAL Corporation ("UAL") stock from the UAL Employee Stock Ownership Plan ("Plan") ten months earlier than they did, arguing that UAL's December 9, 2002 bankruptcy filing was imminent *fourteen months before it actually happened*.  Fourteen months is not "imminent," *i.e.*, impending or about to occur.  Nor was UAL's bankruptcy "highly probable" in October 2001, as Plaintiffs also contend.  Most everyone who has looked at this situation (except for Plaintiffs) agrees that had UAL been able to achieve additional concessions from its unions or receive government loan guarantees, UAL could have averted entirely or significantly delayed bankruptcy.  Indeed, the Plan fiduciaries and the industry investment analyst community certainly thought it would.  Ironically, had UAL avoided bankruptcy, Plaintiffs probably would have sued Defendants for improperly selling the UAL stock when they did.

Plaintiffs, former Plan participants, bring this class action pursuant to 29 U.S.C. § 1132(a)(2), claiming the Plan's named fiduciary responsible for investment decisions, the ESOP Committee and its members, and the Plan's directed trustee, State Street Bank & Trust Company ("State Street"), charged with following the investment decisions of the named fiduciary, breached their fiduciary duties to Plan participants by maintaining Plan investments in UAL stock despite purportedly knowing it was imprudent. TAC ¶¶ 124-128, 132.[1]

Plaintiffs must overcome three distinct, insurmountable hurdles to succeed on their claim against State Street.  First, the Employee Retirement Income Security Act ("ERISA") sets an extremely high bar for Plaintiffs--one they do not even come close to reaching.  Because the Plan was an ESOP,[2] as a matter of law Defendants are exempt from the fiduciary duty of diversification and are entitled to a presumption that they did not breach their duty of prudence by following the terms of the Plan and by failing to diversify the Plan assets.  Courts only may review an ESOP fiduciary's decision to invest in employer securities for *abuse of discretion*, and

---

[1] "TAC" or the "Complaint" refers to the Third Amended Complaint.

[2] An Employee Stock Ownership Plan ("ESOP") is an ERISA plan that invests primarily or exclusively in "qualifying employer securities," which typically are shares of stock in the employer creating the plan. 29 U.S.C. § 1107(d)(6)(A).

1

must presume that a fiduciary's decision to remain invested in employer securities was reasonable. *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

Second, the plain language of the Plan document requires the fiduciary to invest ESOP assets exclusively in UAL Stock. Indeed, Defendants are only permitted to sell the UAL stock--thereby overriding the clear Plan terms--in "extraordinary" circumstances. As acknowledged by Plaintiffs' own fiduciary expert, Lucian Morrison, it is almost unprecedented for an ESOP fiduciary to disregard the terms of a plan and sell employer stock, and in fact, he was *unaware of a fiduciary ever doing so*.

Third, recent case law could not cut further against Plaintiffs here. As the directed trustee, State Street only had a duty to take action (seek direction from the ESOP Committee or possibly even override the Plan terms) if there were *"reliable" contemporaneous, publicly-available information that called into "serious question" UAL's "short-term viability as an ongoing company" (or that UAL's bankruptcy was imminent)*. *See In re WorldCom ERISA Litig.*, 354 F. Supp. 2d 423, 449 (S.D.N.Y. 2005) (emphasis added).

Against the backdrop of these three legal challenges for Plaintiffs, the material facts are undisputed. Following September 11, the fifty percent decline of the UAL stock price as the markets re-opened, and UAL CEO James Goodwin's October 17, 2001 letter (the "Goodwin Letter") warning that wage concessions in addition to expected government loans were necessary to return UAL to profitability, State Street put UAL on its internal "watchlist," (in December 2001) so it could more closely monitor UAL. As the name implies (it is a "watch" list, not a "sell" list), this did not at all mean that State Street had concluded bankruptcy was imminent.

The evidence is further undisputed that between December 2001 and August 2002, State Street carefully and systematically continued its monitoring process, which included meeting with UAL, consulting with outside consultants or advisors, and digesting the extensive public information about the financial condition of the company. State Street had no duty or reason to inquire of the ESOP Committee's decision to hold UAL stock until UAL announced--in August 2002--that it may seek bankruptcy protection. State Street then fulfilled its fiduciary obligations by immediately requesting a meeting of the ESOP Committee to discuss it.

During the series of ESOP Committee meetings that were held in August 2002 at State Street's insistence, because of the financial difficulties facing UAL and the possibility of a potential conflict of interest among the ESOP Committee members, the ESOP Committee, upon

2

the advice of outside counsel, voted to engage State Street as "Investment Manager," delegating the decision as to whether to override the Plan requirement to invest exclusively in company stock to State Street. After further rigorous scrutiny, State Street determined to take the extraordinary (and extremely unpopular) step to begin a trading program on September 27, 2002, selling shares of UAL. As a result of State Street's efforts, the Plan sold over $40 million of UAL stock before UAL filed for bankruptcy in December 2002.

