UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KERI EVANS, et al.,           )<br>                              )<br>       Plaintiffs,           )<br>                              )<br>v.                            )<br>                              )<br>JOHN F. AKERS, et al.,        )<br>                              )<br>       Defendants.           )<br>_____)<br>                              )<br>LAWRENCE W. BUNCH, et al.,    )<br>                              )<br>       Plaintiffs,           )<br>                              )<br>v.                            )<br>                              )<br>W. R. GRACE & CO., et al.,    )<br>                              )<br>       Defendants.           )<br>_____)| Consolidated Under<br>Case No. 04-11380-WGY |

**THE GRACE DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

The parties agree, having all moved for summary judgment, that this case is appropriate for resolution without a trial. For the following reasons, together with all of the reasons previously set forth, the Court should grant summary judgment in favor of the Defendants.

> **1.     The Undisputed Facts Support Judgment in Favor of State Street, in Which Case the Grace Defendants Also Win.**

As the Grace Defendants explained in their opening brief (Docket No. 178, Grace Br. at 10-11), the Plaintiffs' claims against them are dependent on their claims against State Street. If State Street prevails, the Grace Defendants are entitled to judgment. And based on the following undisputed material facts, all of which the Plaintiffs have admitted, State Street is entitled to win:

- At the time period at issue in this case, Grace had been in bankruptcy since 2001 and was facing large and uncertain asbestos liabilities. (Docket No. 185, State Street Fact Nos. 5-9.)

- In December 2003, Grace fiduciaries retained State Street as independent investment manager of the Company stock in its 401(k) retirement plan ("Plan"), with discretion to sell the stock only if State Street determined that the Plan's continued holding of the stock was inconsistent with ERISA. (Docket No. 185, State Street Fact Nos. 14-17.)

- State Street is the industry leader in providing independent fiduciary services, and ranks among the top ten in the Nation in providing investment management advice to company stock funds under ERISA. (Docket No. 185, State Street Fact Nos. 18, 20.)

- State Street hired qualified, independent legal and financial advisors with experience in bankruptcy, asbestos litigation and ERISA to assist it in the Grace engagement. (Docket No. 185, State Street Fact Nos. 32, 33, 36.)

- The State Street team collected and evaluated information about, among other things, the Plan, Grace's finances, the bankruptcy case, and Grace's asbestos liabilities. (Docket No. 185, State Street Fact Nos. 39, 40, 45, 47, 51.)

- In February 2004, State Street concluded, in large part as a result of the uncertainties surrounding Grace's bankruptcy and its huge asbestos liabilities, that the Plan's continued holding of all its Grace stock was inconsistent with ERISA; it began selling some of the Plan's Grace stock in the open market. (Docket No. 185, State Street Fact Nos. 61, 69.)

- After State Street began its selling program, it continued to regularly monitor Grace and its stock. (Docket No. 185, State Street Fact No. 67.)

- State Street received an unsolicited offer from hedge fund D.E. Shaw to purchase the Plan's remaining Grace stock. (Docket No. 185, State Street Fact Nos. 71, 72.)

- After discussing and evaluating D.E. Shaw's offer and ensuring that there was no material information about Grace that it was unaware of, State Street sold the Plan's remaining Grace stock to D.E. Shaw for approximately 18% above its market value. (Docket No. 185, State Street Fact Nos. 75, 76, 78-81, 83-87.)

These undisputed facts demonstrate that State Street, a well-qualified investment manager, undertook an appropriate process, considered all of the relevant facts and circumstances, and reached a reasonable decision that continuing to hold Grace stock in the Grace Plan was inconsistent with ERISA, *i.e.*, the undisputed facts establish that State Street acted prudently. State Street is, therefore, entitled to judgment as a matter of law. And because all of the Plaintiffs' claims against the Grace Defendants are derivative of their claims against State Street, the Grace Defendants are, as a consequence, also entitled to judgment as a matter of law.