Plaintiffs base their unfounded assertion that UAL was facing imminent bankruptcy on October 17, 2001 solely on hindsight, ignoring analyst reports, financial data, and key economic indicators establishing UAL was not about to seek bankruptcy protection any time soon. The undisputed facts demonstrate that at no point prior to September 27, 2002 was it even likely UAL was unraveling, and not simply experiencing substantial, but survivable business difficulties. To establish the imminence of bankruptcy, Plaintiffs mistakenly rely upon (i) the Goodwin Letter sent to UAL employees fourteen months before UAL's bankruptcy speculating about the prospects for UAL if certain costs cutting measures were not successful, which everyone at that time and subsequently agrees was merely a rallying call to the employees and the unions to come to the bargaining table and (ii) the opinion of their directed trustee expert who is not qualified to testify regarding a company's financial viability and whose opinion provides no "analytical support for the milepost dates it sets as the trigger dates for directed trustee action, other than to refer in general terms to the professional judgment of the author." *WorldCom ERISA Litig.*, 354 F. Supp. 2d at 451 (Judge Denise Cote referring to the very same Lucian Morrison who is Plaintiffs' expert in this action).

State Street requests that the Court grant its motion for summary judgment because "there is no genuine issue as to any material fact" and State Street is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005).

## II.    BACKGROUND.

### A.    The Plan and Trust Agreement.

The Plan is an ESOP and therefore functions both as "an employee retirement benefit plan and a 'technique of corporate finance'" that encourages employee ownership. *Martin v.*

0041249/003/ 17776v5

*Feilen*, 965 F.2d 660, 664 (8th Cir. 1992), *cert. denied*, 506 U.S. 1054 (1993)[3]. The Plan

provided that the ESOP Committee was the "named fiduciary," as described in title 29 U.S.C.

§ 1102, consisting of six members: three to be appointed by Air Line Pilots Association

("ALPA"), two by International Association of Machinists ("IAM"), and one by UAL. The

ESOP Committee had the power to "establish an investment policy and objective for the Plan,

except that it is understood that the Plan is designed to invest exclusively in Company Stock, and

to give such directions to the Trustee with respect to the Trust Fund as may be provided in this

Plan or in the Trust Agreement." SUF 1.

     The July 1994 Trust Agreement required State Street to invest the assets of the Trust

Fund "exclusively" in UAL stock at the "direction of the ESOP Committee." SUF 2. Under the

Trust Agreement, State Street had to follow the directions of the ESOP Committee as long as

such direction was in accordance with the terms of the Plan, proper within the meaning of

§ 403(a) of ERISA, 29 U.S.C. § 1103(a) and not contrary to ERISA. SUF 2.

     **B.**    **State Street Monitored UAL's Financial Condition.**

     State Street typically monitored the financial condition of its clients, including UAL,

whose ESOP plans held the client's stock ("Employer Securities"), irrespective of whether State

Street was the primary fiduciary or the directed trustee. SUF 4. CitiStreet LLC ("CitiStreet")

performed this monitoring function on State Street's behalf.[4] CitiStreet had two committees that

met regularly to review Employer Securities: the Fiduciary Committee and the Watchlist

Committee (the latter reported to the former). If an Employer Security were deemed to be "at-

risk," it was placed on a watchlist, to be reviewed more closely by the Watchlist Committee.[5]

SUF 6.

---

[3]  "Because of these dual purposes, ESOPs are not designed to guarantee retirement benefits, and they
place employee retirement assets at a much greater risk than the typical diversified ERISA plan." *Kuper
v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995). To promote the goal of encouraging employees'
ownership of their employer company, an ESOP fiduciary is "exempted from ERISA's duty to 'diversify
the investments of the plan.'" *Id.* at 1458; *Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir.
2003)("[s]ince the very purpose of an ESOP is to give employees stock in the employer, it would be
anomalous if the ESOP's trustees were required to sell most of the stock donated by the company in order
to create a diversified portfolio of stocks").

[4]  State Street entered into a joint venture with Citigroup, Inc. and established CitiStreet. State Street
retained the contractual responsibility for offering fiduciary services to its clients but subcontracted with
CitiStreet to provide such services on its behalf. Daniels Decl. ¶ 6.

[5]  In deciding whether the Employer Security is "at-risk" and should be placed on the watchlist, weight
was given to the following criteria: a company's stock performance deviated from its established

4

UAL is a "legacy" airline carrier,[6] and is one of the largest airlines in an industry that has historically been very cyclical in nature. SUF 8. In the general economic downturn that preceded and continued during the Class Period, UAL's financial condition depended on its ability to generate revenues, control costs such as labor and fuel, and conserve cash during an adverse business cycle. The extraordinary events of 9/11 severely affected the entire airline industry. The U.S. government immediately responded by enacting the Air Transportation Safety and System Stability Act of 2001. This legislation authorized the Air Transportation Stabilization Board ("ATSB") to provide financial aid to the airlines including $5 billion in grants and $10 billion in loan guarantees. SUF 9. Because UAL was the second largest U.S. airline, it was reasonable to believe UAL would receive a significant portion of these funds. Indeed, within eight days of the legislation's enactment, UAL received $391 million in ATSB grants. SUF 10.