2. **The Undisputed Facts Support Judgment in Favor of the Grace Defendants Even If State Street Does Not Prevail.**

Even if State Street were not to prevail, the Grace Defendants would nevertheless be entitled to summary judgment in their favor based on the following undisputed material facts, all of which the Plaintiffs have admitted:

- The Grace fiduciaries decided to hire an independent fiduciary for the Grace Stock Fund in order to avoid the potential conflict of interest they would face by having to decide as fiduciaries whether to retain the Grace stock in the Plan at the same time that they would be participating in the negotiation and formation of a plan of reorganization in Grace's bankruptcy, and having access to information regarding that process that may not be public but may be material to investment decisions regarding the Grace Stock Fund. (Docket No. 179, Grace Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Grace SMF") ¶¶ 8, 9.)

- After meeting with representatives from State Street several times, the Grace fiduciaries hired State Street to be the independent investment manager for the Grace Stock Fund, an institution eminently qualified to act in that capacity. (Docket No. 179, Grace SMF ¶¶ 17, 18, 20-23.)

- The Grace fiduciaries were generally aware of the process State Street would follow in determining whether to sell Grace stock from the Plan. (Docket No. 179, Grace SMF ¶¶ 18, 19.)[1]

- Members of the Grace team provided State Street representatives with documents, answered their questions, and reviewed and commented on State Street's communications with Plan participants before and during State Street's engagement. (Docket No. 179, Grace SMF ¶¶ 18, 19, 29, 31.)[2]

- When the Grace fiduciaries were advised in advance of State Street's decision to begin selling some of the Plan's Grace stock, they ensured that participants were informed of State Street's decision but they did not investigate the reasons behind that decision. (Docket No. 179, Grace SMF ¶¶ 32, 33, 36.)

---

[1] Plaintiffs' response to Fact No. 19, that "[a]lthough Grace claims the materials describe the 'process,' neither the material nor the testimony state that the described process was the *precise* process that State Street would employ" (emphasis added), does not create a factual dispute, but rather a descriptive distinction without a substantive difference. (Docket No. 189, Plaintiffs' Reply to Defendants' Rule 56.1 Statement of Undisputed Facts in Support of Defendants' Motions for Summary Judgment and Plaintiffs' Rule 56.1 Counterstatement of Uncontested Facts ("Bunch Counterstatement").)

[2] Plaintiffs complain that many of the meetings and information exchanges between Grace and State Street took place before December 15, 2003, the effective date of State Street's engagement. (Docket No. 191, Bunch Plaintiffs' Opposition to Motions of the Grace Defendants and the State Street Defendants for Summary Judgment ("Bunch Opp.") at 3.) This is true, but whether Grace's involvement took place before or after the bankruptcy court approved State Street's engagement is entirely immaterial. What *is* material is that State Street conducted a thorough process of due diligence, and that the Grace fiduciaries were aware of and participated in State Street's endeavors.

Plaintiffs also assert that all of the contacts between Grace and State Street were "initiated by State Street." (Bunch Opp. at 16.) But whether State Street or Grace initiated any or all of the contacts between them is also immaterial – the only material fact is that there were contacts between them during which information was exchanged, making the Grace fiduciaries clearly aware of State Street's activities. Tarola testified, for example (contrary to the insinuations of the Plaintiffs, Bunch Opp. at 6-7) that he had several conversations with members of the State Street team – both just before the effective date of State Street's engagement and around the time that State Street was considering whether to sell the Grace Stock Fund. (Tarola Tr. at 47-48, Exhibit E to Declaration of Counsel in Support of Defendants' Joint Response to Plaintiffs' Counterstatement ("9/10/07 Decl.").) It is simply immaterial whether he or the State Street representatives initiated those conversations; what is material is that they occurred – and that fact is undisputed.

- When the Grace fiduciaries were advised in advance of State Street's decision to sell the balance of the Plan's Grace stock to D.E. Shaw (for a premium over the stock's price in the open market), they likewise ensured that participants were informed of State Street's decision. (Docket No. 179, Grace SMF ¶¶ 39, 43.)

- There was a "feeling among the leadership within Grace that [the sale of the Plan's Grace stock] gave the participants a chance to get some cash and move on from what was a real speculative situation." (Docket No. 179, Grace SMF ¶ 40.)

These undisputed material facts establish that the Grace fiduciaries satisfied fully their obligations under ERISA, and are now entitled to summary judgment as a matter of law.