On December 20, 2001, the Watchlist Committee placed UAL on the watchlist after evaluating evidence regarding UAL's financial condition, including: the Goodwin Letter; analyst reports; and a benchmark deviation report showing that UAL stock deviated from its established benchmark three times within a four week period. SUF 11. During the next nine months, the Watchlist Committee actively monitored the performance of UAL stock and regularly provided the Fiduciary Committee with benchmark deviation reports on UAL stock. SUF 12.[7] To monitor UAL, State Street, CitiStreet, and Houlihan Lokey Howard & Zukin ("Houlihan Lokey") (outside consultants to the ESOP Committee) representatives met with a representative of UAL's investor relations department in April 2002, to evaluate UAL's progress in implementing its recovery plan. SUF 15. In May 2002, CitiStreet's Fiduciary Committee issued a report noting UAL had billions of dollars in reserves; analyst reports recommended a "buy" or

---

benchmark three times within a four week period; a company's stock experienced a significant decline; public news (*i.e.*, earning announcements, accounting issues, management issues, bankruptcy, continued financial deterioration); and/or issues relating to trading volumes. SUF 7.

[6] "Legacy carriers" are the major, historical, and traditionally structured U.S. airlines servicing the entire United States and abroad and include UAL, American, Delta, Northwest and Continental.

[7] From December 2001 through July 2002, UAL continued to reduce costs, improve profitability, and reduce cash burn, positively affecting the on-going operations of its business. In June 2002, UAL applied for a 90% ATSB-guaranteed loan of $2 billion ("ATSB loan") to fund operations into the future. SUF 13. On June 20, 2002, UAL had $2.7 billion in cash and cash equivalents and $3.4 billion in unencumbered assets, when it UAL announced that ALPA and salaried management employees had agreed to participate in its cost recovery program, and to accept pay reductions totaling $950 million over 3 years. SUF 14.

5

"hold"; benchmark deviation reports remained favorable; and UAL was actively involved in ongoing negotiations with its unions, the primary goal of which was to reduce costs. SUF 16.

On August 14, 2002 UAL issued a press release announcing the possibility that it might file for bankruptcy protection, State Street responded immediately by requesting a meeting with the ESOP Committee, and such a meeting was held on August 20, 2002. SUF 17. During the meeting, Houlihan Lokey presented draft reports with preliminary findings regarding UAL's financial condition. *Id.* State Street informed the ESOP Committee that it had been monitoring UAL stock (including placement of UAL on its internal watchlist) and asked the Committee whether it had come to any conclusions about the prudence of continuing to hold UAL Stock. SUF 18.

On August 30, 2002, the ESOP Committee responded, on the advice of counsel, by asking State Street to become the Investment Manager of the UAL ESOP, and State Street agreed and became the Investment Manager effective September 7, 2002. SUF 19. In September, State Street evaluated various possible investment for the UAL ESOP, and consulted with the following: Houlihan Lokey, investment bankers, investment analysts, representatives of ALPA and IAM (who expressed optimism about labor negations), and Jake Brace, the UAL CFO (who was hopeful that a solution could be found). SUF 20.

On September 25, 2002, the State Street Fiduciary Committee voted unanimously that it was no longer prudent to hold UAL stock in the ESOP and to authorize appropriate actions to sell the stock as soon as possible. The Fiduciary Committee based its decision on (1) recent news that UAL had failed to reach an agreement with its unions on wage concessions and had not yet received a loan guaranty from the ATSB; (2) Houlihan Lokey's recommendation that UAL stock be sold; and (3) the fact that Charles Smith, State Street's legal counsel, supported a decision to sell. SUF 21. On September 27, 2002, State Street began divesting the UAL ESOP by selling UAL stock. SUF 22. The ATSB loan was denied on December 4, 2002. SUF 23. Just a few days later, on December 9, 2002, UAL filed for bankruptcy. As a result of State Street's efforts, the Plan sold over $40 million of UAL stock before UAL filed for bankruptcy. SUF 24.

6

**III.     STATE STREET DID NOT BREACH ITS LIMITED FIDUCIARY DUTY OF PRUDENCE AS DIRECTED TRUSTEE.**

    **A.     State Street Was Solely A Directed Trustee From The Beginning Of The Class Period To August 29, 2002.**

From November 17, 2001 (the beginning of the Class Period) through August 29, 2002, State Street was the directed trustee pursuant to 29 U.S.C. § 1103(a).[8] The Plan documents establish State Street was the directed trustee. SUF 2. The ESOP Committee, as the named Investment Fiduciary, had the power and discretion to make investment decisions. SUF 1. The Trust Agreement explicitly obligated State Street to follow the Committee's directions and gave State Street no discretion regarding the disposition of the Plan's assets. SUF 2. The ESOP Committee members and their advisors understood that prior to August 29, 2002, State Street was the directed trustee, as evidenced by their engagement of State Street as Investment Manager in late August/September 2002. SUF 3. In sum, it is undisputed that State Street was a directed trustee from the beginning of the Class Period through August 29, 2002.

    **B.     State Street Had A Limited Duty Triggered by Public Information Of Imminent Bankruptcy.**

As "directed trustee," State Street had "limited" fiduciary responsibilities to ensure that the directions it received from the ESOP Committee were in accordance with the Plan and not contrary to ERISA. *See* U.S. Department of Labor Employee Benefits Security Administration Field Assistance Bulletin No. 2004-03 (December 17, 2004), "Fiduciary Responsibilities of Directed Trustees," ("DOL Bulletin"), p. 2[9]; 29 U.S.C. § 1103(a). A directed trustee has no duty to render investment advice or investigate the wisdom of the primary fiduciary's investment

---

[8]   For purposes of this motion only, State Street will concede it became Investment Manager as of August 29, 2002. There is a factual dispute as to when State Street became Investment Manager. The effective date of the Investment Management Agreement is September 7, 2002 (SUF 3), but Plaintiffs claim State Street became Investment Manager on August 29, 2002, when the ESOP Committee voted to engage State Street, which engagement was to later be memorialized in a negotiated writing.