Indeed, while Plaintiffs have asserted purported "disputes" as to a mere three of the 43 undisputed material facts set forth in the Grace Defendants' 56.1 Statement, they claim to dispute *only one* of the some two dozen facts cataloging the Grace fiduciaries' knowledge about State Street, its appointment and performance, and the ongoing monitoring the Grace fiduciaries and their staff undertook. *See* Docket No. 189, Bunch Counterstatement to Grace SMF ¶¶ 17-23, 26, 27, 29-43; *see also* Docket No. 178, Grace Br. at 13-14 (listing nine bullet points demonstrating monitoring activities).[3] The single fact they "dispute" is Fact No. 28: that Grace executives had "several meetings and telephone calls with members of the State Street team (including Duff & Phelps and Goodwin Procter representatives), and answered questions on such matters as Grace's bankruptcy proceedings, finances, asbestos liabilities and available insurance." *See* Docket No. 189, Bunch Counterstatement to Grace SMF ¶ 28. But elsewhere, Plaintiffs *admit* to various meetings and telephone calls that occurred. (Docket No. 189, Bunch Counterstatement to Grace SMF ¶¶ 17, 18, 29, 32, and 39.) And in response to Fact No. 28 itself, Plaintiffs fail to point to any evidence to the contrary (as Local Rule 56.1 requires), but

---

[3] The other two alleged factual disputes concern the process by which State Street was engaged (Docket No. 189, Bunch Counterstatement to Grace SMF ¶¶ 12, 19), but Plaintiffs have not asserted in their opposition that this process was in any way flawed, nor was it, as the Grace Defendants amply demonstrated in their opening brief. (Docket No. 178, Grace Br. at 6-10.)

5

instead merely mischaracterize certain snippets of deposition testimony. For example, Plaintiffs cite to Tarola's deposition to contend that Grace did not provide any information to State Street; that State Street acquired everything it needed from the internet. (Tarola Tr., at 149, Exhibit "A" to Bunch Counterstatement, Fact No. 8). But Tarola plainly did not mean "information" in the way the Plaintiffs imply, because he had, for instance, testified just a few moments earlier about a "due diligence" meeting between representatives of State Street and Grace (including Tarola himself) (Grace SMF ¶ 28), and earlier in the day, testified about his conversations with members of the State Street team (Tarola Tr. at 47-48, Exhibit E to 9/10/07 Decl.). Similarly, Plaintiffs cite McGowan's deposition for the statement that "Grace did not initiate contacts with State Street after the engagement began." (McGowan Tr., at 105, Exhibit "G" to Bunch Counterstatement, Fact No. 2.) But all McGowan actually says on that page is that it was his recollection that "our communications [were] more driven by State Street in terms of requesting information, discussing, you know, matters with Grace management."

In an apparent effort to divert attention from the plethora of undisputed facts showing ongoing monitoring activities by the Grace fiduciaries and their staff, Plaintiffs cling tiresomely to Tarola's deposition response to questions about what he *believed* his continuing responsibilities to be "with respect to State Street's decision on its handling of the Grace stock fund." (Tarola Tr., at 121, Exhibit "A" to Bunch Counterstatement, Fact No. 1.) But as explained in the Grace Defendants' Opposition to the Bunch Plaintiffs' Motion for Summary Judgment ("Grace Opp."), what he believed is not what is material here; rather, it is what he and the other fiduciaries *did* that must be assessed. (Docket No. 190, Grace Opp. at 3-4.) Further, Tarola's comments were clearly nothing more than his non-lawyer way of referring to the new limited role of the IBC with respect to the Grace Stock Fund. In December 2003, Grace had

amended the Plan to allow for the IBC's appointment of an independent fiduciary for the Grace Stock Fund, in which case "[t]he IBC shall not retain the authority to manage the Grace Stock Fund . . . ." (Grace SMF ¶ 10.) This provision reflects ERISA § 405(d), which provides that if an investment manager is appointed for a plan, other fiduciaries are not liable for the acts or omissions of such investment manager, nor are they "under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager." Thus, Tarola was simply expressing his understanding that the investment manager responsibilities – which formerly were one of his primary responsibilities on the IBC – were now squarely in State Street's hands.[4] None of Tarola's testimony undermines the numerous undisputed facts showing that the Grace fiduciaries did all that was required of them in monitoring State Street.