[9]   Courts grant "considerable and in some cases decisive weight" to interpretive bulletins depending on, among other things, the "thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The DOL Bulletin was written by the Department of Labor, which is the agency "entrusted with interpreting and enforcing" ERISA and is therefore entitled to deference. *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1135 (7th Cir. 1986). It is consistent with prior statements of the law as it draws from "[r]ecent court decisions," DOL Bulletin, pp. 1-2, and has recently been relied upon in *WorldCom ERISA Litig.*, 354 F.Supp. at 445-451.

choices "or any obligation to render advice regarding the choices." *WorldCom ERISA Litig.*, 354 F. Supp. at 449; DOL Bulletin, p. 4.

When, as in this case, the directed trustee does not possess material non-public information (SUF 25), it will "rarely have an obligation under ERISA to question the prudence of a direction to purchase publicly traded securities at the market price solely on the basis of publicly available information." DOL Bulletin, p. 5. To hold State Street liable for breaching its fiduciary duties, Plaintiffs must prove, without the benefit of 20/20 hindsight,[10] that the reliable contemporaneous, publicly available information "call[ed] into serious question" UAL's "short-term viability" as an ongoing company. *WorldCom ERISA Litig.*, 354 F. Supp. 2d at 449.

A company must be in extreme financial distress before a directed trustee would have a duty to make further inquiry. "[A] directed trustee's knowledge that a company's 'stock price and profits were declining and that the company was undergoing a restructuring' is not sufficient to find a breach of fiduciary duty where the trustee continued to invest plan funds in the company's stock as directed." *WorldCom ERISA Litig.*, 354 F. Supp. 2d at 449, (quoting *Lalonde v. Textron, Inc.*, 369 F.3d 1, 7 (1st Cir. 2004)); *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1098 (9th Cir. 2004) (applying "brink of collapse" standard to directed trustee of ESOP). This "standard [requiring that bankruptcy is likely to be filed in the short-term] specifies that the time frame at issue in assessing a company's prospects for ongoing viability is the 'short-term.' This requirement emphasizes that public indicators must disclose an imminent collapse, as opposed to long-term indicators that could, for example, forecast a company's future obsolescence." *WorldCom ERISA Litig.*, 354 F. Supp. 2d at 449, n.25. It is almost unprecedented for any ESOP fiduciary to disregard the terms of a plan and sell employer stock. Plaintiff's expert, Mr. Morrison was unaware of a fiduciary ever doing so. SUF 26.

Reliable information means information such as a bankruptcy filing or a securities filing reflecting an extraordinary event. Media or public reports or analyses that "merely speculate on the continued viability of a company does not, in and of itself, constitute knowledge of clear and compelling evidence concerning the company sufficient to give rise to a directed trustee's duty to act." DOL Bulletin, p. 6, n.5.

---

[10] ERISA's fiduciary duty of care "requires prudence, not prescience" and prudence is therefore measured at the time of the fiduciary's decision. *DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, 465 (7th Cir. 1990).

8

Obligating directed trustees to act in less certain circumstances might well encourage directed trustees to act prematurely. A directed trustee that acted at the first signs of "serious trouble" might well subject itself to liability if it divested a plan of company stock, only to have the stock price rebound substantially thereafter. *See Moench v. Robertson*, 62 F.3d 553, 572 (3d Cir. 1995) ("if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in employer securities, it may face liability for that caution, particularly if the employer's securities thrive."), *cert. denied*, 516 U.S. 115 (1996); *see Tatum v. R.J. Reynolds Tobacco Co.*, 294 F. Supp. 2d 776, 779 (M.D.N.C. 2003)(alleging violations of ERISA because defendants had sold company stock at a loss even though market analysts predicted the stock would rebound and the stock did, in fact, rebound.)

### C.    UAL Was Not Facing Imminent Bankruptcy On October 17, 2001.

Plaintiffs contend State Street should have begun to liquidate the ESOP's holdings following the Goodwin Letter, claiming it was at this point that UAL was in "imminent danger of Bankruptcy." Morrison Rep. ¶ 39; TAC ¶ 9.[11] "Imminent" means "about to occur; impending." *See* dictionary.com. There are therefore two aspects of determining whether bankruptcy is "imminent": near in time and reasonably certain to occur. SUF 27. Plaintiffs' only support for this position is the naked conclusion of their expert, Lucian Morrison. Mr. Morrison is the only person who believes (or believed) the Goodwin Letter signified bankruptcy. Many others disagree. Moreover, Morrison is not qualified to render an opinion on the subject. Morrison has no background or expertise in economics or bankruptcy, and his opinion is not supported by the language or context of the Goodwin Letter, or UAL's actual economics at the time. The events which followed the Goodwin Letter made clear that the letter's predictions were far from being certain or imminent.