> **3.      Reduced to Its Essence, Plaintiffs' Only Argument for Liability of the Grace Defendants Is Based on the Fact that They Did Not Investigate State Street's Decision to Sell the Stock.**

Plaintiffs' only real argument here is that the duty to monitor required the Grace Defendants to investigate why *State Street had decided* to sell the Grace Stock in the spring of 2004. Apparently, their theory goes, if the Grace Defendants had investigated, they would have learned that State Street had concluded that the Plan's continued holding of Grace Stock was imprudent because, based primarily on State Street's review of expert analyses, it believed the stock was highly volatile and that there was a better than even chance that ultimately it would end up with little or no value. According to Plaintiffs, if the Grace Defendants had learned this,

---

[4] Tarola was also, of course, clearly concerned about avoiding any appearance of a conflict and thus was careful about inserting himself into State Street's performance – as he testified, he feared he faced liability if he did not take the step of hiring State Street to manage the Grace Stock Fund and alleviate his conflict. (Tarola 47-48, Exhibit E to 9/10/07 Decl.)

7

they would have known that State Street's decision to sell was wrong and constituted a fiduciary breach. Even on the face of it, it is very difficult to make sense of this argument.

Plaintiffs' theory is flawed on many levels, but two in particular are fatal to their claims. First, in neither the brief in support of their own motion for summary judgment, nor in their opposition to the Grace Defendants' motion for summary judgment, have Plaintiffs cited even a single case that supports the proposition that a named fiduciary, after delegating the responsibility to manage plan investments to an independent fiduciary, is then required as part of his monitoring duties to investigate the reasons behind whatever decisions the independent fiduciary makes with respect to the investments. *Not a single case.* There is absolutely no precedent for imposing a duty to monitor on the Grace fiduciaries that required them to delve into State Street's reasoning or its decision-making process.

Second, as explained in the Grace Defendants' opening brief (Grace Br. at 15-18), even if they had learned of State Street's reasoning, there is no logical way to make the leap that the Grace fiduciaries would thereby have known that State Street was breaching its fiduciary duties. To the contrary, Grace itself stated in its SEC filings and in Town Hall Meetings held with employees that it recognized the speculative nature of its stock and the potential that it could become worthless. *See* Docket No. 192, State Street's Opposition to Bunch's Motion for Summary Judgment at 7-10. For this reason, Grace's leadership believed that State Street's sale of the stock was overall a *positive* thing for the participants in the Plan. *See* Grace SMF ¶ 40.

Everyone agrees, moreover, that reasonable people can differ on matters of this nature; that reasonable fiduciaries, after undertaking reasonable investigations, can reach diametrically opposed conclusions that are each nonetheless prudent. State Street's decision to sell came only after months of review and analyses. The Grace Defendants cannot, under the law, be held to a

8

standard requiring some type of clairvoyant powers to see that a conclusion reached after this much time and effort was so "wrong" that it constituted a breach. This is especially so given that *all* of the authority on the duty to monitor is unanimous in *not* requiring a named fiduciary to "second-guess" the decisions of its appointee. *See* Grace Br. at 12-13 and Grace Opp. at 4-5.

### 4. Plaintiffs' Attack on the Conflict of Interest Is Specious.

Both Plaintiffs and the Grace Defendants have devoted much attention to the potential conflict of interest that first prompted State Street's appointment, and whether and how that potential conflict affected the contours of the Grace fiduciaries' monitoring role. Initially, it is important to note that the Court need not address this conflict issue at all. Even if there had been no potential conflict here, there would be no legal basis for requiring more of the Grace fiduciaries in monitoring State Street than what they did. Not even the toughest legal standard requires a monitoring fiduciary to get so involved in the appointee's activities and decision-making as to second-guess those decisions – but that is precisely what Plaintiffs are demanding should have taken place.