#### 1.    *Morrison Alone Believes The Goodwin Letter Signified UAL's Bankruptcy Was Imminent.*

Mr. Morrison is alone in his opinion that the Goodwin Letter signified UAL's bankruptcy was imminent. SUF 28. There are many who do not believe the Goodwin Letter signified bankruptcy was imminent. Defendants' experts -- Andrew Carron, an economist, and Gary

---

[11] Alternatively, Plaintiffs claim that State Street should have acted within thirty days after placing UAL on its watchlist. It is undisputed that State Street's placement of UAL on its watchlist did not reflect that State Street believed UAL was in imminent risk of filing for bankruptcy and therefore this trigger point lacks merit. SUF 66-67.

Sbona, a solvency expert, both of whom are well-qualified to render opinions regarding UAL's financial condition and the likelihood of bankruptcy -- performed in depth analyses of UAL's financial condition and concluded that UAL was not facing imminent bankruptcy until late 2002, well after State Street's selling program was underway. SUF 29-31.

In addition, industry analysts opined that bankruptcy was not imminent. For example, a report from Salomon Smith Barney analyst Brian Harris, reacting to the Goodwin Letter, reflects the typical analyst's view: "We do not think UAL will 'perish' b/c we fully expect the combination of rev. claw back and cost reductions via unprecedented capacity reductions (UAL at 26% vs. most others around 20%) will be sufficient for most of the cyclical majors (including UAL) to survive." SUF 32. In a July 22, 2002 analyst report, Goldman Sachs wrote: "We believe liquidity concerns are overstated, and we maintain our trading buy recommendation." SUF 33.

Also, the President of IAM, on October 23, 2001 stated that the Goodwin Letter was an obvious ploy to gain concessions from the unions and to make clear to the government that UAL needed the loan. SUF 34. Finally, Aon, the independent fiduciary for the four UAL 401(k) plans, did not begin to sell UAL stock from that pension plan until September 27, 2002. SUF 35. Aon began to sell UAL stock at that time because the risk of bankruptcy had increased, but it did not believe UAL was facing imminent bankruptcy until later in 2002, when the ATSB denied UAL's loan application. SUF 35.

Mr. Morrison's opinion is further suspect because he is not qualified to render an opinion regarding when bankruptcy was imminent or regarding UAL's financial condition. He is not an economist or bankruptcy expert, and therefore is not qualified to render any opinion regarding UAL's financial condition. He has never previously opined whether a company's bankruptcy was imminent. He is a lawyer and a former independent fiduciary who relied on firms such as Houlihan Lokey to evaluate a company's financial condition. SUF 36.

### 2.    *The Goodwin Letter's Language And The Context Is Which It Was Sent Do Not Reflect UAL's Bankruptcy Was Imminent.*

The Goodwin Letter is merely a rallying call to the employees and the unions to come to the bargaining table, warning that if they did not, and various other events (such as obtaining a loan) did not occur, UAL may "perish." Goodwin published his letter in the midst of wage negotiations. SUF 37. The unions (and the Committee members) reasonably viewed it as a negotiating ploy to persuade the unions to make substantial wage concessions. Indeed, it reads

10

in its entirety more as a call to employees to make sacrifices than as a forecast of bankruptcy. The letter concludes: "Thank you for your loyalty, for your hard work and for your service on behalf of our customers in these, the most difficult of times. Let's keep it up. The sooner we get to break even [operating cash flow], the sooner we'll remove the doubts about our future." TAC ¶ 63.[12]

The language of the Goodwin Letter, which does not call into "serious question" UAL's viability as a going concern, never uses the word "bankruptcy." It warned UAL would perish if various contingencies did not occur in the future. For example, "if we don't succeed [in getting back to a "break-even cash flow"] we'll eventually run out of money." Such statements do not reflect a "serious question" of UAL's "imminent collapse" and are the types of statements upon which the DOL expressly stated directed trustees need not rely. DOL Bulletin, p. 6 n. 5.

Mr. Morrison admits there was no certainty that the events prophesized in the letter would actually occur. If UAL had received the ATSB loan -- or a portion of it -- it could have survived. SUF 29-30.

###### 3.    The Events Following The Goodwin Letter Do Not Reflect UAL's Bankruptcy Was Imminent.

In the months following the Goodwin Letter, it seemed probable at many points of time that UAL's financial condition would improve. For example, when Goodwin left UAL and Creighton became CEO, the press reported that they believed this was a positive step for UAL because ALPA supported Creighton and it was believed IAM would as well. When the Goodwin Letter was issued, UAL had a large amount of cash (SUF 70), the prospect of union concessions, and the likelihood of obtaining government loans (SUF 71 and 10).

UAL's stock price fell sharply in reaction to the 9/11 attacks. After that drop, however, the stock price showed no clear trend until July 2002. A stock price decline such as the one UAL experienced after 9/11 does not imply that bankruptcy was imminent. SUF 40. The public record is replete with examples of companies recovering from substantial declines over an extended period in their profitability and stock price. SUF 41. In fact, UAL's stock price

---

[12] Plaintiffs point to the Goodwin Letter's inclusion in a UAL 8-K, speculating it means the event was "significant," and attempting to bring it within the scope of "reliable information" of imminent bankruptcy as set forth in the DOL Bulletin. The DOL Bulletin does not state that all 8-Ks necessarily trigger a duty for the directed trustee to take action. In this case, the filing of 8-K is not a particularly unusual event for UAL. In the three-year period 2000-2002, UAL filed fifty-five 8-K statements. SUF 38. UAL's filing of the 8-K alone, therefore, was not meaningful.

increased after the decline on October 18, 2001. For example, UAL stock went up 40% from November 12, 2001 to December 17, 2001.[13] In January 2002 the share price was $14.45, and later in March it went back up to $17. SUF 43.