The law is clear, however, that the scope of the duty to monitor depends on the particular facts and circumstances. 29 C.F.R. § 2509.75-8, FR-17. And here, one of those circumstances was the potential conflict the Grace fiduciaries faced between their responsibilities to the plan participants and their corporate responsibilities in the bankruptcy. Plaintiffs do not challenge that one of the fundamental duties of ERISA fiduciaries is to avoid conflicts of interest. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252 (1993). Further, Plaintiffs have never disputed that the reason for appointing State Street in the first place was this potential conflict, and they have conceded that appointing an independent fiduciary is reasonable and appropriate where a conflict looms. (Mulligan Tr. at 156, Exhibit D to 9/10/07 Decl.) Instead, they contend that no actual

9

conflict ever "arose" after State Street's appointment. *See* Bunch Opp. at 7 (citing Tarola's deposition testimony that he did not believe he faced an actual conflict in April 2004 while State Street was acting as the investment manager). The Grace Defendants agree – obviously, turning the investment management responsibilities over to State Street *did away with the conflict*. The underlying *potential* was clearly still there, however, if the management of the Grace Stock Fund were once again to become the Grace fiduciaries' responsibility. In other words, if State Street had for some reason ceased to serve as the investment manager, the Grace fiduciaries would have been back in the same situation – facing a potential conflict and needing to appoint another independent fiduciary. And that underlying conflict affected every duty the fiduciaries might have had with respect to the Grace Stock Fund, including their duty to monitor State Street's management of that fund. It would make no sense to require a fiduciary facing a potential conflict to appoint an independent fiduciary, but to ignore that conflict in defining the scope of the fiduciary's duty to monitor.

### 5. **Plaintiffs Have No Claim Against the Grace Defendants for Co-Fiduciary Liability.**

Plaintiffs have produced no legal authority and no facts to support a co-fiduciary liability claim against the Grace Defendants. They refuse to accept that ERISA § 405(d) governs this situation – that where an investment manager has been appointed, not all of the types of co-fiduciary claims set forth in § 405(a) are available. Thus, Plaintiffs continue to contend that co-fiduciary liability exists here because the Grace Defendants "failed to remedy" State Street's breach – a claim not cognizable under § 405(d).

Plaintiffs also try to hold on to a co-fiduciary claim for trial by alleging that "issues of fact" exist that preclude summary judgment. However, they cite no such facts, as the rules require them to do. In their motion for summary judgment, the Grace Defendants made the

showing that there was no record evidence whatsoever from which it could be inferred that they had knowledge of a "breach," actively participated in a breach, or actively concealed a breach, as the elements of a co-fiduciary liability claim require in this situation. This showing puts the burden on Plaintiffs to come forward with *some* evidence that they can take to trial. *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir. 1995) ("[o]nce the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial'") (citation omitted). Because they have failed to do so, the Grace Defendants are entitled to summary judgment; no evidence means no trial.[5]

**6.    Conclusion**

For the foregoing reasons, the Grace Defendants respectfully request that summary judgment be entered in their favor.

Dated:  September 10, 2007            Respectfully Submitted,

/s/ Matthew C. Hurley_____
William W. Kannel (BBO# 546724)
(wkannel@mintz.com)
Matthew C. Hurley (BBO# 643638)
(mchurley@mintz.com)
MINTZ, LEVIN COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Facsimile:  (617) 542-2241

---

[5] The only other argument set forth by Plaintiffs that possibly merits a response is their argument that the IBC is a proper defendant in this action. Not a single court in the country has ever found an investment committee like the IBC to be a "person" capable of being sued under ERISA, and Plaintiffs cite no authority for contesting the Grace Defendants' motion on this point. The IBC is unequivocally entitled to summary judgment in its favor.

11

- and -

Carol Connor Cohen
(cohen.carol@arentfox.com)
Nancy S. Heermans
(heermans.nancy@arentfox.com)
Caroline Turner English
(english.caroline@arentfox.com)
Jeffrey H. Ruzal
(ruzal.jeffrey@arentfox.com)
Valerie N. Webb
(webb.valerie@arentfox.com)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202) 857-6054
Facsimile:  (202) 857-6395

*Counsel for Defendants W. R. Grace & Co., W. R. Grace & Co. Investment and Benefits Committee, John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Paul J. Norris, Thomas A. Vanderslice, Fred E. Festa and Robert M. Tarola*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of September 2007, a copy of the foregoing Grace Defendants' Reply Brief in Support of Their Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to all parties who are not served via the Court's electronic filing system.

/s/ Valerie N. Webb
Valerie N. Webb