The opinions of equity analysts about UAL stock did not change markedly during 2001, but they deteriorated in the second half of 2002. The average rating for UAL remained stable (between Buy and Hold) from the beginning of 2001 through July 2002. It was not until August and September 2002 that the average rating declined to Underperform. SUF 46. The analyst reports reflect that analysts did not believe bankruptcy was likely before September 2002. SUF 47.[14]

Data from bond and credit markets also reflect UAL's bankruptcy was not imminent until late 2002. The prices of UAL's unsecured bonds adjusted to more negative conditions following the September 11 attacks, but prices then remained in a fairly stable trading range until July 2002. SUF 49. When, on December 4, 2002, the ATSB denied UAL's application, bond prices fell to their level in UAL bankruptcy, less than $15. SUF 50.

In addition, UAL's independent auditors, Arthur Andersen & Company ("Arthur Andersen"), provided a clean audit opinion and never noted any disagreement with UAL's management's SEC filings reflecting UAL's going concern status. When Deloitte Touche Tomatsu ("Deloitte") was hired in April 2002 to replace Arthur Andersen, Deloitte continued to concur with UAL's management, despite the extraordinary scrutiny that UAL's balance sheet balances would have received from Deloitte, in its role as UAL's new independent auditor. SUF 51-52.

## IV.    STATE STREET DID NOT BREACH ITS FIDUCIARY DUTY AS INVESTMENT MANAGER.

While Plaintiffs contend State Street breached its fiduciary duties as Investment Manager during the period from August 29, 2002 to September 27, 2002, they point to no facts to support the contention. SUF 53. Plaintiffs concede that it would reasonably take any fiduciary approximately one month from whatever the "trigger" point was to the date of the first sale of UAL stock. SUF 54. Assuming State Street became Investment Manager on August 29, 2002, it took State Street less than one month before it began to sell UAL stock. SUF 22. The reason for

---

[13] It was at a low of $10.33 on November 12, 2001 and as of December 17, 2001, it was $14.56. SUF 44.

[14] Analyst reports are reliable and relied upon by directed trustees. SUF 48.

12

the short delay was, as noted above, because several significant events were unfolding at UAL, and State Street believed it was prudent to further analyze those events.

## V.    STATE STREET IS NOT LIABLE AS A CO-FIDUCIARY.

The Complaint alleges State Street violated 29 U.S.C. § 1105(a), by enabling the ESOP Committee members to breach their duties of prudence and loyalty, and by failing to remedy the ESOP Committee's fiduciary breaches. Specifically, Plaintiffs contend State Street knew the ESOP Committee was not monitoring the prudence of continuing to hold UAL stock in the Plan, should have told the Committee it had this duty, and further advised it that UAL was on State Street's internal watchlist. TAC ¶¶ 12, 22, 75. Plaintiffs argue had State Street told the ESOP Committee members this, they would have sold the UAL stock, or appointed an investment manager who would have sold the UAL Stock. TAC ¶¶ 22, 75. Plaintiffs also allege that State Street knew that the ESOP Committee members were conflicted, and that their decision not to sell UAL stock was improperly influenced by that conflict. TAC ¶¶ 11-14, 66-67, 98-99, 124, 129.

To prove State Street liable as a co-fiduciary, Plaintiffs must first prove the ESOP Committee liable for breach of the duties of prudence and loyalty, which they cannot do. Second, they must prove State Street knew the ESOP Committee was breaching its duties and failed to take action; again, there is no evidence to substantiate this contention.

### A.    Defendants Cannot Show The ESOP Committee Is Liable For Breach Of Fiduciary Duty; Therefore, State Street Is Not Liable As A Co-Fiduciary.

#### 1.    The ESOP Committee Did Not Breach Its Duty Of Prudence.

An investment fiduciary's decision to follow the plan sponsor's instruction and remain invested in company stock is entitled to a presumption of reasonableness. *Moench*, 62 F.3d at 571; *Kuper*, 66 F.3d at 1457-59. The "*Moench* presumption" can only be overcome upon a showing that the plan fiduciary had "knowledge of [the] impending collapse" of the company. *See Moench*, 62 F.3d at 572; *Kuper*, 66 F.3d at 1459-60. As discussed above, UAL's bankruptcy was not imminent as of October 17, 2001, and it was reasonable for the fiduciaries not to sell UAL stock from the Plan until September 27, 2002.

#### 2.    The ESOP Committee Is Not Liable For Breach Of The Duty Of Loyalty.

Plaintiffs claim that because each ESOP Committee member was also a union member or a member of UAL management, he suffered from an actual conflict. That is not the law. ERISA

0041249/003/ 17776v5

allows an individual to serve both as a fiduciary and an officer or representative of a plan sponsor.  29 U.S.C. § 1108(c)(3); *Cuddington v. Northern Indiana Public Service Co.*, 33 F.3d 813, 816 (7th Cir. 1994) ("just because the Pension Committee is dominated by [the employer's] employees does not automatically mean that a conflict exists").[15]  Indeed, Mr. Morrison concedes there was only a "potential conflict of interest," and a potential conflict is not actionable. SUF 55.

Plaintiffs contend that the ESOP Committee members' "conflict" caused them not to sell the UAL stock sooner.  However, they also claim the ESOP Committee members did not know they could sell UAL stock (Plaintiffs do not make the argument in the alternative, *i.e.*, they do not claim if the ESOP Committee members knew they could sell UAL stock, then they were conflicted).  This is illogical.  If the ESOP Committee did not know they could take action, how could a conflict have affected their decision not to take action?  Therefore, any alleged conflict could not have caused the alleged loss.

**B.**    **State Street Reasonably Believed The ESOP Committee, Which Had The Primary Responsibility For Monitoring Investment Options, Was Fulfilling Its Fiduciary Obligations.**

Plaintiffs cannot show that State Street knew during the period from October 17, 2001 through August 20, 2002, that the ESOP Committee was not reviewing the prudence of continuing to hold UAL stock in the Plan.  *See WorldCom ERISA Litig.*, 354 F. Supp. 2d at 450. During that time period, as a directed trustee, State Street was not under a duty to investigate the manner in which the ESOP Committee administered the Plan, or to inquire about whether the ESOP Committee contemplated divesting shares of the ESOP.  *Id.* at 450.  State Street had every reason to believe that the ESOP Committee, as investment fiduciary, was discharging its responsibilities to manage and monitor Plan investments.  *See WorldCom ERISA Litig.*, 354 F. Supp. 2d at 450.  The ESOP Committee members were knowledgeable, thoughtful individuals who asked probing questions at the ESOP Committee meetings.  SUF 56.

---

[15]  Plaintiffs must show more than the mere fact that the Committee members had dual loyalties.  At a minimum they must have evidence (which they do not) that the Committee members acted to benefit their own interests.  *See, e.g., Marshall v. Kelly*, 465 F. Supp. 341, 350 (W.D. Okl. 1978)(loans and payment to plan fiduciary and his wholly owned company constituted breach of loyalty).  Even then, if a fiduciary chooses a course of action that incidentally benefits himself, he does not breach his duty of loyalty so long as the action is taken prudently and is in the best interests of the plan.  *See Trenton v. Scott Paper Co.*, 832 F.2d 806, 809 (3d Cir. 1987).

14

The Complaint alleges that the ESOP Committee members did not understand, prior to August 20, 2002, that they had a duty under certain circumstances to override the terms of the Plan. As revealed through discovery, that is factually incorrect--Doug Walsh understood this duty. SUF 57. He understands that duty because he read the ESOP Committee Guidelines, which said the Committee should allow the Plan terms unless to do so would violate ERISA. SUF 57. Given that least one member of the ESOP Committee understood that particular duty, it was certainly reasonable for State Street to believe that other ESOP Committee members understood their fiduciary duties as well.

State Street was not present at all of the ESOP Committee meetings, nor was it present during all communications between the ESOP Committee members and their advisors. SUF 58. Therefore, it was reasonable for State Street to believe that the ESOP Committee was consulting its other advisors regarding its fiduciary duties and the financial condition of UAL. For example, State Street knew the ESOP Committee had three separate, experienced ERISA lawyers who regularly attended its meetings and provided legal advice regarding their fiduciary responsibilities: Bonnie Levitt of Baker & McKenzie LLP, Elizabeth Koby (in-house counsel at ALPA), and Marian Durkin (in-house counsel at UAL). SUF 59. Each lawyer knew the ESOP Committee had a duty under certain circumstances to override the Plan terms and diversify the employer stock. SUF 60. None of them believed that UAL's bankruptcy was imminent, and therefore obviously did not believe it necessary to provide such advice. SUF 61. Indeed, the legal advisors did provide fiduciary advice to their clients, the ESOP Committee members, as reflected in the March 26, 2002 agenda for the ESOP Committee Meeting. SUF 62.

Plaintiffs contend State Street should have provided legal advice to the ESOP Committee members "earlier," advising them that they had a fiduciary duty to monitor the value of the stock and, if appropriate, to sell it. This premise is false -- State Street never provided the ESOP Committee with legal advice regarding its fiduciary duties-- the ESOP Committee's attorney did that. State Street was not to engaged to provide legal advice to the ESOP Committee members regarding their fiduciary responsibilities, and State Street was not obligated to provide (nor could it legally give) such legal advice. SUF 63. Even if State Street had provided the ESOP Committee with advice regarding its fiduciary duties in October or December 2001, it is pure speculation to contend, as Plaintiffs do, that the ESOP Committee members would have sold the UAL stock. Mr. Morrison testified only that "they would have perhaps done something" and

that his "guess" would be that they would have "done more or less what they did [in August 2002]." SUF 64.

In addition Houlihan Lokey provided investment advice to the ESOP Committee, including annual valuation reports, analyses of UAL's financial condition, and presentations regarding the value of UAL stock. These presentations were both oral and written. The presentations included summaries of analyst recommendations, a general industry and economic overview, and information about UAL's financial status. SUF 65. Thus, Plaintiffs cannot demonstrate State Street had any reason to believe the ESOP Committee was not fulfilling its fiduciary duties.

     C.    **By Waiting Until August 2002 To Tell The ESOP Committee That It Had Placed UAL On Its Internal Watchlist, State Street Did Not Cause The ESOP Committee Members To Breach Their Fiduciary Duties.**

State Street did not have a fiduciary duty to tell the ESOP Committee in December 2001 that it had placed UAL on its watchlist. State Street had a reasonable practice of not disclosing to its clients the fact that it had placed a stock on its watchlist. SUF 66-67. Plaintiffs do not have any evidence that any directed trustee has a practice of disclosing to its clients its internal processes and conclusions of its internal processes with regard to its company stock clients. Plaintiffs nevertheless allege State Street should have told the ESOP Committee about the placement of UAL on its watchlist, and if it had done so, the ESOP Committee would have begun selling UAL Stock from the ESOP (or hired State Street as investment manager and State Street would have sold the UAL Stock). There is no evidence to support this--only speculation. Plaintiffs' only "evidence" is their argument that when the Committee was told about the watchlist on August 20, 2002, it appointed State Street as Investment Manager -- and supposedly they would have done exactly what they did in August, regardless of when they were told. That presumption is without merit and completely ignores the fact that UAL's financial condition was dramatically different in December 2001 than in August 2002. One striking difference is UAL's press release stating that UAL might file for bankruptcy. Moreover, the ESOP Committee members maintain they would *not* have sold UAL stock prior to September 27, 2002, when State Street started to sell. SUF 68-69.

**D.**    **State Street Had No Reason To Believe the Committee Members Were Actually Conflicted.**

Plaintiffs allege, "throughout the Class period, State Street knew or should have known that the ESOP Committee members had conflicted loyalties and were breaching their fiduciary duties of prudence and loyalty under ERISA." TAC ¶129.  In support of this allegation, Plaintiffs allege a myriad of non-sequiturs, most of which are completely irrelevant and legally unsupportable.  For example, they claim State Street admitted the ESOP Committee was conflicted.  State Street merely acknowledged the ESOP Committee members had "potential conflicts."  Plaintiffs' expert, Mr. Morrison, admitted that all of State Street's witnesses only testified that there was a potential conflict of interest, and that a potential conflict is not a breach of fiduciary duty--only an actual conflict is a breach.

## VI.    CONCLUSION.

For the reasons set forth above, State Street respectfully requests that summary judgment be granted in its favor and against Plaintiffs.  This motion does not present a close question in light of the favorable state of the law for State Street as directed trustee, the overwhelming evidence of State Street's diligence in monitoring and investigating UAL's financial condition, and the myriad of ways UAL could have averted bankruptcy during the relevant fourteen-month period.

DATED:  April 8, 2005.                                Respectfully submitted,

Randall J. Sunshine (90785898)
Ronald S. Kravitz (90785897)
LINER YANKELEVITZ SUNSHINE &
REGENSTREIF LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024


Mitchell L. Marinello
NOVACK AND MACEY LLP
303 West Madison Street
Chicago, Illinois 60606

Attorneys for Defendant
STATE STREET BANK & TRUST COMPANY

## CERTIFICATE OF SERVICE

Kenneth M. Abell, an attorney, hereby certifies that he served the foregoing **Memorandum of Law in Support of State Street Bank & Trust Company's Motion for Summary Judgment,** by causing a true and correct copy thereof to be sent by messenger or overnight courier, as indicated, to:

| *Counsel for Plaintiffs Jerry R. Summers, George T. Lenormand, Jeffrey D. Crites, Louise Van Rensburg and James E. Shambo:*<br><br>Steve W. Berman<br>Clyde A. Platt<br>Andrew M. Volk<br>Nicholas Styant-Browne<br>Hagens Berman LLP<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA 98101<br><br>BY OVERNIGHT COURIER | *Counsel for Plaintiffs Jerry R. Summers, George T. Lenormand, Jeffrey D. Crites, Louise Van Rensburg and James E. Shambo:*<br><br>Thomas M. Sobol<br>Hagens Berman LLP<br>One Main Street, 4th Floor<br>Cambridge, MA 02142<br><br><br><br>BY OVERNIGHT COURIER |
| --- | --- |
| *Counsel for Plaintiffs Jerry R. Summers, George T. Lenormand, Jeffrey D. Crites, Louise Van Rensburg and James E. Shambo:*<br><br>Kenneth A. Wexler<br>Jennifer F. Connolly<br>The Wexler Firm LLP<br>One North La Salle Street, Suite 2000<br>Chicago, IL 60602<br><br><br>BY MESSENGER | *Counsel for Defendants UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, and Craig Musa:*<br><br>Howard Shapiro<br>Rene E. Thorne<br>Stacey C.S. Cerrone<br>Nicole A. Eichberger<br>Proskauer Rose LLP<br>909 Poydras Street, Suite 1100<br>New Orleans, LA 70112<br><br>BY OVERNIGHT COURIER |
| *Counsel for Defendants UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, and Craig Musa:*<br><br>Max G. Brittain, Jr.<br>Brenna Binns<br>Schiff Hardin LLP<br>233 South Wacker Drive<br>6600 Sears Tower<br>Chicago, IL 60606<br><br>BY MESSENGER | *Counsel for Plaintiffs Jerry R. Summers, George T. Lenormand, Jeffrey D. Crites, Louise Van Rensburg and James E. Shambo:*<br><br>Elizabeth A. Fegan<br>Timothy A. Scott<br>Hagens Berman LLP<br>60 W. Randolph Street, Suite 200<br>Chicago, IL 60601<br><br><br>BY MESSENGER |

on this 8th day of April, 2005.

_____
Kenneth M. Abell